# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY,<br>Plaintiff,<br>v.<br>WAYFARER STUDIOS LLC, et al,<br>Defendants. | No. 24-cv-10049-LJL (lead case) |
| JENNIFER ABEL,<br>Third-Party Plaintiff,<br>v.<br>JONESWORKS LLC,<br>Third-Party Defendant. | |

**DECLARATION OF KRISTIN E. BENDER IN SUPPORT OF BLAKE LIVELY'S OPPOSITION TO THE WAYFARER DEFENDANTS' MOTION FOR CONTINUED SEALING**

I, Kristin E. Bender, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an attorney admitted before this Court, a partner at the law firm of Willkie Farr & Gallagher LLP, 1875 K Street NW, Washington, DC 20006, and counsel of record for Ms. Lively in the above-captioned action.

2. I respectfully submit this declaration in support of Ms. Lively's opposition to the Wayfarer Defendants'[1] motion for continued sealing of certain exhibits and references in the summary judgment and spoliation submissions, ECF No. 1160.

[1] Defined terms used in this declaration have the definitions set forth in Ms. Lively's opposition unless otherwise specified.

3. A true and correct copy of the Hollywood Reporter article entitled *'It Ends With Us' Discovery Sparks Lawsuit Against Rebel Wilson in Sprawling Legal Battle Over 'The Deb'* dated September 5, 2024 is attached hereto as **Exhibit A**.

4. A true and correct copy of the Hollywood Reporter article entitled *Veteran Communications Strategist Melissa Nathan Launches The Agency Group PR Firm* dated June 20, 2024 is attached hereto as **Exhibit B**.

5. A true and correct copy of the HuffPost article entitled *Justin Baldoni's Crisis Team Has Close Ties To Some of Hollywood's Biggest Scandals* dated December 23, 2024 is attached hereto as **Exhibit C**.

6. A true and correct copy of the cross-complaint filed in *Ghost v. Wilson*, Case No. 24STCV17314 (Cal. Sup. Ct.) on September 5, 2025 is attached hereto as **Exhibit D**.

7. A compendium of documents affixed to the Gottlieb Declaration for which Ms. Lively proposes alternative redactions for information remaining under seal is attached hereto as **Exhibit E**.

8. A compendium of documents affixed to the Shapiro Declaration for which Ms. Lively proposes alternative designations for information remaining under seal is attached hereto as **Exhibit F**.

9. A compendium of documents affixed to the Tahler Declaration for which Ms. Lively proposes alternative designations for information remaining under seal is attached hereto as **Exhibit G**.

10. On November 10, 2025, counsel for the Wayfarer Defendants sent via email confidentiality designations for the transcripts of the deposition of Justin Baldoni taken on October

6 and 7, 2025. **Exhibit H** is a true and correct copy of that email and the confidentiality designations attached thereto.

11. On November 10, 2025, counsel for the Wayfarer Defendants sent via email confidentiality designations for the transcripts of the deposition of Jamey Heath taken on October 8 and 9, 2025. **Exhibit I** is a true and correct copy of that email and the confidentiality designations attached thereto.

12. A true and correct copy of the Los Angeles Times article entitled *Who's who in the 'It Ends With Us' controversy* dated December 23, 2024 is attached hereto as **Exhibit J**.

Dated: January 12, 2026

/s/ *Kristin E. Bender*
WILLKIE FARR & GALLAGHER LLP
Kristin E. Bender
1875 K Street NW
Washington, DC 20006
(202) 303-1000
kbender@willkie.com

*Counsel for Blake Lively*

# Exhibit A

https://www.hollywoodreporter.com/business/business-news/it-ends-with-us-discovery-sparks-lawsuit-against-rebel-wilson-1236362604/

# 'It Ends With Us' Discovery Sparks Lawsuit Against Rebel Wilson in Sprawling Legal Battle Over 'The Deb'

Producer Amanda Ghost filed another defamation lawsuit against Wilson after internal emails in the Baldoni-Lively case showed that the actress may have been involved in a public relations campaign to smear her.

**By Winston Cho**

September 5, 2025 1:41pm




Discovery in the legal battle over *It Ends With Us* has unearthed communications laying the groundwork for a defamation lawsuit against Rebel Wilson from the producer of her directorial debut, *The Deb*, who says the actress was behind a series of anonymous websites that accused her sex trafficking.

Last year, *The Deb* producers Amanda Ghost, Gregor Cameron and Vince Holden sued Wilson for defamation after she accused them of sexual harassment and embezzlement. A countersuit from Wilson, multiple public statements from the lead actress of the movie denying claims that she was harassed and a lawsuit from the film's production company alleging that the *Pitch Perfect* star blocked a distribution deal followed.

And on Wednesday, Ghost filed another defamation claim against Wilson, this time for allegedly directing her public relations agency to spread "malevolent lies and smears" about her. She alleges Melissa Nathan, Justin Baldoni's crisis publicist, sent a dossier of false information about her, with the intent of setting up the websites, according to the complaint.

Nathan wrote in a text to another publicist at her agency, per the lawsuit: "So basically Rebel wants a one of those sites… Should be a mixture of that document that I think Carolina pulled about Amanda or the intern pulled… It can be really really harsh… Russian oligarchs and making her a madam basically lol."

Until last month, Wilson was represented in the case by Bryan Freedman, Baldoni's lawyer who was allegedly involved in efforts by Nathan and her firm, TAG PR, to undermine Blake Lively's reputation in retaliation for speaking up about sexual misconduct on the set of the film.

Ghost's lawsuit says the websites, which are no longer active, "carry the unmistakably defamatory meaning" that the producer is "engaged in sex trafficking and pimping women." They include statements that she's the "Indian Ghislaine Maxwell," became a "madame for one of the world's richest men," and that she reinvented herself as a producer "while really procuring young women for the pleasure of the extremely wealthy."

Also at issue: "This strain of constantly procuring women could explain her company UNIGRAM's financial loss of 4.7M pounds last year. And let's only hope the hookers made up for losing her financier $25M by mounting The Great Gatsby stage musical to simply reward an actress for remaining silent about the abuse she suffered at Ghost's hands."

The lawsuit brings defamation claims against Wilson, Nathan, who declined to comment, and TAG.

Wilson has maintained that actress Charlotte MacInnes falsely claimed that she wasn't sexually harassed by Ghost. In a post on *The Deb*'s Instagram account, she wrote that the movie "will never get released because of her lies and support for the people blocking the film's release." She added, "So glad you got your record deal Charlotte at the expense of the 300 people who worked on The Deb and really wanna see it released."

A lawsuit filed against Wilson in July accuses her of interfering with a distribution deal for the movie, with the intent of buying the rights to the musical herself.

# Exhibit B

https://www.hollywoodreporter.com/news/general-news/the-agency-group-pr-communications-firm-melissa-nathan-1235925976/

# Veteran Communications Strategist Melissa Nathan Launches The Agency Group PR Firm

The former executive vp at Hiltzik Strategies launches with a team of execs and a roster of clients that includes Drake, Johnny Depp, the Chainsmokers, Logan Paul, HYBE America and others.

**By Chris Gardner**

June 20, 2024 8:00am

THE AGENCY GROUP PR

Communications and public relations strategist Melissa Nathan has launched The Agency Group.

The Agency Group team specializes in communications, crisis, reputation management, personal publicity and digital team services across entertainment, innovation, corporate and litigation clients. Speaking of, the firm's client roster includes HYBE America, Drake, Johnny Depp, the Chainsmokers, Logan Paul, DreamCrew, PRIME, Rostrum Records, Cedar Park Entertainment and Platoon, a boutique artist service company, among other brands and leaders.

Nathan has assembled a stable of executives at The Agency Group, which has home bases in Los Angeles and New York and a satellite office in Washington D.C. The executive team includes Breanna Butler as executive vp, Carolina Hurley as senior vp, Katie Case as vp, and Alyx Sealy as senior director. Rylie Long and Dervla McNeice round out the team.

About the digital division: TAG has a full-scale digital team led by Roza Kalantari, with a concentration on rapid crisis assessment and response across social media and online platforms. They specialize in media cleanup and brand management, orchestrating campaigns tailored to individual clients. Additional TAG services include branding, digital and social strategy and management, website design and development, social media and production and digital and social advertising.

Nathan formed The Agency Group after serving as executive vp for Matthew Hiltzik as his renowned New York-based Hiltzik Strategies. A number of her executives also made the move

with her from Hiltzik to the Agency Group. Nathan started her career at the Outside Organisation in the United Kingdom under Alan Edwards.

# Exhibit C

https://www.huffpost.com/entry/justin-baldoni-crisis-pr-johnny-depp-drake-clients_n_67697b1ce4b073432f4c5931

# Justin Baldoni's Crisis Team Has Close Ties To Some Of Hollywood's Biggest Scandals

PR expert Melissa Nathan and her company, The Agency Group PR, have reportedly worked with Johnny Depp, Drake and more.

**By Kelby Vera**

Dec 23, 2024, 04:43 PM EST | **Updated** Dec 23, 2024

The crisis management team that represented actor-director Justin Baldoni amid his alleged smear campaign against co-star Blake Lively appears to have links to several other celebrities at the center of major scandals in recent years.

Baldoni's relationship with Melissa Nathan, a publicist who specializes in crisis management, has come under scrutiny after Lively filed a legal complaint accusing Baldoni and associates of engaging in a "retaliatory social manipulation campaign" against his "It Ends With Us" castmate.

Advertisement

Nathan and her public relations firm, The Agency Group PR, are known for specializing in messy situations, including crisis and reputation management.

Nathan worked with Johnny Depp during his 2022 defamation trial against ex-wife Amber Heard.

Before, during and after the trial, Heard faced a deluge of online harassment from Depp fans, who banded together under the hashtag #JusticeForJohnnyDepp. In the end, the jury determined that Heard had defamed Depp and awarded him $15 million in damages.



According to The New York Times and The Hollywood Reporter, The Agency Group PR has also represented a number of celebrities who have been at the center of legal battles and public controversies.

On its website, the agency boasts that its work "redefines the rules of reputation management," with "years of success behind some of the most noteworthy, high-profile crisis and litigation events in recent history."

The company's roster of clients is said to include rappers Drake and Travis Scott, in addition to professional wrestler Logan Paul.

This year, rival rapper Kendrick Lamar accused Drake of having sex with minors in a series of diss tracks. In a November legal complaint, Drake accused recording giant Universal Music Group of helping Lamar defame the "Certified Lover Boy" rapper by releasing the allegedly libelous tracks.



Scott and concert colossus Live Nation are still stuck in civil litigation over the 2021 AstroWorld Festival tragedy in Houston, where a crowd crush resulted in 10 concertgoers' deaths and hundreds of injuries.

Paul is facing a number of legal issues. His beverage company, Prime Hydration, is the target of multiple lawsuits, including allegations of trademark infringement and a multimillion-dollar breach-of-contract dispute.

Nathan even has a Donald Trump connection, previously fielding press inquiries for the president-elect's youngest daughter, Tiffany Trump, during his first run for office, in the 2016 presidential race, according to Politico.

Representatives of Nathan and The Agency Group PR did not immediately respond to HuffPost's request Monday for comment regarding their client list.

Baldoni seemed to be seeking out someone with a knack for reputation rehabilitation when he hired Nathan and her agency in August. At the time, he was contending with an array of negative rumors about his behavior during the making of "It Ends With Us."

After hiring Nathan, a PR proxy battle between Baldoni and Lively appeared to ensue. Lively began to face a slew of negative press, with many of the reports drawing from years-old press appearances that had painted the actor as rude and out of touch. Others criticized the star for having an overly cheery approach to promoting a film whose subject is domestic abuse.

Lively's suit against Baldoni and his production company, Wayfarer Studios, alleges that the negative media attention was the result of a coordinated smear campaign which was orchestrated by Nathan.

As evidence, the filing includes text messages alleged to be between Baldoni, Nathan and his personal publicist, Jennifer Abel. In one of the alleged exchanges included in the filing, a sender said to be Nathan tells her client, "You know we can bury anyone."

# Exhibit D

trellis

Date:

Jan. 12th, 2026

CASE NUMBER: 24STCV17314

# Cross-Complaint; Filed by: Amanda Ghost (Cross-Defendant); As to: Rebel Wilson (Cross-Complainant); Melissa N...

Document prepared for:

Attorney Ken White

**CASE NAME**

AMANDA GHOST, AN INDIVIDUAL, ET AL. VS REBEL WILSON, AN INDIVIDUAL

**DOCUMENT FILED DATE**

Sept. 2nd, 2025

**CASE FILING DATE**

July 12th, 2024

**COUNTY**

Los angeles county, CA

**JUDGE**

Thomas D. Long

**CATEGORY**

Defamation (slander/libel) (General Jurisdiction)

**STATUS**

Pending

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
CAMILLE M. VASQUEZ, Cal Bar No. 273377
CVasquez@sheppardmullin.com
SAMUEL A. MONIZ, Cal Bar No. 313274
SMoniz@sheppardmullin.com
HONIEH UDENKA, Cal Bar No. 319103
HUdenka@sheppardmullin.com
MELISSA MIKAIL, Cal Bar No. 323212
MMikail@sheppardmullin.com
650 Town Center Drive, 10th Floor
Costa Mesa, California 92626-1993
Telephone: 714.513.5100
Facsimile: 714.513.5130

Attorneys for Plaintiff, Cross-Defendant, and Cross-Complainant, AMANDA GHOST

**Electronically FILED by Superior Court of California, County of Los Angeles 9/02/2025 8:01 PM David W. Slayton, Executive Officer/Clerk of Court, By M. Gonzalez, Deputy Clerk**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| AMANDA GHOST, an individual; GREGOR CAMERON, an individual; and VINCE HOLDEN, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>REBEL WILSON, an individual; and DOES 1-50, inclusive,<br><br>Defendants.<br><br>REBEL WILSON, an individual; CAMP SUGAR PRODUCTIONS PTY LTD, an Australian Private Company; REBEL WILSON and CAMP SUGAR PRODUCTIONS PTY LTD, Derivatively on behalf of Dunburn Debutantes Commissioning Company Pty Ltd, an Australian Proprietary Company,<br><br>Cross-Complainants,<br><br>vs.<br><br>AMANDA GHOST, an individual; GREGOR CAMERON, an individual; VINCE HOLDEN, an individual; A.I. FILM | Case No. 24STCV17314<br><br>Assigned for All Purposes to:<br>Hon. Thomas D. Long, Department 48<br><br>**CROSS-COMPLAINT OF AMANDA GHOST**<br><br>Operative Complaint Filed: July 29, 2024<br>Cross-Complaint Filed: October 1, 2024<br>Trial Date: October 5, 2026 |

PRODUCTION LIMITED, a United Kingdom Private Limited Company; UNIGRAM MEDIA LIMITED, a United Kingdom Private Limited Company; DUNBURN DEBUTANTS PTY LTD, an Australian Proprietary Company; DUNBURN DEBUTANTES COMMISSIONING COMPANY PTY LTD, an Australian Proprietary Company; and DOES 1 through 30, inclusive,

Cross-Defendants,

and

DUNBURN DEBUTANTES COMMISSIONING COMPANY PTY LTD, an Australian Proprietary Company;

Nominal Cross-Defendant.

---

AMANDA GHOST, an individual,

Cross-Complainant,

vs.

REBEL WILSON, an individual; MELISSA NATHAN, an individual; THE AGENCY GROUP PR LLC, a Delaware limited liability company; and DOES 1-50, inclusive,

Cross-Defendants.

Plaintiff, Cross-Defendant, and Cross-Complainant Amanda Ghost ("Ms. Ghost") alleges on personal knowledge as to herself and her own conduct, and on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Defendant, Cross-Complainant, and Cross-Defendant Rebel Wilson is at the center of a ruthless campaign to deceive and manipulate the public, tarnish and destroy the reputations of hardworking professionals, and smear and bully her business partners into making unwarranted business concessions. A well-known actress, Rebel has held herself out to the public as a champion of women and a funny, relatable comic actress. But behind the scenes, she has used paid PR professionals to launch a shockingly low and racially-charged attack on another professional woman, all to get her own way in a business dispute and destroy the reputation of a woman who dared to stand up to her.

2. Rebel participated in making a film, The Deb (the "Film" or "The Deb"), in which a number of other companies and individuals were involved, including Ms. Ghost, and Plaintiffs Gregor Cameron and Vince Holden (collectively, the "Producers"). The Film was based on a screenplay by an aspiring young writer named Hannah Reilly, and starred an aspiring young actress named Charlotte MacInnes. Rebel, much older and more experienced in the film industry, had an opportunity to mentor both young women. Instead, she chose to attack them. First, Rebel wanted credit for writing "The Deb," and demanded that Ms. Reilly agree to give Rebel credit for the screenplay. When Ms. Reilly refused, Rebel filed an arbitration against Ms. Reilly with the Australian Writer's Guild ("AWG"). Rebel lost; the AWG decided the dispute largely in favor of Ms. Reilly.

3. But Rebel refused to be told "no." She next attempted to extract credit for writing "The Deb" from the Producers. And, when the Producers could not agree to give it to her – being bound by the decision of the AWG – Rebel tried to intimidate them. Rebel began to spread a lie that Ms. MacInnes had been sexually harassed and made uncomfortable by Ms. Ghost. That was categorically untrue, and once Ms. MacInnes learned of this, she promptly set the record straight: she spoke to Rebel directly, and also provided a written statement confirming that Ms. Ghost had

never done anything inappropriate to her, and that any suggestion otherwise by Rebel was not true.

4. Again, Rebel would not be told "no." She raised the stakes and brought in lawyers, including her former lawyer Bryan Freedman, and outside entertainment professionals, making wild (and false) allegations of misconduct and doubling down on the lie that Ms. Ghost had sexually harassed or abused Ms. MacInnes. When this still failed to produce the desired result, Rebel escalated again. This time, she took to social media, where she broadcast some of the same bogus allegations about the Producers and Ms. MacInnes to her eleven million Instagram followers – accusing the Producers, collectively, of embezzling funds and sexual misconduct toward Ms. MacInnes. The Producers, having been falsely accused before an audience of millions, filed suit against Rebel to commence the above action.

5. Even this did not deter Rebel from her course of destructive conduct. Behind the scenes, she was working with industry and PR professionals on her payroll to spread even more vicious lies about the Producers far and wide through the Internet. The primary focus of Rebel's campaign of online defamation was Ms. Ghost. With the assistance of PR professionals and others in the industry, Rebel caused to be registered and published on the Internet a series of defamatory websites that set forth grotesque lies about Ms. Ghost. The websites, published as such addresses as amandaghost.com and amandaghostsucks.com ("Websites") are openly defamatory and clearly calculated to cause harm to Ms. Ghost's reputation and emotional wellbeing. Not content with that, Rebel caused links to those websites to be emailed to people in Ms. Ghost's life, such as Ms. Reilly. Rebel also orchestrated or caused, directly or indirectly, an entire social media campaign to post references to Ms. Ghost and the Websites publicly. References and links to the Websites were posted thousands of times on social media, as a result, on information and belief, of a targeted campaign by Rebel and her unethical PR team.

6. As noted above, the content of the Websites was patently defamatory – as well as racist and insulting. For instance, in September 2024, malevolent lies and smears about Ms. Ghost were published on amandaghost.com and amandaghostsucks.com, under the headline "AMANDA GHOST IS A DESTROYER OF WORLDS," to spread the outrageously false narrative that Ms. Ghost procures women for a "Russian mafia financier." The attacks, which amount to blatant racist

incitement, also extended to others involved in the dispute, including Ms. MacInnes. The cruel and outrageous nature of these lies is undeniable. For instance, the Websites included the following statements:

a. "We won't stop. We're in this until Amanda Ghost is exposed for the evil that she is. As the Indian Ghislaine Maxwell, she trades on pleasure for protection."

b. "When Amanda Ghost failed as a songwriter, she tried her hand at another commodity and became the madame for one of the world's richest men."

c. "The 2000's Heidi Fleiss, Amanda Ghost learned her trade in theft, discovering how easy it was to steal from talented artists. Her playbook was the same every time: demand writing credits on songs that she never wrote, trick or threaten artists into giving her their publishing rights, and lie – about anything from her ethnicity, education, and even name.

d. "Failing in music she turned full pimp, reinventing herself as a theatrical producer alongside her husband while really procuring young women for the pleasure of the extremely wealthy."

e. "This strain of constantly procuring women could explain her company UNIGRAM's financial loss of 4.7M pounds last year. And let's only hope the hookers made up for losing her financier $25M by mounting The Great Gatsby stage musical to simply reward an actress for remaining silent about the abuse she suffered at Ghost's hands."

f. "In exchange for women, this benefactor helps Ghost plant untrue stories and use attacks in the media as a threat, due to the billionaire's significant advertising spend at multiple publications."

g. "We have to ask ourselves the important questions, and encourage people in positions of power and in the press to do the same. Why is Amanda Ghost allowed to play procuress, affording her protection against the overwhelming evidence against her? What other dark secrets of this man is she hiding? What other dark secrets of hers are being hidden? Why do good looking women who

work for Ghost and her husband go missing?"

h. "My hope is to rally together and share our stories, so that other artists don't have to endure the pain so many have already felt. So that young women aren't subjected to the emotional torture and physical violation of their predecessors. She's the worst kind of malignant demon that preys on the innocent. But finally, the truth will win. This is the end for Amanda Ghost."

7. These statements, in context, carry the unmistakably defamatory meaning that Amanda Ghost is engaged in sex trafficking and pimping young women. That is a complete fiction, dreamed up by Rebel and her agents. Ms. Ghost has recently obtained further confirmation from publicly-filed court documents in another matter, *Lively et al. v. Baldoni et al.*, that various PR professionals working on behalf of Rebel, Cross-Defendant Melissa Nathan, and the Agency Group PR LLC, conspired with and/or aided and abetted Rebel in causing the Websites to be created and their defamatory content published. Communications among Ms. Nathan and others at The Agency Group PR LLC, openly discuss the creation of the Websites. Indeed, Ms. Nathan texted a document entitled "__library . . . _Amanda Ghost website.docx (26KB)," which upon information and belief, is a dossier of false information regarding Ms. Ghost. Ms. Nathan also wrote: **"So basically Rebel wants a one of those sites… Should be a mixture of that document that I think Carolina pulled about Amanda goes [sic] or the intern pulled… It can be really really harsh… Russian oligarchs and making her a madam basically lol[.]"**

8. To Rebel and her paid PR professionals, this cruel, public attack may have been something to "lol" about, but there was nothing humorous about it to Ms. Ghost. She is a professional, a wife, a mother. To have a powerful actress deliberately broadcasting to the world the grotesque lie that Ms. Ghost is the "Indian Ghislaine Maxwell" was devastating. And, incredibly, Rebel just kept going. In late September 2024, Ms. MacInnes, unwilling to allow herself to be used as a pawn of Rebel's gambit, made a public statement to news outlets, once again denying Rebel's false claims about her. Ms. MacInnes emphasized that "There is no truth to the allegations made involving me," and that "I won't be the subject of a fabricated narrative." In response to Ms. MacInnes' heartfelt statement, Rebel again took to social media, where she

doubled down on her false claims against the Producers; falsely accused Ms. MacInnes of lying to secure a lead role and record label from Ms. Ghost (neither of which were even within Ms. Ghost's power to give); and further perpetuated the malicious and false rumor that Ms. MacInnes was a victim of sexual misconduct by Ms. Ghost – all in front of an audience of millions of people. Specifically, Rebel wrote:

> When an actress on her first feature film is asked by a producer to stay in the same apartment as them, and then makes a complaint to me as the director saying said producer "asked her to have a bath and a shower with her and it made her feel uncomfortable" -- what am I supposed to do? Of course I reported it. There is no world where this is acceptable. The fact that this girl has been employed now by this "producer" in the lead role of a production called GATSBY (ART Boston) and given a record label -- should be all the proof you need as to why she has now changed her story.

9. When these intimidation tactics still failed to achieve Rebel's goals, she filed a salacious cross-complaint in the above action in which she brazenly linked to both amandaghost.com and amandaghostsucks.com, as if to brag that she was responsible for their publication.[1] Nor is that the last time Rebel has spread these lies. Indeed, as recently as July 25, 2025, Rebel again posted a series of false and defamatory statements to her millions of social media followers, writing, in part: "What would you do if you were me, a first time female director—and a young cast member says she's living with a producer and had a bath and shower with them and that she feels uncomfortable? What would you do if crew told you they were stealing money from the independent film's really tight budget? I reported both things. I'd do the same again."

10. It is clear that if she is allowed to do so, Rebel will, indeed, "do the same again" – she learns no lessons and seems impervious and indifferent to truth, professionalism, or common decency. Her use of the Websites is only the cruelest example of her misconduct. Ms. Ghost respectfully asks this Court to hold Rebel accountable for her shameless, dishonest, and bullying conduct, and set the record straight.

[1] For the avoidance of doubt, Ms. Ghost does not assert any claim based on the filing of Rebel's Cross-Complaint, and merely refers to its contents for context.

## PARTIES

11. Plaintiff, Cross-Defendant, and Cross-Complainant Amanda Ghost (previously defined herein as "Ms. Ghost") is an individual residing in the United Kingdom, and a Producer of the Film.

12. Defendant, Cross-Complainant, and Cross-Defendant Rebel Wilson (previously defined herein as "Rebel") is an individual residing in Los Angeles, California, and is an actor, director, and producer of the Film.

13. Cross-Defendant Melissa Nathan ("Ms. Nathan") is an individual residing in the State of California, County of Los Angeles.

14. Cross-Defendant The Agency Group PR LLC ("TAG") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of California, County of Los Angeles.

15. Ms. Ghost is ignorant of the true names and capacities of the Cross-Defendants sued herein as Does 1-50, inclusive, and therefore sues these Does by such fictitious names. Ms. Ghost will amend this Complaint to allege the Does' true names and capacities when ascertained. Each of the Does is in some manner responsible for some or all of the acts and/or omissions alleged herein. Ms. Ghost is informed and believe and thereon alleges that one or more of the Does were involved in the making and/or dissemination of the defamatory statements complained of herein, including without limitation the defamatory comments on the Websites. Ms. Ghost is informed and believes, and thereon alleges that the Does include a person named "Jed" who was involved in coordinating and directing the publication of defamatory materials via the websites, in collusion with Ms. Nathan and her staff, and with Rebel. Ms. Ghost will amend this Cross-Complaint to add the correct name of the individual named "Jed" and sued herein as Doe after obtaining further evidence of his or her identity. Rebel, Ms. Nathan, TAG, and Does 1-50 are collectively referred to herein as "Cross-Defendants."

## JURISDICTION AND VENUE

16. Jurisdiction exists and venue is proper in the State of California, County of Los Angeles pursuant to Code of Civil Procedure §§ 395 and 395.2 because Rebel, Ms. Nathan, TAG,

and are residents of or based in the County of Los Angeles, and because the actions complained of herein occurred, in whole or in part, in the County of Los Angeles.

17. This Court has personal jurisdiction over Cross-Defendants because they are residents of the State of California and/or conduct business in the State of California.

## GENERAL ALLEGATIONS

### Rebel and the Producers Agree to Produce "The Deb"

18. In or around February 2023, the Producers were brought on to co-produce a feature film called "The Deb" with Rebel. The Film had a budgeted initial funding limit of 15 million Australian Dollars. Rebel did not contribute any financing towards the production of the Film.

19. "The Deb" was to be directed by Rebel, and produced by the Producers and Rebel, as well as a local producer that would be mutually agreed to by the parties. Because Rebel was a novice director, the parties understood that she would cooperate with the producers to create the Film. Additionally, Rebel contracted to act in the Film.

20. Although Rebel was contracted to provide additional writing for the Film, she was never promised a "written by" credit for the Film. That is because the writing credit for the "The Deb" screenplay belongs to Ms. Reilly, who developed the concept, the original script, and the original screenplay for "The Deb." Ms. Reilly is a young and upcoming Australian writer, who conceived of the original idea for "The Deb," including its core plot, characters, and theme. Ms. Reilly drafted the original screenplay. Initially, Ms. Reilly adapted her script with celebrated Australian musician Megan Washington for a stage play of "The Deb" (the "Stage Play"), which ran in Sydney in mid-2022. Thereafter, a film production of "The Deb" was contemplated and Ms. Reilly revamped her original script into the script for "The Deb" film (the "Screenplay").

### Rebel Tries to Take Credit for Ms. Reilly's Work

21. Once "The Deb" commenced production, Rebel sought to take the lion's share of the credit for the screenplay, and began to demand that she receive a writing credit for herself. Ms. Reilly did not agree that Rebel should receive the writing credit. On November 13, 2023, Rebel submitted the dispute over the writing credit for adjudication by binding arbitration before the Australian Writers' Guild ("AWG"). Neither the Producers nor the production companies involved

in the Film were part of the adjudication process before the AWG. Ms. Reilly and Rebel agreed to be bound by the decision of the AWG. On March 4, 2024, the AWG rendered a credit determination for the Film, finding largely in Ms. Reilly's favor and deciding that the on-screen credits for the Film would be:

*Screenplay by Hannah Reilly*

*Additional Writing by Rebel Wilson*

*Based on a stage-play by Hannah Reilly*

*With music by Megan Washington, and lyrics by Hannah Reilly and Megan Washington*

22. Though she had no legal basis to object to the AWG's decision (and has never filed a legal challenge to the decision), Rebel refused to accept the outcome. She now turned her focus on the Producers, demanding that they override the AWG's ruling and give her a full writing credit. This demand was based on what Rebel asserted was a "prior contractual agreement" to give her a writing credit. This was an after-the-fact invention by Rebel – no such "prior contractual agreement" existed – and the agreements that did exist (which Rebel had negotiated and signed) made clear that the ruling of the AWG was binding. The Producers could not accommodate Rebel's demand for a writing credit – and now found themselves the focus of her anger.

**Rebel Drags Another Young, Aspiring Artist into her Lies**

23. A perpetual source of unnecessary drama, Rebel also targeted the Film's young star, Ms. MacInnes, another young artist who thought her dreams were coming true when she was cast in projects linked to Rebel. Ms. MacInnes and Ms. Ghost became friends due to their mutual appreciation for music. From the outset, Ms. MacInnes and Ms. Ghost (an award winning song writer and music producer) discussed collaborating on other musical projects and even worked on a song together.

24. Instead of flying to and from Sydney from Ms. MacInnes' hometown for filming, to save time and money, Ms. Ghost extended an invitation for Ms. MacInnes to stay at the production apartment where Ms. Ghost was staying in Sydney with a senior member of the production team. Multiple members of the film crew intermittently used this apartment, including Rebel herself; there was nothing unusual about any member of the cast or crew doing so. Ms. MacInnes accepted

the offer.

25. In September 2023, while the dispute between Rebel and Ms. Reilly over the writing credit was coming to a head, an innocent incident occurred that Rebel has exploited and mischaracterized ever since. Ms. MacInnes and Ms. Ghost went swimming in the ocean and the very cold water caused Ms. Ghost to have a severe reaction that became a medical event. Ms. MacInnes aided Ms. Ghost by running a warm shower and bath to warm Ms. Ghost back up. Both women were in their bathing suits, another senior member of the production team staying in the apartment was also present, and there was nothing sexual or inappropriate about the incident whatsoever – it was a medical event.

26. In the days that followed, the cast and crew of the Film heard about this incident from both Ms. Ghost and Ms. MacInnes, who were casually describing the anecdote. Rebel learned the incident and called Ms. MacInnes to ask her about the incident and whether she was alright. Ms. MacInnes explained to Rebel that she had voluntarily assisted Ms. Ghost during her medical episode and had not been made to feel uncomfortable by Ms. Ghost in any way. She specifically and explicitly told Rebel that she was completely comfortable during the entire episode.

27. Rebel nonetheless seized an opportunity to create discord and try to secure an ally in her dispute with Ms. Reilly, and began to spread a lie that Ms. MacInnes had complained about being forced to shower with Ms. Ghost and feeling uncomfortable. Ms. MacInnes was shocked when she eventually realized that Rebel was spreading this false rumor, and promptly rectified the situation by providing a written statement vehemently denying any inappropriate behavior or misconduct by Ms. Ghost. Ms. MacInnes made her written statement on or around September 17, 2023 and it was shared with the producers, including Rebel, within days thereafter.

28. Meanwhile, Ms. MacInnes focused her efforts on a project she and Ms. Ghost had been discussing as far back as the Spring of 2023 and that Ms. Ghost was co-producing – a production called "Gatsby." Ms. MacInnes auditioned for the role, and after auditioning for several of the industry's leading Producers, landed the role in March 2024.

**Rebel Defames The Producer Plaintiffs and Ms. MacInnes**

29. By the summer of 2024, millions of dollars had been invested in "The Deb," the Film was nearly complete, and it was on track to be a success. But Rebel was unhappy. Her efforts to secure a writing credit had been rejected by Ms. Reilly and the AWG. Her various other demands, which included a record label and special publishing rights for the songs in the Film, had not been granted, as they were not contractually supported. Meanwhile, many of those invested in the Film, including the Producers, were trying to hold Rebel to her actual contractual and professional obligations to the Film and its stakeholders.

30. On June 14, 2024, Rebel, through her attorney Bryan Freedman, sent a demand letter to the Producers, attempting to renegotiate contract terms and threatening to publicly litigate a litany of ludicrous and demonstrably false allegations. The Producers and their affiliated companies did not capitulate to Rebel's demands, but made good faith efforts to attempt to resolve their business disputes with Rebel. On July 10, 2024, while those negotiations were in progress, Rebel suddenly posted a video to her Instagram page, with 11 million followers, in which she accused the Producer Plaintiffs of embezzling funds from the Film, sexual misconduct with the lead actress, engaging in bullying and intimidation tactics to conceal their misconduct, and forcing their victims to sign non-disclosure agreements.

31. These contentions are patently false and are the subject of the Producers' original Complaint in this action, which asserts claims against Rebel for defamation. Even after that Complaint was filed, Rebel continued making threats and accusations to those involved in the Film, including claiming to persons involved in the Film that many people (including specifically Sara Bareilles, Brandy, Shakira, Margot Robbie, and Baz Luhrmann) had problems with Ms. Ghost; that the Producers had been responsible for a financial loss on the Gatsby musical; and that if the Producers dared to continue litigating their defamation case, "it will very publicly ruin them."

32. On July 29, 2024, the Producers filed their First Amended Complaint in the Related Action, which was reported in the news media. Rebel's response was to announce that this was an "unfair and grossly abhorrent attack on me in the press," and that she was "cancelling Toronto and all sales/promotion of the film and will be going public as to why."

33. Soon afterwards, the first of the Websites was registered, amandaghost.com, and later that September amandaghostsucks.com was registered. As Ms. Ghost has now learned, Rebel's PR team were having written communications discussing the creation of websites to defame her, and assisted Rebel in creating the Websites and publishing outrageous lies about her. Indeed, Ms. Nathan texted a document entitled "__library . . . _Amanda Ghost website.docx (26KB)," which upon information and belief, is a dossier of false information regarding Ms. Ghost. Ms. Nathan also wrote: **"So basically Rebel wants a one of those sites… Should be a mixture of that document that I think Carolina pulled about Amanda goes [sic] or the intern pulled… It can be really really harsh… Russian oligarchs and making her a madam basically lol[.]"**

34. Outrageous (and blatantly racist) lies about Ms. Ghost, a well-regarded professional with a long record of accomplishment, were published via the Websites, which were, in turn, sought to be promoted on social media. Many of those lies echoed Rebel's previous and subsequent lies. For instance, the Website specifically mentions many of the same supposed "victims" of Ms. Ghost that had been referenced in Rebel's earlier communications (*e.g.*, the Website accuses Ms. Ghost of "the takedown of Sara Bareilles, Brandy, Shakira," and states that that "people like Margot Robbie and Baz Luhrmann choose never to work with Ghost again. She's rotten to the core"). The Websites are blatantly false and defamatory, including without limitation the following statements, which were published or republished on amandaghost.com and amandaghostsucks.com in September 2024:

a. "We won't stop. We're in this until Amanda Ghost is exposed for the evil that she is. As the Indian Ghislaine Maxwell, she trades on pleasure for protection. Enough is enough. There's been too much destruction. Her wrongdoings can no longer remain a Hollywood secret. I have to speak out."

b. "When Amanda Ghost failed as a songwriter, she tried her hand at another commodity and became the madame for one of the world's richest men."

c. "Amanda Ghost learned her trade in theft, discovering how easy it was to steal from talented artists. Her playbook was the same every time: demand writing credits on songs that she never wrote, trick or threaten artists into giving her

their publishing rights and lie – about anything from her ethnicity, education, and even name."

d. "Failing in music she turned full pimp, reinventing herself as a theatrical producer alongside her husband while really procuring young women for the pleasure of the extremely wealthy. Her lethalness and aptitude at this craft is evidence in her actions since – as she continuously seeks out talented people across the industry to control and coerce."

e. "This strain of constantly procuring women could explain her company UNIGRAM's financial loss of 4.7M pounds last year. And let's only hope the hookers made up for losing her financier $25M by mounting The Great Gatsby stage musical to simply reward an actress for remaining silent about the abuse she suffered at Ghost's hands."

f. "In exchange for women, this benefactor helps Ghost plant untrue stories and use attacks in the media as a threat, due to the billionaire's significant advertising spend at multiple publications. It's also the reason I have to write these things here, and cannot easily go to the press.."

g. "We have to ask ourselves the important questions, and encourage people in positions of power and in the press to do the same. Why is Amanda Ghost allowed to play procuress, affording her protection against the overwhelming evidence against her? What other dark secrets of this man is she hiding? What other dark secrets of hers are being hidden? Why do good looking women who work for Ghost and her husband go missing? Why is Ghost still allowed to assert power at Warner Music?"

35. The assertions made on the Websites are utterly and demonstrably false. Indeed, the only person to have ever accused Ms. Ghost of any form of sexual misconduct is none other than Rebel. Ms. Ghost is informed and believes and thereon alleges that Rebel caused this blatant libel to be posted on the Internet, on Websites, amangaghost.com and amandaghostsucks.com, that she specifically caused to be created for that purpose. Multiple individuals associated with Ms. Ghost

personally or professionally then began receiving emails linking to this defamatory language, as Rebel sought to ensure that the damage from the Websites was maximized. For instance, Ms. Reilly received an email linking to one of the websites with the comment "thought you should be aware of this." Rebel, who controls "The Deb's" Instagram page, also publicly posted the Website to that page, with words to the effect that "The Deb's" followers should "please read this." That post was deleted shortly thereafter – perhaps because even Rebel realized that she had been a little too obvious. Rebel's conduct was, in short, specifically intended to cause harm. The damage to Ms. Ghost from this campaign of defamation is enormous – not merely to her peace of her mind, but to her standing in the community and her professional career.

## FIRST CAUSE OF ACTION

### Defamation and Defamation Per Se Against Rebel, Ms. Nathan, TAG, and Does 1-50

36. Ms. Ghost repeats and hereby incorporates by reference the preceding paragraphs as though set forth in full.

37. Rebel, directly or indirectly, and with the material assistance of the other Cross-Defendants, intentionally caused the Websites to be created and caused defamatory statements about Ms. Ghost to be published or caused to be published on them. This includes, without limitation the following statements that were published or republished on amandaghost.com and amandaghostsucks.com in September 2024:

a. "We won't stop. We're in this until Amanda Ghost is exposed for the evil that she is. **As the Indian Ghislaine Maxwell, she trades on pleasure for protection.** Enough is enough. There's been too much destruction. Her wrongdoings can no longer remain a Hollywood secret. I have to speak out."

b. "When Amanda Ghost failed as a songwriter, she tried her hand at another commodity and **became the madame for one of the world's richest men."**

c. "Amanda Ghost learned her trade in theft, discovering how easy it was to steal from talented artists. Her playbook was the same every time: **demand writing credits on songs that she never wrote, trick or threaten artists into giving**

**her their publishing rights and lie – about anything from her ethnicity, education, and even name."**

d. "Failing in music she turned full pimp, reinventing herself as a theatrical producer alongside her husband **while really procuring young women for the pleasure of the extremely wealthy.** Her lethalness and aptitude at this craft is evidence in her actions since – as she continuously seeks out talented people across the industry to control and coerce."

e. **"This strain of constantly procuring women** could explain her company UNIGRAM's financial loss of 4.7M pounds last year. And let's only hope the hookers made up for losing her financier $25M by mounting The Great Gatsby stage musical to **simply reward an actress for remaining silent about the abuse she suffered at Ghost's hands."**

f. **"In exchange for women, this benefactor helps Ghost plant untrue stories** and use attacks in the media as a threat, due to the billionaire's significant advertising spend at multiple publications. It's also the reason I have to write these things here, and cannot easily go to the press.."

g. "We have to ask ourselves the important questions, and encourage people in positions of power and in the press to do the same. **Why is Amanda Ghost allowed to play procuress,** affording her protection against the overwhelming evidence against her? What other dark secrets of this man is she hiding? What other dark secrets of hers are being hidden? **Why do good looking women who work for Ghost and her husband go missing?** Why is Ghost still allowed to assert power at Warner Music?"

38. These statements expressed or implied that Ms. Ghost is corrupt and criminal, accused her of stealing other persons' work, of being a con artist, thief, and pimp, and sexually exploiting young women. The statements insinuate that she is responsible for the disappearance of young women, and that she is involved in procuring young women for a rich financier. The description of her as the "Indian Ghislaine Maxwell" – famously imprisoned for abetting a

billionaire's predatory behavior toward young women – is not merely racist, but a clear charge of heinous criminal conduct. The defamatory meaning of the statements set forth above is self-evident, as they have a natural tendency to harm Ms. Ghost's reputation, subject her to hatred, ridicule, or obloquy, and cause actual harm to her reputation and professional career.

39. The statements set forth above constitute defamation *per se* because, among other things, they impute the commission of a crime and prejudice Ms. Ghost in her business and career.

40. The statements are of and concerning Ms. Ghost.

41. The statements are false. They are simply made up and have no basis whatsoever in fact. Indeed, no one other than Rebel has ever accused Ms. Ghost of any such thing.

42. Rebel and the other Cross-Defendants knew that the statements were false when they caused them to be published, republished, and/or distributed. Rebel, aided by PR professionals simply made up and spread cruel, vicious, utterly false stories about Ms. Ghost. At minimum, the Cross-Defendants acted in reckless disregard of the truth because neither Rebel nor her paid PR professionals had any conceivable basis to make the statements, which are pure fantasy.

43. The statements are unprivileged.

44. As a result of the statements, Ms. Ghost has have suffered damages in an amount in excess of the jurisdictional minimum of this Court, including without limitation, damage to her reputation, damage to her personal brand and goodwill in the community as a successful businesswoman, emotional suffering and distress, loss of potential income and goodwill associated with lost opportunities as a result of the negative publicity associated with the defamatory statements, and associated long-term loss of goodwill and marketability.

45. Rebel was materially assisted in committing these defamatory acts by Ms. Nathan, TAG, and Does 1-50, who assisted Rebel in preparing the defamatory statements, registering the Websites, and causing them to be published and disseminated online.

46. In taking the actions alleged in this Cross-Complaint, Rebel acted willfully and wrongfully, with malice, oppression, and fraud, and in conscious disregard of Ms. Ghost's rights, for which conduct Ms. Ghost is entitled to an award of punitive or exemplary damages.

**SECOND CAUSE OF ACTION**

**Aiding and Abetting Defamation Against Ms. Nathan, TAG and Does 1-50**

47. Ms. Ghost repeats and hereby incorporates by reference the preceding paragraphs as though set forth in full.

48. Rebel, directly or indirectly, intentionally caused the Websites to be created and caused defamatory statements about Ms. Ghost to be published or caused to be published on them. This includes, without limitation the following statements that were published on amandaghostsucks.com in September of 2024:

a. "We won't stop. We're in this until Amanda Ghost is exposed for the evil that she is. As the Indian Ghislaine Maxwell, she trades on pleasure for protection. Enough is enough. There's been too much destruction. Her wrongdoings can no longer remain a Hollywood secret. I have to speak out."

b. "When Amanda Ghost failed as a songwriter, she tried her hand at another commodity and became the madame for one of the world's richest men."

c. "Amanda Ghost learned her trade in theft, discovering how easy it was to steal from talented artists. Her playbook was the same every time: demand writing credits on songs that she never wrote, trick or threaten artists into giving her their publishing rights and lie – about anything from her ethnicity, education, and even name."

d. "Failing in music she turned full pimp, reinventing herself as a theatrical producer alongside her husband while really procuring young women for the pleasure of the extremely wealthy. Her lethalness and aptitude at this craft is evidence in her actions since – as she continuously seeks out talented people across the industry to control and coerce."

e. "This strain of constantly procuring women could explain her company UNIGRAM's financial loss of 4.7M pounds last year. And let's only hope the hookers made up for losing her financier $25M by mounting The Great Gatsby stage musical to simply reward an actress for remaining silent about the abuse

she suffered at Ghost's hands."

f. "In exchange for women, this benefactor helps Ghost plant untrue stories and use attacks in the media as a threat, due to the billionaire's significant advertising spend at multiple publications. It's also the reason I have to write these things here, and cannot easily go to the press.."

g. "We have to ask ourselves the important questions, and encourage people in positions of power and in the press to do the same. Why is Amanda Ghost allowed to play procuress, affording her protection against the overwhelming evidence against her? What other dark secrets of this man is she hiding? What other dark secrets of hers are being hidden? Why do good looking women who work for Ghost and her husband go missing? Why is Ghost still allowed to assert power at Warner Music?"

49. These statements expressed or implied that Ms. Ghost is corrupt and criminal, accused her of stealing other persons' work, of being a con artist, thief, and pimp, and sexually exploiting young women. The statements insinuate that she is responsible for the disappearance of young women, and that she is involved in procuring young women for a rich financier. The description of her as the "Indian Ghislaine Maxwell" – famously imprisoned for abetting a billionaire's predatory behavior toward young women – is not merely racist, but a clear charge of criminal conduct. The defamatory meaning of the statements set forth above is self-evident, as they have a natural tendency to harm Ms. Ghost's reputation, subject her to hatred, ridicule, or obloquy, and cause actual harm to her reputation and professional career.

50. The statements set forth above constitute defamation *per se* because, among other things, they impute the commission of a crime and prejudice Ms. Ghost in her business and career.

51. The statements are of and concerning Ms. Ghost.

52. The statements are false. They are simply made up and have no basis whatsoever in fact. Indeed, no one other than Rebel has ever accused Ms. Ghost of any such thing.

53. Rebel knew that the statements were false when she caused them to be published, republished, and/or distributed. She simply made up a cruel, vicious story about Ms. Ghost. At

minimum, she acted in reckless disregard of the truth because she had no basis to make the statements, which are pure fantasy.

54. The statements are unprivileged.

55. As a result of the statements, Ms. Ghost has suffered damages in an amount in excess of the jurisdictional minimum of this Court, including without limitation, damage to her reputation, damage to her personal brand and goodwill in the community as a successful businesswoman, emotional suffering and distress, loss of potential income and goodwill associated with lost opportunities as a result of the negative publicity associated with the defamatory statements, and associated long-term loss of goodwill and marketability.

56. Rebel was materially assisted in committing these defamatory acts by Ms. Nathan, TAG, and Does 1-50, who assisted Rebel in preparing the defamatory statements, registering the Websites, and causing them to be published and disseminated online.

57. Ms. Nathan, TAG and Does 1-50 knew that Rebel intended to defame and harm Ms. Ghost and acted with the intention of assisting her in that endeavor.

58. Ms. Nathan, TAG, and Does 1-50 helped Rebel defame Ms. Ghost and were, accordingly, a substantial factor in causing Ms. Ghost harm.

59. In taking the actions alleged in this Cross-Complaint, Cross-Defendants acted willfully and wrongfully, with malice, oppression, and fraud, and in conscious disregard of Ms. Ghost's rights, for which conduct Ms. Ghost is entitled to an award of punitive or exemplary damages.

**PRAYER**

WHEREFORE, Ms. Ghost request judgment with each item of this prayer being for relief additional to and alternative to each other item and not an election of remedies, as follows:

1. Compensatory damages according to proof;

2. Costs, expenses, and attorneys' fees, to the extent recoverable;

3. Punitive or exemplary damages;

4. Prejudgment and post-judgment interest in the maximum amounts provided by law; and

5. For such other and further relief as the Court deems just and proper.

DATED: September 2, 2025

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By: /s/ Camille M. Vasquez

CAMILLE M. VASQUEZ
Attorneys for Plaintiff, Cross-Defendant, and Cross-Complainant AMANDA GHOST

# Exhibit H

**From:** Jason Sunshine <jsunshine@lftcllp.com>
**Sent:** Monday, November 10, 2025 4:11 PM
**To:** Licette Lozano; Calendar LA; Rosemary Lopez
**Cc:** Morgan Anastasio; Chip Babcock; Joel Glover; Hudson, Esra; Bruno, Matthew; Gottlieb, Michael; Bender, Kristin; Nathan, Aaron E.; Meryl Governski; Connolly, Michaela; Taustine, Melissa; Kristin Tahler; Maaren Shah; Nicholas Inns; Bryan Freedman; mitra@ahouraianlaw.com; Local KAF. Counsel; Local MS. Counsel; Summer Benson; Theresa Troupson; Vaneta Birtha; Alexandra Shapiro; Jonathan Bach; Alice Buttrick; Rose Khatchikian
**Subject:** Justin Baldoni Confidentiality Designations [Lively v. Wayfarer et al., No. 24-cv-10049 / Jones v. Abel et al., No. 1:25-cv-00779-LJL]
**Attachments:** Justin Baldoni 10-06-2025 Confidentiality Designations.pdf; Justin Baldoni 10-07-2025 Confidentiality Designations.pdf

***** EXTERNAL EMAIL *****

All,

Please see the attached deposition transcripts of Justin Baldoni with confidentiality designations pursuant to the Protective Order:

- The highlighted portions of the transcripts are designated as confidential.
- The rest of the testimony is hereby de-designated.
- There shall be no change to the pre-existing designations of documents marked as exhibits.

All rights reserved.

Thanks,
Jason

Jason H. Sunshine, Esq.
LINER FREEDMAN TAITELMAN + COOLEY LLP
1801 Century Park West, 5th Floor
Los Angeles, California 90067
Tel: (310) 201-0005
Direct: (310) 201-4285
Cell: (917) 841-8716
Fax: (310) 201-0045
Web: www.lftcllp.com

Liner Freedman Taitelman+Cooley

[Home](www.lftcllp.com)
You came here because you have a CRISIS... Relax. We will take care of it. Liner Freedman Taitelman + Cooley LLP " THR the go-to for alpha dogs who see themselves as the underdogs in a crisis. " L.A. Times – L.A. Influential Celebrity legal pit bull. " The Hollywood Reporter an expert in crisis [...]
www.lftcllp.com

*Please note that LFTC's domain name has changed from ftllp.com to lftcllp.com. Emails sent from this domain are not spam.*

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and, as such, is privileged and confidential. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF JUSTIN BALDONI
Los Angeles, California
Monday, October 6, 2025
Stenographically Reported by: Ashley Soevyn,
CALIFORNIA CSR No. 12019

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---0O0---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**CONFIDENTIAL**
Video-recorded Deposition of
JUSTIN BALDONI, taken on behalf of the Plaintiff Jonesworks, et al., Pursuant to Notice, at the offices of Willkie Farr & Gallagher, 2029 Century Park East, Los Angeles, California beginning at 9:15 a.m. and ending at 6:46 p.m. on Monday, October 6, 2025, before me, ASHLEY SOEVYN, California Certified Shorthand Reporter No. 12019.



A P P E A R A N C E S:

For the Plaintiffs Stephanie Jones and Jonesworks LLC:
QUINN EMANUEL URQUHART & SULLIVAN
BY: KRISTIN TAHLER
BY: LAURENNE M. BABAYAN
Attorneys at Law
865 S. Figueroa Street
8th Floor
Los Angeles, California 90017
kristintahler@quinnemanuel.com
laurennebabayan@quinnemanuel.com
(212) 849-7000
-AND-
QUINN EMANUEL URQUHART & SULLIVAN
BY: MAAREN A. SHAH
Attorney at Law
51 Madison Avenue
22nd Floor
New York, New York 10010
maarenshah@quinnemanuel.com
(212) 849-7000



A P P E A R A N C E S:

For the Plaintiff Blake Lively:
MANATT PHELPS & PHILLIPS LLP
BY: ESRA A. HUDSON
Attorney at Law
2049 Century Park East
Suite 1700
Los Angeles, California 90067
ehudson@manatt.com
(310) 312-4207



A P P E A R A N C E S:

For the Plaintiff Blake Lively:
WILLKIE FARR & GALLAGHER
BY: MICHAEL GOTTLIEB
Attorney at Law
2029 Century Park East
Los Angeles, California 90067
mgottlieb@willkie.com
(310) 855-3000
-AND-
WILLKIE FARR & GALLAGHER
BY: MICHAELA CONNOLLY
BY: KRISTIN BENDER
Attorneys at Law
1875 K Street
Northwest
Washington, D.C. 20006
mconnolly@willkie.com
kbender@willkie.com
(202) 303-1245

A P P E A R A N C E S:

For the Plaintiff Blake Lively:
WILLKIE FARR & GALLAGHER
BY: AARON E. NATHAN (VIA ZOOM)
Attorney at Law
787 Seventh Avenue
New York, New York 10019
anathan@willkie.com
(212) 728-8000
-AND-
SLOANE OFFER WEBER AND DERN
BY: LINDSEY STRASBERG (VIA ZOOM)
Attorney at Law
10100 Santa Monica Blvd., Ste. 750
Los Angeles, California 90067
(310) 248-5100



A P P E A R A N C E S:
For the Defendants Wayfarer Studios LLC, Jennifer Abel, Melissa Nathan and Justin Baldoni, Jamey Heath and Steve Sarowitz:
LINER FREEDMAN TAITELMAN+COOLEY
BY: BRYAN FREEDMAN
BY: SUMMER BENSON
BY: THERESA TROUPSON (VIA ZOOM)
BY: JASON SUNSHINE (VIA ZOOM)
Attorneys at Law
1801 Century Park West, 5th Floor
Los Angeles, California 90067
bfreedman@lftcllp.com
sbenson@lftcllp.com
ttropson@lftcllp.com
jsunshine@lfcllp.com
(310) 201-0005



A P P E A R A N C E S:
For the Defendants Wayfarer Studios LLC, Jennifer Abel, Melissa Nathan and Justin Baldoni, Jamey Heath and Steve Sarowitz:
AHOURAIAN LAW
BY: MITRA AHOURAIAN
Attorney at Law
2029 Century Park East
Suite 400
Los Angeles, California 90067
mitra@ahouraianlaw.com
(310) 376-7878

For the Witness Justin Baldoni:
SHAPIRO ARATO BACH
BY: ALEXANDRA SHAPIRO
BY: JONATHAN P. BACH
Attorneys at Law
1140 Avenue of the Americas
17th Floor
New York, New York 10036
ashapiro@shapiroarato.com
jbach@shapiroarato.com
(212) 257-4880



A P P E A R A N C E S:
For the Defendants Jed Wallace and Street Relations, Inc.:
JACKSON WALKER LLP
BY: JOEL R. GLOVER
Attorney at Law
1401 McKinney Street
Suite 1900
Houston, Texas 77010
jglover@jw.com
(713) 752-4226

Also Present:
Jennifer Abel
Melissa Nathan
Jamey Heath
Steve Sarowitz (Via Zoom)
Laura Prather, Esq. (Via Zoom)
Alice Butrrick, Esq. (Via Zoom)
Zach Czerenda, Veritext Legal Solutions Concierge (Via Zoom)
Jonathan Hernandez, Videographer

INDEX TO EXAMINATION

WITNESS: JUSTIN BALDONI


| EXAMINATION BY: | PAGE |
|---|---|
| MS. SHAH | 15 |




INDEX TO EXHIBITS

JUSTIN BALDONI

JONESWORKS, ET AL. V. WAYFARER STUDIOS LLC, ET AL.

Monday, October 6, 2025

Ashley Soevyn, CSR No. 12019


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Text messages dated 7/3/24; Bates No. JONESWORKS_JB_1434 - 1441 | 94 |
| Exhibit 2 | Text messages date range: 7/3/2024; Bates No. JONESWORKS_15478 - 15481 | 101 |
| Exhibit 3 | Email thread dated 7/8/2024 from Katie Warren to Justin Baldoni; Bates No. JONESWORKS_JB_651 | 106 |
| Exhibit 4 | Text messages date range: 8/9/24 - 8/10/24; Bates No. JONESWORKS_16169 - 16170 | 115 |
| Exhibit 5 | Text messages date range: 7/26/24; Bates No. JONESWORKS_39735 - 39736 | 140 |
| Exhibit 6 | Text messages dated 7/26/24; Bates No. JONESWORKS_JB_1142 | 145 |
| Exhibit 7 | The Hollywood Reporter article dated 8/13/2024 titled Justin Baldoni hires crisis PR veteran amid alleged 'It Ends With Us' rift by Carly Thomas and Pamela McClintock | 148 |
| Exhibit 8 | Text messages dated 8/14/2024; Bates No. NATHAN_3972 -3982 | 152 |
| Exhibit 9 | Text messages dated 8/14/24; Bates No. NATHAN_4552 - 4560 | 162 |




INDEX TO EXHIBITS

JUSTIN BALDONI

JONESWORKS, ET AL. V. WAYFARER STUDIOS LLC, ET AL.

Monday, October 6, 2025

Ashley Soevyn, CSR No. 12019


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 10 | Text messages dated 8/13/24; Bates No. NATHAN_1221 - 1227 | 172 |
| Exhibit 11 | Text messages date range: 8/5/2024 - 8/6/2024; Bates No. KCASE-4949 - 4962 | 190 |
| Exhibit 12 | Text messages date range: 1/14/2024; Bates No. JONESWORKS_41606 - 41608 | 223 |
| Exhibit 13 | Text messages dated 8/4/2024; Bates No. NATHAN_2938 - 2940 | 228 |
| Exhibit 14 | Text messages date range: 7/26/2024; Bates No. JONESWORKS_13939 - 13940 | 229 |
| Exhibit 15 | Text messages date range: 4/5/2024; Bates No. JONESWORKS_41609 - 41612 | 231 |
| Exhibit 16 | Text messages date 8/2/2024; Bates No. NATHAN_141 - 151 | 234 |
| Exhibit 17 | Text messages dated 8/5/2024; Bates No. BALDONI_18710 - 18711 | 258 |
| Exhibit 18 | Text messages dated 8/15/2024; Bates No. NATHAN_4562 - 4563 | 278 |
| Exhibit 19 | Text messages dated 8/19/24; Bates No. JONESWORKS_MN_2208 - 2210 | 286 |




***CONFIDENTIAL DEPOSITION PROCEEDINGS***

MONDAY, OCTOBER 6, 2025

--0O0--

THE VIDEOGRAPHER: Good morning. We're on the record. The time is 9:15 a.m. Pacific Daylight Time. Today is October 6, 2025.

My name is Jonathan Hernandez. I'm a video technician with Veritext Legal Solutions located in Los Angeles, California. We are recording these proceedings at 2029 Century Park East, Los Angeles, California.

This is the video deposition of Justin Baldoni in the action entitled Blake Lively v. Wayfarer Studios LLC, et al.

This deposition is being taken on behalf of the plaintiff. The Case No. is 24-CV-10049.

Now, would you all please identify yourselves and who you represent starting with the noticing attorney.

MS. SHAH: Maaren Shah from Quinn Emanuel Urquhart and Sullivan on behalf of Stephanie Jones and Jonesworks.

MS. BABAYAN: Laurenne Babayan from Quinn Emanuel representing Stephanie Jones and Jonesworks, LLC.

MS. TAHLER: Kristin Tahler, Quinn Emanuel, representing Stephanie Jones and Jonesworks.

MR. GOTTLIEB: Mike Gottlieb from Willkie Farr & Gallagher on behalf of Ms. Lively.

MS. HUDSON: Esra Hudson of Manatt, Phelps & Phillips on behalf of Plaintiff Blake Lively.

MS. BENDER: Kristin Bender, Willkie Farr & Gallagher on behalf of Plaintiff Ms. Lively.

MS. CONNOLLY: Michaela Connolly from Willkie Farr & Gallagher on behalf of Ms. Lively.

MR. GLOVER: Joel Glover of Jackson Walker for Jed Wallace and Street Relations, Inc.

MR. FREEDMAN: Bryan Freedman on behalf of the deponent, Justin Baldoni, Jamey Heath, the Wayfarer parties, Jen Abel, Melissa Nathan and the related entities.

MS. BENSON: Summer Benson, Liner Freedman Taitelman & Cooley on behalf of the Wayfarer parties.

MS. AHOURAIAN: Mitra Ahouraian on behalf of the Wayfarer parties.

MR. BACH: Jonathan Bach, Shapiro Arato Bach, on behalf of all the same defendant parties.



MS. SHAPIRO: Alexandra Shapiro, Shapiro Arato Bach, on behalf of Mr. Baldoni and the Wayfarer parties.

THE STENOGRAPHIC REPORTER: Sir, can I please have you raise your right hand.

Do you solemnly state that the testimony you're about to give in this deposition will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, I do.

THE STENOGRAPHIC REPORTER: Great. Thank you.

EXAMINATION

BY MS. SHAH:

Q Good morning, Mr. Baldoni.

A Good morning.

Q We met a minute ago. My name is Maaren Shah, and as you heard, I represent Stephanie Jones and Jonesworks in these related cases.

Can you tell me, have you ever been deposed before today?

A No.

Q Have you ever testified in a court of law before today?

A No.

Q Let's run through some of the ground



rules for depositions so that we can all be operating on the same wavelength.

Do you understand that you're under oath today, the same -- in the same effect as you would be in a court of law?

A I do.

Q And you are required today to give full, complete and truthful testimony.

Do you understand that?

A I do.

Q Is there any reason you would not be able to give full, complete and truthful testimony today?

A There is not.

Q Is there anything that would impede your ability to recall past events while you're testifying today?

A No.

Q During the course of the day, I'm going to be asking you questions. When you answer, if you could please give audible answers as you're doing now so that the court reporter can get an accurate record, that would be appreciated.

A I will do my best.

Q And we're going to try for the benefit of the court reporter to both speak slowly, and if you



could do me the courtesy of trying to wait for my question to be finished before answering, and I will try to wait for your answers to be finished before asking another question, that gives us a cleaner record.

A Deal.

Q All right. Your attorney may be objecting today. If your attorney objects, unless she instructs you not to answer the question, you are still required to answer the question.

A Understood.

Q If you need to take a break for any reason, please let me know. This is not supposed to be an endurance test, but I would ask that you please wait if there is a question pending until you complete your answer, and then we can take a break after that.

A I drink a lot of water, so...

Q We will be taking regular breaks throughout the day. But if you ever need one and the attorneys don't call for one, just let us know.

If for any reason you don't understand any of my questions, please let me know and I'm happy to rephrase them. If you answer my question as stated without asking me to rephrase it, can we

both assume and understand that you understood what I was asking when -- when you answered it?

A Yeah.

Q Can you tell me whether you did anything to prepare for your deposition today?

A Yes.

Q What did you do?

A I worked with my attorneys, three days or so this week.

Q Which attorneys were those?

A Alexandra, Jonathan, Mitra, Theresa, a little bit with Bryan. Yeah.

Q Other than the attorneys that were present, was there anyone else there while you were preparing for your deposition?

A No. Not while I was preparing.

Q You said three days this week. Were there any other sessions before that?

A No.

Q Approximately how long each of the --

A Wait, is today Monday?

Q Yes. Three days last week?

A Last week.

Q Okay. Approximately how long did you prepare on each of the three days last week?



A Four hours. It might have been four days, but for four hours or so each day, not -- I mean, including, like, lunches and bathroom breaks.

Q Were these in-person or Zoom sessions?

A In person.

Q Okay. Do me a favor, actually, and state your full name and address for the record.

A Justin Baldoni. [redacted]

Q Understood.

[redacted]



[redacted]

Q Okay. Did you review any documents to help you prepare for this deposition?

MS. SHAPIRO: Just yes or no.

THE WITNESS: Yes.

BY MS. SHAH:

Q Did any of those documents help refresh your recollection or memory of the events that you'd be testifying here today?

A No.

Q Okay. Are you aware of whether all the documents you reviewed in preparation for this deposition were produced in this case?

A I would assume so.

Q Okay. Did you go back through your phone in preparation for this deposition and review anything on your phone?

A No.

Q You've attended, either by Zoom or in person, some of the other depositions that have taken place in this case; is that right?



A A few, yes.

Q Can you list them for me, please?

A I will try. In person was Ms. Lively. On Zoom, never full depositions, but in part, Jennifer Abel, Melissa Nathan, Stephanie Jones, Jenny Slate. I listened to a little bit of Isabella Ferrara, Ange Giannetti, Alex Saks, Josh Greenstein, and a little Colleen Hoover. And I may be forgetting someone.

Q How about Katie Case?

A A little bit of Katie Case. Thank you.

Q How about Breanna Butler Koslow?

A No. I don't -- I don't believe so.

Q Have you read -- apart from attending or listening into some of the depositions in this case, have you read the transcripts of any of the depositions in this case?

A I have not.

Q Have you read the transcript of Katie Case's deposition?

A I have not.

Q Prior to this deposition, apart from speaking with your attorneys, did you speak with anyone else about the subject of your deposition?

A No.

Q You didn't speak to Jamey Heath about it?
A About the subject of my deposition?
Q Or the fact that you would be having a deposition --
A Oh, yes. Sorry. I misunderstood the question. I thought you meant, like, the content of my deposition.
Q No problem. Anyone else?
A That I would be deposed?
Q Sure.
A Jennifer Abel, my family, my wife. We had a prayer gathering last night with a lot of friends so they were aware that I was being deposed, but that's all I can think of at the moment, yeah.
Q Did you speak to Melissa Nathan about your deposition at all?
A I have not.
Q Did you speak to Steve Sarowitz about your deposition at all?
A I did speak to Steve Sarowitz. We were together here at his deposition.
Q When you spoke to Steve Sarowitz about your deposition, was there an attorney present?
A Yeah. Yes.
Q When you spoke to Jen Abel about your



deposition, was there an attorney present?
A No, that was over the phone.
Q What did you discuss with Jen Abel about your deposition?
A It wasn't a conversation about the deposition. It was like, "you're going to do great." And she was letting me know she was going to be there. But there was no content that was discussed.
Q Anything else?
A She might have said just to keep being honest and shine your light or something to that extent.
Q And when you spoke to Jamey Heath about your deposition, was there an attorney present?
A Jamey and I speak all the time, so it may have come up at one point when it was just us or our families together, but I -- I don't know.
Q Can you recall anything about your conversations with Jamey Heath about your deposition at any point in time when there were not attorneys present?
A Most of the relationship with me and Jamey is bolstering each other and just reminding, like, he -- like a brother reminds me who I am. I



can't think of any other details. It's more like positive encouragement. These are -- these are pretty intense things, so kind of like a friend or a coach or you got this.
Q Have you spoken to Jamey about his deposition?
A No, it's been -- I'm first, so it's been focused on mine.
Q How would you characterize your relationship with Jamey Heath?
A He's one of my best, closest friends.
Q How long has he been one of your best, closest friends?
A I've been married -- I would say 15, 14 years. Maybe 14 years.
Q Were you friends before you began working together, or did you work together before you became friends?
A We were friends before we began working together.
Q How would you characterize your relationship with Jen Abel?
A We -- well, she was my publicist first, and then I think through -- I mean, I like to think of the people I work with as friends, so I would



have considered her a friend. I think through this experience, we've gotten closer. But I would have considered her my publicist.
Q And how would you characterize your relationship with Melissa Nathan?
A A friendly publicist who -- you know, we don't know each other very well. I think this is the second time we met in person. But like everyone else in this case, I think that the bond of being in the situation we're in has maybe brought us closer together. But friendly.
Q Prior to the deposition, did you have any role in helping to gather your documents, emails, texts, voice notes to be produced by your attorneys as discovery in this case?
A Can you ask that again?
Q Sure.
Are you aware that some of your documents, text messages, emails, et cetera, have been given to the plaintiffs in these cases as part of the discovery process?
MS. SHAPIRO: Don't answer that to the extent it -- it calls for information provided by your attorneys to you.
THE WITNESS: Yes.

CONFIDENTIAL

Page 26

BY MS. SHAH:
Q Did you have any role in helping to gather those materials?
A I think so.
Q What was your role?
A I had to hand over my phone multiple times to -- I don't know, I think they are called, like, data scientists. That's what I can remember right now. There were -- I think -- I think I had looked through for various emails, I don't remember the content of, to just make sure that people had everything, or texts that people had everything they needed.
Q What is your preferred method of communication?
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q I don't mean in an existential sense. I mean in a practical sense. Do you like to text? Do you like to email? Do you like to call on the phone?
A It depends. Am I in a lawsuit or not in a lawsuit when I'm communicating?
Q Let's start with a lawsuit.
A Okay. Text, but I'm pretty bad at it

Page 27

these days.
Q So you do use Apple iMessage to communicate, right, text message?
A Yeah.
Q Do you use email to communicate?
A I get a lot of e-mails but I -- not good at responding to them. I do respond at times, but it's generally pretty short.
Q Do you use WhatsApp messaging to communicate?
A I'm on WhatsApp threads with various people.
Q Do you use Signal to communicate?
A Since the lawsuit, I do. Yeah.
Q Before the lawsuit?
A No.
Q Since the lawsuit, who have you used Signal to communicate with?
A Mostly my attorneys, the people that are the defendants, some friends.
Q Do you use Telegram to communicate?
A No.
Q Do you ever send voice notes?
A Yeah.
Q Do you ever record phone calls that

Page 28

you're a participant in?
A I certainly have from time to time.
Q Do you do that frequently?
A No.
Q Did you ever record any phone calls or Zooms with the participants in this case?
A In which case exactly?
Q Either the Blake Lively case or the Stephanie Jones case?
A Yes.
Q How many times would you estimate you recorded the phone calls or Zooms?
A Two to four. Maybe four times, maybe. Might be three.
Q Am I correct to understand that's four times ever that you recorded phone calls or Zooms with any of the participants or witnesses or people involved in the events that underlie either of these litigations?
A I don't do it often. So I imagine it was around four, two to four. I'd have to take a lot of pausing to really think about that which -- I think it's between two and four. Why don't we say four.
Q How about in-person meetings?
MS. SHAPIRO: Objection.

Page 29

THE WITNESS: One that I can think of.
BY MS. SHAH:
Q What is that one?
A I recorded an improv acting session between Jenny Slate and Ms. Lively.
Q That you were also a participant in?
A I was.
Q Where were you located when you recorded that?
A At our production offices in Hoboken, New Jersey.
Q Where was Ms. Slate located?
A In New Jersey.
Q She was with you?
A Yeah.
Q Where was Ms. Lively located?
A I assume she was at her house, which is in New York.
Q Other than that one in-person meeting, can you think of any other in-person meetings that you recorded that have -- that involved any of the participants in the events underlying these cases or had anything to do with the events underlying these cases?
MS. SHAPIRO: Objection.

THE WITNESS: At the moment, I can't.
BY MS. SHAH:
Q Are you aware that your counsel produced to us last night four recordings --
MS. SHAPIRO: Objection to the extent it calls for information provided by your attorneys.
BY MS. SHAH:
Q -- that appear to be recordings by you or phone calls or in-person meetings having to do with this case?
MS. SHAPIRO: Same objection.
THE WITNESS: I would imagine that they would.
BY MS. SHAH:
Q Are you aware that they were produced last night?
MS. SHAPIRO: Objection. Directing you not to answer anything to the extent it calls for information you only know from your attorneys.
THE WITNESS: I can't answer.
BY MS. SHAH:
Q Are you going to follow your counsel's instruction?
A Yes, ma'am.



Q Do you recall recording a phone call between you and any of the following: Ange Giannetti, Josh Greenstein or Todd Black?
A Ange Giannetti. I don't know if Todd Black was on it, but I know Ange. Yeah.
Q Tell me what you recall about that phone call with Ange.
A I haven't listened to them. What I recall is feeling, almost feeling like -- feeling scared and almost feeling like what was happening was, like, I needed a witness. Because what was happening was just kind of -- it felt kind of crazy. But I don't remember the content of the call. I assume it had to do with figuring out how to get through a difficult shoot.
Q What was it at the time that felt kind of crazy to you?
A I don't know exactly what call or when it was recorded so I don't know if I can answer that without more details.
Q Do you remember why you recorded that call?
A Again, I just need to know what call you're referring to.
Q Do you have a memory of a call that you



recorded with Ange Giannetti?
A I have a vague memory. Yes.
Q With respect to that call that you have a vague memory of, do you have any recollection of why you recorded that call?
A I think I felt powerless and scared and kind of lonely, I think.
Q What did you intend to do with that recording?
A Nothing. I just -- I didn't know if I would ever need it one day.
Q Have you needed it?
A I haven't looked at it or listened to it. So apparently not.
Q Did you tell her that you were recording the call?
A I didn't.
Q Where were you located when you recorded the call?
A I don't know. I would have to know the date on the recording, and then I could try to reverse engineer it.
Q From your vague memory of doing this, give me your best estimate of where you were located.



A I honestly have -- I don't know.
Q Is it possible that you were in California?
MS. SHAPIRO: Objection.
THE WITNESS: It's absolutely possible.
BY MS. SHAH:
Q Where was Ange located when you recorded that call?
A I assume she was in California.
Q Do you have a memory of recording any calls with Josh Greenstein?
A No.
Q Do you have a memory of recording any calls with Todd Black?
A Only if Todd were on a call with Ange.
Q Where is Todd Black located?
MS. SHAPIRO: Objection.
THE WITNESS: Like right now?
BY MS. SHAH:
Q No. In general. Where does he live and work?
A He's often in New York. I believe he lives in LA, but he's often shooting movies.
Q Does he maintain an office in LA?
A I don't know.

CONFIDENTIAL

Page 34

Q Do you recall ever recording a call with Stephanie Jones?
A No.
Q Do you recall ever recording a call with Jen Abel?
A I don't.
Q Do you recall ever recording a call with Melissa Nathan?
A No.
Q Other than the one improv session where Jenny Slate and Blake Lively were present that we spoke about, do you recall ever recording a call with Blake Lively?
A No.
Q Do you recall ever recording a call with Tim Miller?
A I don't know who that is.
Q Okay. Other than the one call that we've spoken about that you recorded with Ange Giannetti, you said you might have recorded two to four calls relevant to these litigations.
Do you remember any others?
A Yes.
Q Meaning -- okay. Sorry. Please tell me about them.

Page 35

A Is it -- do you want to finish your question?
Q No. It's all right.
A I didn't mean to interrupt you.
Q I know. It's all right. I was trying to ask a better question but I think I --
A Do you mind re-asking the question?
Q Other than the one call we've spoken about with Ange Giannetti, do you recall recording any other calls?
A Yes.
Q Okay. Please tell me about those.
A I recorded a -- part of a call with Shawn Levy.
Q Who is Shawn Levy?
A Shawn Levy is a director and a -- apparently a very close friend of Ms. Lively and Mr. Reynolds.
Q What do you recall about that call?
A I recall he wanted to speak to me. And as we began talking, I got the feeling that he was calling to kind of adjust or course correct, which made me feel a little uncomfortable.
Q Adjust or course correct from what?
A I didn't know.

Page 36

Q What do you mean when you say "adjust or course correct"? Just explain that to me a little bit more, please.
A It felt like he was being asked to call me. Like he wasn't just calling to talk or check in.
Q And what was he calling you about?
A The movie, It Ends with Us, and Ms. Lively.
Q Was he calling you about the tensions that were arising in relation to that movie?
A No.
Q So what about the movie, It Ends with Us, was he calling you about?
A He was calling to give me advice, it appeared, on how to handle or navigate making a movie with Ms. Lively.
Q When in time was this?
A I could be wrong. I believe it was April of '23.
Q Where were you located when you recorded the call?
A At my office in New Jersey.
Q Where was he located when he was speaking to you on the call?

Page 37

A I don't know.
Q Did you inform him that you were recording the call?
A I did not.
Q Other than these two calls we've now spoken about, one with Ange Giannetti and one with Shawn Levy, can you remember any other phone calls that you recorded?
A It's not something I do often. So no, to be precise. I can't.
Q Does Jamey Heath often record phone calls to your understanding?
A I'm unaware of what Jamey does on his own time.
Q Does Jamey Heath ever record phone calls in the course of his work for Wayfarer to your understanding?
A I don't know. I know he has. But I don't know if it's a regular practice.
Q How do you know he has?
A Because I'm aware of at least a recording.
Q Which recording is that?
A I'm aware of a recording of a WME, WME agent or conversation that happened.

Q How did you become aware of that recording?
A I believe I was -- I believe I was told.
Q By whom?
A I don't remember, but I would assume Jamey.
Q Why was he telling you that he recorded that call?
A My -- I don't -- I can't speak to why he was telling me.
Q Did you have any understanding from what he said to you of why he was telling you?
A Yes.
Q And what was that understanding?
A I believe we were being -- we were being threatened.
Q By whom?
A By Mr. Reynolds and Ms. Lively.
Q Were you on that call?
A No.
Q Do you know who was?
A I know someone from WME, I presume to be my former agent. I think Jennifer Abel was on the call.
Q Anyone else?



A There may have been assistants on the WME side or -- I'm not sure.
Q When you say your former agent at WME, do you mean Danny Greenberg?
A I do.
Q Was your understanding of that call that it was a call between Jamey and Danny Greenberg?
A I actually don't know much about the call. So I don't -- I can't answer that.
Q To your understanding, how were you being threatened at the time by Blake Lively and Ryan Reynolds?
A My understanding was that there were demands being made that I release some sort of public statement that had been drafted by Mr. Reynolds and Ms. Lively and given to an agent. And I had been told there were multiple calls that were coming -- incoming from the agency saying that if Justin doesn't release a statement, then they will -- Ms. Lively and Mr. Reynolds -- will leave William Morris.
I was told that they called, the agency called numerous times, and this evidently was a phone call on which a statement was read that was prepared by Mr. Reynolds and Ms. Lively. And the



only other thing I remember about it was that I was -- that it was inferred that if this wasn't done, the gloves would come off.
Q When were you told -- let's start with this. When were you told about that phone call?
A I presume hours after it happened.
Q And when were you told that that phone call had been recorded?
A I feel like early 2025, I think.
Q Have you ever listened to that recording?
A I have not.
Q Do you know where Jamey was located when he made that recording?
A I would assume in Los Angeles.
Q Do you know if he informed any of the people on the call that he was recording it?
A I don't.
Q Do you know where Danny Greenberg was located during that call?
A I don't.
Q Do you know where Jen Abel was during that call?
A I wasn't there, so I don't.
Q Can you describe for me in your own words what you do for a living?



A I am -- that's a good question. I'm a filmmaker, an actor. I have been an author. I hosted a podcast. And I am part owner of a studio. I guess I'm an entertainment entrepreneur maybe.
Q The part owner of a studio, the studio you're referring to is Wayfarer; is that right?
A Yes, ma'am.
Q What is your percentage ownership of Wayfarer?
A Somewhere between 20 and 25 percent, I think.
Q And the remaining ownership, is that held by Steve Sarowitz?
A Yes.
Q Does anyone else have any part ownership in Wayfarer?
A There are -- I'm not sure contractually if anyone does. But there are -- I know there are two. There might be three people that have like promises of equity or ghost stock or I don't know if anything's been formalized.
Q Who are those two or three people?
A Jamey Heath, Ahmed Kolacheh, and Tera Hanks, I believe.
Q Going through each of them, do you have

CONFIDENTIAL

Page 42

an understanding of why they've been promised ghost equity or some sort of promise of equity in Wayfarer?
A I believe so.
Q Can you tell me?
A I will start with Ahmed. Ahmed was my former partner at Wayfarer Entertainment, which was a small production company that I had started years ago, and he's an independent producer now. But I didn't feel like I could have started Wayfarer without his help with Wayfarer Entertainment so I gave him a small piece of my own equity.
Jamey Heath took a low salary compared, probably, to a lot of other folks and has lived and breathed the company. And Steve and I felt he deserved a small piece of equity.
And I'm still unsure if Tera Hanks officially has any or that any was promised. But when she joined, I think it was discussed. But I don't have a full memory of it.
Q Would you say it's accurate that you and Steve Sarowitz co-founded Wayfarer Studios?
A Yeah, I think so.
Q When did that happen?
A I believe officially, it was around the

Page 43

time of the pandemic, so early 2020. But I know it was starting to happen, like there were conversations in 2019. I just don't know the exact, like, date the papers were signed or things like that.
Q And how did that come about?
A The starting of Wayfarer Studios?
Q Uh-huh.
A I had always wanted to have the means to create movies that I thought could make a difference and help people. And Steve had a very similar world view, and he wanted to make movies that could help people too. So we started Wayfarer.
Q How did you come to know Steve Sarowitz?
A I first met Steve when he was making a film called The Gate. It was a story of the Bab, who was a central figure in the Baha'i faith. And we were introduced because he said he didn't know what he was doing and he needed some guidance. And so I helped him out and we became friends. And we have a shared faith.
Q Do you know approximately when this was that you were introduced to him?
A I don't. I feel like maybe 2016 or 2017.
Q Would you say there's a common thesis or

Page 44

mission at Wayfarer Studios behind the types of projects that you take on?
A That's something we aspire to.
Q What is it?
A To make movies that make people feel. Films that can help people heal. We can bring people together, help people recognize their shared humanity.
Q How many films has Wayfarer made?
A I'm going to fail this test. Does that include films that we didn't make that we invested in?
Q Yes. And why don't you explain to me which are which.
A Our business model is a little fluid in that we will finance and make films, and also we will join other films that are being made and then finance them, or be minority partners in films if they need, like finishing funds. I don't know. This is my answer, unfortunately.
Q Sticking with the number of films that Wayfarer has financed and made itself, can you give me a rough number or list any of them?
A Financed and made. I feel like we're in the -- again, I -- I can't be held to this because,

Page 45

like, I'm going to guess in the 15 number.
Q And then in terms of films that Wayfarer has invested in or provided finishing funds for, can you give me a rough number or name any of them?
A Garfield, Angry Birds. There are -- there are a few others that I just can't -- I apologize, I can't think of the names right now.
Q In terms of the 15 or so films that Wayfarer has financed and made itself, can you give me any names?
A Sure. Clouds -- and these also aren't just us alone. We had partners in a lot of these. Clouds, Nice Indian Boy, Code Three, The Senior, Empire Waist, Black is Beautiful, I think it's called Blackballed, Eleanor the Great, It Ends with Us. I forget the name but it was about -- it's a film about the effects of the illegalization of marijuana, but I don't remember the name. That's what I got right now.
Q Five Feet Apart?
A That was not Wayfarer Studios.
Q Who did that film?
A CBS Films, but Wayfarer Entertainment got a production credit, but there was no financing.
Q Is Wayfarer Studios profitable?

CONFIDENTIAL

Page 46

A I don't know. And I don't know how I -- we would quantify that. I don't believe so.
Q Are you the co-chairman of Wayfarer Studios?
A I am.
Q Do you hold any other titles with respect to Wayfarer Studios?
A I do not.
Q And what are your responsibilities as co-chairman of Wayfarer Studios?
A Mostly thinking of the future direction of where I would like to see the company going. I assist with creative. That's -- that's pretty much it.
Q Do you have any responsibilities with respect to the financials of Wayfarer Studios?
A No.
Q Do you have any responsibilities with respect to the day-to-day operation of Wayfarer Studios?
A No.
Q Would you say that Sarowitz is the money guy and you're the creative force behind Wayfarer Studios?
A Sarowitz is quite creative, but I think

Page 47

that would be a fair observation or summary of how the relationship started.
Q Has that changed over time?
A Somewhat, I believe. Steve's gotten much more involved in the creative, and I think that's -- yeah.
Q Do you have any responsibilities for Wayfarer's contractual relationships?
A No.
Q Do you ever review contracts before Wayfarer assigns them?
A No.
Q Do you have to approve any of the contracts that Wayfarer enters into before they're entered into?
A No.
Q Do you always star in the films that Wayfarer produces?
A No.
Q How many of them have you starred in?
A One.
Q It Ends with Us?
A Yes.
Q Do you always direct the films that Wayfarer produces?

Page 48

A No.
Q How many have you directed?
A Two.
Q Which ones?
A Clouds and It Ends with Us.
Q How long were you a working actor before you founded Wayfarer Studios?
A I've been a working actor for -- well, I didn't work this year. But if we include this year, 20, 21 years. And this is embarrassing math. 2019, five, six, so 15 years or so.
Q You've mentioned a shared faith with Steve Sarowitz. What faith is that?
A The Baha'i faith.
Q How did you come to the Baha'i faith?
A I was born into the Baha'i faith. And then at 15, as is customary for all Baha'i's, I was given the choice to decide if I felt I was a Baha'i. We believe in the independent investigation of truth. So the idea that we don't just become something because our parents are. So at 15, I decided that I was a Baha'i.
Q Do you think the tenets of that faith influence the mission or thesis behind Wayfarer Studios?

Page 49

A I believe so, yeah.
Q How so?
A As Baha'i's, we're told that our work should be a form of service. And so I've always operated with the belief that whatever it is that I do, whether it's in entertainment or anything else, I wanted to find a way for it to be of service. And with Wayfarer Studios, we just wanted to apply some of those same tenets to the studio. The idea that we can create things that elevate consciousness in some abstract way, but without being preachy. And with very universal themes, like the elimination of prejudice, the belief in equality, the telling of stories that maybe don't always get told because Hollywood doesn't maybe feel that they are worth telling.
So in that sense, I believe that our faith has influenced.
Q Over the course of your career or otherwise, have you ever received or been through any media training?
A I went through some media training on Five Feet Apart. I'm not sure if I did any media training for It Ends with Us. I don't believe I did.

Q Other than when you went through media training in relation to Five Feet Apart, can you think of any other times where you've received or been through any media training?
A As I sit here right now, I can't.
Q Over the course of your career or otherwise, have you had any formal acting training?
A Like acting classes? Yes. Yes.
Q How about directing?
A No.
Q Over the course of your career or otherwise at any time, have you ever received or been through any sort of leadership training?
A I think I've had coaching, but I can't think of any formal training.
Q Can you describe for me that coaching?
A I can't remember much about it, unfortunately.
Q Do you know about when that was?
A In my 20s. My late 20s maybe.
Q And other than this leadership coaching, have you ever been to any leadership seminars or programs?
A Like as an attendee?
Q Yes.



A I can't think of any right now.
Q In any other role than an attendee?
A I started speaking in my 30s, and I don't know if I ever spoke at one or not.
Q Do you know a gentleman by the name of Labid Aziz?
A Yes.
Q Who is he?
A Labid?
Q Yes.
A was the original COO of Wayfarer Studios.
Q And when did he cease operating in that role?
A I think about a year into his role.
Q Was he a good COO?
A I'm not sure I'm qualified to judge what a good COO is.
Q Did you ever have any concerns personally with him in his role as COO?
A I did.
Q What were those concerns?
A I felt he would often promise things in dealmaking that weren't possible. He was a bit of a wheeler and a dealer, and there were certain



instances where I did not feel he was telling the truth.
Q Can you identify any of those incidents for me?
A I just remember getting phone calls saying, like, Labid said this or Labid promised this and being very confused because that wasn't something that he could be promising. It was important to me that we were always honest and that we didn't enter into deals with people and make promises that we couldn't keep. And I didn't always feel that that integrity was -- was -- didn't always feel he operated with that -- that integrity.
Q Can you give me any specific examples?
A The one I can think of right now is my dad is also in the entertainment business. He was one of the founding fathers of what is called product placement. And I always wanted to work with my dad, and it's a sweet relationship. But I remember my dad told me that he had promised Labid -- or Labid had promised him that he could build out an entire product placement division of Wayfarer Studios and that he would put him on a salary. And -- and I think he got my dad's hopes up, which my dad, you know, was 70, and that wasn't ever part



of the plan. And I didn't like that he was promising things to even my own family. And yet, I believed that he thought that he could maybe do those things. But there -- the proper protocol was not followed of, like, do we want to build a division. So I didn't feel like that was honest. That's what I can think of right now.
Q Other than that, can you think of any other specific examples?
A I can't.
Q Okay. I think now is probably a good time for a break, if you would like one.
THE WITNESS: I have to pee so that's great.
MS. SHAPIRO: I just want to put on record -- I should have done this before -- that we're designating the entire deposition confidential pursuant to the protective order.
MS. SHAH: Understood.
MS. SHAPIRO: Thank you.
THE VIDEOGRAPHER: We are going off the record. The time is 10:21 a.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record. The time is 10:49 a.m.

BY MS. SHAH:
Q I want to come back to the -- your use of Signal.
A Uh-huh.
Q I think you testified earlier this morning that you had never used Signal before Blake's complaint was filed in December of 2024.
Am I getting that correct?
A I had the app, but I wasn't a participant, like, doing anything on the app.
Q Do you recall when you downloaded the app?
A I recall two different times that I had downloaded the app. The first time I ever heard of Signal was from Stephanie Jones. And I don't know how long ago that was. I feel like that was -- I close my eyes sometimes because I visualize so I understand where I am. I believe it was in 20 -- I think it was around 2020.
She had told me that was her preferred method of communication, but we never communicated on Signal. And then -- and then I think your phone just gets rid of it when you don't use it. And then I downloaded it again. I joined a men's group and they had their group on Signal. But then I was



unable to join officially the men's group so I never joined that group on Signal. And then so it was just kind of an app that was there.
And then I downloaded it probably the day after or two days after the New York Times article and the lawsuit.
Q When you downloaded it a day or two after the New York Times article and the lawsuit, why did you do that?
A I believe it was a group decision to move all of our chats to Signal.
Q Who was in that group that made that group decision?
A My attorneys. I believe all the defendants here.
Q Melissa Nathan?
A Yes.
Q Jen Abel?
A Yes.
Q Jamey Heath?
A Yes.
Q Steve Sarowitz?
A I think he eventually joined, yes.
Q But not at first?
A Steve is always in his own world.



Q Jed Wallace?
A Yes. Yes. Eventually, yes.
Q But not at first?
A I -- I had never met Jed so I don't know if he was originally on there. At the time --
Q You knew who he was?
A I knew who he was. I had heard the name Jed, but I knew who -- I learned who he was around the time of the lawsuit, yeah.
Q What do you mean you learned who he was --
MS. SHAPIRO: Just --
BY MS. SHAH:
Q -- around the time of the lawsuit?
MS. SHAPIRO: Mr. Baldoni, don't reveal any information that you learned from your attorneys.
THE WITNESS: I learned his last name and that he was being sued. And that's when we met.
BY MS. SHAH:
Q When you say that's when you met, what do you mean?
A That's the first time we ever met.
Q In person?
A No, we never met in person.



Q So when you say that's the first time you ever met, do you mean that's the first time you were ever on a direct communication with him?
A Yeah.
Q Prior to that point in time, do you recall being on any communications, whether phone call, in-person meeting, Signal, text, email or any other form of communication where Jed Wallace was also a participant that you were on?
A No.
Q Before that time, do you recall ever hearing his name before?
MS. SHAPIRO: Objection.
MS. SHAH: Whether orally, on a phone call, in a text message, in an email, or through any other form of communication?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MS. SHAH:
Q When?
A I believe around the time that I -- no. After -- after I met Melissa Nathan.
Q Melissa Nathan introduced you to Jed Wallace; is that right?
A I have -- I was never introduced to

CONFIDENTIAL

Page 58

Jed Wallace.
Q Melissa Nathan is the first person who ever mentioned the name Jed Wallace to you; is that right?
A No. I don't believe so.
Q Who is?
A I think it was Jamey. I think Jamey, yes.
Q What do you recall about that instance where Jamey first mentioned the name Jed Wallace to you?
A I recall -- I recall a brief conversation around Melissa's employees. And it was around that same conversation I -- I think I heard the name Breanna and Jed. Like they were part of a team or something.
Q Was it your understanding around the time of that conversation that Jed was one of Melissa's employees or associated with Melissa's work?
MR. GLOVER: Objection. Form.
THE WITNESS: I don't think I had an understanding. I think I wasn't thinking about anything like that.
BY MS. SHAH:
Q Why were you not thinking about anything

Page 59

like that?
A I wasn't thinking about who was an employee or an associate. It was just this is a team.
Q And it was your understanding around the time of that conversation that as part of the team that was being brought on to help you with crisis comms, Jed Wallace would be part of that team, right?
A Yes.
Q And you gained that understanding, at least at first, from Jamey Heath; is that right?
A I believe so, yes.
Q And your understanding around the time of that conversation was that Jed Wallace was going to come on as part of the crisis communications team to handle the social and digital side of things, right?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I'm not sure I was aware of that. I just was hiring crisis PR.
BY MS. SHAH:
Q And you had no awareness or understanding of what Jed did or was to do for you in the realm of crisis PR?

Page 60

A I still don't think I know what Jed does.
Q Why do you say that?
A I like to think of myself as someone who is tech savvy or who understands the Internet. But I'm -- I don't. I guess I still don't think I really have ever grasped what he does.
Q And that's because what he does with respect to the Internet is highly technical and complicated, right?
MR. GLOVER: Objection. Form.
THE WITNESS: Maybe.
BY MS. SHAH:
Q What is it that you don't grasp about what he does with the Internet?
A I know him to be someone that sends a lot of reports. Like a lot of reports. So...
Q What kind of reports?
A Like somebody who spends a lot of time on the Internet Googling and looking up anything that is involved with this case or my name. And then presenting those reports and saying, this is what's happening.
Q What's so complicated about that?
MS. SHAPIRO: Objection.
THE WITNESS: Well, I don't know if

Page 61

that's what his job is. I just -- that's what I don't understand.
BY MS. SHAH:
Q How many -- how many of those such reports has he ever sent to you?
MS. SHAPIRO: Objection.
THE WITNESS: I think that's privileged.
BY MS. SHAH:
Q Did he always ever send those reports to you at the same time as he sent them to your attorneys?
A I've never gotten an individual report, no.
Q So why do you know him as someone who sends reports?
MS. SHAPIRO: Instruct you not to --
THE WITNESS: Yeah, I can't answer that.
MS. SHAPIRO: -- answer to the extent that the answer comes from communications with your attorneys.
BY MS. SHAH:
Q Did you come to the understanding that Jed Wallace sends these such reports before Blake's lawsuit was filed on December 20th?
A No.

CONFIDENTIAL

Page 62

Q You had hired Jed Wallace to be part of your crisis comms team in August of 2024?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: I didn't hire Jed Wallace.
MS. SHAH: Who did?
MS. SHAPIRO: Objection.
THE WITNESS: I assume --
MS. SHAPIRO: Don't -- don't assume anything.
THE WITNESS: Wayfarer.
BY MS. SHAH:
Q You understood Jed Wallace to be working, at least in part, on your behalf with Melissa Nathan's team during this crisis period in August of 2024, right?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I don't know if I understood that.
BY MS. SHAH:
Q What did you understand him to be doing in that time period?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know. Whatever

Page 63

Melissa was doing.
BY MS. SHAH:
Q Did you have attorneys involved in that time period?
A No.
MS. SHAPIRO: Objection. Form.
BY MS. SHAH:
Q When did you first get attorneys involved?
A December 21st or 22nd.
Q Did you have any understanding from August of 2024 to December that Jed was creating any such reports for you?
MR. GLOVER: Objection. Form.
THE WITNESS: No.
BY MS. SHAH:
Q You only learned that after the lawsuits were filed in December of 2024?
A Yeah.
Q When you learned that Jed was creating such reports in December of 2024, was it your understanding that he had only just started creating those reports after the lawsuit was filed or that he had been creating them earlier?
MS. SHAPIRO: Objection.

Page 64

MR. GLOVER: Objection. Form.
MS. SHAPIRO: And I direct you not to answer to the extent any information you have only comes from your attorneys.
THE WITNESS: I don't know.
BY MS. SHAH:
Q You don't know one way or another whether Jed only started creating these reports in December of 2024 or whether he had been creating them earlier?
MR. GLOVER: Objection.
MS. SHAPIRO: Objection. And, again, don't reveal any privileged communications of anything you learned from your lawyers.
THE WITNESS: I genuinely don't know.
BY MS. SHAH:
Q You mentioned earlier that when you started using Signal to communicate after the lawsuits were filed, it was a group decision that involved a number of people and your attorneys?
A Yes.
Q Which attorneys?
THE WITNESS: Am I allowed to answer attorneys?
MS. SHAPIRO: Yeah, no, I'm going to

Page 65

direct you not to answer that question.
MS. SHAH: You're going to direct him not to give me the names of which attorneys were involved in the Signal chats?
MS. SHAPIRO: That's not what you asked. You were asking him about his discussions with his attorneys about using Signal.
BY MS. SHAH:
Q Who were the attorneys that were involved in the Signal chats?
MS. SHAPIRO: You can answer the names.
THE WITNESS: Bryan Freedman.
You can totally get it. It's okay.
Bryan, Summer, Mitra, Jason, Teresa.
Alexandria and Jonathan weren't on the team. Yeah.
BY MS. SHAH:
Q Whose idea was it to move your communications to Signal?
A I don't remember.
Q Was it yours?
A I don't know.
Q Is it possible that it was your idea?
MS. SHAPIRO: Objection.
THE WITNESS: Yeah.

CONFIDENTIAL

Page 66

BY MS. SHAH:
Q Did you understand the purpose of moving these communications to Signal to be that the messages would disappear?
A I understood that to be part of it, yeah.
Q What was the other part of it?
A Getting hacked.
Q You had concerns about your phones being hacked?
A Yeah.
Q Okay.
A Privacy.
Q In the time starting when the lawsuits were filed in December 2024 that you began using Signal with this group of people that you've described, in every single message that you sent or received was there at least one attorney present on that message thread?
MS. SHAPIRO: Objection. Form.
THE WITNESS: I'm sorry. Can you -- it was a long question.
BY MS. SHAH:
Q Since you began using Signal from the time these lawsuits were filed, was there an attorney present on every single message that you

Page 67

sent or received?
A Was an attorney present in every message I sent -- no, because I had -- there were friends that reached out to me on Signal too.
Q Which friends?
A That friend, still trying to get me.
THE WITNESS: Is your son okay?
THE STENOGRAPHIC REPORTER: Sorry. Yeah, he's fine. Just need to -- these are brand new iPads. I apologize.
MS. SHAH: It's all right. Let us know if you want to take a break.
THE STENOGRAPHIC REPORTER: Okay.
MS. SHAPIRO: What was the question?
BY MS. SHAH:
Q Which friends?
A Which friends texted me on Signal?
Q Uh-huh.
A I remember my friend Brett texted me, my friend John. I wasn't responding to very many texts during that time. Ahmed.
THE STENOGRAPHIC REPORTER: Sorry, Ahmed?
THE WITNESS: Ahmed, sorry. I lost my voice this weekend.
THE STENOGRAPHIC REPORTER: That's okay.

Page 68

THE WITNESS: Those are the three I can think about that are not in this lawsuit right now, of friends specific to your question.
BY MS. SHAH:
Q Anyone else?
A Mitz from Wayfarer. And can you repeat the question one more time? I just want to...
Q Who can you recall, whether friends or otherwise, who texted you on Signal that was not part of your defendants and attorneys group?
A That's what I can think of right now. If more come to me later, I will share. But they were not -- when friends texted me, it was not about the lawsuit. They were just texting me.
Q Were they in the habit of texting you on Signal before this?
A No.
Q So they only started texting you on Signal after the lawsuits were filed?
A Yes.
Q And they were texting to check in on how you were doing in the wake of the lawsuits being filed?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.

Page 69

BY MS. SHAH:
Q Did you respond to any of those texts?
A I'm sure I did. I had asked them to text only on Signal.
Q You had asked them to text only on Signal. Had they texted you by a non-Signal method ahead of that?
A They had called. I was really not in a good place. I didn't want to talk.
Q Do you have your cell phone on you right now?
A I don't.
Q Do you have your cell phone in the back room?
A It's in a bag somewhere probably.
Q Do you always set your Signal messages to auto delete?
A I set them to whatever the Signal auto thing is.
Q Are you aware that when message threads originate on the Signal app, they do not self-delete and you have to go in and for each method -- each message thread, if you want it to delete in a certain amount of time, you have to go in and change that setting?

CONFIDENTIAL

Page 70

MS. SHAPIRO: Objection.
THE WITNESS: I thought it was the opposite. But now I know.
BY MS. SHAH:
Q I could be mistaken.
A Yeah, I thought it was -- it starts auto delete and then you have to stop it from. But you could be right and I could be wrong.
Q Do all of your Signal message threads auto delete?
A No.
Q There are some that do not auto delete?
A I believe none of our -- if I'm allowed to say -- none of our legal threads auto delete.
Q Any of the non-legal threads that do not auto delete?
MS. SHAPIRO: Objection.
THE WITNESS: I'm sure -- yeah, I'm sure there are some.
BY MS. SHAH:
Q Have you manually deleted any Signal messages since these lawsuits were filed?
A No. No.
Q During a break in this deposition, can you look at your phone, open your Signal app, and

Page 71

see whether there are any non-legal Signal threads still present on there?
MS. SHAPIRO: I'm going to object to that. Direct you -- I'm going to object to that.
MS. SHAH: You're going to instruct him not to do that?
MS. SHAPIRO: Yes.
MS. SHAH: Okay.
BY MS. SHAH:
Q Would you be capable of doing that if not for your lawyer's instruction?
A I would hope so, with my hands and fingers and brain capacity.
Q Are you going to follow your lawyer's instruction?
A I think I probably should.
Q What do you recall texting with Mitz at Wayfarer about on Signal?
A This whole time period was -- it was crazy. So give me a second. I believe I was sending Mitz screenshots of a lot of old text messages.
Q Which old text messages?
A Things that I believed would help me in telling the truth about what actually happened.

Page 72

Q Text messages with Blake?
A No.
Q Text messages with Stephanie Jones?
A I don't believe I shared any of those with Mitz. No.
Q Text messages with Jen Abel?
A No.
Q Text messages with Melissa Nathan?
A I didn't have any text messages with Melissa Nathan.
Q Text messages with whom then?
A My memory -- text messages with my -- my health coach. Text messages with Don Saladino.
Q Who is your health coach?
A Jennifer Benson.
Q What does she generally do for you?
A She's not my current health coach.
Q What should she generally do for you when she was your health coach?
A She tried to keep me healthy.
Q How?
A Supplements, peptides, helping my immune system.
Q What about your text messages with your health coach did you believe at that time would help

Page 73

you explain the truth of what happened?
A If my memory is correct, I was being accused of many things. But one of them was, like, putting Ms. Lively on a phone call with a dietitian, which was a lie and an extreme distortion of the truth.
Q Who is Dan [sic] Saladino?
A He's a personal trainer.
Q Is he Ms. Lively's personal trainer?
A I would assume so.
Q And what about your text messages with him did you believe at the time would help you demonstrate the truth of what had happened?
A The communication between him and myself that showed that he was also working with me.
Q How many screenshots do you recall sending to Mitz?
A I wish I could tell you. I don't know.
Q More than two?
A Yeah.
Q More than five?
A Probably.
Q More than ten?
A That was a very hard time. I will say yes.

Q More than 15?
A I don't know.
Q More than 20?
A I don't know. I want to help you. I -- I genuinely don't know.
Q It's possible it was more than 20?
MS. SHAPIRO: Objection.
THE WITNESS: That feels like a lot. I don't know.
BY MS. SHAH:
Q Is it possible it was more than 50?
MS. SHAPIRO: Objection.
THE WITNESS: I would be very surprised. That's -- that's a lot.
BY MS. SHAH:
Q Does your Signal thread with Mitz auto delete?
A I -- I don't know. I don't -- I'm not sure.
Q Have you gone back since this litigation started to look at it to see if it's still there?
A No.
Q Can you do that during a break?
MS. SHAPIRO: Objection.
MS. SHAH: Are you going to instruct him



not to do that?
MS. SHAPIRO: Yes, I am.
BY MS. SHAH:
Q Are you going to follow your counsel's instruction?
A I think I am.
Q Are you capable of doing it, if not for your counsel's instruction?
A I would like to think I am.
Q Other than texts with your health coach and texts with Dan Saladino, do you recall sending to Mitz screenshots of texts involving anyone else?
A Not that I can think of.
Q Do you recall sending to Mitz texts of screenshots that had anything to do with Stephanie Jones or Jonesworks or the work that you did with Stephanie Jones or Jonesworks?
MS. SHAPIRO: Objection.
THE WITNESS: There was very little conversation about Stephanie Jones at all during this time.
BY MS. SHAH:
Q Why is that?
A Because I don't think she was top of mind.



Q You said that you had either joined or tried to join a men's group that had a Signal group chat; is that right?
A Yes.
Q What was that men's group?
A It was a group put on by a man named John Wineland. And I wasn't able to commit to the men's group and commitment is a huge part of men's work. So they had added me to the chat, but then I let him know I wasn't able to commit. So then I was not a part of it.
Q Why were you unable to commit?
A I was making a movie.
Q What movie?
A It Ends with Us.
Q You said commitment is a huge part of men's work. What do you mean by that?
A Men's work is based on agreements. And in order to feel vulnerable enough to show any parts of yourself that over the years you would be embarrassed or ashamed with, or to feel truly vulnerable so that you can do good work and be with other men in a sacred space, there are agreements that have to be made beforehand. Like, commitment to show up on time, commitment to, you know, not



miss the meetings, commitment that you're able to actually attend the in-person retreat because those agreements create safety.
Q Had you ever done men's work in the past?
A Yes.
Q How many times?
A I think -- I think it could be considered that some of my daily practice is men's work so I don't think I can give you a number.
Q Over how many years?
A My 30s.
Q What is the purpose of the men's work you do?
A If I were going to distill it, it would to attempt to be an open, kind man.
Q Do you think men need to work on that in order to become that way?
A I think every human does.
Q Then why is it called men's work and not people work?
A Because I believe -- I'm not going to -- I'm not the one who invented or created men's work, but I can give you my opinion, if that's okay.
Q Please.
A I believe that men have to do work with

CONFIDENTIAL

Page 78

men. I think that integration with men and women is, more than likely, very tricky. And I think that women do a lot of work with women. And I think that both men and women need safe spaces for healing.
Q Healing what?
A How much time do you have?
Q Give me the 35-second answer.
A Healing, what, collectively? Healing, what -- what do men and women need to heal from?
Q Sure.
A Millennia of trauma, abuse. Generations and generations of trauma that's been passed down from our families and parents and interpersonal relationship trauma. I'm assuming that was 35 seconds.
Q Do you have a practice of taking handwritten notes?
MS. SHAPIRO: Objection.
THE WITNESS: At times.
BY MS. SHAH:
Q Describe that to me.
A I -- I've always struggled in school. And sometimes when I'm listening to something, I need to write down. Sometimes it helps me remember.
Q Do you carry a notebook dedicated to your

Page 79

handwritten notes?
A Sometimes.
Q Do you carry it everywhere you go?
A No.
Q You only carry it sometimes?
A I don't have just one. I'm not -- I'm not like a journalist notetaker that always walks around with it, no.
Q Did you take handwritten notes in connection with your work on the film It Ends with Us?
A There were a few days that I did, yes.
Q Only a few days?
A Yes.
Q Did you take handwritten notes in connection with any of the publicity or other work you did with Jonesworks or Stephanie Jones or Jen Abel while she was at Jonesworks?
A No.
Q Have you brought a notebook to take handwritten notes to these depositions?
A Yes.
Q Which depositions?
A Blake Lively, and Steve Sarowitz the other day.

Page 80

Q Any others?
A No.
Q Did you take handwritten notes during those depositions?
A Yes, but for my lawyer.
Q Only for your lawyer?
A For both of us.
Q Only for you and your lawyer?
A Yeah, I don't know who else it would be for.
Q Do you still have those handwritten notes?
A I believe I do.
Q Did you take any handwritten notes in preparation for your deposition?
MS. SHAPIRO: Objection. I direct you not to answer. It's on -- it's on the record.
THE WITNESS: What is that?
MS. SHAPIRO: I direct you not to answer.
THE WITNESS: I'm directed not to answer.
MS. SHAH: Can he answer a yes-or-no question? Did he take any handwritten notes in preparation for this deposition; yes or no?
MS. SHAPIRO: Yes.
THE WITNESS: Yes.

Page 81

BY MS. SHAH:
Q How many pages?
MS. SHAPIRO: Just -- I'm going to object to this line. This is work product.
MS. SHAH: Are you instructing him not to answer?
MS. SHAPIRO: Yes, I am.
BY MS. SHAH:
Q Do you still have those handwritten notes?
MS. SHAPIRO: Objection.
THE WITNESS: They were shared with my attorney.
BY MS. SHAH:
Q So you're saying your attorney has a copy of the handwritten notes?
MS. SHAPIRO: Objection. I direct you not to answer these questions.
BY MS. SHAH:
Q My question was: Do you still have the handwritten notes; yes or no?
MS. SHAPIRO: You can answer that yes or no.
THE WITNESS: Yes.

CONFIDENTIAL

Page 82

BY MS. SHAH:
Q Okay. Do you keep a diary?
A I wish I did. God, I wish I did.
Q Is that a no?
A It's a no. I've always -- I've wanted to but I --
Q Do you have a practice of writing daily affirmations?
MS. SHAPIRO: Objection.
THE WITNESS: Sometimes, yes.
BY MS. SHAH:
Q Do you write daily affirmations?
A Currently, no.
Q Have you in the past?
A Yes.
Q Have you in the past year?
A Possibly.
Q Have you in the past three years?
A Yes.
Q Do any of those daily affirmations bear on or relate to anything having to do with your work in connection with the film It Ends with Us or any publicity work?
MS. SHAPIRO: Objection.
THE WITNESS: Not unless me saying I am

Page 83

confident and brave and strong. And I mean, if you think that, it's like those kind of affirmations, yes.
BY MS. SHAH:
Q When did you first meet Stephanie Jones?
A I don't remember the year, but 2018, 2019, 2017. It's one of those three years. I --
Q Do you remember when you first started working with Stephanie Jones or Jonesworks?
A I remember the feeling. Are you asking me do I remember the day, like, the dates or the year or --
Q Yes. Do you remember when in time?
A As I sit here, I can't remember the year or when in time.
Q Did you meet Stephanie Jones long in time before you started working with her as a publicist?
A I believe I was introduced to her and we had a phone call, but I don't know how long after that we started working together.
Q Was it years?
A After the phone call?
Q Uh-huh.
A I wish I could answer. I don't know exactly.

Page 84

Q Where were you in your career when you started working with Stephanie Jones as a publicist?
A I was on a TV show called Jane the Virgin.
Q Had you had a publicist before that?
A Yes.
Q Who was that?
A I had a few. Oh, gosh, the name Sunshine rings a bell or Sun- -- my first publicist's name was Siri, before phones. I had had a few. I -- I'm so sorry, I don't remember the names of the organizations.
Q Why did you switch to Stephanie Jones as your publicist when you began working with her?
A I heard she was amazing.
Q Who did you hear that from?
A The person who introduced us said she had a lot of really great clients.
Q And you began working with Stephanie Jones as a publicist in your personal capacity at first, right?
A Yes.
Q As an actor?
A Yes.
Q And then at sometime thereafter, she

Page 85

began working also with Wayfarer Studios; is that right?
A When Wayfarer Studios was formed, I was already a client of Stephanie Jones as an actor.
Q Uh-huh.
A And then after Wayfarer Studios was formed, then the company, I believe, started to work with the company, yeah.
Q Okay. And after Wayfarer Studios was formed, Stephanie Jones worked as a publicist, both for Wayfarer Studios and for your personal publicity moving forward, right?
A The company did, yeah.
Q The company being Jonesworks?
A Jonesworks, yeah.
Q Okay.
Did you feel, at the time when you began working with Stephanie Jones, were you happy with her work?
MS. SHAPIRO: Objection.
THE WITNESS: Can you be more specific?
BY MS. SHAH:
Q Do you feel she was supportive of your career?
A Yeah. Yeah.

Q Do you think she did good work for you as a publicist?
A Stephanie was never my personal publicist, so that's hard for me to answer. But I was happy overall with what the company was doing for me.
Q How many times over the years would you say you communicated directly with Stephanie?
A Over the years? Like --
Q From the time you started working with her to the time you ceased working with her?
A I mean, we would text. Every once in a while, we would have a phone call. She'd always reach out and congratulate me if something was worth -- if there was something going on or she would send me words of encouragement if I was going to do something or if there was press. But I can't give you an exact number.
Q Did you appreciate the words of encouragement when she sent them to you?
A I did.
Q Did she come to know your family during the time she was working with you?
A Not intimately, but yeah, she did.
Q Did you feel over the years that you were working with her before you began filming It Ends with Us, did you feel like you generally had a positive relationship with Stephanie Jones?



A Yeah.
Q Did you feel that she was generally supportive of you and your career?
A Yeah.
Q Did you feel like she and Jonesworks did good work for you as a publicist?
A I believe they did.
Q Would you agree that she took you on as a client at a relatively early stage in your career?
A I'm not sure about that one.
Q She had a lot of big name clients then, right?
A Yeah.
Q And you were relatively earlier in your career at that point than those big name clients, right?
MS. SHAPIRO: Objection.
THE WITNESS: In comparison, yes. Yeah.
BY MS. SHAH:
Q From the time you began working with Stephanie Jones up until you began filming It Ends with Us, did you ever have any issue with her?



A Can you repeat that question?
Q From the time you began working with Stephanie Jones until the time you began filming It Ends with Us --
A Uh-huh.
Q -- did you ever have any issue with Stephanie Jones?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall any issues. Like, a personal issue, is that what you mean?
BY MS. SHAH:
Q Or professional issue?
A No.
Q Did you ever have any reason to fire her?
MS. SHAPIRO: Objection.
THE WITNESS: No, I remember feeling -- I can remember feeling she didn't have much time for me. But I'm also a realist to know that I'm not The Rock or, you know, so I understood that I was a client but that she was having other people manage me and my career. So there were times when I -- there were many times where I didn't feel she had time for me and that I was just kind of there. But there was no reason to fire her, no, not at all.



BY MS. SHAH:
Q During the times when you felt she didn't personally have time for you, were there other publicists at Jonesworks that did respond on the day to day for your issues?
A Oh, always. Yeah.
Q At some point in time, the publicist who was most responsible for the day to day on your and Wayfarer's account at Jonesworks was Jen Abel; is that right?
A Yes.
Q Did you work very closely with Jen Abel over that time?
A I did.
Q Okay. In the times -- during the time that Jonesworks was your publicist, before the filming of It Ends with Us, did they ever help handle any controversies for you or Wayfarer?
A Any controversies? Would you help me with controversies?
Q Anything you would consider to be a crisis?
A Nothing that -- nothing that became public. But if there was ever something that I felt, like, anxious about, yes.

CONFIDENTIAL

Page 90

Q Does that include when you were sued in connection with Five Feet Apart?
A Yes.
Q Did you consider that to be a crisis?
A I felt like it was a crisis. Yeah.
Q Did Stephanie Jones help you in connection with that crisis?
A There was no PR. It wasn't like a big public thing. But I definitely remember calling her and Jen about it. Yeah.
Q Did she recommend a lawyer to you for that lawsuit?
A I don't remember. She might have.
Q Were there times over the course of your relationship with Stephanie, between when you first hired her and when you began filming It Ends with Us, that you would request a phone call directly with her to deal with an issue?
A I don't think I ever had to request. I think I would just call her. Like it wasn't, like, a formal process. I would just call her.
Q Okay. And would she be responsive?
A Yeah. She would always call me back if she didn't answer then.
Q Do you recall ever making a comment to

Page 91

her that you'd never gotten her voicemail?
A I remember oftentimes telling Stephanie that she needed to take a break because she was always on. And joking with her, like, you got kids and, like, you can only imagine the phone calls and all the people that were -- she was getting. So I could imagine that I made that comment.
Q Do you recall a time when you introduced her to Colleen Hoover?
A I think I do, actually.
Q What do you recall about that?
A I didn't until you just brought it up. But I recall -- I recall learning that Colleen Hoover had done, like, nail polish or something for the book. And I couldn't believe it. And I believe she was getting backlash. Which ultimately was terrible for the project we were developing, this movie. And I remember asking Colleen if she had anybody that was helping her make decisions, like, and she said no. I said, "I think you need a publicist." And so I introduced her to Stephanie Jones.
Q Because you believed that Stephanie Jones could help her with the publicity issues she was experiencing?

Page 92

A I believed that Stephanie could help her in general. I think that to be in the situation that Colleen was in and to not have any support or anyone telling you, like, maybe that's not a good idea, I thought Stephanie could help.
Q And you trusted Stephanie at that time to help, right?
A Yeah.
Q Do you recall introducing her to Colleen by saying "this is my friend, Stephanie Jones"?
A I'm sure I did. I considered her a friend.
Q Do you recall telling Colleen that Stephanie was a master publicist?
A I don't. But I could see myself saying that, yeah.
Q Would that have been accurate in terms of your view at the time? Did you think Stephanie was a master publicist?
A Yeah.
Q Do you recall a time when you learned that Business Insider was planning to publish a negative story about Stephanie Jones?
A Yes.
Q When did you learn that?

Page 93

A The, like, year or month or?
Q As specific as you can give me.
A I know who I learned it from.
Q Who was that?
A Stephanie Jones.
Q What did she tell you?
A She told me -- I don't remember the exact words. But she was very upset. And she was -- she FaceTime'd me crying. And she said that they're, like, trying to ruin her life or something. She was very emotional. I don't remember exact words.
Q Did you feel for her in that situation?
MS. SHAPIRO: Objection.
THE WITNESS: I did. It was very complicated.
BY MS. SHAH:
Q Why was it complicated?
A Because she was my publicist. And I was struggling during that period myself. I didn't have a lot of emotional bandwidth. And we -- while I considered her a friend, I think there are different levels of friendship. And that conversation, it felt -- it felt like I might have not been the best person for her to be FaceTiming with these feelings.
Q Why?

CONFIDENTIAL

Page 94

A Because I was her client. She was meant to be my publicist. And it was -- it was the kind of call you might have with a therapist.
Q Did you offer to write her a letter of support to the Business Insider reporter?
A After she asked me to, I did.
Q And did you, in fact, do that?
A I did.
MS. SHAH: I would like to hand you a document. We're going to mark this as Exhibit 1, please.
(Exhibit 1 marked for identification.)
BY MS. SHAH:
Q For the record, this is a text thread between you and Stephanie Jones dated July 3rd, 2024. It bears the Bates stamp of JONESWORKS_JB_, several zeroes, 1434.
Do you see this?
A Uh-huh.
Q Do you recall this text thread exchanged between you and Stephanie Jones?
A Vaguely. But yes.
Q And you write up at the top. She asks you if you would be open to writing a sentence or two for Business Insider about her and Jonesworks.

Page 95

And you respond:
(As read):
"Hi Steph, I'm so sorry you're going through this. I'd be happy to."
Do you see that?
A I do.
Q Were you happy to?
A Being completely honest, I don't know if I was actually happy to. I think that was what you say, like, I'd be happy to.
Q But you were willing to?
A Absolutely.
Q And she goes on to describe the types of things that might be appearing in the Business Insider story and the things that the reporters were saying when they were calling her clients.
Do you see that?
A Is this paragraph two?
Q Paragraph two through the end of the page.
A Okay.
Q And do you say -- see at the bottom where she writes:
(As read):

Page 96

"Also they wouldn't say a man was 'aggressive' or 'tough' or 'intense.' Those are the words they're using when they call clients."
Do you see that?
A I do see that.
Q Flip the page for me. You write:
(As read):
"I'm sorry you're going through this. Of course not; it's gendered."
Do you see that?
A I do.
Q What did you mean by "it's gendered"?
A I was just -- again, I don't remember exactly what I was feeling in that -- this moment. I know I was -- I do remember feeling again, like, this to me, it made me uncomfortable. I didn't want to tell her that because she was going through so much. It was interesting to be asked by your publicist, whose job it is to handle public relations, to make a public statement for your publicist. So I -- I know I felt uncomfortable.
And from what I'm reading, she says "they wouldn't say a man was aggressive or tough or intense". So I think I was agreeing with her.

Page 97

Trying to make her feel seen by saying "of course not; it's gendered."
So I was under the assumption that what she was saying was that the words we use to describe men are not used in the same way to describe women. So that's, I'm assuming, what I meant when I said "it's gendered."
Q And that the words being used to describe women, like those that she wrote here, are used negatively; whereas, they would not be used negatively as against male professionals. Is that what you understand she was saying?
MS. SHAPIRO: Objection. Objection.
THE WITNESS: I believe that's what she was saying. I'm just not sure I fully agree. But I believe that's what she was saying.
BY MS. SHAH:
Q Do you not agree with that?
MS. SHAPIRO: Objection.
THE WITNESS: I think that a man being called aggressive, tough or intense would also be considered a negative statement.
BY MS. SHAH:
Q Do you think that the press would write articles about a male CEO being aggressive or

CONFIDENTIAL

Page 98

intense or tough --
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q -- the same way they would about a female CEO?
MS. SHAPIRO: Objection.
THE WITNESS: I don't believe we can make an absolute statement like that because I've definitely read things where press would say a man was aggressive or tough or intense in a negative way.
BY MS. SHAH:
Q Do you believe that the press is more apt to write negative articles about a female CEO being aggressive or tough than they are about a male CEO being aggressive or tough?
MS. SHAPIRO: Objection.
THE WITNESS: I want to help you here, I just don't know if we want to debate about gender because I'm not an expert in, like, how many articles are written from a male or female perspective. I know that I have seen many articles putting down male leaders by using aggressive or tough or intense. And I also know that there are much more male CEOs than female CEOs. So, again,

Page 99

I'm not a gender studies major so I couldn't give you -- but what I can say is that oftentimes when a woman is -- we'll say tough, that I think maybe people aren't as used to it. Because oftentimes, men have been in positions of power.
I don't know if that's helpful to you at all.
BY MS. SHAH:
Q Are we debating whether or not the press is more apt to write negative articles about a female CEO being aggressive or tough than they are to write articles about male CEOs being aggressive or tough?
MS. SHAPIRO: Objection.
THE WITNESS: I think I've forgotten what we're debating, to be honest with you.
BY MS. SHAH:
Q Do you think we're debating anything?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not even sure what your original question was.
BY MS. SHAH:
Q You used the word "gendered." What do you mean by that?
A You mean what did I mean when I wrote it?

Page 100

Q What do you understand the word "gendered" to mean generally?
A Something that would be encapsulated by one's gender. Maybe a behavior that is used in one way for one gender and another way for another.
Q Is that what you meant when you used it here?
A When I used it here, I was agreeing with Stephanie Jones because she was -- it appears to me that she was needing to vent and share that they are calling her aggressive or tough or intense. And she says here they wouldn't say a man was aggressive or tough or intense. So I am -- I'm just trying to make her feel better. Again, I can't remember exactly what I was feeling. But it looks to me like I'm saying, yeah, of course not; it's gendered.
Q Did you find her to be aggressive or tough or intense?
A There were times I called her mama bear because of her aggression. Which I said endearingly. But I didn't know -- I didn't know the Stephanie that she was inferring people or accusing her to be.
Q You had not experienced these kind of things from her yourself?

Page 101

MS. SHAPIRO: Objection. Objection.
THE WITNESS: No, I hadn't.
BY MS. SHAH:
Q Did you read the Business Insider article?
A No.
Q You never read it?
A No.
Q You don't have a view one way or another as to whether it was fair or unfair?
A I never read it, so I couldn't.
Q Okay.
MS. SHAH: I'm going to hand you another document.
THE STENOGRAPHIC REPORTER: I will take that.
MS. SHAPIRO: What was the exhibit number?
MS. SHAH: This is Exhibit 2. The one you have is Exhibit 1.
MS. SHAPIRO: Okay.
MS. SHAH: This is going to be Exhibit 2. So we're going to mark for the record Exhibit 2.
(Exhibit 2 marked for identification.)
THE WITNESS: Thanks.

BY MS. SHAH:
Q Which is a document -- it's a text thread between you and Jamey Heath and Jennifer Abel dated July 3rd, 2024 marked with a Bates stamp Jonesworks_, several zeroes, 15478.
Do you see that?
A Uh-huh.
Q This is the same date as the text thread that we were just looking at in Exhibit 1.
A Uh-huh.
Q Do you recall this text thread?
A Yes, I do.
Q And in this text thread, you were working through with Jen Abel and Jamey Heath the content of the statement you are going to provide to Business Insider in support of Stephanie; is that right?
A Can I refresh my memory for a second and just read it?
Q Please, review it.
MR. FREEDMAN: Please read the entire document.
THE WITNESS: Thank you.
BY MS. SHAH:
Q Turn for me to the page that ends in the Bates stamp 15480, please.



You will see a text from you at the top. It's marked 8:10 p.m, where you say:
(As read):
"How's this Jamey? I made it a little more me -- is this too much?"
And then you draft or paste a draft statement below. Do you see that?
A Uh-huh.
Q Okay. In that statement, you write:
(As read):
"Stephanie has always been an exceptional publicist and member of my brain trust not just for me personally, but also for my company, Wayfarer Studios."
Do you see that?
A Uh-huh.
Q Was that an accurate statement at the time you wrote it?
A Yeah. I think it's a -- to be truly fair, it's a bit of an exaggeration. But still true.
Q Are you in the habit of providing press with statements that are exaggerated?
MS. SHAPIRO: Objection.



THE WITNESS: I would not call it a habit. I was just helping a friend.
BY MS. SHAH:
Q To help yourself or a friend, do you think you would provide the press with statements that were exaggerated from the truth?
MS. SHAPIRO: Objection.
THE WITNESS: I don't think I've provided any statements of, like, myself. This was a very rare thing for me.
BY MS. SHAH:
Q In this case, did you provide the press a statement that was exaggerated from the truth?
A Brain trust, looking back, feels -- no, I would say that that's okay, actually.
Q Do you --
A Because I did call on her from time to time. So I would say that this is -- I think it's fine.
Q Do you think it's accurate?
A At the time, I do think it's accurate.
Q Okay.
A Yeah.
Q Then you go on to say:
(As read):



"She is an incredibly hard worker, and she finds a way to be available at all hours of the day, and has gone above and beyond to ensure the success of not just me but my company."
Do you see that?
A I do.
Q Was that a true statement at the time?
A I believe so.
Q Okay. Then you write:
(As read):
"She has built an amazing team who I also work very closely with, and I have never had a moment of hesitation in trusting her."
Do you see that?
A Yes.
Q Was that a true statement at the time?
A It was.
Q And then you go on to write:
(As read):
"Her advice and guidance has always been spot on. I have never personally witnessed her mistreat anyone and on the contrary she has always treated me

CONFIDENTIAL

Page 106

and my team with the utmost respect;
like family."
Do you see that?
A I do.
Q Was that an accurate statement at the time?
A It was.
Q And this in sum and substance is similar to the statement that you ultimately did provide to Katie Warren, who was a reporter at Business Insider, right?
A I would assume so.
MS. SHAH: Okay.
Can you pull tab 33, please?
(Exhibit 3 marked for identification.)
THE WITNESS: Are we done with this one?
MS. SHAH: Yes.
THE WITNESS: You got it.
BY MS. SHAH:
Q This is going to be marked as Exhibit 3. It's an email from you -- sorry. From you to Katie Warren and then from Katie Warren to you --
A Uh-huh.
Q -- dated July 3rd, 2024 and July 4th, 2024, that bears the Bates stamp JONESWORKS_JB_,

Page 107

several zeroes, 651.
Do you see that?
A Uh-huh.
Q Do you remember sending this email to Katie Warren?
A I believe I do.
Q Do you remember her email back to you?
A I believe I do.
Q All right. And if you read the statement that you sent to Katie Warren, is there anything untrue in this statement?
A Do you mind if I just read it?
Q Please do.
Anything untrue in that statement?
A No.
Q Okay. And then Katie Warren responds: (As read):
"Thank you so much for sending this.
Are you free for a quick call sometime
today or tomorrow?"
Do you see that?
A I do.
Q Did you ever have a call with Katie Warren?
A I did not.

Page 108

Q Did you ever respond to this email?
A I did not.
Q Okay. Did you ever -- other than the text thread that we looked at a moment ago in Exhibit 2 between you and Jen Abel and Jamey Heath, did you ever have a phone conversation with Jen Abel about the topic of the Business Insider story?
A I believe I did.
Q More than one?
A I don't think so.
Q What do you recall about that phone conversation?
A I believe Jamey Heath was on the call too. I don't think there was ever a one-on-one call.
Q Okay. What do you recall about that conversation?
A I recall telling them both I felt uncomfortable being asked to email a reporter directly when I was in the middle of -- I was going through a lot. And I remember Jamey being also effusive about -- and -- and saying that -- and agreeing that we should. I wanted to, but I just wasn't -- it was just an uncomfortable position to be in because she was my publicist and she was

Page 109

asking me to make a statement for her. And I just remember feeling weird about it.
I remember Jen saying how much it would mean to Stephanie if I did it. And also, I remember Jen kind of acting more like a publicist in the situation and saying, and yet, if you're not comfortable, you don't have to, but she would really much -- she would really appreciate it if you did.
So Jen was kind of serving as -- as like the -- as my publicist in that moment because Stephanie, in that moment, was kind of reaching out outside of a publicist, more, like, hey, I'm in crisis; I need help.
And then ultimately, I decided to do it for her.
Q So you expressed to Jen Abel that this made you a little bit uncomfortable?
A Jamey Heath and Jen Abel -- Jen Abel. Yeah.
Q But you never expressed that directly to Stephanie Jones, did you?
A No, I didn't.
Q And Jen Abel told you on the call, if you don't want to do this, you don't have to, in sum or substance, right?

A No, she said only do what you're comfortable with, basically. Again, I don't remember the exact words, but she was leaning more towards, it would be really helpful for Stephanie. And also, I think she understood that somebody needed to say to me, like, don't feel pressured. Like, there's other people also giving statements.
Q You understood that there were other clients giving statements in support of Stephanie Jones for that article?
A Stephanie texted me that others were.
Q Okay. Did your statement ultimately appear in the Business Insider article?
A I -- as I said, I never read it. I don't know.
Q Did there come a time when Jen Abel suggested to you or Jamey Heath that you should withdraw your statement from Katie Warren?
A Not that I recall.
Q You were never told that there came a time where Jen Abel suggested to Jamey Heath that you should pull back the statement that you sent to Katie Warren?
A I have no memory of that.
Q Is that something that you would have



expected Jamey Heath to tell you at the time?
MS. SHAPIRO: Objection.
THE WITNESS: If that happened, I would assumed he would.
BY MS. SHAH:
Q But you have no memory of ever being told that?
A No, almost the opposite.
Q Do you know if a decision was ever made by Jamey Heath to keep the statement or to withdraw it?
MS. SHAPIRO: Objection.
THE WITNESS: No, I sent the statement, so I assumed it ended up in the article or it didn't. I don't know.
BY MS. SHAH:
Q Okay. If Jen Abel thought at any point in time that maybe you should withdraw the statement that you sent, would you have expected her to raise that directly with you?
MS. SHAPIRO: Objection.
THE WITNESS: Thinking about that period, no. Jamey was -- Jamey was handling a lot of conversations. I was -- I was -- I think I was finishing -- I don't remember what month this was,



but I imagine I was finishing or working on the movie, and I oftentimes didn't want to be a part of most conversations.
BY MS. SHAH:
Q Did you generally defer to Jamey Heath to make decisions like this?
A Yes.
Q Did you generally defer to him --
A I'm sorry. I need to go back.
Decisions like what?
Q For example, like whether or not you should pull a statement in support of Stephanie Jones that you had already sent to a reporter?
MS. SHAPIRO: Objection.
THE WITNESS: Like I said, I wasn't aware of any -- of that. I wasn't aware that I was ever going to pull a statement.
BY MS. SHAH:
Q Okay. Did you generally defer to Jamey Heath to make decisions around an interface with publicity matters with your publicity team?
A Yeah. Yes.
Q Okay. In the period around July, August, September of 2024 when there was quite a bit of



press activity around you and the film, did you generally defer to Jamey Heath to handle that with your publicist without you?
MS. SHAPIRO: Objection.
THE WITNESS: I think everybody knew at that time that I was going through a lot and that I trusted Jamey to always do what was right. And -- and so, yeah, I don't think -- I don't think people were coming directly to me at that time for anything.
BY MS. SHAH:
Q Do you think it's important to be personally involved in decisions like that?
MS. SHAPIRO: Objection.
THE WITNESS: Decisions like what?
BY MS. SHAH:
Q Like what is happening around the publicity of what you might term a crisis in connection with your making of It Ends with Us?
MS. SHAPIRO: Objection.
THE WITNESS: Well, I -- I remember being involved. I don't think I said I wasn't involved.
BY MS. SHAH:
Q Do you remember --
A If I did, then I misspoke.

Q Do you remember making decisions in connection with that?
MS. SHAPIRO: Objection.
THE WITNESS: I think you'd need to be more specific on what decisions are.
BY MS. SHAH:
Q Any decisions. Did you feel like a decision-maker or did you feel like someone else was a decision-maker?
MS. SHAPIRO: Objection.
THE WITNESS: I can't remember many decisions needing to be made at that time. But I know I was doing press in a very difficult period. So I think that there were definitely things that -- that related to maybe business or high-level things that I wasn't involved with, nor did I want to be.
BY MS. SHAH:
Q Do you think it would have been weird to retract a statement of support that you had previously sent to a reporter?
MS. SHAPIRO: Objection.
THE WITNESS: I think "weird" is a -- do you want to maybe ask me with a different word?
BY MS. SHAH:
Q Would you have been surprised to learn



that Jen Abel asked Jamey to retract the statement of support that you sent for Stephanie Jones to the Business Insider reporter?
A I would be surprised because I don't think or know if she did.
MS. SHAH: Can you pull tab 55, please?
We're going to mark as Exhibit 4 a text conversation between Jen Abel and Jamey Heath, dated August 9th, 2024, that bears the Bates stamp JONESWORKS_, several zeroes, 16169.
(Exhibit 4 marked for identification.)
BY MS. SHAH:
Q Can you read through this for me, please?
A Okay.
Q Have you ever seen this before?
A I have not.
Q Were you aware, before you just looked at this, that this conversation took place?
A Nope.
Q Do you recall events surrounding a Daily Mail article that was published on the topic of tensions between you and Blake Lively on August 8th, 2024?
A I don't remember the specifics of it, but I definitely remember there were articles coming out



at that time.
Q And do you remember the whole -- do you remember a big issue around whether or not Stephanie Jones had ever spoken to the Daily Mail around that time?
A August?
Q Eighth.
A Yes, I do.
Q Okay. You see here that Jen texts Jamey a Daily Mail article that says, at least in this version of the web link: It-ends-Blake-Lively-Justin-Baldoni-Feud," right?
A That is what it says.
Q Okay. And this is right around the time the articles started appearing in the Daily Mail that were kind of first publicizing this alleged feud in traditional media, right?
A I don't know, but I will take your word for it. I don't know if Daily Mail was the first or -- I just -- yeah, I remember there was a lot of things happening during that period.
Q And that was a big deal, right, when -- when the press started picking up this alleged feud between you and Blake?
A Yeah.



Q It was the reason you bright on -- brought on crisis communications?
A Because -- can you -- can you ask that question again?
Q Because the press had started picking up and reporting on an alleged feud between you and Blake?
A Because press was talking about it, yeah, and it was becoming a -- it was becoming a public crisis.
Q Okay. And then right after Jen sends Jamey that article, she says:
(As read):
"Just thought about something. Should I try to get Justin's letter removed from Business Insider?"
Do you see that?
A I do.
Q Okay.
(As read):
"I would need to tell her on background that both Justin and Wayfarer have severed ties."
Do you see that?
A I do.

CONFIDENTIAL

Page 118

Q Had Justin and Wayfarer severed ties with Jonesworks at this point?
A I have no idea. On August 9th, I don't know.
Q Do you have any idea why Jen Abel would be suggesting to Jamey that you leak on background that Justin and Wayfarer have severed ties with Jonesworks?
MS. SHAPIRO: Objection.
THE WITNESS: I remember Jamey sending a text message that I -- that he just told me about to Stephanie, basically saying stop, stop. Don't make any phone calls. And that if she continued, that we would be leaving. But I don't remember the date of that. I don't remember where this is in that timeline. I would need to see. So I don't know if, at this point, he had already told her that we were leaving or -- yeah. I just don't know.
BY MS. SHAH:
Q Jen Abel still worked for Jonesworks at this point, right?
A To my knowledge, yes.
Q Was Jen Abel read in on the issue of Wayfarer and you severing ties with Jonesworks by this point?

Page 119

MS. SHAPIRO: Objection.
THE WITNESS: Can you say that again?
BY MS. SHAH:
Q Was Jen Abel read in on the issue of you and Wayfarer potentially severing ties with Jonesworks by this point?
MS. SHAPIRO: Objection.
THE WITNESS: By read in?
BY MS. SHAH:
Q Was she aware of it?
A Was she aware of it? I -- I wasn't privy to any of those conversations, so I don't know.
Q Okay. Jen Abel goes on to say:
(As read):
"Not -- "so not sure if your lawyers would recommend that as she would need to print that and not sure if that would cause any issues."
Do you see that?
A I do.
Q Do you have any idea what that's about?
A I'm -- I shouldn't assume, but I imagine it's our lawyers at Wayfarer Studios, our business affairs. But...
Q Why would it cause issues if a reporter

Page 120

were to print that Wayfarer and you had severed ties with Jonesworks at this point?
A I can't speculate. I'm -- again, I'm not a part of any of this.
Q You see Jamey Heath writes "Grammy Award Winner" in quotes and then writes "Dummy."
Do you see that?
A Yes.
Q Is Jonesworks a Grammy award-winning publicist?
A I didn't know publicists could win Grammy's.
Q I didn't either, but I'm asking you.
A Jamey is a Grammy award winner, so -- and he always says "dummy." Like, that's his -- that's a joke. Like, he always -- we call each other dummy. So I think maybe -- I'm just guessing, he was quoting the way someone described him because he had won a Grammy at one point in a previous career.
Q Okay.
A But I -- but I don't know.
Q Okay.
A I wasn't on this text chain.
Q Do you know that -- did you know, at the time, that Jen Abel was speaking to Katie Warren,

Page 121

the reporter at Business Insider?
A I -- until you said Katie Warren, I didn't know even who she was, so no.
Q Well, you sent your statement in support of Steph to Katie Warren, right?
A Yeah, but I didn't know what her name was.
Q Okay. Did you have any knowledge around this time that Jen Abel was personally speaking to the reporters at Business Insider about the article that came out about Steph?
A No.
Q Okay. Did you have any knowledge at the time that Melissa Nathan was behind the article at Business Insider that came out about Steph?
MS. SHAPIRO: Objection.
THE WITNESS: What do you mean "behind"?
BY MS. SHAH:
Q Was a primary driving force between -- behind getting it published and its negative slant?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MS. SHAH:
Q Do you know that today?
MS. SHAPIRO: Objection.

THE WITNESS: Are you telling me that?
BY MS. SHAH:
Q I'm asking you if you're aware of that?
A No.
Q Okay. Have you ever heard that before?
MS. SHAPIRO: Object --
THE WITNESS: That she's -- like, that she wrote the article?
BY MS. SHAH:
Q That she planted the article.
A No.
Q Because she was angry at Steph?
A I'm sorry. Melissa was angry at Steph?
Q Correct.
A So she -- so she planted the article?
Q Yes.
A No, I didn't know Melissa at this time.
Q At the time you hired Melissa, did you have any inkling that she was behind the negative article in Business Insider about Steph?
MS. SHAPIRO: Objection.
THE WITNESS: I just learned about it from you, so no.
BY MS. SHAH:
Q Okay. Is that something you would have



wanted to know before you hired her?
MS. SHAPIRO: Objection.
THE WITNESS: Hold on. Would I have wanted to know that the PR person that I was hiring to handle a crisis had evidently, according to you -- not that I don't trust you, written an article about my, at the time current PR person? I would -- yeah. Yes. Yes.
BY MS. SHAH:
Q Okay.
A Sorry. That was a lot.
Q You listened in on part of Melissa Nathan's deposition, right?
A Parts.
Q Did you listen in on the part where she and I were discussing her participation in the Business Insider article against Steph?
A I believe I only listened in for the end of one of the days, and I don't believe it was with you. I don't. But to answer your question, no.
MS. SHAPIRO: Do you want to take a break?
THE WITNESS: In a couple of minutes, we can.
MS. SHAPIRO: Okay.



THE WITNESS: You've been holding it for long.
MS. SHAH: We can go ahead -- let me just ask one last question or two last questions and then we can go ahead and take a lunch break.
THE WITNESS: Sure.
BY MS. SHAH:
Q You said you recalled a point in time when an issue arose about Stephanie Jones potentially contacting the Daily Mail in this early August time period and that causing a big issue, right?
MS. SHAPIRO: Objection.
THE WITNESS: I remember that. I remember -- yes. Yes.
BY MS. SHAH:
Q Okay. Up until that point in time, did you feel you still had a friendly relationship with Stephanie Jones?
A Friendly, yeah.
Q Up until that point in time, did you have any reason to take any issue with anything that Stephanie Jones had done or was doing on your behalf?
MS. SHAPIRO: Objection.



THE WITNESS: Yeah. Yes.
BY MS. SHAH:
Q What?
A I remember feeling, specifically as it related to the Business Insider article, the phone calls I had with her, I remember feeling like she wasn't personally -- my personal, not as an expert or anything like that -- I just remember feeling personally like she seemed off and maybe wasn't of sound mind.
Q What do you mean when you say "wasn't of sound mind"?
A I remember feeling that she was more worried about her own reputation than what I believe to be her work as a publicist in, I would say, taking care of ours.
Q Do you think there is something unsound of mind to be worried about your own reputation as a publicist more than your client's reputations?
MS. SHAPIRO: Objection.
THE WITNESS: No. It was more -- in the conversations I had with her, she felt different than previous conversations. Her speech, at times, was a bit erratic. She was, like, bouncing back and forth between things. Between -- it just felt like

CONFIDENTIAL

Page 126

any person when you have a relationship with someone and they appeared different than they had the last few years of knowing them. That's what made me not sure.

BY MS. SHAH:

Q Not sure if she was of sound mind?

A Not sure if I felt -- let me put it this way. At that point in time, I was grateful that she was not the lead to represent me personally.

Q Who did you think was the lead to represent you personally?

A The person who had been for the last four years or so or three years.

Q Who was that?

A Jennifer Abel.

Q Okay. Do you think that in the time since these lawsuits were filed against you, that you had behaved to anyone differently than you did before?

MS. SHAPIRO: Objection.

THE WITNESS: Yes.

BY MS. SHAH:

Q Do you think the stress of having this kind of public negative spotlight on you has caused that?

Page 127

MS. SHAPIRO: Objection.

THE WITNESS: Yes.

BY MS. SHAH:

Q Do you find it distressing to have negative public articles being written about you?

A I do.

Q Are you aware of any smear websites or social media accounts that were being published about Stephanie Jones in 2024?

MS. SHAPIRO: Objection.

THE WITNESS: No.

BY MS. SHAH:

Q You're not aware of that at all?

A No.

Q Okay. You are aware of a very negative --

A Sorry. Are you saying was I aware or am I aware?

Q Were you aware at the time?

A No. I mean, I am aware that there was a website that's become a whole --

Q Right.

A -- I think a part of this case, but I was not aware then.

Q Okay. You weren't aware at the time that

Page 128

you were having these conversations with Stephanie Jones where you have called into question her mental state, that she was dealing with websites and social media handles under the captions of things like "Stephanie Jones Leaks" and "Stephanie Jones Lies" that were peddling a bunch of defamatory, highly negative statements about her?

MS. SHAPIRO: Objection.

THE WITNESS: I wasn't aware of any of that.

BY MS. SHAH:

Q Okay. You were aware of a Business Insider article that was being written about her that was highly negative, right?

MS. SHAPIRO: Objection.

THE WITNESS: Again, I don't know what was in it or if it was highly negative. But I know that it upset her a lot.

BY MS. SHAH:

Q Okay. As someone who now yourself has experienced very negative public media attention, can you understand how her experiencing very negative, public, unwarranted media attention might have been distressing to her at that time?

MS. SHAPIRO: Objection.

Page 129

THE WITNESS: May I answer without a yes or a no?

BY MS. SHAH:

Q You can answer in whatever way you think is best.

A If I had a relationship with my doctor who was going to perform surgery on me for the last five years, and I went in to meet him before surgery and he started acting strange and then I found out that he was being attacked and he had a lot of personal drama, maybe he was going through a divorce, I wouldn't want him to operate on me because I'm paying him for his services.

So while I understand, especially the way you're phrasing it now, how emotionally disturbing it was for Stephanie, she was my publicist and I was paying her for her services. And for me, having been through what I've been through the last year, it's the reason why I wouldn't take on any jobs because I wouldn't be of sound mind to do my job to the best of my ability while dealing with that stress.

Q Are you of sound mind to do your job to the best of your ability to this date?

MS. SHAPIRO: Objection.

CONFIDENTIAL

Page 130

THE WITNESS: I don't think I understand your question.
BY MS. SHAH:
Q You said you wouldn't be of sound mind to do your job to the best of your ability in the circumstances of what you've been through.
Do I understand that?
A Yes. We just need to define job, and then I can agree with you.
Q Well, I'm just using your words.
A Yeah, so job. So what I was meaning by "job" is if I'm being paid for services.
Q Okay. And that's the reason that you haven't taken on any jobs since this lawsuit has been pending?
MS. SHAPIRO: Objection.
THE WITNESS: No. There's not many jobs being offered to me at the moment.
BY MS. SHAH:
Q Do you feel you are of sound mind?
MS. SHAPIRO: Objection.
THE WITNESS: When?
BY MS. SHAH:
Q Now.
A I don't believe I'm doing a job. I'm

Page 131

just telling the truth. So yes, I do.
Q Did you ever express to Stephanie Jones at the time these sentiments that you're expressing to me now about her mental state or fitness to do her job for you as a publicist?
A It was my feeling that that would have been, in my opinion, unnecessary and would have caused her more pain.
Q Is that a "no"?
MS. SHAPIRO: Objection.
THE WITNESS: That is a "no."
BY MS. SHAH:
Q You didn't fire her at the time because of the sentiments that you're expressing to me now; is that right?
A I didn't personally fire her. No.
Q And Wayfarer did not fire her either as a result of the sentiments you're expressing to me now; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: No, because Jennifer Abel was our main point of contact, my publicist.
MS. SHAH: Okay. Thank you. We can take a lunch now.
THE VIDEOGRAPHER: We are going off the

Page 132

record. The time is 12:31 p.m.
(Lunch recess.)
THE VIDEOGRAPHER: We're back on the record. The time is 1:24 p.m.
BY MS. SHAH:
Q All right. There came a time when you and Wayfarer brought on Melissa Nathan and her firm, TAG, to help you with crisis communications; is that right?
A Yes.
Q How did you become to be introduced to Melissa Nathan?
A Me personally?
Q Yes.
A Do you mean specifically or the sequence of events or?
Q Describe for me the sequence of events that led to you coming to the idea to hire Melissa Nathan and then, ultimately, hiring Melissa Nathan.
A We decided to bring on someone for crisis PR. And Melissa Nathan was, I believe, one of the names that was presented.
Q When in time did you decide to bring on crisis PR?

Page 133

A I believe August of 2024.
Q Do you recall that it was around or before July 25th of 2024?
A That what?
Q That you decided to bring on crisis communications.
A I don't.
Q Okay. Any reason to dispute that?
MS. SHAPIRO: Objection.
THE WITNESS: If you have a document that might dispute it, I would be very open to seeing it. I just don't have the dates in my head.
BY MS. SHAH:
Q And what led you to the decision that you should or needed to bring on crisis communications at that point in time?
A That press was -- people were talking. Press was starting to ask questions; why I wasn't doing any marketing promotion of the film. By this point, I'd been told that I wasn't allowed to attend my own premiere. And I believe fans and press were starting to notice that I was absent and at that point, it became a public conversation. Which, I think to me and to us, felt like a crisis.
Q What about it felt like a crisis to you?

CONFIDENTIAL

Page 134

A Well, I think not -- just the idea of not being allowed to go to my own premiere was -- was very hard. If I think about your question, crisis, to me, feels like another word for not good situation in the public.

So it was just, it wasn't for a -- I feel like regular PR is for run-of-the-mill everyday press. And then if there are situations that are not good, you hire a crisis PR person who specializes in that.

Q And what were you hiring Melissa Nathan and TAG as crisis PR people to do exactly?

A I didn't know much about crisis PR so I didn't really know at the time.

Q Do you have a better understanding now?

A Yes.

Q What is that understanding?

A To combat untrue negative stories with the truth.

Q When did you come to that understanding?

A After I met crisis PR.

Q Meaning Melissa Nathan?

A And the various people that worked with her.

Q At TAG?

Page 135

A Yes.

Q Okay. And when I say TAG, you understand that I'm referring to Melissa Nathan's PR agency, The Agency Group, right?

A Yes.

Q Okay. You said that Melissa Nathan or The Agency Group's names was one of the ones proposed to you as a potential crisis PR; is that right?

A Again, not proposed to me, but I believe -- I believe there were multiple that Jamey had met with.

Q Do you know if Jamey actually spoke to or met with any other than Melissa Nathan and her team?

A I'm not sure.

Q Do you have an understanding of what led Wayfarer and you to hire Melissa Nathan instead of any of the other recommended PRs?

A I believe I entrusted that to Jamey to help make the best decision for us.

Q Do you have an understanding from Jamey or otherwise in terms of why he decided to hire Melissa Nathan over other names that were recommended?

A I didn't ask very many questions at that

Page 136

time. But I believe he thought she was very good at her job.

Q Do you know what led him to believe that?

A I don't.

Q Did you have any personal role in making the decision to hire Melissa Nathan over any of the other crisis PRs that may have been recommended?

A No.

Q Are you aware of where Jamey got the names for potential crisis communications professionals that he was considering?

A I imagine from --

MS. SHAPIRO: Mr. Baldoni, don't speculate.

THE WITNESS: No. I actually don't.

BY MS. SHAH:

Q You don't know?

A No.

Q Do you know if he or anyone else at Wayfarer asked Stephanie Jones for her views on crisis communications professionals that you should hire?

A I don't.

Q Do you know if she recommended Melissa Nathan or not?

Page 137

A If Stephanie Jones recommended? I now know that she didn't.

Q How did you come to that understanding?

MS. SHAPIRO: Mr. Baldoni, don't answer --

THE WITNESS: No --

MS. SHAPIRO: -- if the information came from your lawyers.

THE WITNESS: Yes, I can answer this. Stephanie had sent me a text about Melissa Nathan.

BY MS. SHAH:

Q You knew at the time that Stephanie did not recommend that you hire Melissa Nathan, correct?

MS. SHAPIRO: Objection.

THE WITNESS: I knew that Stephanie did not like Melissa Nathan, yes.

BY MS. SHAH:

Q And Stephanie warned you against hiring Melissa Nathan; isn't that right?

A You could -- I think you could put it that way with my interaction with Stephanie. Yeah.

Q And were you aware that Stephanie also warned Jamey Heath and Tera Hanks against hiring Melissa Nathan?

A I was only aware of what she texted me.

Q Jamey Heath and Tera Hanks never told you that Stephanie Jones had also warned them against hiring Melissa Nathan?
A Not that I recall.
Q Do you have an understanding as to why Stephanie Jones was warning you against hiring Melissa Nathan?
A I vaguely remember -- I think there was a text message that she sent that said she -- I'm reading it in my mind. There was something, there was a word "shady" in there and it was like a link to something that I never clicked on.
Q Other than the text message you're describing with Stephanie Jones, did you ever have a conversation with her about this issue, whether in person or on the phone?
A I don't know. I'm -- my memory of this time was that there was a lot of messages and it, like -- I might have spoken to Stephanie. I don't remember the conversation. But there was like a -- there was like a -- felt like a frantic energy from Stephanie.
Q Did you give any credence to the information that she was giving you in terms of why you should not hire Melissa Nathan to be aligned



with you?
MS. SHAPIRO: Objection.
THE WITNESS: What do you mean by "credence" exactly?
BY MS. SHAH:
Q Did you take her concerns seriously?
A I believe I did.
Q Did you do anything to investigate them further before you hired Melissa Nathan?
A I didn't have any capacity at that time to do personal investigation, no.
Q Did you relay Stephanie's concerns to Jamey Heath or Tera Hanks at the time?
A I believe I did. Yes.
Q Tell me what you recall about the substance of those conversations or communications.
A I remember passing along that Stephanie doesn't like -- I didn't know who Melissa Nathan was -- one of the people. That's what I remember.
Q Do you remember Stephanie Jones telling you in sum or substance that Melissa Nathan and the tactics she uses as a crisis communications professional are not the kinds of tactics that you want to publicly associate yourself with?
A That sounds very familiar.



Q Are you aware that Wayfarer and you decided to hire Melissa Nathan over Stephanie Jones' objections?
A I would imagine so, yes.
MS. SHAH: Okay. I'm going to show you what's marked as a document, Exhibit 5.
(Exhibit 5 marked for identification.)
BY MS. SHAH:
Q It's a text message between you and Stephanie Jones dated July 26, 2024, Bates stamped Jonesworks_, several zeroes, 39735.
Is this the text message that you were referring to that Stephanie Jones sent you where she warned you against hiring Melissa Nathan?
A It appears to be.
Q And this was sent on July 26th, 2024. So does this refresh your recollection that you were considering bringing on crisis PR before July 26th, 2024?
A Yes.
Q Okay. And as you recall, Stephanie Jones sent you a link at the top of the text thread, right?
A Yes.
Q You said you never clicked on that; is



that right?
A Yes.
Q Why not?
A It felt -- it might sound silly but it felt like there was an agenda and it didn't feel -- yeah.
Q And so because it felt to you like she had an agenda, you didn't bother to look at what she was sending you?
MS. SHAPIRO: Objection.
THE WITNESS: I didn't say that.
BY MS. SHAH:
Q How would you say it?
A I was going through a lot in my life at this time and I didn't want to be in the middle or a part of anything like this. So I asked her to please communicate with Jamey and Tera, as they would be handling everything.
Q Do you think it's important for you as a public persona to take care in who you associate yourself with?
MS. SHAPIRO: Objection.
THE WITNESS: Yeah.
BY MS. SHAH:
Q Do you think it's important for you as a

CONFIDENTIAL

Page 142

human being, personally, to take care in who you associate yourself with?
MS. SHAPIRO: Objection.
THE WITNESS: Yeah.
BY MS. SHAH:
Q Have you ever heard, either then or since that time, about the work that Melissa Nathan did as a crisis publicist with respect to a woman named Camilla Sterling, who was found dead in a hotel room that was rented under the name of Scooter Braun's associate, David Bolno?
MS. SHAPIRO: Objection.
THE WITNESS: Through this case in the last few weeks, yes.
BY MS. SHAH:
Q If you had clicked on the link that Stephanie Jones sent you at the time, it appears that you would have learned about it then, doesn't it?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know what was in the article. But if the article said something about crisis PR, then I'm assuming I would have learned.

Page 143

BY MS. SHAH:
Q You can see from the link that she sent, it says "Singer Camilla Sterling died, David Bolno hotel room."
Can you see that?
A Yes.
Q Okay. What have you come to learn since then about the work that Melissa Nathan did in connection with the Camilla Sterling incident?
A Oh, I haven't learned anything. I know what's, I think, being accused of. But I don't actually know anything that Melissa did or didn't do.
Q You never talked to Melissa about this?
A No.
Q Still haven't?
A No.
Q Okay. You will see at the bottom of the text that Stephanie says:
(As read):
"This is the kind of mess Melissa Nathan (crisis PR) lies and cleans up. Bolno works for Scooter and it was a nightmare. Lies. Dirty work."

Page 144

You see that?
A I do.
Q Did you ever ask her what she meant by that?
A I don't believe I did.
Q She then writes:
(As read):
"I'm also don't want Blake's team to align you with people like this Melissa works with."
Do you see that?
A I do.
Q Did you ever ask her what she meant by that?
A I did not.
Q Were you aware at the time that Melissa works with people like Jed Wallace?
MS. SHAPIRO: Objection.
THE WITNESS: I had no idea who Jed Wallace was.
BY MS. SHAH:
Q Okay. So you don't know whether or not that's what Stephanie Jones was also trying to warn you about, right?
MR. GLOVER: Objection. Form.

Page 145

THE WITNESS: I don't know, no. I don't know.
BY MS. SHAH:
Q Because you never asked her what she meant by that?
MS. SHAPIRO: Objection.
THE WITNESS: Unless you have a document that says I did, I don't feel like I did.
MS. SHAH: Okay. I'm going to show you a document that's been marked Exhibit 6.
(Exhibit 6 marked for identification.)
THE WITNESS: You got it.
BY MS. SHAH:
Q It's a text message between Stephanie Jones, Jamey Heath, Tera Hanks, and you --
A Uh-huh.
Q -- dated July 26th, Bates stamped Jonesworks_JB_, several zeroes, 1142.
Do you see this?
A Yes.
Q Okay. Do you recall this text message when you received it?
A Vaguely, yes.
Q Okay. And in this text message, Stephanie Jones warns you, Tera Hanks, and

CONFIDENTIAL

Page 146

Jamey Heath that you should not work with Melissa Nathan because "there's a lot of dirty work she has done" and "it's not someone that you should want in Justin's orb."
Do you see that?
A Yes.
Q Okay. And she goes on to say:
(As read):
"Or for Blake's PR to use as a weapon against him."
Do you see that?
A I do.
Q Did you ever have a conversation with her about what she meant by that?
A I did not have a conversation with Stephanie at all around this.
Q Okay. Do you have any understanding, whether from this text message or anything else that you knew at the time, about what she meant when she said, "I just downloaded Tera on some dark stuff"?
A I don't.
Q Did Tera ever relay the substance of that conversation to you?
A I think I had had a conversation with Tera and Jamey that I didn't want to be a part of

Page 147

any of this. So I trusted them to make the decision. I don't believe she told me anything.
Q Okay. Do you understand from this text message that Stephanie is telling you and Jamey and Tera that it might not be good for you to be associated with someone like Melissa Nathan based on the type of tactics that she has used in the past?
A That seems to be an accurate summary.
Q And that if people knew that you were associated with Melissa Nathan or specifically if Blake's PR came to find out that you had associated yourself with Melissa Nathan, they could use that against you because of who Melissa Nathan was, right?
MS. SHAPIRO: Objection. Objection.
THE WITNESS: I can't speculate to what she meant by that. But it seems to be she says "Blake's PR to use as a weapon" so...
BY MS. SHAH:
Q Okay. Now, Wayfarer and you --
A are you done with this one?
Q I think so.
A Here you go.
Q Wayfarer and you went ahead and hired Melissa Nathan after and despite Stephanie Jones's

Page 148

warnings, right?
MS. SHAPIRO: Objection.
THE WITNESS: I believe so.
BY MS. SHAH:
Q And there came a time in August, after you had hired Melissa Nathan, that The Hollywood Reporter published an article about the fact that you had hired Melissa Nathan, right?
A Yes.
Q I'm going to show you that article.
MS. SHAH: It's a document we're going to mark as Exhibit 7.
(Exhibit 7 marked for identification.)
THE WITNESS: Thank you.
BY MS. SHAH:
Q It's an article from The Hollywood Reporter, dated August 14th, 2024, that says "Justin Baldoni Hires Crisis PR Veteran Amid It Ends with Us Rift."
Do you see that?
A Uh-huh.
Q And it goes on to say:
(As read):
"The director and star has retained the services of Melissa Nathan who

Page 149

represented Johnny Depp during the Amber Heard trial."
Do you see that?
A Excuse me. On the second page, yes.
Q Okay. You were pretty upset when this article came out, right?
A I don't remember what I was feeling.
Q You were worried when this article came out that being publicly associated with Melissa Nathan might make it look like you had something to be guilty for, right?
MS. SHAPIRO: Objection.
THE WITNESS: No, I think -- I think I was just not happy that my crisis PR was being publicized. I don't think it had anything to do with Nathan -- Melissa Nathan.
BY MS. SHAH:
Q Why were you not happy that your crisis PR was publicized?
A Because it felt like more of the -- kind of -- the kind of thing that felt like somebody would plant to draw more attention and fan a flame to something.
Q Fan a flame to what?
A To public speculation, the fan theories

of why I wasn't doing press with anybody and...
Q What were the fan theories at the time about why you weren't doing press with anyone?
A I remember there being a lot of talk about all of the cast unfollowing me, why I wasn't doing press with any of the other cast members. I don't remember the date that this came out, but I don't know if I had already done the premiere or not at this point. But I had also never read an article or seen an article about somebody hiring crisis PR, so I found it odd.
Q And you thought it made you look bad, right?
A Yeah, I think I did.
Q You thought it made you look like you had something to hide?
A I think I had never been involved in anything like this, and I wasn't used to seeing my name in the press in this way at all. And I certainly -- I certainly didn't want my -- my name out there in a negative way.
Q You thought it made it look like you had something to hide that had to do with the allegations of on-set abuse, right?
MS. SHAPIRO: Objection.



THE WITNESS: I'm unaware of any allegations of on-set abuse.
BY MS. SHAH:
Q To this day, you're unaware of any allegations against you of on-set abuse?
MS. SHAPIRO: Objection.
THE WITNESS: Abuse? I'm aware of allegations as were written in the New York Times article and in this lawsuit. Yeah.
BY MS. SHAH:
Q What do you understand those allegations to be?
A I understand that I have been alleged to sexually harass Mrs. Lively. And then that I have alleged to have launched a retaliation smear campaign.
Q Do you recall articles coming out around this time that called your on-set behavior abusive?
MS. SHAPIRO: Objection.
THE WITNESS: I believe I do.
BY MS. SHAH:
Q Okay. So you understand that that was one of the fan theories that was floating around about why you weren't involved in publicity and why all the cast had unfollowed you, right?



MS. SHAPIRO: Objection.
THE WITNESS: Not necessarily.
BY MS. SHAH:
Q Well, yes or no?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MS. SHAH:
Q You're not aware of any fan theories at the time that one of the reasons that the cast unfollowed you and that you were not involved in a lot of the marketing of the film or publicity around the film was because you engaged in abusive or toxic behavior on set?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not aware those were fan theories, no.
BY MS. SHAH:
Q Any theories?
MS. SHAPIRO: Objection.
THE WITNESS: I'm aware that there were leaks to press that accused me of that, but I'm not aware of fan theories.
MS. SHAH: Okay. Thirty-nine, please.
(Exhibit 8 marked for identification.)



BY MS. SHAH:
Q I'm going to hand you a document that's marked as Exhibit 8. It's a text thread between Henny Grace, Melissa Nathan, you. I think that's it.
A Uh-huh.
Q On August 14th, Bates-stamped NATHAN_, several zeros, 3972.
Do you see that?
A I do.
Q Who is Henny Grace?
A That used to be my alias, but it's now become public, so...
Q No longer useful as an alias. All right.
So this is a text thread between you and Melissa Nathan; is that right?
A It appears to be, yes.
Q On August 14th, which is the day after The Hollywood Reporter article that we just looked at was published.
Do you see that?
A Yes.
Q Okay. And halfway down the page, at 8:03 a.m., you write:
(As read):

CONFIDENTIAL

Page 154

"Talk to me about this - so I'm really frustrated about this crisis PR leak - and framing it as Johnny Depp's firm to poise that I have something to hide and also there was abuse."
Do you see that?
A Uh-huh.
Q And so you were concerned about The Hollywood Reporter article framing it specifically with relation to Melissa Nathan's prior association with Johnny Depp that it might mean that you had something to hide and that there was abuse on set, right?
MS. SHAPIRO: Objection.
THE WITNESS: Yes, actually. Yes.
BY MS. SHAH:
Q Okay. And then you say:
(As read):
"I don't understand how we are letting her continue to leak stories and do this to us."
Do you see that?
A Yes.
Q Who is "her"?
A I presume I meant Ms. Lively's team.

Page 155

Q Okay. And then you ask Melissa Nathan to walk you through it. And then I want you to read Melissa Nathan's response on the next page.
A Do you want me to keep reading past page 2?
Q No, you don't need to.
A Okay.
Q So she tells you at the top:
(As read):
"Sure-firstly I am also incredibly frustrated."
Do you see that?
A I do.
Q Then she goes on to say:
(As read):
"A PR should never be part of a story but- I also work with many people who are in trouble and protect them."
Do you see that?
A Uh-huh.
Q Was it your understanding from this text message or any other conversation you had with her about this topic, that she was also frustrated by the publication of The Hollywood Reporter article?
A I'm reading that here now so it appears

Page 156

she was frustrated.
Q Do you remember conveying -- her conveying to you that she was frustrated by it?
A I -- just here. I don't remember outside of this. I -- I was on a plane at the time, so we didn't speak.
Q Okay. Did you speak to her outside of this text message about The Hollywood Reporter article?
A I don't know.
Q Do you recall any phone or in-person conversations with her about The Hollywood Reporter article?
A Definitely not in person. I don't -- I don't remember any phone calls about it. I feel like -- I feel like this was me venting. So this was probably the conversation that we had.
Q Okay. And you're essentially asking her, like, tell me why this isn't a bad look for me, right?
MS. SHAPIRO: Objection.
THE WITNESS: I think I'm trying to understand all of this. I oftentimes reach out to my team to say, help me understand this, I have a feeling about something. I don't like this. Make

Page 157

me feel better about it. What does this mean? What -- what is this? And I'm not -- I'm not a PR expert.
BY MS. SHAH:
Q And would you agree with me that she did try to make you feel better about it?
A It -- it appears that she did try.
Q She's essentially saying, this is not a huge deal, it doesn't look terrible for you, right?
A Yeah. She's saying it's very normal. But that people have crisis PR, but it seems to me that she also said that it's not normal for PR to be part of a story. So...
Q And if you look down to the fourth paragraph, starting "Jen knows."
Do you see that?
A "Jen knows," yes.
Q She said:
(As read):
"Jen knows - I spoke for an hour on the phone from 12-1 a.m. my time she swears she had nothing to do with it but I know someone placed this."
Do you see that?
A I do.

CONFIDENTIAL

Page 158

Q Did you have a suspicion that Jen Abel had placed this?
A No.
Q Did you have a suspicion that Stephanie Jones had placed this?
A I had a suspicion that this was Blake's team placing this.
Q Did you have a suspicion that Melissa Nathan had placed this?
A No.
Q And here, she's essentially communicating to you, I'm frustrated by this, someone placed this, it wasn't me, right?
A I think maybe when I first reached out to her, I may have -- I may have been confused and wondered why my team might place this or if it was a leak. I don't really remember. I just remember it being such a weird headline. But no, I never suspected that Jen placed it.
Q Did you ever suspect that Melissa placed it?
A Not in a negative way. I think if I reached out, I was confirming that no one from my team would brag about me having crisis PR. I didn't think that was something worth bragging or making an

Page 159

announcement about.
Q Did you get confirmation from your team or comfort from your team that no one from your team had leaked this information?
A I believe I did. I believe this is part of that.
Q This message that Melissa is writing to you is part of the confirmation that you were getting that your team didn't have any part in leaking this information, right?
A I believe so.
Q Okay. And then she goes on to say:
(As read):
"It doesn't make you look bad."
Do you see that?
A Yes.
Q You understood from this that she was trying to reassure you that this wasn't a bad look for you, right?
A I imagine that's what she was doing.
Q Okay. And then she said:
(As read):
"All the reporters like and trust me, which is why when they called me, they took out all the social media stuff and

Page 160

did a straight story as they wouldn't kill it."
Do you see that?
A I do.
Q Do you have any understanding of what she meant by "they took out all the social media stuff"?
A No, because even just reading it a second ago, I think I missed that too. Sometimes my reading comprehension isn't great. No, I have "all the reporters like and trust me, which is why they called me." I have no idea what she's talking about.
Q Did you have an understanding, as of this time, that she had spoken to reporters at THR or about this article?
A No.
Q Did you have any understanding about, at the time, that she had tried to influence the article or kill it?
A No, I think I missed that completely.
Q Okay. Is this the type of negative association with Melissa Nathan and her past clients and tactics that you think Steph was warning you about before she hired you -- before you hired Melissa?

Page 161

MS. SHAPIRO: Objection.
THE WITNESS: I can't speculate to what she was worried or warning me about.
BY MS. SHAH:
Q Because you never spoke to her about it yourself?
A Yeah, I never did.
Q Okay. Did Melissa Nathan ever tell you that she, in fact, was responsible for the leak that culminated in this story?
A She never did.
Q Did she ever tell you that she was lying to you when she thought -- when she told you that she was incredibly frustrated by this?
MS. SHAPIRO: Objection.
THE WITNESS: She did not.
BY MS. SHAH:
Q Did she ever tell you when she said "I know someone placed this," that she actually knew who had placed it?
A She, obviously, did not.
Q Did she ever tell you that it was one of her friends?
A Like before, she didn't tell me anything except what I see here.

Q Okay. If those things were true, are those things you would have wanted her to tell you at the time when you reached out to ask about it?
MS. SHAPIRO: Objection.
THE WITNESS: I would imagine so, yes.
BY MS. SHAH:
Q Okay.
MS. SHAH: I'm going to show you -- pull tab 40, please.
THE WITNESS: Do you want me to hold onto this?
MS. SHAH: You don't have to.
I'm going to mark this as Exhibit 9.
(Exhibit 9 marked for identification.)
THE WITNESS: Thanks.
BY MS. SHAH:
Q It's a text thread between you, Melissa Nathan, and Jen Abel, also dated August 14th, 2024, Bates-stamped NATHAN_,several zeroes, 4552.
A Uh-huh.
Q Turn for me to page that's stamped at the bottom 4554, please.
A Can I just read before then, too?
Q Sure.



A What was the page you wanted me to look at?
Q 4554. It's the page you're on.
A Uh-huh.
Okay.
Q Okay. So you're sending a screenshot to Jen and Melissa of a text that your old assistant, Will, sent to you, right?
A Yes.
Q Did you read the text?
A I did.
Q And in that text, he's essentially expressing to you that it's a bad look for you what came out in The Hollywood Reporter story, right?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MS. SHAH:
Q Okay. And you were passing that along to Jen and Melissa to, what, seek their feedback on that text?
A I don't remember why I sent it. I just remember it didn't feel good.
Q Why didn't it feel good?
A Who's on this text, by the way? Oh, it's Melissa.



I mean, I'm being talked about in public and that sucks. And he's telling me that he thinks that it looks like I'm trying to cover something up. And he wants to just share with me because he knows my heart and I -- you know, and I didn't want people to think that because it wasn't true.
Q And isn't this kind of association exactly what Stephanie Jones was warning you about when she advised you not to hire Melissa Nathan?
MS. SHAPIRO: Objection.
THE WITNESS: Again, I don't know what Stephanie Jones was exactly referring to so I can't answer that.
BY MS. SHAH:
Q You understood that she had said to you that being associated with a crisis communications professional like Melissa Nathan could be used against you because of that association, right?
A I remember it at one of the texts you showed me.
Q And here -- here is at least one independent source expressing that same view to you now, right?
A Yes.
Q Okay. Were you bothered by this?



MS. SHAPIRO: Objection.
THE WITNESS: I think I was.
BY MS. SHAH:
Q Okay. Can you think of another example of a director of a film hiring crisis PR during the promotion and release of the film related to the promotion and release of the film?
A I don't -- I can't think of an article where anyone who hires crisis PR publicizes it.
Q My question was: Can you think of a single example of a director who hired crisis PR during the promotion and release of a film?
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q In your industry?
A Do you mean that I know of a director who hired crisis PR, or that I read an article of a director who hired crises PR?
Q Either one. Can you think of any other example that you can think of where a director of a film hired crisis PR during the promotion and release of that film?
A A director of a film hired crisis PR. As I sit here right now, I can't think of a director that I would know that hired crisis PR.

Q Okay. Pretty unique situation in the industry as far as you're aware?
MS. SHAPIRO: Objection.
THE WITNESS: I'm sorry. What was the question?
BY MS. SHAH:
Q Is that a pretty unique situation in your industry as far as you're aware?
A For what?
Q That a director would hire a crisis PR in connection with the promotion and release of a film he was directing or she was directing?
A I don't know. Because I don't think normally people find out when people hire crisis PR.
Q But you can't think of a single other example?
A I can't right now. No.
Q Okay.
MS. SHAH: Tab 83, please.
THE WITNESS: Done with this one?
BY MS. SHAH:
Q Actually, let's look at it for a second more. Just flip forward to the pages ahead of what we were just talking about, from the beginning of the text thread. The pages ahead. Sorry.



MS. SHAPIRO: What is the Bates number?
MS. SHAH: Start at the beginning of the document 4552.
THE WITNESS: Okay.
BY MS. SHAH:
Q And through 4553.
Am I correct that you and Jen and Melissa are talking about, generally speaking, what is going on with publicity around you and the film and this issue and how to handle it?
MS. SHAPIRO: Objection.
THE WITNESS: I think there were more articles coming out that she was sharing and giving me context about. And here, we're talking about the trainer and my back. That's from what I see.
BY MS. SHAH:
Q Okay. At the -- on the first page, the first text, you wrote:
(As read):
"Just woke up, texting Jennifer. With all the texts I'm getting worried about me. I imagine this truce didn't last?"
Do you see that?
A Uh-huh.
Q Do you recall getting texts that morning



or the day before that were concerned about you?
A I remember going to sleep. I don't know if I was on a plane or where -- I don't remember where I was. But there were a lot of people asking if I was okay.
Q And they were asking if you were okay because they had read The Hollywood Reporter article about you hiring Johnny Depp's crisis publicist, right?
A I don't know what they were -- what they had read. I don't know how many articles there were. But I know that people were worried about me.
Q Was it your understanding that that was, at least in part, generated from The Hollywood Reporter article or you think it was just a coincidence and out of the blue?
MS. SHAPIRO: Objection.
THE WITNESS: I had no idea what it was about. That's why I think that's why I was texting Jennifer. And I make reference to a truce between the two PR teams.
BY MS. SHAH:
Q And what did you understand about that truce?
A That they would not be planting any



negative or untrue stories and that we would not be talking to any media.
Q Okay. And you understood that that's a truce that had been made between Melissa Nathan and Leslie Sloane; is that right?
A That's what was told to me.
Q Okay. And you understood as of this time that both Melissa Nathan and the TAG team and Jennifer Abel and the Jonesworks team were interfacing with reporters about the incoming or published stories that were happening around the film and you; is that right?
A I'm sorry. Can you repeat that one more time?
Q Sure. I'm trying to get a sense of what you understood the TAG team and Melissa Nathan and Jennifer Abel to be doing around this time vis-a-vis publicity. You understood that Melissa Nathan had reached out to Leslie Sloane and formed some sort of truce; is that right?
A Yes.
Q Okay. You understood that Melissa Nathan was monitoring and handling any incoming PR inquiries; is that right?
A I think I had believed that both her and

CONFIDENTIAL

Page 170

Jen were doing that.
Q Okay. You understood that Melissa Nathan was interfacing with reporters as necessary on any of these stories, right?
A Interfacing, like -- communicating with?
(Cross talk.)
Q Communicating with? Sure.
A Yeah. Yeah. My understanding was that if someone reached out to her, then she would obviously answer that or communicate with them in whatever way a PR person communicates.
Q And by "someone," you meant a reporter?
A I would imagine.
Q And by "she", you meant Melissa Nathan?
A Or Jennifer Abel.
Q Okay. Did you understand that Melissa Nathan and/or Jennifer Abel were actually speaking to reporters whether on background or otherwise around this time?
A In what capacity?
Q On your behalf.
A Well, I imagine so. There was a -- we were still promoting the movie so...
Q And you understood that both Melissa Nathan and Jennifer Abel were speaking to

Page 171

reporters on your behalf at this time?
A I'm not sure if I ever thought about who was speaking to who.
Q Okay.
A Did you want me to finish -- was there something I didn't answer?
Q No.
A Okay.
Q Were you finished with your answer?
A I believe so.
MS. SHAH: Okay. Eighty-three, please.
THE WITNESS: Now we're done with this?
BY MS. SHAH:
Q Fair to say that you did not view The Hollywood Reporter article as a positive for you when it came out?
A I think that's fair to say.
Q Fair to say you would have been pretty pissed if you had learned that Melissa Nathan had, in fact, leaked the information that resulted in that article, right?
MS. SHAPIRO: Objection.
THE WITNESS: I can't imagine I would have been happy about that.

Page 172

MS. SHAH: All right. I'm going to show you what's been marked as Exhibit 10. It's a text thread between Melissa Nathan, Ashlea, and Amy Chozick dated August 13th, 2024, Bates stamped Nathan_, several zeroes, 1221. Flip through this for me and tell me if you've ever seen this before.
(Exhibit 10 marked for identification.)
THE WITNESS: No, I have never seen this. I don't have to flip through it.
BY MS. SHAH:
Q Sorry. I gave you the wrong one.
Do you know who Amy Chozick is?
A I do not.
Q Do you know if she's a reporter?
A I do not.
Q Okay. Do you know who Ashlea is?
A I do not.
Q Do you know if she's one of Melissa Nathan's good friends?
A I do not.
Q Okay. On the first page of this, there's a text from Amy Chozick and then a text from Melissa Nathan that says:
(As read):
"I am on Zoom but we need to pin Amy

Page 173

threw me to the wolves."
Do you see that?
A Uh-huh.
Q And then Amy says:
(As read):
"I didn't know that Josh would put it on the wires."
Do you see that?
A I do.
Q And then Amy says:
(As read):
"My money is on Melissa against the wolves anyway."
Do you see that?
A I do.
Q Then Melissa says:
"Stop sucking up."
And then Amy says:
"I should be your publicist. Hire me."
Do you see that?
A I do.
Q And Melissa says:
"Done. 0.00 per year."
Do you see that?
A I do.

CONFIDENTIAL

Page 174

Q Now, this text thread is on the same day as The Hollywood Reporter article was published.
MS. SHAPIRO: Is that a question?
MS. SHAH: No.
BY MS. SHAH:
Q Are you aware of whether or not they're talking about The Hollywood Reporter article that named Melissa as your crisis PR?
MS. SHAPIRO: Objection. He just said that he's never seen this before.
THE WITNESS: I've never --
MS. SHAPIRO: Can you move to something that he actually has knowledge of?
MS. SHAH: No. I'm going to ask him the questions I'm going to ask him.
THE WITNESS: Is it okay if I read the document?
MS. SHAH: Of course.
THE WITNESS: Okay. I've read it.
BY MS. SHAH:
Q Do you now understand that they were joking about The Hollywood Reporter article that identified Melissa as your crisis PR?
MS. SHAPIRO: Objection.
THE WITNESS: It appears to be the case.

Page 175

BY MS. SHAH:
Q Okay. Flip with me to the page marked 1222 at the bottom.
A Okay.
Q Do you see where Amy Chozick at around 7:40 says:
(As read):
"I told our friend Josh that Melissa is a boss and has a cool client. Josh told his wife who is a very prominent publicist. Sarah somehow told The Hollywood Reporter and now they are doing a story on Mel."
Do you see that?
A I do.
Q You understand this is how The Hollywood Reporter got that story?
A It appears that is what Amy is saying.
Q Flip the page to 1223. You see a screenshot texted by Melissa of a conversation between her and Pam. Do you see that?
A I do.
Q You don't need to flip back to the article. But I'll represent to you that Pam is Pam McClintock who wrote The Hollywood Reporter story on

Page 176

Melissa.
A Okay.
Q Okay. And you see they're texting.
(As read):
"Good to chat."
Melissa says:
"Just checking in to see if I need to look out for this article and if so, when."
And then Pam says:
"Was just texting you. Story is very fair and going soon."
Melissa says:
"Thank you."
Do you see that?
A Yes.
Q Were you aware that Melissa had spoken on background with The Hollywood Reporter ahead of the story being published?
A I was not.
Q Were you aware that she was managing coverage in The Hollywood Reporter story about her before the story was being published?
A I was not.
Q Amy Chozick writes:

Page 177

"Perfect."
Do you see that?
A Oh, sorry, down here. Yes.
Q And if you flip the page, they are talking about:
(As read):
"What publication?"
"THR."
"Ooh exciting."
"I think so!"
Do you see that?
A Yes.
Q Were you aware that Melissa and her friends were boasting and joking about how good this article was going to be for Melissa at the time?
MS. SHAPIRO: Objection.
THE WITNESS: I wasn't aware of this, so no.
BY MS. SHAH:
Q Because Melissa never told you any of this, did she?
MS. SHAPIRO: Objection.
THE WITNESS: I think I testified to what Melissa told me earlier. Which was not this. So...

BY MS. SHAH:
Q Okay. If you flip the page to 1225, you'll see that Melissa texts The Hollywood Reporter story to this group thread when it goes up.
Do you see that?
A Uh-huh.
Q Okay. And then Ashlea says:
(As read):
"Oh, that's really good, Mel. Like really good."
Do you see that?
A I see it.
Q And then Amy says:
"Boom! This is good."
Right?
A I -- yes, I see it.
Q And then Amy, lower below, says:
(As read):
"You are going to hear from all the problematic men! Dick pic-a-palooza."
Ashlea says:
"Men are always the problem. You're in the right game."
Do you see that?
A I do.



Q What do you think of this seeing it now?
MS. SHAPIRO: Objection.
THE WITNESS: I think it sounds like a group of female friends talking to each other about an article.
BY MS. SHAH:
Q Are you pleased to see that Melissa was joking with her friends about the article that was causing you consternation at the time?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not pleased. I don't think that's the word but...
BY MS. SHAH:
Q Are you pleased by the fact that when you asked her to explain this article for you and what it meant, she didn't tell you any of this?
MS. SHAPIRO: Objection.
THE WITNESS: I'm sorry, can you?
BY MS. SHAH:
Q Are you pleased by the fact that when you asked Melissa, explain this article to me and what it means, she didn't tell you any of this?
MS. SHAPIRO: Objection.
THE WITNESS: Again, I wouldn't say I'm pleased. No.



BY MS. SHAH:
Q Are you pleased to be lumped in, among Melissa's friends, with a group of all the problematic men that need Melissa's help?
MS. SHAPIRO: Objection.
THE WITNESS: I would hope that they weren't thinking I was one of the problematic men, but that she was going to hear from all of the problematic men. Then it says:
(As read):
"Dick pic-a-palooza."
So, whatever that means.
BY MS. SHAH:
Q Do you understand from this that essentially what they're saying is, this is an article about how Melissa has helped Johnny Depp in his abuse trial against Amber Heard and is now helping you in relation to the allegations by Blake Lively against you, and so now she's going to be hearing from all of the problematic men?
MS. SHAPIRO: Objection.
THE WITNESS: I believe one could infer that that was what they were talking about.
BY MS. SHAH:
Q Do you see Melissa anywhere in this text



thread saying, what are you talking about, Justin is not a problematic man?
MS. SHAPIRO: Objection.
THE WITNESS: Not in the pages that you gave me.
BY MS. SHAH:
Q Instead, if you look at 1226, you will see that Ashlea says:
(As read):
"Blake Lively noting Melissa's name. Haha."
Then Amy says:
(As read):
"Joaquin Phoenix is calling."
And then Melissa says:
(As read):
"I fucking wish."
Right?
A I see that.
Q Do you have a view from this text thread about whether or not Melissa thought the publication of this article was going to be good for her business?
MS. SHAPIRO: Objection.
THE WITNESS: I can't guess on what

CONFIDENTIAL

Page 182

Melissa was thinking or feeling at that time.
BY MS. SHAH:
Q Do you think it would have been fair for people to infer from the fact that you chose to hire Melissa Nathan, that you were now one of a group of problematic men that she tended to work with?
MS. SHAPIRO: Objection.
THE WITNESS: Do I think it would be fair for people to infer? I think people's opinions are fair. I mean, I -- I can't control people's opinions.
BY MS. SHAH:
Q Do you think that would be a fair inference for people to draw from the fact that you had hired Melissa Nathan who had also worked with other problematic men?
MS. SHAPIRO: Objection.
THE WITNESS: I think -- yeah. I think that would be fair. I think in this case, yeah.
BY MS. SHAH:
Q Do you think you're a problematic man?
MS. SHAPIRO: Objection.
THE WITNESS: I don't.
BY MS. SHAH:
Q Not in any respect?

Page 183

MS. SHAPIRO: Objection.
THE WITNESS: I'm not sure how to answer that.
BY MS. SHAH:
Q With a yes or no.
A I don't.
Q Okay.
Do you think that this is the type of association, looking back with hindsight, that Steph Jones was trying to warn you about when she warned you not to hire Melissa Nathan?
MS. SHAPIRO: Objection.
THE WITNESS: Again, I -- I don't know everything that was in Stephanie Jones's head, but I think that could be a fair thing to think.
BY MS. SHAH:
Q You said you felt at the time that Stephanie Jones had an agenda in warning you against Melissa Nathan. Do you remember that?
A I do.
Q Seeing this and in hindsight, do you still think she had an agenda or do you think she was trying to protect your interests?
A I don't -- I can't know what she was truly doing. I just know that the feeling that I

Page 184

had at the time. And it felt -- again, it just felt very much like an agenda.
Q Based on everything that has happened since you hired Melissa Nathan, do you regret the decision to hire her?
MS. SHAPIRO: Objection.
THE WITNESS: I really try to not have regrets.
BY MS. SHAH:
Q Is this one of them?
MS. SHAPIRO: Objection.
THE WITNESS: I really try to not have regrets. I don't have regrets.
BY MS. SHAH:
Q You never have regrets?
MS. SHAPIRO: Objection.
THE WITNESS: Not so much regrets. No.
BY MS. SHAH:
Q Okay.
You worked with a woman named Katie Case while she was at The Agency Group; is that right?
A I know the name because she was on messages and a Zoom or here or there, but I -- I don't think I personally worked with her.
Q Okay. But she was on the team at TAG --

Page 185

A Yes.
Q -- that was working with you on the Wayfarer and Baldoni account; is that right?
A Yes. Yes.
Q Okay. You testified that you haven't read her deposition in this case; is that right?
A Correct.
Q Has anyone -- not a lawyer. Has anyone other than a lawyer told you anything about what she testified?
A No.
Q Okay. Are you aware --
A Hold on. I just want to be -- there was Breanna and Katie.
Q Uh-huh.
A And I am not sure who is who. So --
Q Okay.
A -- I -- I may mix the two up because -- but I know they're both employees or former employees or -- so I just want to say that I might confuse two of them.
Q Sure. Have you ever seen them on Zoom? Do you know what they look like?
A I would need the name under their photos --

CONFIDENTIAL

Page 186

Q Okay.
A -- to tell you who was who.
Q Are you aware that Katie Case testified under oath in this case that Melissa Nathan instructed Katie Case to write the copy for the Stephanie Jones Leaks website?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MS. SHAH:
Q Does that surprise you?
MS. SHAPIRO: Objection.
THE WITNESS: It would surprise me.
BY MS. SHAH:
Q Are you aware that Katie Case testified under oath in this case that Melissa Nathan gave her talking points for the copy for the Stephanie Jones Leaks website, including that Stephanie Jones holds clients hostage, that she leaks clients' confidential information, and that she treats her employees horribly?
MS. SHAPIRO: Objection.
THE WITNESS: I was unaware.
BY MS. SHAH:
Q Okay. Are you aware that Katie Case testified under oath in this case that she worked

Page 187

with Melissa and Jed Wallace to create and publish the Stephanie Jones Leaks website?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: I was unaware.
BY MS. SHAH:
Q Are you aware that Katie Case has testified under oath in this case that she wrote copy for five or six tweets at Melissa Nathan and Jed Wallace's instruction for an X account Lying Steph Jones?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I was not aware.
BY MS. SHAH:
Q Melissa Nathan never told this to you?
MS. SHAPIRO: Objection.
THE WITNESS: Nobody has, but you have.
BY MS. SHAH:
Q Okay. Did you speak to Melissa Nathan at all after her own deposition?
MS. SHAPIRO: Outside the presence of lawyers?
MS. SHAH: Yes.
THE WITNESS: Yes, Jamey and I had a

Page 188

one-minute phone call with her.
BY MS. SHAH:
Q What was the substance of that phone call?
A Great job. How are you feeling? Are you okay?
Q What did she say?
A She said she was exhausted and it was really hard. It was mostly -- it was mostly Jamey kind of just pouring into her, making her feel good.
Q During this phone call or any time otherwise, did she ever tell you or Jamey that she and I had a lengthy, lengthy conversation about the Steph Jones Leaks website and what Katie Case testified under oath?
A No.
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MS. SHAH:
Q All right.
Are you aware that Katie Case testified under oath that Melissa -- that she worked with Melissa Nathan and Jed Wallace also to create a smear website against a woman named Amanda Ghost on behalf of their client Rebel Wilson?

Page 189

MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I'm not aware of any of this -- of anything that she had testified. But no.
BY MS. SHAH:
Q Okay. Have you seen any reporting about the fact that Melissa Nathan and Katie Case were involved in creating a smear website about Amanda Ghost on behalf of their client Rebel Wilson?
A I haven't seen anything. I feel like I was made aware that there's another lawsuit happening.
Q Do you know that Melissa Nathan and TAG had been named in this lawsuit?
A I think that's how -- why I was made aware.
Q Okay. Do you know that Jed Wallace has not been named as a defendant in that lawsuit but is named in the lawsuit as one of the people who was involved in creating that smear website on Amanda Ghost?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I do not.

CONFIDENTIAL

Page 190

BY MS. SHAH:
Q Okay. Do you know that Bryan Freedman also represented Rebel Wilson in connection with those lawsuits?
A I did not.
Q Okay. Are you aware that there's text evidence in this case about Melissa instructing Katie Case and Jed Wallace instructing Katie Case about the copy to write against Amanda Ghost on behalf of Rebel Wilson?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: I -- I don't. I didn't even know who Amanda Ghost was.
BY MS. SHAH:
Q No one showed this text to you?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: No.
MS. SHAH: Okay, 68, please. I'm going to hand you what's marked as Exhibit 11. It's a text thread between Katie Case and Melissa Nathan, stamped KCASE, several zeroes, 4949.
(Exhibit 11 marked for identification.)

Page 191

BY MS. SHAH:
Q It's a long text thread, but if you could focus for me on the page 4951.
MS. SHAPIRO: Mr. Baldoni, read as much as you need to to answer questions.
THE WITNESS: I have no idea what I'm looking at here.
BY MS. SHAH:
Q You can --
A This is not something I'm on, right?
Q No, it's not. You can look at any time at as much of this as you want. I'm going to try and help direct you, and I'm going to direct you to start at 4951.
I want you to look at the text message from Melissa Nathan at 9:40 a.m. where she says --
A Sorry. I'm just reading the first page --
Q Sure.
A -- and I'm having a hard time reading. Is this -- is this blown up somewhere?
Q It probably is in the back, but it's not relevant to the questions I'm going to ask you. Feel free to look at it anyway.
Actually, you know what? I am going to

Page 192

ask you about it, so go ahead and look at it.
A Happy I'm preparing.
Okay.
Q Let's start at the top. You'll see at 9:36 a.m., Melissa texts a screenshot from someone named Scott, with a photo.
Do you see that?
A Uh-huh.
Q You understand that to be Scooter Braun, right?
A Yes.
Q You know him, don't you?
A I do.
Q Okay. And then down below, Katie Case says:
(As read):
"Good for you."
And Melissa Nathan says:
(As read):
"He cannot expect us to work with Stephanie. I won't do it."
Do you see that?
A I do.
Q Did you have any understanding at the time that Melissa Nathan had extreme frustration

Page 193

about working with Stephanie Jones on Scooter Braun's account?
A No.
Q No.
Did you have an understanding at the time you hired her that she had extreme animosity towards Stephanie Jones stemming in part from their mutual work on Scooter Braun's account?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MS. SHAH:
Q Have you come to have that understanding at any point since, or is this the first time you're hearing about it?
MS. SHAPIRO: Objection.
THE WITNESS: This is the first time I'm hearing about it in this way, yeah.
BY MS. SHAH:
Q Did Scooter Braun ever express to you any issues that Stephanie Jones and Melissa Nathan had about working together for him?
MS. SHAPIRO: Objection.
THE WITNESS: Scooter and I rarely, if ever, talk.

BY MS. SHAH:
Q Have you talked to him since these lawsuits were filed?
A No.
Q Not once?
A No. Not once.
Q Okay. Are you aware that Melissa Nathan and her team at TAG would regularly send texts about Stephanie Jones calling her a fucking bitch and saying other pretty nasty things about her?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know how I would be aware of that.
BY MS. SHAH:
Q Were you aware that they felt that way?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MS. SHAH:
Q Okay. Were you aware that Melissa and Jen Nathan [sic] joked multiple times about killing Stephanie Jones --
A Sorry. Melissa and Jen?
Q Jen Abel.
A Okay.
Q Forgive me.



A I didn't know if there was a new party to the case.
Q No. My mistake.
Were you aware that Melissa and Jen Abel have joked multiple times about killing Stephanie Jones as a gift to each other?
MS. SHAPIRO: Objection.
THE WITNESS: I am not.
BY MS. SHAH:
Q Okay. That's not something that anybody has mentioned to you?
A No.
Q Okay.
A No.
Q You see below, Melissa says:
(As read):
"He cannot expect us to work with Stephanie. I won't do it."
And then Katie Case says:
(As read):
"It's just not possible. Oh, my gosh, wait. What if you used the Business Insider thing as a reason not to do it? This really showcases how little she can be trusted. I don't want her



interacting with my team. We're working too hard and I'm worried about details being leaked internationally, if there is a difference of opinion."
Do you see that?
A I do.
Q You understand from this text message that Katie Case is suggesting that Melissa Nathan should use the Business Insider article that's coming out about Steph as a reason to try to get Scooter Braun to separate from her.
Do you see that?
MS. SHAPIRO: Objection.
THE WITNESS: I do. I'm just -- my brain is --
MS. SHAPIRO: Can we take a break?
THE WITNESS: No, I'm just trying to -- there's so many pieces here. Okay. So one more time?
BY MS. SHAH:
Q You see that Katie Case is suggesting to Melissa Nathan that they should use this Business Insider article that is coming out about Steph, show it to Scooter as a reason he should stop working with Steph?



MS. SHAPIRO: Objection.
THE WITNESS: Okay.
BY MS. SHAH:
Q Okay?
A And --
Q Do you see that?
A And do I see that? Got it. There's a lot of dots. If this is the same Business Insider thing, which I don't know if it is, then yes. I don't -- I just don't know what the Business Insider thing is they are talking about here. I was not a part of this conversation.
Q Right. And you're not aware that Katie Case and Melissa Nathan actually fed most of the details to the Business Insider reporter to get them to publish that article in the first place, right?
MS. SHAPIRO: Objection.
THE WITNESS: Correct.
MS. SHAH: Okay. All right. Let's keep flipping.
MS. SHAPIRO: Counsel, can we take a ten-minute break, please? Were you almost done with the document? If you're almost done with the document, we can wait until after you finish with the document.

CONFIDENTIAL

Page 198

MS. SHAH: I probably have ten more minutes of questions on this document.
MS. SHAPIRO: Then let's take a break now then.
MS. SHAH: All right. I trust you're not going to talk about the document during the break?
MS. SHAPIRO: No.
MS. SHAH: All right.
THE VIDEOGRAPHER: We are going off the record. The time is 2:46 p.m.
(Recess.)
THE VIDEOGRAPHER: You're back on the record. The time is 3:11 p.m.
BY MS. SHAH:
Q Okay. If you'll look for me at Exhibit 11, which we were discussing before the break, I would like to direct your attention to the page marked 4951.
A Uh-huh.
Q You see at 9:39, it's the second text, Katie Case writes to Melissa Nathan:
(As read):
"Also, hi, how are you?"
Do you see that?
A Yes.

Page 199

Q Okay. And Melissa Nathan writes:
(As read):
"Is 6:30. I'm already trying to kill one Rebel story and dealing with Mattel loss for Bryan."
Do you see that?
A I do.
Q And I'll represent to you that Melissa Nathan testified in this case that Rebel meant Rebel Wilson and Bryan meant Bryan Freedman.
A Thank you.
Q Okay. Then Melissa Nathan writes:
(As read):
"So basically, Rebel wants one of those sites."
MS. SHAPIRO: Objection.
MS. SHAH: I wasn't finished with the question yet, but...
MS. SHAPIRO: Well, okay, but you misread the text.
BY MS. SHAH:
Q Melissa Nathan writes:
(As read):
"So basically, Rebel wants a one of those sites."

Page 200

Do you see that?
A Yes.
Q And then Katie Case responds two texts below:
(As read):
"Ah okay."
And then Melissa writes:
"Should be a mixture of that document that I think Carolina pulled about Amanda goes or the intern pulled, the voice note and this."
And then there's an attachment.
Do you see that?
A Yes.
Q Okay. And then Katie Case writes:
(As read):
"Okdokes. I'll pull this together in the morning."
Do you see that?
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q (As read):
"I'll pull this together this morning."
Do you see that?
A That, I see.

Page 201

Q All right. And then Melissa writes:
(As read):
"Thank you. It can be really, really harsh and then link it to the Jed S voice thing."
Do you see that?
A Yes.
Q All right. I will represent to you that Melissa testified that Jed S is Jed Wallace. Okay.
All right. And if you look at the text above, I will represent to you that she testified that when she said "should be a mixture of that document that I think Carolina pulled about Amanda goes or the intern pulled", Carolina is Carolina Hurley, who works for TAG, and "Amanda goes" meant Amanda Ghost. Okay?
A It's a lot of names. But okay.
Q All right. Then she references a voice note and an attachment. There's a voice note from Jed Wallace attached to this text thread that talks about what the smear allegations against Amanda Ghost should be, that go on the website. Okay?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.

CONFIDENTIAL

Page 202

MS. SHAH: That's not a question. I'm just telling you that.
THE WITNESS: Oh, thank you for telling me.
BY MS. SHAH:
Q Sure. And if you look at the attachment that Melissa attaches, it starts at the page marked 4958.
A Okay.
Q Starts by saying:
(As read):
"This website is dedicated to telling the world the truth about Amanda Ghost who has maliciously tried to destroy the lives of countless artists. Seeing as she is currently funded by one of the world's richest men, it has been near impossible to release information about her wrongdoings for the past two decades."
And at the bottom of the paragraph, it says:
"More recently, her behavior has escalated into unwanted sexual advances on young women. She is the Indian

Page 203

Ghislaine Maxwell whose only friend in this world seems to be convicted felon Boy George."
Do you see all this?
A Yes.
Q Are you aware of whether or not this is a first draft of the copy that ultimately became a smear website against Amanda Ghost?
A I've never seen this before.
Q All right.
A I have no knowledge of any of this stuff.
Q All right. If you flip the page, sorry, to where we were before. My apologies. Go to 4952.
At the top of the page, at 9:56, there's a text from Melissa that says:
(As read):
"Len - Russian oligarchs and making her a madame basically lol said Jed."
Do you see that?
A Uh-huh.
Q I will represent to you that Melissa testified that "Jed" meant Jed Wallace.
A Yes.
Q And then Katie Case writes:
(As read):

Page 204

"Oh, my god. Lol. Okay, this one will be fun."
Do you see that?
A I do.
Q Okay. Flip the page. Next page, 4953. There's a text from Melissa Nathan at 1:58 p.m. in the middle of the page where she says:
(As read):
"I have to drive to this fucking meeting. Do you think you'll have that copy for Jed today because I need to make it really hammy?"
Do you see that?
A Uh-huh.
Q Okay. And Jed meant Jed Wallace. If you go down later in the page, Katie Case says at 4:02 p.m.
(As read):
"Is Jed doing anything on Justin? I'm having Zoe monitor, but that's not the same lol."
Do you see that?
A I see it.
Q Okay. And I will represent to you that Jed meant Jed Wallace and Justin means you.

Page 205

A Great.
Q If you flip the page, Melissa Nathan says:
(As read):
"Not yet. They've not signed him on."
Katie Case writes:
"Urg, I wish they'd get a move on. All they care about is social right now and we can't do anything about it lol. Also, what are we supposed to do about a journalist calling her? Like, do your job, Jen. Lol."
And then Melissa writes:
"Jed and Bryan asking me for copy. Lol, kill me."
Do you see that?
A I do.
Q All right. And I will represent to you that Jed is Jed Wallace and Bryan is Bryan Freedman.
Do you see that?
A I do.
Q All right. Did you have any knowledge before I just showed you this document that this has been produced in this case?
A No.

Q Okay. Would you be surprised to learn that Katie Case testified that Melissa Nathan worked with Bryan Freedman and Jed Wallace to create a smear website against Amanda Ghost on behalf of client Rebel Wilson?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: I believe I would be.
BY MS. SHAH:
Q Okay. Is that something you would've wanted Melissa Nathan to tell you about when she was representing you and suggesting that you bring Jed Wallace on to handle socials?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: I don't know if I would have expected it because I didn't know it existed.
BY MS. SHAH:
Q Okay. If Melissa Nathan and Jed Wallace had a practice of creating smear websites and smear social media accounts against adversaries of their clients, is that something you would have wanted to know before you decided to hire both of them to help you against Blake Lively?
MS. SHAPIRO: Objection.



MR. GLOVER: Objection. Form.
THE WITNESS: I would imagine so, yes.
BY MS. SHAH:
Q Do you know who the Alexander brothers are?
A No.
Q Have you ever heard of three brothers with the last name of Alexander who are real estate agents in Miami who have been accused by many women of rape and sexual misconduct?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MS. SHAH:
Q Okay. Are you aware that Katie Case testified under oath in this case that she also worked with Melissa Nathan and Jed Wallace to create a smear website about the victims of the Alexander brothers on their behalf?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: As I said, I didn't know who they were so I didn't know anything else.
BY MS. SHAH:
Q And nobody has told you, in this litigation, that this is what Katie Case has



testified under oath about the activities of Melissa Nathan and Jed Wallace?
MS. SHAPIRO: I'm going to object and just --
MR. GLOVER: Objection. Form.
MS. SHAPIRO: -- Instruct you and remind you not to provide any information that you only received from any attorneys, if you know anything about the answer to this question.
THE WITNESS: No attorneys had told me that, no. I don't know anything about it. You've told me, though.
BY MS. SHAH:
Q Okay. Is the tactic of creating defamatory smear websites and social media posts about people a tactic that you approve of?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: It is not a tactic that I would ever employ. No.
BY MS. SHAH:
Q Is it a tactic that you would ever approve of?
MS. SHAPIRO: Objection.
THE WITNESS: I think I said a similar



thing to that. I would never approve of anyone creating a smear website for me. I can't stop what someone else does.
BY MS. SHAH:
Q Would you want to knowingly associate yourself with people who regularly employ such tactics against other people?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I can't imagine I would.
BY MS. SHAH:
Q Are you happy that you are now associated with at least two people who have employed such tactics against other people?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: There is nothing about this situation that I am happy about.
BY MS. SHAH:
Q Specifically with respect to the fact that you have associated yourself with at least two people in your employ who have -- who have a history of employing such tactics, are you happy about that?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.

THE WITNESS: As I said, there is nothing about any of this that I'm happy about.
BY MS. SHAH:
Q All right.
Do you have any understanding of whether Melissa Nathan and Jed Wallace have employed these tactics against Stephanie Jones?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: No. I don't know why I would.
BY MS. SHAH:
Q Well, because they work for you.
MS. SHAPIRO: Objection.
THE WITNESS: Who works for me?
BY MS. SHAH:
Q Melissa Nathan and Jed Wallace.
MS. SHAPIRO: Objection.
Counsel, do you have a question?
THE WITNESS: I don't understand --
MS. SHAPIRO: You're making statements. Can you pose a question, please?
BY MS. SHAH:
Q Do you have any knowledge about whether Melissa Nathan and Jed Wallace have employed these tactics against Stephanie Jones during the pendency of these litigations on your behalf?



MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: Absolutely not. Absolutely not.
BY MS. SHAH:
Q Okay. Do you have any idea or understanding about whether Melissa Nathan and Jed Wallace have employed similar tactics against Blake Lively, either before or during the pendency of this lawsuit on your behalf?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
MS. SHAPIRO: And I just want to instruct you again, Mr. Baldoni, to the extent there's a question posed about your understanding about anything after the litigation started, do not share any information you received only from your attorneys.
THE WITNESS: Would you mind repeating the question?
BY MS. SHAH:
Q Do you have any understanding about whether Melissa Nathan and Jed Wallace have employed similar tactics against Blake Lively, either before or during the pendency of this lawsuit on your behalf?



A No.
MR. GLOVER: Objection. Form.
BY MS. SHAH:
Q Is it possible, having seen everything that I've showed you here today, that Melissa Nathan and Jed Wallace have employed these kind of tactics against Stephanie Jones during the pendency of this lawsuit or before?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I have no idea.
BY MS. SHAH:
Q It could have happened; you just might not know about it, right?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: Lots of things could have happened. I don't know about any of them. I don't know how -- I don't know how to answer that or how that's relevant to anything.
BY MS. SHAH:
Q You can't say with 100 percent personal certainty that Melissa Nathan and Jed Wallace have never employed these tactics against Stephanie Jones behind your back, can you?



MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I can tell you that I would never ask them to and I have no knowledge of anything that they've done. So I don't know how to answer that.
BY MS. SHAH:
Q But sitting here today under oath, you cannot tell me with 100 percent certainty that Jed Wallace and Melissa Nathan have never employed these tactics against Stephanie Jones behind your back, can you?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I think you just answered your own question.
BY MS. SHAH:
Q I'm looking for an answer from you.
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: But how could I know something if it happened behind my back?

CONFIDENTIAL

Page 214

BY MS. SHAH:
Q I'm asking if --
A I don't know. I genuinely have no knowledge of any of this. So I just don't understand what you're asking of me.
Q My question is: Are you willing to testify under oath --
A That something is possible?
Q -- with 100 percent certainty that it didn't happen?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: No, because I couldn't testify either way that it didn't happen or did happen because I -- I'm not a part of it. I don't know anything about it.
BY MS. SHAH:
Q Okay. Are you able to testify with 100 percent certainty under oath that Melissa Nathan and Jed Wallace didn't employ similar tactics against Blake Lively behind her back?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: My answer is the same.

Page 215

BY MS. SHAH:
Q Which is no, you cannot testify with 100 percent certainty that it didn't happen?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Can we -- can we ask him questions that he has knowledge of? This is completely out of bounds and --
MS. SHAH: With all due respect --
MS. SHAPIRO: -- crazy.
MS. SHAH: -- you're limited to non-speaking objections. Make your objection and --
(Cross talk.)
MS. SHAPIRO: Yeah. But you -- you have an obligation to ask questions --
MS. SHAH: I'm not going to debate you on the record.
MS. SHAPIRO: -- that are likely calculated to lead to discoverable evidence. None of this fits that criteria.
MS. SHAH: That's in my judgment, not yours. So I'm going to ask my questions --
MS. SHAPIRO: Well, if you want to waste another three hours, go ahead.
MS. SHAH: It might be a waste of your

Page 216

time. It's not a waste of mine.
Can you read that question back, please?
THE STENOGRAPHIC REPORTER: Sure. Let me find it.
MS. SHAPIRO: This is not in good faith, Counsel.
MS. SHAH: I disagree with you, Counsel.
THE STENOGRAPHIC REPORTER: Okay. The last question, which is not -- which is:
(Record read as follows):
"You cannot testify with 100 percent certainty that it didn't happen?"
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: Sure. I -- I -- I have no idea what happened or didn't happen so I can't testify either way whether it did or didn't, as I wasn't a part of any of it.
BY MS. SHAH:
Q It appears that there was a lot about what Melissa Nathan and Jed Wallace were doing with relation to putting up smear websites and social media accounts and digital manipulation that you weren't aware of before I just showed you, right?
MR. GLOVER: Objection. Form.

Page 217

MS. SHAPIRO: Objection.
THE WITNESS: I think that's a fair statement.
BY MS. SHAH:
Q Okay. Do you have an understanding of whether anyone at TAG ever planted or fed information to a reporter that resulted in a negative story about Blake Lively in August of 2024?
MS. SHAPIRO: Objection.
THE WITNESS: I do not.
BY MS. SHAH:
Q You don't know one way or another?
A I know the directives were to not do anything negative. Absolutely.
Q And if someone from TAG has testified in this case that they, in fact, did plant a negative story about Blake Lively, that's not something you were aware of?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MS. SHAH:
Q Are you aware that Breanna Butler Koslow testified under other in this case that she deliberately leaked information to the Daily Mail in August of 2024 that resulted in a negative story

CONFIDENTIAL

Page 218

about Blake Lively?
A I was not.
Q No one has told you that since she testified?
MS. SHAPIRO: Objection. To the extent it calls for any communications with your attorneys, do not answer.
THE WITNESS: No.
BY MS. SHAH:
Q If that had happened in August of 2024, is that someone you would have -- is that something that as TAG's client, you would have expected they run by you before they did?
MS. SHAPIRO: Objection.
THE WITNESS: TAG had very clear directions to not create anything negative.
BY MS. SHAH:
Q And if they did create something negative that resulted in a negative story about Blake Lively, is that something they would have expected -- you would have expected them to tell you about?
MS. SHAPIRO: Objection.
THE WITNESS: I would have expected them to tell probably Jamey. I was not in communication

Page 219

every day about everything.
BY MS. SHAH:
Q Okay.
What's your understanding -- you testified earlier about a truce that you believed was in place between your camp and Blake Lively's camp with respect to media, right?
A Yes.
Q And your understanding is that that truce had been brokered between Melissa Nathan and Leslie Sloane, right?
A That's what was relayed to me.
Q Do you have any understanding of whether or not and how that truce may have been broken?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know.
BY MS. SHAH:
Q Okay. Do you think someone from TAG deliberately leaking negative information about Blake Lively in order to plant a story about her in the Daily Mail broke that truce?
MS. SHAPIRO: Objection.
THE WITNESS: I have -- I don't know.
BY MS. SHAH:
Q Well, the truth -- the truce was to not

Page 220

put out any negative stories about each other, right?
A Yes.
Q And so if someone from TAG did, in fact, put out a negative story about Blake Lively, you would agree with me that that broke the truce, right?
A I'm sorry. Let me go back. My understanding of the truce wasn't negative stories. My understanding of the truce was to not be in touch with any reporters about any of that, anything. So I don't think it was just negative stories. It was commenting on the -- the current speculation.
Q Okay. So if the truce was to not be in contact with any reporters about anything --
A Anything related to the speculation about what people were talking about.
Q Sure. If the truce was to not be in contact with any reporters relating to anything about the speculation about what was going on between you and Blake Lively on the film, you would agree with me that somebody from TAG planting a negative story against Blake Lively broke that truce?
A If that's what happened, then I would

Page 221

imagine that that would be accurate. I don't know if that's what happened. I wasn't there.
Q Well, you were there; you just didn't know, right?
MS. SHAPIRO: Objection.
THE WITNESS: Well, this is the first I'm hearing about any of this, so I don't know.
BY MS. SHAH:
Q Okay. Are you pleased this is the first time you're hearing about any of what I'm telling you now?
MS. SHAPIRO: Objection.
THE WITNESS: You asked me a lot if I'm pleased or happy. I don't think that's a fair characterization of anything that I'm feeling right now.
BY MS. SHAH:
Q Are you unhappy that you never heard before any of the things I'm telling you now?
MS. SHAPIRO: Objection.
THE WITNESS: If they turned out to be true, then yeah, that would be an accurate feeling of what I would feel. But I haven't been able to do any of my own investigation. You're just telling me, and I'm hearing and responding to you.

BY MS. SHAH:
Q If it turns out that all of these things are true, do you wish in hindsight that you had followed Stephanie Jones's advice about Melissa Nathan?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: I -- I don't even know how to answer that. Do I wish in hindsight -- so if everything you're saying is true, do I wish in hindsight that I had followed Stephanie Jones's advice back last year before hiring Melissa Nathan?
BY MS. SHAH:
Q Uh-huh.
A I -- I can't answer that. I...
Q Do you still have no regrets about hiring Melissa Nathan?
A As I said, I really try to not have regrets.
Q So is that a no?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know. I don't know. And I don't mean to laugh at your questions.
MS. SHAPIRO: Time out. The iPads are not updating.



THE STENOGRAPHIC REPORTER: That means Wi-Fi probably cut out. Jonathan will reconnect them.
MS. SHAPIRO: Okay. Thank you.
THE VIDEOGRAPHER: Can you just refresh this?
MS. SHAPIRO: Okay. Thank you.
THE WITNESS: Would you like me to be done with this one?
MS. SHAH: Yes, thank you.
I'm going to show you a document that's been marked as Exhibit 12.
(Exhibit 12 marked for identification.)
BY MS. SHAH:
Q It's a text thread between Jennifer Abel and Matthew -- Matthew Mitchell from January 14th, 2024, Bates-stamped JONESWORKS_, several zeroes, 41606.
Just read through this for me.
THE WITNESS: Yes.
BY MS. SHAH:
Q Have you ever seen this before?
A I -- I have not seen this entire text thread. I do believe that one of these was made public at one point. I think -- I don't know where



it was. I don't know if it was an article, or maybe it was in the lawsuit or something.
Q Have you ever talked to Jennifer Abel about why she said this about you?
A Yes, I did.
Q And what did you say?
A Well, she actually called me one morning. I was sleeping. And she was in tears. And she just said, Justin, I'm so sorry. I said, for what? And then she said, some texts have been made public where I'm talking shit about you, and I'm just so sorry. I don't believe the things that I said. I was just pissed because you didn't want to do something, and I'm sorry.
And I said, I -- I understand. I'm not going to forgive her. I'm not going to, like, hold it against her. I'm sure that -- like, I'm sure if everybody's phone was scanned, I'm sure there's a lot of people that talk shit about a lot of people. So as a -- as a rule, I do my best to not do that. And yet, I am -- I'm sure lots of people have said these things about me.
Q If you flip to the page marked 41608, the text message -- the text message at 2:02 p.m., in the middle of this -- the middle of the page.



A Uh-huh.
Q She writes:
(As read):
"He may fire us because even if we put together an amazing campaign, it's not going to change the fact that he's so unlikable and unrealistic as a leading man. There's no chemistry with him and Blake. You and I both know that she will be resistant to promote this movie, and press will be reluctant to do anything with Justin without Blake being part of it. So there. Those are my thoughts."
Do you see that?
A I do.
Q Have you ever seen this part of the text message before?
A I don't think so.
Q You left Jonesworks to go with Jennifer Abel as a publicist after she was fired from Jonesworks, right?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not sure I agree with the framing of your question.

BY MS. SHAH:
Q Which part do you not agree with?
A Can you ask me again?
Q You left Jonesworks to go with Jennifer Abel as a publicist after Jennifer Abel was fired from Jonesworks, right?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know the -- the sequence. I -- I know that Jennifer had put in her notice, so I'm -- I'm confused by the way the question is asked.
BY MS. SHAH:
Q Let me ask it a different way.
You left Jonesworks to go with Jennifer Abel as a publicist after she left Jonesworks, right?
MS. SHAPIRO: Objection.
THE WITNESS: Yeah. Yes.
BY MS. SHAH:
Q Why?
A Because she was my publicist for years before, and I -- I trusted her.
Q Do you still trust her?
MS. SHAPIRO: Objection.
THE WITNESS: I do.



BY MS. SHAH:
Q Okay. Have you seen any documents or text messages in this case, or otherwise, where Stephanie Jones is talking shit about you the way Jen Abel was?
A I haven't seen any documents about Stephanie Jones in general to my knowledge.
Q Okay.
A Are we done with this one?
Q Yes.
A Okay.
Q Are you aware that after Wayfarer onboarded TAG as its crisis publicist, Katie Case and Melissa Nathan were joking about whether your faith was a cult?
MS. SHAPIRO: Objection.
THE WITNESS: I was not aware.
BY MS. SHAH:
Q What do you think about that?
MS. SHAPIRO: Objection.
THE WITNESS: Well, I think anytime somebody makes a religious joke, I think that's not okay. It seems to have happened a lot in this case.
BY MS. SHAH:
Q Including from your own publicist, it



seems.
MS. SHAPIRO: Objection.
THE WITNESS: If you want to show it to me, I'd be happy to see it. I haven't heard anything. This is the first I'm hearing about it.
BY MS. SHAH:
Q Sure.
MS. SHAH: Tab 139, please.
I will show you a document that's marked as exhibit?
THE STENOGRAPHIC REPORTER: Thirteen.
MS. SHAH: Thirteen.
(Exhibit 13 marked for identification.)
BY MS. SHAH:
Q It's a text thread between Katie Case and Melissa Nathan from August 4th, 2024 with the Bates stamp NATHAN, several zeroes, 2938.
A Okay. Sorry, there is one more page.
Q Have you seen this before?
A I have not.
Q Were you aware that Katie Case and Melissa Nathan were texting things like this about you while they were on a call with you?
MS. SHAPIRO: Objection.
THE WITNESS: I was not.



BY MS. SHAH:
Q What do you think about that?
MS. SHAPIRO: Objection.
THE WITNESS: I think they have every right to say whatever they want.
BY MS. SHAH:
Q Did Jennifer Abel ever warn you or Jamey Heath or Tera Hanks against hiring Melissa Nathan before you brought her on as crisis communications?
A Not to my knowledge.
MS. SHAH: Tab 85, please.
THE WITNESS: Are we done with this one?
MS. SHAH: Yes.
THE WITNESS: Thank you.
MS. SHAH: I'm going to show you what's been marked as Exhibit 14. It's a text thread between Jen Abel, Jamey Heath, Stephanie Jones, and Tera Hanks dated 7/26/2024, marked JONESWORKS_, several zeroes, 13939.
(Exhibit 14 marked for identification.)
BY MS. SHAH:
Q Just read through this for a moment if you'd like.
If you look in the middle of the page

marked 13940.
A Uh-huh.
Q There's a text from Jennifer Abel that says:
(As read):
"Thanks all. As per our conversation, I also had a negative experience where I confronted her with lies and shady behavior and the attempts to poach and I had to get the client involved to straighten out the situation."
Do you see that?
A I do. There was a "with" -- I confronted her, you added a with, but just for the record.
Q Okay. I will rely on what the document says if I misread it.
Do you know whether or not this conversation that she refers to, or this text thread, has to do with Jennifer Abel's prior experience with Melissa Nathan?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not on this thread, so I don't know.
BY MS. SHAH:
Q Did Jamey Heath or Tera Hanks ever relay



the substance of that conversation or this text thread to you?
A I don't believe so.
MS. SHAH: Tab 86, please.
I'm going to hand you a document marked Exhibit 15. For the record, this is a text thread between Jen Abel and Matthew Mitchell, dated 4/5/2024, marked JONESWORKS_, several zeroes, 41609.
(Exhibit 15 marked for identification.)
BY MS. SHAH:
Q Do you see this?
A I do.
Q All right. If you go to the text starting at 2:02 p.m., you will see Matthew Mitchell says:
(As read):
"MN kinda talks out of both sides of her mouth."
And then Jennifer Abel responds:
(As read):
"You think? She's a piece of shit. I honestly used to like her and now I see her for how she really is."
And then Matthew Mitchell writes:
(As read):



"She's manipulating things but he's also covering and keeping her on because of the debt owed to" -- somebody -- "It's gross. Tbh."
Do you see that?
A Uh-huh.
Q Did Jen Abel ever relay to you that she thought, at least at some point, that Melissa Nathan is a piece of shit?
MS. SHAPIRO: Objection.
THE WITNESS: I'm sorry -- I'm just -- I'm almost done with the document.
BY MS. SHAH:
Q Sure.
A Okay. Would you mind re-asking your question?
Q I will ask it this way.
Did Jennifer Abel ever relay to you any negative sentiment she ever had about Melissa Nathan before she recommended that you bring her on as crisis communications?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MS. SHAH:
Q Okay.



Are you aware that after Melissa Nathan was hired as your crisis publicist, Melissa and Jen Abel were talking about Jen taking you and Wayfarer and all of Jonesworks' clients with her when she left Jonesworks?
A I was not.
Q Okay. Do you know whether or not Jennifer Abel recommended that you hire Melissa Nathan so that she could position Melissa Nathan to transition with you and Wayfarer and Jen?
A I'm sorry?
MS. SHAPIRO: Objection.
THE WITNESS: Okay.
BY MS. SHAH:
Q I will start it again.
A I feel like I'm watching an episode of a TV show. Like, following the storylines.
Q Sure.
A Can you break that down simply for me?
Q Yeah. Are you aware of whether or not Jen Abel and Melissa Nathan ever had a plan amongst each other to steal you and Wayfarer as clients from Stephanie Jones?
A I am not aware of any such plan.

CONFIDENTIAL

Page 234

Q Okay. Are you aware of whether that is the reason that Jen Abel recommended that you hire Melissa Nathan?
MS. SHAPIRO: Objection.
THE WITNESS: I am not aware.
BY MS. SHAH:
Q Okay.
MS. SHAH: I'm going to hand you what's been marked as Exhibit 16.
(Exhibit 16 marked for identification.)
THE WITNESS: Thanks. Is this one I'm on?
BY MS. SHAH:
Q Nope.
A Okay.
Q It's a text thread between several people at TAG dated August 2nd, 2024, marked Nathan_, several zeroes, 141.
A May I read through it?
Q Yes.
A All right. Okay.
Q Now, reading through this, do you recognize this as a text thread where the women at TAG are talking through a call that they expect to have with you?

Page 235

A It appears to be.
Q Okay. And this is on August 2nd. Do you know whether or not you had formally retained TAG at this point?
A I don't believe we had.
Q Okay. Do you know whether this was the first call that you were on with TAG by this point?
A August 2nd, I was in Sweden for my wife's birthday, I believe. Yes, I believe this sounds like that was around the day that I met them for the first time.
Q Okay. And before this call, you were provided with a scenario planning document from TAG. Do you recall that?
A This -- this scenario planning document, yes. Yes.
Q And do you recall talking or texting to Jen Abel, after you reviewed the scenario planning document, that you were dissatisfied with it?
A I vaguely remember it. I know there are texts. But I...
Q What do you remember about those conversations with Jen Abel?
A I remember reading it and feeling like it wasn't that impressive of a document.

Page 236

Q Why did you think it wasn't that impressive of a document?
A It just kind of felt like -- I think the feeling I had was that they were just trying to -- the document kind of felt like they were trying to get the gig maybe. But I just remember not feeling that -- just not loving it.
Q Do you recall feeling like it wasn't sufficiently protective of you?
A I remember feeling like there needed to be more defense. Like I just remember feeling I wanted more protection, yeah.
Q Protection against what?
A I don't know. Everything. I was just scared.
Q Scared of what?
A I had never been in a situation like this.
Q What were you scared could happen?
A Well, I'd been -- I'd just been kicked off my own movie, a film that I was working on for five years. People that I had thought were my friends were not following me anymore publicly and it seemed like things were being done intentionally to cause some sort of public conversation. I had

Page 237

never been involved in a crisis and I was just scared. So I think -- I think they could have said they're going to build me an iron dome, and I still probably would have felt like there wasn't enough protection.
Q Were you scared of things that Blake Lively or Ryan Reynolds might do?
A I was terrified of Ryan Reynolds and Blake Lively in general. Especially considering they had just threatened us and said they were taking the gloves off if I didn't release a statement.
Q What did you understand "taking the gloves off" to mean?
A Again, I didn't know. I know what they were able to -- are you okay?
Q Excuse me.
A Yeah. I know somehow they were able to take my movie from me. So I didn't know what they were capable of.
Q Is that what you believed happened? That they took your movie from you?
A Yes.
Q Were you scared at this point in time that Blake Lively might make public any of the

accusations about your on-set behavior that she had made privately to you and to Sony?
MR. GLOVER: Objection. Form.
THE WITNESS: I was afraid -- are you okay?
I was afraid of, honestly, of lies coming out about me.
BY MS. SHAH:
Q Lies from Blake Lively?
A Yes.
Q About your behavior on set?
A Well, it was one of the things. Lies in general. I didn't know -- I mean, at this point, I was already made aware that her team was pitching stories that I was in a cult, and I had already been told that Mr. Reynolds had told agents that I was a predator of some kind so there was -- I was made aware that there was damage that they were trying to do to me already. And I didn't know what they were capable of.
Q Is it fair to say that at this point in time, you wanted to defend yourself in the event that Blake Lively made public some of the accusations about your on-set behavior that she had already made privately, including to you and



Wayfarer and to Sony?
MS. SHAPIRO: Objection.
THE WITNESS: I think it's fair to say that I wanted to plan to defend myself from any lies that were about to be told or anything else they were going to try to do to me.
BY MS. SHAH:
Q Including lies about or what you felt to be lies about her concerns with your on-set behavior?
A I think that is a part of it, yeah.
Q You say in one of these -- so this is a little bit hard to follow, I understand.
A It's all good.
Q If you turn for me to page 142. You see that it looks like Jen Abel -- or sorry. Melissa Nathan has attached screenshots of a conversation between her and Jen Abel.
Do you see that?
A Uh-huh.
Q And if you flip the page to 143, and you can see this better on page 150, it looks like Jen Abel had sent Melissa Nathan screenshots of a conversation that she had with you.
A Okay. So I'm looking at a text message



that came from Melissa to who? To someone else.
Q Look on 143.
A And then inside that text message, it's a screenshot that Melissa included of a text message between me and Jen.
Q It looks like that.
A All right.
Q Flip to 150, if you would.
MS. SHAPIRO: One five zero.
BY MS. SHAH:
Q The screenshots in the black boxes here.
A Uh-huh.
Q Do you recognize that as a text conversation between you and Jen Abel?
A That's my name. So I would assume it is.
Q And you say:
(As read):
"Morning. Not in love with the document they sent. Not sure I'm feeling the protection I feel on the call."
Do you see that?
A I do.
Q What call are you referencing?
A I don't know. I'm imagining -- I don't



see a date on this, but I'm imagining it's the call the first time that I met them.
Q "Them" being TAG?
A Yes.
Q Okay.
A But I can't speak to it 100 percent because I don't know the dates.
Q And if you flip forward to 149. That's backwards. Sure.
You will see the black box looks like the text between you and Jen Abel.
A I'm assuming -- is this from the same text thread?
Q Looks like it to me.
A Okay.
Q And then you see someone write to Jen Abel:
(As read):
"We can't write it down to him. We can't write we will destroy her. We will go to this. We will do this. We will do this. We will do this."
Do you see that?
A I do.
Q And then it looks like Jen responds:

CONFIDENTIAL

Page 242

(As read):
"Of course not. But I told him that's the point of talking through."
Do you see that?
A I do.
Q Do you have a recollection when you expressed to Jen Abel that you weren't thrilled with the scenario planning document that she responded to you, in sum or substance, We're going to have a call with TAG, that's the point of talking this through?
MS. SHAPIRO: Objection.
THE WITNESS: I do not even remember the phone call with Jen --
BY MS. SHAH:
Q Okay.
A -- that we're even talking about.
Q You don't recall the phone call with Jen where you expressed to her that you weren't -- or any text or conversation with Jen where you expressed to her, I'm not thrilled with this document?
A I -- I believe it was in a text message --
Q Uh-huh.
A -- that I think you have here.

Page 243

Q Uh-huh.
A I don't -- I don't know if we had a phone call about it.
Q Okay.
A We might have. But -- what was your question?
Q My question was: When you expressed to her you weren't thrilled with the document --
A Yeah.
Q -- did -- do you remember her giving you any comfort around, we're going to talk it through with TAG, and -- and you should understand it better once we have this call?
A I believe this is what she texted me, which is in this photo. I could -- but, again, I could be mistaken.
Q But independent of this document, do you have a recollection of her responding in that manner or any matter when you said, I'm not thrilled with this document?
A I mean, my recollection is that it was a scenario planning document, and that's -- it's all I really remember about it. I think it was just done via text.
Q Okay.

Page 244

A But I -- you know, if anything else pops in while you're asking me questions, I'll come back and -- and tell you.
Q After you received this scenario planning document, do you recall then getting on a call with people from TAG to talk through the scenario plan?
A I'm sure there was a second call. I don't have a specific memory of that call.
Q Okay. Do you have any general memory of that call?
A I have a memory of the first call. I don't really have a memory of the second call.
Q What is your memory of the first call?
A Mostly that my wife was sitting with me, and we were in Sweden. I was in the middle of trying to pull off this massive surprise for her birthday with all of her friends, and while dealing with all this. And I just -- I remember meeting Melissa. I felt very comforted by like -- like, she felt very motherly. And she seemed very kind. She felt like somebody that I could trust.
I think I remember that I had change -- I think I remember starting by apologizing because I had changed the meeting time so many times because we were so far ahead. That's what I remember.

Page 245

Q Do you recall Stephanie Jones being on that call that you had with TAG?
A I don't.
Q Do you recall Jen Abel being on that call that you had with TAG?
A Yes.
Q Do you recall Stephanie Jones being on the second call that you had with TAG?
A I really don't remember the second call, so I don't know who was on it.
Q Do you remember if Jen Abel was on it?
MS. SHAPIRO: Objection.
THE WITNESS: Same answer. I'm not even sure there was a -- I'm assuming there was a second call, but that's one I don't remember.
BY MS. SHAH:
Q Do you recall Stephanie Jones being on any call you had with TAG?
A I don't.
Q Do you know if Stephanie Jones ever saw the scenario planning document that TAG sent to you?
A I don't.
Q Okay. If you turn to page 144.
It looks like at the top of the page, Breanna Butler and Katie Case are reacting to your



Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

CONFIDENTIAL

Page 246

criticisms about the scenario planning document?
A Uh-huh.
Q And Breanna says:
(As read):
"I'm sorry that document was strong and we walked through all the possibilities of him doing some big sitdown which would kill him."
Do you see that?
A Yes.
Q And then Katie Case writes:
(As read):
"It's really fucking strong. He can't come off as the victim. She'll destroy him."
Do you see that?
A Uh-huh.
Q Did they ever relay, in sum and substance, to you or did anyone at TAG ever relay, in sum and substance to you, that you can't come off as the victim or Blake will destroy you?
A No. I'm -- I'm not sure what this is saying or what it's about.
Q Okay. And then down below, Breanna Butler says:

Page 247

(As read):
"I think he'll be fine on the call once we walk him through."
Do you see that?
A Uh-huh.
Q And then Melissa Nathan says:
(As read):
"He will be. We need to be tough."
Do you see that?
A Uh-huh.
Q And then below, Melissa Nathan writes:
(As read):
"Exactly. Breanna, I need you to be in a good place with your camera on if okay to be able to help me talk really toughly to him. I wouldn't usually ask, but he sounds like a fucking mess."
Do you see that?
A Yes.
Q Did you feel like a fucking mess at the time?
A I don't -- did I feel like a fucking mess? I was really emotional. I mean, I don't know if I would call myself a fucking mess, but I think

Page 248

it's -- they are clearly hearing about me. So they're entitled to their opinion.
Q And then below that, Melissa Nathan writes:
(As read):
"And also, this is the first one that Jen is giving us and she's taking all the clients."
Do you see that?
A I do.
Q Do you have any awareness of whether or not Melissa thought that this -- that you were the first client that Jen was giving to TAG, and that Jen was taking all the clients from Jonesworks when she left?
MS. SHAPIRO: Objection.
THE WITNESS: I have no idea.
BY MS. SHAH:
Q Did Melissa ever encourage you to leave with Jen when she left Jonesworks?
A I don't remember her encouraging me.
Q Are you sure about that?
MS. SHAPIRO: Objection.
THE WITNESS: I remember -- I think I remember telling her I was going to go with her, but

Page 249

I don't -- I don't remember Melissa saying, like, you should go with her.
BY MS. SHAH:
Q What do you recall about telling Melissa that you were going to go with Jen?
A I don't remember the conversation. I remember -- and I don't remember how it came up. But I remember that I was going to go with Jen anyway, so it wasn't like a secret that we were hiding from anybody.
Q Did you make that decision?
A Did I make what decision?
Q To go with Jen when she left Jonesworks, did you make that decision personally?
A That was a consultation between myself and Jamey and I believe, at the time, Tera.
Q And when did that consultation and decision happen between you and Jamey and Tera?
A I don't know exactly when or the date.
Q Can you place it in time in relation to when Jen actually left Jonesworks?
A Can you help me with when she left Jonesworks?
Q Sure. If Jen --
A Or was she fired from Jonesworks?

Because you had said earlier she was fired.
Q Well, I will ask you what you understand about that in a little bit. But this text -- let me ask it this way.
Do you have a recollection of discussing and deciding that you were going to go with Jen, like one day before she actually left or like one month before she actually left?
MS. SHAPIRO: Objection.
THE WITNESS: Can you help me with when she actually left?
BY MS. SHAH:
Q Sure. She left on August 21st of 2024.
A I -- I can't give you -- I -- I don't know. I -- I don't know exactly when.
Q Were you aware that she was planning to leave Jonesworks before she actually left?
A I was made aware via Jamey that she had given Stephanie her notice. And so Jamey let me know that she had given notice, and that she would be staying on through the end of the film promotion.
Q Do you have a sense of when Jamey relayed that to you?
A I don't, but I -- all I remember was that she had given notice. She had let Stephanie know.



Q Do you have the impression that you found out about her giving notice shortly after she gave notice?
A I couldn't -- I couldn't answer that.
Q Okay. After you were informed by Jamey that Jen gave notice to Stephanie, did you immediately decide to go with Jen when she left?
A No.
Q How long after you became aware that Jen planned to leave Jonesworks did you make the decision to go with her?
A I think Jamey and I had a conversation about it. I think it was something that we immediately said, oh, this is something we have to figure out. Like -- because we had had Matthew at Jonesworks. But it was really just Jen and Matthew. And Jen had been with us pretty much since the beginning. So -- so it was one of those -- it was on the list of conversations that Jamey and I had to have. Like, whoa, what do we do? Do we stay? I didn't know what she was going to or where she was going at the time, but it was definitely a conversation. I just -- I don't think that was decided immediately.
Q At some point between when you found out



that she had given notice and when she actually walked out the door at Jonesworks, you -- you had decided --
A Yes.
Q -- that you were going to go with her?
A Yes.
Q Okay. And you had decided that in consultation with Jamie and Tera?
A Yes.
Q Did you make Stephanie Jones aware of that decision when you decided it?
MS. SHAPIRO: Objection.
THE WITNESS: I don't even think we made Jen aware of that decision.
BY MS. SHAH:
Q Did you not?
A No.
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q Okay. When did you make Jen aware of that decision?
A I -- I don't know. I don't remember telling Jen. Probably because I was never asked. I don't -- I don't know when I told Jen I would go with her.



Q Did you ever tell Jen that you would go with her?
A I'm sure I did.
Q Personally?
A I'm sure I did, yeah.
Q Okay. Do you have any recollection of that?
A I think I do. I actually -- yes, I have a -- I have a recollection of a phone call with Jen.
Q And what is your recollection of that phone call?
A It was about one of the other thousand things that we were dealing with. And I let her know that Jamey had let me know that she was giving her notice or she gave her notice. My memory of that call was her saying, and being very clear, that she's sure that they will find someone great to replace her. It had nothing to do with us. And she wanted to make sure she stayed on for me because she knew how intense of a time this was for me, until the movie was done being promoted.
And she went out of her way to almost say, like, you know, everything is going to be fine. You know, Steph's great. Matthew's great. It was like that kind of conversation.

Q Do you remember when in time this was?
A I don't, but I -- I imagine it was within a week or two of whenever Jamey told me.
MS. SHAPIRO: Counsel, can we take a short break?
MS. SHAH: Sure.
THE VIDEOGRAPHER: We're going off the record. The time is 4:21 p.m.
(Recess.)
THE VIDEOGRAPHER: We're back on record. The time is 4:48 p.m.
BY MS. SHAH:
Q Before the break, we were talking about a scenario planning document that you had received from TAG. Do you recall that? Oh, sorry. Almost. Try one more time.
Before the break, we were talking about a scenario planning document that you received from TAG?
A Yes.
Q Do you recall whether you ever received more than one version of that scenario planning document?
A I don't.
Q Do you recall whether it was updated or



revised at any point in time?
A I don't.
Q Okay. To your best recollection, you only recall seeing one version of a scenario planning document; is that correct?
A I -- yes. Yes.
Q Do you remember that you didn't see any other versions or you just don't remember one way or another?
MS. SHAPIRO: Objection.
THE WITNESS: I don't believe I saw a second version.
BY MS. SHAH:
Q Okay. After you were provided with the scenario planning document, describe for me the series of events, to your recollection, in terms of how you came to hire TAG?
MS. SHAPIRO: Objection.
THE WITNESS: Forgive me.
Can you ask one more time?
BY MS. SHAH:
Q Sure. At some point after you received the scenario planning document for TAG, you ultimately hired TAG, right?
A The company did, yes.



Q Yes. Is it your testimony that Wayfarer hired TAG?
A Yes, I believe so.
Q Okay. Do you have an understanding of whether you personally also hired TAG?
A I don't think I personally hired anyone.
Q Okay. And when Wayfarer hired TAG, what was your understanding of what TAG was being brought on to do?
A My understanding was that TAG was being brought on to be crisis public relations representatives.
Q Was -- to your understanding, was TAG given any instructions by you or by Wayfarer in terms of how to proceed once you had hired them?
A I believe so. I believe that Jamey was in communication with them.
Q And do you know what those instructions were?
A I can only speak to the instructions that I gave Jamey or at any time spoke to Jen or on the calls, which was to plan and to just try to get good press out there for the movie.
Q How involved were you personally in discussing with anyone at TAG the type of PR



strategy you all should be employing?
A I don't know. I think I had ideas. I'm not -- I'm not sure how many conversations were happening versus what ideas I was sharing. I was kind of in and out.
Q Do you have any recollection of any ideas you had that you shared with TAG?
A I mean I really wanted to focus, not just TAG, but also Jennifer Abel, I really wanted to focus on amplifying the voices of survivors. I wanted to focus on the DV. I wanted to focus on the movie and not all of this speculation and drama.
Q Did you personally ever have any conversations with Stephanie Jones about the instructions that Wayfarer was giving TAG in terms of how to proceed?
A I don't think I had any real conversations with Stephanie Jones outside of texting through July and August.
Q Do you recall ever communicating with Stephanie Jones, whether on text or in conversation, about the instructions that Wayfarer had given TAG about how to proceed?
A I don't believe so. My memory of texts with Stephanie Jones were focused on letting her

CONFIDENTIAL

Page 258

know that I was not a part of this decision to hire anybody. I wanted to stay out of it. It was too much for me. And I know she sent me a really beautiful message of love and support before the premiere. That's my memory of talking with Stephanie.

Q Okay.

A I think she was on vacation somewhere.

Q Do you have any understanding of whether anyone at Wayfarer had any communications, texts, conversations with Stephanie Jones about what Wayfarer was instructing TAG to do as crisis PR?

A I don't know.

MS. SHAH: Okay. Going to show you a document marked Exhibit 17.

(Exhibit 17 marked for identification.)

THE WITNESS: Should I get rid of this?

MS. SHAH: Yes. Thank you.

It's a text thread between Henny Grace, who is you, Jennifer Abel, Justin Baldoni, I think that's it. So this looks like a text thread between you and Jennifer Abel.

A Uh-huh.

Q -- on August 5th, 2024 with a Bates stamp Baldoni, several zeroes, 18710.

Page 259

Do you see this?

A I do.

Q Okay. And Jennifer Abel -- do you recall this text thread?

A Vaguely. But I know -- I know this was in The New York Times from what I was told.

Q Did you ever read The New York Times article?

A I did not.

Q How did you come to learn about it?

A The New York Times article?

Q Uh-huh.

A I would say it felt like minutes after I received an email, from who I believe was Mr. Gottlieb, I got an email from The New York Times saying they were running a story the next morning. And then the next morning, there were quite a lot of text messages from people worried about me and concerned. So that's -- that's how I learned about it.

Q If you never read The New York Times article, do you have any basis to say whether or not anything contained in it was true or untrue?

MS. SHAPIRO: Objection.

THE WITNESS: My understanding of The New York Times article was that it was taken from the CRD complaint. And I was never interviewed or asked for my opinion or my side of the story. So from the few sentences and the headline, that's what I was able to gather.

Page 260

BY MS. SHAH:

Q What was what you were able to gather?

A That the information they got was from Ms. Lively's CRD complaint, but not from anything that came from me or my side of the story. Which -- and I would very much disagree with the things that Ms. Lively put in her CRD complaint as being untrue.

Q Okay. But sitting here today, can you think of a statement or portion of The New York Times article itself that you can identify as being true or untrue?

A I believe The New York Times article insinuated that I had launched a smear campaign against Ms. Lively, which is completely untrue.

I believe it said that I sexually harassed Ms. Lively, which is also very untrue. So there's two untrue statements.

Q Apart from those two statements or concepts as contained in The New York Times article, is there anything else that was contained in The New York Times article that, sitting here today, you can identify as either true or untrue?

Page 261

A I would be happy to read it while we're sitting together and go through all the things that I feel are untrue but I don't know that that would be the best use of our time.

Q I agree with you, it would not be. So based on what you know about it to date, can you identify any other statement or portion of that article that you can identify as true or untrue?

A I can't comment on the rest of the article at this time.

Q Because you don't know what it said?

A Because I need to go through it to tell you what I think is true and untrue.

Q Okay. If you look at the document, Jennifer Abel starts by saying:

(As read):

"Sony is having a hard time with the word 'friction'. They think it will be taken out as clickbait."

Do you see that?

A Yes.

Q Do you have an understanding as to what she was referring to there?

CONFIDENTIAL

Page 262

A I believe I do.
Q What is that understanding?
A I believe in an interview, I spoke that every set has friction. But oftentimes that friction ends up being something that is great for the film. And I think that's what she was referring to.
Q And did you understand that Sony did not like the use of the word "friction"?
A I believe that's what Ms. Abel was telling me in this text.
Q Okay. Did you have an understanding around this time that Sony had any other disagreements with things that you had said in interviews promoting the film?
A I don't know about disagreements. I know that there was always a conversation around how much of the film should be promoted. You know, using the word "survivor" or talking about domestic violence. And that had been a multi-year conversation.
Q And you thought more of that content should be used in promoting the film and Sony wanted less of that content to be used; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: Sony had initial

Page 263

apprehension about making it an issue movie. And I tried to explain to them that you cannot run from the fact that this is an issue movie. And this was the very reason I was making the movie. And it would be a disservice to all the people whose lives were changed from the film for us to pretend like that's not what the movie's about.
BY MS. SHAH:
Q Did Sony have ultimate approval over the film's marketing plan?
A I need to know what you mean by "approval".
Q Was Sony deeply involved in conversations with Wayfarer and the cast about the film's marketing plan?
A I believe there were many conversations that Sony was having about the marketing plan. They were in charge of marketing. They were the company that was paying for the marketing of the movie.
Q Okay. Then if you go back to this document.
A Yes.
Q Jennifer Abel says:
(As read):
"They obviously don't know about our

Page 264

strategy but let's stick to the words of 'challenge'."
Do you see that?
A Yes.
Q What is your understanding of what she means when she says "they obviously don't know about our strategy"?
A I think our strategy was to ensure that we were only saying positive things and not drawing any attention to what was very clearly at the time an intentional plan to draw attention to friction, if you will.
Q An intentional plan by whom?
A I can only imagine Ms. Lively.
Q And then you send Ms. Abel a text message where you say:
(As read):
"This is what we would need."
A Yes.
Q And you attach a screenshot of a post about Hailey Bieber's history of bullying many women.
Do you see that?
A Yes.
Q What did you mean by "this is what we

Page 265

would need"?
A So I believe at the time, we were going through scenario planning. And like any plan, you have Scenario A, Scenario B, C, D. What if -- what if this happens or this happens or this happens. And I think I had seen this post and I resonated with the word "bullying". And I sent it to Jen saying in the event that Ms. Lively came out and said lies about me, then we would need to come forward with the truth.
Q And was it your suggestion that you would come forward with allegations that Ms. Lively was a bully?
A It was my understanding that I would come forward with what my truth was. And I had felt very bullied.
Q Was it your intention to suggest that you should be coming forward with statements that Ms. Lively was a bully to other women?
A No. This had nothing to do with other women. This was just what this article was about.
Q And this article by its own words is about Hailey Bieber's history of bullying many women, right?
A Yes. I see that.

CONFIDENTIAL

Page 266

Q Okay. And it was your suggestion that in some scenario where Ms. Lively was to come forward with what you felt were lies about you, you would want to come forward in the press with allegations like those contained in this post you sent?
MS. SHAPIRO: Objection.
THE WITNESS: No. Not exactly.
BY MS. SHAH:
Q So how would you correct that?
A So if Ms. Lively were to come forward with lies about me, then I would want to come forward with my truth. So it was about me and my experience. I don't know what this article was about, I actually didn't read it. I saw it. I saw the word "bullying".
At the time, I felt very bullied and scared and very alone. And we were planning for all the various things that could happen. That's why I said "would" as the operative word. This was a part of a scenario planning document and the hope was that the movie was going to come out and everything was going to be fine and everyone was going to have success, and we would never need anything. And that's the truth.
Q Is it your testimony that when you saw

Page 267

and sent this post to Jen Abel, you saw the word "history of bullying" but you did not continue to read where it said "many women"?
MS. SHAPIRO: Objection.
THE WITNESS: This had nothing to do with women. I'm actually -- I don't know if Ms. Lively has bullied other women.
BY MS. SHAH:
Q Did you read any press coverage that came out in August of 2024 that did accuse Ms. Lively of bullying other women?
A Later on, I did.
Q Women including Kjersti Flaa, I believe?
A I learned about that name, yes.
Q Okay. And women including Leighton Meester?
A From Gossip Girl.
Q Yes.
A I didn't read anything about her being a bully to Leighton Meester.
Q Okay. Are you aware that the article that Briana Butler Koslow testified under oath in this case, that she leaked and helped to plant in the Daily Mail about Ms. Lively, contained allegations that Ms. Lively had bullied Kjersti Flaa

Page 268

and had bullied Leighton Meester?
MS. SHAPIRO: Objection.
THE WITNESS: I was unaware of that. I also was unaware that she bullied Leighton Meester.
BY MS. SHAH:
Q And you were unaware of that even though that you here suggested to Jen Abel that what you would need in the event that Ms. Lively disclosed anything negative about you is articles similar to this one that says "Hailey Bieber's history of bullying many women"?
MS. SHAPIRO: Objection.
THE WITNESS: I disagree with the way that question was phrased.
BY MS. SHAH:
Q Do you think that's just a coincidence?
MS. SHAPIRO: Objection.
THE WITNESS: That what is?
BY MS. SHAH:
Q That you suggested that you would need articles about similar to Hailey Bieber's history of bullying many women and then TAG, the company that you employed as crisis PR, did in fact plant an article about Blake Lively bullying other women.
MS. SHAPIRO: Objection.

Page 269

THE WITNESS: So what is the question?
BY MS. SHAH:
Q The question is do you think that's a coincidence?
MS. SHAPIRO: Objection.
THE WITNESS: I don't think it's a coincidence that I felt bullied and then it seems the Internet dug up true stories of how Ms. Lively bullied other people. So it just shows that I wasn't the only one who was bullied.
BY MS. SHAH:
Q When you say "the internet dug up stories" what do you mean by that?
A It seemed like people came forward with their own experiences of being bullied to the extent that I never had to.
Q Okay. How does this fit in with the strategy that you were discussing with Ms. Abel and TAG about promoting positive coverage of the film?
A How does this fit in?
Q Uh-huh.
A This is part of a -- like I said earlier, a what-happens-if scenario.
Q So if positive doesn't work, then you would move to something like this?

MS. SHAPIRO: Objection.
THE WITNESS: If positive doesn't work how?
BY MS. SHAH:
Q What do you mean when you say "this is part of a what-happens-if scenario"?
A As I testified earlier, if Ms. Lively were to capitalize on her threats that her and Mr. Reynolds made through her agent to my agent to me, and plant negative stories, which I was told she already was doing; such as I'm a part of a cult or that I'm a predator, and continued to come forward with lies, then we would have to have some sort of plan. As they are Hollywood titans and I'm very clearly a nobody as it relates or at least what they feel I am or what my former agency thought of me as I was also dropped very quickly per their request.
So we need some sort of plan if someone is attacking you with big guns and missiles and dropping bombs on you. In our day and age, you can't just die. I have a family I have to protect. I have a company that I started. So we were planning for what would happen if she were to attack me and to lie about me and hurt my reputation. That's all it was.



Q And under that text where you send Jen Abel the screenshot of the article about Hailey Bieber, Jen Able responds:
(As read):
"Yes. I literally just spoke to Melissa about this on the break about what we discussed last night for social and digital."
And then she says:
"Focus on Reddit, TikTok, IG."
Do you see that?
A I do.
Q Okay. She mentions "what we discussed last night for social and digital". Is that a discussion that you were a part of?
A I have honestly have no idea what she's talking about here so I don't think I was a part of that call. I don't think she's inferring that her and I discussed anything.
Q Did you and she discuss anything about this?
A Not that, no. Not like that. I don't remember any conversation with Jen about this.
Q Do you recall any conversation with Jen or Melissa about social or digital strategy?



A No. I was very hard to reach during this time. I -- most of my communication was via text, which the world has.
Q Do you understand what the words "social" and "digital" mean in that context?
A I would have assumed they mean the same thing, so I don't know. I still don't know the difference between social and digital because social is inherently digital. So I don't know.
Q Do you understand that "social" means social media?
A Yes.
Q Okay. On the internet?
A Hence, it's digital, which is what I meant with what I said. Like, social media is digital, so I don't know what digital is.
Q Did you understand that social and digital included things like Reddit, TikTok, and Instagram h?
A I didn't know anything about Reddit. But I would assume that include TikTok and Instagram.
Q Okay. Do you recall ever having a conversation with either Jen or Melissa after you sent this Hailey Bieber post where you explain to them that you didn't mean planting stories about



Blake bullying other women, you meant coming forward with stories about Blake bullying you?
MS. SHAPIRO: Objection.
THE WITNESS: I don't remember any conversation. I know Jen and I were together doing press somewhere around this time, and I know Jen knew it was very clear that I wanted to do nothing that would harm Ms. Lively or this film. And that the only times we would only do anything are -- is if we were attacked. And we were attacked, and we still didn't do anything.
BY MS. SHAH:
Q Okay. But do you ever -- do you recall ever having any communication with either Jen or Melissa where you explain to them when I sent you this post about Hailey Bieber, I wasn't suggesting stories about Blake bullying other women, I was suggesting coming forward with my experience about Blake bullying me?
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q Did you ever explain that to them?
MS. SHAPIRO: Objection.
THE WITNESS: I think it was very clear in my relationship with Jen that she knew exactly

CONFIDENTIAL

Page 274

what I meant when I sent this. And that there was never a directive to do anything. So I would be very surprised if anything was actually done.

BY MS. SHAH:

Q But do you recall having any conversations or communications with her or Melissa where you expressed that?

MS. SHAPIRO: Objection.

THE WITNESS: That specific thing?

BY MS. SHAH:

Q Yes.

A I don't have any -- any specific recollections of that.

Q Okay. When Jen says:

(As read):

"I literally just spoke to Melissa about this on the break about what we discussed last night for social and digital."

Do you have any understanding about what was the substance of Jen's conversation with Melissa on this topic?

A I wasn't on the call so I don't know.

Q Is this the only idea that you ever expressed to either Jen or Melissa or anyone at TAG

Page 275

about how you might combat stories that Blake and Ryan might come forward with that you believed were lies?

MS. SHAPIRO: Objection.

THE WITNESS: I don't know. I'm not sure.

BY MS. SHAH:

Q Do you recall discussing the potential around stories that Blake and Ryan crossed the picket line or otherwise violated the writers' strike by rewriting certain scenes in the movie?

MS. SHAPIRO: Objection.

THE WITNESS: I think I do. Yes.

BY MS. SHAH:

Q Okay. Do you recall communicating to Jen and Melissa that one idea might be flipping the narrative on Ryan to make it seem like when he rewrote the rooftop scene in the movie, he was mansplaining how to write a script to a female scriptwriter?

MS. SHAPIRO: Objection.

THE WITNESS: I don't remember exactly what you said, no.

BY MS. SHAH:

Q How do you remember it?

Page 276

A I remember that an article came out -- or essentially, it was like a source said that Ryan thought the script was a disaster and that he had to save it. So they were putting out articles that were basically saying that the film was a mess and he had to come in and save it. And I believe we had learned at the premiere -- at least I had learned -- the following day, I was doing an interview, and I was told that Ms. Lively said that Mr. Reynolds wrote the rooftop scene, which was news to me as the director.

And in the moment, instead of saying that didn't happen to the people/person, I just said how great Ryan was. I didn't -- again, I didn't want to say anything to contradict that. But there was already an existing narrative that was out there.

And so I do remember passing on a message from my partner who had suggested something to that effect, because, essentially, if the script was a mess, then he would be saying that the writer, who was a female who worked her ass off for years on this to get it right, clearly didn't know what she was doing. Which I completely disagreed with.

So flipping a narrative was meant an existing narrative that was already being put out

Page 277

by, I would say, the other side.

Q What did the fact that the writer was a female have anything to do with any of that?

A Well, again, I was passing on a text message from my business partner who was suggesting flipping the narrative.

Q Before we leave this Exhibit 17, I may have asked you this before, but for the record, do you have any recollection of discussing any of this scenario planning that was going on that we were just talking about with Stephanie Jones?

A I don't have any recollection of talking with Stephanie Jones about scenario planning.

MS. SHAH: Okay. This one, please.

BY MS. SHAH:

Q Are you aware of whether anyone at Wayfarer ever had any conversations with Stephanie Jones about the type of scenario planning that you were discussing with Jen Abel and TAG?

A I'm unaware.

MS. SHAH: Okay. I am handing you what's been marked as Exhibit 18. It's a text thread between you, Melissa, and Jen Abel dated August 15, 2024. Bates-stamped Nathan, underscore, several zeroes, 4562.

CONFIDENTIAL

Page 278

(Exhibit 18 marked for identification.)
BY MS. SHAH:
Q Is this the idea from your partner, Steve Sarowitz, about flipping the narrative that you were just testifying discussing flipping the narrative about?
A Can I have a second to read it, please.
Q Of course.
A Okay.
Q So is this the substance of the idea that you were just talking about that came from your partner, Steve Sarowitz, about flipping the script?
A Yes.
Q And that included flipping the script from Ryan saying:
(As read):
"Script was a disaster and he saved the movie, to something about Ryan claiming the female hired was a feminist writer, didn't know how to tackle a female film etc."
Do you see that?
A Yes.
Q This idea that this was a female writer and a female film and that what Ryan Reynolds was

Page 279

saying was essentially misogynistic, did that come from Steve Sarowitz?
MS. SHAPIRO: Objection.
THE WITNESS: I think I said here that my partner, Steve, has asked about this. So I was passing that along.
BY MS. SHAH:
Q So this idea, something about Ryan claiming the female hired was a feminist writer, didn't know how to tackle a female film, etc., came from Steve?
A That was what was passed on to me.
Q Did you use any judgment about whether or not that was a good idea before you passed it along?
MS. SHAPIRO: Objection.
THE WITNESS: I think it's implied in him saying the script was a disaster, so I just pass it along. I didn't disagree with him.
BY MS. SHAH:
Q You didn't disagree with Mr. Sarowitz's idea? Is that what you mean?
A I didn't disagree with what Mr. Sarowitz was -- was saying in terms of what Ryan was inferring when he called the script a disaster.
Q Meaning, that Ryan was essentially acting

Page 280

misogynistically?
MS. SHAPIRO: Objection.
THE WITNESS: One could infer if he's saying the script was a disaster.
BY MS. SHAH:
Q And one could infer that simply from the fact that it was a female writer who wrote the script?
A And a female author, female writer, and yeah.
Q Did you rewrite any portions of the script that the female scriptwriter wrote?
A Did I rewrite any portions of the script? Along with Ms. Lively, I did, yes.
Q Do you think that it can be inferred from that that you were acting misogynistic because it was a female book author and female script writer and you were a man who was tinkering with that script?
MS. SHAPIRO: Objection.
THE WITNESS: I wish I didn't tinker with that script, but I had no choice.
BY MS. SHAH:
Q Okay. And then it goes on to say:
(As read):

Page 281

"And the fact they saved the script from what they think is a disaster after we had a green-lit script and was a WAS strike basically implies they were scabs."
Do you see that?
A Yes.
Q And then, if you flip the page you write:
(As read):
"Which we should 100 percent lead them to."
Do you see that?
A Yes.
Q That last part, "which we should 100 percent lead them to," was that your idea, or were you still relaying what Steve meant?
A I -- I don't know.
Q When you say "which we should 100 percent lead them to," do you mean lead reporters to?
A I actually don't know what I mean here.
BY MS. SHAH:
Q What is your best guess?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know.

BY MS. SHAH:
Q No idea?
A I don't know what I meant.
Q Okay. And then you write:
(As read):
"It's a man coming in to say this female writer sucks and I need to save it. Let him drown in his own pool."
Do you see that?
A Yes.
Q Is that the sum and substance of the idea that you were relating?
A Which part, the pool part or the other part?
Q All of it.
A It seems to be that way, yes. In other words, this is something that he created. Like he came out with a story about this in the first place. This was not something that we came out with and wanted to talk about.
Q Okay. And are you, essentially, saying here that because he came out with this story, let's flip it against him and make him look like a misogynist?
A I think that's -- those are your words.



Q I'm asking if you agree with that interpretation and that idea?
A I don't believe I do.
Q You don't think that the idea that Mr. Sarowitz was relaying was because they came out with this story, let's flip it against them and, essentially, make Ryan look like a misogynist?
MS. SHAPIRO: Objection.
THE WITNESS: I don't believe we had to make Ryan look like a misogynist.
BY MS. SHAH:
Q That wasn't my question.
MS. SHAPIRO: Objection.
THE WITNESS: That was my answer.
BY MS. SHAH:
Q Okay. Do you disagree with the interpretation that the idea that Mr. Sarowitz was relaying was because Ryan had come out with a story about rewriting that scene, you should use his words against him and make him look like a misogynist?
MS. SHAPIRO: Objection.
THE WITNESS: I disagree with what you said because I don't know of a story that came out about Ryan rewriting a scene.



BY MS. SHAH:
Q What basis did you have to believe at the time that Ryan Reynolds had actually said the things that were being reported about here that you're discussing?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not sure.
BY MS. SHAH:
Q You can't remember what basis you had to think that he actually said these things?
A I believe there were many articles that were coming out about how he saved the movie.
Q Do you believe that the press is always accurate?
MS. SHAPIRO: Objection.
THE WITNESS: Are you asking me now or then?
BY MS. SHAH:
Q Both.
A I think, as I sit here today, the press is very inaccurate oftentimes. I think, at the time, I might have had a more optimistic view of the press.
Q Did you essentially take those articles at their word?



A I don't know.
Q Okay. Other than the reporting that was going on at the time about what Mr. Reynolds or Ms. Lively had said about this, do you have any other basis to understand what they had actually said?
A I'm not sure.
Q Okay. Was this also part of this scenario planning that you were discussing?
A I am unsure.
Q How does flipping the narrative in the way that is suggested here reconcile with the view that you should be putting out only positive stories?
A Because it has to do with a defensive measure. So if we're talking about something that was an offensive measure, then flipping an existing narrative would not be us doing anything offensively. It would be us defending. And again, this was me passing something on.
Q Do you recall testifying earlier about whether Melissa Nathan ever encouraged you to leave Jonesworks with Jen Abel when Jen Abel left?
A At this point, I remember some of that, and I would love for you to refresh my memory more.

CONFIDENTIAL

Page 286

MS. SHAH: Sure.
THE WITNESS: Am I passing this one on?
MS. SHAH: Yes. Thank you.
I'm handing you what has been marked as Exhibit 19. It's a text thread between Melissa Nathan and Jen Abel, dated August 19th, 2024. And I just want you to read the first page, if you will. You can read the rest of it, but I'm only going to ask you about the first page.
(Exhibit 19 marked for identification.)
THE WITNESS: Okay.
BY MS. SHAH:
Q Okay. And at the top, Melissa writes:
(As read):
"Just had a nice conversation with Justin. Just him and me. I explained to him a few things."
And then she goes on to explain what she explained to you. And then she says:
(As read):
"I ended it with, and I'm just going to step out of line before I go to bed and tell you, Jen is amazing. She's so loyal. She loves you so much, and you

Page 287

have to go with her. And he was like, oh my God, of course, of course I'm going with her."
Do you see that?
A I do.
Q Do you remember having that conversation with Melissa Nathan?
A Very vaguely.
Q What do you remember about that conversation?
A I remember it was mostly about, like I was thinking I was -- like, she had had a conversation with Leslie Sloane, which I found shocking because -- I just found it very surprising. And she said it was actually -- I think she said it was a nice conversation, and then I just remember a brief exchange at the very end. But I wouldn't -- I wouldn't characterize it the way she is saying it.
Q How do you remember that part differently?
A I remember her saying how much Jen cares about me, but I don't remember her ever saying you have to go with her or egging me on or anything like that, because I was already -- I was already planning on following her wherever she was going.

Page 288

So there was no, like -- this -- if I may, this, to me, looks like more of what I've seen you show me, which is like an exaggeration or inflation of conversations. Maybe her trying to, like, show Jen she has her back. I don't know, but that wasn't what the conversation was exactly.
Q Okay. We discussed this a little bit earlier, but what was behind your decision to leave with Jen Abel when Jen left Jonesworks?
MS. SHAPIRO: Objection.
THE WITNESS: It wasn't any one thing. I think the major thing, it would have been like if I was at William Morris -- maybe I should use a different agency. If I was at an agency and I had an agent for four years or five years and I talked to that agent every day and that agent was soliciting work for me, and the agent called me and said, hey, I'm going to a different agency. My loyalty would be with the agent that I had built the relationship with versus the agency. And that's how I viewed the situation with Jen and Stephanie Jones.
Even if I had a great relationship with the owner of the agency, my day-to-day relationship was with Jen Abel.

Page 289

BY MS. SHAH:
Q And is what you just relayed to me the reason that you personally decided to go with Jen Abel when she left Jonesworks?
A Yes.
Q And is what you just relayed to me consistent with the reason that you, Jamey Heath, and Tara Hanks collectively made to go with Jen Abel when she left Jonesworks?
A I think that's the biggest -- the biggest reason. I think we were -- regardless of anything that was happening with the movie or not with the movie. If there would have been no movie, I think that would have been the decision.
Q I don't understand that answer. What do you mean by that?
A Maybe it's because I didn't understand the question.
Q Sure. You said that you discussed with Jamie Heath and Tera Hanks this conversation around whether you -- you personally and Wayfarer the studio, should go with Jen Abel as your publicist --
A Yes.
Q -- when she left Jonesworks, right?
A Yes.

MS. SHAPIRO: Objection.
BY MS. SHAH:
Q And the three of you collectively made a decision around what to do, right?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MS. SHAH:
Q Is what you just described to me that you felt, you know, a loyalty to your relationship with Jen as your agent versus the owner of the agency?
A I don't know if I would --
MS. SHAPIRO: Objection.
THE WITNESS: -- characterize it as a loyalty.
BY MS. SHAH:
Q Okay. Sure.
Did you and Jamey and Tera ever discuss any other reason to go with Jen Abel when she left Jonesworks other than what you just described to me?
A I think what I just described to you is the majority of the reason. I think that there were other micro reasons, but -- but that wasn't the main reason.
Q What were the other micro reasons?
A It was what we talked about earlier.



The -- just the feeling I got when I had spoken to Steph, Mrs. Jones -- sorry -- during that time with the article and all of that that was going on. Also, just I -- I didn't speak to her very much. Jen was really my point person, or Matthew. It would be like if I was your client. You're a wonderful lawyer and you've been with me -- I'd been your client for four years, and you left your firm to join -- to join Mr. Freedman. And -- and your firm might be great, but I would want to go with you. I mean, that was really the decision.
Q Okay. Is it fair to say that your working relationship with Jen never really changed or was interrupted when she left Jonesworks?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know how to answer that question.
BY MS. SHAH:
Q Okay. You -- you continued to work with Jen Abel as your publicist the day after she left Jonesworks, right? And in the week after she left Jonesworks and the month she left Jonesworks?
MS. SHAPIRO: Objection.
THE WITNESS: My recollection of her leaving Jonesworks was -- was her phone being



confiscated and her being met with, like, security and an attorney, and she had been, like, texting me from, like, another number and trying to get her phone. So from that point on, I know we were still dealing with the premiere, we continued to work together. But there was a gap when she didn't have a phone, and I think she was going through a lot.
BY MS. SHAH:
Q But that gap was a matter of hours or a day; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: Probably. But -- but I believe that my -- if my memory serves me correct -- and I could be wrong -- I was told that she would be staying on with me and Wayfarer until the end of the press cycle. There's like a date. And I -- I believe that this incident happened still while we were within that date. So it was my understanding that she was fulfilling her promise to us.
BY MS. SHAH:
Q Did you ever feel like she was ever unavailable to you as a publicist during this period of time?
A I'm not sure that's something I thought about.



Q Is she still your publicist?
A I think so.
Q Is she currently Wayfarer's publicist?
A I don't know. I -- maybe. I don't know what we're paying her if -- I don't know any of those details.
Q Did you have anything to do with any contractual relationship between Jennifer Abel or her agency, RWA, and Wayfarer or you yourself personally?
A No.
Q Okay.
MS. SHAPIRO: Counsel, can we take a break?
MS. SHAH: Sure.
MS. SHAPIRO: Ten minutes?
MS. SHAH: Yeah.
THE VIDEOGRAPHER: We are going off the record. The time is 5:41 p.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record. The time is 6:11 p.m.
BY MS. SHAH:
Q Okay. I want to talk about the period of time while you were filming It Ends with Us. And I

CONFIDENTIAL

Page 294

want to talk about conversations that you had directly with Stephanie Jones during the filming.
A Okay.
Q Do you recall any conversations that you had directly with Stephanie Jones during filming?
A I remember she came to visit me on set, which was lovely. Outside of that, I can't recall any moments right now.
Q Do you recall any calls that you had with her during filming where you were concerned or upset about any incidents that had happened on set?
A Right now, I -- right now, I don't.
Q Is it possible that there may have been calls between you and her during filming that you just don't recall right now?
MS. SHAPIRO: Objection.
THE WITNESS: May I ask a clarifying question?
BY MS. SHAH:
Q Sure.
A Do you mean just me and Stephanie Jones?
Q No. I mean between you and Stephanie Jones, whether or not there were other people on the call.
A Oh. So then I misunderstood.

Page 295

Q Oh, sure. Okay.
A I do remember a call with me, Stephanie Jones, Jen Abel, and, I believe, Jamie Heath, and myself.
Q Okay. Tell me what you remember about that.
A I remember -- I don't remember when it was. I remember giving them an update on what my experience was like filming the movie. I remember sharing some of the -- some of the moments of conflict that I had with Ms. Lively, just how difficult this movie was. I don't remember it being a long conversation. I remember her responses. I don't remember how long the conversation was.
Q What do you remember about her responses?
A I remember laughing because she got very protective of me and said things that I will not repeat on camera about Ms. Lively and things she's heard about her and Mr. Reynolds. And she talked about a lot about Mr. Reynolds and how terrible he was. And she kind of like was acting like a momma bear. Don't mess with -- and -- and I remember that because she was approaching it like she's been around for a long time so she knows the inside scoop. She's been a publicist for so long, and I

Page 296

think she represented The Rock. And she had said on that call that Mr. Reynolds had, like, terrorized The Rock or something to that extent. Something about a -- something about a letter. I don't remember the details but something about, like, he had written a letter and it was, like, they wouldn't do press together. I don't know. She was -- it was a lot of gossip. But that's why I remember laughing because I was just like, oh.
Q Did you feel supported by her on that call?
A Yeah, as I said earlier, it kind of felt like, oh, don't worry. She's this and that. It will be fine. The movie's going to come out, and it will be awesome. And everybody's had a bad experience with her. It was like that kind of call.
Q And did you feel like she believed what you were relaying to her about your experiences on set?
A Yes. I don't remember sharing much, but what I did share, I just shared the truth. And she -- yeah. Yeah.
Q What do you remember sharing with her about your experiences on set?
A I specifically remember sharing the

Page 297

situation with our trainer and -- and asking him about what he thought Ms. Lively might weigh when we shot the scene where I had to pick her up, because of my back. And how then they confronted me the next day and how this trainer evidently then went and told her that I was asking about her weight or something. And then how that became this big thing. And they sat me down, and I just remember her kind of not being able to believe that that was even a thing.
I -- I believe I shared with her that I -- I had made a comment about the way Jenny Slate looked in her wardrobe. And then I used the word "sexy," and I think she started responding by joking about how -- again, I'm not going to -- I don't want to, if it's okay, repeat the words that she said -- but describing, generalizing the women and their fragility. And then I shared -- I think I talked about the wardrobe, how hard it was with the wardrobe. And just that it felt like it was just a very hard experience. Like, that's kind of what I remember.
Q Do you remember sharing with her any -- anything else regarding your experiences on set in that call?

A I remember sharing how proud I was of the movie but that it was just really hard. But that I was, like, really proud of the work. We hadn't talked in a long time, so it was kind of like a, like -- I hadn't talked to Jenn either. It was just like a check-in about everything.

Q Do you recall sharing with her anything else about the conflicts that you were having with Ms. Lively on the set?

A I don't -- right now, I don't recall.

Q Do you recall how that call came about?

A No.

Q Do you know whether you had asked for it?

A I don't.

Q Okay.

Do you recall her providing any guidance to you around being more sensitive to the optics with a woman like Ms. Lively who had just given birth with respect to the weight question or anything like that?

MS. SHAPIRO: Objection.

THE WITNESS: No, the opposite. She was very -- she jumped right in to putting Ms. Lively down and talking about her reputation.



BY MS. SHAH:

Q Did you record that call?

A No.

Q Do you know if Jamey recorded that call?

A I don't.

Q Do you know if Jen Abel recorded that call?

A I don't.

Q Do you think she had any reason to disbelieve what you were telling her on that call?

A I can't speak to what she might believe or not believe.

Q Do you recall whether or not she had recently had major surgery within the week or two before that call?

A I remember her having surgery, and I don't remember what the surgery was, but anytime someone in my life has a surgery, I would always reach out. And I'm very into, like, health, and I have a health coach -- or had -- and biohacking and things. So I -- I think I probably reached out and offered if there was any way I could be of service to her.

Q Do you recall any urgency around getting on the phone with her from your side to discuss



these issues with her?

A Like I said, I really don't remember the context or when the call was or anything like that.

Q Okay. Other than this one call that we've been talking about, do you recall having any other calls with Stephanie Jones during filming, whether or not there were any other people on it?

A I don't.

Q Do you recall -- are you sure that you didn't have any other calls, or you just don't remember one way or another?

A I have no memory of any other calls, but if you, like, have a phone log where we talked or something, I would be happy to change that. I just don't -- I don't have any memory of another phone call with Stephanie. It was -- I mostly spoke to Jennifer Abel, and I didn't speak to Jennifer Abel very often during the filming.

Q How often would you say you spoke with Jennifer Abel during the filming outside of the presence of Stephanie Jones?

A Only if there was something that she wanted me to promote or if there was anything that we were doing for the movie. But I don't have any specific memories right now.



Q Do you recall ever having any conversations with Jennifer Abel outside the presence of Stephanie Jones where you relayed to Jennifer Abel anything about your on-set experiences or difficulties you were having with Ms. Lively during filming?

A I don't -- I don't remember.

I feel left out of the note-taking.

Q Sorry?

A I'm just joking.

Q You previously -- I don't know if you still do -- hosted a podcast called Man Enough; is that right?

A That is correct.

Q What is the conception behind the Man Enough podcast, in your own words?

A What is the conception, meaning how was it conceived?

Q Sure. Let's start there.

A The Man Enough podcast was originally going to be an accompanying podcast to a book that I had released years ago called "Man Enough."

Q And what was that book about?

A That book was about my own journey to redefine and undefine what masculinity was for

CONFIDENTIAL

Page 302

myself.
Q And can you describe that journey for me briefly here?
A Do you want me to describe my whole book journey briefly?
Q Is it possible?
A I'm happy to try. I just don't know what "briefly" is.
Q I'm just trying to understand, what was the idea behind that book and the podcast?
A Well, the book was really a self-exploration of looking at all the unconscious messages that I've taken on as a man but, more importantly, as human in my life -- all the mistakes I've made, the social constructs and kind of invisible scripts that I maybe have been living by that I wasn't even aware of -- and putting them in a form that I was hopeful could help other men.
And the podcast, I think was -- to answer your question -- was a way to have a conversation around those same topics that, oftentimes, were uncomfortable so that we could have something for men outside of -- outside of the book.
Q Did the book or the podcast deal with notions of toxic masculinity? Was that part of it?

Page 303

A I actually say in the book that I don't like to use that phrase "toxic masculinity," so I will answer your question "no." But I think that would be more of a perception based on who was listening.
Q What phrase do you prefer than "toxic masculinity," or why do you not like using that phrase?
A As I wrote about, I think that the phrase "toxic masculinity" was inherently divisive. I believed it became political, and a lot of men felt attacked by the use of the word. And I didn't feel that it made any sense to use a term that would immediately make men defensive, especially because those were the very men that I wanted to reach. And I also don't believe that masculinity is inherently toxic. I never have. I was very proud to be a man. I never felt like I needed to apologize for being a man, and I know that was -- that was something that was going around a lot with the phrase "toxic masculinity."
And that said, there were a lot of people that maybe kind of lumped in this idea that because I was doing a podcast and writing a book about masculinity, that I was saying that masculinity was

Page 304

toxic. But generally, those were people that didn't read my book or listen to the podcast. I just wanted to help men and help men embrace all the parts of them that made them human. And that also means the stuff that sucks and that you never want to look at and that maybe you've been hiding or you don't even realize you're hiding. And it was just about confronting those parts of ourselves and just holding ourselves accountable to try to be better men.
Q What are some --
A I'm sorry. That wasn't very brief.
Q It's all right. And you'll forgive me if I'm using the wrong terminology around this stuff, but feel free to use whatever you think are the appropriate words. But you said --
A A lot.
Q Yeah. When you said "the stuff that sucks that you never want to look at or maybe you've been hiding or you don't even realize you've been hiding," can you give me some examples of what kind of "stuff" you're talking about?
A Sure. I mean, a lot of men deal with shame. A lot of men -- I mean, suicide among men is increasing yearly, and many more men take their own

Page 305

lives than women. And there is a belief in -- and I don't say this as an expert, this is just from my own research and experience. There's a belief in this specific world that this happens because men don't have a support system, because men have been taught to not share their pain and their trauma because it's oftentimes used against them and weaponized against them by both men and women. So an example could be a man that was abused as a child who never spoke to anybody about it.
In this case, I will give you an example of a man that was maybe abused by an older man, but this man identifies as being heterosexual. But because he was abused by an older man, struggles with the abuse itself and being taken advantage of. But also the fact that he was abused by a man, he's also questioning his sexuality or his gender. And also, there is a preconceived notion that as a man, you don't want to go to therapy because it makes you less of a man.
So perhaps this man didn't get the help that he needed, and he was, as we say, suffering in silence. And he didn't know who to reach out to. And instead, that man took out all of these feelings of shame and unworthiness and confusion about what

CONFIDENTIAL

Page 306

happened to him and blamed himself and would take that out on other people -- maybe other men, maybe other women, maybe this man himself became an abuser. And the whole idea is that this is something that as a man, you would find embarrassing and shameful because it's not something that is socially accepted or acceptable to talk about.

So the hope was to normalize getting the help you need to normalize vulnerability. Let men know that they're not alone. And that there is all kinds of examples of these types of things. I'm happy to name another one if you want me to. And again, this is just a hypothetical man. And many of these men end up eventually taking their own lives, and that breaks my heart, and hurting women in the process, which also breaks my heart.

Q Did any of your work on the podcast or in this book around this idea of "Man Enough" have to do with gender norms or gender relations as between men and women?

A I mean, I think the entire book was inherently about gender and masculinity specifically. But as I said in the book, I'm not an expert and the book was much more my personal journey in trying to use as many anecdotes and

Page 307

stories that I could find in my life to point men to a -- to a direction of maybe them being able to look at themselves. I'm sure some of that was -- it was discussed either on the podcast or in the book as just it's a -- like, this is a large, large conversation. And my book was meant to be just a tiny little piece of a personal journey meant for -- mostly meant for men. But as we know, many women read it and then gave it to their men.

Q Have you seen reporting around you that identifies you as an ally of women or a feminist ally?

A I would say so, yeah.

Q Do you believe yourself to be an ally of women or a feminist ally?

A I certainly have attempted to be.

Q You're aware of the Me-Too movement, I'm assuming?

A I am.

Q Are you aware of an idea that came out of the Me-Too movement that one should believe women, both believe women when they speak out about misconduct against them?

A Yes, I'm aware.

Q Do you agree with that idea?

Page 308

A I think that is a very nuanced question that I can't give you a yes-or-no answer to.

Q Are you aware of something called the He-Too movement?

A No, but I could imagine what it is.

Q It's, essentially, a response to the Me-Too movement about men who believe they've been falsely accused by women of misconduct.

MS. SHAPIRO: Is that a question?

THE WITNESS: Oh, then I -- then, no I don't know what -- I don't know what that is.

BY MS. SHAH:

Q Okay. What did you think it was?

MS. SHAPIRO: Objection.

THE WITNESS: I actually thought it was like "him too," like he also has been sexually harassed or sexually assaulted. Because oftentimes, people think men can't be sexually harassed or assaulted and that it's only women. But I think that if we're talking about equality, it's important to create room for men to be able to share their experience of sexual harassment or assault. Because I believe one in five men have been sexually assaulted, which is a pretty big number. But again, not as an expert, just something that I've read. So

Page 309

that's what I thought you were meaning about "him too."

BY MS. SHAH:

Q Are you aware of -- or have you been following a lot of the commentary about you on social media since this lawsuit began, in general?

A I have had very long breaks where I didn't. And then there have been times I feel like I need to know what's happening and I go look. Unfortunately, people don't necessarily respect boundaries, and people send me lots of things, so I have to constantly ask people to not send me things. But there have been many months where I have not been following. And then there's been months where I have.

Q Have you seen that, online at least, you've become, in certain circles, kind of a hero or a figurehead of the MAGA movement?

A No. I don't mean to laugh, but I --

Q You've not seen anything like that?

A No, I didn't -- I didn't know where you were going with it, but I didn't think you were going with that.

Q All right. I'm not going to ask you about your political affiliation.

CONFIDENTIAL

Page 310

A I don't have a -- I don't have a red hat.
MR. BACH: You've asked about everything else.
MS. SHAH: I don't care about that one.
THE WITNESS: Am I -- is that true? That's all right. You just surprised me there.
MS. SHAPIRO: Can I -- time out. How much time do we have left, Mr. Videographer?
THE VIDEOGRAPHER: We're at six hours and 40 minutes.
MS. SHAPIRO: Is that all? Are you sure?
THE WITNESS: I'm sorry.
BY MS. SHAH:
Q So you've not seen the legions of MAGA supporters who have come out in support of you on social media?
A No.
Q Okay.
A That's very surprising.
Q And you're not aware that you have a very pro-MAGA fan base on social media?
A You're making me aware. Are these like the "Make America Great Again" red hat people?
Q That's what I mean, yes.
A Is there anything you want to show me

Page 311

that's like...
Q Not right now, no. I just didn't know if you had been following this during the course of this lawsuit.
A Maybe I should. That's a...
Q Are you aware that on social media you've also become, to some, like a poster boy for the He-Too movement, meaning the --
A As I said, I wasn't aware of what He-Too meant.
Q And by "He-Too," I mean a movement around the idea of men being falsely accused of sexual misconduct by women?
A So was I aware that I was a poster boy for the He-Too movement?
Q Uh-huh.
A I was not.
Q Okay.
A As I said, I didn't know what -- I thought He-Too meant something else.
Q Other than the term "He-Too," are you aware that during the course of the lawsuit, you've become kind of a hero or poster boy for this idea of men being falsely accused by women?
A No. "Hero," it's a very strong word.

Page 312

MS. SHAPIRO: Looks like you're on your last page. You don't have to use all seven hours, you know.
THE WITNESS: We're here.
BY MS. SHAH:
Q Do you know what the "manosphere" is, if I use that word?
A I do know what the manosphere is. That is one I do know.
Q What do you understand by that term?
A The manosphere, to my understanding, is -- it was like an alt-right movement that took place on or in parts of the web, which I don't know. Maybe Reddit or some places that -- that kind of bred this idea that men are victims and created, I don't know the exact term, but like these cells of men who would, like, take out their anger on women.
Q Are you aware that during the course of these lawsuits, you've also become kind of a hero to the manosphere?
A I'm learning all kinds of new things today; so, thank you.
Q I can see that.
A No. I don't know where the manosphere is, nor do I know where to find that information.

Page 313

But I hope that people in the manosphere, if they do think of me as a hero, would then go read my book. Because I think that could then maybe -- I always wanted to get the book into the manosphere. This is a weird way to do it. And I don't mean that like as a joke. Like, that was always a thing that we had talked about, is how do we -- how do we reach the men in the manosphere. So maybe -- maybe God is laughing right now.
Q Is the manosphere a movement that you want to be associated with?
MS. SHAPIRO: Objection.
THE WITNESS: I think I just answered your question. No. I'm not meaning to laugh at you. It's just, no, absolutely not. Like I said, I absolutely would want them to read my books and give my book for boys to their young boys. Because all of my work is about helping men actually do the opposite of my understanding of what the manosphere is, which is to not take your anger and aggression out that you have in the world, out onto women and the women of your life. And to go to therapy and to not harbor that anger and that resentment and to get it out of your body. And to, yeah, so -- so maybe some good will come out of this if they are reading

my stuff.
BY MS. SHAH:
Q Do you know whether, during the course of the lawsuit, anyone on your team has been stoking these constituencies in your favor on social media?
MS. SHAPIRO: Objection. And I don't -- I'm just going to instruct you not to provide any information based on what your lawyers have communicated to you.
THE WITNESS: That's okay. My lawyers haven't told me anything. I didn't know anything about it.
BY MS. SHAH:
Q So you're not aware one way or another whether anyone on your team has been stoking these constituencies that I've mentioned in your favor on social media?
A I don't know where I would even find the manosphere; so, no.
Q Do you think Jed Wallace can find the manosphere?
MR. BACH: Come on. We got six hours and 45 minutes. If you have real questions, ask them, but this is silly.
THE WITNESS: I have no idea.



MS. SHAH: One defendant per deposition, please.
MR. BACH: One defendant but one person sitting here late at night, wondering what you're doing here at this point. You're just improvising.
MS. SHAH: All right. That's enough. That's enough. I'm going to go off the record if you continue to eat up my time.
MR. BACH: Go ahead.
THE WITNESS: I'm happy to answer your question. I don't know anything about what Jed Wallace knows or where he could find the manosphere.
MS. SHAH: Okay.
BY MS. SHAH:
Q What do you know about what Jed Wallace does?
A I know he's very good at compiling information and then sending it, as I believe I testified to earlier. I know he can help. I had -- I've had people call me and, like, threat -- like, leave me threats. I've had death threats. So I know that he knows people in security, so he was able to help me get security.
I know that he loves his family a lot. I



know that he had a -- I think he had a health scare, but I don't know much about what he does or what he can do.
Q Have you read Ms. Jones' lawsuit in this case?
A I haven't.
Q Okay.
MS. SHAH: I think that's all I have for you.
THE WITNESS: Thank you.
MS. SHAH: Thank you.
MS. SHAPIRO: This marks the conclusion of today's deposition. We are going off the record. The time is 6:46 p.m.

(WHEREUPON THE DEPOSITION CONCLUDED AT 6:46 p.m.)



CERTIFICATE OF DEPONENT

I have read the foregoing transcript of my deposition and except for any corrections or changes noted on the errata sheet, I hereby subscribe to the transcript as an accurate record of the statements made by me.

_________________________
JUSTIN BALDONI

SUBSCRIBED AND SWORN before and to me this ____ day of ________________, 20___.

_________________________
NOTARY PUBLIC

My Commission expires:

CONFIDENTIAL



REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 7th day of October 2025.

ASHLEY SOEVYN
CSR No. 12019



ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Blake Lively v. Wayfarer Studios LLC, Et Al.
DATE OF DEPOSITION: 10/6/2025
WITNESSES' NAME: Justin Baldoni

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Justin Baldoni

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF __________, 20__.

(NOTARY PUBLIC) MY COMMISSION EXPIRES:

**&**

**&** 2:21 3:5,16 4:4 5:4,12 6:4 14:5,7,10,12,20

**0**

**0.00** 173:23
**0o0** 1:3 2:3 13:3

**1**

**1** 11:7 94:10,12 101:20 102:9
**1/14/2024** 12:11
**10** 12:7 172:2,7
**10/6/2025** 319:3
**100** 212:25 213:12 214:9 214:19 215:2 216:11 241:6 281:10,15,18
**10010** 3:21
**10019** 6:8
**10036** 8:21
**10049** 1:7 2:7 13:16
**101** 11:9
**10100** 6:15
**106** 11:11
**10:21** 53:22
**10:49** 53:25
**11** 12:8 190:21 190:24 198:16
**1140** 8:19
**1142** 11:17 145:18
**115** 11:13
**12** 12:10 223:12 223:13
**12-1** 157:21
**12019** 1:23 2:25 11:5 12:5 318:25
**1221** 12:7 172:5
**1222** 175:3
**1223** 175:19
**1225** 178:2
**1226** 181:7
**1227** 12:7
**12:31** 132:1
**13** 12:12 228:13
**139** 228:8
**13939** 12:15 229:20
**13940** 12:15 230:1
**13th** 172:4
**14** 12:14 24:14 24:15 229:17 229:21
**140** 11:15
**1401** 9:7
**141** 12:18 234:18
**142** 239:15
**143** 239:21 240:2
**1434** 11:7 94:17
**144** 245:23
**1441** 11:8
**145** 11:17
**148** 11:18
**149** 241:8
**14th** 148:17 153:7,18 162:19 223:16
**15** 10:6 12:16 24:14 45:1,8 48:11,17,21 74:1 231:6,9 277:24
**150** 239:22 240:8
**151** 12:18
**152** 11:22
**15478** 11:10 102:5
**15480** 102:25
**15481** 11:10
**16** 12:18 234:9 234:10
**16169** 11:14 115:10
**16170** 11:14
**162** 11:23
**17** 12:19 258:15 258:16 277:7
**1700** 4:8
**172** 12:7
**17th** 8:20
**18** 12:21 277:22 278:1
**1801** 7:11
**18710** 12:20 258:25
**18711** 12:20
**1875** 5:16
**19** 12:22 286:5 286:11
**190** 12:8
**1900** 9:8
**19th** 286:7
**1:24** 132:4
**1:58** 204:6

**2**

**2** 11:9 101:19 101:22,23,24 108:5 155:5
**20** 41:10 48:10 54:18 74:3,6 317:13 319:22
**20006** 5:18
**201-0005** 7:17
**2016** 43:24
**2017** 43:24 83:7
**2018** 83:6
**2019** 43:3 48:10 83:7
**202** 5:21
**2020** 43:1 54:19
**2024** 54:7 62:2 62:16 63:12,18 63:21 64:9

66:14 94:16 102:4 106:24 106:25 112:25 115:9,23 127:9 133:1,3 140:10 140:16,19 148:17 162:19 172:4 217:8,25 218:10 223:17 228:16 234:17 250:13 258:24 267:10 277:24 286:7
**2025** 1:22 2:24 11:4 12:4 13:2 13:6 40:9 318:22
**2029** 2:21 5:7 8:8 13:10
**2049** 4:7
**20s** 50:20,20
**20th** 61:24
**21** 48:10
**212** 3:14,23 6:10 8:24
**21st** 63:10 250:13
**2208** 12:23
**2210** 12:23
**223** 12:10
**228** 12:12
**229** 12:14
**22nd** 3:20 63:10
**23** 36:20
**231** 12:16
**234** 12:18
**24** 1:7 2:7 13:16
**248-5100** 6:17
**25** 1:7 2:7 41:10
**257-4880** 8:24
**258** 12:19
**25th** 133:3
**26** 140:10
**26th** 140:16,19 145:17
**278** 12:21
**286** 12:22
**2938** 12:13 228:17
**2940** 12:13
**2:02** 224:24 231:14
**2:46** 198:10
**2nd** 234:17 235:2,8

**3**

**3** 11:11 106:15 106:20
**303-1245** 5:21
**30s** 51:3 77:11
**310** 4:11 5:10 6:17 7:17 8:12
**312-4207** 4:11
**33** 106:14
**35** 78:7,14
**376-7878** 8:12
**3972** 11:22 153:8
**39735** 11:16 140:11
**39736** 11:16
**3982** 11:22
**3:11** 198:13
**3rd** 94:15 102:4 106:24

**4**

**4** 11:13 115:7 115:11
**4/5/2024** 12:16 231:8
**40** 162:9 310:10
**400** 8:9
**41606** 12:11 223:18
**41608** 12:11 224:23
**41609** 12:17 231:8
**41612** 12:17
**449** 1:7 2:7
**45** 314:23
**4552** 11:24 162:20 167:3
**4553** 167:6
**4554** 162:23 163:3
**4560** 11:24
**4562** 12:21 277:25
**4563** 12:21
**4949** 12:9 190:23
**4951** 191:3,14 198:18
**4952** 203:13
**4953** 204:5
**4958** 202:8
**4962** 12:9
**4:02** 204:17
**4:21** 254:8
**4:48** 254:11
**4th** 106:24 228:16

**5**

**5** 11:15 140:6,7
**50** 74:11
**51** 3:19
**55** 115:6
**5:41** 293:19
**5th** 7:11 258:24

**6**

**6** 1:22 2:24 11:4,17 12:4 13:2,6 145:10 145:11
[redacted] 19:12
19:11,12
**651** 11:12 107:1

**6669** 318:24
**68** 190:20
**6:11** 293:22
**6:30** 199:3
**6:46** 2:23 316:14,16

**7**

**7** 11:18 148:12 148:13
**7/26/2024** 12:14 229:19
**7/26/24** 11:15 11:17
**7/3/2024** 11:9
**7/3/24** 11:7
**7/8/2024** 11:11
**70** 52:25
**713** 9:11
**728-8000** 6:10
**750** 6:15
**752-4226** 9:11
**77010** 9:9
**787** 6:7
**7:40** 175:6
**7th** 318:22

**8**

**8** 11:22 152:24 153:3
**8/10/24** 11:13
**8/13/2024** 11:19
**8/13/24** 12:7
**8/14/2024** 11:22
**8/14/24** 11:23
**8/15/2024** 12:21
**8/19/24** 12:22
**8/2/2024** 12:18
**8/4/2024** 12:12
**8/5/2024** 12:9 12:19
**8/6/2024** 12:9
**8/9/24** 11:13
**83** 166:19
**849-7000** 3:14 3:23
**85** 229:12
**855-3000** 5:10
**86** 231:4
**865** 3:9
**8:03** 153:24
**8:10** 103:2
**8th** 3:10 115:23

**9**

**9** 11:23 162:13 162:14
**90017** 3:11
**90067** 4:9 5:8 6:16 7:12 8:10
**94** 11:7
**9:15** 2:23 13:5
**9:36** 192:5
**9:39** 198:20
**9:40** 191:16
**9:56** 203:14
**9th** 115:9 118:3

**a**

**a.m.** 2:23 13:5 53:22,25 153:24 157:21 191:16 192:5
**aaron** 6:5
**abel** 1:10 2:10 7:3 8:3 9:17 14:17 21:5 22:11,25 23:3 24:22 34:5 38:23 40:21 55:18 72:6 79:18 89:9,12 102:3,14 108:5 108:6 109:16 109:18,18,23 110:16,21 111:17 115:1,8 118:5,20,23 119:4,13 120:25 121:9 126:15 131:21 158:1 162:18 169:9,17 170:15,17,25 194:23 195:4 223:15 224:3 225:21 226:5,5 226:15 227:5 229:7,18 230:3 231:7,19 232:7 232:18 233:3,8 233:22 234:2 235:18,23 239:16,18,23 240:14 241:11 241:17 242:7 245:4,11 257:9 258:20,22 259:3 261:17 262:10 263:23 264:15 267:1 268:7 269:18 271:2 277:19 277:23 285:23 285:23 286:6 288:9,24 289:4 289:8,22 290:18 291:20 293:8 295:3 299:6 300:17 300:17,20 301:2,4
**abel's** 230:19
**ability** 16:15 129:21,24 130:5
**able** 16:11 76:7 76:10 77:1 214:18 221:23 237:16,18 247:15 260:5,7 271:3 297:9 307:2 308:21 315:24

**above** 105:3 201:11
**absent** 133:22
**absolute** 98:8
**absolutely** 33:5 95:12 211:5,5 217:14 313:15 313:16
**abstract** 49:11
**abuse** 78:11 150:24 151:2,5 151:7 154:5,12 180:17 305:15
**abused** 305:9 305:12,14,16
**abuser** 306:4
**abusive** 151:18 152:12
**acceptable** 306:7
**accepted** 306:7
**accompanying** 301:21
**account** 89:9 185:3 187:10 193:2,8
**accountable** 304:9
**accounts** 127:8 206:21 216:23
**accurate** 16:21 42:21 92:17 103:18 104:20 104:21 106:5 147:8 221:1,22 284:14 317:6
**accusations** 238:1,24
**accuse** 267:10
**accused** 73:3 143:11 152:21 207:9 308:8 311:12,24
**accusing** 100:22
**acting** 29:4 50:7,8 109:5 129:9 279:25 280:16 295:21
**action** 13:13 318:19
**activities** 208:1
**activity** 113:1
**actor** 41:2 48:6 48:8 84:23 85:4
**actually** 19:6 39:8 71:25 77:2 91:10 95:9 104:15 135:13 136:15 143:12 154:15 161:19 166:22 170:17 174:13 191:25 197:14 224:7 249:21 250:7,8,11,17 252:1 253:8 266:14 267:6 274:3 281:20 284:3,10 285:5 287:15 303:1 308:15 313:18
**added** 76:9 230:14
**address** 19:7,8
**adjust** 35:22,24 36:1
**advances** 202:24
**advantage** 305:15
**adversaries** 206:21
**advice** 36:15 105:22 222:4 222:12
**advised** 164:9
**affairs** 119:24
**affiliation** 309:25
**affirmations** 82:8,12,20 83:2
**afraid** 238:4,6
**age** 270:20
**agency** 39:18 39:22 135:3,4,7 184:21 270:16 288:14,14,18 288:20,23 290:10 293:9
**agenda** 141:5,8 183:18,22 184:2
**agent** 37:25 38:23 39:3,16 270:9,9 288:15 288:16,16,17 288:19 290:10
**agents** 207:9 238:16
**aggression** 100:20 313:20
**aggressive** 96:2 96:24 97:21,25 98:10,15,16,23 99:11,12 100:11,12,17
**ago** 15:16 42:9 54:16 108:4 160:8 301:22
**agree** 87:11 97:15,18 130:9 157:5 220:6,22 225:24 226:2 261:7 283:1 307:25
**agreeing** 96:25 100:8 108:23
**agreements** 76:18,23 77:3
**ah** 200:6
**ahead** 69:7 124:3,5 147:24 166:23,25

176:18 192:1 215:24 244:25 315:9
**ahmed** 41:23 42:6,6 67:21,22 67:23
**ahouraian** 8:5 8:6 14:22,22
**ahouraianlaw...** 8:11
**al** 1:8,13,15 2:8 2:13,15,20 11:3 11:3 12:3,3 13:14 319:2
**alex** 21:7
**alexander** 207:4,8,17
**alexandra** 8:16 15:1 18:11
**alexandria** 65:15
**alias** 153:12,14
**alice** 9:22
**align** 144:9
**aligned** 138:25
**allegations** 150:24 151:2,5 151:8,11 180:18 201:21 265:12 266:4 267:25
**alleged** 11:20 116:16,23 117:6 151:13 151:15
**allowed** 64:23 70:13 133:20 134:2
**ally** 307:11,12 307:14,15
**alt** 312:12
**amanda** 188:24 189:9,20 190:9 190:14 200:10 201:13,15,16 201:22 202:13 203:8 206:4
**amazing** 84:15 105:12 225:5 286:24
**amber** 149:2 180:17
**america** 310:23
**americas** 8:19
**amid** 11:20 148:18
**amount** 69:24
**amplifying** 257:10
**amy** 172:3,12 172:22,25 173:4,10,18 175:5,18 176:25 178:13 178:17 181:12
**anathan** 6:9
**anecdotes** 306:25
**ange** 21:7 31:3 31:4,5,7 32:1 33:7,15 34:19 35:9 37:6
**angeles** 1:21 2:22 3:11 4:9 5:8 6:16 7:12 8:10 13:9,11 40:14
**anger** 312:17 313:20,23
**angry** 45:5 122:12,13
**animosity** 193:6
**announcement** 159:1
**answer** 16:19 17:9,10,16,24 25:22 30:18,20 31:19 39:9 44:20 61:17,18 61:19 64:3,23 65:1,11 78:7 80:17,19,20,21 81:6,18,22 83:24 86:4 90:24 123:20 129:1,4 137:4,9 164:13 170:10 171:6,9 183:2 191:5 208:9 212:22 213:9 213:21 214:24 218:7 222:9,15 245:13 251:4 283:14 289:15 291:16 302:19 303:3 308:2 315:10
**answered** 18:2 213:18 313:13
**answering** 17:2
**answers** 16:20 17:3
**anxious** 89:25
**anybody** 91:19 150:1 195:10 249:10 258:2 305:10
**anymore** 236:23
**anything's** 41:21
**anytime** 227:21 299:17
**anyway** 173:13 191:24 249:9
**apart** 21:14,22 45:20 49:23 50:2 90:2 260:23
**apologies** 203:13
**apologize** 45:7 67:10 303:18
**apologizing** 244:23

**app** 54:9,10,12 54:14 55:3 69:21 70:25
**apparently** 32:14 35:17
**appear** 30:8 110:13
**appeared** 36:16 126:2
**appearing** 95:14 116:15
**appears** 100:9 140:15 142:17 153:17 155:25 157:7 174:25 175:18 216:20 235:1
**apple** 27:2
**apply** 49:8
**appreciate** 86:19 109:8
**appreciated** 16:22
**apprehension** 263:1
**approaching** 295:23
**appropriate** 304:16
**approval** 263:9 263:12
**approve** 47:13 208:16,23 209:1
**approximately** 18:20,24 43:22
**april** 36:19
**apt** 98:13 99:10
**arato** 8:15 14:24 15:2
**arising** 36:11
**arose** 124:9
**article** 11:18 55:5,8 101:5 110:10,13 111:14 115:21 116:10 117:12 121:10,14 122:8,10,15,20 123:7,17 125:5 128:13 142:22 142:22 148:7 148:10,16 149:6,8 150:9 150:10 151:9 153:19 154:9 155:24 156:9 156:13 160:15 160:19 165:8 165:17 168:7 168:15 171:15 171:21 174:2,7 174:22 175:24 176:8 177:15 179:5,8,15,21 180:16 181:22 196:9,23 197:16 224:1 259:8,11,22 260:1,15,17,24 261:1,10,12 265:21,22 266:13 267:21 268:24 271:2 276:1 291:3
**articles** 97:25 98:14,21,22 99:10,12 115:25 116:15 127:5 151:17 167:13 168:11 268:9,21 276:4 284:11,24
**artists** 202:15
**ashamed** 76:21
**ashapiro** 8:22
**ashlea** 172:3,16 178:7,21 181:8
**ashley** 1:23 2:24 11:5 12:5 318:2,24
**asked** 36:4 65:5 69:3,5 94:6 96:19 108:19 115:1 136:20 141:16 145:4 179:15,21 221:13 226:11 252:23 260:2 277:8 279:5 298:13 310:2
**asking** 16:19 17:4,25 18:2 35:7 65:6 83:10 91:18 109:1 120:13 122:3 156:18 168:4,6 205:14 214:2,5 232:15 244:2 283:1 284:16 297:1,6
**asks** 94:23
**aspire** 44:3
**ass** 276:21
**assault** 308:22
**assaulted** 308:17,19,24
**assigns** 47:11
**assist** 46:13
**assistant** 163:7
**assistants** 39:1
**associate** 59:3 139:24 141:20 142:2,11 209:5
**associated** 58:19 147:6,10 147:11 149:9 164:16 209:12 209:21 313:11
**association** 154:10 160:22 164:7,18 183:9
**assume** 18:1 20:18 29:17 31:14 33:9

38:5 40:14 62:8,9 73:10 106:12 119:22 240:15 272:21
**assumed** 111:4 111:14 272:6
**assuming** 78:14 97:6 142:23 241:12 245:14 307:18
**assumption** 97:3
**attach** 264:20
**attached** 201:20 239:17
**attaches** 202:7
**attachment** 200:12 201:19 202:6
**attack** 270:23
**attacked** 129:10 273:10 273:10 303:12
**attacking** 270:19
**attempt** 77:15
**attempted** 307:16
**attempts** 230:9
**attend** 77:2 133:20
**attended** 20:23
**attendee** 50:24 51:2
**attending** 21:14
**attention** 128:21,23 149:22 198:17 264:10,11
**attorney** 3:18 4:6 5:6 6:6,14 8:7 9:6 13:19 17:7,8 22:23 23:1,15 66:17 66:25 67:2 81:13,15 292:2 318:18
**attorneys** 3:8 5:15 7:10 8:18 17:21 18:8,10 18:13 21:23 23:21 25:14,24 27:19 30:6,19 55:14 56:17 61:11,20 63:3,8 64:4,20,22,24 65:3,7,9 68:10 208:8,10 211:20 218:6
**audible** 16:20
**august** 62:2,16 63:12 112:24 115:9,23 116:6 118:3 124:11 133:1 148:5,17 153:7,18 162:19 172:4 217:8,25 218:10 228:16 234:17 235:2,8 250:13 257:19 258:24 267:10 277:24 286:7
**author** 41:2 280:9,17
**auto** 69:17,18 70:6,10,12,14 70:16 74:16
**available** 105:2
**avenue** 3:19 6:7 8:19
**award** 120:5,9 120:14
**aware** 20:15 22:13 25:18 30:3,15 37:21 37:24 38:1 59:20 69:20 112:16,17 115:17 119:10 119:11 122:3 127:7,13,15,17 127:18,19,20 127:24,25 128:9,12 136:9 137:22,25 140:1 144:16 151:7 152:8,15 152:20,22 166:2,8 174:6 176:17,21 177:13,17 185:12 186:3 186:14,24 187:7,14 188:21 189:3 189:11,16 190:6 194:7,13 194:15,19 195:4 197:13 203:6 207:14 216:24 217:18 217:22 227:12 227:17 228:21 233:1,21,25 234:1,5 238:14 238:18 250:16 250:18 251:9 252:10,14,20 267:21 277:16 302:17 307:17 307:20,24 308:3 309:4 310:20,22 311:6,9,14,22 312:18 314:14
**awareness** 59:23 248:11
**awesome** 296:15
**aziz** 51:6

**b**

**b** 265:4
**bab** 43:16

**babayan** 3:7 13:23,23
**bach** 8:15,17 14:24,24,25 15:2 310:2 314:22 315:3,9
**back** 20:19 53:24 54:2 69:13 74:20 90:23 104:14 107:7 110:22 112:9 125:24 132:3 167:15 175:23 183:9 191:22 198:12 213:3,15,25 214:21 216:2 220:8 222:12 244:2 254:10 263:20 288:5 293:21 297:4
**background** 117:21 118:6 170:18 176:18
**backlash** 91:16
**backwards** 241:9
**bad** 26:25 150:12 156:19 159:14,18 163:13 296:15
**bag** 69:15
**baha'i** 43:17 48:14,15,16,18 48:22
**baha'i's** 48:17 49:3
**baldoni** 1:20 2:19 7:3 8:3,14 10:2 11:2,11,19 12:2,20 13:13 14:16 15:2,14 19:8 56:15 116:12 136:13 137:4 148:18 185:3 191:4 211:16 258:20 258:25 317:10 319:3,21
**bandwidth** 93:20
**base** 310:21
**based** 76:18 147:6 184:3 261:8 303:4 314:8
**basically** 110:2 118:12 199:14 199:24 203:18 276:5 281:4
**basis** 259:22 284:2,9 285:5
**bates** 11:7,9,12 11:13,15,17,22 11:24 12:7,9,11 12:13,14,16,18 12:20,21,23 94:16 102:4,25 106:25 115:9 140:10 145:17 153:7 162:19 167:1 172:4 223:17 228:16 258:24 277:24
**bathroom** 19:3
**bear** 82:20 100:19 295:22
**bears** 94:16 106:25 115:9
**beautiful** 45:14 258:4
**becoming** 117:9,9
**bed** 286:23
**began** 24:16,19 35:21 66:14,23 84:14,19 85:1 85:17 87:1,23 87:24 88:3,4 90:16 309:6
**beginning** 2:22 166:24 167:2 251:18
**behalf** 2:19 13:15,21 14:5,7 14:10,12,15,20 14:22,25 15:2 62:14 124:24 170:21 171:1 188:25 189:9 190:10 206:4 207:18 211:2 211:12 212:3
**behaved** 126:18
**behavior** 100:4 151:18 152:13 202:23 230:9 238:1,11,24 239:10
**belief** 49:5,13 305:1,3
**believe** 21:13 33:22 36:19 38:3,3,15 41:24 42:4,25 46:2 47:4 48:19 49:1,17,24 54:18 55:10,14 57:21 58:5 59:13 70:13 71:20 72:4,25 73:12 77:21,25 80:13 83:18 85:7 87:10 91:15,16 97:14 97:16 98:7,13 105:9 107:6,8 108:8,13 123:18,19 125:14 130:25 132:22 133:1 133:21 135:11 135:11,19 136:1,3 139:7 139:14 144:5

147:2 148:3 151:20 159:5,5 159:11 171:10 180:22 206:8 223:24 224:12 231:3 235:5,9,9 242:22 243:14 249:16 255:11 256:3,16,16 257:24 259:14 260:17,20 262:1,3,10 263:16 265:2 267:13 276:6 283:3,9 284:2 284:11,13 292:13,17 295:3 297:9,11 299:11,12 303:16 307:14 307:21,22 308:7,23 315:19
**believed** 53:3 71:24 91:23 92:1 169:25 219:5 237:21 275:2 296:17 303:11
**bell** 84:9
**bender** 5:14 14:9,9
**benefit** 16:24
**benson** 7:7 14:19,19 72:15
**best** 16:23 24:11,12 32:24 93:23 129:5,21 129:24 130:5 135:20 224:20 255:3 261:6 281:22
**better** 35:6 100:14 134:15 157:1,6 239:22 243:12 304:9
**beyond** 105:4
**bfreedman** 7:13
**bieber** 271:3 272:24 273:16
**bieber's** 264:21 265:23 268:10 268:21
**big** 87:14,18 90:8 116:3,22 124:11 246:7 270:19 297:7 308:24
**biggest** 289:10 289:10
**biohacking** 299:20
**birds** 45:5
**birth** 298:19
**birthday** 235:9 244:17
**bit** 18:12 21:6 21:11 36:3 51:24 103:21 109:17 112:25 125:24 239:13 250:3 288:7
**bitch** 194:9
**black** 31:3,5 33:14,16 45:14 240:11 241:10
**blackballed** 45:15
**blake** 1:5,15 2:5,15 4:3 5:3 6:3 13:13 14:7 28:8 34:11,13 39:11 72:1 79:24 115:22 116:12,24 117:7 180:19 181:10 206:24 211:11 212:1 214:21 217:8 217:17 218:1 218:20 219:6 219:20 220:5 220:21,23 225:9,12 237:6 237:9,25 238:9 238:23 246:21 268:24 273:1,2 273:17,19 275:1,9 319:2
**blake's** 54:7 61:23 144:8 146:9 147:11 147:18 158:6
**blamed** 306:1
**blown** 191:21
**blue** 168:16
**blvd** 6:15
**boasting** 177:14
**body** 313:24
**bolno** 142:11 143:3,23
**bolstering** 23:24
**bombs** 270:20
**bond** 25:9
**book** 91:15 280:17 301:21 301:23,24 302:4,10,11,23 302:24 303:1 303:24 304:2 306:18,21,23 306:24 307:4,6 313:2,4,17
**books** 313:16
**boom** 178:14
**born** 48:16
**boss** 175:9
**bother** 141:8
**bothered** 164:25

**bottom** 95:23 143:18 162:23 175:3 202:21
**bouncing** 125:24
**boundaries** 309:11
**bounds** 215:8
**box** 241:10
**boxes** 240:11
**boy** 45:13 203:3 311:7,14 311:23
**boys** 313:17,17
**brag** 158:24
**bragging** 158:25
**brain** 71:13 103:13 104:14 196:14
**brand** 67:9
**braun** 192:9 193:19 196:11
**braun's** 142:10 193:2,8
**brave** 83:1
**break** 17:12,16 53:12 67:12 70:24 74:23 91:3 123:22 124:5 196:16 197:22 198:3,6 198:17 233:20 254:5,13,17 271:6 274:17 293:14
**breaks** 17:19 19:3 306:15,16 309:7
**breanna** 21:12 58:15 185:14 217:22 245:25 246:3,24 247:13
**breathed** 42:15
**bred** 312:15
[redacted] 19:11
**brett** 67:19
**briana** 267:22
**brief** 58:12 287:17 304:12
**briefly** 302:3,5 302:8
**bright** 117:1
**bring** 44:6 132:21,24 133:5,15 206:12 232:20
**bringing** 140:18
**broke** 219:21 220:6,23
**broken** 219:14
**brokered** 219:10
**brother** 23:25
**brothers** 207:4 207:7,18
**brought** 25:10 59:7 79:20 91:12 117:2 132:7 229:9 256:8,11
**bryan** 7:6 14:15 18:12 65:12,14 190:2 199:5,10,10 205:14,19,19 206:3
**build** 52:21 53:5 237:3
**built** 105:12 288:19
**bullied** 265:16 266:16 267:7 267:25 268:1,4 269:7,9,10,15
**bully** 265:13,19 267:20
**bullying** 264:21 265:7,23 266:15 267:2 267:11 268:11 268:22,24 273:1,2,17,19
**bunch** 128:6
**business** 44:15 52:16 92:22 94:5,25 95:15 101:4 102:15 106:11 108:7 110:13 114:15 115:3 117:16 119:23 121:1 121:10,15 122:20 123:17 125:5 128:13 181:23 195:22 196:9,23 197:8 197:10,15 277:5
**butler** 21:12 217:22 245:25 246:25 267:22
**butrrick** 9:22

**c**

**c** 3:1 4:1 5:1 6:1 7:1 8:1 9:1 265:4
**calculated** 215:19
**california** 1:21 1:23 2:22,25 3:11 4:9 5:8 6:16 7:12 8:10 13:9,11 19:14 19:16,20,22 20:1,3 33:3,9 318:3,21
**call** 17:21 26:20 31:1,7,13,18,22 31:23,25 32:3,5 32:16,19 33:8 33:15 34:1,4,7 34:12,15,18

35:8,13,19 36:4 36:22,25 37:3 38:8,19,24 39:6 39:7,9,24 40:5 40:8,16,19,22 57:7,15 73:4 83:19,22 86:13 90:17,20,21,23 94:3 96:4 104:1,17 107:19,23 108:13,15 109:23 120:16 188:1,4,11 228:23 234:24 235:7,12 240:21,24 241:1 242:9,13 242:17 243:3 243:13 244:5,7 244:8,10,11,12 244:13 245:2,4 245:8,9,15,18 247:2,25 253:9 253:11,16 271:18 274:23 294:24 295:2 296:2,11,16 297:25 298:11 299:2,4,7,10,15 300:3,4,16 315:21
**called** 26:7 39:22,23 43:16 45:15 52:17 69:8 77:19 84:3 97:21 100:19 128:2 151:18 159:24 160:11 224:7 279:24 288:17 301:12,22 308:3
**calling** 35:22 36:5,7,10,14,15 90:9 95:16 100:11 181:14 194:9 205:11
**calls** 25:23 27:25 28:5,12 28:16 30:6,9,18 33:11,14 34:20 35:10 37:5,7,11 37:15 39:17 52:5 91:5 118:13 125:6 156:15 218:6 256:22 294:9 294:14 300:6 300:10,12
**camera** 247:14 295:18
**camilla** 142:9 143:3,9
**camp** 219:6,7
**campaign** 151:16 225:5 260:18
**capable** 71:10 75:7 237:20 238:20
**capacity** 71:13 84:21 139:10 170:20
**capitalize** 270:8
**captions** 128:4
**care** 125:16 141:20 142:1 205:8 310:4
**career** 49:19 50:6,11 84:1 85:24 87:6,12 87:18 88:22 120:19
**cares** 287:21
**carly** 11:20
**carolina** 200:9 201:13,14,14
**carry** 78:25 79:3,5
**case** 1:7,7,7 2:7 2:7,7 13:16 20:17,25 21:10 21:11,15,17 25:9,15 28:6,7 28:8,9 30:10 60:20 104:12 127:23 142:13 174:25 182:19 184:20 185:6 186:3,4,5,14,15 186:24,25 187:7,8 188:14 188:21 189:7 190:7,8,8,22 192:14 195:2 195:19 196:8 196:21 197:14 198:21 199:9 200:3,15 203:24 204:16 205:6,24 206:2 207:14,15,25 217:16,23 227:3,13,23 228:15,21 245:25 246:11 267:23 305:11 316:5 319:2
**case's** 21:20
**cases** 15:18 25:20 29:22,24
**cast** 150:5,6 151:25 152:9 263:14
**cause** 119:18 119:25 236:25
**caused** 126:24 131:8
**causing** 124:11 179:9
**cbs** 45:23
**cease** 51:13
**ceased** 86:11
**cell** 69:10,13

**cells** 312:16
**central** 43:17
**century** 2:21 4:7 5:7 7:11 8:8 13:10
**ceo** 97:25 98:5 98:14,15 99:11
**ceos** 98:25,25 99:12
**certain** 51:25 69:24 275:11 309:17
**certainly** 28:2 150:20,20 307:16
**certainty** 213:1 213:12 214:9 214:19 215:3 216:12
**certificate** 317:1 318:1
**certified** 2:25 318:2
**certify** 318:4,17
**cetera** 25:19
**chain** 120:23
**chairman** 46:3 46:10
**challenge** 264:2
**change** 69:24 225:6 244:22 300:14 319:5
**changed** 47:3 244:24 263:6 291:13
**changes** 317:5
**characterizati...** 221:15
**characterize** 24:9,21 25:4 287:18 290:13
**charge** 263:18
**chat** 76:3,9 176:5
**chats** 55:11 65:4,10
**check** 36:5 68:21 298:6
**checking** 176:7
**chemistry** 225:8
**child** 305:9
**choice** 48:18 280:22
**chose** 182:4
**chozick** 172:4 172:12,22 175:5 176:25
**circles** 309:17
**circumstances** 130:6
**claiming** 278:18 279:9
**clarifying** 294:17
**classes** 50:8
**cleaner** 17:4
**cleans** 143:23
**clear** 218:15 253:16 273:7 273:24
**clearly** 248:1 264:10 270:15 276:22
**clickbait** 261:21
**clicked** 138:12 140:25 142:16
**client** 85:4 87:12 88:21 94:1 175:9 188:25 189:9 206:5 218:12 230:10 248:13 291:6,8
**client's** 125:19
**clients** 84:18 87:14,18 95:17 96:4 110:9 160:22 186:18 186:18 206:22 233:4,23 248:8 248:14
**close** 35:17 54:17
**closely** 89:12 105:13
**closer** 25:2,10
**closest** 24:11,13
**clouds** 45:11,13 48:5
**coach** 24:4 72:13,14,17,19 72:25 75:10 299:20
**coaching** 50:14 50:16,21
**code** 45:13
**coincidence** 168:16 268:16 269:4,7
**collectively** 78:8 289:8 290:3
**colleen** 21:8 91:9,14,19 92:3 92:9,13
**combat** 134:18 275:1
**come** 23:17 40:3 43:6,14 48:15 54:2 59:16 61:22 68:12 86:22 110:16 134:20 137:3 143:7 193:12 244:2 246:14,20 259:10 265:9 265:12,14 266:2,4,10,11 266:21 270:12 275:2 276:6 279:1 283:18 296:14 310:15

313:25 314:22
**comes** 61:19 64:4
**comfort** 159:3 243:11
**comfortable** 109:7 110:2
**comforted** 244:19
**coming** 39:18 113:9 115:25 132:18 151:17 167:13 196:10 196:23 238:6 265:18 273:1 273:18 282:6 284:12
**comment** 90:25 91:7 261:11 297:12
**commentary** 309:5
**commenting** 220:13
**commission** 317:20 319:25
**commit** 76:7,10 76:12
**commitment** 76:8,16,24,25 77:1
**common** 43:25
**comms** 59:8 62:2
**communicate** 27:3,5,10,13,18 27:21 64:18 141:17 170:10
**communicated** 54:21 86:8 314:9
**communicates** 170:11
**communicating** 26:23 158:11 170:5,7 257:20 275:15
**communication** 26:15 54:21 57:3,8,16 73:14 218:25 256:17 272:2 273:14
**communicati...** 57:6 59:16 61:19 64:13 65:18 66:3 117:2 132:8 133:6,15 136:10,21 139:16,22 164:16 218:6 229:10 232:21 258:10 274:6
**company** 42:8 42:15 46:12 85:7,8,13,14 86:5 103:14 105:5 255:25
263:18 268:22 270:22
**compared** 42:13
**comparison** 87:21
**compiling** 315:18
**complaint** 54:7 260:2,9,12
**complete** 16:8 16:12 17:16
**completely** 95:8 160:20 215:8 260:19 276:23
**complicated** 60:9,23 93:15 93:17
**comprehension** 160:9
**conceived** 301:18
**conception** 301:15,17
**concepts** 260:24
**concerned** 154:8 168:1 259:19 294:10
**concerns** 51:19 51:22 66:8 139:6,12 239:9
**concierge** 9:23
**concluded** 316:16
**conclusion** 316:12
**confident** 83:1
**confidential** 1:18 2:17 13:1 53:17 186:19
**confirmation** 159:2,8
**confirming** 158:23
**confiscated** 292:1
**conflict** 295:11
**conflicts** 298:8
**confronted** 230:8,13 297:4
**confronting** 304:8
**confuse** 185:21
**confused** 52:7 158:15 226:10
**confusion** 305:25
**congratulate** 86:14
**connection** 79:10,16 82:22 90:2,7 113:19 114:2 143:9 166:11 190:3

**connolly** 5:13 14:11,11
**consciousness** 49:10
**consider** 89:21 90:4
**considered** 25:1,3 77:7 92:11 93:21 97:22
**considering** 136:11 140:18 237:9
**consistent** 289:7
**consolidated** 1:14,15 2:14,15
**constantly** 309:12
**consternation** 179:9
**constituencies** 314:5,16
**constructs** 302:15
**consultation** 249:15,17 252:8
**contact** 131:22 220:15,19
**contacting** 124:10
**contained** 259:23 260:24 260:25 266:5 267:24
**content** 22:6 23:8 26:11 31:13 102:14 262:21,23
**context** 167:14 272:5 300:3
**continue** 154:20 267:2 315:8
**continued** 118:13 270:12 291:19 292:5
**contracts** 47:10 47:14
**contractual** 47:8 293:8
**contractually** 41:17
**contradict** 276:15
**contrary** 105:25
**control** 182:10
**controversies** 89:18,19,20
**conversation** 23:5 37:25 58:12,14,18 59:6,15 75:20 93:22 108:6,12 108:17 115:8 115:18 133:23 138:15,20 146:13,15,23 146:24 155:22 156:17 175:20 188:13 197:12 230:6,18 231:1 236:25 239:18 239:24 240:14 242:19 249:6 251:12,23 253:25 257:21 262:17,20 271:23,24 272:23 273:5 274:21 286:16 287:6,10,13,16 288:6 289:20 295:13,14 302:20 307:6
**conversations** 23:20 43:3 111:24 112:3 119:12 125:22 125:23 128:1 139:16 156:12 235:23 251:19 257:3,14,18 258:11 263:13 263:16 274:6 277:17 288:4 294:1,4 301:2
**conveying** 156:2,3
**convicted** 203:2
**coo** 51:11,16,18 51:20
**cool** 175:9
**cooley** 7:5 14:20
**copy** 81:15 186:5,16 187:9 190:9 203:7 204:11 205:14
**correct** 28:15 35:22,24 36:2 54:8 73:2 122:14 137:13 167:7 185:7 197:18 255:5 266:9 292:13 301:14 318:15 318:22
**corrections** 317:4
**counsel** 30:3 197:21 210:19 216:6,7 254:4 293:13
**counsel's** 30:22 75:4,8
**countless** 202:15
**couple** 123:23
**course** 16:18 35:22,24 36:2 37:16 49:19 50:6,11 90:14

96:10 97:1 100:16 174:18 242:2 278:8 287:2,2 311:3 311:22 312:18 314:3
**court** 1:1 2:1 15:22 16:5,21 16:25
**courtesy** 17:1
**cover** 164:3
**coverage** 176:22 267:9 269:19
**covering** 232:2
**crazy** 31:12,17 71:20 215:10
**crd** 260:2,9,12
**create** 43:10 49:10 77:3 187:1 188:23 206:3 207:16 218:16,18 308:21
**created** 77:22 282:17 312:15
**creating** 63:12 63:20,22,24 64:8,9 189:8,20 206:20 208:14 209:2
**creative** 46:13 46:23,25 47:5
**credence** 138:23 139:4
**credit** 45:24
**crises** 165:18
**crisis** 11:19 59:7,16,21,25 62:2,15 89:22 90:4,5,7 109:13 113:18 117:2 117:10 123:5 132:8,21,25 133:5,15,24,25 134:3,9,12,13 134:21 135:8 136:7,10,21 139:22 140:18 142:8,23 143:22 148:18 149:14,18 150:10 154:2 157:11 158:24 164:16 165:5,9 165:11,17,21 165:23,25 166:10,14 168:8 174:8,23 227:13 229:9 232:21 233:2 237:1 256:11 258:12 268:23
**criteria** 215:20
**criticisms** 246:1
**cross** 170:6 215:13
**crossed** 275:9
**crying** 93:9
**csr** 1:23 11:5 12:5 318:25
**culminated** 161:10
**cult** 227:15 238:15 270:11
**current** 72:17 123:7 220:13
**currently** 82:13 202:16 293:3
**customary** 48:17
**cut** 223:2
**cv** 1:7,7 2:7,7 13:16
**cycle** 292:16
**czerenda** 9:23

**d**

**d** 265:4
**d.c.** 5:18
**dad** 52:16,19 52:20,25
**dad's** 52:24
**daily** 77:8 82:7 82:12,20 115:20 116:4 116:10,15,19 124:10 217:24 219:21 267:24
**damage** 238:18
**dan** 73:7 75:11
**danny** 39:4,7 40:18
**dark** 146:20
**data** 26:8
**date** 11:9,13,15 12:8,10,14,16 12:18 32:21 43:4 102:8 118:14 129:24 150:7 241:1 249:19 261:8 292:16,18 319:3
**dated** 11:7,11 11:17,19,22,23 12:7,12,19,21 12:22 94:15 102:3 106:24 115:8 140:10 145:17 148:17 162:18 172:4 229:19 231:7 234:17 277:23 286:6 318:22
**dates** 83:11 133:12 241:7
**david** 142:11 143:3
**day** 16:18 17:20 19:2 32:11 46:19,19 55:4,7 79:25

83:11 89:4,5,8 89:8 105:3 151:4 153:18 168:1 174:1 219:1 235:10 250:7 270:20 276:8 288:16 288:23,23 291:20 292:10 297:5 317:13 318:22 319:22
**daylight** 13:6
**days** 18:8,17,22 18:25 19:2 27:1 55:5 79:12,13 123:19
**dead** 142:9
**deal** 17:6 90:18 116:22 157:9 302:24 304:23
**dealer** 51:25
**dealing** 128:3 129:21 199:4 244:17 253:13 292:5
**dealmaking** 51:24
**deals** 52:10
**death** 315:22
**debate** 98:19 215:16
**debating** 99:9 99:16,18
**debt** 232:3
**decades** 202:20
**december** 54:7 61:24 63:10,12 63:18,21 64:8 66:14
**decide** 48:18 132:24 251:7
**decided** 48:22 109:14 132:21 133:5 135:22 140:2 206:23 251:24 252:3,7 252:11 289:3
**deciding** 250:6
**decision** 55:10 55:13 64:19 111:9 114:8,9 133:14 135:20 136:6 147:2 184:5 249:11 249:12,14,18 251:11 252:11 252:14,21 258:1 288:8 289:14 290:4 291:11
**decisions** 91:20 112:6,10,21 113:13,15 114:1,5,7,12
**declare** 318:20
**dedicated** 78:25 202:12
**deeply** 263:13
**defamatory** 128:7 208:15
**defend** 238:22 239:4
**defendant** 1:12 2:12 14:25 189:18 315:1,3
**defendants** 1:9 1:15 2:9,15 7:2 8:2 9:2 27:20 55:15 68:10
**defending** 285:19
**defense** 236:11
**defensive** 285:15 303:14
**defer** 112:5,8 112:20 113:2
**define** 130:8
**definitely** 90:9 98:9 114:14 115:25 156:14 251:22
**delete** 69:17,21 69:23 70:7,10 70:12,14,16 74:17
**deleted** 70:21
**deliberately** 217:24 219:19
**demands** 39:14
**demonstrate** 73:13
**depends** 26:22
**deponent** 14:16 317:1 318:14
**deposed** 15:20 22:9,13
**deposition** 1:20 2:18 13:1,12,15 15:7 18:5,15 20:7,17,20 21:20,22,24 22:2,4,7,16,19 22:21,23 23:1,4 23:6,15,20 24:6 25:12 53:17 70:24 80:15,23 123:13 185:6 187:21 315:1 316:13,16 317:4 319:3
**depositions** 16:1 20:24 21:4,15,17 79:21,23 80:4
**depp** 149:1 154:11 180:16
**depp's** 154:3 168:8
**dern** 6:12
**describe** 40:24 50:16 78:21 95:13 97:4,5,8 132:17 255:15 302:2,4

**described** 66:16 120:18 290:8,19,20
**describing** 138:14 297:17
**description** 11:6 12:6
**deserved** 42:16
**designating** 53:17
**despite** 147:25
**destroy** 202:14 241:20 246:14 246:21
**details** 24:1 31:20 196:3 197:15 293:6 296:5
**developing** 91:18
**diary** 82:2
**dick** 178:20 180:11
**die** 270:21
**died** 143:3
**dietitian** 73:4
**difference** 43:10 196:4 272:8
**different** 54:13 93:21 114:23 125:22 126:2 226:13 288:14 288:18
**differently** 126:18 287:20
**difficult** 31:15 114:13 295:12
**difficulties** 301:5
**digital** 59:17 216:23 271:8 271:14,25 272:5,8,9,14,16 272:16,18 274:19
**direct** 47:24 57:3 64:2 65:1 65:2 71:4 80:16,19 81:17 191:13,13 198:17
**directed** 48:2 80:20
**directing** 30:17 50:9 166:12,12
**direction** 46:11 307:2
**directions** 218:16
**directive** 274:2
**directives** 217:13
**directly** 86:8 90:18 108:20 109:20 111:20 113:9 294:2,5
**director** 35:16 148:24 165:5 165:11,16,18 165:20,23,24 166:10 276:11
**dirty** 143:24 146:2
**disagree** 216:7 260:11 268:13 279:18,20,22 283:16,22
**disagreed** 276:23
**disagreements** 262:14,16
**disappear** 66:4
**disaster** 276:3 278:17 279:17 279:24 280:4 281:2
**disbelieve** 299:10
**disclosed** 268:8
**discoverable** 215:19
**discovery** 25:15 25:21
**discuss** 23:3 271:20 290:17 299:25
**discussed** 23:9 42:19 271:7,13 271:19 274:18 288:7 289:19 307:4
**discussing** 123:16 198:16 250:5 256:25 269:18 275:8 277:9,19 278:5 284:5 285:9
**discussion** 271:15
**discussions** 65:6
**dispute** 133:8 133:11
**dissatisfied** 235:19
**disservice** 263:5
**distill** 77:14
**distortion** 73:5
**distressing** 127:4 128:24
**district** 1:1,2 2:1,2
**disturbing** 129:15
**division** 52:22 53:6
**divisive** 303:10
**divorce** 129:12
**doctor** 129:6
**document** 94:10 101:14 102:2,21 133:10 140:6

145:7,10 148:11 153:2 167:3 174:17 197:23,24,25 198:2,6 200:8 201:13 205:23 223:11 228:9 230:15 231:5 232:12 235:13 235:15,19,25 236:2,5 240:19 242:8,21 243:8 243:17,20,22 244:5 245:21 246:1,5 254:14 254:18,23 255:5,15,23 258:15 261:16 263:21 266:20
**documents** 20:6,11,16 25:13,19 227:2 227:6
**doing** 16:20 32:23 43:19 54:10 62:22 63:1 68:22 71:10 75:7 86:5 114:13 124:23 130:25 133:19 150:1,3 150:6 159:20 169:17 170:1 175:13 183:25 204:19 216:21 246:7 270:11 273:5 276:8,23 285:18 300:24 303:24 315:5
**dome** 237:3
**domestic** 262:19
**don** 72:13
**door** 252:2
**dots** 197:8
**downloaded** 54:11,14,24 55:4,7 146:20
**draft** 103:6,6 203:7
**drafted** 39:15
**drama** 129:11 257:12
**draw** 149:22 182:14 264:11
**drawing** 264:9
**drink** 17:18
**drive** 204:9
**driving** 121:19
**dropped** 270:17
**dropping** 270:20
**drown** 282:8
**due** 215:9
**dug** 269:8,12
**dummy** 120:6 120:15,17
**dv** 257:11

**e**

**e** 3:1,1 4:1,1 5:1 5:1 6:1,1,5 7:1 7:1 8:1,1 9:1,1 27:6
**earlier** 54:5 63:24 64:10,17 87:17 177:24 219:5 250:1 269:22 270:7 285:21 288:8 290:25 296:12 315:20
**early** 40:9 43:1 87:12 124:10
**east** 2:22 4:7 5:7 8:8 13:11
**eat** 315:8
**effect** 16:4 276:19
**effects** 45:17
**effusive** 108:22
**egging** 287:23
**ehudson** 4:10
**eighth** 116:7
**eighty** 171:11
**either** 20:23 28:8,18 76:1 120:13 131:17 142:6 165:19 211:11 212:1 214:14 216:17 261:2 272:23 273:14 274:25 298:5 307:4
**eleanor** 45:15
**elevate** 49:10
**elimination** 49:12
**email** 11:11 26:20 27:5 57:7,15 106:21 107:4,7 108:1 108:19 259:14 259:15
**emails** 25:13,19 26:10
**emanuel** 3:5,16 13:20,24 14:2
**embarrassed** 76:21
**embarrassing** 48:10 306:5
**embrace** 304:3
**emotional** 93:11,20 247:24
**emotionally** 129:15
**empire** 45:14
**employ** 208:20 209:6,22 214:20
**employed** 209:13 210:6 210:25 211:10

211:25 212:9 213:2,13 268:23
**employee** 59:3 318:18
**employees** 58:13,19 185:19,20 186:20
**employing** 209:23 257:1
**encapsulated** 100:3
**encourage** 248:19
**encouraged** 285:22
**encouragement** 24:2 86:16,20
**encouraging** 248:21
**endearingly** 100:21
**ended** 111:14 286:22
**ends** 11:20 36:8 36:13 45:16 47:22 48:5 49:24 76:15 79:11 82:22 87:2,25 88:5 89:17 90:17 102:24 113:19 116:12 148:19 262:5 293:25
**endurance** 17:14
**energy** 138:21
**engaged** 152:12
**engineer** 32:22
**ensure** 105:4 264:8
**enter** 52:10
**entered** 47:15
**enters** 47:14
**entertainment** 41:4 42:7,11 45:23 49:6 52:16
**entire** 52:22 53:17 102:20 223:23 306:21
**entities** 14:18
**entitled** 13:13 248:2
**entrepreneur** 41:4
**entrusted** 135:19
**episode** 233:17
**equality** 49:13 308:20
**equity** 41:20 42:2,2,12,16
**errata** 317:5 319:1
**erratic** 125:24
**escalated** 202:24
**especially** 129:14 237:9 303:14
**esq** 9:21,22
**esra** 4:5 14:6
**essentially** 156:18 157:8 158:11 163:12 180:15 276:2 276:19 279:1 279:25 282:21 283:7 284:24 308:6
**estate** 207:8
**estimate** 28:11 32:24
**et** 1:8,13,15 2:8 2:13,15,20 11:3 11:3 12:3,3 13:14 25:19 319:2
**event** 238:22 265:8 268:8
**events** 16:15 20:12 28:18 29:22,23 115:20 132:16 132:17 255:16
**eventually** 55:23 56:2 306:14
**everybody** 113:5
**everybody's** 224:18 296:15
**everyday** 134:7
**evidence** 190:7 215:19
**evidently** 39:23 123:5 297:5
**exact** 43:3 86:18 93:7,11 110:3 312:16
**exactly** 28:7 31:18 83:25 96:15 100:15 134:12 139:4 164:8,12 247:13 249:19 250:15 266:7 273:25 275:22 288:6
**exaggerated** 103:24 104:6 104:13
**exaggeration** 103:21 288:3
**examination** 10:1,5 15:12 318:10
**example** 112:11 165:4,11,20 166:16 305:9 305:11

**examples** 52:14 53:9 304:21 306:11
**except** 161:25 317:4
**exceptional** 103:12
**exchange** 287:17
**exchanged** 94:20
**exciting** 177:9
**excuse** 149:4 237:17
**exhausted** 188:8
**exhibit** 11:6,7,9 11:11,13,15,17 11:18,22,23 12:6,7,8,10,12 12:14,16,18,19 12:21,22 94:10 94:12 101:17 101:19,20,22 101:23,24 102:9 106:15 106:20 108:5 115:7,11 140:6 140:7 145:10 145:11 148:12 148:13 152:24 153:3 162:13 162:14 172:2,7 190:21,24 198:16 223:12 223:13 228:10 228:13 229:17 229:21 231:6,9 234:9,10 258:15,16 277:7,22 278:1 286:5,11
**exhibits** 11:1 12:1
**existed** 206:17
**existential** 26:18
**existing** 276:16 276:25 285:17
**expect** 192:20 195:17 234:24
**expected** 111:1 111:19 206:17 218:12,21,21 218:24
**experience** 25:2 230:7,20 266:13 273:18 295:9 296:16 297:21 305:3 308:22
**experienced** 100:24 128:21
**experiences** 269:15 296:18 296:24 297:24 301:4
**experiencing** 91:25 128:22
**expert** 98:20 125:7 157:3 305:2 306:24 308:25
**expires** 317:20 319:25
**explain** 36:2 44:13 73:1 179:15,21 263:2 272:24 273:15,22 286:19
**explained** 286:17,20
**exploration** 302:12
**express** 131:2 193:19
**expressed** 109:16,20 242:7,18,20 243:7 274:7,25
**expressing** 131:3,14,18 163:13 164:22
**extent** 23:13 25:23 30:5,18 61:18 64:3 211:16 218:5 269:15 296:3
**extreme** 73:5 192:25 193:6
**eyes** 54:17

**f**

**facetime'd** 93:9
**facetiming** 93:24
**fact** 22:3 94:7 148:7 161:9 171:20 179:14 179:20 182:4 182:14 189:7 209:20 217:16 220:4 225:6 263:3 268:23 277:2 280:7 281:1 305:16
**fail** 44:10
**fair** 47:1 101:10 103:21 171:14,17,18 176:12 182:3,8 182:10,13,19 183:15 217:2 221:14 238:21 239:3 291:12
**faith** 43:17,21 48:12,13,14,15 48:16,23 49:18 216:5 227:15
**falsely** 308:8 311:12,24
**familiar** 139:25
**families** 23:18 78:13

**family** 22:11 53:2 86:22 106:2 270:21 315:25
**fan** 149:22,24 149:25 150:2 151:23 152:8 152:16,22 310:21
**fans** 133:21
**far** 166:2,8 244:25
**farr** 2:21 5:4,12 6:4 14:5,9,12
**fathers** 52:17
**favor** 19:6 314:5,16
**fed** 197:14 217:6
**feedback** 163:19
**feel** 35:23 40:9 42:10 43:24 44:5,24 49:15 52:1,12,13 53:6 54:16 76:19,21 85:17,23 86:25 87:2,5,8 88:23 93:12 97:1 100:14 110:6 114:7,8 124:18 130:20 134:6 141:5 145:8 156:15,16 157:1,6 163:22 163:23 188:10 189:10 191:24 221:23 233:17 240:20 247:21 247:23 261:5 270:16 292:21 296:10,17 301:8 303:12 304:15 309:8
**feeling** 31:9,9,9 31:10 35:21 83:10 88:17,18 96:15,16 100:15 109:2 125:4,6,8,13 131:6 149:7 156:25 182:1 183:25 188:5 221:15,22 235:24 236:4,6 236:8,10,11 240:20 291:1
**feelings** 93:24 305:24
**feels** 74:8 104:14 134:4
**feet** 45:20 49:23 50:2 90:2
**felon** 203:2
**felt** 31:12,16 32:6 36:4 42:15 48:18 51:23 89:2,25 90:5 93:23,23 96:22 108:18 125:22,25 126:7 133:24 133:25 138:21 141:4,5,7 149:20,21 183:17 184:1,1 194:15 236:3,5 237:4 239:8 244:19,20,21 259:13 265:15 266:3,16 269:7 290:9 296:12 297:20 303:11 303:18
**female** 98:4,14 98:21,25 99:11 179:4 275:19 276:21 277:3 278:19,20,24 278:25 279:9 279:10 280:7,9 280:9,12,17,17 282:7
**feminist** 278:19 279:9 307:11 307:15
**ferrara** 21:7
**feud** 116:12,17 116:23 117:6
**fi** 223:2
**figueroa** 3:9
**figure** 43:17 251:15
**figurehead** 309:18
**figuring** 31:14
**filed** 19:24 54:7 61:24 63:18,23 64:19 66:14,24 68:19,23 70:22 126:17 194:3
**film** 43:16 45:17,22 79:10 82:22 113:1 133:19 152:11 152:12 165:5,6 165:7,12,21,22 165:23 166:11 167:9 169:12 220:21 236:21 250:21 262:6 262:15,18,22 263:6 269:19 273:8 276:5 278:20,25 279:10
**film's** 263:10 263:14
**filming** 87:1,24 88:4 89:17 90:16 293:25 294:2,5,10,14 295:9 300:6,18 300:20 301:6

**filmmaker** 41:2
**films** 44:6,9,11 44:16,17,18,21 45:2,8,23 47:17 47:24
**finance** 44:16 44:18
**financed** 44:22 44:24 45:9
**financially** 318:19
**financials** 46:16
**financing** 45:24
**find** 49:7 100:17 127:4 147:11 166:14 216:4 253:17 306:5 307:1 312:25 314:18 314:20 315:12
**finds** 105:2
**fine** 67:9 104:19 247:2 253:23 266:22 296:14
**fingers** 71:13
**finish** 35:1 171:5 197:24
**finished** 17:2,3 171:9 199:17
**finishing** 44:19 45:3 111:25 112:1
**fire** 88:15,25 131:13,16,17 225:4
**fired** 225:21 226:6 249:25 250:1
**firm** 132:7 154:3 291:8,10
**first** 24:7,23 43:15 54:14 55:24 56:3,23 57:1,2 58:2,10 59:12 63:8 83:5,8 84:9,21 90:15 116:16 116:19 158:14 167:17,18 172:21 191:17 193:13,16 197:16 203:7 221:6,9 228:5 235:7,11 241:2 244:11,13 248:6,13 282:18 286:8,9
**firstly** 155:10
**fit** 269:17,20
**fitness** 131:4
**fits** 215:20
**five** 45:20 48:11 49:23 50:2 73:21 90:2 129:8 187:9 236:22 240:9 288:15 308:23
**flaa** 267:13,25
**flame** 149:22 149:24
**flip** 96:7 166:23 172:5,9 175:2 175:19,23 177:4 178:2 203:12 204:5 205:2 224:23 239:21 240:8 241:8 281:8 282:23 283:6
**flipping** 197:20 275:16 276:24 277:6 278:4,5 278:12,14 285:11,17
**floating** 151:23
**floor** 3:10,20 7:11 8:20
**fluid** 44:15
**focus** 191:3 257:8,10,11,11 271:10
**focused** 24:8 257:25
**folks** 42:14
**follow** 30:22 71:14 75:4 239:13
**followed** 53:5 222:4,11
**following** 31:2 233:18 236:23 276:8 287:25 309:5,14 311:3
**follows** 216:10
**force** 46:23 121:19
**foregoing** 317:3 318:5,15,21
**forget** 45:16
**forgetting** 21:9
**forgive** 194:25 224:16 255:19 304:13
**forgotten** 99:15
**form** 49:4 57:8 57:16 58:20 59:18 60:10 62:4,17 63:6,14 64:1 66:19 144:25 187:4 187:12 189:1 189:22 190:12 190:17 201:25 206:7,15 207:1 207:19 208:5 208:18 209:8 209:15,25 210:8 211:4,14 212:5,12,18 213:4,16,22 214:12,22 215:5 216:14 216:25 222:7

238:3 302:18
**formal** 50:7,15 90:21
**formalized** 41:21
**formally** 235:3
**formed** 85:3,7 85:10 169:19
**former** 38:23 39:3 42:7 185:19 270:16
**forth** 125:25 318:6
**forward** 85:12 166:23 241:8 265:10,12,15 265:18 266:2,4 266:10,12 269:14 270:12 273:1,18 275:2
**found** 129:9 142:9 150:11 251:1,25 287:13,14
**founded** 42:22 48:7
**founding** 52:17
**four** 19:1,1,2 28:13,13,15,21 28:21,23,23 30:4 34:20 126:12 288:15 291:8
**fourth** 157:14
**fragility** 297:18
**framing** 154:3 154:9 225:25
**frantic** 138:21
**free** 107:19 191:24 304:15
**freedman** 7:5,6 14:15,15,20 65:12 102:20 190:2 199:10 205:19 206:3 291:9
**frequently** 28:3
**friction** 261:20 262:4,5,9 264:11
**friend** 24:3 25:1 35:17 67:6,19,20 92:10,12 93:21 104:2,4 175:8 203:1
**friendly** 25:6 25:11 124:18 124:20
**friends** 22:13 24:11,13,16,18 24:19,25 27:20 43:20 67:3,5,16 67:17 68:3,8,13 161:23 172:19 177:14 179:4,8 180:3 236:23
244:17
**friendship** 93:22
**frustrated** 154:2 155:11 155:23 156:1,3 158:12 161:14
**frustration** 192:25
**fucking** 181:17 194:9 204:9 246:13 247:17 247:21,23,25
**fulfilling** 292:19
**full** 16:7,12 19:7 21:4 42:20
**fully** 97:15
**fun** 204:2
**funded** 202:16
**funds** 44:19 45:3
**further** 139:9 318:17
**future** 46:11

**g**

**gained** 59:11
**gallagher** 2:21 5:4,12 6:4 14:5 14:10,12
**game** 178:23
**gap** 292:6,9
**garfield** 45:5
**gate** 43:16
**gather** 25:13 26:3 260:5,7
**gathering** 22:12
**gender** 98:19 99:1 100:4,5 305:17 306:19 306:19,22
**gendered** 96:10 96:13 97:2,7 99:23 100:2,16
**general** 33:20 92:2 227:7 237:9 238:13 244:9 309:6
**generalizing** 297:17
**generally** 27:8 72:16,18 87:2,5 100:2 112:5,8 112:20 113:2 167:8 304:1
**generated** 168:14
**generations** 78:11,12
**gentleman** 51:5
**genuinely** 64:15 74:5 214:3

**george** 203:3
**getting** 52:5 54:8 66:7 91:6 91:16 121:20 159:9 167:21 167:25 244:5 299:24 306:8
**ghislaine** 203:1
**ghost** 41:20 42:1 188:24 189:9,21 190:9 190:14 201:16 201:22 202:13 203:8 206:4
**giannetti** 21:7 31:3,4 32:1 34:19 35:9 37:6
**gift** 195:6
**gig** 236:6
**girl** 267:17
**give** 15:7 16:7 16:12,20 32:24 36:15 44:22 45:4,9 52:14 65:3 71:20 77:9,23 78:7 86:18 93:2 99:1 138:23 250:14 304:21 305:11 308:2 313:16
**given** 25:20 39:16 48:18 250:19,20,25 252:1 256:14 257:22 298:18
**gives** 17:4
**giving** 110:7,9 138:24 167:13 243:10 248:7 248:13 251:2 253:14 257:15 295:8
**glover** 9:5 14:13,13 58:20 59:18 60:10 62:4,17 63:14 64:1,11 144:25 187:4,12 189:1 189:22 190:12 190:17 201:25 206:7,15 207:1 207:19 208:5 208:18 209:8 209:15,25 210:8 211:4,14 212:5,12,18 213:4,16,22 214:12,22 215:5 216:14 216:25 222:7 238:3
**gloves** 40:3 237:11,14
**go** 20:19 69:22 69:24 79:3 104:24 105:20 112:9 124:3,5 134:2 147:23 192:1 201:22 203:13 204:16 215:24 220:8 225:20 226:4 226:14 231:13 241:21 248:25 249:2,5,8,13 250:6 251:7,11 252:5,24 253:1 261:4,14 263:20 286:23 287:1,23 289:3 289:8,22 290:18 291:10 305:19 309:9 313:2,22 315:7 315:9
**god** 82:3 204:1 287:2 313:8
**goes** 95:13 119:13 146:7 148:22 155:14 159:12 178:4 200:10 201:14 201:15 280:24 286:19
**going** 16:18,24 23:6,7 30:22 41:25 44:10 45:1 46:12 53:21 59:15 64:25 65:2 71:3,4,5,14 74:25 75:4 77:14,21 81:3 86:15,16 94:10 95:3 96:9,18 101:13,22,23 102:15 106:20 108:20 112:18 113:6 115:7 129:7,11 131:25 140:5 141:14 145:9 148:10,11 153:2 162:8,13 167:8 168:2 172:1 174:14 174:15 176:12 177:15 178:19 180:8,19 181:22 190:20 191:12,13,23 191:25 198:6,9 208:3 215:16 215:22 220:20 223:11 224:16 224:16 225:6 229:16 231:5 234:8 237:3 239:6 242:9 243:11 248:25 249:5,8 250:6 251:21,22 252:5 253:23 254:7 258:14

265:2 266:21 266:22,22 277:10 285:3 286:9,22 287:3 287:25 288:18 291:3 292:7 293:18 296:14 297:15 301:21 303:20 309:22 309:23,24 314:7 315:7 316:13
**good** 13:4 15:14,15 27:6 41:1 51:16,18 53:11 69:9 76:22 86:1 87:9 92:4 134:4,9 136:1 147:5 163:22 163:23 172:19 176:5 177:14 178:9,10,14 181:22 188:10 192:17 216:5 239:14 247:14 256:22 279:14 313:25 315:18
**googling** 60:19
**gosh** 84:8 195:21
**gossip** 267:17 296:8
**gotten** 25:2 47:4 61:12 91:1
**gottlieb** 5:5 14:4,4 259:15
**grace** 153:4,11 258:19
**grammy** 120:5 120:9,14,19
**grammy's** 120:12
**grasp** 60:13
**grasped** 60:6
**grateful** 126:8
**great** 15:10 23:7 45:15 53:14 84:18 160:9 188:5 205:1 253:17 253:24,24 262:5 276:14 288:22 291:10 310:23
**green** 281:3
**greenberg** 39:4 39:7 40:18
**greenstein** 21:7 31:3 33:11
**gross** 232:4
**ground** 15:25
**group** 54:24,25 55:1,2,10,12,13 64:19 66:15 68:10 76:2,2,5 76:6,8 135:4 178:4 179:4 180:3 182:5 184:21
**group's** 135:7
**guess** 41:4 45:1 60:5 181:25 281:22
**guessing** 120:17
**guidance** 43:19 105:22 298:16
**guilty** 149:11
**guns** 270:19
**guy** 46:23

**h**

**h** 272:19
**habit** 68:15 103:23 104:2
**hacked** 66:7,9
**haha** 181:11
**hailey** 264:21 265:23 268:10 268:21 271:2 272:24 273:16
**halfway** 153:23
**hammy** 204:12
**hand** 15:5 26:6 94:9 101:13 153:2 190:21 231:5 234:8
**handing** 277:21 286:4
**handle** 36:16 59:17 89:18 96:20 113:2 123:5 167:10 206:13
**handles** 128:4
**handling** 111:23 141:18 169:23
**hands** 71:12
**handwritten** 78:17 79:1,9,15 79:21 80:3,11 80:14,22 81:9 81:16,21
**hanks** 41:24 42:17 137:23 138:1 139:13 145:15,25 229:8,19 230:25 289:8 289:20
**happen** 42:24 43:2 214:10,14 214:15 215:3 216:12,16 236:19 249:18 266:18 270:23 276:13
**happened** 37:25 40:6 71:25 73:1,13 111:3 184:3 212:16,21

213:25 216:16 218:10 220:25 221:2 227:23 237:21 292:17 294:11 306:1
**happening** 31:10,12 60:22 113:17 116:21 169:11 189:12 257:4 289:12 309:9
**happens** 265:5 265:5,5 269:23 270:6 305:4
**happy** 17:24 85:18 86:5 95:4,7,9,10 149:14,18 171:24 192:2 209:12,18,23 210:2 221:14 228:4 261:3 300:14 302:7 306:12 315:10
**harass** 151:14
**harassed** 260:21 308:17 308:18
**harassment** 308:22
**harbor** 313:23
**hard** 73:24 86:4 105:1 134:3 188:9 191:20 196:2 239:13 261:19 272:1 297:19 297:21 298:2
**harm** 273:8
**harsh** 201:4
**hat** 310:1,23
**he'll** 247:2
**head** 133:12 183:14
**headline** 158:18 260:4
**heal** 44:6 78:9
**healing** 78:4,5 78:8,8
**health** 72:13,14 72:17,19,25 75:10 299:19 299:20 316:1
**healthy** 72:20
**hear** 84:16 178:19 180:8
**heard** 15:17 54:14 56:7 58:14 84:15 122:5 142:6 149:2 180:17 207:7 221:18 228:4 295:19
**hearing** 57:12 180:20 193:14 193:17 221:7 221:10,25 228:5 248:1
**heart** 164:5 306:15,16
**heath** 7:3 8:3 9:19 14:16 22:1 23:14,20 24:10 37:11,15 41:23 42:13 55:20 59:12 102:3,14 108:5 108:13 109:18 110:17,21 111:1,10 112:5 112:21 113:2 115:8 120:5 137:23 138:1 139:13 145:15 146:1 229:8,18 230:25 289:7 289:20 295:4
**held** 41:12 44:25
**help** 20:7,11 42:11 43:11,12 44:6,7 59:7 71:24 72:25 73:12 74:4 89:17,19 90:6 91:24 92:1,5,7 98:18 104:4 109:13 132:8 135:20 156:24 180:4 191:13 206:23 247:15 249:22 250:10 302:18 304:3,3 305:21 306:9 315:20,24
**helped** 43:20 180:16 267:23
**helpful** 99:6 110:4
**helping** 25:13 26:2 72:22 91:19 104:2 180:18 313:18
**helps** 78:24
**henny** 153:4,11 258:19
**hernandez** 9:25 13:7
**hero** 309:17 311:23,25 312:19 313:2
**hesitation** 105:14
**heterosexual** 305:13
**hey** 109:12 288:18
**hi** 95:3 198:23
**hide** 150:16,23 154:4,12
**hiding** 249:10 304:6,7,20,21
**high** 114:15
**highly** 60:8 128:7,14,17

**hindsight** 183:9 183:21 222:3,9 222:11
**hire** 62:5 132:18 134:9 135:17,22 136:6,22 137:13 138:25 140:2 164:9 166:10,14 173:19 182:4 183:11 184:5 206:23 233:8 234:2 255:17 258:1
**hired** 62:1 90:16 122:18 123:1 139:9 147:24 148:6,8 160:24,24 165:11,17,18 165:21,23,25 182:15 184:4 193:6 233:2 255:24 256:2,5 256:6,7,15 278:19 279:9
**hires** 11:19 148:18 165:9
**hiring** 59:21 123:4 132:19 134:11 137:18 137:23 138:3,6 140:14 150:10 165:5 168:8 222:12,16 229:8
**history** 209:22 264:21 265:23 267:2 268:10 268:21
**hoboken** 29:10
**hold** 46:6 123:3 162:10 185:13 224:16
**holding** 124:1 304:9
**holds** 186:17
**hollywood** 11:18 49:15 148:6,16 153:19 154:9 155:24 156:8 156:12 163:14 168:7,14 171:15 174:2,7 174:22 175:12 175:16,25 176:18,22 178:3 270:14
**home** 19:8
**honest** 23:12 52:9 53:6 95:8 99:16
**honestly** 33:1 231:22 238:6 271:16
**hoover** 21:8 91:9,14
**hope** 71:12 180:6 266:20 306:8 313:1
**hopeful** 302:18
**hopes** 52:24
**horribly** 186:20
**hostage** 186:18
**hosted** 41:3 301:12
**hotel** 142:9 143:4
**hour** 157:20
**hours** 19:1,2 40:6 105:3 215:24 292:9 310:9 312:2 314:22
**house** 29:17
**houston** 9:9
**how's** 103:4
**hudson** 4:5 14:6,6
**huge** 76:8,16 157:9
**huh** 43:8 54:4 67:18 83:23 85:5 88:6 94:19 102:7,10 103:8,17 106:23 107:3 145:16 148:21 153:6 154:7 155:20 162:21 163:4 167:24 173:3 178:6 185:15 192:8 198:19 203:20 204:14 222:14 225:1 230:2 232:6 239:20 240:12 242:24 243:1 246:2,17 247:5,10 258:23 259:12 269:21 311:16
**human** 77:18 142:1 302:14 304:4
**humanity** 44:8
**hurley** 201:15
**hurt** 270:24
**hurting** 306:15
**hypothetical** 306:13

**i**

**idea** 48:20 49:9 65:17,22 92:5 118:3,5 119:21 132:18 134:1 144:19 160:11 168:18 191:6 211:8 212:14 216:16 248:17 271:16 274:24 275:16 278:3

278:10,24 279:8,14,21 281:15 282:2 282:11 283:2,4 283:17 302:10 303:23 306:4 306:18 307:20 307:25 311:12 311:23 312:15 314:25
**ideas** 257:2,4,6
**identification** 94:12 101:24 106:15 115:11 140:7 145:11 148:13 152:24 162:14 172:7 190:24 223:13 228:13 229:21 231:9 234:10 258:16 278:1 286:11
**identified** 174:23
**identifies** 305:13 307:11
**identify** 13:17 52:3 260:15 261:2,9,10
**ig** 271:10
**illegalization** 45:18
**imagine** 28:20 30:12 91:5,7 112:1 119:22 136:12 140:4 159:20 162:5 167:22 170:13 170:22 171:23 207:2 209:10 221:1 254:2 264:14 308:5
**imagining** 240:25 241:1
**imessage** 27:2
**immediately** 251:7,14,24 303:14
**immune** 72:22
**impede** 16:14
**implied** 279:16
**implies** 281:4
**important** 52:9 113:12 141:19 141:25 308:20
**importantly** 302:14
**impossible** 202:18
**impression** 251:1
**impressive** 235:25 236:2
**improv** 29:4 34:10
**improvising** 315:5
**inaccurate** 284:21
**incident** 143:9 292:17
**incidents** 52:3 294:11
**include** 44:11 48:9 90:1 272:21
**included** 240:4 272:18 278:14
**including** 19:3 186:17 227:25 238:25 239:8 267:13,15
**incoming** 39:18 169:10,23
**increasing** 304:25
**incredibly** 105:1 155:10 161:14
**independent** 42:9 48:19 164:22 243:17
**index** 10:1 11:1 12:1
**indian** 45:13 202:25
**individual** 61:12
**industry** 165:15 166:2,8
**infer** 180:22 182:4,9 280:3,6
**inference** 182:14
**inferred** 40:2 280:15
**inferring** 100:22 271:18 279:24
**inflation** 288:3
**influence** 48:24 160:18
**influenced** 49:18
**inform** 37:2
**information** 25:23 30:6,19 56:16 64:3 137:7 138:24 159:4,10 171:20 186:19 202:18 208:7 211:19 217:7 217:24 219:19 260:8 312:25 314:8 315:19
**informed** 40:15 251:5
**inherently** 272:9 303:10 303:16 306:22
**initial** 262:25
**inkling** 122:19

**inquiries** 169:24
**inside** 240:3 295:24
**insider** 92:22 94:5,25 95:15 101:4 102:16 106:11 108:7 110:13 115:3 117:16 121:1 121:10,15 122:20 123:17 125:5 128:13 195:23 196:9 196:23 197:8 197:10,15
**insinuated** 260:18
**instagram** 272:19,21
**instance** 58:9
**instances** 52:1
**instruct** 61:16 71:5 74:25 208:6 211:15 314:7
**instructed** 186:5
**instructing** 81:5 190:7,8 258:12
**instruction** 30:23 71:11,15 75:5,8 187:10
**instructions** 256:14,18,20 257:15,22
**instructs** 17:9
**integration** 78:1
**integrity** 52:12 52:13
**intend** 32:8
**intense** 24:3 96:2,25 97:21 98:1,10,24 100:11,13,18 253:20
**intention** 265:17
**intentional** 264:11,13
**intentionally** 236:24
**interacting** 196:1
**interaction** 137:21
**interested** 318:19
**interesting** 96:19
**interests** 183:23
**interface** 112:21
**interfacing** 169:10 170:3,5
**intern** 200:10 201:14
**internationally** 196:3
**internet** 60:4,8 60:14,19 269:8 269:12 272:13
**interpersonal** 78:13
**interpretation** 283:2,17
**interrupt** 35:4
**interrupted** 291:14
**interview** 262:3 276:8
**interviewed** 260:2
**interviews** 262:15
**intimately** 86:24
**introduced** 43:18,23 57:23 57:25 83:18 84:17 91:8,21 132:11
**introducing** 92:9
**invented** 77:22
**invested** 44:11 45:3
**investigate** 139:8
**investigation** 48:19 139:11 221:24
**invisible** 302:16
**involved** 28:18 29:21 47:5 60:20 63:3,9 64:20 65:4,9 113:13,22,22 114:16 150:17 151:24 152:10 189:8,20 230:10 237:1 256:24 263:13
**involving** 75:12
**ipads** 67:10 222:24
**iron** 237:3
**isabella** 21:6
**issue** 87:25 88:7,11,13 90:18 116:3 118:23 119:4 124:9,11,22 138:15 167:10 263:1,3
**issues** 88:10 89:5 91:24 119:18,25 193:20 300:1

**j**

**jackson** 9:4 14:13

**jamey** 7:3 8:3 9:19 14:16 22:1 23:14,16 23:20,24 24:5 24:10 37:11,13 37:15 38:6 39:7 40:12 41:23 42:13 55:20 58:7,7,10 59:12 102:3,14 103:4 108:5,13 108:21 109:18 110:17,21 111:1,10,23,23 112:5,21 113:2 113:7 115:1,8 116:9 117:12 118:6,10 120:5 120:14 135:11 135:13,19,21 136:9 137:23 138:1 139:13 141:17 145:15 146:1,25 147:4 187:25 188:9 188:12 218:25 229:8,18 230:25 249:16 249:18 250:18 250:19,22 251:5,12,19 253:14 254:3 256:16,21 289:7 290:17 299:4
**jamie** 252:8 289:20 295:4
**jane** 84:3
**january** 223:16
**jason** 7:9 65:14
**jb** 11:7,12,17 94:16 106:25 145:18
**jbach** 8:23
**jed** 9:2 14:14 56:1,4,8 57:8 57:23 58:1,3,10 58:15,18 59:8 59:15,24 60:1 61:23 62:1,5,13 63:12,20 64:8 144:17,20 187:1,10 188:23 189:17 190:8 201:4,9,9 201:20 203:18 203:22,22 204:11,15,15 204:19,25,25 205:14,19,19 206:3,12,19 207:16 208:2 210:6,17,25 211:10,25 212:9 213:1,13 214:20 216:21 314:20 315:12 315:16
**jen** 14:17 22:25 23:3 24:22 34:5 40:21 55:18 72:6 79:17 89:9,12 90:10 102:14 108:5,6 109:3,5 109:9,16,18,18 109:23 110:16 110:21 111:17 115:1,8 116:9 117:11 118:5 118:20,23 119:4,13 120:25 121:9 157:15,17,20 158:1,19 162:18 163:7 163:19 167:7 170:1 194:20 194:22,23 195:4 205:12 227:5 229:18 231:7 232:7 233:3,3,11,22 234:2 235:18 235:23 239:16 239:18,23 240:5,14 241:11,17,25 242:7,13,17,19 245:4,11 248:7 248:13,14,20 249:5,8,13,21 249:24 250:6 251:6,7,9,16,17 252:14,20,23 252:24 253:1,9 256:21 265:7 267:1 268:7 271:2,3,23,24 272:23 273:5,6 273:14,25 274:14,25 275:15 277:19 277:23 285:23 285:23 286:6 286:24 287:21 288:4,9,9,21,24 289:4,8,22 290:10,18 291:5,13,20 295:3 299:6
**jen's** 274:21
**jenn** 298:5
**jennifer** 1:10 2:10 7:2 8:2 9:17 21:5 22:11 38:23 72:15 102:3 126:15 131:21 167:20 168:20 169:9,17 170:15,17,25 223:15 224:3 225:21 226:5,5 226:9,15 229:7 230:3,19

231:19 232:18 233:8 257:9 258:20,22 259:3 261:17 263:23 293:8 300:17,17,20 301:2,4
**jenny** 21:6 29:5 34:11 297:12
**jersey** 29:11,13 36:23
**jglover** 9:10
**joaquin** 181:14
**job** 61:1 96:20 129:20,23 130:5,8,11,12 130:25 131:5 136:2 188:5 205:12
**jobs** 129:19 130:14,17
**joel** 9:5 14:13
**john** 67:20 76:6
**johnny** 149:1 154:3,11 168:8 180:16
**join** 44:17 55:1 76:2 291:9,9
**joined** 42:19 54:24 55:2,23 76:1
**joke** 120:16 227:22 313:6
**joked** 194:20 195:5
**joking** 91:4 174:22 177:14 179:8 227:14 297:14 301:10
**jonathan** 8:17 9:25 13:7 14:24 18:11 65:15 223:2
**jones** 3:3 13:21 13:24 14:2 15:17 21:5 28:9 34:2 54:15 72:3 75:16,17,20 79:17 83:5,9,16 84:2,13,20 85:4 85:10,18 87:3 87:24 88:4,8 90:6 91:22,23 92:10,23 93:5 94:15,21 100:9 109:21 110:10 112:13 115:2 116:4 124:9,19 124:23 127:9 128:2,5,6 131:2 136:20 137:1 138:2,6,14 139:20 140:2 140:10,13,21 142:17 144:23 145:15,25 158:5 164:8,12 183:10,18 186:6,16,17 187:2,11 188:14 193:1,7 193:20 194:9 194:21 195:6 210:7 211:1 212:10 213:2 213:14 227:4,7 229:18 233:24 245:1,7,17,20 252:10 257:14 257:18,21,25 258:11 277:11 277:13,18 288:21 291:2 294:2,5,21,23 295:3 300:6,21 301:3 316:4
**jones's** 147:25 183:14 222:4 222:11
**jonesworks** 1:12 2:12,20 3:3 11:3,7,10 11:12,14,16,17 12:3,11,15,17 12:23 13:22,24 14:3 15:18 75:16,17 79:17 79:18 83:9 85:14,15 87:8 89:4,9,16 94:16 94:25 102:5 106:25 115:10 118:2,8,20,24 119:6 120:2,9 140:11 145:18 169:9 223:17 225:20,22 226:4,6,14,16 229:19 231:8 233:4,5 248:14 248:20 249:13 249:21,23,25 250:17 251:10 251:16 252:2 285:23 288:9 289:4,9,24 290:19 291:14 291:21,22,22 291:25
**josh** 21:7 31:3 33:11 173:6 175:8,9
**journalist** 79:7 205:11
**journey** 301:24 302:2,5 306:25 307:7
**jsunshine** 7:16
**judge** 51:17
**judgment** 215:21 279:13
**july** 94:15 102:4 106:24 106:24 112:24

133:3 140:10 140:16,19 145:17 257:19
**jumped** 298:23
**justin** 1:20 2:19 7:3 8:3,14 10:2 11:2,11,19 12:2 13:13 14:16 19:8 39:19 116:12 117:22 118:1,7 148:18 181:1 204:19 204:25 224:9 225:12 258:20 286:17 317:10 319:3,21
**justin's** 117:15 146:4
**jw.com** 9:10

**k**

**k** 5:16
**katie** 11:11 21:10,11,19 106:10,21,22 107:5,10,16,23 110:18,23 120:25 121:2,5 184:20 185:14 186:3,5,14,24 187:7 188:14 188:21 189:7 190:8,8,22 192:14 195:19 196:8,21 197:13 198:21 200:3,15 203:24 204:16 205:6 206:2 207:14,25 227:13 228:15 228:21 245:25 246:11
**kbender** 5:20
**kcase** 12:9 190:23
**keep** 23:11 52:11 72:20 82:2 111:10 155:4 197:19
**keeping** 232:2
**kicked** 236:20
**kids** 91:4
**kill** 160:2,19 199:3 205:15 246:8
**killing** 194:20 195:5
**kind** 24:3 31:12 31:12,16 32:7 35:22 55:3 60:17 77:15 83:2 88:24 94:2 100:24 109:5,9,11 116:16 126:24 143:21 149:20 149:21 164:7 188:10 212:9 236:3,5 238:17 244:20 253:25 257:5 295:21 296:12,16 297:8,21 298:4 302:15 303:23 304:21 309:17 311:23 312:14 312:19
**kinda** 231:17
**kinds** 139:23 306:11 312:21
**kjersti** 267:13 267:25
**knew** 56:6,7,8 113:5 137:12 137:15 146:19 147:9 161:19 253:20 273:7 273:25
**know** 17:13,21 17:23 23:7,18 25:6,7 26:7 30:19 31:4,5,18 31:19,23 32:10 32:20,20 33:1 33:25 34:17 35:5,25 37:1,18 37:18,19,20 38:21,22 39:8 40:12,15,18,21 41:18,20 43:1,3 43:14,18,22 44:19 46:1,1 50:19 51:4,5 52:25 54:15 56:4 60:1,15,25 61:14 62:19,25 64:5,7,15 65:21 67:11 70:3 73:18 74:2,4,5 74:9,18 76:10 76:25 80:9 83:19,24 86:22 88:19,20 93:3 95:8 96:16,22 98:19,22,24 99:6 100:21,21 110:15 111:9 111:15 114:13 115:5 116:18 116:19 118:4 118:16,18 119:12 120:11 120:21,24,24 121:3,6,24 122:17 123:1,4 128:16,17 134:13,14 135:13 136:3 136:17,19,24 137:2 138:17 139:18 142:21 143:10,12 144:22 145:1,2 150:8 156:10 157:23 161:19

164:5,11 165:16,25 166:13 168:2 168:10,11,12 172:12,14,16 172:18 173:6 183:13,24,25 184:22 185:19 185:23 189:13 189:17 190:2 190:14 191:25 192:12 194:12 195:1 197:9,10 206:16,17,23 207:4,21,22 208:8,11 210:10 212:17 212:21,22,22 213:8,24 214:3 214:16 217:12 217:13 219:16 219:23 221:1,4 221:7 222:8,22 222:23 223:25 224:1 225:9 226:8,9 230:17 230:23 233:7 235:3,6,20 236:14 237:15 237:15,18,19 238:13,19 240:25 241:7 243:2 244:1 245:10,20 247:24 249:19 250:15,15,20 250:25 251:21 252:22,24 253:14,14,23 253:24 256:18 257:2 258:1,3 258:13 259:5,5 261:5,8,13 262:16,16,18 263:11,25 264:6 266:13 267:6 272:7,7,9 272:16,20 273:5,6 274:23 275:5 276:22 278:20 279:10 281:17,20,24 282:3 283:23 285:1 288:5 290:9,11 291:16 292:4 293:4,4,5 296:7 298:13 299:4,6 301:11 302:7 303:19 305:23 306:10 307:8 308:11,11 309:9,21 311:2 311:19 312:3,6 312:8,9,13,16 312:24,25 314:3,11,18 315:11,16,18 315:20,23,25 316:1,2

**knowing** 126:3

**knowingly** 209:5

**knowledge** 118:22 121:8 121:13 174:13 203:11 205:22 210:24 213:7 214:4 215:7 227:7 229:11

**knows** 157:15 157:17,20 164:4 295:24 315:12,23

**kolacheh** 41:23

**koslow** 21:12 217:22 267:22

**kristin** 3:6 5:14 14:1,9

**kristintahler** 3:12

**l**

**la** 33:23,24

**labid** 51:6,9 52:6,6,20,21

**large** 307:5,5

**late** 50:20 315:4

**laugh** 222:23 309:19 313:14

**laughing** 295:16 296:8 313:9

**launched** 151:15 260:18

**laura** 9:21

**laurenne** 3:7 13:23

**laurennebaba...** 3:13

**law** 3:8,18 4:6 5:6,15 6:6,14 7:10 8:5,7,18 9:6 15:22 16:5

**laws** 318:21

**lawsuit** 19:20 19:22,24 26:22 26:23,24 27:14 27:15,17 55:6,8 56:9,14 61:24 63:23 68:2,14 90:12 130:14 151:9 189:11 189:14,18,19 211:12 212:2 212:11 224:2 309:6 311:4,22 314:4 316:4

**lawsuits** 63:17 64:19 66:13,24 68:19,22 70:22 126:17 190:4 194:3 312:19

**lawyer** 80:5,6,8 90:11 185:8,9 291:7
**lawyer's** 71:11 71:14
**lawyers** 64:14 119:15,23 137:8 187:23 314:8,10
**lead** 1:7 2:7 126:9,10 215:19 281:10 281:15,19,19
**leaders** 98:23
**leadership** 50:13,21,22
**leading** 225:7
**leak** 118:6 154:2,20 158:17 161:9
**leaked** 159:4 171:20 196:3 217:24 267:23
**leaking** 159:10 219:19
**leaks** 128:5 152:21 186:6 186:17,18 187:2 188:14
**leaning** 110:3
**learn** 92:25 114:25 143:7 206:1 259:10
**learned** 56:8,10 56:16,18 63:17 63:20 64:14 92:21 93:3 122:22 142:18 142:24 143:10 171:19 259:19 267:14 276:7,7
**learning** 91:13 312:21
**leave** 39:20 248:19 250:17 251:10 277:7 285:22 288:8 315:22
**leaving** 118:14 118:18 291:25
**led** 132:18 133:14 135:16 136:3
**left** 225:20 226:4,14,15 233:5 248:15 248:20 249:13 249:21,22 250:7,8,11,13 250:17 251:7 285:23 288:9 289:4,9,24 290:18 291:8 291:14,20,21 291:22 301:8 310:8
**legal** 9:23 13:8 70:14,15 71:1
**legions** 310:14
**leighton** 267:16 267:20 268:1,4
**len** 203:17
**lengthy** 188:13 188:13
**leslie** 169:5,19 219:10 287:13
**letter** 94:4 117:15 296:4,6
**letting** 23:7 154:19 257:25
**level** 114:15
**levels** 93:22
**levy** 35:14,15 35:16 37:7
**lfcllp.com** 7:16
**lftcllp.com** 7:13 7:14,15
**lie** 73:5 270:24
**lies** 128:6 143:22,24 230:8 238:6,9 238:12 239:4,8 239:9 265:9 266:3,11 270:13 275:3
**life** 93:10 141:14 299:18 302:14 307:1 313:22
**light** 23:12
**likely** 78:2 215:18
**limited** 215:11
**lindsey** 6:13
**line** 81:4 275:10 286:23 319:5
**liner** 7:5 14:19
**link** 116:11 138:11 140:22 142:16 143:2 201:4
**list** 21:2 44:23 251:19
**listen** 123:15 304:2
**listened** 21:6 31:8 32:13 40:10 123:12 123:18
**listening** 21:15 78:23 303:5
**lit** 281:3
**literally** 271:5 274:16
**litigation** 74:20 207:25 211:18
**litigations** 28:19 34:21 211:2
**little** 18:12 21:6 21:8,11 35:23 36:2 44:15

75:19 103:4 109:17 195:24 239:13 250:3 288:7 307:7
**live** 33:20
**lived** 20:3 42:14
**lively** 1:5,15 2:5 2:15 4:3 5:3 6:3 13:13 14:5 14:8,10,12 21:3 28:8 29:5,16 34:11,13 35:17 36:9,17 38:18 39:11,16,20,25 73:4 79:24 115:22 116:12 151:14 180:19 181:10 206:24 211:11 212:1 214:21 217:8 217:17 218:1 218:20 219:20 220:5,21,23 237:7,9,25 238:9,23 260:12,19,21 264:14 265:8 265:12,19 266:2,10 267:6 267:10,24,25 268:8,24 269:8 270:7 273:8 276:9 280:14 285:4 295:11 295:18 297:2 298:9,18,23 301:5 319:2
**lively's** 73:9 154:25 219:6 260:9
**lives** 33:23 202:15 263:5 305:1 306:14
**living** 19:22 40:25 302:16
**ljl** 1:7,7 2:7,7
**llc** 1:8,12,13 2:8 2:12,13 3:4 7:2 8:2 11:3 12:3 13:14,25 319:1 319:2
**llp** 4:4 9:4
**located** 13:9 29:8,12,16 32:18,25 33:7 33:16 36:21,24 40:12,19
**log** 300:13
**lol** 203:18 204:1,21 205:9 205:12,15
**lonely** 32:7
**long** 18:20,24 24:12 48:6 54:16 66:21 83:16,19 124:2 191:2 251:9 295:13,14,24 295:25 298:4 309:7
**longer** 153:14
**look** 70:25 74:21 141:8 149:10 150:12 150:15,22 156:19 157:9 157:14 159:14 159:18 163:1 163:13 166:22 176:8 181:7 185:23 191:11 191:15,24 192:1 198:15 201:10 202:6 229:25 240:2 261:16 282:23 283:7,10,20 304:6,19 307:2 309:9
**looked** 26:10 32:13 108:4 115:17 153:19 297:13
**looking** 60:19 102:9 104:14 183:9 191:7 213:21 239:25 302:12
**looks** 100:15 164:3 239:16 239:22 240:6 241:10,14,25 245:24 258:21 288:2 312:1
**los** 1:21 2:22 3:11 4:9 5:8 6:16 7:12 8:10 13:9,11 40:14
**loss** 199:5
**lost** 67:23
**lot** 17:18 22:12 27:6 28:21 42:14 45:12 60:15,16,18 71:21 74:8,14 78:3 84:18 87:14 93:20 108:21 111:23 113:6 116:20 123:11 128:18 129:10 138:18 141:14 146:2 150:4 152:11 168:4 197:8 201:17 216:20 221:13 224:19 224:19 227:23 259:17 292:7 295:20 296:8 303:11,20,22 304:17,23,24 309:5 315:25
**lots** 212:20 224:21 309:11

**love** 240:18 258:4 285:25
**lovely** 294:7
**loves** 286:25 315:25
**loving** 236:7
**low** 42:13
**lower** 178:17
**loyal** 286:25
**loyalty** 288:19 290:9,14
**lumped** 180:2 303:23
**lunch** 124:5 131:24 132:2
**lunches** 19:3
**lying** 161:12 187:10

**m**

**m** 3:7
**ma'am** 30:24 41:7
**maaren** 3:17 13:20 15:16
**maarenshah** 3:22
**madame** 203:18
**made** 35:23 39:14 40:13 44:9,17,22,24 45:9 55:12 76:24 91:7 96:17 103:4 109:17 111:9 114:12 126:3 150:12,15,22 169:4 189:11 189:15 223:24 224:10 238:2 238:14,17,23 238:25 250:18 252:13 270:9 289:8 290:3 297:12 302:15 303:13 304:4 317:7 318:10
**madison** 3:19
**maga** 309:18 310:14,21
**mail** 115:21 116:4,10,15,19 124:10 217:24 219:21 267:24
**mails** 27:6
**main** 131:22 290:22
**maintain** 33:24
**major** 99:1 288:12 299:14
**majority** 290:21
**make** 26:11 43:10,12 44:5,5 44:11,16 52:10 91:19 96:21 97:1 98:7 100:14 109:1 112:6,21 118:12 135:20 147:1 149:10 156:25 157:6 159:14 168:20 204:12 215:12 237:25 249:11 249:12,14 251:10 252:10 252:20 253:19 275:17 282:23 283:7,10,20 303:14 310:23
**maker** 114:8,9
**makes** 227:22 305:19
**making** 36:16 43:15 76:13 90:25 113:19 114:1 136:5 158:25 188:10 203:17 210:21 263:1,4 310:22
**male** 97:11,25 98:15,21,23,25 99:12
**maliciously** 202:14
**mama** 100:19
**man** 76:6 77:15 96:1,24 97:20 98:9 100:12 181:2 182:21 225:8 280:18 282:6 301:12 301:15,20,22 302:13 303:17 303:19 305:9 305:12,12,13 305:14,16,18 305:20,21,24 306:3,5,13,18
**manage** 88:21
**managing** 176:21
**manatt** 4:4 14:6
**manatt.com** 4:10
**manipulating** 232:1
**manipulation** 216:23
**manner** 243:18
**manosphere** 312:6,8,11,20 312:24 313:1,4 313:8,10,19 314:19,21 315:13
**mansplaining** 275:19
**manually** 70:21
**marijuana** 45:18
**mark** 94:10 101:23 115:7

148:12 162:13
**marked** 94:12 101:24 102:4 103:2 106:15 106:20 115:11 140:6,7 145:10 145:11 148:13 152:24 153:3 162:14 172:2,7 175:2 190:21 190:24 198:18 202:7 223:12 223:13 224:23 228:9,13 229:17,19,21 230:1 231:5,8,9 234:9,10,17 258:15,16 277:22 278:1 286:4,11
**marketing** 133:19 152:11 263:10,15,17 263:18,19
**marks** 316:12
**married** 24:14
**masculinity** 301:25 302:25 303:2,7,10,16 303:21,25,25 306:22
**massive** 244:16
**master** 92:14 92:19
**materials** 26:3
**math** 48:10
**mattel** 199:4
**matter** 243:19 292:9
**matters** 112:22
**matthew** 223:16,16 231:7,14,24 251:15,16 291:5
**matthew's** 253:24
**maxwell** 203:1
**mcclintock** 11:21 175:25
**mckinney** 9:7
**mconnolly** 5:19
**mean** 19:3 24:24 26:18,19 35:4 36:1 39:4 56:10,22 57:2 76:17 83:1 86:12 88:11 96:13 99:24,25 99:25 100:2 109:4 121:17 125:11 127:20 132:15 139:3 154:11 157:1 164:1 165:16 182:10 222:23 237:14 238:13 243:21 247:24 257:8 263:11 264:25 269:13 270:5 272:5,6 272:25 279:21 281:19,20 289:16 291:11 294:21,22 304:23,24 306:21 309:19 310:24 311:11 313:5
**meaning** 34:24 130:11 134:22 279:25 301:17 309:1 311:8 313:14
**means** 43:9 179:22 180:12 204:25 223:1 264:6 272:10 304:5
**meant** 22:6 94:1 97:6 100:6 144:3,13 145:5 146:14 146:19 147:17 154:25 160:6 170:12,14 179:16 199:10 199:10 201:15 203:22 204:15 204:25 272:15 273:1 274:1 276:24 281:16 282:3 307:6,7,8 311:10,20
**measure** 285:16,17
**media** 49:21,22 49:23 50:1,4 116:17 127:8 128:4,21,23 159:25 160:6 169:2 206:21 208:15 216:23 219:7 272:11 272:15 309:6 310:16,21 311:6 314:5,17
**meester** 267:16 267:20 268:1,4
**meet** 83:5,16 129:8
**meeting** 29:19 57:7 204:10 244:18,24
**meetings** 28:24 29:20 30:9 77:1
**mel** 175:13 178:9
**melissa** 7:3 8:3 9:18 14:17 21:5 22:15 25:5 34:8 55:16 57:22,23 58:2 62:15 63:1 72:8,10

121:14 122:13 122:17,18 123:13 132:7 132:12,19,20 132:22 134:11 134:22 135:3,6 135:14,17,23 136:6,25 137:10,13,16 137:19,24 138:3,7,25 139:9,18,21 140:2,14 142:7 143:8,12,14,22 144:9,16 146:2 147:6,10,12,13 147:25 148:6,8 148:25 149:10 149:16 153:4 153:16 154:10 155:1,3 158:9 158:20 159:7 160:22,25 161:8 162:18 163:7,19,25 164:9,17 167:7 169:4,8,16,18 169:22 170:2 170:14,17,25 171:19 172:3 172:19,23 173:12,16,22 174:8,23 175:8 175:20 176:1,6 176:13,17 177:13,15,20 177:24 178:3 179:7,21 180:16,25 181:15,21 182:1,5,15 183:11,19 184:4 186:4,15 187:1,9,16,20 188:22,23 189:7,13 190:7 190:22 191:16 192:5,18,25 193:20 194:7 194:19,22 195:4,15 196:8 196:22 197:14 198:21 199:1,9 199:12,22 200:7 201:1,9 202:7 203:15 203:21 204:6 205:2,13 206:2 206:11,19 207:16 208:2 210:6,17,25 211:9,25 212:8 213:1,13 214:19 216:21 219:10 222:5 222:12,17 227:14 228:16 228:22 229:9 230:20 232:8 232:19 233:1,2 233:9,10,22 234:3 239:17 239:23 240:1,4 244:19 247:6 247:11 248:3 248:12,19 249:1,4 271:6 271:25 272:23 273:15 274:6 274:16,21,25 275:16 277:23 285:22 286:6 286:14 287:7

**melissa's** 58:13 58:18,19 180:3 180:4 181:10

**member** 1:7 2:7 103:12

**members** 150:6

**memories** 300:25

**memory** 20:12 31:25 32:2,4,23 33:10,13 42:20 72:12 73:2 102:17 110:24 111:6 138:17 244:8,9,11,12 244:13 253:15 257:24 258:5 285:25 292:13 300:12,15

**men** 76:23 77:16,25 78:1,1 78:4,9 97:5 99:5 178:20,22 180:4,7,9,20 182:6,16 202:17 302:18 302:23 303:11 303:14,15 304:3,3,10,23 304:24,24,25 305:4,5,8 306:2 306:9,14,20 307:1,8,9 308:7 308:18,21,23 311:12,24 312:15,17 313:8,18

**men's** 54:24 55:1 76:2,5,7,8 76:17,18 77:4,8 77:12,19,22

**mental** 128:3 131:4

**mentioned** 48:12 58:3,10 64:17 195:11 314:16

**mentions** 271:13

**mess** 143:21 247:18,21,24 247:25 276:5 276:20 295:22

**message** 27:3 57:15 66:16,18 66:25 67:2 69:20,23 70:9 118:11 138:9 138:13 140:9 140:12 145:14 145:21,24 146:18 147:4 155:22 156:8 159:7 191:15 196:7 224:24 224:24 225:18 239:25 240:3,4 242:23 258:4 264:15 276:17 277:5
**messages** 11:7 11:9,13,15,17 11:22,23 12:7,8 12:10,12,14,16 12:18,19,21,22 25:19 66:4 69:16 70:22 71:22,23 72:1,3 72:6,8,9,11,12 72:13,24 73:11 138:18 184:23 227:3 259:18 302:13
**messaging** 27:9
**met** 15:16 25:8 43:15 56:4,19 56:21,23,25 57:2,22 134:21 135:12,14 235:10 241:2 292:1
**method** 26:14 54:21 69:6,22
**mgottlieb** 5:9
**miami** 207:9
**michael** 5:5
**michaela** 5:13 14:11
**micro** 290:22 290:24
**middle** 108:20 141:15 204:7 224:25,25 229:25 244:15
**mike** 14:4
**mill** 134:7
**millennia** 78:11
**miller** 34:16
**mind** 35:7 75:25 107:12 125:10,12,18 126:6 129:20 129:23 130:4 130:20 138:10 211:21 232:15
**mine** 24:8 216:1
**minority** 44:18
**minute** 15:16 188:1 197:22
**minutes** 123:23 198:2 259:13 293:16 310:10 314:23
**misconduct** 207:10 307:23 308:8 311:13
**misogynist** 282:24 283:7 283:10,20
**misogynistic** 279:1 280:16
**misogynistic...** 280:1
**misread** 199:19 230:16
**missed** 160:8 160:20
**missiles** 270:19
**mission** 44:1 48:24
**misspoke** 113:25
**mistake** 195:3
**mistaken** 70:5 243:16
**mistakes** 302:14
**mistreat** 105:24
**misunderstood** 22:5 294:25
**mitchell** 223:16 231:7,14,24
**mitra** 8:6,11 14:22 18:11 65:14
**mitz** 68:6 71:17 71:21 72:5 73:17 74:16 75:12,14
**mix** 185:18
**mixture** 200:8 201:12
**mn** 12:23 231:17
**model** 44:15
**moment** 22:14 30:1 96:15 105:14 108:4 109:10,11 130:18 229:23 276:12
**moments** 294:8 295:10
**momma** 295:21
**monday** 1:22 2:23 11:4 12:4 13:2 18:21
**money** 46:22 173:12
**monica** 6:15
**monitor** 204:20
**monitoring** 169:23
**month** 93:1 111:25 250:8 291:22

**months** 19:19 309:13,14
**morning** 13:4 15:14,15 54:6 167:25 200:18 200:23 224:7 240:18 259:16 259:17
**morris** 39:21 288:13
**motherly** 244:20
**mouth** 231:18
**move** 19:16 55:10 65:17 174:12 205:7 269:25
**moved** 19:10 19:13,18
**movement** 307:17,21 308:4,7 309:18 311:8,11,15 312:12 313:10
**movie** 36:8,11 36:13,17 76:13 76:14 91:18 112:2 170:23 225:11 236:21 237:19,22 253:21 256:23 257:12 263:1,3 263:4,19 266:21 275:11 275:18 278:18 284:12 289:12 289:13,13 295:9,12 298:2 300:24
**movie's** 263:7 296:14
**movies** 33:23 43:10,12 44:5
**moving** 66:2 85:12
**multi** 262:20
**multiple** 26:6 39:17 135:11 194:20 195:5
**mutual** 193:7

**n**

**n** 3:1 4:1 5:1 6:1 7:1 8:1 9:1
**nail** 91:14
**name** 13:7 15:16 19:7 45:4,16,19 51:5 56:7,18 57:12 58:3,10,14 60:20 84:8,9 87:14,18 121:6 142:10 150:19 150:20 181:10 184:22 185:24 207:8 240:15 267:14 306:12 319:2,3
**named** 76:6 142:8 174:8 184:20 188:24 189:14,18,19 192:6
**names** 45:7,10 65:3,11 84:11 132:23 135:7 135:23 136:10 201:17
**narrative** 275:17 276:16 276:24,25 277:6 278:4,6 285:11,18
[redacted]
**nasty** 194:10
**nathan** 6:5 7:3 8:3 9:18 11:22 11:24 12:7,13 12:18,21 14:17 21:5 22:15 25:5 34:8 55:16 57:22,23 58:2 72:8,10 121:14 132:7 132:12,19,20 132:22 134:11 134:22 135:6 135:14,17,23 136:6,25 137:10,13,16 137:19,24 138:3,7,25 139:9,18,21 140:2,14 142:7 143:8,22 146:2 147:6,10,12,13 147:25 148:6,8 148:25 149:10 149:16,16 153:4,7,16 155:1 158:9 160:22 161:8 162:18,19 164:9,17 169:4 169:8,16,18,22 170:2,14,17,25 171:19 172:3,5 172:23 182:5 182:15 183:11 183:19 184:4 186:4,15 187:9 187:16,20 188:23 189:7 189:13 190:22 191:16 192:18 192:25 193:20 194:7,20 196:8 196:22 197:14 198:21 199:1,9 199:12,22 204:6 205:2 206:2,11,19 207:16 208:2 210:6,17,25 211:9,25 212:8

213:1,13 214:19 216:21 219:10 222:5 222:12,17 227:14 228:16 228:17,22 229:9 230:20 232:8,19 233:1 233:9,10,22 234:3,17 239:17,23 247:6,11 248:3 277:24 285:22 286:6 287:7
**nathan's** 62:15 123:13 135:3 154:10 155:3 172:19
**navigate** 36:16
**near** 202:18
**necessarily** 152:2 309:10
**necessary** 170:3
**need** 17:12,20 31:23 32:11 44:19 67:9 77:16 78:4,9,24 91:21 109:13 112:9 114:4 117:21 118:16 119:16 130:8 155:6 172:25 175:23 176:7 180:4 185:24 191:5 204:11 247:8,13 261:14 263:11 264:18 265:1,9 266:23 268:8 268:20 270:18 282:7 306:9 309:9
**needed** 26:13 31:11 32:12 43:19 91:3 110:6 133:15 236:10 303:18 305:22
**needing** 100:10 114:12
**negative** 92:23 97:22 98:10,14 99:10 121:20 122:19 126:24 127:5,16 128:7 128:14,17,21 128:23 134:18 150:21 158:22 160:21 169:1 217:8,14,16,25 218:16,18,19 219:19 220:1,5 220:9,12,23 230:7 232:19 268:9 270:10
**negatively** 97:10,11
**never** 21:4 54:6 54:21 55:1 56:4,25 57:25 61:12 86:3 91:1 101:7,11 105:14,23 109:20 110:14 110:20 138:1 138:12 140:25 143:14 145:4 150:9,17 155:16 158:18 161:5,7,11 172:8 174:10 174:11 177:20 184:15 187:16 203:9 209:1 213:2,7,13 221:18 236:17 237:1 252:23 259:21 260:2 266:23 269:16 274:2 291:13 303:17,18 304:5,19 305:10
**new** 1:2 2:2 3:21,21 6:8,8 8:21,21 29:10 29:13,18 33:22 36:23 55:5,8 67:9 151:8 195:1 259:6,7 259:11,15,21 259:25 260:14 260:17,24,25 312:21 319:1
**news** 276:10
**nice** 45:13 286:16 287:16
**night** 22:12 30:4,16 271:7 271:14 274:18 315:4
**nightmare** 143:24
**nine** 152:23
**non** 69:6 70:15 71:1 215:12
**nope** 115:19 234:14
**normal** 157:10 157:12
**normalize** 306:8,9
**normally** 166:14
**norms** 306:19
**northwest** 5:17
**notary** 317:17 319:25
**note** 200:11 201:19,19 301:8
**notebook** 78:25 79:20
**noted** 317:5

**notes** 25:14 27:23 78:17 79:1,9,15,21 80:3,12,14,22 81:10,16,21 318:16
**notetaker** 79:7
**notice** 2:20 133:22 226:10 250:19,20,25 251:2,3,6 252:1 253:15,15
**noticing** 13:19
**noting** 181:10
**notion** 305:18
**notions** 302:25
**nuanced** 308:1
**number** 44:21 44:23 45:1,4 64:20 77:9 86:18 101:18 167:1 292:3 308:24
**numerous** 39:23

**o**

**oath** 16:3 186:4 186:15,25 187:8 188:15 188:22 207:15 208:1 213:11 214:7,19 267:22 318:7
**object** 71:3,4 81:3 122:6 208:3
**objecting** 17:8
**objection** 26:16 28:25 29:25 30:5,11,17 33:4 33:17 57:13,17 58:20 59:18,19 60:10,24 61:6 62:3,4,7,17,18 62:24 63:6,14 63:25 64:1,11 64:12 65:23 66:19 68:24 70:1,17 74:7,12 74:24 75:18 78:18 80:16 81:11,17 82:9 82:24 85:20 87:20 88:9,16 93:13 97:13,13 97:19 98:2,6,17 99:14,19 101:1 101:1 103:25 104:7 111:2,12 111:21 112:15 113:4,14,20 114:3,10,21 118:9 119:1,7 121:16,21,25 122:21 123:2 124:13,25 125:20 126:20 127:1,10 128:8 128:15,25 129:25 130:16 130:21 131:10 131:20 133:9 137:14 139:2 141:10,22 142:3,12,20 144:18,25 145:6 147:15 147:15 148:2 149:12 150:25 151:6,19 152:1 152:5,14,19 154:14 156:21 161:1,15 162:4 163:15 164:10 165:1,13 166:3 167:11 168:17 171:22 174:9 174:24 177:16 177:22 179:2 179:10,17,23 180:5,21 181:3 181:24 182:7 182:17,22 183:1,12 184:6 184:11,16 186:7,11,21 187:3,4,12,13 187:17 188:17 189:1,2,22,23 190:11,12,17 190:18 193:9 193:15,22 194:11,16 195:7 196:13 197:1,17 199:16 200:20 201:24,25 206:6,7,14,15 206:25 207:1 207:11,19,20 208:5,17,18,24 209:8,9,15,16 209:24,25 210:8,9,14,18 211:3,4,13,14 212:5,12,13,18 212:19 213:4,5 213:16,17,22 213:23 214:11 214:12,22,23 215:4,5,12 216:13,14,25 217:1,9,19 218:5,14,23 219:15,22 221:5,12,20 222:6,7,21 225:23 226:7 226:17,24 227:16,20 228:2,24 229:3 230:21 232:10 232:22 233:13 234:4 238:3 239:2 242:11

245:12 248:16
248:23 250:9
252:12,18
255:10,18
259:24 262:24
266:6 267:4
268:2,12,17,25
269:5 270:1
273:3,20,23
274:8 275:4,12
275:21 279:3
279:15 280:2
280:20 281:23
283:8,13,21
284:6,15
288:10 290:1,5
290:12 291:15
291:23 292:11
294:16 298:21
308:14 313:12
314:6
**objections**
140:3 215:12
318:9
**objects** 17:8
**obligation**
215:15
**observation**
47:1
**obviously**
161:21 170:10
263:25 264:6
**october** 1:22
2:24 11:4 12:4
13:2,6 318:22
**odd** 150:11
**offensive**
285:17
**offensively**
285:19
**offer** 6:12 94:4
**offered** 130:18
299:22
**office** 33:24
36:23
**offices** 2:21
29:10
**officially** 19:18
19:18 42:18,25
55:1
**oftentimes** 91:2
99:2,4 112:2
156:23 262:4
284:21 302:21
305:7 308:17
**oh** 22:5 84:8
89:6 143:10
163:24 177:3
178:9 195:21
202:3 204:1
251:14 254:15
287:2 294:25
295:1 296:9,13
308:10
**okay** 18:24
19:6,10 20:3,6
20:15,19 26:25
34:18,24 35:12
53:11 65:13
66:11 67:7,13
67:25 71:8
77:23 82:2
85:9,16 89:15
90:22 95:22
101:12,21
103:9 104:15
104:22 105:10
106:13 107:16
108:3,16
110:12 111:17
112:20,24
115:14 116:9
116:14 117:11
117:19 119:13
120:20,22
121:8,13 122:5
122:25 123:10
123:25 124:17
126:16 127:15
127:25 128:12
128:20 130:13
131:23 133:8
135:2,6 140:5
140:21 143:7
143:18 144:22
145:9,21,24
146:7,17 147:3
147:20 149:5
151:22 152:23
153:23 154:17
155:1,7 156:7
156:18 159:12
159:21 160:21
161:8 162:1,7
163:5,6,18
164:25 165:4
166:1,18 167:4
167:17 168:5,6
169:3,7,22
170:2,16 171:4
171:8,11
172:16,21
174:16,19
175:2,4 176:2,3
178:2,7 183:7
184:19,25
185:5,12,17
186:1,24
187:20 188:6
189:6,17 190:2
190:6,20 192:3
192:14 194:7
194:19,24
195:10,13
196:18 197:2,4
197:19 198:15
199:1,12,19
200:6,15 201:9
201:16,17,23
202:9 204:1,5
204:15,24
206:1,10,19
207:14 208:14
211:8 214:18
216:8 217:5
219:3,18

220:14 221:9 223:4,7 227:2,8 227:11,23 228:18 230:15 232:15,25 233:7,14 234:1 234:7,15,21 235:2,6,12 237:16 238:5 239:25 241:5 241:15 242:15 243:4,25 244:9 245:23 246:24 247:15 251:5 252:7,20 253:6 255:3,14 256:4 256:7 258:7,14 259:3 260:13 261:16 262:12 263:20 266:1 267:15,21 269:17 271:13 272:13,22 273:13 274:14 275:15 277:14 277:21 278:9 280:24 282:4 282:21 283:16 285:2,8 286:12 286:14 288:7 290:16 291:12 291:19 293:12 293:24 294:3 295:1,5 297:16 298:15 300:4 308:13 310:18 311:18 314:10 315:14 316:7

**okdokes** 200:17

**old** 71:21,23 163:7

**older** 305:12,14

**oligarchs** 203:17

**onboarded** 227:13

**once** 86:12 194:5,6 243:13 247:2 256:15

**one's** 100:4

**ones** 48:4 135:7

**online** 309:16

**ooh** 177:9

**open** 70:25 77:15 94:24 133:11

**operate** 129:12

**operated** 49:5 52:13

**operating** 16:2 51:13

**operation** 46:19

**operative** 266:19

**opinion** 77:23 131:7 196:4 248:2 260:3

**opinions** 182:9 182:11

**opposite** 70:3 111:8 298:22 313:19

**optics** 298:17

**optimistic** 284:22

**orally** 57:14

**orb** 146:4

**order** 53:18 76:19 77:17 219:20

**organizations** 84:12

**original** 51:11 99:21

**originally** 56:5 301:20

**originate** 69:21

**outside** 109:12 156:4,7 187:22 257:18 294:7 300:20 301:2 302:23,23

**overall** 86:5

**owed** 232:3

**own** 37:13 40:24 42:12 53:2 55:25 125:14,18 133:21 134:2 187:21 213:19 221:24 227:25 236:21 265:22 269:15 282:8 301:16,24 304:25 305:3 306:14

**owner** 41:3,5 288:23 290:10

**ownership** 41:8 41:12,15

**p**

**p** 3:1,1 4:1,1 5:1,1 6:1,1 7:1 7:1 8:1,1,17 9:1,1

**p.m** 103:2

**p.m.** 2:23 132:1 132:4 198:10 198:13 204:6 204:17 224:24 231:14 254:8 254:11 293:19 293:22 316:14 316:16

**pacific** 13:5

**page** 10:5 11:6 12:6 95:21 96:7 102:24 149:4 153:23 155:3,5 162:22 163:1,3 167:17 172:21 175:2 175:19 177:4 178:2 191:3,18

198:18 202:7 203:12,14 204:5,5,7,16 205:2 224:23 224:25 228:18 229:25 239:15 239:21,22 245:23,24 281:8 286:8,10 312:2 319:5
**pages** 81:2 166:23,25 181:4
**paid** 130:12
**pain** 131:8 305:6
**palooza** 178:20 180:11
**pam** 175:21,24 175:24 176:10
**pamela** 11:20
**pandemic** 43:1
**papers** 43:4
**paragraph** 95:19,20 157:15 202:21
**parents** 48:21 78:13
**park** 2:22 4:7 5:7 7:11 8:8 13:10
**part** 21:4 25:20 35:13 41:3,5,15 52:25 58:15 59:6,8,16 62:1 62:14 66:5,6 68:10 76:8,11 76:16 112:2 120:4 123:12 123:15 127:23 141:16 146:25 155:16 157:13 159:5,8,9 168:14 193:7 197:12 214:15 216:18 225:13 225:17 226:2 239:11 258:1 266:19 269:22 270:6,11 271:15,17 281:14 282:13 282:13,14 285:8 287:19 302:25
**participant** 28:1 29:6 54:10 57:9
**participants** 28:6,17 29:22
**participation** 123:16
**parties** 14:17 14:21,23,25 15:3 318:18
**partner** 42:7 276:18 277:5 278:3,12 279:5
**partners** 44:18 45:12
**parts** 76:19 123:14 304:4,8 312:13
**party** 1:11,12 2:11,12 195:1
**pass** 279:17
**passed** 78:12 279:12,14
**passing** 139:17 163:18 276:17 277:4 279:6 285:20 286:2
**past** 16:15 77:4 82:14,16,18 147:7 155:4 160:22 202:19
**paste** 103:6
**pausing** 28:22
**paying** 129:13 129:17 263:19 293:5
**peddling** 128:6
**pee** 53:13
**penalty** 318:20
**pendency** 211:1,11 212:2 212:10
**pending** 17:15 130:15
**people** 24:25 26:11,12 27:12 27:19 28:17 40:16 41:19,22 43:11,13 44:5,6 44:7,7 52:10 64:20 66:15 77:20 88:21 91:6 99:4 100:22 110:7 113:8 133:17 134:12,23 139:19 144:9 144:17 147:9 155:17 157:11 164:5 166:14 166:14 168:4 168:12 182:4,9 182:14 189:19 208:16 209:6,7 209:13,14,22 220:17 224:19 224:19,21 234:16 236:22 244:6 259:18 263:5 269:9,14 276:13 294:24 300:7 303:22 304:1 306:2 308:18 309:10 309:11,12 310:23 313:1 315:21,23
**people's** 182:9 182:10
**peptides** 72:22

**percent** 41:10 212:25 213:12 214:9,19 215:3 216:11 241:6 281:10,15,18
**percentage** 41:8
**perception** 303:4
**perfect** 177:1
**perform** 129:7
**period** 19:25 62:15,23 63:4 71:19 93:19 111:22 112:24 114:13 116:21 124:11 292:22 293:24
**perjury** 318:20
**person** 19:4,5 20:24 21:3 25:8 28:24 29:19,20 30:9 56:24,25 57:7 58:2 77:2 84:17 93:24 123:4,7 126:1 126:12 134:9 138:16 156:11 156:14 170:11 276:13 291:5 315:3
**persona** 141:20
**personal** 73:8,9 84:20 85:11 86:3 88:11 125:7 129:11 136:5 139:11 212:25 306:24 307:7
**personally** 51:19 89:3 103:13 105:23 113:13 121:9 125:7,9 126:9 126:11 131:16 132:13 142:1 184:24 249:14 253:4 256:5,6 256:24 257:13 289:3,21 293:10
**perspective** 98:22
**phelps** 4:4 14:7
**phillips** 4:4 14:7
**phoenix** 181:14
**phone** 20:19,21 23:2 26:6,21 27:25 28:5,12 28:16 30:9 31:1,6 37:7,11 37:15 39:24 40:5,7 52:5 54:22 57:6,14 69:10,13 70:25 73:4 83:19,22 86:13 90:17 91:5 108:6,11 118:13 125:5 138:16 156:11 156:15 157:21 188:1,3,11 224:18 242:13 242:17 243:2 253:9,11 291:25 292:4,7 299:25 300:13 300:15
**phones** 66:8 84:10
**photo** 192:6 243:15
**photos** 185:25
**phrase** 303:2,6 303:8,9,20
**phrased** 268:14
**phrasing** 129:15
**pic** 178:20 180:11
**pick** 297:3
**picket** 275:10
**picking** 116:23 117:5
**piece** 42:12,16 231:21 232:9 307:7
**pieces** 196:18
**pin** 172:25
**pissed** 171:19 224:13
**pitching** 238:14
**place** 20:25 69:9 115:18 158:16 197:16 219:6 247:14 249:20 282:18 312:13 318:6
**placed** 157:23 158:2,5,9,12,19 158:20 161:19 161:20
**placement** 52:18,22
**places** 312:14
**placing** 158:7
**plaintiff** 1:6,11 2:6,11,19 4:3 5:3 6:3 13:16 14:7,10
**plaintiffs** 1:14 2:14 3:3 25:20
**plan** 53:1 233:22,25 239:4 244:6 256:22 263:10 263:15,17 264:11,13 265:3 270:14 270:18
**plane** 156:5 168:3

**planned** 251:10
**planning** 92:22 235:13,15,18 242:8 243:22 244:4 245:21 246:1 250:16 254:14,18,22 255:5,15,23 265:3 266:17 266:20 270:23 277:10,13,18 285:9 287:25
**plant** 149:22 217:16 219:20 267:23 268:23 270:10
**planted** 122:10 122:15 217:6
**planting** 168:25 220:22 272:25
**please** 13:17 15:5 16:20 17:13,15,23 19:9 21:2 34:24 35:12 36:3 77:24 94:11 102:19 102:20,25 106:14 107:13 115:6,13 141:17 152:23 162:9,23 166:19 171:11 190:20 197:22 210:22 216:2 228:8 229:12 231:4 277:14 278:7 315:2
**pleased** 179:7 179:11,14,20 179:25 180:2 221:9,14
**poach** 230:9
**podcast** 41:3 301:12,16,20 301:21 302:10 302:19,24 303:24 304:2 306:17 307:4
**point** 23:17,21 57:5 87:18 89:7 111:17 118:2,17,21,25 119:6 120:2,19 124:8,17,21 126:8 131:22 133:16,20,23 150:9 193:13 223:25 232:8 235:4,7 237:24 238:13,21 242:3,10 251:25 255:1 255:22 285:24 291:5 292:4 307:1 315:5
**points** 186:16
**poise** 154:4
**polish** 91:14
**political** 303:11 309:25
**pool** 282:8,13
**pops** 244:1
**portion** 260:14 261:9
**portions** 280:11 280:13
**pose** 210:22
**posed** 211:17
**position** 108:24 233:9
**positions** 99:5
**positive** 24:2 87:3 171:15 264:9 269:19 269:24 270:2 285:13
**possibilities** 246:6
**possible** 33:2,5 51:24 65:22 74:6,11 195:21 212:7 214:8 294:13 302:6
**possibly** 82:17
**post** 264:20 265:6 266:5 267:1 272:24 273:16
**poster** 311:7,14 311:23
**posts** 208:15
**potential** 135:8 136:10 275:8
**potentially** 119:5 124:10
**pouring** 188:10
**power** 99:5
**powerless** 32:6
**pr** 11:19 59:21 59:25 90:8 123:4,7 132:22 132:25 134:7,9 134:12,13,21 135:3,8 140:18 142:23 143:22 146:9 147:11 147:18 148:18 149:14,19 150:10 154:2 155:16 157:2 157:11,12 158:24 165:5,9 165:11,17,18 165:21,23,25 166:10,14 168:21 169:23 170:11 174:8 174:23 256:25 258:12 268:23
**practical** 26:19
**practice** 37:19 77:8 78:16 82:7 206:20

**prather** 9:21
**prayer** 22:12
**preachy** 49:11
**precise** 37:10
**preconceived** 305:18
**predator** 238:17 270:12
**prefer** 303:6
**preferred** 26:14 54:20
**prejudice** 49:13
**premiere** 133:21 134:2 150:8 258:5 276:7 292:5
**preparation** 20:16,20 80:15 80:23
**prepare** 18:5 18:25 20:7
**prepared** 39:25
**preparing** 18:15,16 192:2
**presence** 187:22 300:21 301:3
**present** 9:16 18:14 22:23 23:1,15,22 34:11 66:17,25 67:2 71:2
**presented** 132:23
**presenting** 60:21
**press** 86:17 97:24 98:9,13 99:9 103:23 104:5,12 113:1 114:13 116:23 117:5,8 133:17 133:18,21 134:8 150:1,3,6 150:19 152:21 225:11 256:23 266:4 267:9 273:6 284:13 284:20,23 292:16 296:7
**pressured** 110:6
**presume** 38:22 40:6 154:25
**pretend** 263:6
**pretty** 24:3 26:25 27:8 46:13 149:5 166:1,7 171:18 194:10 251:17 308:24
**previous** 120:19 125:23
**previously** 19:14 114:20 301:11
**primary** 121:19
**print** 119:17 120:1
**prior** 19:25 21:22 25:12 57:5 154:10 230:19
**privacy** 66:12
**privately** 238:2 238:25
**privileged** 61:7 64:13
**privy** 119:11
**pro** 310:21
**probably** 42:14 53:11 55:4 69:15 71:16 73:22 156:17 191:22 198:1 218:25 223:2 237:4 252:23 292:12 299:21
**problem** 22:8 178:22
**problematic** 178:20 180:4,7 180:9,20 181:2 182:6,16,21
**proceed** 256:15 257:16,23
**proceedings** 13:1,10 318:5
**process** 25:21 90:21 306:16
**produced** 20:17 25:14 30:3,15 205:24
**producer** 42:9
**produces** 47:18 47:25
**product** 52:18 52:22 81:4
**production** 29:10 42:8 45:24
**professional** 88:13 139:23 164:17
**professionals** 97:11 136:11 136:21
**profitable** 45:25
**programs** 50:23
**project** 91:17
**projects** 44:2
**prominent** 175:10
**promise** 42:2 51:23 292:19
**promised** 42:1 42:18 52:6,20 52:21
**promises** 41:20 52:11
**promising** 52:8 53:2

**promote** 225:10 300:23
**promoted** 253:21 262:18
**promoting** 170:23 262:15 262:22 269:19
**promotion** 133:19 165:6,7 165:12,21 166:11 250:21
**proper** 53:4
**proposed** 135:8 135:10
**propounded** 318:9
**protect** 155:18 183:23 270:21
**protection** 236:12,13 237:5 240:20
**protective** 53:18 236:9 295:17
**protocol** 53:4
**proud** 298:1,3 303:17
**provide** 102:15 104:5,12 106:9 208:7 314:7
**provided** 25:23 30:6 45:3 104:8 235:13 255:14
**providing** 103:23 298:16
**prs** 135:18 136:7
**public** 39:15 89:24 90:9 96:20,21 117:9 126:24 127:5 128:21,23 133:23 134:5 141:20 149:25 153:13 164:1 223:25 224:10 236:25 237:25 238:23 256:11 317:17 319:25
**publication** 155:24 177:7 181:21
**publicist** 24:23 25:3,6 83:17 84:2,5,14,20 85:10 86:2,4 87:9 89:7,16 91:21 92:14,19 93:18 94:2 96:20,22 103:12 108:25 109:5,10,12 113:3 120:10 125:15,19 129:16 131:5 131:22 142:8 168:8 173:19 175:11 225:21 226:5,15,21 227:13,25 233:2 289:22 291:20 292:22 293:1,3 295:25
**publicist's** 84:9
**publicists** 89:4 120:11
**publicity** 79:16 82:23 85:11 91:24 112:22 112:22 113:18 151:24 152:11 167:9 169:18
**publicized** 149:15,19
**publicizes** 165:9
**publicizing** 116:16
**publicly** 139:24 149:9 236:23
**publish** 92:22 187:1 197:16
**published** 115:21 121:20 127:8 148:7 153:20 169:11 174:2 176:19 176:23
**pull** 106:14 110:22 112:12 112:18 115:6 162:8 200:17 200:23 244:16
**pulled** 200:9,10 201:13,14
**purpose** 66:2 77:12
**pursuant** 2:20 53:18
**put** 52:23 53:15 76:6 126:7 137:20 173:6 220:1,5 225:4 226:9 260:12 276:25 318:7
**putting** 73:4 98:23 216:22 276:4 285:13 298:23 302:17

**q**

**qualified** 51:17
**quantify** 46:2
**question** 17:2,4 17:9,10,15,24 22:6 35:2,6,7 41:1 65:1 66:21 67:14 68:3,7 80:22 81:20 88:2 99:21 117:4 123:20 124:4 128:2 130:2 134:3 165:10 166:5 174:3

199:18 202:1 208:9 210:19 210:22 211:17 211:22 213:19 214:6 216:2,9 225:25 226:11 232:16 243:6,7 268:14 269:1,3 283:12 289:18 291:17 294:18 298:19 302:20 303:3 308:1,9 313:14 315:11
**questioning** 305:17
**questions** 16:19 17:23 81:18 124:4 133:18 135:25 174:15 191:5,23 198:2 215:7,15,22 222:23 244:2 314:23 318:9
**quick** 107:19
**quickly** 270:17
**quinn** 3:5,16 13:20,23 14:1
**quinnemanue...** 3:12,13,22
**quite** 46:25 112:25 259:17
**quotes** 120:6
**quoting** 120:18

**r**

**r** 3:1 4:1 5:1 6:1 7:1 8:1 9:1,5
**raise** 15:5 111:19
**range** 11:9,13 11:15 12:8,10 12:14,16
**rape** 207:10
**rare** 104:10
**rarely** 193:23
**reach** 86:14 156:23 272:1 299:19 303:15 305:23 313:7
**reached** 67:4 158:14,23 162:3 169:19 170:9 299:21
**reaching** 109:11
**reacting** 245:25
**read** 21:14,16 21:19 39:24 95:2,25 96:8 98:9 101:4,7,11 102:18,20 103:3,10 104:25 105:11 105:21 107:9 107:12,17 110:14 115:13 117:13,20 118:23 119:4,8 119:14 143:20 144:7 146:8 148:23 150:9 153:25 154:18 155:2,9,15 157:19 159:13 159:22 162:24 163:10 165:17 167:19 168:7 168:11 172:24 173:5,11 174:16,19 175:7 176:4 177:6 178:8,18 180:10 181:9 181:13,16 185:6 191:4 192:16,19 195:16,20 198:22 199:2 199:13,23 200:5,16,22 201:2 202:11 203:16,25 204:8,18 205:4 216:2,10 223:19 225:3 229:23 230:5 231:16,20,25 234:19 240:17 241:18 242:1 246:4,12 247:1 247:7,12 248:5 259:7,21 261:3 261:18 263:24 264:17 266:14 267:3,9,19 271:4 274:15 278:7,16 280:25 281:9 282:5 286:7,8 286:15,21 304:2 307:9 308:25 313:2 313:16 316:4 317:3
**reading** 96:23 138:10 155:4 155:25 160:7,9 191:17,20 234:22 235:24 313:25
**real** 207:8 257:17 314:23
**realist** 88:19
**realize** 304:7 304:20
**really** 28:22 60:6 69:8 84:18 109:7,8 110:4 134:14 154:1 158:17 178:9,10 184:7 184:12 188:9 195:24 201:3,3 204:12 222:18 231:23 243:23

244:12 245:9 246:13 247:15 247:24 251:16 257:8,9 258:3 291:5,11,13 298:2,3 300:2 302:11
**realm** 59:24
**reason** 16:11 17:13,22 88:15 88:25 117:1 124:22 129:19 130:13 133:8 195:23 196:10 196:24 234:2 263:4 289:3,7 289:11 290:18 290:21,23 299:9 319:5
**reasons** 152:9 290:22,24
**reassure** 159:18
**rebel** 188:25 189:9 190:3,10 199:4,9,10,14 199:24 206:5
**recall** 16:15 23:19 31:1,6,9 34:1,4,7,12,15 35:9,19,20 54:11,13 57:6 57:11 58:9,12 58:12 68:8 71:17 73:16 75:11,14 88:10 90:25 91:8,11 91:13,13 92:9 92:13,21 94:20 102:11 108:11 108:16,18 110:19 115:20 133:2 138:4 139:15 140:21 145:21 151:17 156:11 167:25 235:14,17 236:8 242:17 244:5 245:1,4,7 245:17 249:4 254:15,21,25 255:4 257:20 259:3 271:24 272:22 273:13 274:5 275:8,15 285:21 294:4,7 294:9,15 298:7 298:10,11,16 299:13,24 300:5,9 301:1
**recalled** 124:8
**received** 49:20 50:3,12 66:17 67:1 145:22 208:8 211:19 244:4 254:14 254:18,21 255:22 259:14
**recently** 202:23 299:14
**recess** 53:23 132:2 198:11 254:9 293:20
**recognize** 44:7 234:23 240:13
**recollection** 20:12 32:4 140:17 242:6 243:18,21 250:5 253:6,9 253:10 255:3 255:16 257:6 277:9,12 291:24
**recollections** 274:13
**recommend** 90:11 119:16 137:13
**recommended** 135:18,24 136:7,24 137:1 232:20 233:8 234:2
**reconcile** 285:12
**reconnect** 223:2
**record** 13:5 16:22 17:5 19:7 27:25 28:5 37:11,15 53:16,22,25 80:17 94:14 101:23 132:1,4 198:10,13 215:17 216:10 230:14 231:6 254:8,10 277:8 293:19,22 299:2 315:7 316:13 317:6
**recorded** 1:20 2:18 28:12,16 29:4,8,21 31:19 31:21 32:1,5,18 33:7 34:19,20 35:13 36:21 37:8 38:7 40:8 299:4,6 318:11
**recording** 13:10 31:1 32:9,15,21 33:10,13 34:1,4 34:7,12,15 35:9 37:3,22,23,24 38:2 40:10,13 40:16
**recordings** 30:4 30:8
**red** 310:1,23
**reddit** 271:10 272:18,20 312:14
**redefine** 301:25

**reference** 168:20
**references** 201:18
**referencing** 240:24
**referring** 31:24 41:6 135:3 140:13 164:12 261:25 262:6
**refers** 230:18
**refresh** 20:11 102:17 140:17 223:5 285:25
**regarding** 297:24
**regardless** 289:11
**regret** 184:4
**regrets** 184:8 184:13,13,15 184:17 222:16 222:19
**regular** 17:19 37:19 134:7
**regularly** 194:8 209:6
**relate** 82:21
**related** 14:18 15:18 114:15 125:5 165:6 220:16
**relates** 270:15
**relating** 220:19 282:12
**relation** 36:11 50:2 154:10 180:18 216:22 249:20
**relations** 9:2 14:14 96:21 256:11 306:19
**relationship** 23:23 24:10,22 25:5 47:2 52:19 78:14 87:3 90:15 124:18 126:1 129:6 273:25 288:20,22,23 290:9 291:13 293:8
**relationships** 47:8
**relative** 318:17
**relatively** 87:12 87:17
**relay** 139:12 146:22 230:25 232:7,18 246:18,19
**relayed** 219:12 250:22 289:2,6 301:3
**relaying** 281:16 283:5,18 296:18
**release** 39:14 39:19 165:6,7 165:12,22 166:11 202:18 237:11
**released** 301:22
**relevant** 34:21 191:23 212:23
**religious** 227:22
**reluctant** 225:11
**rely** 230:15
**remaining** 41:12
**remember** 26:8 26:10 31:13,21 34:22 37:7 38:5 40:1 45:18 50:17 52:5,20 65:19 67:19 78:24 83:6,8,10,11,13 83:14 84:11 88:17,18 90:9 90:13 91:2,18 93:7,11 96:14 96:16 100:14 107:4,7 108:21 109:2,3,4 110:3 111:25 113:21 113:24 114:1 114:11 115:24 115:25 116:2,3 116:20 118:10 118:14,15 124:14,15 125:4,6,8,13 138:8,20 139:17,19,20 149:7 150:4,7 156:2,4,15 158:17,17 163:21,22 164:19 168:2,3 183:19 235:20 235:22,24 236:6,10,11 242:12 243:10 243:23 244:18 244:22,23,25 245:9,11,15 248:21,24,25 249:1,6,7,7,8 250:24 252:22 254:1 255:7,8 271:23 273:4 275:22,25 276:1,17 284:9 285:24 287:6,9 287:11,16,19 287:21,22 294:6 295:2,5,7 295:7,8,9,12,13 295:14,15,16 295:22 296:5,8 296:20,23,25 297:8,22,23

298:1 299:16 299:17 300:2 300:11 301:7
**remind** 208:6
**reminding** 23:24
**reminds** 23:25
**removed** 117:15
**rented** 142:10
**repeat** 68:6 88:2 169:13 295:18 297:16
**repeating** 211:21
**rephrase** 17:24 17:25
**replace** 253:18
**report** 61:12
**reported** 1:23 284:4
**reporter** 2:25 11:18 15:4,10 16:21,25 67:8 67:13,22,25 94:5 101:15 106:10 108:19 112:14 114:20 115:3 119:25 121:1 148:7,17 153:19 154:9 155:24 156:8 156:12 163:14 168:7,15 170:12 171:15 172:14 174:2,7 174:22 175:12 175:17,25 176:18,22 178:3 197:15 216:3,8 217:7 223:1 228:11 318:3
**reporter's** 318:1
**reporters** 95:16 121:10 159:23 160:10,14 169:10 170:3 170:18 171:1 220:11,15,19 281:19
**reporting** 117:6 189:6 285:2 307:10 319:1
**reports** 60:16 60:16,17,21 61:5,9,15,23 63:13,21,23 64:8
**represent** 13:18 15:17 126:9,11 175:24 199:8 201:8,11 203:21 204:24 205:18
**representatives** 256:12
**represented** 149:1 190:3 296:1
**representing** 13:24 14:2 206:12
**reputation** 125:14,18 270:24 298:24
**reputations** 125:19
**request** 90:17 90:19 270:17
**requested** 318:14
**required** 16:7 17:10
**research** 305:3
**resentment** 313:23
**reside** 19:14
**resident** 20:1
**resistant** 225:10
**resonated** 265:6
**respect** 32:3 46:6,16,19 60:8 106:1 142:8 182:25 209:20 215:9 219:7 298:19 309:10
**respond** 27:7 69:2 89:4 95:1 108:1
**responded** 242:8
**responding** 27:7 67:20 221:25 243:18 297:14
**responds** 107:16 200:3 231:19 241:25 271:3
**response** 155:3 308:6
**responses** 295:13,15
**responsibilities** 46:9,15,18 47:7
**responsible** 89:8 161:9
**responsive** 90:22
**rest** 261:11 286:8
**result** 131:18
**resulted** 171:20 217:7,25 218:19
**retained** 148:24 235:3
**retaliation** 151:15
**retract** 114:19 115:1

**retreat** 77:2
**reveal** 56:15 64:13
**reverse** 32:22
**review** 20:6,20 47:10 102:19 318:13
**reviewed** 20:16 235:18
**revised** 255:1
**rewrite** 280:11 280:13
**rewriting** 275:11 283:19 283:24
**rewrote** 275:18
**reynolds** 35:18 38:18 39:12,16 39:20,25 237:7 237:8 238:16 270:9 276:9 278:25 284:3 285:3 295:19 295:20 296:2
**richest** 202:17
**rid** 54:23 258:17
**rift** 11:20 148:19
**right** 15:5 17:7 20:4,25 26:9 27:3 33:18 35:3,5 41:6 45:7,19 50:5 51:1 52:15 53:7 57:24 58:4 59:9,12,17 60:9 62:16 67:11 68:2,11 69:10 70:8 76:3 84:21 85:2,12 87:15 87:19 89:10 92:7 102:16 106:11 107:9 109:25 113:7 116:12,14,17 116:22 117:11 118:21 121:5 123:13 124:12 127:22 128:14 131:15,19 132:6,9 135:4,9 137:19 140:23 141:1 144:24 147:14 148:1,8 149:6,11 150:13,24 151:25 153:14 153:16 154:13 156:20 157:9 158:13 159:10 159:19 163:8 163:14 164:18 164:23 165:24 166:17 168:9 169:5,12,20,24 170:4 171:21 172:1 178:15 178:23 181:18 184:21 185:3,6 188:20 191:10 192:10 197:13 197:16,19 198:5,8 201:1,8 201:10,18 203:10,12 205:8,18,22 210:4 212:17 216:24 219:7 219:11 220:2,7 221:4,15 225:22 226:6 226:16 229:5 231:13 234:21 240:7 255:24 262:23 265:24 276:22 289:24 290:4 291:21 292:10 294:8 294:12,12,15 298:10,23 300:25 301:13 304:13 309:24 310:6 311:2 312:12 313:9 315:6
**rings** 84:9
**road** 19:11
**rock** 88:20 296:1,3
**role** 25:13 26:2 26:5 51:2,14,15 51:20 136:5
**rooftop** 275:18 276:10
**room** 69:14 142:9 143:4 308:21
**rough** 44:23 45:4
**ruin** 93:10
**rule** 224:20
**rules** 16:1
**run** 15:25 134:7 218:13 263:2
**running** 259:16
**russian** 203:17
**rwa** 293:9
**ryan** 39:12 237:7,8 275:2,9 275:17 276:2 276:14 278:15 278:18,25 279:8,23,25 283:7,10,18,24 284:3

**s**

**s** 3:1,9 4:1 5:1 6:1 7:1 8:1 9:1 201:4,9 319:5
**sacred** 76:23

**safe** 78:4
**safety** 77:3
**saks** 21:7
**saladino** 72:13 73:7 75:11
**salary** 42:13 52:23
**santa** 6:15
**sarah** 175:11
**sarowitz** 7:4 8:4 9:20 22:18 22:20,22 41:13 42:22 43:14 46:22,25 48:13 55:22 79:24 278:4,12 279:2 279:22 283:5 283:17
**sarowitz's** 279:20
**sat** 297:8
**save** 276:4,6 282:7
**saved** 278:17 281:1 284:12
**savvy** 60:4
**saw** 245:20 255:11 266:14 266:14,25 267:1
**saying** 39:18 52:6 60:21 81:15 82:25 92:10,15 95:16 97:1,4,12,15,16 100:16 108:22 109:3,6 118:12 127:17 157:8 157:10 175:18 180:15 181:1 194:10 202:10 222:10 246:23 249:1 253:16 259:16 261:17 264:9 265:8 276:5,12,20 278:15 279:1 279:17,23 280:4 282:21 287:18,21,22 303:25
**says** 96:23 100:12 116:10 116:13 117:12 120:15 143:3 143:19 145:8 147:17 148:17 172:23 173:4 173:10,16,18 173:22 175:6 176:6,10,13 178:7,13,17,21 180:9 181:8,12 181:15 191:16 192:15,18 195:15,19 202:22 203:15 204:7,16 205:3 230:4,16 231:15 246:3 246:25 247:6 263:23 264:6 268:10 271:9 274:14 286:20
**sbenson** 7:14
**scabs** 281:5
**scanned** 224:18
**scare** 316:1
**scared** 31:10 32:6 236:15,16 236:19 237:2,6 237:24 266:17
**scenario** 235:13 235:15,18 242:8 243:22 244:4,6 245:21 246:1 254:14 254:18,22 255:4,15,23 265:3,4,4 266:2 266:20 269:23 270:6 277:10 277:13,18 285:9
**scene** 275:18 276:10 283:19 283:24 297:3
**scenes** 275:11
**school** 78:22
**scientists** 26:8
**scoop** 295:25
**scooter** 142:10 143:23 192:9 193:1,8,19,23 196:11,24
**scott** 192:6
**screenshot** 163:6 175:20 192:5 240:4 264:20 271:2
**screenshots** 71:21 73:16 75:12,15 239:17,23 240:11
**script** 275:19 276:3,19 278:12,14,17 279:17,24 280:4,8,12,13 280:17,19,22 281:1,3
**scripts** 302:16
**scriptwriter** 275:20 280:12
**second** 25:8 71:20 78:7 102:17 149:4 160:7 166:22 198:20 244:7 244:12 245:8,9 245:14 255:12 278:7
**seconds** 78:15

**secret** 249:9
**security** 292:1 315:23,24
**see** 46:12 71:1 74:21 92:15 94:18 95:5,18 95:23 96:5,6,11 102:6 103:1,7 103:16 105:6 105:16 106:3 107:2,21 116:9 117:17,24 118:16 119:19 120:5,7 143:2,5 143:18 144:1 144:11 145:19 146:5,11 148:20 149:3 153:9,21 154:6 154:22 155:12 155:19 157:16 157:24 159:15 160:3 161:25 167:15,23 173:2,8,14,20 173:24 175:5 175:14,19,21 176:3,7,15 177:2,11 178:3 178:5,11,12,16 178:24 179:7 180:25 181:8 181:19 192:4,7 192:22 195:15 196:5,12,21 197:6,7 198:20 198:24 199:6 200:1,13,19,24 200:25 201:6 203:4,19 204:3 204:13,22,23 205:16,20 225:15 228:4 230:12 231:11 231:14,22 232:5 239:15 239:19,22 240:22 241:1 241:10,16,23 242:4 246:9,16 247:4,9,19 248:9 255:7 259:1 261:22 264:3,23 265:25 271:11 278:22 281:6 281:12 282:9 287:4 312:23
**seeing** 133:11 150:18 179:1 183:21 202:15 255:4
**seek** 163:19
**seem** 275:17
**seemed** 125:9 236:24 244:20 269:14
**seems** 147:8,17 157:11 203:2 227:23 228:1 269:7 282:16
**seen** 97:1 98:22 115:15 150:10 172:6,8 174:10 185:22 189:6 189:10 203:9 212:7 223:22 223:23 225:17 227:2,6 228:19 265:6 288:2 307:10 309:16 309:20 310:14
**self** 69:21 302:12
**seminars** 50:22
**send** 27:23 61:9 86:16 194:8 264:15 271:1 309:11,12
**sending** 71:21 73:17 75:11,14 107:4,18 118:10 141:9 163:6 315:19
**sends** 60:15 61:15,23 117:11
**senior** 45:13
**sense** 26:18,19 49:17 169:15 250:22 303:13
**sensitive** 298:17
**sent** 61:5,10 66:16 67:1,3 86:20 107:10 110:22 111:13 111:19 112:13 114:20 115:2 121:4 137:10 138:9 140:13 140:16,22 142:17 143:2 163:8,21 239:23 240:19 245:21 258:3 265:7 266:5 267:1 272:24 273:15 274:1
**sentence** 94:24
**sentences** 260:4
**sentiment** 232:19
**sentiments** 131:3,14,18
**separate** 196:11
**september** 112:25
**sequence** 132:15,17 226:9
**series** 255:16
**seriously** 139:6

**serves** 292:13
**service** 49:4,7 299:22
**services** 129:13 129:17 130:12 148:25
**serving** 109:9
**session** 29:4 34:10
**sessions** 18:18 19:4
**set** 69:16,18 150:24 151:2,5 151:18 152:13 154:12 238:1 238:11,24 239:9 262:4 294:6,11 296:19,24 297:24 298:9 301:4 318:6
**setting** 69:25
**seven** 312:2
**seventh** 6:7
**several** 19:25 94:17 102:5 107:1 115:10 140:11 145:18 153:8 162:19 172:5 190:23 223:17 228:17 229:20 231:8 234:16,18 258:25 277:25
**severed** 117:23 118:1,7 120:1
**severing** 118:24 119:5
**sexual** 202:24 207:10 308:22 311:12
**sexuality** 305:17
**sexually** 151:14 260:20 308:16 308:17,18,23
**sexy** 297:14
**shady** 138:11 230:8
**shah** 3:17 10:6 13:20,20 15:13 15:17 20:10 26:1,17 29:2 30:2,7,14,21 33:6,19 53:19 54:1 56:13,20 57:14,19 58:24 59:22 60:12 61:3,8,21 62:6 62:12,21 63:2,7 63:16 64:6,16 65:2,8,16 66:1 66:22 67:11,15 68:4 69:1 70:4 70:20 71:5,8,9 74:10,15,25 75:3,22 78:20 80:21 81:1,5,8 81:14,19 82:1 82:11 83:4 85:22 87:22 88:12 89:1 93:16 94:9,13 97:17,23 98:3 98:12 99:8,17 99:22 101:3,13 101:19,22 102:1,23 104:3 104:11 106:13 106:17,19 111:5,16 112:4 112:19 113:11 113:16,23 114:6,17,24 115:6,12 118:19 119:3,9 121:18,23 122:2,9,24 123:9 124:3,7 124:16 125:2 126:5,22 127:3 127:12 128:11 128:19 129:3 130:3,19,23 131:12,23 132:5 133:13 136:16 137:11 137:17 139:5 140:5,8 141:12 141:24 142:5 142:15 143:1 144:21 145:3,9 145:13 147:19 148:4,11,15 149:17 151:3 151:10,21 152:3,7,17,23 153:1 154:16 157:4 161:4,17 162:6,8,12,16 163:17 164:14 165:3,14 166:6 166:19,21 167:2,5,16 168:22 171:11 171:13 172:1 172:10 174:4,5 174:14,18,20 175:1 177:19 178:1 179:6,13 179:19 180:1 180:13,24 181:6 182:2,12 182:20,24 183:4,16 184:9 184:14,18 186:9,13,23 187:6,15,19,24 188:2,19 189:5 190:1,15,20 191:1,8 193:11 193:18 194:1 194:14,18 195:9 196:20 197:3,19 198:1 198:5,8,14

199:17,21 200:21 202:1,5 206:9,18 207:3 207:13,23 208:13,21 209:4,11,19 210:3,12,16,23 211:7,23 212:6 212:15,24 213:10,20 214:1,17 215:1 215:9,11,16,21 215:25 216:7 216:19 217:4 217:11,21 218:9,17 219:2 219:17,24 221:8,17 222:1 222:13 223:10 223:14,21 226:1,12,19 227:1,18,24 228:6,8,12,14 229:1,6,12,14 229:16,22 230:24 231:4 231:10 232:13 232:24 233:15 234:6,8,13 238:8 239:7 240:10 242:14 245:16 248:18 249:3 250:12 252:15,19 254:6,12 255:13,21 258:14,18 260:6 263:8 266:8 267:8 268:5,15,19 269:2,11 270:4 273:12,21 274:4,10 275:7 275:14,24 277:14,15,21 278:2 279:7,19 280:5,23 281:21 282:1 283:11,15 284:1,8,18 286:1,3,13 289:1 290:2,7 290:15 291:18 292:8,20 293:15,17,23 294:19 299:1 308:12 309:3 310:4,13 312:5 314:2,13 315:1 315:6,14,15 316:8,11

**shame** 304:24 305:25

**shameful** 306:6

**shapiro** 8:15,16 14:24 15:1,1,1 20:8 25:22 26:16 28:25 29:25 30:5,11 30:17 33:4,17 53:15,20 56:12 56:15 57:13,17 59:19 60:24 61:6,16,18 62:3 62:7,9,18,24 63:6,25 64:2,12 64:25 65:5,11 65:23 66:19 67:14 68:24 70:1,17 71:3,7 74:7,12,24 75:2 75:18 78:18 80:16,19,24 81:3,7,11,17,22 82:9,24 85:20 87:20 88:9,16 93:13 97:13,19 98:2,6,17 99:14 99:19 101:1,17 101:21 103:25 104:7 111:2,12 111:21 112:15 113:4,14,20 114:3,10,21 118:9 119:1,7 121:16,21,25 122:6,21 123:2 123:21,25 124:13,25 125:20 126:20 127:1,10 128:8 128:15,25 129:25 130:16 130:21 131:10 131:20 133:9 136:13 137:4,7 137:14 139:2 141:10,22 142:3,12,20 144:18 145:6 147:15 148:2 149:12 150:25 151:6,19 152:1 152:5,14,19 154:14 156:21 161:1,15 162:4 163:15 164:10 165:1,13 166:3 167:1,11 168:17 171:22 174:3,9,12,24 177:16,22 179:2,10,17,23 180:5,21 181:3 181:24 182:7 182:17,22 183:1,12 184:6 184:11,16 186:7,11,21 187:3,13,17,22 188:17 189:2 189:23 190:11 190:18 191:4 193:9,15,22 194:11,16 195:7 196:13

196:16 197:1 197:17,21 198:3,7 199:16 199:19 200:20 201:24 206:6 206:14,25 207:11,20 208:3,6,17,24 209:9,16,24 210:9,14,18,21 211:3,13,15 212:13,19 213:5,17,23 214:11,23 215:4,6,10,14 215:18,23 216:5,13 217:1 217:9,19 218:5 218:14,23 219:15,22 221:5,12,20 222:6,21,24 223:4,7 225:23 226:7,17,24 227:16,20 228:2,24 229:3 230:21 232:10 232:22 233:13 234:4 239:2 240:9 242:11 245:12 248:16 248:23 250:9 252:12,18 254:4 255:10 255:18 259:24 262:24 266:6 267:4 268:2,12 268:17,25 269:5 270:1 273:3,20,23 274:8 275:4,12 275:21 279:3 279:15 280:2 280:20 281:23 283:8,13,21 284:6,15 288:10 290:1,5 290:12 291:15 291:23 292:11 293:13,16 294:16 298:21 308:9,14 310:7 310:11 312:1 313:12 314:6 316:12

**shapiroarato....** 8:22,23

**share** 68:12 100:10 164:4 211:18 296:21 305:6 308:21

**shared** 43:21 44:7 48:12 72:4 81:12 257:7 296:21 297:11,18

**sharing** 167:13 257:4 295:10 296:20,23,25 297:23 298:1,7

**shawn** 35:13,15 35:16 37:7

**she'd** 86:13

**she'll** 246:14

**sheet** 317:5 319:1

**shine** 23:12

**shit** 224:11,19 227:4 231:21 232:9

**shocking** 287:14

**shoot** 31:15

**shooting** 33:23

**short** 27:8 254:5

**shorthand** 2:25 318:2,16

**shortly** 251:2

**shot** 297:3

**show** 76:19,25 84:3 140:5 145:9 148:10 162:8 172:1 196:24 223:11 228:3,9 229:16 233:18 258:14 288:2,4 310:25

**showcases** 195:24

**showed** 73:15 164:20 190:16 205:23 212:8 216:24

**shows** 269:9

**sic** 73:7 194:20

**side** 39:2 59:17 260:3,10 277:1 299:25

**sides** 231:17

**signal** 27:13,18 54:3,6,15,22,25 55:2,11 57:7 64:18 65:4,7,10 65:18 66:3,15 66:23 67:4,17 68:9,16,19 69:4 69:6,6,16,18,21 70:9,21,25 71:1 71:18 74:16 76:2

**signature** 318:24

**signed** 43:4 205:5

**silence** 305:23

**silly** 141:4 314:24

**similar** 43:11 106:8 208:25 211:10 212:1 214:20 268:9 268:21

**simply** 233:20 280:6

**singer** 143:3
**single** 66:16,25 165:11 166:15
**sir** 15:4
**siri** 84:10
**sit** 50:5 83:14 165:24 284:20
**sitdown** 246:7
**sites** 199:15,25
**sitting** 213:11 244:14 260:13 261:1,4 315:4
**situation** 25:10 92:2 93:12 109:6 134:5 166:1,7 209:18 230:11 236:17 288:21 297:1
**situations** 134:8
**six** 19:10 48:11 187:9 310:9 314:22
**slant** 121:20
**slate** 21:6 29:5 29:12 34:11 297:12
**sleep** 168:2
**sleeping** 224:8
**sloane** 6:12 169:5,19 219:11 287:13
**slowly** 16:25
**small** 42:8,12 42:16
**smear** 127:7 151:15 188:24 189:8,20 201:21 203:8 206:4,20,20 207:17 208:15 209:2 216:22 260:18
**social** 59:17 127:8 128:4 159:25 160:6 205:8 206:21 208:15 216:22 271:7,14,25 272:4,8,8,10,11 272:15,17 274:18 302:15 309:6 310:16 310:21 311:6 314:5,17
**socially** 306:7
**socials** 206:13
**soevyn** 1:23 2:24 11:5 12:5 318:2,24
**solemnly** 15:6
**soliciting** 288:17
**solutions** 9:23 13:8
**somebody** 60:18 110:5 149:21 150:10 220:22 227:22 232:4 244:21
**somewhat** 47:4
**son** 67:7
**sony** 238:2 239:1 261:19 262:8,13,22,25 263:9,13,17
**soon** 176:12
**sorry** 22:5 34:24 66:20 67:8,22,23 84:11 95:3 96:9 106:21 112:9 122:13 123:11 127:17 166:4,25 169:13 172:11 177:3 179:18 191:17 194:22 203:12 220:8 224:9,12,14 228:18 232:11 233:12 239:16 246:5 254:15 291:2 301:9 304:12 310:12
**sort** 39:14 42:2 50:13 169:19 236:25 270:13 270:18
**sound** 125:10 125:12 126:6 129:20,23 130:4,20 141:4
**sounds** 139:25 179:3 235:9 247:17
**source** 164:22 276:2
**southern** 1:2 2:2
**space** 76:23
**spaces** 78:4
**speak** 16:25 21:23 22:1,15 22:18,20 23:16 35:20 38:9 156:6,7 187:20 241:6 256:20 291:4 299:11 300:17 307:22
**speaking** 21:23 36:24 51:3 120:25 121:9 167:8 170:18 170:25 171:3 215:12
**specializes** 134:10
**specific** 52:14 53:9 68:3 85:21 93:2 114:5 244:8 274:9,12 300:25 305:4

**specifically** 125:4 132:15 147:10 154:9 209:20 296:25 306:23
**specifics** 115:24
**speculate** 120:3 136:14 147:16 161:2
**speculation** 149:25 220:13 220:16,20 257:12
**speech** 125:23
**spends** 60:18
**spoke** 22:22,25 23:14 34:12 51:4 135:13 157:20 161:5 256:21 262:3 271:5 274:16 300:16,19 305:10
**spoken** 24:5 34:19 35:8 37:6 116:4 138:19 160:14 176:17 291:1
**spot** 105:23
**spotlight** 126:24
**stage** 87:12
**stamp** 94:16 102:4,25 106:25 115:9 228:17 258:25
**stamped** 140:10 145:17 153:7 162:19 162:22 172:4 190:23 223:17 277:24
**star** 47:17 148:24
**starred** 47:20
**start** 26:24 40:4 42:6 167:2 191:14 192:4 233:16 301:19
**started** 42:8,10 43:13 47:2 51:3 63:22 64:8,18 68:18 74:21 83:8,17 83:20 84:2 85:7 86:10 116:15,23 117:5 129:9 211:18 270:22 297:14
**starting** 13:18 43:2,7 66:13 133:18,22 157:15 231:14 244:23
**starts** 70:6 202:7,10 261:17
**state** 15:6 19:6 128:3 131:4 318:3
**stated** 17:25
**statement** 39:15,19,24 96:21 97:22 98:8 102:15 103:7,9,18 104:13 105:8 105:18 106:5,9 107:9,11,14 109:1 110:12 110:18,22 111:10,13,18 112:12,18 114:19 115:1 121:4 217:3 237:12 260:14 261:9
**statements** 103:24 104:5,9 110:7,9 128:7 210:21 260:22 260:23 265:18 317:7 318:10
**states** 1:1 2:1
**stay** 251:20 258:2
**stayed** 253:19
**staying** 250:21 292:15
**ste** 6:15
**steal** 233:23
**stemming** 193:7
**stenographic** 15:4,10 67:8,13 67:22,25 101:15 216:3,8 223:1 228:11
**stenographic...** 1:23 318:11
**step** 286:23
**steph** 95:3 121:5,11,15 122:12,13,20 123:17 160:23 183:10 187:11 188:14 196:10 196:24,25 291:2
**steph's** 253:24
**stephanie** 3:3 13:21,24 14:2 15:17 21:5 28:9 34:2 54:15 72:3 75:16,17,20 79:17 83:5,9,16 84:2,13,20 85:4 85:10,18 86:3,8 87:3,24 88:4,8 90:6,15 91:2,22 91:23 92:1,5,6 92:10,14,18,23 93:5 94:15,21

100:9,22 102:16 103:11 109:4,11,21 110:4,10,11 112:13 115:2 116:4 118:12 124:9,19,23 127:9 128:2,5,6 129:16 131:2 136:20 137:1 137:10,12,15 137:18,21,22 138:2,6,14,19 138:22 139:17 139:20 140:2 140:10,13,21 142:17 143:19 144:23 145:15 145:25 146:16 147:4,25 158:5 164:8,12 183:14,18 186:6,16,17 187:2 192:21 193:1,7,20 194:9,21 195:6 195:18 210:7 211:1 212:10 213:2,14 222:4 222:11 227:4,7 229:18 233:24 245:1,7,17,20 250:19,25 251:6 252:10 257:14,18,21 257:25 258:6 258:11 277:11 277:13,18 288:21 294:2,5 294:21,23 295:3 300:6,16 300:21 301:3

**stephanie's** 139:12

**sterling** 142:9 143:3,9

**steve** 7:4 8:4 9:20 22:18,20 22:22 41:13 42:15,22 43:11 43:14,15 48:13 55:22,25 79:24 278:4,12 279:2 279:5,11 281:16

**steve's** 47:4

**stick** 264:1

**sticking** 44:21

**stock** 41:20

**stoking** 314:4 314:15

**stop** 70:7 118:12,12 173:17 196:24 209:2

**stories** 49:14 134:18 154:20 169:1,11 170:4 220:1,9,12 238:15 269:8 269:13 270:10 272:25 273:2 273:17 275:1,9 285:14 307:1

**story** 43:16 92:23 95:15 108:7 155:16 157:13 160:1 161:10 163:14 175:13,17,25 176:11,19,22 176:23 178:4 199:4 217:8,17 217:25 218:19 219:20 220:5 220:23 259:16 260:3,10 282:18,22 283:6,18,23

**storylines** 233:18

**straight** 160:1

**straighten** 230:11

**strange** 129:9

**strasberg** 6:13

**strategy** 257:1 264:1,7,8 269:18 271:25

**street** 3:9 5:16 9:2,7 14:14

**stress** 126:23 129:22

**strike** 275:11 281:4

**strong** 83:1 246:5,13 311:25

**struggled** 78:22

**struggles** 305:14

**struggling** 93:19

**studies** 99:1

**studio** 41:3,5,5 49:9 289:22

**studios** 1:8,13 2:8,13 7:2 8:2 11:3 12:3 13:14 42:22 43:7 44:1 45:21,25 46:4,7 46:10,16,20,24 48:7,25 49:8 51:12 52:23 85:1,3,6,9,11 103:15 119:23 319:2

**stuff** 146:20 159:25 160:6 203:11 304:5 304:14,18,22 314:1

**subject** 21:24 22:2

**subscribe** 317:6
**subscribed** 317:12 319:22
**substance** 106:8 109:25 139:16,21 146:22 188:3 231:1 242:9 246:19,20 274:21 278:10 282:11
**success** 105:4 266:23
**sucking** 173:17
**sucks** 164:2 282:7 304:5,19
**sued** 56:19 90:1
**suffering** 305:22
**sufficiently** 236:9
**suggest** 265:17
**suggested** 110:17,21 268:7,20 276:18 285:12
**suggesting** 118:6 196:8,21 206:12 273:16 273:18 277:5
**suggestion** 265:11 266:1
**suicide** 304:24
**suite** 4:8 8:9 9:8
**sullivan** 3:5,16 13:21
**sum** 106:8 109:24 139:21 242:9 246:18 246:20 282:11
**summary** 47:1 147:8
**summer** 7:7 14:19 65:14
**sun** 84:9
**sunshine** 7:9 84:8
**supplements** 72:22
**support** 92:3 94:5 102:16 110:9 112:12 114:19 115:2 121:4 258:4 305:5 310:15
**supported** 296:10
**supporters** 310:15
**supportive** 85:23 87:6
**supposed** 17:13 205:10
**sure** 22:10 25:17 26:11 39:2 41:17 45:11 49:23 51:17 59:20 69:3 70:18,18 74:19 78:10 87:13 92:11 97:15 99:20 119:15,17 124:6 126:4,6,7 135:15 155:10 162:25 169:15 170:7 171:2 183:2 185:16 185:22 191:19 202:6 216:3,15 220:18 224:17 224:17,18,21 225:24 228:7 232:14 233:19 240:19 241:9 244:7 245:14 246:22 248:22 249:24 250:13 253:3,5,17,19 254:6 255:22 257:3 275:6 284:7 285:7 286:1 289:19 290:16 292:24 293:15 294:20 295:1 300:9 301:19 304:23 307:3 310:11
**surgery** 129:7,8 299:14,16,17 299:18
**surprise** 186:10 186:12 244:16
**surprised** 74:13 114:25 115:4 206:1 274:3 310:6
**surprising** 287:14 310:19
**surrounding** 115:20
**survivor** 262:19
**survivors** 257:10
**suspect** 158:20
**suspected** 158:19
**suspicion** 158:1 158:4,6,8
**swears** 157:21
**sweden** 235:8 244:15
**sweet** 52:19
**switch** 84:13
**sworn** 317:12 319:22
**system** 72:23 305:5

**t**

**tab** 106:14 115:6 162:9 166:19 228:8 229:12 231:4

**tackle** 278:20 279:10
**tactic** 208:14 208:16,19,22
**tactics** 139:22 139:23 147:7 160:23 209:7 209:14,23 210:7 211:1,10 212:1,9 213:2 213:14 214:20
**tag** 132:8 134:12,25 135:2 169:8,16 184:25 189:13 194:8 201:15 217:6,15 218:15 219:18 220:4,22 227:13 234:17 234:24 235:3,7 235:13 241:3 242:10 243:12 244:6 245:2,5,8 245:18,21 246:19 248:13 254:15,19 255:17,23,24 256:2,5,7,8,10 256:13,25 257:7,9,15,22 258:12 268:22 269:19 274:25 277:19
**tag's** 218:12
**tahler** 3:6 14:1 14:1
**taitelman** 7:5 14:20
**take** 17:12,16 28:21 44:2 67:12 79:9,15 79:20 80:3,14 80:22 91:3 101:15 116:18 123:21 124:5 124:22 129:19 131:23 139:6 141:20 142:1 196:16 197:21 198:3 237:19 254:4 284:24 293:13 304:25 306:1 312:17 313:20
**taken** 2:19 13:15 20:25 130:14 260:1 261:21 302:13 305:15 318:5 318:16
**talk** 36:5 69:9 150:4 154:1 170:6 193:24 198:6 215:13 224:19 243:11 244:6 247:15 282:20 293:24 294:1 306:7
**talked** 143:14 164:1 194:2 224:3 288:15 290:25 295:19 297:18 298:4,5 300:13 313:7
**talking** 35:21 117:8 133:17 160:11 166:24 167:8,14 169:2 174:7 177:5 179:4 180:23 181:1 186:16 197:11 220:17 224:11 227:4 233:3 234:24 235:17 242:3 242:10,16 254:13,17 258:5 262:19 271:17 277:11 277:12 278:11 285:16 298:24 300:5 304:22 308:20
**talks** 201:20 231:17
**tara** 289:8
**taught** 305:6
**tbh** 232:4
**team** 58:15 59:4,6,8,16 62:2,15 65:15 105:12 106:1 112:22 135:14 144:8 154:25 156:24 158:7 158:16,24 159:2,3,3,9 169:8,9,16 184:25 194:8 196:1 238:14 314:4,15
**teams** 168:21
**tears** 224:8
**tech** 60:4
**technical** 60:8
**technician** 13:8
**telegram** 27:21
**tell** 15:19 18:4 31:6 32:15 34:24 35:12 42:5 73:18 93:6 96:18 111:1 117:21 139:15 156:19 161:8,12,18,22 161:24 162:2 172:6 179:16 179:22 186:2 188:12 206:11 213:6,12 218:21,25 244:3 253:1 261:14 286:24 295:5

**telling** 38:7,10 38:12 49:13,16 52:1 71:25 91:2 92:4,13 108:18 122:1 131:1 139:20 147:4 164:2 202:2,3,12 221:10,19,24 248:25 249:4 252:23 262:11 299:10
**tells** 155:8
**ten** 73:23 197:22 198:1 293:16
**tended** 182:6
**tenets** 48:23 49:9
[redacted] 19:11
**tensions** 36:10 115:22
**tera** 41:24 42:17 137:23 138:1 139:13 141:17 145:15 145:25 146:20 146:22,25 147:5 229:8,19 230:25 249:16 249:18 252:8 289:20 290:17
**teresa** 65:14
**term** 113:18 303:13 311:21 312:10,16
**terminology** 304:14
**terms** 45:2,8 92:17 135:22 138:24 255:16 256:15 257:15 279:23
**terrible** 91:17 157:9 295:20
**terrified** 237:8
**terrorized** 296:2
**test** 17:14 44:10
**testified** 15:22 54:5 177:23 185:5,10 186:3 186:14,25 187:8 188:15 188:21 189:4 199:9 201:9,11 203:22 206:2 207:15 208:1 217:15,23 218:4 219:5 267:22 270:7 315:20
**testify** 214:7,14 214:18 215:2 216:11,17
**testifying** 16:16 20:13 278:5 285:21
**testimony** 15:6 16:8,12 256:1 266:25 318:8
**texas** 9:9
**text** 11:7,9,13 11:15,17,22,23 12:7,8,10,12,14 12:16,18,19,21 12:22 25:19 26:19,25 27:3 57:7,15 69:3,5 71:21,23 72:1,3 72:6,8,9,11,12 72:13,24 73:11 86:12 94:14,20 102:2,8,11,13 103:1 108:4 115:7 118:11 120:23 137:10 138:9,13 140:9 140:12,22 143:19 145:14 145:21,24 146:18 147:3 153:3,15 155:21 156:8 162:17 163:7 163:10,12,20 163:24 166:25 167:18 172:2 172:22,22 174:1 180:25 181:20 190:6 190:16,22 191:2,15 196:7 198:20 199:20 201:10,20 203:15 204:6 223:15,23 224:24,24 225:17 227:3 228:15 229:17 230:3,18 231:1 231:6,13 234:16,23 239:25 240:3,4 240:13 241:11 241:13 242:19 242:22 243:24 250:3 257:21 258:19,21 259:4,18 262:11 264:15 271:1 272:2 277:4,22 286:5
**texted** 67:17,19 68:9,13 69:6 110:11 137:25 175:20 243:14
**texting** 68:14 68:15,18,21 71:17 167:20 168:19 176:3 176:11 228:22 235:17 257:19 292:2

**texts** 25:14 26:12 67:20 69:2 75:10,11 75:12,14 116:9 164:19 167:21 167:25 178:3 192:5 194:8 200:3 224:10 235:21 257:24 258:10
**thank** 15:10 21:11 53:20 102:22 107:18 131:23 148:14 176:14 199:11 201:3 202:3 223:4,7,10 229:15 258:18 286:3 312:22 316:10,11
**thanks** 101:25 162:15 230:6 234:11
**themes** 49:12
**theories** 149:25 150:2 151:23 152:8,16,18,22
**therapist** 94:3
**therapy** 305:19 313:22
**theresa** 7:8 18:11
**thesis** 43:25 48:24
**thing** 40:1 69:19 90:9 104:10 149:21 183:15 195:23 197:9,11 201:5 209:1 272:7 274:9 288:11 288:12 297:7 297:10 313:6
**things** 24:3 43:4 49:10 51:23 53:2,4 59:17 71:24 73:3 95:14,15 98:9 100:25 114:14,15 116:21 125:25 128:5 162:1,2 194:10 212:20 221:19 222:2 224:12,22 228:22 232:1 236:24 237:6 238:12 253:13 260:11 261:4 262:14 264:9 266:18 272:18 284:3,10 286:18 295:17 295:18 299:21 306:11 309:11 309:12 312:21
**think** 19:10,12 22:14 24:1,24 24:24 25:1,7,9 26:4,7,9,9 28:22,22 29:1 29:20 32:6,7 35:6 38:23 40:9 41:11 42:19,23 45:7 45:14 46:25 47:5 48:23 50:3,14,15 51:1 51:15 52:15,24 53:7,8,11 54:5 54:19,22 55:23 58:7,7,14,21,22 60:1,3,5 61:7 68:2,11 71:16 75:6,9,13,24 77:7,7,9,16,18 78:1,2,3 83:2 86:1 90:19,20 91:10,20 92:2 92:18 93:21 95:9 96:25 97:20,24 99:3 99:15,18 103:20 104:5,8 104:18,20,21 108:10,14 110:5 111:24 113:5,8,8,12,22 114:4,14,18,22 115:5 120:17 125:17 126:10 126:16,23 127:23 129:4 130:1 133:24 134:1,3 137:20 138:8 141:19 141:25 143:11 146:24 147:22 149:13,13,15 150:14,17 153:4 156:22 158:14,22,25 160:8,20,23 164:6 165:2,4,8 165:10,19,20 165:24 166:13 166:15 167:12 168:15,19 169:25 171:17 177:10,23 179:1,3,12 182:3,8,9,13,18 182:18,19,21 183:8,15,15,22 183:22 184:24 189:15 200:9 201:13 204:10 208:25 213:18 217:2 219:18 220:12 221:14 223:25 225:19 227:19,21,22 229:2,4 231:21 236:1,3 237:2,2 239:3,11 242:25 243:23

244:22,23 247:2,25 248:24 251:12 251:13,23 252:13 253:8 256:6 257:2,17 258:8,20 260:14 261:15 261:20 262:6 264:8 265:6 268:16 269:3,6 271:17,18 273:24 275:13 279:4,16 280:15 281:2 282:25 283:4 284:10,20,21 287:15 288:12 289:10,11,13 290:20,21 292:7 293:2 296:1 297:14 297:18 299:9 299:21 302:19 303:3,9 304:15 306:21 308:1 308:13,18,19 309:22 313:2,3 313:13 314:20 316:1,8

**thinking** 46:11 58:22,25 59:2 111:22 180:7 182:1 287:12

**thinks** 164:2

**third** 1:11,12 2:11,12

**thirteen** 228:11 228:12

**thirty** 152:23

**thomas** 11:20

**thought** 22:6 43:10 53:3 70:2,6 92:5 111:17 117:14 136:1 150:12 150:15,22 161:13 171:2 181:21 232:8 236:22 248:12 262:21 270:16 276:3 292:24 297:2 308:15 309:1 311:20

**thoughts** 225:14

**thousand** 253:12

**thr** 160:14 177:8

**thread** 11:11 66:18 69:23 74:16 94:14,20 102:2,8,11,13 108:4 140:22 153:3,15 162:17 166:25 172:3 174:1 178:4 181:1,20 190:22 191:2 201:20 223:15 223:24 228:15 229:17 230:19 230:22 231:2,6 234:16,23 241:13 258:19 258:21 259:4 277:22 286:5

**threads** 27:11 69:20 70:9,14 70:15 71:1

**threat** 315:21

**threatened** 38:16 39:11 237:10

**threats** 270:8 315:22,22

**three** 18:8,17 18:22,25 28:14 41:19,22 45:13 68:1 82:18 83:7 126:13 171:11 207:7 215:24 290:3

**threw** 173:1

**thrilled** 242:7 242:20 243:8 243:19

**ties** 117:23 118:1,7,24 119:5 120:1

**tiktok** 271:10 272:18,21

**tim** 34:16

**time** 13:5,6 19:25 20:4 23:16,21 25:8 28:2,2 31:16 36:18 37:14 39:11 43:1 47:3 50:12 53:12,22,25 54:14 56:5,9,14 56:23 57:1,2,5 57:11,21 58:17 59:6,14 60:18 61:10 62:23 63:4 66:13,24 67:21 68:7 69:24 71:19 72:25 73:12,24 75:21 76:25 78:6 83:13,15 83:16 85:17 86:10,11,23 87:23 88:3,4,18 88:24 89:3,7,13 89:15 91:8 92:6,18,21 103:19 104:17 104:18,21 105:8,18 106:6 110:16,21 111:1,18 113:6 113:9 114:12

116:1,5,14 120:25 121:9 121:14 122:17 122:18 123:7 124:8,11,17,21 126:8,16 127:19,25 128:24 131:3 131:13 132:1,4 132:6,24 133:16 134:14 136:1 137:12 138:18 139:10 139:13 141:15 142:7,17 144:16 146:19 148:5 150:2 151:18 152:9 156:5 157:21 160:14,18 162:3 169:7,14 169:17 170:19 171:1 177:15 179:9 182:1 183:17 184:1 188:11 191:11 191:20 192:25 193:5,13,16 196:19 198:10 198:13 216:1 221:10 222:24 235:11 237:24 238:22 241:2 244:24 247:22 249:16,20 251:22 253:20 254:1,8,11,16 255:1,20 256:21 261:6 261:12,19 262:13 264:10 265:2 266:16 272:2 273:6 284:3,22 285:3 291:2 292:23 293:19,22,25 295:24 298:4 310:7,8 315:8 316:14 318:6,7 318:10

**timeline** 118:16

**times** 26:7 27:7 28:11,13,16 39:23 50:3 54:13 55:5,8 77:6 78:19 86:7 88:22,23 89:2,15 90:14 100:19 125:23 151:8 194:20 195:5 244:24 259:6,7,11,15 259:21 260:1 260:15,17,24 261:1 273:9 309:8

**tinker** 280:21

**tinkering** 280:18

**tiny** 307:7

**titans** 270:14

**titled** 11:19

**titles** 46:6

**today** 13:6 15:20,23 16:4,7 16:12,16 17:8 18:5,21 20:13 107:20 121:24 204:11 212:8 213:11 260:13 261:1 284:20 312:22

**today's** 316:13

**todd** 31:3,4 33:14,15,16

**together** 22:21 23:18 24:17,17 24:20 25:11 44:7 83:20 193:21 200:17 200:23 225:5 261:4 273:5 292:6 296:7

**told** 38:3 39:17 39:22 40:4,5,7 49:3,14 52:20 54:20 93:7 109:23 110:20 111:6 118:11 118:17 133:20 138:1 147:2 161:13 169:6 175:8,10,11 177:20,24 185:9 187:16 207:24 208:10 208:12 218:3 238:16,16 239:5 242:2 252:24 254:3 259:6 270:10 276:9 292:14 297:6 314:11

**tomorrow** 107:20

**took** 42:13 87:11 115:18 159:25 160:6 237:22 305:24 312:12

**top** 75:24 94:23 103:1 140:22 155:8 192:4 203:14 245:24 286:14

**topic** 108:7 115:21 155:23 274:22

**topics** 302:21

**totally** 65:13

**touch** 220:10

**tough** 96:2,24 97:21 98:1,10 98:15,16,24 99:3,11,13

100:11,13,18 247:8
**toughly** 247:16
**towards** 110:4 193:6
**toxic** 152:12 302:25 303:2,6 303:10,17,20 304:1
**traditional** 116:17
**trainer** 73:8,9 167:15 297:1,5
**training** 49:21 49:22,24 50:2,4 50:7,13,15
**transcribed** 318:12
**transcript** 21:19 317:3,6 318:13,16
**transcripts** 21:16
**transition** 233:10
**trauma** 78:11 78:12,14 305:6
**treated** 105:25
**treats** 186:19
**trial** 149:2 180:17
**tricky** 78:2
**tried** 72:20 76:2 160:18 202:14 263:2
**trouble** 155:18
**troupson** 7:8
**truce** 167:22 168:20,24 169:4,20 219:5 219:9,14,21,25 220:6,9,10,14 220:18,24
**true** 103:22 105:8,18 162:1 164:6 221:22 222:3,10 259:23 260:16 261:2,10,15 269:8 310:5 318:15,21
**truly** 76:21 103:20 183:25
**trust** 103:13 104:14 123:6 159:23 160:10 198:5 226:23 244:21
**trusted** 92:6 113:7 147:1 195:25 226:22
**trusting** 105:15
**truth** 15:8,8,8 48:20 52:2 71:25 73:1,6,13 104:6,13 131:1 134:19 202:13 219:25 265:10 265:15 266:12 266:24 296:21
**truthful** 16:8 16:12
**try** 16:24 17:3 21:3 32:21 117:15 157:6,7 184:7,12 191:12 196:10 222:18 239:6 254:16 256:22 302:7 304:9
**trying** 17:1 35:5 67:6 93:10 97:1 100:13 144:23 156:22 159:18 164:3 169:15 183:10,23 196:17 199:3 236:4,5 238:18 244:16 288:4 292:3 302:9 306:25
**ttropson** 7:15
**turn** 102:24 162:22 239:15 245:23
**turned** 221:21
**turns** 222:2
**tv** 84:3 233:18
**tweets** 187:9
**two** 19:19,19 28:13,21,23 34:20 37:5 41:19,22 48:3 54:13 55:5,7 73:19 94:25 95:19,20 124:4 168:21 185:18 185:21 200:3 202:19 209:13 209:21 254:3 260:22,23 299:14
**type** 147:7 160:21 183:8 256:25 277:18
**types** 44:1 95:13 306:11

**u**

**uh** 43:8 54:4 67:18 83:23 85:5 88:6 94:19 102:7,10 103:8,17 106:23 107:3 145:16 148:21 153:6 154:7 155:20 162:21 163:4 167:24 173:3 178:6 185:15 192:8 198:19 203:20 204:14 222:14 225:1 230:2 232:6 239:20

240:12 242:24 243:1 246:2,17 247:5,10 258:23 259:12 269:21 311:16
**ultimate** 263:9
**ultimately** 91:17 106:9 109:14 110:12 132:19 203:7 255:24
**unable** 55:1 76:12
**unavailable** 292:22
**unaware** 37:13 151:1,4 186:22 187:5 268:3,4,6 277:20
**uncomfortable** 35:23 96:17,22 108:19,24 109:17 302:22
**unconscious** 302:12
**undefine** 301:25
**under** 16:3 97:3 128:4 142:10 185:24 186:4,15,25 187:8 188:15 188:22 207:15 208:1 213:11 214:7,19 217:23 267:22 271:1 318:7,20 318:20
**underlie** 28:18
**underlying** 29:22,23
**underscore** 277:24
**understand** 16:3,9 17:22 18:1 28:15 54:18 61:2 62:22 66:2 97:12 100:1 128:22 129:14 130:1,7 135:2 147:3 151:11 151:13,22 154:19 156:23 156:24 168:23 170:16 174:21 175:16 180:14 192:9 196:7 210:20 214:5 224:15 237:13 239:13 243:12 250:2 262:8 272:4,10,17 285:5 289:15 289:17 302:9 312:10
**understanding** 37:12,17 38:11 38:14 39:6,10 39:13 42:1 58:17,22 59:5 59:11,14,23 61:22 63:11,22 134:15,17,20 135:16,21 137:3 138:5 146:17 155:21 160:5,13,17 168:13 170:8 192:24 193:5 193:12 210:5 211:9,17,24 217:5 219:4,9 219:13 220:9 220:10 256:4,8 256:10,13 258:9 259:25 261:24 262:2 262:12 264:5 265:14 274:20 292:18 312:11 313:19
**understands** 60:4
**understood** 17:11 18:1 19:23 53:19 62:13,20 66:5 88:20 110:5,8 159:17 164:15 169:3,7,16,18 169:22 170:2 170:24
**unfair** 101:10
**unfollowed** 151:25 152:10
**unfollowing** 150:5
**unfortunately** 44:20 50:18 309:10
**unhappy** 221:18
**unique** 166:1,7
**united** 1:1 2:1
**universal** 49:12
**unlikable** 225:7
**unnecessary** 131:7
**unrealistic** 225:7
**unsound** 125:17
**unsure** 42:17 285:10
**untrue** 107:11 107:14 134:18 169:1 259:23 260:12,16,19 260:21,22 261:2,5,10,15
**unwanted** 202:24
**unwarranted** 128:23

**unworthiness** 305:25
**update** 295:8
**updated** 254:25
**updating** 222:25
**upset** 93:8 128:18 149:5 294:10
**urg** 205:7
**urgency** 299:24
**urquhart** 3:5 3:16 13:21
**use** 27:2,5,9,13 27:21 54:2,23 97:4 146:9 147:12,18 196:9,22 261:6 262:9 279:13 283:19 288:13 303:2,12,13 304:15 306:25 312:2,7
**used** 27:17 54:6 97:5,8,9,10 99:4,23 100:4,6 100:8 147:7 150:18 153:12 164:17 195:22 231:22 262:22 262:23 297:13 305:7
**useful** 153:14
**uses** 139:22
**using** 64:18 65:7 66:14,23 96:3 98:23 130:10 262:18 303:7 304:14
**usually** 247:16
**utmost** 106:1

**v**

**v** 11:3 12:3 13:14 319:2
**vacation** 258:8
**vague** 32:2,4,23
**vaguely** 94:22 138:8 145:23 235:20 259:5 287:8
**various** 26:10 27:11 134:23 266:18
**vent** 100:10
**venting** 156:16
**veritext** 9:23 13:8 319:1
**version** 116:11 254:22 255:4 255:12
**versions** 255:8
**versus** 257:4 288:20 290:10
**veteran** 11:19 148:18
**victim** 246:14 246:21
**victims** 207:17 312:15
**video** 1:20 2:18 13:8,12
**videographer** 9:25 13:4 53:21,24 131:25 132:3 198:9,12 223:5 254:7,10 293:18,21 310:8,9
**view** 43:12 92:18 101:9 164:22 171:14 181:20 284:22 285:12
**viewed** 288:21
**views** 136:20
**violated** 275:10
**violence** 262:19
**virgin** 84:4
**vis** 169:17,17
**visit** 294:6
**visualize** 54:17
**voice** 25:14 27:23 67:24 200:11 201:5 201:18,19
**voicemail** 91:1
**voices** 257:10
**vs** 1:7,11,14 2:7 2:11,14
**vulnerability** 306:9
**vulnerable** 76:19,22

**w**

**waist** 45:14
**wait** 17:1,3,15 18:21 195:22 197:24
**wake** 68:22
**walk** 155:2 247:3
**walked** 246:6 252:2
**walker** 9:4 14:14
**walks** 79:7
**wallace** 9:2 14:14 56:1 57:8,24 58:1,3 58:10 59:8,15 61:23 62:1,5,13 144:17,20 187:1 188:23 189:17 190:8 201:9,20 203:22 204:15 204:25 205:19 206:3,13,19 207:16 208:2 210:6,17,25

211:10,25 212:9 213:1,13 214:20 216:21 314:20 315:12 315:16
**wallace's** 187:10
**want** 35:1 53:5 53:15 54:2 67:12 68:7 69:9,23 74:4 96:17 98:18,19 109:24 112:2 114:16,23 123:21 129:12 139:24 141:15 144:8 146:4,25 150:20 155:2,4 162:10 164:5 171:5 185:13 185:20 191:12 191:15 195:25 209:5 211:15 215:23 224:13 228:3 229:5 266:4,11 276:14 286:7 291:10 293:24 294:1 297:15 302:4 304:5,19 305:19 306:12 310:25 313:11 313:16
**wanted** 35:20 43:9,12 49:7,8 52:18 82:5 108:23 123:1,4 162:2 163:1 206:11,22 236:12 238:22 239:4 253:19 257:8,9,11,11 258:2 262:22 273:7 282:20 300:23 303:15 304:3 313:4
**wants** 164:4 199:14,24
**wardrobe** 297:13,19,20
**warn** 144:23 183:10 229:7
**warned** 137:18 137:23 138:2 140:14 183:11
**warning** 138:6 160:23 161:3 164:8 183:18
**warnings** 148:1
**warns** 145:25
**warren** 11:11 106:10,22,22 107:5,10,16,24 110:18,23 120:25 121:2,5
**washington** 5:18
**waste** 215:23 215:25 216:1
**watching** 233:17
**water** 17:18
**wavelength** 16:2
**way** 49:7,11 64:7 77:17 97:5 98:4,11 100:5,5 101:9 105:2 120:18 126:8 129:4,14 137:21 150:19 150:21 158:22 163:24 170:11 193:17 194:15 214:14 216:17 217:12 226:10 226:13 227:4 232:17 250:4 253:22 255:8 268:13 282:16 285:12 287:18 297:12 299:22 300:11 302:20 313:5 314:14
**wayfarer** 1:8 1:13 2:8,13 7:2 8:2 11:3 12:3 13:14 14:17,21 14:23 15:3 37:16 41:6,9,16 42:3,7,10,11,22 43:7,13 44:1,9 44:22 45:2,9,21 45:23,25 46:3,7 46:10,16,19,23 47:11,14,18,25 48:7,24 49:8 51:11 52:22 62:11 68:6 71:18 85:1,3,6 85:9,11 89:18 103:14 117:22 118:1,7,24 119:5,23 120:1 131:17 132:7 135:17 136:20 140:1 147:20 147:24 185:3 227:12 233:4 233:10,23 239:1 256:1,7 256:14 257:15 257:22 258:10 258:12 263:14 277:17 289:21 292:15 293:9 319:2
**wayfarer's** 47:8 89:9 293:3
**we've** 25:2 34:18 35:8 37:5 300:5
**weapon** 146:9 147:18

**weaponized** 305:8
**web** 116:11 312:13
**weber** 6:12
**website** 127:21 186:6,17 187:2 188:14,24 189:8,20 201:22 202:12 203:8 206:4 207:17 209:2
**websites** 127:7 128:3 206:20 208:15 216:22
**week** 18:9,17 18:22,23,25 254:3 291:21 299:14
**weekend** 67:24
**weeks** 142:14
**weigh** 297:2
**weight** 297:6 298:19
**weird** 109:2 114:18,22 158:18 313:5
**went** 49:22 50:1 129:8 147:24 253:22 297:5
**west** 7:11
**whatsapp** 27:9 27:11
**wheeler** 51:25
**whoa** 251:20
**wi** 223:2
**wife** 22:11 175:10 244:14
**wife's** 235:8
**william** 39:21 288:13
**willing** 95:11 214:6
**willkie** 2:21 5:4 5:12 6:4 14:4,9 14:12
**willkie.com** 5:9 5:19,20 6:9
**wilson** 188:25 189:9 190:3,10 199:10 206:5
**win** 120:11
**wineland** 76:7
**winner** 120:6 120:14
**winning** 120:9
**wires** 173:7
**wish** 73:18 82:3 82:3 83:24 181:17 205:7 222:3,9,10 280:21
**withdraw** 110:18 111:10 111:18
**witness** 8:14 10:2 15:9 20:9 25:25 29:1 30:1,12,20 31:11 33:5,18 53:13 56:18 57:18 58:21 59:20 60:11,25 61:7,17 62:5,8 62:11,19,25 63:15 64:5,15 64:23 65:12,24 66:20 67:7,23 68:1,25 70:2,18 74:8,13 75:19 78:19 80:18,20 80:25 81:12,24 82:10,25 85:21 87:21 88:10,17 93:14 97:14,20 98:7,18 99:15 99:20 101:2,25 102:22 104:1,8 106:16,18 111:3,13,22 112:16 113:5 113:15,21 114:4,11,22 118:10 119:2,8 121:17,22 122:1,7,22 123:3,23 124:1 124:6,14 125:1 125:21 126:21 127:2,11 128:9 128:16 129:1 130:1,17,22 131:11,21 133:10 136:15 137:6,9,15 139:3 141:11 141:23 142:4 142:13,21 144:19 145:1,7 145:12 147:16 148:3,14 149:13 151:1,7 151:20 152:2,6 152:15,20 154:15 156:22 161:2,16 162:5 162:10,15 163:16 164:11 165:2 166:4,20 167:4,12 168:18 171:12 171:23 172:8 174:11,16,19 174:25 177:17 177:23 179:3 179:11,18,24 180:6,22 181:4 181:25 182:8 182:18,23 183:2,13 184:7 184:12,17 186:8,12,22 187:5,14,18,25 188:18 189:3 189:24 190:13

190:19 191:6 193:10,16,23 194:12,17 195:8 196:14 196:17 197:2 197:18 202:3 206:8,16 207:2 207:12,21 208:10,19,25 209:10,17 210:1,10,15,20 211:5,21 212:14,20 213:6,18,24 214:13,24 216:15 217:2 217:10,20 218:8,15,24 219:16,23 221:6,13,21 222:8,22 223:8 223:20 225:24 226:8,18,25 227:17,21 228:3,25 229:4 229:13,15 230:22 232:11 232:23 233:14 234:5,11 238:4 239:3 242:12 245:13 248:17 248:24 250:10 252:13 255:11 255:19 258:17 259:25 262:25 266:7 267:5 268:3,13,18 269:1,6 270:2 273:4,24 274:9 275:5,13,22 279:4,16 280:3 280:21 281:24 283:9,14,22 284:7,16 286:2 286:12 288:11 290:6,13 291:16,24 292:12 294:17 298:22 308:10 308:15 310:5 310:12 312:4 313:13 314:10 314:25 315:10 316:10 318:7,8

**witnessed** 105:24

**witnesses** 28:17

**witnesses'** 319:3

**wme** 37:24,24 38:22 39:1,3

**woke** 167:20

**wolves** 173:1 173:13

**woman** 99:3 142:8 184:20 188:24 298:18

**women** 78:1,3 78:3,4,9 97:5,9 202:25 207:9 234:23 264:22 265:19,21,24 267:3,6,7,11,13 267:15 268:11 268:22,24 273:1,17 297:17 305:1,8 306:3,15,20 307:8,11,15,21 307:22 308:8 308:19 311:13 311:24 312:17 313:21,22

**won** 120:19

**wondered** 158:16

**wonderful** 291:7

**wondering** 315:4

**word** 99:23 100:1 114:23 116:18 134:4 138:11 179:12 261:20 262:9 262:19 265:7 266:15,19 267:1 284:25 297:13 303:12 311:25 312:7

**words** 40:24 86:16,19 93:8 93:11 96:3 97:4,8 110:3 130:10 264:1 265:22 272:4 282:17,25 283:19 297:16 301:16 304:16

**work** 24:17,25 33:21 37:16 48:9 49:3 52:18 58:19 75:16 76:8,17 76:18,22 77:4,8 77:12,16,19,20 77:22,25 78:3 79:10,16 81:4 82:21,23 85:7 85:19 86:1 87:9 89:12 105:13 125:15 142:7 143:8,25 146:1,2 155:17 182:6 192:20 193:8 195:17 210:13 269:24 270:2 288:17 291:19 292:5 298:3 306:17 313:18

**worked** 18:8 85:10 118:20 134:23 182:15

184:20,24 186:25 188:22 206:2 207:16 276:21
**worker** 105:1
**working** 24:16 24:19 48:6,8 62:13 73:15 83:9,17,20 84:2 84:14,19 85:1 85:18 86:10,11 86:23 87:1,23 88:3 102:13 112:1 185:2 193:1,21 196:2 196:25 236:21 291:13
**works** 143:23 144:10,17 201:15 210:15
**world** 43:11 55:25 202:13 203:2 272:3 305:4 313:21
**world's** 202:17
**worried** 125:14 125:18 149:8 161:3 167:21 168:12 196:2 259:18
**worry** 296:13
**worth** 49:15 86:15 158:25
**would've** 206:10
**write** 78:24 82:12 94:4,23 96:7 97:24 98:14 99:10,12 103:9 105:10 105:20 153:24 186:5 190:9 241:16,19,20 275:19 281:8 282:4
**writer** 276:20 277:2 278:19 278:24 279:9 280:7,9,17 282:7
**writers** 275:10
**writes** 95:24 120:5,6 144:6 176:25 198:21 199:1,12,22 200:7,15 201:1 203:24 205:6 205:13 225:2 231:24 246:11 247:11 248:4 286:14
**writing** 82:7 94:24 159:7 303:24
**written** 98:21 123:6 127:5 128:13 151:8 296:6
**wrong** 36:19 70:8 172:11 292:14 304:14
**wrongdoings** 202:19
**wrote** 97:9 99:25 103:19 122:8 167:18 175:25 187:8 276:10 280:7 280:12 303:9

**x**

**x** 187:10

**y**

**yeah** 18:3,12 22:14,24 27:4 27:14,24 29:15 31:5 42:23 47:6 49:1 56:9 57:4 61:17 63:19 64:25 65:15,24 66:5 66:10 67:8 70:6,18 73:20 80:9 85:8,13,15 85:25,25 86:24 87:4,7,16,21 89:6 90:5,10,23 92:8,16,20 100:16 103:20 104:23 109:19 112:23 113:8 116:20,25 117:8 118:18 121:6 123:8 124:20 125:1 130:11 137:21 141:6,23 142:4 150:14 151:9 157:10 161:7 170:8,8 182:18 182:19 193:17 215:14 221:22 226:18 233:21 236:12 237:18 239:11 243:9 253:5 280:10 293:17 296:12 296:22,22 304:18 307:13 313:24
**year** 48:9,9 51:15 82:16 83:6,12,14 93:1 129:18 173:23 222:12 262:20
**yearly** 304:25
**years** 19:25 24:15,15 42:8 48:10,11 76:20 77:10 82:18 83:7,21 86:7,9 86:25 126:3,13 126:13 129:8 226:21 236:22 276:21 288:15

288:15 291:8 301:22
**york** 1:2 2:2 3:21,21 6:8,8 8:21,21 29:18 33:22 55:5,8 151:8 259:6,7 259:11,15,21 260:1,14,17,24 261:1 319:1
**young** 202:25 313:17

**z**

**zach** 9:23
**zero** 240:9
**zeroes** 94:17 102:5 107:1 115:10 140:11 145:18 162:20 172:5 190:23 223:17 228:17 229:20 231:8 234:18 258:25 277:25
**zeros** 153:8
**zoe** 204:20
**zoom** 6:5,13 7:8 7:9 9:20,21,22 9:24 19:4 20:23 21:4 172:25 184:23 185:22
**zooms** 28:6,12 28:16

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**CONFIDENTIAL**
VOLUME II
VIDEO-RECORDED DEPOSITION OF JUSTIN BALDONI
Los Angeles, California
Tuesday, October 7, 2025

Stenographically Reported by: Ashley Soevyn,
CALIFORNIA CSR No. 12019

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---0O0---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

**CONFIDENTIAL**

Video-recorded Deposition of JUSTIN BALDONI, taken on behalf of the Plaintiff Blake Lively, Pursuant to Notice, at the offices of Willkie Farr & Gallagher, 2029 Century Park East, Los Angeles, California beginning at 9:11 a.m. and ending at 7:29 p.m. on Tuesday, October 7, 2025, before me, ASHLEY SOEVYN, California Certified Shorthand Reporter No. 12019.



A P P E A R A N C E S:

For the Plaintiffs Stephanie Jones and Jonesworks LLC:

QUINN EMANUEL URQUHART & SULLIVAN
BY: KRISTIN TAHLER
BY: LAURENNE M. BABAYAN
Attorneys at Law
865 S. Figueroa Street
8th Floor
Los Angeles, California 90017
kristintahler@quinnemanuel.com
laurennebabayan@quinnemanuel.com
(212) 849-7000

-AND-

QUINN EMANUEL URQUHART & SULLIVAN
BY: MAAREN A. SHAH
Attorney at Law
51 Madison Avenue
22nd Floor
New York, New York 10010
maarenshah@quinnemanuel.com
(212) 849-7000



A P P E A R A N C E S:

For the Plaintiff Blake Lively:

MANATT PHELPS & PHILLIPS LLP
BY: STEPHANIE ROESER
BY: ESRA HUDSON
Attorneys at Law
2049 Century Park East
Suite 1700
Los Angeles, California 90067
sroeser@manatt.com
ehudson@manatt.com
(310) 312-4207



A P P E A R A N C E S:

For the Plaintiff Blake Lively:

WILLKIE FARR & GALLAGHER
BY: MICHAEL GOTTLIEB
Attorney at Law
2029 Century Park East
Los Angeles, California 90067
mgottlieb@willkie.com
(310) 855-3000

-AND-

WILLKIE FARR & GALLAGHER
BY: MICHAELA CONNOLLY
BY: KRISTIN BENDER
BY: JULIET DALE (Via Zoom)
Attorneys at Law
1875 K Street
Northwest
Washington, D.C. 20006
mconnolly@willkie.com
kbender@willkie.com
jdale@willkie.com
(202) 303-1245

CONFIDENTIAL

Page 6

A P P E A R A N C E S:

For the Plaintiff Blake Lively:
WILLKIE FARR & GALLAGHER
BY: AARON E. NATHAN (VIA ZOOM)
Attorney at Law
787 Seventh Avenue
New York, New York 10019
anathan@willkie.com
(212) 728-8000
-AND-
SLOANE OFFER WEBER AND DERN
BY: LINDSEY STRASBERG (VIA ZOOM)
Attorney at Law
10100 Santa Monica Blvd., Ste. 750
Los Angeles, California 90067
(310) 248-5100

Page 7

A P P E A R A N C E S:
For the Defendants Wayfarer Studios LLC, Jennifer Abel, Melissa Nathan and Justin Baldoni, Jamey Heath and Steve Sarowitz:
LINER FREEDMAN TAITELMAN+COOLEY
BY: BRYAN FREEDMAN
BY: SUMMER BENSON
BY: THERESA TROUPSON (VIA ZOOM)
BY: JASON SUNSHINE (VIA ZOOM)
Attorneys at Law
1801 Century Park West, 5th Floor
Los Angeles, California 90067
bfreedman@lftcllp.com
sbenson@lftcllp.com
ttroupson@lftcllp.com
jsunshine@lfcllp.com
(310) 201-0005

Page 8

A P P E A R A N C E S:
For the Defendants Wayfarer Studios LLC, Jennifer Abel, Melissa Nathan and Justin Baldoni, Jamey Heath and Steve Sarowitz:
AHOURAIAN LAW
BY: MITRA AHOURAIAN
Attorney at Law
2029 Century Park East
Suite 400
Los Angeles, California 90067
mitra@ahouraianlaw.com
(310) 376-7878
For the Witness Justin Baldoni:
SHAPIRO ARATO BACH
BY: ALEXANDRA SHAPIRO
BY: JONATHAN P. BACH
BY: ALICE BUTTRICK
Attorneys at Law
1140 Avenue of the Americas
17th Floor
New York, New York 10036
ashapiro@shapiroarato.com
jbach@shapiroarato.com
abuttrick@shapiroarato.com
(212) 257-4880

Page 9

A P P E A R A N C E S:

For the Defendants Jed Wallace and Street Relations, Inc.:

JACKSON WALKER LLP
BY: JOEL R. GLOVER
Attorney at Law
1401 McKinney Street
Suite 1900
Houston, Texas 77010
jglover@jw.com
(713) 752-4226



Z O O M A P P E A R A N C E S:

Blake Lively
Melissa Nathan
Zach Czerenda, Veritext Legal Solutions Concierge
(Via Zoom)
Laura Prather, Esq.

Also Present in the deposition room:
Steve Sarowitz
Jennifer Abel
Jamey Heath
Jonathan Hernandez, Videographer



INDEX TO EXAMINATION

WITNESS: JUSTIN BALDONI


| EXAMINATION BY: | PAGE |
|---|---|
| MR. GOTTLIEB | 18 |

WITNESS INSTRUCTION NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 29 | 8 |




INDEX TO EXHIBITS

JUSTIN BALDONI

BLAKE LIVELY V. WAYFARER STUDIOS LLC, ET AL.

Tuesday, October 7, 2025

Ashley Soevyn, CSR No. 12019


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 20 | Text messages dated 2/26/2024; Bates No. WAYFARER_139046 - 139076 | 45 |
| Exhibit 21 | Text messages dated 9/27/2024; Bates No. HEATH_31887 - 31889 | 90 |
| Exhibit 22 | Text messages date range: 6/15/2024; Bates No. SPE_BL2193 - 2197 | 134 |
| Exhibit 23 | Email thread dated 12/23/22 from Jamey Heath to Justin; Bates No. BALDONI_26086 - 26090 | 152 |
| Exhibit 24 | Email dated 3/28/23 from Alex Saks to Jamey Heath among others; Bates No. BALDONI_30723 | 158 |
| Exhibit 25 | Email thread dated 4/10/23 to Justin Baldoni subject: IEWU Official Clean White Production Draft a/o 4.5.23; Bates No. BALDONI_3641 - 3759 | 163 |
| Exhibit 26 | Text messages dated 5/30/2023; Bates No. BALDONI_31947 - 31950 | 186 |
| Exhibit 27 | Text message date range: 5/27/23; Bates No. JS224 - 225 | 196 |
| Exhibit 28 | Text messages date range: 6/24/2024; Bates No. JONESWORKS_13502 - 13503 | 207 |

CONFIDENTIAL

Page 14

INDEX TO EXHIBITS
JUSTIN BALDONI
BLAKE LIVELY V. WAYFARER STUDIOS LLC, ET AL.
Tuesday, October 7, 2025
Ashley Soevyn, CSR No. 12019

| EXHIBIT NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 29 | Team JB Social Media text message dated 8/5/2024; Bates No. TOSCOVIC_89 - 103 | 217 |
| Exhibit 30 | Text messages date range: 6/1/2023; Bates No. SPE_BL2026 - 2035 | 232 |
| Exhibit 31 | Text messages dated 11/10/2023; Bates No. BALDONI_16447 - 16452 | 241 |
| Exhibit 32 | Text messages dated 11/12/2023; Bates No. BALDONI_26193 - 26198 | 255 |
| Exhibit 33 | Document titled BL-38461 - 38462 | 266 |
| Exhibit 34 | Prayers and Support text messages dated 1/5/2024; Bates No. BALDONI_26204 - 26206 | 269 |
| Exhibit 35 | Text messages dated 2/23/2024; Bates No. BALDONI_18852 - 18858 | 274 |
| Exhibit 36 | Text messages dated 4/27/2024; Bates No. BALDONI_33560 - 33566 | 287 |
| Exhibit 37 | Email thread dated 2/20/23 from Justin Baldoni to Alex Saks among others; Bates No. SPE_BL5563 - 5564 | 293 |
| Exhibit 38 | PR Thread w Tag text messages dated 8/2/24; Bates No. NATHAN_5497 - 5506 | 311 |

Page 15

INDEX TO EXHIBITS
JUSTIN BALDONI
BLAKE LIVELY V. WAYFARER STUDIOS LLC, ET AL.
Tuesday, October 7, 2025
Ashley Soevyn, CSR No. 12019

| EXHIBIT NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 39 | Text messages dated 8/15/2024; Bates No. BALDONI_15407 - 15409 | 334 |

Page 16

***CONFIDENTIAL DEPOSITION PROCEEDINGS***
TUESDAY, OCTOBER 8, 2025
---O0O---

THE VIDEOGRAPHER: Good morning. We're on the record. The time is 9:11 a.m. Pacific Daylight Time. Today is October 7th, 2025.

My name is Jonathan Hernandez. I'm a video technician with Veritext Legal Solutions located in Los Angeles, California.

We are recording these proceedings at 2029 Century Park East, Los Angeles, California. This is the video deposition of Justin Baldoni in the action entitled Blake Lively v. Wayfarer Studios LLC. This deposition is being taken on behalf of the plaintiff. The Case No. is 24-CV-10049.

Now, would you all please identify yourselves and who you represent, starting with the noticing attorney.

MR. GOTTLIEB: Good morning. Mike Gottlieb from Willkie Farr & Gallagher on behalf of the Plaintiff, Blake Lively.

MS. CONNOLLY: Michaela Connolly from Willkie Farr & Gallagher on behalf of Blake Lively.

MS. HUDSON: Esra Hudson of Manatt, Phelps & Phillips on behalf of Plaintiff, Blake

Page 17

Lively.

MS. BENDER: Kristin Bender, Willkie Farr & Gallagher on behalf of Blake Lively.

MS. ROESER: Stephanie Roeser, Manatt Phelps & Phillips also on behalf of Plaintiff, Blake Lively.

MS. TAHLER: Kristin Tahler, Quinn Emanuel on behalf of Stephanie Jones and Jonesworks.

MS. BABAYAN: Laurenne Babayan, Quinn Emanuel on behalf of Stephanie Jones and Jonesworks.

MR. GLOVER: Joel Glover of Jackson Walker for Jed Wallace and Street Relations, Inc.

MS. BENSON: Summer Benson of Liner Freedman Taitelman & Cooley on behalf of the Wayfarer parties.

MR. BACH: Jonathan Bach, Shapiro Arato Bach on behalf of the Wayfarer parties and the deponent, Justin Baldoni.

MS. SHAPIRO: Alexandra Shapiro, Shapiro Arato Bach, on behalf of Mr. Baldoni and the Wayfarer parties.

And I just want to note for the record that we are designating this deposition confidential pursuant to the protective order.

MR. FREEDMAN: Bryan Freedman on behalf

of the Wayfarer and related parties and Mitra Ahouraian is also present representing the Wayfarer parties.

THE VIDEOGRAPHER: Thank you. Now will the court reporter please introduce yourself and administer the oath to the witness, and then counsel may begin.

THE STENOGRAPHIC REPORTER: Good morning, everybody. I'm Ashley Soevyn, California Steno Reporter 12019.

And can I please have you raise your right hand?

Do you solemnly state that the testimony you're about to give in this deposition will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE STENOGRAPHIC REPORTER: Great. Thank you.

EXAMINATION

BY MR. GOTTLIEB:

Q Good morning, Mr. Baldoni.
A Good morning.
Q Have you ever been sexually harassed?
A Yes.
Q When?



A That I have reported or just in my life?
Q Let's start with when -- ones you've talked about. Times you've talked about.
A Harassed -- I -- I believe I spoke about a time when I was in the Burke Williams spa in West Hollywood. And I was in the hot tub waiting for a massage, and I had my shorts on, my bathing suit shorts on. And there was a gentleman that was in -- that was like multiple hot tubs, and he was in another hot tub, and I saw him look at me. Which I was used to, looks and things.

And then he joined me in my hot tub. And he started to share he was a producer or a manager. And then he tried to get me to take my bathing suit off because he said that all the other actors and celebrities go in the hot tub naked. I said I wasn't comfortable with that. So I jumped in the other hot tub.

And then he followed me into that hot tub, and he was nude. And he walked -- I was sitting in the hot tub, and he walked right up to me fully nude, and then he sat in the hot tub with me and he continued to try to get me to take off my bathing suit, and I left.
Q And I think you told this story in an



interview with Glamour magazine; is that right?
A I don't know which magazine it was. I remember talking about it only once, and it was right after a speech that I gave.
Q Okay. After that TED talk that you gave?
A Yes, at TEDWomen.
Q Do you recall being asked the question prompting that answer: Did you ever feel like you were harassed or victimized on set?
A I don't remember that.
Q Okay. But as you sit here today, this is the first example that you have brought up in response to my question of whether you've ever been sexually harassed?
A That's the first response that -- I think you asked me if I've talked about it publicly.
Q Okay.
A Yeah.
Q Why did you feel harassed by what this producer did?
A Well, he was asking me to get naked in the hot tub with him and standing very close to me with his naked genitals, like intentionally walking close to my face. It was just him and I in there. And he was using -- like, he was using the idea that



he's a successful manager to try to get me to do something I didn't want to do. And it was very sexual.
Q It made you uncomfortable?
A You could say that. Yeah.
Q And you told him that you didn't want him to do that?
A Yes.
Q And then he did it again?
A Yes.
Q And then you left?
A Yes.
Q Why did you perceive this person to have power? Or how did he seem powerful to you?
A He said -- he said that he was powerful. I don't think I felt that he was powerful necessarily, but he was claiming he knew all these A-list stars. And he would say things like Clooney is in here all the time without his shorts on. And, you know, referring to, you know -- I don't know. I was -- I was maybe 25 and, yeah. He was older, much older.
Q Did he touch you?
A No.
Q Did he threaten you?

A No.
Q So he didn't assault you?
A I wouldn't call it assault. I don't believe I characterized it as assault.
Q I didn't say you did, sir.
A Yeah.
Q You were bigger and stronger than this guy, right?
A I would imagine I was.
Q This wasn't someone the size of Dwayne Johnson or The Rock or something like that?
A It was not.
Q So if it had come to it, you probably could have knocked the guy out?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not much of a fighter. I would have left.
BY MR. GOTTLIEB:
Q You didn't work for the guy, right?
A No.
Q So you had no employment relationship with him?
A No, I didn't.
Q Okay. Did you -- do you know who he was?
A I think he told me his name. But...



Q Did you try and find him after the incident and talk to him about it?
A No.
Q Did you find him before you talked about this event in Glamour magazine?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MR. GOTTLIEB:
Q You didn't want to give him an opportunity to take accountability for his actions and make it right?
A I didn't name him.
Q But you described him and described who he was friends with and the spa you were in?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know if I described who his friends were.
BY MR. GOTTLIEB:
Q Do you know his name as you sit here today?
A No.
Q I think you've already talked about your experience with your college girlfriend; is that right?
A Yes.



Q Do you believe that your college girlfriend sexually assaulted you?
A I do.
Q Do you believe she raped you?
A I'm not sure if I believe she raped me. No.
Q If I understand some of the talks you've given about this, this is something that you sort of remembered or confronted during therapy?
MS. SHAPIRO: Objection.
THE WITNESS: Yes. Yes.
BY MR. GOTTLIEB:
Q How many years after this event or events occurred would you say you confronted it through therapy?
A Maybe starting about 10 years after.
Q Okay. And I'm not going to ask you about conversations you've had with your therapist or your lawyers in this deposition. But apart of from those conversations with your therapist, what did you do to try to piece back together what had happened to you that 10 years prior?
A I mean, it was a lot of therapy. A lot of meditation. Thinking about it, going back and forth. It wasn't like just one moment and then



suddenly, it's like, oh, that's what happened. It was -- it's a journey. And the memories, they shift, and they come and go, and then you justify. But it was just a lot of therapy. Conversations with my wife.
Q How long did the -- I think you've described this as a very bad relationship; is that fair?
A It was not a good relationship.
Q The relationship with the college girlfriend?
A Yeah.
Q How long did it last?
A I believe about a year and a half.
Q Did you all have mutual friends?
A I believe at that point, it was just we all kind of had the same friends.
Q You had a group of friends that in college -- and sorry, what years of college was this for you?
A Freshman year going into sophomore year.
Q Okay. So you had a group of friends that you all hung out with -- and sorry. I need to back up.
Where did you go to college?

A Cal State Long Beach.
Q Okay. So freshman and sophomore at Cal State Long Beach, that's a big school, right?
A Yes.
Q And you and your girlfriend had a relationship that lasted some amount of time. I imagine there are other people who knew who you were dating?
MS. SHAPIRO: Objection.
THE WITNESS: She didn't attend the school. She didn't go to college.
BY MR. GOTTLIEB:
Q Did your friends at -- your friends at college know who you were dating?
A Yeah, a few of them did.
Q Okay. Before you talked about what happened to you in public, did you go back to talk to your college girlfriend?
A No.
Q Did you try to find her?
A No.
Q Did you ever attempt to communicate to let her know that you were going to be accusing her of sexual abuse in public?
MS. SHAPIRO: Objection.



THE WITNESS: No.
BY MR. GOTTLIEB:
Q Did you ever go back to talk to any of your college friends or people that you might have hung out with mutually to tell them what you were going to do?
A I don't know anybody from back then.
Q Do you have any idea whether or not your college girlfriend would agree with the way you have remembered the events relating to the losing of your virginity?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know what she would think. I don't know who she is anymore.
BY MR. GOTTLIEB:
Q But you thought it was okay to go on TV and tell the world that your college girlfriend had sexually abused you without ever talking to her about it?
MS. SHAPIRO: Objection.
THE WITNESS: I wasn't aware I needed to ask her permission to share my story.
BY MR. GOTTLIEB:
Q Am I right that one of the things that was most traumatic about this to you is that you



were saving yourself for marriage?
A That was a part of it. I also just wasn't ready.
Q And so you were -- you were a virgin at age 18 when you met her in college?
A Yes.
Q And I believe your description of what happened is that you woke up in the middle of the night, and she was taking it from you. Is that an accurate description of your words?
A No.
MS. SHAPIRO: Objection.
BY MR. GOTTLIEB:
Q Okay. How would you describe it?
A I think you're confusing two different stories. I don't --
Q Okay.
A -- mean to, you know, say you're wrong. But that wasn't the story that I shared in my book.
Q Okay. You've never described the incident when you lost your virginity as waking up and discovering your college girlfriend was taking it from you without your consent?
A No, that wasn't the story of how I lost my virginity.



Q Okay.
A There was --
Q I'm mistaken then?
A Yeah. There -- there was a moment in the relationship where I was -- I was woken up by her on top of me having sex with me, but that was after I had already lost my virginity.
Q What is her name?
MS. SHAPIRO: Objection. I'm going to instruct you not to answer that.
MR. GOTTLIEB: On what basis?
MS. SHAPIRO: It's irrelevant and not calculated to lead to discoverable evidence.
MR. GOTTLIEB: That is not a proper basis to instruct a witness not to answer a question.
MS. SHAPIRO: I'm instructing him not to answer.
BY MR. GOTTLIEB:
Q Are you going to follow your counsel's instruction?
A I am.
Q Would you be capable of telling me her name but for your counsel's instruction?
A I would.
Q Okay. Are there any other incidents

CONFIDENTIAL

Page 30

relating to sexual harassment or abuse that you have suffered that you have talked about publicly?
A I don't believe so.
Q Did these experiences inform why you wanted to make It Ends with Us into a movie?
A Not -- I don't know if that -- if it was a conscious thing. Once I was -- once I had read it, once I was making it, it informed how I wanted to make the movie. But it wasn't, like, the reason for making the movie.
Q Okay. I think I understand you. It wasn't the originating seed --
A No.
Q -- but it did inform how you approached the making of the movie, your personal experiences?
A It 100 percent informed the narrative arc of the film. And yeah, I would say -- I would say the adaptation from the book to the script. And also how I was able to connect with it.
Q And it, obviously, has informed your podcast, correct? By "it," I mean your experiences we've just discussed.
A My sexual trauma --
Q Yes.
A -- has informed my podcast. It's not the

Page 31

reason I did my podcast. But there was absolutely moments where we discussed sexual trauma, and yeah, it's one of the many things we discuss.
Q Okay. And I will stick with your framing, which I like, which is not the thing that caused it originally, but informed in some ways. So it's the same with respect to this question.
Did your experiences inform what you wanted out of Wayfarer Studios?
MS. SHAPIRO: Objection.
THE WITNESS: Did my experiences with sexual trauma --
BY MR. GOTTLIEB:
Q Inform in any way --
A -- inform in any way what I wanted out of Wayfarer Studios? Not consciously.
Q Perhaps subconsciously?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not an expert on the subconscious, but I imagine the subconscious exists in all of us.
BY MR. GOTTLIEB:
Q But you do believe that work is service, right?
MS. SHAPIRO: Objection.

Page 32

THE WITNESS: I believe that work should be and can be a form of service, correct.
BY MR. GOTTLIEB:
Q And you believe in the tenets of the Baha'i faith?
A Is that a question?
Q Yeah.
A Do I believe -- yes. Absolutely.
Q And Wayfarer is a Baha'i-inspired organization; is it not? Wayfarer Studios.
A I think we were very mindful, actually, to not make it a Baha'i-inspired organization. But it was inspired by the principles of the Baha'i faith. I don't believe it's officially labeled a Baha'i-inspired organization, and there are reasons behind that.
Q Sure. It's not a Baha'i only studio, right?
A Absolutely not.
Q But it is, nonetheless, inspired by many of the principles or tenets of the Baha'i faith; is that fair?
A By the belief system of the people who started it, inspired by it, yeah.
Q And that would be, at least in its

Page 33

current form, you and Mr. Sarowitz?
A Correct.
Q And you both share the Baha'i faith?
A We both --
MS. SHAPIRO: Objection.
THE WITNESS: We both share that we are both Baha'i's, yes.
BY MR. GOTTLIEB:
Q And you both have talked about, publicly many times, some of what you considered to be the important tenets of the Baha'i faith?
MS. SHAPIRO: Objection.
THE WITNESS: I think that's accurate, yeah.
BY MR. GOTTLIEB:
Q Okay. Did you ever tell anyone you ran a Baha'i set?
A A Baha'i set? I have no idea. I don't know what a Baha'i set would be. If I did, you're welcome to show me.
Q Did you ever hear Mr. Sarowitz refer to your sets as a -- any of your sets as a Baha'i set?
A I have not.
Q Would you even know how to describe what a Baha'i set is?

A A set with all Baha'i's? I don't know.
Q Well, so you're the director, and you're the co-founder of the studio. And I'm here and I'm asking you, okay?
A Yeah. Yeah.
Q Okay. Someone has told me that your set is a Baha'i set. Okay?
A Are you -- sorry. Are you giving me a --
MS. SHAPIRO: Objection.
BY MR. GOTTLIEB:
Q Just let me finish my question.
A Okay.
Q So let's establish some principles. You're the cofounder of Wayfarer Studios, correct?
A Correct.
Q You were the director of It Ends with Us, correct?
A Correct.
Q Producer?
A No.
Q Lead actor?
A Second lead actor.
Q Second lead actor. And I come to you now and I say, Mr. Baldoni, you're the director of this film, you're the cofounder of this studio. Someone



has told me this is -- the set of It Ends with Us is a Baha'i set. What does that mean?
MS. SHAPIRO: Objection.
THE WITNESS: I have no idea.
BY MR. GOTTLIEB:
Q Okay. I want to read you something Mr. Sarowitz says and I -- you watched some of his deposition so you may have been in for talking about some of this. I just want to know if you agree, disagree or --
A Is this from his deposition or something else?
Q It's not. It is something he said elsewhere so I'm going to read it to you, and I'm going to ask you your thoughts on it.
A Okay.
Q This is from a talk that he gave in 2020. He said:
(As read):
"Art reflects society and society reflects art, and we want to make art that raises spirits. That's the number one thing. If you really want to say what Justin and I are doing together, what he does so well and I support him



in doing, is he makes movies that uplift our spirits and I'm so happy to be his partner in doing that so it is really just -- so it is really another practical application of faith. "
Do you agree with what Mr. Sarowitz said there?
A I agree that those are his feelings and that it's really nice, yeah.
Q Do you share his feelings with respect to what I just read you?
A Can you read it one more time?
Q (As read):
"Art reflects society and society reflects art, and we want to make art that raises spirits. That's the number one thing. If you really want to say what Justin and I are doing together, what he does so well and I support him in doing, is he makes movies that uplift our spirits."
And I will stop right there because the rest of it is surplusage.
MS. SHAPIRO: Are you going to pose a question?



MR. GOTTLIEB: He asked me to repeat what I read so he can decide if he agrees with it or not, and I have just done that.
THE WITNESS: Yeah. I think that I would agree that that's our intention, 100 percent.
BY MR. GOTTLIEB:
Q Now let me read to you what he said two sentences before. He said:
(As read):
"So I look at Hollywood right now, TV and movies, is a lot of what it is, is gratuitous sex, gratuitous violence. It's things that lower the soul."
Do you agree with Mr. Sarowitz that in Hollywood, gratuitous sex and gratuitous violence lower the soul?
MS. SHAPIRO: Objection.
THE WITNESS: Me and Steve have had many conversations where we tend to disagree on things that lower the soul. So I think that we are in agreement most of the time, and also I think that a blanket statement like that would be hard to agree with.
BY MR. GOTTLIEB:
Q Do you agree with him on the proposition

CONFIDENTIAL

Page 38

that gratuitous sex in Hollywood films is a bad thing?

A I think where Steve and I would have conversations is, what is gratuitous and what is not. As Steve is somebody who wouldn't even want there to be a cigarette or marijuana in a film even if it had to do with the storyline. And any sex at all, at times, Steve has felt was gratuitous. So we've had different conversations about that.

Q Okay.

A So we have to define gratuitous before I can agree with his statement.

Q All right. Let's start from the premise of, do you think gratuitous sex, however you define it, not how Mr. Sarowitz defines it --

A Yeah.

Q -- do you think that is a problem in Hollywood films?

MS. SHAPIRO: Objection.

THE WITNESS: There's a lot of films that are made in Hollywood, and I'm not trying to dodge your question, but I just want to be mindful of generalizing. I think that we have -- I believe we've put so much sex and sexualized so many things that we've become numb to it. And over time, since

Page 39

we've become numb to it -- and I'm speaking generally as a "we", collective "we" -- in order to have more of a shock effect than I think that's where Hollywood has gone and made, like -- like sex has just become just something that you expect to see oftentimes, that doesn't actually have to do with the storyline or -- or I don't know if it necessarily moves the plot forward.

So in that sense, I guess I would agree. And I think that in general, Hollywood doesn't make movies for the soul much anymore. It does -- I mean, there are certain people that do. But I'm just saying it's definitely become much more about attention and money and just competing with other places for people's attention in whatever can shock them the most is what wins.

BY MR. GOTTLIEB:

Q And you founded Wayfarer to be different from what you just described; is that right?

MS. SHAPIRO: Objection.

THE WITNESS: I did.

BY MR. GOTTLIEB:

Q You founded Wayfarer to be lights in the darkness; is that correct?

A That was a part of the mission.

Page 40

Q You, in founding Wayfarer, said that in Steve Sarowitz you had resources and a partner who shared values and beliefs; is that fair?

A Yeah.

Q Do you recall saying about Wayfarer Studios that you and Mr. Heath "were making a concerted effort to build a spiritual enterprise in every sense of the word, where everybody is free to have their own beliefs and express opinions that may be different from the executives or the shareholders, where there is true unity and equality across the board, and where we're mindful of the positions of power and how those power dynamics work"?

A Was the question do I remember saying that?

Q Do you remember saying that?

A It sounds more like something I've written. I'm not sure if it --

Q Does it sound like something you would write or say?

A I don't know if I'm that eloquent when I speak. But it sounds like it's definitely in line with something that I believe or aspire to.

Q If I told you that that quote appeared

Page 41

out of a publication on Baha'iteachings.org entitled "Wayfarer Studios Aims to be a Light in the Darkness," would that refresh your recollection at all?

MS. SHAPIRO: Objection.

THE WITNESS: That would confirm it was probably something that I wrote versus I said.

BY MR. GOTTLIEB:

Q Okay. And do you believe that you have created a spiritual enterprise where everyone is free to have their own beliefs and express their own opinions that may be different from the executives or the shareholders?

MS. SHAPIRO: Objection.

THE WITNESS: Do I believe I've created it?

BY MR. GOTTLIEB:

Q Along with others. Do you believe in Wayfarer Studios, you've achieved that objective?

A To be very frank, I don't know that it's something that could ever be fully 100 percent achieved. I know we strive for it, but I wouldn't be comfortable saying we've achieved it.

Q Okay. You've strived for it?

A Strived, yeah.

Page 42

Q And in creating the culture at Wayfarer Studios, do you believe that you have tried to be mindful of the positions of power and how those power dynamics work?
MS. SHAPIRO: Objection.
THE WITNESS: Again, it's something that we strive for. Not perfect at, but strived.
BY MR. GOTTLIEB:
Q As the director of It Ends with Us, do you believe you had more power than members of the cast or crew that were not directors?
MS. SHAPIRO: Objection.
THE WITNESS: In thinking about power dynamics, yes.
BY MR. GOTTLIEB:
Q And you supervised essentially everyone who was on the set, directly or indirectly; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not sure if I would consider that my role as a director.
BY MR. GOTTLIEB:
Q Were you ultimately responsible for what happened on the set of It Ends with Us?
MS. SHAPIRO: Objection.

Page 43

THE WITNESS: I wouldn't put that solely on the director, no. But I was partly --
BY MR. GOTTLIEB:
Q I didn't ask if you --
A -- responsible.
Q I didn't ask if you were the only person.
MS. SHAPIRO: Can you not interrupt his answer?
MR. GOTTLIEB: You're right. You're right. Finish your answer. I apologize.
THE WITNESS: Oh, I just said I wasn't -- I don't think I was the only person responsible. But I was a part of that responsibility, of course.
BY MR. GOTTLIEB:
Q Okay. So I'm not asking if you were the only person who was responsible. But as the director, are you ultimately responsible for what occurs on the set of your movies?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not sure that I would completely agree with that, the way that question is framed.
BY MR. GOTTLIEB:
Q Okay. What is it about the question that you disagree with, the framing of the question?

Page 44

A I just think the premise is off.
Q What piece of the premise is off?
A One of the director's jobs is to bring on a great team and each of those team members have responsibilities. I think it would be impossible for a director to manage everybody. So there are department heads and producers and executive producers and all kinds of various jobs that each have people reporting under them and that each have their own responsibility.
So like if, you know, something happened to an extra, I don't know if that's ultimately the director's responsibility. If the catering was cold that day, I don't know if that's the director's responsibility.
If a stunt person was killed, I don't know if that's the director's responsibility. There is a stunt department. So that's what I mean by the premise. At least my understanding of what you were asking.
Q What about what the director does?
MS. SHAPIRO: Objection.
BY MR. GOTTLIEB:
Q Who is responsible for that?
A Could you be more specific?

Page 45

Q Well, the director is not responsible for the caterers or the stunt doubles, but what about the director? Is the director responsible for what the director does?
A Yes, of course. I was just answering your question to the best that I could.
Q Okay. So we can at least agree that as the director of It Ends with Us, you were responsible for what you did on the set?
A I was responsible for a lot, yeah.
Q What you did, what some other people did, that we'll have to define as we go through the day, but not everything; is that fair?
MS. SHAPIRO: Objection.
THE WITNESS: Not solely responsible for everything, but responsible, of course. I'm the director.
BY MR. GOTTLIEB:
Q Okay. Did Wayfarer Studios have policies and procedures that were in place during the filming of It Ends with Us?
MS. SHAPIRO: Objection.
THE WITNESS: Policies and procedures?
BY MR. GOTTLIEB:
Q Any policies and procedures that were in

place?
A I believe so.
Q And were those policies and procedures applicable to you as the director of the film, to the best of your knowledge?
MS. SHAPIRO: Objection.
THE WITNESS: You have to be more specific on what policies and procedures that you mean.
MR. GOTTLIEB: Okay.
THE STENOGRAPHIC REPORTER: Exhibit 20 for the record.
(Exhibit 20 marked for identification.)
BY MR. GOTTLIEB:
Q Mr. Baldoni, you've been handed a document marked as Exhibit 20. It's a document bearing the Bates Nos. WAYFARER_139046 through 139076.
And you can take a look. It's a lengthy document.
A Am I on this document?
Q Take a look through the first few pages, and the first thing I'm going to ask you is if you recognize it, and then I will ask you some more questions.



Mr. Baldoni, I think you've now had a chance to look at the cover letter --
A Yes.
Q -- and the Table of Contents.
A I haven't looked at all the Table of Contents of it.
Q You flipped through it?
A Would you like me to look at them?
Q There is not going to be a quiz on it, I promise.
A Sure.
Q The main thing -- the first thing I want -- the first thing I want to ask you is: Have you ever seen this? Not the text chain that's on the front, but the employee handbook that begins on the page with the Bates No. 139049 on it?
A I believe years ago, yes.
Q Okay. And you and Mr. Sarowitz sign off on the introductory letter to this handbook; is that correct?
A Our names are on there. So yes, we do.
Q You are the co-chairman of the studio; is that correct?
A That is correct.
Q There is no other chairman of the studio



you're aware of?
MS. SHAPIRO: Objection.
THE WITNESS: Just Steve Sarowitz and myself.
BY MR. GOTTLIEB:
Q What are the responsibilities that go along with being, to the best of your understanding, the co-chairman of Wayfarer Studios?
A My responsibilities?
Q Any responsibilities that you believe apply to you?
A My responsibilities are to -- to help select and pick who I believe, along with my co-chairman, to be the best managers for the company. To help the company in its creative direction. More bird's-eye view of ideally hopefully where we're going. And then to consult with -- with the CEO, and president, and upper management. And my specific responsibilities are also to help with creative for the various projects that we have.
Q Okay.
A Based on my time.
Q You see in the cover letter that you and Mr. Sarowitz have written for this handbook, a



reference to Wayfarer Studios being a Baha'i-inspired organization?
A I see that. Yes.
Q We were talking a little bit about that before. It's not a --
A Yes.
Q This is consistent with what you previously testified to?
MS. SHAPIRO: Objection.
THE WITNESS: Yeah, I -- I did not remember -- we had many conversations about actually not calling it a Baha'i-inspired organization. So I think legally we did not. And that was mostly because we didn't ever want to make anybody feel like they were working at a religious company. So I believe an early version of this did not have it on there, which is where my memory was coming from. But I do see it here, and I don't deny that.
BY MR. GOTTLIEB:
Q Okay. Are you aware of a later version of this handbook in which that was removed?
A I'm not aware of a later version. I imagine this is the most recent version. I believe there have been different versions of this various letter over the years.

CONFIDENTIAL

Page 50

Q And when you say legally you were not a Baha'i-inspired organization, I'm not going to be asking you for your legal opinions during this deposition.
A No, no, no.
Q What are you saying?
A It was just in the starting of an organization as it relates to the Baha'i faith, we did not want our company to, in any way, be a part of the Baha'i faith as an organization.
Q I see.
A So that's essentially what I mean, is that because the Baha'i faith's internal government, if you will, is different than maybe like the Catholic church or other Christian organizations, there is a Baha'i organization that actually is a government in the Baha'i faith. And we did not want a company to legally be tied or associated with an official Baha'i organization.
Q I understand.
A So that was the debate and the conversation around like a Baha'i-inspired organization and what that actually means.
Q Okay. Do you see where you've written, with Mr. Sarowitz, "This handbook has been written

Page 51

to serve as the guide for our relationship and the various work rules"?
A Yes.
Q And then do you see, if you flip a page over, in the Table of Contents, there is a series of categories. I'm looking, sir, at page 139050, there is a list of categories of different types of -- of rules that apply to employees of the company?
A Are you looking at employment -- underneath "Employment"?
Q I'm just seeing -- asking you if you see in the Table of Contents a bunch of different categories of policies, procedures and rules --
A Yes, I do --
Q -- that apply to the company?
A -- I do see that.
Q Okay. If you flip ahead to page 5 of this document, which is WAYFARER_139053. Do you see at the top of that page, "Equal Employment Opportunities, Anti-Discrimination, Anti-Harassment, and Anti-Retaliation Policy" at the top?
A Yes, I do.
Q And have you ever read this, this policy?
A I don't know if I've read this one, no.
Q You don't know or you think you haven't?

Page 52

A The policy that is directly in front of me, I don't know if I have read this policy.
Q Okay. So do you know if you've ever had any kind of training on this policy, this anti-discrimination, anti-harassment, and anti-retaliation policy?
A Yes, I believe I have.
Q When was that?
A I think every couple years.
Q When was the last time you attended one?
A In person?
Q At all. Virtually or in person?
A Virtually -- virtually, I completed mine last week --
Q Okay.
A -- for this year.
Q For the year 2025?
A Yes.
Q Prior to that, do you recall the last time you had training on this policy?
A I imagine it was two years before that.
Q Do you recall there ever being a training on anti-discrimination, anti-harassment and anti-retaliation during the production of It Ends with Us?

Page 53

A Yes.
Q Did you attend that training?
A I did.
Q Did you attend that training in person?
A Yes.
Q Where was it?
A In our production offices.
Q On the set in New Jersey?
A Not a set, but the production offices in New Jersey.
Q Okay. The production offices in New Jersey near where the -- strike that.
A Yeah --
Q Strike that.
A All right.
Q It's a bad question.
Okay. We'll come back to that.
During that training, do you remember going through examples or scenarios of types of conduct that would be a violation or a potential violation of this anti-discrimination, anti-harassment, and anti-retaliation policy?
A I can't remember specifics, but I do -- that was the -- the bulk of the harassment training.
Q Was there a presentation?

CONFIDENTIAL

Page 54

A It was a man -- yeah. We were in person but the man was over Zoom --
Q Okay.
A -- from my memory.
Q Were there slides?
A I'm assuming there were, yes.
Q Okay. So if I showed you some slides, you might be able to tell me if they were the ones you saw?
A To be very honest, if you showed me slides, I would not know if they were the exact ones I saw. It was years ago.
Q I think I said might be able to tell me, but okay. Fair enough.
Do you see at the top of page 5, in the second paragraph, second sentence, the sentence:
(As read):
"Wayfarer Studios strictly prohibits discrimination, harassment or retaliation against employees, applicants or any other covered person"?
A I see that.
Q And that's the Wayfarer Studios policy, right?

Page 55

A Yes.
Q Do you agree with it?
A Yes.
Q You've done your best to follow it?
A I have done my best to follow it, yes.
Q Do you see a long list of characteristics that under the Wayfarer Studios policy are protected?
MS. SHAPIRO: Objection.
THE WITNESS: May I read it?
BY MR. GOTTLIEB:
Q Sure thing.
A I've read this paragraph.
Q Okay. You've read the paragraph that lists out the protected characteristics, correct?
A Yes.
Q So you see that gender is protected?
A I do.
Q You see that sex is protected?
A Yes.
Q And you see that further includes pregnancy, breastfeeding, childbirth?
A I do.
Q Do you see that height and weight are also protected characteristics?

Page 56

A Height, weight and -- yes.
Q And do you see in the next line down after that paragraph, the sentence that says:
(As read):
"All Wayfarer Studios employees, officers, principals, agents, workers and representatives are prohibited from engaging in unlawful discrimination, harassment and/or retaliation"?
A Yes.
Q And you were an officer of Wayfarer Studios; is that correct?
A As co-chairman, I believe I am.
Q And you were also an agent or an employee because you were hired to be the director of It Ends with Us?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MR. GOTTLIEB:
Q And you certainly represented Wayfarer Studios in your role as co-chairman, right?
A I believe I am.
Q And, in fact, you and Mr. Sarowitz are the highest people in the hierarchy of Wayfarer; is that right?

Page 57

MS. SHAPIRO: Objection.
THE WITNESS: Yeah.
BY MR. GOTTLIEB:
Q Ultimately, the CEO and upper management answer to you and Mr. Sarowitz; is that right?
A Ultimately, yes.
Q In other words, if you and Mr. Sarowitz decide that, you know, you had it with Mr. Heath, it's your decision whether to get rid of him, right?
A Yes. Do you want to tell him or should I?
Q I think you should. It would go over smoother.
So do you see that one paragraph down from the sentence I just read, the anti-harassment policy?
A I see that.
Q And do you see where it says --
A I have not read this, so...
Q Okay.
A Can I read it?
Q Why don't you read that -- I'm going to ask you questions about the next three paragraphs, so if you want to read the next three paragraphs, then I will ask you questions about them.

A I think I've gotten through them now.
Q Okay. So back on the previous page, page 5 of this document, in the start of the anti-harassment policy, do you see the sentence that reads:
(As read):
"Wayfarer Studios prohibits harassment, disrespectful or unprofessional conduct by any employee of the company, including supervisors, managers and co-workers."
Do you see that?
A I do.
Q Do you understand what that means?
A That we prohibit harassment by anybody at the company.
Q Okay. Do you see then the sentence that starts with "Harassment may be verbal, written, or physical conduct"?
A I do.
Q Okay. So if you carry that sentence over to the next page:
(As read):
"Harassment may be verbal, written, or physical conduct."



Go to the -- in front of the A, B and C:
(As read):
"That, A, has the purpose or effect of creating an intimidating, hostile or offensive work environment; or, B, has the purpose or effect of unreasonably interfering with an individual's work performance; or, C, otherwise adversely affects an individual's employment opportunities."
Do you see that sentence?
A I do.
Q Do you recall ever receiving training with respect to any of those concepts in the sentence I just read to you?
A I believe I do.
Q Do you recall receiving training that discussed that harassment can be conduct that has either the purpose or the effect of creating a hostile or offensive work environment?
A I do.
Q Okay. And do you see the -- in the next paragraph, the sentence that reads:
(As read):
"Sexual harassment includes harassment



that is not necessarily sexual in nature."
Do you see that?
A Yes.
Q You've been trained on that concept?
A I believe I have.
Q And you see further down there is another A, B, and C here because, of course, we lawyers love to put A, Bs and Cs into our -- into our documents. Do you see subsection C says:
(As read):
"Such conduct has the purpose or effect of substantially and unreasonably interfering with an individual's work performance by creating an intimidating, hostile, or offensive working environment."
Do you see that?
A I do.
Q Do you understand what that means?
A I believe I do.
Q And you've been trained on that as well?
A I believe I have.
Q Okay. Do you see where it says:
(As read):



"Sexual harassment may include a range of subtle and not so subtle behaviors"?
A Yes.
Q And it can include:
(As read):
"Sexual jokes or innuendo, commentary about an individual's body, sexual prowess or sexual deficiencies or touching"?
MS. SHAPIRO: Objection.
BY MR. GOTTLIEB:
Q I know I left some words out.
A Yeah, yeah, yeah.
Q But do you see the words that I read there --
A Yes.
Q -- in this policy?
A Yes.
Q And you've been trained on this as well?
A I believe I have.
Q And because of that training, you understand that the policy prohibits behavior that has these effects on employees regardless of whether those effects were intended; is that right?
MS. SHAPIRO: Objection.

CONFIDENTIAL

Page 62

THE WITNESS: I believe so, yes.
BY MR. GOTTLIEB:
Q Okay. If you turn -- sorry. If you look then at "Supervisor and Manager Responsibilities." Do you see where it reads:
(As read):
"If any supervisor or manager becomes aware of a violation of this policy, they are obligated to report the violation to human resource management so Wayfarer Studios can investigate and, if appropriate, take corrective action"?
A Yes.
Q You understood that was your responsibility as a supervisor or manager?
MS. SHAPIRO: Objection.
THE WITNESS: Yeah.
BY MR. GOTTLIEB:
Q And that was Mr. Heath's responsibility as a supervisor or manager?
A Yes.
Q On the next page, do you see the section entitled "Investigation"?
A Yes.

Page 63

Q Do you see where it reads:
(As read):
"Any reported allegations of harassment, discrimination, or retaliation will be promptly and thoroughly investigated by qualified personnel in an impartial manner."
Do you see that?
A I do.
Q Do you see it says:
(As read):
"Wayfarer Studios will ensure that these personnel will use the evidence to reach reasonable conclusions"?
A Yes.
Q And then one more sentence down after that.
(As read):
"Wayfarer Studios will maintain appropriate documentation and tracking to ensure reasonable progress is made."
Do you see all that?
A Uh-huh.
Q And then there is a discussion of what happens at the close of investigation.

Page 64

Do you see that?
A Yes.
Q And you see that depending on what's found in an investigation, "Wayfarer Studios will consider appropriate options for remedial actions and resolution and if misconduct is found, Wayfarer Studios shall take prompt, corrective action as appropriate."
Do you see that?
A Yes.
Q Was any investigation of the type described here in this paragraph conducted for the conduct that is at issue in this litigation?
MS. SHAPIRO: Objection.
THE WITNESS: Not until this lawsuit was filed and we were made aware of the conduct.
BY MR. GOTTLIEB:
Q So I think your testimony is, this lawsuit was filed --
A Uh-huh.
Q -- you were made aware of conduct?
A We were made aware of allegations of misconduct.
Q Okay. And then you launched an investigation?

Page 65

MS. SHAPIRO: Objection.
THE WITNESS: Correct.
BY MR. GOTTLIEB:
Q And is that because -- am I understanding you correctly to say you were made aware of allegations in the filing of this lawsuit that you were unaware of previously?
A Correct.
Q What are the allegations as you sit here today that you understand were made in the lawsuit that you were not aware of previously?
MS. SHAPIRO: Objection.
THE WITNESS: Sexual harassment, retaliation. I mean, there is a very long list that I'm sure you have that you can present me and I can tell you what I was aware of or what I wasn't.
BY MR. GOTTLIEB:
Q So I will do this to try to be clear and that we understand each other.
I understand sexual harassment and retaliation to be legal labels that can include different incidents that might occur that inform those legal labels. Is that how you understand them?
MS. SHAPIRO: Objection.

THE WITNESS: Can you say that one more time?
BY MR. GOTTLIEB:
Q Let me try it a different way because that's going to take us down a lengthy rabbit hole that you won't like and your lawyers won't like and I will regret.
You said that you had not been aware of allegations of sexual harassment and retaliation until the filing of the lawsuit?
A Yes.
Q Okay. Do you understand that there were factual allegations that informed Ms. Lively's complaint asserting sexual harassment and retaliation?
A Can you break down what you mean by that?
Q Do you understand that Ms. Lively's complaint or this lawsuit that you have said led to the launching of an investigation, that lawsuit included allegations of events that took place on specific dates and times that Ms. Lively asserted constituted sexual harassment and retaliation?
Do you understand that?
A Yes, I understand that.
Q Okay. Is it your testimony that you were



unaware of the incidents that were described in the complaint? Or is it your testimony that you were unaware that Ms. Lively thought that those incidents constituted sexual harassment and retaliation?
MS. SHAPIRO: Objection.
THE WITNESS: My testimony is that this lawsuit and The New York Times article and the CRD complaint was the first that I had heard of many of these allegations that evidently I was at or a part of, which I completely disagree with whether or not they happened.
That said, the reason we launched an investigation was because this was the first official complaint, lawsuit against us. So that investigation happened because it was past the HR complaint situation. It was now an official, very public situation.
BY MR. GOTTLIEB:
Q Is it your understanding of the Wayfarer policy that in order to investigate allegations of sexual harassment and retaliation, that an official HR complaint needs to be filed by the complainant?
A I'm not sure.
Q In fact, didn't we just look at on page 6 of the policy in the section entitled "Supervisor



and Manager Responsibilities," there's a line that says:
(As read):
"If any supervisor or manager becomes aware of a violation of this policy, they are obligated to report the violation to human resources/management so Wayfarer Studios can investigate and, if appropriate, take corrective action"?
MS. SHAPIRO: Objection.
THE WITNESS: I see that, yes.
BY MR. GOTTLIEB:
Q So it is actually under your -- Wayfarer Studios' policy, it's not incumbent upon the person who feels that they have been harassed to come forward with a formal HR complaint; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know if there is another part of this that says there needs to be a formal HR complaint or not, so I don't know.
BY MR. GOTTLIEB:
Q Okay. You don't see one as you're sitting here looking at this page, do you? Under the box that says "Supervisor and Manager



Responsibilities"?
MS. SHAPIRO: Objection.
THE WITNESS: No, I don't see one.
BY MR. GOTTLIEB:
Q Okay. You testified yesterday, I believe, that you've never read The New York Times article; is that correct?
A Never personally read it, no.
Q You've never sat down to read the article published by The New York Times written by Megan Twohey about the incidents in this case?
A I did not personally sit down to read it.
Q So as you sit here today, you do not know personally anything that that article says?
MS. SHAPIRO: Objection.
THE WITNESS: No, I would not say that that's true.
BY MR. GOTTLIEB:
Q You have no personal knowledge from your own experience of what that article says; is that right?
A I have personal firsthand knowledge from my attorneys giving me point by point all that was in the article.
Q Okay. So let me try it this way because

CONFIDENTIAL

Page 70

I don't want to ask you questions about your conversations with your lawyers.
Other than what other people have told you, whether attorneys or anybody else, other than what other people have told you about what is in the Megan Twohey article, do you have any knowledge of what is in it?
A I do.
Q And what is that based on?
A It's based on reading parts of it.
Q What parts of it do you recall reading?
A I remember reading the beginning and then feeling sick. I remember reading some of the details around what I was being accused of. I remember just seeing my private text messages on there and being very confused. I remember reading that they had launched an investigation or that they had done a -- like it was an investigative -- she had done this investigation and gone through thousands of documents but never spoken to me or anyone from our company.
Q Was that troubling to you?
A That a investigative journalist did a New York Times article on -- put my picture and my face on the cover and didn't ask me any questions about

Page 71

it? I found that troubling.
Q It's important in understanding an event that has happened in talking to the eyewitnesses, right?
MS. SHAPIRO: Objection.
THE WITNESS: Are you meaning when you're an investigative journalist and you're writing for The New York Times?
BY MR. GOTTLIEB:
Q As a human being searching for truth?
MS. SHAPIRO: Objection.
THE WITNESS: If the writer wasn't there, I would assume so.
BY MR. GOTTLIEB:
Q One of the reasons you were upset is that you felt like there were incidents that were described that left out your perspective; is that right?
A There were many reasons that I was upset.
Q My question was, one of the reasons you were upset is because there are incidents that were described that left out your perspective on what happened; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.

Page 72

BY MR. GOTTLIEB:
Q Okay. When -- relatedly when Ms. Lively sent her California Civil Rights Department complaint to you through attorneys --
A Via you.
Q -- did you read it?
A No, not that version of it, no.
Q Did you ever read it?
A Not the initial one that was sent.
Q I think you said yesterday you didn't read Stephanie Jones' lawsuit; is that correct?
A No.
Q Did you read Ms. Lively's amended complaint in this case?
A I did.
Q When did you read that?
A I think shortly after it was filed. I don't know the month.
Q Okay. Back on the policy.
A And I read the previous version, not that you asked me.
Q The original complaint?
A I think there was a complaint.
Q And an amended complaint?
A Pre -- (Cross talk.)

Page 73

Q Okay. Did you read the complaint that you filed in Federal Court before it was filed?
A I did.
Q Did you read the complaint that you filed against The New York Times before it was filed?
A I did.
Q Everything all the way through?
A To the best of my reading ability.
Q Did you believe that everything in The New York Times complaint was truthful and accurate?
A I believed it to be.
Q Did you believe that everything in the complaint and amended complaint that you filed in Federal Court in the Southern District of New York, everything in it and the attachment to be truthful and accurate?
MS. SHAPIRO: Objection to form.
THE WITNESS: I believed it to be.
BY MR. GOTTLIEB:
Q Okay. Back on the document, page 7. Do you see the section on "Anti-Retaliation"?
A Yes.
Q Do you see the policy states:
(As read):
"Retaliation against an individual

"reporting harassment in good faith" -- sorry -- "for reporting harassment or discrimination in good faith or for participating in an investigation of a claim of harassment or discrimination is a serious violation of this policy and like harassment or discrimination itself will be subject to disciplinary action, which might include termination of employment. Acts of retaliation should be reported immediately and will be promptly investigated and addressed."

Do you see that?
A I do.
Q Do you understand that policy?
A I think I do.
Q Were you trained on it?
A I believe I was.
Q Do you see in the next section, what an employee is supposed to do if they believe they have been subject to misconduct under the policy?
I can be a little more specific with my question --
A Yes.



Q The answer is yes?
A I was just reading it. Yes.
Q Okay. Do you see the sentence says:
(As read):
"If an employee believes they've been subject to misconduct under this policy, they may file a complaint with the appropriate agency."
Do you see that?
A Yes.
Q And you see that the agencies that Wayfarer Studios is directing its employees to file a complaint, if they believe they have been subject to misconduct under the policy, are the California Department of Fair Employment and Housing and the Federal Equal Employment Opportunity Commission?
Do you see that?
A Yes.
Q Do you know whether Ms. Lively filed complaints with these agencies?
A I imagine -- is the CRD complaint this?
Q My question is what you know.
A I don't technically know.
MR. GOTTLIEB: Okay. I think now is a good time for a break.



THE VIDEOGRAPHER: We are going off the record. The time is 10:21 a.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record. The time is 10:39 a.m.
BY MR. GOTTLIEB:
Q Mr. Baldoni, you spoke in publicly about a pornography addiction; is that right?
A I have.
Q You were exposed to pornography for the first time at age 10; is that right?
A You must have read my book.
Q I have read some things. You've talked about how that addition affected your relationship with women?
A I believe I have.
Q And how in some ways, and you'll use your words and not mine, it infected or polluted your relationship to women; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: I think I've written when I have spoken about it publicly, it's been in relation to the part of the brain that's fired when one views pornographic images or graphic images in general.



BY MR. GOTTLIEB:
Q Okay. I'm most interested in what you said publicly about how in your view being exposed to pornography repetitively affects one's view of consent. Do you recall giving a talk called "Boys Will Be Human: A Talk on Healthy Masculinity with Justin Baldoni"?
A I wrote a book called Boys Will Be Human, and I imagine I've done a talk or two, yeah.
Q Some interviews about the subject of the book?
A Is this a speech that I gave or is this an interview that I gave?
Q This is during an interview, and I want to read you what you said. You said:
(As read):
"When you hit 11 or 12-years-old and your friends have a phone and maybe you don't and you're being shown things for the first time and then you start to think, that is what women want, and in porn, as we know, no means yes or try harder. It starts to become very confusing, which is definitely something that happened to me."

Do you recall ever saying anything like that?
A I'm sure I did, yes.
Q Is that what happened to you?
MS. SHAPIRO: Objection.
THE WITNESS: When I was -- when I was sexually assaulted, yes.
BY MR. GOTTLIEB:
Q Okay. You said after that:
(As read):
"I'm sure I have crossed boundaries and lines in my teens and 20s not even thinking about it, simply because of the porn I was consuming."
Do you recall saying that?
A I'm sure I did say it, yes.
Q Was that true?
A Again, I don't know. I said I'm sure I had. But I have never crossed a -- never not had consent with a woman. It was -- it was said in most of my book and most of my speaking is speaking to men so that men don't have to feel ashamed of whatever it is they're experiencing.
So in that certain situation, I'm not saying that I have crossed boundaries or not gotten



consent. But what I'm essentially saying is, there's even a possibility that in my teens and 20s, I wasn't aware.
Q Well, literally what you said is:
(As read):
"I'm sure I have crossed boundaries and lines in my teens and 20s not even thinking about it simply because of the porn I was consuming."
So that's what you said. And my question to you is: Do I understand your testimony to be that you were essentially making that up in order to make other men feel that you were relatable to them?
MS. SHAPIRO: Objection.
THE WITNESS: No. I'm sure I had crossed boundaries in my teens and 20s. I'm sure I have.
BY MR. GOTTLIEB:
Q And do you think that was because of the exposure that you had to this kind of toxic pornography?
A I'm sure that that was a part of it. It was also a different time and part of why I wrote the book, was that consent wasn't taught to boys. And I wanted to make sure that we taught consent to boys and men.



Q If I told you, Mr. Baldoni, that quote I just read to you was from a discussion that you had with "No More," does that refresh your recollection at all in 2023?
A I'm sure it -- I'm sure it was.
Q Okay. Would it surprise you to learn that in a discussion with No More --
A No.
Q -- you said that you were sure that you had crossed boundaries and lines in your teens and 20s, "not even thinking about it simply because of the porn I was consuming"?
A No, it doesn't surprise me.
Q Did you ever consider whether people listening to that conversation with you and No More might be upset or triggered by that statement you made?
MS. SHAPIRO: Objection.
THE WITNESS: No. As this is a conversation that is about healing. And these are conversations that I've had with the women at No More. And I think anybody that works in this space can agree that pornography, when given to young people, messes with their brains. And we need all hands on deck. So I have no problem being open



about what was a pornography addiction in my, you know, early teens and 20s.
BY MR. GOTTLIEB:
Q When did you free yourself of the addiction to pornography?
MS. SHAPIRO: Objection.
THE WITNESS: So I don't have a clinical addiction to pornography. I will start there. So clinically speaking, I technically have always been free of addiction --
BY MR. GOTTLIEB:
Q You're not a doctor?
A - to pornography.
MS. SHAPIRO: Objection to --
THE WITNESS: I am not a doctor. But what I'm saying is, I have never been diagnosed with a pornography addiction. It was something that I talked about because I felt I was consuming porn when I was emotional or in my teens when I felt lonely. Mixed with, like, hormones changing and, you know, all of the various things. And I also wasn't exposed, like a lot of boys and men are today, because I was born with dial-up modems.
BY MR. GOTTLIEB:
Q Same.

CONFIDENTIAL

Page 82

A So, I imagine. We were timing our bathroom visits at the same time so I'm assuming we're similar in age. So I've probably been free of it since I felt like I had one. I'd say early 30s.
Q Okay. But it's fair to say that you have spoken openly and publicly --
A Very openly.
Q -- about having an addiction to pornography for some period of time earlier in your life, correct?
A Yes, I was just clarifying because addiction is --
Q Sure. You're not a doctor?
MS. SHAPIRO: Can you -- I'm sorry. I just want to ask both of you to wait until the other one finishes.
MR. GOTTLIEB: My apologies. I will try harder.
THE WITNESS: Likewise.
BY MR. GOTTLIEB:
Q You attended Ms. Lively's deposition, correct?
A I did.
Q Do you remember at her deposition when your counsel, Mr. Freedman, asked my client,

Page 83

Ms. Lively, would it surprise you that Justin never had an addiction to pornography?
A I don't remember that.
Q Do you have any idea why?
MS. SHAPIRO: Objection.
THE WITNESS: Why what?
BY MR. GOTTLIEB:
Q Why would somebody who knows anything about you say that?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not a lawyer. I don't know.
BY MR. GOTTLIEB:
Q Do you believe that -- you don't believe that having an addiction to pornography absolves men of whatever they do as a result of that addiction, do you?
MS. SHAPIRO: Objection.
THE WITNESS: Far from it.
BY MR. GOTTLIEB:
Q And you believe men who cross boundaries with women should be held accountable for that, right?
A I think crossing boundaries is a very general, broad statement. But if based on whatever

Page 84

the boundary that was crossed, I think there should be an appropriate reconciliation, conversation, atonement.
Q If one partner, regardless of gender, to a relationship, romantic, sexual or otherwise, sets a boundary --
A Yes.
Q -- do you believe that boundary is negotiable?
A No.
MS. SHAPIRO: Objection.
BY MR. GOTTLIEB:
Q Okay. So once the boundary is set, somebody crosses it, you believe that the person who crosses the boundary ought to be accountable?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MR. GOTTLIEB:
Q Okay. Do you recall ever talking about a meeting or a moment that you had with Britney Spears?
MS. SHAPIRO: Objection.
THE WITNESS: I think I do.
BY MR. GOTTLIEB:
Q Do you recall meeting Britney Spears on

Page 85

the scene of Jane the Virgin?
A I do.
Q Do you recall talking about that and telling a story about how "I went up and gave her a hug" -- or I gave her a 'hey.' I was like, 'hey.' I gave her a big hug, and I think I scared her because she was like, 'hi' and then I just kind of had this awkward moment of, like, did I just harass Britney Spears."
Do you recall saying that?
A I don't recall saying that, but I believe I'm sure that I said it.
Q Is that consistent with your recollection of how you remember that occurring, what I just said?
A I don't remember giving her a hug. But I remember it -- I was way -- I think I was way too excited to meet her, yes. But I don't remember the details of it. But I can't imagine that I was telling a -- not telling the truth and sharing a story about it.
Q Okay. Have you ever been --
A She was very nice.
Q Sorry?
A She was very nice.

CONFIDENTIAL

Page 86

Q Okay. I'm pleased to hear that. Have you ever been the subject of a workplace investigation?
A Like they were investigating me?
Q Investigating any aspect of your conduct at work?
A Not that I can think of.
Q Prior to the events of this case, are you aware of whether anyone has ever accused you of harassment?
A To my knowledge, I have never been accused of harassment.
Q Prior to the events of this case, are you aware of any time where you were accused of inappropriate behavior at work?
A No.
Q Have you ever been disciplined at -- in your time at Wayfarer Studios for any conduct, your conduct, at work?
A No.
Q Other than what has occurred in this case, has anyone to your knowledge ever refused to work with you on account of your behavior?
A Not to my knowledge.
Q Wayfarer produced the film, Empire Waist;

Page 87

is that correct?
A Yes.
Q And who was the writer and director of Empire Waist?
A Claire Ayoub.
Q Were you involved in the production of Empire Waist?
A In a similar way that I'm involved in other productions, yes.
Q Sorry.
A Yes.
Q What is that way?
A I helped with the creative. I helped cast it. I helped Claire get the main song for the film. And the editing process. Introducing her to a friend of mine. I gave notes on the edit. I approved casting. I helped her find the lead actress by having the idea to make a TikTok video looking for a very specific person. And we -- because of that work, we discovered somebody that was phenomenal. And I just tried to support. I visited set and gave notes when I was there that she found very helpful, I think.
Q It sounds like you did a lot?
A Not in comparison to what a, like,

Page 88

on-the-ground producer does, but it's just part of what I do.
Q But you do recall visiting the set?
A Yes.
Q Okay. Did Ms. Ayoub accuse you of misconduct?
A No.
Q Ever?
A No.
Q You never heard from anyone that Ms. Ayoub had problems with your behavior on the set or during the production of Empire Waist?
A I never heard from anyone that Ms. Ayoub had problems with my behavior.
Q Even as you sit here today, have you still not heard anything -- and, again, I don't want to -- nothing that you might have learned from your lawyers. So other than conversations you may have had with your lawyers, have you ever heard from Mr. Heath or anyone else at Wayfarer Studios that Ms. Ayoub had problems with your behavior during the production of Empire Waist?
A Again, I'm just trying to be specific to your question. I have never heard that Ms. Ayoub had problems with my behavior. However, I am aware

Page 89

that Ms. Ayoub has signed a declaration that evidently said that I was abusive to her or something like that.
Q Have you read that declaration?
A I have.
Q And that's a declaration that Ms. Ayoub filed in this case, right?
A Surprisingly, yes.
Q In the second paragraph of that declaration, Ms. Ayoub writes:
(As read):
"I wrote and directed a film called Empire Waist which was produced by Wayfarer Studios LLC. Justin Baldoni, a founder of Wayfarer, was producer. As part of my work on Empire Waist, I had repeated negative interactions with Mr. Baldoni and his associates, including verbal abuse by Mr. Baldoni. I asked Wayfarer that Mr. Baldoni not be permitted on set during the majority of production as a result of those experiences."
Do you recall reading that?
A I recall reading that.

CONFIDENTIAL

Page 90

Q Did you verbally abuse Ms. Ayoub at any time?
A God, no.
Q So is it your testimony that Ms. Ayoub is lying in what she's written here?
A It's my testimony that I did not verbally abuse her. I don't want to call her a liar.
Q Have you ever talked to her about whether she feels that you verbally abused her?
A I spoke to her many times, especially after what could be considered an incident. And we had a lovely relationship. Which is why I was invited to set and I was very surprised.
Q Did anyone ever tell you that Ms. Ayoub had asked to have you removed from her set?
A No.
Q Even as you sit here today, no one's ever told you that?
A No. I was never asked to be removed from her set. On the contrary, I was invited.
Q Did you also read in Ms. Ayoub's declaration that:
(As read):
"Empire Waist was set to be released in the fall of 2024 in August of that

Page 91

year. As a result of my experiences with Mr. Baldoni and ongoing press coverage relating to Mr. Baldoni and It Ends with Us, I requested that he not be involved in Empire Waist marketing or public relations effort. Wayfarer agreed to my request."
Do you remember reading that?
A I did.
Q Do you believe that statement is truthful or false?
A I was not made aware that she did not want me to help promote the movie.
Q Okay.
MR. GOTTLIEB: This is Exhibit 21.
THE STENOGRAPHIC REPORTER: Exhibit 21 for the record.
(Exhibit 21 marked for identification.)
MR. GOTTLIEB: Mr. Baldoni, you've been handed a document marked as Exhibit 21, which is a document bearing the Bates No. HEATH 31887 through 31889.
THE WITNESS: Uh-huh.
BY MR. GOTTLIEB:
Q Who is Ashmi Dang, by the way?

Page 92

A Ashmi is the head of marketing for Wayfarer Studios.
Q Okay. And who is Andrew Calof?
A Calof is our head of production and development.
Q Okay. And this is a text message involving Ms. Dang, Mr. Calof, Mr. Heath, Ms. Angela Cardon. Who is Angela Cardon?
A Angela is the executive under Andrew Calof.
Q Okay. And Tera Hanks, who is that?
A Tera Hanks is the president of Wayfarer Studios.
Q Okay. So this is a text exchange involving those people on September 27, 2024. And do you see at the top of this, at page 3187, the first page of the exhibit, do you see there's a screenshot of a text there?
A I do.
Q Do you see Ms. Dang shares a screenshot of what she says is Claire's message with the group?
A Do you mind if I read the whole document?
Q I don't.
A Okay.
Q Do you see how Ms. Dang has screenshot

Page 93

Claire's message at the top of this text exchange?
A Yes.
Q And do you see how Claire's message says:
(As read):
"Genuinely feeling f'ing sick. That man was banned from my set"?
A I see that.
Q And do you see how everyone in this text chain understands that "that man" is referring to you?
A Yes.
Q Did any of the individuals on this text thread ever inform you that Ms. Ayoub believed she had had you banned from her set?
A I'm not sure how she could have believed that. So to answer your question, no.
Q Okay. On the next page at the top, do you see Ms. Dang writes at 1:46 p.m.:
(As read):
"I'll add during the early days of working with her on the marketing, she called to express how upsetting the experience was for her, and she had language added to her agreement as a result."

CONFIDENTIAL

Page 94

Do you see that?
A I do.
Q Do you know what Ms. Dang is referring to with the language added to her agreement?
A This is the first I'm seeing of it.
Q Did anyone ever talk to you about changes that were made to Claire Ayoub's agreement based upon how upsetting the experience had been for her?
A No.
Q Do you see a bit lower down in the text, at 5:23 p.m., Ms. Dang says:
(As read):
"To close the loop, JB took down and reposted the trailer with updated copy"?
A Yes.
Q JB is you?
A Yes.
Q Do you --
A I presume.
Q Do you recall reposting or posting at any time the trailer for Empire Waist?
A Yes.
Q Do you recall doing that around this time, at the end of September 2024?

Page 95

A I would imagine that was the time, yes.
Q You earlier said something about what could be considered an incident that had occurred that you discussed with Ms. Ayoub?
A Yes.
Q What was the incident?
A Claire and I had a -- a lovely relationship. It was -- she was a first-time filmmaker, and I very much believed in the film that she was trying to make. Also, I was made aware that she was very inexperienced. So I had offered to mentor her and help her any way that I could. So we went back and forth. We had a few calls, I believe. And I was building a relationship with her from that point.
And at the same time, Claire was working with her producing partner to get the budget in line for the movie. We had greenlit her movie at $2 million. It was a movie that nobody else wanted. It was a movie that I believed in the message of very strongly, and I wanted to support her.
And we had a partner at the time, which was Procter & Gamble. And it was my understanding that the budget had inflated from 2 million to 3, then to 4, then to 5. After multiple conversations

Page 96

with my executive team, she was unable to get the budget down.
On a phone call with Procter & Gamble, I imagine there were eight or nine, maybe 10 people on that call, and ourselves, we were going through where we are with the budget. Procter & Gamble was not putting much in. We were the majority financiers. And I was very clear with her that we would not be making her movie if she couldn't get her budget down.
That was the extent of the conversation. There was no voice raised. It was me simply acting as the chairman at the time. There was no president, or I don't believe there was a CEO. And I just said, we won't be making your movie unless you get the budget down. And my understanding was that she was very unhappy with that and that she felt, what was relayed to me, that I threw her under the bus. Which is also very typical. I mean, directors are unhappy with studios all the time when people won't make their movies for the price. But that was -- genuinely, that was it.
And then I think maybe a month went by, and I sent her a voice note before day one of filming. I'm sure by now you're familiar with my

Page 97

voice notes.
Q Tell me more.
A Well, there was a voice note around the world I sent to Ms. Lively that everyone has heard, I guess.
And I sent her a lovely voice note saying how much I believed in her and the mission. And she responded, and we had a lovely text exchange. And we texted throughout most of production. To which point, I then came to visit.
Q When was the conversation that you had with Ms. Ayoub that you are recounting here?
A Before pre-production even began. I don't even know.
Q Before pre-production?
A Yeah, this was in the deal --
Q It was not on the --
A Sorry. This was in the dealing-making phase before there was even a contract, before we had agreed to even make the movie.
Q Okay. Before it -- before there was a set?
A There was no set. Yes.
Q It was on the phone?
A Over Zoom.

CONFIDENTIAL

Page 98

Q Nobody else wanted Ms. Ayoub's movie?
A No.
Q You saved it?
A No. Like -- like very often, people come to us when other studios or companies don't believe in the films. And if we believe that it speaks to the mission of why we are here, we will take the risk.
Q You said "everyone around the world has heard my voice note to Ms. Lively"?
A I was making a joke. But yeah.
Q That's because you released it, right?
A Yeah. Actually, I did not release that. But...
Q You instructed someone to release it on your behalf?
A Actually, I did not.
Q You knew it was going to be released on your behalf?
A That's privileged.
Q Okay. Did there ever come a time in August of 2024 where you learned --
A Is this -- do you want me to get rid of this or you want --
Q You're free to do what you want with it.

Page 99

Did there ever come a time during August of 2024 when you learned that there was a woman on TikTok alleging that you invited her up to your hotel room years ago and some incident that occurred alongside that?
A I think I learned about that in Ms. Lively's complaint.
Q You had not -- no one had told you about that in August of 2024?
A I have no memory of that.
Q You have no memory of discussing with anyone at Wayfarer, anyone at TAG, or with Ms. Abel a social media post alleging that you had been -- that you had invited some girl up to a hotel room years ago?
MS. SHAPIRO: Objection.
THE WITNESS: Like I said, I believe I heard about it for the first time reading her CRD complaint.
BY MR. GOTTLIEB:
Q Okay --
A But if you have anything that can refresh my memory, I'm happy to look at it. But I --
Q Have you -- I'm sorry. Go ahead.
A Yeah.

Page 100

Q Have you reviewed that post since the filing of Ms. Lively's lawsuit?
A I have never seen it.
Q Do you have any idea what the -- what this woman alleged?
A From what I've been made aware since then, that I invited her to a hotel room.
Q Okay. Do you know whether that occurred or not?
A I have never invited a woman to a hotel room that wasn't my wife.
Q Have you ever invited a woman to a hotel room before you were married?
A No.
Q Never? You're sure?
A I wish I was that confident before I was married.
Q So the answer to my question is, you are sure that prior to your marriage and after your marriage, you have never invited a woman in any circumstance, in any capacity, up to a hotel room that you were staying in?
MS. SHAPIRO: Objection.
THE WITNESS: I am sure that before I was married or while being married, I have never invited

Page 101

a woman up to a hotel room that I was staying in.
BY MR. GOTTLIEB:
Q Okay. Who's Shane Norman?
A Presumably not the woman that you're talking about right now.
Q Who is Shane Norman?
A Shane Norman is a former employee of Wayfarer Entertainment.
Q And Wayfarer Entertainment was a predecessor company to Wayfair Studios?
A Correct.
Q And what was your role with respect to Wayfarer Entertainment?
A Founder -- co-founder.
Q What was Shane Norman's role with Wayfarer Entertainment?
A Shane Norman was brought on by our CEO at the time to assist with the building and the creation of, at the time, which was the beginning of Man Enough.
Q The podcast?
A There was no podcast. It was -- it was to help -- excuse me. It was to help in the launch of the book Man Enough, and to figure out ways that we could do activations and get more men involved.

Q Did you know that Mr. Norman was being hired before he was hired?
A I knew -- yes. I -- I was introduced to Mr. Norman, and we had a job interview together. Yes.
Q Okay. You interviewed Mr. Norman?
A I did. Well, the last interview because he would be working with -- with me directly.
Q Okay. A number of people interviewed Mr. Norman; you were the final interview?
A Correct.
Q And you approved hiring him?
A I did.
Q You thought he would be good at the job for which you were hiring him?
A He presented fantastically.
Q Okay. And it didn't work out that way, right?
MS. SHAPIRO: Objection.
THE WITNESS: It did not.
BY MR. GOTTLIEB:
Q Mr. Norman was extremely abusive to women?
A I think you're referring to Mr. Sarowitz's testimony?



Q I am.
A I don't know if I would characterize it that way. We discovered that he was very combative, and it had -- we had been made aware, after some time, which we were frustrated we didn't know earlier, that he had made several women cry. And he was not listening to their ideas.
Q Let me read you what Mr. Sarowitz said and ask you if it's true.
A Okay.
Q What Mr. Sarowitz -- sorry. Mr. Sarowitz, I had to learn how to pronounce his name.
Mr. Sarowitz said:
(As read):
"We had an issue where we had an employee who was extremely abusive to women. It got to the point where each woman that they got in a meeting with was left with tears."
Is that a truthful statement about Shane Norman?
A I don't know if that's a truthful statement. I don't know if every woman that he was in a meeting with was left in tears.



Q Did that statement fairly capture the gist of Mr. Norman's behavior when he was employed by Wayfarer Entertainment?
A I can't speak to Mr. Sarowitz's intention with those words. But my understanding was that that is a -- maybe an exaggeration, but very well could be Mr. Sarowitz's view on what happened.
Q Would you agree with me that Mr. Sarowitz is a very thoughtful man?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MR. GOTTLIEB:
Q And you were here during his deposition, for at least part of it, right?
A I was.
Q He considered my questions very carefully before he answered them; you remember that, right?
MS. SHAPIRO: Objection. Objection.
THE WITNESS: I do remember that. Yes.
BY MR. GOTTLIEB:
Q And seemed to me he was being truthful and trying to be accurate; is that your impression also?
A I'm not saying that he wasn't truthful.
Q But you are saying that he was



exaggerating?
MS. SHAPIRO: Objection.
THE WITNESS: I said that in my opinion, having handled the situation alongside him, I wouldn't have characterized it in that way.
BY MR. GOTTLIEB:
Q Do you know he said a little bit later that there were many complaints made about Mr. Norman. And when I said, "many complaints, do you know about how many?" He answered: "Virtually every woman that they ever worked with."
Is that true?
A It's my understanding that Mr. Sarowitz was not directly involved in any of this, outside of when it finally came to our attention from the CEO. So he's free to express his opinion. But as the person that was there, I don't believe that that's a fair understanding of exactly what happened. I think it was far more nuanced than that.
Q Was an investigation performed?
A I believe so, yeah.
Q Did the investigation corroborate that virtually every woman that Mr. Norman worked with had complained about his behavior?
A I don't remember the full details, but I

imagine it did. Yes.
Q Did the investigation provide a basis for removing Mr. Norman from the position he was in?
A Yes.
Q Did you agree with that?
A Yes.
Q Did you review the -- whatever the final report or recommendation was that described Mr. Norman's behavior?
A Yes.
Q Did you find that informative in understanding what had occurred?
A Yes.
Q And you found it informative in understanding what had occurred, even though you had been present for a lot of what occurred; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: Not correct.
BY MR. GOTTLIEB:
Q You weren't present for any of the incidents that were described in the report of the investigation into Mr. Norman's behavior?
A I was not.
Q That report was in writing?



A Correct.
Q Do you know who conducted it or wrote it?
A An outside group of former attorneys who do HR, I believe.
Q Do you know who that was?
A I don't recall the name. Multiple women. I think it was two or three women.
Q Was it important to you that it was women who did that investigation?
MS. SHAPIRO: Objection.
THE WITNESS: I don't remember it being important to me.
BY MR. GOTTLIEB:
Q Well, you just brought it up right now. You said it was multiple women. I didn't ask you their genders. Why did your brain go to that?
MS. SHAPIRO: Objection.
THE WITNESS: If you have a neuroscientist here, we could ask him. I have no idea. But as I recall, I can give you my understanding.
I see things in pictures. So I'm very right-brained, I believe. And when I thought of the women who I had just seen in my mind on Zoom, they were, in fact, women. And so as my brain saw that



they were women, I said women. I hope that answers your question.
BY MR. GOTTLIEB:
Q It does.
Did you support Mr. Sarowitz's decision about the employment action to take with respect to Mr. Norman?
A I did.
Q And you know that that employment action meant that he remained on with Man Enough in a consulting or part-time position for a number of months?
A Yes.
Q And he continued to be paid?
A Yes.
Q And you supported that?
A I did.
Q Who is Liz Plank?
A Liz Plank is my former co-host of the Man Enough podcast.
Q How long was she your co-host?
A Maybe three years.
Q What changed?
A What changed?
Q What changed that caused her to not be



your co-host anymore?
A The -- I imagine The New York Times article and the entire world thinking I was a bad man.
Q Did she tell you that?
A No.
Q Did you talk to her when she quit?
A No.
Q Did you read anything that she wrote about why she didn't want to be a co-host anymore?
A I believe it was shown to me, yes.
Q Do you recall what it said?
A I can't recall exactly what it said, no.
Q Was it not important to you to understand why Ms. Plank wanted to discontinue a three-year-long professional relationship at that point in time?
MS. SHAPIRO: Objection.
THE WITNESS: Can you ask the question a different way?
BY MR. GOTTLIEB:
Q I can try. You said you didn't talk to her after she quit?
A No.
Q And you didn't reach out to her to talk

CONFIDENTIAL

Page 110

to her?
A No.
Q You weren't interested in hearing from her her perspective on why she didn't want to be co-host of this podcast that was very important to you anymore?
MS. SHAPIRO: Objection.
THE WITNESS: That's not it at all.
BY MR. GOTTLIEB:
Q So what is it?
MS. SHAPIRO: Objection.
THE WITNESS: My memory, if it's correct, was that when she resigned from the podcast, she was asked -- she had asked to pass on that she didn't want anyone to reach out to her.
BY MR. GOTTLIEB:
Q Who did you hear that from?
A I believe the person who runs the Man Enough podcast.
Q Who is that?
A Tera.
Q Tera?
A His name is Tera. T -- yeah. Go ahead.
Q Sorry. First and last name, please?
A Right. I'm having a hard time thinking

Page 111

of his last name right now, forgive me.
Q Okay. So it's someone named Tera?
A Former. We don't currently have a Man Enough podcast, but he ran it, yes. And Jamey Heath was also the one who informed me.
Q Okay. So someone named Tera and Mr. Heath informed you that Liz Plank did not want to be contacted?
A That she didn't want anyone from the show contacting her.
Q Did they tell you why?
A No.
Q Did you ask?
A I assumed.
Q What did you assume?
A I assumed that she didn't want to have a conversation about why she left.
Q Okay.
A And I tried to respect that.
Q On the set of It Ends with Us, at any point in time did you have a practice of hugging people to start your day?
A I think some people would qualify me as a hugger.
Q Is that a yes?

Page 112

MS. SHAPIRO: Objection.
THE WITNESS: I wouldn't call it a practice. I also have a practice of high-fiving people so...
BY MR. GOTTLIEB:
Q My question was: On the set of It Ends with Us, at any point in time, did you have a practice of hugging people or giving hugs at the start of the day?
A I wouldn't call it a practice. But if you ask a different version of the question, I might give you the answer that you want.
Q Your lawyer is going to get really mad at you if you try to do that.
Are there any days that you can think of where you began the day by hugging multiple people at the start of the day's work?
MS. SHAPIRO: Objection.
THE WITNESS: Sure. Yes.
BY MR. GOTTLIEB:
Q On more than one day?
A Yes.
Q Was it every day on the production of It Ends with Us?
A Did I give a hug to more than one person

Page 113

on every day --
Q Every day. At the start of the day?
A I'm sure I did or got hugged. I don't know if it was exclusively giving.
Q Did Mr. Heath?
MS. SHAPIRO: Objection.
THE WITNESS: I wasn't with Mr. Heath all day, every day.
BY MR. GOTTLIEB:
Q Okay. On the first day of shooting, do you know if you greeted people at the start of that day, May 15th, 2023, with hugs?
A I don't. But I imagine I did and was given hugs too.
Q Cast members and crew?
MS. SHAPIRO: Objection.
THE WITNESS: Is that a question?
BY MR. GOTTLIEB:
Q Did you hug cast members and members of the crew on May 15th, the first day of production?
A I imagine hugs were exchanged between cast members and crew.
Q Including, perhaps, some people you had not met before?
MS. SHAPIRO: Objection.

THE WITNESS: I'm not sure. I mean, maybe.
BY MR. GOTTLIEB:
Q Did you have any conversations before you hugged people on your set about whether they were comfortable with physical touching?
A Not any more than people had with me when they came to give me a hug. I think there is just a -- I think there's just an energy. Like, no offense, but I wouldn't give you a hug so. But I just think there's a human energy that two people maybe unconsciously exchange. I don't know if you believe -- I'm not saying you have to believe in energy. I'm just saying that I think there's a -- there's a human greeting when you're starting something that is going to be a journey, that's not going to be easy, where you're creating an environment. And oftentimes, like the way that I move through the world, I think I'm very open and people would oftentimes will hug me. Present counsel excluded.
Q No hurt feelings, sir.
You were the director of this film, right?
A Yes.



Q And you're a supervisor?
A Yes.
Q And the policy that we walked through in some length before, one of the things it references in it is hugging. Do you recall that?
A I do recall that.
Q You also understand, because it's part of how you set up your studio, that there are power dynamics at play in the workplace, right?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MR. GOTTLIEB:
Q And you also understand, because you've spoken eloquently and admirably about many of these topics, about violence and abuse, that there are some people that have deeply held traumas that they have not exposed or fully gone through or talked about, right?
MS. SHAPIRO: Objection.
THE WITNESS: Of course.
BY MR. GOTTLIEB:
Q And that might include somebody that has had a trauma that makes them just uncomfortable with being touched?
A Absolutely.



Q Okay. You hugged Ms. Lively on multiple occasions on the set, right?
A Yes.
Q Every day?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MR. GOTTLIEB:
Q How many times would you estimate?
A That I hugged Ms. Lively?
Q On the set. So not outside of the set environment, but at work on the set?
MS. SHAPIRO: Objection.
THE WITNESS: Are these hugs -- I'm so sorry --
BY MR. GOTTLIEB:
Q Sorry. This is --
A Are these hugs that I initiated, or are these hugs that I was a recipient of?
Q You can characterize it however you'd like.
A I just want to be as accurate in my testimony as possible --
Q Okay.
A -- as it relates to the hugging. That was my question -- that was the question. Which



one?
Q You can include hugs that you believe you initiated and hugs you believe Ms. Lively initiated.
MS. SHAPIRO: Objection.
THE WITNESS: Like lump them all together?
BY MR. GOTTLIEB:
Q Sure. Your best estimate.
A Okay.
Q Number of times.
MS. SHAPIRO: Objection.
THE WITNESS: Maybe a greeting and an exit. So at the most maybe -- again, I don't know. I don't know. I don't know. That's my answer to you, Mr. Gottlieb. I don't know.
BY MR. GOTTLIEB:
Q Fair enough. And when you don't know, that's what I always want your answer to be.
A I don't know.
Q Do you know who Vivian Baker is?
A Vivian Baker is Ms. Lively's makeup artist, I believe.
Q Do you know that she testified under oath in this case?
A I assume her testimony would be under

CONFIDENTIAL

Page 118

oath.
Q Do you know that she testified under oath in this case?
A Yes.
Q Are you aware that she testified that there was a culture of hugging on the set of It Ends with Us?
A I am now.
Q Are you aware that she said that that made a number of people uncomfortable?
A I find that odd.
Q You find that odd, why?
A Because Mrs. Baker was often the one that would run up and give me a hug.
Q And because of that, you find it odd that she testified that a number of people felt uncomfortable with the culture of hugging on the set of It Ends with Us?
A Correct.
Q Do you remember earlier when you testified about the hot tub?
A You're referring to what? Sexually harassed?
Q When you were sexually harassed in the hot tub?

Page 119

A Yes.
Q Do you remember that moment when you thought, maybe I should do what this powerful person is suggesting that I ought to do?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know if I testified to having a moment where I thought maybe I should do what he's suggesting I do.
BY MR. GOTTLIEB:
Q Do you remember saying that to Glamour?
A I don't remember saying that to Glamour.
Q Do you remember thinking that for a moment?
MS. SHAPIRO: Objection.
THE WITNESS: I remember seeing his naked genitals inches away from my face before he walked and lowered himself into the hot tub and asked me to take off my pants.
MR. GOTTLIEB: Okay.
THE WITNESS: My shorts. I don't know if I remember feeling, should I? I remember feeling, how do I leave the situation?
BY MR. GOTTLIEB:
Q Do you think Ms. Baker was perjuring herself when she said that multiple people felt

Page 120

uncomfortable because of the culture of hugging on the set of It Ends with Us?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not sure how my assumption of Ms. Baker's testimony would lead to perjury.
BY MR. GOTTLIEB:
Q Do you or do you not think she was being truthful when she said that multiple people felt uncomfortable about a culture of hugging on the set of It Ends with Us?
MS. SHAPIRO: Objection.
THE WITNESS: I think she was being truthful. That's not why I said I thought it was odd.
BY MR. GOTTLIEB:
Q Okay. Did you ever hear from anyone on the set of It Ends with Us that hugging, daily hugging, was making them uncomfortable?
A There was a point in time that I heard that, yes.
Q And when was that?
A That was from Ange Giannetti and, I believe, Alex Saks.
Q Do you recall when that was?

Page 121

A It was early on in production. Maybe first week or two.
Q Okay. So that's in May of 2023?
MS. SHAPIRO: Objection.
THE WITNESS: I have a feeling you know the date better than me. So, yes.
BY MR. GOTTLIEB:
Q And what did you do when Ms. Saks and Ms. Giannetti told you that certain people felt uncomfortable with the hugging on the set of It Ends with Us?
MS. SHAPIRO: Objection.
THE WITNESS: I stopped hugging.
BY MR. GOTTLIEB:
Q Did you perform an investigation?
A Because people didn't want there to be as much hugging?
Q That's my question.
A No.
Q Did you inform anybody in HR?
A I did not.
Q Even though hugging is one of the items that appears in your sexual harassment policy?
MS. SHAPIRO: Objection.
THE WITNESS: I was unaware of any

CONFIDENTIAL

Page 122

official complaint of the hugging. In fact, quite the opposite.
BY MR. GOTTLIEB:
Q Again, and we did this before, you understand, because we had this exchange before, that an official complaint does not need to be filed in order for something to violate the Wayfarer Studios sexual harassment policy, right?
MS. SHAPIRO: Objection.
THE WITNESS: Correct.
BY MR. GOTTLIEB:
Q And you understand that there are supervisor responsibilities that apply --
MS. SHAPIRO: Objection.
BY MR. GOTTLIEB:
Q -- that do not depend upon the filing of an official HR complaint, right?
MS. SHAPIRO: Objection.
THE WITNESS: Correct.
BY MR. GOTTLIEB:
Q Okay.
A But just to point you back to 9054, page 6, paragraph 1, 2, 3, 4, 5, 6. It says:
(As read):
"If any supervisor or manager becomes

Page 123

aware of a violation of this policy."
And I stand by the fact that I was not aware of any violation of the policy.
Q Okay. So you would need to -- under your understanding of the policy, you would need to determine, in your judgment, that the policy had been violated before you got HR involved?
MS. SHAPIRO: Objection.
THE WITNESS: I don't believe I was aware of any violation of the policy. If that were the case, then every single person on that set would have been reported to HR who engaged in any sort of hugging. Including, ironically, Mrs. Baker, who hugged, each time she saw me, post the incident where I was made aware of the hugging. Which made me feel very awkward.
BY MR. GOTTLIEB:
Q Okay. Is it your testimony that after this conversation with Ms. Saks and Ms. Giannetti, that there was no more hugging on the set of It Ends with Us that occurred, that you were a part of?
MS. SHAPIRO: Objection.
THE WITNESS: My recollection is, I was very aware once I was made -- once I was made aware

Page 124

that, I believe it was Ms. Saks and Mrs. Slate, specifically felt the set was too huggie. Hence, my feeling that there was no violation. It was a generalization, and I believe the word used was huggie or comfy. Which I think would have been a strange thing to report.
I remember very much being extra conscious and aware of the energy between who I were to approach on a daily basis and who I were to hug. I remember shifting to many more high-fives than hugs. Including solely for Mrs. Slate and Ms. Lively. So good morning, high five. I don't think there was ever a hug that took place between myself, Mrs. Slate or Ms. Lively after I became aware that the set was too huggie.
BY MR. GOTTLIEB:
Q In any prior movie you worked on or set you worked on, did the issue of hugging ever come up to your recollection?
A No.
Q This was the first time that you had ever had this issue raised, addressed, spoken about?
A This is the first time for many things, Mr. Gottlieb.
Q Did you ever tell Ms. Lively that you had

Page 125

spoken to her deceased father?
A Let me shift gears real quick. Please ask the question again.
Q Did you ever tell Ms. Lively that you had spoken to her deceased father?
A No.
Q And is that because -- is your answer no because, in your view, you told Ms. Lively that you had prayed to her deceased father?
MS. SHAPIRO: Objection.
THE WITNESS: No, I'm -- I'm talking about the context of the conversation and the multiple conversations that happened regarding Ms. Lively's, unfortunately, deceased father.
BY MR. GOTTLIEB:
Q Was there ever a point in time when you told Ms. Lively that you had communicated in any form with her deceased father?
A I insinuated to Ms. Lively in a conversation, where the previous day we had spoken about life after death and various things, which we don't have to discuss now, that I had prayed for her dad, and I had asked him to bless our movie.
Q Who else was there when you had that conversation with Ms. Lively?

CONFIDENTIAL

Page 126

A This was at her -- I don't know what you call it. She used to call it Buckingham Palace, as she said, because so many celebrities walked through there. I think that was her office in her penthouse apartment, which was the place that Ms. Lively requested all of our meetings be. It was just her and myself.

Q It's your testimony that Ms. Lively used to refer to that as Buckingham Palace?

A That's what -- that's what her and Mr. Reynolds would call it.

Q Okay.

A They may have said it was something that Taylor Swift had said.

Q And so your testimony is that at a meeting in the office in Ms. Lively's apartment building, you shared with Ms. Lively that you had prayed to her deceased father?

MS. SHAPIRO: Objection.

THE WITNESS: For and asked, yes. Asked him to bless our movie.

BY MR. GOTTLIEB:

Q Is there any other time that you can recall that you mentioned to Ms. Lively communicating in any way with her deceased father?

Page 127

MS. SHAPIRO: Objection.

THE WITNESS: May I ask a clarifying question?

BY MR. GOTTLIEB:

Q Sure.

A What do you mean by "communicating"?

Q I think it's more important that I understand what you mean by "communicating."

A If communicating means a two-way conversation, is that what you're implying? That I'm suggesting to Ms. Lively that I had a two-way conversation with her deceased father?

Q I'm asking what you recollect saying to Ms. Lively. And so -- I don't want us to get tripped up on talking to, communicating. What did you express to Ms. Lively about whatever interaction or message or prayer -- what -- what did you express to Ms. Lively about her deceased father, any time other than what you just told me?

A May -- may I provide a little bit of context and then answer the question?

Q I can't stop you.

A You could.

Q Go ahead.

A I would give you consent.

Page 128

Q Go ahead, sir.

A The previous day in her office, as was customary, Ms. Lively and I were having conversations about all sorts of things. She was an actor, and I'm a director and I'm also an actor, and part of that is getting to know the person that you're acting with. This is something that all acting coaches and people I believe at a high level do. You get to know the person that you're working with.

And I was made aware that Ms. Lively's father had passed somewhat recently, I think within a few years. And I had imagined that it might be difficult to be making a movie for the first time since his passing, since I learned he was, like, an acting coach. So I asked her if this was the first film that she's made since he's passed. And she said, yes. And I -- I think I said something about that -- that must be hard. And what was he like? You know, I've always found it, in my years of experience being a human, that oftentimes it's nice to discuss the memories of the people who have passed, and from what I had heard, they were very close.

So just in a way of having a conversation

Page 129

with Ms. Lively to build a connection, as we were working together fairly intimately, so she shared a little bit about her dad. I remember asking if she had any spiritual beliefs or so. And then I asked if it was okay if I shared mine. And so I shared a very brief summary of my faith, specifically because I said that we have some really beautiful beliefs about life after death.

And so then I shared that, you know, I really believe that those of us -- the people in our lives, our loved ones who pass on, are closer to us now than they were when they were here. I gave her the analogy of the womb, and how in the Baha'i faith, we are told that when we are infants in the womb, we have our whole world of existence. We have -- we are developing things. We are developing our eyes, our ears. We are developing our skin, our lungs. We are developing all of these things, but we don't have any use for them in the womb world. All the while, we are co-existing in this world, so basically, a baby is in both places at once.

But we are aware of the baby in the womb, and we can pray for it, and we can influence it. And then I just explained that our belief is that when we die of the womb, we're born into this world

and we need everything that we were developing. But when we die in this world, we only take with us our spiritual qualities.

But as it relates to her father, I was explaining that where we go next, which I believe you can call it heaven, or I believe you're Jewish, like most of my family, whatever you believe in or don't believe in, what I was explaining to her was that I believe that just like we could pray for the baby in the womb, I believe they can help us and pray for us, which is why all these little coincidences and miracles can happen.

So based on that conversation, which I actually went back and told my wife that Ms. Lively and I had a lovely conversation about life, she seemed very engaged. But also, she's an actress so maybe she wasn't.

That next morning when I came in, because I had prayed for her father, I let her know that. And so it was in the context of this larger conversation, which I summarized shortly. It was much longer than that, that I offered a prayer for her father and I asked him to bless our film because I believe that those who have passed on can still help us. I wasn't in any way saying that her and



I -- him and I had, like, a conversation and bro'd out. And that wasn't at all the context, nor do I think if you were a witness in the room, you would have felt that way.

MS. SHAPIRO: Mr. Gottlieb, can we take a short break?

MR. GOTTLIEB: After I'm done asking a follow-up question to that answer, which was approximately six minutes long.

THE WITNESS: I'm sorry. I asked for -- I wasn't --

BY MR. GOTTLIEB:

Q You gave me context. I told you you could.

A I was only following directions.

Q I am noting that it lasted six minutes.

I am not interested in -- in this question, I am not interested in what you intended to communicate. I'm interested in what you recall specifically saying, the words you specifically recall saying.

And at any point in time that you can think of, did you say to Ms. Lively that you had spoken to or had a conversation with her deceased father?



MS. SHAPIRO: Objection.

THE WITNESS: At no point in time, have I ever spoken to Ms. Lively and said that I had a conversation with her deceased father. Nor have I ever said to anyone that I've had a conversation with anyone who was deceased, as I was not born with that ability to speak to the dead.

BY MR. GOTTLIEB:

Q Okay. And I am almost --

MS. SHAPIRO: Can we please take a break?

MR. GOTTLIEB: I am almost done.

MS. SHAPIRO: One more question, and then we're taking a break.

BY MR. GOTTLIEB:

Q Do you recall ever saying to Ms. Lively after she referenced in a joke, tell my dad he owes me 40 bucks? Do you recall ever pulling $40 out of the coat of one of your pockets?

MS. SHAPIRO: Objection.

BY MR. GOTTLIEB:

Q Out of the pockets of one of your coats?

MS. SHAPIRO: Objection.

THE WITNESS: So I remember a very funny coincidence, and I don't believe it was $40. I believe it was 20. So I -- from my perspective, I



remember that it was 20. And the reason I remember it was 20 was because on the way to her apartment, I found $20 on the road. And I remember it was 20 because I'm sure if you found 20 bucks, that's a very rare thing to find.

So she made a joke, as Ms. Lively often does, and so I made a joke back. And the conversation was, no way, I just found -- I just found 20 bucks. That was -- it was two people joking. And it was never intended, nor meant to be anything that was serious. And -- but I did find $20.

BY MR. GOTTLIEB:

Q I'm going to honor your counsel's request now.

MS. SHAPIRO: We're going to take a break.

THE VIDEOGRAPHER: We are going off the record. The time is 11:46 a.m.

(Recess.)

THE VIDEOGRAPHER: We're back on the record. The time is 12:09 p.m.

BY MR. GOTTLIEB:

Q Mr. Baldoni, yesterday you were asked a question about whether you've done any leadership

training. I think you said something about doing leadership coaching at some point in your 20s?
A Yes.
Q Was any of that ever with an organization called Landmark?
A No.
Q Never had any affiliation with, attended any sessions with Landmark Forum?
A No.
Q Any recollection, as you sit here today, of who the leadership coaching or training was with?
A It was a man who I was referred to by somebody, just one on one.
Q Okay.
Back to It Ends with Us. In the course of production on It Ends with Us, did you ever invite the department heads to go to a bathhouse or spa with you?
A I -- I may have.
Q Do you have a recollection of it as you sit here today?
A Like in a formal way, like, to all the -- all the department heads?
Q Any invitation in any form?
A Yeah, I believe I did.



MR. GOTTLIEB: Okay. I'm going to mark a document, a document that's been marked as Exhibit 22. It's a document bearing the Bates Nos. SPE_BL_2193 through 2197. It's a text exchange dated June 15th, 2024.
(Exhibit 22 marked for identification.)
BY MR. GOTTLIEB:
Q And I'm going to represent to you, Mr. Baldoni, that this is a text exchange between Alex Saks and Ange Giannetti. Ange Giannetti is the home --
A Okay.
Q -- home number that is blacked out there.
Why don't you take a look at this and then I will ask you some questions.
A Sure.
Q Have you had a chance to look at Exhibit 21, Mr. Baldoni?
A I believe this is Exhibit 22.
Q Thank you for correcting me. I'm terrible with the exhibit numbers.
Have you had a chance to look at what is marked as Exhibit 22?
A I have.
Q Do you see in Exhibit 22 on page 2194,



which is the first page of the text exchange, Ms. Saks writes to Ms. Giannetti at 2:53 p.m.:
(As read):
"Justin was very dismissive of her when she wanted to direct and then used Jamey to try to manipulate her when he realized she couldn't. She should co-direct it after she got daddio going."
Do you see that?
A I do.
Q Do you know who Ms. Saks is referring to here?
A I could only assume.
Q Who would you assume she's referring to?
A Well, the director of Daddio was our writer, which was Christy Hall.
Q Okay. And so you understand her to be discussing you being very dismissive of Christy Hall?
MS. SHAPIRO: Objection.
THE WITNESS: I -- I see that Alex is saying that I'm dismissive of her in this text message to Ange Giannetti, yes.



BY MR. GOTTLIEB:
Q Okay. Do you believe you were dismissive to Christy Hall?
A Not at all.
Q Do you see at 2:57 p.m., Ms. Saks says:
(As read):
"In short, she didn't feel respected as a female voice on the team. And on a movie like this, that felt especially bad"?
A I do see that.
Q Do you see that she also says -- "she," being Ms. Saks, says of Ms. Hall:
(As read):
"She's scared of a backlash. Who isn't?"
A I see that.
Q Did you understand, one way or the other, whether Ms. Hall felt disrespected as a female voice on the team?
A Not -- I didn't. Not until -- not officially until I read this just now.
Q And you testified earlier that Ms. Saks and Ms. Giannetti is who you learned the concerns or complaints, however you describe it, about the

CONFIDENTIAL

Page 138

hugging, that they're the ones who told you?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MR. GOTTLIEB:
Q And that was in May of 2023?
A I would presume so.
Q Okay. So you see that Ms. Giannetti, at 2:59 p.m. says:
(As read):
"So many things stacking up people are so upset or pissed off about. I cannot believe how they just keep on coming."
Do you see that?
A I do.
Q Is that consistent with your understanding of what was happening as of June 15th, 2024?
A I don't remember what was happening in June 15th, 2024 --
Q Okay.
A -- outside of --
Q Do you see where Ms. Saks says, I don't think he remembers --
MS. SHAPIRO: I'm sorry. I think you interrupted.

Page 139

BY MR. GOTTLIEB:
Q Oh, I'm sorry. I thought you were done.
A Outside of being isolated and kicked off my own film.
Q Okay. Do you see Ms. Saks says:
(As read):
"I think this is where the narcissism is dangerous, and I don't think he remembers honestly, or knows that he's doing anything wrong"?
A I see that.
Q Do you agree with Ms. Saks that you did not remember or knew that you were doing anything wrong?
A Can I ask what you're referring to?
Q I'm referring to Ms. Saks' words on June 15th, 2024.
A I can't begin to speculate about what Ms. Saks is referring to when she says "I don't think he remembers honestly, or knows that he's doing anything wrong."
Q Do you see at 3:01 p.m., Ms. Giannetti says:
(As read):
"With this many people and issues, I

Page 140

mean, they" -- I'm assuming that's they, T-G-E-Y -- "just keep coming"?
A Oh, yes.
Q 3:01 p.m.?
A Yes, I do.
Q And then Ms. Saks replies:
(As read):
"Him and Jamey have a way of making women and some men feel like shit."
Do you see that?
A I see that.
Q And she says:
(As read):
"it is deep because they sign the checks."
Do you see that?
A I do.
Q And by "sign the checks," she's referring to Wayfarer Studios paying for people's compensation on the film It Ends with Us, right?
MS. SHAPIRO: Objection.
THE WITNESS: I can't assume. I'm not on this text chain.
BY MR. GOTTLIEB:
Q Who did sign the checks?

Page 141

A Not myself.
Q Did Wayfarer Studios pay for people's salaries, compensation, on the film It Ends with Us?
A I would imagine so.
Q And you as the director and co-studio head had the authority to hire, fire, remove, and discipline people on the set if you chose to do so?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MR. GOTTLIEB:
Q And then you see a reference at 3:05 p.m. by Ms. Saks saying:
(As read):
"Do you remember when I called Andy Davis a few weeks in and was like, 'Andy, he's inviting the department heads to go to Russian baths with him.'"
Do you see that?
A Yes.
Q Who is Andy Davis?
A I believe Andy Davis is the -- he might be the head of production at Sony Studios.
Q Okay. And on the next --
A The person in charge of production at

CONFIDENTIAL

Page 142

Sony.
Q All right. And on the next page, Ms. Saks says:
(As read):
"I was like, 'what do I do?' He was like, 'you have to tell him he can't do that.' Everybody has something weird, uncomfortable, and bad to say."
Do you see that?
A Yes. I see Ange says that, yes.
Q Sorry. Ange said that:
(As read):
"Everybody has something weird, uncomfortable, and bad to say"?
A Yes.
Q Did Ms. Saks tell you that you weren't allowed to take people to Russian baths?
A No, she didn't.
Q Did anyone tell you?
A No, she didn't.
Q Did Ms. Giannetti ever tell you that many people had something weird or uncomfortable or bad to say about what was happening on the film?
A No, she didn't.
Q Did anyone?

Page 143

MS. SHAPIRO: Objection.
THE WITNESS: Not until I read about them like this.
BY MR. GOTTLIEB:
Q Are you troubled reading this now?
MS. SHAPIRO: Objection.
THE WITNESS: What do you mean by "troubled"?
BY MR. GOTTLIEB:
Q What would you have done if you had been handed this text chain on June 15th, 2024 between Alex Saks -- Alex Saks was the producer on the film, right?
A Yes.
Q And Ange Giannetti was the --
A Executive in charge.
Q Executive in charge?
A For Sony.
Q For Sony. So if you had known on June 15th, 2024 that in Ms. Giannetti's view, that everyone has something weird, uncomfortable, and bad to say about what was happening on your set, what would you have done?
MS. SHAPIRO: Objection.
THE WITNESS: On June 15th, the movie

Page 144

was already finished. And I believe anything that's referenced in this text exchange, if I'm not mistaken, either happened before the movie began as it relates to what you said about Christy Hall, or in pre-production. But I could be wrong.
BY MR. GOTTLIEB:
Q What would you have done, recognizing that, on June 15th, 2024, if you had seen this?
MS. SHAPIRO: Objection.
THE WITNESS: I can't speculate to what I would have done on June 15th because I didn't see it.
BY MR. GOTTLIEB:
Q Would it have changed anything about what you did after June 15th, 2024?
MS. SHAPIRO: Objection.
THE WITNESS: I can't answer that.
BY MR. GOTTLIEB:
Q Who is Russell? Do you see a reference to Russell at 3:07 p.m.?
A I do.
Q Who is Russell?
A Russell was our production designer.
Q Do you see that Ms. Saks says:
(As read):

Page 145

"Russell said when he wrapped, he felt like he left a cult"?
A I do see that.
Q Do you find that offensive?
MS. SHAPIRO: Objection.
THE WITNESS: It wouldn't be the first time people around this case have said I was in a cult.
BY MR. GOTTLIEB:
Q I think you testified earlier about meetings with Ms. Lively that occurred in her apartment; is that right?
A Yes.
Q Is that the first place that you met with Ms. Lively?
A The first place -- it was in the same building, yes.
Q In the same apartment building?
A In the building.
Q Different room but same building?
A Different apartment.
Q Different apartment, same building?
A Yes.
Q Okay.
A Am I done with this?

Q Sure.
When was that meeting, the first meeting?
A Sometime in December before Christmas. Sorry. I think it was December 22.
Q And when you first met with Ms. Lively, she had not yet agreed to play the role of Lily in the film; is that right?
A Yes.
Q And you had not yet decided whether you were sure if you wanted her to play the role of Lily in the film, right?
A Correct.
Q You thought you did, though, right?
MS. SHAPIRO: Objection.
THE WITNESS: I thought I did what?
BY MR. GOTTLIEB:
Q When you went to that meeting, traveled to the meeting --
A Yes.
Q -- you prepared for the meeting?
A Yes.
Q And you discussed the meeting in advance with certain people?
A Yes.
Q Like Mr. Heath?



A Yes.
Q And others?
A (Witness nods head.)
Q And is it fair to say that you were hopeful that you and Ms. Lively would reach an understanding and she would agree to play the role of Lily in the film?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MR. GOTTLIEB:
Q And at that point in time, you had made the decision that along with directing the film, you would play the co-lead role in the film?
A Yes.
Q Is that the role of Ryle?
A Yes.
Q And before, I asked you if you were a producer and you said no, you're an executive producer; is that correct?
A Yes.
Q Okay.
A I was, but eventually I -- I wasn't.
Q You were for some period of time?
A Yes.
Q Okay. In the first meeting, along with



other topics, you and Ms. Lively discussed your families; is that right?
A Yes.
Q And at the time, Ms. Lively was pregnant?
A Very pregnant, yes.
Q She was soon to give birth?
A Yes.
Q And that would not be the first time. Ms. Lively had children already, right?
A Yes. They were all over the apartment.
Q And Ms. Lively was pregnant with a boy; is that right?
A Yes.
Q And the two of you discussed certain things about Ms. Lively's baby?
MS. SHAPIRO: Objection.
THE WITNESS: Unborn baby, yes.
BY MR. GOTTLIEB:
Q Among other things, you discussed whether Ms. Lively's baby would be circumcised, right?
MS. SHAPIRO: Objection.
THE WITNESS: That was a conversation, yes.
BY MR. GOTTLIEB:
Q And in the context of that conversation,



did you at any point share with Ms. Lively whether you were circumcised?
A Yes.
Q Did Ms. Lively ask you whether you were circumcised?
A Directly, no.
Q Who was present at the moment when you relayed to Ms. Lively that you were circumcised?
A There were people going all around. Mr. Reynolds was in and out of the conversation. She had, I think, two nannies. I felt like there was a housekeeper there. Her assistant was walking around. I think she had two assistants there. Her and I were sitting on the couch, but there was people all around.
Q Have you ever told any other work colleague at any point in time about your genitalia?
MS. SHAPIRO: Objection.
THE WITNESS: I don't talk about my genitalia, so no.
BY MR. GOTTLIEB:
Q Prior to Ms. Lively accepting the role of Lily Bloom, she received a copy of the script; is that right?
A Yes.

CONFIDENTIAL

Page 150

Q And you did not write that script; is that correct?
MS. SHAPIRO: Objection.
THE WITNESS: Correct. I developed it with Christy Hall.
BY MR. GOTTLIEB:
Q Christy Hall was the screenwriter?
A Yes.
Q Okay. Do you recall when that script was sent to Ms. Lively?
A I assume before the meeting.
Q Do you know whether the script that Ms. Lively received before the meeting and prior to when she accepted the role of Lily Bloom was the same script that was used once you started shooting?
A It certainly was not.
Q Okay.
Did you have an understanding prior to the start of production whether the issue of nudity or sex scenes was important in any respect to Ms. Lively?
MS. SHAPIRO: Objection.
THE WITNESS: Can you say that one -- repeat the question?

Page 151

BY MR. GOTTLIEB:
Q Did you have an understanding prior to the start of production whether the issue of nudity or sex scenes were important in any respect to Ms. Lively?
MS. SHAPIRO: Objection.
THE WITNESS: I knew that Ms. Lively felt that the movie needed to be very sexy. But outside of that, I -- can you repeat the question one more time? I want to make sure I answer it correctly.
BY MR. GOTTLIEB:
Q Did you have an understanding prior to the start of production whether the issue of nudity or sex scenes were important in any respect to Ms. Lively?
MS. SHAPIRO: Objection.
THE WITNESS: Prior to the start of production, not -- okay. Prior to the start of principle photography, yes.
BY MR. GOTTLIEB:
Q Okay. And, in fact, I think you know that Ms. Lively had a series of conditions or principles in her -- in negotiating her offer that related to nudity or sex scenes?
MS. SHAPIRO: Objection.

Page 152

BY MR. GOTTLIEB:
Q Do you know that?
MS. SHAPIRO: Objection.
THE WITNESS: Are you referring to the nudity rider?
BY MR. GOTTLIEB:
Q Do you know anything about what Ms. Lively negotiated into her agreement prior to signing onto the role of Lily Bloom in the film, relating to sex scenes or nudity?
A I am aware of specific -- specific demands or requests as it relates to a document in, I believe, November. But that was after we had started filming.
Are you meaning before principle photography began?
Q Do you recall Mr. Heath ever sending you, in December of 2022, changes that Ms. Lively had made to her agreement relating to the role of Lily Bloom in It Ends with Us?
A No.
Q All right. So as you sit here today, you don't have a recollection one way or the other of whether Ms. Lively negotiated or otherwise insisted on certain conditions relating to nudity or sex

Page 153

scenes in the film?
A In December of 2022, I don't recall.
MR. GOTTLIEB: Okay. We're going to mark Exhibit 23.
(Exhibit 23 marked for identification.)
BY MR. GOTTLIEB:
Q Exhibit 23, Mr. Baldoni, please take a look through. And while you're looking through the record, I will note that Exhibit 23 is a document bearing the Bates Nos. BALDONI 26086 through 26090, which is an email exchange with an attachment.
Once you've had a chance to look, I will ask you some questions about it.
A Thank you.
Q Have you taken a few minutes to look over this document, Mr. Baldoni?
A I have. I have.
Q And Exhibit 23 is an email and attachment that Mr. Heath sent to you on December 23rd, 2022; is that correct?
A Exhibit 23 looks like an email from Lindsey Strasberg.
Q You see the very top of the page, sir?
A Oh, yes.
Q And do you see how it has a subject that

says:
(As read):
"Forward: Blake Lively,
It Ends with Us, Role of Lily"?
A Yes.
Q And that forward at the top of the page is something that --
A Got it. I understand now.
Q -- Mr. Heath --
A Yes.
Q So this is a document that Mr. Heath sent to you on December 23rd, 2022?
A Apparently, yes.
Q Okay. And Mr. Heath has forwarded you the markup of the agreement from Ms. Lively's team relating to the role of Lily Bloom on It Ends with Us?
A Yes.
Q Okay. And in that markup, a few things.
Do you notice how on the page marked 26089, which is page 2 of the agreement, there is a section that is titled "Approvals."
Do you see that?
A Sorry. Where is it again?
Q It's on the page that is page 2 of the



markup agreement. It says 26089 in the bottom right-hand corner. There is a section that says "Travel" --
A Yes. Yes.
Q -- and right underneath "Travel," you see "Approvals"?
A Yes.
Q And you see that it says in the marked up version:
(As read):
"Artists will have mutual approval
rights over the following."
Then there's a sub-point A about hair, and then there's a sub-point B that's been edited to say simply, "the screenplay."
Do you see that?
A Yes.
Q And so it was important to Ms. Lively in this agreement, at least as it's being expressed here on December 23rd, that she would have mutual approval rights over the screenplay.
Do you see that?
MS. SHAPIRO: Objection.
THE WITNESS: I see what I believe is the first round of markups and negotiations from



Ms. Lively's side.
BY MR. GOTTLIEB:
Q Okay.
A Because I also see it says, "Produced by credit on screen." So to me it looks like this was the first round of everything. It's like the wish list of everything that her team would want.
Q Okay. And do you have an understanding of whether Ms. Lively's ultimate agreement with Wayfarer included mutual approval rights over the screenplay?
MS. SHAPIRO: Objection.
THE WITNESS: I imagine it would.
BY MR. GOTTLIEB:
Q Then on the next page, Section 13, you see a number of items under "Miscellaneous"?
A Yes.
Q And this is on page 3 of the markup agreement, which is BALDONI 26090.
Do you see how Ms. Lively's team has written in here in sub-point A:
(As read):
"No use of the artist's name, voice, or
likeness in merchandise."
And then, other things there without



prior written consent?
A Yes.
Q Does that seem like a fairly standard provision that goes into these kinds of agreements?
MS. SHAPIRO: Objection.
THE WITNESS: I would imagine so.
BY MR. GOTTLIEB:
Q In your experience, is that a fairly standard provision that an actor would ask for?
MS. SHAPIRO: Objection.
THE WITNESS: I can't speculate. I'm not an expert in contracts.
BY MR. GOTTLIEB:
Q Something that would be important to you in one of your agreements?
MS. SHAPIRO: Objection.
THE WITNESS: No use of artist's name, voice, or likeness in merchandising without my consent?
BY MR. GOTTLIEB:
Q Yes.
A Yes.
Q Okay. You see Subsection D, "Approval of Press Releases and Statements"?
A Yes.

Q Is that something that would also be important to you in a film you were co-leading?
A I'm not sure I have ever asked for that or thought that I could have that. But, again, I can't speculate. And I also -- do you have the final contract by chance?
Q I'm asking you about this document right now, sir.
A Okay.
Q Do you see how in Subsection E, it's written in:
(As read):
"No nudity/simulated sex, without artist's prior written consent and negotiation/execution of a nudity rider."
Do you see that?
A Very standard, yes.
Q That's very standard?
A Yes.
Q Okay. And you understood Ms. Lively to be asking for that as of December 23rd, 2022?
A Looking at this document, I understand that to be a -- yeah, being asked for it by her team along with all of the other things that were asked



for here in red.
MR. GOTTLIEB: Okay. Let's do that, please. This is Exhibit 24. It's, thankfully, a short one.
(Exhibit 24 marked for identification.)
BY MR. GOTTLIEB:
Q Mr. Baldoni, you've been handed what's been marked as Exhibit 24, which is a document bearing the Bates No. BALDONI 30723 that is an email from Alex Saks to yourself, Jamey Heath, and Ange Giannetti with copies to others on March 28th, 2023. Subject line: "Sex Scene/Nudity Meeting."
A Yes.
Q Have you had a chance to look at this?
A This, I have, yes.
Q Okay. It's helpful that it's only two sentences.
A It is.
Q So Ms. Saks writes -- and this is an email Ms. Saks sent to you, Jamey Heath, and Ange Giannetti on March 28th, 2023?
A It appears to be.
Q Ms. Saks says:
(As read):
"Can the four of us hop on to discuss



the above, in regard to Blake specifically, in the next couple of days?"
Is that right?
A Yes.
Q And the above is the subject line: "Sex Scene/Nudity Meeting"?
A Yes.
Q Do you understand what Ms. Saks was referring to or talking about in this email to you?
A I don't.
Q Do you have any idea whether any such discussion happened around March 28th, 2023?
A I remember there were many conversations trying to have these conversations. I don't remember specifically when it happened.
Q Okay. Do you have a recollection of a conversation about sex scenes or nudity happening at some point towards the end of March, start of April 2023?
A I remember a few conversations, yes.
Q Okay. Do you remember a few conversations with Ms. Saks, Ms. Giannetti, and any of the other people referenced here on this email?
A Yes.



MS. SHAPIRO: Objection.
BY MR. GOTTLIEB:
Q Okay. Were those meetings that you recall and, as you sit here today, in person, on the phone, Zoom? What do you recall?
MS. SHAPIRO: Objection.
THE WITNESS: I don't -- I don't recall. I know we were in pre-production. So I think by this point, we were in the office. So some may have been in person; some may have been Zoom.
BY MR. GOTTLIEB:
Q Okay. You earlier testified about an initial meeting you had with Ms. Lively in December of 2022. This is now the end of March 2023.
Had you been working on edits to the script in between December of 2022 and March of 2023?
A Yes. Per Sony's direction.
Q How many different drafts of the script would you estimate you had gone through between the end of December 2022 and this point in March of 2023?
A I have no idea.
Q If we wanted to know the answer to that question, would there be an answer contained in

CONFIDENTIAL

Page 162

digital form in any program or software that you all used for managing changes to the script?

MS. SHAPIRO: Objection.

THE WITNESS: I'm not a technical expert in Final Draft. I imagine it would also be in the -- when I gave my laptop and phone and everything to the data people for the lawsuit.

BY MR. GOTTLIEB:

Q What program did you use for writing or making edits to the script?

A Final Draft.

Q Final Draft. And in that program, did you ever have occasion to go back and look at prior drafts to compare kind of where you were and where you'd been?

MS. SHAPIRO: Objection.

THE WITNESS: I believe so. Yeah, I had to learn Final Draft.

BY MR. GOTTLIEB:

Q And do you recall in Final Draft there being a function for notes and ways of indicating where changes had been made?

A Yes.

Q How -- to the best of your recollection, as you sit here today, how do you know looking at a

Page 163

script in Final Draft where changes had been made from the last draft?

A You would have I think the option to -- like as you type something in, it keeps what was there before and I think it puts like a strike through it.

Q There were stars on the side?

A There were stars on the side when it gets exported in the final, like the export, the final export.

Q Wherever you send out to --

A Yeah, because you wouldn't want it to have the strikes because that would be confusing. It would be too much dialogue.

Q Okay. So when you edit a script in this program and then you send it out for other people to review, the way that I would know if I were reviewing your new draft where changes had been made is that there would be stars --

MS. SHAPIRO: Objection.

BY MR. GOTTLIEB:

Q -- on the side?

MS. SHAPIRO: Objection.

THE WITNESS: Correct.

MR. GOTTLIEB: Okay. Let's take a look

Page 164

at one example of that, and this will be Exhibit 25.

And Mr.Baldoni, I'm going to say this now before handing this to you because this is a script of the entire movie, I am not --

(Exhibit 25 marked for identification.)

THE WITNESS: You don't want me to read the whole script?

MR. GOTTLIEB: I'm not going to ask you to do a table read.

THE WITNESS: There you go.

THE STENOGRAPHIC REPORTER: Thanks.

BY MR. GOTTLIEB:

Q So Exhibit 25 is a document bearing the Bates Nos. BALDONI 3641 through 3759 and am I right, Mr. Baldoni, that this is a version of the script that has been sent from someone to you on or about April 10th, 2023?

A It appears so.

Q What's the "official clean white production draft"?

A The first -- I think white is the first color that you would have when you start to prep a movie.

Q Okay. And do you know who sent this to you from the production office?

Page 165

A Whoever was handling distribution.

Q Okay. So this is April 10th. Do you have any estimate or any recollection at all as you sit here today of how many different drafts the script had gone through from December of '22 until this point in April of 2023?

A Official drafts? I don't believe any official drafts.

Q Any drafts that had been saved on the system as a new draft?

A I couldn't -- I couldn't estimate.

Q Is it fair to say that you were tinkering with the script often during that period of time?

MS. SHAPIRO: Objection.

THE WITNESS: Tinkering wouldn't be the word I use.

BY MR. GOTTLIEB:

Q Revising?

A I was -- yeah, I was revising. Sure.

Q You were making edits, and I think you said earlier, in conjunction with Sony?

A In conjunction with the producers and also the writer, Christy Hall.

Q Okay. I want to direct your attention to page 47 of the script, which is the page marked with

CONFIDENTIAL

Page 166

the Bates No. BALDONI 3690.
A Okay.
Q On page 47, I believe we were in Scene 39 and there is a description at the bottom of the page of a bedroom scene. Do you see where I am?
A Yes.
Q And do you see in that description of a bedroom scene a description of a sex scene between the characters Ryle and Lily?
A Yes.
Q What part of the movie is this?
MS. SHAPIRO: Objection.
THE WITNESS: This is the beginning of their romance, I believe. This is right as they are falling in love on screen.
BY MR. GOTTLIEB:
Q Did you write the words that appear from the bolded bedroom to the end of the page where you have an italicized:
(As read):
"These nearly two" -- "these two newly formed lovers" -- then italicized -- "become one"?
A I don't believe I did.
Q Who do you believe wrote that?

Page 167

A I believe those were Christy Hall's words.
Q All three paragraphs?
A I'm sure that I adjusted some words. This to me, my memory of it is, this was written and feels like Christy Hall's writing.
Q Do you know one way or the other as you sit here today whether this description of a bedroom scene between Ryle and Lily was in the script that was sent to Ms. Lively in December of 2022?
A My recollection is that many of the intimate scenes were worked on since that first draft that Ms. Lively had.
Q So that would be a no with respect to this scene?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know specifically this scene, if it was in the script or not.
BY MR. GOTTLIEB:
Q So your recollection is that many of the intimate scenes were worked on since the first draft sent to Ms. Lively in 2022, but you're not certain whether this was one of those scenes?
MS. SHAPIRO: Objection.
THE WITNESS: No, I believe I was

Page 168

answering your question about whether this scene was in the initial script or not.
BY MR. GOTTLIEB:
Q Okay.
A That's all.
Q So yes or no, was it?
A That's what I said, is I don't know if it was in the initial script.
Q Okay. But then in response to it, you also said --
A That's --
Q -- my recollection is that many of the intimate scenes were worked on since the first draft that Ms. Lively had?
A Correct.
Q So you're saying that many of the intimate scenes that were in the script --
A Yes.
Q -- that Ms. Lively saw in December of 2022 were scenes that you were working on in between December of 2022 and April of 2023?
A Correct.
MS. SHAPIRO: Objection.
BY MR. GOTTLIEB:
Q Okay. Were you working on those scenes

Page 169

with Ms. Lively at that time?
A No, I wasn't.
Q Okay. You were working on them with Ms. Hall?
A Ms. Hall, Alex Saks, Andrew Calof, Ange Giannetti, Jamey Heath.
Q Okay. If you turn the page, one page, to page 49, you see Scene 42, Boston Grace Hospital, Hallway, Neurosurgery Floor."
You see that?
A Uh-huh.
Q And do you see a discussion of a scene at the hospital when Lily comes to see Ryle?
A Yes.
Q And there is an exchange there in dialogue where Lily says:
(As read):
"Hello there, Doctor."
Ryle says:
"Hey, I didn't expect to see you today."
And Lily (coy, sexy) says:
"Yeah, well, I think I need a physical. Maybe you can help me out."
Do you see that?

A Yes.
Q Did you write that?
A I did not.
Q Who wrote that?
A This was specifically an idea that Christy Hall had when we were meeting together over two days in my office at Wayfarer.
Q Did you think it was a good idea?
A I think I did at the time. That's probably why it's in the script.
Q Did you ever change your mind about that?
A Change my mind about putting it in the script or that it was a good idea?
Q That it was a good idea.
A I'm not sure. I don't believe Ms. Lively liked it and so then we took it out.
Q Is there anybody else who didn't like it?
A I don't recall. I feel like it made the script because people liked it that were -- I was collaborating with.
Q What did you like about this?
MS. SHAPIRO: Objection.
THE WITNESS: About this scene?
BY MR. GOTTLIEB:
Q About that dialogue.



A Oh. Well, I can't comment on the dialogue. The dialogue is -- much of dialogue like this is always a work-in-progress. Until an actress says it outloud, you don't know if it works.
But to answer your question, specifically, there was a request from Sony to add more sexy to the movie and we were constantly looking for ways to do it, that also fit into the budget because we had location constraints, time constraints. We could only be in certain places at certain times. As I remember, this specific instance was a little bit of the tail wagging the dog, because we were having to pay a lot of money to rent out a hospital, and there weren't enough scenes to shoot in the hospital.
And so as producers do and as a director does, we are trying to figure out how to give the co-studio the notes that they want which are, as an example, adding a sexy scene to help their relationship. And, also, the budget constraints of having enough to shoot in a hospital.
So when you put those two things together, I believe Christy had a great idea of, like, oh, maybe there is like -- you know, maybe she should play doctor, you know.



And as I often did, she's a woman. She's a brilliant writer. I'm not going to argue with her of what is sexy or not. Because I wanted this to be from that gaze anyways. So I thought it was perfectly fine.
I will only also add that we were also constantly going back to the book to figure out how to adapt it in a way that made Ryle and Lily's relationship more sexual and Atlas' and Lily's relationship more romantic. Because we wanted them to be two very different situations.
So there was a lot more talk about making sure there was more Ryle and Lily because in the book, there is a -- by the time they get together, there is a lot more sexual interaction between the two. And we just didn't have nearly enough in the movie.
Q Is there a scene in the book that involves Ryle and Lily playing doctor in the hospital and then having sex in an exam room?
A No.
Q And I think your testimony was, it was a good idea to add this because it made good use of the amount that the studio was paying to the hospital for production?



MS. SHAPIRO: Objection.
THE WITNESS: I don't believe that was my testimony.
BY MR. GOTTLIEB:
Q Would adding a sex scene not in the book be considered gratuitous?
MS. SHAPIRO: Objection.
THE WITNESS: No. Because none of the sex scenes that were in the movie as they currently exist were ever in the book in the way that they are.
BY MR. GOTTLIEB:
Q If you flip to page 81 of the script, which is BALDONI 3724.
Are you there with me, sir?
A Yes.
Q Do you see A69?
A Yes.
Q And that is a reference to "ARIA HOTEL, PENTHOUSE SUITE NIGHT"?
A Yes.
Q And this is wedding night for Ryle and Lily?
A Yes.
Q And you see towards the end of that, it's

written:
(As read):
"As the two climax at the same time, they lock eyes and cannot help but smile, baffled that they found each other"?
A Yes.
Q Whose idea was it to add "the two climax at the same time"?
A Christy Hall.
Q When did she communicate that to you?
A We did it -- we were writing together. We were in a room in my office. We were specifically working on a lot of the sex scenes and --
Q What did -- sorry. Go ahead.
A And we -- yeah. This was -- we were writing a movie that was filled with romance and lust and intimacy and sex. And, again, these are all outlines, right, so a script has far less description than a book. So you have It Ends with Us, which has a ton of pages and very detailed descriptions of various scenes so that you can paint the picture in your mind. And all writers do. Which I learned a lot on this process, is you



have to give some sort of outline so that as you're reading the script, you have an idea of what's happening. And then you work out all the details once you start production, both with the actress in accordance with what is standard for approval. And then after the actress, with the intimacy coordinators to figure out what each of these things really mean.
Q Did you ever have a conversation with anyone else, cast, crew, production on It Ends with Us about Lily and Ryle climaxing together, other than Christy Hall?
A I think I spoke about every single intimate sex scene with our intimacy coordinator.
Q Okay. So Ms. Hall, your intimacy coordinator --
A And then eventually, Ms. Lively.
Q Okay. And then Ms. Lively?
A Yes.
Q Do you ever recall having a conver -- so do you recall having a conversation with Ms. Lively about this specific line here?
A I don't recall it being about this specific line.
Q Do you have any recollection of having a



conversation with Ms. Lively about the scene in which you discussed you and your wife?
MS. SHAPIRO: Objection.
THE WITNESS: I remember a conversation, not discussing a scene, where I brought up my wife, yes.
BY MR. GOTTLIEB:
Q And what do you recall bringing up?
A The day before I had a meeting with the intimacy coordinator, to go over ideas for all of these scenes, I wrote down a bunch of notes from that meeting. The following day, I had a meeting set with Ms. Lively to specifically talk about the sex scenes. That was the actual point of the meeting. In that meeting, I read through and walked through the notes that I had discussed with the intimacy coordinator.
One of them was an idea that had come up where Ryle and Lily were making love. Lily had climaxed or had an orgasm, to speak frankly here, and Ryle did not. And the idea, as the intimacy coordinator and I were talking about things that women have not seen on camera yet, things that would be unique, that would be attractive to the female gaze, which was the purpose of that meeting, the



idea was that Ryle would then stop and say "just watching you was enough" or "I'm good" or something like that.
When I shared that with Ms. Lively, she then made it personal and said ,"Oh, God, that would mortify me if that happened to me." To which I then responded, as one does because when you're two grown adults with children who are married in the context of talking about sex scenes, with a movie that you're making with a person who is understanding that there are going to be sex scenes in a book based with a lot of sex in it, the only thing you really have to share are personal experiences. So I said, "Oh, well, some of the most beautiful moments have been when that's happened with me and my wife." And that was it.
Q So you were interested in shooting the scene from the female gaze?
A I was interested in shooting all the sex scenes from the female gaze.
Q Did Ms. Lively have a female gaze?
A I would imagine so if she's a female.
Q Did you believe she had one?
A Of course.
Q Did you believe that that gaze was

CONFIDENTIAL

Page 178

important in incorporating ideas about how these various scenes should be shot?
MS. SHAPIRO: Objection.
THE WITNESS: Absolutely. That's why I incorporated all of Ms. Lively's ideas without hesitation.
BY MR. GOTTLIEB:
Q And it's your testimony that when you say Ms. Lively said she would be mortified, that you believe she was referring to?
A If that happened to her, were her words.
Q If that happened to her in her personal life?
A Yes. It was a personal comment. Like it was inferring that if -- she was inferring that if her husband didn't finish, if she didn't finish her husband or climax her husband, that she would be mortified.
Q That's what --
A That's what she said. So she said, "Oh, that would mortify me if it happened to me."
Q Your recollection as you sit here today about a meeting that occurred in April of 2023?
MS. SHAPIRO: Objection.
THE WITNESS: I would imagine that's the

Page 179

date.
BY MR. GOTTLIEB:
Q Okay. Your recollection is that you specifically recall Ms. Lively saying about herself personally, she would be mortified if the events described in the scene happened to her in her personal life?
MS. SHAPIRO: Objection.
THE WITNESS: Yes. That's why I then shared what I shared. That was -- and that was a very normal thing for Ms. Lively. You are two adults, two professionals, having a conversation, and one of the only things you have is your personal experience. So I didn't think anything of it.
BY MR. GOTTLIEB:
Q Did you ever tell Ms. Lively that Christy Hall was working with you on drafts of the script in April of 2023?
A My recollection -- bless you.
My recollection is that Ms. Lively was on spring break and we didn't -- I don't think we were in that much communication. But I don't -- I don't know.
Q So you don't know if you ever told Ms. Lively that one way or the other?

Page 180

A I imagine I did because I oftentimes told her I'm not a writer, and I was kind of in this position where I was having to write.
Q Okay. You imagine you did. But earlier, we talked about it's your recollection that matters. So do you have a recollection?
A I don't have a specific recollection of a conversation where I said to Ms. Lively that Christy was helping me.
Q Okay. But you did tell her that you had worked on ideas for these scenes with an intimacy coordinator?
A That was the entire context of the meeting we had at her place.
Q And who was the intimacy coordinator?
A Lizzy Talbot.
Q Did you read Ms. Talbot's deposition transcript in this case?
A No.
Q Have you ever talked to Ms. Talbot about her recollection of any of the events relating to the script or production in this case?
A No.
MR. GOTTLIEB: Okay. I think it is about lunch time. So why don't we go off the record?

Page 181

THE VIDEOGRAPHER: We are going off the record. The time is 1:05 p.m.
(Lunch recess.)
(continuing)
AFTERNOON SESSION
TUESDAY, OCTOBER 7, 2025
---0O0---
THE VIDEOGRAPHER: We're back on the record. The time is 2:02 p.m.
BY MR. GOTTLIEB:
Q Did there come a time in May of 2023 where you learned that Jenny Slate and Ms. Lively had made concerns known regarding comments that you had made on the set?
A In May of 2023? I believe, yes. Yes.
Q Who told you about Ms. Slate and Ms. Lively's concerns?
A Ange Giannetti. Alex Saks.
Q Separately or together?
A Separate conversations.
Q With Ms. Giannetti, was that a conversation in person?
A No.
Q On the phone?
A Yes.

CONFIDENTIAL

Page 182

Q How about Ms. Saks?
A Phone.
Q Okay. What do you recall Ms. Saks telling you about Ms. Slate's concerns?
A I recall her having lunch with Ms. Slate and saying that Ms. Slate -- she listed a few things. She said Ms. Slate had not appreciated the recording that I had made during pre-production with her and Ms. Lively. She had not appreciated a comment that I had made on-set regarding her wardrobe, something she was wearing. I believe she also said that Ms. Slate didn't like that I was interacting with the fans outside. There was a lot of fans when we were shooting. And then, on certain breaks I would go and just say hi to them because they were out there all day.
And if I recall correctly, she was saying to Ms. Saks that she didn't want to be asked to go out and do that as well because she was a private person. So she was asking to not interact with -- to be asked to interact with the fans. I don't know if it was Alex or Ange who told me that she had felt the set was too huggie or comfortable or whatever. I know huggie was a word that was used because I remember the word.

Page 183

That's the best of my recollection at the moment.
Q So between Ms. Saks and Ms. Giannetti, you were told that Ms. Slate thought the set was too huggie, yes?
A You asked me about just Ms. Saks, so I was just answering for Ms. Saks.
Q I thought you just said you weren't sure if it was Ms. Saks or Ms. Giannetti that said that?
A Oh, no. I thought your original question was to recount what Ms. Saks told me. If I misheard that --
Q That's fine.
A -- I thought you were breaking the two up.
Q Did Ms. Giannetti's description of Ms. Slate's concerns differ in any material respect to you?
MS. SHAPIRO: Objection.
THE WITNESS: Slightly.
BY MR. GOTTLIEB:
Q In what way?
A I specifically recall -- to further answer your question, it was a FaceTime.
Q With?

Page 184

A Ms. Giannetti.
Q Okay.
A It was not a phone call.
Q So a FaceTime with Ms. Giannetti. What do you recall that's different?
A What's different is that Ms. Giannetti had told me that she had asked Ms. Slate if she wanted to file a report, if she wanted her to do something with it. That was not something that was -- that Alex had said anything about. To which Ms. Slate said, no. Ms. Giannetti had also said on that call that when Ms. Slate had said that I had commented on her wardrobe and used the word "sexy," that Ms. Giannetti asked if she felt it was sexual or if I was hitting on her, and she said, no, it wasn't sexual. She just didn't appreciate it.
That's how in my recollection -- oh, and I believe it was from Ms. Giannetti that I had heard that Ms. Slate didn't appreciate the way that Jamey or Mr. Heath had offered to pay for her additional housing, as he was talking about the sanctity of motherhood. And I wasn't there, so I don't know. But she didn't like that, I guess.
Q And so before when you were testifying about what Ms. Saks told you, you had mentioned a

Page 185

comment about a wardrobe. That comment about a wardrobe included the use of the word "sexy"?
A Correct.
Q And your testimony is that that comment was about the wardrobe choice?
A I don't think that's what I said.
Q Okay. We'll get back to your description of that in just a moment.
Am I correct that in response to receiving this information from Ms. Saks and Ms. Giannetti, you sent a message to Ms. Slate?
A Well, this was the first I had heard about it. Ms. Slate had not come to me directly, and I felt -- I felt terrible, and I wanted to apologize. But I also didn't want to burden her with that or make her uncomfortable. And so I thought it would be best, based on the kind of the power dynamic and the awkwardness of it, to actually send it to Alex so that I didn't have to, like, force her to accept my apology or something. So I was just trying to be respectful. And so, yes, I sent Alex a message to send to Ms. Slate.
Q You didn't want to make Ms. Slate uncomfortable by sending her a message directly?
A Yes.

CONFIDENTIAL

Page 186

Q And that's because you understood that Ms. Slate was already uncomfortable in certain respects?
MS. SHAPIRO: Objection.
THE WITNESS: Well, I understood that since she had shared that she had not appreciated some of my behavior. As soon as I was aware of it, I didn't want to add to that in any way. So I wanted to send it to her so I didn't, like, create anymore discomfort.
BY MR. GOTTLIEB:
Q Anymore discomfort?
MS. SHAPIRO: Objection.
THE WITNESS: Yes. Correct.
BY MR. GOTTLIEB:
Q Okay. And you were also informed about Ms. Lively's discomfort as well, correct?
MS. SHAPIRO: Objection.
THE WITNESS: Not from Alex Saks.
BY MR. GOTTLIEB:
Q From whom?
A Ange Giannetti.
Q Let's bracket that and come back to it. Let's continue on Ms. Slate for a moment.
A Okay.

Page 187

MR. GOTTLIEB: I want to show you a document. This will be Exhibit 26.
(Exhibit 26 marked for identification.)
BY MR. GOTTLIEB:
Q Mr. Baldoni you've been handed what's been marked as Exhibit 26. This is a document bearing the Bates Nos. BALDONI 31947 through 31950.
A Uh-huh.
Q And this is a text exchange between you and Alex Saks; is that correct?
A It appears to be.
Q The date is May 30th, 2023; is that correct?
A May 30th, 2023, yes.
Q Okay. And do you see at the bottom of page 31948 at 9:46 p.m., you ask Ms. Saks if you can send your notes to Jenny and Blake?
A I do.
Q And then, do you see on page 31949, you send two draft notes to Ms. Slate and Ms. Lively?
A I do.
Q You send them to Ms. Saks, draft notes to --
A Yes --
(Cross talk.)

Page 188

Q -- to Ms. Slate and Ms. Lively?
A -- I send them to Ms. Saks, yes.
Q Okay. And in the note to Ms. Slate, that you're asking Ms. Saks to send, you say:
(As read):
"I recognize the last few days of filming have been difficult, but I wanted you to know that the work is really great and I'm excited for what we're creating."
Were you being straightforward and truthful when you said that the last few days of filming have been difficult?
A Yes. I said:
(As read):
"First off, thank you for putting in -- putting your all into the film."
And then I said:
(As read):
"I recognize that the last few days of filming have been difficult."
So that was -- well, it was -- they were -- yeah, they were difficult, so I was being truthful, of course.
Q Those few days had been challenging on

Page 189

the set?
A Every day on a movie set is honestly challenging, but those few days, yeah, there were a lot of big challenges those few days, production wise.
Q Then you say:
(As read):
"Equally important is that I was made aware of your concerns. I wanted you to know they are fully received. I hear you and adjustments will be made accordingly."
And your reference there to your concerns, are those the concerns that you had just listed out to me that you had been relayed from Ms. Saks and Ms. Giannetti?
A Correct. The ones involving myself, yes.
Q Are there any other concerns that as you sit here today, you can think of that you could have been referring to other than the ones you just testified about?
A Specifically, I -- I was answering your question as it related to Jenny Slate, so if you're talking about concerns in general...
Q What I'm talking about is your reference

CONFIDENTIAL

Page 190

here to your concerns. And all I'm trying to understand, sir, is if other than what you just testified to, there's anything else you can think about that you were referring to when you wrote "your concerns"?
MS. SHAPIRO: Objection.
THE WITNESS: I would go back to a previous question, and then I would -- I would include a concern that wasn't, I don't think, mentioned to me from Alex. But if you're asking if I was inferring anything, there was a instance that happened with Ms. Lively on set as well, where I also used the word "sexy" in relation to wardrobe that Ms. Slate was there for. So I would lump that into the overall concerns.
BY MR. GOTTLIEB:
Q And you knew that Ms. Slate was concerned about that comment as well to Ms. Lively?
A Ms. Slate and I had a conversation with Ms. Lively about that comment.
Q Okay. And Ms. Slate told you she did not appreciate or feel comfortable with that comment?
A Those -- I don't believe those were the words she used.
Q What were the words she used?

Page 191

A I believe she -- I don't have the exact words, but it had to do with, in general, we are -- it's like, we are -- the collective, we are staying away from using those words to describe, you know, women's bodies. It was like a -- in kind of like a -- Ms. Slate is a very funny woman, kind of a disarming, joking kind of way. But it wasn't your words. So I just...
Q Do you think that was Ms. Slate's female gaze?
MS. SHAPIRO: Objection.
THE WITNESS: Do I think her words --
BY MR. GOTTLIEB:
Q Objection to describing her wardrobe as sexy would constitute her female gaze on that particular situation?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MR. GOTTLIEB:
Q Did you have a different gaze from your male perspective?
A I don't know if it's possible that I can have a different gaze as a male. So I'm sorry, I don't know what you're asking.
Q So Ms. Slate, not you, would know from

Page 192

the female gaze, the impact of having somebody say that you're -- you look sexy in a piece of clothing?
MS. SHAPIRO: Objection.
THE WITNESS: That's not what I said to Ms. Lively. But absolutely, Ms. Slate would have a female gaze and I would not.
BY MR. GOTTLIEB:
Q Would Ms. Lively have one?
A As I said earlier, so long as Ms. Lively identifies as a female, she would have a female gaze.
Q Okay. Do you see -- were any of the concerns that were reported to you by Ms. Slate provided to anyone in HR at Wayfarer Studios?
A To my knowledge, no.
Q You did not report any of the concerns that Ms. Slate had raised with you to anyone in the HR department at Wayfarer Studios?
A I did not.
Q Do you see that you've also written a note to Ms. Lively here?
A I have.
Q And you essentially use similar language here with respect to Ms. Lively's concerns; is that right?

Page 193

A Yes.
Q You say:
(As read):
"I want you to know that I've been made aware of your concerns and I hear you. They are fully received and adjustments will be made imminently."
Do you see that?
A Yes.
Q And you say:
(As read):
"The dailies are looking wonderful and while the last two days were tough, I assure you that your work was fantastic."
Do you see that?
A Yes.
Q And you say:
(As read):
"I truly believe you're creating one of your most honest performances that will have a long lasting and powerful impact."
Do you see that also?
A I do.

Q Were you being dishonest when you wrote this to Ms. Lively?
A No.
Q You believed all of that?
A Yes.
Q You did not believe as of May 30th, 2023, that Ms. Lively's concerns had been fabricated?
MS. SHAPIRO: Objection.
THE WITNESS: The concerns -- well, I don't think we've talked about her concerns yet, but...
BY MR. GOTTLIEB:
Q The concerns to which you are responding here when you say:
(As read):
"I've been made aware of your concerns and I hear you. They are fully received and adjustments will be made imminently."
With respect to those concerns that you're saying that you've been made aware of and they are fully received and adjustments will be made imminently, those concerns were not fabricated, right?



MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MR. GOTTLIEB:
Q You believe Ms. Lively made those -- communicated those concerns to you -- had -- let me strike that.
You believed that Ms. Lively communicated those concerns in good faith?
MS. SHAPIRO: Objection.
THE WITNESS: I believe that the primary concern, also being COVID, the reason that I was told she called Ange Giannetti, is a very valid concern. I was made aware of the -- that she also didn't appreciate the use of the word "sexy," but also that I apologized in the moment, and in her own words, we were good because we had actually discussed this in person afterwards. The majority of the concerns that I took seriously had to do with the way the set was being run. She was very adamant when she spoke to Sony about the firing of the first AD, she wanted a change.
So it was my understanding that the majority of the phone call with Ms. Giannetti had to do with COVID, and the firing of the first AD. And those were the concerns that I can recall being



aware of, which I do not believe were fabricated and she had every right to feel the way that she felt.
BY MR. GOTTLIEB:
Q Including her concern with respect to your use of the word "sexy"?
A She has every right to feel that way about that word, but I also -- that was something that we worked through immediately on the spot.
Q And I appreciate that, but to underscore the point, it's your testimony as you sit here today that Ms. Lively's concern with respect to your use of the word "sexy," that wasn't something she made up to take control of the film, right?
MS. SHAPIRO: Objection.
THE WITNESS: I do not believe she made up the instance where I used the word "sexy" to describe specifically her wardrobe, no, I don't.
BY MR. GOTTLIEB:
Q And Ms. Slate's concerns were not made up so that Ms. Lively could take control of the film, right?
A No. I also can't speak to what Ms. Lively's intentions were at the time.
Q I want to show you -- did you ever talk to Ms. Slate after sending this message? Did you



ever talk to her about this situation or her concerns directly?
A I didn't feel it was appropriate to put her in that situation. So from that point on, I gave her high-fives and complimented her on her work and didn't hug her and never used the word "sexy" again.
MR. GOTTLIEB: I want to show you a document. I will mark it as Exhibit 27. And Exhibit 27 is a document bearing the Bates Nos. JS 224 through 225, which is a text message dated May 27th between Jenny Slate and Josh Pearl.
Take a minute to read that.
(Exhibit 27 marked for identification.)
BY MR. GOTTLIEB:
Q And Mr. Baldoni, I appreciate that looking at some of this may be difficult. This -- who is Josh Pearl, first of all?
A I don't know.
Q The text that we were looking at in the prior exhibit, which is Exhibit 26, and the messages that you had sent to Ms. Slate and Ms. Lively was from May 30th. This is an exchange on May 27th; is that right?
A It appears to be.

CONFIDENTIAL

Page 198

Q And were you aware by May 27th that Ms. Slate felt -- she says:
(As read):
"I am not scared or anything, just repulsed and deeply irritated."
Were you aware that's how she felt as of May 27th?
A No.
Q Were you aware that --
A Actually, I'm sorry. I would like to correct that for the record. I don't know the date that Alex said anything to me or that I talked to Ange. So if, in fact, it was the 26th, I don't want to speak incorrectly. So I don't know what I felt or what I knew or didn't know on the 27th. It very well could have been.
Q You might have known that she was deeply irritated by then?
A No. I don't know what day Alex and her had lunch. So I'm unsure what -- I'm just talking about the date. That's all.
Q You characterize before how the "sexy" comment was described to you; is that right?
MS. SHAPIRO: Objection.

Page 199

BY MR. GOTTLIEB:
Q Your understanding of -- your understanding of Ms. Slate's understanding of the "sexy" comment as told to you by Ms. Saks and Giannetti; is that fair?
A Yes.
MS. SHAPIRO: Objection.
BY MR. GOTTLIEB:
Q Okay. Do you see at 10:24, Ms. Slate characterizing that comment in her own words?
A Yes.
Q And do you see there she says:
(As read):
"At that point he had made the comment to me about looking sexy, but I had decided just to try to push past it even though it made me feel so unsettled and deeply, deeply disappointed and irritated"?
A I do.
Q Did you know that's how Ms. Slate felt?
A I didn't.
Q How does it make you feel now knowing that that's how Ms. slate felt in that moment?
MS. SHAPIRO: Objection.

Page 200

THE WITNESS: Sad.
BY MR. GOTTLIEB:
Q You talk before about your desire to tell the story through the female gaze; is that correct?
A It was a desire, yes.
Q Why did you choose a male director?
A Well, for some time I was actually looking for a female director. I went back and forth from the very beginning of if I should direct or not. Originally, I had optioned the book to direct it, and that was the original plan. And that was back in 2019 or so. And culturally, the conversation changed very fast, and so I thought maybe I shouldn't direct it. So there was a period of time where I wasn't going to direct it.
And then, in the developing of it with Christy Hall, and in speaking to many of the women in my life and women who do specific work as it relates to gender, I sought advice. I started feeling like I was seeing the movie and what was possible. And I thought if I could surround myself with the right team, that there was actually something that I could do justice to because it wasn't solely a female story. There also were elements that I believe could be really helpful to

Page 201

men.
So ultimately, because I had the rights to the film and it was ultimately my decision and in consultation with friends and my wife and team, ultimately I believed in myself enough to take on the role.
Q You thought you would be the best person to direct this film?
A At the time I did.
Q Did Colleen Hoover ever tell you that she wanted the director of It Ends with Us to be a female?
A My recollection from the very beginning was that Colleen Hoover knew I was going to be directing this film. That was why she gave me the rights.
Q So my question is, at any point in time, did Colleen Hoover ever tell you that she wanted the director of the film to be female?
A I don't remember a conversation like that. It may have happened, but I feel like I would remember.
Q Okay. Do you recall ever having a conversation with anyone where they told you maybe the director of this movie should be a female?

CONFIDENTIAL

Page 202

A I think during the time that I was just discussing where there was big shifts culturally, yes, which is why we were looking for a female director for quite some time.

Q Okay. But ultimately, you decided you were better positioned to tell the story?

MS. SHAPIRO: Objection.

THE WITNESS: I wouldn't characterize it that way at all.

BY MR. GOTTLIEB:

Q Do you recall ever saying to Brandon Sklenar on the film set, something to the effect of, I have to tell you something but I don't want to get canceled or lose my job. You can't say anything on this set anymore?

A I have heard that in someone else's testimony, and that is not something I said. That's also not the way that I speak.

Q Whose testimony did you hear that in?

A I believe Jenny Slate's.

Q Did you come to ever feel like you couldn't be open or candid or unfiltered on your set?

A Yes. But not for any reason that it's inferred in that text, nor would I ever say anything

Page 203

to Brandon Sklenar like that.

Q So if somebody said they heard you say that, your under-oath testimony would be they are mistaken?

A My under-oath testimony is that I don't believe I ever said anything to that -- to that effect to Brandon Sklenar.

Q Did you say to Ms. Slate when you made the "sexy" comment, that you could say that because your wife was there?

MS. SHAPIRO: Objection.

THE WITNESS: My recollection of the "sexy" comment was that it was all kind of said in one sentence.

BY MR. GOTTLIEB:

Q And what was the one sentence?

A Ms. Slate walked in. As a director, I was doing whatever I was doing, getting the set ready. I looked over to her. She was wearing a -- I believe black leather pants, which were designed to, I'm sure, look sexy. And without thinking, I said something to the effect of, oh, wow, those pants look sexy on you. And my memory, if it serves me correctly, I then -- my wife was in the room nearby. And I think in my head I was like, oh,

Page 204

maybe I shouldn't have said that. And I said, and I say that as a married man with my wife in the other room. Because I did not want it to come off in any way like it apparently did. So I was just -- in that moment it was just an instance where I said something that I was like, ah, I probably shouldn't have said that. And just tried to not make it super awkward and made a bad joke at the end of it.

Q What you just described to me, I probably shouldn't have said that, my wife's in the other room, is that something you said outloud or is that in your head what you were thinking?

A Well, I was -- it was like an internal dialogue --

Q Internal dialogue?

A -- like a -- it just came out. It was an instance where I said something without thinking.

Q Okay. Have you ever discussed, in the context of the events of this film, and what happened on set, have you ever discussed trying to describe them as a component of neurodivergence?

MS. SHAPIRO: Objection.

THE WITNESS: That being an instance, yes.

Page 205

BY MR. GOTTLIEB:

Q And what is it about that instance that you believe is a -- well, first of all, how are you neurodivergent?

A I've been diagnosed with ADHD combined.

Q Do you take medications for that?

A I do.

Q Are any of those medications stimulants?

A I believe -- I'm not 100 percent sure, but it might be, yes.

Q Is that a daily medication?

A Yes.

Q Were you on that medication at the time of production of It Ends with Us?

A I was not.

Q Okay. Is that why you suggested to your publicists at one point, trying to go on a podcast or a show of some kind and have a discussion about how what you had been accused of was because of your neurodivergence?

MS. SHAPIRO: Objection.

THE WITNESS: I was never going to go in a show to talk about what I have been accused of. I remember specifically, one being very interested in general to go on a certain show. I believe his name

CONFIDENTIAL

Page 206

is Dr. Amen, who literally saved the life of one of my best friends. And the things that at the time, I knew I was being -- I don't think accused of is the right word, but I knew that I had these instances that had made, as an example, Ms. Slate feel uncomfortable or, at the time, Ms. Lively, had to do with the few instances where I made the mistake of saying something where I didn't think fully.
BY MR. GOTTLIEB:
Q Is that something you describe of as impulsive speech?
MS. SHAPIRO: Objection.
THE WITNESS: I think it could be characterized as that; although, I'm not a therapist.
BY MR. GOTTLIEB:
Q Would it surprise you to learn that in talking with some people from your publicist team, you described going on that show of that doctor in order to discuss some of the things you had been, quote, "accused of"?
MS. SHAPIRO: Objection.
THE WITNESS: That would surprise me because that was not something that I specifically ever said. I never said I wanted to go on a show to

Page 207

discuss things I'd been accused of.
BY MR. GOTTLIEB:
Q You never said, most of what I've been accused of could be explained by your neurodivergence?
MS. SHAPIRO: Objection.
THE WITNESS: Feel free to correct me if I'm wrong, but what you just said is not what you had asked me previously.
BY MR. GOTTLIEB:
Q Well, I'm just focused on the words "accused of." And you seem to be saying that you've never described what happened on the set of It Ends with Us in those terms. I'm trying to understand if that's what your testimony is.
MS. SHAPIRO: Objection.
THE WITNESS: No, my testimony is specific to your question, which was, did I ever try to go on a show to specifically discuss the things that I was accused of on the set of It Ends with Us.
BY MR. GOTTLIEB:
Q Okay.
A So to answer your question, no. And I do believe that the other answer to your question is that impulsive speech could absolutely be and is

Page 208

oftentimes the reason for someone like myself saying something that I didn't fully think through.
THE WITNESS: Are we done with these?
MR. GOTTLIEB: I think so.
THE WITNESS: What about the script?
MR. GOTTLIEB: Your call.
THE WITNESS: All right. I'll save it.
MR. GOTTLIEB: Mr. Baldoni, you've been handed what's been marked as Exhibit 28. Exhibit 28 is a document bearing the Bates Nos. JONESWORKS 13502 through 13503. It's a text exchange on June 24, 2024 between yourself, Ms. Abel, and Matthew Mitchell.
Please take a look. Once you're done, I will ask you some questions.
(Exhibit 28 marked for identification.)
THE WITNESS: Okay.
BY MR. GOTTLIEB:
Q You've read the document marked as Exhibit 28?
A I have.
Q This is a text exchange between you and Ms. Abel and Mr. Mitchell on June 24th, 2024?
A Correct.
Q This is before the premiere?

Page 209

A Yes.
Q This is before any of the social media controversy about the premiere and the events surrounding the premiere had surfaced; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: I'm unsure.
BY MR. GOTTLIEB:
Q And you write at 12:52 p.m. on the 24th to this group that you're thinking about the Dr. Amen -- is it Amen or Amen?
A I think it's -- I don't know. Amen.
Q We'll use Amen.
You want to do The Dr. Amen Show. You say:
(As read):
"With everything going on, I want to have an offensive move showing my neurodivergence and some of the attributes that come with it so that I can start talking about it. Most anything that I have been 'accused of' is social awkwardness and impulsive speech, and I think me sitting down with him and just looking at my brain

and talking about some of these things will be helpful for me."

Do you see that?

A I do.

Q You wrote that?

A I did.

Q What had you been accused of as of June 24, 2024?

A So what I put in quotes there is because I haven't been accused of. That's why I put it in quotes. So there was nothing I had been officially accused of; hence, the need for quotation. I believe by this point, I was made aware of the unfollowing. And something that I had been working on over the last year and a half in therapy, was my neurodivergence, and a lifetime of being undiagnosed and the suffering that comes along with that.

And so what I'm suggesting here, is -- first of all, The Dr. Amen Show had reached out to me independently. And I had been wanting to do it because it's very expensive to get the brain scan done, and they were offering it for free, number one. In some way I think I was justifying why to do it with my team. And I also thought it would be really helpful, as I've done with everything else in



my life, to use my own experiences and shortcomings or, in this case, neurodivergence to help other people feel seen.

So yeah, it would have been helpful for me to sit down and have him scan my brain and tell me specifically what is going on.

Q Your testimony is that when you wrote this at 12:52 p.m. on June 24th, that when you said, "most anything I have been accused of is social awkwardness and impulsive speech," you were referring to a null set?

MS. SHAPIRO: Objection.

THE WITNESS: I'm sorry?

BY MR. GOTTLIEB:

Q Well, you said in response to my question, that the reason you put accused of in quotes is because there had nothing you had been officially accused of; hence, the need for quotation. And then you said, "I believe by this point, I was made aware of the unfollowing."

So is it -- maybe I'm misunderstanding your testimony.

(Cross talk.)

A What does null set mean? I don't understand what that means.



Q Maybe I'm misunderstanding your testimony. Is your testimony that you had not been officially accused of anything as of this point?

MS. SHAPIRO: Objection.

THE WITNESS: I hadn't been accused of anything. There had been, if you will, illusions to things. But there has not been like an accusation of sorts.

BY MR. GOTTLIEB:

Q Is what you were saying to your team here that the thing you wanted to get ahead of were insinuations about your conduct?

MS. SHAPIRO: Objection.

THE WITNESS: I think that I wanted to make it very public because I had spent the last decade using the things I was struggling with to help people. I wanted to also show that I had been diagnosed as neurodivergent, and like so many people, I struggle with it. And I thought it could be really helpful to myself but also to others.

BY MR. GOTTLIEB:

Q You know what it means to get ahead of a problem or get ahead of an issue, right?

A Yes.

Q You had concerns as of this point, by



late-June, that something might come out publicly about what had happened on the set of It Ends with Us, correct?

MS. SHAPIRO: Objection.

THE WITNESS: By this point in late-June, Ms. Lively had acknowledged that everything on round two had gone perfect. We had gone through the edit. By this point, I had had my film taken from me. I was excluded from finishing my own movie. Not being able to sound mix color, even approve the final picture. The cast had begun unfollowing me, and I was also told that I was not going to be sure if I was going to be attending the premiere. I did not know what was possible because nobody was saying anything. It was all whisperings. And I was preparing for absolutely anything.

BY MR. GOTTLIEB:

Q By this point in late June of 2024, did you understand that it had been insinuated that you had sexually harassed Ms. Lively or that you had engaged in sexual harassment on the set of It Ends with Us?

MS. SHAPIRO: Objection.

THE WITNESS: I had never thought of the words "sexual harassment." There had been

CONFIDENTIAL

Page 214

insinuations of various things, but done in a way that didn't actually say anything.

BY MR. GOTTLIEB:

Q Not insinuations of sexual harassment; is that what you're saying?

MS. SHAPIRO: Objection.

THE WITNESS: The word "sexual harassment" or anything around sexual harassment, first time I ever saw that was in The New York Times and when you emailed me.

BY MR. GOTTLIEB:

Q Okay. I want to be very clear. The words "sexual harassment" never occurred to you in respect to what Ms. Lively had described happened on the set until you received her complaint; is that your testimony?

MS. SHAPIRO: Objection.

THE WITNESS: I can't say it never occurred to me. It was very clear that Ms. Lively was insinuating things that came to a return-to-work document, but to answer your question, I can't say if I ever thought she was insinuating the word "sexual harassment" or not. I don't know.

BY MR. GOTTLIEB:

Q Do you ever recall communicating to

Page 215

anyone that you thought sexual harassment was being insinuated or suggested about you or your conduct?

MS. SHAPIRO: Objection.

THE WITNESS: I'm not sure, but I know that I certainly didn't agree with -- or the insinuations.

BY MR. GOTTLIEB:

Q If you had thought that sexual harassment was being insinuated, suggested, would you have wanted some kind of an investigation to be done or to exonerate yourself?

MS. SHAPIRO: Objection.

THE WITNESS: I'm not sure.

BY MR. GOTTLIEB:

Q I'm going to mark a document. Before I do, Mr. Baldoni, I see you have a drink in front of you.

A Yes.

Q That's a drink called "Update," right?

A Yes.

Q Are you a sponsor or a promoter of Update?

A A sponsor?

Q Yeah.

A What do you mean by a "sponsor"?

Page 216

Q Have you ever done promotions for that drink that is sitting in front of you here today?

A I'm an investor in it.

Q You're an investor?

A Yeah.

Q Have you ever done social media posts or any kind of product endorsements for that drink?

A I may have done a story, probably at some point.

Q Did you ever do a story or promotion about that drink during the marketing of the film It Ends with Us?

A Actually, I think -- I think I had given one to my publicist, Jen, and she was wired, and she liked it. So I did a story of her drinking it. I did, yes.

Q She was wired?

A She was, like, enjoying it. She was like enjoying the drink.

Q It's a stimulant, right?

A It's a non-caffeinated stimulant.

Q Are you aware of how relentlessly Ms. Lively has been savaged for promoting her hair care products during the marketing of It Ends with Us?

Page 217

MS. SHAPIRO: Objection.

THE WITNESS: I'm aware that's part of -- I don't know if I would ever use the word "savaged," but I'm assuming you mean, like, had negative press.

BY MR. GOTTLIEB:

Q Have you ever commented on Ms. Lively's marketing of her products during the time that It Ends with Us was being promoted and marketed?

A Publicly?

Q Publicly or privately?

A I'm sure I did privately.

Q Have you ever said it was tone deaf?

A I don't know if I said those words, meaning they came from me or if I was repeating that that's what I had heard, but I'm sure -- I feel like that's what it was, yes.

Q Do you know if your team has ever criticized Ms. Lively for the marketing of her hair care products during the launch of It Ends with Us?

MS. SHAPIRO: Objection.

THE WITNESS: I think they have.

BY MR. GOTTLIEB:

Q You thought, in fact, that Ms. Lively deserved to be criticized for promoting her hair care products around the same time that

CONFIDENTIAL

Page 218

It Ends with Us was released, didn't you?
MS. SHAPIRO: Objection.
THE WITNESS: I wouldn't -- I don't think that's a fair characterization of what I thought.
BY MR. GOTTLIEB:
Q You were happy that Ms. Lively was attacked for promoting her products during the launch of It Ends with Us; were you not?
MS. SHAPIRO: Objection.
THE WITNESS: I don't think that's a fair characterization of what's...
MR. GOTTLIEB: I'm going to show you what's been marked as Exhibit 29.
(Exhibit 29 marked for identification.)
BY MR. GOTTLIEB:
Q Exhibit 29 is a document bearing the Bates Nos. TOSKOVIC 089 through TOSKOVIC 103. This is a text exchange between yourself, Mr. Heath, Ms. Toskovic, Ms. Abel, and others on August 5th, 2024.
Do you see on the first page there, you have sent through a picture of an Update drink?
A I have.
Q That's the same drink you've got in front of you now, right? Different flavor?

Page 219

A It's a different flavor.
Q Same drink, different flavor?
A Yes.
Q And then you -- is this your social media team that you're texting with on this chain?
A I believe it was at the time.
Q You and the social media team talk about a social media post, which I think it looks like an Instagram story; is that right?
A That's correct.
Q And the comment on one of those that appears on page 091 is:
(As read):
"It Ends with movie press tour, Day 1. Gotta fuel up with drink Update."
Do you see that?
A I do.
Q It says:
(As read):
"Keeps me energized without the caffeine."
Do you see that?
A Oh, yes. On the second page, I do.
Q So you were promoting -- August 5th was the first day of the press junket; is that right?

Page 220

A I don't know the first day of the press junket.
Q That's the same day you gave an interview with Elle UK magazine in which you used the word "friction"?
A I probably did 20, 30, 40 interviews that day. I don't know, but I imagine it was the same day.
Q Okay. Do you see on page 93, if you flip further in, there's a picture of you --
A I'm just going to continue to read, if you don't mind.
MR. GOTTLIEB: I do not mind.
(Interference of audio from Zoom attendee)
MR. GOTTLIEB: What is that? Can you mute? Can you mute everyone.
THE VIDEOGRAPHER: Ms. Strasberg?
BY MR. GOTTLIEB:
Q You can turn back to page 93.
At the bottom, do you see a picture of yourself there?
A I do.
Q I think I recognize that hotel. It's a hotel in New York City you're standing in?
A Yes.

Page 221

Q I like that hotel.
A Me too.
Q You've got a very good-looking outfit on. And in the caption, there are different brands that are tagged there; is that right?
A Styling and grooming -- oh, sorry. Yes.
Q Do you see the different brands that are being -- for top, pants, shoes, watch, and necklace?
A Yes.
Q And those are meant to be tagged in a social media post?
A Yes.
Q To let people know what you're wearing, right?
A Yes.
Q That's pretty standard during the promotion -- well, that's fairly standard when you're wearing clothes, movie star, promoting a film, to let people know what brands you're wearing?
A This was fairly new to me, but I believe it's standard for movie stars.
Q Did you ever get any backlash that you can recall for being insensitive or tone deaf for promoting a drink in which you were an investor or clothing that you were wearing in connection with

CONFIDENTIAL

Page 222

your promotion of the film It Ends with Us?
MS. SHAPIRO: Objection.
THE WITNESS: To my knowledge, I don't know if there is a direct link between the molecule paraxanthine and -- comes from caffeine and domestic violence. So I don't believe there was any backlash for me posting one Instagram story about this drink.
MR. GOTTLIEB: I will move to strike that as nonresponsive.
BY MR. GOTTLIEB:
Q My question was, did you ever get any backlash that you can recall for being insensitive or tone deaf for promoting a drink in which you were an investor or clothing that you were wearing in connection with your promotion of the film It Ends with Us; yes or no?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not going to answer the question the way it was framed.
MR. GOTTLIEB: You have to. It's my deposition.
MS. SHAPIRO: Objection. Mr. Heath [sic], just answer it however best you can.
MR. GOTTLIEB: He's Mr. Baldoni.
MS. SHAPIRO: Sorry.

Page 223

MR. BACH: He should answer it too.
THE WITNESS: Who am I?
Can you ask it again?
BY MR. GOTTLIEB:
Q It's a yes-or-no question.
Do you recall ever receiving any social media backlash for your promotion of that drink on August 5th, 2024?
A I don't recall any backlash to me posting about Update.
Q Do you recall any backlash for you tagging TAG Heuer, Manolo, another brand, David Yurman, in connection with this picture that was posted on August 5, 2024?
A I don't recall any backlash specific to my outfit or the text, no.
Q Okay. Can you ever recall anyone telling you that they thought doing this, nodding to products in connection with a very serious movie, was insensitive or tone deaf?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MR. GOTTLIEB:
Q Is that gendered?
MS. SHAPIRO: Objection.

Page 224

THE WITNESS: May I answer the question?
BY MR. GOTTLIEB:
Q It's the reason I asked it.
MS. SHAPIRO: Objection to the commentary.
THE WITNESS: I don't believe it's gendered.
MR. GOTTLIEB: All right. I think we've been going for a while. Why don't we go off record.
THE VIDEOGRAPHER: We are going off the record. The time is 2:58 p.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record. The time is 3:25 p.m.
BY MR. GOTTLIEB:
Q What character did Isabella Ferrer play in the movie?
A She played young Lily Bloom.
Q Was young Lily Bloom under the age of 18?
A The character was under the age of 18.
Q That's what I meant. The character, young Lily Bloom, was under the age of 18 or supposed to be depicting someone under the age of 18?
A Correct.

Page 225

Q Was there a sex scene involving young Lily Bloom?
A Yes.
Q Did you attend Ms. Ferrer's deposition?
A Parts of it.
Q Did you attend the part where she testified under oath that after she and Alex Neustaedter filmed a sex scene, you went up to them and said, I know I'm not to say this -- I know I'm not supposed to say this, but that was hot?
A I heard that part, yes.
Q Was that true?
A I have no memory of saying that to them.
Q Do you believe Ms. Ferrer is a truthful person?
MS. SHAPIRO: Objection.
THE WITNESS: I have no way of knowing.
BY MR. GOTTLIEB:
Q If you said that, could you understand how Ms. Ferrer could be taken aback or upset by that comment?
MS. SHAPIRO: Objection.
THE WITNESS: As a director, I probably say -- go up to actors in between scenes 100 times a day, and whatever I said in that moment was

CONFIDENTIAL

Page 226

attempting to make them feel good about what they just did and comfortable. I don't think the context of the way I said it was offensive at all.
BY MR. GOTTLIEB:
Q Okay. Did you ever do any writing on the script during the period of the writers' strike?
A That is when the majority of the changes were made, yes.
Q Including changes that you made?
A Yes.
Q Did you ever ask while you were making changes to the script during the strike to have your name removed from the draft of the script?
MS. SHAPIRO: Objection.
THE WITNESS: On the contrary, I remember thinking that I should put both my name and Ms. Lively's name on it. And then I was told that we should probably have it removed, and in place, put Ange Giannetti's name.
BY MR. GOTTLIEB:
Q And you did that, right?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MR. GOTTLIEB:
Q And the reason for doing that -- and you

Page 227

have a very good memory -- the reason for doing that was to show solidarity with the strike; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: I don't believe that to be the reason.
BY MR. GOTTLIEB:
Q Would you be surprised if there was an email where you said that the reason for taking your name off of the script was in order to show solidarity with the strike?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know if I'd be surprised at anything at this point.
BY MR. GOTTLIEB:
Q That's not one of the documents you reviewed in preparation for --
MS. SHAPIRO: Objection.
BY MR. GOTTLIEB:
Q -- your testimony today?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not allowed to comment on the documents that I reviewed.
BY MR. GOTTLIEB:
Q You are allowed to comment if it was a

Page 228

document that you reviewed in preparation for your testimony today.
MS. SHAPIRO: No. I'm instructing you not to reveal what, if any -- which, if any, documents you were shown by your attorneys, which is protected by the privilege, work product.
THE WITNESS: I'd be happy to see the document.
BY MR. GOTTLIEB:
Q You're going to follow your attorney's instruction on that?
A I like to do that, yes.
Q Did you ever cross picket lines?
A I think every time I was on set during the writers' strike, I was crossing the picket line.
Q Did you ever ask anyone else to cross picket lines during the writers' strike?
A We only asked people to cross if they were comfortable crossing.
Q Is that a yes?
MS. SHAPIRO: Objection.
THE WITNESS: I didn't personally ask anybody to cross a picket line, no.
BY MR. GOTTLIEB:
Q But Wayfarer Studios did?

Page 229

MS. SHAPIRO: Objection.
BY MR. GOTTLIEB:
Q If they were comfortable?
MS. SHAPIRO: Objection.
THE WITNESS: I would say the production. It was very clear to everybody that if they didn't want to cross, they didn't have to cross. That was my understanding of it, but I wasn't in charge of that.
BY MR. GOTTLIEB:
Q Did you ever tell Ms. Abel or Ms. Nathan, who were out talking to the press about Ryan Reynolds crossing picket lines and violating Guild rules, that you yourself had crossed picket lines and violated the terms of the writers' strike?
MS. SHAPIRO: Objection.
THE WITNESS: I don't remember ever saying Ryan Reynolds crossed a picket line.
BY MR. GOTTLIEB:
Q Did you ever mention to Ms. Abel or Ms. Nathan at all that you had written on the script during the writers' strike?
A I think Ms. Abel was aware that I wrote.
Q Why do you think that?
A Because Ms. Abel was aware that both

CONFIDENTIAL

Page 230

myself and Blake wrote. I had told her.
Q Did you tell her that you had also -- Wayfarer Studios had also asked people who were comfortable to cross picket lines to come to work?
MS. SHAPIRO: Objection.
THE WITNESS: I don't remember a specific conversation with Ms. Abel about that.
BY MR. GOTTLIEB:
Q We talked a little bit earlier about a comment using the word "sexy" involving both Ms. Slate and Ms. Lively, right?
A Yes.
Q The comment to Ms. Lively, am I right that that occurred during the filming of the bar scene?
A The onesie bar scene, yes.
Q The onesie bar scene.
And is it correct that you made a comment that Ms. Lively, her dress -- and I'll let you characterize it -- looked sexy or hot?
A No.
Q What did you say?
A It wasn't a dress. So I was just answering your question.
Q I didn't mean to say "her dress," but it

Page 231

appears from the transcript, I did.
How would you characterize your comment using the word "sexy"?
A In a conversation where I was speaking to Ms. Lively about her wardrobe, as the director, I wanted to see the onesie because all the characters were wearing onesie's. She had a large jacket on, and we were having a bit of a negotiation, as I was trying to gently ask her to remove it.
And like many conversations with Ms. Lively, there's a back-and-forth that can go on for quite some time. And it got to the point where I believe I said to her that it looked hot, to which she replied -- earlier, she had said she thought it was cute, and that's why she wanted to wear it. And then I had said it -- down the line, I had said it looked hot. And she said, That's not what I was going for.
And then I made a joke. I said, sexy? She goes, Not that either. And then immediately, I paused, and I said, I'm sorry, did I just cross a boundary? And Mrs. Slate shared what we talked about earlier, to which case I thanked them both. I apologized to Ms. Lively again.
And I was in the middle of, you know,

Page 232

getting everything ready. I think at one point I let Ms. Lively know that she had something in her teeth before filming, because we were getting ready to go shoot. And then I came back later, five minutes later, before we started filming, and I thanked Mrs. Slate for what she said.
I said that was -- I said something along the lines of, That can't be easy. I wish you didn't need to say what you said, and I really appreciate you sharing that with me. And I apologized again to Ms. Lively for using the word "sexy" as it related specifically to her character's wardrobe.
Q Were the cameras recording when that exchange happened?
A The cameras for the movie?
Q Any cameras.
A I believe there was some behind-the-scenes cameras filming, yes.
Q Have you watched the video from that exchange?
A I have.
Q Have you produced the video from that exchange in this case to Ms. Lively?
A I believe every single piece of video as it relates to the movie was produced from my

Page 233

attorneys.
Q When did you last watch that scene, that recording?
A January maybe.
Q You didn't mention anything about missing the HR meeting. Did you say anything about missing the HR meeting?
A Yes, I did. In response to Jenny Slate's kind of -- as I mentioned earlier, joke, as she was saying, We don't say that anymore, I immediately responded and said, I guess I missed the sexual harassment meeting.
Q Did you miss the sexual harassment meeting?
A That's why I made the joke, because I did not miss the sexual harassment meeting.
MR. GOTTLIEB: All right. Let's look at a document.
(Exhibit 30 marked for identification.)
BY MR. GOTTLIEB:
Q This is a document that's been marked as Exhibit 30, another text exchange between Ms. Saks and Ms. Giannetti on June 1st, 2023. And it bears the Bates No. SPE_BL 2026 through 2035. And I'm really only going to be asking you, Mr. Baldoni,

CONFIDENTIAL

Page 234

about the exchange on page 2028. Actually, sorry. It's -- there is a little bit of carryover on 2027.
A I would still like to read the whole document, if possible.
Q I'm just trying to help direct your attention. So go ahead and read.
MS. AHOURAIAN: Mr. Gottlieb, did you mark this as 30 or 31?
MR. GOTTLIEB: 30.
MS. AHOURAIAN: Thank you.
BY MR. GOTTLIEB:
Q Have you had a chance to read this entire document, Mr. Baldoni?
A I just did, yes.
Q And this is a text exchange between Ms. Saks and Ms. Giannetti on June 1st, 2023?
A It appears to be.
Q You saw one of the things they were discussing was Ms. Saks' belief that they needed new ADs on the film immediately?
A Yes.
Q And she wasn't saying, in what you just read, that Ms. Lively was telling her there needed to be new ADs, right?
A No.

Page 235

Q That was Ms. Saks' view?
A That is, I did not read her saying anything about Ms. Lively wanting new ADs.
Q On the first two pages of this document, do you see Ms. Saks recounts a conversation that she participated in between Ms. Lively and Mr. Heath?
A Yes.
Q And she describes that as a tough chat?
A That's what she says.
Q And says:
(As read):
"Called Jamey out in front of me and Justin kindly, but was very direct"?
A I see that.
Q Did you witness that conversation?
A I believe I did.
Q Do you see on page 2028 at 9:42 p.m. -- or, a.m., sorry -- 9:42 a.m., Ms. Saks begins to describe -- well, she says:
(As read):
"You, Jamey, make jokes about how you can't make eye contact with people anymore, as if to undermine and lessen the importance of people not wanting to be cozy" -- "comfy, cozy on the set."

Page 236

Do you see that?
A Yes.
Q Did you ever make jokes about being unable to make eye contact with people on the set anymore?
A I did not.
Q Did Mr. Heath?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know what Mr. Heath did.
BY MR. GOTTLIEB:
Q Okay. And then she describes a meeting that took place on day two in which Mr. Heath went into Ms. Lively's trailer.
Do you see that?
A I see that.
Q Is what Ms. Saks describes here an accurate reflection of what Ms. Lively said during that meeting that you witnessed?
MS. SHAPIRO: Objection.
THE WITNESS: I was -- I'm sorry. Say that one more time?
BY MR. GOTTLIEB:
Q The description of what Ms. Lively said and how she described the meeting in the trailer

Page 237

that you see here on this page 2028, is that an accurate reflection of what you recall Ms. Lively saying?
MS. SHAPIRO: Objection.
THE WITNESS: I think that's why I'm a bit confused, because you said "Ms. Lively."
BY MR. GOTTLIEB:
Q Ms. Saks is describing something Ms. Lively said, right?
A I'm sorry. Before, you said "Ms. Lively."
Q I know. Let's start at step one.
A Yes.
Q We can agree that Ms. Saks is describing something Ms. Lively has said?
A Yes, yes, yes.
Q And that was something Ms. Lively said in a conversation that you witnessed, correct?
MS. SHAPIRO: Objection.
THE WITNESS: Okay. Is what -- if I can repeat the question, and tell me if I'm right. If what Alex Saks is texting Ange Giannetti here, if this is what I remember Ms. Lively saying in the meeting that I witnessed?

CONFIDENTIAL

Page 238

BY MR. GOTTLIEB:
Q Right now, I'm not asking you about what happened in the trailer. I'm asking you about your recollection --
A This is accurate.
Q -- of the meeting that you witnessed and whether this description is an accurate reflection, as you sit here today, of the meeting that you witnessed?
MS. SHAPIRO: Objection.
THE WITNESS: I don't think it's fully accurate.
BY MR. GOTTLIEB:
Q Okay. Let's go step by step.
Do you recall Ms. Lively saying that on day two, Mr. Heath went into her trailer?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall her saying that on day two, Mr. Heath went into her trailer.
BY MR. GOTTLIEB:
Q Do you recall Ms. Lively telling a story about Mr. Heath entering her trailer?
A Yes.
Q Do you recall her saying, Oh, actually, I'm getting body makeup done, or something to that

Page 239

effect?
A I recall the way she told the story was that when he entered, she said, Come in, but I'm getting body makeup done, so please turn away.
Q And that's more or less what Ms. Saks is saying in 943. She says, "you can come in if you don't look"?
MS. SHAPIRO: Objection.
THE WITNESS: Again, I don't remember her saying, "you can come in if you don't look." That doesn't feel accurate to me.
BY MR. GOTTLIEB:
Q Okay.
A Nor does this next piece. That's -- that's -- that's all I'm saying, is my recollection was this is -- this is like four lines in a text message, so I can't say this is exactly what Mrs. Lively said.
Q So do you recall Ms. Lively saying that Mr. Heath was looking in her direction the entire conversation when she turned around?
A No. I remember Ms. Lively saying that when she turned around, she had noticed that Mr. Heath was looking in her direction.
Q And do you recall Ms. Lively saying that

Page 240

that made her feel uncomfortable?
A No.
Q Do you recall Ms. Lively saying this in a way that she seemed happy about it?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MR. GOTTLIEB:
Q She seemed unhappy about it?
A I think -- no, I don't think it was a -- she wasn't upset. She didn't seem upset.
Q Do -- is it your testimony that you believe Ms. Lively to be saying she didn't care one way or the other that Mr. Heath was looking at her in the trailer that day?
MS. SHAPIRO: Objection.
THE WITNESS: That's not what I said.
BY MR. GOTTLIEB:
Q I'm trying to understand what you recollect, and if you recollect that Ms. Lively relayed this story because she was troubled, bothered, concerned, whatever word you would like to use about it, or if you're saying something different.
MS. SHAPIRO: Objection.
THE WITNESS: Well, you had asked me if I

Page 241

thought Ms. Lively was upset, and that's why she was sharing the story. I can't, one, speculate to what Ms. Lively was feeling. All I was saying was that she did not seem upset as she was sharing the story. It felt like this was something that she wanted to share to ensure it didn't happen again. But I can't speculate as to what she was feeling or not feeling.
BY MR. GOTTLIEB:
Q She didn't want it to happen again; you understood that?
A Yes.
Q Okay.
Did anyone talk to HR about that incident, the incident in the trailer?
A To my knowledge, no.
Q Do you know one way or another whether Ms. Lively started locking her trailer door after that event?
A I do not.
Q Did Sony ever issue any kind of warning to you or to Mr. Heath so far as you know?
A A warning?
Q A warning.
A No, not that I'm aware of.
Q A caution?

CONFIDENTIAL

Page 242

A You're welcome to refresh my memory, but not that I can think of.
Q That's fine. I'm just interested if you recall any time that they cautioned, warned, or otherwise issued any -- anything that sounded like that to you?
A I don't recall a warning or a caution.
MR. GOTTLIEB: Let's do Exhibit 31.
(Exhibit 31 marked for identification.)
BY MR. GOTTLIEB:
Q Mr. Baldoni, you've been handed what's been marked as Exhibit 31, which is a document bearing the Bates Nos. BALDONI 16447 through 16452, and this is a text chain, I believe, between yourself, Mr. Heath, Ms. Abel, and Stephanie Jones on November 10th, 2023.
Let me know once you've had a chance to look at it.
A Okay.
Q Had a chance to review Exhibit 31, Mr. Baldoni?
A I have.
Q Do you recognize this document?
A I do.
Q You've seen this before?

Page 243

A I have.
Q You've seen both the text and the attachment before?
A Yes.
Q This text chain -- Henny Grace is your alias; is that right?
A Was, yes.
Q Was your alias. And -- and you are communicating through that with Mr. Heath, Ms. Abel, and Stephanie Jones; is that right?
A Yes. That's just the name on my -- the way that my phone is set up.
Q Okay.
A That's not like I show up as Henny Grace to be anybody else.
Q And the date is November 10, 2023?
A It appears so.
Q And you're asking Ms. Abel and Ms. Jones for a Zoom, correct?
A Yes.
Q Why were you asking your publicist for a Zoom about the attached document?
A I wanted to share it with them.
Q At 10:11 p.m., Mr. Heath sends through what appears to be a screenshot of a message from

Page 244

someone named Lindsey to Imene and Joseph. Did I pronounce that first name right?
A Close enough.
Q You tell me.
A Imene.
Q Imene. Imene and Joseph. And have you seen that text before?
A I believe this is a text that was an email, so yes.
Q So it's a text forwarding through a language from the email; is that right?
A Correct.
Q And this was the cover email that was sent to the Protections for Return to Production that are on the following pages?
A I believe so, yes.
Q And Lindsey Strasberg is an attorney who represented Ms. Lively; is that right?
A I believe so, yes.
Q And is this around the time that you first learned of the enclosed list of protections?
A I would imagine so.
Q Do you see how at the top of that message, Ms. Strasberg writes:
(As read):

Page 245

"It is no surprise to the film's producer that the experience of shooting the film has been deeply concerning on many levels"?
A I do see that, yes.
Q And by that point in time, you were aware of and familiar with a number of concerns that had been expressed by multiple people on the set of It Ends with Us; is that correct?
MS. SHAPIRO: Objection.
THE WITNESS: No. We were very surprised by that language.
BY MR. GOTTLIEB:
Q Okay. You see the next sentence after that:
(As read):
"The complaints of our client and others have been repeatedly conveyed and well-documented throughout pre-production and photography."
Do you see that?
A I do see that.
Q Is it your testimony that you were surprised by that language as well?
MS. SHAPIRO: Objection.

CONFIDENTIAL

Page 246

THE WITNESS: I was surprised by all of this, yes.
BY MR. GOTTLIEB:
Q The next sentence says:
(As read):
"While we reserve all legal rights, at this stage our client is willing to forego a more formal HR process in favor of everyone returning to work and finishing the film as long as the set is safe moving forward."
Do you see that?
A I do.
Q You understood that the objective of this list was to allow the production of the film to continue as long as safe -- as long as the set is safe moving forward?
A Yes.
Q And then, the next sentence says:
(As read):
"In order for our client to feel safe returning to the production, we are attaching a list of protections that will need to be guaranteed and observed by the film's producers."

Page 247

Do you see that?
A Yes.
Q And you understood that reference to be a list -- the reference to the list to be the 17 points that are on the attached page?
A After I read this, I learned that to be the case, yes.
Q Okay. And you also understood -- well, let me ask it this way.
Did you think at this point in time that legal action might be possible with respect to what Ms. Lively was asserting here?
MS. SHAPIRO: Objection.
THE WITNESS: I had no idea what Ms. Lively was asserting here.
BY MR. GOTTLIEB:
Q Did you read the 17 points?
A I did.
Q Do you recall reading them promptly when you received this?
A I do.
Q Do you recall reading them more than once?
A That, I don't recall, but...
Q Do you see references in the 17-point

Page 248

list to an intimacy coordinator being present at all times?
Do you see a reference in No. 1 --
A Yes.
Q -- for an intimacy coordinator being present at all times?
A Yes.
Q And you knew that Ms. Lively had concerns about some of the intimate scenes in the movie, correct?
MS. SHAPIRO: Objection.
THE WITNESS: This was just -- it was -- I mean, it's an easy yes. A lot of these things are just things that are no issues.
BY MR. GOTTLIEB:
Q What do you mean by that?
A She wants an intimacy coordinator present at all times when she's on set, that's fine.
Q It's a reasonable ask?
A Sure.
Q That's not something that is fabricated?
MS. SHAPIRO: Objection.
THE WITNESS: What do you mean?
BY MR. GOTTLIEB:
Q That's not a demand based on some

Page 249

fabricated event?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know what the event is. There's no talking about an event here. It's just a ask for an intimacy coordinator present at all times. We already had an intimacy coordinator, so...
BY MR. GOTTLIEB:
Q Do you see a reference to No. 3:
(As read):
"There is to be no spontaneous improvising of any scenes involving physical touching, simulated sex, or nudity"?
A Yes.
Q Was that also a reasonable ask?
A I have no idea what that was about, and that is a reasonable ask.
Q Did you later come to learn what that was about?
MS. SHAPIRO: Objection.
THE WITNESS: I later learned that Ms. Lively had said that there was improvising of a -- of a dance scene, but I had no understanding of that receiving this document.

CONFIDENTIAL

Page 250

BY MR. GOTTLIEB:
Q Later, you understood because you sent a video out to the public about that dance scene, right?
MS. SHAPIRO: Objection.
THE WITNESS: I didn't personally send a video out.
BY MR. GOTTLIEB:
Q You had it sent out?
MS. SHAPIRO: Objection.
THE WITNESS: I didn't have it sent out, but I agreed for it to go out, yes.
BY MR. GOTTLIEB:
Q And that video of that scene involved improvi- -- improvisation of intimacy; is that correct?
MS. SHAPIRO: Objection.
THE WITNESS: I don't believe so.
BY MR. GOTTLIEB:
Q Is it your testimony that everything that occurred during that scene was written into the script?
MS. SHAPIRO: Objection.
THE WITNESS: No. It's my testimony that I wouldn't qualify that as intimacy.

Page 251

BY MR. GOTTLIEB:
Q Nothing in the video of the dance scene from the bar is something you would describe as intimacy?
A I am not a representative of SAG, nor am I an intimacy coordinator, but I don't believe that intimacy coordinator would describe the actions in that video as an intimate scene.
Q Did it involve physical touching?
A Dancing, so yes, we were already -- the two characters were already touching in that scene.
Q Did it involve kissing?
A To my understanding, there was no kissing in that scene.
Q But there was kissing in the video, correct?
A No.
Q Did you attempt to kiss Ms. Lively?
A No.
Q In the filming of that scene?
A No.
Q Okay.
You see in No. 6 it says:
(As read):
"No one will enter, attempt to enter,

Page 252

interrupt, pressure, request to entrance to BL's trailer while she is in a state of undress for any reason"?
A I see that, yes.
Q You understood what that referred to; did you not?
A I made an assumption at the time, but again, very surprising considering everything after that conversation was fine.
Q You mentioned before a discussion about Ms. Lively getting COVID, right?
A Yes.
Q You see a reference to No. 9, Ms. Lively being exposed to COVID?
A Yes.
Q So that one is not made up either, right?
MS. SHAPIRO: Objection.
THE WITNESS: To my knowledge, Ms. Lively had COVID-19. She said she did.
BY MR. GOTTLIEB:
Q Do you see the paragraph 10, saying:
(As read):
"There shall be no retaliation of any kind against Ms. -- against BL for raising concerns about the conduct

Page 253

described in this letter or for these requirements. Any changes in attitude, sarcasm, marginalization, or other negative behavior, either on set or otherwise, including during publicity and promotional work, as a result of these requests, is retaliatory and unacceptable, and will be met with immediate action."
Do you see that?
A I do.
Q And you ultimately agreed to that; did you not?
MS. SHAPIRO: Objection.
THE WITNESS: I still do.
BY MR. GOTTLIEB:
Q And Wayfarer Studios agreed to that as well, right?
A I believe Wayfarer Studios is who agreed to this, yes.
Q Do you see the reference in paragraph 17 to the holding of an:
(As read):
"All-hands, in-person meeting before production resumes"?

CONFIDENTIAL

Page 254

A Yes.
Q Do you see that that meeting was supposed to include:
(As read):
"The director, all producers, the Sony representative, the newly-engaged third-party producer, BL and BL's designated representatives to confirm and approve a plan for the implementation of the above that will be adhered to for the physical and emotional safety of BL, her employees, and all the cast and crew moving forward"?
A I do.
Q Did that meeting occur?
A I believe that meeting did occur.
Q When did that meeting occur?
A The evening before day one of production. I don't have the exact date offhand.
Q January 4th, 2024?
A That sounds -- that sounds correct.
Q And where was that meeting held?
A Ms. Lively and Mr. Reynolds' residence.
Q And did all those people that you see

Page 255

listed there in paragraph 17 attend to the best of your knowledge?
A They did, but I don't believe anyone knew what -- that that was the meeting --
Q Okay.
A -- that they were attending.
MR. GOTTLIEB: Exhibit 32.
THE WITNESS: I may after like the next round need to --
MS. SHAPIRO: Do you want to take a break now to go to the bathroom?
MR. GOTTLIEB: If you want to take a break now for the restroom, we can.
THE WITNESS: Can we take a quick break?
MS. SHAPIRO: Ten minutes.
THE WITNESS: I don't need that much time.
MS. SHAPIRO: Five minutes.
MR. GOTTLIEB: It's hard to take a very short break just because people have to --
THE WITNESS: Okay.
MR. GOTTLIEB: Let's go off the record, please.
THE VIDEOGRAPHER: We are going off the record. The time is 4:06 p.m.

Page 256

(Recess.)
THE VIDEOGRAPHER: We're back on the record. The time is 4:20 p.m.
BY MR. GOTTLIEB:
Q Mr. Baldoni, before the break, I had handed you Exhibit 32. I'm going to ask you about your message that appears on the first page, first full page of Exhibit 32. Exhibit 32 is a text chain between yourself and a number of individuals on November 12th, 2023; is that right?
(Exhibit 32 marked for identification.)
THE WITNESS: Yes.
BY MR. GOTTLIEB:
Q And how would you describe -- it looks like there's a title to this group. It says: "Prayers and support."
What is that?
A This is just a group of some of my best male friends.
Q And Mr. Heath is on there. He's a friend and also a co-worker, right?
A Yes.
Q And what about Mr. Musiol?
A My best friend and not technically a co-worker. Former partner.

Page 257

Q Former partner from Wayfarer Entertainment?
A Yes.
Q But not with Wayfarer Studios?
A Not in an official capacity.
Q Okay. Anybody else in this chain that was with or an employee of Wayfarer Studios?
A No.
Q Okay.
So then, looking at your message, you have a message that carries over from BALDONI 26194 to 26195. And that's a message that you send to this group, it looks like 11:49 a.m. on November 12th, 2023; is that right?
A Yes.
Q And this is a day or two after you received the 17-point return to production?
A I -- I -- I haven't seen this, so I would love to read it.
Q Okay. Please do. I am not going to ask you anything about it past your message.
A Okay. I read it.
Q You knew that the returns for -- the protections for the return to production document with the 17 conditions, insinuated that you were

CONFIDENTIAL

Page 258

unsafe/sexually harassing?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know what I knew at the time, but I clearly said that. I think I didn't know what she was actually insinuating, but I was clearly scared and filled with anxiety.
BY MR. GOTTLIEB:
Q Okay. But the words you used were:
(As read):
"I am unsafe/sexually harassing, et cetera, et cetera, et cetera," right?
MS. SHAPIRO: Objection.
THE WITNESS: We all know what this document insinuates.
BY MR. GOTTLIEB:
Q Do you recall earlier in your testimony, I was asking you questions about whether you have ever understood that it was insinuated that you had sexually harassed anyone?
A I do remember that part of the conversation.
Q And you answered that question with a no, right?
MS. SHAPIRO: Objection.
THE WITNESS: Not sure what I answered.

Page 259

BY MR. GOTTLIEB:
Q Okay. Here you are saying:
(As read):
"We all know what this document insinuates," right?
A I see that.
Q You say:
(As read):
"This is all a manipulation," right?
A I see that I said that too.
Q You say:
(As read):
"There's even silly things, inferring Jamey was inappropriate, which is silly," right?
A I read that, yes.
Q Is the reference to Mr. Heath that's in the 17-point list a reference to entering trailers?
MS. SHAPIRO: Objection.
THE WITNESS: I have no idea what I was referring to here.
BY MR. GOTTLIEB:
Q Okay. But what you knew was you thought that there was something inferring that Mr. Heath had been inappropriate, which you thought was silly?

Page 260

MS. SHAPIRO: Objection.
THE WITNESS: I don't know what I was saying was silly. That's what I can tell you.
BY MR. GOTTLIEB:
Q You said that:
(As read):
"This letter was sent in an effort to gain power over you personally and the studio," right?
A I think that's what I believed.
Q That's what you believed at the time?
A Very clearly, yes.
Q Yet, you thought all or nearly all of the requests or the conditions in the letter were reasonable, right?
MS. SHAPIRO: Objection.
THE WITNESS: I did.
BY MR. GOTTLIEB:
Q So what kind of a plan is that?
MS. SHAPIRO: Objection.
BY MR. GOTTLIEB:
Q If you're trying to come up with a plan to assert power and domination over somebody, why would you send them a list of 17 very reasonable things to do?

Page 261

MS. SHAPIRO: Objection.
THE WITNESS: I can't speculate as to why someone would do that.
BY MR. GOTTLIEB:
Q In the list of 17 conditions or the text that was accompanying it that was screenshot in the document we just looked at, was there any demand to send Ms. Lively the unfinished director's cut of the movie?
A In what -- in what we read together?
Q In what we read together.
A No.
Q Was there any demand that Ms. Lively be allowed to take control of the edit of the film?
A In the 17-point list?
Q In the 17-point list.
A No.
Q Was there any demand about ultimate control over the content of the film?
MS. SHAPIRO: Objection.
THE WITNESS: I believe there was in the 17-point list.
BY MR. GOTTLIEB:
Q And what is your recollection of that?
A I believe there was a paragraph that --

CONFIDENTIAL

Page 262

where she asked for ultimate control over some of the content of the film, just like what you said.
Q What content was that?
A I believe any intimate scene depicting her character.
Q Over intimate scenes, correct?
A Yes, but --
Q Okay.
A -- I consider that content.
Q You say to your friend group:
(As read):
"We don't believe she will leave or leak to press, but this is her threat of a nuclear bomb, as she knows this is the only way to get to me."
Do you see that?
A I do.
Q What did you mean, "this is the only way to get to me"?
A I'm not sure what I meant.
Q Do you believe that as you sit here today, that the 17-point list was a nuclear bomb and the only way to get to you?
A Again, I -- I don't know what I meant. This was a text sent in a very confusing, dark

Page 263

period, where I had no idea what was happening, and I was filled with anxiety.
Q Did you consider the 17-point list and the letter attached to it to be something that was pretty sensitive?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not sure I know what you mean.
BY MR. GOTTLIEB:
Q Was it the kind of document that at the time you would have wanted to get out in public?
THE WITNESS: I can't imagine I would want that.
BY MR. GOTTLIEB:
Q You would have wanted it to be confidential, right?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MR. GOTTLIEB:
Q It involved a series of conditions relating to It Ends with Us and the production of It Ends with Us that involved rather sensitive matters, right?
MS. SHAPIRO: Objection.
THE WITNESS: It was a legal document

Page 264

that came to our attorneys, so yes.
BY MR. GOTTLIEB:
Q And it involved issues relating to personnel and employment with respect to the film, right?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MR. GOTTLIEB:
Q So why did you feel like it was appropriate to send details about that to a friend group that included lots of people that didn't work at Wayfarer Studios?
MS. SHAPIRO: Objection.
THE WITNESS: I don't believe I sent the document itself or any attachments.
BY MR. GOTTLIEB:
Q You just described it?
MS. SHAPIRO: Objection.
THE WITNESS: I wasn't aware that there was anything in that document saying that I couldn't describe it.
BY MR. GOTTLIEB:
Q Before when I was asking you about the incident in Ms. Lively's trailer involving Mr. Heath, did you ever take any steps to confirm or

Page 265

learn what had actually happened in that meeting?
MS. SHAPIRO: Objection.
THE WITNESS: My understanding is anything that happened during that meeting interaction was discussed in person and worked out, and my recollection is Mr. Heath apologized to her for even looking in her direction. That's what he was apologizing for, and it never happened again.
BY MR. GOTTLIEB:
Q Did you ever take any steps to decide for yourself what you thought had happened?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not sure what further steps I could have taken, as Ms. Lively herself spoke to Jamey, and she was -- and they were the two people involved.
BY MR. GOTTLIEB:
Q You later came to learn that Mr. Heath had a different view of what happened in the trailer with Ms. Lively, right?
A Slightly different at the time.
Q And so did you take any steps to try to ascertain whose version of events was correct or accurate?
A No. Because at the time, the stories

CONFIDENTIAL

Page 266

seemed to be pretty similar and there was no -- there was no reason to. It was worked out.
Q Eventually, you believed Mr. Heath's version of what happened in the trailer?
MS. SHAPIRO: Objection.
THE WITNESS: Again, at that time, which was 2023, the versions were very close. They seemed to be very different now.
BY MR. GOTTLIEB:
Q Earlier, we talked a little bit about the January 4th meeting in Ms. Lively's apartment.
Do you recall that?
A Yes.
Q You said -- well, withdrawn.
You attended that meeting?
A I did.
Q It was memorable?
MS. SHAPIRO: Objection.
THE WITNESS: That's one way to put it.
BY MR. GOTTLIEB:
Q Would you characterize it as traumatic?
A I, for me, would. I'm not sure if anyone else would.
Q I'm only asking about you, sir.
MS. SHAPIRO: Objection.

Page 267

THE WITNESS: Yeah.
BY MR. GOTTLIEB:
Q During that meeting, did Ms. Lively read a list from her phone?
A She did.
Q Do you have a distinct memory of her reading a list of incidents or items from her phone to the group during that meeting?
A I do.
Q Okay.
MR. GOTTLIEB: I'm going to mark the next exhibit, Exhibit 33. Mr. Baldoni, you've been handed what's been marked as Exhibit 33. This is a document bearing the Bates Nos. BL 38461 through BL 38462.
(Exhibit 33 marked for identification.)
BY MR. GOTTLIEB:
Q Have you had a chance to review this exhibit, Exhibit 33?
A I have.
Q Do you know one way or the other as you sit here today, whether this is the list that Ms. Lively read from her phone during that meeting on January 4th?
A This was not the list that Ms. Lively

Page 268

read from her phone.
Q How do you know that this is not the list that Ms. Lively read from, from her phone, in that meeting on January 4th, 2024?
A For one, she never used the wording "no more." So that's how I know, first off.
Q Okay. And you know that based on your specific recollection of how she spoke to you during that meeting?
A I know that because I was present and in shock of what I was hearing, and paid very close attention to the words, and "no more" was never used. It also says an updated list, so I'm not sure when it was updated.
Q Okay. Well, apart from your identification of "no more," do you have any other reason to believe that this list is not what Ms. Lively read from during the meeting on January 4th, 2024?
MS. SHAPIRO: Objection.
THE WITNESS: I think that's a big one. I mean, the fact that she never said "no more" shows it's not the same list.
BY MR. GOTTLIEB:
Q I'm asking if there's any other reason?

Page 269

A Yes, there are certain -- I would say there's quite a few things in here that were not read or discussed that day.
Q Do you recall Ms. Lively saying during the meeting that this was the worst experience of her life?
A I do.
Q Do you recall her saying during the meeting that others had witnessed this behavior?
MS. SHAPIRO: Objection.
THE WITNESS: I don't remember those exact words, no.
BY MR. GOTTLIEB:
Q Do you recall the words "creepy" or "abuse" being used in reference to your behavior?
A I definitely don't remember the word "abuse." I think I remember the word "creepy."
Q Do you recall feeling embarrassed while Ms. Lively was reading out these items?
A I think that could be accurate for one of the things I was feeling, yeah.
Q I want to mark another exhibit. Before I go on, Mr. Baldoni, I can't remember if Ange Giannetti is one of the people whose depositions you listened to.

CONFIDENTIAL

Page 270

Did you listen to that one?
A I listened to part of it, yes.
Q Did you listen to the part where she testified about the January 4th meeting?
A I'm unsure.
Q Do you know one way or another, whether Ange Giannetti testified about whether this list, Exhibit 33, is what she remembered Ms. Lively sharing during that meeting?
A I don't know.
Q Would you be surprised to learn that Ms. Giannetti testified this is the list she remembers Ms. Lively sharing?
MS. SHAPIRO: Objection.
THE WITNESS: I wouldn't be surprised.
MR. GOTTLIEB: Okay. Exhibit 34. Mr. Baldoni, you've been handed what's been marked as Exhibit 34, which is another text chain in the "Prayers and support" text there we talked about, I think in Exhibit 32. This is a document bearing the Bates Nos. BALDONI 26204 through 26206.
Go ahead and read it.
(Exhibit 34 marked for identification.)
THE WITNESS: Okay.

Page 271

BY MR. GOTTLIEB:
Q This is a text chain on January 5th, 2024 with the "Prayers and support" group that you testified about previously?
A It appears to be so.
Q And is that a -- is that a WhatsApp group or is that a group just on your phone?
A I don't think it was WhatsApp. I think it was just a message.
Q And this is the day after the January 4th meeting, right?
A It appears to be January 5th, correct.
Q Mr. Wilson is asking for an update at 6:20 p.m.?
A Yes.
Q And you respond?
A I certainly do.
Q And in your response, you acknowledge that Ms. Lively conveyed that you had made her feel unsafe; is that right?
A Essentially, that's what she said, yes.
Q You say:
(As read):
"My brain was trying to defend itself when they were needing me to apologize

Page 272

for all the ways I have fucked up and made her feel unsafe." Right?
A That's what I wrote, yes.
Q And you disagreed with Ms. Lively, I imagine?
A Very strongly.
Q But you understood very well her to be saying that you had made her feel unsafe, right?
A I understood that that's what she was insinuating by reading from this list.
Q Okay. And you say here, you were:
(As read):
"Read from a phone all the things that I did. While many of them were based in actual situations, the events were wrong and things were taken completely out of context."
Do you see that?
A I do.
Q And so were you saying here that the list includes a number of things and situations that occurred, but you disagree with the way that they were being framed and the context they were being placed in?
MS. SHAPIRO: Objection.

Page 273

THE WITNESS: Yes, completely.
BY MR. GOTTLIEB:
Q You see here "the word creepy and abused were used in reference to me and my behavior"?
A I do see that, yes.
Q And you see a little bit later, you say that you were:
(As read):
"Unable to respond. Mr. Heath did a beautiful job apologizing. You were embarrassed that you were unable to formulate the correct words to apologize and honestly feel like a bad person."
Do you see that?
A I would beat myself up a lot, clearly.
Q You said:
(As read):
"It's hard to feel so much of what they believe about me is false because they are so convinced that it's real."
Do you see that?
A I do.
Q Did it occur to you that they might be right?

CONFIDENTIAL

Page 274

MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MR. GOTTLIEB:
Q Did it occur to you that maybe some of the ways you had perceived how your actions had affected Ms. Lively were inconsistent with how Ms. Lively perceived your actions?
MS. SHAPIRO: Objection.
THE WITNESS: Can you ask that one more time?
BY MR. GOTTLIEB:
Q Did it occur to you that maybe you and Ms. Lively did not share the same feelings about events that you both recognized occurred?
MS. SHAPIRO: Objection.
THE WITNESS: I think it was very clear we didn't share the same feelings. My issue was with the actual events themselves.
BY MR. GOTTLIEB:
Q Did it occur to you that certain events that you knew had occurred, might have had a different kind of an effect on Ms. Lively than they had on you?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not sure.

Page 275

BY MR. GOTTLIEB:
Q You were told that this was the worst experience of Ms. Lively's life?
A I believe I wrote that down, so...
Q Did that give you -- did that give you pause, Mr. Baldoni?
MS. SHAPIRO: Objection.
THE WITNESS: In what way?
BY MR. GOTTLIEB:
Q In a way that you were making a movie about an important subject, it was important to you, consistent with the mission of your studio. You wanted to empower women and tell a story through a female gaze, and you had your lead actor, co-star, saying it was the worst experience of her life?
MS. SHAPIRO: Objection.
THE WITNESS: I found it very confusing.
MR. GOTTLIEB: This is 35.
(Exhibit 35 marked for identification.)
THE WITNESS: Thanks.
BY MR. GOTTLIEB:
Q Mr. Baldoni, you've been handed what's been marked as Exhibit 35. It's a document bearing the Bates Nos. BALDONI 18852 through 18856.
A Uh-huh.

Page 276

Q And I apologize if I've asked this before, but who is Travis Van Winkle?
A It's one of my best friends.
Q Okay. Not a Wayfarer employee?
A Not a Wayfarer employee.
Q And this is a text chain between you and Mr. Van Winkle on February 23rd, 2024; is that right?
A Yes.
Q All right. Take a minute, read through it, and I will ask you some questions.
You've had a chance to read Exhibit 35?
A I have.
Q This is your text exchange with Mr. Van Winkle?
A It is.
Q At 11:15 a.m., which is on the bottom of page 18854, in reference to Sony you say:
(As read):
"They just want the movie to do well and they can't release a movie the star doesn't promote."
Do you see that?
A Yes.
Q You believe that was true, right?

Page 277

A At one point, Josh had said they would release it even if she doesn't. But my saying, "they can't," I mean, I'm just mincing words, but overall, they did not want to or suggest releasing a movie that a star wouldn't promote.
Q Sort of common knowledge the studio doesn't want to release a film that the lead didn't want to engage in the promotion of?
A Yes.
Q Not a super controversial proposition, right?
A I don't think that would be.
Q All right. That was true from day one, right?
A What was?
Q That if Ms. Lively didn't want to promote the movie, it was going to be difficult to release it?
A I'm sure that was one of the reasons that Sony suggested her.
Q And it was one of the reasons you wanted her on the film, right, because if Ms. Lively promoted the movie, the movie would be more successful?
MS. SHAPIRO: Objection.

CONFIDENTIAL

Page 278

THE WITNESS: I'm sure that was one of the reasons.
BY MR. GOTTLIEB:
Q Because she's a star?
A Yeah.
Q In fact, you recall having a conversation with Mr. Heath at the time you were trying to bring Ms. Lively on in December of 2022, where you and Mr. Heath say, "Everybody loves Blake Lively"?
A I don't remember that conversation, but I'm sure you have it.
Q Would it surprise you if you had that conversation with Mr. Heath?
MS. SHAPIRO: Objection.
THE WITNESS: I -- I don't think it would.
BY MR. GOTTLIEB:
Q You thought in December of 2022, Ms. Lively had a sterling reputation; is that right?
A I believe I did.
Q And that she was well liked by fans? Yes?
A Yes, I believe I did.
Q And the kind of person who could help drive box office success, right?

Page 279

A Yes. Along with her husband and her best friend.
Q And the kind of person who could help get the message, the important message, of your movie out, right?
MS. SHAPIRO: Objection.
THE WITNESS: Yes. I hoped that that would be a big part of it.
BY MR. GOTTLIEB:
Q So would you have disagreed in December of 2022 if somebody had said to you, Ms. Lively has got a terrible well-known reputation in the industry; nobody likes her?
MS. SHAPIRO: Objection.
THE WITNESS: Nobody told me that.
BY MR. GOTTLIEB:
Q If Katie Case or Breanna Koslow had told you that in December of 2022, would you have found that very surprising?
MS. SHAPIRO: Objection.
THE WITNESS: I don't think I can speculate on that.
BY MR. GOTTLIEB:
Q Okay. On the previous page 18853, at 11:01 a.m., you say of Ms. Lively:

Page 280

(As read):
"She had the nuclear bomb. If she doesn't promote the movie, she can leak that I'm a bad person or that she felt unsafe with me and all the stuff she has on me. Then she's the victim. It's the Taylor Swift playbook. So she can ask for whatever she wants because she knows I know."
Do you see that?
A I do.
Q Did you mean that?
MS. SHAPIRO: Objection.
THE WITNESS: What part of it?
BY MR. GOTTLIEB:
Q All of it.
A I don't know.
Q You had agreed to the conditions that Ms. Lively asked for to return to set, right?
A Yes.
Q And upon the return to production, so far as production on the set went, things went pretty well, right?
A According to your own complaint, it went -- everything went great.

Page 281

Q Any other incidents that you can think of after January 4, 2024?
A No.
Q So what is all this stuff that Ms. Lively had on you that constituted the nuclear bomb?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know.
BY MR. GOTTLIEB:
Q Would it be the items in the list that Ms. Lively read from in the meeting on January 4th you're referring to here?
MS. SHAPIRO: Objection.
THE WITNESS: I'm sure that was a part of it.
BY MR. GOTTLIEB:
Q Is that what -- sorry, go ahead.
A No, please.
Q Is that what you were afraid that Ms. Lively might leak?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not sure what she was going to do. I can't -- I was very in the dark.
BY MR. GOTTLIEB:
Q What else would you have been thinking of when you are referring to a nuclear bomb, and you

refer to her -- Ms. Lively leaking, "I'm a bad person or that she felt unsafe with me"?
MS. SHAPIRO: Objection.
THE WITNESS: I think when you are somebody small in the industry like myself, and you're dealing with a titan like Ms. Lively and some of the most powerful people in the world, which are her best friends, and you're in the situation that I was in, I think it's very reasonable, especially at this point, to be concerned about what's possible and what's not. I -- I was spinning at this point.
BY MR. GOTTLIEB:
Q Is there anything else you can think of other than the material contained within the 17-point list or the list that Ms. Lively read from on January 4th, 2024, that as you sit here today, you might have been referring to when you referred to a nuclear bomb that could be leaked?
MS. SHAPIRO: Objection.
THE WITNESS: Nothing about the 17-point list. But I assure you that that list that was read to me contained complete fabrications of the truth. So I very well could have -- could have had that be a part of what I felt scared of, lies. But I didn't know. I didn't know anything. I knew that at this



point, my gut feeling was that she was going to take over the film.
BY MR. GOTTLIEB:
Q Lies. When you say "lies," you mean, lies insinuating that you had made Ms. Lively feel unsafe?
A No. That's not what I mean.
Q Lies insinuating that you had sexually harassed Ms. Lively?
MS. SHAPIRO: Objection.
THE WITNESS: No. I'm speaking about lies in general.
BY MR. GOTTLIEB:
Q You're the co-head of Wayfarer Studios; are you not?
A I am the co-chairman.
Q The co-chairman of Wayfarer Studios. But the executives answer to you and Mr. Sarowitz?
MS. SHAPIRO: Objection. Objection.
THE WITNESS: The executives answer to our CEO, and our CEO reports to me and Sarowitz.
BY MR. GOTTLIEB:
Q And you testified earlier that you could fire the CEO if you wanted to?
A I imagine I could do -- yeah, I imagine I



could.
Q And it's Mr. Sarowitz's money that financed this particular project; is that right?
A Co-financed.
Q Co-financed?
A Yes.
Q If you had wanted to, you could have just decided not to go forward with the movie, right?
MS. SHAPIRO: Objection.
THE WITNESS: At what point?
BY MR. GOTTLIEB:
Q At any point.
A Not necessarily.
Q As of February 23, 2024, could you have pulled the plug on the movie?
A I don't believe so.
Q Even -- you don't believe you could have done so without inviting litigation; is that what you're saying?
MS. SHAPIRO: Objection.
THE WITNESS: I believe this was the biggest project that we'd ever invested in, ever had, and we had a tremendous amount of money invested in it, and so did Sony who were our partners, so we had an obligation, a fiduciary



obligation to Sony, and to Steve's family to not pull out of the film.
BY MR. GOTTLIEB:
Q To not lose that money?
MS. SHAPIRO: Objection.
THE WITNESS: It wasn't just about money. It was one of the major factors, yes.
BY MR. GOTTLIEB:
Q Okay. But nonetheless, you're the co-founder of the studio, right?
A Yes.
Q You're the director of the film, right?
A Yes.
Q You are the co-lead actor, right?
A Yes.
Q You are an executive producer, right?
A At that time, I was.
Q That is a lot of accumulated power on one movie; is it not?
MS. SHAPIRO: Objection.
THE WITNESS: It is, and also I don't think it's unusual.
BY MR. GOTTLIEB:
Q Is that the typical arrangement that you're familiar with?

CONFIDENTIAL

Page 286

A I wouldn't say it's a typical way.
MS. SHAPIRO: Objection.
BY MR. GOTTLIEB:
Q It's not typical. It's also not unheard of; is that what you're saying?
MS. SHAPIRO: Objection.
THE WITNESS: Yeah.
BY MR. GOTTLIEB:
Q And you knew that that accumulation of positions gave you a lot of power over the movie, didn't you?
MS. SHAPIRO: Objection.
THE WITNESS: I don't believe I thought of it that way.
BY MR. GOTTLIEB:
Q Did it make you mad that Ms. Lively had power in the context of the production of the film?
MS. SHAPIRO: Objection.
THE WITNESS: Did it make me mad that Ms. Lively had power, no.
BY MR. GOTTLIEB:
Q Do you recall ever having a conversation with any representatives of WME before Ms. Lively was signed onto the film about the conditions and the demands that she was making in advance for

Page 287

coming onto the film?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall a specific conversation.
BY MR. GOTTLIEB:
Q Do you recall ever drafting content that you wanted to communicate to WME that you share with Mr. Heath in December of 2022?
A I don't, but I'd be happy to see it.
Q Do you recall ever saying, "I discovered this book"?
A I don't recall.
Q "I control this film"?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall.
BY MR. GOTTLIEB:
Q Did you discover the book?
MS. SHAPIRO: Objection.
THE WITNESS: Did I discover the book? The book was given to me by my book agent.
BY MR. GOTTLIEB:
Q Did you turn It Ends with Us into a success as a book?
A No, not me singularly.
Q Did you play a substantial role in it

Page 288

becoming a success as a book?
MS. SHAPIRO: Objection.
THE WITNESS: I'm sorry. I was -- I thought you said movie. The book, I played no role in it becoming a successful book.
BY MR. GOTTLIEB:
Q Okay. That was Colleen Hoover, right?
A Completely.
MR. GOTTLIEB: Mr. Baldoni, you've been handed what's been marked as Exhibit 36. Exhibit 36 is document bearing the Bates Nos. BALDONI 33560 through 33566. And this is a text chain between you and Mr. Heath on April 27th, 2024.
(Exhibit 36 marked for identification.)
THE WITNESS: Yes.
BY MR. GOTTLIEB:
Q You're having a discussion here with Mr. Heath about the trailer?
A If it's okay, I'd love to read it. I haven't seen it.
Q Oh, sure. Sorry.
A Okay.
Q I understand this is a very personal exchange you had with your friend, Mr. Heath?
A It is.

Page 289

Q And a moment of vulnerability and candor, right?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MR. GOTTLIEB:
Q You're talking in this exchange with Mr. Heath about frustrations that have been building for you and culminating in the construction of the trailer; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: I believe so, yes.
BY MR. GOTTLIEB:
Q And you say a series of things to Mr. Heath, and that causes Mr. Heath to get a little bit upset?
A That's a pattern that we have together. We tell each other the truth, and we get shit out. And then we -- and then we come back to each other.
Q And then Mr. Heath --
A He's always a voice of reason for me.
Q Sorry.
Mr. Heath, I think, wisely advises that you both sleep it off and come back tomorrow, right?
A He's a wise man.
Q And when you do come back, you apologize

CONFIDENTIAL

Page 290

to Mr. Heath for what you were saying the night before, right? At 2:23 p.m. on the 27th, on page 33565?

A Yeah. I believe we could sum it up that way.

Q And what you say is, you've just come out of therapy, and you're purging shit out and exhausted. And then you say:

(As read):

"So much fear of Blake coming out and going public about how I'm a bad person and unsafe and not who I say I am."

Do you see that?

A I do.

Q And that's similar language to the fear that you describe to Mr. Van Winkle in the document we just looked at a few minutes ago from February, right?

MS. SHAPIRO: Objection.

THE WITNESS: I believe so.

BY MR. GOTTLIEB:

Q You were very concerned that Ms. Lively would go public with some of the materials or allegations that had been contained in the 17-point list and in the list you read on January 4th,

Page 291

right?

MS. SHAPIRO: Objection.

THE WITNESS: Again, I disagree with anything to do with the 17-point list.

BY MR. GOTTLIEB:

Q But you think it might have referred to items that were in the January 4th list?

MS. SHAPIRO: Objection.

THE WITNESS: I'm sure I had feelings about the lies that I felt were in the January 4th meeting, but I think it's a very reasonable feeling that I'm expressing here.

BY MR. GOTTLIEB:

Q Mr. Baldoni, was the thought of someone saying publicly that you were not who you say you are, one of your biggest fears?

A I think based on where I was emotionally in my healing journey therapy at the time in going through this film, I would imagine that was a fear, yes.

Q And that's what you're referencing here to Mr. Heath, isn't it, with your reference to the little boy that you're so intertwined with?

MS. SHAPIRO: Objection.

THE WITNESS: I'm just out of therapy and

Page 292

clearly not very sober in terms of my emotional state. So I was extremely sensitive and vulnerable and clearly in a very dark place at that moment.

BY MR. GOTTLIEB:

Q I understand, and I'm sorry to press on it, but you're saying to Mr. Heath, I think, particularly in this carryover message at 2:33 p.m. on 27th, that your personality is being overrun by this little boy who feels scared and threatened; is that what you're conveying to Mr. Heath in this message?

MS. SHAPIRO: Objection.

THE WITNESS: No.

BY MR. GOTTLIEB:

Q That's not what you meant by:

(As read):

"He's been running the show when he feels scared and threatened and that's who you get so frustrated with"?

MS. SHAPIRO: Objection.

THE WITNESS: What I meant by that is, in moments of intense emotion, in moments where I'm short or can get angry very quickly, in those moments, I believe that is the little boy in me that doesn't feel safe. And it's in those moments, like

Page 293

the moment I just read, watching the way that I was even texting him, almost with like a frantic energy, it's like a -- it feels like a little kid. And in those moments, it feels like that boy is in charge. It's -- it's not literal by any means.

BY MR. GOTTLIEB:

Q But that feeling, which I recognize is a figurative description of your internal process, is what you're describing to Mr. Heath occurred to you emotionally the night before, right?

MS. SHAPIRO: Objection.

THE WITNESS: I can't say exactly.

BY MR. GOTTLIEB:

Q And that feeling or the little boy or however we described it, was able to make you behave towards your best friend, and the CEO of Wayfarer Studios, in a way that you clearly regretted the next day, right?

MS. SHAPIRO: Objection.

THE WITNESS: I think this is a very normal conversation for best friends who have been friends for as long as Jamey and I have, to have a outlet or a safe place to be angry and then to come back. I think marriage is a place like that, and I think friendships like mine and Jamey's, which I to

CONFIDENTIAL

Page 294

this day feel so lucky to have, where you're not judged for moments where you're oversensitive or emotional or you can say stuff you don't mean and come back later and not be judged. That's what I meant.

MR. GOTTLIEB: All right. Thank you, Mr. Baldoni. We're going to go off record.

THE VIDEOGRAPHER: We are going off the record. The time is 5:14 p.m.

(Recess.)

THE VIDEOGRAPHER: We're back on the record the time is 5:44 p.m.

MR. GOTTLIEB: Mr. Baldoni, you're being handed what's been marked as Exhibit 37.

(Exhibit 37 marked for identification.)

THE WITNESS: Thank you.

MR. GOTTLIEB: Exhibit 37 is an email you sent to Alex Saks, Ange Giannetti, Jamey Heath, Andrew Calof, and AJ Marbory on February 20th, 2023. It bears Bates No. SPE_BL 5563 through 5564.

THE WITNESS: I'm going to read it, if that's all right.

MR. GOTTLIEB: Yeah.

MS. AHOURAIAN: Steve?

Page 295

(Phone interruption.)

MR. SAROWITZ: Sorry about that.

MR. GOTTLIEB: Can we go off record, please?

THE VIDEOGRAPHER: We're going off the record. The time is 5:47 p.m.

(Recess.)

THE VIDEOGRAPHER: We're back on the record. The time is 5:47 p.m.

BY MR. GOTTLIEB:

Q Mr. Baldoni, we're looking at what's been marked as Exhibit 37, same as we were before the break. And this is a message that you sent to Alex Saks, Ange Giannetti, Mr. Heath, Mr. Calof, copy to AJ Marbory on February 20, 2023?

A Correct.

Q Who is AJ Marbory?

A I'm sorry. I'm still finishing reading.

Q Okay.

A Thank you.

Q You sent this email?

A I did.

Q It was an apology to the group?

A Yes.

Q And especially to Alex Saks?

Page 296

A Yes.

Q Who is AJ Marbory?

A My former assistant.

Q You talked about this apology in a talk you did with Jane Randolph from No More a month later, in March of 2023; is that right?

A I don't know.

Q You say here that:

(As read):

"Over the last few months, I haven't been the safest place for myself, and in that, energetically, I feel I've failed at being a safe place for others."

Do you see that?

A I do.

Q Did you think that you had failed at being a safe place for others in the last few months?

A I think I was being very hard on myself here.

Q Okay. Does that mean you were being dishonest?

MS. SHAPIRO: Objection.

THE WITNESS: No, no. But as I sit here today, and I read this, I feel I was disproportionately hard on myself.

Page 297

BY MR. GOTTLIEB:

Q You talk about how in a meeting that you had recently with Ms. Saks and Ms. Giannetti and Mr. Calof, Mr. Heath, you had interrupted and mansplained something as it relates to abuse and data and statistics to Ms. Saks; is that right?

A That's correct.

Q And you promised that:

(As read):

"As we go forward, I will make sure that doesn't happen again to any of the women involved in this film"?

MS. SHAPIRO: Objection.

THE WITNESS: That is what I said.

BY MR. GOTTLIEB:

Q You said you would always listen?

A Yes.

Q Do you think pressure had been getting to you at this point the end of February 2023?

MS. SHAPIRO: Objection.

THE WITNESS: I don't know if I can answer it's been getting to me. I think I felt a lot of pressure.

CONFIDENTIAL

Page 298

BY MR. GOTTLIEB:
Q And that pressure had caused you to act in a way where you failed it being a safe place for others?
A No.
Q Would you have said these things you said here to Ms. Saks if Ms. Saks had not been a woman?
MS. SHAPIRO: Objection.
THE WITNESS: I don't think I can answer that question.
BY MR. GOTTLIEB:
Q Did you watch or read Ms. Saks' deposition testimony?
A I did not read it. I watched some of it.
Q Did you watch the part where Ms. Saks testified about an incident on set in which she felt verbally abused by you?
A I don't remember hearing "verbally abused," no.
Q Do you recall Ms. Saks testifying about how you had yelled at her on the set at one point?
A I remember her testifying that, yes.
Q And she had felt frightened by that?
A I'm not sure if that was her testimony.
Q Do you recall Ms. Saks walking off of set

Page 299

after that incident occurred?
A I do not.
Q With respect to AJ Marbory, do you remember at any point in time asking -- is AJ Marbory a man or a woman?
A Woman.
Q Do you recall at any point in time having Ms. Marbory take a harassment prevention class on your behalf?
A No.
Q Do you recall at any point in time in April of 2023 that you were supposed to be taking a harassment prevention class?
A I don't.
Q Do you recall in exchange with Ms. Marbory on April 2, 2023 in which she said, "you're acing your harassment prevention class. Truly stellar job." And you responded "thank you, I'm working really hard at it"?
A I don't.
Q Okay. I want to ask you about the birth scene in It Ends with Us.
A Are we done with this?
Q Yes. Did you suggest that Ms. Lively perform the birth scene naked?

Page 300

A No.
Q Did Mr. Heath?
A No.
Q Did anyone else?
A I don't know.
Q Did you want Ms. Lively to perform the birth scene without most of her clothes on?
A No.
Q Did you ever tell Ms. Lively that your wife had ripped her clothes off during childbirth?
MS. SHAPIRO: Objection.
THE WITNESS: I do not recall a conversation where I said she ripped her clothes off during childbirth.
BY MR. GOTTLIEB:
Q Do you recall ever sharing any information with Ms. Lively in speaking about the birth scene in the movie, where you recounted information about your wife giving birth, to Ms. Lively?
MS. SHAPIRO: Objection.
THE WITNESS: I remember numerous conversations where Ms. Lively and I were talking about our -- and I don't mean my birth, but our, like, collective births, where she shared personal

Page 301

information and then I shared personal information about my wife.
BY MR. GOTTLIEB:
Q And as you sit here today, you can't recall any conversation in which the topic included the amount of clothing or the type of clothing that Ms. Lively's character ought to wear during the birthing scene?
MS. SHAPIRO: Objection.
THE WITNESS: I don't remember anything specific about clothing. That was definitely not the -- what we were talking about in terms of all the conversation around the -- our births.
BY MR. GOTTLIEB:
Q Did you ever ask Mr. Heath to share any portion of a video of his wife giving birth with Ms. Lively?
A I did.
Q Did you specify when you asked Mr. Heath to share that video with Ms. Lively what he should share from it or how much he should share from it?
MS. SHAPIRO: Objection.
THE WITNESS: The only video I'm aware of is after his -- after the birth of his child. So I believe there's only one that I asked him to share.

CONFIDENTIAL

Page 302

BY MR. GOTTLIEB:
Q There's only one video that you're aware of that you've ever seen?
A That I asked him to share?
Q That you asked him to share with Ms. Lively?
A Yes.
Q And your testimony is that that video begins after the point that the baby was born?
A I have not watched the video in years. I believe it was the birth of his daughter. And my memory of the beginning of that video is that him and his wife Natasha and his baby are in a birthing tub surrounded by his family.
Q Do you have any knowledge, one way or the other, whether the entire event of the birth of Mr. Heath's child was filmed or put on video?
A I was not there.
Q You were not there?
A I was not at the birth of his child.
Q But do you know, one way or the other, whether there is video of his wife giving birth?
A As I said, I was not there so I would not know.
Q And were you present when Mr. Heath

Page 303

showed this video to Ms. Lively?
MS. SHAPIRO: Objection.
THE WITNESS: I was not.
BY MR. GOTTLIEB:
Q Do you know, one way or the other, how much of the video Mr. Heath showed to Ms. Lively?
A I have no personal knowledge of that.
Q Do you know whether Wayfarer Studios ever described the video that Mr. Heath showed to Ms. Lively as a birthing video?
A I don't.
Q Do you recall testifying yesterday about some communications with Melissa Nathan and the TAG team about a scenario planning document?
A Yes.
Q And I think it was in Exhibit 16 that was introduced yesterday and there was a document in which you were asked some questions about saying that you didn't feel that this scenario document -- scenario planning document was all that impressive. Do you recall testifying to that effect?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall my exact testimony from yesterday.

Page 304

BY MR. GOTTLIEB:
Q Do you recall yesterday saying that about the scenario planning document; you thought it wasn't that impressive and you felt like they were just trying to get the gig?
A It sounds like that's what I said and you're reading it, so I'm going to -- I'm going to say yes.
Q Do you recall testifying yesterday that you were feeling so scared and anxious that even if they had proposed to build an iron dome, you wouldn't have felt protected?
A I do remember that.
Q And you testified that you were extremely worried about the gloves coming off. Remember?
A As I think anyone would be. Yes.
Q Okay. First of all, at the point in which you were exchanging this information about the scenario planning document, do you recall when you were exchanging back-and-forth communications with Ms. Abel or Ms. Nathan about the scenario planning document and what TAG was proposing to do?
MS. SHAPIRO: Objection.
THE WITNESS: August.

Page 305

BY MR. GOTTLIEB:
Q If I told you that Exhibit 16 had a date of August 2nd on it, would that sound right to you?
MS. SHAPIRO: Objection.
THE WITNESS: I would believe you.
BY MR. GOTTLIEB:
Q At that point, you're not yet in New York for the press junket, right?
A On?
Q August 2, 2024?
A I was in Sweden, correct.
Q The first day of the press junket was August 5th; was that right?
A Thank you for telling me, yes.
Q On August 8th, you fly to Chicago; is that right?
A That sounds about right.
Q So on August 2nd, there is not a lot of social media chatter about the premiere and what is happening with the premiere, right?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know.
BY MR. GOTTLIEB:
Q But the edit is done, right?
A The edit?

Q Of the film. The movie's done, right?
A It had been done for months, yes.
Q Posters were printed?
A Posters were printed, yes.
Q The trailer's been out for months?
A Correct.
Q All that is left at this point is the premiere, right?
A And more promotion.
Q And the thing that you're afraid of, the storm that you see coming, is the reaction to when you and the cast don't appear at the premiere together, right?
MS. SHAPIRO: Objection.
THE WITNESS: One of the things.
BY MR. GOTTLIEB:
Q What were you afraid people would infer when you and the cast did not appear together at the premiere?
MS. SHAPIRO: Objection.
THE WITNESS: I think what I was afraid of was what I didn't know people would infer. I think the Internet is a scary place, and I think that what happens is, when a situation is created, I believe intentionally, to leave Easter eggs that



something could be amiss so that the Internet can fill in the blanks, I think anything is possible. I think imaginations can run wild, and I also think that -- that at that point, that's where lies can be told. And I think all of that was very scary to me.
BY MR. GOTTLIEB:
Q Did it occur to you at this time, Mr. Baldoni, that there might be a good reason why Jenny Slate didn't want to follow you on social media, and didn't want to appear alongside you at the premiere?
MS. SHAPIRO: Objection.
THE WITNESS: I had a perfectly fine working relationship with Jenny Slate from the moment that I was made aware that she didn't like my "sexy" comment about her wardrobe and all the hugs, so from that point on, Ms. Slate and I never had an issue, nor discussed anything.
BY MR. GOTTLIEB:
Q Did it occur to you that Isabela Ferrer might have a reason why she didn't want to appear alongside you at the premiere?
MS. SHAPIRO: Objection.
THE WITNESS: I was very confused by why Ms. Ferrer unfollowed me and wouldn't appear



with me. I had no idea.
BY MR. GOTTLIEB:
Q Did you ask her why?
MS. SHAPIRO: Objection.
THE WITNESS: I think it was very clear that when a person publicly unfollows you, and also through channels tells you they don't want you at the premiere or they won't attend, I think I took the hint that I shouldn't reach out to anybody and ask.
BY MR. GOTTLIEB:
Q But you didn't reach out and ask, right?
A I did not believe that anything that I had to say could compete with any influence that Ms. Lively had.
Q Even though in your view, all of this was based on lies?
MS. SHAPIRO: Objection.
THE WITNESS: When you're dealing with, arguably, the most powerful couple in Hollywood with the most powerful friends in the world, mixed with someone who's extremely charming and personable and has so much to offer someone as young as her, by that point, there was nothing I believe I could have said to her that would -- that could affect any



influence that Ms. Lively had had on her, so I did not even try.
BY MR. GOTTLIEB:
Q So it's your testimony that you believed that the reason that all of the cast members who unfollowed you and did not want to appear alongside you at the premiere, that all of them did that only because Blake Lively and Ryan Reynolds had pressured them to do so?
MS. SHAPIRO: Objection.
THE WITNESS: That's not my testimony.
BY MR. GOTTLIEB:
Q Is that what you believe?
A I believe that prior to meeting and working with Ms. Lively, I have never had anyone unfollow me or ask to not be seen in a photo with me. That's what I believe.
Q Because you had never experienced that before, are you saying that you attribute the cause of the unfollowing and the request to not appear alongside you at the premiere, you attribute the cause of all of that to Ms. Lively?
MS. SHAPIRO: Objection.
THE WITNESS: That's not my testimony.

CONFIDENTIAL

Page 310

BY MR. GOTTLIEB:
Q Do you think your conduct on the set of It Ends with Us had anything to do with the decisions made by cast members, other than Ms. Lively, to not want to follow you and not appear alongside you at the premiere?
MS. SHAPIRO: Objection.
THE WITNESS: I am unsure if --
MR. GOTTLIEB: Can you repeat the question? This is not working for me.
THE STENOGRAPHIC REPORTER:
(Record read as follows):
"Do you think your conduct on the set of It Ends With Us had anything to do with the decisions made by cast members, other than Ms. Lively, not wanting to follow you and not appearing alongside you at the premiere?"
THE WITNESS: I can't speculate and answer that question.
BY MR. GOTTLIEB:
Q You don't know what their motivations were?
A I think it's impossible to know what anybody's motivation is.

Page 311

Q And you didn't ask what their motivations were?
A I did not ask what anyone's motivations were.
Q And notwithstanding that you were very concerned and very afraid, you did not initiate an investigation at this point in time to clear your name?
MS. SHAPIRO: Objection.
THE WITNESS: I did not initiate an investigation at that time.
BY MR. GOTTLIEB:
Q Instead, you retained The Agency Group, right?
MS. SHAPIRO: Objection.
THE WITNESS: I would not classify it as that.
BY MR. GOTTLIEB:
Q And you commissioned the scenario planning document to get ahead of what you thought might be coming?
MS. SHAPIRO: Objection.
THE WITNESS: I just want to go back. I did not use the word instead of investigating. I just want to say that's not it. I disagree.

Page 312

BY MR. GOTTLIEB:
Q You didn't investigate, correct?
A I did not investigate.
Q You didn't talk to the cast members who had unfollowed you, correct?
A Correct.
Q You didn't go out and give an interview and speak publicly where you said, I'm concerned there are misconceptions or misapprehensions about what has happened on the set; you didn't do that, right?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MR. GOTTLIEB:
Q Instead, what you did is, you asked your team to prepare a plan in the event that any information became public, right?
MS. SHAPIRO: Objection.
THE WITNESS: No.
MR. GOTTLIEB: Okay. Thirty-eight.
(Exhibit 38 marked for identification.)
Exhibit 38 -- Exhibit 38 is a document bearing Bates Nos. NATHAN 5497 through 5506. And I will represent to you, sir, there are two versions of the same document attached to this at the end, so

Page 313

you'll only --
THE WITNESS: Is there any reason for that?
BY MR. GOTTLIEB:
Q That's how it was produced to us. And so in looking through this, you only need to look through the texts and the first four pages there.
A So I'm not to look at the document?
Q You can look through the texts, and then just -- all I'm saying is, you don't need to read the same document twice.
A Are we sure you know it's the exact same document?
Q I'm going to represent to you that it is.
A Okay. But are we sure?
Q Your lawyers will call me on that if I'm lying.
MR. GOTTLIEB: I'm wrong. It's very different. I will retract my statement, and you may review whole thing.
THE WITNESS: She didn't even have to call you out on it.
MR. GOTTLIEB: I apologize. I was mistaken. My mistake.
THE WITNESS: Can I borrow this pen?

CONFIDENTIAL

Page 314

BY MR. GOTTLIEB:
Q Sure.
I'm sorry, Mr. Baldoni. I can represent to you, if you look at the text, that the only difference between the two documents is reflected in that second message on the text page, is a correction.
A You mean you can represent to me what you just did?
Q Yeah.
A But you were just wrong.
Q Do you want to read the text?
A I'm just -- not that I don't trust you, but in the same way, I just want to read it, if that's okay.
Q Okay.
MS. AHOURAIAN: Sorry, I would like to clarify. So these are duplicates of the -- I know you've been going back and forth about that.
MR. GOTTLIEB: No, there's a change made. There's one change.
MS. AHOURAIAN: Between this and this?
MR. GOTTLIEB: There's two documents attached at the end. They're both attachments that are referenced in the text messages, which you will

Page 315

see if you follow through. And there's a description of the change that's made in the text messages.
MS. AHOURAIAN: Got it. Thank you.
MR. GOTTLIEB: And, again, this was how the document was produced to us.
MS. AHOURAIAN: Understood.
BY MR. GOTTLIEB:
Q Mr. Baldoni, I'm going to ask you to stop your review now. You've been reading this document for ten minutes, and I promise you I will not ask you questions -- any questions about the differences between the two versions of this.
A I just want you to know, I just finished reading this, and I felt like I was reading at a decent speed.
Q Okay. I'm not -- I'm stating for the record the reason I'm asking you to stop your review now.
This is a document that is a text message exchange between you, Mr. Heath, Ms. Case, Ms. Nathan and others on August 2nd, 2024; is that correct?
A That appears to be correct.
Q And there are two versions of this

Page 316

scenario planning document that are attached to this; is that right?
A That's what I'm taking yours and everyone's word for.
Q Okay. And you recall being sent this scenario planning document; is that right?
A Again, I believe I do.
Q You testified about it yesterday feeling that it didn't provide the protection that you were looking for at the time?
A Is this the same version of the document that I was testifying about yesterday?
Q Can we agree that you testified about a scenario planning document sent to you by TAG that you were unimpressed with?
MS. SHAPIRO: Objection.
THE WITNESS: Yes. I just don't know if that's this one or not.
BY MR. GOTTLIEB:
Q Okay. Do you know as you sit here today, which, if any, of the services or activities or tactics laid out in the scenario planning documents were put into motion?
MS. SHAPIRO: Objection.
THE WITNESS: My understanding, based on

Page 317

my directives, and I believe Mr. Heath's, was that nothing was to be put into motion. We were in a completely defensive place.
BY MR. GOTTLIEB:
Q Did you know that alongside Jen Abel and her team, TAG did, in fact, manage media inquiries regarding the news on background as sources familiar?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know what that means.
BY MR. GOTTLIEB:
Q You don't know what it means to talk to the media as a source familiar?
MS. SHAPIRO: Objection.
THE WITNESS: A source familiar, specify, please.
BY MR. GOTTLIEB:
Q You don't know what it means to talk to a reporter not on the record and an official statement, but rather, saying you, reporter, can print this is what happened based on a source familiar?
MS. SHAPIRO: Objection.
THE WITNESS: Being very honest, the way

CONFIDENTIAL

Page 318

that you're describing it is not something that I -- I mean, I know they speak to reporters. That's their job in PR. But a source familiar is not something I've heard.

BY MR. GOTTLIEB:

Q So you knew that Ms. Abel and the TAG team were talking to reporters during their engagement?

A I -- I mean, Ms. Abel's engagement, that's her -- that's her job, is to speak to reporters.

Q Okay. So I'm asking you if you know one way or the other, whether TAG and Ms. Abel were managing media inquiries regarding the news on background as sources familiar?

MS. SHAPIRO: Objection.

THE WITNESS: I was not with them, so I would have no way to know one way or the other.

BY MR. GOTTLIEB:

Q Did you have a view on whether you wanted them to be doing that?

MS. SHAPIRO: Objection.

THE WITNESS: Yes, I did. I had a very strong view.

Page 319

BY MR. GOTTLIEB:

Q And what was that view?

A I didn't want them saying anything that was negative about anybody or anything.

Q You didn't want them saying anything that was negative about anyone or anything even on background?

A Absolutely.

Q Even off the record?

A I don't know if I can be more specific than I just was.

Q Do you know if they ever, Ms. Abel and TAG, working on your behalf, said anything negative about anyone to members of the media during this period of time in August of 2024?

MS. SHAPIRO: Objection.

THE WITNESS: Again, I don't know how I would know that.

BY MR. GOTTLIEB:

Q Did you want TAG to be providing information to ensure that your narrative was properly represented in any and all coverage?

A That my narrative was properly representative in any and all coverage? The only narrative that I wanted to make sure was properly

Page 320

represented was my original intentions for why I wanted to make this movie. That was extremely important to me.

Q Do you know, one way or the other, whether TAG confirmed that outlets on intending covering the story, especially those impactful to your, Mr. Heath's, and Wayfarer's interests, were fully briefed on the situation, including and not limited to The Hollywood Reporter, Variety, Deadline, The Wrap, New York Post, Daily Mail, et cetera?

MS. SHAPIRO: Objection.

THE WITNESS: I feel like I can save you a lot of questions by telling you that this was a scenario planning document that was never, from my end, given approval to execute on any level.

BY MR. GOTTLIEB:

Q Any piece of this document?

MS. SHAPIRO: Objection.

THE WITNESS: Yes.

BY MR. GOTTLIEB:

Q It's your testimony that you believe that you never approved TAG or Ms. Abel doing any of the things that are listed in this document?

A I believe we started this conversation by

Page 321

you saying if I remembered my testimony and that I wasn't satisfied with this document. So if I'm answering your question the way that I think you're asking it, then that would be yes, because I did not like this document. I didn't find it to be amazing. And so there was nothing that could be approved from it. I didn't ever approve this document.

Q You wanted TAG to do something else?

A I was not satisfied with this particular document.

Q And you had a call following up on this scenario planning document with Ms. Nathan and Ms. Abel, right?

A I don't remember the specifics of the call, but I'm sure I did.

Q Did they talk to you in that call about what it would mean to get ahead of the narrative?

A Not that I remember.

Q You have no recollection of discussing with Ms. Nathan or Ms. Abel things that could be done to get ahead of the narrative that you were afraid might come out?

MS. SHAPIRO: Objection.

THE WITNESS: My conversations with Ms. Abel and Ms. Nathan were very few together. And

CONFIDENTIAL

Page 322

they were very, very clear that I wanted to focus on the good.
BY MR. GOTTLIEB:
Q Do you remember looking at a document that had a post of Hailey Bieber embedded in it yesterday; it was Exhibit 17?
A I can't recall the exhibit number, but I do remember the document.
Q And you testified that -- I will represent to you --
A Is this still -- are we done?
Q We're done.
I will represent to you that Exhibit 17 that was admitted yesterday was a text exchange with you, Ms. Abel -- you and Ms. Abel on August 5th, 2024.
A Do you have it? I would love to see it so I can reference it.
Q Well, I'm going to just ask you some questions. August 5th was the start of the press junket, right?
A If that's the date you gave me before, then I will continue to believe you, yes.
Q And you testified yesterday that there was a reference to friction that you and Ms. Abel

Page 323

discussed, and you had used the word "friction" in an interview that you had given, and Sony had objected to that. Do you recall that?
MS. SHAPIRO: Objection.
THE WITNESS: I remember a text message where she was saying that Sony didn't like the word "friction." But, again, it would be easier if you would give me the document because then I can respond to it.
BY MR. GOTTLIEB:
Q I understand that. Do you recall the text message Ms. Abel sent to you saying:
(As read):
"Sony is having a hard time with the word 'friction.' They think it will be taken out as clickbait. They obviously don't know about our strategy. But let's stick to the word of 'challenge' in the role that you had as a director to get everyone to come together and be on the same page to create something beautiful."
Do you remember that exchange?
A Yes, I do, from yesterday's deposition.
Q You testified that the reference to

Page 324

"friction" was part of the strategy to saying only positive things and not drawing attention to the situation; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: Do we have my testimony, and I can just confirm that was exactly what I said, or are you paraphrasing that?
BY MR. GOTTLIEB:
Q Is that consistent with your recollection?
A I believe so.
Q Isn't it, in fact, true that the use of the word "friction" was itself a press strategy to get ahead of a particular narrative?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not sure. I feel like that's -- there's only so many words you can use to describe in a positive way what was experienced.
BY MR. GOTTLIEB:
Q Would you be surprised to learn that TAG and Ms. Abel had specifically discussed you using the word "friction" in order to plant a seed and get ahead of a narrative?
MS. SHAPIRO: Objection.
THE WITNESS: I don't agree with the way

Page 325

that you are characterizing that question.
BY MR. GOTTLIEB:
Q Did you agree with Sony that the word "friction" at a time when there was speculation in the fan community about a feud, was clickbait?
MS. SHAPIRO: Objection.
THE WITNESS: I don't remember agreeing with much of anything Sony was saying during that time.
BY MR. GOTTLIEB:
Q Including their advice about how to market the film?
A I believe from day one, before I even sold the film to Sony or partnered with them, we had disagreements on how to market the film.
Q And it is in response to that message about friction from Ms. Abel that you sent Ms. Abel the message, the screenshot of the Hailey Bieber thread from Twitter, right?
A No.
Q It's not?
A No.
Q You said it in response to what?
A Would you mind reading me the time of my message and the time of the Hailey Bieber message?

CONFIDENTIAL

Page 326

Q Sure. The time of the first message from Ms. Abel is 10:42 a.m., and the time of your message to Ms. Abel about Hailey Bieber is at 12:06 p.m.
A So I don't have a calculator, but could you help me with how much time is between those two texts?
Q I think you know how much time is between those two texts.
A I genuinely don't know how much time.
Q What is it you would like to say?
A Well, your question was, was it a response?
Q And your testimony, I gather, is, no, it was not?
A That is my testimony, that it was not a response.
Q Okay. What were you responding to when you said, "this is what we would need," and you sent the text -- the Twitter thread of Hailey Bieber?
MS. SHAPIRO: Objection.
THE WITNESS: That's -- I don't agree with the question. I can't answer that.
BY MR. GOTTLIEB:
Q What were you sent -- what were you trying to convey -- no, strike that.

Page 327

Why did you send this text message at 12:06 p.m. to Ms. Abel in which you say:
(As read):
"This is what we would need."
And the only thing you have put into the text message is a screenshot of a Twitter thread where the line at the top says:
(As read):
"Hailey Bieber's history of bullying many women, not just Selena Gomez, throughout the years thread."
MS. SHAPIRO: Objection.
THE WITNESS: That's a very long question you just asked me.
BY MR. GOTTLIEB:
Q Why did you send that to Ms. Abel?
A But I can't answer the "why." It was not a response. That's why I couldn't answer the question.
Q Why did you send it to Ms. Abel?
A Again, we were in a place of defense. And as you may have seen from many of the early text threads you've shown me, I was afraid. At this point, I felt I was up against Goliath and Blake Lively and her husband, Ryan Reynolds, and everyone

Page 328

in their circle, Hugh Jackman, Shawn Levy, Taylor Swift.
By that point, as I testified earlier, I was essentially forced, or threatened, to step down off my film. I wasn't able to finish my own film even considering it tested higher. Somehow the actress of my movie who was not a producer was able to take complete control of the film.
By this point, Ms. Lively had requested that my name be removed. So I had my "a film by credit" removed. I was removed from the majority of marketing materials, from the poster. I was being removed, for the most, from the trailer. I know that she had been working with Taylor Swift to make sure that she got the song that she wanted in the film. And I had assumed that that was not a battle or a fight that I could ever win.
All of the cast had unfollowed me. Which is a very public thing to do right before a movie comes out, all in unison. And at that time, I was being threatened via my agency that if I didn't release a statement, then -- then the gloves would come off.
Now, I don't know the exact sequence of the time in which I sent that text. But I will tell

Page 329

you that the feeling and the aura around the environment that was created, not by me at that time, created a lot of fear. I didn't know what was possible. So we were in a defensive mode because at this point, I didn't know what Ms. Lively or her group of powerful Hollywood elites were capable of.
So I saw a message -- or I saw a tweet, which I did not read, and I saw that it was a celebrity woman who had a history of bullying. And I resonated with the term "bullying" because to me that was a true statement to what I experienced. I felt I was being very bullied.
So I sent that to Ms. Abel on a whim in an emotional state, but I made sure to preface it with, this is what we would, with an emphasis and the operative word being "would" need. Not that we need to do this. Not that I want this. But this is what we would need if lies were to be spread about me intentionally.
Q The gloves would come off conversation hadn't happened at the time you sent this, right?
A So then we can imagine that that conversation -- it was all mixed into the same feeling, but the feeling I had was everything else that I said.

Q You hadn't been threatened yet?
MS. SHAPIRO: Objection.
THE WITNESS: I wouldn't agree with that.
BY MR. GOTTLIEB:
Q You mentioned being -- having your "film by credit" removed?
A Yes.
Q Do you know what another word for the "film by credit" is in Hollywood?
A I would love you to educate me.
Q Have you ever heard it referred to as the "vanity credit"?
A No.
Q Do you understand that there is significant controversy in the industry, in your industry, over the use of the "film by credit"?
A I was not aware.
Q Are you aware that it has been criticized by a number of directors because it conveys that all of the people who work on a movie are less important than the director?
MS. SHAPIRO: Objection.
THE WITNESS: I was not aware until you just said that.



BY MR. GOTTLIEB:
Q Did Ms. Lively -- was she the cause of your "film by credit" being removed from this movie?
A What was relayed to me was that Ms. Lively requested it be removed.
Q Do you know what other directors you admire and look up to do with respect to the "film by credit"?
MS. SHAPIRO: Objection.
THE WITNESS: I wouldn't know.
BY MR. GOTTLIEB:
Q Would you want to have a credit that's known as the "vanity credit" be something you sought on a film written by Colleen Hoover with the screenplay, a woman, screenplay written by a woman, with many women acting on it, would you want a credit that's known as the "vanity credit" attached to your name?
MS. SHAPIRO: Objection.
THE WITNESS: Until you brought it up right now, this was the first I'd ever heard of it.
BY MR. GOTTLIEB:
Q You never thought to ask?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not sure how I can ask



about something I don't know about.
BY MR. GOTTLIEB:
Q Did Ms. Lively remove you from the trailer?
A What was related to me was that she was attempting to.
Q Who had approval authority over the trailer?
A What do you mean exactly?
Q Who had approval authority over the trailer, the trailer that was released? Who was in charge?
A I believe Ms. Lively.
Q You believe Blake Lively had the approval authority over the final trailer that was released for the film It Ends with Us?
A From my understanding, in many ways that's what she claimed in her letter to the Producers Guild of America.
Q Did you ever ask Sony's president why your "film by credit" was removed?
A Sony's president relayed to Jamey, it's my understanding, or it could have been Ange, why my "film by credit" was removed.
Q Did you ever confirm with anyone who



actually made the decision about the final composition of the trailer?
MS. SHAPIRO: Objection.
THE WITNESS: I spoke to -- I was having some conversations with Ange Giannetti and some of the people involved in the trailer.
BY MR. GOTTLIEB:
Q Did you do a promotional event at the release -- upon the release of the trailer?
A I did.
Q Was Ms. Lively there?
A She was not.
Q Was Colleen Hoover there?
A Yes.
Q Was there a floral pop-up shop?
A I believe there was.
Q Did you make bouquets?
A With Ms. Hoover, I did.
Q You and Ms. Hoover made bouquets?
A I believe that's what I just said.
Q For influencers and fans?
A It was a pop-up shop for influencers and fans, correct.
MR. GOTTLIEB: Can I get a time check, please? And can we go off the record?

CONFIDENTIAL

Page 334

THE VIDEOGRAPHER: We are going off the record. The time is 6:36 p.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record. The time is 7:05 p.m.
MS. SHAPIRO: I just want to note for the record, that we have now been going for 13 hours and 35 minutes with Mr. Baldoni. We took a break that was supposed to be 15 minutes. It has now been almost half an hour. And we are all very tired. The witness is extremely tired, and this is unacceptable.
MR. GOTTLIEB: Noted.
BY MR. GOTTLIEB:
Q Did you record the January 4th, 2024 meeting?
A Can you ask that one more time?
Q Did you record the January 4th, 2024 meeting that happened in Ms. Lively's apartment?
A No.
Q Did Mr. Heath?
A I'm unaware of any such recording.
Q Are you aware of anyone on your team having recorded that meeting?
A Mr. Heath is the only person on my team

Page 335

that was at that meeting.
Q Okay.
A So I guess to answer your question, no.
MR. GOTTLIEB: This is Exhibit 39. This is a document that was Exhibit 18 from yesterday, and what we were searching for before we went back on the record here.
(Exhibit 39 marked for identification.)
THE WITNESS: Okay.
BY MR. GOTTLIEB:
Q And so you testified about this exhibit yesterday. We've marked it as Exhibit 39 for everyone's convenience because we don't have the exhibits from yesterday here with us. So Exhibit 39 is a text chain that you testified about yesterday, between you, Ms. Nathan, Ms. Abel, the three of you, on August 15th, 2024.
Do you recall testifying about this text chain yesterday?
A I believe I do.
Q And in this text chain on the 15th of August, you were talking about how Mr. Sarowitz had asked you about:
(As read):
"Flipping the narrative from this leak

Page 336

this a.m. about Ryan saying script was a disaster and he saved the movie."
Do you see that?
A If it's okay I'm -- I know I testified yesterday, but I'm just going to read it very quickly so then I can answer all your questions.
Q Okay.
A Thank you.
Q Exhibit 18 from yesterday and Exhibit 39 from today, is an exchange on the 15th of August between you, Ms. Nathan, and Ms. Abel?
A Yes.
Q And you talk about something Mr. Sarowitz had said to you earlier about:
(As read):
"Flipping the narrative from the leak this a.m. about Ryan saying script was a disaster and he saved the movie"?
A Yes.
Q And I think you testified that you were unsure what the basis of the belief that Ryan had said the script was a disaster and saved the movie was; is that right?
A I -- what I'm saying here, if I read my words, is "from this leak this a.m." so some sort of

Page 337

leak that morning, so an article.
Q Do you know whether Mr. Reynolds himself ever had said publicly that the script was a disaster and that he saved the movie?
A I don't think I could know.
Q Do you know whether he ever said that privately?
A I don't think I could know that.
Q So you don't know whether this statement attributed to Mr. Reynolds was actually made by him at any point in time?
A I don't think it's possible that I could know that.
Q Do you know the point in time at which Mr. Reynolds was alleging to have worked on or saved the script, according to what you were responding to here?
MS. SHAPIRO: Objection.
THE WITNESS: What I know is that during the premiere, Ms. Lively, for some reason, offered up the fact that her husband wrote the -- what is arguably one of the top five most important scenes in the film. And I believe this appeared to be PR that was trying to justify or calm the backlash that was caused by Ms. Lively's own words.

BY MR. GOTTLIEB:
Q And in response to that, you suggest on the next page over, at two o'clock, page marked 15408:
(As read):
"The fact that they saved the script from what they think is a disaster after we had a green lit script and was a strike, basically implies they were scabs."
Do you see that?
A Yes.
Q And you said:
(As read):
"Which we should 100 percent lead them to."
Do you see that?
A I do.
Q You were writing during the strike; were you not?
A I was.
Q So you were a scab?
A I would have no problem being called a scab.
Q And what you wanted to do was lead



reporters to the fact that in response to this sourced statement, what they should really be printing is that Mr. Reynolds and Ms. Lively were scabs?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MR. GOTTLIEB:
Q Knowing that you had written during the strike?
MS. SHAPIRO: Objection.
THE WITNESS: I'm sorry. I just said no.
BY MR. GOTTLIEB:
Q I'm going to ask my questions --
A Is that a different question?
MS. SHAPIRO: Please.
BY MR. GOTTLIEB:
Q You've answered no.
MS. SHAPIRO: Counsel --
BY MR. GOTTLIEB:
Q And the next question is, you knew you had written during the strike, correct?
A Yes.
Q And you knew that Wayfarer had asked people who are comfortable to come to work during the strike; is that right?



A Like every other production, correct.
Q Did you want reporters to know that?
A I was not hiding that.
Q Is being called a scab a positive or a negative implication in your view?
A I'm not sure I can answer that.
Q But you wanted reporters to go in that direction, right?
MS. SHAPIRO: Objection.
THE WITNESS: What I believe I was doing was passing on a message from my partner, Steve, who relayed to me after reading a story that appeared to be in response from something Ms. Lively said on her own. She was not even asked about whether or not her husband wrote a scene. And then, because of that, received a lot of negative backlash, as did Mr. Reynolds, because why would Mr. Reynolds be a WGA writer writing a scene in someone's movie that he's not credited for. And so Steve, seeing Mr. Reynolds' apparent leak that the script was a disaster, which seemed like he was trying to save his own image in that moment, asked me to pass on to Melissa and Jen that an idea could be presented, which would be flipping this narrative that our movie was a disaster to begin with.



And this, again, was a purely defensive conversation. There was an offensive move done to say that our script was originally a disaster, and we were implying that this could happen. We did not say, go do it. I don't -- unless you have something where I did.
BY MR. GOTTLIEB:
Q Do you have -- you characterize these as offensive and defensive; yet, you have admitted that you have absolutely no idea whether Mr. Reynolds ever said that the movie was a disaster that he saved?
MS. SHAPIRO: Objection.
THE WITNESS: Untrue. I do know he said it.
BY MR. GOTTLIEB:
Q You know that he said that the movie was a disaster that he saved?
A Yes.
Q Okay. And you know that how?
A He said it at the January 4th meeting, in person, to my face.
Q And did he say that in public any time that you ever heard him say that?
A I found it odd that something he said to

CONFIDENTIAL

Page 342

me in a very angry, aggressive tone at a meeting in front of my partners and my best friend somehow ended up magically in the press during a time when there was supposed to be a truce, as soon as his wife, Mrs. Lively, made him look really bad on her own.
Q It's awfully convenient that you remember that right now, isn't it, Mr. Baldoni?
MS. SHAPIRO: Objection.
THE WITNESS: You did bring up a lot of things for me to remember over this and --
BY MR. GOTTLIEB:
Q Did you --
A Yes. I did remember just now.
Q Did you ever communicate in writing to anyone at any time about the January 4th meeting that Mr. Reynolds said that?
MS. SHAPIRO: Objection.
THE WITNESS: There was a lot of things Mr. Reynolds said that I never shared with anybody outside of my wife, as it was extremely humiliating, embarrassing, and traumatic to me.
BY MR. GOTTLIEB:
Q Do you recall when you learned that Mr. Reynolds had blocked or unfollowed you on social

Page 343

media?
A Are you looking for the exact date because I do not have that?
Q Estimate?
A No. I remember the feeling.
Q Do you remember what month it was in?
A July or August, I'm assuming.
Q If I told you that you learned about it in May of 2024, would that surprise you?
MS. SHAPIRO: Objection.
THE WITNESS: It wouldn't surprise me. That entire time period is a big mess.
BY MR. GOTTLIEB:
Q Do you recall ever sending content to your digital team to boost or amplify?
A Yeah, I do.
Q Do you know how the digital team -- who is the digital team?
A I -- I have no idea. I knew there was a digital team. I assumed it was the people that we had hired from TAG.
Q Do you know what it meant -- did you understand what it meant for them to boost or amplify content you were sending to them?
A Technically, no, but I remember at the

Page 344

time assuming that it meant what the word "boost" is, like to -- you know, like if I'm going to give my son a boost, I'm going to help him up. So to boost.
Q And you -- but as you sit here today, you don't have an understanding of how that team went about boosting or amplifying the content you sent for them to -- to boost?
A I don't.
Q Do you have any recollection as you sit here today about the number of pieces of content you sent through to the digital team while they were engaged to boost or amplify?
MS. SHAPIRO: Objection.
THE WITNESS: I don't.
BY MR. GOTTLIEB:
Q Do you believe that the digital team you retained didn't do any actual work?
MS. SHAPIRO: Objection.
THE WITNESS: Do I believe they didn't actually boost or amplify? I have no idea.
BY MR. GOTTLIEB:
Q You don't know what they did?
A I have no idea if they actually did what or boosted what we asked them to boost.

Page 345

Q Do you know how much Wayfarer Studios ultimately paid Street Relations for its work?
A I don't.
Q Would it surprise you to learn that Wayfarer Studios paid Street Relations approximately $100,000 for its work?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I don't think that would surprise me.
BY MR. GOTTLIEB:
Q Do you think Mr. Heath would spend $100,000 of Wayfarer's money paying a vendor that did nothing?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: I can't speculate as to what Mr. Heath would do or would not do with $100,000.
BY MR. GOTTLIEB:
Q What was your share of the profits derived from the film It Ends with Us?
A I believe I had a back-end deal of around -- I don't know all the, like, plus, minus, costs all that stuff, but I think the number was

CONFIDENTIAL

Page 346

around 10 percent.
Q Do you know how much in total compensation, roughly, you received in all forms of payment from the film It Ends with Us?
A To date, I don't know.
Q Do you have any estimate of the amount?
A To date?
Q To date.
A I would guess somewhere between 3- and 5 million.
Q Do you think your total share of compensation -- well, let me put it this way. Were you paid as director a fee or an amount?
A Yes.
Q Were you paid as an actor a fee or amount?
A Very small amount, yes.
Q And then, you had some share of profits in an agreement that was with Wayfarer Studios or It Ends with Us LLC?
A I don't have a share of profits that I'm aware of based on any agreement.
Q What do you have a share of profits based on?
MS. SHAPIRO: Objection.

Page 347

THE WITNESS: To my knowledge, I have ownership stake in the entire company.
BY MR. GOTTLIEB:
Q And so your -- the amount of money that you have made off of the film is derived from a combination of what you were paid as a director, what you were paid as an actor, and your ownership interest in the company?
A False.
Q Please correct me.
A I do not pay myself from any ownership interest in the company.
Q You were entitled to a share of profits from the company, but you've elected not to take it; is that what you're saying?
A Mr. Sarowitz and I have a different agreement than that.
Q What is your different agreement with Mr. Sarowitz?
A That I do not take or we do not take any percentage that isn't -- the studio has not -- hasn't returned a profit, so taking from anything that is not profitable would be taking from the studio. So while the success of the film is amazing, and the studio did make money, Mr. Sarowitz

Page 348

has invested, to my knowledge, over $100 million and that's nowhere near the amount of profit we made on It Ends with Us. So I have not taken, nor will I take any share of that.
Q Is there documentation that memorializes what you just said to me?
A I don't believe so.
Q Is there documentation that would show the payments that you have received, if any, derived from the film It Ends with Us?
A Of course.
Q Have you produced those to us?
A My lawyers have everything that would need to be produced, so I would assume that if that was something that would need to be produced, that they would produce it.
Q Do you recall telling us in an interrogatory response that you first anticipated litigation about It Ends with Us in August of 2024?
A I don't remember, but I'm assuming that's correct.
Q Did you understand after that point in time that you were required to preserve all documents concerning the litigation that you anticipated?

Page 349

A No.
Q When did you understand that?
A I believe this last week.
Q This last week is the first time you understood that you were required to preserve documents in this case?
A Yes, but I preserve them anyways.
Q What steps did you take to preserve your documents, if any, in August of 2024?
A By not deleting anything.
Q Okay. So you didn't delete anything. Did you have any understanding of the retention policies that existed on your email account?
A Can you be more specific?
Q Do you have any knowledge as you sit here today one way or the other, whether the email accounts that you use have retention policies on them?
MS. SHAPIRO: Objection.
THE WITNESS: Retention, meaning like they stay or they don't stay?
BY MR. GOTTLIEB:
Q They stay or they get deleted after a period of time.
A I always have on all my e-mails that they

CONFIDENTIAL

Page 350

never delete.
Q Do you use a Wayfarer Studios email address?
A That's one of my emails, yes.
Q And do you know for a fact that that email account, the retention policy, is set to never delete?
A I believe I intentionally make sure that it never deletes because I always go back and look for emails.
Q Did you talk to somebody at Wayfarer Studios about setting that policy for your email?
A I believe I did. All -- all Gmail, all my personal emails, everything never -- nothing deletes.
Q How about WhatsApp?
A I have all my WhatsApps. They don't delete.
Q You don't have any chains in WhatsApp that have an auto delete timer on them?
A I don't think I was aware that WhatsApp had that function.
Q How about Signal?
A Signal? What about it?
Q Are all of your chats in Signal set to

Page 351

retain indefinitely?
A They are now.
Q I thought you testified yesterday that certain of your Signal chats were set to retain indefinitely and certain were not?
A Yeah, but then I wanted to make sure that they were all set to retain indefinitely.
Q So is it your testimony that the chats that you mentioned with your friends, not with your -- not with lawyers and your co-defendants, but chats that you have on Signal with your friends, are set to be preserved indefinitely?
A Yes. It should be.
Q What about your handwritten notes that you've taken in notebooks?
MS. SHAPIRO: Objection.
THE WITNESS: What about them?
BY MR. GOTTLIEB:
Q Did you take any steps to go search through them to find responsive ones to give to your attorneys?
A I did. I produced them.
Q And those have all been produced to us to the best of your knowledge?
A Yes.

Page 352

Q Do you recall about when you instructed your social media team to start posting you only talking about domestic violence and clips?
MS. SHAPIRO: Objection.
THE WITNESS: I don't remember the date.
BY MR. GOTTLIEB:
Q Okay. I will represent to you that -- that this text is from August 8th, 2024 at 3:30 p.m.
A Okay.
Q And you've written:
(As read):
"Hey, just landed. What is the TikTok strategy? I'd like you guys to start posting me only talking about domestic violence in clips and why this movie is so important."
Does that sound like a text you would have written?
A It does.
Q Do you know why you were sending that instruction at 3:30 p.m. on August 8th, 2024?
A Because I felt like that's what I wanted.
Q Do you know where you had just landed from?

Page 353

A I don't.
Q Do you recall flying around the 8th of August to Chicago with Mr. Heath and Ms. Abel and others in New York?
A I do.
Q Is it possible that you had just landed from that flight from New York to Chicago when you sent this message to your team?
MS. SHAPIRO: Objection.
THE WITNESS: It's entirely possible.
BY MR. GOTTLIEB:
Q Do you recall following up with the team in a conversation about the content that you wanted posted on your social media feeds from this point forward?
A I don't remember a specific follow-up conversation.
Q Do you recall changing your profile?
MS. SHAPIRO: Objection.
THE WITNESS: I do.
BY MR. GOTTLIEB:
Q And putting a link to No More in your profile?
MS. SHAPIRO: Objection.
THE WITNESS: Yes, I do.

BY MR. GOTTLIEB:
Q And you don't have any memory as you sit here today about why it was at that moment on the 8th of August that you made the decision to do that?
MS. SHAPIRO: Objection.
THE WITNESS: Specifically at that moment, I don't.
BY MR. GOTTLIEB:
Q Why didn't you do that at the start of the press junket?
MS. SHAPIRO: Objection.
THE WITNESS: I think at the start of the press junket, I had extreme anxiety because I was not welcome at my own film premiere. And I think that I was in fight or flight. And if I'm honest about some of those things, I don't think I was thinking about PR strategy; I was thinking about survival.
BY MR. GOTTLIEB:
Q Do you recall asking anyone from your team around this time to go through your private DMs to look for messages?
A Yes.
Q Do you recall asking them to look for -- specifically look for messages from survivors?



A Yes.
Q Do you recall asking them to read and respond to some of those messages on your behalf?
A Yes.
Q Did that happen?
A Yes.
Q Does that mean, Mr. Baldoni, that -- strike that.
Do you know if messages were sent from your social media accounts to whoever was sending you messages?
A I had asked NoMore.org. Specifically, I had asked to employ a survivor who was sensitive to this topic because I was receiving so many messages from survivors who were sharing very personal, deep, traumatic things. Survivors are reaching out to me and saying that they need help leaving their abuser. I didn't feel I was qualified to answer. And I couldn't sleep at night knowing that I might ignore a message from a woman who could die, if I don't respond. And one of my goals and missions that you have shown me today, is that I did believe this movie, as lofty as it sound, could save a life.
And so I asked No More, we employed a survivor, and her job for weeks was to just go



through my DMs and respond to women who needed help. Men who were also sharing their stories. And make sure that they felt seen and were able to get the help that they deserved and needed. I was not qualified for that task.
Q I appreciate all that, Mr. Baldoni. My only question for you is whether you know, in sending those responses, did those responses come from your own social media account?
A They did, as those responses were in response to things that came -- like people were pouring their hearts out to me, Justin.
Q Do you know whether those responses disclosed that you were -- you were not the one that was reading and responding to the messages?
A I don't.
Q Okay.
MS. SHAPIRO: How much time is left?
MR. GOTTLIEB: You don't need to ask. I'm done.
MS. SHAPIRO: Good.
THE VIDEOGRAPHER: We are going off the record. The time is 7:29 p.m.

(WHEREUPON THE DEPOSITION CONCLUDED AT 7:29 p.m.)



CERTIFICATE OF DEPONENT

I have read the foregoing transcript of my deposition and except for any corrections or changes noted on the errata sheet, I hereby subscribe to the transcript as an accurate record of the statements made by me.

______________________________
JUSTIN BALDONI

SUBSCRIBED AND SWORN before and to me this ____ day of ________________, 20___.

______________________________
NOTARY PUBLIC

My Commission expires:

CONFIDENTIAL



REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 8th day of October, 2025.

ASHLEY SOEVYN
CSR No. 12019



ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Blake Lively v. Wayfarer Studios LLC, Et Al.
DATE OF DEPOSITION: 10/7/2025
WITNESSES' NAME: Justin Baldoni

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Justin Baldoni

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF __________, 20__.

(NOTARY PUBLIC) MY COMMISSION EXPIRES:

**&**

**&** 2:21 3:5,16 4:4 5:4,12 6:4 16:20,23,25 17:3,5,14 95:23 96:3,6

**0**

**089** 218:17
**091** 219:12
**0o0** 1:3 2:3 181:7

**1**

**1** 122:23 219:14 248:3
**1/5/2024** 14:16
**10** 24:16,22 76:11 96:4 243:16 252:21 346:1
**10/7/2025** 359:3
**100** 30:16 37:5 41:21 205:9 225:24 338:15 348:1
**100,000** 345:6 345:13,19
**10010** 3:21
**10019** 6:8
**10036** 8:21
**10049** 1:7 2:7 16:15
**10100** 6:15
**103** 14:9 218:17
**10:11** 243:24
**10:21** 76:2
**10:24** 199:9
**10:39** 76:5
**10:42** 326:2
**10th** 164:17 165:2 242:16
**11** 77:17
**11/10/2023** 14:12
**11/12/2023** 14:13
**1140** 8:19
**11:01** 279:25
**11:15** 276:17
**11:46** 133:19
**11:49** 257:13
**12** 77:17
**12/23/22** 13:12
**12019** 1:23 2:25 13:5 14:5 15:5 18:10 358:25
**12:06** 326:3 327:2
**12:09** 133:22
**12:52** 209:9 211:8
**12th** 256:10 257:14
**13** 156:15 334:7
**134** 13:10
**13502** 13:23 208:11
**13503** 13:23 208:11
**139046** 13:7 46:17
**139049** 47:16
**139050** 51:6
**139053** 51:18
**139076** 13:8 46:18
**1401** 10:7
**15** 334:9
**152** 13:12
**15407** 15:7
**15408** 338:4
**15409** 15:7
**158** 13:14
**15th** 113:12,20 135:5 138:17 138:19 139:17 143:11,20,25 144:8,11,15 335:17,21 336:10
**16** 303:16 305:2
**163** 13:16
**16447** 14:12 242:13
**16452** 14:12 242:13
**17** 247:4,17,25 253:21 255:1 257:17,25 259:18 260:24 261:5,15,16,22 262:22 263:3 282:15,20 290:24 291:4 322:6,13
**1700** 4:9
**17th** 8:20
**18** 12:6 28:5 224:19,20,22 224:24 335:5 336:9
**1801** 7:11
**186** 13:19
**1875** 5:17
**18852** 14:18 275:24
**18853** 279:24
**18854** 276:18
**18856** 275:24
**18858** 14:18
**19** 252:19
**1900** 10:8
**196** 13:21
**1:05** 181:2
**1:46** 93:18
**1st** 233:23 234:16

**2**

**2** 95:19,24 122:23 154:21 154:25 299:16 305:10

**2/20/23** 14:21
**2/23/2024** 14:18
**2/26/2024** 13:7
**20** 13:7 46:11 46:13,16 132:25 133:1,2 133:3,3,4,9,12 220:6 295:15 357:13 359:22
**20006** 5:19
**201-0005** 7:17
**2019** 200:12
**202** 5:23
**2020** 35:17
**2022** 152:18 153:2,19 154:12 158:22 161:14,16,21 167:10,22 168:20,21 278:8,18 279:11,18 287:8
**2023** 80:4 113:12 121:3 138:5 159:11 159:21 160:13 160:20 161:14 161:17,22 164:17 165:6 168:21 178:23 179:18 181:11 181:15 187:12 187:14 194:7 233:23 234:16 242:16 243:16 256:10 257:14 266:7 294:20 295:15 296:6 297:21 299:12 299:16
**2024** 90:25 92:15 94:25 98:22 99:2,9 135:5 138:17 138:19 139:17 143:11,20 144:8,15 208:12,23 210:8 213:18 218:20 223:8 223:14 254:21 268:4,19 271:3 276:7 281:2 282:16 284:14 288:13 305:10 315:22 319:15 322:16 334:15 334:18 335:17 343:9 348:19 349:9 352:8,22
**2025** 1:21 2:23 13:4 14:4 15:4 16:2,6 52:17 181:6 358:22
**2026** 233:24
**2027** 234:2
**2028** 234:1 235:17 237:1
**2029** 2:21 5:7 8:8 16:11
**2035** 14:11 233:24
**2049** 4:8
**207** 13:22
**20s** 78:12 79:2 79:7,16 80:11 81:2 134:2
**20th** 294:20
**21** 13:9 91:15 91:16,18,20 135:18
**212** 3:14,23 6:10 8:25
**217** 14:8
**2193** 135:4
**2194** 135:25
**2197** 13:11 135:4
**22** 13:10 135:3 135:6,19,23,25 146:4 165:5
**224** 197:11
**225** 13:21 197:11
**22nd** 3:20
**23** 13:12 153:4 153:5,7,9,18,21 284:14
**232** 14:10
**23rd** 153:19 154:12 155:20 158:22 276:7
**24** 1:7 2:7 13:14 16:15 159:3,5,8 208:12 210:8
**241** 14:12
**248-5100** 6:17
**24th** 208:23 209:9 211:8
**25** 1:7 2:7 13:16 21:21 164:1,5,13
**255** 14:13
**257-4880** 8:25
**26** 13:19 187:2 187:3,6 197:21
**26086** 13:13 153:10
**26089** 154:21 155:1
**26090** 13:13 153:10 156:19
**26193** 14:14
**26194** 257:11
**26195** 257:12
**26198** 14:14
**26204** 14:17 270:21
**26206** 14:17 270:21
**266** 14:15

**269** 14:16
**26th** 198:13
**27** 13:21 92:15 197:9,10,14
**274** 14:18
**27th** 197:12,23 198:1,7,15 288:13 290:2 292:8
**28** 13:22 208:9 208:9,16,20
**287** 14:19
**28th** 159:11,21 160:13
**29** 12:12 14:8 218:13,14,16
**293** 14:21
**2:02** 181:9
**2:23** 290:2
**2:33** 292:7
**2:53** 136:2
**2:57** 137:5
**2:58** 224:11
**2:59** 138:8
**2nd** 305:3,18 315:22

**3**

**3** 95:24 122:23 156:18 249:9 346:9
**3/28/23** 13:14
**30** 14:10 220:6 233:19,22 234:8,9
**303-1245** 5:23
**30723** 13:15 159:9
**30s** 82:4
**30th** 187:12,14 194:7 197:23
**31** 14:12 234:8 242:8,9,12,20
**310** 4:13 5:10 6:17 7:17 8:12
**311** 14:23
**312-4207** 4:13
**3187** 92:16
**31887** 13:9 91:21
**31889** 13:9 91:22
**31947** 13:20 187:7
**31948** 187:16
**31949** 187:19
**31950** 13:20 187:7
**32** 14:13 255:7 256:6,8,8,11 270:20
**33** 14:15 267:12 267:13,16,19 270:8
**334** 15:7
**33560** 14:20 288:11
**33565** 290:3
**33566** 14:20 288:12
**34** 14:16 270:16 270:18,23
**35** 14:18 275:18 275:19,23 276:12 334:8
**36** 14:19 288:10 288:10,14
**3641** 13:18 164:14
**3690** 166:1
**37** 14:21 294:14 294:15,17 295:12
**3724** 173:14
**3759** 13:18 164:14
**376-7878** 8:12
**38** 14:23 312:21 312:22,22
**38461** 14:15 267:14
**38462** 14:15 267:15
**39** 15:7 166:3 335:4,8,12,14 336:9
**3:01** 139:22 140:4
**3:05** 141:11
**3:07** 144:20
**3:25** 224:14
**3:30** 352:9,22

**4**

**4** 95:25 122:23 281:2
**4.5.23** 13:18
**4/10/23** 13:16
**4/27/2024** 14:19
**40** 132:17,17,24 220:6
**400** 8:9
**42** 169:8
**449** 1:7 2:7
**45** 13:7
**47** 165:25 166:3
**49** 169:8
**4:06** 255:25
**4:20** 256:3
**4th** 254:21 266:11 267:24 268:4,19 270:4 271:11 281:10 282:16 290:25 291:7,10 334:15,18 341:21 342:16

**5**

**5** 51:17 54:15 58:3 95:25 122:23 223:14 346:10
**5/27/23** 13:21

**5/30/2023** 13:19
**51** 3:19
**5497** 14:24 312:23
**5506** 14:24 312:23
**5563** 294:21
**5564** 14:22 294:21
**5:14** 294:9
**5:23** 94:11
**5:44** 294:12
**5:47** 295:6,9
**5th** 7:11 218:20 219:24 223:8 271:3,12 305:13 322:15 322:20

**6**

**6** 67:24 122:23 122:23 251:23
**6/1/2023** 14:10
**6/15/2024** 13:11
**6/24/2024** 13:23
**6669** 358:24
**6:20** 271:14
**6:36** 334:2

**7**

**7** 1:21 2:23 13:4 14:4 15:4 73:20 181:6
**713** 10:11
**728-8000** 6:10
**750** 6:15
**752-4226** 10:11
**77010** 10:9
**787** 6:7
**7:05** 334:5
**7:29** 2:23 356:23,25
**7th** 16:6

**8**

**8** 12:12 16:2
**8/15/2024** 15:7
**8/2/24** 14:24
**8/5/2024** 14:8
**81** 173:13
**849-7000** 3:14 3:23
**855-3000** 5:10
**865** 3:9
**89** 14:9
**8th** 3:10 305:15 352:8,22 353:2 354:4 358:22

**9**

**9** 252:13
**9/27/2024** 13:9
**90** 13:9
**90017** 3:11
**90067** 4:10 5:8 6:16 7:12 8:10
**9054** 122:22
**93** 220:9,19
**943** 239:6
**9:11** 2:22 16:5
**9:42** 235:17,18
**9:46** 187:16

**a**

**a.m.** 2:22 16:5 76:2,5 133:19 235:18,18 257:13 276:17 279:25 326:2 336:1,17,25
**a69** 173:17
**aaron** 6:5
**aback** 225:20
**abel** 1:10 2:10 7:3 8:3 11:23 99:12 208:13 208:23 218:19 229:11,20,23 229:25 230:7 242:15 243:9 243:18 304:21 317:5 318:6,13 319:12 320:23 321:13,20,25 322:15,15,25 323:12 324:21 325:17,17 326:2,3 327:2 327:16,20 329:13 335:16 336:11 353:3
**abel's** 318:9
**ability** 73:8 132:7
**able** 30:19 54:8 54:13 213:10 293:15 328:5,7 356:3
**above** 160:1,6 254:10
**absolutely** 31:1 32:8,19 115:25 178:4 192:5 207:25 213:16 319:8 341:10
**absolves** 83:15
**abuse** 26:24 30:1 89:19 90:1,7 115:15 269:15,17 297:7
**abused** 27:18 90:9 273:3 298:17,19
**abuser** 355:17
**abusive** 89:2 102:22 103:17
**abuttrick** 8:24
**accept** 185:20
**accepted** 150:14
**accepting** 149:22
**accompanying** 261:6

**accordance** 175:5
**account** 86:23 349:13 350:6 356:9
**accountability** 23:10
**accountable** 83:22 84:15
**accounts** 349:17 355:10
**accumulated** 285:18
**accumulation** 286:9
**accurate** 28:10 33:13 73:10,16 104:22 116:21 236:18 237:2 238:5,7,12 239:11 265:24 269:20 357:6
**accusation** 212:7
**accuse** 88:5
**accused** 70:14 86:9,12,14 205:19,23 206:3,21 207:1 207:4,12,20 209:22 210:7 210:10,12 211:9,16,18 212:3,5
**accusing** 26:23
**achieved** 41:19 41:22,23
**acing** 299:17
**acknowledge** 271:18
**acknowledged** 213:6
**act** 298:2
**acting** 96:12 128:7,8,16 331:16
**action** 16:13 62:13 64:7 68:10 74:9 108:6,9 247:11 253:9 358:19
**actions** 23:10 64:5 251:7 274:5,7
**activations** 101:25
**activities** 316:21
**actor** 34:21,22 34:23 128:5,5 157:9 275:14 285:14 346:15 347:7
**actors** 19:15 225:24
**actress** 87:18 130:16 171:3 175:4,6 328:7
**acts** 74:10
**actual** 176:14 272:15 274:18 344:18
**actually** 32:11 39:6 49:11 50:16,23 68:14 98:13,17 130:14 185:18 195:16 198:10 200:7,22 214:2 216:13 234:1 238:24 258:5 265:1 333:1 337:10 344:21 344:24
**ad** 195:21,24
**adamant** 195:19
**adapt** 172:8
**adaptation** 30:18
**add** 93:20 171:6 172:6,23 174:8 186:8
**added** 93:24 94:4
**addiction** 76:8 81:1,5,8,10,17 82:8,12 83:2,15 83:16
**adding** 171:19 173:5
**addition** 76:14
**additional** 184:20
**address** 350:3
**addressed** 74:13 124:22
**adhd** 205:5
**adhered** 254:11
**adjusted** 167:4
**adjustments** 189:11 193:6 194:19,23
**administer** 18:6
**admirably** 115:14
**admire** 331:7
**admitted** 322:14 341:9
**ads** 234:20,24 235:3
**adults** 177:8 179:12
**advance** 146:22 286:25
**adversely** 59:8
**advice** 200:19 325:11
**advises** 289:22
**affect** 308:25
**affected** 76:14 274:6
**affects** 59:9 77:4

**affiliation** 134:7
**afraid** 281:18 306:10,17,21 311:6 321:22 327:23
**afternoon** 181:5
**age** 28:5 76:11 82:3 224:19,20 224:22,23
**agencies** 75:11 75:20
**agency** 75:8 311:13 328:21
**agent** 56:14 287:20
**agents** 56:6
**aggressive** 342:1
**ago** 47:17 54:12 99:4,15 290:17
**agree** 27:9 35:9 36:6,8 37:5,14 37:22,25 38:12 39:9 43:21 45:7 55:2 80:23 104:8 106:5 139:12 147:6 215:5 237:14 316:13 324:25 325:3 326:21 330:3
**agreed** 91:7 97:20 146:6 250:12 253:12 253:17,19 280:18
**agreeing** 325:7
**agreement** 37:21 93:24 94:4,7 152:8,19 154:15,21 155:1,19 156:9 156:19 346:19 346:22 347:17 347:18
**agreements** 157:4,15
**agrees** 37:2
**ah** 204:6
**ahead** 51:17 99:24 110:23 127:24 128:1 174:16 212:11 212:22,23 234:6 270:22 281:16 311:20 321:17,21 324:14,23
**ahouraian** 8:5 8:6 18:2 234:7 234:10 294:25 314:17,22 315:4,7
**ahouraianlaw...** 8:11
**aims** 41:2
**aj** 294:19 295:15,17 296:2 299:3,5
**al** 1:8,13,15 2:8 2:13,15 13:3 14:3 15:3 359:2
**alex** 13:14 14:21 120:24 135:10 136:22 143:12,12 159:10 169:5 181:18 182:22 184:10 185:19 185:22 186:19 187:10 190:10 198:12,19 225:7 237:22 294:18 295:13 295:25
**alexandra** 8:15 17:19
**alias** 243:6,8
**alice** 8:17
**allegations** 63:3 64:22 65:6,9 66:9,13,20 67:9 67:20 290:24
**alleged** 100:5
**alleging** 99:3 99:13 337:15
**allow** 246:15
**allowed** 142:17 227:22,25 261:14
**alongside** 99:5 105:4 307:10 307:22 309:6 309:21 310:6 310:18 317:5
**amazing** 321:5 347:25
**amen** 206:1 209:11,11,11 209:12,13,14 210:19
**amended** 72:13 72:24 73:13
**america** 332:19
**americas** 8:19
**amiss** 307:1
**amount** 26:6 172:24 284:23 301:6 346:6,13 346:16,17 347:4 348:2
**amplify** 343:15 343:24 344:13 344:21
**amplifying** 344:7
**analogy** 129:13
**anathan** 6:9
**andrew** 92:3,9 169:5 294:19

**andy** 141:15,16 141:21,22
**ange** 120:23 135:10,10 136:24 142:10 142:11 143:15 159:10,20 169:6 181:18 182:22 186:22 195:12 198:13 226:19 237:22 269:24 270:7 294:18 295:14 332:23 333:5
**angela** 92:7,8,9
**angeles** 1:20 2:22 3:11 4:10 5:8 6:16 7:12 8:10 16:9,11
**angry** 292:23 293:23 342:1
**answer** 12:10 20:8 29:10,15 29:17 43:8,10 57:5 75:1 93:16 100:18 112:12 117:14 117:18 125:7 127:21 131:8 144:17 151:10 161:24,25 171:5 183:24 207:23,24 214:21 222:18 222:23 223:1 224:1 283:18 283:20 297:24 298:9 310:20 326:22 327:17 327:18 335:3 336:6 340:6 355:18
**answered** 104:17 105:10 258:22,25 339:17
**answering** 45:5 168:1 183:7 189:22 230:24 321:3
**answers** 108:1
**anti** 51:20,20 51:21 52:5,5,6 52:23,23,24 53:21,22,22 57:15 58:4 73:21
**anticipated** 348:18,25
**anxiety** 258:6 263:2 354:13
**anxious** 304:10
**anybody** 27:7 49:14 58:15 70:4 80:22 121:20 170:17 228:23 243:15 257:6 308:9 319:4 342:20
**anybody's** 310:25
**anymore** 27:14 39:11 109:1,10 110:6 186:10 186:12 202:15 233:10 235:23 236:5
**anyone's** 311:3
**anyways** 172:4 349:7
**apart** 24:19 268:15
**apartment** 126:5,16 133:2 145:12,18,21 145:22 148:10 266:11 334:19
**apologies** 82:17
**apologize** 43:10 185:15 271:25 273:13 276:1 289:25 313:23
**apologized** 195:15 231:24 232:10 265:6
**apologizing** 265:8 273:10
**apology** 185:20 295:23 296:4
**apparent** 340:20
**apparently** 154:13 204:4
**appear** 166:17 306:12,18 307:10,21,25 309:6,20 310:5
**appeared** 40:25 337:23 340:12
**appearing** 310:17
**appears** 121:23 159:22 164:18 187:11 197:25 219:12 231:1 234:17 243:17 243:25 256:7 271:5,12 315:24
**applicable** 46:4
**applicants** 54:21
**application** 36:5
**apply** 48:11 51:8,15 122:13
**appreciate** 184:16,19 190:22 195:14 196:9 197:16 232:9 356:6
**appreciated** 182:7,9 186:6
**approach** 124:9

**approached** 30:14
**appropriate** 62:12 63:20 64:5,8 68:9 75:8 84:2 197:3 264:10
**approval** 155:11,21 156:10 157:23 175:5 320:16 332:7,10,14
**approvals** 154:22 155:6
**approve** 213:10 254:9 321:7
**approved** 87:17 102:12 320:23 321:6
**approximately** 131:9 345:5
**april** 160:20 164:17 165:2,6 168:21 178:23 179:18 288:13 299:12,16
**arato** 8:14 17:16,20
**arc** 30:16
**arguably** 308:20 337:22
**argue** 172:2
**aria** 173:19
**arrangement** 285:24
**art** 35:20,21,21 36:14,15,15
**article** 67:7 69:7,9,14,20,24 70:6,24 109:3 337:1
**artist** 117:22
**artist's** 156:23 157:17 158:14
**artists** 155:11
**ascertain** 265:23
**ashamed** 78:22
**ashapiro** 8:22
**ashley** 1:23 2:24 13:5 14:5 15:5 18:9 358:2,24
**ashmi** 91:25 92:1
**asked** 20:7,16 37:1 72:21 82:25 89:20 90:15,19 110:14,14 119:17 125:23 126:20,20 128:16 129:4 130:23 131:10 133:24 147:17 158:3,24,25 182:18,21 183:6 184:7,14 207:9 224:3 228:18 230:3 240:25 262:1 276:1 280:19 301:19,25 302:4,5 303:18 312:15 327:14 335:23 339:23 340:14,22 344:25 355:12 355:13,24
**asking** 20:21 34:4 43:15 44:20 50:3 51:11 127:13 129:3 131:7 158:7,22 182:20 188:4 190:10 191:24 233:25 238:2,3 243:18,21 258:17 264:23 266:24 268:25 271:13 299:4 315:18 318:12 321:4 354:20 354:24 355:2
**aspect** 86:5
**aspire** 40:24
**assault** 22:2,3,4
**assaulted** 24:2 78:7
**assert** 260:23
**asserted** 66:21
**asserting** 66:14 247:12,15
**assist** 101:18
**assistant** 149:12 296:3
**assistants** 149:13
**associated** 50:18
**associates** 89:18
**assume** 71:13 111:15 117:25 136:14,15 140:22 150:11 348:14
**assumed** 111:14,16 328:16 343:20
**assuming** 54:6 82:2 140:1 217:4 343:7 344:1 348:20
**assumption** 120:5 252:7
**assure** 193:14 282:21
**atlas** 172:9
**atonement** 84:3
**attached** 243:22 247:5 263:4 312:25

314:24 316:1 331:17
**attaching** 246:23
**attachment** 73:15 153:11 153:18 243:3
**attachments** 264:15 314:24
**attacked** 218:7
**attempt** 26:22 251:18,25
**attempting** 226:1 332:6
**attend** 26:10 53:2,4 225:4,6 255:1 308:8
**attended** 52:10 82:21 134:7 266:15
**attendee** 220:14
**attending** 213:13 255:6
**attention** 39:14 39:15 105:15 165:24 234:6 268:12 324:2
**attitude** 253:2
**attorney** 3:18 5:6 6:6,14 8:7 10:6 16:18 244:17 358:18
**attorney's** 228:10
**attorneys** 3:8 4:7 5:16 7:10 8:18 69:23 70:4 72:4 107:3 228:5 233:1 264:1 351:21
**attractive** 176:24
**attribute** 309:19,21
**attributed** 337:10
**attributes** 209:20
**audio** 220:14
**august** 90:25 98:22 99:1,9 218:20 219:24 223:8,14 304:24 305:3 305:10,13,15 305:18 315:22 319:15 322:15 322:20 335:17 335:22 336:10 343:7 348:19 349:9 352:8,22 353:3 354:4
**aura** 329:1
**authority** 141:6 332:7,10,15
**auto** 350:20
**avenue** 3:19 6:7 8:19
**aware** 27:21 48:1 49:20,22 62:8 64:16,21 64:22 65:5,11 65:16 66:8 68:5 79:3 86:9 86:14 88:25 91:12 95:10 100:6 103:4 118:5,9 123:1,3 123:9,15,25,25 124:8,15 128:11 129:22 152:11 186:7 189:9 193:5 194:17,22 195:13 196:1 198:1,6,9 210:13 211:20 216:22 217:2 229:23,25 241:24 245:6 264:19 301:23 302:2 307:15 330:17,18,23 334:23 346:22 350:21
**awfully** 342:7
**awkward** 85:8 123:16 204:8
**awkwardness** 185:18 209:23 211:10
**ayoub** 87:5 88:5,11,13,21 88:24 89:1,6,10 90:1,4,14 93:13 95:4 97:12
**ayoub's** 90:21 94:7 98:1

**b**

**b** 59:1,5 60:8 155:14
**babayan** 3:7 17:9,9
**baby** 129:21,22 130:10 148:15 148:17,20 302:9,13
**bach** 8:14,16 17:16,16,17,20 223:1
**back** 24:21,24 25:23 26:17 27:3,7 53:17 58:2 72:19 73:20 76:4 95:13 122:22 130:14 133:7 133:21 134:15 162:13 172:7 181:8 185:7 186:23 190:7

200:8,12 220:19 224:13 231:11 232:4 256:2 289:18 289:23,25 293:24 294:4 294:11 295:8 304:20 311:23 314:19 334:4 335:6 345:23 350:9
**background** 317:7 318:15 319:7
**backlash** 137:15 221:22 222:6,12 223:7 223:9,11,15 337:24 340:16
**bad** 25:7 38:1 53:16 109:3 137:10 142:8 142:14,22 143:21 204:8 273:13 280:4 282:1 290:11 342:5
**baffled** 174:5
**baha'i** 32:5,9 32:12,13,15,17 32:21 33:3,11 33:17,18,19,22 33:25 34:7 35:2 49:2,12 50:2,8,10,13,16 50:17,19,22 129:13
**baha'i's** 33:7 34:1
**baha'iteachin...** 41:1
**baker** 117:20 117:21 118:13 119:24 123:13
**baker's** 120:5
**baldoni** 1:19 2:19 7:3 8:3,13 12:2 13:2,13,15 13:17,18,20 14:2,12,14,17 14:18,20,21 15:2,7 16:12 17:18,20 18:21 34:24 46:15 47:1 76:7 77:7 80:1 89:14,18 89:19,20 91:2,3 91:19 133:24 135:9,18 153:7 153:10,16 156:19 159:7,9 164:14,15 166:1 173:14 187:5,7 197:16 208:8 215:16 222:24 233:25 234:13 242:11 242:13,21 256:5 257:11 267:12 269:23 270:17,21 275:6,22,24 288:9,11 291:14 294:7 294:13 295:11 307:8 314:3 315:9 334:8 342:8 355:7 356:6 357:10 359:3,21
**banned** 93:6,14
**bar** 230:14,16 230:17 251:3
**based** 48:23 70:9,10 83:25 94:7 130:13 177:12 185:17 248:25 268:7 272:14 291:17 308:17 316:25 317:22 346:22 346:23
**basically** 129:21 338:9
**basis** 29:11,14 106:2 124:9 336:21
**bates** 13:7,9,11 13:13,15,18,20 13:21,23 14:8 14:10,12,14,16 14:18,20,22,24 15:7 46:17 47:16 91:21 135:3 153:10 159:9 164:14 166:1 187:7 197:10 208:10 218:17 233:24 242:13 267:14 270:21 275:24 288:11 294:20 312:23
**bathhouse** 134:17
**bathing** 19:7,14 19:24
**bathroom** 82:2 255:11
**baths** 141:17 142:17
**battle** 328:16
**beach** 26:1,3
**bearing** 46:17 91:21 135:3 153:10 159:9 164:13 187:7 197:10 208:10 218:16 242:13 267:14 270:20 275:23 288:11 312:23
**bears** 233:23 294:20
**beat** 273:16

**beautiful** 129:7 177:14 273:10 323:22
**becoming** 288:1,5
**bedroom** 166:5 166:8,18 167:8
**began** 97:13 112:16 144:3 152:16
**beginning** 2:22 70:12 101:19 166:13 200:9 201:13 302:12
**begins** 47:15 235:18 302:9
**begun** 213:11
**behalf** 2:19 16:14,20,23,25 17:3,5,8,10,14 17:17,20,25 98:16,19 299:9 319:13 355:3
**behave** 293:15
**behavior** 61:22 86:15,23 88:11 88:14,21,25 104:2 105:24 106:9,23 186:7 253:4 269:9,15 273:4
**behaviors** 61:2
**belief** 32:23 129:24 234:19 336:21
**beliefs** 40:3,9 41:11 129:4,7
**believe** 19:4 22:4 24:1,4,5 25:14,16 28:7 30:3 31:23 32:1,4,8,14 38:23 40:24 41:9,15,18 42:2 42:10 46:2 47:17 48:10,13 49:16,23 52:7 56:13,22 59:16 60:6,21,23 61:20 62:1 69:6 73:9,12 74:19,21 75:13 76:16 83:14,14 83:21 84:8,14 85:11 91:10 95:13 96:14 98:5,6 99:17 105:17,21 107:4,23 109:11 110:18 114:13,13 117:2,3,22 120:24 123:9 124:1,4 128:8 129:10 130:5,6 130:7,8,9,10,24 132:24,25 134:25 135:19 137:2 138:12 141:22 144:1 152:13 155:24 162:17 165:7 166:3,14,24,25 167:1,25 170:15 171:23 173:2 177:23 177:25 178:10 181:15 182:11 184:18 190:23 191:1 193:20 194:6 195:4,10 196:1,15 200:25 202:20 203:6,20 205:3 205:9,25 207:24 210:13 211:19 219:6 221:20 222:6 224:6 225:14 227:5 231:13 232:17,24 235:16 240:12 242:14 244:8 244:16,19 250:18 251:6 253:19 254:17 255:3 261:21 261:25 262:4 262:12,21 264:14 268:17 273:20 275:4 276:25 278:20 278:23 284:16 284:17,21 286:13 289:11 290:4,20 292:24 301:25 302:11 305:5 306:25 308:13 308:24 309:13 309:14,17 316:7 317:1 320:22,25 322:23 324:11 325:13 332:13 332:14 333:16 333:20 335:20 337:23 340:10 344:17,20 345:23 348:7 349:3 350:8,13 355:22
**believed** 73:11 73:18 93:13,15 95:9,20 97:7 194:4 195:7 201:5 260:10 260:11 266:3 309:4
**believes** 75:5
**bender** 5:14 17:2,2
**benson** 7:7 17:13,13
**best** 45:6 46:5 48:7,14 55:4,5

73:8 117:8 162:24 183:1 185:17 201:7 206:2 222:23 255:1 256:18 256:24 276:3 279:1 282:8 293:16,21 342:2 351:24
**better** 121:6 202:6
**bfreedman** 7:13
**bieber** 322:5 325:18,25 326:3,19
**bieber's** 327:9
**big** 26:3 85:6 189:4 202:2 268:21 279:8 343:12
**bigger** 22:7
**biggest** 284:22 291:16
**bird's** 48:16
**birth** 148:6 299:21,25 300:7,18,19,24 301:16,24 302:11,16,20 302:22
**birthing** 301:8 302:13 303:10
**births** 300:25 301:13
**bit** 49:4 94:10 105:7 127:20 129:3 171:12 230:9 231:8 234:2 237:6 266:10 273:6 289:15
**bl** 14:15 135:4 233:24 252:24 254:7,12 267:14,15 294:21
**bl's** 252:2 254:7
**bl2026** 14:10
**bl2193** 13:11
**bl5563** 14:22
**black** 203:20
**blacked** 135:13
**blake** 1:5,15 2:5,15,20 4:3 5:3 6:3 11:2 13:3 14:3 15:3 16:13,21,23,25 17:3,5 154:3 160:1 187:17 230:1 278:9 290:10 309:8 327:24 332:14 359:2
**blanket** 37:22
**blanks** 307:2
**bless** 125:23 126:21 130:23 179:19
**blocked** 342:25
**bloom** 149:23 150:14 152:9 152:20 154:16 224:18,19,22 225:2
**blvd** 6:15
**board** 40:12
**bodies** 191:5
**body** 61:7 238:25 239:4
**bolded** 166:18
**bomb** 262:14 262:22 280:2 281:5,25 282:18
**book** 28:19 30:18 76:12 77:8,11 78:21 79:23 101:24 172:7,14,18 173:5,10 174:21 177:11 200:10 287:11 287:17,19,20 287:20,23 288:1,4,5
**boost** 343:15,23 344:1,3,4,8,13 344:21,25
**boosted** 344:25
**boosting** 344:7
**born** 81:23 129:25 132:6 302:9
**borrow** 313:25
**boston** 169:8
**bothered** 240:21
**bottom** 155:1 166:4 187:15 220:20 276:17
**boundaries** 78:11,25 79:6 79:16 80:10 83:21,24
**boundary** 84:1 84:6,8,13,15 231:22
**bouquets** 333:17,19
**box** 68:25 278:25
**boy** 148:11 291:23 292:9 292:24 293:4 293:14
**boys** 77:5,8 79:23,25 81:22
**bracket** 186:23
**brain** 76:23 107:16,25 209:25 210:21 211:5 271:24

**brained** 107:23
**brains** 80:24
**brand** 223:12
**brandon** 202:12 203:1,7
**brands** 221:4,7 221:19
**break** 66:16 75:25 131:6 132:10,13 133:17 179:21 255:10,13,14 255:20 256:5 295:13 334:8
**breaking** 183:14
**breaks** 182:15
**breanna** 279:17
**breastfeeding** 55:22
**brief** 129:6
**briefed** 320:8
**brilliant** 172:2
**bring** 44:3 278:7 342:10
**bringing** 176:8
**britney** 84:20 84:25 85:9
**bro'd** 131:1
**broad** 83:25
**brought** 20:12 101:17 107:14 176:5 331:20
**bryan** 7:6 17:25
**bs** 60:9
**buckingham** 126:2,9
**bucks** 132:17 133:4,9
**budget** 95:17 95:24 96:2,6,10 96:16 171:9,20
**build** 40:7 129:1 304:11
**building** 95:14 101:18 126:17 145:17,18,19 145:20,22 289:7
**bulk** 53:24
**bullied** 329:12
**bullying** 327:9 329:9,10
**bunch** 51:12 176:11
**burden** 185:15
**burke** 19:5
**bus** 96:19
**buttrick** 8:17

**c**

**c** 3:1 4:1 5:1 6:1 7:1 8:1 10:1 11:1 59:1,8 60:8,10
**caffeinated** 216:21
**caffeine** 219:21 222:5
**cal** 26:1,2
**calculated** 29:13
**calculator** 326:4
**california** 1:20 1:23 2:22,24 3:11 4:10 5:8 6:16 7:12 8:10 16:9,11 18:9 72:3 75:14 358:3,21
**call** 22:3 90:7 96:3,5 112:2,10 126:2,2,11 130:6 184:3,12 195:23 208:6 313:16,22 321:11,15,16
**called** 77:5,8 89:12 93:22 134:5 141:14 195:12 215:19 235:12 338:23 340:4
**calling** 49:12
**calls** 95:13
**calm** 337:24
**calof** 92:3,4,7 92:10 169:5
294:19 295:14 297:6
**camera** 176:23
**cameras** 232:13 232:15,16,18
**canceled** 202:14
**candid** 202:22
**candor** 289:1
**capable** 29:22 329:6
**capacity** 100:21 257:5
**caption** 221:4
**capture** 104:1
**cardon** 92:8,8
**care** 216:24 217:19,25 240:12
**carefully** 104:16
**carries** 257:11
**carry** 58:21
**carryover** 234:2 292:7
**case** 1:7,7,7 2:7 2:7,7 16:15 69:11 72:14 86:8,13,22 89:7 117:24 118:3 123:11 145:7 180:18,22 211:2 231:23 232:23 247:7

279:17 315:21 349:6 359:2
**cast** 42:11 87:14 113:15 113:19,22 175:10 213:11 254:13 306:12 306:18 309:5 310:4,15 312:4 328:18
**casting** 87:17
**categories** 51:6 51:7,13
**caterers** 45:2
**catering** 44:13
**catholic** 50:15
**cause** 309:19 309:22 331:2
**caused** 31:6 108:25 298:2 337:25
**causes** 289:14
**caution** 241:25 242:7
**cautioned** 242:4
**celebrities** 19:16 126:3
**celebrity** 329:9
**century** 2:21 4:8 5:7 7:11 8:8 16:11
**ceo** 48:18 57:4 96:14 101:17 105:15 283:21 283:21,24 293:16
**certain** 39:12 78:24 121:9 146:23 148:14 152:25 167:22 171:10,11 182:14 186:2 205:25 269:1 274:20 351:4,5
**certainly** 56:20 150:16 215:5 271:17
**certificate** 357:1 358:1
**certified** 2:24 358:2
**certify** 358:4,17
**cetera** 258:11 258:11,11 320:11
**chain** 47:14 93:9 140:23 143:11 219:5 242:14 243:5 256:8 257:6 270:18 271:2 276:6 288:12 335:15,19,21
**chains** 350:19
**chairman** 47:22,25 48:8 48:14 56:13,21 96:13 283:16 283:17
**challenge** 323:18
**challenges** 189:4
**challenging** 188:25 189:3
**chance** 47:2 135:17,22 153:12 158:6 159:14 234:12 242:17,20 267:18 276:12
**change** 170:11 170:12 195:21 314:20,21 315:2 359:5
**changed** 108:23,24,25 144:14 200:13
**changes** 94:6 152:18 162:2 162:22 163:1 163:18 226:7,9 226:12 253:2 357:5
**changing** 81:20 353:18
**channels** 308:7
**character** 224:16,20,21 262:5 301:7
**character's** 232:12
**characteristics** 55:6,15,25
**characterizati...** 218:4,11
**characterize** 103:2 116:19 198:22 202:8 230:20 231:2 266:21 341:8
**characterized** 22:4 105:5 206:14
**characterizing** 199:10 325:1
**characters** 166:9 231:6 251:11
**charge** 141:25 143:16,17 229:8 293:4 332:12
**charming** 308:22
**chat** 235:8
**chats** 350:25 351:4,8,11
**chatter** 305:19
**check** 333:24
**checks** 140:15 140:18,25
**chicago** 305:15 353:3,7

**child** 301:24 302:17,20
**childbirth** 55:22 300:10 300:14
**children** 148:9 177:8
**choice** 185:5
**choose** 200:6
**chose** 141:7
**christian** 50:15
**christmas** 146:3
**christy** 136:17 136:19 137:3 144:4 150:5,7 165:23 167:1,6 170:6 171:23 174:10 175:12 179:17 180:8 200:17
**church** 50:15
**cigarette** 38:6
**circle** 328:1
**circumcised** 148:20 149:2,5 149:8
**circumstance** 100:21
**city** 220:24
**civil** 72:3
**claim** 74:5
**claimed** 332:18
**claiming** 21:17
**claire** 87:5,14 94:7 95:7,16
**claire's** 92:21 93:1,3
**clarify** 314:18
**clarifying** 82:11 127:2
**class** 299:8,13 299:17
**classify** 311:16
**clean** 13:17 164:19
**clear** 65:18 96:8 214:12,19 229:6 274:16 308:5 311:7 322:1
**clearly** 258:4,6 260:12 273:16 292:1,3 293:17
**clickbait** 323:16 325:5
**client** 82:25 245:17 246:7 246:21
**climax** 174:3,8 178:17
**climaxed** 176:20
**climaxing** 175:11
**clinical** 81:7
**clinically** 81:9
**clips** 352:3,16
**clooney** 21:18
**close** 20:22,24 63:25 94:13 128:24 244:3 266:7 268:11
**closer** 129:11
**clothes** 221:18 300:7,10,13
**clothing** 192:2 221:25 222:14 301:6,6,11
**coach** 128:16
**coaches** 128:8
**coaching** 134:2 134:11
**coat** 132:18
**coats** 132:21
**cofounder** 34:14,25
**coincidence** 132:24
**coincidences** 130:12
**cold** 44:13
**collaborating** 170:20
**colleague** 149:17
**collective** 39:2 191:3 300:25
**colleen** 201:10 201:14,18 288:7 331:14 333:13
**college** 23:23 24:1 25:10,19 25:19,25 26:11 26:14,18 27:4,9 27:17 28:5,22
**color** 164:22 213:10
**combative** 103:3
**combination** 347:6
**combined** 205:5
**come** 22:13 25:3 34:23 53:17 68:16 98:4,21 99:1 124:18 176:18 181:11 185:13 186:23 202:21 204:3 209:20 213:1 230:4 239:3,6,10 249:19 260:22 289:18,23,25 290:6 293:23 294:4 321:22 323:20 328:23 329:20 339:24 356:8
**comes** 169:13 210:17 222:5

328:20
**comfortable** 19:17 41:23 114:6 182:23 190:22 226:2 228:19 229:3 230:4 339:24
**comfy** 124:5 235:25
**coming** 49:17 138:12 140:2 287:1 290:10 304:15 306:11 311:21
**comment** 171:1 178:14 182:10 185:1,1,4 190:18,20,22 198:23 199:4 199:10,14 203:9,13 219:11 225:21 227:22,25 230:10,13,18 231:2 307:16
**commentary** 61:6 224:5
**commented** 184:13 217:6
**comments** 181:13
**commission** 75:16 357:20 359:25
**commissioned** 311:19
**common** 277:6
**communicate** 26:22 131:19 174:11 287:7 342:15
**communicated** 125:17 195:5,7
**communicating** 126:25 127:6,8 127:9,15 214:25 243:9
**communication** 179:22
**communicati...** 303:13 304:20
**community** 325:5
**companies** 98:5
**company** 48:15 48:15 49:15 50:9,18 51:8,15 58:9,16 70:21 101:10 347:2,8 347:12,14
**compare** 162:14
**comparison** 87:25
**compensation** 140:19 141:3 346:3,12
**compete** 308:14
**competing** 39:14
**complainant** 67:22
**complained** 105:24
**complaint** 66:14,18 67:2,8 67:14,16,22 68:17,21 72:4 72:14,22,23,24 73:1,4,10,13,13 75:7,13,21 99:7 99:19 122:1,6 122:17 214:15 280:24
**complaints** 75:20 105:8,9 137:25 245:17
**complete** 282:22 328:8
**completed** 52:13
**completely** 43:21 67:10 272:16 273:1 288:8 317:3
**complimented** 197:5
**component** 204:21
**composition** 333:2
**concept** 60:5
**concepts** 59:14
**concern** 190:9 195:11,13 196:4,11
**concerned** 190:17 240:21 282:10 290:22 311:6 312:8
**concerning** 245:4 348:24
**concerns** 137:24 181:13 181:17 182:4 183:17 189:9 189:14,14,18 189:24 190:1,5 190:15 192:13 192:16,24 193:5 194:7,10 194:11,14,17 194:21,24 195:5,8,18,25 196:19 197:2 212:25 245:7 248:8 252:25
**concerted** 40:7
**concierge** 11:4
**concluded** 356:25
**conclusions** 63:14
**conditions** 151:22 152:25

257:25 260:14 261:5 263:20 280:18 286:24
**conduct** 53:20 58:8,19,25 59:18 60:12 64:13,16,21 86:5,18,19 212:12 215:2 252:25 310:2 310:13
**conducted** 64:12 107:2
**confident** 100:16
**confidential** 1:17 2:17 16:1 17:23 263:16
**confirm** 41:6 254:8 264:25 324:6 332:25
**confirmed** 320:5
**confronted** 24:9,14
**confused** 70:16 237:6 307:24
**confusing** 28:15 77:24 163:13 262:25 275:17
**conjunction** 165:21,22
**connect** 30:19
**connection** 129:1 221:25 222:15 223:13 223:19
**connolly** 5:13 16:22,22
**conscious** 30:7 124:8
**consciously** 31:16
**consent** 28:23 77:5 78:20 79:1,23,24 127:25 157:1 157:19 158:14
**consider** 42:21 64:5 80:14 262:9 263:3
**considered** 33:10 90:11 95:3 104:16 173:6
**considering** 252:8 328:6
**consistent** 49:7 85:13 138:15 275:12 324:9
**consolidated** 1:14,15 2:14,15
**constantly** 171:7 172:7
**constitute** 191:15
**constituted** 66:22 67:4 281:5
**constraints** 171:9,10,20
**construction** 289:8
**consult** 48:17
**consultation** 201:4
**consulting** 108:11
**consuming** 78:14 79:9 80:12 81:18
**contact** 235:22 236:4
**contacted** 111:8
**contacting** 111:10
**contained** 161:25 282:14 282:22 290:24
**content** 261:19 262:2,3,9 287:6 343:14,24 344:7,11 353:13
**contents** 47:4,6 51:5,12
**context** 125:12 127:21 130:20 131:2,13
148:25 177:8 180:13 204:19 226:2 272:17 272:23 286:17
**continue** 186:24 220:11 246:16 322:23
**continued** 19:23 108:14
**continuing** 181:4
**contract** 97:19 158:6
**contracts** 157:12
**contrary** 90:20 226:15
**control** 196:13 196:20 261:14 261:19 262:1 287:13 328:8
**controversial** 277:10
**controversy** 209:3 330:15
**convenience** 335:13
**convenient** 342:7
**conver** 175:20
**conversation** 50:22 80:15,20 84:2 96:11 97:11 111:17

123:19 125:12
125:20,25
127:10,12
128:25 130:13
130:15,21
131:1,24 132:4
132:5 133:8
148:22,25
149:10 160:18
175:9,21 176:1
176:4 179:12
180:8 181:22
190:19 200:13
201:20,24
230:7 231:4
235:5,15
237:18 239:21
252:9 258:21
278:6,10,13
286:22 287:4
293:21 300:13
301:5,13
320:25 329:20
329:23 341:2
353:13,17
**conversations**
24:18,20 25:4
37:19 38:4,9
49:11 70:2
80:21 88:18
95:25 114:4
125:13 128:4
160:14,15,21
160:23 181:20
231:10 300:23
321:24 333:5
**convey** 326:25
**conveyed**
245:18 271:19
**conveying**
292:10
**conveys** 330:19
**convinced**
273:21
**cooley** 7:5
17:14
**coordinator**
175:14,16
176:10,17,22
180:12,15
248:1,5,17
249:5,6 251:6,7
**coordinators**
175:7
**copies** 159:11
**copy** 94:15
149:23 295:14
**corner** 155:2
**correct** 30:21
32:2 33:2
34:14,15,17,18
39:24 47:20,23
47:24 55:15
56:12 65:2,8
69:7 72:11
82:10,22 87:1
101:11 102:11
106:19 107:1
110:12 118:19
122:10,19
146:12 147:19
150:2,4 153:20
163:24 168:15
168:22 185:3,9
186:14,17
187:10,13
189:17 198:11
200:4 207:7
208:24 213:3
219:10 224:25
230:18 237:18
243:19 244:12
245:9 248:10
250:16 251:16
254:22 262:6
265:23 271:12
273:12 295:16
297:9 305:11
306:6 312:2,5,6
315:23,24
333:23 339:21
340:1 347:10
348:21 358:15
358:22
**correcting**
135:20
**correction**
314:7
**corrections**
357:4
**corrective**
62:12 64:7
68:9
**correctly** 65:5
151:10 182:17
203:24
**corroborate**
105:22
**costs** 345:25
**couch** 149:14
**counsel** 18:6
82:25 114:21
339:18
**counsel's** 29:19
29:23 133:14
**couple** 52:9
160:2 308:20
**course** 43:13
45:5,16 60:8
115:20 134:15
177:24 188:24
348:11
**court** 1:1 2:1
18:5 73:2,14
**cover** 47:2
48:24 70:25
244:13
**coverage** 91:3
319:22,24
**covered** 54:21
**covering** 320:6
**covid** 195:11,24
252:11,14,19
**coy** 169:22
**cozy** 235:25,25

**crd** 67:7 75:21 99:18
**create** 186:9 323:21
**created** 41:10 41:15 306:24 329:2,3
**creating** 42:1 59:4,19 60:15 114:17 188:10 193:20
**creation** 101:19
**creative** 48:15 48:20 87:13
**credit** 156:5 328:11 330:6,9 330:12,16 331:3,8,12,13 331:17,17 332:21,24
**credited** 340:19
**creepy** 269:14 269:17 273:3
**crew** 42:11 113:15,20,22 175:10 254:13
**criticized** 217:18,24 330:18
**cross** 72:25 83:21 187:25 211:23 228:13 228:16,18,23 229:7,7 230:4 231:21
**crossed** 78:11 78:19,25 79:6 79:15 80:10 84:1 229:14,18
**crosses** 84:14 84:15
**crossing** 83:24 228:15,19 229:13
**cry** 103:6
**cs** 60:9
**csr** 1:23 13:5 14:5 15:5 358:25
**culminating** 289:8
**cult** 145:2,8
**culturally** 200:12 202:2
**culture** 42:1 118:6,17 120:1 120:10
**current** 33:1
**currently** 111:3 173:9
**customary** 128:3
**cut** 261:8
**cute** 231:15
**cv** 1:7,7 2:7,7 16:15
**czerenda** 11:4

**d**

**d** 157:23
**d.c.** 5:19
**dad** 125:23 129:3 132:16
**daddio** 136:8 136:16
**dailies** 193:12
**daily** 120:18 124:9 205:11 320:10
**dale** 5:15
**dance** 249:24 250:3 251:2
**dancing** 251:10
**dang** 91:25 92:7,20,25 93:18 94:3,11
**dangerous** 139:8
**dark** 262:25 281:22 292:3
**darkness** 39:24 41:3
**data** 162:7 297:8
**date** 13:10,21 13:22 14:10 121:6 179:1 187:12 198:11 198:21 243:16 254:20 305:2 322:22 343:2 346:5,7,8 352:5 359:3
**dated** 13:7,9,12 13:14,16,19 14:8,12,13,16 14:18,19,21,24 15:7 135:5 197:11 358:22
**dates** 66:21
**dating** 26:8,14
**daughter** 302:11
**david** 223:12
**davis** 141:15,21 141:22
**day** 44:14 45:12 96:24 111:22 112:9 112:16,21,23 113:1,2,2,8,8 113:10,12,20 116:4 125:20 128:2 176:9,12 182:16 189:2 198:19 219:14 219:25 220:1,3 220:7,8 225:25 236:13 238:16 238:19 240:14 254:19 257:16 269:3 271:10 277:13 293:18 294:1 305:12 325:13 357:13

358:22 359:22
**day's** 112:17
**daylight** 16:6
**days** 93:20 112:15 160:3 170:7 188:6,12 188:20,25 189:3,4 193:13
**dead** 132:7
**deadline** 320:10
**deaf** 217:12 221:23 222:13 223:20
**deal** 97:16 345:23
**dealing** 97:18 282:6 308:19
**death** 125:21 129:8
**debate** 50:21
**decade** 212:16
**deceased** 125:1 125:5,9,14,18 126:18,25 127:12,18 131:24 132:4,6
**december** 146:3,4 152:18 153:2,19 154:12 155:20 158:22 161:13 161:16,21 165:5 167:10 168:19,21 278:8,18 279:10,18 287:8
**decent** 315:16
**decide** 37:2 57:8 265:10
**decided** 146:9 199:16 202:5 284:8
**decision** 57:9 108:5 147:12 201:3 333:1 354:4
**decisions** 310:4 310:15
**deck** 80:25
**declaration** 89:1,4,6,10 90:22
**declare** 358:20
**deep** 140:14 355:15
**deeply** 115:16 198:5,17 199:18,18 245:3
**defend** 271:24
**defendant** 1:12 2:12
**defendants** 1:9 1:15 2:9,15 7:2 8:2 10:2 351:10
**defense** 327:21
**defensive** 317:3 329:4 341:1,9
**deficiencies** 61:8
**define** 38:11,14 45:12
**defines** 38:15
**definitely** 39:13 40:23 77:24 269:16 301:11
**delete** 349:11 350:1,7,18,20
**deleted** 349:23
**deletes** 350:9 350:15
**deleting** 349:10
**demand** 248:25 261:7,13,18
**demands** 152:12 286:25
**deny** 49:18
**department** 44:7,18 72:3 75:15 134:17 134:23 141:16 192:18
**depend** 122:16
**depending** 64:3
**depicting** 224:23 262:4
**deponent** 17:18 357:1 358:14
**deposition** 1:19 2:18 11:21 16:1,12,14 17:23 18:14 24:19 35:8,11 50:4 82:21,24 104:13 180:17 222:21 225:4 298:13 323:24 356:25 357:4 359:3
**depositions** 269:25
**derived** 345:22 347:5 348:9
**dern** 6:12
**describe** 28:14 33:24 137:25 191:4 196:17 204:21 206:10 235:19 251:3,7 256:14 264:21 290:16 324:18
**described** 23:13,13,16 25:7 28:20 39:19 64:12 67:1 71:17,22 106:8,22 179:6 198:23 204:9 206:19 207:13 214:14 236:25 253:1 264:17 293:15 303:9

**describes** 235:8 236:12,17
**describing** 191:14 237:8 237:14 293:9 318:1
**description** 13:6 14:6 15:6 28:7,10 166:4,7 166:8 167:8 174:21 183:16 185:7 236:24 238:7 293:8 315:2
**descriptions** 174:23
**deserved** 217:24 356:4
**designated** 254:8
**designating** 17:23
**designed** 203:20
**designer** 144:23
**desire** 200:3,5
**detailed** 174:23
**details** 70:14 85:19 105:25 175:3 264:10
**determine** 123:6
**developed** 150:4
**developing** 129:16,16,17 129:18 130:1 200:16
**development** 92:5
**diagnosed** 81:16 205:5 212:18
**dial** 81:23
**dialogue** 163:14 169:16 170:25 171:2,2 171:2 204:14 204:15
**die** 129:25 130:2 355:20
**differ** 183:17
**difference** 314:5
**differences** 315:12
**different** 28:15 38:9 39:18 40:10 41:12 49:24 50:14 51:7,12 65:22 66:4 79:22 109:20 112:11 145:20,21,22 161:19 165:4 172:11 184:5,6 191:20,23 218:25 219:1,2 221:4,7 240:23 265:19,21 266:8 274:22 313:19 339:14 347:16,18
**difficult** 128:14 188:7,13,21,23 197:17 277:17
**digital** 162:1 343:15,17,18 343:20 344:12 344:17
**direct** 136:5,8 165:24 200:9 200:11,14,15 201:8 222:4 234:5 235:13
**directed** 89:12
**directing** 75:12 147:12 201:15
**direction** 48:16 161:18 239:20 239:24 265:7 340:8
**directions** 131:15
**directives** 317:1
**directly** 42:17 52:1 102:8 105:14 149:6 185:13,24 197:2
**director** 34:2 34:16,24 42:9 42:21 43:2,17 44:6,21 45:1,3 45:3,4,8,17 46:4 56:15 87:3 114:23 128:5 136:16 141:5 171:16 200:6,8 201:11 201:19,25 202:4 203:17 225:23 231:5 254:5 285:12 323:19 330:21 346:13 347:6
**director's** 44:3 44:13,14,17 261:8
**directors** 42:11 96:20 330:19 331:6
**disagree** 35:10 37:19 43:25 67:10 272:22 291:3 311:25
**disagreed** 272:4 279:10
**disagreements** 325:15
**disappointed** 199:19

**disarming** 191:7
**disaster** 336:2 336:18,22 337:4 338:7 340:21,25 341:3,11,18
**disciplinary** 74:8
**discipline** 141:7
**disciplined** 86:17
**disclosed** 356:14
**discomfort** 186:10,12,17
**discontinue** 109:15
**discover** 287:17 287:19
**discoverable** 29:13
**discovered** 87:20 103:3 287:10
**discovering** 28:22
**discrimination** 51:20 52:5,23 53:21 54:19 56:8 63:4 74:3 74:5,7
**discuss** 31:3 125:22 128:22 159:25 206:20 207:1,19
**discussed** 30:22 31:2 59:18 95:4 146:22 148:1,14,19 176:2,16 195:17 204:18 204:20 265:5 269:3 307:18 323:1 324:21
**discussing** 99:11 136:19 176:5 202:2 234:19 321:19
**discussion** 63:24 80:2,7 160:13 169:12 205:18 252:10 288:17
**dishonest** 194:1 296:23
**dismissive** 136:4,19,23 137:2
**disproportion...** 297:2
**disrespected** 137:19
**disrespectful** 58:8
**distinct** 267:6
**distribution** 165:1
**district** 1:1,2 2:1,2 73:14
**dms** 354:21 356:1
**doctor** 81:12,15 82:13 169:18 171:25 172:19 206:19
**document** 14:15 46:16,16 46:20,21 51:18 58:3 73:20 91:20,21 92:22 135:2,2,3 152:12 153:9 153:16 154:11 158:7,23 159:8 164:13 187:2,6 197:9,10 208:10,19 214:21 215:15 218:16 228:1,8 233:18,21 234:4,13 235:4 242:12,23 243:22 249:25 257:24 258:14 259:4 261:7 263:10,25 264:15,20 267:14 270:20 275:23 288:11 290:16 303:14 303:17,19,20 304:3,19,22 311:20 312:22 312:25 313:8 313:11,13 315:6,10,20 316:1,6,11,14 320:15,18,24 321:2,5,7,10,12 322:4,8 323:8 335:5
**documentation** 63:20 348:5,8
**documented** 245:19
**documents** 60:9 70:20 227:16,23 228:5 314:5,23 316:22 348:24 349:6,9
**dodge** 38:21
**dog** 171:13
**doing** 35:24 36:1,3,18,20 94:24 134:1 139:10,13,21 203:18,18 223:18 226:25 227:1 318:21 320:23 340:10
**dome** 304:11
**domestic** 222:5 352:3,15

**domination** 260:23
**door** 241:17
**doubles** 45:2
**dr** 206:1 209:11 209:14 210:19
**draft** 13:18 162:5,11,12,18 162:20 163:1,2 163:18 164:20 165:10 167:13 167:21 168:13 187:20,22 226:13
**drafting** 287:6
**drafts** 161:19 162:14 165:4,7 165:8,9 179:17
**drawing** 324:2
**dress** 230:19,23 230:25
**drink** 215:16 215:19 216:2,7 216:11,19 218:22,24 219:2,15 221:24 222:7 222:13 223:7
**drinking** 216:15
**drive** 278:25
**duplicates** 314:18
**dwayne** 22:10
**dynamic** 185:18
**dynamics** 40:13 42:4,14 115:9

**e**

**e** 3:1,1 4:1,1 5:1 5:1 6:1,1,5 7:1 7:1 8:1,1 10:1 10:1 11:1,1 140:2 158:10 349:25
**earlier** 82:9 95:2 103:6 118:20 137:23 145:10 161:12 165:21 180:4 192:9 230:9 231:14,23 233:9 258:16 266:10 283:23 328:3 336:14
**early** 49:16 81:2 82:4 93:20 121:1 327:22
**ears** 129:17
**easier** 323:7
**east** 2:21 4:8 5:7 8:8 16:11
**easter** 306:25
**easy** 114:17 232:8 248:13
**edit** 87:16 163:15 213:7 261:14 305:24 305:25
**edited** 155:14
**editing** 87:15
**edits** 161:15 162:10 165:20
**educate** 330:10
**effect** 39:3 59:3 59:6,19 60:12 202:13 203:7 203:22 239:1 274:22 303:21
**effects** 61:23,24
**effort** 40:7 91:6 260:7
**eggs** 306:25
**ehudson** 4:12
**eight** 96:4 312:20
**either** 59:19 144:3 231:20 252:16 253:4
**elected** 347:14
**elements** 200:25
**elites** 329:6
**elle** 220:4
**eloquent** 40:22
**eloquently** 115:14
**else's** 202:16
**email** 13:12,14 13:16 14:21 153:11,18,21 159:9,20 160:10,24 227:9 244:9,11 244:13 294:17 295:21 349:13 349:16 350:2,6 350:12
**emailed** 214:10
**emails** 350:4,10 350:14
**emanuel** 3:5,16 17:8,10
**embarrassed** 269:18 273:11
**embarrassing** 342:22
**embedded** 322:5
**emotion** 292:22
**emotional** 81:19 254:12 292:1 294:3 329:14
**emotionally** 291:17 293:10
**emphasis** 329:15
**empire** 86:25 87:4,7 88:12,22 89:13,16 90:24 91:5 94:22

**employ** 355:13
**employed** 104:2 355:24
**employee** 47:15 56:14 58:9 74:21 75:5 101:7 103:17 257:7 276:4,5 358:18
**employees** 51:8 54:20 56:5 61:23 75:12 254:12
**employment** 22:21 51:9,10 51:19 59:9 74:10 75:15,16 108:6,9 264:4
**empower** 275:13
**enclosed** 244:21
**ended** 342:3
**endorsements** 216:7
**ends** 30:5 34:16 35:1 42:9,24 45:8,21 52:25 56:16 91:4 111:20 112:7 112:24 118:7 118:18 120:2 120:11,18 121:11 123:21 134:15,16 140:20 141:3 152:20 154:4 154:17 174:22 175:11 201:11 205:14 207:14 207:20 213:3 213:22 216:12 216:25 217:8 217:19 218:1,8 219:14 222:1 222:16 245:9 263:21,22 287:22 299:22 310:3,14 332:16 345:22 346:4,20 348:3 348:10,19
**energetically** 296:12
**energized** 219:20
**energy** 114:9 114:11,14 124:8 293:2
**engage** 277:8
**engaged** 123:12 130:16 213:21 254:6 344:13
**engagement** 318:8,9
**engaging** 56:8
**enjoying** 216:18,19
**ensure** 63:12 63:21 241:6 319:21
**enter** 251:25,25
**entered** 239:3
**entering** 238:22 259:18
**enterprise** 40:7 41:10
**entertainment** 101:8,9,13,16 104:3 257:2
**entire** 109:3 164:4 180:13 234:12 239:20 302:16 343:12 347:2
**entirely** 353:10
**entitled** 16:13 41:1 62:24 67:25 347:13
**entrance** 252:2
**environment** 59:5,20 60:17 114:18 116:11 329:2
**equal** 51:19 75:16
**equality** 40:11
**equally** 189:8
**errata** 357:5 359:1
**especially** 90:10 137:9 282:9 295:25 320:6
**esq** 11:6
**esra** 4:6 16:24
**essentially** 42:16 50:12 79:1,12 192:23 271:21 328:4
**establish** 34:13
**estimate** 116:8 117:8 161:20 165:3,11 343:4 346:6
**et** 1:8,13,15 2:8 2:13,15 13:3 14:3 15:3 258:10,11,11 320:11 359:2
**evening** 254:19
**event** 23:5 24:13 71:2 241:18 249:1,3 249:4 302:16 312:16 333:8
**events** 24:13 27:10 66:20 86:8,13 179:5 180:21 204:19 209:3 265:23 272:15 274:14 274:18,20
**eventually** 147:22 175:17 266:3

**everybody** 18:9 40:8 44:6 142:7,13 229:6 278:9
**everyone's** 316:4 335:13
**evidence** 29:13 63:13
**evidently** 67:9 89:2
**exact** 54:11 191:1 254:20 269:12 303:23 313:12 328:24 343:2
**exactly** 105:18 109:13 239:17 293:12 324:6 332:9
**exaggerating** 105:1
**exaggeration** 104:6
**exam** 172:20
**examination** 12:1,5 18:19 358:10
**example** 20:12 164:1 171:19 206:5
**examples** 53:19
**except** 357:4
**exchange** 92:14 93:1 97:8 114:12 122:5 135:4,9 136:1 144:2 153:11 169:15 187:9 197:23 208:12 208:22 218:18 232:14,20,23 233:22 234:1 234:15 276:14 288:24 289:6 299:15 315:21 322:14 323:23 336:10
**exchanged** 113:21
**exchanging** 304:18,20
**excited** 85:18 188:9
**excluded** 114:21 213:9
**exclusively** 113:4
**excuse** 101:23
**execute** 320:16
**execution** 158:15
**executive** 44:7 92:9 96:1 143:16,17 147:18 285:16
**executives** 40:10 41:12 283:18,20
**exhausted** 290:8
**exhibit** 13:6,7,9 13:10,12,14,16 13:19,21,22 14:6,8,10,12,13 14:15,16,18,19 14:21,23 15:6,7 46:11,13,16 91:15,16,18,20 92:17 135:3,6 135:18,19,21 135:23,25 153:4,5,7,9,18 153:21 159:3,5 159:8 164:1,5 164:13 187:2,3 187:6 197:9,10 197:14,21,21 208:9,9,16,20 218:13,14,16 233:19,22 242:8,9,12,20 255:7 256:6,8,8 256:11 267:12 267:12,13,16 267:19,19 269:22 270:8 270:16,18,20 270:23 275:19 275:23 276:12 288:10,10,14 294:14,15,17 295:12 303:16 305:2 312:21 312:22,22 322:6,7,13 335:4,5,8,11,12 335:14 336:9,9
**exhibits** 13:1 14:1 15:1 335:14
**exist** 173:10
**existed** 349:13
**existence** 129:15
**existing** 129:20
**exists** 31:20
**exit** 117:13
**exonerate** 215:11
**expect** 39:5 169:20
**expensive** 210:21
**experience** 23:23 69:20 93:23 94:8 128:21 157:8 179:14 245:2 269:5 275:3,15
**experienced** 309:18 324:18 329:11
**experiences** 30:4,15,21 31:8 31:11 89:23 91:1 177:13

211:1
**experiencing** 78:23
**expert** 31:19 157:12 162:4
**expires** 357:20 359:25
**explained** 129:24 207:4
**explaining** 130:5,8
**export** 163:9,10
**exported** 163:9
**exposed** 76:10 77:3 81:22 115:17 252:14
**exposure** 79:19
**express** 40:9 41:11 93:22 105:16 127:16 127:17
**expressed** 155:19 245:8
**expressing** 291:12
**extent** 96:11
**extra** 44:12 124:7
**extreme** 354:13
**extremely** 102:22 103:17 292:2 304:14 308:22 320:2 334:11 342:21
**eye** 48:16 235:22 236:4
**eyes** 129:17 174:4
**eyewitnesses** 71:3

**f**

**f'ing** 93:5
**fabricated** 194:8,24 196:1 248:21 249:1
**fabrications** 282:22
**face** 20:24 70:24 119:16 341:22
**facetime** 183:24 184:4
**fact** 56:23 67:24 107:25 122:1 123:2 151:21 198:13 217:23 268:22 278:6 317:6 324:12 337:21 338:6 339:1 350:5
**factors** 285:7
**factual** 66:13
**failed** 296:13 296:17 298:3
**fair** 25:8 32:22 40:3 45:13 54:14 75:15 82:5 105:18 117:17 147:4 165:12 199:5 218:4,10
**fairly** 104:1 129:2 157:3,8 221:17,20
**faith** 32:5,14,21 33:3,11 36:5 50:8,10,17 74:1 74:3 129:6,14 195:8
**faith's** 50:13
**fall** 90:25
**falling** 166:15
**false** 91:11 273:20 347:9
**familiar** 96:25 245:7 285:25 317:8,14,16,23 318:3,15
**families** 148:2
**family** 130:7 285:1 302:14
**fan** 325:5
**fans** 182:13,14 182:21 278:21 333:21,23
**fantastic** 193:15
**fantastically** 102:16
**far** 83:19 105:19 174:20 241:21 280:21
**farr** 2:21 5:4,12 6:4 16:20,23 17:2
**fast** 200:13
**father** 125:1,5 125:9,14,18 126:18,25 127:12,18 128:12 130:4 130:19,23 131:25 132:4
**favor** 246:9
**fear** 290:10,15 291:19 329:3
**fears** 291:16
**february** 276:7 284:14 290:17 294:20 295:15 297:21
**federal** 73:2,14 75:16
**fee** 346:13,15
**feeds** 353:14
**feel** 20:8,19 49:14 78:22 79:13 123:16 137:7 140:9 170:18 190:22 196:2,6 197:3 199:17,23 201:21 202:21

206:5 207:7 211:3 217:15 226:1 239:11 240:1 246:21 264:9 271:19 272:2,8 273:13 273:19 283:5 292:25 294:1 296:12 297:1 303:19 320:13 324:16 355:18
**feeling** 70:13 93:5 119:21,21 121:5 124:3 200:20 241:3,7 241:7 269:18 269:21 283:1 291:11 293:7 293:14 304:10 316:8 329:1,24 329:24 343:5
**feelings** 36:8,10 114:22 274:13 274:17 291:9
**feels** 68:16 90:9 167:6 292:9,18 293:3,4
**felt** 21:16 38:8 71:16 81:18,19 82:4 96:18 118:16 119:25 120:9 121:9 124:2 131:4 137:9,19 145:1 149:11 151:7 182:22 184:14 185:14,14 196:2 198:2,6 198:15 199:21 199:24 241:5 280:4 282:2,24 291:10 297:24 298:16,23 304:4,12 315:15 327:24 329:12 352:23 356:3
**female** 137:8 137:19 176:24 177:18,20,21 177:22 191:9 191:15 192:1,6 192:10,10 200:4,8,24 201:12,19,25 202:3 275:14
**ferrer** 224:16 225:14,20 307:20,25
**ferrer's** 225:4
**feud** 325:5
**fiduciary** 284:25
**fight** 328:17 354:15
**fighter** 22:16
**figueroa** 3:9
**figurative** 293:8
**figure** 101:24 171:17 172:7 175:7
**file** 75:7,12 184:8
**filed** 64:16,19 67:22 72:17 73:2,2,4,5,13 75:19 89:7 122:6
**filing** 65:6 66:10 100:2 122:16
**fill** 307:2
**filled** 174:18 258:6 263:2
**film** 30:17 34:25 38:6 46:4 86:25 87:15 89:12 95:9 114:23 128:17 130:23 139:4 140:20 141:3 142:23 143:12 146:7 146:11 147:7 147:12,13 152:9 153:1 158:2 188:17 196:13,20 201:3,8,15,19 202:12 204:19 213:8 216:11 221:19 222:1 222:15 234:20 245:3 246:10 246:15 261:14 261:19 262:2 264:4 277:7,22 283:2 285:2,12 286:17,24 287:1,13 291:19 297:14 306:1 325:12 325:14,15 328:5,5,8,10,16 330:5,9,16 331:3,7,14 332:16,21,24 337:23 345:22 346:4 347:5,24 348:10 354:14
**film's** 245:1 246:25
**filmed** 225:8 302:17
**filming** 45:20 96:25 152:14 188:7,13,21 230:14 232:3,5 232:18 251:20
**filmmaker** 95:9
**films** 38:1,18 38:20 98:6
**final** 102:10 106:7 158:6

162:5,11,12,18 162:20 163:1,9 163:9 213:10 332:15 333:1
**finally** 105:15
**financed** 284:3 284:4,5
**financially** 358:19
**financiers** 96:8
**find** 23:1,4 26:20 87:17 106:11 118:11 118:12,15 133:5,11 145:4 321:5 351:20
**fine** 172:5 183:13 242:3 248:18 252:9 307:13
**finish** 34:11 43:10 178:16 178:16 328:5
**finished** 144:1 315:14
**finishes** 82:16
**finishing** 213:9 246:10 295:18
**fire** 141:6 283:24
**fired** 76:23
**firing** 195:20 195:24
**first** 20:12,15 46:22,23 47:12 47:13 67:8,13 76:11 77:20 92:17 94:5 95:8 99:18 110:24 113:10 113:20 121:2 124:21,23 128:14,16 136:1 145:6,14 145:16 146:2,5 147:25 148:8 155:25 156:6 164:21,21 167:12,21 168:13 185:12 188:16 195:20 195:24 197:18 205:3 210:19 214:9 218:21 219:25 220:1 235:4 244:2,21 256:7,7 268:6 304:17 305:12 313:7 326:1 331:21 348:18 349:4
**firsthand** 69:22
**fit** 171:8
**five** 124:12 232:4 255:18 337:22
**fives** 124:10 197:5
**fiving** 112:3
**flavor** 218:25 219:1,2
**flight** 353:7 354:15
**flip** 51:4,17 173:13 220:9
**flipped** 47:7
**flipping** 335:25 336:16 340:24
**floor** 3:10,20 7:11 8:20 169:9
**floral** 333:15
**fly** 305:15
**flying** 353:2
**focus** 322:1
**focused** 207:11
**follow** 29:19 55:4,5 131:8 228:10 307:9 310:5,17 315:1 353:16
**followed** 19:19
**following** 131:15 155:12 176:12 244:15 321:11 353:12
**follows** 310:12
**force** 185:20
**forced** 328:4
**forego** 246:8
**foregoing** 357:3 358:5,15,21
**forgive** 111:1
**form** 32:2 33:1 73:17 125:18 134:24 162:1 345:7,16
**formal** 68:17 68:21 134:22 246:8
**formed** 166:22
**former** 101:7 107:3 108:19 111:3 256:25 257:1 296:3
**forms** 346:3
**formulate** 273:12
**forth** 24:25 95:13 200:9 231:11 304:20 314:19 358:6
**forum** 134:8
**forward** 39:8 68:17 154:3,6 246:11,17 254:14 284:8 297:12 353:15
**forwarded** 154:14
**forwarding** 244:10

**found** 64:4,6 71:1 87:23 106:14 128:20 133:3,4,8,9 174:5 275:17 279:18 341:25
**founded** 39:18 39:23
**founder** 34:3 89:15 101:14 101:14 285:10
**founding** 40:1
**four** 159:25 239:16 313:7
**framed** 43:22 222:19 272:23
**framing** 31:5 43:25
**frank** 41:20
**frankly** 176:20
**frantic** 293:2
**free** 40:8 41:11 81:4,10 82:3 98:25 105:16 207:7 210:22
**freedman** 7:5,6 17:14,25,25 82:25
**freshman** 25:21 26:2
**friction** 220:5 322:25 323:1,7 323:15 324:1 324:13,22 325:4,17
**friend** 87:16 256:20,24 262:10 264:10 279:2 288:24 293:16 342:2
**friends** 23:14 23:17 25:15,17 25:18,22 26:13 26:13 27:4 77:18 201:4 206:2 256:19 276:3 282:8 293:21,22 308:21 351:9 351:11
**friendships** 293:25
**frightened** 298:23
**front** 47:15 52:1 59:1 215:16 216:2 218:24 235:12 342:2
**frustrated** 103:5 292:19
**frustrations** 289:7
**fucked** 272:1
**fuel** 219:15
**full** 105:25 256:8
**fully** 19:22 41:21 115:17 189:10 193:6 194:18,23 206:8 208:2 238:11 320:8
**function** 162:21 350:22
**funny** 132:23 191:6
**further** 55:21 60:7 183:23 220:10 265:13 358:17

**g**

**g** 140:2
**gain** 260:8
**gallagher** 2:21 5:4,12 6:4 16:20,23 17:3
**gamble** 95:23 96:3,6
**gather** 326:13
**gaze** 172:4 176:25 177:18 177:20,21,25 191:10,15,20 191:23 192:1,6 192:11 200:4 275:14
**gears** 125:2
**gender** 55:17 84:4 200:19
**gendered** 223:24 224:7
**genders** 107:16
**general** 39:10 76:24 83:25 189:24 191:2 205:25 283:12
**generalization** 124:4
**generalizing** 38:23
**generally** 39:2
**genitalia** 149:17,20
**genitals** 20:23 119:16
**gentleman** 19:8
**gently** 231:9
**genuinely** 93:5 96:22 326:9
**getting** 128:6 203:18 232:1,3 238:25 239:4 252:11 297:20 297:24
**giannetti** 120:23 121:9 123:19 135:10 135:10 136:2 136:24 137:24 138:7 139:22 142:21 143:15 159:11,21 160:23 169:6

181:18,21 183:3,9 184:1,4 184:6,11,14,18 185:11 186:22 189:16 195:12 195:23 199:5 233:23 234:16 237:22 269:24 270:7,12 294:18 295:14 297:5 333:5
**giannetti's** 143:20 183:16 226:19
**gig** 304:5
**girl** 99:14
**girlfriend** 23:23 24:2 25:11 26:5,18 27:9,17 28:22
**gist** 104:2
**give** 18:14 23:9 107:20 112:12 112:25 114:8 114:10 118:14 127:25 148:6 171:17 175:1 275:5,5 312:7 323:8 344:2 351:20
**given** 24:8 80:23 113:14 216:13 287:20 320:16 323:2
**giving** 34:8 69:23 77:5 85:16 112:8 113:4 300:19 301:16 302:22
**glamour** 20:1 23:5 119:10,11
**glover** 10:5 17:11,11 345:7 345:16
**gloves** 304:15 328:22 329:20
**gmail** 350:13
**go** 19:16 25:3 25:25 26:11,17 27:3,16 45:12 48:6 57:12 59:1 99:24 107:16 110:23 127:24 128:1 130:5 134:17 141:17 162:13 164:10 174:16 176:10 180:25 182:15,18 190:7 205:17 205:22,25 206:25 207:19 224:9 225:24 231:11 232:4 234:6 238:14 250:12 255:11 255:22 269:23 270:22 281:16 284:8 290:23 294:7 295:3 297:12 311:23 312:7 333:25 340:7 341:5 350:9 351:19 354:21 355:25
**goals** 355:21
**god** 90:3 177:5
**goes** 157:4 231:20
**going** 24:17,24 25:21 26:23 27:6 29:9,19 35:14,15 36:24 46:23 47:9 48:17 50:2 53:19 57:22 66:5 76:1 96:5 98:18 112:13 114:16,17 133:14,16,18 135:1,8 136:9 149:9 153:3 164:2,8 172:2,7 177:11 181:1 200:15 201:14 205:22 206:19 209:17 211:6 213:12,13 215:15 218:12 220:11 222:18 224:9,10 228:10 231:18 233:25 255:24 256:6 257:20 267:11 277:17 281:22 283:1 290:11 291:18 294:7,8,22 295:5 304:7,7 313:14 314:19 315:9 322:19 334:1,7 336:5 339:13 344:2,3 356:22
**goliath** 327:24
**gomez** 327:10
**good** 16:4,19 18:8,21,22 25:9 74:1,3 75:25 102:14 124:12 170:8,13,14 172:23,23 177:2 195:8,16 221:3 226:1 227:1 307:8 322:2 356:21
**gotta** 219:15
**gotten** 58:1 78:25
**gottlieb** 5:5 12:6 16:19,20 18:20 22:18 23:8,18 24:12 26:12 27:2,15 27:23 28:13 29:11,14,18

| | | | |
|---|---|---|---|
| 31:13,22 32:3 33:8,15 34:10 35:5 37:1,6,24 39:17,22 41:8 41:17 42:8,15 42:22 43:3,9,14 43:23 44:23 45:18,24 46:10 46:14 48:5 49:19 55:11 56:19 57:3 61:11 62:2,19 64:17 65:3,17 66:3 67:18 68:13,22 69:4 69:18 71:9,14 72:1 73:19 75:24 76:6 77:1 78:8 79:17 81:3,11 81:24 82:17,20 83:7,13,20 84:12,18,24 91:15,19,24 99:20 101:2 102:21 104:12 104:20 105:6 106:20 107:13 108:3 109:21 110:9,16 112:5 112:20 113:9 113:18 114:3 115:12,21 116:7,15 117:7 | 117:15,16 119:9,19,23 120:7,16 121:7 121:14 122:3 122:11,15,20 123:17 124:16 124:24 125:15 126:22 127:4 131:5,7,12 132:8,11,14,20 133:13,23 135:1,7 137:1 138:4 139:1 140:24 141:10 143:4,9 144:6 144:13,18 145:9 146:16 147:10 148:18 148:24 149:21 150:6 151:1,11 151:20 152:1,6 153:3,6 156:2 156:14 157:7 157:13,20 159:2,6 161:2 161:11 162:8 162:19 163:21 163:25 164:8 164:12 165:17 166:16 167:19 168:3,24 170:24 173:4 173:12 176:7 178:7 179:2,15 | 180:24 181:10 183:21 186:11 186:15,20 187:1,4 190:16 191:13,19 192:7 194:13 195:3 196:3,18 197:8,15 199:1 199:8 200:2 202:10 203:15 205:1 206:9,16 207:2,10,21 208:4,6,8,18 209:8 211:14 212:9,21 213:17 214:3 214:11,24 215:7,14 217:5 217:22 218:5 218:12,15 220:13,15,18 222:8,10,20,24 223:4,23 224:2 224:8,15 225:18 226:4 226:20,24 227:7,15,19,24 228:9,24 229:2 229:10,19 230:8 233:17 233:20 234:7,9 234:11 236:11 236:23 237:7 238:1,13,20 | 239:12 240:7 240:17 241:8 242:8,10 245:13 246:3 247:16 248:15 248:24 249:8 250:1,8,13,19 251:1 252:20 253:16 255:7 255:12,19,22 256:4,13 258:7 258:15 259:1 259:22 260:4 260:18,21 261:4,23 263:9 263:14,19 264:2,8,16,22 265:9,17 266:9 266:20 267:2 267:11,17 268:24 269:13 270:16 271:1 273:2 274:3,11 274:19 275:1,9 275:18,21 278:3,17 279:9 279:16,23 280:15 281:8 281:15,23 282:12 283:3 283:13,22 284:11 285:3,8 285:23 286:3,8 286:15,21 |

287:5,16,21 288:6,9,16 289:5,12 290:21 291:5 291:13 292:4 292:14 293:6 293:13 294:6 294:13,17,24 295:3,10 297:3 297:17 298:1 298:11 300:15 301:3,14 302:1 303:4 304:1 305:1,6,23 306:16 307:6 307:19 308:2 308:11 309:3 309:12 310:1,9 310:21 311:12 311:18 312:1 312:14,20 313:4,18,23 314:1,20,23 315:5,8 316:19 317:4,12,18 318:5,19 319:1 319:19 320:17 320:21 322:3 323:10 324:8 324:19 325:2 325:10 326:23 327:15 330:4 331:1,11,22 332:2 333:7,24 334:13,14 335:4,10 338:1 339:7,12,16,19 341:7,16 342:12,23 343:13 344:16 344:22 345:11 345:20 347:3 349:22 351:18 352:6 353:11 353:21 354:1,8 354:19 356:19

**government** 50:13,17

**grace** 169:8 243:5,14

**graphic** 76:24

**gratuitous** 37:12,12,15,15 38:1,4,8,11,14 173:6

**great** 18:17 44:4 171:23 188:9 280:25

**green** 338:8

**greenlit** 95:18

**greeted** 113:11

**greeting** 114:15 117:12

**grooming** 221:6

**ground** 88:1

**group** 25:18,22 92:21 107:3 209:10 256:15 256:18 257:13 262:10 264:11 267:8 271:4,6,7 295:23 311:13 329:6

**grown** 177:7

**guaranteed** 246:24

**guess** 39:9 97:5 184:23 233:11 335:3 346:9

**guide** 51:1

**guild** 229:14 332:19

**gut** 283:1

**guy** 22:8,14,19

**guys** 352:14

**h**

**hailey** 322:5 325:18,25 326:3,19 327:9

**hair** 155:13 216:23 217:18 217:24

**half** 25:14 210:15 334:10

**hall** 136:17,20 137:3,13,19 144:4 150:5,7 165:23 169:4,5 170:6 174:10 175:12,15 179:17 200:17

**hall's** 167:1,6

**hallway** 169:9

**hand** 18:12 155:2

**handbook** 47:15,19 48:25 49:21 50:25

**handed** 46:15 91:20 143:11 159:7 187:5 208:9 242:11 256:6 267:13 270:17 275:22 288:10 294:14

**handing** 164:3

**handled** 105:4

**handling** 165:1

**hands** 80:25 253:24

**handwritten** 351:14

**hanks** 92:11,12

**happen** 130:12 241:6,9 297:13 341:4 355:5

**happened** 24:21 25:1 26:17 28:8 42:24 44:11 67:11,15 71:3 71:23 77:25 78:4 104:7 105:18 125:13

144:3 160:13 160:16 177:6 177:15 178:11 178:12,21 179:6 190:12 201:21 204:20 207:13 213:2 214:14 232:14 238:3 265:1,4,8 265:11,19 266:4 312:10 317:22 329:21 334:19
**happening** 138:16,18 142:23 143:22 160:18 175:3 263:1 305:20
**happens** 63:25 306:24
**happy** 36:2 99:23 218:6 228:7 240:4 287:9
**harass** 85:8
**harassed** 18:23 19:4 20:9,14,19 68:16 118:23 118:24 213:20 258:19 283:9
**harassing** 258:1,10
**harassment** 30:1 51:20 52:5,23 53:22 53:24 54:19 56:9 57:15 58:4,7,15,18,24 59:18,25,25 61:1 63:4 65:13,20 66:9 66:14,22 67:4 67:21 74:1,2,5 74:7 86:10,12 121:23 122:8 213:21,25 214:4,8,8,13,23 215:1,8 233:12 233:13,16 299:8,13,17
**hard** 37:22 110:25 128:19 255:19 273:19 296:20 297:2 299:19 323:14
**harder** 77:23 82:18
**head** 92:1,4 141:6,23 147:3 203:25 204:12 283:14
**heads** 44:7 134:17,23 141:17
**healing** 80:20 291:18
**healthy** 77:6
**hear** 33:21 86:1 110:17 120:17 189:11 193:5 194:18 202:19
**heard** 67:8 88:10,13,16,19 88:24 97:4 98:10 99:18 120:20 128:23 184:18 185:12 202:16 203:2 217:15 225:11 318:4 330:11 331:21 341:24
**hearing** 110:3 268:11 298:18
**hearts** 356:12
**heath** 7:3 8:3 11:24 13:9,13 13:15 40:6 57:8 88:20 91:21 92:7 111:4,7 113:5,7 146:25 152:17 153:19 154:9 154:11,14 159:10,20 169:6 184:20 218:18 222:22 235:6 236:7,9 236:13 238:16 238:19,22 239:20,24 240:13 241:21 242:15 243:9 243:24 256:20 259:17,24 264:25 265:6 265:18 273:9 278:7,9,13 287:8 288:13 288:18,24 289:7,14,14,19 289:22 290:1 291:22 292:6 292:10 293:9 294:18 295:14 297:6 300:2 301:15,19 302:25 303:6,9 315:21 334:21 334:25 345:12 345:18 353:3
**heath's** 62:20 266:3 302:17 317:1 320:7
**heaven** 130:6
**height** 55:24 56:1
**held** 83:22 115:16 254:23
**hello** 169:18
**help** 48:12,15 48:20 91:13 95:12 101:23 101:23 130:10 130:25 169:24 171:19 174:4

211:2 212:17 234:5 278:24 279:3 326:5 344:3 355:17 356:1,4
**helped** 87:13 87:13,14,17
**helpful** 87:23 159:16 200:25 210:2,25 211:4 212:20
**helping** 180:9
**henny** 243:5,14
**hernandez** 11:25 16:7
**hesitation** 178:6
**heuer** 223:12
**hey** 85:5,5 169:20 352:13
**hi** 85:7 182:15
**hiding** 340:3
**hierarchy** 56:24
**high** 112:3 124:10,12 128:8 197:5
**higher** 328:6
**highest** 56:24
**hint** 308:9
**hire** 141:6
**hired** 56:15 102:2,2 343:21
**hiring** 102:12 102:15
**history** 327:9 329:9
**hit** 77:17
**hitting** 184:15
**holding** 253:22
**hole** 66:5
**hollywood** 19:6 37:10,15 38:1 38:18,21 39:4 39:10 308:20 320:9 329:6 330:9
**home** 135:11 135:13
**honest** 54:10 193:21 317:25 354:15
**honestly** 139:9 139:20 189:2 273:13
**honor** 133:14
**hoover** 201:10 201:14,18 288:7 331:14 333:13,18,19
**hop** 159:25
**hope** 108:1
**hoped** 279:7
**hopeful** 147:5
**hopefully** 48:17
**hormones** 81:20
**hospital** 169:8 169:13 171:14 171:15,21 172:20,25
**host** 108:19,21 109:1,10 110:5
**hostile** 59:4,20 60:16
**hot** 19:6,9,10 19:12,16,18,19 19:21,22 20:22 118:21,25 119:17 225:10 230:20 231:13 231:17
**hotel** 99:4,14 100:7,10,12,21 101:1 173:19 220:23,24 221:1
**hour** 334:10
**hours** 334:7
**housekeeper** 149:12
**housing** 75:15 184:21
**houston** 10:9
**hr** 67:15,22 68:17,21 107:4 121:20 122:17 123:7,12 192:14,18 233:6,7 241:13 246:8
**hudson** 4:6 16:24,24
**hug** 85:5,6,16 112:25 113:19 114:8,10,20 118:14 124:9 124:13 197:6
**hugged** 113:3 114:5 116:1,9 123:14
**hugger** 111:24
**huggie** 124:2,5 124:15 182:23 182:24 183:5
**hugging** 111:21 112:8,16 115:5 116:24 118:6 118:17 120:1 120:10,18,19 121:10,13,17 121:22 122:1 123:13,15,20 124:18 138:1
**hugh** 328:1
**hugs** 112:8 113:12,14,21 116:13,17,18 117:2,3 124:11 307:16
**huh** 63:23 64:20 91:23 169:11 187:8 275:25

**human** 62:10 68:7 71:10 77:6,8 114:11 114:15 128:21
**humiliating** 342:21
**hung** 25:23 27:5
**hurt** 114:22
**husband** 178:16,17,17 279:1 327:25 337:21 340:15

**i**

**idea** 20:25 27:8 33:18 35:4 83:4 87:18 100:4 107:20 160:12 161:23 170:5,8,13,14 171:23 172:23 174:8 175:2 176:18,21 177:1 247:14 249:17 259:20 263:1 308:1 340:23 341:10 343:19 344:21 344:24
**ideally** 48:16
**ideas** 103:7 176:10 178:1,5 180:11
**identification** 46:13 91:18 135:6 153:5 159:5 164:5 187:3 197:14 208:16 218:14 233:19 242:9 256:11 267:16 268:16 270:23 275:19 288:14 294:15 312:21 335:8
**identifies** 192:10
**identify** 16:16
**iewu** 13:17
**ignore** 355:19
**ii** 1:18
**illusions** 212:6
**image** 340:22
**images** 76:24 76:24
**imaginations** 307:3
**imagine** 22:9 26:7 31:20 49:23 52:21 75:21 77:9 82:1 85:19 95:1 96:4 106:1 109:2 113:13,21 141:4 156:13 157:6 162:5 177:22 178:25 180:1,4 220:7 244:22 263:12 272:5 283:25 283:25 291:19 329:22
**imagined** 128:13
**imene** 244:1,5 244:6,6
**immediate** 253:9
**immediately** 74:11 196:8 231:20 233:10 234:20
**imminently** 193:7 194:20 194:24
**impact** 192:1 193:23
**impactful** 320:6
**impartial** 63:7
**implementati...** 254:10
**implication** 340:5
**implies** 338:9
**implying** 127:10 341:4
**importance** 235:24
**important** 33:11 71:2 107:8,12 109:14 110:5 127:7 150:20 151:4,14 155:18 157:14 158:2 178:1 189:8 275:11 275:11 279:4 320:3 330:20 337:22 352:17
**impossible** 44:5 310:24
**impression** 104:22
**impressive** 303:20 304:4
**improvi** 250:15
**improvisation** 250:15
**improvising** 249:12,23
**impulsive** 206:11 207:25 209:23 211:10
**inappropriate** 86:15 259:14 259:25
**inches** 119:16
**incident** 23:2 28:21 90:11 95:3,6 99:4 123:14 241:14

241:14 264:24 298:16 299:1
**incidents** 29:25 65:22 67:1,3 69:11 71:16,21 106:22 267:7 281:1
**include** 61:1,4 65:21 74:9 115:22 117:2 190:9 254:3
**included** 66:20 156:10 185:2 264:11 301:5
**includes** 55:21 59:25 272:21
**including** 58:10 89:19 113:23 123:13 124:11 196:4 226:9 253:5 320:8 325:11
**inconsistent** 274:6
**incorporated** 178:5
**incorporating** 178:1
**incorrectly** 198:14
**incumbent** 68:15
**indefinitely** 351:1,5,7,12
**independently** 210:20
**index** 12:1 13:1 14:1 15:1
**indicating** 162:21
**indirectly** 42:17
**individual** 73:25
**individual's** 59:7,9 60:14 61:7
**individuals** 93:12 256:9
**industry** 279:13 282:5 330:15,16
**inexperienced** 95:11
**infants** 129:14
**infected** 76:18
**infer** 306:17,22
**inferred** 202:25
**inferring** 178:15,15 190:11 259:13 259:24
**inflated** 95:24
**influence** 129:23 308:14 309:1
**influencers** 333:21,22
**inform** 30:4,14 31:8,14,15 65:22 93:13 121:20
**information** 185:10 300:17 300:19 301:1,1 304:18 312:17 319:21
**informative** 106:11,14
**informed** 30:8 30:16,20,25 31:6 66:13 111:5,7 186:16
**initial** 72:9 161:13 168:2,8
**initiate** 311:6 311:10
**initiated** 116:17 117:3,3
**innuendo** 61:6
**inquiries** 317:6 318:14
**insensitive** 221:23 222:12 223:20
**insinuated** 125:19 213:19 215:2,9 257:25 258:18
**insinuates** 258:14 259:5
**insinuating** 214:20,22 258:5 272:10 283:5,8
**insinuations** 212:12 214:1,4 215:6
**insisted** 152:24
**inspired** 32:9 32:12,13,15,20 32:24 49:2,12 50:2,22
**instagram** 219:9 222:7
**instance** 171:12 190:11 196:16 204:5,17,23 205:2
**instances** 206:4 206:7
**instruct** 29:10 29:15
**instructed** 98:15 352:1
**instructing** 29:16 228:3
**instruction** 12:10 29:20,23 228:11 352:22
**intended** 61:24 131:18 133:10
**intending** 320:5
**intense** 292:22

**intention** 37:5 104:4
**intentionally** 20:23 306:25 329:19 350:8
**intentions** 196:23 320:1
**interact** 182:20 182:21
**interacting** 182:13
**interaction** 127:16 172:15 265:5
**interactions** 89:17
**interest** 347:8 347:12
**interested** 77:2 110:3 131:17 131:18,19 177:17,19 205:24 242:3 358:19
**interests** 320:7
**interference** 220:14
**interfering** 59:7 60:14
**internal** 50:13 204:13,15 293:8
**internet** 306:23 307:1
**interrogatory** 348:18
**interrupt** 43:7 252:1
**interrupted** 138:25 297:6
**interruption** 295:1
**intertwined** 291:23
**interview** 20:1 77:13,14 102:4 102:7,10 220:3 312:7 323:2
**interviewed** 102:6,9
**interviews** 77:10 220:6
**intimacy** 174:19 175:6 175:14,15 176:10,17,21 180:11,15 248:1,5,17 249:5,6 250:15 250:25 251:4,6 251:7
**intimate** 167:12 167:21 168:13 168:17 175:14 248:9 251:8 262:4,6
**intimately** 129:2
**intimidating** 59:4 60:16
**introduce** 18:5
**introduced** 102:3 303:17
**introducing** 87:15
**introductory** 47:19
**invested** 284:22 284:24 348:1
**investigate** 62:11 67:20 68:8 312:2,3
**investigated** 63:6 74:12
**investigating** 86:4,5 311:24
**investigation** 62:24 63:25 64:4,11,25 66:19 67:13,15 70:17,19 74:4 86:3 105:20,22 106:2,23 107:9 121:15 215:10 311:7,11
**investigative** 70:18,23 71:7
**investor** 216:3 216:4 221:24 222:14
**invitation** 134:24
**invite** 134:17
**invited** 90:13 90:20 99:3,14 100:7,10,12,20 100:25
**inviting** 141:16 284:18
**involve** 251:9 251:12
**involved** 87:6,8 91:5 101:25 105:14 123:7 250:14 263:20 263:22 264:3 265:16 297:14 333:6
**involves** 172:19
**involving** 92:7 92:15 189:17 225:1 230:10 249:12 264:24
**iron** 304:11
**ironically** 123:13
**irrelevant** 29:12
**irritated** 198:5 198:18 199:19
**isabela** 307:20
**isabella** 224:16
**isolated** 139:3
**issue** 64:13 103:16 124:18 124:22 150:19

151:3,13 212:23 241:20 274:17 307:18
**issued** 242:5
**issues** 139:25 248:14 264:3
**italicized** 166:19,22
**items** 121:22 156:16 267:7 269:19 281:9 291:7

**j**

**jacket** 231:7
**jackman** 328:1
**jackson** 10:4 17:11
**jamey** 7:3 8:3 11:24 13:13,15 111:4 136:6 140:8 159:10 159:20 169:6 184:19 235:12 235:21 259:14 265:15 293:22 294:18 332:22
**jamey's** 293:25
**jane** 85:1 296:5
**january** 233:4 254:21 266:11 267:24 268:4 268:19 270:4 271:3,11,12 281:2,10 282:16 290:25 291:7,10 334:15,18 341:21 342:16
**jason** 7:9
**jb** 14:8 94:13 94:17
**jbach** 8:23
**jdale** 5:22
**jed** 10:2 17:12
**jen** 216:14 317:5 340:23
**jennifer** 1:10 2:10 7:2 8:2 11:23
**jenny** 181:12 187:17 189:23 197:12 202:20 233:8 307:9,14
**jersey** 53:8,10 53:12
**jewish** 130:6
**jglover** 10:10
**job** 102:4,14 202:14 273:10 299:18 318:3 318:10 355:25
**jobs** 44:3,8
**joel** 10:5 17:11
**johnson** 22:11
**joined** 19:12
**joke** 98:11 132:16 133:6,7 204:8 231:19 233:9,15
**jokes** 61:6 235:21 236:3
**joking** 133:10 191:7
**jonathan** 8:16 11:25 16:7 17:16
**jones** 3:3 17:8 17:10 72:11 242:15 243:10 243:18
**jonesworks** 1:12 2:12 3:3 13:23 17:8,10 208:11
**joseph** 244:1,6
**josh** 197:12,18 277:1
**journalist** 70:23 71:7
**journey** 25:2 114:16 291:18
**js** 197:11
**js224** 13:21
**jsunshine** 7:16
**judged** 294:2,4
**judgment** 123:6
**juliet** 5:15
**july** 343:7
**jumped** 19:17
**june** 135:5 138:17,19 139:17 143:11 143:20,25 144:8,11,15 208:12,23 210:8 211:8 213:1,5,18 233:23 234:16
**junket** 219:25 220:2 305:8,12 322:21 354:10 354:13
**justice** 200:23
**justify** 25:3 337:24
**justifying** 210:23
**justin** 1:19 2:19 7:3 8:3,13 12:2 13:2,13,17 14:2 14:21 15:2 16:12 17:18 35:24 36:18 77:7 83:1 89:14 136:4 235:13 356:12 357:10 359:3 359:21
**jw.com** 10:10

**k**

**k** 5:17

**katie** 279:17
**kbender** 5:21
**keep** 138:12 140:2
**keeps** 163:4 219:20
**kicked** 139:3
**kid** 293:3
**killed** 44:16
**kind** 25:17 52:4 79:19 85:7 162:14 180:2 185:17 191:5,6 191:7 203:13 205:18 215:10 216:7 233:9 241:20 252:24 260:19 263:10 274:22 278:24 279:3
**kindly** 235:13
**kinds** 44:8 157:4
**kiss** 251:18
**kissing** 251:12 251:13,15
**knew** 21:17 26:7 98:18 102:3 139:13 151:7 190:17 198:15 201:14 206:3,4 248:8 255:3 257:23 258:3 259:23 274:21 282:25 286:9 318:6 339:20,23 343:19
**knocked** 22:14
**know** 20:2 21:20,20,20 22:24 23:16,19 26:14,23 27:7 27:13,14 28:18 30:6 33:19,24 34:1 35:9 39:7 40:22 41:20,22 44:11,12,14,17 51:24,25 52:2,3 54:11 57:8 61:12 68:19,21 69:13 72:18 75:19,22,23 77:22 78:18 81:2,21 83:12 94:3 97:14 100:8 102:1 103:2,5,23,24 105:7,10 107:2 107:5 108:9 113:4,11 114:12 117:13 117:14,14,15 117:17,19,20 117:23 118:2 119:6,20 121:5 126:1 128:6,9 128:20 129:9 130:19 136:12 150:12 151:21 152:2,7 161:8 161:24 162:25 163:17 164:24 167:7,17 168:7 171:4,24,25 179:23,24 182:21,24 184:22 188:8 189:10 191:4 191:22,24,25 193:4 197:19 198:11,14,15 198:19 199:21 209:12 212:22 213:14 214:23 215:4 217:3,13 217:17 220:1,7 221:13,19 222:4 225:9,9 227:13 231:25 232:2 236:9 237:12 241:16 241:21 242:17 249:3 258:3,5 258:13 259:4 260:2 262:24 263:7 267:21 268:2,6,7,10 270:6,10 280:9 280:17 281:7 282:25,25 296:7 297:23 300:5 302:21 302:24 303:5,8 305:22 306:22 310:22,24 313:12 314:18 315:14 316:17 316:20 317:5 317:10,13,19 318:2,12,18 319:10,12,17 319:18 320:4 323:17 326:7,9 328:13,24 329:3,5 330:8 331:6,10 332:1 336:4 337:2,5,6 337:8,9,13,14 337:19 340:2 341:14,17,20 343:17,22 344:2,23 345:1 345:24 346:2,5 350:5 352:21 352:24 355:9 356:7,13
**knowing** 199:23 225:17 339:8 355:19
**knowledge** 46:5 69:19,22 70:6 86:11,22 86:24 192:15 222:3 241:15 252:18 255:2

277:6 302:15 303:7 347:1 348:1 349:15 351:24
**known** 143:19 181:13 198:17 279:12 331:13 331:17
**knows** 83:8 139:9,20 262:14 280:9
**koslow** 279:17
**kristin** 3:6 5:14 17:2,7
**kristintahler** 3:12

**l**

**labeled** 32:14
**labels** 65:21,23
**laid** 316:22
**landed** 352:13 352:24 353:6
**landmark** 134:5,8
**language** 93:24 94:4 192:23 244:11 245:12 245:24 290:15
**laptop** 162:6
**large** 231:7
**larger** 130:20
**lasted** 26:6 131:16
**lasting** 193:22
**late** 213:1,5,18
**launch** 101:23 217:19 218:8
**launched** 64:24 67:12 70:17
**launching** 66:19
**laura** 11:6
**laurenne** 3:7 17:9
**laurennebaba...** 3:13
**law** 3:8,18 4:7 5:6,16 6:6,14 7:10 8:5,7,18 10:6
**laws** 358:21
**lawsuit** 64:15 64:19 65:6,10 66:10,18,19 67:7,14 72:11 100:2 162:7
**lawyer** 83:11 112:13
**lawyers** 24:19 60:8 66:6 70:2 88:18,19 313:16 348:13 351:10
**lead** 1:7 2:7 29:13 34:21,22 34:23 87:17 120:5 147:13
275:14 277:7 285:14 338:15 338:25
**leadership** 133:25 134:2 134:11
**leading** 158:2
**leak** 262:13 280:3 281:19 335:25 336:16 336:25 337:1 340:20
**leaked** 282:18
**leaking** 282:1
**learn** 80:6 103:12 162:18 206:17 249:19 265:1,18 270:11 324:20 345:4
**learned** 88:17 98:22 99:2,6 128:15 137:24 174:25 181:12 244:21 247:6 249:22 342:24 343:8
**leather** 203:20
**leave** 119:22 262:12 306:25
**leaving** 355:17
**led** 66:18
**left** 19:24 21:11 22:17 61:12
71:17,22 103:20,25 111:17 145:2 306:7 356:18
**legal** 11:4 16:8 50:3 65:21,23 246:6 247:11 263:25
**legally** 49:13 50:1,18
**length** 115:4
**lengthy** 46:19 66:5
**lessen** 235:23
**letter** 47:2,19 48:24 49:25 253:1 260:7,14 263:4 332:18
**level** 128:8 320:16
**levels** 245:4
**levy** 328:1
**lfcllp.com** 7:16
**lftcllp.com** 7:13 7:14,15
**liar** 90:7
**lies** 282:24 283:4,4,5,8,12 291:10 307:4 308:17 329:18
**life** 19:1 82:10 125:21 129:8 130:15 178:13 179:7 200:18

206:1 211:1 269:6 275:3,15 355:23
**lifetime** 210:16
**light** 41:2
**lights** 39:23
**liked** 170:16,19 216:15 278:21
**likeness** 156:24 157:18
**likes** 279:13
**likewise** 82:19
**lily** 146:6,10 147:7 149:23 150:14 152:9 152:20 154:4 154:16 166:9 167:9 169:13 169:16,22 172:13,19 173:23 175:11 176:19,19 224:18,19,22 225:2
**lily's** 172:8,9
**limited** 320:9
**lindsey** 6:13 153:22 244:1 244:17
**line** 12:11 40:23 56:2 68:1 95:17 159:12 160:6 175:22,24 228:15,23 229:18 231:16 327:7 359:5
**liner** 7:5 17:14
**lines** 78:12 79:7 80:10 228:13 228:17 229:13 229:15 230:4 232:8 239:16
**link** 222:4 353:22
**list** 21:18 51:7 55:6 65:14 156:7 244:21 246:15,23 247:4,4 248:1 259:18 260:24 261:5,15,16,22 262:22 263:3 267:4,7,22,25 268:2,13,17,23 270:7,12 272:10,20 281:9 282:15 282:15,21,21 290:25,25 291:4,7
**listed** 182:6 189:15 255:1 320:24
**listen** 270:1,3 297:18
**listened** 269:25 270:2
**listening** 80:15 103:7
**lists** 55:15
**lit** 338:8
**literal** 293:5
**literally** 79:4 206:1
**litigation** 64:13 284:18 348:19 348:24
**little** 49:4 74:23 105:7 127:20 129:3 130:11 171:12 230:9 234:2 266:10 273:6 289:14 291:23 292:9 292:24 293:3 293:14
**lively** 1:5,15 2:5 2:15,20 4:3 5:3 6:3 11:2 13:3 14:3 15:3 16:13,21,23 17:1,3,6 66:21 67:3 72:2 75:19 83:1 97:4 98:10 116:1,9 117:3 124:12,14,25 125:4,8,17,19 125:25 126:5,8 126:17,24 127:11,14,16 127:18 128:3 129:1 130:14 131:23 132:3 132:15 133:6 145:11,15 146:5 147:5 148:1,4,9,11 149:1,4,8,22 150:10,13,21 151:5,7,15,22 152:8,18,24 154:3 155:18 158:21 161:13 167:10,13,22 168:14,19 169:1 170:15 175:17,18,21 176:1,13 177:4 177:21 178:9 179:4,11,16,20 179:25 180:8 181:12 182:9 187:20 188:1 190:12,18,20 192:5,8,9,21 194:2 195:4,7 196:20 197:22 206:6 213:6,20 214:14,19 216:23 217:18 217:23 218:6 230:11,13,19 231:5,11,24 232:2,11,23

234:23 235:3,6 236:18,24 237:2,6,9,11,15 237:17,23 238:15,21 239:18,19,22 239:25 240:3 240:12,19 241:1,3,17 244:18 247:12 247:15 248:8 249:23 251:18 252:11,13,18 254:24 261:8 261:13 265:14 265:20 267:3 267:23,25 268:3,18 269:4 269:19 270:8 270:13 271:19 272:4 274:6,7 274:13,22 277:16,22 278:8,9,19 279:11,25 280:19 281:4 281:10,19 282:1,6,15 283:5,9 286:16 286:20,23 290:22 299:24 300:6,9,17,20 300:23 301:17 301:20 302:6 303:1,6,10 308:15 309:1,8 309:15,22 310:5,16 327:25 328:9 329:5 331:2,5 332:3,13,14 333:11 337:20 339:3 340:13 342:5 359:2

**lively's** 66:13 66:17 72:13 82:21 99:7 100:2 117:21 125:14 126:16 128:11 148:15 148:20 154:15 156:1,9,20 178:5 181:17 186:17 192:24 194:7 196:11 196:23 217:6 226:17 236:14 264:24 266:11 275:3 301:7 334:19 337:25

**lives** 129:11

**liz** 108:18,19 111:7

**lizzy** 180:16

**ljl** 1:7,7 2:7,7

**llc** 1:8,12,13 2:8 2:12,13 3:4 7:2 8:2 13:3 14:3 15:3 16:14 89:14 346:20 359:1,2

**llp** 4:4 10:4

**located** 16:9

**location** 171:9

**lock** 174:4

**locking** 241:17

**lofty** 355:23

**lonely** 81:20

**long** 25:6,13 26:1,3 55:6 65:14 108:21 109:16 131:9 192:9 193:22 246:10,16,16 293:22 327:13

**longer** 130:22

**look** 19:10 37:10 46:19,22 47:2,8 62:3 67:24 99:23 135:14,17,22 153:8,12,15 159:14 162:13 163:25 192:2 203:21,23 208:14 233:17 239:7,10 242:18 313:6,8 313:9 314:4 331:7 342:5 350:9 354:22 354:24,25

**looked** 47:5 203:19 230:20 231:13,17 261:7 290:17

**looking** 51:6,9 68:24 87:19 153:8 158:23 162:25 171:8 193:12 197:17 197:20 199:15 200:8 202:3 209:25 221:3 239:20,24 240:13 257:10 265:7 295:11 313:6 316:10 322:4 343:2

**looks** 19:11 153:21 156:5 219:8 256:14 257:13

**loop** 94:13

**los** 1:20 2:22 3:11 4:10 5:8 6:16 7:12 8:10 16:9,11

**lose** 202:14 285:4

**losing** 27:10

**lost** 28:21,24 29:7

**lot** 24:23,23 25:4 37:11 38:20 45:10

81:22 87:24 106:16 171:13 172:12,15 174:14,25 177:12 182:13 189:4 248:13 273:16 285:18 286:10 297:25 305:18 320:14 329:3 340:16 342:10,19
**lots** 264:11
**love** 60:8 166:15 176:19 257:19 288:19 322:17 330:10
**loved** 129:11
**lovely** 90:12 95:7 97:6,8 130:15
**lovers** 166:22
**loves** 278:9
**lower** 37:13,16 37:20 94:10
**lowered** 119:17
**lucky** 294:1
**lump** 117:5 190:14
**lunch** 180:25 181:3 182:5 198:20
**lungs** 129:18
**lust** 174:19
**lying** 90:5 313:17

**m**

**m** 3:7 11:1
**maaren** 3:17
**maarenshah** 3:22
**mad** 112:13 286:16,19
**made** 21:4 38:21 39:4 63:21 64:16,21 64:22 65:5,10 80:17 91:12 94:7 95:10 100:6 103:4,6 105:8 118:10 123:15,15,25 123:25 128:11 128:17 133:6,7 147:11 152:19 162:22 163:1 163:18 170:18 172:8,23 177:5 181:13,14 182:8,10 189:8 189:11 193:4,7 194:17,19,22 194:23 195:4 195:13 196:12 196:15,19 199:14,17 203:8 204:8 206:5,7 210:13 211:20 226:8,9 230:18 231:19 233:15 240:1 252:7,16 271:19 272:2,8 283:5 307:15 310:4,15 314:20 315:2 329:14 333:1 333:19 337:10 342:5 347:5 348:2 354:4 357:7 358:10
**madison** 3:19
**magazine** 20:1 20:2 23:5 220:4
**magically** 342:3
**mail** 320:10
**mails** 349:25
**main** 47:12 87:14
**maintain** 63:19
**major** 285:7
**majority** 89:21 96:7 195:17,23 226:7 328:11
**make** 23:11 30:5,9 32:12 35:21 36:15 39:10 49:14 79:13,24 87:18 95:10 96:21 97:20 151:10 185:16,23 199:23 204:7 212:15 226:1 235:21,22 236:3,4 286:16 286:19 293:15 297:12 319:25 320:2 328:14 333:17 347:25 350:8 351:6 356:2
**makes** 36:1,20 115:23
**makeup** 117:21 238:25 239:4
**making** 30:8,10 30:15 40:6 79:12 96:9,15 97:18 98:11 120:19 128:14 140:8 162:10 165:20 172:12 176:19 177:10 226:11 275:10 286:25
**male** 191:21,23 200:6 256:19
**man** 54:1,2 93:6,9 101:20 101:24 104:9 108:10,19 109:4 110:18

111:3 134:12 204:2 289:24 299:5
**manage** 44:6 317:6
**management** 48:19 57:4 62:10 68:7
**manager** 19:13 21:1 62:4,7,16 62:21 68:1,4,25 122:25
**managers** 48:14 58:10
**managing** 162:2 318:14
**manatt** 4:4 16:24 17:4
**manatt.com** 4:11,12
**manipulate** 136:6
**manipulation** 259:9
**manner** 63:7
**manolo** 223:12
**mansplained** 297:7
**marbory** 294:19 295:15 295:17 296:2 299:3,5,8,16
**march** 159:11 159:21 160:13 160:19 161:14 161:16,21 296:6
**marginalizati...** 253:3
**marijuana** 38:6
**mark** 135:1 153:3 197:9 215:15 234:8 267:11 269:22
**marked** 46:13 46:16 91:18,20 135:2,6,23 153:5 154:20 155:8 159:5,8 164:5 165:25 187:3,6 197:14 208:9,16,19 218:13,14 233:19,21 242:9,12 256:11 267:13 267:16 270:17 270:23 275:19 275:23 288:10 288:14 294:14 294:15 295:12 312:21 335:8 335:12 338:3
**market** 325:12 325:15
**marketed** 217:8
**marketing** 91:6 92:1 93:21 216:11,24 217:7,18 328:12
**markup** 154:15 154:19 155:1 156:18
**markups** 155:25
**marriage** 28:1 100:19,20 293:24
**married** 100:13 100:17,25,25 177:8 204:2
**masculinity** 77:6
**massage** 19:7
**material** 183:17 282:14
**materials** 290:23 328:12
**matters** 180:5 263:23
**matthew** 208:13
**mckinney** 10:7
**mconnolly** 5:20
**mean** 24:23 28:18 30:21 35:2 39:12 44:18 46:9 50:12 65:14 66:16 96:19 114:1 127:6,8 140:1 143:7 175:8 211:24 215:25 217:4 230:25 248:13 248:16,23 262:18 263:8 268:22 277:3 280:12 283:4,7 294:3 296:22 300:24 314:8 318:2,9 321:17 332:9 355:7
**meaning** 71:6 152:15 217:14 349:20
**means** 50:23 58:14 60:20 77:22 127:9 211:25 212:22 293:5 317:11 317:13,19
**meant** 108:10 133:10 221:10 224:21 262:20 262:24 292:15 292:21 294:5 343:22,23 344:1
**media** 14:8 99:13 209:2 216:6 219:4,7,8 221:11 223:7

305:19 307:10 317:6,14 318:14 319:14 343:1 352:2 353:14 355:10 356:9
**medication** 205:11,13
**medications** 205:6,8
**meditation** 24:24
**meet** 85:18
**meeting** 84:20 84:25 103:19 103:25 126:16 146:2,2,17,18 146:20,22 147:25 150:11 150:13 159:12 160:7 161:13 170:6 176:9,12 176:12,15,15 176:25 178:23 180:14 233:6,7 233:12,14,16 236:12,19,25 237:24 238:6,8 253:24 254:2 254:16,17,18 254:23 255:4 265:1,4 266:11 266:15 267:3,8 267:23 268:4,9 268:18 269:5,9 270:4,9 271:11 281:10 291:11 297:4 309:14 334:16,19,24 335:1 341:21 342:1,16
**meetings** 126:6 145:11 161:3
**megan** 69:10 70:6
**melissa** 7:3 8:3 11:3 303:13 340:23
**member** 1:7 2:7
**members** 42:10 44:4 113:15,19 113:19,22 309:5 310:4,16 312:4 319:14
**memorable** 266:17
**memorializes** 348:5
**memories** 25:2 128:22
**memory** 49:17 54:4 99:10,11 99:23 110:12 167:5 203:23 225:13 227:1 242:1 267:6 302:12 354:2
**men** 78:22,22 79:13,25 81:22 83:15,21 101:25 140:9 201:1 356:2
**mention** 229:20 233:5
**mentioned** 126:24 184:25 190:10 233:9 252:10 330:5 351:9
**mentor** 95:12
**merchandise** 156:24
**merchandising** 157:18
**mess** 343:12
**message** 13:21 14:8 92:6,21 93:1,3 95:20 127:17 136:24 185:11,22,24 196:25 197:11 239:17 243:25 244:24 256:7 257:10,11,12 257:21 271:9 279:4,4 292:7 292:11 295:13 314:6 315:20 323:5,12 325:16,18,25 325:25 326:1,2 327:1,6 329:7 340:11 353:8 355:20
**messages** 13:7 13:9,10,19,22 14:10,12,13,16 14:18,19,23 15:7 70:15 197:21 314:25 315:3 354:22 354:25 355:3,9 355:11,14 356:15
**messes** 80:24
**met** 28:5 113:24 145:14 146:5 253:8
**mgottlieb** 5:9
**michael** 5:5
**michaela** 5:13 16:22
**middle** 28:8 231:25
**mike** 16:19
**million** 95:19 95:24 346:10 348:1
**mincing** 277:3
**mind** 92:22 107:24 170:11 170:12 174:24 220:12,13 325:24

**mindful** 32:11 38:22 40:12 42:3
**mine** 52:13 76:18 87:16 129:5 293:25
**minus** 345:24
**minute** 197:13 276:10
**minutes** 131:9 131:16 153:15 232:5 255:15 255:18 290:17 315:11 334:8,9
**miracles** 130:12
**misapprehen...** 312:9
**miscellaneous** 156:16
**misconceptions** 312:9
**misconduct** 64:6,23 74:22 75:6,14 88:6
**misheard** 183:11
**missed** 233:11
**missing** 233:5,6
**mission** 39:25 97:7 98:7 275:12
**missions** 355:21
**mistake** 206:7 313:24
**mistaken** 29:3 144:3 203:4 313:24
**misunderstan...** 211:21 212:1
**mitchell** 208:13 208:23
**mitra** 8:6,11 18:1
**mix** 213:10
**mixed** 81:20 308:21 329:23
**mode** 329:4
**modems** 81:23
**molecule** 222:4
**moment** 24:25 29:4 84:20 85:8 119:2,7,13 149:7 183:2 185:8 186:24 195:15 199:24 204:5 225:25 289:1 292:3 293:1 307:15 340:22 354:3,7
**moments** 31:2 177:14 292:22 292:22,24,25 293:4 294:2
**money** 39:14 171:13 284:2 284:23 285:4,6 345:13 347:4 347:25
**monica** 6:15
**month** 72:18 96:23 296:5 343:6
**months** 108:12 296:10,19 306:2,5
**morning** 16:4 16:19 18:8,21 18:22 124:12 130:18 337:1
**mortified** 178:9 178:18 179:5
**mortify** 177:6 178:21
**motherhood** 184:22
**motion** 316:23 317:2
**motivation** 310:25
**motivations** 310:22 311:1,3
**move** 114:19 209:18 222:8 341:2
**moves** 39:8
**movie** 30:5,9 30:10,15 91:13 95:18,18,19,20 96:9,15 97:20 98:1 124:17 125:23 126:21 128:14 137:9 143:25 144:3 151:8 164:4,23 166:11 171:7 172:17 173:9 174:18 177:9 189:2 200:20 201:25 213:9 219:14 221:18 221:21 223:19 224:17 232:15 232:25 248:9 261:9 275:10 276:20,21 277:5,17,23,23 279:4 280:3 284:8,15 285:19 286:10 288:4 300:18 320:2 328:7,19 330:20 331:3 336:2,18,22 337:4 340:18 340:25 341:11 341:17 352:16 355:23
**movie's** 306:1
**movies** 36:1,20 37:11 39:11 43:18 96:21
**moving** 246:11 246:17 254:13

**mr.baldoni** 164:2
**multiple** 19:9 95:25 107:6,15 112:16 116:1 119:25 120:9 125:13 245:8
**musiol** 256:23
**mute** 220:16,16
**mutual** 25:15 155:11,20 156:10
**mutually** 27:5

**n**

**n** 3:1 4:1 5:1 6:1 7:1 8:1 10:1 11:1
**naked** 19:16 20:21,23 119:15 299:25
**name** 16:7 22:25 23:12,19 29:8,23 103:13 107:6 110:23 110:24 111:1 156:23 157:17 205:25 226:13 226:16,17,19 227:10 243:11 244:2 311:8 328:10 331:18 359:2,3
**named** 111:2,6 244:1
**names** 47:21
**nannies** 149:11
**narcissism** 139:7
**narrative** 30:16 319:21,23,25 321:17,21 324:14,23 335:25 336:16 340:24
**natasha** 302:13
**nathan** 6:5 7:3 8:3 11:3 14:24 229:11,21 303:13 304:21 312:23 315:22 321:12,20,25 335:16 336:11
**nature** 60:2
**near** 53:12 348:2
**nearby** 203:25
**nearly** 166:21 172:16 260:13
**necessarily** 21:17 39:8 60:1 284:13
**necklace** 221:8
**need** 25:23 80:24 122:6 123:4,5 130:1 169:23 210:12 211:18 232:9 246:24 255:9 255:16 313:6 313:10 326:18 327:4 329:16 329:17,18 348:14,15 355:17 356:19
**needed** 27:21 151:8 234:19 234:23 356:1,4
**needing** 271:25
**needs** 67:22 68:20
**negative** 89:17 217:4 253:4 319:4,6,13 340:5,16
**negotiable** 84:9
**negotiated** 152:8,24
**negotiating** 151:23
**negotiation** 158:15 231:8
**negotiations** 155:25
**neurodiverge...** 204:21 205:20 207:5 209:19 210:16 211:2
**neurodivergent** 205:4 212:18
**neuroscientist** 107:19
**neurosurgery** 169:9
**neustaedter** 225:8
**never** 28:20 69:6,8,9 70:20 78:19,19 81:16 83:1 86:11 88:10,13,24 90:19 100:3,10 100:15,20,25 133:10 134:7 197:6 205:22 206:25 207:3 207:13 213:24 214:13,18 265:8 268:5,12 268:22 307:17 309:15,18 320:15,23 331:23 342:20 350:1,6,9,14
**new** 1:2 2:2 3:21,21 6:8,8 8:21,21 53:8,10 53:11 67:7 69:6,10 70:23 71:8 73:5,10,14 109:2 163:18 165:10 214:9 220:24 221:20 234:19,24

235:3 305:7 320:10 353:4,7 359:1
**newly** 166:21 254:6
**news** 317:7 318:14
**nice** 36:9 85:23 85:25 128:21
**night** 28:9 173:20,22 290:1 293:10 355:19
**nine** 96:4
**nodding** 223:18
**nods** 147:3
**nomore.org.** 355:12
**non** 216:21
**nonresponsive** 222:9
**normal** 179:11 293:21
**norman** 101:3 101:6,7,17 102:1,4,6,10,22 103:22 105:9 105:23 106:3 108:7
**norman's** 101:15 104:2 106:9,23
**northwest** 5:18
**nos** 46:17 135:3 153:10 164:14 187:7 197:10 208:10 218:17 242:13 267:14 270:21 275:24 288:11 312:23
**notary** 357:17 359:25
**note** 17:22 96:24 97:3,6 98:10 153:9 188:3 192:21 334:6
**notebooks** 351:15
**noted** 334:13 357:5
**notes** 87:16,22 97:1 162:21 171:18 176:11 176:16 187:17 187:20,22 351:14 358:16
**notice** 2:20 154:20
**noticed** 239:23
**noticing** 16:18
**noting** 131:16
**notwithstandi...** 311:5
**november** 152:13 242:16 243:16 256:10
257:14
**nuanced** 105:19
**nuclear** 262:14 262:22 280:2 281:5,25 282:18
**nude** 19:20,22
**nudity** 150:19 151:3,13,24 152:5,10,25 158:13,15 159:12 160:7 160:18 249:14
**null** 211:11,24
**numb** 38:25 39:1
**number** 35:22 36:16 102:9 108:11 117:10 118:10,16 135:13 156:16 210:22 245:7 256:9 272:21 322:7 330:19 344:11 345:25
**numbers** 135:21
**numerous** 300:22

**o**

**o** 11:1,1 13:18
**o'clock** 338:3
**o0o** 16:3
**oath** 18:6 117:23 118:1,2 203:3,5 225:7 358:7
**objected** 323:3
**objection** 22:15 23:6,15 24:10 26:9,25 27:12 27:20 28:12 29:9 31:10,18 31:25 33:5,12 34:9 35:3 37:17 38:19 39:20 41:5,14 42:5,12,19,25 43:19 44:22 45:14,22 46:6 48:2 49:9 55:9 56:17 57:1 61:10,25 62:17 64:14 65:1,12 65:25 67:5 68:11,18 69:2 69:15 71:5,11 71:24 73:17 76:20 78:5 79:14 80:18 81:6,14 83:5,10 83:18 84:11,16 84:22 99:16 100:23 102:19 104:10,18,18

105:2 106:18
107:10,17
109:18 110:7
110:11 112:1
112:18 113:6
113:16,25
115:10,19
116:5,12 117:4
117:11 119:5
119:14 120:3
120:12 121:4
121:12,24
122:9,14,18
123:8,23
125:10 126:19
127:1 132:1,19
132:22 136:21
138:2 140:21
141:8 143:1,6
143:24 144:9
144:16 145:5
146:14 147:8
148:16,21
149:18 150:3
150:22 151:6
151:16,25
152:3 155:23
156:12 157:5
157:10,16
161:1,6 162:3
162:16 163:20
163:23 165:14
166:12 167:16
167:24 168:23
170:22 173:1,7
176:3 178:3,24
179:8 183:19
186:4,13,18
190:6 191:11
191:14,17
192:3 194:9
195:1,9 196:14
198:24 199:7
199:25 202:7
203:11 204:22
205:21 206:12
206:22 207:6
207:16 209:6
211:12 212:4
212:13 213:4
213:23 214:6
214:17 215:3
215:12 217:1
217:20 218:2,9
222:2,17,22
223:21,25
224:4 225:16
225:22 226:14
226:22 227:4
227:12,18,21
228:21 229:1,4
229:16 230:5
236:8,20 237:4
237:19 238:10
238:17 239:8
240:5,15,24
245:10,25
247:13 248:11
248:22 249:2
249:21 250:5
250:10,17,23
252:17 253:14
258:2,12,24
259:19 260:1
260:16,20
261:1,20 263:6
263:17,24
264:6,13,18
265:2,12 266:5
266:18,25
268:20 269:10
270:14 272:25
274:1,8,15,24
275:7,16
277:25 278:14
279:6,14,20
280:13 281:6
281:12,20
282:3,19
283:10,19,19
284:9,20 285:5
285:20 286:2,6
286:12,18
287:2,14,18
288:2 289:3,10
290:19 291:2,8
291:24 292:12
292:20 293:11
293:19 296:24
297:15,22
298:8 300:11
300:21 301:9
301:22 303:2
303:22 304:23
305:4,21
306:14,20
307:12,23
308:4,18
309:10,23
310:7 311:9,15
311:22 312:12
312:18 316:16
316:24 317:9
317:15,24
318:16,22
319:16 320:12
320:19 321:23
323:4 324:4,15
324:24 325:6
326:20 327:12
330:2,22 331:9
331:19,24
333:3 337:18
339:5,10 340:9
341:13 342:9
342:18 343:10
344:14,19
345:7,8,15,16
346:25 349:19
351:16 352:4
353:9,19,24
354:5,11

**objections**
358:9

**objective** 41:19
246:14

**obligated** 62:9 68:6
**obligation** 284:25 285:1
**observed** 246:24
**obviously** 30:20 323:16
**occasion** 162:13
**occasions** 116:2
**occur** 65:22 254:16,17,18 273:24 274:4 274:12,20 307:7,20
**occurred** 24:14 86:21 95:3 99:4 100:8 106:12,15,16 123:21 145:11 178:23 214:13 214:19 230:14 250:21 272:22 274:14,21 293:9 299:1
**occurring** 85:14
**occurs** 43:18
**october** 1:21 2:23 13:4 14:4 15:4 16:2,6 181:6 358:22
**odd** 118:11,12 118:15 120:15 341:25
**offense** 114:10
**offensive** 59:5 59:20 60:16 145:4 209:18 226:3 341:2,9
**offer** 6:12 151:23 308:23
**offered** 95:11 130:22 184:20 337:20
**offering** 210:22
**offhand** 254:20
**office** 126:4,16 128:2 161:9 164:25 170:7 174:13 278:25
**officer** 56:11
**officers** 56:6
**offices** 2:20 53:7,9,11
**official** 13:17 50:19 67:14,16 67:21 122:1,6 122:17 164:19 165:7,8 257:5 317:20
**officially** 32:14 137:22 210:11 211:18 212:3
**oftentimes** 39:6 114:18,20 128:21 180:1 208:1
**oh** 25:1 43:11 139:2 140:3 153:24 171:1 171:24 177:5 177:14 178:20 183:10 184:17 203:22,25 219:23 221:6 238:24 288:21
**okay** 20:5,11 20:17 22:24 24:17 25:22 26:2,16 27:16 28:14,17,20 29:1,25 30:11 31:4 33:16 34:4,6,7,12 35:6,16 38:10 41:9,24 43:15 43:24 45:7,19 46:10 47:18 48:22 49:20 50:24 51:17 52:3,15 53:11 53:17 54:3,7,14 55:14 57:20 58:2,17,21 59:22 60:24 62:3 64:24 66:12,25 68:23 69:5,25 72:2,19 73:1,20 75:3,24 77:2 78:9 80:6 82:5 84:13,19 85:22 86:1 88:5 91:14 92:3,6,11,14,24 93:17 97:21 98:21 99:21 100:8 101:3 102:6,9,17 103:10 111:2,6 111:18 113:10 116:1,23 117:9 119:19 120:17 121:3 122:21 123:4,18 126:12 129:5 132:9 134:14 135:1,12 136:18 137:2 138:7,20 139:5 141:24 145:24 147:21,25 150:9,17 151:18,21 153:3 154:14 154:19 156:3,8 157:23 158:9 158:21 159:2 159:16 160:17 160:22 161:3 161:12 163:15 163:25 164:24 165:2,24 166:2 168:4,9,25

169:3,7 175:15 175:18 179:3 180:4,10,24 182:3 184:2 185:7 186:16 186:25 187:15 188:3 190:21 192:12 199:9 201:23 202:5 204:18 205:16 207:22 208:17 214:12 220:9 223:17 226:5 236:12 237:20 238:14 239:13 241:12 242:19 243:13 245:14 247:8 251:22 255:5,21 257:6 257:9,20,22 258:8 259:2,23 262:8 267:10 268:7,15 270:16,24 272:11 276:4 279:24 285:9 288:7,19,22 295:19 296:22 299:21 304:17 312:20 313:15 314:15,16 315:17 316:5 316:20 318:12 326:17 335:2,9 336:4,7 341:20 349:11 352:7 352:10 356:17

**old** 77:17

**older** 21:21,22

**once** 20:3 30:7 30:7,8 84:13 123:25,25 129:21 150:15 153:12 175:4 208:14 242:17 247:23

**one's** 77:4 90:17

**ones** 19:2 54:8 54:11 129:11 138:1 189:17 189:20 351:20

**onesie** 230:16 230:17 231:6

**onesie's** 231:7

**ongoing** 91:2

**open** 80:25 114:19 202:22

**openly** 82:6,7

**operative** 329:16

**opinion** 105:3 105:16

**opinions** 40:9 41:12 50:3

**opportunities** 51:20 59:10

**opportunity** 23:10 75:16

**opposite** 122:2

**option** 163:3

**optioned** 200:10

**options** 64:5

**order** 17:24 39:2 67:20 79:12 122:7 206:20 227:10 246:21 324:22

**organization** 32:10,12,15 49:2,12 50:2,8 50:10,16,19,23 134:4

**organizations** 50:15

**orgasm** 176:20

**original** 72:22 183:10 200:11 320:1

**originally** 31:6 200:10 341:3

**originating** 30:12

**ought** 84:15 119:4 301:7

**outfit** 221:3 223:16

**outlet** 293:23

**outlets** 320:5

**outline** 175:1

**outlines** 174:20

**outloud** 171:4 204:11

**outside** 105:14 107:3 116:10 138:21 139:3 151:8 182:13 342:21

**overall** 190:15 277:4

**overrun** 292:8

**oversensitive** 294:2

**owes** 132:16

**own** 40:9 41:11 41:11 44:10 69:20 139:4 195:15 199:10 211:1 213:9 280:24 328:5 337:25 340:14 340:22 342:6 354:14 356:9

**ownership** 347:2,7,11

**p**

**p** 3:1,1 4:1,1 5:1,1 6:1,1 7:1 7:1 8:1,1,16 10:1,1 11:1,1

**p.m.** 2:23 93:18 94:11 133:22

136:2 137:5 138:8 139:22 140:4 141:11 144:20 181:2,9 187:16 209:9 211:8 224:11 224:14 235:17 243:24 255:25 256:3 271:14 290:2 292:7 294:9,12 295:6 295:9 326:3 327:2 334:2,5 352:9,22 356:23,25
**pacific** 16:5
**page** 12:5,11 13:6 14:6 15:6 47:16 51:4,6,17 51:19 54:15 58:2,3,22 62:23 67:24 68:24 73:20 92:16,17 93:17 122:23 135:25 136:1 142:2 153:23 154:6,20,21,25 154:25 156:15 156:18 165:25 165:25 166:3,4 166:18 169:7,7 169:8 173:13 187:16,19 218:21 219:12 219:23 220:9 220:19 234:1 235:17 237:1 247:5 256:7,8 276:18 279:24 290:3 314:6 323:21 338:3,3 359:5
**pages** 46:22 174:22 235:4 244:15 313:7
**paid** 108:14 268:11 345:2,5 346:13,15 347:6,7
**paint** 174:24
**palace** 126:2,9
**pants** 119:18 203:20,23 221:8
**paragraph** 54:16 55:13,14 56:3 57:14 59:23 64:12 89:9 122:23 252:21 253:21 255:1 261:25
**paragraphs** 57:23,24 167:3
**paraphrasing** 324:7
**paraxanthine** 222:5
**park** 2:21 4:8 5:7 7:11 8:8 16:11
**part** 28:2 39:25 43:13 50:9 67:9 68:20 76:23 79:21,22 88:1 89:16 104:14 108:11 115:7 123:21 128:6 166:11 217:2 225:6,11 258:20 270:2,3 279:8 280:14 281:13 282:24 298:15 324:1
**participated** 235:6
**participating** 74:4
**particular** 191:16 284:3 321:9 324:14
**particularly** 292:7
**parties** 17:15 17:17,21 18:1,3 358:18
**partly** 43:2
**partner** 36:3 40:2 84:4 95:17,22 256:25 257:1 340:11
**partnered** 325:14
**partners** 284:25 342:2
**parts** 70:10,11 225:5
**party** 1:11,12 2:11,12 254:7
**pass** 110:14 129:11 340:22
**passed** 128:12 128:17,23 130:24
**passing** 128:15 340:11
**past** 67:15 199:16 257:21
**pattern** 289:16
**pause** 275:6
**paused** 231:21
**pay** 141:2 171:13 184:20 347:11
**paying** 140:19 172:24 345:13
**payment** 346:4
**payments** 348:9
**pearl** 197:12,18
**pen** 313:25
**penalty** 358:20
**penthouse** 126:4 173:20

**people** 26:7 27:4 32:23 39:12 44:9 45:11 56:24 70:3,5 80:14,24 92:15 96:4,21 98:4 102:9 111:22,23 112:4,8,16 113:11,23 114:5,7,11,20 115:16 118:10 118:16 119:25 120:9 121:9,16 128:8,22 129:10 133:9 138:10 139:25 141:7 142:17 142:22 145:7 146:23 149:9 149:15 160:24 162:7 163:16 170:19 206:18 211:3 212:17 212:19 221:13 221:19 228:18 230:3 235:22 235:24 236:4 245:8 254:25 255:20 264:11 265:16 269:24 282:7 306:17 306:22 330:20 333:6 339:24 343:20 356:11
**people's** 39:15 140:19 141:2
**perceive** 21:13
**perceived** 274:5,7
**percent** 30:16 37:5 41:21 205:9 338:15 346:1
**percentage** 347:21
**perfect** 42:7 213:7
**perfectly** 172:5 307:13
**perform** 121:15 299:25 300:6
**performance** 59:8 60:15
**performances** 193:21
**performed** 105:20
**period** 82:9 147:23 165:13 200:14 226:6 263:1 319:15 343:12 349:24
**perjuring** 119:24
**perjury** 120:6 358:20
**permission** 27:22
**permitted** 89:21
**person** 21:13 43:6,12,16 44:16 52:11,12 53:4 54:1,22 68:15 84:14 87:19 105:17 110:18 112:25 119:3 123:11 128:6,9 141:25 161:4,10 177:10 181:22 182:20 195:17 201:7 225:15 253:24 265:5 273:14 278:24 279:3 280:4 282:2 290:11 308:6 334:25 341:22
**personable** 308:22
**personal** 30:15 69:19,22 177:5 177:13 178:12 178:14 179:7 179:13 288:23 300:25 301:1 303:7 350:14 355:15
**personality** 292:8
**personally** 69:8 69:12,14 179:5 228:22 250:6 260:8
**personnel** 63:7 63:13 264:4
**perspective** 71:17,22 110:4 132:25 191:21
**phase** 97:19
**phelps** 4:4 16:25 17:5
**phenomenal** 87:21
**phillips** 4:4 16:25 17:5
**phone** 77:18 96:3 97:24 161:5 162:6 181:24 182:2 184:3 195:23 243:12 267:4,7 267:23 268:1,3 271:7 272:13 295:1
**photo** 309:16
**photography** 151:19 152:16 245:20
**physical** 58:19 58:25 114:6 169:23 249:13

251:9 254:11
**pick** 48:13
**picket** 228:13 228:15,17,23 229:13,14,18 230:4
**picture** 70:24 174:24 213:11 218:22 220:10 220:20 223:13
**pictures** 107:22
**piece** 24:21 44:2 192:2 232:24 239:14 320:18
**pieces** 344:11
**pissed** 138:11
**place** 45:20 46:1 66:20 124:13 126:5 145:14,16 180:14 226:18 236:13 292:3 293:23,24 296:11,13,18 298:3 306:23 317:3 327:21 358:6
**placed** 272:24
**places** 39:15 129:21 171:10
**plaintiff** 1:6,11 2:6,11,19 4:3 5:3 6:3 16:15 16:21,25 17:5
**plaintiffs** 1:14 2:14 3:3
**plan** 200:11 254:9 260:19 260:22 312:16
**plank** 108:18 108:19 109:15 111:7
**planning** 303:14,20 304:3,19,21 311:20 316:1,6 316:14,22 320:15 321:12
**plant** 324:22
**play** 115:9 146:6,10 147:6 147:13 171:25 224:16 287:25
**playbook** 280:7
**played** 224:18 288:4
**playing** 172:19
**please** 16:16 18:5,11 110:24 125:2 132:10 153:7 159:3 208:14 239:4 255:23 257:20 281:17 295:4 317:17 333:25 339:15 347:10
**pleased** 86:1
**plot** 39:8
**plug** 284:15
**plus** 345:24
**pockets** 132:18 132:21
**podcast** 30:21 30:25 31:1 101:21,22 108:20 110:5 110:13,19 111:4 205:17
**point** 25:16 69:23,23 95:15 97:10 103:18 109:17 111:21 112:7 120:20 122:22 125:16 131:22 132:2 134:2 147:11 149:1,17 155:13,14 156:21 160:19 161:9,21 165:6 176:14 196:10 197:4 199:14 201:17 205:17 210:13 211:20 212:3,25 213:5 213:8,18 216:9 227:14 231:12 232:1 245:6 247:10,25 257:17 259:18 261:15,16,22 262:22 263:3 277:1 282:10 282:11,15,20 283:1 284:10 284:12 290:24 291:4 297:21 298:21 299:4,7 299:11 302:9 304:17 305:7 306:7 307:4,17 308:24 311:7 327:24 328:3,9 329:5 337:11 337:14 348:22 353:14
**points** 247:5,17
**policies** 45:19 45:23,25 46:3,8 51:13 349:13 349:17
**policy** 51:21,23 52:1,2,4,6,20 53:22 54:24 55:7 57:16 58:4 61:17,22 62:8 67:20,25 68:5,15 72:19 73:23 74:6,16 74:22 75:7,14 115:3 121:23 122:8 123:1,3,5 123:6,10 350:6 350:12

**polluted** 76:18
**pop** 333:15,22
**porn** 77:22 78:14 79:9 80:12 81:18
**pornographic** 76:24
**pornography** 76:8,10 77:4 79:20 80:23 81:1,5,8,13,17 82:9 83:2,15
**portion** 301:16
**pose** 36:24
**position** 106:3 108:11 180:3
**positioned** 202:6
**positions** 40:13 42:3 286:10
**positive** 324:2 324:18 340:4
**possibility** 79:2
**possible** 116:22 191:22 200:21 213:14 234:4 247:11 282:10 307:2 329:4 337:12 353:6 353:10
**post** 99:13 100:1 123:14 219:8 221:11 320:10 322:5
**posted** 223:14 353:14
**poster** 328:12
**posters** 306:3,4
**posting** 94:21 222:7 223:9 352:2,15
**posts** 216:6
**potential** 53:20
**pouring** 356:12
**power** 21:14 40:13,13 42:3,4 42:10,13 115:8 185:18 260:8 260:23 285:18 286:10,17,20
**powerful** 21:14 21:15,16 119:3 193:22 282:7 308:20,21 329:6
**pr** 14:23 318:3 337:23 354:17
**practical** 36:5
**practice** 111:21 112:3,3,8,10
**prather** 11:6
**pray** 129:23 130:9,11
**prayed** 125:9 125:22 126:18 130:19
**prayer** 127:17 130:22
**prayers** 14:16 256:16 270:19 271:3
**pre** 72:25 97:13 97:15 144:5 161:8 182:8 245:20
**predecessor** 101:10
**preface** 329:14
**pregnancy** 55:22
**pregnant** 148:4 148:5,11
**premiere** 208:25 209:3,4 213:13 305:19 305:20 306:8 306:12,19 307:11,22 308:8 309:7,21 310:6,18 337:20 354:14
**premise** 38:13 44:1,2,19
**prep** 164:22
**preparation** 227:17 228:1
**prepare** 312:16
**prepared** 146:20
**preparing** 213:16
**present** 11:21 18:2 65:15 106:16,21 114:20 149:7 248:1,6,17 249:5 268:10 302:25
**presentation** 53:25
**presented** 102:16 340:23
**preserve** 348:23 349:5,7 349:8
**preserved** 351:12
**president** 48:18 92:12 96:14 332:20,22
**press** 91:2 157:24 217:4 219:14,25 220:1 229:12 262:13 292:5 305:8,12 322:20 324:13 342:3 354:10 354:13
**pressure** 252:1 297:20,25 298:2
**pressured** 309:8

**presumably** 101:4
**presume** 94:20 138:6
**pretty** 221:16 263:5 266:1 280:22
**prevention** 299:8,13,17
**previous** 58:2 72:20 125:20 128:2 190:8 279:24
**previously** 49:8 65:7,11 207:9 271:4
**price** 96:21
**primary** 195:10
**principals** 56:6
**principle** 151:19 152:15
**principles** 32:13,21 34:13 151:23
**print** 317:22
**printed** 306:3,4
**printing** 339:3
**prior** 24:22 52:19 86:8,13 100:19 124:17 149:22 150:13 150:18 151:2 151:12,17,18 152:8 157:1 158:14 162:13 197:21 309:14
**private** 70:15 182:19 354:21
**privately** 217:10,11 337:7
**privilege** 228:6
**privileged** 98:20
**probably** 22:13 41:7 82:3 170:10 204:6,9 216:8 220:6 225:23 226:18
**problem** 38:17 80:25 212:23 338:23
**problems** 88:11 88:14,21,25
**procedures** 45:20,23,25 46:3,8 51:13
**proceedings** 16:1,10 358:5
**process** 87:15 174:25 246:8 293:8
**procter** 95:23 96:3,6
**produce** 348:16
**produced** 86:25 89:13 156:4 232:22 232:25 313:5 315:6 348:12 348:14,15 351:22,23
**producer** 19:13 20:20 34:19 88:1 89:15 143:12 147:18 147:19 245:2 254:7 285:16 328:7
**producers** 44:7 44:8 165:22 171:16 246:25 254:5 332:19
**producing** 95:17
**product** 216:7 228:6
**production** 13:17 52:24 53:7,9,11 87:6 88:12,22 89:22 92:4 97:9,13,15 112:23 113:20 121:1 134:16 141:23,25 144:5,23 150:19 151:3 151:13,18 161:8 164:20 164:25 172:25 175:4,10 180:22 182:8 189:4 205:14 229:5 244:14 245:20 246:15 246:22 253:25 254:19 257:17 257:24 263:21 280:21,22 286:17 340:1
**productions** 87:9
**products** 216:24 217:7 217:19,25 218:7 223:19
**professional** 109:16
**professionals** 179:12
**profile** 353:18 353:23
**profit** 347:22 348:2
**profitable** 347:23
**profits** 345:21 346:18,21,23 347:13
**program** 162:1 162:9,12 163:16
**progress** 63:21 171:3
**prohibit** 58:15

**prohibited** 56:7
**prohibits** 54:18 58:7 61:22
**project** 284:3 284:22
**projects** 48:20
**promise** 47:10 315:11
**promised** 297:10
**promote** 91:13 276:22 277:5 277:16 280:3
**promoted** 217:8 277:23
**promoter** 215:21
**promoting** 216:23 217:24 218:7 219:24 221:18,24 222:13
**promotion** 216:10 221:17 222:1,15 223:7 277:8 306:9
**promotional** 253:6 333:8
**promotions** 216:1
**prompt** 64:7
**prompting** 20:8
**promptly** 63:5 74:12 247:19
**pronounce** 103:12 244:2
**proper** 29:14
**properly** 319:22,23,25
**proposed** 304:11
**proposing** 304:22
**proposition** 37:25 277:10
**propounded** 358:9
**protected** 55:8 55:15,17,19,25 228:6 304:12
**protection** 316:9
**protections** 244:14,21 246:23 257:24
**protective** 17:24
**provide** 106:2 127:20 316:9
**provided** 192:14
**providing** 319:20
**provision** 157:4 157:9
**prowess** 61:8
**public** 26:17,24 67:17 91:6 212:15 250:3 263:11 290:11 290:23 312:17 328:19 341:23 357:17 359:25
**publication** 41:1
**publicist** 206:18 216:14 243:21
**publicists** 205:17
**publicity** 253:5
**publicly** 20:16 30:2 33:9 76:7 76:22 77:3 82:6 213:1 217:9,10 291:15 308:6 312:8 337:3
**published** 69:10
**pull** 285:2
**pulled** 284:15
**pulling** 132:17
**purely** 341:1
**purging** 290:7
**purpose** 59:3,6 59:19 60:12 176:25
**pursuant** 2:20 17:24
**push** 199:16
**put** 38:24 43:1 60:9 70:24 171:22 197:3 210:9,10 211:16 226:16 226:19 266:19 302:17 316:23 317:2 327:5 346:12 358:7
**puts** 163:5
**putting** 96:7 170:12 188:16 188:17 353:22

**q**

**qualified** 63:6 355:18 356:5
**qualify** 111:23 250:25
**qualities** 130:3
**question** 20:7 20:13 29:15 31:7 32:6 34:11 36:25 38:22 40:15 43:21,24,25 45:6 53:16 71:20 74:24 75:22 79:10 88:24 93:16 100:18 108:2 109:19 112:6 112:11 113:17 116:25,25

121:18 125:3 127:3,21 131:8 131:18 132:12 133:25 150:24 151:9 161:25 168:1 171:5 183:10,24 189:23 190:8 201:17 207:18 207:23,24 211:16 214:21 222:11,19 223:5 224:1 230:24 237:21 258:22 298:10 310:10,20 321:3 325:1 326:11,22 327:13,19 335:3 339:14 339:20 356:7
**questions** 46:25 57:23,25 70:1 70:25 104:16 135:15 153:13 208:15 258:17 276:11 303:18 315:12,12 320:14 322:20 336:6 339:13 358:9
**quick** 125:2 255:14
**quickly** 292:23 336:6
**quinn** 3:5,16 17:7,9
**quinnemanue...** 3:12,13,22
**quit** 109:7,23
**quite** 122:1 202:4 231:12 269:2
**quiz** 47:9
**quotation** 210:12 211:19
**quote** 40:25 80:1 206:21
**quotes** 210:9,11 211:17

**r**

**r** 3:1 4:1 5:1 6:1 7:1 8:1 10:1,5 11:1
**rabbit** 66:5
**raise** 18:11
**raised** 96:12 124:22 192:17
**raises** 35:22 36:16
**raising** 252:25
**ran** 33:16 111:4
**randolph** 296:5
**range** 13:10,21 13:22 14:10 61:1
**raped** 24:4,5
**rare** 133:5
**rather** 263:22 317:21
**reach** 63:14 109:25 110:15 147:5 308:9,12
**reached** 210:19
**reaching** 355:16
**reaction** 306:11
**read** 30:7 35:6 35:14,19 36:11 36:12,13 37:2,7 37:9 51:23,24 52:2 54:17 55:10,13,14 56:4 57:15,19 57:21,22,24 58:6,23 59:2,15 59:24 60:11,25 61:5,14 62:6 63:2,11,18 68:3 69:6,8,9,12 72:6,8,11,13,16 72:20 73:1,4,24 75:4 76:12,13 77:15,16 78:10 79:5 80:2 89:4 89:11 90:21,23 92:22 93:4,19 94:12 103:8,15 109:9 122:24 136:3 137:6,14 137:22 138:9 139:6,24 140:7 140:13 141:13 142:4,12 143:2 144:25 154:2 155:10 156:22 158:12 159:24 164:6,9 166:20 169:17 174:2 176:15 180:17 188:5,15,19 189:7 193:3,11 193:19 194:16 197:13 198:3 199:13 208:19 209:16 219:13 219:19 220:11 234:3,6,12,23 235:2,11,20 244:25 245:16 246:5,20 247:6 247:17 249:10 251:24 252:22 253:23 254:4 257:19,22 258:9 259:3,8 259:12,16 260:6 261:10 261:11 262:11 267:3,23 268:1 268:3,18 269:3 270:22 271:23 272:12,13 273:8,18

276:10,12,19 280:1 281:10 282:15,21 288:19 290:9 290:25 292:16 293:1 294:22 296:9 297:1,11 298:12,14 310:12 313:10 314:12,14 323:13 327:3,8 329:8 335:24 336:5,15,24 338:5,14 352:12 355:2 357:3
**reading** 70:10 70:11,12,13,16 73:8 75:2 89:24,25 91:8 99:18 143:5 175:2 247:19 247:22 267:7 269:19 272:10 295:18 304:7 315:10,15,15 325:24 340:12 356:15
**reads** 58:5 59:23 62:5 63:1
**ready** 28:3 203:19 232:1,3
**real** 125:2 273:21
**realized** 136:7
**really** 35:23 36:4,4,9,17 112:13 129:7 129:10 175:8 177:13 188:9 200:25 210:25 212:20 232:9 233:25 299:19 339:2 342:5
**reason** 30:9 31:1 67:12 133:1 195:11 202:24 208:1 211:16 224:3 226:25 227:1,6 227:9 252:3 266:2 268:17 268:25 289:20 307:8,21 309:5 313:2 315:18 337:20 359:5
**reasonable** 63:14,21 248:19 249:16 249:18 260:15 260:24 282:9 291:11
**reasons** 32:15 71:15,19,20 277:19,21 278:2
**recall** 20:7 40:5 52:19,22 59:13 59:17 70:11 77:5 78:1,15 84:19,25 85:3 85:10,11 88:3 89:24,25 94:21 94:24 107:6,20 109:12,13 115:5,6 120:25 126:24 131:19 131:21 132:15 132:17 150:9 152:17 153:2 161:4,5,7 162:20 170:18 175:20,21,23 176:8 179:4 182:3,5,17 183:23 184:5 195:25 201:23 202:11 214:25 221:23 222:12 223:6,9,11,15 223:17 237:2 238:15,18,21 238:24 239:2 239:19,25 240:3 242:4,7 247:19,22,24 258:16 266:12 269:4,8,14,18 278:6 286:22 287:3,6,10,12 287:15 298:20 298:25 299:7 299:11,15 300:12,16 301:5 303:12 303:21,23 304:2,9,19 316:5 322:7 323:3,11 335:18 342:24 343:14 348:17 352:1 353:2,12 353:18 354:20 354:24 355:2
**received** 149:23 150:13 189:10 193:6 194:19 194:23 214:15 247:20 257:17 340:16 346:3 348:9
**receiving** 59:13 59:17 185:10 223:6 249:25 355:14
**recent** 49:23
**recently** 128:12 297:5
**recess** 76:3 133:20 181:3 224:12 256:1 294:10 295:7 334:3

**recipient** 116:18
**recognize** 46:24 188:6,20 220:23 242:23 293:7
**recognized** 274:14
**recognizing** 144:7
**recollect** 127:13 240:19 240:19
**recollection** 41:3 80:3 85:13 123:24 124:19 134:10 134:20 152:23 160:17 162:24 165:3 167:11 167:20 168:12 175:25 178:22 179:3,19,20 180:5,6,7,21 183:1 184:17 201:13 203:12 238:4 239:15 261:24 265:6 268:8 321:19 324:10 344:10
**recommendat...** 106:8
**reconciliation** 84:2
**record** 16:5 17:22 46:12 76:2,5 91:17 133:19,22 153:9 180:25 181:2,9 198:11 224:9,11,14 255:22,25 256:3 294:7,9 294:12 295:3,6 295:9 310:12 315:18 317:20 319:9 333:25 334:2,5,7,15,18 335:7 356:23 357:6
**recorded** 1:19 2:18 334:24 358:11
**recording** 16:10 182:8 232:13 233:3 334:22
**recount** 183:11
**recounted** 300:18
**recounting** 97:12
**recounts** 235:5
**red** 159:1
**refer** 33:21 126:9 282:1
**reference** 49:1 141:11 144:19 173:19 189:13 189:25 247:3,4 248:3 249:9 252:13 253:21 259:17,18 269:15 273:4 276:18 291:22 322:18,25 323:25
**referenced** 132:16 144:2 160:24 314:25
**references** 115:4 247:25
**referencing** 291:21
**referred** 134:12 252:5 282:17 291:6 330:11
**referring** 21:20 93:9 94:3 102:24 118:22 136:12,15 139:15,16,19 140:18 152:4 160:10 178:10 189:20 190:4 211:11 259:21 281:11,25 282:17
**reflected** 314:5
**reflection** 236:18 237:2 238:7
**reflects** 35:20 35:21 36:14,15
**refresh** 41:3 80:3 99:22 242:1
**refused** 86:22
**regard** 160:1
**regarding** 125:13 181:13 182:10 317:7 318:14
**regardless** 61:23 84:4
**regret** 66:7
**regretted** 293:17
**relatable** 79:13
**related** 18:1 151:24 189:23 232:11 332:5
**relatedly** 72:2
**relates** 50:8 116:24 130:4 144:4 152:12 200:19 232:25 297:7
**relating** 27:10 30:1 91:3 152:10,19,25 154:16 180:21 263:21 264:3
**relation** 76:22 190:13

**relations** 10:2 17:12 91:6 345:2,5
**relationship** 22:21 25:7,9,10 26:6 29:5 51:1 76:14,19 84:5 90:12 95:8,14 109:16 171:20 172:9,10 307:14
**relative** 358:17
**relayed** 96:18 149:8 189:15 240:20 331:4 332:22 340:12
**release** 98:13 98:15 276:21 277:2,7,17 328:22 333:9,9
**released** 90:24 98:12,18 218:1 332:11,15
**releases** 157:24
**releasing** 277:4
**relentlessly** 216:22
**religious** 49:15
**remained** 108:10
**remedial** 64:5
**remember** 20:3 20:10 40:15,17 49:11 53:18,23 70:12,13,15,16 82:24 83:3 85:14,16,17,18 91:8 104:17,19 105:25 107:11 118:20 119:2 119:10,11,12 119:15,21,21 124:7,10 129:3 132:23 133:1,1 133:3 138:18 139:13 141:14 160:14,16,21 160:22 171:11 176:4 182:25 201:20,22 205:24 226:15 229:17 230:6 237:23 239:9 239:22 258:20 269:11,16,17 269:23 278:10 298:18,22 299:4 300:22 301:10 304:13 304:15 321:14 321:18 322:4,8 323:5,23 325:7 342:7,11,14 343:5,6,25 348:20 352:5 353:16
**remembered** 24:9 27:10 270:8 321:1
**remembers** 138:23 139:9 139:20 270:13
**remove** 141:6 231:9 332:3
**removed** 49:21 90:15,19 226:13,18 328:10,11,11 328:13 330:6 331:3,5 332:21 332:24
**removing** 106:3
**rent** 171:14
**repeat** 37:1 150:24 151:9 237:21 310:9
**repeated** 89:17
**repeatedly** 245:18
**repeating** 217:14
**repetitively** 77:4
**replied** 231:14
**replies** 140:6
**report** 62:9 68:6 106:8,22 106:25 124:6 184:8 192:16 192:13
**reported** 1:23 19:1 63:3 74:11 123:12
**reporter** 2:25 18:5,8,10,17 46:11 91:16 164:11 310:11 317:20,21 320:9 358:3
**reporter's** 358:1
**reporters** 318:2 318:7,11 339:1 340:2,7
**reporting** 44:9 74:1,2 359:1
**reports** 283:21
**reposted** 94:14
**reposting** 94:21
**represent** 16:17 135:8 312:24 313:14 314:3,8 322:10,13 352:7
**representative** 251:5 254:6 319:24
**representatives** 56:7 254:8 286:23
**represented** 56:20 244:18 319:22 320:1
**representing** 18:2

**repulsed** 198:5
**reputation** 278:19 279:12
**request** 91:7 133:14 171:6 252:1 309:20
**requested** 91:4 126:6 328:9 331:5 358:14
**requests** 152:12 253:7 260:14
**required** 348:23 349:5
**requirements** 253:2
**reserve** 246:6
**residence** 254:24
**resigned** 110:13
**resolution** 64:6
**resonated** 329:10
**resource** 62:10
**resources** 40:2 68:7
**respect** 31:7 36:10 59:14 101:12 108:6 111:19 150:20 151:4,14 167:14 183:17 192:24 194:21 196:4,11 214:14 247:11 264:4 299:3 331:7
**respected** 137:7
**respectful** 185:21
**respects** 186:3
**respond** 271:16 273:9 323:9 355:3,21 356:1
**responded** 97:8 177:7 233:11 299:18
**responding** 194:14 326:17 337:16 356:15
**response** 20:13 20:15 168:9 185:9 211:15 233:8 271:18 325:16,23 326:12,16 327:18 338:2 339:1 340:13 348:18 356:11
**responses** 356:8,8,10,13
**responsibilities** 44:5 48:6,9,10 48:12,19 62:4 68:1 69:1 122:13
**responsibility** 43:13 44:10,13 44:15,17 62:16 62:20
**responsible** 42:23 43:5,12 43:16,17 44:24 45:1,3,9,10,15 45:16
**responsive** 351:20
**rest** 36:23
**restroom** 255:13
**result** 83:16 89:22 91:1 93:25 253:6
**resumes** 253:25
**retain** 351:1,4 351:7
**retained** 311:13 344:18
**retaliation** 51:21 52:6,24 53:22 54:20 56:9 63:5 65:14,21 66:9 66:15,22 67:4 67:21 73:21,25 74:10 252:23
**retaliatory** 253:7
**retention** 349:12,17,20 350:6
**retract** 313:19
**return** 214:20 244:14 257:17 257:24 280:19 280:21
**returned** 347:22
**returning** 246:9,22
**returns** 257:23
**reveal** 228:4
**review** 106:7 163:17 242:20 267:18 313:20 315:10,18 358:13
**reviewed** 100:1 227:17,23 228:1
**reviewing** 163:18
**revising** 165:18 165:19
**reynolds** 126:11 149:10 229:13,18 254:24 309:8 327:25 337:2 337:10,15 339:3 340:17 340:17,20 341:10 342:17 342:20,25

**rid** 57:9 98:23
**rider** 152:5 158:16
**right** 18:12 19:21 20:1,4 22:8,19 23:11 23:24 26:3 27:24 31:24 32:18 36:22 37:10 38:13 39:19 42:18 43:9,10 53:15 54:25 56:21,25 57:5,9 61:24 68:17 69:21 71:4,18,23 76:8 76:11,19 83:23 89:7 98:12 101:5 102:18 104:14,17 106:17 107:14 107:23 110:25 111:1 114:24 115:9,18 116:2 122:8,17 140:20 142:2 143:13 145:12 146:7,11,13 148:2,9,12,20 149:24 152:22 155:2,5 158:7 160:4 164:14 166:14 174:20 192:25 194:25 196:2,6,13,21 197:24 198:23 200:22 206:4 208:7 209:5 212:23 215:19 216:20 218:25 219:9,25 221:5 221:14 224:8 226:21 227:3 230:11,13 233:17 234:24 237:9,21 238:2 243:6,10 244:2 244:11,18 250:4 252:11 252:16 253:18 256:10,21 257:14 258:11 258:23 259:5,9 259:15 260:9 260:15 263:16 263:23 264:5 265:20 271:11 271:20 272:2,8 273:25 276:8 276:10,25 277:11,13,14 277:22 278:19 278:25 279:5 280:19,23 284:3,8 285:10 285:12,14,16 288:7 289:2,9 289:23 290:2 290:18 291:1 293:10,18 294:6,23 296:6 297:8 305:3,8 305:13,16,17 305:20,24 306:1,8,13 308:12 311:14 312:11,17 316:2,6 321:13 322:21 324:3 325:19 328:19 329:21 331:21 336:23 339:25 340:8 342:8
**rights** 72:3 155:12,21 156:10 201:2 201:16 246:6
**ripped** 300:10 300:13
**risk** 98:8
**road** 133:3
**rock** 22:11
**roeser** 4:5 17:4 17:4
**role** 42:21 56:21 101:12 101:15 146:6 146:10 147:6 147:13,15 149:22 150:14 152:9,19 154:4 154:16 201:6 287:25 288:4 323:19
**romance** 166:14 174:18
**romantic** 84:5 172:10
**room** 11:21 99:4,14 100:7 100:11,13,21 101:1 131:3 145:20 172:20 174:13 203:24 204:3,11
**roughly** 346:3
**round** 155:25 156:6 213:6 255:9
**rules** 51:2,8,13 229:14
**run** 118:14 195:19 307:3
**running** 292:17
**runs** 110:18
**russell** 144:19 144:20,22,23 145:1
**russian** 141:17 142:17
**ryan** 229:13,18 309:8 327:25 336:1,17,21
**ryle** 147:15 166:9 167:9 169:13,19

172:8,13,19 173:22 175:11 176:19,21 177:1

**s**

**s** 3:1,9 4:1 5:1 6:1 7:1 8:1 10:1 11:1 359:5
**sad** 200:1
**safe** 246:11,16 246:17,21 292:25 293:23 296:13,18 298:3
**safest** 296:11
**safety** 254:12
**sag** 251:5
**saks** 13:15 14:21 120:24 121:8 123:19 124:1 135:10 136:2,12 137:5 137:13,23 138:22 139:5 139:12,16,19 140:6 141:12 142:3,16 143:12,12 144:24 159:10 159:19,20,23 160:9,23 169:5 181:18 182:1,3 182:18 183:3,6 183:7,9,11 184:25 185:10 186:19 187:10 187:16,22 188:2,4 189:16 199:4 233:22 234:16,19 235:1,5,18 236:17 237:8 237:14,22 239:5 294:18 295:14,25 297:5,8 298:7,7 298:12,15,20 298:25
**salaries** 141:3
**sanctity** 184:21
**santa** 6:15
**sarcasm** 253:3
**sarowitz** 7:4 8:4 11:22 33:1 33:21 35:7 36:6 37:14 38:15 40:2 47:18 48:3,25 50:25 56:23 57:5,7 103:8,11 103:12,14 104:8 105:13 283:18,21 295:2 335:22 336:13 347:16 347:19,25
**sarowitz's** 102:25 104:4,7 108:5 284:2
**sat** 19:22 69:9
**satisfied** 321:2 321:9
**savaged** 216:23 217:3
**save** 208:7 320:13 340:21 355:23
**saved** 98:3 165:9 206:1 336:2,18,22 337:4,15 338:6 341:12,18
**saving** 28:1
**saw** 19:10 54:9 54:12 107:25 123:14 168:19 214:9 234:18 329:7,7,8
**saying** 39:13 40:5,15,17 41:23 50:6 78:1,15,25 79:1 81:16 85:10,11 97:6 104:24,25 114:13,14 119:10,11 127:13 130:25 131:20,21 132:15 136:23 141:12 168:16 179:4 182:6,17 194:22 202:11 206:8 207:12 208:1 212:10 213:14 214:5 225:13 229:18 233:10 234:22 235:2 237:3,23 238:15,18,24 239:6,10,15,19 239:22,25 240:3,12,22 241:3 252:21 259:2 260:3 264:20 269:4,8 272:8,20 275:15 277:2 284:19 286:5 287:10 290:1 291:15 292:6 303:18 304:2 309:19 313:10 317:21 319:3,5 321:1 323:6,12 324:1 325:8 336:1,17,24 347:15 355:17
**says** 35:7 56:3 57:18 60:10,24 63:10 68:2,20 68:25 69:14,20 75:3 92:21 93:3 94:11 122:23 137:5

137:12,13 138:8,22 139:5 139:19,23 140:12 142:3 142:10 144:24 154:1 155:1,2,8 156:4 159:23 169:16,19,22 171:4 198:2 199:12 219:18 235:9,10,19 239:6 246:4,19 251:23 256:15 268:13 327:7
**sbenson** 7:14
**scab** 338:22,24 340:4
**scabs** 338:10 339:4
**scan** 210:21 211:5
**scared** 85:6 137:15 198:4 258:6 282:24 292:9,18 304:10
**scary** 306:23 307:5
**scenario** 303:14 303:19,20 304:3,19,21 311:19 316:1,6 316:14,22 320:15 321:12
**scenarios** 53:19
**scene** 85:1 159:12 160:7 166:3,5,8,8 167:9,15,18 168:1 169:8,12 170:23 171:19 172:18 173:5 175:14 176:1,5 177:18 179:6 225:1,8 230:15 230:16,17 233:2 249:24 250:3,14,21 251:2,8,11,14 251:20 262:4 299:22,25 300:7,18 301:8 340:15,18
**scenes** 150:20 151:4,14,24 152:10 153:1 160:18 167:12 167:21,23 168:13,17,20 168:25 171:14 173:9 174:14 174:23 176:11 176:14 177:9 177:11,20 178:2 180:11 225:24 232:18 248:9 249:12 262:6 337:22
**school** 26:3,11
**screen** 156:5 166:15
**screenplay** 155:15,21 156:11 331:15 331:15
**screenshot** 92:18,20,25 243:25 261:6 325:18 327:6
**screenwriter** 150:7
**script** 30:18 149:23 150:1,9 150:12,15 161:16,19 162:2,10 163:1 163:15 164:3,7 164:15 165:5 165:13,25 167:9,18 168:2 168:8,17 170:10,13,19 173:13 174:20 175:2 179:18 180:22 208:5 226:6,12,13 227:10 229:21 250:22 336:1 336:17,22 337:3,16 338:6 338:8 340:20 341:3
**search** 351:19
**searching** 71:10 335:6
**second** 34:22 34:23 54:16,16 89:9 219:23 314:6
**section** 62:23 67:25 73:21 74:20 154:22 155:2 156:15
**see** 39:6 48:24 49:3,18 50:11 50:24 51:4,11 51:16,18 54:15 54:23 55:6,17 55:19,21,24 56:2 57:14,17 57:18 58:4,12 58:17 59:11,22 60:3,7,10,18,24 61:14 62:5,23 63:1,8,10,22 64:1,3,9 68:12 68:23 69:3 73:21,23 74:14 74:20 75:3,9,11 75:17 92:16,17 92:20,25 93:3,7 93:8,18 94:1,10 107:22 135:25 136:10,22 137:5,11,12,17 138:7,13,22

139:5,11,22 140:10,11,16 141:11,19 142:9,10 144:11,19,24 145:3 153:23 153:25 154:23 155:5,8,16,22 155:24 156:4 156:16,20 157:23 158:10 158:17 166:5,7 169:8,10,12,13 169:20,25 173:17,25 187:15,19 192:12,20 193:8,16,24 199:9,12 210:3 215:16 218:21 219:16,22 220:9,20 221:7 228:7 231:6 235:5,14,17 236:1,15,16 237:1 244:23 245:5,14,21,22 246:12 247:1 247:25 248:3 249:9 251:23 252:4,13,21 253:10,21 254:2,25 259:6 259:10 262:16 272:18 273:3,5 273:6,15,22 276:23 280:10 287:9 290:13 296:15 306:11 315:1 322:17 336:3 338:11 338:17

**seed** 30:12 324:22

**seeing** 51:11 70:15 94:5 119:15 200:20 340:19

**seem** 21:14 157:3 207:12 240:10 241:4

**seemed** 104:21 130:16 240:4,8 266:1,7 340:21

**seen** 47:14 100:3 107:24 144:8 176:23 211:3 242:25 243:2 244:7 257:18 288:20 302:3 309:16 327:22 356:3

**select** 48:13

**selena** 327:10

**send** 163:11,16 185:19,22 186:9 187:17 187:20,22 188:2,4 250:6 257:12 260:24 261:8 264:10 327:1,16,20

**sending** 152:17 185:24 196:25 343:14,24 352:21 355:10 356:8

**sends** 243:24

**sense** 39:9 40:8

**sensitive** 263:5 263:22 292:2 355:13

**sent** 72:3,9 96:24 97:4,6 150:10 153:19 154:11 159:20 164:16,24 167:10,22 185:11,22 197:22 218:22 244:14 250:2,9 250:11 260:7 262:25 264:14 294:18 295:13 295:21 316:5 316:14 323:12 325:17 326:18 326:24 328:25 329:13,21 344:7,12 353:8 355:9

**sentence** 54:16 54:16 56:3 57:15 58:4,17 58:21 59:11,15 59:23 63:16 75:3 203:14,16 245:14 246:4 246:19

**sentences** 37:8 159:17

**separate** 181:20

**separately** 181:19

**september** 92:15 94:25

**sequence** 328:24

**series** 51:5 151:22 263:20 289:13

**serious** 74:6 133:11 223:19

**seriously** 195:18

**serve** 51:1

**serves** 203:23

**service** 31:23 32:2

**services** 316:21

**session** 181:5

**sessions** 134:8

**set** 20:9 33:17 33:18,19,22,25

34:1,6,7 35:1,2 42:17,24 43:18 45:9 53:8,9 84:13 87:22 88:3,11 89:21 90:13,15,20,24 93:6,14 97:22 97:23 111:20 112:6 114:5 115:8 116:2,10 116:10,11 118:6,17 120:2 120:10,18 121:10 123:11 123:20 124:2 124:15,17 141:7 143:22 176:13 181:14 182:10,23 183:4 189:1,2 190:12 195:19 202:12,15,23 203:18 204:20 207:13,20 211:11,24 213:2,21 214:15 228:14 235:25 236:4 243:12 245:8 246:10,16 248:18 253:4 280:19,22 298:16,21,25 310:2,13 312:10 350:6 350:25 351:4,7 351:12 358:6

**sets** 33:22,22 84:5

**setting** 350:12

**seventh** 6:7

**several** 103:6

**sex** 29:6 37:12 37:15 38:1,7,14 38:24 39:4 55:19 150:20 151:4,14,24 152:10,25 158:13 159:12 160:6,18 166:8 172:20 173:5,9 174:14,19 175:14 176:14 177:9,11,12,19 225:1,8 249:13

**sexual** 21:3 26:24 30:1,23 31:2,12 59:25 60:1 61:1,6,7,8 65:13,20 66:9 66:14,22 67:4 67:21 84:5 121:23 122:8 172:9,15 184:14,16 213:21,25 214:4,7,8,13,23 215:1,8 233:11 233:13,16

**sexualized** 38:24

**sexually** 18:23 20:14 24:2 27:18 78:7 118:22,24 213:20 258:1 258:10,19 283:8

**sexy** 151:8 169:22 171:7 171:19 172:3 184:13 185:2 190:13 191:15 192:2 195:14 196:5,12,16 197:6 198:22 199:4,15 203:9 203:13,21,23 230:10,20 231:3,19 232:11 307:16

**shah** 3:17

**shane** 101:3,6,7 101:15,17 103:21

**shapiro** 8:14,15 17:16,19,19,19 22:15 23:6,15 24:10 26:9,25 27:12,20 28:12 29:9,12,16 31:10,18,25 33:5,12 34:9 35:3 36:24 37:17 38:19 39:20 41:5,14 42:5,12,19,25 43:7,19 44:22 45:14,22 46:6 48:2 49:9 55:9 56:17 57:1 61:10,25 62:17 64:14 65:1,12 65:25 67:5 68:11,18 69:2 69:15 71:5,11 71:24 73:17 76:20 78:5 79:14 80:18 81:6,14 82:14 83:5,10,18 84:11,16,22 99:16 100:23 102:19 104:10 104:18 105:2 106:18 107:10 107:17 109:18 110:7,11 112:1 112:18 113:6 113:16,25 115:10,19 116:5,12 117:4 117:11 119:5 119:14 120:3 120:12 121:4 121:12,24

122:9,14,18
123:8,23
125:10 126:19
127:1 131:5
132:1,10,12,19
132:22 133:16
136:21 138:2
138:24 140:21
141:8 143:1,6
143:24 144:9
144:16 145:5
146:14 147:8
148:16,21
149:18 150:3
150:22 151:6
151:16,25
152:3 155:23
156:12 157:5
157:10,16
161:1,6 162:3
162:16 163:20
163:23 165:14
166:12 167:16
167:24 168:23
170:22 173:1,7
176:3 178:3,24
179:8 183:19
186:4,13,18
190:6 191:11
191:17 192:3
194:9 195:1,9
196:14 198:24
199:7,25 202:7
203:11 204:22
205:21 206:12
206:22 207:6
207:16 209:6
211:12 212:4
212:13 213:4
213:23 214:6
214:17 215:3
215:12 217:1
217:20 218:2,9
222:2,17,22,25
223:21,25
224:4 225:16
225:22 226:14
226:22 227:4
227:12,18,21
228:3,21 229:1
229:4,16 230:5
236:8,20 237:4
237:19 238:10
238:17 239:8
240:5,15,24
245:10,25
247:13 248:11
248:22 249:2
249:21 250:5
250:10,17,23
252:17 253:14
255:10,15,18
258:2,12,24
259:19 260:1
260:16,20
261:1,20 263:6
263:17,24
264:6,13,18
265:2,12 266:5
266:18,25
268:20 269:10
270:14 272:25
274:1,8,15,24
275:7,16
277:25 278:14
279:6,14,20
280:13 281:6
281:12,20
282:3,19
283:10,19
284:9,20 285:5
285:20 286:2,6
286:12,18
287:2,14,18
288:2 289:3,10
290:19 291:2,8
291:24 292:12
292:20 293:11
293:19 296:24
297:15,22
298:8 300:11
300:21 301:9
301:22 303:2
303:22 304:23
305:4,21
306:14,20
307:12,23
308:4,18
309:10,23
310:7 311:9,15
311:22 312:12
312:18 316:16
316:24 317:9
317:15,24
318:16,22
319:16 320:12
320:19 321:23
323:4 324:4,15
324:24 325:6
326:20 327:12
330:2,22 331:9
331:19,24
333:3 334:6
337:18 339:5
339:10,15,18
340:9 341:13
342:9,18
343:10 344:14
344:19 345:8
345:15 346:25
349:19 351:16
352:4 353:9,19
353:24 354:5
354:11 356:18
356:21

**shapiroarato....**
8:22,23,24

**share** 19:13
27:22 33:3,6
36:10 149:1
177:13 241:6
243:23 274:13
274:17 287:7
301:15,20,21
301:21,25
302:4,5 345:21

346:11,18,21 346:23 347:13 348:4
**shared** 28:19 40:3 126:17 129:2,5,5,9 177:4 179:10 179:10 186:6 231:22 300:25 301:1 342:20
**shareholders** 40:11 41:13
**shares** 92:20
**sharing** 85:20 232:10 241:2,4 270:9,13 300:16 355:15 356:2
**shawn** 328:1
**sheet** 357:5 359:1
**shift** 25:3 125:2
**shifting** 124:10
**shifts** 202:2
**shit** 140:9 289:17 290:7
**shock** 39:3,15 268:11
**shoes** 221:8
**shoot** 171:15,21 232:4
**shooting** 113:10 150:15 177:17,19
182:14 245:3
**shop** 333:15,22
**short** 131:6 137:7 159:4 255:20 292:23
**shortcomings** 211:1
**shorthand** 2:25 358:2,16
**shortly** 72:17 130:21
**shorts** 19:7,8 21:19 119:20
**shot** 178:2
**show** 33:20 111:9 187:1 196:24 197:8 205:18,23,25 206:19,25 207:19 209:14 210:19 212:17 218:12 227:2 227:10 243:14 292:17 348:8
**showed** 54:7,10 303:1,6,9
**showing** 209:18
**shown** 77:19 109:11 228:5 327:23 355:22
**shows** 268:22
**sic** 222:23
**sick** 70:13 93:5
**side** 156:1 163:7,8,22
**sign** 47:18 140:14,18,25
**signal** 350:23 350:24,25 351:4,11
**signature** 358:24
**signed** 89:1 286:24
**significant** 330:15
**signing** 152:9
**silly** 259:13,15 259:25 260:3
**similar** 82:3 87:8 192:23 266:1 290:15
**simply** 78:13 79:8 80:11 96:12 155:15
**simulated** 158:13 249:13
**single** 123:11 175:13 232:24
**singularly** 287:24
**sir** 22:5 51:6 114:22 128:1 153:23 158:8 173:15 190:2 266:24 312:24
**sit** 20:11 23:19 65:9 69:12,13 88:15 90:17 134:10,21 152:22 161:4 162:25 165:4 167:8 178:22 189:19 196:10 211:5 238:8 262:21 267:22 282:16 296:25 301:4 316:20 344:5,10 349:15 354:2
**sitting** 19:21 68:24 149:14 209:24 216:2
**situation** 67:16 67:17 78:24 105:4 119:22 191:16 197:1,4 282:8 306:24 320:8 324:3
**situations** 172:11 272:15 272:21
**six** 131:9,16
**size** 22:10
**skin** 129:17
**sklenar** 202:12 203:1,7
**slate** 124:1,11 124:14 181:12 181:16 182:5,6

182:7,12 183:4 184:7,11,12,19 185:11,13,22 185:23 186:2 186:24 187:20 188:1,3 189:23 190:14,17,19 190:21 191:6 191:25 192:5 192:13,17 196:25 197:12 197:22 198:2 199:9,21,24 203:8,17 206:5 230:11 231:22 232:6 307:9,14 307:17
**slate's** 182:4 183:17 191:9 196:19 199:3 202:20 233:8
**sleep** 289:23 355:19
**slides** 54:5,7,11
**slightly** 183:20 265:21
**sloane** 6:12
**small** 282:5 346:17
**smile** 174:5
**smoother** 57:13
**sober** 292:1
**social** 14:8 99:13 209:2,23 211:10 216:6 219:4,7,8 221:11 223:6 305:19 307:9 342:25 352:2 353:14 355:10 356:9
**society** 35:20 35:20 36:14,14
**soevyn** 1:23 2:24 13:5 14:5 15:5 18:9 358:2,24
**software** 162:1
**sold** 325:14
**solely** 43:1 45:15 124:11 200:24
**solemnly** 18:13
**solidarity** 227:2 227:11
**solutions** 11:4 16:8
**somebody** 38:5 83:8 84:14 87:20 115:22 134:13 192:1 203:2 260:23 279:11 282:5 350:11
**someone's** 340:18
**somewhat** 128:12
**son** 344:3
**song** 87:14 328:15
**sony** 141:23 142:1 143:18 143:19 165:21 171:6 195:20 241:20 254:5 276:18 277:20 284:24 285:1 323:2,6,14 325:3,8,14
**sony's** 161:18 332:20,22
**soon** 148:6 186:7 342:4
**sophomore** 25:21 26:2
**sorry** 25:19,23 34:8 62:3 74:2 82:14 85:24 87:10 97:18 99:24 103:11 110:24 116:14 116:16 131:10 138:24 139:2 142:11 146:4 154:24 174:16 191:23 198:10 211:13 221:6 222:25 231:21 234:1 235:18 236:21 237:10 281:16 288:3 288:21 289:21 292:5 295:2,18 314:3,17 339:11
**sort** 24:8 123:12 175:1 277:6 336:25
**sorts** 128:4 212:8
**sought** 200:19 331:13
**soul** 37:13,16 37:20 39:11
**sound** 40:20 213:10 305:3 352:18 355:23
**sounded** 242:5
**sounds** 40:18 40:23 87:24 254:22,22 304:6 305:17
**source** 317:14 317:16,22 318:3
**sourced** 339:2
**sources** 317:7 318:15
**southern** 1:2 2:2 73:14
**spa** 19:5 23:14 134:18
**space** 80:22
**spe** 13:11 14:10 14:22 135:4

233:24 294:21
**speak** 40:23 104:4 132:7 176:20 196:22 198:14 202:18 312:8 318:2,10
**speaking** 39:1 78:21,21 81:9 200:17 231:4 283:11 300:17
**speaks** 98:6
**spears** 84:21,25 85:9
**specific** 44:25 46:8 48:19 66:21 74:23 87:19 88:23 152:11,11 171:11 175:22 175:24 180:7 200:18 207:18 223:15 230:6 268:8 287:3 301:11 319:10 349:14 353:16
**specifically** 124:2 129:6 131:20,20 160:2,16 167:17 170:5 171:6 174:14 176:13 179:4 183:23 189:22 196:17 205:24 206:24 207:19 211:6 232:12 324:21 354:6 354:25 355:12
**specifics** 53:23 321:14
**specify** 301:19 317:16
**speculate** 139:18 144:10 157:11 158:5 241:2,7 261:2 279:22 310:19 345:17
**speculation** 325:4
**speech** 20:4 77:12 206:11 207:25 209:24 211:10
**speed** 315:16
**spend** 345:12
**spent** 212:15
**spinning** 282:11
**spirits** 35:22 36:2,16,21
**spiritual** 40:7 41:10 129:4 130:3
**spoke** 19:4 76:7 90:10 175:13 195:20 265:15 268:8 333:4
**spoken** 70:20 76:22 82:6 115:14 124:22 125:1,5,20 131:24 132:3
**sponsor** 215:21 215:23,25
**spontaneous** 249:11
**spot** 196:8
**spread** 329:18
**spring** 179:21
**sroeser** 4:11
**stacking** 138:10
**stage** 246:7
**stake** 347:2
**stand** 123:2
**standard** 157:3 157:9 158:18 158:19 175:5 221:16,17,21
**standing** 20:22 220:24
**star** 221:18 275:14 276:21 277:5 278:4
**stars** 21:18 163:7,8,19 221:21
**start** 19:2 38:13 58:3 77:20 81:8 111:22 112:9,17 113:2 113:11 150:19 151:3,13,17,18 160:19 164:22 175:4 209:21 237:12 322:20 352:2,14 354:9 354:12
**started** 19:13 32:24 150:15 152:14 200:19 232:5 241:17 320:25
**starting** 16:17 24:16 50:7 114:15
**starts** 58:18 77:23
**state** 18:13 26:1 26:3 252:3 292:2 329:14 358:3
**statement** 37:22 38:12 80:16 83:25 91:10 103:21 103:24 104:1 313:19 317:21 328:22 329:11 337:9 339:2
**statements** 157:24 357:7 358:10
**states** 1:1 2:1 73:23

**stating** 315:17
**statistics** 297:8
**stay** 349:21,21 349:23
**staying** 100:22 101:1 191:3
**ste** 6:15
**stellar** 299:18
**steno** 18:9
**stenographic** 18:8,17 46:11 91:16 164:11 310:11
**stenographic...** 1:23 358:11
**step** 237:12 238:14,14 328:4
**stephanie** 3:3 4:5 17:4,8,10 72:11 242:15 243:10
**steps** 264:25 265:10,14,22 349:8 351:19
**sterling** 278:19
**steve** 7:4 8:4 11:22 37:18 38:3,5,8 40:2 48:3 294:25 340:11,19
**steve's** 285:1
**stick** 31:4 323:18
**stimulant** 216:20,21
**stimulants** 205:8
**stop** 36:22 127:22 177:1 315:9,18
**stopped** 121:13
**stories** 28:16 265:25 356:2
**storm** 306:11
**story** 19:25 27:22 28:19,24 85:4,21 200:4 200:24 202:6 216:8,10,15 219:9 222:7 238:21 239:2 240:20 241:2,4 275:13 320:6 340:12
**storyline** 38:7 39:7
**straightforward** 188:11
**strange** 124:6
**strasberg** 6:13 153:22 220:17 244:17,24
**strategy** 323:17 324:1,13 352:14 354:17
**street** 3:9 5:17 10:2,7 17:12 345:2,5
**strictly** 54:18
**strike** 53:12,14 163:5 195:6 222:8 226:6,12 227:2,11 228:15,17 229:15,22 326:25 338:9 338:19 339:9 339:21,25 355:8
**strikes** 163:13
**strive** 41:22 42:7
**strived** 41:24 41:25 42:7
**strong** 318:24
**stronger** 22:7
**strongly** 95:21 272:6
**struggle** 212:19
**struggling** 212:16
**studio** 32:17 34:3,25 47:22 47:25 115:8 141:5 171:18 172:24 260:9 275:12 277:6 285:10 347:21 347:24,25
**studios** 1:8,13 2:8,13 7:2 8:2 13:3 14:3 15:3 16:13 31:9,16 32:10 34:14 40:6 41:2,19 42:2 45:19 48:8 49:1 54:18,24 55:7 56:5,12,21 58:7 62:11 63:12,19 64:4,7 68:8,15 75:12 86:18 88:20 89:14 92:2,13 96:20 98:5 101:10 122:8 140:19 141:2,23 192:14,18 228:25 230:3 253:17,19 257:4,7 264:12 283:14,17 293:17 303:8 345:1,5 346:19 350:2,12 359:2
**stuff** 280:5 281:4 294:3 345:25
**stunt** 44:16,18 45:2
**styling** 221:6
**sub** 155:13,14 156:21
**subconscious** 31:20,20

**subconsciously** 31:17
**subject** 13:17 74:8,22 75:6,13 77:10 86:2 153:25 159:12 160:6 275:11
**subscribe** 357:6
**subscribed** 357:12 359:22
**subsection** 60:10 157:23 158:10
**substantial** 287:25
**substantially** 60:13
**subtle** 61:2,2
**success** 278:25 287:23 288:1 347:24
**successful** 21:1 277:24 288:5
**suddenly** 25:1
**suffered** 30:2
**suffering** 210:17
**suggest** 277:4 299:24 338:2
**suggested** 205:16 215:2,9 277:20
**suggesting** 119:4,8 127:11 210:18
**suit** 19:7,14,24
**suite** 4:9 8:9 10:8 173:20
**sullivan** 3:5,16
**sum** 290:4
**summarized** 130:21
**summary** 129:6
**summer** 7:7 17:13
**sunshine** 7:9
**super** 204:7 277:10
**supervised** 42:16
**supervisor** 62:4 62:7,16,21 67:25 68:4,25 115:1 122:13 122:25
**supervisors** 58:10
**support** 14:16 35:25 36:19 87:21 95:21 108:5 256:16 270:19 271:3
**supported** 108:16
**supposed** 74:21 224:23 225:10 254:2 299:12 334:9 342:4
**sure** 24:5 32:17 40:19 42:20 43:20 47:11 55:12 65:15 67:23 78:3,11 78:16,18 79:6 79:15,16,21,24 80:5,5,9 82:13 85:12 93:15 96:25 100:15 100:19,24 112:19 113:3 114:1 117:8 120:4 127:5 133:4 135:16 146:1,10 151:10 158:3 165:19 167:4 170:15 172:13 183:8 203:21 205:9 213:12 215:4,13 217:11,15 248:20 258:25 262:20 263:7 265:13 266:22 268:13 274:25 277:19 278:1 278:11 281:13 281:21 288:21 291:9 297:12 298:24 313:12 313:15 314:2 319:25 321:15 324:16 326:1 328:15 329:14 331:25 340:6 350:8 351:6 356:3
**surfaced** 209:4
**surplusage** 36:23
**surprise** 80:6 80:13 83:1 206:17,23 245:1 278:12 343:9,11 345:4 345:10
**surprised** 90:13 227:8,14 245:11,24 246:1 270:11 270:15 324:20
**surprising** 252:8 279:19
**surprisingly** 89:8
**surround** 200:21
**surrounded** 302:14
**surrounding** 209:4
**survival** 354:18
**survivor** 355:13,25
**survivors** 354:25 355:15

355:16
**sweden** 305:11
**swift** 126:14 280:7 328:2,14
**sworn** 357:12 359:22
**system** 32:23 165:10

**t**

**t** 110:23 140:2
**table** 47:4,5 51:5,12 164:9
**tactics** 316:22
**tag** 14:23 99:12 223:12 303:13 304:22 316:14 317:6 318:6,13 319:13,20 320:5,23 321:8 324:20 343:21
**tagged** 221:5 221:10
**tagging** 223:12
**tahler** 3:6 17:7 17:7
**tail** 171:12
**taitelman** 7:5 17:14
**take** 19:14,23 23:10 46:19,22 62:12 64:7 66:5 68:9 98:7 108:6 119:18 130:2 131:5 132:10 133:16 135:14 142:17 153:7 163:25 196:13,20 197:13 201:5 205:6 208:14 255:10,12,14 255:19 261:14 264:25 265:10 265:22 276:10 283:1 299:8 328:8 347:14 347:20,20 348:4 349:8 351:19
**taken** 2:19 16:14 153:15 213:8 225:20 265:14 272:16 323:16 348:3 351:15 358:5 358:16
**talbot** 180:16 180:20
**talbot's** 180:17
**talk** 20:5 23:2 26:17 27:3 35:17 72:25 77:5,6,9 94:6 109:7,22,25 149:19 172:12 176:13 187:25 196:24 197:1 200:3 205:23 211:23 219:7 241:13 296:4 297:4 312:4 317:13,19 321:16 336:13 350:11
**talked** 19:3,3 20:16 23:4,22 26:16 30:2 33:9 76:13 81:18 90:8 115:17 180:5 180:20 194:11 198:12 230:9 231:22 266:10 270:19 296:4
**talking** 20:3 27:18 35:8 49:4 71:3 84:19 85:3 101:5 125:11 127:15 160:10 176:22 177:9 184:21 189:24 189:25 198:20 206:18 209:21 210:1 229:12 249:4 289:6 300:23 301:12 318:7 335:22 352:3,15
**talks** 24:7
**task** 356:5
**taught** 79:23,24
**taylor** 126:14 280:7 328:2,14
**team** 14:8 44:4 44:4 96:1 137:8,20 154:15 156:7 156:20 158:24 200:22 201:4 206:18 210:24 212:10 217:17 219:5,7 303:14 312:16 317:6 318:7 334:23 334:25 343:15 343:17,18,20 344:6,12,17 352:2 353:8,12 354:21
**tears** 103:20,25
**technical** 162:4
**technically** 75:23 81:9 256:24 343:25
**technician** 16:8
**ted** 20:5
**tedwomen** 20:6
**teens** 78:12 79:2,7,16 80:10 81:2,19
**teeth** 232:3
**tell** 27:5,17 33:16 54:8,13

57:10 65:16 90:14 97:2 109:5 111:11 124:25 125:4 132:16 142:6 142:16,19,21 179:16 180:10 200:3 201:10 201:18 202:6 202:13 211:5 229:11 230:2 237:21 244:4 260:3 275:13 289:17 300:9 328:25
**telling** 29:22 85:4,20,20 182:4 223:17 234:23 238:21 305:14 320:14 348:17
**tells** 308:7
**ten** 255:15 315:11
**tend** 37:19
**tenets** 32:4,21 33:11
**tera** 92:11,12 110:21,22,23 111:2,6
**term** 329:10
**termination** 74:9
**terms** 207:14 229:15 292:1 301:12
**terrible** 135:21 185:14 279:12
**tested** 328:6
**testified** 49:8 69:5 117:23 118:2,5,16,21 119:6 137:23 145:10 161:12 189:21 190:3 225:7 270:4,7 270:12 271:4 283:23 298:16 304:14 316:8 316:13 322:9 322:24 323:25 328:3 335:11 335:15 336:4 336:20 351:3
**testifying** 184:24 298:20 298:22 303:12 303:21 304:9 316:12 335:18
**testimony** 18:13 64:18 66:25 67:2,6 79:11 90:4,6 102:25 116:22 117:25 120:5 123:18 126:8 126:15 172:22 173:3 178:8 185:4 196:10 202:17,19 203:3,5 207:15 207:17 211:7 211:22 212:2,2 214:16 227:20 228:2 240:11 245:23 250:20 250:24 258:16 298:13,24 302:8 303:24 309:4,11,24 320:22 321:1 324:5 326:13 326:15 351:8 358:8
**texas** 10:9
**text** 13:7,9,10 13:19,21,22 14:8,10,12,13 14:16,18,19,23 15:7 47:14 70:15 92:6,14 92:18 93:1,8,12 94:10 97:8 135:4,9 136:1 136:23 140:23 143:11 144:2 187:9 197:11 197:20 202:25 208:11,22 218:18 223:16 233:22 234:15 239:16 242:14 243:2,5 244:7,8 244:10 256:8 261:5 262:25 270:18,19 271:2 276:6,14 288:12 314:4,6 314:12,25 315:2,20 322:14 323:5 323:12 326:19 327:1,6,22 328:25 335:15 335:18,21 352:8,18
**texted** 97:9
**texting** 219:5 237:22 293:2
**texts** 313:7,9 326:6,8
**thank** 18:4,17 135:20 153:14 188:16 234:10 294:6,16 295:20 299:18 305:14 315:4 336:8
**thanked** 231:23 232:6
**thankfully** 159:3
**thanks** 164:11 275:20

**therapist** 24:18 24:20 206:15
**therapy** 24:9 24:15,23 25:4 210:15 290:7 291:18,25
**theresa** 7:8
**thing** 30:7 31:5 35:23 36:17 38:2 46:23 47:12,12,13 55:12 124:6 133:5 177:12 179:11 212:11 306:10 313:20 327:5 328:19
**things** 19:11 21:18 27:24 31:3 37:13,19 38:24 76:13 77:19 81:21 107:22 115:4 124:23 125:21 128:4 129:16 129:18 138:10 148:15,19 154:19 156:25 158:25 171:22 175:7 176:22 176:23 179:13 182:7 206:2,20 207:1,19 210:1 212:7,16 214:1 214:20 234:18 248:13,14 259:13 260:25 269:2,21 272:13,16,21 280:22 289:13 298:6 306:15 320:24 321:20 324:2 342:11 342:19 354:16 355:16 356:11
**think** 19:25 20:15 21:16 22:25 23:22 25:6 27:14 28:15 30:11 32:11 33:13 37:4,20,21 38:3 38:14,17,23 39:3,10 43:12 44:1,5 47:1 49:13 51:25 52:9 54:13 57:12 58:1 64:18 72:10,17 72:23 74:17 75:24 76:21 77:21 79:18 80:22 83:24 84:1,23 85:6,17 86:7 87:23 96:23 99:6 102:24 105:19 107:7 111:23 112:15 114:8,9 114:11,14,19 119:24 120:8 120:13 124:5 124:13 126:4 127:7 128:12 128:18 131:3 131:23 134:1 138:23,24 139:7,8,20 145:10 146:4 149:11,13 151:21 161:8 163:3,5 164:21 165:20 169:23 170:8,9 172:22 175:13 179:14 179:21 180:24 185:6 189:19 190:3,9 191:9 191:12 194:11 202:1 203:25 206:3,8,13 208:2,4 209:12 209:24 210:23 212:14 216:13 216:13 217:21 218:3,10 219:8 220:23 224:8 226:2 228:14 229:23,24 232:1 237:5 238:11 240:9,9 242:2 247:10 258:4 260:10 268:21 269:17 269:20 270:20 271:8,8 274:16 277:12 278:15 279:21 281:1 282:4,9,13 285:22 289:22 291:6,11,17 292:6 293:20 293:24,25 296:17,20 297:20,24 298:9 303:16 304:16 306:21 306:23,23 307:2,3,3,5 308:5,8 310:2 310:13,24 321:3 323:15 326:7 336:20 337:5,8,12 338:7 345:9,12 345:25 346:11 350:21 354:12 354:14,16
**thinking** 24:24 42:13 78:13 79:8 80:11 109:3 110:25 119:12 203:21 204:12,17 209:10 226:16 281:24 354:17 354:17

**third** 1:11,12 2:11,12 254:7
**thirty** 312:20
**thoroughly** 63:6
**thought** 27:16 67:3 102:14 107:23 119:3,7 120:14 139:2 146:13,15 158:4 172:4 183:4,8,10,14 185:17 200:13 200:21 201:7 210:24 212:19 213:24 214:22 215:1,8 217:23 218:4 223:18 231:14 241:1 259:23,25 260:13 265:11 278:18 286:13 288:4 291:14 304:3 311:20 331:23 351:3
**thoughtful** 104:9
**thoughts** 35:15
**thousands** 70:20
**thread** 13:12 13:16 14:21,23 93:13 325:19 326:19 327:6 327:11
**threads** 327:23
**threat** 262:13
**threaten** 21:25
**threatened** 292:9,18 328:4 328:21 330:1
**three** 57:23,24 107:7 108:22 109:16 167:3 335:16
**threw** 96:18
**tied** 50:18
**tiktok** 87:18 99:3 352:13
**time** 16:5,6 19:5 21:19 26:6 36:12 37:21 38:25 48:23 52:10,20 66:2 75:25 76:2,5,11 77:20 79:22 82:2,9 86:14,18 90:2 94:22,25 95:1,8 95:16,22 96:13 96:20 98:21 99:1,18 101:18 101:19 103:5 108:11 109:17 110:25 111:21 112:7 120:20 123:14 124:21 124:23 125:16 126:23 127:18 128:14 131:22 132:2 133:19 133:22 145:7 147:11,23 148:4,8 149:17 151:10 165:13 169:1 170:9 171:9 172:14 174:3,9 180:25 181:2,9,11 196:23 200:7 200:15 201:9 201:17 202:1,4 205:13 206:2,6 214:9 217:7,25 219:6 224:11 224:14 228:14 231:12 236:22 242:4 244:20 245:6 247:10 252:7 255:17 255:25 256:3 258:4 260:11 263:11 265:21 265:25 266:6 274:10 278:7 285:17 291:18 294:9,12 295:6 295:9 299:4,7 299:11 307:7 311:7,11 316:10 319:15 323:14 325:4,9 325:24,25 326:1,2,5,7,9 328:20,25 329:3,21 333:24 334:2,5 334:17 337:11 337:14 341:23 342:3,16 343:12 344:1 348:23 349:4 349:24 354:21 356:18,23 358:6,7,10
**timer** 350:20
**times** 19:3 33:10 38:8 66:21 67:7 69:6,10 70:24 71:8 73:5,10 90:10 109:2 116:8 117:10 171:11 214:9 225:24 248:2,6 248:18 249:6
**timing** 82:1
**tinkering** 165:12,15
**tired** 334:10,11
**titan** 282:6
**title** 256:15
**titled** 14:15 154:22
**today** 16:6 20:11 23:20

65:10 69:13 81:23 88:15 90:17 134:10 134:21 152:22 161:4 162:25 165:4 167:8 169:21 178:22 189:19 196:10 216:2 227:20 228:2 238:8 262:22 267:22 282:16 297:1 301:4 316:20 336:10 344:5 344:11 349:16 354:3 355:22
**together** 24:21 35:24 36:18 102:4 117:6 129:2 170:6 171:23 172:14 174:12 175:12 181:19 261:10 261:11 289:16 306:13,18 321:25 323:20
**told** 19:25 21:6 22:25 34:6 35:1 40:25 70:3,5 80:1 90:18 99:8 121:9 125:8,17 127:19 129:14 130:14 131:13 138:1 149:16 179:24 180:1 181:16 182:22 183:4,11 184:7 184:25 190:21 195:12 199:4 201:24 213:12 226:17 230:1 239:2 275:2 279:15,17 305:2 307:5 343:8
**tomorrow** 289:23
**ton** 174:22
**tone** 217:12 221:23 222:13 223:20 342:1
**took** 66:20 94:13 124:13 170:16 195:18 236:13 308:8 334:8
**top** 29:6 51:19 51:21 54:15 92:16 93:1,17 153:23 154:6 221:8 244:23 327:7 337:22
**topic** 301:5 355:14
**topics** 115:15 148:1
**toscovic** 14:9
**toskovic** 218:17 218:17,19
**total** 346:2,11
**touch** 21:23
**touched** 115:24
**touching** 61:9 114:6 249:13 251:9,11
**tough** 193:13 235:8
**tour** 219:14
**towards** 160:19 173:25 293:16
**toxic** 79:19
**tracking** 63:20
**trailer** 94:14,22 236:14,25 238:3,16,19,22 240:14 241:14 241:17 252:2 264:24 265:19 266:4 288:18 289:9 328:13 332:4,8,11,11 332:15 333:2,6 333:9
**trailer's** 306:5
**trailers** 259:18
**trained** 60:5,22 61:19 74:18
**training** 52:4 52:20,22 53:2,4 53:18,24 59:13 59:17 61:21 134:1,11
**transcribed** 358:12
**transcript** 180:18 231:1 357:3,6 358:13 358:16
**trauma** 30:23 31:2,12 115:23
**traumas** 115:16
**traumatic** 27:25 266:21 342:22 355:16
**travel** 155:3,5
**traveled** 146:17
**travis** 276:2
**tremendous** 284:23
**tried** 19:14 42:2 87:21 111:19 204:7
**triggered** 80:16
**tripped** 127:15
**troubled** 143:5 143:8 240:20
**troubling** 70:22 71:1
**troupson** 7:8
**truce** 342:4
**true** 40:11 69:17 78:17 103:9 105:12 225:12 276:25

277:13 324:12 329:11 358:15 358:21
**truly** 193:20 299:18
**trust** 314:13
**truth** 18:15,15 18:15 71:10 85:20 282:22 289:17
**truthful** 73:10 73:15 91:10 103:21,23 104:21,24 120:9,14 188:12,24 225:14
**try** 19:23 21:1 23:1 24:21 26:20 65:18 66:4 69:25 77:22 82:17 109:22 112:14 136:6 199:16 207:18 265:22 309:2
**trying** 38:21 88:23 95:10 104:22 160:15 171:17 185:21 190:1 204:20 205:17 207:14 231:9 234:5 240:18 260:22 271:24 278:7 304:5 326:25 337:24 340:21
**ttroupson** 7:15
**tub** 19:6,10,12 19:16,18,20,21 19:22 20:22 118:21,25 119:17 302:14
**tubs** 19:9
**tuesday** 1:21 2:23 13:4 14:4 15:4 16:2 181:6
**turn** 62:3 169:7 220:19 239:4 287:22
**turned** 239:21 239:23
**tv** 27:16 37:10
**tweet** 329:7
**twice** 313:11
**twitter** 325:19 326:19 327:6
**two** 28:15 37:7 52:21 77:9 107:7 114:11 121:2 127:9,11 133:9 148:14 149:11,13 159:16 166:21 166:21 170:7 171:22 172:11 172:16 174:3,8 177:7 179:11 179:12 183:14 187:20 193:13 213:7 235:4 236:13 238:16 238:19 251:11 257:16 265:15 312:24 314:5 314:23 315:13 315:25 326:5,8 338:3
**twohey** 69:11 70:6
**type** 64:11 163:4 301:6
**types** 51:7 53:19
**typical** 96:19 285:24 286:1,4

**u**

**uh** 63:23 64:20 91:23 169:11 187:8 275:25
**uk** 220:4
**ultimate** 156:9 261:18 262:1
**ultimately** 42:23 43:17 44:12 57:4,6 201:2,3,5 202:5 253:12 345:2
**unable** 96:1 236:4 273:9,11
**unacceptable** 253:8 334:12
**unaware** 65:7 67:1,3 121:25 334:22
**unborn** 148:17
**uncomfortable** 21:4 115:23 118:10,17 120:1,10,19 121:10 142:8 142:14,22 143:21 185:16 185:24 186:2 206:6 240:1
**unconsciously** 114:12
**under** 44:9 55:7 68:14,24 74:22 75:6,14 92:9 96:18 117:23,25 118:2 123:4 156:16 203:3,5 224:19,20,22 224:23 225:7 358:7,20,20
**undermine** 235:23
**underneath** 51:10 155:5
**underscore** 196:9

**understand** 24:7 30:11 50:20 58:14 60:20 61:22 65:10,19,20,23 66:12,17,23,24 74:16 79:11 109:14 115:7 115:13 122:5 122:12 127:8 136:18 137:18 154:8 158:23 160:9 190:2 207:15 211:25 213:19 225:19 240:18 288:23 292:5 323:11 330:14 343:23 348:22 349:2
**understanding** 44:19 48:7 65:4 67:19 71:2 95:23 96:16 104:5 105:13,18 106:12,15 107:21 123:5 138:16 147:6 150:18 151:2 151:12 156:8 177:10 195:22 199:2,3,3 229:8 249:24 251:13 265:3 316:25 332:17,23 344:6 349:12
**understands** 93:9
**understood** 62:15 158:21 186:1,5 241:10 246:14 247:3,8 250:2 252:5 258:18 272:7,9 315:7 349:5
**undiagnosed** 210:16
**undress** 252:3
**unfiltered** 202:22
**unfinished** 261:8
**unfollow** 309:16
**unfollowed** 307:25 309:6 312:5 328:18 342:25
**unfollowing** 210:14 211:20 213:11 309:20
**unfollows** 308:6
**unfortunately** 125:14
**unhappy** 96:17 96:20 240:8
**unheard** 286:4
**unimpressed** 316:15
**unique** 176:24
**unison** 328:20
**united** 1:1 2:1
**unity** 40:11
**unlawful** 56:8
**unprofessional** 58:8
**unreasonably** 59:6 60:13
**unsafe** 258:1,10 271:20 272:2,8 280:5 282:2 283:6 290:12
**unsettled** 199:18
**unsure** 198:20 209:7 270:5 310:8 336:21
**untrue** 341:14
**unusual** 285:22
**update** 215:19 215:22 218:22 219:15 223:10 271:13
**updated** 94:14 268:13,14
**uplift** 36:2,21
**upper** 48:18 57:4
**upset** 71:15,19 71:21 80:16 138:11 225:20 240:10,10 241:1,4 289:15
**upsetting** 93:22 94:8
**urquhart** 3:5 3:16
**use** 63:13 76:17 129:19 156:23 157:17 162:9 165:16 172:23 185:2 192:23 195:14 196:5 196:11 209:13 211:1 217:3 240:22 311:24 324:12,17 330:16 349:17 350:2
**used** 19:11 124:4 126:2,8 136:5 150:15 162:2 182:24 184:13 190:13 190:24,25 196:16 197:6 220:4 258:8 268:5,13 269:15 273:4 323:1
**using** 20:25,25 191:4 212:16 230:10 231:3 232:11 324:21

**v**

**v** 13:3 14:3 15:3 16:13 359:2
**valid** 195:12
**values** 40:3
**van** 276:2,7,15 290:16
**vanity** 330:12 331:13,17
**variety** 320:9
**various** 44:8 48:20 49:24 51:2 81:21 125:21 174:23 178:2 214:1
**vendor** 345:13
**verbal** 58:18,24 89:19
**verbally** 90:1,6 90:9 298:17,18
**veritext** 11:4 16:8 359:1
**version** 49:16 49:20,22,23 72:7,20 112:11 155:9 164:15 265:23 266:4 316:11
**versions** 49:24 266:7 312:24 315:13,25
**versus** 41:7
**victim** 280:6
**victimized** 20:9
**video** 1:19 2:18 16:8,12 87:18 232:19,22,24 250:3,7,14 251:2,8,15 301:16,20,23 302:2,8,10,12 302:17,22 303:1,6,9,10
**videographer** 11:25 16:4 18:4 76:1,4 133:18,21 181:1,8 220:17 224:10,13 255:24 256:2 294:8,11 295:5 295:8 334:1,4 356:22
**view** 48:16 77:3 77:4 104:7 125:8 143:20 235:1 265:19 308:16 318:20 318:24 319:2 340:5
**views** 76:23
**violate** 122:7
**violated** 123:7 229:15
**violating** 229:13
**violation** 53:20 53:21 62:8,10 68:5,7 74:6 123:1,3,10 124:3
**violence** 37:12 37:15 115:15 222:6 352:3,16
**virgin** 28:4 85:1
**virginity** 27:11 28:21,25 29:7
**virtually** 52:12 52:13,13 105:10,23
**visit** 97:10
**visited** 87:22
**visiting** 88:3
**visits** 82:2
**vivian** 117:20 117:21
**voice** 96:12,24 97:1,3,6 98:10 137:8,19 156:23 157:18 289:20
**volume** 1:18
**vs** 1:7,11,14 2:7 2:11,14
**vulnerability** 289:1
**vulnerable** 292:2

**w**

**w** 14:23
**wagging** 171:12
**waist** 86:25 87:4,7 88:12,22 89:13,16 90:24 91:5 94:22
**wait** 82:15
**waiting** 19:6
**waking** 28:21
**walked** 19:20 19:21 115:3 119:16 126:3 176:15 203:17
**walker** 10:4 17:12
**walking** 20:23 149:12 298:25
**wallace** 10:2 17:12
**want** 17:22 21:2,6 23:9 35:6,9,21,23 36:15,17 38:5 38:22 47:13,13 49:14 50:9,17 57:10,24 70:1 77:14,21 82:15 88:16 90:7 91:13 98:23,24

98:25 109:10 110:4,15 111:7 111:9,16 112:12 116:21 117:18 121:16 127:14 151:10 156:7 163:12 164:6 165:24 171:18 182:18 185:15,23 186:8 187:1 193:4 196:24 197:8 198:14 202:14 204:3 209:14,17 214:12 229:7 241:9 255:10 255:12 263:13 269:22 276:20 277:4,7,8,16 299:21 300:6 307:9,10,21 308:7 309:6 310:5 311:23 311:25 314:12 314:14 315:14 319:3,5,20 329:17 331:12 331:16 334:6 340:2

**wanted** 30:5,8 31:9,15 79:24 95:19,21 98:1 109:15 136:5 146:10 161:24 172:3,10 184:8 184:8 185:14 186:9 188:8 189:9 195:21 201:11,18 206:25 212:11 212:14,17 215:10 231:6 231:15 241:5 243:23 263:11 263:15 275:13 277:21 283:24 284:7 287:7 318:20 319:25 320:2 321:8 322:1 328:15 338:25 340:7 351:6 352:23 353:13

**wanting** 210:20 235:3,24 310:17

**wants** 248:17 280:8

**wardrobe** 182:11 184:13 185:1,2,5 190:13 191:14 196:17 231:5 232:12 307:16

**warned** 242:4

**warning** 241:20,22,23 242:7

**washington** 5:19

**watch** 221:8 233:2 298:12 298:15

**watched** 35:7 232:19 298:14 302:10

**watching** 177:2 293:1

**way** 27:9 31:14 31:15 43:21 50:9 66:4 69:25 73:7 85:17,17 87:8 87:12 91:25 95:12 102:17 103:3 105:5 109:20 114:18 126:25 127:9 127:11 128:25 130:25 131:4 133:2,8 134:22 137:18 140:8 152:23 163:17 167:7 172:8 173:10 179:25 183:22 184:19 186:8 191:7 195:19 196:2,6 202:9,18 204:4 210:23 214:1 222:19 225:17 226:3 239:2 240:4,13 241:16 243:12 247:9 262:15 262:18,23 266:19 267:21 270:6 272:22 275:8,10 286:1 286:14 290:5 293:1,17 298:3 302:15,21 303:5 314:14 317:25 318:13 318:18,18 320:4 321:3 324:18,25 346:12 349:16

**wayfair** 101:10

**wayfarer** 1:8 1:13 2:8,13 7:2 8:2 13:3,7 14:3 15:3 16:13 17:15,17,21 18:1,2 31:9,16 32:9,10 34:14 39:18,23 40:1,5 41:2,19 42:1 45:19 46:17 48:8 49:1 51:18 54:18,24 55:7 56:5,11,20 56:24 58:7 62:11 63:12,19 64:4,6 67:19

68:8,14 75:12 86:18,25 88:20 89:14,15,20 91:7 92:2,12 99:12 101:8,9 101:13,16 104:3 122:7 140:19 141:2 156:10 170:7 192:14,18 228:25 230:3 253:17,19 257:1,4,7 264:12 276:4,5 283:14,17 293:16 303:8 339:23 345:1,5 346:19 350:2 350:11 359:2
**wayfarer's** 320:7 345:13
**ways** 31:6 76:17 101:24 162:21 171:8 272:1 274:5 332:17
**we've** 30:22 38:9,24,25 39:1 41:23 194:11 224:8 335:12
**wear** 231:15 301:7
**wearing** 182:11 203:19 221:13 221:18,19,25 222:14 231:7
**weber** 6:12
**wedding** 173:22
**week** 52:14 121:2 349:3,4
**weeks** 141:15 355:25
**weight** 55:24 56:1
**weird** 142:7,13 142:22 143:21
**welcome** 33:20 242:1 354:14
**went** 85:4 95:13 96:23 130:14 146:17 200:8 225:8 236:13 238:16 238:19 280:22 280:22,25,25 335:6 344:6
**west** 7:11 19:5
**wga** 340:18
**whatsapp** 271:6,8 350:16 350:19,21
**whatsapps** 350:17
**whim** 329:13
**whisperings** 213:15
**white** 13:17 164:19,21
**wife** 25:5 100:11 130:14 176:2,5 177:15 201:4 203:10 203:24 204:2 300:10,19 301:2,16 302:13,22 342:5,21
**wife's** 204:10
**wild** 307:3
**williams** 19:5
**willing** 246:7
**willkie** 2:21 5:4 5:12 6:4 16:20 16:23 17:2
**willkie.com** 5:9 5:20,21,22 6:9
**wilson** 271:13
**win** 328:17
**winkle** 276:2,7 276:15 290:16
**wins** 39:16
**wired** 216:14 216:17
**wise** 189:5 289:24
**wisely** 289:22
**wish** 100:16 156:6 232:8
**withdrawn** 266:14
**witness** 8:13 12:2,10 18:6,16 22:16 23:7,16 24:11 26:10 27:1,13,21 29:15 31:11,19 32:1 33:6,13 35:4 37:4,18 38:20 39:21 41:6,15 42:6,13 42:20 43:1,11 43:20 45:15,23 46:7 48:3 49:10 55:10 56:18 57:2 62:1,18 64:15 65:2,13 66:1 67:6 68:12,19 69:3,16 71:6,12 71:25 73:18 76:21 78:6 79:15 80:19 81:7,15 82:19 83:6,11,19 84:17,23 91:23 99:17 100:24 102:20 104:11 104:19 105:3 106:19 107:11 107:18 109:19 110:8,12 112:2 112:19 113:7 113:17 114:1 115:11,20

116:6,13 117:5
117:12 119:6
119:15,20
120:4,13 121:5
121:13,25
122:10,19
123:9,24
125:11 126:20
127:2 131:3,10
132:2,23
136:22 138:3
140:22 141:9
143:2,7,25
144:10,17
145:6 146:15
147:3,9 148:17
148:22 149:19
150:4,23 151:7
151:17 152:4
155:24 156:13
157:6,11,17
161:7 162:4,17
163:24 164:6
164:10 165:15
166:13 167:17
167:25 170:23
173:2,8 176:4
178:4,25 179:9
183:20 186:5
186:14,19
190:7 191:12
191:18 192:4
194:10 195:2
195:10 196:15
200:1 202:8
203:12 204:23
205:22 206:13
206:23 207:7
207:17 208:3,5
208:7,17 209:7
211:13 212:5
212:14 213:5
213:24 214:7
214:18 215:4
215:13 217:2
217:21 218:3
218:10 222:3
222:18 223:2
223:22 224:1,6
225:17,23
226:15,23
227:5,13,22
228:7,22 229:5
229:17 230:6
235:15 236:9
236:21 237:5
237:20 238:11
238:18 239:9
240:6,16,25
245:11 246:1
247:14 248:12
248:23 249:3
249:22 250:6
250:11,18,24
252:18 253:15
255:8,14,16,21
256:12 258:3
258:13,25
259:20 260:2
260:17 261:2
261:21 263:7
263:12,18,25
264:7,14,19
265:3,13 266:6
266:19 267:1
268:21 269:11
270:15,24
273:1 274:2,9
274:16,25
275:8,17,20
278:1,15 279:7
279:15,21
280:14 281:7
281:13,21
282:4,20
283:11,20
284:10,21
285:6,21 286:7
286:13,19
287:3,15,19
288:3,15 289:4
289:11 290:20
291:3,9,25
292:13,21
293:12,20
294:16,22
296:25 297:16
297:23 298:9
300:12,22
301:10,23
303:3,23
304:24 305:5
305:22 306:15
306:21 307:13
307:24 308:5
308:19 309:11
309:24 310:8
310:19 311:10
311:16,23
312:13,19
313:2,21,25
316:17,25
317:10,16,25
318:17,23
319:17 320:13
320:20 321:24
323:5 324:5,16
324:25 325:7
326:21 327:13
330:3,23
331:10,20,25
333:4 334:11
335:9 337:19
339:6,11
340:10 341:14
342:10,19
343:11 344:15
344:20 345:9
345:17 347:1
349:20 351:17
352:5 353:10
353:20,25
354:6,12 358:7
358:8
**witnessed**
236:19 237:18

237:24 238:6,9 269:9
**witnesses'** 359:3
**wme** 286:23 287:7
**woke** 28:8
**woken** 29:5
**woman** 78:20 99:2 100:5,10 100:12,20 101:1,4 103:19 103:24 105:11 105:23 172:1 191:6 298:7 299:5,6 329:9 331:15,15 355:20
**womb** 129:13 129:15,19,22 129:25 130:10
**women** 76:15 76:19 77:21 80:21 83:22 102:23 103:6 103:18 107:6,7 107:8,15,24,25 108:1,1 140:9 176:23 200:17 200:18 275:13 297:14 327:10 331:16 356:1
**women's** 191:5
**wonderful** 193:12
**word** 40:8 124:4 165:16 182:24,25 184:13 185:2 190:13 195:14 196:5,7,12,16 197:6 206:4 214:7,22 217:3 220:4 230:10 231:3 232:11 240:21 269:16 269:17 273:3 311:24 316:4 323:1,6,15,18 324:13,22 325:3 329:16 330:8 344:1
**wording** 268:5
**words** 28:10 57:7 61:12,14 76:18 104:5 131:20 139:16 166:17 167:2,4 178:11 190:24 190:25 191:2,4 191:8,12 195:16 199:10 207:11 213:25 214:13 217:13 258:8 268:12 269:12,14 273:12 277:3 324:17 336:25 337:25
**work** 22:19 31:23 32:1 40:14 42:4 51:2 59:5,7,20 60:14 86:6,15 86:19,23 87:20 89:16 102:17 112:17 116:11 149:16 171:3 175:3 188:8 193:14 197:5 200:18 214:20 228:6 230:4 246:9 253:6 264:11 330:20 339:24 344:18 345:2,6
**worked** 105:11 105:23 124:17 124:18 167:12 167:21 168:13 180:11 196:8 265:5 266:2 337:15
**worker** 256:21 256:25
**workers** 56:6 58:11
**working** 49:15 60:17 93:21 95:16 102:8 128:9 129:2 161:15 168:20 168:25 169:3 174:14 179:17 210:14 299:19 307:14 309:15 310:10 319:13 328:14
**workplace** 86:2 115:9
**works** 80:22 171:4
**world** 27:17 97:4 98:9 109:3 114:19 129:15,19,20 129:25 130:2 282:7 308:21
**worried** 304:15
**worst** 269:5 275:2,15
**wow** 203:22
**wrap** 320:10
**wrapped** 145:1
**write** 40:21 150:1 166:17 170:2 180:3 209:9
**writer** 71:12 87:3 136:17 165:23 172:2 180:2 340:18
**writers** 174:24 226:6 228:15 228:17 229:15

229:22
**writes** 89:10 93:18 136:2 159:19 244:24
**writing** 71:7 106:25 162:9 167:6 174:12 174:18 226:5 338:19 340:18 342:15
**written** 40:19 48:25 50:24,25 58:18,24 69:10 76:21 90:5 156:21 157:1 158:11,14 167:5 174:1 192:20 229:21 250:21 331:14 331:15 339:8 339:21 352:11 352:19
**wrong** 28:18 139:10,14,21 144:5 207:8 272:16 313:18 314:11
**wrote** 41:7 77:8 79:22 89:12 107:2 109:9 166:25 170:4 176:11 190:4 194:1 210:5 211:7 229:23 230:1 272:3 275:4 337:21 340:15

**y**

**y** 140:2
**yeah** 20:18 21:5 21:21 22:6 25:12 26:15 29:4 30:17 31:2 32:7,24 33:14 34:5,5 36:9 37:4 38:16 40:4 41:25 45:10 49:10 53:13 54:1 57:2 61:13,13,13 62:18 77:9 97:16 98:11,13 99:25 105:21 110:23 134:25 158:24 162:17 163:12 165:19 169:23 174:17 188:23 189:3 211:4 215:24 216:5 267:1 269:21 278:5 283:25 286:7 290:4 294:24 314:10 343:16 351:6
**year** 25:14,21 25:21 52:16,17 91:1 109:16 210:15
**years** 24:13,16 24:22 25:19 47:17 49:25 52:9,21 54:12 77:17 99:4,15 108:22 128:13 128:20 302:10 327:11
**yelled** 298:21
**yesterday** 69:5 72:10 133:24 303:12,17,24 304:2,9 316:8 316:12 322:6 322:14,24 335:5,12,14,15 335:19 336:5,9 351:3
**yesterday's** 323:24
**york** 1:2 2:2 3:21,21 6:8,8 8:21,21 67:7 69:6,10 70:24 71:8 73:5,10,14 109:2 214:9 220:24 305:7 320:10 353:4,7 359:1
**young** 80:23 224:18,19,22 225:1 308:23
**yurman** 223:13

**z**

**z** 11:1
**zach** 11:4
**zoom** 5:15 6:5 6:13 7:8,9 11:5 54:2 97:25 107:24 161:5 161:10 220:14 243:19,22

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit I

**From:** Jason Sunshine <jsunshine@lftcllp.com>
**Sent:** Monday, November 10, 2025 4:11 PM
**To:** Licette Lozano; Calendar LA; Rosemary Lopez
**Cc:** Morgan Anastasio; Chip Babcock; Joel Glover; Hudson, Esra; Bruno, Matthew; Gottlieb, Michael; Bender, Kristin; Nathan, Aaron E.; Meryl Governski; Connolly, Michaela; Taustine, Melissa; Kristin Tahler; Maaren Shah; Nicholas Inns; Bryan Freedman; mitra@ahouraianlaw.com; Local KAF. Counsel; Local MS. Counsel; Summer Benson; Theresa Troupson; Vaneta Birtha; Alexandra Shapiro; Jonathan Bach; Alice Buttrick; Rose Khatchikian
**Subject:** Jamey Heath Confidentiality Designations [Lively v. Wayfarer et al., No. 24-cv-10049 / Jones v. Abel et al., No. 1:25-cv-00779-LJL]
**Attachments:** Jamey Heath 10-8-2025 Confidentiality Designations.pdf; Jamey Heath 10-9-2025 Confidentiality Designations.pdf

***** EXTERNAL EMAIL *****

All,

Please see the attached deposition transcripts of Jamey Heath with confidentiality designations pursuant to the Protective Order:

- The highlighted portions of the transcripts are designated as confidential.
- The rest of the testimony is hereby de-designated.
- There shall be no change to the pre-existing designations of documents marked as exhibits.

All rights reserved.

Thanks,
Jason

Jason H. Sunshine, Esq.
LINER FREEDMAN TAITELMAN + COOLEY LLP
1801 Century Park West, 5th Floor
Los Angeles, California 90067
Tel: (310) 201-0005
Direct: (310) 201-4285
Cell: (917) 841-8716
Fax: (310) 201-0045
Web: www.lftcllp.com

LF TC Liner Freedman Taitelman+Cooley

Home

You came here because you have a CRISIS... Relax. We will take care of it. Liner Freedman Taitelman + Cooley LLP " THR the go-to for alpha dogs who see themselves as the underdogs in a crisis. " L.A. Times – L.A. Influential Celebrity legal pit bull. " The Hollywood Reporter an expert in crisis [...]
www.lftcllp.com

*Please note that LFTC's domain name has changed from ftllp.com to lftcllp.com. Emails sent from this domain are not spam.*

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and, as such, is privileged and confidential. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF JAMEY HEATH
Los Angeles, California
Wednesday, October 8, 2025

Stenographically Reported by: Ashley Soevyn, CALIFORNIA CSR No. 12019

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.
Consolidated Defendants.

---

**CONFIDENTIAL**

Video-recorded Deposition of JAMEY HEATH, taken on behalf of the Plaintiff Blake Lively, Pursuant to Notice, at the offices of Manatt Phelps & Phillips, 2049 Cenury Park East Los Angeles, California beginning at 9:12 a.m. and ending at 7:41 p.m. on Wednesday, October 8, 2025, before me, ASHLEY SOEVYN, California Certified Shorthand Reporter No. 12019.

A P P E A R A N C E S:

For the Plaintiffs Stephanie Jones and Jonesworks LLC:

QUINN EMANUEL URQUHART & SULLIVAN
BY: KRISTIN TAHLER
BY: OLIVIA HOLMES
Attorneys at Law
865 S. Figueroa Street
8th Floor
Los Angeles, California 90017
kristintahler@quinnemanuel.com
oliviaholmes@quinnemanuel.com
(212) 849-7000

-AND-

QUINN EMANUEL URQUHART & SULLIVAN
BY: MAAREN A. SHAH
Attorney at Law
51 Madison Avenue
22nd Floor
New York, New York 10010
maarenshah@quinnemanuel.com
(212) 849-7000

A P P E A R A N C E S:

For the Plaintiff Blake Lively:

MANATT PHELPS & PHILLIPS LLP
BY: ESRA HUDSON
BY: STEPHANIE ROESER
BY: KATELYN CLIMACO
Attorneys at Law
2049 Century Park East
Suite 1700
Los Angeles, California 90067
ehudson@manatt.com
sroeser@manatt.com
ehudson@manatt.com
(310) 312-4207

A P P E A R A N C E S:

For the Plaintiff Blake Lively:

WILLKIE FARR & GALLAGHER
BY: MICHAEL GOTTLIEB
Attorney at Law
2029 Century Park East
Los Angeles, California 90067
mgottlieb@willkie.com
(310) 855-3000

-AND-

WILLKIE FARR & GALLAGHER
BY: KRISTIN BENDER (Via Zoom)
Attorneys at Law
1875 K Street
Northwest
Washington, D.C. 20006
kbender@willkie.com
(202) 303-1245

A P P E A R A N C E S:

For the Plaintiff Blake Lively:

SLOANE OFFER WEBER AND DERN
BY: LINDSEY STRASBERG (VIA ZOOM)
Attorney at Law
10100 Santa Monica Blvd., Ste. 750
Los Angeles, California 90067
(310) 248-5100

A P P E A R A N C E S:

For the Defendants Wayfarer Studios LLC, Jennifer Abel, Melissa Nathan and Justin Baldoni, Jamey Heath and Steve Sarowitz:

LINER FREEDMAN TAITELMAN+COOLEY
BY: BRYAN FREEDMAN
BY: SUMMER BENSON
BY: JASON SUNSHINE (VIA ZOOM)
Attorneys at Law
1801 Century Park West, 5th Floor
Los Angeles, California 90067
bfreedman@lftcllp.com
sbenson@lftcllp.com
jsunshine@lftcllp.com
(310) 201-0005

A P P E A R A N C E S:

For the Witness Justin Baldoni:

SHAPIRO ARATO BACH
BY: ALEXANDRA SHAPIRO
BY: JONATHAN P. BACH
Attorneys at Law
1140 Avenue of the Americas
17th Floor
New York, New York 10036
ashapiro@shapiroarato.com
jbach@shapiroarato.com
(212) 257-4880

A P P E A R A N C E S:

For the Defendants Wayfarer Studios LLC, Jennifer Abel, Melissa Nathan and Justin Baldoni, Jamey Heath and Steve Sarowitz:

AHOURAIAN LAW
BY: MITRA AHOURAIAN
Attorney at Law
2029 Century Park East
Suite 400
Los Angeles, California 90067
mitra@ahouraianlaw.com
(310) 376-7878

For the Defendants Jed Wallace and Street Relations, Inc.:

JACKSON WALKER LLP
BY: JOEL R. GLOVER
Attorney at Law
1401 McKinney Street
Suite 1900
Houston, Texas 77010
jglover@jw.com
(713) 752-4226

A P P E A R A N C E S:

Also Present:

Blake Reynolds, (Via Zoom)

Justin Baldoni, Defendant

Dan Acosta, Veritext Legal Solutions Concierge (Via Zoom)

Jonathan Hernandez, Videographer

INDEX TO EXAMINATION

WITNESS: JAMEY HEATH


| EXAMINATION BY: | PAGE |
|---|---|
| MS. HUDSON | 17 |

# INDEX TO EXHIBITS

JAMEY HEATH

BLAKE LIVELY V. WAYFARER STUDIOS LLC, ET AL.

Wednesday, October 8, 2025

Ashley Soevyn, CSR No. 12019


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | So glad you've joined us! document; Bates No. HEATH_34943 - 34970 | 97 |
| Exhibit 2 | Email dated 11/10/23 from Alex Saks to Alex Saks; Bates No. AS8 | 117 |
| Exhibit 3 | Email dated 3/12/23 from Alex Saks to Jamey Heath; Bates No. HEATH_48501 | 119 |
| Exhibit 4 | Email thread dated 4/27/23 from Jamey Heath to Jill Sacco; Bates No. HEATH_48499 - 48500 | 125 |
| Exhibit 5 | Document titled No Quote/Non-Precedental; Bates No. SPE_BL1 - SPE_BL140 | 153 |
| Exhibit 6 | Text messages dated 12/9/22; Bates No. BALDONI_18877 - 18878 | 160 |
| Exhibit 8 | Text messages 12/19/22; Bates No. BALDONI_18879 - 18881 | 169 |
| Exhibit 9 | Text messages date range: 1/4/2023; Bates No. BL-21306 - 21307 | 173 |
| Exhibit 10 | Email thread dated 5/21/23 from Nicholas Pizzino to Elyse Litwack; Bates No. HEATH_46126 - 46137 | 197 |

INDEX TO EXHIBITS
JAMEY HEATH
BLAKE LIVELY V. WAYFARER STUDIOS LLC, ET AL.
Wednesday, October 8, 2025
Ashley Soevyn, CSR No. 12019


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 11 | Text messages date range: 6/1/2023; Bates No. BL-11580 -11581 | 214 |
| Exhibit 12 | Text messages dated 5/28/2023; Bates No. HEATH_35492 - 35493 | 254 |
| Exhibit 13 | Email thread dated 11/9/23 from Lindsey Strasberg to Imene Meziane; Bates No. WAYFARER_140991 - 140993 | 261 |
| Exhibit 14 | Prayers and support text message dated 11/12/23; Bates No. HEATH_51120 - 51125 | 273 |
| Exhibit 15 | Second Amended Complaint for Sexual Harrasment, Retaliation, Breach of Contract, False Light, Defamation and other claims | 281 |
| Exhibit 16 | Text messages dated 6/17/24; Bates No. TOSKOVIC_677 - 678 | 313 |
| Exhibit 17 | 18 | 315 |
| Exhibit 18 | Spreadsheet of timeline | 315 |
| Exhibit 19 | Email thread dated 8/7/24 from Jennifer Abel to Katie Case; Bates No. HEATH_28187 | 339 |
| Exhibit 20 | Email thread dated 8/8/24 from Jed Wallace to Katie Case; Bates No. SR1.9 - 10 | 348 |

INDEX TO EXHIBITS

JAMEY HEATH

BLAKE LIVELY V. WAYFARER STUDIOS LLC, ET AL.

Wednesday, October 8, 2025

Ashley Soevyn, CSR No. 12019


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 21 | Text messages date range: 8/10/24 - 1/10/25; Bates No. SR 1.54 - 55 | 352 |
| Exhibit 7 | Text messages dated 12/24/22; Bates No. BALDONI_33491 - 33495 | 382 |

***CONFIDENTIAL DEPOSITION PROCEEDINGS***

WEDNESDAY, OCTOBER 8, 2025

---000---

THE VIDEOGRAPHER: Good morning. We're on the record.

The time is 9:12 a.m. Pacific Daylight time. Today is October 8th, 2025. My name is Jonathan Hernandez. I'm a video technician with Veritext Legal Solutions, located in Los Angeles, California. We are recording these proceedings at 2049 Century Park East, Los Angeles, California.

This is the video deposition of Jamey Heath in the action entitled Blake Lively v. Wayfarer Studios LLC, et al. This deposition is being taken on behalf of the plaintiff. The case No. is 24-cv-10049.

Now, would you all please identify yourselves and who you represent, starting with the noticing attorney.

MS. HUDSON: Esra Hudson of Manatt, Phelps & Phillips on behalf of Plaintiff, Blake Lively.

MS. ROESER: Stephanie Roeser of Manatt, Phelps & Phillips on behalf of Plaintiff, Blake Lively.

MS. CLIMACO: Katelyn Climaco also from Manatt, Phelps & Phillips on behalf of Plaintiff, Blake Lively.

MR. GOTTLIEB: Mike Gottlieb from Willkie Farr & Gallagher on behalf of Ms. Lively.

MR. GRAMAJO: Fraylin Gramajo from Manatt, Phelps & Phillips on behalf of Ms. Lively.

MS. TAHLER: Kristin Tahler, Quinn Emanuel, on behalf of Stephanie Jones and Jonesworks.

MS. HOLMES: Olivia Holmes from Quinn Emanuel, on behalf of Stephanie Jones and Jonesworks.

MR. GLOVER: Joel Glover of Jackson Walker for Jed Wallace and Street Relations, Incorporated.

MS. BENSON: Summer Benson of Liner Freedman Taitelman & Cooley on behalf of the Wayfarer parties.

MS. AHOURAIAN: Mitra Ahouraian on behalf of the Wayfarer parties.

MR. FREEDMAN: Bryan Freedman on behalf of Jamey Heath, the deponent, Justin Baldoni, Jen Abel, Melissa Nathan, and their related entities and the Wayfarer parties.

MS. SHAPIRO: Alexandra Shapiro of Shapiro Arato Bach on behalf of Mr. Heath and all the Wayfarer related parties.

THE VIDEOGRAPHER: Thank you.

MS. HUDSON: Just for the record, also present here today are parties Jennifer Abel, Steve Sarowitz, and Justin Baldoni.

MS. SHAPIRO: And we are designating this deposition as confidential, pursuant to the protective order.

THE STENOGRAPHIC REPORTER: Okay. Good morning, everybody. I'm Ashley Soevyn, California reporter 12019.

Sir, can I please have you raise your right hand?

Do you solemnly state that the testimony you're about to give in this deposition will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

THE STENOGRAPHIC REPORTER: Great, thank you.

EXAMINATION

BY MS. HUDSON:

Q Now, Mr. Heath, can you state your full name for the record?

A Jamey Heath -- or my legal name?
Q Yes.
A James Heath.
Q Have you ever been known by any other name?
A I have, Jamey, my whole life. Also, professionally, for many years, I went by Jamey Jaz, J-A-Z.
Q And you spell Jamey, J-A-M-E-Y; is that right?
A Correct.
[redacted]
Q Have you been deposed on any other occasions?

A I have not.
Q But you've sat in on quite a few depositions; is that right?
A I have.
Q Are there any depositions that have been taken in this case that you did not sit in on?
A Yes. Several.
Q Do you recall which ones you did sit in on?
A I can do my best.
Q That's all I can ask.
A Ms. Lively, Jennifer Abel. And when I say "the others," I was not present for all of them, for the duration.
Q You were -- you were present for the full duration of Ms. Lively's?
A I was. Jennifer Abel, in and out, one of the days. Melissa Nathan, in and out. I barely saw much of hers. Of course, Justin Baldoni's.
Q And you -- you were present for all of Justin Baldoni's deposition, correct?
A Correct.
Present for Steve Sarowitz for the first two hours, and then I was not here. Portions of Isabela Ferrer. Most of -- well, not true, probably

about half of Jenny Slate's. A quarter or so of Colleen Hoover. I was present for Ange Giannetti.
Q For the entire deposition?
A Correct. Some of -- no, was I in person? I was in person for Danny Greenberg.
Q So you -- you participated in the -- you were present for the entire deposition for that one?
A Correct. You might have to help me because there's a lot of people --
Q Warren Zavala?
A Warren, I did not see.
Q Josh Greenstein?
A I did not see Warren. Josh, portions of it, small portions.
Q Katie Case?
A I think maybe 10 minutes of that.
Q Breanna Koslow?
A Probably the same, a few minutes.
Q Okay.
So having participated in all or part of these many depositions, you have a pretty good understanding of what the rules of the road are for depositions, right?
A I believe I do.
Q I am not going to repeat those for you

here today. But I do want to ask you if you are taking any medication that will affect your testimony today?

A I have not.

Q Have you consumed alcohol in the last 24 hours?

A I've never had a drink of alcohol.

Q You've never had alcohol?

A In my life.

Q Are you under the influence of any substance that would affect your testimony today?

A Coffee.

Q Do you think your coffee is going to affect your testimony?

A No.

Q Is there any reason that you can't give your best testimony here today?

A There is not.

Q When did you first meet Justin Baldoni?

A Meet him? Maybe 20 years ago.

Q And in what context did you meet him?

A He was friends with mutual friends. I think he had just moved to Los Angeles or somewhere around that time and so we knew of each other. I actually knew of him before that as well because my

family knew his family. So I knew of him but hadn't met him.

Q When you say "your family knew his family," were you familiar with each other through your church?

A No. Which is not a church, by the way, But just for clarification. But no, my grandmother knew his mom.

Q Got it. And when you say "it's not a church," you mean, Baha'i, you don't refer to it as a church?

A Yeah. There is no clergy in the Baha'i faith.

Q I understand.

And at some point, you and Mr. Baldoni became close, correct?

A Yes.

Q When did that take place?

A Fifteen years ago about.

Q And what brought you from this relationship where you knew each other through this family relationship to becoming close friends?

A Justin was hosting in his home, what would you call it, a gathering of sorts of different artists, people connected to the entertainment

field. Not only the entertainment, but primarily who were talking about elevated concepts, like how we can be better in the world. And to talk about spiritual concepts no matter where you were from. What your spiritual background didn't matter, that wasn't the point. It was more just to find out what we all agree upon, and how do we unify in that. He -- I saw him somewhere. He invited me to it.

Q And you said that was about 15 years ago?

A Correct.

Q And then, how did you become friends more closely from that experience?

MS. SHAPIRO: Objection.

THE WITNESS: Through that experience, we started spending more time. I admired him for his unique ability to inspire others to care about things they may have not thought about they cared about. And he's 15 years younger than I am, about 14. And I was impressed with his ability to inspire all age groups.

BY MS. HUDSON:

Q And so over the course of time, he became not just a close friend but your best friend, right?

A One of my best friends for sure.

Q You often describe him as your best

friend, right?
A I often describe him as one of my best friends for sure.
Q And have even described him as your brother, right?
A I do, indeed.
Q And you've said publicly that you love him?
A I do.
Q And he has said that he loves you, right?
A I believe he does.
Q And that's accurate; you have a very affectionate relationship with each other?
A Sure.
Q You list him as one of the top three people in your life who you think would drop everything for you, right?
A Indeed.
Q And he's even given you money when you were having financial trouble, right?
A You've done your research. He has.
Q And what were the circumstances under which that occurred?
A Hit a rough patch in your life. And as you're navigating through that rough patch, he

offered support.
Q And when was that?
A Fourteen years ago. Somewhere around that time, maybe a little less. But...
Q And your wives are also close friends, right?
A They are.
Q You would describe them as best friends?
A Of each other's best friends. I only make the distinction because there are many people that you enjoy friendship with and are a circle of trust. And he is amongst the top of those, and I believe they are as for each other as well.
Q Did Mr. Baldoni date your wife at some point?
A No.
Q He never dated her?
A No.
Q Did you date his wife?
A No.
Q Have you ever told anyone that Mr. Baldoni dated your wife?
A They -- Justin met my wife at a salsa club, invited her to the very thing that I had mentioned, the gathering he was doing, and -- and

for about five minutes, they kind of wondered, huh, you're good looking, you're good looking. Hung out a little bit. Was it a dates? And -- and that became a joke that nothing -- nothing transpired other than that little moment. And that became a joke that I joke with him, that he dated my wife before I ever was with him -- with her.

Q And in addition to being your best friend, your brother, someone that you love, someone who you are close with his family, Mr. Baldoni is also your boss, right?

MS. SHAPIRO: Objection.

THE WITNESS: Technically, yes.

BY MS. HUDSON:

Q And he decides, for example, how much you get paid, right?

A He is one of them, yes.

Q And the other one is Mr. Sarowitz, right?

A Yes.

Q And Mr. Baldoni, along with Mr. Sarowitz, also decides if you get equity in Wayfarer, correct?

A Yes.

Q Which they haven't decided to give you yet, correct?

MS. SHAPIRO: Objection.

THE WITNESS: No. I have a small piece of equity.

BY MS. HUDSON:

Q You have a small? How much equity do you have in Wayfarer?

A It's either 1 or 2 percent.

Q Do you -- is that written down somewhere or is that a verbal equity offer?

A It was verbal and then it was written down somewhere. And I do not know where it is, but it is.

Q You think it's written down somewhere that you don't know?

A A few years ago, they presented me with a piece of paper telling me that you have some equity now in Wayfarer. It's three years ago, I guess. Don't quote me on that, but that's my memory. And -- and I don't recall if it's been memorialized beyond that.

Q You -- Mr. Baldoni mentioned on Monday in his testimony that you have a Grammy. It sounds like you had a career prior to going -- becoming the CEO of Wayfarer. What did you do?

A I was a -- it's hard to say "was," but composer, producer of music, film, television,

albums, and had production companies, a record label under Universal. So everything in the music entertainment field was where my career laid.

Q You said you had a record label under Universal?

A I did.

Q What was the name of the label?

A Opopp, O-P-O-P-P.

Q And what years did you have that label at Universal?

A I was 26, 27. So whatever year that is, 20 years ago. And that label lasted a -- maybe three, four years.

Q Okay. And then did you work for other companies or were you an independent producer?

A For the most part, independent. I've never worked for a company in that regard. I've always had my independent life. But you contract, and then you're doing something for a while. I was signed with EMI, Warner Bros., a couple other companies as a writer, and so they are essentially my publisher. But as a company and working wise, I've always been independent.

Q And how did you win a Grammy?

A Got lucky.

Q And who did you -- what work did you do for the Grammy?
A I produced Gladys Knight, and her album won R&B Album of the Year, and I was one of the fortunate ones.
Q And why did you stop this working -- doing this career in the music industry?
A Well, I'm trying to accept that I -- that -- to say that I've stopped because it's always part of my life. So the idea that that's not present as much as it was, it's hard to say, so forgive me for the pause. What was your original question? Would you repeat it? I'm sorry.
Q Why did you stop working in the music industry?
A The music industry has changed quite a bit. So what was once an incredibly lucrative opportunity to -- to be successful and finance wise and, also, the elite musicians and writers and producers, the ones that were really good, had an outlet to do it. But as technology started growing, then you had more and more. The field became greater. The competition became greater. The products became -- I don't want to judge anyone's product, but maybe it wasn't considered as high a

caliber because you had kids in an apartment on a computer doing something. Didn't maybe have the same integrity. And because of that, the landscape changed. And then as many -- as for many things, you pivot.

Q And you pivoted to Wayfarer?

A I did.

Q How did you -- well, when did you first become employed by Wayfarer?

A About five years ago.

Q And how did you come to be employed there? I realized it's founded by your best friend, but how did you become an employee at your best friend's company?

A As I said, Justin and I have been friends and we worked together a lot before I was at Entertainment. I'm at Wayfarer Studios. He had Wayfarer Entertainment, and I worked a lot on a lot of the projects that he did.

Q What kind of work?

A Did music, scored, and -- and adjacently, consulted with him on things that he was doing.

He then was, about five years ago, was working through something. He asked for my consultation, among some others. The next day he

called and said, I need you to be a part of my company. And I said -- my words were, "fuck off, no thanks," jokingly, Ms. Esra, just so we're clear. Meaning, like, I'm not interested in tending to your garden. I've got my own garden.

So at first I was like, yeah. And I asked, "doing what?" He's like, your whole life has been in the entertainment world. You know what we do. We work together. The way that you lead and operate and your understanding of things is -- I feel is what we need in our company. So...

Q And what position did he offer you?

A There was no particular position. This was the -- he says, I just need you in it. I agreed that I would, at some point, kind of take a look inside.

Q Within --

A Again, this was at a time when I was full-time spending on music and my own production company, and I was at a crossroad.

Q So you were looking for something new, and he was offering something new?

A Kind of lined up.

Q This was in 2020?

A Yes.

Q And when was Wayfarer founded to your understanding?
A Wayfarer Studios?
Q Yes.
A 2019.
Q And if I use the term "Wayfarer," I'm referring to Wayfarer Studios LLC, unless I say otherwise, okay?
A You got it.
Q So it was a fairly new company?
A Yes.
Q Were there any employees when you joined?
A Yes.
Q How many?
A One, two, three, four, five, six, seven -- around 10 maybe, somewhere in that realm.
Q So when you were hired, what position were you hired into?
A As I stated, there wasn't a particular position. In the creative world, it's just more come and bring your creativity, your observation, your consultation, and -- and kind of like see where that -- what that might look like.
Q Well, at some point, you became president, though, right?

A There was a few titles before that, but yes.
Q What was the first title?
A Interim COO.
Q And how long did you hold that position?
A Three months.
Q And then what did you do after that?
A Title?
Q Yes.
A Co-COO.
Q Co-COO?
A Correct.
Q Who was the other COO?
A Manu.
THE STENOGRAPHIC REPORTER: Can I have a spelling, please?
THE WITNESS: M-A-N-U. And for some reason, his last name is escaping me. But I'm happy to give it to you when I recall it.
BY MS. HUDSON:
Q And how long were you then co-COO with Manu?
A Another three months.
Q What was your next position?
A President.

Q How long did you hold that position?
A Until almost two years ago or -- or maybe a year and eight months or so when we brought on Tera Hanks. We gave her the title of president and I became COO -- CEO. So to be clear, the -- at all times, I was, with both titles, essentially, the head of the company in that regard. They are just titles. All of these titles are ridiculous to me anyways.
Q You see yourself as head of the company with respect to the day -- day-to-day operations?
MS. SHAPIRO: Objection.
THE WITNESS: Day-to-day operations, we have an operations manager. So...
BY MS. HUDSON:
Q Well, what do you mean by "head of the company"?
A I just mean the top -- the -- the person that ultimately signs off on -- daily operations would be one of them. Our deals and most of our creative. Of course, not meaning to omit the chairman, but their job is different or their role is different.
Q And in the president role, what is distinct between the president and the CEO

positions?
A I think with each company, that might be different.
Q And just to be clear, I'm asking for Wayfarer?
A I understand. I get you.
For Wayfarer, a lot of people wear and share different hats. So I said earlier, I think these titles for the most part, even though we have to live by them, are only ways to separate some sort of hierarchy, and I think they're stupid for the most part. It just separates people. But you have to have some sort of organizational structure, of course.
So -- so some of the differences is ultimately, I sign off. Tera, who is our president, has her unique set of skills and we utilize them where needed or where she feels they are most needed.
Q So she -- does she support you in the -- in your CEO role?
A Sure.
Q But the buck stops with you, right?
MS. SHAPIRO: Objection.
THE WITNESS: Again, omitting the

chairmen who are not involved daily, yes.
BY MS. HUDSON:
Q And with respect to the structure, under you and Ms. Hanks, what other employees are there at Wayfarer?
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q Let's start with the time period 2023 to 2024.
MS. SHAPIRO: Objection.
THE WITNESS: You want me to name them --
BY MS. HUDSON:
Q Let's identify --
A -- or just the roles?
Q -- what the roles are.
A I see. We have a CFO, a head of physical production, a president of production and development, a vice president of production and development, vice president of operations, a vice president of marketing. At the time, a -- I don't know if he was an SVP or a VP, but of Man Enough. Not specifically the podcast, but anything that was related to it. A controller, two editors, an office manager, many assistants, and maybe I've missed a few.

Q I didn't hear human resources in there.
A Human resources, thank you.
Q So with respect to these positions, the VP of marketing and communications, that's Ashmi Dang?
A Correct.
Q The VP of operations is Mitz Toskovic?
A Correct.
Q And then, Brian Singer is the CFO?
A Correct.
Q And have these people, as I've described them, held these positions since at least 2023?
A Yes.
Q You mentioned Tera Hanks as the president. Andrew Calof, is he the president of production and development?
A Correct.
Q And he's also held that position since 2023?
A Yes.
Q John Logan Pierson, is he the head of physical production?
A He is.
Q Okay. And has he held that position since at least 2023?

A Yes. He -- he -- yes, yes, he has.
Q And then for VP of creative, is that Angela Cardon?
A Yes.
Q Has she held that position since 2023?
A She has.
Q For -- with respect to HR, is Cynthia Barnes Slater your head of HR?
A She is.
Q You know she describes herself online as retired. Is that not accurate?
A She retired from -- she was a head of HR of -- I can't recall the company. It's like GMC or, you know, a big corporation. She retired from that. And then she does private working HR for smaller companies.
Q So in a consultant role, essentially?
A Yes.
Q And how long has she held that position?
A With Wayfarer?
Q Yes.
A As long as I've been there so...
Q Is she physically present in California?
A She is.
Q She doesn't live in Illinois?

A No. Let me rephrase that. Not as far as I know. But yes, she lives in California, unless something's changed.
Q And does Wayfarer have an office?
A Yes.
Q Does Ms. Barnes Slater work in Wayfarer's office?
A Not regularly.
Q Does she work from home?
A Yes.
Q Is there anyone in human resources other than Ms. Barnes Slater?
A I know Mitz assists her in the operations level. Outside of that, no.
Q Has Ms. Barnes Slater always worked at home?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MS. HUDSON:
Q Does she ever come into the office?
A Yes.
Q How often?
A She does not have a schedule, so I would not be able to put a number on it.
Q Can you give me an estimate?

A It would be a guess. Once a month.
Q And who is Shekinah Reese?
A She's my assistant, previous assistant.
Q Okay. And AJ Marbory?
A She was Justin's assistant.
Q And how long was Ms. Reese your assistant?
A There's a block of time that's gone, so I don't want to waste time thinking about it. But a year and a half, maybe two years. Maybe '23, '24.
Q '23, '24? And who is your current assistant?
A I share now an assistant with Tera, who is -- sorry, Isabelle, and I can't recall her last name because it's a wonderful name that's hard to pronounce.
Q And Jarriesse Blackmon, was she your assistant at some point?
A No.
Q Was she someone else's assistant?
A Jarriesse is a male.
Q Oh.
A It's okay. And he works assisting Justin.
Q Okay. Now, during much of Mr. Baldoni's

deposition, he didn't know much about Wayfarer's finances. Is that something you're familiar with?

A More than him. More than him, but I do have a CFO that would know more than I.

Q Okay. What are -- in your CEO role, how would you describe your duties?

A I put them in four buckets, our financial strategy being a part of that. Helping determine what we might invest in, where best to spend our money, utilize it, what kind of deals we're doing, at what level, what the percentages would be on our return. Things of that nature. And included in that would be deal making and approving that.

The second one is then creative. Quality control, making sure that our product is in line within the expectations of Justin, of myself, of course, Steve, and our overall mission to -- that it's aligned with us. And, also, aside from quality, just the creative process.

And then you take a third bucket, which is leadership coaching. And when I say "coaching," I mean that of a how do you inspire one to remember their nobility and that their purpose on life isn't just to use a pen and a piece of paper but, rather, their worth lies in their humanity. And the job

they do is just an extension of their humanity. How do you inspire people in that regard? To inspire that the work that we want to do at Wayfarer, as they hear me often say, it's not about making money. We have to, but that's not our purpose. And to foster a culture that feels safe and trustworthy. Let's put that in the third bucket.

And the fourth bucket would maybe be a bit of a diplomat, I suppose, right, building relationships with others. And while Justin, of course, is the celebrity face as you might see him, and super involved with his creative mind, I'm more of the business face. So...

Q So you build relationships in the business community?

A Agreed.

Q Are you familiar with Wayfarer's profit and loss statements over the last five years?

A I have an overall view.

Q You all produced in this case pursuant to an order Wayfarer's profit and loss statements. And are you -- did you put those together for the production?

A I did not.

Q Have you seen them?

A I don't believe so.
Q They show that Wayfarer has been operating at a net loss since 2020?
A Yes.
Q Does that sound right to you?
A 100 percent.
Q And as -- in 2024, they show that net income was negative 18 million. Does that sound --
A In 2024?
Q In 2024.
A I would have to see something to understand what I'm looking at. So I -- I can't confirm that exactly. But overall, yeah. You mean as -- overall -- forgive me. You're talking about for the year 2024 or as of 2024?
Q For the year -- well, I will show you the statement. You can tell me --
A Okay.
Q -- if you can. But it says that as -- in 2024, Wayfarer's operating at a net loss of $18 million?
A Yeah, I'd have to see what we're -- what we're talking about to understand.
Q Okay. And who prepares the profit and loss statements?

A That would be Brian Singer.
Q Do you know how Wayfarer funds its operations at operating at a net loss of $18 million?
MS. SHAPIRO: Objection.
THE WITNESS: Yeah.
BY MS. HUDSON:
Q How does it do that?
A Steve's investments.
Q So when Wayfarer needs funding, it looks to Steve Sarowitz to provide cash?
MS. SHAPIRO: Objection.
THE WITNESS: There has been a payment -- a funding schedule that he had committed to. And based on that funding, that is what allows Wayfarer to operate.
BY MS. HUDSON:
Q Do you have a contract with Mr. Sarowitz to provide funding at a certain rate for the company?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know.
BY MS. HUDSON:
Q If Mr. Sarowitz decided not to continue to provide the funding, would Wayfarer be able to

continue its operations?
MS. SHAPIRO: Objection.
THE WITNESS: Well, isn't that the million-dollar question? You fund a business in its beginning hoping that it will be profitable. And the goal is to not fund it anymore. But he had committed to do so. But, yeah, of course, it's within his discretion to turn off the faucet.
BY MS. HUDSON:
Q Does Wayfarer have access to lines of credit, loans, or other financing?
A Do we have access? Do we have any lines of credit? Two different questions. We do not from my -- I do not believe we have any lines of credit, no. Access is a different question.
Q Do you know how much revenue Wayfarer received from the film It Ends with Us?
A I have an estimate.
Q What is that?
A To be clear, you want to know our profit, our complete revenue or just our profit?
Q Well --
A Let me just --
Q Why don't we -- why don't you break down the nature of the revenue.

A Sure.

Q And then we can talk about profit.

A We -- I think we have received to date, gross number, about $60 million. We had $40 million, about, invested into it. That is incorrect. We had about $31 million, I believe, invested into it. Correct. And we have about 29 that would be left over after we've paid ourself back. But out of that 29 million, there's a lot of -- a lot of things to still pay for that. So that is just the basic budget that you put in 31, that leaves you with 29. And then you owe contractual obligations that you pay out of that.

So what Wayfarer's profit is, I don't know that yet.

Q You don't know that yet. And you're still paying off those expenses?

A Correct.

Q Do you have an estimate?

A I don't. There's many, many, many, many contracts. Many people that you owe money to when money comes in. So you don't know until you've got all of your accounts that have come in, and then you know where you are. And we're still in that.

Q And are you continuing to receive revenue

related to It Ends with Us?
MS. SHAPIRO: Objection.
THE WITNESS: We will, like any film, it will take many years before you receive all of your income.
BY MS. HUDSON:
Q Do you -- do you get revenue from streaming, for example?
MS. SHAPIRO: Objection. Just to be clear, Counsel, Mr. Heath is not here as a 30(b)(6) witness. He's here in his personal capacity.
MS. HUDSON: Thank you.
BY MS. HUDSON:
Q Go ahead.
A Question again, please?
Q Does Wayfarer get revenue from streaming for It Ends with Us, as far as you know?
A Basically, no. Depending upon where it lives, there might be some different nuance there. But that is part of the distribution deal that you might do with Sony and part of your agreement that they then -- but don't hold me to that because I have to see it. We do a lot of contracts, a lot of different deals. They all look differently. So...
Q And the manner in which Wayfarer received

revenues for It Ends with Us is set forth in the contract with Sony; is that correct?

A Yes.

Q Do you have an estimate for additional revenues that you anticipate coming from It Ends with Us --

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q -- based on the way you understand the revenue streams to be set up?

MS. SHAPIRO: Objection.

THE WITNESS: I do.

BY MS. HUDSON:

Q Okay. And what do you estimate?

A Over the next 10 years, the rough estimate is about another 45 million. Rough estimate. That is, as I'm told very clearly, could drop to 25 in five minutes, and could go up to 55 in five minutes.

Q And what impacts that range --

A Deals --

Q -- to your understanding?

A -- that you have. So like every so often, contracts change with, as you mentioned streaming, what you anticipate is going to happen

based on those sales, doesn't come to fruition. Like a market so to speak, right, you -- you can estimate, but you don't control a market. So based on those.

Q Prior to joining Wayfarer as an employee, had you produced any films?

A As a on-the-ground producer, no. Prior -- I'm sorry. You said prior to it?

Q Correct.

A No.

Q Had you been on a film set before?

A Many.

Q In what capacity?

A As I mentioned, I was a composer for projects throughout my life, so I would visit for those. Without giving you a whole back story, my family was also involved in the entertainment industry, so my childhood and life was only around entertainment, music side and film side. Movie sets and television sets were a normal part.

Q So you said that you had not been a producer on a film, though, before Wayfarer. And what was the term that you used?

A On-the-ground producer.

Q On-the-ground producer?

A Yeah, but that -- that was --
Q What does that mean to you? What's the difference between on-the-ground producer and whatever you did?
MS. SHAPIRO: Objection.
THE WITNESS: Before It Ends with Us?
BY MS. HUDSON:
Q Prior to joining Wayfarer, you said you were not an on-the-ground producer. What did you mean by that?
A I misunderstood your question.
Q Okay.
A Because you asked me prior. I thought I heard you -- what I interpreted your question to be is at Wayfarer. There are other films in Wayfarer that I am -- have producer credit or executive producer credit, and I was just being clear about that. But prior to Wayfarer, correct.
Q So prior to Wayfarer, you were a producer in -- with respect to your music work; is that right?
A Correct.
Q So you had not been a film or TV producer prior to Wayfarer, correct?
A Correct.

Q And when you joined Wayfarer, you said that you were -- worked in an executive producer capacity on other films?

MS. SHAPIRO: Objection.

THE WITNESS: When I joined Wayfarer -- repeat the question, please.

BY MS. HUDSON:

Q You said when you joined Wayfarer, you worked in executive producer capacity on other films for Wayfarer?

A Yeah.

Q How many?

A There are some with title and some without. I would say all of them without title. The reason why I say that is because there's only so many credits that you have for a film for on screen.

Q So you have no film credits for all of the --

A I do. No, I do.

Q Okay.

A On credit film would be about -- sorry to interrupt you -- four or five of them.

Q Four or five?

A I believe so.

Q When you say -- do you know what films

they are?

A Garfield. Eleanor The Great. Ezra. I'm having trouble remembering the other films, but there is one or two more. I just don't know it.

Q Of the four or five films in which you had credit, do you have producer credit on any of those films or is it executive producer?

A Executive producer credit.

Q Did you have a producer credit on any film prior to It Ends with Us?

A I don't know.

Q Can you think of any sitting here today?

MS. SHAPIRO: Objection.

THE WITNESS: At the moment, I can't recall.

BY MS. HUDSON:

Q And at the films that you listed, were any of them produced prior to It Ends with Us?

A Yes.

Q Which ones?

A Ezra.

Q And what -- and to your understanding --

A Garfield.

Q Oh. Oh. Pardon me --

A It's okay.

Q -- to interrupt you.
Ezra, Garfield.
A I think Will and Harper. But I'm -- you're going to have to forgive some of my time because, as you know, the last year has been a year. So my sense of timing is a little. So I don't want you to...
Q And what, in your mind, is the distinction between executive producer and producer?
A In general?
Q Yes. On a film.
A Yeah. A producer is, typically, generally somebody who is involved in a project from the beginning to the end in different capacities. Some are given a producer credit just as part of their contract. For instance, you might have a writer who, as part of their contract, they -- they get a producer credit, even though they won't be in the actual building of the project beyond that. But for the most part, it's people who are involved from the beginning to the end and who have their hands in the sandbox.
Q Handling the day-to-day of producing the film, correct?
A Sure. An executive producer comes in

different many shapes. It could be because you were involved in the -- just developing the project but not involved in producing. It could be because you brought some money to it. There are distributors that, if they distribute the movie, and they would like an EP credit. And then there are vanity credits. Those are pretty much the distinctions.

Q So you got a producer credit on It Ends with Us, correct?

A I did.

Q Why did you receive a producer credit on that film? Let -- let me ask you another question.

You -- you were provided a producer credit at the outset of that film, correct; it was not something that was provided at the end?

MS. SHAPIRO: Objection.

THE WITNESS: Correct.

BY MS. HUDSON:

Q And what did you anticipate your role would be on that film for you to receive a producer credit from the outset?

MS. SHAPIRO: Objection.

THE WITNESS: As I had mentioned, producers are in the sandbox doing the work, creatively, business wise, and that was my

involvement from the outset.
BY MS. HUDSON:
Q Were you involved in all aspects of the film?
A Yeah, generally speaking.
Q And did you anticipate that you would be from the beginning?
MS. SHAPIRO: Objection.
THE WITNESS: It depends on when we -- we determine the beginning.
BY MS. HUDSON:
Q Well, what would you consider the beginning?
A Well, I would say the beginning is when -- film-wise, I don't mean the project, pre-development and all of those stages. Justin had had this film for some time and there was different iterations of it. You don't necessarily have your team together because you don't know what it's going to be yet. But once the movie started coming together, I was extremely instrumental. Let me rephrase that. Hands-on and led our negotiations with Sony.
Q And your producer role was more significant on this movie than it had been on prior

films, correct?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MS. HUDSON:
Q And there were -- on the other films that you mentioned where you worked as an executive producer, there were producers on those films, correct?
A Correct.
Q If you attended Mr. Baldoni's deposition and Mr. Sarowitz's deposition, you might recall we went through some policies and procedures. We're going to do that a little bit today as well.
A You got it.
Q Let me ask you a little bit more about the producer role. When you -- when you're the producer on the film, do you supervise the cast and crew?
MS. SHAPIRO: Objection.
THE WITNESS: Do I supervise the cast and crew?
BY MS. HUDSON:
Q Yes. Do you see your role as including supervision of the cast and crew?
MS. SHAPIRO: Objection.

THE WITNESS: No.
BY MS. HUDSON:
Q Did you see yourself as having any employees who reported to you as producer?
MS. SHAPIRO: Objection.
THE WITNESS: Yeah.
BY MS. HUDSON:
Q Who reported to you?
A Different department heads would report to the producers, not necessarily Jamey. But using the term and title producer, department heads.
Q And do you agree that it's important for any film project to have a process in place for reporting concerns about the workplace?
MS. SHAPIRO: Objection.
THE WITNESS: I do.
BY MS. HUDSON:
Q And that there be protocols in place to ensure a safe workplace?
MS. SHAPIRO: Objection.
THE WITNESS: I do.
BY MS. HUDSON:
Q Do you think it's important for the cast and crew to be trained in the appropriate workplace behavior?

MS. SHAPIRO: Objection.
THE WITNESS: Repeat the question, please.
BY MS. HUDSON:
Q Do you think it's important for cast and crew on a film to be trained in appropriate workplace behavior?
MS. SHAPIRO: Objection.
THE WITNESS: Generally, yes.
BY MS. HUDSON:
Q Do you think it's important that the cast and crew feel comfortable raising concerns they may have about the workplace?
MS. SHAPIRO: Objection.
THE WITNESS: I do.
BY MS. HUDSON:
Q And do you also think it's important that cast and crew can report workplace misconduct to someone other than the person who they believe is engaging in the misconduct?
MS. SHAPIRO: Objection.
THE WITNESS: Repeat the question, please.
BY MS. HUDSON:
Q Do you think it's important that cast and

crew be able to report workplace misconduct to someone other than the person they believe is engaging in the conduct?

MS. SHAPIRO: Objection.

THE WITNESS: Makes sense, yes.

BY MS. HUDSON:

Q And why does that make sense?

A If -- if someone has a concern with someone, to bring it to that person may not always feel safe, so there is another avenue to bring it up.

Q And that's because that person might have a conflict of interest --

A Sure.

Q -- evaluating their own misconduct, right?

MS. SHAPIRO: Objection.

THE WITNESS: I -- I don't want to speculate to what the reason why that person is. But I understand that someone may not want to bring up a concern about a person they may have a concern with directly.

BY MS. HUDSON:

Q Is it also important, in your view, that workplace concerns be investigated?

MS. SHAPIRO: Objection.
THE WITNESS: It depends.
BY MS. HUDSON:
Q On what?
A What the evaluation or what the concern is, or what -- if someone is concerned that the water is too hot, then one might determine there's no need for an investigation. Someone concerned -- so it depends on what the concerns are.
Q Are there any specific concerns that come to mind for you that you think generally would merit an investigation?
MS. SHAPIRO: Objection.
THE WITNESS: I'm sure I can come up with some.
BY MS. HUDSON:
Q Well, why don't you try if there are some that you think of?
MS. SHAPIRO: Objection.
THE WITNESS: That would merit an investigation?
BY MS. HUDSON:
Q Yes.
MS. SHAPIRO: Objection.
THE WITNESS: If there was a clear

concern that someone is being discriminated against.
BY MS. HUDSON:
Q That merits an investigation?
A If there is a clear -- well, I can finish my answer, if that's okay.
Q Sure. I'm sorry. I didn't realize you were still --
A That's okay.
Q Go ahead. Complete your answer.
A If there is a clear concern that someone feels discriminated against, and it is clear amongst the parties that that is what is being expressed and someone knows to do something with something, sure, I'd suppose that's how all HR policies demonstrate things should be done.
Q And would the same be true for concerns about harassment?
MS. SHAPIRO: Objection.
THE WITNESS: I think the same would be true for anything that there might be a legitimate, understandable, recognizable...
BY MS. HUDSON:
Q And how would -- how do you determine if something --
MS. SHAPIRO: I think he was still

talking. Can you not interrupt his answers, please?

BY MS. HUDSON:

Q Oh. Were you still talking?

A I was, but it's okay. Thank you.

Q No, no. You go ahead. You paused so I thought you were done.

A I understand.

Q But if you have more to say, please do.

A If there was a -- if there was an understanding that there was something that needed to be moved beyond just someone expressing something, sure.

Q And I think you said if there was a legitimate, understandable, recognizable concern --

A Yeah.

Q -- that would merit investigation; is that right?

A I don't know if it would merit an investigation. I'm saying that it would merit consideration for a step to be taken.

Q Okay.

A I don't know. These are -- it's kind of a bit of a hypothetical. So if you want to give me, like, a direct thing, I can speak to that.

Q Fair enough.

With respect to things like harassment and discrimination, in your role as CEO, how do you determine if something is a legitimate, understandable, and recognizable concern that merits an investigation?

MS. SHAPIRO: Objection.

THE WITNESS: Well, you can't investigate something if you don't know there's something to investigate. That's -- that's what I mean by recognizable.

BY MS. HUDSON:

Q Are there certain magic words that you look for in making that determination?

MS. SHAPIRO: Objection.

THE WITNESS: No.

BY MS. HUDSON:

Q What kind of information would you need to have for you to determine something was a legitimate, understandable, recognizable concern?

MS. SHAPIRO: Objection.

THE WITNESS: I would need to know what I don't know.

BY MS. HUDSON:

Q Do you, in your role as CE --

A I think anybody would.

Q Okay. Fair enough.
In your role as CEO, do you receive training on harassment, discrimination, and retaliation?
A We do.
Q How often do you receive training?
A Wayfarer gets it -- we have it every year -- every two years, and every year for managers. I believe that's it. I believe that's it.
Q So in that training, do you get information about what kinds of things might fall within the category of a legitimate, understandable, recognizable concern?
MS. SHAPIRO: Objection.
THE WITNESS: We really -- can we do something for a moment? You're quoting something I said in context so that's not my answer for everything.
BY MS. HUDSON:
Q Okay.
A I just want to be clear. Like, from -- in that question, that was it. And you're going to refer to that, which I understand why you might want to, but I want it clear that is not my testimony

and -- and expression for every answer. Okay?
So...
Q So in your training, do you learn information about what type of concern might fall within the categories of harassment, discrimination, or retaliation to trigger your decision to initiate an investigation?
MS. SHAPIRO: Objection.
THE WITNESS: Yeah. We -- we -- I think that's something that everyone learns in those trainings.
BY MS. HUDSON:
Q So when you said that you would need to understand that there was something that needed to be moved beyond someone expressing something, would you rely on your training in order to make that determination?
MS. SHAPIRO: Objection.
THE WITNESS: I think anyone would rely on training in knowing how to proceed with something.
BY MS. HUDSON:
Q Would you rely on your employment policies to make that decision?
MS. SHAPIRO: Objection.

THE WITNESS: Sure.
BY MS. HUDSON:
Q Have you read Wayfarer's employment policies?
A I have.
Q Do you think it's important for you to be familiar with the policies as the CEO of Wayfarer?
A I do.
MS. SHAPIRO: Objection.
Counsel, could we take a 10-minute break?
MS. HUDSON: Sure.
THE WITNESS: How long have we been going?
MS. SHAPIRO: About an hour.
THE VIDEOGRAPHER: We are going off the record. The time is 10:15 a.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record. The time is 10:33 a.m.
BY MS. HUDSON:
Q Mr. Heath, do you ever record phone calls?
A I have.
Q Do you have a practice of recording phone calls?

MS. SHAPIRO: Objection.
THE WITNESS: I do not.
BY MS. HUDSON:
Q How often do you record phone calls?
MS. SHAPIRO: Objection.
THE WITNESS: In my entire life, I've recorded three maybe, maybe four in the same period of time.
BY MS. HUDSON:
Q In your entire life, you've recorded three or four phone calls?
A Correct.
Q And -- and in what -- when -- when were those phone calls recorded?
A Sometime at the -- I don't know the months, but in 2024 of -- I believe around August, I believe, maybe July, somewhere in there.
Q And were all of those phone calls that you recorded related in some way to It Ends with Us?
MS. SHAPIRO: Objection.
THE WITNESS: In some way, yes.
BY MS. HUDSON:
Q Sunday we received a production of four call recordings under your Bates-label starting with Heath. Are those the calls that you recorded?

MS. SHAPIRO: Objection.
THE WITNESS: Yes.
MS. SHAPIRO: Don't testify as to any information provided by counsel to you.
BY MS. HUDSON:
Q And just so I understand, in your entire life, you have never recorded a phone call except for the four calls that were produced to us; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: Not that I can recall, other than if -- and I don't have a particular memory, but so I'm forthright, there have been a few therapy calls -- a few therapy calls I've had over my lifetime, that the therapist would suggest to record for the reflection. But I don't have a particular memory of if I did or not.
BY MS. HUDSON:
Q And in those calls, both you and the therapist knew that the call was being recorded, right?
A Correct.
Q And you said it was maybe three or four calls. Could you not remember that it was four?
MS. SHAPIRO: Objection.

THE WITNESS: I just wanted to be accurate.
BY MS. HUDSON:
Q Do you ever call -- record Zoom meetings?
A I have no memory of recording a Zoom, unless it has been a Zoom that everyone knows is being recorded for whatever the purpose it would be recorded.
Q So you have no recollection of ever recording a Zoom without the participants all knowing that a Zoom is being recorded; is that right?
A Correct.
Q And sitting here today, can you recall any Zooms that were recorded even in that manner?
MS. SHAPIRO: Objection.
MS. HUDSON: I am going to strike that question.
BY MS. HUDSON:
Q Let's go back to the calls.
You said there were four calls that you recorded in the July to August 2024 time frame, correct?
MS. SHAPIRO: Objection.
THE WITNESS: I believe they were that

time.

BY MS. HUDSON:

Q Okay. For each of those calls -- let's start with the first one you recall, the earliest call that you recall recording.

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q Where were you located?

A I don't recall the sequence of them so --

Q Okay.

A -- if you'd like to pick a call and we can talk about that particular one.

Q Well, there was one call that sounds like the participants are Stephanie Jones and Jennifer Abel; is that accurate? There is one call that includes Stephanie Jones and Jennifer Abel?

A I don't know that it includes Jennifer Abel, but...

Q Okay. So there is a call that includes Stephanie Jones; is that right?

A Correct.

Q All right. When was that call made?

A Sometime in August, the beginning of August in '24.

Q And where were you located when that call

was recorded?
A I believe I was in Chicago.
Q Were -- where were you in Chicago? Were you in an office? Were you in a car? What was your physical location at the time the call was recorded?
A I don't recall.
Q You don't recall whether you were moving at the time the call was made?
MS. SHAPIRO: Objection.
THE WITNESS: I don't. I may have been. I don't. I don't.
BY MS. HUDSON:
Q Other than you and Stephanie Jones, did anyone else participate in the call?
A What do you mean "participate"?
Q Was there anyone else present for the call?
A Oh, there could have been. I don't recall. I don't recall specifically.
Q You don't recall if there was -- there was another woman involved that participated?
A I don't. I don't.
Q And where was Stephanie Jones located for that call?
A I don't know.

Q Why did you record the call?
A I felt the need to document what I was unsure and felt uneasy with Stephanie's, I don't want to say her state of mind, but what she might or might not say that felt contentious.
Q Were you concerned that she was going to tell Sony that she did not place a story in The Daily Mail?
MS. SHAPIRO: Objection.
THE WITNESS: Well, no, I was not concerned -- why don't you ask the question again because I might need it rephrased.
BY MS. HUDSON:
Q Were you concerned that Ms. Jones was going to contact Sony and tell them that she had not placed an article in The Daily Mail?
MS. SHAPIRO: Objection.
THE WITNESS: No, that wasn't my concern.
BY MS. HUDSON:
Q Why did you feel the need to record the call?
MS. SHAPIRO: Objection.
(Jonathan Bach entering deposition room.)
THE WITNESS: At this point, I had grown concerned with Stephanie's ability to adequately

represent and speak on our behalf. And based on some previous conversations with her, I was losing confidence, and I knew this was a testy situation. And I wanted to document anything she might say to me.

BY MS. HUDSON:

Q Did you tell Ms. Jones that you were recording the call?

A I did not.

Q Why not?

A Simply because I wanted to have documented what she -- where she was or her state of mind was, and I didn't allow her to know.

Q You didn't want her to know?

A I didn't deliberately think I didn't want her to know. I just didn't announce it.

Q Were you planning to use it against her in someway?

A No.

Q And you said you couldn't remember if there was a third person listening in to the call?

A I just don't recall, but if there was, then I'm not saying there wasn't. I just don't recall it.

Q So you don't remember, for example, if at

some point you muted the phone call and talked to another party who was overhearing that call?

MS. SHAPIRO: Objection.

THE WITNESS: I haven't listened to the call other than one time I listened to a portion of it. I did have -- I don't recall when, so I just don't.

BY MS. HUDSON:

Q Do you recall specifically the subject matter that you were discussing?

A Yeah.

Q What was the subject matter?

A The subject matter was, essentially, I had learned that she may have been someone that contacted, I believe it was The Daily Mail, but an outlet. And I was trying to work through it. And my primary concern was that, and her primary concern was defending herself. And -- or that she said that she didn't. I wasn't focused on that part of it, but more, rather, what I needed her to do as someone that represented us.

Q And did you -- you don't recall if there was another person there but --

A If there was, I'm happy for you to tell me there was, and I won't -- I'm not here to deny

it.

Q Well, there is another -- there is a woman's voice on the recording.

A Okay.

Q And what I would like to know is, did you announce to the other person whose voice is heard on the recording that you were recording?

MS. SHAPIRO: Objection.

THE WITNESS: I don't have a memory of that.

BY MS. HUDSON:

Q So you may have also recorded that person without their knowledge?

MS. SHAPIRO: Objection.

THE WITNESS: Sure.

BY MS. HUDSON:

Q Did you -- you said you haven't listened to the recording; is that right?

A Other than the one time I just stated, which I don't recall when I listened to a portion of it, but I don't recall when that was.

Q You didn't listen to it before it was produced in this case?

A No.

Q How long have you known that you had it?

A Since -- since I recorded it.
Q Since the time you recorded it until the time you produced it, did you share it with anyone?
MS. SHAPIRO: Objection. He didn't produce it. The lawyers produced it.
MS. HUDSON: Okay. Thank you for that clarification.
BY MS. HUDSON:
Q Until the time you recorded it through the time that your lawyers produced it, did you share the recording with anyone?
MS. SHAPIRO: Other than your lawyers.
THE WITNESS: Yeah, I don't believe so.
BY MS. HUDSON:
Q You didn't play it for any other person?
A I don't believe so.
Q And when did you first share the recording with your lawyers?
A I don't know.
Q Was it -- I think Mr. Baldoni testified that he became aware of some recordings that you made in January of 2025. Did you -- early 2025. Did you share --
A I'm sorry. Repeat that. In January 2025?

Q In early 2025.
A I don't know what you're talking about.
Q Mr. Baldoni testified that he became aware of some of the recordings you did in early 2025.
A Oh, I see. Okay. Not things that I recorded in 2025. That he became aware of recordings in 2025?
Q Correct.
Did you share the recording with your lawyers around that same time period as well?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know when it was shared. There's been -- there's been so much to hand over. I don't know.
BY MS. HUDSON:
Q But safe to say, you shared it before Sunday of this week?
A I imagine so.
Q Other than describing the general subject of that call, do you recall anything else about what was said on that -- on the call with Stephanie Jones?
A I don't remember specific words, but the sentiment of the call for sure.

Q In which you described already?
MS. SHAPIRO: Objection.
THE WITNESS: This was at a time when we were doing everything we can to manage through a really tough situation. And we were trying to keep any fires from developing of speculation and -- and chaos. And at this point there was --
BY MS. HUDSON:
Q So just so you're clear, Mr. Heath --
A I'm sorry.
Q -- my question -- I'm going to -- is not why you recorded the call; it was if you recall what was said.
A Okay.
Q And you said you recall the general sentiment of the call, so --
A I was trying to get there.
Q Okay.
MS. SHAPIRO: Counsel, can you not interrupt him when he is finishing an answer, please?
MS. HUDSON: I -- I wanted to strike the answer because it wasn't responding to my question.
BY MS. HUDSON:
Q My question is, do you recall what was

said on the call?
A Yeah, I'm doing my best to answer it.
Q Okay. Well, I don't need to know all of the background and sentiment. I just need to know what -- if you remember what was said.
MS. SHAPIRO: Objection to the commentary.
THE WITNESS: Okay. I will do my best.
BY MS. HUDSON:
Q Thank you.
A Yes. We were discussing for quite a while that I did not want her to contact anybody, as we were trying to maintain a position of -- of being careful with everyone another so that we did not bolster something. And in that conversation, she was only concerned with any allegation or insinuation that she may have been the -- be the one to make this call.
And while I very much understood her position, by making a call at that time would only add fuel. And I did not want that to happen.
Q And you mean making a call to Sony?
A Making a call to anybody. Sony wasn't really it. I don't recall it was only about Sony. It was about also contacting whoever the person was

from The Daily Mail or doing some investigation. So that is what I was really focused on, was that she was doing her job in that regard, and she was more concerned about herself. And while I may understand that on a personal level, from a business perspective we were not seeming to be aligned. And that was the basis of the call.

Q Okay. And did you record the whole call or did you start recording at some point after the call had begun?

A I believe it was into the call. At some point into the call.

Q And you recorded it on your phone? In other words, you didn't have another recording device, right?

A I don't know how I recorded it. I -- I probably used -- somebody maybe -- maybe I used somebody's phone and asked them if I could use their phone for it. Or maybe I had -- I don't recall how I did it.

Q Okay.

A Because I believe I was on my phone speaking to her, so I may have used something else.

Q Do you have a device that you use for recording calls?

MS. SHAPIRO: Objection.
THE WITNESS: No. I would have used somebody else's phone or someone else's device to -- to record it.
BY MS. HUDSON:
Q There was another call that sounded like it included Josh Greenstein, Danni Maggin, and Gloria Hann from Sony. Was that one of the calls you recorded?
A I don't recall if it was those three, but if this was a Sony marketing call, yes.
Q Do you recall recording a Sony marketing call?
A That particular one seems to be the one. That's the only one that I have that I know was recorded.
Q And you said you don't know if those were the participants. Do you recall recording a -- do you have in mind --
A Yes.
Q -- the specific participants for a call that you recorded?
A I remember recording a call. And I believe that either -- I don't know if all three of them were on. I can't recall exactly that, but that

would be the call that you're mentioning. You're now identifying the names. I'm just not sure if all of that is accurate.

Q Are there any of those three that you recall with certainty were on that call?

MS. SHAPIRO: Objection.

THE WITNESS: I'm not certain -- I'm not certain who was on that marketing call.

BY MS. HUDSON:

Q But if they're calling themselves -- if they're identifying themselves as Danni, Gloria, and Josh on the call --

A Yeah. I would -- yeah, it would be that.

Q Let me just finish my question.

A Sure.

Q If they're identifying themselves as Danni, Gloria, and Josh on the call, then it would be safe to say that those are the people that were on that call; is that right?

A Yes.

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q And where were you located when that call was recorded?

MS. SHAPIRO: Objection.

THE WITNESS: Do you mean state?
BY MS. HUDSON:
Q City and state.
A Yeah. I believe I would have been in Los Angeles.
Q And where in Los Angeles? In your office or home?
A I don't remember.
Q Do you know where the participants -- the other participants in the call were located?
A I don't. I don't know if they were working remotely or out of their offices. I don't.
Q And is it your understanding that Danni Maggin, Gloria Hann, and Josh Greenstein work in Los Angeles also?
MS. SHAPIRO: Objection.
THE WITNESS: It is.
BY MS. HUDSON:
Q And why did you record that call?
A We were at a point where we were discussing and being told that we were not allowed to either go to the premiere, or if there was, what that would look like separately. We were trying to navigate through all of that and all that led up to that, and I did not know who to trust at this point.

And I was concerned.
Q What was the point of recording the call?
A So I could listen, reflect back to it possibly. A lot is said, and I wanted to have some sort of memory of it to document it.
Q Did you tell any of the participants in the call that you were recording them?
A I did not.
Q And why not?
A I didn't consciously think of why not. I just didn't.
Q Well, if you were just using it as a record, couldn't you have said, I would like to record this call to keep a record?
MS. SHAPIRO: Objection.
THE WITNESS: I could have.
BY MS. HUDSON:
Q Were you intending to use the call against the participants in some way?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MS. HUDSON:
Q Who, if anyone, did you share that call with?
A Other than my lawyers, I don't believe

anybody.
Q And did you -- when you provided the calls to your lawyers, did you do it all at the same time or did you provide them one by one?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall.
BY MS. HUDSON:
Q So you may have not provided them all at one time?
MS. SHAPIRO: Objection.
THE WITNESS: I may have reply -- provided one in one day, maybe one the next day. You know, in reviewing what I had, doing the best I could.
BY MS. HUDSON:
Q Okay. Is there anything that you recall being said on that call that stands out to you?
MS. SHAPIRO: Objection.
THE WITNESS: I don't remember the call. I don't remember the content of the call.
BY MS. HUDSON:
Q Did it relate to the premiere --
A It related --
Q -- of the film?
A Correct. It related to the premiere.

That was the purpose of the call. But I haven't listened to it since.

Q There was another call that involved, it sounded like Patrick Whitesell at WME.

Does that sound familiar?

A It does.

Q Who else participated in that call?

A There was somebody on his team. I don't recall who it was.

Q Was it Marie Sheehy?

A It may have been.

Q Did Danny Greenberg participate in that call?

A I don't remember. He could have.

Q How about Jennifer Abel?

A I believe she was.

Q Where were you located when that call occurred?

A I believe I was in my office.

Q In Los Angeles?

A Correct.

Q And the other participants, to your understanding, were they all also in Los Angeles?

A I don't know. I don't know if they all were, so I don't know.

Q Do you understand that Patrick Whitesell typically is located in Los Angeles?
MR. FREEDMAN: Whitesell?
MS. HUDSON: Yeah.
MS. SHAPIRO: Objection.
THE WITNESS: I don't know. I don't know where he spends most of his work time. I don't.
BY MS. HUDSON:
Q And how about Danni Maggin? Did you understand that Danni Maggin works out of Los Angeles?
A I believe so.
Q Okay. And resides in Los Angeles as far as you know?
A I don't know where she resides, but I --
Q I'm sorry, Danny Greenberg.
A Danny Greenberg?
Q Yes.
A Yes, I know that he's in Los Angeles, yes.
Q Okay. And Jennifer Abel you understand also lives in Los Angeles?
A I do.
Q Okay. You mentioned earlier that you may have borrowed someone's phone to make a recording.

Whose phone would you have borrowed for the Stephanie Jones call?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know. I'm just -- I don't recall the actual mechanism of what I did at that moment, but I could have borrowed someone's phone so I can record it.
BY MS. HUDSON:
Q I believe you said you listened to part of the Stephanie Jones call. Did you do that after Ms. Lively filed her CRD complaint in California in December of 2024?
A I believe so.
Q And did you send the call to your lawyers before -- either this Jones call or any of the four calls to your lawyers before you sued Ms. Lively?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall the time.
BY MS. HUDSON:
Q Did you announce to any of the participants in the call with Patrick Whitesell that they were being recorded?
A I did not.
Q Why did you record that call?
A I was incredibly worried of what I was

hearing about Ms. Lively and Mr. Reynolds and how they were speaking about us. And during the call -- or the purpose of the call, from what I understood, was Patrick Whitesell wanted to discuss with us that Mr. Reynolds and Ms. Lively had some feelings and that unless we fell in line to some degree, the gloves would come off. And I started feeling threatened at this point, so I wanted 100 percent to have something of that nature documented and not just rely on my memory if I needed to reflect on it.
Q And why didn't you tell the participants that you were recording them?
A That wasn't my concern at that time.
Q And when you say "threatened," you mean -- what do you mean by that?
A I don't know what it meant. I just felt -- I felt quite vulnerable.
Q Not physically threatened?
A Not physically.
Q And did you mean threatened in that Ms. Lively might make allegations that she believed she was harassed in the workplace, public?
MS. SHAPIRO: Objection.
THE WITNESS: No, that wasn't it.

BY MS. HUDSON:

Q That wasn't it?

A No.

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q You can't articulate what the threat was?

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q Is that right?

A I can articulate a host of things, a host of things that led up to that moment. Do you want me to do that now?

Q No, I don't. I'm not asking you to articulate a host of things. I'm asking if you can articulate the threat. What -- what is the threat that you believe would -- what did you believe you were being threatened with?

MS. SHAPIRO: Objection.

THE WITNESS: I don't know what the exact threat was.

BY MS. HUDSON:

Q Okay.

A I can only articulate all of the feelings that led me to feel that there was a threat.

Q Okay. And you said there was another

call with -- there was a fourth call.
Do you recall who was on that one?
MS. SHAPIRO: Objection.
THE WITNESS: I'm happy for you to tell me who's on that one. I can speak to it.
BY MS. HUDSON:
Q Was there another call with Danny Greenberg?
A There was.
Q And who else participated in that call?
A I believe -- I believe Jen was on that call, Jen Abel.
Q Anyone else?
A I believe there was someone else from his side, but I don't recall who.
Q From Danny Greenberg's office?
A I believe so.
Q From WME?
A I think so.
Q Okay.
A I don't -- I don't exactly remember.
Q And where were you when that phone call was made?
A Same place, in my office.
Q In your office in Los Angeles?

A Correct.
Q And you said Jen Abel and Dan Greenberg reside in Los Angeles.
Do you have any reason to think they were anywhere other than Los Angeles for that call?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MS. HUDSON:
Q And with respect to the -- all of the calls other than the one with Stephanie Jones, did you -- did you -- what device did you use to record those?
MS. SHAPIRO: Objection.
THE WITNESS: I was on the phone, so I may have used my computer or iPad, whatever -- something of that nature that was there. I don't recall which.
BY MS. HUDSON:
Q So you believe you used some device other than your phone?
A Yeah. I was on my phone and I used, I believe, my computer maybe. But I don't know. I don't recall.
Q Okay. And did you -- did you tell any of the participants in that call that you were

recording them?
A I did not.
Q And Danny Greenberg is -- was Wayfarer's agent at the time?
A He's actually Justin's direct agent or was his agent.
Q So --
A He adjacently would help with Wayfarer and have calls, but he wasn't officially Wayfarer's agent.
Q So Danny Greenberg was Mr. Baldoni's agent, and Jen Abel was Wayfarer's publicist, correct?
MS. SHAPIRO: Objection.
THE WITNESS: Correct. And she was -- and she's also Justin's publicist, was acting as publicist on behalf of --
BY MS. HUDSON:
Q And why did you recall -- why did you record a call with them?
A Danny was calling to read to us a letter that we were told was written by Ryan Reynolds and Blake Lively. And they were going to articulate the call to me, so I recorded it so I could have the call the -- the letter documented.

Q Why didn't you announce to them that you were recording the call?

A That wasn't what I was thinking at the time. I just wanted to record it.

Q Why not tell them?

A I didn't have a conscious thought about it.

Q What -- what did you intend to do with that recording?

MS. SHAPIRO: Objection.

THE WITNESS: Exactly what I said. I needed -- they were articulating to me a letter that they would not send me so I could have it and review it, so I recorded it so I could have that.

BY MS. HUDSON:

Q Okay. And did you share that recording with anyone other than your lawyers?

A I do not believe so.

Q You didn't share it with Mr. Baldoni?

A I do not believe so.

Q Okay. And have you listened to that call since you recorded it?

A Probably around the same time I reviewed the other ones. So maybe when I sent them over to our legal team.

Q And you believe you listened to all of those calls and sent them over to your legal team after Ms. Lively filed her lawsuit?

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q Or her CRD complaint, I should say, in December of 2024?

MS. SHAPIRO: Objection.

THE WITNESS: Is that when I would have sent it to our legal team?

BY MS. HUDSON:

Q Did you listen to them and send them to your legal team after Ms. Lively filed her CRD complaint?

MS. SHAPIRO: Objection.

THE WITNESS: That's what I can recall. I don't have a particular memory of it.

BY MS. HUDSON:

Q You said that you had been friends with Mr. Baldoni for about 20 years, or -- or you knew him for about 20 years, right?

A No, I -- so yeah, I had met him about 20 years ago, yeah.

Q And at that time, was it before or after Mr. Baldoni was in college when you met him?

A I think I testified that I knew of him or maybe, you know, I had seen him for the first time he came to town, so I'd only seen him a couple times. So I don't -- I don't know.
Q Were you friends with him in college?
A No.
Q You heard him tell the story of his college girlfriend at his deposition yesterday?
A I did.
Q Has he told you that story before?
A I know parts of that story.
Q He had told you parts of that story?
A I knew some parts. He's -- he's shared this publically I believe about it, you know, this incident.
Q But did you -- the two of you ever have a one-on-one conversation about it?
A I don't think so.
Q You don't think so? Has he ever told you who his college girlfriend was?
A No.
Q So you don't know the name of his college girlfriend?
A Absolutely not.
Q Have you ever seen pictures of his

college girlfriend?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know the name. I don't know who she is. I know nothing about her.
BY MS. HUDSON:
Q Okay. Okay. Let's take a look real quick.
A Do you want me to read something?
MS. HUDSON: I will hand you a document that we are going to mark as Exhibit 1 to your deposition.
(Exhibit 1 marked for identification.)
THE WITNESS: You got it. I don't gotta read this whole thing. Do you want me to read the whole thing?
BY MS. HUDSON:
Q I do not want you to read the whole thing. I'm going to point you to specific language that I want you to take a look at.
But let me ask you generally, as you're flipping through this, do you recognize this as Wayfarer's employee handbook?
MS. SHAPIRO: Mr. Heath, read as much as you need to to answer the questions.

BY MS. HUDSON:

Q Well, I have no question pending right now, and I don't need you to read the whole thing. I just want you to identify it as Wayfarer's employee handbook.

MR. FREEDMAN: I would caution you to read the whole thing also.

MS. HUDSON: Counsel, I don't have a question pending other than, is it the employee handbook that has Mr. Heath's Bates stamp on it?

And I just want to remind everyone for the record that only one lawyer is permitted to object on the record. And there should be no coaching of witnesses, no speaking objections. We don't need to tell the witness every time he gets a document to take his time and read it. Okay?

MS. SHAPIRO: We don't need anymore speeches.

MR. FREEDMAN: And you should stop speaking also.

MS. SHAPIRO: You should stop speaking. We don't need speeches from you. You're here to ask questions. He's here to answer them. And that's how we're going to proceed.

MS. HUDSON: Well, the way we proceed is

if you continue to do that, we will stop the deposition and I will call the Court. So one --
MS. SHAPIRO: That's fine.
MS. HUDSON: -- one lawyer at a time, and no speaking objections. And also --
MS. SHAPIRO: No commentary from you --
MS. HUDSON: -- no coaching the witness.
MS. SHAPIRO: -- there's no -- been no coaching of the witness.
MS. HUDSON: Yes. Yes, there has. Both you and Mr. Freedman --
MS. SHAPIRO: No, there has not.
MS. HUDSON: -- both said simultaneously to take your time reading a document.
MS. SHAPIRO: Can you please just ask your questions and --
MR. FREEDMAN: Let's go.
MS. SHAPIRO: -- Mr. Heath will answer them?
MS. HUDSON: I will.
MS. SHAPIRO: That's what we're here for.
MS. HUDSON: That is what I will do next.
MS. SHAPIRO: Thank you.
THE WITNESS: Okay. I don't need to read the whole thing. I know what this is. I want to

just make sure this was, in fact --

BY MS. HUDSON:

Q My question is: Is this the employee handbook?

A It appears to be.

Q Okay. And you said previously that you've reviewed the employee handbook, correct?

MS. SHAPIRO: Objection.

THE WITNESS: Yeah, I've reviewed this before.

BY MS. HUDSON:

Q Okay. Let's take a look at -- I'm going to direct your attention to the document Bates-stamped 4947 at the bottom.

A Okay.

Q And this is -- at the top, it says:

(As read):

"Equal Employment Opportunity Anti-Discrimination Anti-Harassment and Anti-Retaliation Policy."

Do you see that?

A I do.

Q And it begins by saying that:

(As read):

"Wayfarer Studios provides equal

employment opportunities to all employees."

Do you see that?

A I do.

Q And it also provides that:

(As read):

"Wayfarer is committed to providing a workplace that is free of discrimination."

And then it provides a number of different categories that are protected from discrimination.

Do you see that?

A I do.

Q And those categories include sex.

Do you see that?

A I do.

Q And gender?

A Yes.

Q And also pregnancy and marital status?

A I do.

Q Okay. And you understand those are categories of characteristics that are protected under Wayfarer's policy?

A I see that.

Q And you understand that, also? That was my question to you.
A I you understand that as best as I can not being a lawyer or an HR expert.
Q Fair enough. And if you go down a little bit further on this page, there is an anti-harassment policy.
Do you see that?
A I do.
Q And this policy says that:
(As read):
"Sexual harassment and any form of harassment based on any protected category is prohibited."
Do you -- do you understand that?
A I do.
Q And you understand, also, that the policy applies to all individuals involved in the operation of the company?
A I do.
Q And anyone who comes in contact with the company?
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q You understand that as well?

A Do you have a particular line that I can read --
Q Sure?
A -- that can refresh my understanding of it?
Q Sure. The next line says that:
(As read):
"Wayfarer Studios prohibits harassment, disrespectful or unprofessional conduct by any employee of the company, including supervisors, managers, and coworkers."
And then it goes on to say that:
(As read):
"The policy also applies to vendors, customers, independent contractors, unpaid interns, volunteers, persons providing services pursuant to contract, and any other persons who employees may come in contact with"?
A I see that.
Q Okay. And you understood that as well?
A To the best of my ability, yes.
Q All right. If you could -- I will direct your attention to the next page that ends in 34948.

A Uh-huh.
Q The second paragraph discusses sexual harassment specifically.
Do you see that?
A I do.
Q And it says:
(As read):
"Sexual harassment is strictly prohibited."
Did you understand that to be Wayfarer's policy?
A Yes.
Q And did you also understand that under Wayfarers policy, sexual harassment includes harassment that is not necessarily sexual in nature?
A It gives examples, offensive remarks about one's sex or gender.
Q Right. But you understood that sexual harassment doesn't necessarily have to be sexual in nature?
A I understand that as long as we continue the sentence, because where you're not pausing at a comma or a period, so I believe that the whole sentence needs to be included in order for me to respond.

Q So you believe that the part of the sentence that says "sexual harassment does not necessarily have to be sexual in nature" is not a standalone sentence that you --
A No, No --
Q Yeah.
A -- I'm not trying to argue that. I just don't want to make commen- -- give commentary on a portion rather than the whole thing. That's all.
Q Well, setting aside what -- do you -- do you understand generally that sexual harassment does not have to be sexual in nature?
MS. SHAPIRO: Objection.
THE WITNESS: To the best of my understanding, I think that generalization is probably correct, but I am no expert in this.
BY MS. HUDSON:
Q Okay. And it includes, like you said, offensive remarks about one's sex or gender, right, according to this policy?
A It does.
Q And it also includes:
(As read):
"Verbal or physical conduct of a sexual nature when the submission of such

conduct is either implicitly or explicitly a term or condition of employment, or the conduct has the purpose or the effect of substantially or unreasonably interfering with an individual's work performance by creating an intimidating, hostile or offensive work environment."

Do you see that part?

A I see it.

Q And you understand that the behavior is not -- the conduct is prohibited even if it has the effect of substantially or unreasonably interfering with an individual's work performance?

MS. SHAPIRO: Objection.

THE WITNESS: I see what it says there.

BY MS. HUDSON:

Q Okay. And I just want to make sure you understand, not just see, that conduct that has an effect is prohibited under your policy as well, not just conduct that has purpose?

MS. SHAPIRO: Objection.

THE WITNESS: I see what it says there.

BY MS. HUDSON:

Q And you understand that?

A I understand the general understanding of it, yes.

Q And -- okay. You -- and what -- what is it that you understand that to mean?

A I understand that -- yes, any sort -- any things in this nature are prohibited.

Q And do you understand that it's prohibited even if it has the effect of causing these things? That creating an -- an -- interfering with an individual's work performance, creating an intimidating, hostile or offensive work environment, even if that's not the purpose of the conduct?

MS. SHAPIRO: Objection.

THE WITNESS: I understand what that states there, yes.

BY MS. HUDSON:

Q And you -- okay. And then if you go on to the next paragraph --

A Yes.

Q -- it says that:

(As read):

"Sexual harassment may include a range of subtle and not-so-subtle behaviors."

Do you understand that?

A I understand it.

Q And that these -- that the:
(As read):
"Depending on the circumstances, the behaviors can include sexual jokes and innuendo."
Right?
A I can see that there.
Q You can see that and do you -- do you understand that? That sexual harassment can include sexual jokes and innuendo?
A I understand that it's there, yes.
Q Well, I under- -- I'm not asking you if you can read it. I'm asking if you understand it?
A Sure. I understand that it's there. I do.
Q I -- I'm not asking you if you understand it's there.
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q I'm understanding [sic] --
A I'm sorry.
Q -- if you understand the language that's being used here?
MS. SHAPIRO: Objection.
THE WITNESS: My answer is, I understand

that it's there. That's all I can give you.
BY MS. HUDSON:
Q That's all you can do? So you can't say whether you understand that sexual jokes and innuendo can be sexual harassment?
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q According to your policy?
MS. SHAPIRO: Objection.
THE WITNESS: I understand that it says that there, yes.
BY MS. HUDSON:
Q Do you understand what those words mean?
A I do.
Q Okay. And it also says that sexual harassment may include "verbal abuse of a sexual nature."
Do you understand that?
A I do.
Q And that it also may include "commentary about an individual's body or sexual prowess."
Do you understand that those things can also be sexual harassment?
MS. SHAPIRO: Objection.
THE WITNESS: I understand that that is

written here and says that. Yes, I do.
BY MS. HUDSON:
Q And you understand that's Wayfarer's policy, that those things constitute sexual harassment?
MS. SHAPIRO: Objection.
THE WITNESS: No, I don't agree with -- I'm not going to agree with the last statement, that those things constitute sexual harassment. I'm not an expert on this.
BY MS. HUDSON:
Q Well, you agree that Wayfarer's policy says that those are among the range of behaviors that may -- may be sexually harassing?
A Yeah. That's a different characterization. "May" versus "are" are very different for me. So that's a distinction that was important.
Q And you understand, though, that things like commenting on an individual's body may be sexual harassment under your policy?
A I'm going to -- I'm going to say that I understand what it says here and I can follow. Do I understand it to the level that my attorney or my HR person does, I don't.

Q Well, I didn't ask you that.
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q I'm just asking you for your understanding.
A I think I've testified to it.
Q Okay. Well, do you also understand that your policy provides that touching in certain circumstances may also constitute sexual harassment?
A "May," I think, again, this is -- I'm not trying to be combative with you. You are a lawyer and you are really brilliant, and I've seen your work. And I'm not. So I want to be careful that what I'm testifying to is accurate and not -- so I see that, but I also think the context when you say "touching," I think that depends on what kind of touching, certainly.
Q Well, this -- I'm not going to argue with you. I'm just trying to understand if you understand what Wayfarer's policy says?
A I understand what Wayfarer's policy says, yes.
Q And you understand that it identifies certain types of behavior that can be sexually harassing, right?

A I see that.
Q And the behaviors that I'm reading to you are the ones that are included in Wayfarer's policy.
Do you understand that?
A I see it. I see that.
Q You see it, but do you understand it?
A I understand that.
Q Okay. And it also includes:
(As read):
"Physical, verbal or visual conduct of a sexual nature."
That can include -- that can be sexually harassing as well under Wayfarer's policy, right?
MS. SHAPIRO: Objection.
THE WITNESS: Sure.
BY MS. HUDSON:
Q Okay. And then I would like you to move down a little -- on the page a little bit to the section that focuses on supervisor and manager responsibilities.
Do you see that?
A I do. I see it.
Q It says:
(As read):
"If any supervisor or manager becomes

aware of a violation of this policy, they are obligated to report the violation to human resources or management so Wayfarer Studios can investigate and, if appropriate, take corrective action."

Do you see that?

A I do.

Q And did you understand in your management role, you had an obligation to report to human resources any time you became aware of conduct that fell within this policy?

MS. SHAPIRO: Objection.

THE WITNESS: If I became aware of conduct that fell within this policy, I see that I am obligated to report that.

BY MS. HUDSON:

Q Okay.

A If I became aware of it.

Q And you understand that before this moment?

A Yes.

Q Okay. And have you always understood that's your obligation?

MS. SHAPIRO: Objection.

THE WITNESS: Yes.
BY MS. HUDSON:
Q Let's take a look at the next page ending in 3949.
A Okay.
Q There's a section on Investigation. Do you see that?
A I do.
Q And it says:
(As read):
"Any reported allegations of harassment, discrimination or retaliation will be promptly and thoroughly investigated by qualified personnel in an impartial manner. Wayfarer Studios will ensure that these personnel will use the evidence to reach reasonable conclusions. The investigation may include individual interviews of parties involved, and Wayfarer Studios will maintain appropriate documentation and tracking to ensure reasonable progress is made."
Did you understand that that was Wayfarer's policies -- policy regarding

investigations?
A I do.
Q Okay. And it also says at the end:
(As read):
"If misconduct is found, Wayfarer Studios shall take prompt, corrective action, as appropriate. Corrective action might include termination from employment."
Did you understand that to be Wayfarer's policy with respect to investigation?
A I do.
Q Okay. You understand it now, and you've always understood that, right?
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q Is that right?
A Correct.
Q And you've actually been involved with investigations of workplace matters in your role at Wayfarer, correct?
MS. SHAPIRO: Objection.
THE WITNESS: I believe so.
BY MS. HUDSON:
Q Yes. Wayfarer also has an

anti-retaliation policy, correct?
A It does.
Q And it says if there are:
(As read):
"Retaliation against an individual for reporting harassment or discrimination in good faith or for participating in an investigation of a claim of harassment or discrimination is a serious violation of the policy and can also subject one to disciplinary action including termination."
Right?
A Uh-huh.
Q Yes?
A Yes, I see that.
Q Okay. All right.
Did Wayfarer -- was there a separate human resources department on the movie It Ends with Us?
A A separate human resources?
Q Yes.
A No. Typically, movies don't have a separate human resources department.
Q That's your understanding?

A Yes.
MS. HUDSON: Okay. I'm going to hand you a --
THE WITNESS: Typically, yes.
MS. HUDSON: -- document that we're marking as Exhibit 2.
(Exhibit 2 marked for identification.)
THE WITNESS: Am I going to need this anymore?
MS. SHAPIRO: Give it to the court reporter.
THE STENOGRAPHIC REPORTER: Thank you.
THE WITNESS: You got it. Thank you.
BY MS. HUDSON:
Q This is an email chain dated March 13th, 2023, from Alex Saks to Andy Davis, Andrew Lieberman, Bates-stamped AS000008.
Now, Mr. Heath, you are not copied on this email, but it references you. And the subject is "Spoke to Jamey."
Do you see that?
A I do.
Q And it says:
(As read):
"Per our conversation. And he's good

with Sony taking the lead on all workplace hotline/email type things if Sony is allowed to. He gets it all and agrees. Andrea is also aware."
Who is Alex Saks?
A She was our lead producer on It Ends with Us.
Q Okay. And do you know what conversation she's referencing here?
A I don't -- I don't know this conversation, no. I mean --
Q Did you have a conversation with Ms. Saks about Sony taking the lead on workplace hotlines and emails for the production of It Ends with Us?
A We may have. I don't recall it.
Q You don't recall it?
A No.
Q Okay. And do you understand why Ms. Saks thought it might be a good idea for Sony to take the lead?
MS. SHAPIRO: Objection.
THE WITNESS: I don't remember this conversation. This looks like this was in March. So before production, so I think she's just -- as we are setting up production on the ground, this looks

like she's inquiring about it, but that's all I can speak to. I don't know anything about it.

BY MS. HUDSON:

Q Okay. But you don't have any reason to dispute that at the time you told Ms. -- you may have told Ms. Saks that Sony should take -- you would be fine with Sony taking the lead on workplace hotline/email type of things?

A I may have. I have no reason to dispute that. I just don't -- I can't also confirm it. I don't recall it.

MS. HUDSON: Okay. I'm going to hand you a document that we'll mark as Exhibit 3.

(Exhibit 3 marked for identification.)

THE WITNESS: Thank you.

BY MS. HUDSON:

Q This is an email from Alex Saks to Jamey Heath and others, dated March 12th, Bates-stamped HEATH_48501.

Now, this one you did receive, right, Mr. Heath?

A From Alex, this is sent to me, yes.

Q Do you recognize this email?

A I recognize the email is coming from Alex Saks. I do.

Q And this subject -- the subject of this email is "Harassment and Workplace Hotline."

Do you see that?

A I do.

Q And she says:

(As read):

"Was thinking this weekend and I'm not sure what protocols Wayfarer already has in place, but I think because of Justin's role at Wayfarer, our workplace harassment protocol should come from Sony on the show. We should do their training Zoom before we start and their email/hotline should be distro'd" -- I think that's distributed --

A Correct.

Q (As read):

-- "to crew upon hiring. Let me know if you will be amenable to this."

Does this refresh your recollection at all about a conversation with Ms. Saks on this subject?

A I do not recall the conversation, but this seems all reasonable.

Q Okay. And you think it's reasonable for her to have made that suggestion?

A Sure.

Q And do you understand her concern about Justin -- making -- strike that.

Do you understand that she was making the suggestion that Sony handle the training and have a workplace email and hotline because of Justin's role at Wayfarer?

A Do I understand that that is what she was articulating?

Q Yes.

A I can see that's articulated here, yes.

Q And do you understand why Justin's role at Wayfarer would have an impact on her view?

MS. SHAPIRO: Objection.

THE WITNESS: I can't speak to if it impacted her view or not other than she's making a suggestion, she's bringing it to be aware -- for us to be made aware of, and that's what I see.

BY MS. HUDSON:

Q So Mr. Baldoni on this production, he was the director, correct?

A He was.

Q He was the lead actor?

A He was.
Q He was the chair?
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q Correct? Of Wayfarer?
A He was.
Q He was also your best friend, right? Correct?
A One of my dear, best friends, yes.
Q Yes. So you can -- do you think it's the case that Ms. Saks was suggesting this because Mr. Baldoni held a number of senior positions within this production and it may be difficult for Wayfarer to not be conflicted in its handling of HR matters?
MS. SHAPIRO: Objection.
THE WITNESS: Okay. You just -- I'm so sorry. You just articulated a whole narrative that I don't read in here, so I don't -- I don't read that.
BY MS. HUDSON:
Q What do you read? What do you think she -- she means here?
A She's bringing up something for us to consider, Justin's role at Wayfarer.
Q Well, what do you think she means by

Justin's role at Wayfarer?
A Exactly --
MS. SHAPIRO: Objection.
THE WITNESS: -- that he has multiple roles, and we should consider Sony running this.
BY MS. HUDSON:
Q And why would multiple roles in your understanding affect who handled the HR matters?
MS. SHAPIRO: Objection.
THE WITNESS: In my understanding or my understanding of hers? Because I -- I cannot speak to what her -- her reasoning was and what she thought.
BY MS. HUDSON:
Q So you have no idea what she meant by that?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not going to speculate.
BY MS. HUDSON:
Q You're not going to speculate?
A No.
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q But you thought it was a good idea at the time?

MS. SHAPIRO: Objection.
THE WITNESS: I didn't necessarily think it was a good or bad idea. But at this time, there's many ideas all being thrown because it's in the middle of production, and we're figuring stuff out, and this seemed like a reasonable suggestion.
BY MS. HUDSON:
Q Okay. But you don't know why it would be reasonable?
MS. SHAPIRO: Objection.
THE WITNESS: You want me to speculate on her reason, and I can't do that.
MS. HUDSON: Okay.
MS. SHAPIRO: Counsel, let's take a 10-minute break.
MS. HUDSON: Well, have we even been going an hour?
MS. SHAPIRO: Yes.
MS. SHAPIRO: Just over an hour.
THE VIDEOGRAPHER: An hour and two minutes.
MS. HUDSON: Fine. 10 minutes?
THE VIDEOGRAPHER: We are going off the record. The time is 11:35 a.m.
(Recess.)

THE VIDEOGRAPHER: We're back on the record. The time is 11:57 a.m.
BY MS. HUDSON:
Q Mr. Heath, you said that you had been involved in some employee investigations before, correct?
MS. SHAPIRO: Objection.
THE WITNESS: I said I believe I have.
BY MS. HUDSON:
Q And you were involved on investigations on the set that had to do with --
A Oh, on the set?
Q Let me finish my question.
You were also -- you were involved specifically in investigations having to do with It Ends with Us, correct?
A There was one.
Q There was one.
MS. HUDSON: I'm going to hand you what we've marked as Exhibit 4.
(Exhibit 4 marked for identification.)
MS. CLIMACO: Did you get one, Alexandra?
BY MS. HUDSON:
Q Exhibit 4 is a -- an email from -- between Jamey Heath and several other participants,

dated April, 27, 2023, Bates-stamped HEATH_48499.

At the bottom part of this email, Mr. Heath, there's a discussion about a complaint by someone at Local 52.

Do you see that?

A I do.

Q Do you recognize this email?

A I don't recall the specific email, but I remember the -- the subject.

Q But you received this, correct, this email, and participated in this email chain?

A I did.

Q And it said that there was a call from someone at Local 52 that needs the HR department information immediately regarding a complaint, correct?

A Correct.

Q And then you respond, in response to a question, who handles HR at Wayfarer, you respond, correct?

A I see that.

Q And your response is:

(As read):

"We do have HR at Wayfarer. However, we may want to have an outside agency

for the show."
Why did you say that?
A I don't have a recollection of why I said this at that time.
Q Looking at this now, do you have any understanding of why you might want to have an outside agency for that show?
MS. SHAPIRO: Objection.
THE WITNESS: I would only be guessing.
BY MS. HUDSON:
Q And what -- if you were guessing, what would you say?
MS. SHAPIRO: Objection.
THE WITNESS: That I would only be guessing.
BY MS. HUDSON:
Q So you don't know why Ms. Saks suggested having an outside entity provide HR services, and you don't know why you suggested that either; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: At this time, there was a constant flow of suggestions, as we were still building the foundation for many things, so I don't know -- I don't know what my exact thought was at

this time other than responding to the email.
BY MS. HUDSON:
Q And you didn't -- you didn't think that, like, Ms. Saks thought that the fact that Justin was having so many roles in leadership might create a problem for dealing with HR issues?
MS. SHAPIRO: Objection.
THE WITNESS: No, I did not think that.
BY MS. HUDSON:
Q You didn't think that. And you have no idea why you might have suggested an outside agency; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: This is over two years ago. I do not recall my feeling at the time.
BY MS. HUDSON:
Q And you never did have any outside HR agency provide support for It Ends with Us, correct?
A We did not have an HR representative specifically for the movie, as what was determined was specifically Indies and most other shows don't have an HR outside of the production company that provides it.
Q Just to make sure I understand what you're saying here, you're referring to the bottom

of this email where Andrea Ajemian says:
(As read):
"Normally on Indies there are no HR departments, so who should I send?"
MS. SHAPIRO: Objection.
THE WITNESS: I see that she says that here. But I'm also saying that any movie that I've been involved in, and anyone that I know that -- any other producers have told me they've been involved in or our studio, there is not an HR presence.
BY MS. HUDSON:
Q There's no HR presence on movies?
A Outside of the production company.
Q So you -- when you say "outside the production company," you mean outside of Wayfarer?
MS. SHAPIRO: Objection.
THE WITNESS: Outside of whatever production company or the studio that is running the movie.
BY MS. HUDSON:
Q So the studio that was running the movie here is Wayfarer, right?
A Correct.
Q Okay. And are you saying that it's your view that Wayfarer HR was responsible for this

production?

MS. SHAPIRO: Objection.

THE WITNESS: I'm not saying that. I'm saying that Wayfarer has HR, and movies don't typically have an HR person on set.

BY MS. HUDSON:

Q So what is your understanding of who was responsible for human resources matters for the movie It Ends with Us?

A My understanding is I deferred to Alex Saks, ultimately, and Jill Sacco, who was our production supervisor, as well as Andrea, who was our line producer, that if there was -- concerns would go to them if there were any brought up. They would then learn what the next step was should it need to go to another step. And in this case, they had asked for Wayfarer's HR or they wanted to know who, and that's -- we just followed what their suggestions were at that time.

Q So you deferred the notion of human resources issues to Alex Saks, Jill Sacco, and Andrea Ajemian?

A For the movie itself?

Q Uh-huh.

A They were ones that were more experienced

with how policies or -- or what the procedure would be -- excuse me -- not policies, but the procedure would be for anything as it pertains to the movie.

Q And were Alex Saks, Jill Sacco, or Andrea Ajemian employees of Wayfarer Studios?

A They were employees of It Ends With Us.

Q They were not Wayfarer employees, right?

A They were not.

Q But you were?

A Yes.

Q And was there any other information given to anybody who worked on It Ends with Us that if they had a human resources concern, they should go to Alex Saks, Jill Sacco or Andrea Ajemian?

MS. SHAPIRO: Objection.

THE WITNESS: From my understanding, the normal protocol that happens at all movies, happened on It Ends with Us.

MS. HUDSON: We'll move to strike as nonresponsive.

THE WITNESS: Okay.

BY MS. HUDSON:

Q Can you answer the question I asked?

A I'm happy to. I thought I did.

Q You did not.

MS. SHAPIRO: Objection.
THE WITNESS: Okay. Give it to me again.
BY MS. HUDSON:
Q My question was -- I'm going to read it exactly how I asked it.
A All right.
Q Was there any information given to anybody who worked on It Ends with Us that if they had a human resources concern, they should go to Alex Saks, Jill Sacco, or Andrea Ajemian?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know if there was a specific email that said that.
BY MS. HUDSON:
Q Or a -- not -- any information?
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q Verbal, email, text message?
A I don't know.
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q You've never seen anything like that, correct?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall.

BY MS. HUDSON:
Q You can't recall ever seeing something like that, correct?
MS. SHAPIRO: Objection.
THE WITNESS: I don't have a memory of it.
BY MS. HUDSON:
Q As the CEO of Wayfarer, did you do anything to ensure that cast and crew on It Ends with Us knew who to raise concerns to if they had any?
A That would not fall under the job description of the CEO.
Q I thought you said it was the CEO's job to make sure that it was a safe workplace?
A Correct, for Wayfarer.
Q You didn't -- you didn't consider your job to make sure that the set was a safe workplace?
A No, that's not what I said.
Q Okay.
A Wayfarer Studios, in our operations, but It Ends with Us is its own small business. And the people that were running that business, essentially, me included for sure, were responsible for how the procedures went about on there. I deferred to those

who were used to running those small businesses on the ground.

Q Who ran It Ends with Us Movie LLC?

A That would have been a combination of Wayfarer and Sony.

Q Wayfarer and Sony?

A I believe so.

Q Sony had a leadership role in It Ends with Us LLC?

A Your question was who ran it. I believe the LLC was run -- and I could be wrong on this so I can confirm this -- but was the both parties in that.

Q Well, you're the CEO of Wayfarer?

A Correct.

Q Do you understand that It Ends with Us LLC is a wholly owned subsidiary of Wayfarer?

A It may be. I don't have specific memory of it at the moment.

Q So you don't know who owns It Ends with Us LLC -- It Ends with Us Movie LLC?

A I know that Wayfarer is party to it. I don't know if Sony is as well.

Q So you think Sony might have an ownership interest in It Ends With Us Movie LLC?

A They may. I don't know.
Q Okay. You remember when we looked at the employee handbook, it says that those policies apply to everyone who interacts with employees of Wayfarer, right?
A Understood.
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q Okay. So you understood the policies also applied to people on the set, right?
MS. SHAPIRO: Objection.
THE WITNESS: Sure.
BY MS. HUDSON:
Q So going back to who ran the set -- or who ran It Ends with Us Movie LLC, you're saying you, as CEO of Wayfarer, you did not consider it your role as you might -- strike that.
I believe you said you had a leadership role with It Ends with Us LLC also?
MS. SHAPIRO: Objection.
THE WITNESS: No. I mean, I have a leadership role in the movie --
BY MS. HUDSON:
Q In the movie?
A -- the actual production.

Q Okay. And would you -- you would consider yourself a supervisor or management for the -- for the purposes of the production --

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q -- correct?

MS. SHAPIRO: Objection.

THE WITNESS: For particular roles.

BY MS. HUDSON:

Q For particular roles. Which roles are that?

A Financial. Some creative. And assisting with department heads when they might need something.

Q And it sounds similar to your duties as CEO, except you left out making sure that there is a safe workplace. Is that not part of what your -- you saw your role as a producer of It Ends with Us and the CEO of Wayfarer?

MS. SHAPIRO: Objection.

THE WITNESS: As a producer on the set, there were different hats that we all wore at different times. So sure. I'm making the distinction for CEO. Because practically speaking, I will just give you an example. Let's take a Tom

Rothman, who's the CEO of Sony, who's got 50 movies happening maybe at one time. Each movie has its own production and they are the ones implementing and determining who is running what. He's not necessarily aware of every production and who is doing what.

BY MS. HUDSON:

Q But Tom Rothman isn't a producer on all of those movies.

A Fair enough. That's why --

Q You were.

A -- I'm saying as a producer, but you're referring to me as a CEO so I'm just making a distinction between the CEO of Wayfarer and me as producer. That's all.

Q I think my question referred to you as the producer and the CEO of Wayfarer.

A Okay.

Q And in those capacities, you saw -- are you saying you did not see part of your job duties as ensuring the safe was set --

A Sure.

Q -- the set was safe?

A Sure.

MS. SHAPIRO: Objection.

THE WITNESS: Absolutely.
BY MS. HUDSON:
Q Okay. All right. But just to go back to -- I want to make sure I understand. It's your understanding that Indie movies just have no HR; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: That they don't have HR departments, that they don't have a representative on set specifically that's HR.
BY MS. HUDSON:
Q That they don't have any human resources representatives?
MS. SHAPIRO: Objection.
THE WITNESS: That typically there are -- the understanding is that you would go to one of your supervisors, production supervisor, or the line producer, or the AD. Also on call sheets, there are numbers of hotlines, and also there are -- you have your unions such as SAG and -- and so on.
BY MS. HUDSON:
Q Do you know whether there was a hotline provided to anybody who worked on It Ends with Us to call regarding human resources matters?
A I believe there was a hotline on all the

call sheets that went out regarding if there was concerns of any matters that there was a line.

Q If there was a hotline, who answered that?

A I don't know.

Q You don't know who answered the hotline?

A I do not.

Q Did Wayfarer pay for someone to answer the hotline?

A Wayfarer didn't, but It Ends with Us would have.

Q It Ends with Us would have. Were you responsible at all for any of the financial management of It Ends with Us?

A On a top level.

Q At a top level. Okay. Do you have any recollection of ever authorizing or paying someone to man a hotline for the movie It Ends with Us?

A No, I would have not seen that specifically.

Q You would not. And sitting here today, you don't know if that had actually happened, right?

A No, I do know there was a hotline.

Q There was a hotline?

A There was.

Q So was there a contract with an outside agency to provide a hotline for It Ends with Us?
A I do not know.
Q You don't know?
A I was not in charge of that.
Q So we haven't seen any evidence of a hotline in this case. If you have a hotline, would you provide that to your lawyer so they can produce it to us?
MS. SHAPIRO: Objection.
THE WITNESS: There -- there was some number. I'm not sure if it's called a hotline. But there is some number that was afforded to people to call in case there was safety concerns.
BY MS. HUDSON:
Q Okay. Safety concerns or human resources concerns?
A I don't have the language in front of me. I don't know.
Q Okay. All right. And, again, do you recall ever seeing anything in which employees were told there is a human resources hotline that you can call if you have any concerns about the types of things we talked about earlier, harassment, discrimination or retaliation?

MS. SHAPIRO: Objection.
THE WITNESS: I don't know if there was that particular language or not.
BY MS. HUDSON:
Q You understand there might be a distinction between physical workplace safety and human resources --
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q -- issues?
MS. SHAPIRO: Objection.
THE WITNESS: I understand that.
BY MS. HUDSON:
Q Okay. And you wouldn't expect employees, if they were given a hotline to call for physical safety issues like someone being injured on the set, that that would -- that they would automatically understand that that's the number they should call for harassment, discrimination or retaliation issues, right?
MS. SHAPIRO: Objection.
THE WITNESS: Understand that basic premise, yes.
BY MS. HUDSON:
Q Okay.

Mr. Baldoni testified yesterday about a -- about Claire Ayoub. Do you recall that testimony?
A I do.
Q Yes. And Ms. Ayoub testified that she -- I'm sorry. Ms. Ayoub submitted a declaration in which she said that she was subject to repeated negative interactions with Mr. Baldoni and his associates, including verbal abuse by Mr. Baldoni.
Do you recall that?
A Do I recall the conversation you had yesterday or Mr. Baldoni had yesterday?
Q Well, let me -- let me -- do you -- first of all, are you familiar with Ms. Ayoub's declaration?
A I am.
Q Okay. And do you recall that language that I just read to you from Ms. Ayoub's declaration?
A I do recall the language from her declaration.
Q Okay. And under Wayfarer's handbook, if you recall that we looked at, it said harassment may be verbal, written or physical conduct that denigrates or shows hostility or aversion toward an

individual.
Do you recall that?
MS. SHAPIRO: Objection.
THE WITNESS: I recall us having that conversation.
BY MS. HUDSON:
Q Do you recall the language?
A I do.
Q Okay. Do you have Mr. -- do you have any understanding of what Ms. Ayoub was referencing in her declaration?
A I have an understanding of the truth of what happened.
Q What does that mean?
A That her declaration absolutely, completely is not accurate.
Q So you think Ms. Ayoub lied in her declaration under penalty of perjury?
MS. SHAPIRO: Objection.
THE WITNESS: I'm not going to suggest what she didn't do. I'm just saying it's not accurate.
BY MS. HUDSON:
Q Well, Mr. Baldoni described yesterday what he believes was the incident that might have

upset Ms. Ayoub. Did you hear that testimony?
A I did.
Q And he said that, you know, he told Ms. Ayoub she had to keep her movie within a budget or Wayfarer wasn't going to fund it.
Do you recall that testimony?
A I do.
Q Okay. Do you have a different recollection of what you understand Ms. Ayoub was talking about with respect to repeated negative interactions with Mr. Baldoni and his associates, including verbal abuse by Mr. Baldoni?
MS. SHAPIRO: Objection.
THE WITNESS: I don't.
BY MS. HUDSON:
Q You don't?
A No.
Q Were you in the meeting that Mr. Baldoni described?
A I was as -- as there were 10, 12 others as well.
Q Okay. And is your recollection any different than his is with respect to what occurred in that meeting?
A Some of the nuance. But essentially.

Q What is different in your recollection?
MS. SHAPIRO: Objection.
THE WITNESS: Claire, at this point, had frustrations with her contract because we had essentially greenlit the movie at around $2 million. As oftentimes budgets grow, this got to be about $3 million and we -- we saw the -- the benefit of raising the budget up so that a movie could be well made. It kept growing. It got to the point where now P&G -- where Mr. Baldoni's recollection is wrong, was that P&G came in after we had already been involved in developing this.

They then liked the project and wanted to contribute some money, about a million dollars. So that allowed the budget to go up to about 4. And then we got to 5. And in order to include P&G in the actual production and give them a percentage, we had to give up some of ours and Claire had to give up some of hers. And she did not want to. And she thought it should be all of ours.

We had a bit of a discussion to try to get there. She was not happy that she had to give up some of her percentage. Our argument with her and her lawyers was we're bringing on a new partner, we'll give up X, you should give up X, we share in

this together. But she was not happy. So by the time this conversation happened, and we were trying to keep the budget within a certain number, she was not happy with the fact that we wouldn't continue growing the number. Justin was very clear with her and said that we would not be able to finance the movie if the -- if the budget was not able to come down and be at that $5 million mark. And he said it very clearly.

BY MS. HUDSON:

Q Did he yell?

A Did not yell. He said it very definitively, and it was of the likes of, Claire, I just have to be honest with you, we've been doing our best with this. We're not going to go ahead and produce this movie if we can't get it there. I need that to be clear.

Q So your description sounds consistent with what Mr. Baldoni said. I think my question to you is: Did you -- did you have anything inconsistent --

A ^I said nuance.

Q So you wanted to tell me this story to give me the nuance?

MS. SHAPIRO: Objection. Counsel, ask

questions --
MS. HUDSON: I just want to make sure I understand.
THE WITNESS: I said --
MS. SHAPIRO: -- don't make speeches.
THE WITNESS: I said -- I said there was some nuance that was different. You asked me --
BY MS. HUDSON:
Q Fair enough.
A -- what's the nuance --
Q Fair enough.
A -- so I gave it to you. I just answered your question.
Q Okay. And that -- that, to your understanding, is the only issue that took place with Ms. Ayoub, what you -- as you've described it?
A Yes.
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q Okay. And it is the case that Ms. Ayoub asked that Mr. -- that Mr. Baldoni not be involved in Empire Waist's marketing or public relations efforts, as far as you understand?
MS. SHAPIRO: Objection.
THE WITNESS: That came in September of

'24, after there was chatter online about It Ends with Us, and she was concerned that that chatter might have an impact on her movie, and she didn't want to associate with it.

BY MS. HUDSON:

Q Did she also ask that Mr. Baldoni not come to the set of Empire Waist?

A Never once.

Q So that is not true? That's just a lie that Ms. Ayoub was telling us?

A That is something the first time we ever heard --

Q Uh-huh.

A -- expressed. I don't know the date, but years later.

Q When you say years later?

MS. SHAPIRO: Objection.

THE WITNESS: Within the last six months, year, something. She -- she said something to Ashmi in the marketing -- no, this would have been in September of '24. She said something that she didn't want Justin to -- to post something, I believe it was.

BY MS. HUDSON:

Q Are you referencing the text message that

Mr. Baldoni testified about yesterday?
A I don't know what text message that was.
Q Okay.
A So she had conveyed to Ashmi that she didn't want him to promote the movie based on what was going on. And in that, she also expressed, which I heard for the first time or anyone had heard for the first time, where she said something, he was banned from set. But I'm sure if you do more investigation, you will see that there is nothing that leads for you to believe that. I'm helping you with that one.
Q Okay. There was also some testimony by Mr. Baldoni about -- and also Mr. Sarowitz about Shane Norman.
Do you recall that?
A I do.
Q Mr. Baldoni and Mr. Sarowitz claimed that Mr. Norman -- there were multiple complaints from multiple women about his behavior towards them.
Do you recall that?
A I do.
Q And that there was an investigation conducted; is that right?
A There was.

Q By some outside entity; is that right?
A Yes.
Q And were you involved in overseeing that?
A I was not involved in overseeing it.
Q Did you have any involvement in that?
A This was prior to Wayfarer Studios, into the merge of Wayfarer Studios -- or not the merge. Into the formation of Wayfarer Studios and part of the closing of Entertainment. So when this began, I was not at Wayfarer Studios, but I became involved because it was trailing into me joining.
Q I see. And it turned into a lawsuit, right?
A You can say that.
Q Mr. Norman sued Wayfarer, correct?
A He did.
Q And he also sued Mr. Baldoni, correct?
A He did.
Q And have you seen his lawsuit?
A I have.
Q And you know his lawsuit does not reference complaints about women -- complaints by women or an investigation or a termination related to those issues?
MS. SHAPIRO: Objection.

THE WITNESS: I don't recall what's in his lawsuit.
BY MS. HUDSON:
Q His lawsuit claims that he was terminated in retaliation for raising complaints to Mr. Baldoni that the CFO and other employees were being racially insensitive to him?
A I know what his complaint says in that regard, yes.
Q You know what it says in that regard. Okay.
And he says that he -- are you aware that Mr. Norman made complaints about racial insensitivity during his employment?
A You mean after he was removed?
Q He -- the -- during his employment?
MS. SHAPIRO: Objection.
THE WITNESS: I can't speak to during that time employment. I was not there.
BY MS. HUDSON:
Q You were not there? Okay.
A But I can speak to the investigation, and I can testify that Steve Sarowitz's testimony, his recollection is not accurate.
Q It's not accurate?

A It is not accurate.
Q Okay. In what way?
A He was not removed for harassing women. That is completely inaccurate. He was investigated for bullying. And the investigation determined that out of those people, two of them were men, one was a woman. And for the anti-harassment, there was no charge found. There was nothing wrong with him in that regard. For bullying, he was found to be liable for bullying, and that was the recommendation to have him moved.
Q Uh-huh.
A So his recollection is confused with I think a lot. So...
Q Well, we might ask to see that investigation because I think that was one of the things we asked for, were documents regarding prior complaints. And then we can see for ourselves --
MS. SHAPIRO: Objection. Can you stop making speeches? Just ask questions, please.
MS. HUDSON: I was going to ask him if --
MS. SHAPIRO: Just ask your questions.
MS. HUDSON: Yeah.
MS. SHAPIRO: Ask questions.
MS. HUDSON: Thank you. Thank you. I

appreciate it.
THE WITNESS: And I'm sorry.
BY MS. HUDSON:
Q Yeah?
A And I know that he ended up suing --
Q Yes.
A -- us for racial discrimination. A black man hired and fired by a black woman --
Q Uh-huh.
A -- after he was removed for the reasons why I said.
Q Okay. You said you were involved in the negotiation of the agreement with Sony for It Ends with Us?
A I was.
Q Okay. And did you sign that agreement?
A I did.
Q Okay.
MS. HUDSON: I'm going to hand you a document we're going to mark Exhibit 5.
(Exhibit 5 marked for identification.)
BY MS. HUDSON:
Q And this should be very simple.
A Okay.
Q My only question for you here is --

A Okay.
Q -- is this the agreement between Sony and Wayfarer for It Ends with Us LLC?
A Well, I don't see a signature on it, so...
Q So if you turn to the page that's Bates-stamped SPE_BL0000049.
A Ending in 49?
Q Ending in 49, you will see signatures.
A Okay. Okay. I see it now.
Q And do you recognize what the signature under Wayfarer Studios LLC as yours?
A I do.
Q And do you also see the signature under It Ends with Us Movie LLC as yours?
A I do.
Q And you see this document identifies you as the president of both of these entities?
A I see it.
Q And were you, in fact, the president of It Ends with Us Movie LLC?
A Apparently so.
Q Okay. And do you recognize that -- can you -- is this the agreement between Wayfarer and Sony for It Ends with Us LLC?

A I would have to spend some time reading it to authenticate whether or not it is.
Q What -- what -- what is in here that you would -- that you feel would help you understand whether it was that agreement?
A The entire document.
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q You think you need to read the entire document to understand if this is the agreement?
A I would have to verify that the entire document is what it is before I could verify to you that it is the agreement. I think that's fair.
Q Did you sign more than one doc -- did -- more than one agreement with Sony?
A I don't recall.
Q You may have signed more than one agreement with Sony?
A I don't recall. I don't know if there was any revisions. I can't recall at this time what there was. And I'm only speaking to if this is it, so I'm assuming. I'm just saying I can't verify that it is by just looking at -- glancing at it.
Q Okay. I'm going to have you set that aside for now.

A Okay.
Q And we can come back to that later.
A Sure.
Q Okay?
A Are we done with -- here you go.
Q Now, at some point, you all began casting for It Ends with Us, correct?
A Yes.
Q And a key theme for the movie It Ends with Us is female empowerment, right?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MS. HUDSON:
Q And did you think that you would need a strong actress to play the role of Lily Bloom?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MS. HUDSON:
Q And were Sony and Wayfarer hoping to land an A-list actress?
MS. SHAPIRO: Objection.
THE WITNESS: I think it's more nuanced than that, but eventually, we came to the understanding that that was what we were seeking.

BY MS. HUDSON:
Q And yesterday, Mr. Baldoni testified that, you know, Wayfarer was excited to what Ms. Lively could bring to the film along with her husband and best friend?
MS. SHAPIRO: Objection.
THE WITNESS: I don't understand the question. Along with whose husband?
BY MS. HUDSON:
Q Ms. Lively.
A And whose best friend?
Q Ms. Lively.
A I'm sorry. I don't understand the question.
Q Do you recall Mr. Baldoni's testimony that Wayfarer was excited about what Ms. Lively could bring to the film, including -- along with her husband and best friend?
MS. SHAPIRO: Objection.
THE WITNESS: Am I the one that's being referenced as best friend or her husband is being best -- I don't understand.
BY MS. HUDSON:
Q Her husband -- you don't have a husband, do you?

A No, but I don't know if it's her husband and best friend.
Q Her husband and her best friend.
A Got it. Okay.
Q Do you recall that testimony?
A I don't. But okay.
Q Was it a -- Ms. Lively was an experienced actress, correct?
A I believe so.
Q And she had a network of actors, directors and other people in the industry, and you all understood that, right?
A Sure.
Q Okay. And did you believe that casting Ms. Lively would bring more attention to the film?
A I don't know if we contemplated that.
Q Well, you knew that she was a big star, right?
MS. SHAPIRO: Objection.
THE WITNESS: Yeah, sure.
BY MS. HUDSON:
Q And I believe Mr. Baldoni testified yesterday that he believed, at the time, Ms. Lively had a stellar reputation.
MS. SHAPIRO: Objection.

BY MS. HUDSON:
Q Did you agree?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know if I agreed or disagreed. I -- I don't know if I know much -- knew much about her reputation.
BY MS. HUDSON:
Q Well, you had no reason to think that she had a bad reputation at that time, correct?
MS. SHAPIRO: Objection.
THE WITNESS: I had heard through several people that she was a little high maintenance. That's -- that's all I had heard at that time.
BY MS. HUDSON:
Q From who?
A I don't recall who. That was just from the different people learning that we were thinking of casting her.
Q You can't identify anyone at that time who told you she was high maintenance?
A This is '22, almost three years ago. So, no.
Q Did you ever send any text messages or emails to anyone involved in casting Ms. Lively where you expressed any belief that she might have

been high maintenance at that time?
MS. SHAPIRO: Objection.
THE WITNESS: No, because the truth is, many people are high maintenance. Many people say things about other people. And so it wasn't a cause for concern. But being that you asked me had I heard anything else, that's what I had heard. That was the extent of it at that time.
BY MS. HUDSON:
Q Okay.
MS. HUDSON: I'll hand you what's been marked as Exhibit 6.
(Exhibit 6 marked for identification.)
THE WITNESS: Sure.
BY MS. HUDSON:
Q It's a text chain between Jamey Heath, Justin Baldoni, dated December 9th, 2022, Bates-stamped BALDONI_18877.
Do you recognize this as a text chain that you and Mr. Baldoni participated in?
A If you allow me to read it, I can confirm that.
Q I'm going to direct you to, you know, specific areas for questions. I'm just asking --
A I understand.

Q Yeah.

A I can give you an advance. I'm not able to comment on something unless I understand full context. So I have to read it from -- I have to. Just for anything that you give me, I'm going to certainly read it.

Q Are you telling me that every document that I give you, you need to read the entire thing before I can ask you any questions about it?

A No --

MS. SHAPIRO: Objection.

THE WITNESS: No, but if you're giving me something of this nature, my intention is I need to understand the context. That's all.

BY MS. HUDSON:

Q I don't -- right now, I'm only asking you if you recognize it as a text chain between you and Mr. Baldoni?

A It appears to be, yes.

Q Okay. So --

A Can I read it?

Q You -- you can take a moment to read it, but I don't think you need to read the whole thing for the questions I'm going to ask.

A Okay. How about -- how about we do this.

How about you ask me the question, and then I can determine whether or not I need to read it?

Q I think that's a great idea.

A Great.

Q Let's do it like that.

A All right.

Q Okay. So at the top of this text chain, there's a chain -- there's a text from you. Do you see that?

A I do.

Q And it says:

(As read):

"If we get Blake on this movie, holy shit. You would be directing and starring in a movie with one of the biggest female stars."

A Okay. I'm going to ask that I read it because you're now asking me to read something, and I'd like to read the whole thing.

Q Well, I read it for you --

A I know, but I'd like --

Q -- did you hear it?

MS. SHAPIRO: Objection.

THE WITNESS: I would like to read the whole document.

MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q Okay. You want to read the whole document before you --
A I want to read --
Q -- hear my question?
A -- what -- yes. Because you're now ask -- you're reading things to me. I can read for myself at this point, if that's okay.
Q Go ahead.
A Thank you.
Okay. Thank you.
Q You done?
A I am.
Q So I'm going to go back to what I just read to you.
A Okay.
Q Which was:
(As read):
"If we get Blake on this movie, holy shit. You would be directing and starring in a movie with one of the biggest female stars."
Is that an accurate reflection of how you felt at the time you sent this text message?

A Absolutely.
Q All right. And then if you go down to the next thing you write here, you say:
(As read):
"My son's girlfriend was over last night and she heard me talking about Blake and she said, 'OMG, I love her so much." She's a black 20 year old."
Was this an accurate statement when you wrote it?
A It was.
Q Okay. And then Mr. Baldoni responded:
(As read):
"Everyone loves her. It's pretty wild."
Do you see that?
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q Well, he says "it's pretty wind."
A Yeah.
Q And then corrects it, and says "wild."
A I see that.
Q So and -- and you understood that it was his view at the time that everyone loves Blake, right?

A Yes, I see that.
Q And then you concur, "so wild," right?
A I do.
Q Okay. And so you all were excited about the notion of getting Blake Lively to star in this movie, right?
A That's not a simple yes or no for me in your question. We were excited for a host of reasons. One of them was, we were excited getting someone that could add a lot of value to it, and she was certainly, at that point, one of them. So I just -- yes, I may have over explained, and I apologize. Yeah, we were excited that Blake was on it.
Q And, in fact, you -- you made some accommodations to ensure that she could have the role, right?
MS. SHAPIRO: Objection.
THE WITNESS: We had to make the accommodations.
BY MS. HUDSON:
Q In order for Ms. Lively to take on the role, correct?
A It was a condition, so we had no choice but to make the accommodations.

Q Well, you could have gone with someone else, couldn't you?

A In order to have Ms. Lively, we had to -- the condition was, we had to make some accommodations.

Q Right. That was my question. Thank you.

A I don't know if that was exactly your question, but okay.

Q So, for example, the -- it was Mr. Baldoni's original plan to film a movie in Boston, correct?

A It was.

Q But he moved the location to New Jersey to accommodate Ms. Lively, correct?

A Correct.

Q And Ms. Lively had another film coming up in the -- that she was going to film in the spring. Do you recall that?

A I do.

Q Of 2023. And you recall that you -- that Wayfarer agreed to move the start date of shooting for It Ends with Us from March to May in order to accommodate Ms. Lively's filming schedule.

Do you recall that?

A Reluctantly.

Q Reluctantly or not, it was agreed to, correct?
A It was.
Q And that was because you wanted to have Ms. Lively star in this film, right?
A Yes.
Q And if you didn't want to make those accommodations, you could have selected somebody else to star in the film, right?
A It wasn't that simple.
Q What do you mean by that?
A Others had passed on the movie.
Q You were having a hard time getting it cast?
A For one reason or another.
Q Was it because it was being -- it was being directed by an unknown filmmaker?
A I don't recall the exact reasons why.
Q Was it because there was a limited budget?
A I don't recall the exact reasons why.
Q So are you saying that Blake Lively is the only actress that would accept the role?
A No.
MS. SHAPIRO: Objection.

THE WITNESS: I didn't say that.
BY MS. HUDSON:
Q So you had other options?
A We did not have other options at the moment, at that time.
Q So you felt if Ms. Lively didn't take this role, nobody else would?
MS. SHAPIRO: Objection.
THE WITNESS: That's not what I said. I just said we didn't have other options at the time. My point is, to just be clear so we don't have to do a little "cat and mouse" here, yes, we were happy she was doing it. We also were -- we didn't have a plethora of options. So you are put into a position where you might make some concessions where you might not otherwise if you had some other options. We also were very happy to have Ms. Lively.
BY MS. HUDSON:
Q And didn't Ms. Hoover say -- Colleen Hoover say that Blake Lively was her "dream Lily" and she couldn't believe it?
A She did say that.
Q And do you recall helping Mr. Baldoni craft a script to communicate with Ms. Lively to persuade her to take the role?

MS. SHAPIRO: Objection.
THE WITNESS: I don't recall it, but it sounds like something I might be involved in.
MS. HUDSON: Handing you a document that we will mark as Exhibit 8.
(Exhibit 8 marked for identification.)
BY MS. HUDSON:
Q And I'm going to ask you if this is the text -- a text chain that you recognize as the document I just referenced, where you wrote a script for Mr. Baldoni to persuade Ms. Lively to take the role. This is a text chain between you and Mr. Baldoni, dated December 19th, 2022, Bates stamp BALDONI 18879.
Again, Mr. Heath, I'm asking if you recognize this as the document that you were referencing?
A I'm almost done with it. I would like to finish it.
Okay.
Q Can you answer the question then?
A Remind me the question, please.
Q You testified that you recall writing a script for Mr. Baldoni to persuade Ms. Lively to accept the film.

I asked you, is that document the script?
A I don't want to be a stickler, but I did not say that I was -- I wrote -- I recalled -- I said I don't recall it, but I believe that's something that I may have been involved with, not that I corroborated that I wrote a script. I just want to be clear about that. And also -- yes, this appears to be something -- my text.
Q I understand it appears to be your text, but is it a text that you wrote to help Mr. Baldoni persuade Ms. Lively to join the film?
A It is a text I wrote to give him some ideas, as oftentimes people collaborate, and how can I articulate something -- a message, the best. And this was some of my ideas, yes.
Q Okay. I'm not asking about generic ideas, though. The purpose was to persuade Ms. Lively to join the film, correct?
A No. I do not gather that from this, exactly.
Q Then what was the purpose?
A The purpose was, we were dealing with the time constraint, and we could not get her to commit one way or another. And there was this other movie going on. We were trying to negotiate who would

start, as you can read in here, and we needed her to make a decision. So it wasn't so much about persuading her to do it, but it was rather like -- forgive the term -- "shit or get off the pot."

We needed to know. We needed to know what was happening so that we could plan accordingly. And we did want her. I'm not dismissing that. Of course, we wanted her. But we needed to kind of, as oftentimes in some point of negotiation, draw a line.

Q Okay.

A And it was delicate. So you want to be delicate with an artist. So we were consulting about how to address a delicate situation with humanity, but also be -- well, directly.

Q And at some point, Ms. Lively accepted the role, correct?

A She did.

Q And part of what she had requested was a producer credit, right?

A Originally.

Q Originally. And you told her agent that you're not -- the company -- Wayfarer is not going to agree to a producer credit now, but should she come on and demonstrate that she's filling a role as

a producer:
(As read):
"We will be willing to at least discuss it again," right?
A I don't know when I had sent that. So I -- you must have something that shows me that I said that.
Q Do you recall saying that?
A I don't recall.
Q Do you recall telling Mr. Zavala that?
A I recall that we would not agree to a producer credit.
Q But you don't recall telling him that, should she come on and demonstrate that she's filling a role as producer, we will be willing to at least discuss it again?
A I'm sure -- I would need to see it to understand the context.
Q Well, Mr. Zavala testified to it in his deposition.
A Oh, that's great. But I'm sure he testified to it based on something. I'm just saying you're reading to me what I wrote. I'm happy to look at what I -- where I wrote it.
MS. HUDSON: Handing you a document that

we're marking as Exhibit 9.

THE WITNESS: Okay. Thank you.

(Exhibit 9 marked for identification.)

THE WITNESS: I'm sorry. Thank you so much.

THE STENOGRAPHIC REPORTER: No worries.

BY MS. HUDSON:

Q This is a text chain between Justin Grey Stone, Warren Zavala, and Blake Lively, dated January 4, 2023, Bates-stamped BL 21306 to 21307.

If you go down to the bottom, Mr. Heath, there's a text message from Mr. Zavala where he says, at 3:21 p.m.:

(As read):

"I thought it best to share this because of the way it's framed and because I work for you and not him. Hey, man, yes, they did. Very much needed. Thanks for helping with that. So shall we get the attorneys to work through the deal now? We have discussed internally, and we are excited about her coming in as an EP. The producer credit isn't going to change for us, but I believe you've

already accepted that. I will tell you off the record that should she come on and demonstrate that she's filling a role as producer, we will be willing to at least discuss it again. But that's where we are."

A Okay.

Q Do you see that language?

Now, Mr. Zavala testified at his deposition that this was a communication from you that he cut and pasted into this text.

Do you recall that?

A I'm happy to talk about this, but I also want to state on the record, what I'm reading is something that he sent to her. So apparently, him copy/pasting something. So I'm not seeing my actual documentation.

Q Correct.

A I'm seeing his now reposting it.

Q That's correct.

A The telephone game happens here, and I just want to be clear that whatever I speak to is based on what I'm reading and not my own writing.

Q Well, did you tell Mr. Zavala that if Ms. Lively demonstrated that she's filling a role as

producer, you will at least be willing to discuss it again?

A I don't recall this exact text when I wrote it, but I can tell you this: I think whenever you are trying to negotiate and let someone down softly, you use language that can help facilitate that.

I think my statement beforehand, if this is, indeed, correct, is "the producer credit isn't going to change for us," is what I said. "But I believe you already accepted that."

But as an olive branch, as a way to recognize the clients and who they are, yeah, listen, if we -- if at some point that makes sense to discuss it, we will discuss it.

Q So is your answer yes; you believe you did say this to Mr. Zavala?

A It looks like I did.

Q Okay.

MS. HUDSON: We're going to -- we'll take a break for lunch if everyone wants to do that now. Can we do 45 minutes?

THE WITNESS: 45?

MS. HUDSON: Yes.

THE VIDEOGRAPHER: We are going off the

record. The time is 12:55 p.m.
(Lunch recess.)
---000---
AFTERNOON SESSION
WEDNESDAY, OCTOBER 8, 2025
THE VIDEOGRAPHER: We're back on the
record. The time is 2:01 p.m.
BY MS. HUDSON:
Q Mr. Heath, I understand that Ms. Lively
testified that you showed her a video of your wife
giving birth, right?
A I'm aware.
Q And you understand that this is an
incident that she found uncomfortable?
MS. SHAPIRO: Objection.
THE WITNESS: I'm aware now.
BY MS. HUDSON:
Q You're aware -- you didn't know then?
A I did not.
Q You did not know at the time that she
found it -- that she was uncomfortable with that?
A I did not.
Q When was the first time you learned she
was uncomfortable?
A I want to say when the CRD complaint was.

Q When the CRD complaint was, okay. So that was the first time you believe you felt -- you understood that she was uncomfortable; is that right?

MS. SHAPIRO: Objection.

THE WITNESS: In the context described, yes.

BY MS. HUDSON:

Q In the context described, okay. And the -- she testified that you showed her this video after the birthing scene was already filmed.

Do you recall that?

MS. SHAPIRO: Objection.

THE WITNESS: I don't recall her exact testimony, but I believe that to be true.

BY MS. HUDSON:

Q Okay. And she testified that Mr. Baldoni had tried to persuade her to film the birth scene nude.

Do you recall that?

MS. SHAPIRO: Objection.

THE WITNESS: I don't recall if I learned that for the first time in the deposition. But I think that was stated in her suit.

BY MS. HUDSON:

Q Okay. Do you -- were you present for any conversation in which Mr. Baldoni talked to Ms. Lively about being nude in the birthing scene?

A No.

Q Okay. And did you at some point show Ms. Lively a video of your wife giving birth?

A I did not show her a video of my wife giving birth.

Q Did you show her a video in which your wife was nude?

A Yeah. My wife was nude in the tub, covered with the baby in a towel.

Q Your wife was in a towel in the video?

A No. There was a towel to keep the baby warm. The baby was on top of my wife, and there was a towel there.

Q In the video that you showed Ms. Lively, were your wife's breasts exposed?

A No. The baby was covering on top of her, and the towel was there. Honestly, could you maybe see a side of it or something of that nature? That's possible. I don't recall exactly, but that's essentially the scene of the video.

Q You produced a video in -- your lawyers produced a video in this case.
Did you provide the video of -- a video in which your wife is in a tub with a baby to your lawyers to produce to us in this case?
A I did.
Q Okay. Where was that video stored?
A You mean when I -- at what point?
Q At the point that you took it to give it to your lawyers. Where did you get it? Where was it?
A I believe it was on my phone.
Q It was on your phone?
A I believe so.
Q Okay. Did you edit the video at all before giving it to your lawyers?
A I did not.
Q So the video you gave was the complete video as it existed on your phone?
A Correct.
Q What, in your memory, did the video depict?
A It's our midwife, my sister, my kids, my wife, myself, our newborn baby. I believe we were singing or praying. The baby was crying, and then

at some point we were whispering a prayer in the baby's ear.

Q That's what you recall?

A Yeah.

Q And your wife was in a tub?

A A birthing tub, yeah.

Q A birthing tub.

And you said she wasn't clothed, but she had a towel over her?

MS. SHAPIRO: Objection.

THE WITNESS: The towel was more over the baby, I think, because, you know, when the baby came out of the water and you bring it up, then it's wet. So you put a dry towel to cover it.

BY MS. HUDSON:

Q And in the video that you gave to your lawyers to give to us, were you in the video?

A I am.

Q And are you nude in that video?

A No.

Q Were -- did your wife give birth in a tub?

A She did.

Q Were you in the tub when she gave birth?

A I was.

Q The entire time?
A I believe so.
Q You were there the whole time she was giving birth?
A I was.
Q Who filmed the video?
A That particular one, I believe, was my daughter.
Q Your daughter?
A My older daughter.
Q Your older daughter.
Did you give your daughter instructions for filming?
A I'm not sure. What do you mean?
Q Did you ask her to film any particular part of the birth?
A No. She just was -- her and my sister both, actually, were filming different stages of the labor and the birth and afterwards.
Q So did someone else film a different stage other than the stage that is depicted in the video that you gave to your lawyers to produce to us?
MS. SHAPIRO: Objection.
THE WITNESS: I think I'm a little

confused, but I think your question is, are there other -- is there other video of the duration of my child being born and after and beforehand?

BY MS. HUDSON:

Q Sure.

A Yes.

Q What other stages of the delivery are depicted in the video?

A Her entire birth.

Q How long was the birth?

A Oh, gosh. I don't remember. The whole birthing? Couple of hours.

Q And it's all on film?

A No, no, no. I just mean the birth took a couple of hours at different times. But if you're wondering if the birth is filmed, it is.

Q The delivery itself?

A It is.

Q So the baby crowning and coming out is all filmed?

A Yes. The baby being delivered, yes, for sure.

Q Were you in the tub with your wife when the baby was actually delivered?

A I was.

Q Do you know in the film depicting your -- the baby actually being delivered, are you in that, or is there -- are you in the shot?
A I'm sorry. Can you repeat it? I just want to follow.
Q Yes.
When the baby is being delivered, are you in the shot of the film?
A I think so.
Q Have you watched all of that film of the birth and delivery of your child?
A No.
Q You haven't watched it all?
A Not all of it. I mean, we -- at some point we've seen -- reflected on it and seen some portions of it, but no.
Q Is it all on your phone?
A No.
Q It's not? Which ones are on your phone?
A Just the one with the baby on my wife, and the one I described.
Q The one -- the one that you produced in this case, that's the only one that is on your phone?
A Yes. The one I produced and the one that

I showed to Ms. Lively.
Q Is that the only one that has ever been on your phone?
A I don't know for sure.
Q How did that one get on your phone?
A Well, originally, we had uploaded to preserve them on, I believe, Dropbox. And then on Dropbox, then I would download it to my phone. So that's how it would have got on my phone. Or maybe even -- maybe some portions were filmed with my phone. Maybe my daughter had my phone. I don't recall the process of that time, but --
Q So some portions might have been filmed on your phone, but the only one that remained on your phone was the one that you produced; is that what you're saying?
MS. SHAPIRO: Objection.
THE WITNESS: Yeah. That's the only one that I would keep on my phone, as that's something that I would feel appropriate if my phone was falling into the wrong hands.
BY MS. HUDSON:
Q You said that you were not nude in that video, but you were not wearing a shirt, correct?
A I was not wearing a shirt.

Q Would you agree that it's not really clear what you're wearing beyond -- if anything, beyond a shirt from that video?
MS. SHAPIRO: Objection.
THE WITNESS: Yeah. I would agree that you wouldn't know otherwise, I suppose.
BY MS. HUDSON:
Q So going back to the -- well, you said there might have been other portions of the birth video on your phone.
When would those other portions -- when did you remove the other ones?
MS. SHAPIRO: Objection.
THE WITNESS: From -- I don't even know if they were ever on my phone to begin with. So I wouldn't have had to remove them.
BY MS. HUDSON:
Q You said you thought that some portions of the birthing video might have been taken with your phone?
MS. SHAPIRO: Objection.
THE WITNESS: Correct. But once I would have them, then I would upload them to Dropbox.
BY MS. HUDSON:
Q Immediately?

A Within -- I mean, immediately? Not in the moment of the birth. Week and two weeks it's happening, but, you know, at some point...
Q So it's your testimony that you -- to the extent there were other videos on your phone, you removed all of them onto Dropbox except for the one that you produced in this case; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: I'm saying that at some point. I don't know exactly what was on my phone during the time of the birth, but eventually, I did not have them.
BY MS. HUDSON:
Q Did you send that video that you gave to your lawyers to anyone?
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q Other than your lawyers?
A Not that I can recall.
Q Did you send it to Melissa Nathan?
A I do not recall.
Q Can you access Dropbox from your phone?
A I can.
Q Have you ever accessed any of the videos of your -- of your wife's birth -- not your wife's

birth -- strike that.

Have you ever accessed any of the birth videos on Dropbox from your phone?

A I don't have a particular memory of it.

Q You can't say one way or the other?

A I don't have a memory of it.

Q So going back to the day on which you showed the video to Ms. Lively, her testimony was that when she saw it, she immediately saw that it was a naked woman that you were showing her, that she didn't know what it was. It had no context, that you did not ask if she wanted to see it, and did not ask for her consent. And then you told her that the video was of your wife giving birth.

Is that an accurate description of the incident in which you showed Ms. Lively the video?

MS. SHAPIRO: Objection.

THE WITNESS: No.

BY MS. HUDSON:

Q Which part of that, in your view, is not accurate?

MS. SHAPIRO: Objection.

THE WITNESS: I think a lot of that is inaccurate.

BY MS. HUDSON:
Q Okay.
A We're leaving out -- I'm sorry.
Q Go ahead.
MS. HUDSON: I'm sorry, do you have an objection?
MS. SHAPIRO: (Indicating.)
MS. HUDSON: No? Okay.
MS. SHAPIRO: Do you have another question?
MS. HUDSON: I don't have a question. He's answering a question.
MS. SHAPIRO: He already answered the question.
MS. HUDSON: He was still speaking.
THE WITNESS: Can you repeat the question? I forgot it. I'm sorry.
BY MS. HUDSON:
Q Yeah. What -- you were about to describe what you think of this description is inaccurate.
A Yeah. And I said a lot of it.
Q What exactly?
A Well, what I showed her was not what is described there. When I had walked up to her, prompted by Justin asking me and saying that they

had had a conversation at some point and that he believed -- what I understood, that he believed that she wanted to see it, that he had mentioned something about it.

So when I approached her, I had said something, Hey, Blake -- thinking that she wanted to see it. Justin said something, You wanted to see this. She walked up for a second. She glanced at the phone. She may have looked for half a second. And then she asked me, Does your wife know? Is it okay with you showing this?

I said, Yeah, of course. I wouldn't show anything that my wife wasn't comfortable with.

She then said -- I don't remember her exact words, but she said something like, Oh, I'm eating right now. I need to eat some protein. Because she had a plate of protein for her own purposes with the baby, and -- but I will come see it later. I'll find you later, and I'll -- and, I would love it. And then she also said, like, I think that's all wonderful and beautiful.

And I was, like, Okay, great. I left, and that was the end of the conversation.

Q She said, I think that's all wonderful and beautiful?

A I don't know if those were her words, but she was very gracious and very kind, and nothing seemed to be of any concern.

Q Did you -- when she asked you if your wife had given consent for her -- for you to share that video, did you say, She's not weird about that kind of stuff?

A No.

Q You didn't say that?

A Of course not.

Q And why did you -- what did Mr. Baldoni tell you with respect to Ms. Lively wanting to see that video?

A I had known -- there had been quite a bit of conversation about how -- beforehand, how he wanted to shoot the actual birthing scene in the movie and his overall -- he had, like, four or five ideas of how he wanted to shoot it, how he might want to depict the scenario. And from what I understand, he and Blake had many conversations about it as well.

One of them that he was considering was shot in the style of a home birth. He thought about doing it on an iPhone. He was just throwing out different ideas. There was no decision made at that

time over -- over weeks. And then, eventually, they decided not to shoot it that way.

So Justin -- I believe it was at the Route, the bar we filmed The Route at. I was sitting over on a chair, doing some work on my phone. Justin comes over and says, Hey, I was talking to Blake. I was talking about your beautiful video with your wife. Would you mind showing it to her? I said, yeah, sure. I didn't think twice about it. I went over, walked over to her, and then the rest, as I explained already, happened.

Q It's your -- you didn't say anything to Ms. Lively before you showed her the video because it was your understanding that Mr. Bal -- that she had specifically asked for it?

MS. SHAPIRO: Objection.

THE WITNESS: My understanding at the time was that they had just had a conversation or just at some point had a conversation, and that she was expecting or -- or that she was aware.

BY MS. HUDSON:

Q So you didn't say anything prefatory, like, This is the video that Justin said you wanted to look at?

A I did say something when I walked up. I was like, Hey, Blake. Justin had mentioned you wanted to see this. And then I immediately showed her the screen.
Q You mean -- and was it playing at the time?
A I don't recall if it was playing or paused.
Q Do you know what scene was specifically showing, what was visible to Ms. Lively when you hit play?
A Well, the first portion of the video -- which, again, she had only seen maybe a half a second of it -- is only my wife sitting here, the baby on top. And that's what she would have seen.
Q So your testimony is, what you showed her was the very beginning of the video?
A Yeah, for sure.
MS. SHAPIRO: Objection.
MS. HUDSON: Okay.
THE WITNESS: Either it was paused or playing. I don't recall that, but for sure.
BY MS. HUDSON:
Q Do you remember what date this was?
A I have come to believe and know that the

date is May 23rd.
Q When you showed her the video?
A Correct.
Q Do you know when the birthing scene was filmed?
A I do.
Q What date?
A I don't know the date. I know it was a couple or few days beforehand.
Q It was before you showed her the video, right?
A It was.
Q You said that Mr. Baldoni talked to you about the video in the context, as you understood it, of some debate about how that scene would be shot, right?
A Right. Right.
Q Okay. So since the scene had been shot already, what was the purpose of showing her the video?
MS. SHAPIRO: Objection.
THE WITNESS: Well, I can't tell you exactly his purpose, but I think I had an understanding of it. But I don't know what his exact thinking was at that moment.

BY MS. HUDSON:
Q And you didn't ask?
A I didn't, because he had mentioned that he and Blake were speaking and gave me that context and said that she wanted to see it. At least that's what I understood him to be saying to me. So I thought it was reasonable.
Q And you said you understood that's what he was saying to you. So he may have been saying something different?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall his exact words, but that's the impression I got from the words he had said to me.
BY MS. HUDSON:
Q Okay. And Ms. Lively testified that you did not tell her why you were showing her the video. You're claiming today that you said, Justin asked me to show you this, right?
MS. SHAPIRO: Objection.
THE WITNESS: I've always said that.
BY MS. HUDSON:
Q Well, I've never talked to you about it before so I didn't know what you've been saying.
MS. SHAPIRO: Objection. Ask questions,

please.

MS. HUDSON: I am asking questions.

MS. SHAPIRO: That wasn't a question. It was a snarky comment. Please ask questions.

BY MS. HUDSON:

Q Mr. Heath?

A Yes.

Q Your testimony is that this -- what Ms. Lively said is not accurate when you -- when she said that you did not tell her why you were showing her the video?

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q Is that right?

A Can you repeat to me what you asked?

MS. HUDSON: I'm going to strike it.

BY MS. HUDSON:

Q Did you ever ask Mr. Baldoni why Ms. Lively wanted to see that video?

A I don't recall having a specific conversation afterwards.

Q Did you have any -- do you have any -- did you question at all what Mr. Baldoni had told you about what Ms. Lively wanted when she asked you if your wife was okay with you sharing the video

with her?
MS. SHAPIRO: Objection.
THE WITNESS: Sorry. I need you to rephrase that. I didn't follow.
BY MS. HUDSON:
Q You said Ms. Lively asked you if it was okay for -- with your wife if you shared the video, right?
A Yes.
Q When -- when she asked you that, did you have any questions whether it was accurate that she had asked to see the video?
MS. SHAPIRO: Objection.
THE WITNESS: Did I ask Blake that?
BY MS. HUDSON:
Q When she asked you if it was okay with your wife, did you have any question about whether it was accurate that she was the one who had asked to see the video?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MS. HUDSON:
Q Okay.
A I -- no. This -- this interaction for me was an innocuous. It seemed completely -- it was a

nothing. It seemed in context of -- they were there filming and a lot of conversations happening. And so I -- I did not think about that after that.

Q And there's been some testimony about Mr. Sarowitz being at the set the day of the birthing video. I'm sorry -- the day the birth scene was filmed?

A Yes.

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q And -- and you recall him being there that day as well, correct?

A He was there later that day.

Q I understand. But he was there on the set at some point during that day, correct?

A Correct.

MS. HUDSON: I'm going to hand you what we've marked as Exhibit 9.

MS. SHAPIRO: There is already an Exhibit 9.

MS. AHOURAIAN: I have Exhibit 9.

THE WITNESS: Do you need this back?

MS. HUDSON: It's Exhibit 10.

(Exhibit 10 marked for identification.)

THE WITNESS: Okay.

MS. HUDSON: If you don't mind putting the sticker on.

THE WITNESS: On top of this one?

MS. HUDSON: Yes.

THE WITNESS: Sure. You got it.

BY MS. HUDSON:

Q I don't have anything for you to read just yet. I'm going to ask you some questions off the document, and then I will ask you to look at something on the document, okay?

So it's my understanding that -- that Wayfarer has taken the position that there was a closed set the day of the birthing scene; is that right?

A Yeah. I believe every day was a closed set.

Q Okay. I think in the amended complaint at page 27, you take the position that it was a closed set, right?

A Yes.

Q Okay. And what do you understand "closed set" to mean?

A That it's not open to the public, or people that don't have either a need or are not invited to be there.

Q Okay. And when people are invited to a closed set, are they required to be listed on the call sheet?
A No.
Q They are not required to be listed on the call sheet?
A That if what?
Q If they're invited to a set on a closed set day, are they not required to be on the call sheet?
MS. SHAPIRO: Objection.
THE WITNESS: That, I don't know.
BY MS. HUDSON:
Q You don't know?
A I don't know.
Q What would you expect on a closed set day that someone who would be present would -- you would expect to see their name on a call sheet?
MS. SHAPIRO: Objection.
THE WITNESS: In my experience, not -- no. Every day was a closed set on every call sheet. So even on a day that we were maybe filming a car scene of people driving, still on our call sheets, I believe it was closed.

BY MS. HUDSON:
Q Was it an actual closed set just because it said so on the call sheet?
MS. SHAPIRO: Objection.
THE WITNESS: I believe all days were closed sets.
BY MS. HUDSON:
Q All days were closed. So then -- so and then -- the -- the call sheets list who is permitted on the set, correct?
A I don't have that answer.
Q So you don't know if it's a closed set, how you keep track of that?
MS. SHAPIRO: Objection.
THE WITNESS: That would be a question more for our AD and line producer, I believe.
BY MS. HUDSON:
Q Do you understand that the term -- the term "closed set" to have a specific meaning with respect to intimacy and nudity?
A I don't know if I know that exact language.
Q So you don't know what "closed set" means with respect to intimacy and nudity; is that what you're saying?

MS. SHAPIRO: Objection.
THE WITNESS: I do know that when you have a closed set that is only necessary personnel only, it's different than necessarily a more broad term of a closed set.
BY MS. HUDSON:
Q And you don't know how it is that it's determined who's necessary for a closed set; is that what you're saying?
A No, that's not what I'm saying. I'm saying the difference in a closed set versus a set that is closed but authorized personnel only.
Q Those are different things in your mind?
A In my experience, but I could be wrong.
Q And what are the circumstances in which you have a closed set with authorized personnel only?
A You might have a set that's only the people necessary for that actual filming. So do you need, for instance, hair and makeup there? They're not necessarily necessary for the scene. Do you need the grips that have already done their work, that are normally on a closed set, but they're not in there for personnel only that is needed to actually film that scene.

Q And how is it reflected? Who are the authorized personnel that can be there?

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q Wouldn't that be on the call sheet?

MS. SHAPIRO: Objection.

THE WITNESS: I don't know.

BY MS. HUDSON:

Q You don't know?

A I don't.

Q What is the purpose of a call sheet to your understanding?

A It's for the AD, for the director, for the producers to understand who the crew and cast will be there.

Q And when it's a closed set day, does it also include anyone who's authorized to be on the set that day?

MS. SHAPIRO: Objection.

THE WITNESS: I don't know if that means authorized or not, but I, in this case, would defer to Alex Saks, who was more the lead on these things. So I would defer to her knowledge.

BY MS. HUDSON:

Q Was Alex Saks responsible for placing

names on the call sheet?
A I don't know that to be one way or another.
Q Or authorizing names for the call sheet?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know that to be one way or another.
BY MS. HUDSON:
Q How would you control who was on the set other than putting people on a call sheet on days in which the set is closed for intimacy and nudity?
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q How do you know who is authorized and who isn't, is my question?
MS. SHAPIRO: Objection.
THE WITNESS: The AD is the one who determines who's necessary for that.
BY MS. HUDSON:
Q So the -- and would you expect the AD to write that down somewhere?
A I don't know. I can say that the call sheet, even if it was a scene that required intimacy, the call sheet would still include the whole crew because you might have to set up. You

might have all the different departments that need to do the work there. Set decorators, for instance, would be on the call sheet. But that doesn't mean they're there for the actual filming. And the AD would ask people to leave and only have necessary personnel.

Q Okay. Now, you're familiar also with Ms. Lively's description of an incident in which you were in her makeup trailer when she was in a state of undress, right?

A Do I understand her description of it?

Q You've -- you understand the -- her description of it, right?

A I do understand or I -- yes, I -- I know that she has a description of it, yes.

Q And did you hear the descriptions of Vivian Baker and Anne Carroll of that incident?

A I did. Bless you.

MS. SHAPIRO: Thank you.

BY MS. HUDSON:

Q And you understand that Ms. Lively, Ms. Carroll, and Ms. Baker all testified that she was in her makeup trailer in a state of undress?

MS. SHAPIRO: Objection.

THE WITNESS: I heard what they said,

yeah.
BY MS. HUDSON:
Q And you understand that they said she was not clothed from waist up?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall exactly. I remember hearing some inconsistencies even in their own versions, but I recall them testifying about that, yeah.
BY MS. HUDSON:
Q And you recall testimony that Ms. Lively's breasts were exposed?
A I recall somebody saying something of that nature. I don't recall who.
Q And do you recall testimony that you came into the -- that when you came to the trailer, that it was communicated, no, no, no, or whoa, whoa, whoa, or don't come in, words to that effect?
MS. SHAPIRO: Objection.
THE WITNESS: I recall somebody saying something like that.
BY MS. HUDSON:
Q Okay. Somebody among these three people who have testified about --
A Correct.

Q -- this; is that right? Yes. Okay.
And you recall the testimony was that notwithstanding those statements not to come in, you came in nonetheless?
MS. SHAPIRO: Objection.
THE WITNESS: I've heard their version of that, yes.
BY MS. HUDSON:
Q And you understand the version of Ms. Baker, Ms. Carroll, and Ms. Lively is that you also insisted on staying in the trailer in order to have a meeting, which you said something along the lines of, if we don't have it now, we're not going to have it at all?
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q You recall that testimony?
MS. SHAPIRO: Objection.
THE WITNESS: I recall something of that nature.
BY MS. HUDSON:
Q Okay. And you recall the testimony that you were asked to turn around and not look at Ms. Lively, given her state of undress?
MS. SHAPIRO: Objection.

THE WITNESS: And the question is?

BY MS. HUDSON:

Q Do you recall that testimony?

A Something of that nature.

Q Okay. And you recall that notwithstanding that, that you looked at Ms. Lively in the mirror and you were observed by more than one of these witnesses to have seen her reflection in which she was exposed with her breast exposed, specifically?

MS. SHAPIRO: Objection.

THE WITNESS: Yeah, I've heard -- I've heard them -- some version of that.

BY MS. HUDSON:

Q Okay. And you've heard the testimony that Ms. Lively said, I told you to turn around and not look, or words to that effect?

MS. SHAPIRO: Objection.

THE WITNESS: You're saying the testimony was that she -- that she said that according to their story during this --

BY MS. HUDSON:

Q Correct.

A -- alleged incident?

Q Correct.

A I don't exactly recall that.
Q Okay. All right. And -- and you recall the sum and substance of it was that Ms. Lively was uncomfortable with you having come into the trailer and looked at her with her breasts exposed?
MS. SHAPIRO: Objection.
THE WITNESS: Yeah. I heard -- I heard her testimony.
BY MS. HUDSON:
Q Okay. You heard the testimony of Ms. Baker and Ms. Carroll that they also were uncomfortable?
MS. SHAPIRO: Objection.
THE WITNESS: I heard their testimony.
BY MS. HUDSON:
Q And you heard their testimony that they also observed Ms. Lively being uncomfortable at that moment?
MS. SHAPIRO: Objection.
THE WITNESS: I heard their testimony.
BY MS. HUDSON:
Q Okay. Was there an incident in which you were in Ms. Lively's makeup trailer, along with Ms. Carroll and Ms. Baker, when she was in a state of undress?

A I don't know that she was in a state of undress.

Q Do you -- do you have a specific memory of the incident that Ms. Carroll, Ms. Baker, and Ms. Lively described?

A I do.

Q Okay. And what is your memory of that incident?

A Well, this is day two of shooting. We had got a text that morning, maybe the night before, but it could have been that morning, from Ms. Lively that she wanted to meet with me and Ange and Justin and Alex. We tried to have the meeting that morning. It didn't work out. We tried to have it in the afternoon. Several attempts and we were not able to achieve.

At the end of shooting, we were at the cemetery. I approached her and said, I know you wanted to meet today, but it's getting late, and suggested that maybe we do it the next day or something. She had said that she was going back to her makeup trailer, could we meet her there, and we could have the conversation then.

Not the conversation that she wanted to have in the morning, the conversation about whether

or not we were going to do it that night or the next day.

Q So the conversation, just so I understand it, was just about when the meeting was going to take place?

A She was hoping to have it that day, that night, and now that it was at the end of the day, I was concerned about her turnaround time.

Q So just to be clear, though, the conversation that you were going to have with Ms. Lively in her makeup trailer, in your understanding, was about when this meeting was going to take place?

MS. SHAPIRO: Objection.

THE WITNESS: Whether we were going to do it that night or the next day.

BY MS. HUDSON:

Q Okay.

A So the four of us, Justin, myself, Ange Giannetti, and Alex Saks, all went to her makeup trailer, the four of us. I knocked. Heard some sort of "come in" or "yes" or some indication that led me to believe it was okay to open the door.

Q So the opposite of what the three witnesses said?

A You asked me what.
Q I just want to make sure I understand. You -- they said -- they all said they said no, and you heard yes; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: Can -- I don't --
MS. SHAPIRO: Will you let him finish his answer? You asked him to describe his memory of the event, and you keep interrupting him.
MS. HUDSON: Well, I'm asking questions as he is providing the answer.
THE WITNESS: Would it be okay if I just give you my answer?
BY MS. HUDSON:
Q Go ahead.
A Is that all right?
Q Go ahead.
A So I then knocked, to be clear, with Justin and Ange and Alex with me at the bottom of her steps. I knocked on the door, heard some indication to come in. As I took a step up, I saw that she was leaned back. She looked what I thought was either maybe breastfeeding or nursing. I said to her, oh, it looks like you're busy, I can come back. As I turned around she says, no, that's okay.

You can come in, just look away. And I said, sure.

Now, I never saw the front of her. I just saw this which appeared to me a familiar -- familiar position of her feeding or nursing or pumping. So then I walked over to the side, looked away. We had a two-minute conversation, could have been three minutes, about whether or not we were going to have the meeting that night or the next day. I was trying to negotiate with her, could we do it tomorrow because I was worried about the turnaround time, and we would lose money, which is an implication -- we would lose hours in the next day, which is an implication of money.

We had a conversation back and forth. She eventually said no, she had to have it tonight and she would not waive any sort of turnaround time and do it off record. So I then left, walked down the stairs out of the makeup trailer where Ange, Justin, and Alex were. Reported to them, she wants to do it tonight. I tried to convince her to do it tomorrow, but she wants to do it tonight.

She walked out four or five minutes later, greeted us, said, hello. We went into her then trailer, and we had a discussion about what she wanted to meet with us.

Q And when she came to the trailer for the meeting, did she say anything about what had just occurred in her makeup trailer?
A She did not. This is on day two. This is May.
Q May 16th?
A May 16.
Q Did you ever learn that Ms. Lively had a different view of the incident in the trailer prior to her testimony?
A I learned that her different view is when I read the CRD complaint.
Q So you didn't hear any concerns raised by Ms. Lively regarding this incident in the trailer on the second day of shooting until the CRD complaint?
A We had a conversation about it on June 1st, two weeks later, but not that there was a concern.
Q Okay. And when you say, "we had a conversation about it two weeks later," who are you talking about?
A There was a conversation with Blake, Justin, myself, and Alex Saks, about she had got COVID and we returned to set. And we had a morning conversation before we started working.

Q And who called that meeting on June 1st?
A I believe it was Blake.
MS. HUDSON: Exhibit 11.
(Exhibit 11 marked for identification.)
MS. SHAPIRO: Are we done with Exhibit 10?
MS. HUDSON: Yes.
MS. SHAPIRO: Okay.
BY MS. HUDSON:
Q Mr. Heath, do you recognize this as the text message in which Ms. Lively invited you to a meeting with Ms. Saks and Mr. --
A Yeah.
Q -- Baldoni?
A Yeah. I see it.
Q And she says she wants to give you a check-in before rehearsal:
(As read):
"I can pop out of my makeup trailer early and meet you in the -- in my trailer. Eager to get back to work on a solid track."
Do you see that?
A Yes.

Q Yes. And this is a text message that you received and participated in, correct?
A Correct.
Q And it's dated June 1st, 2023, Bates-stamped BL 11580.
Were you present for Ms. Saks' testimony about this meeting on June 1st?
A I was.
Q Okay. So you heard that in the meet- -- that Ms. Saks said in the meeting, Ms. Lively brought up that she had been shown a video of your wife giving birth, which made her uncomfortable?
MS. SHAPIRO: Objection.
THE WITNESS: What is the question?
BY MS. HUDSON:
Q You -- you -- did you -- you heard Ms. Saks testify that in this meeting on June 1st, Ms. Lively brought up that she had been shown a video of your wife giving birth and it made her uncomfortable?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall Ms. Saks' exact words, but I remember her talking about it.
BY MS. HUDSON:
Q And you remember her testifying to that

effect?

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q Whether those are the exact words she used, right?

A I honestly don't recall what she had said.

Q You don't -- do -- you don't recall any aspect of her testimony about the June 1st meeting?

MS. SHAPIRO: Objection.

THE WITNESS: No, no. I just don't recall what -- what she had said.

BY MS. HUDSON:

Q Okay.

A I just don't.

Q Well, did you -- do you recall from her testimony learning that or hearing that Ms. Saks described Ms. Lively in this meeting saying she was uncomfortable?

MS. SHAPIRO: Objection.

THE WITNESS: Honestly, I don't recall. I just -- I just remember her saying that there was a conversation about it.

BY MS. HUDSON:

Q Okay. Well, do you recall during that

meeting, regardless of what Ms. Saks said, do you recall Ms. Lively saying that she was uncomfortable by being shown the video?
A I do not.
Q You don't recall that?
A She never said to me that she was uncomfortable.
Q Okay. So Ms. Saks is lying?
MS. SHAPIRO: Objection.
THE WITNESS: I have no judgment about Ms. Saks. I'm just telling you what happened.
BY MS. HUDSON:
Q Okay.
Do you recall Ms. Saks testifying that you tried to clarify that you thought Justin told Ms. Lively about the video and that Ms. Lively wanted to see it?
A Hold on. For clarity, you were just talking about --
Q Yes.
A -- the trailer.
Q No. We're talking about --
A I thought --
Q -- the video.
A Okay.

Q We're talking about the June 1st meeting and what Ms. Saks said about it.
A Okay. I thought you were referring to the video so I misunderstood. Okay. About the trailer?
Q Yes.
A So both questions with regard to the video?
Q Correct.
A Yeah, okay. Now I'm clear.
Q During that meeting you recall Ms. -- do you recall Ms. Saks in her testimony saying that you said on this June 1st meeting that you tried to clarify that you thought Justin told Ms. Lively about the video and that Ms. Lively wanted to see it?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall what Ms. Saks said.
BY MS. HUDSON:
Q Okay. Did you do that in the meeting?
MS. SHAPIRO: Objection.
THE WITNESS: It was brought up and Justin did interject and say that he was the one that asked me to show her.

BY MS. HUDSON:

Q Okay. So if Ms. Lively wasn't saying she was uncomfortable, what was your understanding of the reason she brought up the video?

MS. SHAPIRO: Objection.

THE WITNESS: I can tell you what the interaction was and what I inferred from it.

BY MS. HUDSON:

Q Sure.

A As she came back from having COVID and as her text said she wanted to get off to a -- to a:

(As read):

"Back to work on a solid track."

She said to me that, "Jamey, you know when you walked up to me to show me the video with your wife, I thought you were showing me porn." I said, Oh my God. I'm so sorry. Really? Oh my gosh. She was like, I know that it wasn't, but it startled me. I thought that's what you were showing me. I was like, Oh my gosh, I'm so sorry. And then we moved on. She didn't say anything that it was uncomfortable. She was just telling me that's what she thought. She recognized that what she thought it was, that it was, in fact, what I showed her. And then she moved on to the next subject.

Q So you didn't take from her telling you she thought you were showing her porn as an indication that she might have been uncomfortable?
A I did not.
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q Okay. All right. And did Ms. Lively also say in that June 1st meeting that everything is too comfortable on set?
A I don't recall that.
Q Okay. Ms. Saks testified to that. If you don't recall, you don't have any reason to dispute Ms. Saks' memory, do you?
MS. SHAPIRO: Objection.
THE WITNESS: I can't speak about her memory in any way. I only can tell you what I recall. I don't recall that.
BY MS. HUDSON:
Q You don't recall one way or the other?
A I have no memory of it.
Q Okay. And Ms. Live- -- Ms. Saks also said that Ms. Lively said that she requested that the set be more professional in this meeting?
MS. SHAPIRO: Objection.
THE WITNESS: I remember something about

that. I just don't know the details, but I do remember her saying something about that.

BY MS. HUDSON:

Q Ms. Saks also said there was -- that Ms. Lively said there was a lot of hugging and touching amidst the Wayfarer team during that movie -- during that meeting?

MS. SHAPIRO: Objection.

THE WITNESS: Yeah. I don't know what I recall about that one because I don't really hug people on set, and mostly I high-five them. I'm a high-fiver. So I -- I didn't necessarily take that in other than maybe -- so I don't really recall the context for it. Maybe it was specific.

BY MS. HUDSON:

Q But -- but it is the case that you recall Ms. Lively saying that; is that right?

MS. SHAPIRO: Objection.

THE WITNESS: I remember something about it. I just don't recall more than that.

BY MS. HUDSON:

Q Okay. And you also recall Ms. Lively saying sometimes that you all would make jokes about how you couldn't do that?

MS. SHAPIRO: Objection.

THE WITNESS: I don't recall that at all.
BY MS. HUDSON:
Q Okay.
A In fact, I -- I specifically -- that would have perked my ears, so I have no memory of that.
Q Well, you remember Ms. Saks' testimony that she said, "In her view, that's not how a workplace or the leaders of a workplace should operate. They shouldn't be making light of the behavior that makes their employees uncomfortable."
Do you recall her saying that?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall Ms. Saks saying that.
BY MS. HUDSON:
Q Okay. And then in the June 1st meeting, did Ms. Lively also bring up the trailer incident as you coming into her trailer while she was getting her body makeup taken off and that she didn't have any clothes on?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MS. HUDSON:
Q Okay. Ms. Saks testified to that, that

this is what Ms. Lively said. So you're disputing Ms. Saks' memory?

MS. SHAPIRO: Objection.

THE WITNESS: I don't mean to dispute anybody's memory. Okay? I can just only tell you what had happened. That's not -- that's not --

BY MS. HUDSON:

Q Did Ms. Lively discuss the trailer incident?

A She did bring it up, yeah.

Q What did she say about it in your memory?

A After she had said something about, as I said, that she thought the video at first was porn, recognized that it wasn't, because it was not. She then said, also, you know, when you came into the trailer a couple of weeks, I asked you to look away and at some point you made eye contact with me. And I was like, oh, I didn't even know that. She says, I'm not saying you were trying to cop a look. I'm just saying that I had asked you to turn away, and you made eye contact with me. I was like, oh I'm so sorry. I didn't even realize that. Maybe I happened to glance through conversation. I have no memory of it. But -- and then she moved onto the next.

She never said anything about being uncomfortable. She -- my experience with Ms. Lively at this point is that she pointed things out all the time. So it was just more. But it never felt like in any way did I get a sense that she was claiming that she was uncomfortable.

Q Would she have to use the specific words, "I am uncomfortable," in order for you to glean from what she was telling you that she was uncomfortable?

A No.

MS. SHAPIRO: Objection.

THE WITNESS: No, no, no.

BY MS. HUDSON:

Q Well, what would she have had to do, other than use those words, to indicate to you that she was uncomfortable?

MS. SHAPIRO: Objection.

THE WITNESS: I can't speculate to that. I only can say that there was nothing about it that made me believe that she was expressing that she was uncomfortable, other than she had COVID concerns. She was pointing out a lot of things that she didn't like about production, and it was a list of things.

BY MS. HUDSON:

Q Okay. And you knew then at minimum, she

didn't like these things; is that right?

MS. SHAPIRO: Objection. Objection.

THE WITNESS: I did not know that.

BY MS. HUDSON:

Q Mr. Baldoni testified that he understood she was bringing those things up because she wanted them to stop. She didn't want you to show her videos of your wife giving birth, and she did not want you to come into her trailer and look at her.

MS. SHAPIRO: Objection.

THE WITNESS: I don't recall that being his testimony, by the way, that he had said I did not -- that he said those words.

BY MS. HUDSON:

Q And what was your understanding? She was just pointing it out to you? She didn't have any concerns about those things?

MS. SHAPIRO: Objection.

THE WITNESS: I took it as her pointing out something like oftentimes people point out something that when we have a misunderstanding. I thought you were -- as like the video, for instance, oh my gosh, I thought you were showing me porn. It wasn't. So there's no issue there. She's just more expressing it, amongst other things. But I never

took it like there was any sort of insinuation of that she was uncomfortable.

BY MS. HUDSON:

Q And you said there were other things that she was pointing out during that meeting. What do you recall?

MS. SHAPIRO: Objection.

THE WITNESS: Yeah. Her frustration with COVID. She had some trailer issues that I can't recall if it came up in that moment or not. She felt that -- I can't remember what she said about Alex, but there was a thing or two with Alex. She talked to Justin. She expressed some of the things that were -- she wanted us to be aware of about set.

MS. SHAPIRO: Can we take a break?

MS. HUDSON: Can we just finish this line?

MS. SHAPIRO: Sure.

BY MS. HUDSON:

Q So you said that you didn't recall Ms. Lively saying anything about making -- about how "you make jokes about how you can't make eye contact with people anymore as if to undermine and lessen the importance of people not wanting to be comfy/cozy on set." You don't recall her saying

anything like that?

MS. SHAPIRO: Objection.

THE WITNESS: I'm sorry. Can you -- Can you repeat that, please? I'm sorry.

BY MS. HUDSON:

Q You don't -- I just want to -- let me ask this in a different way.

A Okay.

Q After this meeting took place, Ms. Saks sent a summary of the meeting to Ange Giannetti in a text message.

A Okay.

Q Okay. And both Ms. Giannetti and Ms. Saks have testified about this text chain. And in the text chain, Ms. Saks says:

(As read):

"The other piece was that she was like, 'you, Jamey, make jokes about how you can't make eye contact with people anymore, as if to undermine and lessen the importance of people not wanting to be comfy/cozy on set.'"

Do you recall Ms. Lively saying that to you on June 1st?

MS. SHAPIRO: Objection.

THE WITNESS: No.

MS. HUDSON: Okay. We can take a break.

THE VIDEOGRAPHER: We are going off the record. The time is 2:58 p.m.

(Recess.)

THE VIDEOGRAPHER: We're back on the record. The time is 3:26 p.m.

BY MS. HUDSON:

Q Mr. Heath, during Ms. Saks' deposition, she testified that Mr. Baldoni yelled at her three different times and that you were present for each of those.

Do you recall that?

MS. SHAPIRO: Objection.

THE WITNESS: I do not recall that.

BY MS. HUDSON:

Q Okay. Do you recall in Mr. Baldoni's testimony yesterday, he talked about an apology letter that he sent -- an email that he sent regarding an incident with Miss -- Ms. Saks on February 18th, 2023?

MS. SHAPIRO: Objection.

THE WITNESS: I'm sorry. The date, I'm not sure. So I might see something to refresh it, but I think -- I'm not sure what you're referring

to. I mean, I think I do, but I'm not sure.
BY MS. HUDSON:
Q You -- you know the -- the lengthy apology email that Mr. Baldoni --
A Yes.
Q -- wrote that he testified about yesterday. Do you recall that?
A I do.
Q You recall it arising out of an incident with Alex Saks?
MS. SHAPIRO: Objection.
THE WITNESS: I think all the testimony I've heard about it is -- is -- has much nuance that doesn't make what I've heard -- my memory at all about it. Not at all. Forgive me.
BY MS. HUDSON:
Q But you know which incident I'm referring to, correct?
A I do. I do. I do.
Q And you said your memory about that is different?
MS. SHAPIRO: Objection.
THE WITNESS: Yes, some -- some material things.

BY MS. HUDSON:
Q Some material things. Okay. And I'm going to come back to that in a moment.
A Sure.
Q Ms. Saks also testified that there was a Zoom call in January 2023 where you, Ms. Giannetti, and Mr. Calof, along with Mr. Baldoni, were discussing creative notes on the script and the Mr. Baldoni yelled at Ms. Saks.
MS. SHAPIRO: Objection. There is no question.
BY MS. HUDSON:
Q Do you recall that incident?
MS. SHAPIRO: Objection.
THE WITNESS: I believe that there is some confusion.
BY MS. HUDSON:
Q By whom?
A I don't know who. But I don't know there to be two incidences.
Q You don't know there to be two incidences?
A I do not.
Q Okay. So the only thing you recall is this one incident that resulted in the apology

letter, which you recall differently than the testimony you've heard; is that right?

MS. SHAPIRO: Objection.

THE WITNESS: Correct.

BY MS. HUDSON:

Q Okay. So you don't recall the Zoom call that Ms. Saks testified about?

MS. SHAPIRO: Objection.

THE WITNESS: I think the Zoom call was the apology letter that came after.

BY MS. HUDSON:

Q So there was -- there -- but just to -- you -- there were not two incidents as far as you recall; is that right?

MS. SHAPIRO: Objection.

THE WITNESS: As far as I recall? Correct.

BY MS. HUDSON:

Q Okay. And then she also testified about a third time when there was filming at the Root location, that she was sitting at the monitor and that you and Ms. Giannetti were behind her and that Mr. Baldoni went up to her and asked her how she thought the scene was going and if he was getting it. And she thought he did and expressed that she

didn't believe that they needed to reshoot it again. And that he yelled at her, slammed his hands on the director's chair next to her, and walked away.

And that she turned around, and told Ange and you that if something like that happened again, she would walk off the movie.

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q Did you hear that testimony from Ms. -- Ms. Saks?

MS. SHAPIRO: Objection.

THE WITNESS: I heard her talking about it, but I don't recall her words.

BY MS. HUDSON:

Q Okay. Do you recall her describing it effectively -- to the effect that I just did?

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q Well, strike that.

Do you recall an incident that is effectively similar to what Ms. Saks described?

A I recall the incident.

Q Okay.

A Of -- the incident that she's describing. But the way she describes it, I don't recall it

exactly that way. But more -- more importantly, I don't recall her testimony to it.
Q Okay. Fair enough. But you recall the -- the incident that I'm referencing here at the Root location --
A I do.
Q -- but you recall something different. So what do you -- what is your recollection?
A It's not that it's drastically different, just that it -- this is -- this is so -- let me be really honest with you. This whole process is really challenging because I'm one that speaks with -- with my hands and with excitement, and I'm trying to be very mindful and reverent of the -- the gravity of everything we're talking about.
There was a lot -- and what date was this? Can you remind me of the date, please, or I can see?
Q Ms. Saks said it was -- the set -- the filming on the -- the Root location.
A Yeah, I just can't recall the date that was.
Q I -- I don't think the date is that important.
MS. SHAPIRO: Objection.

THE WITNESS: Well, it's important for what --

BY MS. HUDSON:

Q I believe she testified that it was either June 17th or June 18th.

A Right. So this was --

Q I'm sorry. June 7th or June 8th.

A Okay. Fair enough. This was, we had new ADs.

Q Uh-huh.

A We had -- Justin was dealing with time constraint. A lot of pressure to get this scene within a certain time.

Whenever you have a lot of people working on something, it can cause some stress and different ideas and different opinions. We had new ADs with disgruntled PAs that were loyal to our previous ADs that we had to fire.

And now they're working under new ADs and there's feelings about that. And Justin is managing through, recognizing there is PAs that are having feelings that the other one was fired. And now they have to learn a new footing with these new ones. And now, from that, he's trying to get the scene. I'm constantly going in there with him. And I'm

saying to him, dude, we need to wrap this up. But he hadn't captured it yet.

And I've gone in there three or four times because I can speak to him very clearly, we need to wrap this up in ten minutes. And he understood, but he didn't capture it yet, which is his choice as director. So when he came out to talk to me and Alex and Ange, he was very passionate about that he didn't have it yet. And Alex said something. I don't recall what she said. And his response was like -- he said something like, Alex, I'm the director. I need to get this.

That was the volume and the tone that I remember. And I do remember him when he said that, he -- the director's chair has like flappy material. And when he did it, he -- he -- he hit this -- not hit it aggressively, but he hit it or it flapped and he was like, I'm the director. I gotta get this. And then he was forced to walk back -- not forced, but, you know, he had to hurry up and get back to set. And then Alex did respond with, did you see that? Did you see what he just did? And Ange's response was like, he's not wrong, Alex.

And Alex was like, yeah, but didn't you just see how he just yelled at me? And she's like,

she's [sic] not wrong. He's the director. And he's just -- he's trying to get this done. And she was like, if he ever does that to me again, I'm going to walk off the set.

And her and Ange got into it because Ange was like, what is the problem? He's just -- and Alex had her feelings about it. And that's essentially what I recall.

So I don't want to discredit Alex's feelings or whatever she felt, but I think the way that I've heard it, recall it testified is very exaggerated to -- to the actual incident and the circumstances.

Q And you understand that Ms. Saks said that she felt physically intimidated --

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q -- by Mr. Baldoni's behavior?

MS. SHAPIRO: Objection.

THE WITNESS: Okay.

BY MS. HUDSON:

Q And she called his response rageful?

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q But in your view, she was exaggerating?

MS. SHAPIRO: Objection.
THE WITNESS: Ms. Hudson, I feel like if you asked anybody that was on that set at that moment that no one would say he was rageful.
BY MS. HUDSON:
Q And Ms. Saks also testified that you did not say anything at that time of that incident; is that your memory also?
A At that exact moment, she and Ange were discussing it, and Alex then left out the back door. And then shortly after I went -- I would not say followed her but, you know, went to go have a conversation with her and see how she was because she seemed -- certainly, she was upset.
Q Did you say anything at that time?
A I just -- I don't recall our conversation. I just remember I went out and just walked with her for a little bit, and then tried to have her feel better.
Q Did Ms. Saks talk to you after she had a brunch with Jenny Slate on May 29th, 2023 about complaints that Ms. Slate had raised?
A She never talked to me about it that I recall.
Q Ms. Saks testified that she told you

about Ms. Slate's complaints. Are you saying that's not accurate?

MS. SHAPIRO: Objection.

THE WITNESS: I don't recall that. I think she might be confusing that maybe she had a conversation with Justin, but I can't say for sure. But I don't have a recollection of her telling me directly anything.

BY MS. HUDSON:

Q She testified that she told you that Jenny Slate talked about two incidents in which Mr. Baldoni called her hot or sexy.

A No, that's not accurate. There was one incident that they were referring to, not two.

Q Did you have a Zoom call with Alex Saks in which she talked to you about Ms. Slate's concerns?

A I don't recall.

Q You don't recall, so you might have?

MS. SHAPIRO: Objection.

THE WITNESS: I have no memory of it.

BY MS. HUDSON:

Q You have no memory. Okay.

And Miss -- so Ms. Slate -- Ms. Saks also testified about a number of other things that

she's -- she told you about that brunch with Jenny Slate. And you're saying you don't recall her having any conversation with you about concerns raised by Ms. Slate at a brunch on May 29th, 2023?

MS. SHAPIRO: Objection.

THE WITNESS: I have no recollection of a conversation with her about it.

BY MS. HUDSON:

Q Okay. Ms. Saks also testified that she strongly encouraged you to investigate Ms. Slate's complaints. Do you recall Ms. Saks saying anything like that to you?

A No.

Q She testified that she encouraged you to do so on three separate occasions.

A Wow.

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q You don't recall her saying that to you on three separate occasions?

MS. SHAPIRO: Objection.

THE WITNESS: Those conversations never happened. I can say that emphatically, absolutely not.

BY MS. HUDSON:

Q And you didn't respond to her that you heard it and said they needed to talk about it?

MS. SHAPIRO: Objection.

THE WITNESS: I'm sorry. I didn't understand the question.

BY MS. HUDSON:

Q And you -- you don't recall saying that you heard what Ms. Saks was saying and that they needed to talk about -- you needed to talk about what you were going to do next, essentially?

MS. SHAPIRO: Objection.

THE WITNESS: No.

BY MS. HUDSON:

Q Okay. And you -- do you -- Ms. Saks also testified that, at some point shortly thereafter, you said that you weren't going to do an investigation and that you sort of tap danced around the idea that it would be better for all -- it would be better for all of this not to be on an official record?

MS. SHAPIRO: Objection.

THE WITNESS: Are you asking me if I remember when Alex said that?

BY MS. HUDSON:
Q I'm asking you if you said that to Alex consistent with her testimony?
A I will give you two statements. I never said that to her. And I remember her saying that. And when she said that, I wanted to -- it was all I could stand to not say something outloud like, what's happening?
Q She also testified that you didn't want the behavior written down, documented anywhere in the event that someone wanted to talk about it again in the future.
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q Is that accurate?
MS. SHAPIRO: Objection.
THE WITNESS: I'm sorry. You're asking if that -- if -- did I say that?
BY MS. HUDSON:
Q Did you say that to Ms. Saks?
A Absolutely not.
Q Okay. So your testimony is she's making that up?
MS. SHAPIRO: Objection.
THE WITNESS: My testimony is that I

never said that.

BY MS. HUDSON:

Q Okay. Did you become aware, at any time, that Ms. Slate had concerns?

A At what time?

Q Any time.

A Yeah, I -- I became aware that there was some things that she had shared. Yes.

Q And who did she share them with?

A I don't recall when I learned and who, but I believe Ange was someone I believe she spoke to. I'm -- I'm a little unclear about that. And I've learned after the fact that -- that apparently, she had this conversation with -- with Alex. Let me -- let me rephrase that. I know that she had a conversation with Alex, but I had never had the conversation with Alex so I didn't know firsthand from her.

Q And you learned from -- you are referring to, you said in your prior testimony, that Ms. Saks told you that there was one time when Mr. Baldoni -- that Ms. Slate reported to her that there was one time Mr. Baldoni said she was hot or sexy. Is that what you're referring to?

MS. SHAPIRO: Objection.

THE WITNESS: I had learned at some point that she -- that she had brought up this particular incident up, yeah.
BY MS. HUDSON:
Q "She" meaning Jenny Slate?
A Correct.
Q To -- to Ms. Saks?
A Correct.
Q Okay. And you learned that from Ms. Saks?
A I did not learn it from Ms. Saks. I do not recall and believe that. I think I learned that -- I think I learned that from Ange.
Q Okay. And do you recall when you learned it?
A I believe that would have been May 28th or May 29th.
Q And in what -- how did you learn that?
A In a conversation with Ange.
Q And did -- did -- what -- what did Ms. Giannetti tell you?
A She had said -- I don't recall the exact words at this point, but -- because honestly, there's so much that we've learned along the way. So much conflicting ideas. And when, who learned

what, and when at this point, it's all just a bunch of -- some of it is mumbo jumbo.

Q So you -- you only testify about what you recall.

A I know. I'm just giving you context of why I'm doing my best to think about it.

Q Okay.

A But I hear you.

Ange had -- I believe had called Justin. And then I believe Justin called me, so the three of us were on a call. We were talking about coming back from COVID because we had been shut down. What we were going to do, what scenes we had knocked out. Things of, you know, just kind of what was the plan.

And on that call, she had mentioned that she had a conversation with Blake and that she was unhappy about getting COVID. And she had some frustrations with the way that production had handled the COVID protocol or the lack of COVID protocol, something of that nature. And she had said during that call, she had mentioned to her something about Justin making reference to her wardrobe as sexy.

And that also, she had a conversation -- or that she had heard from Blake or she heard

directly from Jenny, I don't recall exactly that, about Justin making reference to her wardrobe.

Q So in -- in your memory, both Ms. Lively and Ms. Slate specifically said that the reference was to their wardrobes?

MS. SHAPIRO: Objection.

THE WITNESS: That's how I understood it to be.

BY MS. HUDSON:

Q And what was the reference? Did Ms. Giannetti say anything -- elaborate on what the specific reference was?

A You know, we have update calls all the time what's going on and report, like, what happened on set that day? What happened yesterday?

Q I'm just talking about this one phone call --

A I understand.

Q -- that you're talking about.

A I understand. I understand. So this was one of them.

Q Well, I'm asking you if Ms. Giannetti elaborated on what she meant by the wardrobe comment. Did she tell you what the comment was --

MS. SHAPIRO: Objection.

BY MS. HUDSON:
Q -- for either Ms. Lively or Ms. Slate?
A Yeah, that something about Justin had used the word "sexy" in reference to their wardrobe.
Q For both of them?
MS. SHAPIRO: Objection.
THE WITNESS: I don't remember the exact words, but something of that nature.
BY MS. HUDSON:
Q Okay. Is there anything else you recall about that call with Ms. Giannetti?
A Yes. And then Ange had said, did you show Blake a video that had something to do with your wife and the birth of your child? And I said, yeah, I mean, I showed her the -- yeah, I showed her a video. We tried to. And then she was like, yeah, she was mentioning that you showed it to her, and she thought maybe it was something else or she didn't understand why you had showed it to her or something like that. I don't remember the exact dialogue, but it was something of that nature.
Q And --
A She -- she made me aware that she had had that conversation with Blake.
Q And that was before you had the

June 1st meeting --
A Correct.
Q -- with Ms. Lively directly, correct?
A Correct.
Q Is there anything else that Ms. -- Ms. Giannetti told you in this meeting on 5/28 or 5/29?
A I can't recall anything else.
Q Did she suggest any course of action as a result of the things she was telling you?
A I don't recall.
Q Did it -- so by this point -- well, strike that.
Did you have any conversations directly with Ms. Slate?
A I did not.
Q Did you have any conversations directly with Ms. Lively about the wardrobe comment that you referred to?
A Did I have a conversation --
Q Yes.
A -- with her directly?
Q Yes.
A Not directly.
Q Okay. Did you have it indirectly?

MS. SHAPIRO: Objection.
THE WITNESS: On the June 1st conversation that we were in her trailer, she had mentioned it to Justin.
BY MS. HUDSON:
Q She mentioned the -- Mr. Baldoni saying something about her looking sexy?
A She said something about like, hey, I know you guys talked to Ange. Just wanted to like say we're all cool. We're good. You know, I know that we had the conversation about the wardrobe. Something like this. I'm kind of paraphrasing a little bit. And she was just like, wanted to clear the air. We're good. I want -- let's get back from COVID. And let's get back on a good foot.
Q So your testimony is, she told you that she knew you had talked to Ange?
A Correct.
Q The comments that Ms. Giannetti told you about, the "sexy" comments to Ms. Slate and Ms. Lively, were you present for either one of those --
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q -- when they were made?

MS. SHAPIRO: Objection.

THE WITNESS: In regard to the Jenny Slate, no. In fact, I don't know -- I don't know if I even knew about it until we had the conversation with Ange or something. I was not exactly close present for the Blake conversation, but minutes afterwards, I was -- I was on set and I was aware.

BY MS. HUDSON:

Q Minutes afterwards. Who told you?

A Justin.

Q What did he say?

A He had just been on set talking about wardrobe or something. I wasn't there for it. From what I understood, he then, a few minutes later, because he was directing and there was a lot to do on set, he walked over to me and said, hey, I just had a conversation with Blake and Jenny and I was -- we were talking about her wardrobe, and I was just apologizing to them because, you know, I may have mentioned that her outfit was -- I don't remember the expression exactly that he had said at the time. Only later did I learn, but maybe he said that I referred to her wardrobe as "sexy" or something.

And I apologized because I, you know -- I didn't want to make her feel like I was using

elementary language or something like that. I was like, oh, did you apologize? He was like, yeah. I was like, what happened? He was like, no, it was -- it was all fine. I just -- you know, that just happened. I was like, okay. Everything good? He was like, yeah. And then he went back over, and from what I understand, they -- they had a brief conversation about it, and then we started shooting.

So that's the extent that I knew at the time.

Q Did you understand when you had talked to Ms. Giannetti that neither Ms. Lively nor -- that both Ms. Lively and Ms. Slate were uncomfortable with Mr. Baldoni's references to them as "sexy"?

MS. SHAPIRO: Objection.

THE WITNESS: I don't recall that being part of the dialogue.

BY MS. HUDSON:

Q No? Why did you think Ms. Giannetti was telling you about it?

MS. SHAPIRO: Objection.

THE WITNESS: There are so many moving parts all the time. There's always things happening. Always things to be aware of, and that's how I took it.

BY MS. HUDSON:
Q That's how you took it?
A Yeah.
Q Just a piece of information for you to gather and not do anything with?
MS. SHAPIRO: Objection.
THE WITNESS: There was nothing about it that appeared that there was something to do with.
BY MS. HUDSON:
Q Do you understand that Ms. -- now that Ms. Slate was uncomfortable --
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q -- with that comment?
MS. SHAPIRO: Objection.
THE WITNESS: Yeah, I heard -- I heard her deposition.
BY MS. HUDSON:
Q You heard her deposition. And you heard her describe the text exchange that she had with her team regarding press and promotion on the film in June of 2023?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know what you're referencing. I'm sorry.

BY MS. HUDSON:
Q Okay. Did you hear her testify about a text in which she told her team, hey, guys, I don't want anything to do with Justin. I don't want to talk to him, like nothing. And the same goes for Jamey, who is truly unprofessional.
Do you recall her testifying about that?
A I don't know if that was -- if I remember her exact words, but I remember her saying something of that nature.
Q Do you recall her saying also:
(As read):
"But this has been a really gross and disturbing shoot, and I'm one of many who feel this way. And Blake and I have both complained directly to Ange at Sony, and they agree with us, by the way. Justin is truly a false ally, and I'm unwilling to do anything that promotes the image that he's crafting as a male feminist. Like, honestly, I have no words to describe what a fraud he is."
Do you remember her talking about that in her deposition?

MS. SHAPIRO: Objection.
THE WITNESS: Her deposition was a couple of weeks ago.
BY MS. HUDSON:
Q Yes.
A Um...
Q You understand that --
A This is what she said a couple of weeks ago, is what I'm saying.
Q Yeah. You understand that she communicated -- these are the words she communicated to her team on June 4th, 2023?
MS. SHAPIRO: Objection.
THE WITNESS: I'm learning as we go.
BY MS. HUDSON:
Q Okay. So do you now understand that as of June 4th, 2023, Ms. Slate was uncomfortable?
MS. SHAPIRO: Objection.
THE WITNESS: I believe -- yes, I recognize that that is what she's stating.
BY MS. HUDSON:
Q Okay. And even though Ms. Giannetti raised to you that both Ms. Slate and Ms. Lively had talked to her about the fact that Mr. Baldoni had called them "sexy," you didn't think there was

anything to do with that information?
MS. SHAPIRO: Objection.
THE WITNESS: At that time, with the information given, there did not seem to be anything to do, no. Not from anybody that had had the conversation, including Ange.
MS. HUDSON: Okay. I'm going to hand you a document that we marked as Exhibit 12.
(Exhibit 12 marked for identification.)
BY MS. HUDSON:
Q Exhibit 12 is a text chain between you, Jamey Heath, and Justin Baldoni, dated May 28th, 2023, Bates-stamped HEATH 34492.
Do you recognize this as a text chain between you and Mr. Baldoni, Mr. Heath?
A Allow me a quick moment to read it.
Q My question to you is only about what is on the second page.
A I understand. I want to read up to that point, please.
Q How about we do this, if you don't mind: I'd like to direct your attention to what I'm asking you about, and if you feel like you need to read the entire thing to get context, then you can do so.
A I am so sorry. I want to be so

respectful. If you're going to put a document in front of me and you're going to ask me about it, I would really like to read it.

Q I am not asking about the whole document. I'm asking you about one or two things that you said. So I would like to ask you, and then if you feel like you need to read the entire thing for context, you're welcome to do that. But I don't want to do it in reverse order, because I'm not asking about this whole document, okay?

So if you could turn to the second page --

A I need to ask for guidance on this one. So forgive me.

Q What do you mean, you need to ask for guidance?

A I would like to ask my attorneys for guidance that if you hand me a document, do I not have a right to request to read it? Is that within my right, because you were asking me --

MS. SHAPIRO: Can we just -- this is a two-page document. I think you've spent more time arguing with him about it than it would've taken him to read it.

MS. HUDSON: Well --

MS. SHAPIRO: I'm just pointing it out.

MS. HUDSON: We're taking an excessive amount of time to read documents, respectfully. So --

MS. SHAPIRO: This is a two-page document.

THE WITNESS: You've given me four. I'm trying to do my best --

BY MS. HUDSON:

Q I understand, but I just want to ask you questions. So if you don't mind, if I could just bring you to the -- to the questions I want to ask you, and then if you need to look, that's fine.

That was a suggestion you made. Let's try and do that. How about it?

A Accepted.

Q Okay. Thank you.

If you would look at the second page, 35493. At the top of the page, it says, from Mr. Baldoni:

(As read):

"I told Steve more today."

Do you see that?

A I see it.

Q And then you respond:

(As read):

"I talked to Steve last night also. I didn't share about the comments the ladies had feelings about. Didn't want to share anything you hadn't yet."

Do you see that?

A I do.

Q Then Mr. Baldoni responds:

(As read):

"I shared with him today."

Do you see that?

A I do.

Q My question for you is, the comments the ladies had feelings about, what does that refer to?

A Okay. So, respectfully, you asked me about this and there's context beforehand, so I would like to read it.

Q All right. Go ahead.

A Okay. Thank you.

Q Which ladies' comments were you referring to there?

A I don't really recall exactly what was happening at this moment, but -- I don't.

Q Do you know who the ladies were that you were referring to there?

A I don't recall sending this.
Q Well, I am not asking if you recall sending it. I'm just asking if you recall which comments you were talking about there -- or which ladies you were talking about?
A I don't recall sending it, so I don't recall what I was thinking. So looking at it now, I would only be guessing. And I might be able to make a good guess, but I don't want to guess it incorrectly.
Q Well, you read the whole thing for context, right?
A I did.
Q Maybe Mr. Baldoni's response will help provide you some additional context.
He said:
(As read):
"I shared with him today. He said he should come to sit and remind Blake whose money this is. And I said, 'that's not the best idea.'"
A Right.
Q Does this refresh your recollection that one of the ladies was Ms. Lively?
A It may have been.

Q It may have been. And any other lady might have been Ms. Slate, right?
A It may have been, but I just don't know for sure.
Q It may have been that the comments that you are referring to were the ones that Ms. Slate and Ms. Lively had raised to Ms. Giannetti, correct?
A I don't recall sending it. I don't recall this conversation, so I really don't -- I'm not -- I just don't want to be wrong about something so...
Q Did you ever talk to Mr. Baldoni what it is that he shared with Steve?
A I did not.
Q Did you understand Steve to be Steve Sarowitz?
A I did.
Q Do you know what you talked to Steve Sarowitz about?
A Did I know what?
Q What you talked to Steve Sarowitz about the night before?
A I don't recall what we talked about, but I know this was during COVID and a shutdown. So maybe it was an update.

Q Are there any other two ladies who had -- I'm sorry.
Are there any other ladies who had feelings about comments other than Ms. Lively and Ms. Slate?
MS. SHAPIRO: Objection.
THE WITNESS: This is why -- I can guess. This is a tricky one for me here. You're asking me to deduce, and I can't.
BY MS. HUDSON:
Q I'm not asking you to deduce. I'm asking you, are there other ladies who may -- who had concerns about comments on set?
MS. SHAPIRO: Objection.
THE WITNESS: No. But I don't see that I'm saying "on set" here.
BY MS. HUDSON:
Q Okay. Are there other ladies that you knew about on May 28th, 2023 who had feelings about comments?
A I could guess that possibly it is about Blake and Jenny, since that's what you're asking. I could guess, but I don't know for sure.
Q It's an educated guess, right, that that's probably what you're talking about here?

MS. SHAPIRO: Objection.
THE WITNESS: I'm doing my best to not just hit a wall here. And I can't. I can't say.
BY MS. HUDSON:
Q Okay.
A This is two years ago, and I don't know.
MS. HUDSON: Okay. I'm going to hand you a document that we're marking as Exhibit 13.
THE WITNESS: Sure. Do you want this one?
THE STENOGRAPHIC REPORTER: Thank you.
(Exhibit 13 marked for identification.)
BY MS. HUDSON:
Q Exhibit 13 email from Lindsey Strasberg to Imene Meziane and Joseph Lanius, dated November 9th, 2023, and it has an attachment entitled "Protections for Return to Production," Bates-stamped WAYFARER 140991 through 140993.
A I see it.
Q Have you seen this email before, Mr. Heath?
A Yes. Just -- quickly just briefing it, but yes.
Q You understand this to be the cover email that sends to your -- Wayfarer's lawyers,

Ms. Lively's Protections for Return to Production, right?

A Yes, I see that.

Q With the protections attached, right?

A I see that.

Q Yes. And you understand that's what this is?

A I do.

Q Okay. Who is Imene Meziane?

A Imene, by the way, is how to pronounce it. And she's our legal counsel at Wayfarer.

Q Is she in-house counsel?

A She is.

Q And what is her title?

A VP of legal affairs.

Q And Mr. Lanius is outside counsel?

A Correct.

Q Okay. All right. And when did you first see this email and the Protections for Return to Production?

A November 9th, I believe, the day it was sent.

Q Okay. And when you received it, did you read it?

A I did.

Q What did you understand, if anything, the protections that are listed here to refer to?
A To refer to -- this seems like a list of conditions that she wants to return to set.
Q Okay. And this is sent in November.
What was the status of the production on November 9th?
A We were working through the WGA strike, which we finally got through. Then we were dealing with the SAG strike. We were trying to get ahead of the SAG strike because we didn't know when it would leave. So we took the risk of setting production back up, which incurred a lot of costs, hoping that the SAG strike would end so that we could get the movie done.
And we were successful in that, gambling that it would end. I was in contact with her agent and lawyers, trying to get Blake to commit to coming this day. I thought everything was fine. Instead of her showing up, we got this letter, and I was very confused.
Q You were confused?
A I was.
Q Okay. So it says:
(As read):

"In order for Blake Lively" --
If you look at page 2 of the beginning of the protections.
A Yeah.
Q (As read:)
"In order for Blake Lively to be able to return to production on the film, each of the following protections must be agreed to in writing and met without fail going forward."
Do you see that?
A I do.
Q So I'm going to take you to number 6.
A Okay.
Q It says:
(As read):
"No one will enter, attempt to enter, interrupt, pressure, or request entrance to BL's trailer while she is in a state of undress for any reason."
Do you see that?
A I do.
Q Did you have any idea why Ms. Lively wanted that protection?
MS. SHAPIRO: Objection.

THE WITNESS: It seems like a protection that anybody would want, that no one would enter, pressure, or request to enter anybody's trailer while they are in a state of undress.

BY MS. HUDSON:

Q Mm-hm. And when you saw this protection, did you connect it in any way to the incident that Ms. Lively raised to you on June 1st of you going into her trailer?

MS. SHAPIRO: Objection.

THE WITNESS: No, because I did not see this as anything other than a requirement to come back to set.

BY MS. HUDSON:

Q You didn't see it as an indication that things were not okay for Ms. Lively's perspective on set?

MS. SHAPIRO: Objection.

THE WITNESS: I saw this as a list of things that she needed to come back to set.

BY MS. HUDSON:

Q You didn't see this list as an indication that she was unhappy about things that were going on, on set?

MS. SHAPIRO: Objection.

THE WITNESS: If I would have thought that, then it would have said something different. I would assume if you want that to be known, then it would say something differently. So I didn't -- I did not read that --

BY MS. HUDSON:

Q What would you have needed to see in this list of 17 protections for you to understand that Ms. Lively was not okay with things that had happened on set?

MS. SHAPIRO: Objection.

THE WITNESS: I can only tell you that this -- if I got this in a contract tomorrow with an actor and number 6 was there, we would just say "Okay." It would be that simple.

BY MS. HUDSON:

Q So you didn't think anything was being insinuated by this document?

MS. SHAPIRO: Objection.

THE WITNESS: At this time when I got this, I was looking at it from how we get the movie back going. We had to share this with legal counsel because this was a legal document, and we all determined that these were all things that were reasonable.

BY MS. HUDSON:
Q Okay. Did you read the cover email?
A I did.
Q So if you look at the cover letter -- cover email, it says:
(As read):
"It is no surprise to the film's producers that the experience of shooting the film has been deeply concerning on many levels. The complaints of our client and others have been repeatedly conveyed and well-documented throughout pre-production and photography."
Did you read that when you read the protections?
A I did.
Q And that didn't give you any indication that the protections related to the description of the set that is contained in the cover email?
MS. SHAPIRO: Objection.
THE WITNESS: Our set had experienced two strikes. We had replaced our ADs. We had COVID. There was a lot going on. So I would say the film did have some concerns for a host of people. And as

well, this last sentence:
(As read):
"The complaints of our clients and others conveyed, well-documented throughout pre-production and photography."
I knew of no complaints, so this particular thing did not lead me to believe, therefore, it means this document is something specific that insinuates.
BY MS. HUDSON:
Q So when Ange Giannetti told you that both Jenny Slate and Ms. Lively had spoken to her, you didn't view those conversations as complaints?
MS. SHAPIRO: Objection.
THE WITNESS: No. Nor did she, nor did -- there was nothing to make us think that.
BY MS. HUDSON:
Q Okay. And the meeting on June 1st, where Ms. Lively told you directly, you didn't see that as a complaint?
MS. SHAPIRO: Objection.
THE WITNESS: Blake would have many meetings. So this was -- she got COVID, and she wanted to address and talk about some things. This

was no different than many.
BY MS. HUDSON:
Q You understand that Mr. Baldoni had written an apology note to both Ms. Slate and Ms. Lively?
A I'm aware.
Q You're aware of that?
A Yeah.
Q Did you not understand that those apologies arose from concerns that they raised?
MS. SHAPIRO: Objection.
THE WITNESS: I understood that Justin was wanting to meet anybody where they were and recognized, you know, that if someone talked to someone about something, he's -- he's an apologizer. He wants to recognize anything, whether he's at fault, at no fault, if he walks by you too quickly -- whatever it may be.
So, yeah, he wanted to -- and there were some feelings about it. We got shut down. There's -- I can't exactly speak to what he was going, but it wasn't uncustomary for Justin to send that.
BY MS. HUDSON:
Q Okay. And the letter goes on to say:

(As read):

"While we reserve all legal rights, at this stage our client is willing to forego a more formal HR process in favor of everyone returning to work and finishing the film, as long as the set is safe moving forward. In order for our client to feel safe returning to the production, we are attaching a list of protections that will need to be guaranteed and observed by the film's producers."

Did you have any understanding of why an HR process was invoked here?

MS. SHAPIRO: Objection.

THE WITNESS: I missed what you just read there. Can you take me to where you were just reading?

BY MS. HUDSON:

Q I'm reading from Ms. Strasberg's email, the second paragraph.

A Okay.

Q And asking you, did you understand why an HR process was invoked there?

MS. SHAPIRO: Objection.

THE WITNESS: I read this and read this as willing to forego a more formal HR process, meaning that there is nothing -- there is no HR to discuss. And I may have thought, what is this referring to? But my main concern was, how do we get this movie back going? She wants these things signed. They all seem like nothing that we have an issue with. So how do we move forward?

BY MS. HUDSON:

Q In your view, what constitutes a complaint? Does someone have to say, "I am now making a complaint," in your view, for it to be clear that it's a complaint?

MS. SHAPIRO: Objection.

THE WITNESS: No, not necessarily. I'm not -- this is not -- I'm not an HR expert, so...

BY MS. HUDSON:

Q But you get trained every two years, right?

A I do, yes.

Q And you read the handbook, right?

A I have.

Q So in any of those trainings or in the handbook, is there anything that you understood about what information had to be conveyed to you for

you to understand it as a complaint?

MS. SHAPIRO: Objection.

THE WITNESS: We are trained to have, from my understanding, discernment to some extent. And if there is anything that leads one to believe that there's something that needs to be addressed, then you take it to HR. At this point there was nothing that led us to believe that.

MS. HUDSON: So the next document is marked "attorneys' eyes only," but it -- but both but Mr. Heath is a recipient and Mr. Baldoni is a recipient.

THE WITNESS: Okay.

MS. HUDSON: So I'm going to ask if you will waive the "attorneys' eyes only"?

MS. SHAPIRO: Can I see the document?

MS. HUDSON: Yeah. It's something that's been testified to by --

THE WITNESS: So I suppose, either way, I get to see it.

MS. HUDSON: You get to see it.

THE WITNESS: Yeah.

MS. SHAPIRO: Can I just have a minute to consult with counsel?

MS. HUDSON: Off the record. Let's go

off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 4:16 p.m.

(Recess.)

THE VIDEOGRAPHER: We're back on the record. The time is 4:35 p.m.

MS. HUDSON: For the record, Exhibit 14 had been designated "attorneys' eyes only." Counsel for Mr. Heath, who is production assist, has de-designated the document as "attorneys' eyes only," and it's designated as "confidential" for the purposes of the deposition, reserving the right to redesignate it as "attorneys' eyes only" following the deposition if it's going to be filed in court.

(Exhibit 14 marked for identification.)

BY MS. HUDSON:

Q Mr. Heath, this is an email chain that Mr. Baldoni talked about yesterday with his prayer group on November 12th, 2023. And you were copied on this as well, right?

A I see that I am, yes.

Q And do you recall receiving this text chain on or about November 12th, 2023?

A I recall this. I don't recall receiving it at the time. There was a lot going on. So --

Q Okay.
A Yeah.
Q And you understand from Mr. Baldoni's testimony yesterday that this document, this text chain, was in reference to the 17-point list that you-all had received on November 9th, right?
A Yes. And, also, just know, I left many times during the -- during the deposition, and I think I left during this time. So I don't know if I know all that was said during that.
Q Okay. But you can see, seeing it now, that this text chain is in reference to the 17-point list, right?
A I see that.
Q Okay. And you see on the page Bates-stamped -- there are two Bates stamps, but the lower Bates stamp is 51220.
Do you see that?
A I see that.
Q That Mr. Baldoni says:
(As read):
"Pretty tough to digest, as, of course, we all know what this document insinuates, that I am/unsafe/sexually harassing, et cetera, et cetera,

et cetera. There's even silly things
inferring Jamey was inappropriate,
which is silly."

Do you see that?

A I do.

Q And did you understand at the time that Mr. Baldoni, at least, viewed the 17-point list as an insinuation that he was unsafe, sexually harassing, and inferring that you were inappropriate?

A I do see that he writes this here. This is on the 12th, right?

Q Yes.

A This is a few days after we had received the document.

Q Yes.

A I don't remember this exactly coming in because this is his writing and not mine. But I do know that Justin, at this point, was -- I don't know what the proper term is, but he was thinking of all scenarios and filling in blanks and trying to think of a lot of stuff, and I think this is an expression of some of his -- some of his thoughts.

Q Right. And his thoughts, at the time, were that that document insinuated that he was

unsafe, sexually harassing, and that you engaged in inappropriate conduct, right?

MS. SHAPIRO: Objection.

THE WITNESS: I need you to repeat what you said there because I didn't see that exactly.

BY MS. HUDSON:

Q Which part do you need me to repeat, Mr. Heath?

A Where you just --

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q You want me to say my question again?

A Yes, please.

Q Okay.

A I'LL tell you what. I withdraw it. I heard it. Now I'm understanding.

I see what he wrote here.

Q Yes. And you understand that it was his view that the 17-point list document insinuated that he is unsafe, sexually harassing, and inferred that you were inappropriate?

MS. SHAPIRO: Objection.

THE WITNESS: I see that this paragraph says that.

BY MS. HUDSON:

Q That's not what I am asking you because I know you can read, Mr. Heath. So I'm asking you --

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q -- a different question.

MS. SHAPIRO: Objection.

THE WITNESS: I understand.

BY MS. HUDSON:

Q Okay? My question is: You understood when you saw this that Mr. Baldoni, he viewed the 17-point list as insinuating that he was unsafe, sexually harassing, and inferring that you engaged in inappropriate behavior?

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q Is that right?

MS. SHAPIRO: Objection.

THE WITNESS: I -- I'm just having a hard time saying that you're asking me to determine what Justin meant, and I don't know what he was thinking at this time.

BY MS. HUDSON:

Q I'm not asking you to ask -- say what he's thinking. I'm asking you, if you read the

words --
A Yes.
Q -- you understand that that -- that this is -- that he was saying how he viewed this document?
MS. SHAPIRO: Objection.
THE WITNESS: I see that this -- this suggests that he was considering this to be something that could be possible.
BY MS. HUDSON:
Q I see. Okay.
And do you know how your in-house counsel, Imene, I think you said her name was?
A Imene.
Q How she responded to Ms. Strasberg's email?
MS. SHAPIRO: Objection.
THE WITNESS: I don't see that.
BY MS. HUDSON:
Q Do you recall her saying that the protections were not -- were not only reasonable but essential?
A I don't recall the -- the language. You can show it to me.
Q Okay. Did you think the 17 protections

that were in that document were reasonable?
A I think taking them -- take -- taking them as they are written, yes, I think they are ultimately reasonable.
Q Okay. At some point, did Ms. Lively come back to the production?
A She did.
Q And did filming resume?
A It did.
Q What date did it resume; do you recall?
A January 5th, 2024, I believe.
Q Prior to returning to filming, was there a meeting at Ms. Lively's apartment?
A There was.
Q And were you at that meeting?
A I was.
Q And if you go back to the protections document --
A Okay.
Q -- you will see --
A Can I pull this one up? I think it's this one. Maybe it's this one. Okay. I see it.
Q Number 17 was:
(As read):
"An all-hands, in-person meeting before

production resumes which will include the director, all producers, the Sony representative, the newly-engaged third-party producer, Ms. -- BL and BL's designated representative to confirm and approve a plan for implementation of all the above that will be adhered to for the physical and emotional safety of BL, her employees and all the cast and crew moving forward."

Do you see that?

A I do.

Q Okay. And there was a meeting that included all of those participants in her apartment on January 4th, the day before production began, right?

A Yes.

Q Okay. And have you read Ms. Lively's second amended complaint?

A I have.

MS. HUDSON: Okay. I'm going to hand you that document, the second amended complaint, which we have marked as Exhibit 15.

(Exhibit 15 marked for identification.)

THE WITNESS: Do you want me to read the whole thing?

BY MS. HUDSON:

Q I definitely don't want you to read the whole thing. I am going to point you to something very specific in this document.

If you turn to page 7.

A Okay.

Q You will see paragraphs 19 and 20 refer to the January 4th meeting and the participants.

Do you see that?

A I do.

Q And the participants that are listed in paragraph 19, is that an accurate list of who was present?

A Chris Surgent was also present for the beginning portion of it.

Q Okay. Other than that, is it an accurate list?

A Yes.

Q And then in paragraph 20, the complaint says that during the meeting, that Ms. Lively read the list below in its entirety. And then below is a list of 30 points.

Do you see that?

A I see the 30-point list that's included in this document.
Q Okay. And you see in the complaint where it says Ms. Lively said she read the list below in its entirety, right?
A I see that.
Q Okay. And did you attend the entire meeting?
A I did.
Q Okay. And you said you've read the second amended complaint before, right?
A I have, but I don't recall every single detail of it. There's been many legal motions moving on around. So I did at the time, yes.
Q Well, I would like you to take a moment and look at this 30-point list, and tell me if you recall Ms. Lively discussing each of these things during the January 4th meeting.
A You mean did she -- I just want to be clear -- discuss any of the things inferred in these things? Because she did not read this list.
Q Your position is she did not read from a list?
A She did read a few things from her phone. She did not read this list. So I just want to know

what you want me to do because...
Q Are you saying Ms. Lively read a different list?
A I'm saying Ms. Lively read a few things from her phone, maybe nine or ten things, that were not phrased in this way at all.
Q When you say they "were not phrased in this way," what do you mean by that?
A Well, nothing ever said "no more." And the way that it's written was not -- she read more -- it wasn't firsthand, but it was -- it was less -- it was not phrased like this.
Q So each one of these 30 points addresses a topic. Are -- are there any topics that are addressed in these 30 points that Ms. Lively did not cover during the meeting?
MS. SHAPIRO: Objection.
THE WITNESS: Yeah.
BY MS. HUDSON:
Q Which ones?
A Okay. Well, we can take our time going through them. I -- I don't know how you want to do this. But, like, starting with number 1, "no more showing nude videos or images of women." Then it says "including producer's wife," which insinuates

that there were other ones. "To BL and her or her employees." So, yeah, we -- we talked about that video again where she had brought it up.

Q So you talked about the video but --

MS. SHAPIRO: Can you let him finish?

THE WITNESS: So we talked about the video. We didn't talk about the details of it. We just talked to -- brought up again that that video was shown. Again, I apologized to her recognizing that she was surprised by it. And -- but this wasn't written. But that topic was.

So no more mention of Baldoni or Heath's previous pornography addiction. I don't have a pornography addiction. So certainly, she wouldn't have never read that, and I don't know what that refers to. So no, that was not discussed.

Q Did she talk about Mr. Baldoni's referencing pornography addiction during this meeting?

A I believe she mentioned something about it.

Q Okay. Did she talk about wanting to -- neither her nor her employees to hear personal experiences of -- of other people's sex lives, including as it relates to spouses or others?

A Where -- what number are you reading, please?
Q Three.
A I think she said something about that.
Q Did she say -- did she talk about number -- in number 4, did she want to -- did she say that she wanted no discussion about -- with her or her employees of personal times that physical consent was not given in sexual acts either -- as either the abuser or the abused?
A I do not recall that.
Q You don't recall that?
A I do not.
Q Okay. Did she recount a story in which Mr. Baldoni talked about times that he had engaged in actions with women without consent?
A No.
Q She didn't talk about that. Okay.
Did she talk about the description -- anyone describing their own genitalia to her and asking that that not happen?
A No.
Q She didn't talk about Mr. --
A Let me rephrase it. No, not that I remember in any sense.

Q She didn't talk about Mr. Baldoni telling her that he was circumcised?
A No.
Q She didn't talk about that in this meeting?
A No.
Q Did she talk about how she didn't want to have any more jokes or disparaging comments about HR complaints that Wayfarer's already received or about missing the HR meeting?
A No.
Q She didn't talk about it; you're certain?
A I am -- she never said anything about HR complaints. Maybe -- she may have said something to Justin about the commenting -- referring to her wardrobe as "sexy." That may have been there, but these rest, no.
Q Okay. What do you remember her talking about at this meeting?
A I can continue to go through it.
Q Well, I think I would rather have your memory. What do you recall her talking about?
A I think I need to read through it.
Q I'm not asking you about that anymore. Now I'm asking just for your memory.

MS. SHAPIRO: Just for the -- you can ask whatever questions you want. I just want to be clear on the record that you did ask earlier for him to go through all 30 --

MS. HUDSON: Yes.

MS. SHAPIRO: -- and tell you. And he's -- he never got to finish that --

MS. HUDSON: I -- I understand --

MS. SHAPIRO: -- so I just want the record --

MS. HUDSON: I --

MS. SHAPIRO: To be clear on that.

MS. HUDSON: -- understand. I'm withdrawing that question now.

BY MS. HUDSON:

Q And I just want to ask you your memory of the January 4th meeting. What topics did Ms. Lively discuss in the January 4th meetings to your memory.

A I remember her talking about her father. I remember her talking about something about Justin lingering on her lip. I do not believe we talked about this trailer thing that has come up. I need -- I need to think about it for longer because there's been so much information and really that --

so let me read this so that some of it might reflect -- refresh my memory.

She mentioned -- I remember her saying something about that Justin shouldn't cry anymore to her or with her or something of that nature. There may have been a couple more, but those are the ones I remember. A lot of these things were not addressed, nor do they -- did they make any sense to be addressed being that many of them were already in the 17-point list.

For instance, why would she read number 30 to us as we were in an in-person meeting? That -- there's no sense in that. We had already agreed to no monitors being viewed and that the intimacy coordinator be on set at all times. Why would she read that when we already agreed to it? So...

Q So is it your memory she didn't raise things that you had already agreed to?

MS. SHAPIRO: Objection.

THE WITNESS: No, not necessarily. My memory is she did not read this list.

BY MS. HUDSON:

Q All right. And you have now testified all the things that you could recall her -- her

talking about during that meeting?
A Yeah. I could -- there could be maybe another one that I'm just not remembering. But as I said, she read a handful of these, maybe nine, maybe 10 of them. But not this. And -- and I can say that had I read anything at that moment that said "no more," it would have been a very different conversation.
Q And why is that?
A Because "no more" explicitly says that it's happened before.
Q Well, you knew that some things had happened before because you had been informed about them, right?
MS. SHAPIRO: Objection.
THE WITNESS: I'm just saying that it says "no more" in different ways. "No more descriptions of their own genitalia" does not imply, does not suggest, does not leave room for anything. It specifically says something of that nature. And had this list been read at that time, that would have been a different conversation.
BY MS. HUDSON:
Q How long did the meeting last?
A Five hours, six hours, somewhere around

there.

Q And you've given me a full scope of your memory about what was discussed in that five or six hours?

MS. SHAPIRO: Objection.

THE WITNESS: No, a lot of it was Ryan belittling Justin.

BY MS. HUDSON:

Q For five or six hours?

A A lot of it was.

Q And when you say "belittling," what do you mean by that?

A When this first -- when she first started reading a couple of her things and Justin was hearing this, taking this in, and trying to make sense of it, he was frozen by hearing this stuff. And instead of -- well, let me not say instead of -- and his reaction was -- was that he was being a coward. That what you do when a woman says this to you and points out these things, you just stand up and you just apologize and apologize. And Justin was just like, but I didn't do this. And then he raised his voice and used some language and insinuated that he was not a good guy.

Q That Mr. Baldoni was not a good guy?

A Yeah.
Q Yeah.
A And he -- and he did it very aggressively. He did it to me as well. More at him. It was -- it may have been the hardest thing I have ever witnessed someone talking to another person with such belittlement.
Q So after that meeting, did you have an understanding that there were things that were happening in connection with filming this movie that Ms. Lively was uncomfortable with?
MS. SHAPIRO: Objection.
THE WITNESS: I understood that she had shared some things that did not make sense, and I believe were fabricated.
BY MS. HUDSON:
Q You believe were fabricated?
A Not all of them.
Q Uh-huh.
A Either distorted --
Q Uh-huh.
A -- or fabricated.
Q Now, did you think it would be a good idea to conduct an investigation at that point?
MS. SHAPIRO: Objection.

THE WITNESS: Her letter started with -- as we went back to it after this meeting, with in lieu of an HR report, we would sign these things. And if any -- at this point, if any of these things were referencing that, there was nothing to investigate.

BY MS. HUDSON:

Q In lieu of a formal HR process, I think it said.

A Yes.

Q So you decided that since Ms. Lively said in November, in lieu of an HR process, there was no need for an investigation?

MS. SHAPIRO: Objection.

THE WITNESS: We did not determine that that was necessary.

BY MS. HUDSON:

Q You -- you did not determine. You -- so you determined it was not necessary; is that right?

A We did not determine it was necessary. We never came to the point to think that it was necessary because in it, while she was expressing it, it was very confusing because she was not -- it was almost like he was a child. Not that she felt threatened or that she felt -- it just felt like he

was a child and it was talking that. It wasn't -- so our perspective from that point was, once we left and had some conversations with Ange, and Justin was a little frozen because of -- of the aggressive nature of it, she couldn't wait to -- appeared to could not wait to get back to work tomorrow, and we moved forward.

Q So did Ms. Lively -- did you consider that other people might be uncomfortable on set?

A No, we hadn't heard anything else about anybody being uncomfortable. There was a lot of insinuations about -- I think she brought up also -- she brought up saging, talking to her dead father. There was a lot of stuff that was mixed in here that was just -- she didn't like Justin. She didn't like me. She didn't like that he cried. She mentioned that. There was a lot in there, so it was -- there was a lot going on.

Q Did you actually have a conversation and make a decision not to do an investigation?

A No.

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q Did the topic of an investigation come up at any time prior to receiving Ms. Lively's CRD

complaint?

A No. Not that I recall.

Q At some point, did you have a dinner with Colleen Hoover in connection with the trailer launch?

A We did.

Q And when was that?

A You're going to have to refresh my memory.

Q I will do that.

A I think it was, you know, two or three months before. Two months before release, I think. Three months maybe. But I don't know.

MS. SHAPIRO: Jonathan, how much more time?

THE VIDEOGRAPHER: We've been on the record for five hours and 14 minutes.

MS. SHAPIRO: Thank you.

THE WITNESS: Ms. Hudson, I won't need this anymore, will I?

BY MS. HUDSON:

Q No, thank you. Do you recall what day the trailer launch event took place? Was that May 6th?

A I don't recall.

Q Okay. You don't recall. Well, you recall the trailer was released in May, correct?
A I will take your word for it if you know it. There's a lot of dates in my head, so I don't recall.
Q Okay. All right. Well, you recall going to dinner with --
A I do.
Q -- Ms. Hoover the night of the trailer launch event, right?
A Uh-huh.
Q Okay.
A Was that May 6th?
Q Yes.
A Okay. I will trust that you're correct.
Q And who else was at that dinner?
A Myself, Justin, Colleen, and I believe her friend's name is Taryn (ph.).
Q Did you hear Ms. Hoover's testimony about that dinner?
A I believe I did.
Q Okay. And --
A But I don't -- I don't quite recall it.
Q What is your recollection about that dinner?

A You mean the whole dinner?
Q Well, let me ask you this. So it was -- it was -- what was the purpose of the dinner? Because you all invited Ms. -- Ms. Hoover to the dinner, correct?
A I believe Justin was responding to her request to go out to have a dinner. At least that's what I recall it, and then Justin informed me that they were going to go out to dinner and would I like to join.
Q Uh-huh. And did you tell Ms. Hoover that you were concerned that Ms. Lively was going to say that you had sexually harassed her?
MS. SHAPIRO: Objection.
THE WITNESS: I never said that. Absolutely not.
BY MS. HUDSON:
Q Did you tell Ms. Hoover that she had given you a list of 17 protections that she -- she required before she would return to work?
A We may have referenced that.
Q Okay. And why did you tell Ms. Hoover that?
A We had a -- Justin specifically had many years now, five years, or four years, or something

of working and having a friendship with her. I had developed one over the last couple of years. We were going out to dinner, and she was curious about what's been so hard. She could tell that it's been a troubled experience due to all of the strikes and the script and some of what we experienced with our AD and a lot of Blake's demands. And I don't recall what the impetus was, but it's just like, this is what we've been dealing with.

Q You told Ms. Hoover what, in your view, you had been dealing with with Ms. Lively, correct?

A As it pertains to the production of the film, yes.

Q Okay. Because Ms. Hoover didn't know anything about any issues with production up until that point, correct?

A That's not -- that's not entirely true.

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q Well, that's what she testified to.

MS. SHAPIRO: Objection.

THE WITNESS: Okay.

BY MS. HUDSON:

Q But you -- you think she knew something more?

MS. SHAPIRO: Objection.
THE WITNESS: She did.
BY MS. HUDSON:
Q Okay. And what is -- and what's your basis for that?
A Because we would talk to her throughout it, and she didn't know the details, but she knew that we were struggling with making our days. She knew that, at some point, we had to get rid of our AD. That Blake was -- had control of the script and the challenges of that. She knew that -- I don't recall if she knew -- what she knew of just how Justin was kind of tiptoeing around her constantly.
Q Around who?
A Blake.
Q You're -- you're saying that Ms. Hoover knew that --
A No, I said I don't recall if she knew, but she knew that he was treading, always being mindful of how to navigate. She had such strong opinions about stuff all the time. And him being the director and how -- how that -- how to navigate that.
Q Were you involved in conversations with Ms. Hoover and Mr. Baldoni where he talked about

that with Ms. Hoover?

MS. SHAPIRO: Objection.

THE WITNESS: No, I remember I'd had a couple conversations, how's it going. She came to visit set. It was just like, this is what we're doing. This is really hard. It wasn't anything other than she was a friend. We had known her. She had no relationship with Blake. It wasn't like anything other than just like, this is what we are experiencing.

BY MS. HUDSON:

Q Mr. Heath, I want to be very clear here. Are you saying that prior to this May 6th dinner, you participated in a conversation in which you told Ms. Hoover --

A That there were struggles?

Q With Ms. Lively specifically?

MS. SHAPIRO: Objection.

THE WITNESS: Yeah, she knew a little bit.

BY MS. HUDSON:

Q I didn't ask you what she knew. I want to know what you told her prior to May 6, 2024.

MS. SHAPIRO: Objection.

THE WITNESS: Simply that it was a

struggle to manage Blake with the script. That we weren't making our days all the time. That she had an opinion about a lot. A little bit of that.
BY MS. HUDSON:
Q You told Ms. Lively prior to this dinner on May 6th -- I mean --
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q You told Ms. Hoover this prior to the dinner on May 6th, 2024?
MS. SHAPIRO: Objection.
THE WITNESS: I don't remember exactly to what detail, but there was some conversation about it.
BY MS. HUDSON:
Q When?
A I don't remember when. We had talk -- I had talked to her throughout.
Q Well, you had talked to Ms. Hoover throughout the production?
A No. Yes, throughout. But maybe once every month, once every -- she'd come to set. We'd ask her for questions.
Q You talked to Ms. Hoover once a month?
MS. SHAPIRO: Objection.

THE WITNESS: Probably.

BY MS. HUDSON:

Q Probably? Do you have any phone records reflecting that you talked to Ms. Hoover once a month? Well, we have your phone records, so we can look, right?

A Please. Please.

Q Okay.

A And text messages, yeah.

Q And text messages with her once a month about Ms. Lively?

MS. SHAPIRO: Objection.

THE WITNESS: Or emails. Yes. No, not about Ms. Lively. That I would just be in contact with Ms. Hoover.

BY MS. HUDSON:

Q Once a month?

MS. SHAPIRO: Objection.

THE WITNESS: It could be once every five weeks. I'm just telling you that I would -- throughout the production, we -- we would talk throughout the production.

BY MS. HUDSON:

Q Uh-huh. And how many times throughout the production did you tell Ms. Hoover prior to

May 6 that you were having difficulties with Ms. Lively?

MS. SHAPIRO: Objection.

THE WITNESS: It wasn't specifically about Ms. Lively. It just was the process of making the movie and what some of the difficulties are.

BY MS. SHAPIRO:

Q Okay. Well, I'm specifically asking about Ms. Lively. Because Ms. Hoover testified that the first time she heard --

A Yeah.

Q -- that you had any issues with Ms. Lively, "you" meaning Wayfarer and Mr. Baldoni, was May 6th?

A Yeah.

Q Okay? So I'm going to be very, very clear about whether you said anything before that. Are you clear in your memory that you said something about Ms. Lively to Ms. Hoover prior to May 6th?

A Yes.

Q Okay. But you don't know when and you don't know what you said; is that right?

MS. SHAPIRO: Objection.

THE WITNESS: I would not remember when because the event was not some big event. It just

was when you catch up, how's it going? And then you share some of the stuff that you're experiencing.

BY MS. HUDSON:

Q And can you say with any specificity the stuff that you were experiencing with Ms. Lively that you told Ms. Hoover about prior to May 6?

MS. SHAPIRO: Objection.

THE WITNESS: I do not know specifically. I just know that there was a general update, and that would have been included to some degree.

BY MS. HUDSON:

Q What -- what is the "that"?

A That it was hard making our days. That Blake was -- Justin, we were navigating how to manage what was challenging about working with Blake. Her having this script, and us not always getting it. And the changes and then her and Justin trying to figure out the balance creatively. I don't know what portion of all of that, but that's what we were dealing with. And some of that I know that I would have expressed.

Q You know that you would have expressed?

A Yes.

Q Okay. You spoke on them at the May 6 dinner with Ms. Hoover about the return to work

protections. Did you tell Ms. Hoover, during this dinner, that Ms. Lively had raised issues about you sharing the birth video with her?

MS. SHAPIRO: Objection.

THE WITNESS: You know, I have a memory that we spoke about that, but I don't recall what was spoken about.

BY MS. HUDSON:

Q Did you tell Ms. Hoover that Ms. Lively had a -- had raised an issue about you coming into her trailer while she was undressed?

MS. SHAPIRO: Objection.

THE WITNESS: I don't recall ever saying that she raised an issue. I had said that we knew that the whole production included normal -- not problems, like normal situations like the strikes, everything I mentioned. And, also, this is what we were experiencing with Blake.

And in recalling it, we had thought about, huh, remember that she thought that I -- when I showed her that video, she thought it was porn. It was not. And I had shared that with her. Some -- some version of that.

BY MS. HUDSON:

Q Okay. And I think my -- my question to

you now is about the trailer. Did you say -- share anything about that with Ms. Hoover?
A Oh, I don't recall specifically about that.
Q Okay. Do you --
A And I don't think so, but I don't recall that.
Q Okay. Did you talk to Ms. Hoover about the fact that Ms. Lively had -- and Ms. Slate had raised that Mr. -- Mr. Baldoni had called them sexy?
A I think at least one of the events, maybe Justin had shared, but I don't recall what it was.
Q Okay. Did you tell -- did you or Mr. Baldoni tell Ms. Hoover that you were concerned that Ms. Lively might make her concerns public?
A No.
Q Did you tell Ms. Hoover that Ms. Lively was working on Sony's cut of the film?
A I imagine so.
Q Did you tell Ms. Hoover that you thought it was going to become public that Ms. Lively was working on a cut of the film?
A I don't recall. I mean, that -- that would have been something that we were navigating through because we were facing a lot. But...

Q Did you tell -- did you or Mr. Baldoni tell Ms. Hoover at this dinner that you're not saying she's a narcissist but she's exhibiting narcissistic behavior?
A I don't recall that comment.
Q You recall Ms. Hoover saying she heard that comment at the dinner?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall that comment being said.
BY MS. HUDSON:
Q I understand, but I'm asking you if you recall Ms. Hoover testifying to that?
MS. SHAPIRO: Objection.
THE WITNESS: I can't recall exactly what her words were, but I don't recall that.
BY MS. HUDSON:
Q What was your -- you and Mr. Baldoni's purpose of talking to Ms. Hoover about Ms. Lively at this dinner?
MS. SHAPIRO: Objection.
THE WITNESS: I don't think there was an agenda. In fact, there wasn't an agenda. This was someone that we had worked with; we knew. Oftentimes you have conversations about what your

workday is like, what your workweek is like, what you've been experiencing. And there was a bit of sharing about that.

BY MS. HUDSON:

Q And did you hear Ms. Hoover's view of how she felt about that dinner after the fact?

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q And her --

A Specifically what?

Q She testified how she felt about this dinner in her deposition that you listened to, correct?

MS. SHAPIRO: Objection.

THE WITNESS: I don't recall specifically.

BY MS. HUDSON:

Q You don't recall what she said about that?

A I would need you to refresh me.

Q Okay. You don't recall that she said she was essentially disturbed by the fact that you all were being so critical of a woman who she didn't even know at this time?

MS. SHAPIRO: Objection.

THE WITNESS: I don't recall her saying that.
BY MS. HUDSON:
Q You don't recall her saying that in her testimony? What do you --
A I don't --
Q Okay. Go ahead.
A I'm not saying she didn't. I don't recall that.
Q Okay.
A I do recall her saying something about that she felt that Justin and I were trying to get her on our side. I heard -- I remember something of that nature, which didn't make sense to me because they didn't know each other. Why would there be a need to bring someone on your side when there is no relationship on the -- on another side? That -- that was not our intention. So I didn't understand her testimony in that regard.
Q That is a very good question.
MS. HUDSON: Why don't we take a quick break?
THE WITNESS: Okay.
MS. HUDSON: Okay.
THE VIDEOGRAPHER: We are going off the

record. The time is 5:15 p.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record. The time is 5:42 p.m.
BY MS. HUDSON:
Q Mr. Heath, did you discuss your testimony with your attorneys during the break?
MS. SHAPIRO: Objection. It's just yes or no.
THE WITNESS: Am I allowed to share --
MS. SHAPIRO: No.
THE WITNESS: -- what I talked about with my attorneys?
MS. SHAPIRO: No.
BY MS. HUDSON:
Q No. You can answer the question. Did you discuss your testimony with your attorneys during the break?
MS. SHAPIRO: I'm going to direct you not to disclose any communications with your attorneys.
THE WITNESS: A bit.
BY MS. HUDSON:
Q So is the answer yes?
MS. SHAPIRO: I'm directing you not to --
THE WITNESS: Answer?

MS. SHAPIRO: -- answer any question that calls for any communications you had with your attorneys.

MS. HUDSON: Well, the -- are you directing him not to answer the question, did you discuss your testimony with your attorneys during the break?

MS. SHAPIRO: Yes.

MS. HUDSON: You're telling him not to answer that?

MS. SHAPIRO: Correct.

MS. HUDSON: Well, he already answered it, and he said "a bit."

MS. SHAPIRO: Well --

MS. HUDSON: Okay? So I'm taking the position that there is no attorney-client privilege because you are not permitted to talk about his testimony during the break and that any privilege has been waived.

THE WITNESS: No, but I -- can I be clear about that, though?

BY MS. HUDSON:

Q Yes, you're free to speak about what you discussed with your attorneys during the break.

MS. SHAPIRO: No.

THE WITNESS: We're just talking about my -- my disposition and just me. Just my --

MS. SHAPIRO: Jamey, Jamey, we're directing you not to answer these questions.

BY MS. HUDSON:

Q Did you discuss the substance of your testimony with your lawyers during the break?

MS. SHAPIRO: I'm directing you not to answer that question.

BY MS. HUDSON:

Q Did you talk about how to answer questions with your attorneys during the break?

MS. SHAPIRO: I'm going to direct you not to answer any questions about your discussions with your attorneys during the break.

BY MS. HUDSON:

Q Are you following your attorney's instruction?

A I always will follow my attorneys.

Q Okay. So you won't answer that as a yes or a no? Did you discuss the substance of your testimony with your attorneys during the break?

MS. SHAPIRO: I'm directing you not to answer that question.

BY MS. HUDSON:

Q Are you going to follow your attorney's instruction?

A I think that would be best, always.

Q Okay. Did you discuss how to answer questions with your attorneys during the break?

MS. SHAPIRO: I'm directing you not to answer questions about your discussions with your attorneys.

BY MS. HUDSON:

Q Are you following your attorney's instruction?

A I think it's always best to follow my attorney's instructions.

Q Okay. Did you have any discussions with your attorney about how a question should be handled during the break?

MS. SHAPIRO: I'm going to direct you not to answer any questions about your discussions with your attorneys.

THE WITNESS: Same answer.

BY MS. HUDSON:

Q Same answer? You're not going to answer? Okay.

Did you discuss any documents that were

the subject of testimony with your attorneys during your break?

MS. SHAPIRO: I direct you not to answer any questions about your discussions with your attorneys.

BY MS. HUDSON:

Q Are you following that instruction?

A Yes.

Q Okay.

MS. HUDSON: Hand you Exhibit 16.

(Exhibit 16 marked for identification.)

THE WITNESS: Sure.

BY MS. HUDSON:

Q Exhibit 64 is a --

MS. SHAPIRO: Sixty-four or 16?

MS. HUDSON: I'm sorry.

BY MS. HUDSON:

Q Exhibit 16 is a text chain from -- between Jamey Heath and Mitz Toskovic, dated June 17th, 2024, Bates-stamped TOSKOVIC_677.

Do you recognize this as a text chain between you and Ms. Toskovic?

A Yes.

Q And you participated in this text communication with Mitz Toskovic, correct?

A Yes.

Q And you ask her in this text chain, you say you have -- you've got a big job for you.

Do you see that at 3:14 p.m. on page 1?

A I see it.

Q And then if you turn to the next page, you tell her:

(As read):

"I need you to start putting a timeline doc. Try to get as close to dates as possible. We can fill in the links when I get back. But when Justin and Blake met to write. AJ maybe had in calendar. Can you access? When we shot the first karaoke scene, it's when I showed her the video of Tasha. When Ange visited the first time and had the, quote, 'makeup trailer convo that apparently looked at her,' end quote. When we shot the graveyard scene. When Justin met with trainer. When Justin had convo with Blake and Ryan regarding asking about her weight. When we had the convo when we went back in Blake's house with Ange and Todd. Essentially,

anything we can get either the date and alleged incident or the general time frame and we can narrow in later. Something chronological. Best you can. Consult with Reese where needed. The doc can be have gaps but at least let's get something started."

And then you go on to say:

(As read):

"Whatever you can remember. Whatever Reese remembers. Whatever AJ may remember. Anything at all. Also, when we got letter from Blake. Just anything that tells the story chronologically, and then we will just continue to build it."

Do you see that?

A I do.

Q Okay.

MS. HUDSON: I'm going to give you another document now. What are we, Exhibit 17? And Exhibit 18.

(Exhibit 17 marked for identification.)

(Exhibit 18 marked for identification.)

BY MS. HUDSON:
Q You asked Ms. Toskovic to put together a timeline on June 17th, correct?
A Are you referring to this document?
Q Yes.
A I see that.
Q Okay. And Exhibit 17 is an email forwarding a timeline.
Do you see that?
A I do.
Q And then Exhibit 18, I'll represent for the record, is the document that was produced to us that is reflected in the attachment to that email that says "document produced in native format."
A Can you repeat the -- the last thing? Sorry, I was --
Q Sure.
A -- I was finishing 17.
Q Sure.
So Exhibit 17 is an email forwarding a timeline.
Do you see that?
A I do.
Q Okay. And then it says, on the second page of that email, "produced in native format"?

A Uh-huh. I do. Yes.
Q I'm representing to you that the native format that we received in the production from your lawyers is that document.
A Okay.
Q Okay? Is this document, Exhibit 18, the timeline that you asked Ms. Toskovic to create?
A It looks to be so.
Q Okay. Why did you ask Ms. Toskovic to create a timeline on June 17th?
A Just to have a timeline of our whole experience of the movie.
Q Your whole experience of the movie, as it relates to Ms. Lively?
A Just our -- the timeline of what we experienced throughout the movie, yes.
Q For what purpose?
A So we could have a record of our -- our -- the last year and a half of what we have experienced.
Q Why?
A There was a lot that went on over the year and a half on different levels, production and all levels. I just wanted to have a timeline of it.
Q Well, your -- your text message to

Ms. Toskovic doesn't say anything about things that happened during production in general, right?

MS. SHAPIRO: Objection.

THE WITNESS: Right. Uh-huh.

BY MS. HUDSON:

Q All of the things that are in your text message to Mitz Toskovic relate to Ms. Lively, correct?

MS. SHAPIRO: Objection.

THE WITNESS: Yeah, I see that's in the -- in the text message. Yeah.

BY MS. HUDSON:

Q So why did you ask Ms. Toskovic to create a timeline on June 17th, 2024 related to Ms. Lively?

A That was one of the aspects of our whole time on the movie, and I also wanted to include that.

Q Well, you didn't say reference anything else, correct? You only referenced issues related to Ms. Lively in your text messages to Mitz Toskovic, correct?

MS. SHAPIRO: Objection.

THE WITNESS: In this particular text message, that's -- that's all it speaks to.

BY MS. HUDSON:

Q Yeah, that's all you said when you asked Ms. Toskovic to create a timeline, correct?

MS. SHAPIRO: Objection.

THE WITNESS: In this text message, that's what it refers to. Yes.

BY MS. HUDSON:

Q Do you have another text message?

MS. SHAPIRO: Objection.

THE WITNESS: I don't know.

BY MS. HUDSON:

Q Okay. Well, why are -- my question to you, Mr. Heath, is: Why you were asking Ms. Toskovic to create a timeline that references events related to Ms. Lively on June 17th, 2024?

A Our experience of the movie, and at this point in June, we were unsure. Justin had lost the movie, I think, by this point. We were dealing with a lot of conversations with Sony about how to navigate moving forward with him as the director. We've got the release of the movie coming up -- and in all of this and being confused of where we stood with all of this, I just wanted to have documented just our -- our whole experience with the movie.

Q For what purpose?

A Just so I could have a good recollection of it. So that I knew what our last year and a half was.

Q Were you looking for a timeline of incidents related to Ms. Lively's complaints?

MS. SHAPIRO: Objection.

THE WITNESS: No, not necessarily. We just -- I just wanted any experience that we had in all capacities to be -- have a timeline.

BY MS. HUDSON:

Q Well, but the timeline doesn't address every experience that you had in all capacities, does it?

A I haven't gone through the whole thing, but in all capacities, just with our experience. Certainly with -- I mean, I can see that, you know, a lot of this is with Blake, so that was a big part of our experience.

Q That was a big part of your experience. And incidents where Ms. Blake -- or Ms. Lively expressed concerns, correct?

MS. SHAPIRO: Objection.

THE WITNESS: I would say it's exactly what I said it was.

BY MS. HUDSON:
Q And the incidents that you identified to Ms. Toskovic are incidents that you were aware that Ms. Lively had raised concerns of prior to June 17th, 2024, correct?
A Can you repeat that, please?
MS. HUDSON: The incidents that you raised to Mitz Toskovic were incidents that you were aware of prior to June 17th, 2024 that Ms. Lively had raised concerns about, correct?
MS. SHAPIRO: Objection.
THE WITNESS: In this text message, it references some of those. Yes.
BY MS. HUDSON:
Q Yes. So the -- you -- you were aware of the incidents that you told Ms. Toskovic about prior to June 17th, 2024, correct?
MS. SHAPIRO: Objection.
THE WITNESS: Was I aware? Yes, I was aware that Justin met with the trainer. I was aware about -- he asked about the weight. I was aware of some of these things. Yes.
BY MS. HUDSON:
Q Well, you were aware of all of them because you wrote them down, right?

A Yes.
Q And you wouldn't have been able to write them down if you weren't aware of all of them, correct?
A I was aware --
MS. SHAPIRO: Objection.
THE WITNESS: I was aware that these were included, yes.
BY MS. HUDSON:
Q That these were all things that Ms. Lively had raised concerns about, correct?
MS. SHAPIRO: Objection.
THE WITNESS: Some of them; some of them not.
BY MS. HUDSON:
Q Okay. Which one of these lists are not things that Ms. Lively had raised concerns about that you were aware of on June 17th?
MS. SHAPIRO: Objection.
THE WITNESS: Well, just as I go through it, when we shot the graveyard scene. When we had a meeting at Blake's home.
BY MS. HUDSON:
Q Why did you want to have a record of when you had the meeting at Blake's home?

A It was one of the things that we'd experienced on the movie.
Q Uh-huh. And when you said "essentially anything we can get either the date and alleged incident," what did you mean by "alleged incident"?
A I don't recall. I don't know.
Q Are -- are -- you don't know what you meant by "alleged incident"?
A I don't know exactly.
Q Okay. And did you have any further follow-up with Mitz Toskovic about what you meant by "alleged incident"?
A I don't know.
Q You don't know if you did?
A I don't know.
Q But somehow from -- did you give her any direction beyond what you put in this Exhibit 16?
A I don't know.
Q Had you talked to Ms. Toskovic about the alleged incidents before?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall.
BY MS. HUDSON:
Q Do you -- did you assume she understood what you meant by that?

MS. SHAPIRO: Objection.
THE WITNESS: I don't know what I meant by that, but I see that there's a list of things here that specifically asked her to. So other than that, I don't.
BY MS. HUDSON:
Q What I'm asking you, Mr. Heath, is: Did you have a belief that Mitz Toskovic would understand what you meant by "alleged incidents"?
A I don't know.
Q You don't know?
A I don't know. I don't know what I meant by that.
Q Do you -- is it Ms. Toskovic that created the timeline in Exhibit 18?
A She was -- she assisted, yes.
Q Who else was involved in creating this timeline?
A Myself.
Q What did you do to create this timeline?
A Just gave -- gave more info to -- what this is here, added to this timeline.
Q How much of the information in this timeline did you put in the timeline?
A I don't know.

Q When -- did you create -- did you put the -- share information from yourself to put into this timeline around this same time period, June of 2024?

A I don't recall.

Q When was the timeline completed?

A I don't know. I don't recall really. Unless there was a date on it. I don't know.

Q Well, the timeline was completed at least by July 31st, right, which is the date that it was sent to TAG, correct?

A I believe here -- I believe here it says it's a work in progress.

Q A work in progress. So do you know how much of the timeline was complete by July 31st?

A I don't.

Q Was it at least the amount that was attached to the email?

MS. SHAPIRO: Objection.

THE WITNESS: I imagine so.

BY MS. HUDSON:

Q There are a couple of dates that postdate that email at the end of this timeline, August 3rd, 2024 and August 6th, 2024. Do you know how those dates got on there?

A I don't at the moment.
Q Okay. Do you think this timeline that was sent to TAG was complete up to at least July 30th, 2024 at the time it was sent?
A I would be guessing. I don't know for sure.
Q Okay. But it was complete at least as of August 6th, 2024, correct?
A I don't know.
Q Well, this is your document, Mr. Heath.
A I know. I just don't -- I don't recall.
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q Okay. Did you add or direct anyone to add any information to this timeline after August 6th, 2024?
A I don't have a recollection of it.
Q Okay. This timeline was complete, though, before -- well, let me ask you this.
When was the -- the -- the timeline that you produced in the form that it was produced, when was it completed?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know. I would need a document to help me -- help understand that

because I'm just guessing. I don't know.

BY MS. HUDSON:

Q Well, it was produced as attached to that email.

A I see.

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q Okay. So do you have any reason to believe that it was not complete as of the date of that email?

MS. SHAPIRO: Objection.

THE WITNESS: I'm -- I'm just guessing because I just don't know. I'm just looking at it and I'm seeing this, and I don't know at that time what was attached. So I don't.

BY MS. HUDSON:

Q Other than you and Ms. Toskovic, did anyone else provide information for this timeline?

A I don't know. It is possible. I don't know.

Q Well, this was a document you asked to have prepared, right?

A Correct. I imagine it's just Mitz and I, but that's the best -- that's the best that I know.

Q You think it's just you and Ms. Toskovic?

MS. SHAPIRO: Objection.
THE WITNESS: I believe, but I don't know for sure.
BY MS. HUDSON:
Q Did you talk to Mr. Baldoni about this timeline?
A I may have.
Q Did you get his input in preparing it?
A I do not think so.
Q This timeline was complete before Ms. Lively filed her CRD complaint, correct?
A Well, if it was sent on July 31st, then whatever -- at whatever stage it was, this would have been in July of '24.
Q And the document that we're looking at now that was produced to us as attached to that email, which is how it came to us, that -- July 31st, 2024 would have been before Ms. Lively filed her CRD complaint, correct?
MS. SHAPIRO: Objection.
THE WITNESS: July 31st is certainly before January '25, or December 21st.
BY MS. HUDSON:
Q And you have no -- you have no reason to believe that this timeline was updated or changed in

any way after, at minimum, August 6th, 2024, correct?

MS. SHAPIRO: Objection.

THE WITNESS: I don't know.

BY MS. HUDSON:

Q You don't know?

A I don't.

Q Okay. You have no recollection of making any changes to this timeline after August 6th, 2024, correct?

A To this timeline --

MS. SHAPIRO: Objection.

THE WITNESS: -- I don't have a recollection.

BY MS. HUDSON:

Q Okay. And you don't know -- you didn't direct Ms. Toskovic to make changes to this timeline after August 6th, 2024, correct?

A I don't recall. I don't know.

Q Okay. Why did you send the timeline -- or why did you have the timeline sent to -- well, strike that.

Do you know why the timeline was sent to The Agency Group?

A To TAG?

Q Yes.
A I think at that point, it was a -- a quick way to give them a glimpse of a timeline of our experience.
Q Your experience with Ms. Lively?
A Our experience that was outlined in this timeline.
Q Your experience with Ms. Lively?
A That is part of it.
Q Okay. It was a way to give TAG a quick update -- or a summary of the alleged incidents, as you described them, correct?
MS. SHAPIRO: Objection.
THE WITNESS: I wouldn't characterize it as that. I just think it was a quick way to get a little bit of an update of some of the elements.
BY MS. HUDSON:
Q Some of the elements of issues that had arisen with Ms. Lively, correct?
A Of our experience of the set, and some of that included experiences with Ms. Lively for sure.
Q And that's because you had retained TAG at that point to help you with crisis management related to your concerns about Ms. Lively potentially going public, correct?

MS. SHAPIRO: Objection.

THE WITNESS: No, it wasn't about Ms. Lively going public.

BY MS. HUDSON:

Q What was it about?

A We didn't know what would become public. We knew that there was a lot of contention. We knew that Justin was at a point where he had lost the movie. People had unfollowed him. We heard whisperings that she was saying some things about us that were not kind. We didn't know where we stood, and some of this was like, what is this -- if any sort of media or people start looking into why are they unfollowing, what is going on there? We just wanted some guidance and some -- some consultation of how we manage that.

Q And this information that's in this timeline is what you wanted TAG to know if people were speculating about why Mr. Baldoni was being unfollowed, correct?

MS. SHAPIRO: Objection.

THE WITNESS: This was part of it.

BY MS. HUDSON:

Q Did you ever tell someone that you were hiring a crisis management team that was costing you

$9 million?
A Yeah, I said that. It was a hyperbole. It was a joke.
Q What does that mean?
MS. SHAPIRO: Objection.
THE WITNESS: I said to my wife yesterday about a sandwich that cost $6,000. It was a way to say that we're spending money. And it was an exaggeration just to make a funny point.
BY MS. HUDSON:
Q Meaning, it was, in your view, expensive?
A I mean, that's relative. It just was we're having to spend money. PR is expensive. Lawyers are expensive, as you know, like right now. Everything you do is expensive. It's just a reference to things cost money. But it certainly was not mine -- $9 million. That's just a way to have fun with a number.
Q And in addition to TAG, you also hired Jed Wallace and Street Relations, right?
A We eventually did, yes.
Q And you were involved in the decision to hire Mr. Wallace and Street Relations, correct?
A I was.
Q Who else was involved in that decision?

A Part of the consultation was me, Jen. Melissa was the one that suggested it to me. But in terms of the ultimate decision, I'm the one who signed off on it.
Q You authorized it?
A I did.
Q When did you first hear about Mr. Wallace and Street Relations?
A I don't recall when it was.
Q You -- you said Melissa Nathan recommended --
A Correct.
Q -- them?
A Correct.
Q Okay. And what did Melissa Nathan tell you about Mr. Wallace and Street Relations?
A That he was someone that helps supported crisis PR. That they would need some additional support in monitoring. That was pretty much it.
Q That was it, just additional support and monitoring?
A That was -- that was most -- mostly it. Yeah.
Q That was your understanding?
A It was.

Q Did you ever speak with Mr. Wallace or -- Mr. Wallace yourself?
A I did at some point.
Q Did you speak with Mr. Wallace before you retained him?
A I do not believe so.
Q You don't -- you don't believe so.
What did you understand that Wayfarer was hiring him to do?
MR. GLOVER: Objection, form.
BY MS. HUDSON:
Q Let me -- strike that.
Did you have an understanding of what Wayfarer was hiring him to do?
A Yeah, I had an understanding that crisis PR needed some support, and I don't understand that world. It's not my world at all. And when they said they needed some support, great.
Q So you thought it was generic support?
MS. SHAPIRO: Objection.
THE WITNESS: I don't speak the language. I don't understand it. They needed some help. It seemed reasonable. So we signed off on it.
BY MS. HUDSON:
Q And you had no idea what form this help

would come in; is that what you're saying?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: As I said, I don't -- I got a frog in my throat. Can you just give me this?
I would say that crisis PR and PR are not anything that I fully get. I understand, like, general PR that you have for, like, promoting movies and things of that nature. But when there are concerns that you don't know of any crisis that could potentially happen, you consult with those people and their recommendations, is what I went by.
BY MS. HUDSON:
Q You just blindly took the recommendation to retain Mr. Wallace without understanding what he did; is that what you're saying?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: That happens all the time.
BY MS. HUDSON:
Q That happens all the time?
A All the time. I just hired three contractors -- a contractor hired three people to help with my house. I have no idea what they're doing. He said he needed them. There's a plumber

to this. I don't know what they do exactly, other than he needed some support.

Q Did you understand what capabilities Mr. Wallace or Street Relations could perform before hiring him?

A I was understanding that he was going to monitor. He was more of a digital guy that understood the Internet, and he could view and monitor them.

Q So your understanding was he was only going to be monitoring?

A I believe so.

Q And what did you -- what did you understand that to mean?

A I did not understand it. It's like a code that I just don't get, so...

Q You think monitoring is a code?

A No, I'm saying it's like code. I don't understand code. I don't understand crisis PR.

Q Did you understand that there would be some output to Wayfarer from Mr. Wallace or Street Relations?

MR. GLOVER: Objection. Form.

MS. SHAPIRO: Objection.

THE WITNESS: I didn't have a full

understanding. I know that crisis PR, TAG, needed support and they would really work together.

BY MS. HUDSON:

Q Did you get a quote for how much it was going to cost to --

A At some point.

Q -- to get support from Mr. Wallace and Street Relations?

A Uh-huh.

Q And how much was that?

A I believe we agreed to 30 thousand a month.

Q And what did you understand that -- you said it was monitoring?

MS. SHAPIRO: Objection.

THE WITNESS: Yeah, I believe so. I believe that was pretty much what I understood.

BY MS. HUDSON:

Q Pretty much what you understood?

A Yeah.

Q Okay. I think earlier you said it was mostly monitoring. Did you have an understanding that it was anything else?

A Monitoring, possibly reporting maybe. That was -- that was the general understanding that

I had.
Q Did you discuss with Mr. Baldoni hiring Jed Wallace of Street Relations?
A I don't recall. I don't remember.
Q Did you discuss with anyone else at Wayfarer what Mr. Wallace was being hired to do?
A I may have.
Q Did you discuss it with Mr. Sarowitz?
A I don't have a particular memory of it but I -- but I may have. I don't know.
Q Did you receive an email outlining the work that Mr. Wallace would be doing for Wayfarer?
MR. GLOVER: Objection. Form.
THE WITNESS: I believe there was an email that came in that I only know about more recently, but I never looked at it.
BY MS. HUDSON:
Q You didn't look at it?
A I did not.
Q Did it come to you?
A I believe my email was on it, yes.
Q You believe it did come to you?
A I believe so.
Q But you're saying --
A Only because I've learned more recently

that something came and I may have got it.
Q So an email came to you outlining what Mr. Wallace would do?
MR. GLOVER: Objection.
BY MS. HUDSON:
Q You believe you --
MR. GLOVER: My apologies.
BY MS. HUDSON:
Q Just to make sure I understand.
You believe an email came to you that outlined what your understanding was, but what you believe -- what was being described about -- what -- strike that.
A It's okay.
MS. HUDSON: Let me show you the email. How about that?
THE WITNESS: All right. You got it.
MS. HUDSON: I'm going to hand you what we marked as Exhibit 19.
(Exhibit 19 marked for identification.)
THE WITNESS: Can I get some water? Do you mind if I just get up and get the water?
MS. HUDSON: Sure. Go right ahead. Actually, if you wouldn't mind. The videographer is going to get you some.

THE WITNESS: Thank you so much.
BY MS. HUDSON:
Q Exhibit 19 is an email chain, dated August 7th, 2024, Bates-stamped HEATH_28187. The bottom of this chain is an email from Katie Case to Jamey Heath, Jennifer Abel, Melissa Nathan and Breanna B.
A Yeah.
Q Subject "Social Digital Mitigation Remediation."
Do you see that?
A Uh-huh.
Q Is that a yes?
A I do see it.
Q Okay. And is this the email that you believe you received that set forth what Street Relations would do that you didn't read?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: Yes, now that I'm looking at this, I can confirm that I never saw this in real time at that time.
BY MS. HUDSON:
Q You did not see this in real time?
A I do not have any recollection of seeing

this.

Q This is your email address, though, correct?

A It is.

Q Okay. So -- and it says on here that:

(As read):

"The team will focus on the social and digital elements."

Do you see that?

A I do.

Q (As read):

"Boosting SEO efforts and updating with new content to enforce SEO efforts, monitoring and directly influencing forums that are working against Justin and Wayfarer to adjust the narrative in real time and collate assets and background to work in conjunction with Jen and her team as well as TAG PR."

Do you see that?

A I do.

Q Okay. Now, you mentioned that you understood Mr. Wallace and Street Relations would be doing monitoring but not these other things that are listed here, right?

MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: I never saw these other things listed here.
BY MS. HUDSON:
Q And no one told you about them?
MS. SHAPIRO: Objection. Objection.
THE WITNESS: I -- I never discussed or recall seeing anything about this.
BY MS. HUDSON:
Q Okay. And the next sentence says:
(As read):
"The integral part here is to execute all without fingerprints."
Do you see that?
A I see that?
Q And your testimony here today is that you did not see this email at the time that the plan was to execute all of this without fingerprints?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I don't believe I ever responded to this. I never saw this at the time.
BY MS. HUDSON:
Q Okay.

So did you have any conversations with Mr. Wallace directly about what his work was?
A Not about what his work was.
Q You never talked to Mr. Wallace about what he was doing for Wayfarer?
A I did not have a -- at this point, I had a discussion with him more about saying, hello, I know you're here to help the team, but I did not talk about what he was doing.
Q Did you ever speak with Mr. Wallace about the work that he was doing for Wayfarer that he was retained to do?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I don't believe so.
BY MS. HUDSON:
Q You never did?
A I do not believe so. I don't have a recollection of having a specific discussion.
Q Okay.
A About what he was doing.
Q So Ms. Abel responded to this email on August 7th?
A Yeah.
Q And you are copied on the response as

well. It's sent to you and Katie Case.
Do you see that?
A I do.
Q Did you receive Ms. Abel's email?
A I don't believe I have ever looked at this thread.
Q So you had two emails here, and you didn't look at either one of these; is that what you're saying?
MS. SHAPIRO: Objection.
THE WITNESS: I get so many emails today, and I'm not dealing with the granular work of this stuff. This was not my language so I was not monitoring all this stuff. Once it got to a point of decision-making, then they would report to me. I would either take a call, maybe respond to one or two emails, and that was it. But I did not look at the granular discussions.
BY MS. HUDSON:
Q Okay.
A Or at least I don't recall ever doing so. Not ever, but mostly.
Q Did you pay Mr. Wallace's invoices?
A I did.
Q Okay. Do you recall that Ms. Nathan also

described Mr. Wallace's services as "most importantly untraceable" to you?

MR. GLOVER: Objection. Form.

MS. SHAPIRO: Objection.

THE WITNESS: I don't recall that at the time.

BY MS. HUDSON:

Q Do you recall her describing to you the crisis work that was going to be performed for Wayfarer to be "most importantly untraceable"?

MS. SHAPIRO: Objection.

MR. GLOVER: Objection. Form.

THE WITNESS: I don't have a particular memory about that. Is it possible that something of that nature was said and I don't recall it? I suppose, but I -- I don't -- I don't recall anything.

BY MS. HUDSON:

Q Did you receive a text that said that?

MS. SHAPIRO: Objection.

MR. GLOVER: Objection. Form.

THE WITNESS: I'm happy for you to share it with me.

BY MS. HUDSON:

Q You don't recall a -- a text that you

received that said, "all of this will most importantly be untraceable"?

MR. GLOVER: Objection. Form.

THE WITNESS: Is this a group text?

BY MS. HUDSON:

Q I'm just asking you if you recall?

A I don't -- as I've said, I don't recall.

Q Okay. Did -- yeah. And you don't recall Ms. Nathan communicating that to you verbally?

MR. GLOVER: Objection. Form.

MS. SHAPIRO: Objection.

THE WITNESS: Certainly, not verbally. But I don't recall anything that I looked at any of these at the time. There was a lot going on. I was distracted with most other things. And I assumed that Melissa was -- and Jen were more granular in it. And once there was time to discuss something in person, meeting on the phone, they would update me.

BY MS. HUDSON:

Q Okay.

A This just looks like a clarification -- as I'm reading it, like something -- Jen looks like she's just clarifying, so I don't see that I've responded to any of this.

Q And the -- well, the -- this details what

the money is for, right?

MR. GLOVER: Objection. Form.

MS. SHAPIRO: Objection.

BY MS. HUDSON:

Q This explains what the $30,000 is being used for; isn't that what this is -- what this email is?

MR. GLOVER: Objection. Form.

MS. SHAPIRO: Objection.

THE WITNESS: It appears that this is a proposal of some sort. And that these are possible services, and it's preliminary discussions. That's what it seems to me.

BY MS. HUDSON:

Q In Ms. Abel's email above, she talks about -- she says that the -- strike that.

MS. HUDSON: I'm handing you Exhibit 20.

MS. SHAPIRO: Mr. Hernandez, how much time is left?

THE VIDEOGRAPHER: We're at six hours, eleven minutes.

MS. HUDSON: Exhibit 20 is an email chain including Mr. Wallace, Katie Case, Jamey Heath and Melissa Nathan. Bates-stamped SR100009.

(Exhibit 20 marked for identification.)

BY MS. HUDSON:
Q Mr. Heath, do you recognize this as an email chain in which you participated?

A I do.
Q So this one you recognize?
MS. SHAPIRO: Objection.
THE WITNESS: I can see that I participated. Let me just say that I can see I participated, that my email is on it, but I'm looking for -- that have I participated in it? I don't see that I have. But I see that it's --
BY MS. HUDSON:
Q Do you recall receiving this email?
A I don't recall receiving it. But I see that it's directed to me. "Jamey, an absolute pleasure."
Q Well, I see -- I -- I'm -- I'm -- I want -- what I'm asking you, though, is what -- whether you recall receiving this email at the time. And your answer to that is no?
A I don't recall it.
Q Do you recall Melissa Nathan telling you -- introducing you to Jed and telling you that:
(As read):

"We will be having his team assist on
all social activity based off our own
conversations as well as their digital
plan you are in receipt of."

Do you recall her communicating that to you?

A I don't recall this email.

Q You don't recall this email?

A I don't.

Q Do you recall learning that Ms. Nathan communicated to you that:

(As read):

"Jed and team have worked on some of
the most monumental BTS projects
globally"?

A I don't. I just know that, at this stage now, we were bringing on TAG, I believe, had already -- now was helping us. They had said they needed support. And maybe they were trying to introduce me to Jed at some point, but I don't believe we connected, and I did not read all the details of what was going on so...

Q So it says, in this email from Melissa Nathan at the bottom, that:

(As read):

"Jed is aware that we are going for their, quote, two option for $30,000 per month for three months."

Do you see that?

A I do.

Q Did you know what Ms. Nathan was referring to as the, quote, two option?

A I don't recall what I knew. I would need to see where I'm involved at this point. There was many conversations. I was, you know, quickly having phone calls. There was a lot. So what I recall is that for $30,000 a month, this is what it will cost for him to help and join. And I had to approve a number. I think there was another option with a different amount -- a different price to it. And this is what we chose. But, again, I was not involved in the granular of this.

Q You were not involved? Okay. All right.

A My only conversations were just to give instructions on what I expected anybody that was working for us to do.

Q And what was that? What were those?

A Just to do it in line with how we wanted to position ourselves always, was to keep a clear head about making sure that we're doing things that

doesn't add any fire to anything, that only defends whatever we need to to make sure that stories are accurate in case they come in, and to monitor what is going on. And I wanted people to hear that from me.

Q And you were not looking at the written communications that were coming to you that were describing the actual services that were going to be provided?

MR. GLOVER: Objection. Form.

MS. SHAPIRO: Objection.

THE WITNESS: I don't know if I would have even understood the services. So I would have conversations just so that people could hear my voice, and I could tell them what I expected. I don't know how you do all the granular stuff. I just expect it to be done in this way.

BY MS. HUDSON:

Q Okay. And in the granular stuff was given to you, but you're saying you didn't read it, right?

MR. GLOVER: Objection. Form.

MS. SHAPIRO: Objection.

THE WITNESS: I did not read the granular stuff. I did not.

BY MS. HUDSON:
Q Okay.
A I don't -- I don't believe so because I have no memory of it at that time.
MS. HUDSON: Let's go off the record.
THE VIDEOGRAPHER: We are going off the record. The time is 6:28 p.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record. The time is 6:44 p.m.
BY MS. HUDSON:
Q Mr. Heath, I'm handing you a document that we've marked as Exhibit 21.
A Okay.
MS. HUDSON: Exhibit 21 is an email chain between Mr. Heath and Jed Wallace, dated August 10, 2024, SR_154 through 55.
(Exhibit 21 marked for identification.)
BY MS. HUDSON:
Q Do you recognize this communication between you and Mr. Wallace, Mr. Heath?
A I do.
Q And you participated in this on August 10th, 2024 -- well, starting on August 10th, 2024?

A I did.
Q Okay. And the first communication in the chain is from you to Mr. Wallace, right?
A It is.
Q And you asked Mr. Wallace to give you a call, correct?
A I do.
Q Did you talk to Mr. Wallace? Did he give you a call?
A I don't remember who called, but we did speak.
Q You did speak. And what did you discuss?
A I -- I have a -- pretty much a very customary thing that I do whenever there's someone that's going to be working with us at Wayfarer. I want to say hello regardless of what they are doing. And then have them hear from me who we are, how we want to go about things. I know that you've joined the team. So nice to meet you. You know, we've hired crisis because we're not -- we just needed some consultation of some of the stuff we've been experiencing and some of our fears and all that we've been through at this point.
And I know that you're here to assist and, you know, just please know I'm not suggesting

you're doing anything that would not be consistent with who we are, but I want you to hear from me about how we operate. We exchanged some pleasantries. And the rest seems to be about that.
Q Did Mr. Wallace say anything in this phone call?
A Great to meet you. You know, we will do our best to -- to monitor and to, you know, do some good work. And it was more on that regard.
Q Did he say anything else?
A I don't recall exactly what he said. But that was the purpose of the call.
Q Did you talk at all about what Mr. Wallace would be doing for Wayfarer?
A I don't believe so.
Q And I think you said you wanted to make sure that -- that you're not suggesting that you're doing anything that would not be consistent with who we are. Did you have some concern that Mr. Wallace might be doing some work that would be inconsistent with who Wayfarer is?
MR. GLOVER: Objection. Form.
THE WITNESS: No, I did not have concern about him specifically. I just have this conversation with everyone. Every movie that we

make. Anyone that we're involved with in any level. I always express, like, how I like to do business. And he was one included in that.

BY MS. HUDSON:

Q And you didn't ask him anything about the work he was going to be doing for the money that Wayfarer was paying him; is that right?

MS. SHAPIRO: Objection.

THE WITNESS: I don't believe so. I don't think so.

BY MS. HUDSON:

Q Did you have any other conversations with Mr. Wallace, other than this one, regarding the work that Mr. Wallace -- let me ask you first.

Did you have any other conversations with Mr. Wallace at all other than this one?

A Yeah, we had a few conversations.

Q When was your next conversation with Mr. Wallace?

A I don't remember when the next one was.

Q Was it in August of 2024?

A It may have been. I don't recall when it was.

Q How many times did you speak with Mr. Wallace in August of 2024?

A A handful. I don't know exactly.
Q And do you recall any of the -- those conversations with any specificity?
A From our first conversation, he seemed like a really nice guy. We talked about -- I remember we talked about our kids, and he would just check in, how are you doing. He knew that there was a lot of social noise going on, and he was just oftentimes calling to express his -- for lack of a better word, his love.
Q So Mr. -- your conversations with Mr. Wallace after meeting him in August of 2024 were about his love for you?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: No.
BY MS. HUDSON:
Q When you say "his love," what do you mean by that?
A That's a term I would use just to express some -- some nice words of encouragement. You know, we see what's going on. We're monitoring. I hope you're well. Things of that nature.
Q Did he tell you what he saw going on?
A We did not really get into that much,

other than him saying things like, things are looking okay out there. So sorry for what's going on. He would give some general acknowledgments of that nature, but we didn't get into the weeds.

Q He didn't tell you what it was he saw?

A I don't recall exactly what was said, but we did not get into weeds of stuff.

Q So your -- your testimony is that in the conversations that you had with Mr. Wallace, they were just check-ins essentially about your well-being?

MS. SHAPIRO: Objection.

THE WITNESS: I mean, I'm looking at our text threads here. "I appreciate this message. Congrats on a big weekend. Appreciate you. Looking forward to meeting you. Just checking in." That was typically, you know -- we connected.

BY MS. HUDSON:

Q You didn't have conversations about the work, though, is that what you're saying, that you had contracted with Mr. Wallace to do for nearly $100,000?

MS. SHAPIRO: Objection.

MR. GLOVER: Objection. Form.

THE WITNESS: It would be like me having

a conversation with somebody about a world in a language I just don't understand. That wasn't our conversation. It was just more -- we connected and that was what our conversations were.

BY MS. HUDSON:

Q I'm trying to understand why you feel the world that Mr. Wallace occupied was something that you couldn't understand. Why is that?

MS. SHAPIRO: Objection.

THE WITNESS: I am not a digital monitoring person that understands social media and all of that. So...

BY MS. HUDSON:

Q What did you understand digital monitoring to mean?

A Monitoring what was going on in the digital realm.

Q And you weren't curious about how Mr. Wallace did that?

A It wasn't one of my -- I didn't have any reason to be concerned about it or think about it beyond that. It just was he was here to help, and that's all that -- that's all that mattered. He was doing it in a way that I understood was aligned with us.

Q On August 11th, Mr. Wallace said -- you -- you refer to Signal.
Do you see that?
A Which one is this?
Q August 11th at 12:02 a.m.
A Hey, man, I appreciate your message. I could tell after speaking with you --
Q In the middle, you say:
(As read):
"As for Signal, I'm not on it, but we'll set that up this week for sure. I'll let you know once I've done that."
Do you see that?
A I do.
Q Did you set up Signal at this time?
A I must have. I think I might -- I think I did.
Q And did you let Mr. Wallace know that you had set it up?
A I don't know.
Q Did you communicate with Mr. Wallace on Signal at this -- after August 11th, 2024?
A I think there was a few -- a few messages sent.
Q And when did you first send a Signal

message to Mr. Wallace?
A I don't recall.
Q When did you first receive a Signal message from Mr. Wallace, if at all?
A I don't recall. I guess it would have been around this time. That's my guess.
Q Okay. And did you communicate on Signal with anyone else after you obtained Signal?
A I don't think so.
Q The only person --
A There could have been somebody, but I don't think so.
Q The only one you recall communicating with on Signal was Mr. Wallace?
MS. SHAPIRO: Objection.
THE WITNESS: The time, I don't remember. It could have been. I -- I would have to refresh my memory. Maybe there was something with Jen and Melissa on there, but I don't have a specific memory of it.
BY MS. HUDSON:
Q Did you have a group chain with Mr. Wallace, Ms. Abel, and Ms. Nathan at this time?
A I don't know if that was on Signal or a text message, but I think that we did.

Q You think you did on Signal?
A I don't know which one.
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q You might have on Signal?
MS. SHAPIRO: Objection.
THE WITNESS: We may have.
BY MS. HUDSON:
Q You believe that there was at minimum a text chain with you, Ms. Nathan, and Mr. Wallace?
MR. GLOVER: Objection. Form.
BY MS. HUDSON:
Q Regardless of platform?
MS. SHAPIRO: Objection.
THE WITNESS: I think there may have been. I don't -- I'm happy to be refreshed.
BY MS. HUDSON:
Q Other than Mr. Wallace and possibly Ms. Nathan and Ms. Abel, is there anyone else that you recall communicating with on Signal and in August of 2024?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know the month. There was so many ways of communicating, email, phone -- excuse me -- text messages. Signal could

have been one of them. I just don't know.
BY MS. HUDSON:
Q So you may have communicated with other people on Signal in August of 2024 other than the ones you identify?
A I don't have a particular recollection of it because I think that was the only people that I communicated with at that time, but I don't know.
Q Did you communicate with Mr. Freedman on Signal in August of 2024?
A I don't know.
Q You may have?
A I don't know.
Q Did you communicate with Mr. Baldoni on Signal in August of 2024?
A I don't know.
Q When you downloaded Signal, did you make any effort to change any of the settings for the handling of preservation of messages?
A In August?
Q When you downloaded Signal?
A No.
Q Did the messages that you exchanged on Signal in August of 2024 automatically disappear as far as you know?

MS. SHAPIRO: Objection.

THE WITNESS: I think that depends on whatever thread I was on, whoever initiated it may have set the settings. I don't have any particular memory of myself setting something to disappear.

BY MS. HUDSON:

Q And did you set up your Signal messages so that they would not disappear?

A In August?

Q Yes.

A I don't believe I was thinking about that.

Q Did you communicate by Signal in September of 2024?

A I may have.

Q And who do you believe you may have communicated with on Signal in September of 2024?

MS. SHAPIRO: Objection.

THE WITNESS: It would be a guess. I just don't know.

BY MS. HUDSON:

Q Did you communicate with Mr. Wallace on Signal in September of 2024?

MR. GLOVER: Objection. Form.

THE WITNESS: I may have.

BY MS. HUDSON:

Q Did you communicate with Ms. Abel on Signal in September of 2024?

A I may have.

Q Did you communicate with Ms. Nathan on Signal in 2024?

A I may have.

Q Is -- did you communicate with Mr. Freedman on Signal in 2024 -- in September of 2024?

A I know for sure not.

Q And why do you know that one for sure?

A Well, because I only had one conversation with Mr. Freedman.

Q On Signal?

A No. I had one conversation with him in -- I don't remember what month it was. Maybe it was in August.

Q Did you communicate with anyone on Signal in October of 2024?

A I may have.

Q And did you speak with -- did you communicate with Mr. Wallace on Signal in October of 2024?

A It's the same. I may have. I'm -- I

don't have a particular recollection of it. I'm certainly not disputing that I would or would. I just don't have a memory. I mean, I don't know.

Q Did you communicate -- do you have any memory of communicating with Mr. Wallace in November of 2024 on Signal?

A I may have.

Q And I asked you about Mr. Wallace in October and November. In those months, did you communicate with Ms. Nathan or Ms. Abel on Signal?

MS. SHAPIRO: Objection.

THE WITNESS: I may have.

BY MS. HUDSON:

Q Did you communicate with anyone -- any Wayfarer employees on Signal between August and December 2024?

A I don't know during that -- during that period of time.

Q You don't know but you may have?

A I don't have a memory of it during that time, no.

Q For any of the communications that you had on Signal between August and December 2024, do you have any of them still?

MR. GLOVER: Objection. Form.

THE WITNESS: I haven't done anything to them.
BY MS. HUDSON:
Q You haven't done anything to them?
A I haven't deleted anything.
Q Have you looked at Signal to see if you have any messages with Mr. Wallace, Ms. Abel, Ms. Nathan, or anyone else connected to this matter between August and December 2024?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall.
BY MS. HUDSON:
Q You don't know if you've looked?
A From August to December?
Q Yes.
MS. SHAPIRO: Objection.
THE WITNESS: You're saying from August to December, that period, if I've looked even like yesterday or last month or that? Or are you talking about in that time frame?
BY MS. HUDSON:
Q Have you looked for to see if you have any of the Signal communications that you engaged in with Mr. Wallace, Ms. Abel, Ms. Nathan, or anyone else connected with this matter for the time period

August 2024 through December 2024?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know.
BY MS. HUDSON:
Q You don't know if you've looked?
A I don't know.
Q Do you have your phone here with you?
A I do.
Q Is Signal on your phone?
A It is.
Q So if we wanted to know if you had any communications between August and December of 2024 with Mr. Wallace, Ms. Nathan, or Ms. Abel, or anyone else affiliated with this manner, you could check, correct?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: In theory, sure.
BY MS. HUDSON:
Q You would be capable of looking, right?
A I am capable.
Q Okay.
The Signal messages that you believe you engaged in with Mr. Wallace in August of 2024, do you recall what the subject matter of those

communications were?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: I don't.
BY MS. HUDSON:
Q Did Mr. Wallace tell you why he wanted you to -- why he suggested Signal for you?
MS. SHAPIRO: Objection.
THE WITNESS: I don't remember specifically.
BY MS. HUDSON:
Q Do you remember generally?
A I think Signal, from what I understood, was a platform that was protected beyond many others that could be hacked. So that's what I understood the reason for people using Signal.
Q Did you observe in any of the communications that you made on Signal that they disappeared?
A Did I ever observe -- repeat that, please.
Q Yes. Let me strike that. I am going to ask you a different question.
A Okay.
Q For the time period between August 2024

and December 2024, do you recall ever observing that a message you had sent or received on Signal during that time period disappeared?
A I don't have a particular memory of it.
Q Okay. Did Wayfarer have any policies, procedures, or practices regarding document retention?
A All of our emails are -- are retained. There is no auto delete.
Q Are they retained forever?
A I believe so.
Q Okay. Does Wayfarer have any policies or procedures on document retention?
A I -- I do not know the answer to that, if we have a particular policy about document retention.
Q So you said that your emails don't auto delete, right? Are there any policies that direct employees not to delete emails manually?
A I don't know the answer to that.
Q Does Wayfarer have any policies, procedures, or practices regarding document deletion?
A I don't know the answers to that in general -- generally.

Q Have you taken any steps to learn if Wayfarer has any policies, practices, or procedures regarding document retention or deletion?

MS. SHAPIRO: Objection. Just to be clear again, he's not here as a 30(b)(6) witness.

THE WITNESS: I have not taken any particular steps as a company to make sure that our -- there is some sort of policy. But Wayfarer is -- is aware to not delete anything.

BY MS. HUDSON:

Q And how would you know? How is Wayfarer aware not to delete anything?

MS. SHAPIRO: Objection.

THE WITNESS: Once we received the CRD complaint, sometime at that point we were made aware, and that was communicated.

BY MS. HUDSON:

Q So you -- you weren't aware of any obligations to preserve or not delete documents until you received the CRD complaint?

MS. SHAPIRO: Objection.

THE WITNESS: Was not aware.

BY MS. HUDSON:

Q So did you make any effort to preserve or not delete documents prior to receiving the CRD

complaint?
MS. SHAPIRO: Objection.
THE WITNESS: Other than what I said, that there was no reason or auto delete happening, there was no particular effort to go outside the normal scope.
BY MS. HUDSON:
Q And you said that you received instructions to preserve documents after Ms. Lively filed her CRD complaint?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know if it was the CRD complaint or the lawsuit. I don't recall, but during that period we learned that there was -- or maybe it was a -- maybe it was a notice from Mr. Gottlieb. Sometime in that frame we were made aware. I don't recall where it came from.
BY MS. HUDSON:
Q Are you talking about the cease and desist letter that we sent?
A It may have been that. I don't recall exactly. It was just in that time frame.
Q And did you take some steps to preserve documents once you received the cease and desist letter?

A Yes.
Q What steps did you take?
A Made sure that personally, if there was anything that was said to disappear or delete, that they were not. Told Wayfarer parties to not delete anything, that in case they otherwise might. I can't recall at the moment, but I think those were the general steps.
Q Okay. And did you have any personal devices that were set for automatic deletion at that time?
MS. SHAPIRO: Objection.
THE WITNESS: There may have been some threads that were on Signal. So I just reviewed them and made sure that they were not on disappearing mode.
BY MS. HUDSON:
Q So what was -- what was there between August and December 2024, you ensured it was not on auto disappearing mode?
MS. SHAPIRO: Objection.
THE WITNESS: I don't understand the question.
BY MS. HUDSON:
Q Well, you said that you had some

communications between August and December of 2024, correct?

A Yes.

Q And when you got the cease and desist letter, you looked at the threads to make sure that they were not on automatic disappearing mode, correct?

A Correct.

Q So at the time that you did that, those threads existed, correct?

A Correct. I imagine so.

Q And they should still be there then, right?

A I believe they would be.

Q And were any of those threads related in any way to Ms. Lively, Mr. Reynolds, or any of the issues in this litigation?

MS. SHAPIRO: Objection. Form.

THE WITNESS: I didn't pay attention to the content. I just made sure that whatever thread there was, was -- was not -- there is no nothing in there that would auto delete or auto disappear.

BY MS. HUDSON:

Q And that's for all your Signal communications?

A I believe so, yes.
Q And you said that there were instructions given to other Wayfarer parties. How were those instructions given?
A If I recall, I had a meeting with everybody that we had received a lawsuit or something and instruct everybody to just preserve, if they weren't already, their documents.
Q And this was verbal, this meeting?
MS. SHAPIRO: Objection.
THE WITNESS: I believe so.
BY MS. HUDSON:
Q And who was at that meeting? Was it -- what -- let me ask you this way.
It was Zoom? Was it in person? How did this meeting take place?
A Mostly in person. There may have been some Zoom participants.
Q And who was present?
A It would have been the Wayfarer staff.
Q All the Wayfarer staff?
A I believe so.
Q You assembled the whole company?
A I do that often.
Q Okay. But I'm asking you here. You

assembled the whole company to --
A I believe so.
Q And was the purpose of that, to discuss document preservation?
A That's one of the things that I had said. I don't recall the exact purpose, but that was something that I expressed.
Q Did you take any steps to ensure that people followed that direction?
A I don't recall.
Q When Mr. Wallace talked to you about Signal, did he mention the app's disappearing feature?
A I don't believe so.
Q Did he tell you that he used the app's disappearing feature?
MR. GLOVER: Objection. Form.
THE WITNESS: I don't believe so.
BY MS. HUDSON:
Q Did Mr. Wallace suggest to you that you should use the app's disappearing feature?
A I don't believe so.
MR. GLOVER: Objection. Form.
BY MS. HUDSON:
Q Did Mr. Wallace give you any explanation

at all as to why you should communicate using Signal?

MS. SHAPIRO: Objection.

THE WITNESS: I don't recall. I just know that I understood, again, that it was a safe platform to share sensitive material that oftentimes can be hacked through other means.

BY MS. HUDSON:

Q And what sensitive material did you understand that Mr. Wallace might be sharing with you?

MR. GLOVER: Objection. Form.

THE WITNESS: We were talking about sensitive text, this movie and our fear and crisis, how we manage through this. And that seemed to be something we wouldn't want any chance of someone hacking.

BY MS. HUDSON:

Q And those are the things you talked to Mr. Wallace about on Signal?

MS. SHAPIRO: Objection.

THE WITNESS: No. I'm giving you my reason of -- my understanding of why we would use Signal.

BY MS. HUDSON:
Q Okay. We talked earlier about Shane Norman's lawsuit against Wayfarer.
Do you recall that?
A I do.
Q Wayfarer was also sued by Travis Flores, correct?
A Yes.
Q And Travis Flores sued for copyright and infringement based on his book Three Feet Apart, correct?
A I don't know what the name of the book was, but I think that's basically the story.
Q And he claimed that the Wayfarer movie Five Feet Apart was based on his story, right?
A I believe something like that.
Q And it was your lawyer, Bryan Freedman, who represented Mr. Flores in that lawsuit, correct?
A I've learned something to that extent, but I was not -- I don't believe I was at Wayfarer at the time.
Q Okay. And did you ever see Mr. Freedman's statement in January of 2025, about the fact that he was representing you after having represented Mr. Flores in a lawsuit against

Wayfarer?

MS. SHAPIRO: Objection.

THE WITNESS: I vaguely recall something about it.

BY MS. HUDSON:

Q And do you recall that he said that, "the previous lawsuit that he filed against Mr. Baldoni and Wayfarer, that Mr. Baldoni had done nothing wrong and that there was no liability on their part whatsoever"?

MS. SHAPIRO: Objection.

MS. HUDSON: You're saying that's in his statement?

BY MS. HUDSON:

Q Yes. Do you recall hearing that statement from Mr. Freedman?

MS. SHAPIRO: Objection.

THE WITNESS: I have a vague memory of that. Something of that.

BY MS. HUDSON:

Q And do you recall Mr. Freedman's statement in which he said, "As a result, the case was resolved without any liability on Justin's or Wayfarer or any other defendant's part. This only further confirmed to me that Justin and Wayfarer are

exceedingly honorable and highly ethical"?
A Okay.
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q Do you recall that statement from Mr. Freedman?
A I have a vague memory of it.
Q Did it concern you at all that Mr. Freedman sued you even though he believed his client did nothing wrong and that there was no liability on your part whatsoever?
MS. SHAPIRO: Objection.
THE WITNESS: Can you repeat that, please?
BY MS. HUDSON:
Q Did it concern you at all that Bryan Freedman sued Wayfarer and Mr. Baldoni, even though he believed that they did nothing wrong, and that there was no liability on their part whatsoever?
MS. SHAPIRO: Objection.
THE WITNESS: Well, I don't know -- I don't know what the timing of that, so I can't really speak to it. It could certainly mean that after he took the case and was moving forward, he learned otherwise and that was his statement. I

don't know. I can speak to it.
BY MS. HUDSON:
Q Well, did it concern you that Mr. Freedman publicly stated that his own client claims had no merit?
MS. SHAPIRO: Objection.
THE WITNESS: I didn't give it a mind.
BY MS. HUDSON:
Q You didn't -- you didn't give it a mind?
A No.
Q You didn't think about that?
A I did not.
MS. SHAPIRO: Objection.
BY MS. HUDSON:
Q Okay. Did you know that Mr. Flores was dead at the time Mr. Freedman made his statement?
MS. SHAPIRO: Objection.
THE WITNESS: I am aware that Mr. Flores has passed, yes.
BY MS. HUDSON:
Q Okay.
MS. SHAPIRO: Counsel, this has nothing to do with this lawsuit.
MS. HUDSON: I don't need your speaking objections. My questions are done. We're moving

on. Thank you. Don't waste my time on the record with that.

MS. SHAPIRO: Well, you shouldn't waste the witness' time and counsel's time --

(Cross talk.)

MS. HUDSON: I'm going to hand the witness a document --

MS. SHAPIRO: -- with matters, not proper matters of discovery.

MS. HUDSON: That's a speaking objection. Please do not make it. Thank you.

MS. SHAPIRO: You got 14 minutes left.

BY MS. HUDSON:

Q Are you aware that Mr. Freedman threatened your --

MS. SHAPIRO: Fourteen.

MS. HUDSON: Counsel.

MS. SHAPIRO: Counsel.

MS. HUDSON: Let's go off the record. You can say whatever you want to say to me off the record.

MS. SHAPIRO: Let's go back on the record. Let's go back on the record.

MS. HUDSON: I'm not going on the record. You're not using my time --

(Cross talk.)
MS. SHAPIRO: If you're going to use them, use them up. Go.
THE VIDEOGRAPHER: Off the record?
MS. SHAPIRO: No. Go back on the record.
MS. HUDSON: I am not using my time for you to talk.
BY MS. HUDSON:
Q Are you aware that Mr. Freedman threatened journalists on Wayfarer's behalf?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know what you're referring to.
BY MS. HUDSON:
Q Are you aware that Mr. Freedman told a journalist that, "You are a liar and dishonest and I am coming after you"?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know what you're referring to.
MS. HUDSON: I'm going to hand the reporter a document -- hand the witness a document that we've marked as Exhibit 22 [sic].
(Exhibit 7 marked for identification.)

THE WITNESS: Okay.

BY MS. HUDSON:

Q We -- this is a text chain between Mr. Baldoni and Mr. Heath dated January 24th, 20 -- I'm sorry -- December 24th, 2022.

MS. HUDSON: Actually, can we switch that out? That was Exhibit 7 that I had previously marked.

THE WITNESS: You don't want me to read this?

BY MS. HUDSON:

Q I'm going to take that one because I'm going to give you Exhibit 7 instead.

Do you recognize this as a text chain between you and Mr. Baldoni on December 24th, 2022 Bates-stamped BALDONI 33491?

MS. SHAPIRO: I don't have Exhibit 7. I have 6 and 8.

MS. HUDSON: We -- you can take Exhibit 22 as now Exhibit 7.

MS. SHAPIRO: Okay.

THE WITNESS: What was your question?

BY MS. HUDSON:

Q I just asked you if you recognize this text chain?

CONFIDENTIAL



A I don't yet. I need to look at it.
Q Have you looked at this long enough to recognize it as a text chain between you and Mr. Baldoni, Mr. Heath?
MS. SHAPIRO: Objection.
THE WITNESS: I haven't because I don't recall this.
BY MS. HUDSON:
Q You don't recall this text chain?
A I don't.
Q Okay. Do you recall Mr. Baldoni sending you a text in which he drafted a communication to Warren Zavala?
A I'm sorry. As I said, I don't recall this so --
Q Do you know who Warren Zavala is?
A I do.
Q You don't recall Mr. Baldoni giving you a draft of a text communication to Mr. Zavala?
A I don't recall this, so --
Q Okay. Well, you -- you -- can you see on page 333492 [sic], that Mr. Baldoni has written you a text?
A I can see that.
Q Okay. And at the top of the text, it

says "Warren."
Do you see that?
A I'm so sorry. If you're going to hand me a document, I -- I want to be able to read it.
Q I'm only asking you if you see the word "Warren"? Do you need to read the whole text to answer that question, Mr. Heath?
MS. SHAPIRO: Objection.
THE WITNESS: But before you ask me questions about it, if you're going to hand me a document, I would like to know what I'm reading.
BY MS. HUDSON:
Q I -- I am -- I am -- I -- I am not asking you questions about the whole document.
A Yeah.
Q I'm only asking you if you see the word "Warren."
Do you see that?
MS. SHAPIRO: Objection.
THE WITNESS: Okay. I can see "Warren."
BY MS. HUDSON:
Q Okay. Thank you.
And then, if you look at the first paragraph that Mr. Baldoni has written here --
A I'm sorry --

Q Are you refusing to answer questions unless you read this entire document?

MS. SHAPIRO: Objection.

THE WITNESS: If you're going to ask me something about a document, I just want to be able to read it.

BY MS. HUDSON:

Q I -- go ahead. Finish reading it. You've already read about half of it. You can finish.

A No, I hadn't. I would like to read it. If you're going to ask me, I just -- I just want to be -- understand what I'm responding to.

MS. HUDSON: Okay. Let's go off the record.

MS. SHAPIRO: We're not going off the record.

MS. HUDSON: I'm taking a break. Yes, we are.

MS. SHAPIRO: We're not going off the record.

MS. HUDSON: Yes, we are. Yes, we are. It's not up to you. This is my deposition. We're going to go off the record.

MR. BACH: How much time is left?

MS. SHAPIRO: There's six-minutes left. Oh, sorry, seven minutes.
MS. HUDSON: Okay. I have seven minutes.
THE VIDEOGRAPHER: Nine minutes left.
MS. HUDSON: Nine. There you go. We're gonna take a 10-minute break. We'll come back for the last nine.
MR. BACH: Let's make a record before you go. Let's make a record.
(Cross talk.)
MS. HUDSON: Not on the record. Not on my time.
MR. BACH: Can we go on the record?
MS. HUDSON: Absolutely not. Okay. You can go on the record and make any statement you want --
MR. BACH: I'm going to go on the record.
MS. HUDSON: -- but you're not taking my nine minutes. I'm not -- you are not taking my nine minutes to make a record.
MS. SHAPIRO: So you can ask more questions about a dead former client of one of the lawyers in this case?
MS. HUDSON: If you want to make a --
MS. SHAPIRO: And how is that -- how is

that proper?

MS. HUDSON: I understand that you are new to this case, and you don't understand everything.

MR. BACH: I want to go on the record. I don't care whether --

(Cross talk.)

MS. SHAPIRO: I'm new to this case, but I'm not new to the practice of law. I've been practicing law for over 30 years. I know the rules, ma'am.

MS. HUDSON: We're going off the record. I have nine minutes left, and I'm going to use them to ask some questions. If you want to make a record, you can add time and make whatever record you want.

MR. BACH: Okay.

MS. HUDSON: Okay? Will you agree that you will -- this is not counting against my nine minutes?

MR. BACH: That's fine. But I want it on the record. I want a record of what's happened.

MS. HUDSON: You -- you want a record of what's happened?

MR. BACH: Yes.

MS. HUDSON: You can make a record if -- if you will --

MR. BACH: I would like to, if you will let me.

MS. HUDSON: If -- I will let you if you will agree that it is not going to impact my nine minutes.

MR. BACH: I've already said fine to that. Do I need to say it again?

MS. HUDSON: Okay. You can make whatever record you want. I'm going to take a break.

MR. BACH: Okay. Can we go on the record for this?

MS. HUDSON: You don't need the video for this. You can just do it for the --

MR. BACH: I'll do it on the video. We're -- I don't need the video.

THE VIDEOGRAPHER: We're still on the record.

MR. BACH: Are we on the record?

Yeah, I just want to say, we had a break less than an hour ago. We made clear to counsel that we didn't want another break, that this same witness is being deposed tomorrow. That this process is exhausting. That he's expected to

testify for another seven hours plus breaks tomorrow.

She came back from a break and part of her questioning had nothing whatsoever to do with the claims and defenses in this case. She was clearly at the point where the questioning becomes optional and rhetorical, and she engaged in a series of questions aimed to drive a wedge between this deponent and his lawyer, and to tarnish the reputation of the lawyer. That is how she has used her time --

MS. HUDSON: This has nothing --

MR. BACH: Excuse me. I'm making a record.

MS. HUDSON: Then we are going to excuse the witness from the room because you are speaking and coaching the witness right now.

MR. BACH: I am not coaching the witness at all.

MS. HUDSON: This is totally inappropriate. This is totally inappropriate. You are coaching the witness. You are making a very long speaking objection. It -- there is no purpose. There's no judge in the room. Everything that you're saying is -- you can make an argument about

it. We're not going to do this in front of the witness.

MR. BACH: Technically, a speaking objection is when there's a question pending and you object to the question.

MS. HUDSON: No.

MR. BACH: I'm not objecting to --

(Cross talk.)

MS. HUDSON: Speaking on the record is not permitted like this. You're objecting to the break. Objection noted. We're taking a break.

MR. BACH: All right. This isn't -- this is silly.

MS. HUDSON: Okay.

MR. BACH: This is silly.

MS. HUDSON: I do not want you to coach the witness anymore and --

MS. SHAPIRO: We're not coaching the witness.

MS. HUDSON: -- make other statements on the record about the witness. If you insist on doing that, the witness should leave the room. Okay?

MR. BACH: I am going to defer to you in every respect. Whatever I need to do to let you

make my statement on the record, I'm going to do. Okay?

MS. HUDSON: Then you can excuse the witness from the room if you insist on making this statement.

MR. BACH: Okay. Jamey, go outside. Go outside, as I continue.

After we made clear our concerns about breaks, the witness is --

MS. HUDSON: Yeah. I would like to also note that you are not the -- the -- you are not the representative lawyer.

MR. BACH: If you cut me off again, I'm going to call Judge Hyman on the phone now.

MS. HUDSON: You want to tell him that you, who are not defending the deposition, are wanting to make a ten-minute speaking objection?

MR. BACH: Can you let me speak and then you can make whatever speech you want about me and you can say whatever you want about me. But you are going to let me --

(Cross talk.)

MS. HUDSON: Yeah, Mr. Bach, you are not defending this deposition. You are a participant here who has decided to make a speech on the record.

MR. BACH: We're not kids on a playground. You just said if Mr. Heath left the room, I could make my statement. Now you're not letting me make my statement. Can I make my statement?

MS. HUDSON: You can make your statement over my objection. Okay? That you --

MR. BACH: Just let me know when I can make my --

MS. HUDSON: -- you should --

MR. BACH: -- statement. I'm just going to sit here and not say --

MS. HUDSON: -- you should not be making any statement on the record.

MR. BACH: -- anything until you tell me I can make my statement.

MS. HUDSON: If you -- you are disrupting the deposition in order to make a statement as the non-defending lawyer in this deposition.

MR. BACH: Are you done?

MS. HUDSON: And if you -- I don't agree. I excused the witness. If you want to continue, I'm just going to let you do this so we can finish this deposition. And then we're going to take a break, and we're going to take our last nine minutes. So

if you want to make this statement, for whatever reason, go ahead.

MR. BACH: Are you done?

MS. HUDSON: I am done.

MR. BACH: Okay. Can I talk?

MS. HUDSON: You can talk.

MR. BACH: Okay.

As I've been saying, after we made clear that we're concerned about the breaks, we're concerned about the witness being tired, the next line of questioning had to do -- had nothing to do with the case, but simply had to do with the client and his lawyer and trying to drive a wedge. And now, the questioning lawyer wants to take yet another break. It's clear from the content of her questioning that she's no longer focused on the merits of the case, and that she's conducted her substantive questioning.

I don't see another need for a break. I think the deposition is practically over. The client is tired and has to go tomorrow. I think this is abusive. I think it's unnecessary, and I object.

MS. HUDSON: All right. Ten minutes. Off the record. Thank you.

THE VIDEOGRAPHER: We are going off the record. The time is 7:24 p.m.

(Recess.)

THE VIDEOGRAPHER: We're back on the record. The time is 7:34 p.m.

BY MS. HUDSON:

Q Mr. Heath, as Wayfarer's sole human resources representative, has Ms. Barnes Slater, to your knowledge, provided human resources support to any Wayfarer production?

MS. SHAPIRO: Objection.

THE WITNESS: I don't know.

BY MS. HUDSON:

Q You're not aware of Ms. Barnes Slater providing human resources support to any Wayfarer production?

MS. SHAPIRO: Objection.

THE WITNESS: I don't know.

BY MS. HUDSON:

Q Did Wayfarer provide copies of its handbook to the cast and crew on It Ends with Us?

A I don't know.

Q Did Wayfarer provide access to its employee -- employee handbook to the cast and crew of It Ends with Us?

MS. SHAPIRO: Objection.
THE WITNESS: I don't know.
BY MS. HUDSON:
Q Do you know whether a training was provided to cast and crew regarding respectful workplace on It Ends with Us?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MS. HUDSON:
Q Are there -- do you know who attended that training?
A I believe all the crew.
Q Are there any records reflecting who attended the training?
A I don't know.
Q Who would know?
A I don't know.
Q You don't know who would know about the records?
A I don't.
Q Did you have any discussions with Ms. Barnes Slater regarding providing human resource support to It Ends with Us?
A I don't recall.
Q You have no specific recollection of

talking to Ms. Barnes Slater about providing human resources support for the film?

MS. SHAPIRO: Objection.

THE WITNESS: The one complaint that came in, she provided support. That's all I know.

BY MS. HUDSON:

Q Which complaint is that?

A When the sound mixer was not hired.

Q You're talking about the complaint that came through Local 52 that we looked at earlier?

A Correct.

Q You said Ms. Barnes Slater provided support for that?

MS. SHAPIRO: Objection.

THE WITNESS: I believe so.

BY MS. HUDSON:

Q And what support did she provide for that complaint?

A I don't know.

Q Why do you believe Ms. Barnes Slater provided support for that complaint?

A That's what I can recall. That's all I recall.

Q And in what manner did she provide support?

A I don't recall at the moment. I don't recall.
Q Did you speak with Ms. Barnes Slater about the complaint from Local 52?
A I have a vague recollection of speaking to her. That's...
Q Did she give you any advice on how to proceed with respect to that complaint?
A I don't recall. I know specifically they had asked to speak to HR at Wayfarer, so I put them in contact with them. That's what I remember.
Q Did you discuss with Ms. Barnes Slater providing support to address any cast or crew concerns on It Ends with Us?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall.
BY MS. HUDSON:
Q You don't recall having done that?
A I don't.
Q What is the basis for your understanding that concerns of employees on an independent film should be raised to the line AD or the production supervisor?
MS. SHAPIRO: Objection.
THE WITNESS: That's what I was told.

BY MS. HUDSON:
Q By whom?
A By the production supervisor, I believe Alex Saks.
Q Alex Saks told you that employee complaints should be brought to the line AD and production supervisor?
A I don't know specifically. I just know that they were saying if there's anything that needed to be -- any concerns, that they would report to them. That was standard protocol.
Q That's what Ms. Saks told you?
A At some point, yes.
Q And did she say that that was her understanding of the protocol with respect to human resources concerns on an independent film?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall beyond that.
BY MS. HUDSON:
Q You don't recall beyond that. So you don't recall her specifically saying human resources concerns of employees should be brought to the line AD and production supervisor?
A I don't recall that.
Q The training that you referenced, did you

attend in person?
A It was a Zoom that I -- that I attended.
Q Did you attend in person?
MS. SHAPIRO: Objection.
THE WITNESS: The individual giving it was on Zoom so I was in person on the computer, but he was on Zoom.
BY MS. HUDSON:
Q You were in person on a computer?
A The training was remote. The individual giving the training was remote so I was in front of my computer on the training.
Q So were you -- you were not in a room with the other cast and crew; is that right?
A No.
Q Was the other cast and crew assembled in a room for the training; do you know?
A I don't know.
Q And where -- where were you physically located when you took it?
A I was at the production offices in New Jersey.
Q In an office?
A Correct.
Q And do you have any record of having

attended the training?
A I don't know.
Q Did you disclose any of the alleged incidents related to Ms. Lively to Ms. Barnes Slater?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MS. HUDSON:
Q Did you ever speak with Ms. Barnes Slater about Ms. Lively?
A I don't recall.
Q Did you ever speak with Ms. Barnes Slater about Ms. Slate?
A I don't recall.
Q Did you ever speak with Ms. Barnes Slater about any concerns on the production of It Ends with Us?
A I don't recall.
Q You have no recollection of having done so, correct?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall. I do not.
BY MS. HUDSON:
Q Earlier we talked about call recording.
A Uh-huh.

Q Have you ever recorded conversations with people in person?

MS. SHAPIRO: Objection.

THE WITNESS: I have not.

MS. HUDSON: Are you aware that Travis Flores's estate sued Mr. Freedman today for malpractice?

MS. SHAPIRO: Objection.

THE WITNESS: I am not.

MS. HUDSON: No further questions.

THE VIDEOGRAPHER: This concludes -- this marks the conclusion of today's deposition. We are going off the record. The time is 7:41 p.m.

(WHEREUPON THE DEPOSITION CONCLUDED AT 7:41 p.m.)

CERTIFICATE OF DEPONENT

I have read the foregoing transcript of my deposition and except for any corrections or changes noted on the errata sheet, I hereby subscribe to the transcript as an accurate record of the statements made by me.

_____________________________

JAMEY HEATH

SUBSCRIBED AND SWORN before and to me this ____ day of ________________, 20___.

_______________________________

NOTARY PUBLIC

My Commission expires:

REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 10th day of October 2025.



ASHLEY SOEVYN

CSR No. 12019

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Blake Lively v. Wayfarer Studios LLC
DATE OF DEPOSITION: 10/8/2025
WITNESSES NAME: Jamey Heath

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| ____ | ________ | __________________________ | ________________________ |
| ____ | ________ | __________________________ | ________________________ |
| ____ | ________ | __________________________ | ________________________ |
| ____ | ________ | __________________________ | ________________________ |
| ____ | ________ | __________________________ | ________________________ |
| ____ | ________ | __________________________ | ________________________ |
| ____ | ________ | __________________________ | ________________________ |
| ____ | ________ | __________________________ | ________________________ |
| ____ | ________ | __________________________ | ________________________ |
| ____ | ________ | __________________________ | ________________________ |
| ____ | ________ | __________________________ | ________________________ |
| ____ | ________ | __________________________ | ________________________ |
| ____ | ________ | __________________________ | ________________________ |
| ____ | ________ | __________________________ | ________________________ |
| ____ | ________ | __________________________ | ________________________ |

______________________________
Jamey Heath

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF ____________, 20__.

_____________________

_______________________ (NOTARY PUBLIC) MY COMMISSION EXPIRES:

**&**

**&** 2:21 3:5,16 4:4 5:3,13 15:21,24 16:2,5 16:7,18

**0**

**0o0** 1:3 2:3 15:3 176:3

**1**

**1** 12:7 27:6 97:10,12 283:23 314:4
**1.54** 14:8
**1/10/25** 14:8
**1/4/2023** 12:20
**10** 12:21 13:23 20:16 32:16 48:15 66:10 124:15,22 144:20 197:23 197:24 214:7 289:5 352:16 387:6
**10/8/2025** 405:3
**100** 43:6 89:8
**100,000** 357:22
**10010** 3:21
**10036** 8:9
**10049** 1:7 2:7 15:16
**10100** 6:7
**10:15** 66:16
**10:33** 66:19
**10th** 352:24,25 404:22
**11** 13:6 214:4,5
**11/10/23** 12:9
**11/12/23** 13:13
**11/9/23** 13:10
**1140** 8:7
**11580** 13:7 215:5
**11581** 13:7
**117** 12:9
**119** 12:10
**11:35** 124:24
**11:57** 125:2
**11th** 359:1,5,22
**12** 13:8 144:20 254:8,9,11
**12/19/22** 12:18
**12/24/22** 14:9
**12/9/22** 12:16
**12019** 1:23 2:25 12:5 13:5 14:5 17:13 404:25
**125** 12:12
**12:02** 359:5
**12:55** 176:1
**12th** 119:18 273:19,23 275:12
**13** 13:10 261:8 261:12,14
**13th** 117:16
**14** 13:12 23:19 273:7,15 294:17 381:12
**1401** 9:20
**140991** 13:11 261:18
**140993** 13:11 261:18
**15** 13:14 23:9 23:18 280:24 280:25
**153** 12:14
**154** 352:17
**16** 13:17 213:7 313:10,11,15 313:18 323:17
**160** 12:16
**169** 12:18
**16th** 213:6
**17** 11:6 13:18 266:8 274:5,12 275:7 276:19 277:12 278:25 279:23 288:10 296:19 315:21 315:23 316:7 316:18,20
**1700** 4:10
**173** 12:19
**17th** 8:8 234:5 313:20 316:3 317:10 318:14 319:15 321:5,9 321:17 322:18
**18** 13:18,19 43:8,21 44:4 315:22,24 316:11 317:6 324:15
**1801** 7:10
**1875** 5:16
**18877** 12:17 160:18
**18878** 12:17
**18879** 12:18 169:14
**18881** 12:18
**18th** 228:21 234:5
**19** 13:20 281:9 281:14 339:19 339:20 340:3
**1900** 9:21
**197** 12:21
**19th** 169:13
**1st** 213:17 214:2 215:4,7 215:17 216:9 218:1,13 220:8 222:17 227:24 247:1 248:2 265:8 268:19

**2**

**2** 12:9 27:6 117:6,7 145:5 264:2

**20** 13:22 21:20 28:12 95:20,21 95:22 164:8 281:9,21 347:17,22,25 383:4 403:13 405:22
**20006** 5:18
**201-0005** 7:15
**2019** 32:5
**202** 5:20
**2020** 31:24 43:3
**2022** 160:17 169:13 383:5 383:15
**2023** 36:8 37:12 37:19,25 38:5 117:16 126:1 166:20 173:10 215:4 228:21 230:6 237:21 239:4 251:22 253:12,17 254:13 260:19 261:16 273:19 273:23
**2024** 36:9 43:7 43:9,10,15,15 43:20 67:16 69:22 88:12 95:7 279:11 299:23 300:10 313:20 318:14 319:15 321:5,9 321:17 325:4 325:24,24 326:4,8,16 328:18 329:1,9 329:18 340:4 352:17,24,25 355:21,25 356:12 359:22 361:21 362:4 362:10,15,24 363:14,17,23 364:3,6,9,10,20 364:24 365:6 365:16,23 366:9 367:1,1 367:12,24 368:25 369:1 372:19 373:1
**2025** 1:21 2:24 12:4 13:4 14:4 15:2,7 76:22,22 76:25 77:1,5,7 77:8 176:5 377:23 404:22
**2029** 5:6 9:9
**2049** 2:21 4:9 15:11
**21** 14:7 352:13 352:15,18
**212** 3:14,23 8:12
**21306** 12:20 173:10
**21307** 12:20 173:10
**214** 13:6
**21st** 328:22
**22** 159:21 382:23 383:20
**22nd** 3:20
**23** 40:10,11
**23rd** 193:1
**24** 1:7 2:7 15:16 21:6 40:10,11 70:24 148:1,21 328:14
**248-5100** 6:9
**24th** 383:4,5,15
**25** 1:7 2:7 48:18 328:22
**254** 13:8
**257-4880** 8:12
**26** 28:11
**261** 13:10
**27** 28:11 126:1 198:18
**273** 13:12
**281** 13:14
**28187** 13:21 340:4
**28th** 243:16 254:13 260:19
**29** 46:7,9,12
**29th** 237:21 239:4 243:17
**2:01** 176:7
**2:58** 228:4

**3**

**3** 12:10 119:13 119:14 145:7
**3/12/23** 12:10
**30** 47:10 281:24 282:1,16 283:13,15 287:4 288:12 337:11 370:5 388:10
**30,000** 347:5 350:2,12
**303-1245** 5:20
**30th** 326:4
**31** 46:6,11
**310** 4:15 5:9 6:9 7:15 9:13
**312-4207** 4:15
**313** 13:17
**315** 13:18,19
**31st** 325:10,15 328:12,18,21
**333492** 384:22
**33491** 14:10 383:16
**33495** 14:10
**339** 13:20
**34492** 254:13
**348** 13:22
**34943** 12:7

**34948** 103:25
**34970** 12:8
**352** 14:7
**35492** 13:9
**35493** 13:9 256:19
**376-7878** 9:13
**382** 14:9
**3949** 114:4
**3:14** 314:4
**3:21** 173:13
**3:26** 228:7
**3rd** 325:24

**4**

**4** 12:12 125:20 125:21,24 145:15 173:10 285:6
**4/27/23** 12:12
**40** 46:5
**400** 9:10
[redacted] 18:15
**449** 1:7 2:7
**45** 48:16 175:22 175:23
**46126** 12:22
**46137** 12:23
**48499** 12:13 126:1
**48500** 12:13
**48501** 12:11 119:19
**49** 154:8,9
**4947** 100:14
**4:16** 273:3
**4:35** 273:6
**4th** 253:12,17 280:16 281:10 282:18 287:17 287:18

**5**

**5** 12:14 145:16 146:8 153:20 153:21
**5/21/23** 12:21
**5/28** 247:6
**5/28/2023** 13:8
**5/29** 247:7
**50** 137:1
**51** 3:19
**51120** 13:13
**51125** 13:13
**51220** 274:17
**52** 126:4,14 397:10 398:4
**55** 14:8 48:18 352:17
**5:15** 309:1
**5:42** 309:4
**5th** 7:10 279:11

**6**

**6** 12:16 47:10 160:12,13 264:13 266:14 299:23 302:1 303:6,24 370:5 383:18
**6,000** 332:7
**6/1/2023** 13:7
**6/17/24** 13:17
**60** 46:4
[redacted] 18:15
**64** 313:14
**6669** 404:24
**677** 13:17 313:20
**678** 13:17
**6:28** 352:7
**6:44** 352:10
**6th** 294:24 295:13 299:13 300:6,10 302:14,19 325:24 326:8 326:16 329:1,9 329:18

**7**

**7** 14:9 281:7 382:24 383:7 383:13,17,20
**713** 9:24
**750** 6:7
**752-4226** 9:24
**77010** 9:22
**7:24** 395:2
**7:34** 395:5
**7:41** 2:23 402:13,15
**7th** 234:7 340:4 343:23

**8**

**8** 1:21 2:24 12:4,18 13:4 14:4 15:2 169:5,6 176:5 383:18
**8/10/24** 14:8
**8/7/24** 13:20
**8/8/24** 13:22
**849-7000** 3:14 3:23
**855-3000** 5:9
**865** 3:9
**8th** 3:10 15:7 234:7

**9**

**9** 12:19 173:1,3 197:18,20,21 332:1,17
**90017** 3:11
[redacted] 18:15
**90067** 4:11 5:7 6:8 7:11 9:11
**97** 12:7
**9:12** 2:23 15:6
**9th** 160:17 261:16 262:21 263:7 274:6

**a**

**a.m.** 2:23 15:6 66:16,19 124:24 125:2 359:5
**abel** 1:10 2:10 7:3 9:3 13:21 16:24 17:6 19:12,17 70:15 70:16,18 86:15 87:21 91:12 92:2 93:12 340:6 343:22 360:23 361:19 364:2 365:10 366:7,24 367:13
**abel's** 344:4 347:15
**ability** 23:16,19 72:25 103:23
**able** 39:24 44:25 59:1 146:6,7 161:2 209:16 258:8 264:6 322:2 385:4 386:5
**above** 280:7 347:15
**absolute** 348:16
**absolutely** 96:24 138:1 143:15 164:1 239:23 241:21 296:16 387:14
**abuse** 109:16 142:9 144:12
**abused** 285:10
**abuser** 285:10
**abusive** 394:22
**accept** 29:8 167:23 169:25
**accepted** 171:16 174:1 175:11 256:16
**access** 45:10,12 45:15 186:22 314:14 395:23
**accessed** 186:24 187:2
**accommodate** 166:14,23
**accommodati...** 165:16,20,25 166:5 167:8
**accounts** 46:23
**accurate** 24:12 38:11 69:2 70:15 82:3 111:14 143:16 143:22 151:24 151:25 152:1 163:24 164:9 187:15,21 195:9 196:11 196:18 238:2 238:13 241:15 281:14,18 351:3 403:6
**achieve** 209:16
**acknowledg...** 357:3
**acosta** 10:6
**acting** 93:16
**action** 15:13 113:6 115:7,8 116:11 247:9 404:19
**actions** 285:16
**activity** 349:2
**actor** 121:25 266:14
**actors** 158:10
**actress** 156:15 156:20 158:8 167:23
**acts** 285:9
**actual** 53:19 88:5 135:25 145:17 174:16 190:16 200:2 201:19 204:4 236:12 351:8
**actually** 21:25 93:5 115:19 139:22 181:18 182:24 183:2 201:25 293:19 339:24 383:6
**ad** 138:18 200:16 202:13 203:17,20 204:4 297:7 298:10 398:22 399:6,23
**add** 79:21 165:10 326:14 326:15 351:1 388:15
**added** 324:22
**addiction** 284:13,14,18
**addition** 26:8 332:19
**additional** 48:4 258:15 333:18 333:20
**address** 18:13 18:17 171:14 268:25 320:11 341:2 398:13
**addressed** 272:6 283:15 288:8,9
**addresses** 283:13
**adequately** 72:25
**adhered** 280:8
**adjacently** 30:21 93:8
**adjust** 341:16
**admired** 23:15
**ads** 234:9,16,17 234:19 267:23

**advance** 161:2
**advice** 398:7
**affairs** 262:15
**affect** 21:2,11 21:14 123:8
**affectionate** 24:13
**affiliated** 367:14
**afforded** 140:13
**afternoon** 176:4 209:15
**age** 23:20
**agency** 126:25 127:7 128:11 128:18 140:2 329:24
**agenda** 306:23 306:23
**agent** 93:4,5,6 93:10,12 171:22 263:17
**aggressive** 293:4
**aggressively** 235:17 291:4
**ago** 21:20 22:19 23:9 25:3 27:14,16 28:12 30:10,23 34:2 95:23 128:14 159:21 253:3,9 261:6 389:22
**agree** 23:7 57:12 110:7,8 110:12 159:2 171:24 172:11 185:1,5 252:17 388:18 389:6 393:21
**agreed** 31:14 42:16 159:4 166:21 167:1 264:9 288:14 288:16,19 337:11
**agreement** 47:21 153:13 153:16 154:2 154:24 155:5 155:10,13,15 155:18
**agrees** 118:4
**ahead** 47:14 61:9 62:5 146:15 163:10 188:4 211:15 211:17 257:18 263:10 308:7 339:23 386:8 394:2
**ahouraian** 9:6 9:7 16:20,20 197:21
**ahouraianlaw...** 9:12
**aimed** 390:8
**air** 248:14
**aj** 40:4 314:13 315:11
**ajemian** 129:1 130:22 131:5 131:14 132:10
**al** 1:8,13,15 2:8 2:13,15 12:3 13:3 14:3 15:14
**album** 29:3,4
**albums** 28:1
**alcohol** 21:5,7 21:8
**alex** 12:9,9,10 117:16 118:5 119:17,22,25 130:10,21 131:4,14 132:10 202:22 202:25 209:13 210:20 211:19 212:19 213:23 226:12,12 229:10 235:8,9 235:11,21,23 235:24 236:7 237:10 238:15 240:24 241:2 242:14,16,17 399:4,5
**alex's** 236:9
**alexandra** 8:4 17:1 125:22
**aligned** 41:18 80:6 358:24
**allegation** 79:16
**allegations** 89:21 114:11
**alleged** 207:24 315:2 323:4,5,8 323:12,20 324:9 330:11 401:3
**allow** 73:13 160:21 254:16
**allowed** 83:21 118:3 145:15 309:10
**allows** 44:15
**ally** 252:18
**amenable** 120:20
**amended** 13:14 198:17 280:20 280:23 282:11
**americas** 8:7
**amidst** 221:6
**amount** 256:3 325:17 350:15
**andrea** 118:4 129:1 130:12 130:22 131:4 131:14 132:10

**andrew** 37:15 117:17
**andy** 117:16
**ange** 20:2 209:12 210:20 211:19 212:18 227:10 232:4 235:8 236:5,5 237:9 242:11 243:13,19 244:9 246:12 248:9,17 249:5 252:16 254:6 268:12 293:3 314:17,25
**ange's** 235:22
**angela** 38:3
**angeles** 1:20 2:22 3:11 4:11 5:7 6:8 7:11 9:11 15:9,11 18:15 21:23 83:5,6,15 86:20 86:23 87:2,11 87:13,19,22 91:25 92:3,5
**anne** 204:17
**announce** 73:16 75:6 88:20 94:1
**answer** 61:5,9 64:18 65:1 78:20,23 79:2 97:24 98:23 99:18 108:25 131:23 139:8 169:21 175:16 200:11 211:8 211:11,13 309:16,23,25 310:1,5,10 311:4,9,11,14 311:20,24 312:5,8,19,21 312:23,23 313:3 348:21 369:14,20 385:7 386:1
**answered** 139:3,6 147:12 188:13 310:12
**answering** 188:12
**answers** 62:1 369:24
**anti** 100:19,19 100:20 102:7 116:1 152:7
**anticipate** 48:5 48:25 54:19 55:6
**anybody** 63:25 79:12,23 85:1 131:12 132:8 138:23 237:3 254:5 265:2 269:13 293:11 350:20
**anybody's** 223:5 265:3
**anymore** 45:6 98:17 117:9 226:23 227:20 286:24 288:4 294:20 391:17
**anyone's** 29:24
**anyways** 34:9
**apart** 377:10 377:15
**apartment** 30:1 279:13 280:15
**apologies** 269:10 339:7
**apologize** 165:13 250:2 290:21,21
**apologized** 249:24 284:9
**apologizer** 269:15
**apologizing** 249:19
**apology** 228:18 229:4 230:25 231:10 269:4
**app's** 375:12,15 375:21
**apparently** 154:22 174:15 242:13 314:19
**appeared** 212:3 251:8 293:5
**appears** 100:5 161:19 170:8,9 347:10
**applied** 135:10
**applies** 102:18 103:15
**apply** 135:3
**appreciate** 153:1 357:14 357:15 359:6
**approached** 189:5 209:18
**appropriate** 57:24 58:6 113:5 114:22 115:7 184:20
**approve** 280:6 350:13
**approving** 41:13
**april** 126:1
**arato** 8:3 17:2
**areas** 160:24
**argue** 105:7 111:18
**arguing** 255:23
**argument** 145:23 390:25
**arisen** 330:19
**arising** 229:9
**arose** 269:10
**article** 72:16
**articulate** 90:6 90:10,14,15,23

93:23 170:14
**articulated** 121:13 122:17
**articulating** 94:12 121:11
**artist** 171:13
**artists** 22:25
**as000008** 117:17
**as8** 12:9
**ashapiro** 8:10
**ashley** 1:23 2:24 12:5 13:5 14:5 17:12 404:2,24
**ashmi** 37:5 148:19 149:4
**aside** 41:18 105:10 155:25
**asked** 30:24 31:7 50:13 80:18 130:17 131:23 132:5 147:7,21 152:17 160:6 170:1 189:10 190:4 191:16 194:18 195:15 195:24 196:6 196:10,12,16 196:18 206:23 211:1,8 218:25 223:16,20 231:23 237:3 257:15 316:2 317:7 319:2 321:21 324:4 327:21 353:5 365:8 383:24 398:10
**asking** 35:4 90:13,14 108:12,13,16 111:4 160:24 161:16 162:18 169:15 170:16 188:25 195:2 211:10 240:23 241:2,17 245:22 254:22 255:4,5,10,20 258:2,3 260:8 260:11,11,22 270:23 277:2,3 277:20,24,25 285:21 286:24 286:25 302:8 306:12 314:23 319:13 324:7 346:6 348:19 374:25 385:5 385:13,16
**aspect** 216:9
**aspects** 55:3 318:15
**assembled** 374:23 375:1 400:16
**assets** 341:17
**assist** 273:9 349:1 353:24
**assistant** 40:3,3 40:5,7,12,13,18 40:20
**assistants** 36:24
**assisted** 324:16
**assisting** 40:23 136:12
**assists** 39:13
**associate** 148:4
**associates** 142:9 144:11
**assume** 266:3 323:24
**assumed** 346:15
**assuming** 155:22
**attached** 262:4 325:18 327:3 327:15 328:16
**attaching** 270:9
**attachment** 261:16 316:13
**attempt** 264:17
**attempts** 209:15
**attend** 282:7 400:1,3
**attended** 56:10 396:10,14 400:2 401:1
**attention** 100:13 103:25 158:15 254:22 373:19
**attorney** 3:18 5:5 6:6 9:8,19 15:19 110:24 310:16 312:16 404:18
**attorney's** 311:17 312:2 312:11,14
**attorneys** 3:8 4:8 5:15 7:9 8:6 173:20 255:17 272:10 272:15 273:8 273:10,13 309:7,13,17,20 310:3,6,24 311:12,15,19 311:22 312:6,9 312:20 313:1,5
**august** 67:16 69:22 70:23,24 325:24,24 326:8,16 329:1 329:9,18 340:4 343:23 352:16 352:24,25 355:21,25 356:12 359:1,5 359:22 361:21 362:4,10,15,20

362:24 363:9 364:18 365:15 365:23 366:9 366:14,17 367:1,12,24 368:25 372:19 373:1
**authenticate** 155:2
**authorized** 201:12,16 202:2,17,21 203:14 333:5
**authorizing** 139:17 203:4
**auto** 369:9,17 371:4 372:20 373:22,22
**automatic** 372:10 373:6
**automatically** 141:17 362:24
**avenue** 3:19 8:7 59:10
**aversion** 142:25
**aware** 76:21 77:4,7 113:1,11 113:14,19 118:4 121:19 121:20 137:5 151:12 176:12 176:16,18 191:21 226:14 242:3,7 246:23 249:7 250:24 269:6,7 321:3,9 321:15,19,20 321:20,21,24 322:3,5,7,18 350:1 370:9,12 370:16,18,22 371:17 380:18 381:14 382:9 382:15 395:14 402:5
**ayoub** 142:2,5 142:6 143:10 143:17 144:1,4 144:9 147:16 147:20 148:10
**ayoub's** 142:14 142:18

**b**

**b** 47:10 340:7 370:5
**baby** 178:13,15 178:16,20 179:4,24,25 180:12,12 182:19,21,24 183:2,7,20 189:18 192:15
**baby's** 180:2
**bach** 8:3,5 17:2 72:23 386:25 387:8,13,17 388:5,17,21,25 389:3,8,12,16 389:20 390:13 390:18 391:3,7 391:12,15,24 392:6,13,18,23 393:1,8,11,15 393:20 394:3,5 394:7
**back** 46:9 49:16 66:18 69:20 84:3 125:1 135:14 138:3 156:2 163:15 176:6 185:8 187:7 197:22 209:21 211:22,25 212:14 214:22 219:10,13 228:6 230:3 235:19,20 237:10 244:12 248:14,15 250:6 263:13 265:13,20 266:22 271:6 273:5 279:6,17 292:2 293:6 309:3 314:12 314:24 352:9 381:22,23 382:5 387:6 390:3 395:4
**background** 23:5 79:4 341:18
**bad** 124:3 159:9
**baha'i** 22:10,12
**baker** 204:17 204:22 206:10 208:11,24 209:4
**bal** 191:15
**balance** 303:18
**baldoni** 7:3 8:2 9:3 10:5 12:17 12:18 14:10 16:23 17:7 21:19 22:15 25:14,22 26:10 26:20 27:20 76:20 77:3 94:19 95:20,25 121:22 122:12 142:1,8,9,12 143:24 144:11 144:12,18 146:19 147:21 148:6 149:1,14 149:18 150:17 151:5 157:2 158:22 160:17 160:18,20 161:18 164:12 168:23 169:11 169:13,14,24

170:10 177:17 178:3 190:11 193:13 195:18 195:23 214:15 225:5 228:10 229:4 230:7,9 231:23 238:12 242:21,23 248:6 253:24 254:12,15 256:20 257:8 259:12 269:3 272:11 273:18 274:20 275:7 277:11 284:12 285:15 286:1 290:25 298:25 302:13 305:10 305:14 306:1 328:5 331:19 338:2 362:14 378:7,8 379:17 383:4,15,16 384:4,11,18,22 385:24
**baldoni's** 19:19 19:21 40:25 56:10 93:11 145:10 157:15 166:10 228:17 236:18 250:14 258:14 274:3 284:17 306:18
**banned** 149:9
**bar** 191:4
**barely** 19:18
**barnes** 38:8 39:6,12,15 395:8,14 396:22 397:1 397:12,20 398:3,12 401:4 401:9,12,15
**based** 44:15 48:9 49:1,3 73:1 102:13 149:5 172:22 174:23 349:2 377:10,15
**basic** 46:11 141:22
**basically** 47:18 377:13
**basis** 80:7 298:5 398:20
**bates** 12:7,9,11 12:13,15,17,18 12:20,22 13:7,9 13:11,13,17,21 13:23 14:8,10 67:24 98:10 100:14 117:17 119:19 126:1 154:7 160:18 169:13 173:10 215:5 254:13 261:18 274:16 274:16,17 313:20 340:4 347:24 383:16
**beautiful** 189:21,25 191:8
**becoming** 22:22 27:22
**began** 150:9 156:6 280:16
**beginning** 2:22 45:5 53:14,21 55:7,10,13,14 70:23 192:17 264:2 281:17
**begins** 100:23
**begun** 80:10
**behalf** 2:19 15:15,21,24 16:2,5,7,9,12 16:18,20,22 17:2 73:1 93:17 382:10
**behavior** 57:25 58:7 106:11 111:24 149:20 222:11 236:18 241:10 277:14 306:4
**behaviors** 107:23 108:4 110:13 112:2
**belief** 159:25 324:8
**believe** 20:24 24:11 25:13 43:1 45:14 46:6 51:24 58:19 59:2 64:9,9 67:16,17 69:25 71:2 74:15 76:13,16 80:11,22 81:24 83:4 84:25 86:16,19 87:12 88:9,13 90:16 90:16 91:11,11 91:14,17 92:19 92:22 94:18,20 95:1 96:14 104:23 105:1 115:23 125:8 134:7,10 135:18 138:25 148:23 149:11 158:9,14,22 168:21 170:4 173:25 175:11 175:16 177:2 177:15 179:12 179:14,24 181:2,7 184:7 191:3 192:25 198:15 199:24 200:5,16 210:23 214:3 224:20 230:15 232:1 234:4

242:11,11 243:12,16 244:9,10 253:19 262:21 268:8 272:5,8 279:11 284:20 287:22 291:15 291:17 295:17 295:21 296:6 325:12,12 327:9 328:2,25 334:6,7 336:12 337:11,16,17 338:14,21,22 338:23 339:6 339:10,12 340:16 342:22 343:15,18 344:5 349:17 349:21 352:3 354:15 355:9 361:9 363:11 363:16 367:23 369:11 373:14 374:1,11,22 375:2,14,18,22 377:16,20 396:12 397:15 397:20 399:3

**believed** 89:21 158:23 189:2,2 379:9,18

**believes** 143:25

**belittlement** 291:7

**belittling** 290:7 290:11

**bender** 5:14

**benefit** 145:7

**benson** 7:7 16:17,17

**best** 19:10 21:17 23:23,24 23:25 24:2 25:8,9 26:8 30:12,13 41:9 79:2,8 85:13 102:3 103:23 105:14 122:7,9 146:15 157:5 157:11,18,21 157:22 158:2,3 170:14 173:15 244:6 256:8 258:21 261:2 312:4,13 315:4 327:24,24 354:8

**better** 23:3 237:19 240:19 240:20 356:10

**beyond** 27:19 53:19 62:11 65:15 185:2,3 323:17 358:22 368:14 399:18 399:20

**bfreedman** 7:12

**big** 38:14 158:17 302:25 314:3 320:17 320:19 357:15

**biggest** 162:16 163:23

**birth** 176:11 177:18 178:7,9 180:21,24 181:4,16,19 182:9,10,14,16 183:11 185:9 186:2,11,25 187:1,2,14 190:23 197:6 215:12,19 225:8 246:14 304:3

**birthing** 177:11 178:4 180:6,7 182:12 185:19 190:16 193:4 197:6 198:13

**bit** 26:3 29:17 42:9 56:13,15 62:23 102:6 112:18 145:21 190:14 237:18 248:13 299:20 300:3 307:2 309:21 310:13 330:16

**bl** 12:20 13:7 173:10 215:5 280:4,9 284:1

**bl's** 264:19 280:5

**bl0000049** 154:7

**bl1** 12:15

**bl140** 12:15

**black** 153:7,8 164:8

**blackmon** 40:17

**blake** 1:5,15 2:5,15,19 4:3 5:2 6:3 10:4 12:3 13:3 14:3 15:13,22,24 16:3 93:23 162:13 163:20 164:7,24 165:5 165:13 167:22 168:20 173:9 189:6 190:20 191:7 192:2 194:4 196:14 213:22 214:3 244:16,25 246:13,24 249:6,17 252:15 258:19 260:22 263:18 264:1,6 268:23 298:10,15

299:8 300:1 303:14,16 304:18 314:13 314:22 315:13 320:17,20 405:2
**blake's** 297:7 314:24 322:22 322:25
**blanks** 275:21
**bless** 204:18
**blindly** 335:14
**block** 40:8
**bloom** 156:15
**blvd** 6:7
**body** 109:21 110:20 222:20
**bolster** 79:15
**book** 377:10,12
**boosting** 341:12
**born** 182:3
**borrowed** 87:25 88:1,6
**boss** 26:11
**boston** 166:11
**bottom** 100:14 126:2 128:25 173:11 211:19 340:5 349:24
**branch** 175:12
**breach** 13:15
**break** 45:24 66:10 124:15 175:21 226:15 228:2 308:22 309:7,18 310:7 310:18,24 311:7,12,15,22 312:6,17 313:2 386:18 387:6 389:11,21,23 390:3 391:11 391:11 393:24 394:15,19
**breaks** 390:1 392:9 394:9
**breanna** 20:17 340:7
**breast** 207:9
**breastfeeding** 211:23
**breasts** 178:19 205:12 208:5
**brian** 37:9 44:1
**brief** 250:7
**briefing** 261:22
**brilliant** 111:12
**bring** 32:21 59:9,10,20 157:4,17 158:15 180:13 222:18 223:10 256:12 308:16
**bringing** 121:19 122:23 145:24 225:6 349:17
**broad** 201:4
**bros** 28:20
**brother** 24:5 26:9
**brought** 22:20 34:3 54:4 130:14 215:11 215:18 218:23 219:4 243:2 284:3,8 293:12 293:13 399:6 399:22
**brunch** 237:21 239:1,4
**bryan** 7:6 16:22 377:17 379:16
**bts** 349:14
**buck** 35:23
**bucket** 41:20 42:7,8
**buckets** 41:7
**budget** 46:11 144:4 145:8,15 146:3,7 167:20
**budgets** 145:6
**build** 42:14 315:16
**building** 42:9 53:19 127:24
**bullying** 152:5 152:9,10
**bunch** 244:1
**business** 42:13 42:15 45:4 54:25 80:5 133:22,23 355:2
**businesses** 134:1
**busy** 211:24

**c**

**c** 3:1 4:1 5:1 6:1 7:1 8:1 9:1 10:1
**calendar** 314:14
**caliber** 30:1
**california** 1:20 1:23 2:22,25 3:11 4:11 5:7 6:8 7:11 9:11 15:10,11 17:12 18:20,22 38:23 39:2 88:11 404:3,21
**call** 22:24 67:24 68:7,20 69:4 70:5,11,13,15 70:19,22,25 71:5,8,14,17,24 72:1,21 73:8,21 74:1,2,5 77:21 77:22,25 78:12 78:16 79:1,18 79:20,22,23

80:7,8,10,11,12 81:6,11,13,21 81:23 82:1,5,8 82:12,17,19,23 83:10,19 84:2,7 84:14,18,23 85:17,19,20 86:1,3,7,13,17 88:2,10,14,15 88:21,24 89:2,3 91:1,1,7,10,12 91:22 92:5,25 93:20,24,25 94:2,21 99:2 126:13 138:18 138:24 139:1 140:14,23 141:15,18 199:3,6,9,18,21 199:23 200:3,9 202:5,11 203:1 203:4,10,22,24 204:3 230:6 231:6,9 238:15 244:11,15,21 245:17 246:11 344:16 353:6,9 354:6,12 392:14 401:24
**called** 31:1 140:12 214:1 236:22 238:12 244:9,10 253:25 305:10 353:10
**calling** 82:10 93:21 356:9
**calls** 66:22,25 67:4,11,14,18 67:25 68:8,14 68:14,19,24 69:20,21 70:3 80:25 81:8 85:3 88:16 92:10 93:9 95:2 245:13 310:2 350:11
**calof** 37:15 230:7
**capabilities** 336:3
**capable** 367:20 367:21
**capacities** 53:14 137:19 320:9,12,15
**capacity** 47:11 49:13 51:3,9
**capture** 235:6
**captured** 235:2
**car** 71:4 199:22
**cardon** 38:3
**care** 23:16 388:6
**cared** 23:17
**career** 27:22 28:3 29:7
**careful** 79:14 111:13
**carroll** 204:17 204:22 206:10 208:11,24 209:4
**case** 1:7,7,7 2:7 2:7,7 13:21,23 15:15 19:6 20:15 42:20 75:23 122:11 130:16 140:7 140:14 147:20 179:2,5 183:23 186:7 202:21 221:16 340:5 344:1 347:23 351:3 372:6 378:22 379:24 387:23 388:3,8 390:5 394:12 394:17 405:2
**cash** 44:11
**cast** 56:17,20 56:24 57:23 58:5,11,18,25 133:9 167:14 202:14 280:10 395:21,24 396:5 398:13 400:14,16
**casting** 156:6 158:14 159:18 159:24
**cat** 168:12
**catch** 303:1
**categories** 65:5 101:11,15,23
**category** 64:13 102:14
**cause** 160:5 234:15
**causing** 107:8
**caution** 98:6
**ce** 63:24
**cease** 371:19,24 373:4
**celebrity** 42:11
**cemetery** 209:18
**century** 4:9 5:6 7:10 9:9 15:11
**cenury** 2:21
**ceo** 27:23 34:5 34:25 35:21 41:5 63:2 64:2 66:7 133:8,13 134:14 135:16 136:16,19,24 137:1,13,14,17
**ceo's** 133:14
**certain** 44:19 63:12 82:7,8 111:8,24 146:3 234:13 286:12
**certainly** 111:17 161:6 165:11 237:14

284:14 320:16 328:21 332:16 346:12 365:2 379:23
**certainty** 82:5
**certificate** 403:1 404:1
**certified** 2:25 404:2
**certify** 404:4,17
**cetera** 274:25 274:25 275:1
**cfo** 36:16 37:9 41:4 151:6
**chain** 117:15 126:11 160:16 160:19 161:17 162:7,8 169:9 169:12 173:8 227:14,15 254:11,14 273:17,23 274:5,12 313:18,21 314:2 340:3,5 347:22 348:3 352:15 353:3 360:22 361:10 383:3,14,25 384:3,9
**chair** 122:2 191:5 232:3 235:15
**chairman** 34:22
**chairmen** 36:1
**challenges** 298:11
**challenging** 233:12 303:15
**chance** 376:16
**change** 48:24 173:25 175:10 362:18 405:5
**changed** 29:16 30:4 39:3 328:25
**changes** 303:17 329:9,17 403:5
**chaos** 78:7
**characteristics** 101:23
**characterizati...** 110:16
**characterize** 330:14
**charge** 140:5 152:8
**chatter** 148:1,3
**check** 214:18 356:7 357:10 367:14
**checking** 357:16
**chicago** 71:2,3
**child** 182:3 183:11 246:14 292:24 293:1
**childhood** 49:18
**choice** 165:24 235:7
**chose** 350:16
**chris** 281:16
**chronological** 315:4
**chronologica...** 315:15
**church** 22:5,6 22:10,11
**circle** 25:11
**circumcised** 286:2
**circumstances** 24:22 108:3 111:9 201:15 236:13
**city** 83:3
**claim** 116:8
**claimed** 149:18 377:14
**claiming** 194:18 224:6
**claims** 13:16 151:4 380:4 390:5
**claire** 142:2 145:3,18 146:13
**clarification** 22:7 76:7 346:21
**clarify** 217:15 218:14
**clarifying** 346:23
**clarity** 217:18
**clear** 31:3 34:5 35:4 45:20 47:10 50:17 60:25 61:4,10 61:11 64:22,25 78:9 146:5,17 168:11 170:7 174:22 185:2 210:9 211:18 218:10 248:13 271:13 282:20 287:3,12 299:12 302:17 302:18 310:20 350:24 370:5 389:22 392:8 394:8,15
**clearly** 48:17 146:9 235:4 390:6
**clergy** 22:12
**client** 267:11 270:3,8 310:16 379:10 380:4 387:22 394:12 394:21
**clients** 175:13 268:3

**climaco** 4:7 16:1,1 125:22
**close** 22:16,22 23:23 25:5 26:10 249:5 314:10
**closed** 198:13 198:15,19,21 199:2,8,16,21 199:24 200:2,6 200:8,12,19,23 201:3,5,8,11,12 201:16,23 202:16 203:11
**closely** 23:12
**closing** 150:9
**clothed** 180:8 205:4
**clothes** 222:21
**club** 25:24
**coach** 391:16
**coaching** 41:21 41:21 98:14 99:7,9 390:17 390:18,22 391:18
**code** 336:16,17 336:18,19
**coffee** 21:12,13
**collaborate** 170:13
**collate** 341:17
**colleen** 20:2 168:20 294:4 295:17
**college** 95:25 96:5,8,20,22 97:1
**combative** 111:11
**combination** 134:4
**come** 30:11 32:21 39:20 46:23 49:1 60:10,14 89:7 103:20 120:12 146:7 148:7 156:2 171:25 172:14 174:2 189:18 192:25 205:18 206:3 208:4 210:22 211:21,24 212:1 225:9 230:3 258:19 265:12,20 279:5 287:23 293:24 300:22 335:1 338:20 338:22 351:3 387:6
**comes** 46:22 53:25 102:21 191:6
**comfortable** 58:12 189:13 220:9
**comfy** 226:25 227:22
**coming** 48:5 55:20 119:24 166:16 173:23 182:19 222:19 244:11 263:18 275:17 304:10 319:21 351:7 382:17
**comma** 104:23
**commen** 105:8
**comment** 161:3 195:4 245:24 245:24 247:18 251:14 306:5,7 306:9
**commentary** 79:7 99:6 105:8 109:20
**commenting** 110:20 286:15
**comments** 248:19,20 257:3,13,20 258:4 259:5 260:4,13,20 286:8
**commission** 403:20 405:25
**commit** 170:23 263:18
**committed** 44:14 45:7 101:7
**communicate** 168:24 359:21 360:7 362:9,14 363:13,22 364:2,5,8,19,23 365:4,10,14 376:1
**communicated** 205:17 253:11 253:11 349:11 362:3,8 363:17 370:16
**communicating** 346:9 349:5 360:13 361:20 361:24 365:5
**communication** 174:10 313:25 352:20 353:2 384:12,19
**communicati...** 37:4 309:20 310:2 351:7 365:22 366:23 367:12 368:1 368:18 373:1 373:25
**community** 42:15
**companies** 28:1 28:15,21 38:16
**company** 28:17 28:22 30:14

31:2,11,20 32:10 34:7,10 34:17 35:2 38:13 44:20 102:19,22 103:10 128:22 129:13,15,18 171:23 370:7 374:23 375:1
**competition** 29:23
**complained** 252:16
**complaint** 13:14 88:11 95:6,14 126:3 126:15 151:8 176:25 177:1 198:17 213:12 213:15 268:21 271:11,12,13 272:1 280:20 280:23 281:21 282:3,11 294:1 328:11,19 370:15,20 371:1,10,13 397:4,7,9,18,21 398:4,8
**complaints** 149:19 150:22 150:22 151:5 151:13 152:18 237:22 238:1 239:11 267:11 268:3,7,14 286:9,14 320:5 399:6
**complete** 45:21 61:9 179:18 325:15 326:3,7 326:18 327:9 328:10
**completed** 325:6,9 326:22
**completely** 143:16 152:4 196:25
**composer** 27:25 49:14
**computer** 30:2 92:15,22 400:6 400:9,12
**concepts** 23:2,4
**concern** 59:8 59:21,21 60:5 61:1,10 62:14 63:4,19 64:14 65:4 72:18 74:17,17 89:13 121:4 131:13 132:9 160:6 190:3 213:18 271:5 354:19 354:23 379:8 379:16 380:3
**concerned** 60:6 60:8 72:6,11,14 72:25 79:16 80:4 84:1 148:2 210:8 296:12 305:14 358:21 394:9 394:10
**concerning** 267:10
**concerns** 57:14 58:12 59:25 60:9,10 61:16 130:13 133:10 139:2 140:14 140:16,17,23 213:13 224:21 225:17 238:17 239:3 242:4 260:13 267:25 269:10 305:15 320:21 321:4 321:10 322:11 322:17 330:24 335:10 392:8 398:14,21 399:10,16,22 401:16
**concessions** 168:15
**concierge** 10:6
**concluded** 402:15
**concludes** 402:11
**conclusion** 402:12
**conclusions** 114:18
**concur** 165:2
**condition** 106:2 165:24 166:4
**conditions** 263:4
**conduct** 59:3 103:9 105:24 106:1,3,12,19 106:21 107:12 112:10 113:11 113:15 142:24 276:2 291:24
**conducted** 149:24 394:17
**confidence** 73:3
**confidential** 1:17 2:17 15:1 17:9 273:11
**confirm** 43:13 119:10 134:12 160:21 280:6 340:21
**confirmed** 378:25
**conflict** 59:13
**conflicted** 122:14
**conflicting** 243:25

**confused** 152:13 182:1 263:21,22 319:22
**confusing** 238:5 292:23
**confusion** 230:16
**congrats** 357:15
**conjunction** 341:18
**connect** 265:7
**connected** 22:25 349:21 357:17 358:3 366:8,25
**connection** 291:10 294:4
**conscious** 94:6
**consciously** 84:10
**consent** 187:13 190:5 285:9,16
**consider** 55:12 122:24 123:5 133:17 135:16 136:2 293:8
**consideration** 62:20
**considered** 29:25
**considering** 190:22 278:8
**consistent** 146:18 241:3 354:1,18
**consolidated** 1:14,15 2:14,15
**constant** 127:23
**constantly** 234:25 298:13
**constitute** 110:4,9 111:9
**constitutes** 271:10
**constraint** 170:23 234:12
**consult** 272:24 315:5 335:11
**consultant** 38:17
**consultation** 30:25 32:22 331:15 333:1 353:21
**consulted** 30:22
**consulting** 171:13
**consumed** 21:5
**contact** 72:15 79:12 102:21 103:20 223:17 223:21 226:22 227:19 263:17 301:14 398:11
**contacted** 74:15
**contacting** 79:25
**contained** 267:20
**contemplated** 158:16
**content** 85:20 341:13 373:20 394:15
**contention** 331:7
**contentious** 72:5
**context** 21:21 64:18 111:15 161:4,14 172:18 177:6,9 187:11 193:14 194:4 197:1 221:14 244:5 254:24 255:8 257:16 258:12 258:15
**continue** 44:24 45:1 99:1 104:21 146:4 286:20 315:16 392:7 393:22
**continuing** 46:25
**contract** 13:15 28:18 44:18 48:2 53:16,17 103:19 140:1 145:4 266:13
**contracted** 357:21
**contractor** 335:23
**contractors** 103:16 335:23
**contracts** 46:21 47:23 48:24
**contractual** 46:13
**contribute** 145:14
**control** 41:15 49:3 203:9 298:10
**controller** 36:23
**conversation** 79:15 96:17 117:25 118:8 118:11,12,23 120:22,24 142:11 143:5 146:2 178:3 189:1,23 190:15 191:19 191:20 195:21 209:23,24,25 210:3,10 212:6 212:14 213:16 213:20,22,25

216:23 223:23 237:13,17 238:6 239:3,7 242:14,16,17 243:19 244:16 244:24 246:24 247:20 248:3 248:11 249:4,6 249:17 250:8 254:6 259:9 289:8,22 293:19 299:14 300:13 354:25 355:18 356:4 358:1,3 364:13 364:16
**conversations** 73:2 190:20 197:2 239:22 247:14,17 268:14 293:3 298:24 299:4 306:25 319:19 343:1 349:3 350:10,19 351:14 355:12 355:15,17 356:3,11 357:9 357:19 358:4 402:1
**conveyed** 149:4 267:12 268:4 271:25
**convince** 212:20
**convo** 314:18 314:22,24
**coo** 33:4,10,11 33:13,21 34:5
**cool** 248:10
**cooley** 7:5 16:18
**coordinator** 288:15
**cop** 223:19
**copied** 117:18 273:19 343:25
**copies** 395:20
**copy** 174:16
**copyright** 377:9
**corporation** 38:14
**correct** 18:11 19:21,22 20:4,8 22:16 23:10 26:21,24 33:12 37:6,8,10,17 46:7,18 48:2 49:9 50:18,22 50:24,25 53:24 54:9,14,17 56:1 56:8,9 67:12 68:22 69:13,23 70:21 77:9 85:25 86:21 92:1 93:13,15 100:7 105:16 115:18,21 116:1 120:17 121:23 122:5,8 125:6,16 126:10,16,17 126:20 128:18 129:23 132:23 133:3,16 134:15 136:6 150:15,17 156:7 158:8 159:9 165:23 166:11,14,15 167:2 170:18 171:17 174:18 174:20 175:9 179:20 184:24 185:22 193:3 197:12,15,16 200:10 205:25 207:23,25 215:2,3 218:9 229:18 231:4 231:17 243:6,8 247:2,3,4 248:18 259:7 262:17 295:2 295:15 296:5 297:11,16 307:13 310:11 313:25 316:3 318:8,19,21 319:3 320:21 321:5,10,17 322:4,11 325:11 326:8 327:23 328:11 328:19 329:2 329:10,18 330:12,19,25 331:20 332:23 333:12,14 341:3 353:6 367:15 373:2,7 373:8,10,11 377:7,11,18 397:11 400:24 401:20 404:15 404:22
**corrections** 403:4
**corrective** 113:6 115:6,7
**corrects** 164:21
**corroborated** 170:6
**cost** 332:7,16 337:5 350:12
**costing** 331:25
**costs** 263:13
**counsel** 47:10 66:10 68:4 78:19 98:8 124:14 146:25 262:11,12,16 266:22 272:24 273:8 278:13

380:22 381:17 381:18 389:22
**counsel's** 381:4
**counting** 388:19
**couple** 28:20 96:3 182:12,15 193:9 223:16 253:2,8 288:6 290:14 297:2 299:4 325:22
**course** 19:19 23:22 34:21 35:14 41:17 42:11 45:7 171:8 189:12 190:10 247:9 274:22
**court** 1:1 2:1 99:2 117:10 273:14
**cover** 180:14 261:24 267:2,4 267:5,20 283:16
**covered** 178:13
**covering** 178:20
**covid** 213:24 219:10 224:21 226:9 244:12 244:17,19,19 248:15 259:24 267:23 268:24
**coward** 290:19
**coworkers** 103:12
**cozy** 226:25 227:22
**craft** 168:24
**crafting** 252:20
**crd** 88:11 95:6 95:13 176:25 177:1 213:12 213:15 293:25 328:11,19 370:14,20,25 371:10,13
**create** 128:5 317:7,10 318:13 319:3 319:14 324:20 325:1
**created** 324:14
**creating** 106:7 107:9,10 324:17
**creative** 32:20 34:21 38:2 41:14,19 42:12 136:12 230:8
**creatively** 54:25 303:18
**creativity** 32:21
**credit** 45:11,13 45:14 50:16,17 51:21 52:6,6,8 52:9 53:15,18 54:6,8,11,14,21 171:20,24 172:12 173:24 175:9
**credits** 51:16 51:17 54:7
**crew** 56:18,21 56:24 57:24 58:6,12,18 59:1 120:19 133:9 202:14 203:25 280:10 395:21 395:24 396:5 396:12 398:13 400:14,16
**cried** 293:16
**crisis** 330:23 331:25 333:18 334:15 335:6 335:10 336:19 337:1 345:9 353:20 376:14
**critical** 307:23
**cross** 381:5 382:1 387:10 388:7 391:8 392:22
**crossroad** 31:20
**crowning** 182:19
**cry** 288:4
**crying** 179:25
**csr** 1:23 12:5 13:5 14:5 404:25
**culture** 42:6
**curious** 297:3 358:18
**current** 40:11
**currently** 18:12
**customary** 353:14
**customers** 103:16
**cut** 174:11 305:18,22 392:13
**cv** 1:7,7 2:7,7 15:16
**cynthia** 38:7

**d**

**d.c.** 5:18
**daily** 34:19 36:1 72:8,16 74:15 80:1
**dan** 10:6 92:2
**danced** 240:18
**dang** 37:5
**danni** 81:7 82:11,17 83:14 87:9,10
**danny** 20:5 86:12 87:16,17 91:7,16 93:3,11 93:21

**date** 12:19 13:6 14:7 25:14,19 46:3 148:14 166:21 192:24 193:1,7,8 228:23 233:16 233:17,21,23 279:10 315:1 323:4 325:8,10 327:9 405:3
**dated** 12:9,10 12:12,16,21 13:8,10,13,17 13:20,22 14:9 25:17,22 26:6 117:15 119:18 126:1 160:17 169:13 173:9 215:4 254:12 261:15 313:19 340:3 352:16 383:4 404:22
**dates** 26:3 295:4 314:10 325:22,25
**daughter** 181:8 181:9,10,11,12 184:11
**davis** 117:16
**day** 30:25 34:11,11,11,13 34:13 53:23,23 85:12,12 187:7 197:5,6,12,13 197:15 198:13 198:15 199:9 199:16,21,22 202:16,18 209:9,20 210:2 210:6,7,16 212:9,13 213:4 213:15 245:15 262:21 263:19 280:16 294:22 403:13 404:22 405:22
**daylight** 15:6
**days** 19:18 193:9 200:5,8 203:10 275:14 298:8 300:2 303:13
**de** 273:10
**dead** 293:13 380:16 387:22
**deal** 41:13 47:20 173:21
**dealing** 128:6 170:22 234:11 263:9 297:9,11 303:20 319:18 344:12
**deals** 34:20 41:10 47:24 48:21
**dear** 122:9
**debate** 193:15
**december** 88:12 95:7 160:17 169:13 328:22 365:16 365:23 366:9 366:14,18 367:1,12 369:1 372:19 373:1 383:5,15
**decided** 26:23 44:24 191:2 292:11 392:25
**decides** 26:15 26:21
**decision** 65:6 65:24 171:2 190:25 293:20 332:22,25 333:3 344:15
**declaration** 142:6,15,19,21 143:11,15,18
**declare** 404:20
**decorators** 204:2
**deduce** 260:9 260:11
**deeply** 267:9
**defamation** 13:16
**defendant** 1:12 2:12 10:5
**defendant's** 378:24
**defendants** 1:9 1:15 2:9,15 7:2 9:2,15
**defending** 74:18 392:16 392:24 393:19
**defends** 351:1
**defenses** 390:5
**defer** 202:21,23 391:24
**deferred** 130:10,20 133:25
**definitely** 281:4
**definitively** 146:13
**degree** 89:6 303:10
**delete** 369:9,18 369:19 370:9 370:12,19,25 371:4 372:4,5 373:22
**deleted** 366:5
**deletion** 369:23 370:3 372:10
**deliberately** 73:15
**delicate** 171:12 171:13,14
**delivered** 182:21,24 183:2,7

**delivery** 182:7 182:17 183:11
**demands** 297:7
**demonstrate** 61:14 171:25 172:14 174:3
**demonstrated** 174:25
**denigrates** 142:25
**deny** 74:25
**department** 57:9,11 116:19 116:24 126:14 136:13
**departments** 129:4 138:9 204:1
**depending** 47:18 108:3
**depends** 55:9 60:2,9 111:16 363:2
**depict** 179:22 190:19
**depicted** 181:21 182:8
**depicting** 183:1
**deponent** 16:23 390:9 403:1 404:14
**deposed** 18:24 389:24
**deposition** 1:19 2:18 15:1,12,14 17:9,17 19:21 20:3,7 41:1 56:10,11 72:23 96:8 97:11 99:2 172:20 174:10 177:23 228:9 251:17 251:19 252:25 253:2 273:12 273:14 274:8 307:12 386:23 392:16,24 393:18,19,24 394:20 402:12 402:15 403:4 405:3
**depositions** 19:3,5 20:21,23
**dern** 6:4
**describe** 23:25 24:2 25:8 41:6 188:19 211:8 251:20 252:22
**described** 24:4 37:11 78:1 143:24 144:19 147:16 177:6,9 183:21 188:24 209:5 216:18 232:21 330:12 339:12 345:1
**describes** 38:10 232:25
**describing** 77:20 232:15 232:24 285:20 345:8 351:8
**description** 12:6 13:6 14:6 133:13 146:18 187:15 188:20 204:8,11,13,15 267:19 285:19
**descriptions** 204:16 289:18
**designated** 273:8,10,11 280:5
**designating** 17:8
**desist** 371:20 371:24 373:4
**detail** 282:13 300:13
**details** 221:1 284:7 298:7 346:25 349:22
**determination** 63:13 65:17
**determine** 41:8 55:10 60:7 61:23 63:3,18 162:2 277:20 292:15,18,20
**determined** 128:20 152:5 201:8 266:24 292:19
**determines** 203:18
**determining** 137:4
**developed** 297:2
**developing** 54:2 78:6 145:12
**development** 36:18,19 37:16 55:16
**device** 80:15,24 81:3 92:11,19
**devices** 372:10
**dialogue** 246:21 250:17
**difference** 50:3 201:11
**differences** 35:15
**different** 22:24 34:22,23 35:3,8 45:13,15 47:19 47:24 53:14 54:1 55:17 57:9 101:11 110:15,17 136:22,23 144:8,23 145:1

147:7 159:17 181:18,20 182:15 190:25 194:10 201:4 201:13 204:1 213:9,11 227:7 228:11 229:21 233:7,9 234:15 234:16 266:2 269:1 277:6 283:3 289:7,17 289:22 317:23 350:15,15 368:23
**differently** 47:24 231:1 266:4
**difficult** 122:13
**difficulties** 302:1,6
**digest** 274:22
**digital** 336:7 340:9 341:8 349:3 358:10 358:14,17
**dinner** 294:3 295:7,16,20,25 296:1,3,5,7,9 297:3 299:13 300:5,10 303:25 304:2 306:2,7,20 307:6,12
**diplomat** 42:9
**direct** 62:24 93:5 100:13 103:24 160:23 254:22 309:19 311:13 312:18 313:3 326:14 329:17 369:18
**directed** 167:17 348:16
**directing** 162:14 163:21 249:15 309:24 310:5 311:4,8 311:23 312:7
**direction** 323:17 375:9
**directly** 59:22 171:15 238:8 245:1 247:3,14 247:17,22,24 252:16 268:20 341:14 343:2
**director** 121:23 202:13 235:7 235:12,18 236:1 280:2 298:22 319:20
**director's** 232:3 235:15
**directors** 158:11
**disagreed** 159:5
**disappear** 362:24 363:5,8 372:4 373:22
**disappeared** 368:19 369:3
**disappearing** 372:16,20 373:6 375:12 375:16,21
**discernment** 272:4
**disciplinary** 116:11
**disclose** 309:20 401:3
**discovery** 381:9
**discredit** 236:9
**discretion** 45:8
**discriminated** 61:1,11
**discrimination** 63:2 64:3 65:5 100:19 101:9 101:12 114:12 116:6,9 140:25 141:19 153:7
**discuss** 89:4 172:3,16 174:5 175:1,15,15 223:8 271:4 282:20 287:18 309:6,17 310:6 311:6,21 312:5 312:25 338:2,5 338:8 346:17 353:12 375:3 398:12
**discussed** 173:22 284:16 290:3 310:24 342:8
**discusses** 104:2
**discussing** 74:10 79:11 83:21 230:8 237:10 282:17
**discussion** 126:3 145:21 212:24 285:7 343:7,19
**discussions** 311:14 312:8 312:15,19 313:4 344:18 347:12 396:21
**disgruntled** 234:17
**dishonest** 382:16
**dismissing** 171:8
**disparaging** 286:8
**disposition** 311:2
**dispute** 119:5,9 220:13 223:4

**disputing** 223:1 365:2
**disrespectful** 103:9
**disrupting** 393:17
**distinct** 34:25
**distinction** 25:10 53:9 110:17 136:24 137:14 141:6
**distinctions** 54:7
**distorted** 291:20
**distracted** 346:15
**distribute** 54:5
**distributed** 120:15
**distribution** 47:20
**distributors** 54:4
**district** 1:1,2 2:1,2
**distro'd** 120:15
**disturbed** 307:22
**disturbing** 252:14
**doc** 155:14 314:10 315:6
**document** 12:7 12:14 72:2 73:4 84:5 97:9 98:16 99:14 100:13 117:5 119:13 153:20 154:17 155:6 155:10,12 161:7 162:25 163:4 169:4,10 169:16 170:1 172:25 198:9 198:10 254:8 255:1,4,10,18 255:22 256:6 261:8 266:18 266:23 268:9 272:9,16 273:10 274:4 274:23 275:15 275:25 276:19 278:5 279:1,18 280:23 281:6 282:2 315:21 316:4,12,14 317:4,6 326:10 326:25 327:21 328:15 352:12 369:6,13,15,22 370:3 375:4 381:7 382:22 382:22 385:4 385:11,14 386:2,5
**documentation** 114:22 174:17
**documented** 73:12 89:9 93:25 241:10 267:13 268:4 319:23
**documents** 152:17 256:3 312:25 370:19 370:25 371:9 371:24 374:8
**doing** 25:25 28:19 29:7 30:2,22 31:7 41:10 54:24 78:4 79:2 80:1 80:3 85:13 137:6 146:14 168:13 190:24 191:5 244:6 261:2 299:6 335:25 338:12 341:24 343:5,9 343:11,21 344:21 350:25 353:16 354:1 354:14,18,20 355:6 356:7 358:24 391:22
**dollar** 45:4
**dollars** 145:14
**door** 210:23 211:20 237:10
**download** 184:8
**downloaded** 362:17,21
**draft** 384:19
**drafted** 384:12
**drastically** 233:9
**draw** 171:10
**dream** 168:20
**drink** 21:7
**drive** 390:8 394:13
**driving** 199:23
**drop** 24:16 48:18
**dropbox** 184:7 184:8 185:23 186:6,22 187:3
**dry** 180:14
**dude** 235:1
**due** 297:5
**duration** 19:14 19:16 182:2
**duties** 41:6 136:15 137:20

**e**

**e** 3:1,1 4:1,1 5:1 5:1 6:1,1 7:1,1 8:1,1 9:1,1 10:1,1 18:9
**eager** 214:22

**ear** 180:2
**earlier** 35:8 87:24 140:24 287:3 337:21 377:2 397:10 401:24
**earliest** 70:4
**early** 76:22 77:1,4 214:21
**ears** 222:5
**east** 2:21 4:9 5:6 9:9 15:11
**eat** 189:16
**eating** 189:16
**edit** 179:15
**editors** 36:23
**educated** 260:24
**effect** 106:4,13 106:20 107:8 205:18 207:17 216:1 232:16
**effectively** 232:16,21
**effort** 362:18 370:24 371:5
**efforts** 147:23 341:12,13
**ehudson** 4:12 4:14
**eight** 34:3
**either** 27:6 81:24 83:22 88:15 106:1 127:19 192:21 198:24 211:23 234:5 246:2 248:21 272:19 285:9,10 291:20 315:1 323:4 344:8,16
**elaborate** 245:11
**elaborated** 245:23
**eleanor** 52:2
**elementary** 250:1
**elements** 330:16,18 341:8
**elevated** 23:2
**eleven** 347:21
**elite** 29:19
**else's** 40:20 81:3,3
**elyse** 12:22
**email** 12:9,10 12:12,21 13:10 13:20,22 117:15,19 118:2 119:8,17 119:23,24 120:2,14 121:8 125:24 126:2,7 126:8,11,11 128:1 129:1 132:13,18 228:19 229:4 261:14,20,24 262:19 267:2,5 267:20 270:20 273:17 278:16 316:7,13,20,25 325:18,23 327:4,10 328:17 338:11 338:15,21 339:2,10,15 340:3,5,15 341:2 342:18 343:22 344:4 347:6,15,22 348:3,10,14,20 349:7,8,23 352:15 361:24
**emails** 118:14 159:24 301:13 344:7,11,17 369:8,17,19
**emanuel** 3:5,16 16:9,12
**emi** 28:20
**emotional** 280:9
**emphatically** 239:23
**empire** 147:22 148:7
**employed** 30:9 30:11
**employee** 30:13 49:5 97:22 98:5,9 100:3,7 103:10 125:5 135:3 395:24 395:24 399:5 404:18
**employees** 32:12 36:4 57:4 101:2 103:20 131:5,6 131:7 135:4 140:21 141:14 151:6 222:11 280:9 284:2,23 285:8 365:15 369:19 398:21 399:22
**employment** 65:23 66:3 100:18 101:1 106:3 115:9 151:14,16,19
**empowerment** 156:10
**encouraged** 239:10,14
**encouragement** 356:21
**ended** 153:5
**ends** 45:17 47:1 47:17 48:1,6 50:6 52:10,18 54:9 67:19

103:25 116:20 118:7,14 125:16 128:18 130:9 131:6,12 131:18 132:8 133:10,22 134:3,9,16,21 134:21,25 135:15,19 136:18 138:23 139:10,12,14 139:18 140:2 148:2 153:14 154:3,15,21,25 156:7,10 166:22 395:21 395:25 396:6 396:23 398:14 401:17
**enforce** 341:13
**engaged** 276:1 277:13 280:3 285:15 366:23 367:24 390:7
**engaging** 58:20 59:3
**enjoy** 25:11
**ensure** 57:19 114:16,23 133:9 165:16 375:8
**ensured** 372:19
**ensuring** 137:21
**enter** 264:17,17 265:2,3
**entering** 72:23
**entertainment** 22:25 23:1 28:3 30:17,18 31:8 49:17,19 150:9
**entire** 20:3,7 67:6,10 68:6 155:6,9,11 161:8 181:1 182:9 254:24 255:7 282:7 386:2
**entirely** 297:17
**entirety** 281:23 282:5
**entities** 16:24 154:18
**entitled** 15:13 261:17
**entity** 127:18 150:1
**entrance** 264:19
**environment** 106:8 107:11
**ep** 54:6 173:23
**equal** 100:18 100:25
**equity** 26:21 27:2,4,8,15
**errata** 403:5 405:1
**escaping** 33:18
**esra** 4:5 15:20 31:3
**essential** 278:22
**essentially** 18:23 28:21 34:6 38:17 74:13 133:23 144:25 145:5 178:24 236:8 240:11 307:22 314:25 323:3 357:10
**estate** 402:6
**estimate** 39:25 45:18 46:19 48:4,14,16,17 49:3
**et** 1:8,13,15 2:8 2:13,15 12:3 13:3 14:3 15:14 274:25 274:25 275:1
**ethical** 379:1
**evaluating** 59:15
**evaluation** 60:5
**event** 211:9 241:11 294:23 295:10 302:25 302:25
**events** 305:11 319:14
**eventually** 156:23 186:11 191:1 212:15 332:21
**everybody** 17:12 374:6,7
**evidence** 114:17 140:6
**exact** 90:19 127:25 167:18 167:21 175:3 177:14 189:15 193:25 194:12 200:21 215:23 216:4 237:9 243:22 246:7 246:20 252:9 375:6
**exactly** 43:13 81:25 91:21 94:11 123:2 132:5 166:7 170:20 178:23 186:10 188:22 193:23 205:6 208:1 233:1 245:1 249:5,21 257:22 269:21 275:17 276:5 300:12 306:15 320:23 323:9 336:1 354:11

356:1 357:6
371:22
**exaggerated**
236:12
**exaggerating**
236:25
**exaggeration**
332:9
**examination**
11:1,5 17:22
404:10
**example** 26:15
47:8 73:25
136:25 166:9
**examples**
104:16
**exceedingly**
379:1
**except** 68:7
136:16 186:6
403:4
**excessive** 256:2
**exchange**
251:20
**exchanged**
354:3 362:23
**excited** 157:3
157:16 165:4,8
165:9,13
173:23
**excitement**
233:13
**excuse** 131:2
361:25 390:13
390:15 392:3
**excused** 393:22
**execute** 342:13
342:19
**executive** 50:16
51:2,9 52:7,8
53:9,25 56:6
**exhausting**
389:25
**exhibit** 12:6,7,9
12:10,12,14,16
12:18,19,21
13:6,6,8,10,12
13:14,17,18,19
13:20,22 14:6,7
14:9 97:10,12
117:6,7 119:13
119:14 125:20
125:21,24
153:20,21
160:12,13
169:5,6 173:1,3
197:18,20,21
197:23,24
214:4,5,7 254:8
254:9,11 261:8
261:12,14
273:7,15
280:24,25
313:10,11,14
313:18 315:21
315:22,23,24
316:7,11,20
317:6 323:17
324:15 339:19
339:20 340:3
347:17,22,25
352:13,15,18
382:23,24
383:7,13,17,20
383:20
**exhibiting**
306:3
**exhibits** 12:1
13:1 14:1
**existed** 179:19
373:10
**expect** 141:14
199:16,18
203:20 351:17
**expectations**
41:16
**expected**
350:20 351:15
389:25
**expecting**
191:21
**expenses** 46:17
**expensive**
332:11,13,14
332:15
**experience**
23:12,14
199:20 201:14
224:2 267:8
297:5 317:12
317:13 319:16
319:24 320:8
320:12,15,18
320:19 330:4,5
330:6,8,20
**experienced**
130:25 158:7
267:22 297:6
317:16,20
323:2
**experiences**
284:24 330:21
**experiencing**
299:10 303:2,5
304:18 307:2
353:22
**expert** 102:4
105:16 110:10
271:16
**expires** 403:20
405:25
**explained**
165:12 191:11
**explains** 347:5
**explanation**
375:25
**explicitly** 106:2
289:10
**exposed** 178:19
205:12 207:9,9
208:5
**express** 355:2
356:9,20
**expressed**
61:12 148:14
149:6 159:25

226:13 231:25 303:21,22 320:21 375:7
**expressing** 62:11 65:15 224:20 225:25 292:22
**expression** 65:1 249:21 275:22
**extension** 42:1
**extent** 160:8 186:5 250:9 272:4 377:19
**extremely** 55:21
**eye** 223:17,21 226:22 227:19
**eyes** 272:10,15 273:8,10,13
**ezra** 52:2,21 53:2

**f**

**fabricated** 291:15,17,22
**face** 42:11,13
**facilitate** 175:6
**facing** 305:25
**fact** 100:1 128:4 146:4 154:20 165:15 219:24 222:4 242:13 249:3 253:24 305:9
306:23 307:6 307:22 377:24
**fail** 264:10
**fair** 62:25 64:1 102:5 137:10 147:9,11 155:13 233:3 234:8
**fairly** 32:10
**faith** 22:13 116:7
**fall** 64:12 65:4 133:12
**falling** 184:21
**false** 13:15 252:18
**familiar** 22:4 41:2 42:17 66:7 86:5 142:14 204:7 212:3,4
**family** 22:1,1,3 22:4,22 26:10 49:17
**far** 39:1 47:17 87:13 147:23 231:13,16 362:25
**farr** 5:3,13 16:5
**father** 287:20 293:13
**faucet** 45:8
**fault** 269:17,17
**favor** 270:5
**fear** 376:14
**fears** 353:22
**feature** 375:13 375:16,21
**february** 228:21
**feeding** 212:4
**feel** 31:11 58:12 59:10 72:20 90:24 155:4 184:20 237:2 237:19 249:25 252:15 254:23 255:7 270:8 358:6
**feeling** 89:7 128:15
**feelings** 89:5 90:23 234:20 234:22 236:7 236:10 257:4 257:14 260:4 260:19 269:20
**feels** 35:18 42:6 61:11
**feet** 377:10,15
**fell** 89:6 113:12 113:15
**felt** 72:2,3,5 89:17,17 163:25 168:6 177:2 224:4 226:11 236:10
236:15 292:24 292:25,25 307:6,11 308:12
**female** 156:10 162:16 163:23
**feminist** 252:21
**ferrer** 19:25
**field** 23:1 28:3 29:22
**fifteen** 22:19
**figueroa** 3:9
**figure** 303:18
**figuring** 124:5
**filed** 88:11 95:3 95:13 273:14 328:11,19 371:10 378:7
**fill** 314:11
**filling** 171:25 172:15 174:3 174:25 275:21
**film** 27:25 45:17 47:3 49:11,19,22 50:23 51:16,17 51:21 52:10 53:11,24 54:12 54:14,20 55:4 55:15,17 56:17 57:13 58:6 85:24 157:4,17 158:15 166:10 166:16,17

167:5,9 169:25 170:11,18 177:18 181:15 181:20 182:13 183:1,8,10 201:25 251:21 264:7 267:9,24 270:6 297:13 305:18,22 397:2 398:21 399:16
**film's** 267:7 270:11
**filmed** 177:11 181:6 182:16 182:20 184:10 184:13 191:4 193:5 197:7
**filming** 166:23 181:13,18 197:2 199:22 201:19 204:4 231:20 233:20 279:8,12 291:10
**filmmaker** 167:17
**films** 49:6 50:15 51:3,9,25 52:3,5,7,17 56:1,5,7
**finally** 263:9
**finance** 29:18 146:6
**finances** 41:2
**financial** 24:20 41:7 136:12 139:13
**financially** 404:19
**financing** 45:11
**find** 23:6 189:19
**fine** 99:3 119:7 124:22 250:4 256:13 263:19 388:21 389:8
**fingerprints** 342:14,19
**finish** 61:4 82:14 125:13 169:19 211:7 226:16 284:5 287:7 386:8,10 393:23
**finishing** 78:20 270:6 316:18
**fire** 234:18 351:1
**fired** 153:8 234:22
**fires** 78:6
**first** 19:23 21:19 30:8 31:6 33:3 70:4 76:17 96:2 142:14 148:11 149:7,8 176:23 177:2,23 192:12 223:13 262:18 290:13 290:13 302:10 314:15,17 333:7 353:2 355:14 356:4 359:25 360:3 385:23
**firsthand** 242:17 283:11
**five** 26:1 30:10 30:23 32:15 42:18 48:18,19 51:22,23 52:5 190:17 212:22 221:11 289:25 290:3,9 294:17 296:25 301:19 377:15
**fiver** 221:12
**flapped** 235:17
**flappy** 235:15
**flipping** 97:21
**floor** 3:10,20 7:10 8:8
**flores** 377:6,9 377:18,25 380:15,18
**flores's** 402:6
**flow** 127:23
**focus** 341:7
**focused** 74:19 80:2 394:16
**focuses** 112:19
**follow** 110:23 183:5 196:4 311:19 312:2 312:13 323:11
**followed** 130:18 237:12 375:9
**following** 264:8 273:13 311:17 312:11 313:7
**foot** 248:15
**footing** 234:23
**forced** 235:19 235:19
**forego** 270:4 271:2
**foregoing** 403:3 404:5,15,21
**forever** 369:10
**forgive** 29:12 43:14 53:4 171:4 229:15 255:14
**forgot** 188:17
**form** 102:12 326:21 334:10 334:25 335:2 335:17 336:23 338:13 340:18 342:2,20 343:13 345:3 345:12,21 346:3,10 347:2

347:8 351:10 351:22 354:22 356:15 357:24 361:11 363:24 365:25 367:17 368:3 373:18 375:17,23 376:12
**formal** 270:4 271:2 292:8
**format** 316:14 316:25 317:3
**formation** 150:8
**former** 387:22
**forth** 48:1 212:14 340:16 404:6
**forthright** 68:13
**fortunate** 29:5
**forums** 341:15
**forward** 264:10 270:7 271:8 280:11 293:7 319:20 357:16 379:24
**forwarding** 316:8,20
**foster** 42:6
**found** 115:5 152:8,9 176:14 176:21
**foundation** 127:24
**founded** 30:12 32:1
**four** 18:18 28:13 32:15 41:7 51:22,23 52:5 67:7,11,23 68:8,23,24 69:21 88:15 190:17 210:19 210:21 212:22 235:3 256:7 296:25 313:15
**fourteen** 25:3 381:16
**fourth** 42:8 91:1
**frame** 69:22 315:3 366:20 371:16,22
**framed** 173:16
**fraud** 252:22
**fraylin** 16:6
**free** 101:8 310:23
**freedman** 7:5,6 16:18,22,22 87:3 98:6,19 99:11,17 362:9 364:9,14 377:17 378:16 379:6,9,17 380:4,16 381:14 382:9 382:15 402:6
**freedman's** 377:23 378:21
**friend** 23:23,23 24:1 26:9 30:12 122:7 157:5,11,18,21 158:2,3 299:7
**friend's** 30:14 295:18
**friends** 21:22 21:22 22:22 23:11,24 24:3 25:5,8,9 30:15 95:19 96:5 122:9
**friendship** 25:11 297:1
**frog** 335:5
**front** 140:18 212:2 255:2 391:1 400:11
**frozen** 290:16 293:4
**fruition** 49:1
**frustration** 226:8
**frustrations** 145:4 244:18
**fuck** 31:2
**fuel** 79:21
**full** 17:24 19:15 31:19 161:3 290:2 336:25
**fully** 335:7
**fun** 332:18
**fund** 45:4,6 144:5
**funding** 44:10 44:14,15,19,25
**funds** 44:2
**funny** 332:9
**further** 102:6 323:10 378:25 402:10 404:17
**future** 241:12

**g**

**gallagher** 5:3 5:13 16:5
**gambling** 263:16
**game** 174:21
**gaps** 315:6
**garden** 31:5,5
**garfield** 52:2 52:23 53:2
**gather** 170:19 251:5
**gathering** 22:24 25:25
**gender** 101:18 104:17 105:19
**general** 53:10 77:20 78:15 107:1 303:9 315:2 318:2

335:8 337:25 357:3 369:25 372:8
**generalization** 105:15
**generally** 53:13 55:5 58:9 60:11 97:20 105:11 368:12 369:25
**generic** 170:16 334:19
**genitalia** 285:20 289:18
**getting** 165:5,9 167:13 209:19 222:20 231:24 244:17 303:17
**giannetti** 20:2 210:20 227:10 227:13 230:6 231:22 243:21 245:11,22 246:11 247:6 248:19 250:12 250:19 253:22 259:7 268:12
**girlfriend** 96:8 96:20,23 97:1 164:5
**give** 17:17 21:16 26:23 33:19 39:25 62:23 105:8 109:1 117:10 132:2 136:25 145:17,18,18 145:22,25,25 146:24 161:2,5 161:8 170:12 179:9 180:17 180:21 181:12 211:13 214:17 241:4 267:18 315:20 323:16 330:3,10 335:5 350:19 353:5,8 357:3 375:25 380:7,9 383:13 398:7
**given** 24:19 53:15 131:11 132:7 141:15 190:5 206:24 254:4 256:7 285:9 290:2 296:19 351:20 374:3,4
**gives** 104:16
**giving** 49:16 161:12 176:11 178:7,9 179:16 181:4 187:14 215:12,19 225:8 244:5 376:22 384:18 400:5,11
**glad** 12:7
**gladys** 29:3
**glance** 223:23
**glanced** 189:8
**glancing** 155:23
**glean** 224:8
**glimpse** 330:3
**globally** 349:15
**gloria** 81:8 82:11,17 83:14
**glover** 9:18 16:14,14 334:10 335:2 335:17 336:23 338:13 339:4,7 340:18 342:2 342:20 343:13 345:3,12,21 346:3,10 347:2 347:8 351:10 351:22 354:22 356:15 357:24 361:11 363:24 365:25 367:17 368:3 375:17 375:23 376:12
**gloves** 89:7
**gmc** 38:13
**go** 47:14 48:18 61:9 62:5 69:20 83:22 99:17 102:5 107:17 130:14 130:16 131:13 132:9 138:3,16 145:15 146:15 156:5 163:10 163:15 164:2 173:11 188:4 211:15,17 237:12 253:14 257:18 272:25 279:17 286:20 287:4 296:7,9 308:7 315:8 322:20 339:23 352:5 353:18 371:5 381:19 381:22,23 382:3,5 386:8 386:14,24 387:5,9,13,15 387:17 388:5 389:12 392:6,6 394:2,21
**goal** 45:6
**god** 219:17
**goes** 103:13 252:5 269:25
**going** 20:25 21:13 27:22 48:25 53:4 55:19 56:13 64:23 66:13,15 69:17 72:6,15 78:11 93:23 97:10,18 98:24

100:12 110:8 110:22,22 111:18 117:2,8 119:12 123:18 123:20 124:17 124:23 125:19 132:4 135:14 143:20 144:5 146:15 149:6 152:21 153:19 153:20 155:24 160:23 161:5 161:24 162:17 163:15 166:17 169:8 170:25 171:23 173:24 175:10,20,25 185:8 187:7 195:16 197:17 198:8 206:13 209:21 210:1,4 210:10,12,15 212:8 228:3 230:3 231:24 234:25 236:3 240:11,17 244:13 245:14 254:7 255:1,2 261:7 264:10 264:13 265:8 265:23 266:22 267:24 269:22 271:6 272:14 273:2,14,25 280:22 281:5 283:21 293:18 294:8 295:6 296:9,12 297:3 299:4 302:16 303:1 305:21 308:25 309:19 311:13 312:2 312:18,23 315:20 330:25 331:3,14 336:6 336:11 337:5 339:18,25 345:9 346:14 349:22 350:1 351:4,8 352:6 353:15 355:6 356:8,22,24 357:2 358:16 368:22 381:6 381:24 382:2 382:21 383:12 383:13 385:3 385:10 386:4 386:12,16,20 386:24 387:17 388:12,13 389:6,11 390:15 391:1 391:24 392:1 392:14,21 393:11,23,24 393:25 395:1 402:13

**gonna** 387:6

**good** 15:4 17:11 20:21 26:2,2 29:20 116:7 117:25 118:19 123:24 124:3 248:10 248:14,15 250:5 258:9 290:24,25 291:23 308:20 320:1 354:9

**gosh** 182:11 219:18,20 225:23

**gotta** 97:13 235:18

**gottlieb** 5:4 16:4,4 371:16

**gracious** 190:2

**gramajo** 16:6,6

**grammy** 27:21 28:24 29:2

**grandmother** 22:7

**granular** 344:12,18 346:16 350:17 351:16,19,24

**graveyard** 314:20 322:21

**gravity** 233:15

**great** 17:20 52:2 162:3,4 172:21 189:22 334:18 354:7

**greater** 29:23 29:23

**greenberg** 20:5 86:12 87:16,17 91:8 92:2 93:3 93:11

**greenberg's** 91:16

**greenlit** 145:5

**greenstein** 20:12 81:7 83:14

**greeted** 212:23

**grey** 173:8

**grips** 201:22

**gross** 46:4 252:13

**ground** 49:7,24 49:25 50:3,9 118:25 134:2

**group** 273:19 329:24 346:4 360:22

**groups** 23:20

**grow** 145:6

**growing** 29:21 145:9 146:5

**grown** 72:24

**guaranteed** 270:11

**guess** 27:16 40:1 258:9,9

260:7,21,23,24 360:5,6 363:19
**guessing** 127:9 127:11,15 258:8 326:5 327:1,12
**guidance** 255:13,16,18 331:15
**guy** 290:24,25 336:7 356:5
**guys** 248:9 252:3

**h**

**hacked** 368:15 376:7
**hacking** 376:17
**hair** 201:20
**half** 18:18 20:1 40:10 189:9 192:13 317:19 317:23 320:2 386:9
**hand** 17:15 77:15 97:9 117:2 119:12 125:19 153:19 160:11 197:17 254:7 255:18 261:7 280:22 313:10 339:18 381:6 382:21 382:22 385:3 385:10
**handbook** 97:22 98:5,10 100:4,7 135:3 142:22 271:21 271:24 395:21 395:24
**handful** 289:4 356:1
**handing** 169:4 172:25 347:17 352:12
**handle** 121:7
**handled** 123:8 244:19 312:16
**handles** 126:19
**handling** 53:23 122:14 362:19
**hands** 53:21 55:22 184:21 232:2 233:13 279:25
**hanks** 34:4 36:4 37:14
**hann** 81:8 83:14
**happen** 48:25 79:21 285:21 335:11
**happened** 131:17 139:22 143:13 146:2 191:12 217:11 223:6,23 232:5 239:23 245:14 245:15 250:3,5 266:10 289:11 289:13 318:2 388:22,24
**happening** 137:2 171:6 186:3 197:2 241:8 250:24 257:23 291:10 371:4
**happens** 131:17 174:21 335:19,21
**happy** 33:18 74:24 91:4 131:24 145:22 146:1,4 168:12 168:17 172:23 174:13 345:22 361:16
**harassed** 89:22 296:13
**harassing** 110:14 111:25 112:13 152:3 274:25 275:9 276:1,20 277:13
**harassment** 61:17 63:1 64:3 65:5 100:19 102:7 102:12,13 103:8 104:3,8 104:14,15,19 105:2,11 107:22 108:9 109:5,16,23 110:5,9,21 111:9 114:12 116:6,9 120:2 120:11 140:24 141:19 142:23 152:7
**hard** 27:24 29:11 40:15 167:13 277:19 297:4 299:6 303:13
**hardest** 291:5
**harper** 53:3
**harrasment** 13:15
**hats** 35:8 136:22
**head** 34:7,10 34:16 36:16 37:21 38:8,12 295:4 350:25
**heads** 57:9,11 136:13
**hear** 37:1 42:4 144:1 162:22 163:6 204:16 213:13 232:9 244:8 252:2 284:23 295:19

307:5 333:7 351:4,14 353:17 354:2
**heard** 50:14 75:6 96:7 148:12 149:7,7 159:11,13 160:7,7 164:6 204:25 206:6 207:12,13,15 208:7,7,10,14 208:16,20 210:21 211:4 211:20 215:9 215:16 229:13 229:14 231:2 232:12 236:11 240:3,9 244:25 244:25 251:16 251:16,19,19 276:16 293:10 302:10 306:6 308:13 331:9
**hearing** 89:1 205:7 216:17 290:15,16 378:15
**heath** 1:19 2:19 7:3 9:3 11:2 12:2,7,11,11,13 12:13,22 13:2,9 13:13,21 14:2 15:13 16:23 17:2,24 18:1,3 47:10 66:21 67:25 78:9 97:23 99:18 117:18 119:18 119:19,21 125:4,25 126:1 126:3 160:16 169:15 173:11 176:9 195:6 214:11 228:9 254:12,13,15 261:21 272:11 273:9,17 276:8 277:3 299:12 309:6 313:19 319:13 324:7 326:10 340:4,6 347:23 348:2 352:12,16,21 383:4 384:4 385:7 393:2 395:7 403:10 405:3,21
**heath's** 98:10 284:12
**held** 37:12,18 37:24 38:5,19 122:12
**hello** 212:23 343:7 353:16
**help** 20:8 93:8 155:4 170:10 175:6 258:14 326:25,25 330:23 334:22 334:25 335:24 343:8 350:13 358:22
**helping** 41:8 149:11 168:23 173:19 349:18
**helps** 333:17
**hernandez** 10:8 15:8 347:18
**hey** 173:18 189:6 191:6 192:2 248:8 249:16 252:3 359:6
**hierarchy** 35:11
**high** 29:25 159:12,20 160:1,4 221:11 221:12
**highly** 379:1
**hire** 332:23
**hired** 32:17,18 153:8 332:19 335:22,23 338:6 353:20 397:8
**hiring** 120:19 331:25 334:9 334:14 336:5 338:2
**hit** 24:24 192:10 235:16 235:17,17 261:3
**hm** 265:6
**hold** 33:5 34:1 47:22 217:18
**holmes** 3:7 16:11,11
**holy** 162:13 163:20
**home** 22:23 39:9,16 83:7 190:23 322:22 322:25
**honest** 146:14 233:11
**honestly** 178:21 216:6,21 243:23 252:21
**honorable** 379:1
**hoover** 20:2 168:19,20 294:4 295:9 296:4,11,18,22 297:10,14 298:16,25 299:1,15 300:9 300:19,24 301:4,15,25 302:9,19 303:6 303:25 304:1,9 305:2,8,14,17 305:20 306:2,6 306:13,19

**hoover's** 295:19 307:5
**hope** 356:22
**hoping** 45:5 156:19 210:6 263:13
**host** 90:10,10 90:14 165:8 267:25
**hostile** 106:7 107:11
**hostility** 142:25
**hosting** 22:23
**hot** 60:7 238:12 242:23
**hotline** 118:2 119:8 120:2,14 121:8 138:22 138:25 139:3,6 139:9,18,23,24 140:2,7,7,12,22 141:15
**hotlines** 118:13 138:19
**hour** 66:14 124:17,19,20 389:22
**hours** 19:24 21:6 182:12,15 212:12 289:25 289:25 290:4,9 294:17 347:20 390:1
**house** 262:12 278:12 314:25 335:24
**houston** 9:22
**how's** 299:4 303:1
**hr** 38:7,8,12,15 61:14 102:4 110:24 122:14 123:8 126:14 126:19,24 127:18 128:6 128:17,19,22 129:3,10,12,25 130:4,5,17 138:5,8,10 270:4,14,24 271:2,3,16 272:7 286:8,10 286:13 292:3,8 292:12 398:10
**hudson** 4:5 11:6 15:20,20 17:5,23 23:21 26:14 27:3 33:20 34:15 36:2,7,12 39:19 44:7,17,23 45:9 47:6,12,13 48:8 48:13 50:7 51:7 52:16 54:18 55:2,11 56:4,22 57:2,7 57:17,22 58:4 58:10,16,24 59:6,23 60:3,16 60:22 61:2,22 62:2 63:11,16 63:23 64:20 65:12,22 66:2 66:11,20 67:3,9 67:22 68:5,18 69:3,17,19 70:2 70:7 71:12 72:13,19 73:6 74:8 75:11,16 76:6,8,14 77:16 78:8,22,24 79:9 81:5 82:9,22 83:2,18 84:17 84:22 85:7,15 85:21 87:4,8 88:8,19 90:1,5 90:8,21 91:6 92:8,18 93:18 94:15 95:5,11 95:18 97:5,9,16 98:1,8,25 99:4 99:7,10,13,20 99:22 100:2,11 102:24 105:17 106:17,24 107:16 108:19 109:2,7,12 110:2,11 111:3 112:16 113:17 114:2 115:16 115:24 117:2,5 117:14 119:3 119:12,16 121:21 122:4 122:20 123:6 123:14,19,23 124:7,13,16,22 125:3,9,19,23 127:10,16 128:2,9,16 129:11,20 130:6 131:19 131:22 132:3 132:14,17,21 133:1,7 135:8 135:13,23 136:5,9 137:7 138:2,11,21 140:15 141:4,9 141:13,24 143:6,23 144:15 146:10 147:2,8,19 148:5,24 151:3 151:20 152:21 152:23,25 153:3,19,22 155:8 156:13 156:18 157:1,9 157:23 158:21 159:1,7,14 160:9,11,15 161:15 163:2 164:18 165:21 168:2,18 169:4

| | | | |
|---|---|---|---|
| 169:7 172:25 | 219:1,8 220:6 | 268:11,18 | 313:17 315:20 |
| 173:7 175:20 | 220:18 221:3 | 269:2,24 | 316:1 318:5,12 |
| 175:24 176:8 | 221:15,21 | 270:19 271:9 | 319:1,7,11 |
| 176:17 177:8 | 222:2,16,24 | 271:17 272:9 | 320:10 321:1,7 |
| 177:16 178:1 | 223:7 224:13 | 272:14,17,21 | 321:14,23 |
| 180:15 182:4 | 224:24 225:4 | 272:25 273:7 | 322:9,15,23 |
| 184:22 185:7 | 225:14 226:3 | 273:16 276:6 | 323:23 324:6 |
| 185:17,24 | 226:16,19 | 276:11 277:1,5 | 325:21 326:13 |
| 186:13,17 | 227:5 228:2,8 | 277:9,16,23 | 327:2,7,16 |
| 187:19 188:1,5 | 228:16 229:2 | 278:10,19 | 328:4,23 329:5 |
| 188:8,11,15,18 | 229:16 230:1 | 280:22 281:3 | 329:15 330:17 |
| 191:22 192:20 | 230:12,17 | 283:19 287:5,8 | 331:4,23 |
| 192:23 194:1 | 231:5,11,18 | 287:11,13,15 | 332:10 334:11 |
| 194:15,22 | 232:8,14,18 | 288:23 289:23 | 334:24 335:13 |
| 195:2,5,13,16 | 234:3 236:17 | 290:8 291:16 | 335:20 337:3 |
| 195:17 196:5 | 236:21,24 | 292:7,17 | 337:18 338:17 |
| 196:15,22 | 237:2,5 238:9 | 293:23 294:19 | 339:5,8,15,18 |
| 197:10,17,23 | 238:22 239:8 | 294:21 296:17 | 339:23 340:2 |
| 198:1,4,6 | 239:18 240:1,7 | 297:19,23 | 340:23 342:5 |
| 199:13 200:1,7 | 240:14 241:1 | 298:3 299:11 | 342:10,24 |
| 200:17 201:6 | 241:14,19 | 299:21 300:4,8 | 343:16 344:19 |
| 202:4,8,24 | 242:2 243:4 | 300:15 301:2 | 345:7,18,24 |
| 203:8,13,19 | 245:9 246:1,9 | 301:16,23 | 346:5,19 347:4 |
| 204:20 205:2 | 248:5,24 249:8 | 303:3,11 304:8 | 347:14,17,22 |
| 205:10,22 | 250:18 251:1,9 | 304:24 306:11 | 348:1,13 |
| 206:8,16,21 | 251:13,18 | 306:17 307:4,8 | 351:18 352:1,5 |
| 207:2,14,22 | 252:1 253:4,15 | 307:17 308:3 | 352:11,15,19 |
| 208:9,15,21 | 253:21 254:7 | 308:21,24 | 355:4,11 |
| 210:17 211:10 | 254:10 255:25 | 309:5,15,22 | 356:17 357:18 |
| 211:14 214:4,8 | 256:2,9 260:10 | 310:4,9,12,15 | 358:5,13 |
| 214:10 215:15 | 260:17 261:4,7 | 310:22 311:5 | 360:21 361:4,8 |
| 215:24 216:3 | 261:13 265:5 | 311:10,16 | 361:12,17 |
| 216:13,24 | 265:14,21 | 312:1,10,22 | 362:2 363:6,21 |
| 217:12 218:20 | 266:6,16 267:1 | 313:6,10,13,16 | 364:1 365:13 |

366:3,12,21 367:4,19 368:5 368:11 370:10 370:17,23 371:7,18 372:17,24 373:23 374:12 375:19,24 376:8,18 377:1 378:5,12,14,20 379:4,15 380:2 380:8,14,20,24 381:6,10,13,17 381:19,24 382:6,8,14,21 383:2,6,11,19 383:23 384:8 385:12,21 386:7,14,18,22 387:3,5,11,14 387:18,24 388:2,12,18,23 389:1,5,10,14 390:12,15,20 391:6,9,14,16 391:20 392:3 392:10,15,23 393:6,10,13,17 393:21 394:4,6 394:24 395:6 395:13,19 396:3,9 397:6 397:16 398:17 399:1,19 400:8 401:8,23 402:5 402:10

**hug** 221:10

**hugging** 221:5

**huh** 26:1 104:1 116:14 130:24 148:13 152:12 153:9 234:10 291:19,21 295:11 296:11 301:24 304:20 317:1 318:4 323:3 337:9 340:12 401:25

**human** 37:1,2 39:11 113:3,10 116:19,21,24 130:8,20 131:13 132:9 138:12,24 140:16,22 141:7 395:7,9 395:15 396:22 397:1 399:15 399:21

**humanity** 41:25 42:1 171:15

**hung** 26:2

**hurry** 235:20

**husband** 157:5 157:8,18,21,24 157:24 158:1,3

**hyman** 392:14

**hyperbole** 332:2

**hypothetical** 62:23

**i**

**idea** 29:10 118:19 123:15 123:24 124:3 128:11 162:3 240:19 258:21 264:23 291:24 334:25 335:24

**ideas** 124:4 170:13,15,17 190:18,25 234:16 243:25

**identification** 97:12 117:7 119:14 125:21 153:21 160:13 169:6 173:3 197:24 214:5 254:9 261:12 273:15 280:25 313:11 315:23 315:24 339:20 347:25 352:18 382:24

**identified** 321:2

**identifies** 111:23 154:17

**identify** 15:17 36:13 98:4 159:19 362:5

**identifying** 82:2,11,16

**illinois** 38:25

**image** 252:20

**images** 283:24

**imagine** 77:19 305:19 325:20 327:23 373:11

**imene** 13:10 261:15 262:9 262:10 278:13 278:14

**immediately** 126:15 185:25 186:1 187:9 192:3

**impact** 121:15 148:3 389:6

**impacted** 121:18

**impacts** 48:20

**impartial** 114:15

**impetus** 297:8

**implementati...** 280:7

**implementing** 137:3

**implication** 212:12,13

**implicitly** 106:1
**imply** 289:18
**importance** 226:24 227:21
**important** 57:12,23 58:5 58:11,17,25 59:24 66:6 110:18 233:24 234:1
**importantly** 233:1 345:2,10 346:2
**impressed** 23:19
**impression** 194:13
**inaccurate** 152:4 187:24 188:20
**inappropriate** 275:2,10 276:2 276:21 277:14 390:21,21
**incidences** 230:20,22
**incident** 96:15 143:25 176:14 187:16 204:8 204:17 207:24 208:22 209:4,8 213:9,14 222:19 223:9 228:20 229:9 229:17 230:13 230:25 232:20 232:22,24 233:4 236:12 237:7 238:14 243:3 265:7 315:2 323:5,5,8 323:12
**incidents** 231:13 238:11 320:5,20 321:2 321:3,7,8,16 323:20 324:9 330:11 401:4
**include** 101:15 107:22 108:4,9 109:16,20 112:12 114:19 115:8 145:16 202:17 203:24 280:1 318:16
**included** 41:12 81:7 104:24 112:3 133:24 280:15 282:1 303:10 304:15 322:8 330:21 355:3
**includes** 70:16 70:17,19 104:14 105:18 105:22 112:8
**including** 56:23 103:11 116:12 142:9 144:12 157:17 254:6 283:25 284:25 347:23
**income** 43:8 47:5
**inconsistencies** 205:7
**inconsistent** 146:21 354:20
**incorporated** 16:16
**incorrect** 46:6
**incorrectly** 258:10
**incredibly** 29:17 88:25
**incurred** 263:13
**independent** 28:15,16,18,23 103:16 398:21 399:16
**index** 11:1 12:1 13:1 14:1
**indicate** 224:15
**indicating** 188:7
**indication** 210:22 211:21 220:3 265:15 265:22 267:18
**indie** 138:5
**indies** 128:21 129:3
**indirectly** 247:25
**individual** 114:19 116:5 143:1 400:5,10
**individual's** 106:6,14 107:10 109:21 110:20
**individuals** 102:18
**industry** 29:7 29:15,16 49:18 158:11
**inferred** 219:7 276:20 282:20
**inferring** 275:2 275:9 277:13
**influence** 21:10
**influencing** 341:14
**info** 324:21
**information** 63:17 64:12 65:4 68:4 126:15 131:11 132:7,15 251:4 254:1,4 271:25 287:25 324:23 325:2 326:15 327:18 331:17

**informed** 289:13 296:8
**infringement** 377:10
**initiate** 65:6
**initiated** 363:3
**injured** 141:16
**innocuous** 196:25
**innuendo** 108:5 108:10 109:5
**input** 328:8
**inquiring** 119:1
**ins** 357:10
**insensitive** 151:7
**insensitivity** 151:14
**inside** 31:16
**insinuated** 266:18 275:25 276:19 290:24
**insinuates** 268:10 274:24 283:25
**insinuating** 277:12
**insinuation** 79:17 226:1 275:8
**insinuations** 293:12
**insist** 391:21 392:4
**insisted** 206:11
**inspire** 23:16 23:19 41:22 42:2,2
**instance** 53:16 201:20 204:2 225:22 288:11
**instruct** 374:7
**instruction** 311:18 312:3 312:12 313:7
**instructions** 181:12 312:14 350:20 371:9 374:2,4
**instrumental** 55:21
**integral** 342:13
**integrity** 30:3
**intend** 94:8
**intending** 84:18
**intention** 161:13 308:18
**interaction** 196:24 219:7
**interactions** 142:8 144:11
**interacts** 135:4
**interest** 59:13 134:25
**interested** 31:4 404:19
**interfering** 106:5,13 107:9
**interim** 33:4
**interject** 218:24
**internally** 173:22
**internet** 336:8
**interns** 103:17
**interpreted** 50:14
**interrupt** 51:22 53:1 62:1 78:20 264:18
**interrupting** 211:9
**interviews** 114:20
**intimacy** 200:20,24 203:11,24 288:15
**intimidated** 236:15
**intimidating** 106:7 107:11
**introduce** 349:20
**introducing** 348:24
**invest** 41:9
**invested** 46:5,7
**investigate** 63:7 63:9 113:5 239:10 292:6
**investigated** 59:25 114:14 152:4
**investigation** 60:8,12,21 61:3 62:16,19 63:5 65:7 80:1 114:6,19 115:11 116:8 149:10,23 150:23 151:22 152:5,16 240:18 291:24 292:13 293:20 293:24
**investigations** 115:1,20 125:5 125:10,15
**investments** 44:9
**invited** 23:8 25:24 198:25 199:1,8 214:12 296:4
**invoices** 344:23
**invoked** 270:14 270:24
**involved** 36:1 42:12 49:17 53:13,20 54:2,3 55:3 71:21 86:3 102:18 114:20 115:19 125:5,10,14

129:8,9 145:12 147:21 150:3,4 150:10 153:12 159:24 169:3 170:5 298:24 324:17 332:22 332:25 350:9 350:17,18 355:1
**involvement** 55:1 150:5
**ipad** 92:15
**iphone** 190:24
**isabela** 19:25
**isabelle** 40:14
**issue** 147:15 225:24 271:8 304:10,14
**issues** 128:6 130:21 141:10 141:16,20 150:24 226:9 297:15 302:12 304:2 318:19 330:18 373:17
**iterations** 55:18

**j**

**j** 18:8,9
**jackson** 9:17 16:14
**james** 18:3
**jamey** 1:19 2:19 7:3 9:3 11:2 12:2,11,13 13:2 14:2 15:13 16:23 18:1,6,7,9 57:10 117:20 119:18 125:25 160:16 219:14 227:18 252:6 254:12 275:2 311:3,3 313:19 340:6 347:23 348:16 392:6 403:10 405:3 405:21
**january** 76:22 76:25 173:10 230:6 279:11 280:16 281:10 282:18 287:17 287:18 328:22 377:23 383:4
**jarriesse** 40:17 40:21
**jason** 7:8
**jaz** 18:7
**jbach** 8:11
**jed** 9:15 13:23 16:15 332:20 338:3 348:24 349:13,20 350:1 352:16
**jen** 16:24 91:11 91:12 92:2 93:12 333:1 341:19 346:16 346:22 360:18
**jennifer** 1:10 2:10 7:2 9:2 13:21 17:6 19:12,17 70:15 70:16,18 86:15 87:21 340:6
**jenny** 20:1 237:21 238:11 239:1 243:5 245:1 249:2,17 260:22 268:13
**jersey** 166:13 400:22
**jglover** 9:23
**jill** 12:13 130:11,21 131:4,14 132:10
**job** 34:22 41:25 80:3 133:12,14 133:18 137:20 314:3
**joel** 9:18 16:14
**john** 37:21
**join** 170:11,18 296:10 350:13
**joined** 12:7 32:12 51:1,5,8 353:18
**joining** 49:5 50:8 150:11
**joke** 26:4,6,6 332:3
**jokes** 108:4,10 109:4 221:23 226:22 227:18 286:8
**jokingly** 31:3
**jonathan** 8:5 10:8 15:8 72:23 294:14
**jones** 3:3 16:9 16:12 70:14,16 70:20 71:13,23 72:14 73:7 77:23 88:2,10 88:15 92:10
**jonesworks** 1:12 2:12 3:3 16:10,13
**joseph** 261:15
**josh** 20:12,13 81:7 82:12,17 83:14
**journalist** 382:16
**journalists** 382:10
**jsunshine** 7:14
**judge** 29:24 390:24 392:14
**judgment** 217:10
**july** 67:17 69:22 325:10

325:15 326:4 328:12,14,18 328:21
**jumbo** 244:2
**june** 213:17 214:2 215:4,7 215:17 216:9 218:1,13 220:8 222:17 227:24 234:5,5,7,7 247:1 248:2 251:22 253:12 253:17 265:8 268:19 313:20 316:3 317:10 318:14 319:15 319:17 321:5,9 321:17 322:18 325:3
**justin** 7:3 8:2 9:3 10:5 16:23 17:7 19:19,21 21:19 22:23 25:23 30:15 40:24 41:16 42:10 55:16 121:5 128:4 146:5 148:22 160:17 173:8 188:25 189:7 191:3,6,24 192:2 194:18 209:12 210:19 211:19 212:19 213:23 217:15 218:14,24 226:13 234:11 234:20 238:6 244:9,10,22 245:2 246:3 248:4 249:10 252:4,18 254:12 269:12 269:22 275:19 277:21 286:15 287:21 288:4 290:7,14,21 293:3,15 295:17 296:6,8 296:24 298:13 303:14,17 305:12 308:12 314:12,21,21 319:17 321:20 331:8 341:15 378:25
**justin's** 40:5 93:5,16 120:10 121:8,14 122:24 123:1 378:23
**jw.com** 9:23

**k**

**k** 5:16
**karaoke** 314:15
**katelyn** 4:7 16:1
**katie** 13:21,23 20:15 340:5 344:1 347:23
**kbender** 5:19
**keep** 78:5 84:14 144:4 146:3 178:15 184:19 200:13 211:9 350:24
**kept** 145:9
**key** 156:9
**kids** 30:1 179:23 356:6 393:1
**kind** 26:1 30:20 31:15,23 32:22 41:10 62:22 63:17 111:16 171:9 190:2,7 244:14 248:12 298:13 331:11
**kinds** 64:12
**knew** 21:24,25 22:1,1,3,8,21 68:20 73:3 95:20 96:1,13 133:10 158:17 159:5 224:25 248:17 249:4 250:9 260:19 268:7 289:12 297:24 298:7,9 298:11,12,12 298:17,18,19 299:19,22 304:14 306:24 320:2 331:7,7 350:8 356:7
**knight** 29:3
**knocked** 210:21 211:18 211:20 244:13
**know** 27:10,13 31:8 36:21 38:10,14 39:2 39:13 41:1,4 44:2,22 45:16 45:20 46:15,16 46:22,24 47:17 51:25 52:4,11 53:5 55:19 62:18,22 63:8 63:21,22 67:15 70:17 71:25 73:13,14,16 75:5 76:19 77:2,13,15 79:3 79:4 80:16 81:15,17,24 83:9,11,25 85:13 86:24,24 86:25 87:6,6,14 87:15,19 88:4 89:16 90:19 92:22 96:2,4,11 96:14,22 97:3,4 97:4 99:25 118:8,10 119:2

120:19 124:8 127:17,19,25 127:25 129:8 130:17 132:12 132:19 134:20 134:22,23 135:1 138:22 139:5,6,22,23 140:3,4,19 141:2 144:3 148:14 149:2 150:21 151:8 151:10 153:5 155:19 157:3 158:1,16 159:4 159:5,5 160:23 162:21 166:7 171:5,5 172:5 176:18,20 180:12 183:1 184:4 185:6,14 186:3,10 187:11 189:10 190:1 192:9,25 193:4,8,8,24 194:24 199:12 199:14,15 200:12,21,21 200:23 201:2,7 202:7,9,20 203:2,6,14,22 204:14 209:1 209:18 219:14 219:18 221:1,9 223:15,18 225:3 229:3,17 230:19,19,21 235:20 237:12 242:15,17 244:5,14 245:13 248:9 248:10,10 249:3,3,19,24 250:4 251:24 252:8 257:24 259:3,18,20,24 260:23 261:6 263:11 269:14 274:7,9,10,23 275:19,19 277:3,21 278:12 282:25 283:22 284:15 294:11,13 295:3 297:14 298:7 299:23 302:21,22 303:8,9,19,20 303:22 304:5 307:24 308:15 319:10 320:16 323:6,7,9,13,14 323:15,18 324:2,10,11,12 324:12,25 325:7,8,14,25 326:5,9,11,24 327:1,13,14,19 327:20,24 328:2 329:4,6 329:16,19,23 331:6,11,18 332:14 335:10 336:1 337:1 338:10,15 343:8 349:16 350:6,10 351:12,16 353:18,19,24 353:25,25 354:7,8 356:1 356:21 357:17 359:12,18,20 360:24 361:2 361:23 362:1,8 362:11,13,16 362:25 363:20 364:11,12 365:3,17,19 366:13 367:3,5 367:6,11 369:14,20,24 370:11 371:12 376:5 377:12 379:21,22 380:1,15 382:12,19 384:16 385:11 388:10 393:8 395:12,18,22 396:2,4,10,15 396:16,17,18 396:18 397:5 397:19 398:9 399:8,8 400:17 400:18 401:2

**knowing** 65:20 69:11

**knowledge** 75:13 202:23 395:9

**known** 18:4 75:25 190:14 266:3 299:7

**knows** 61:13 69:6

**koslow** 20:17

**kristin** 3:6 5:14 16:8

**kristintahler** 3:12

**l**

**label** 28:1,4,7,9 28:12 67:24

**labor** 181:19

**lack** 244:19 356:9

**ladies** 257:4,14 257:20,24 258:5,24 260:1 260:3,12,18

**lady** 259:1

**laid** 28:3

**land** 156:19

**landscape** 30:3
**language** 97:18 108:22 140:18 141:3 142:17 142:20 143:7 174:8 175:6 200:22 250:1 278:23 290:23 334:21 344:13 358:2
**lanius** 261:15 262:16
**lasted** 28:12
**late** 209:19
**launch** 294:5 294:23 295:10
**law** 3:8,18 4:8 5:5,15 6:6 7:9 8:6 9:6,8,19 388:9,10
**laws** 404:21
**lawsuit** 95:3 150:12,19,21 151:2,4 371:13 374:6 377:3,18 377:25 378:7 380:23
**lawyer** 98:12 99:4 102:4 111:11 140:8 377:17 390:9 390:10 392:12 393:19 394:13 394:14
**lawyers** 76:5,10 76:12,18 77:11 84:25 85:3 88:14,16 94:17 145:24 179:1,5 179:10,16 180:17 181:22 186:15,18 261:25 263:18 311:7 317:4 332:14 387:23
**lead** 1:7 2:7 31:9 118:1,6,13 118:20 119:7 121:25 202:22 268:8
**leaders** 222:9
**leadership** 41:21 128:5 134:8 135:18 135:22
**leads** 149:11 272:5
**leaned** 211:22
**learn** 65:3 130:15 213:8 234:23 243:11 243:18 249:22 370:1
**learned** 74:14 176:23 177:22 213:11 242:10 242:13,19 243:1,9,12,13 243:14,24,25 338:25 371:14 377:19 379:25
**learning** 159:17 216:17 253:14 349:10
**learns** 65:10
**leave** 204:5 263:12 289:19 391:22
**leaves** 46:12
**leaving** 188:3
**led** 55:22 83:24 90:11,24 210:23 272:8
**left** 46:8 136:16 189:22 212:17 237:10 274:7,9 293:2 347:19 381:12 386:25 387:1,4 388:13 393:2
**legal** 10:6 15:9 18:1 94:25 95:2,10,13 262:11,15 266:22,23 270:2 282:13
**legitimate** 61:20 62:14 63:3,19 64:13
**lengthy** 229:3
**lessen** 226:23 227:20
**letter** 93:21,25 94:12 228:19 231:1,10 263:20 267:4 269:25 292:1 315:13 371:20 371:25 373:5
**letting** 393:4
**level** 39:14 41:11 80:5 110:24 139:15 139:16 355:1
**levels** 267:10 317:23,24
**lftcllp.com** 7:12 7:13,14
**liability** 378:9 378:23 379:11 379:19
**liable** 152:10
**liar** 382:16
**lie** 148:9
**lieberman** 117:17
**lied** 143:17
**lies** 41:25
**lieu** 292:3,8,12
**life** 18:6,23 21:9 24:16,24 28:18 29:10 31:7 41:23 49:15,18 67:6 67:10 68:7

**lifetime** 68:15
**light** 13:15 222:10
**liked** 145:13
**likes** 146:13
**lily** 156:15 168:21
**limited** 167:19
**lindsey** 6:5 13:10 261:14
**line** 41:15 89:6 103:1,6 130:13 138:17 139:2 171:10 200:16 226:17 350:23 394:11 398:22 399:6,22 405:5
**lined** 31:23
**liner** 7:5 16:17
**lines** 45:10,12 45:14 206:13
**lingering** 287:22
**links** 314:11
**lip** 287:22
**list** 24:15 156:20 200:9 224:23 263:3 265:19,22 266:8 270:9 274:5,13 275:7 276:19 277:12 281:14,19,23 281:24 282:1,4 282:16,21,23 282:25 283:3 288:10,22 289:21 296:19 324:3
**listed** 52:17 199:2,5 263:2 281:13 341:25 342:4
**listen** 75:22 84:3 95:12 175:14
**listened** 74:4,5 75:17,20 86:2 88:9 94:21 95:1 307:12
**listening** 73:21
**lists** 322:16
**litigation** 373:17
**little** 25:4 26:3 26:5 53:6 56:13,15 102:5 112:18,18 159:12 168:12 181:25 237:18 242:12 248:13 293:4 299:19 300:3 330:16
**litwack** 12:22
**live** 18:12 35:10 38:25 220:21
**lived** 18:16,22
**lively** 1:5,15 2:5 2:15,20 4:3 5:2 6:3 12:3 13:3 14:3 15:13,22 15:25 16:3,5,7 19:12 88:11,16 89:1,5,21 93:23 95:3,13 157:4 157:10,12,16 158:7,15,23 159:24 165:5 165:22 166:3 166:14,16 167:5,22 168:6 168:17,20,24 169:11,24 170:11,18 171:16 173:9 174:25 176:9 178:4,7,18 184:1 187:8,16 190:12 191:14 192:10 194:16 195:9,19,24 196:6 204:21 206:10,24 207:6,16 208:3 208:17 209:5 209:11 210:11 213:8,14 214:12 215:10 215:18 216:18 217:2,16,16 218:14,15 219:2 220:7,22 221:5,17,22 222:18 223:1,8 224:2 226:21 227:23 245:3 246:2 247:3,18 248:21 250:12 250:13 253:23 258:24 259:7 260:4 264:1,6 264:23 265:8 266:9 268:13 268:20 269:5 279:5 281:22 282:4,17 283:2 283:4,15 287:18 291:11 292:11 293:8 296:12 297:11 299:17 300:5 301:11,14 302:2,5,9,13,19 303:5 304:2,9 305:9,15,17,21 306:19 317:14 318:7,14,20 319:15 320:20 321:4,9 322:11 322:17 328:11 328:18 330:5,8 330:19,21,24 331:3 371:9 373:16 401:4 401:10 405:2

**lively's** 19:16 166:23 204:8 205:12 208:23 262:1 265:16 279:13 280:19 293:25 320:5
**lives** 39:2 47:19 87:22 284:24
**ljl** 1:7,7 2:7,7
**llc** 1:8,12,13 2:8 2:12,13 3:4 7:2 9:2 12:3 13:3 14:3 15:14 32:7 134:3,9,11 134:17,21,21 134:25 135:15 135:19 154:3 154:12,15,21 154:25 405:1,2
**llp** 4:4 9:17
**loans** 45:11
**local** 126:4,14 397:10 398:4
**located** 15:9 70:8,25 71:23 82:23 83:10 86:17 87:2 400:20
**location** 71:5 166:13 231:21 233:5,20
**logan** 37:21
**long** 18:16,22 33:5,21 34:1 38:19,22 40:6 66:12 75:25 104:21 182:10 270:6 289:24 384:2 390:23
**longer** 287:24 394:16
**look** 31:15 32:23 47:24 63:13 83:23 97:6,19 100:12 114:3 172:24 191:25 198:9 206:23 207:17 212:1 223:16 223:19 225:9 256:13,18 264:2 267:4 282:16 301:6 338:18 344:8 344:17 384:1 385:23
**looked** 135:2 142:23 189:9 207:6 208:5 211:22 212:5 314:19 338:16 344:5 346:13 366:6,13,18,22 367:5 373:5 384:2 397:10
**looking** 26:2,2 31:21 43:12 127:5 155:23 248:7 258:7 266:21 320:4 327:13 328:15 331:13 340:20 348:11 351:6 357:2,13,15 367:20
**looks** 44:10 118:23,25 175:18 211:24 317:8 346:21 346:22
**los** 1:20 2:22 3:11 4:11 5:7 6:8 7:11 9:11 15:9,11 18:15 21:23 83:5,6,15 86:20,23 87:2 87:11,13,19,22 91:25 92:3,5
**lose** 212:11,12
**losing** 73:2
**loss** 42:18,21 43:3,20,25 44:3
**lost** 319:17 331:8
**lot** 20:9 30:16 30:18,18 35:7 46:9,10 47:23 47:23 84:4 152:14 165:10 187:23 188:21 197:2 221:5 224:22 233:16 234:12,14 249:15 263:13 267:24 273:25 275:22 288:7 290:6,10 293:11,14,17 293:18 295:4 297:7 300:3 305:25 317:22 319:19 320:17 331:7 346:14 350:11 356:8
**love** 24:7 26:9 164:7 189:20 356:10,13,18
**loves** 24:10 164:14,24
**lower** 274:17
**loyal** 234:17
**lucky** 28:25
**lucrative** 29:17
**lunch** 175:21 176:2
**lying** 217:8

**m**

**m** 18:9 33:17
**ma'am** 388:11
**maaren** 3:17
**maarenshah** 3:22
**made** 70:22 71:8 76:22 91:23 114:23

121:2,20 145:9 151:13 165:15 190:25 215:12 215:19 223:17 223:21 224:20 246:23 248:25 256:14 368:18 370:15 371:16 372:3,15 373:20 380:16 389:22 392:8 394:8 403:7 404:10
**madison** 3:19
**maggin** 81:7 83:14 87:9,10
**magic** 63:12
**mail** 72:8,16 74:15 80:1
**main** 271:5
**maintain** 79:13 114:21
**maintenance** 159:12,20 160:1,4
**make** 25:10 59:7 65:16,24 79:18 87:25 89:21 100:1 105:8 106:18 128:24 133:15 133:18 138:4 147:2,5 165:19 165:25 166:4 167:7 168:15 171:2 211:2 221:23 226:22 226:22 227:18 227:19 229:14 249:25 258:8 268:17 288:8 290:15 291:14 293:20 305:15 308:14 329:17 332:9 339:9 351:2 354:16 355:1 362:17 370:7,24 373:5 381:11 387:8,9 387:15,20,24 388:14,15 389:1,10 390:25 391:20 392:1,17,19,25 393:3,4,4,6,9 393:16,18 394:1
**makes** 59:5 175:14 222:11
**makeup** 201:20 204:9,23 208:23 209:22 210:11,21 212:18 213:3 214:20 222:20 314:18
**making** 41:13 41:15 42:4 63:13 79:20,22 79:23 121:5,6 121:18 136:16 136:23 137:13 152:20 222:10 226:21 241:22 244:22 245:2 271:12 298:8 300:2 302:5 303:13 329:8 344:15 350:25 390:13,22 392:4 393:13
**male** 40:21 252:21
**malpractice** 402:7
**man** 36:21 139:18 153:8 173:18 359:6
**manage** 78:4 300:1 303:15 331:16 376:15
**management** 113:4,9 136:2 139:14 330:23 331:25
**manager** 34:14 36:24 112:19 112:25
**managers** 64:9 103:11
**managing** 234:20
**manatt** 2:20 4:4 15:20,23 16:2,7
**manatt.com** 4:12,13,14
**manner** 47:25 69:15 114:15 367:14 397:24
**manu** 33:14,22
**manually** 369:19
**marbory** 40:4
**march** 117:16 118:23 119:18 166:22
**marie** 86:10
**marital** 101:20
**mark** 97:10 119:13 146:8 153:20 169:5
**marked** 97:12 117:7 119:14 125:20,21 153:21 160:12 160:13 169:6 173:3 197:18 197:24 214:5 254:8,9 261:12 272:10 273:15 280:24,25 313:11 315:23 315:24 339:19 339:20 347:25 352:13,18

382:23,24 383:8
**market** 49:2,3
**marketing** 36:20 37:4 81:11,12 82:8 147:22 148:20
**marking** 117:6 173:1 261:8
**marks** 402:12
**material** 229:23 230:2 235:15 376:6,9
**matter** 23:4,5 74:10,12,13 366:8,25 367:25
**mattered** 358:23
**matters** 115:20 122:14 123:8 130:8 138:24 139:2 381:8,9
**mckinney** 9:20
**mean** 22:10 34:16,18 41:22 43:13 50:2,10 55:15 63:9 71:15 79:22 83:1 89:15,15 89:20 107:4 109:13 118:11 129:15 135:21 143:14 151:15 167:11 179:8 181:14 182:14 183:14 186:1 192:5 198:22 204:3 223:4 229:1 246:15 255:15 282:19 283:8 290:12 296:1 300:6 305:23 320:16 323:5 332:4,12 336:14 356:18 357:13 358:15 365:3 379:23
**meaning** 31:4 34:21 200:19 243:5 271:3 302:13 332:11
**means** 122:22 122:25 200:23 202:20 268:9 376:7
**meant** 89:16 123:15 245:23 277:21 323:8 323:11,25 324:2,9,12
**mechanism** 88:5
**media** 331:13 358:11
**medication** 21:2
**meet** 21:19,20 21:21 209:12 209:19,22 212:25 214:21 215:9 269:13 353:19 354:7
**meeting** 144:18 144:24 206:12 209:13 210:4 210:12 212:8 213:2 214:1,13 215:7,10,17 216:9,18 217:1 218:1,11,13,21 220:8,23 221:7 222:18 226:5 227:9,10 247:1 247:6 268:19 279:13,15,25 280:14 281:10 281:22 282:8 282:18 283:16 284:19 286:5 286:10,19 287:17 288:12 289:1,24 291:8 292:2 322:22 322:25 346:18 356:12 357:16 374:5,9,13,16
**meetings** 69:4 268:24 287:18
**melissa** 7:3 9:3 16:24 19:18 186:20 333:2 333:10,15 340:6 346:16 347:24 348:23 349:24 360:19
**member** 1:7 2:7
**memorialized** 27:18
**memory** 27:17 68:13,17 69:5 75:9 84:5 89:10 95:17 133:5 134:18 179:21 187:4,6 209:3,7 211:8 220:13,16,20 222:5 223:2,5 223:11,24 229:14,20 237:8 238:21 238:23 245:3 286:22,25 287:16,19 288:2,18,22 290:3 294:9 302:18 304:5 338:9 345:14 352:4 360:18 360:19 363:5 365:3,5,20 369:4 378:18 379:7

**men** 152:6
**mention** 284:12 375:12
**mentioned** 25:25 27:20 37:14 48:24 49:14 54:23 56:6 87:24 189:3 192:2 194:3 244:15 244:21 248:4,6 249:20 284:20 288:3 293:16 304:17 341:22
**mentioning** 82:1 246:17
**merge** 150:7,7
**merit** 60:11,20 62:16,18,19 380:5
**merits** 61:3 63:4 394:17
**message** 13:12 132:18 148:25 149:2 163:25 170:14 173:12 214:12 215:1 227:11 317:25 318:7,11,24 319:5,8 321:12 357:14 359:6 360:1,4,25 369:2
**messages** 12:16 12:18,19 13:6,8 13:17 14:7,9 159:23 301:9 301:10 318:20 359:23 361:25 362:19,23 363:7 366:7 367:23
**met** 22:2 25:23 95:22,25 264:9 314:13,21 321:20
**meziane** 13:11 261:15 262:9
**mgottlieb** 5:8
**michael** 5:4
**middle** 124:5 359:8
**midwife** 179:23
**mike** 16:4
**million** 43:8,21 44:4 45:4 46:4 46:5,6,9 48:16 145:5,7,14 146:8 332:1,17
**mind** 42:12 53:8 60:11 72:4 73:13 81:19 191:8 198:1 201:13 254:21 256:11 339:22,24 380:7,9
**mindful** 233:14 298:20
**mine** 275:18 332:17
**minimum** 224:25 329:1 361:9
**minute** 66:10 124:15 212:6 272:23 387:6 392:17
**minutes** 20:16 20:18 26:1 48:18,19 124:21,22 175:22 212:7 212:22 235:5 249:6,9,14 294:17 347:21 381:12 387:1,2 387:3,4,19,20 388:13,20 389:7 393:25 394:24
**mirror** 207:7
**misconduct** 58:18,20 59:1 59:15 115:5
**missed** 36:24 270:16
**missing** 286:10
**mission** 41:17
**misunderstan...** 225:21
**misunderstood** 50:11 218:4
**mitigation** 340:9
**mitra** 9:7,12 16:20
**mitz** 37:7 39:13 313:19,25 318:7,20 321:8 323:11 324:8 327:23
**mixed** 293:14
**mixer** 397:8
**mm** 265:6
**mode** 372:16 372:20 373:6
**mom** 22:8
**moment** 26:5 52:14 64:17 88:6 90:11 113:21 134:19 161:22 168:5 186:2 193:25 208:18 226:10 230:3 237:4,9 254:16 257:23 282:15 289:6 326:1 372:7 398:1
**monday** 27:20
**money** 24:19 41:10 42:4 46:21,22 54:4 145:14 212:11

212:13 258:20 332:8,13,16 347:1 355:6
**monica** 6:7
**monitor** 231:21 336:7,9 351:3 354:8
**monitoring** 333:19,21 336:11,17 337:14,22,24 341:14,24 344:14 356:22 358:11,15,16
**monitors** 288:14
**month** 40:1 300:22,24 301:5,10,17 337:12 350:3 350:12 361:23 364:17 366:19
**months** 33:6,23 34:3 67:16 148:18 294:12 294:12,13 350:3 365:9
**monumental** 349:14
**morning** 15:4 17:12 209:10 209:11,14,25 213:24
**motions** 282:13
**mouse** 168:12
**move** 112:17 131:19 166:21 271:8
**moved** 21:23 62:11 65:15 152:11 166:13 219:21,25 223:24 293:7
**movie** 49:19 54:5 55:20,25 116:19 128:20 129:7,19,21 130:9,23 131:3 134:3,21,25 135:15,22,24 137:2 139:18 144:4 145:5,8 146:7,16 148:3 149:5 154:15 154:21 156:9 162:13,15 163:20,22 165:6 166:10 167:12 170:24 190:17 221:7 232:6 263:15 266:21 271:6 291:10 302:6 317:12,13,16 318:16 319:16 319:18,21,24 323:2 331:9
354:25 376:14 377:14
**movies** 116:23 129:12 130:4 131:17 137:1,9 138:5 335:8
**moving** 71:7 250:22 270:7 280:10 282:14 319:20 379:24 380:25
**multiple** 123:4 123:7 149:19 149:20
**mumbo** 244:2
**music** 27:25 28:2 29:7,14,16 30:21 31:19 49:19 50:20
**musicians** 29:19
**muted** 74:1
**mutual** 21:22

**n**

**n** 3:1 4:1 5:1 6:1 7:1 8:1 9:1 10:1 33:17
**naked** 187:10
**name** 15:7 17:25 18:1,5 28:7 33:18 36:11 40:15,15 96:22 97:3
199:18 278:13 295:18 377:12 405:2,3
**names** 82:2 203:1,4
**narcissist** 306:3
**narcissistic** 306:4
**narrative** 122:17 341:16
**narrow** 315:3
**nathan** 7:3 9:3 16:24 19:18 186:20 333:10 333:15 340:6 344:25 346:9 347:24 348:23 349:10,24 350:6 360:23 361:10,19 364:5 365:10 366:8,24 367:13
**native** 316:14 316:25 317:2
**nature** 41:12 45:25 89:9 92:16 104:15 104:20 105:3 105:12,25 107:6 109:17 112:11 161:13 178:22 205:14 206:20 207:4

244:20 246:8 246:21 252:10 288:5 289:20 293:5 308:14 335:9 345:15 356:23 357:4
**navigate** 83:24 298:20,22 319:20
**navigating** 24:25 303:14 305:24
**nearly** 357:21
**necessarily** 55:18 57:10 104:15,19 105:3 124:2 137:5 201:4,21 221:12 271:15 288:21 320:7
**necessary** 201:3,8,19,21 203:18 204:5 292:16,19,20 292:22
**need** 31:1,11,14 60:8 63:17,21 65:13 72:2,12 72:20 79:3,4 97:24 98:3,15 98:17,22 99:24 117:8 130:16 136:13 146:16 155:9 156:14 161:8,13,23 162:2 172:17 189:16 196:3 197:22 198:24 201:20,22 204:1 235:1,5 235:12 254:23 255:7,13,15 256:13 270:10 276:4,7 286:23 287:24,24 292:13 294:19 307:20 308:16 314:9 326:24 333:18 350:8 351:2 380:24 384:1 385:6 389:9,14,17 391:25 394:19
**needed** 35:18 35:19 62:10 65:14 74:20 89:10 94:12 171:1,5,5,9 173:19 201:24 232:1 240:3,10 240:10 265:20 266:7 315:5 334:16,18,22 335:25 336:2 337:1 349:19 353:20 399:10
**needs** 44:10 104:24 126:14 272:6
**negative** 43:8 142:8 144:10
**negotiate** 170:25 175:5 212:9
**negotiation** 153:13 171:10
**negotiations** 55:22
**neither** 250:12 284:23
**net** 43:3,7,20 44:3
**network** 158:10
**never** 21:7,8 25:17 28:17 68:7 128:17 132:22 148:8 194:23 212:2 217:6 224:1,4 225:25 237:23 239:22 241:4 242:1,16 284:15 286:13 287:7 292:21 296:15 338:16 340:21 342:3,8 342:23 343:4 343:17
**new** 1:2 2:2 3:21,21 8:9,9 31:21,22 32:10 145:24 166:13 234:8,16,19,23 234:23 341:13 388:3,8,9 400:21 405:1
**newborn** 179:24
**newly** 280:3
**nice** 353:19 356:5,21
**nicholas** 12:22
**night** 164:6 209:10 210:1,7 210:16 212:8 257:2 259:22 295:9
**nine** 283:5 289:4 387:4,5,7 387:19,19 388:13,19 389:6 393:25
**nobility** 41:23
**noise** 356:8
**non** 12:15 393:19
**nonresponsive** 131:20
**normal** 49:20 131:17 304:15 304:16 371:6
**normally** 129:3 201:23
**norman** 149:15 149:19 150:15

151:13
**norman's** 377:3
**northwest** 5:17
**notary** 403:17 405:25
**note** 269:4 392:11
**noted** 391:11 403:5
**notes** 230:8 404:16
**notice** 2:20 371:15
**noticing** 15:19
**notion** 130:20 165:5
**notwithstandi...** 206:3 207:6
**november** 261:16 262:21 263:5,7 273:19 273:23 274:6 292:12 365:5,9
**nuance** 47:19 144:25 146:22 146:24 147:7 147:10 229:13
**nuanced** 156:22
**nude** 177:19 178:4,11,12 180:19 184:23 283:24
**nudity** 200:20 200:24 203:11
**number** 39:24 46:4 101:10 122:12 140:12 140:13 141:18 146:3,5 238:25 264:13 266:14 279:23 283:23 285:1,6,6 288:11 332:18 350:14
**numbers** 138:19
**nursing** 211:23 212:4

**o**

**o** 28:8,8
**oath** 404:7
**object** 98:13 391:5 394:23
**objecting** 391:7 391:10
**objection** 23:13 26:12,25 34:12 35:24 36:6,10 39:17 44:5,12 44:21 45:2 47:2,9 48:7,11 50:5 51:4 52:13 54:16,22 55:8 56:2,19,25 57:5,15,20 58:1 58:8,14,21 59:4 59:17 60:1,13 60:19,24 61:18 63:6,14,20 64:15 65:8,18 65:25 66:9 67:1,5,20 68:1 68:10,25 69:16 69:24 70:6 71:9 72:9,17,22 74:3 75:8,14 76:4 77:12 78:2 79:6 81:1 82:6,21,25 83:16 84:15,20 85:5,10,18 87:5 88:3,17 89:23 90:4,7,18 91:3 92:6,13 93:14 94:10 95:4,8,15 97:2 100:8 102:23 105:13 106:15,22 107:13 108:18 108:24 109:6,9 109:24 110:6 111:2 112:14 113:13,25 115:15,22 118:21 121:16 122:3,15 123:3 123:9,17,22 124:1,10 125:7 127:8,13,21 128:7,13 129:5 129:16 130:2 131:15 132:1 132:11,16,20 132:24 133:4 135:7,11,20 136:4,7,20 137:25 138:7 138:14 140:10 141:1,8,11,21 143:3,19 144:13 145:2 146:25 147:18 147:24 148:17 150:25 151:17 152:19 155:7 156:11,16,21 157:6,19 158:19,25 159:3,10 160:2 161:11 162:23 163:1 164:17 165:18 167:25 168:8 169:1 176:15 177:5 177:13,21 180:10 181:24 184:17 185:4 185:13,21 186:8,16 187:17,22 188:6 191:17 192:19 193:21 194:11,20,25

195:12 196:2
196:13,20
197:9 199:11
199:19 200:4
200:14 201:1
202:3,6,19
203:5,12,16
204:24 205:5
205:19 206:5
206:15,18,25
207:11,18
208:6,13,19
210:14 211:5
215:13,21
216:2,10,20
217:9 218:17
218:22 219:5
220:5,14,24
221:8,18,25
222:13,22
223:3 224:11
224:17 225:2,2
225:10,18
226:7 227:2,25
228:14,22
229:11,22
230:10,14
231:3,8,15
232:7,11,17
233:25 236:16
236:19,23
237:1 238:3,20
239:5,17,21
240:4,12,22
241:13,16,24
242:25 245:6
245:25 246:6
248:1,23 249:1
250:15,21
251:6,12,15,23
253:1,13,18
254:2 260:6,14
261:1 264:25
265:10,18,25
266:11,19
267:21 268:15
268:22 269:11
270:15,25
271:14 272:2
276:3,10,22
277:4,7,15,18
278:6,17
283:17 288:20
289:15 290:5
291:12,25
292:14 293:22
296:14 297:18
297:21 298:1
299:2,18,24
300:7,11,25
301:12,18
302:3,23 303:7
304:4,12 306:8
306:14,21
307:7,14,25
309:8 318:3,9
318:22 319:4,9
320:6,22
321:11,18
322:6,12,19
323:21 324:1
325:19 326:12
326:23 327:6
327:11 328:1
328:20 329:3
329:12 330:13
331:1,21 332:5
334:10,20
335:2,3,17,18
336:23,24
337:15 338:13
339:4 340:18
340:19 342:1,2
342:7,7,20,21
343:13,14
344:10 345:3,4
345:11,12,20
345:21 346:3
346:10,11
347:2,3,8,9
348:7 351:10
351:11,22,23
354:22 355:8
356:14,15
357:12,23,24
358:9 360:15
361:3,6,11,14
361:22 363:1
363:18,24
365:11,25
366:10,16
367:2,16,17
368:2,3,8 370:4
370:13,21
371:2,11
372:12,21
373:18 374:10
375:17,23
376:3,12,21
378:2,11,17
379:3,12,20
380:6,13,17
381:10 382:11
382:18 384:5
385:8,19 386:3
390:23 391:4
391:11 392:17
393:7 395:11
395:17 396:1,7
397:3,14
398:15,24
399:17 400:4
401:6,21 402:3
402:8
**objections**
98:14 99:5
380:25 404:9
**obligated** 113:2
113:16
**obligation**
113:10,24
**obligations**
46:13 370:19
**observation**
32:21

**observe** 368:17 368:20
**observed** 207:7 208:17 270:11
**observing** 369:1
**obtained** 360:8
**occasions** 18:25 239:15,20
**occupied** 358:7
**occurred** 24:23 86:18 144:23 213:3
**october** 1:21 2:24 12:4 13:4 14:4 15:2,7 176:5 364:20 364:23 365:9 404:22
**offensive** 104:16 105:19 106:8 107:11
**offer** 6:4 27:8 31:12
**offered** 25:1
**offering** 31:22
**office** 36:23 39:4,7,20 71:4 83:6 86:19 91:16,24,25 400:23
**offices** 2:20 83:12 400:21
**official** 240:20
**officially** 93:9
**oftentimes** 145:6 170:13 171:9 225:20 306:25 356:9 376:6
**oh** 40:22 52:24 52:24 62:3 71:18 77:6 125:12 172:21 182:11 189:15 211:24 219:17 219:17,20 223:18,21 225:23 250:2 305:3 387:2
**okay** 17:11 20:19 28:14 32:8 37:24 40:4,23,25 41:5 43:18,24 48:14 50:12 51:20 52:25 61:5,8 62:4,21 64:1,21 65:1 70:3,10,19 75:4 76:6 77:6 78:14,18 79:3,8 80:8,21 85:16 87:13,21,24 90:22,25 91:20 92:24 94:16,21 97:6,6 98:16 99:24 100:6,12 100:15 101:22 103:22 105:18 106:18 107:3 107:17 109:15 111:7 112:8,17 113:18,23 114:5 115:3,13 116:17 117:2 118:8,18 119:4 119:12 121:1 122:16 124:8 124:13 129:24 131:21 132:2 133:20 135:2,9 136:1 137:18 138:3 139:16 140:16,20 141:14,25 142:17,22 143:9 144:8,22 147:14,20 149:3,13 151:11,21 152:2 153:12 153:16,18,24 154:1,10,10,23 155:24 156:1,4 158:4,6,14 160:10 161:20 161:25 162:7 162:17 163:3,9 163:12,17 164:12 165:4 166:8 169:20 170:16 171:11 173:2 174:7 175:19 177:1,9 177:17 178:2,6 179:7,15 188:2 188:8 189:11 189:22 192:20 193:18 194:16 195:25 196:7 196:16,23 197:25 198:10 198:17,21 199:1 204:7 205:23 206:1 206:22 207:5 207:15 208:2 208:10,22 209:7 210:18 210:23 211:12 211:25 213:19 214:9 215:9 216:14,25 217:8,13,25 218:3,4,10,21 219:2 220:7,11 220:21 221:22 222:3,17,25 223:5 224:25 227:8,12,13 228:2,17 230:2 230:24 231:6 231:19 232:15 232:23 233:3 234:8 236:20

238:23 239:9 240:15 241:22 242:3 243:9,14 244:7 246:10 247:25 250:5 252:2 253:16 253:22 254:7 255:10 256:17 257:15,19 260:18 261:5,7 262:9,18,23 263:5,24 264:14 265:16 266:9,15 267:2 268:19 269:25 270:22 272:13 274:1,11,15 276:14 277:10 278:11,25 279:5,19,22 280:14,19,22 281:8,18 282:3 282:7,10 283:21 284:22 285:14,18 286:18 295:1,6 295:12,15,22 296:22 297:14 297:22 298:4 301:8 302:8,16 302:21 303:24 304:25 305:5,8 305:13 307:21 308:7,10,23,24 310:15 311:20 312:5,15,24 313:9 315:19 316:7,24 317:5 317:6,9 319:12 322:16 323:10 326:2,7,14,18 327:8 329:8,16 329:20 330:10 333:15 337:21 339:14 340:15 341:5,22 342:11,25 343:20 344:20 344:25 346:8 346:20 350:18 351:19 352:2 352:14 353:2 357:2 360:7 367:22 368:24 369:5,12 372:9 374:25 377:2 377:22 379:2 380:15,21 383:1,21 384:11,21,25 385:20,22 386:14 387:3 387:14 388:17 388:18 389:10 389:12 391:14 391:23 392:2,6 393:7 394:5,7

**old** 164:8
**older** 181:10,11
**olive** 175:12
**olivia** 3:7 16:11
**oliviaholmes** 3:13
**omg** 164:7
**omit** 34:21
**omitting** 35:25
**once** 29:17 40:1 55:20 148:8 185:22 293:2 300:21,22,24 301:4,10,17,19 344:14 346:17 359:12 370:14 371:24
**one's** 104:17 105:19
**ones** 19:8 29:5 29:20 52:20 94:24 112:3 130:25 137:3 183:19 185:12 234:23 259:6 283:20 284:1 288:6 362:5
**online** 38:10 148:1
**open** 198:23 210:23
**operate** 31:10 44:16 222:10 354:3

**operating** 43:3 43:20 44:3
**operation** 102:18
**operations** 34:11,13,14,19 36:19 37:7 39:13 44:3 45:1 133:21
**opinion** 300:3
**opinions** 234:16 298:21
**opopp** 28:8
**opportunities** 101:1
**opportunity** 29:18 100:18
**opposite** 210:24
**option** 350:2,7 350:14
**optional** 390:7
**options** 168:3,4 168:10,14,16
**order** 17:10 42:21 65:16 104:24 145:16 165:22 166:3 166:22 206:11 224:8 255:9 264:1,6 270:7 393:18
**organizational** 35:13

**original** 29:12 166:10
**originally** 171:21,22 184:6
**ourself** 46:8
**outfit** 249:20
**outlet** 29:21 74:16
**outlined** 330:6 339:11
**outlining** 338:11 339:2
**outloud** 241:7
**output** 336:21
**outset** 54:14,21 55:1
**outside** 39:14 126:25 127:7 127:18 128:11 128:17,22 129:13,14,15 129:17 140:1 150:1 262:16 371:5 392:6,7
**overall** 41:17 42:19 43:13,14 190:17
**overhearing** 74:2
**overseeing** 150:3,4
**owe** 46:12,21
**own** 31:5,19 59:15 133:22 137:2 174:23 189:17 205:8 285:20 289:18 349:2 380:4
**owned** 134:17
**ownership** 134:24
**owns** 134:20

**p**

**p** 3:1,1 4:1,1 5:1,1 6:1,1 7:1 7:1 8:1,1,5 9:1 9:1 10:1,1 28:8 28:8,8
**p&g** 145:10,11 145:16
**p.m.** 2:23 173:13 176:1,7 228:4,7 273:3,6 309:1,4 314:4 352:7,10 395:2 395:5 402:13 402:15
**pacific** 15:6
**page** 11:5 12:6 13:6 14:6 102:6 103:25 112:18 114:3 154:6 198:18 254:18 255:12 255:22 256:5 256:18,19 264:2 274:15 281:7 314:4,6 316:25 384:22 405:5
**paid** 26:16 46:8
**paper** 27:15 41:24
**paragraph** 104:2 107:18 270:21 276:23 281:14,21 385:24
**paragraphs** 281:9
**paraphrasing** 248:12
**pardon** 52:24
**park** 2:21 4:9 5:6 7:10 9:9 15:11
**part** 20:20 28:16 29:10 31:1 35:9,12 41:8 47:20,21 49:20 53:15,17 53:20 74:19 88:9 105:1 106:9 126:2 136:17 137:20 150:8 171:19 181:16 187:20 250:17 276:7 320:17,19 330:9 331:22 333:1 342:13 378:9,24 379:11,19 390:3
**participant** 392:24
**participants** 69:10 70:14 81:18,21 83:9 83:10 84:6,19 86:22 88:21 89:11 92:25 125:25 280:15 281:10,13 374:18
**participate** 71:14,15 86:12
**participated** 20:6,20 71:21 86:7 91:10 126:11 160:20 215:2 299:14 313:24 348:3,9 348:10,11 352:23
**participating** 116:7
**particular** 31:13 32:19 68:12,17 70:12 81:14 95:17 103:1 136:8,10 141:3 181:7,15

187:4 243:2 268:8 318:23 338:9 345:13 362:6 363:4 365:1 369:4,15 370:7 371:5
**parties** 16:19 16:21,25 17:3,6 61:12 114:20 134:12 372:5 374:3 404:18
**partner** 145:24
**parts** 96:11,12 96:13 250:23
**party** 1:11,12 2:11,12 74:2 134:22 280:4
**pas** 234:17,21
**passed** 167:12 380:19
**passionate** 235:8
**pasted** 174:11
**pasting** 174:16
**patch** 24:24,25
**patrick** 86:4 87:1 88:21 89:4
**pause** 29:12
**paused** 62:5 192:8,21
**pausing** 104:22
**pay** 46:10,13 139:8 344:23 373:19
**paying** 46:17 139:17 355:7
**payment** 44:13
**pen** 41:24
**penalty** 143:18 404:20
**pending** 98:2,9 391:4
**people** 20:9 22:25 24:16 25:10 35:7,12 37:11 42:2 46:21 53:20 82:18 133:23 135:10 140:13 152:6 158:11 159:12,17 160:4,4,5 170:13 198:24 199:1,23 201:19 203:10 204:5 205:23 221:11 225:20 226:23,24 227:19,21 234:14 267:25 293:9 331:9,13 331:18 335:12 335:23 351:4 351:14 362:4,7 368:16 375:9 402:2
**people's** 284:24
**percent** 27:6 43:6 89:8
**percentage** 145:17,23
**percentages** 41:11
**perform** 336:4
**performance** 106:6,14 107:10
**performed** 345:9
**period** 36:8 67:7 77:11 104:23 325:3 365:18 366:18 366:25 368:25 369:3 371:14
**perjury** 143:18 404:20
**perked** 222:5
**permitted** 98:12 200:9 310:17 391:10
**person** 20:4,5 34:18 58:19 59:2,9,12,19,21 73:21 74:23 75:6,12 76:15 79:25 110:25 130:5 279:25 288:12 291:7 346:18 358:11 360:10 374:15 374:17 400:1,3 400:6,9 402:2
**personal** 47:11 80:5 284:23 285:8 372:9
**personally** 372:3
**personnel** 114:15,17 201:3,12,16,24 202:2 204:6
**persons** 103:17 103:19
**perspective** 80:6 265:16 293:2
**persuade** 168:25 169:11 169:24 170:11 170:17 177:18
**persuading** 171:3
**pertains** 131:3 297:12
**ph** 295:18
**phelps** 2:21 4:4 15:21,24 16:2,7
**phillips** 2:21 4:4 15:21,24 16:2,7
**phone** 66:21,24 67:4,11,14,18 68:7 74:1

80:13,18,19,22 81:3 87:25 88:1,7 91:22 92:14,20,21 179:12,13,19 183:17,19,24 184:3,5,8,9,11 184:11,14,15 184:19,20 185:10,15,20 186:5,10,22 187:3 189:9 191:6 245:16 282:24 283:5 301:3,5 346:18 350:11 354:6 361:25 367:7,9 392:14
**photography** 267:14 268:6
**phrased** 283:6 283:7,12
**physical** 36:16 37:22 71:5 105:24 112:10 141:6,15 142:24 280:8 285:8
**physically** 38:23 89:18,19 236:15 400:19
**pick** 70:11
**pictures** 96:25
**piece** 27:1,15 41:24 227:17 251:4
**pierson** 37:21
**pivot** 30:5
**pivoted** 30:6
**pizzino** 12:22
**place** 22:18 57:13,18 72:7 91:24 120:9 147:15 210:5 210:13 227:9 294:23 374:16 404:6
**placed** 72:16
**placing** 202:25
**plaintiff** 1:6,11 2:6,11,19 4:3 5:2 6:3 15:15 15:21,24 16:2
**plaintiffs** 1:14 2:14 3:3
**plan** 166:10 171:6 244:14 280:6 342:18 349:4
**planning** 73:17
**plate** 189:17
**platform** 361:13 368:14 376:6
**play** 76:15 156:15 192:11
**playground** 393:2
**playing** 192:5,7 192:22
**pleasantries** 354:4
**please** 15:17 17:14 33:16 47:15 51:6 58:3,23 62:1,8 78:21 99:15 152:20 169:22 195:1,4 227:4 233:17 254:20 276:13 285:2 301:7,7 321:6 353:25 368:21 379:14 381:11
**pleasure** 348:17
**plethora** 168:14
**plumber** 335:25
**plus** 390:1
**podcast** 36:22
**point** 22:15 23:6 25:15 31:15 32:24 40:18 72:24 74:1 78:7 80:9 80:12 83:20,25 84:2 89:8 97:18 145:3,9 156:6 163:9 165:11 168:11 171:9,16 175:14 178:6 179:8,9 180:1 183:15 186:3 186:10 189:1 191:20 197:15 223:17 224:3 225:20 240:16 243:1,23 244:1 247:12 254:20 272:7 274:5,12 275:7,19 276:19 277:12 279:5 281:5 282:1,16 288:10 291:24 292:4,21 293:2 294:3 297:16 298:9 319:17 319:18 330:2 330:23 331:8 332:9 334:3 337:6 343:6 344:14 349:20 350:9 353:23 370:15 390:6 399:13
**pointed** 224:3
**pointing** 224:22 225:16,19 226:5 256:1

**points** 281:24 283:13,15 290:20
**policies** 56:12 61:14 65:24 66:4,7 114:25 131:1,2 135:3,9 369:5,12,18,21 370:2
**policy** 100:20 101:24 102:7 102:10,17 103:15 104:11 104:14 105:20 106:20 109:8 110:4,12,21 111:8,20,21 112:3,13 113:1 113:12,15 114:25 115:11 116:1,10 369:15 370:8
**pop** 214:20
**porn** 219:16 220:2 223:13 225:23 304:21
**pornography** 284:13,14,18
**portion** 74:5 75:20 105:9 192:12 281:17 303:19
**portions** 19:24 20:13,14 183:16 184:10 184:13 185:9 185:11,18
**position** 31:12 31:13 32:17,20 33:5,24 34:1 37:18,24 38:5 38:19 79:13,20 168:14 198:12 198:18 212:4 282:22 310:16 350:24
**positions** 35:1 37:3,12 122:12
**possible** 178:23 278:9 314:11 327:19 345:14 347:11
**possibly** 84:4 260:21 337:24 361:18
**post** 148:22
**postdate** 325:22
**pot** 171:4
**potentially** 330:25 335:11
**pr** 332:13 333:18 334:16 335:6,6,8 336:19 337:1 341:19
**practically** 136:24 394:20
**practice** 66:24 388:9
**practices** 369:6 369:22 370:2
**practicing** 388:10
**prayer** 180:1 273:18
**prayers** 13:12
**praying** 179:25
**pre** 55:16 267:14 268:5
**precedental** 12:15
**prefatory** 191:23
**pregnancy** 101:20
**preliminary** 347:12
**premiere** 83:22 85:22,25
**premise** 141:23
**prepared** 327:22
**prepares** 43:24
**preparing** 328:8
**presence** 129:10,12
**present** 10:3 17:6 19:13,15 19:20,23 20:2,7 29:11 38:23 71:16 178:2 199:17 215:6 228:11 248:21 249:6 281:15 281:16 374:19
**presented** 27:14
**preservation** 362:19 375:4
**preserve** 184:7 370:19,24 371:9,23 374:7
**president** 32:25 33:25 34:4,24 34:25 35:16 36:17,18,19,20 37:15,15 154:18,20
**press** 251:21
**pressure** 234:12 264:18 265:3
**pretty** 20:21 54:7 164:14,19 274:22 333:19 337:17,19 353:13
**previous** 40:3 73:2 234:17 284:13 378:7
**previously** 100:6 383:7
**price** 350:15

**primarily** 23:1
**primary** 74:17 74:17
**prior** 18:19 27:22 49:5,8,8 50:8,13,18,19 50:24 52:10,18 55:25 150:6 152:17 213:9 242:20 279:12 293:25 299:13 299:23 300:5,9 301:25 302:19 303:6 321:4,9 321:16 370:25
**private** 38:15
**privilege** 310:16,18
**probably** 19:25 20:18 80:17 94:23 105:16 260:25 301:1,3
**problem** 128:6 236:6
**problems** 304:16
**procedure** 131:1,2
**procedures** 56:12 133:25 369:6,13,22 370:2
**proceed** 65:20 98:24,25 398:8
**proceedings** 15:1,10 404:5
**process** 41:19 57:13 184:12 233:11 270:4 270:14,24 271:2 292:8,12 302:5 389:25
**produce** 76:5 140:8 146:16 179:5 181:22
**produced** 29:3 42:20 49:6 52:18 68:8 75:23 76:3,5,10 179:1,2 183:22 183:25 184:15 186:7 316:12 316:14,25 326:21,21 327:3 328:16
**producer** 27:25 28:15 49:7,22 49:24,25 50:3,9 50:16,17,19,23 51:2,9 52:6,7,8 52:9 53:9,9,12 53:15,18,25 54:8,11,13,20 55:24 56:7,16 56:17 57:4,11 118:6 130:13 136:18,21 137:8,12,15,17 138:18 171:20 171:24 172:1 172:12,15 173:24 174:4 175:1,9 200:16 280:4
**producer's** 283:25
**producers** 29:20 54:24 56:7 57:10 129:9 202:14 267:8 270:12 280:2
**producing** 53:23 54:3
**product** 29:25 41:15
**production** 28:1 31:19 36:17,17,18 37:16,22 42:23 67:23 118:14 118:24,25 121:22 122:13 124:5 128:22 129:13,15,18 130:1,12 135:25 136:3 137:3,5 138:17 145:17 224:23 244:18 261:17 262:1,20 263:6 263:12 264:7 267:14 268:5 270:9 273:9 279:6 280:1,16 297:12,15 300:20 301:21 301:22,25 304:15 317:3 317:23 318:2 395:10,16 398:22 399:3,7 399:23 400:21 401:16
**products** 29:24
**professional** 220:23
**professionally** 18:7
**profit** 42:17,21 43:24 45:20,21 46:2,14
**profitable** 45:5
**progress** 114:23 325:13 325:14
**prohibited** 102:14 104:9 106:12,20 107:6,8
**prohibits** 103:8
**project** 53:13 53:19 54:2 55:15 57:13 145:13

**projects** 30:19 49:15 349:14
**promote** 149:5
**promotes** 252:20
**promoting** 335:8
**promotion** 251:21
**prompt** 115:6
**prompted** 188:25
**promptly** 114:13
**pronounce** 40:16 262:10
**proper** 275:20 381:8 388:1
**proposal** 347:11
**propounded** 404:9
**protected** 101:11,23 102:13 368:14
**protection** 264:24 265:1,6
**protections** 261:17 262:1,4 262:19 263:2 264:3,8 266:8 267:16,19 270:10 278:21 278:25 279:17 296:19 304:1
**protective** 17:10
**protein** 189:16 189:17
**protocol** 120:11 131:17 244:19 244:20 399:11 399:15
**protocols** 57:18 120:8
**provide** 44:11 44:19,25 85:4 127:18 128:18 140:2,8 179:3 258:15 327:18 395:20,23 397:17,24
**provided** 54:13 54:15 68:4 85:2,8,12 138:23 351:9 395:9 396:5 397:5,12,21
**provides** 100:25 101:5 101:10 111:8 128:23
**providing** 101:7 103:18 211:11 395:15 396:22 397:1 398:13
**prowess** 109:21
**public** 89:22 147:22 198:23 305:15,21 330:25 331:3,6 403:17 405:25
**publically** 96:14
**publicist** 93:12 93:16,17
**publicly** 24:7 380:4
**publisher** 28:22
**pull** 279:21
**pumping** 212:5
**purpose** 41:23 42:5 69:7 86:1 89:3 106:4,21 107:12 170:17 170:21,22 193:19,23 202:11 296:3 306:19 317:17 319:25 354:12 375:3,6 390:23
**purposes** 136:3 189:18 273:12
**pursuant** 2:20 17:9 42:20 103:18
**put** 39:24 41:7 42:7,22 46:11 168:14 180:14 255:1 316:2 323:17 324:24 325:1,2 398:10 404:7
**putting** 198:1 203:10 314:9

**q**

**qualified** 114:14
**quality** 41:14 41:19
**quarter** 20:1
**question** 29:13 45:4,15 47:15 50:11,14 51:6 54:12 58:2,22 64:23 69:18 72:11 78:11,23 78:25 82:14 98:2,9 100:3 102:2 125:13 126:19 131:23 132:4 134:10 137:16 146:19 147:13 153:25 157:8,14 162:1 163:6 165:8 166:6,8 169:21 169:22 182:1 188:10,11,12 188:14,17 195:3,23 196:17 200:15 203:15 207:1

215:14 230:11 240:6 254:17 257:13 276:12 277:6,10 287:14 304:25 308:20 309:16 310:1,5 311:9 311:24 312:16 319:12 368:23 372:23 383:22 385:7 391:4,5
**questioning** 390:4,6 394:11 394:14,16,18
**questions** 45:13 97:24 98:23 99:16 147:1 152:20,22,24 160:24 161:9 161:24 194:25 195:2,4 196:11 198:8 211:10 218:7 256:11 256:12 287:2 300:23 311:4 311:12,14 312:6,8,19 313:4 380:25 385:10,14 386:1 387:22 388:14 390:8 402:10 404:9
**quick** 97:7 254:16 308:21 330:3,10,15
**quickly** 261:22 269:18 350:10
**quinn** 3:5,16 16:8,11
**quinnemanue...** 3:12,13,22
**quite** 19:2 29:16 79:11 89:17 190:14 295:23
**quote** 12:15 27:17 314:18 314:19 337:4 350:2,7
**quoting** 64:17

**r**

**r** 3:1 4:1 5:1 6:1 7:1 8:1 9:1,18 10:1
**r&b** 29:4
**racial** 151:13 153:7
**racially** 151:6
**rageful** 236:22 237:4
**raise** 17:14 133:10 288:18
**raised** 213:13 237:22 239:4 253:23 259:7 265:8 269:10 290:23 304:2 304:10,14 305:10 321:4,8 321:10 322:11 322:17 398:22
**raising** 58:12 145:8 151:5
**ran** 134:3,10 135:14,15
**range** 12:19 13:6 14:7 48:20 107:22 110:13
**rate** 44:19
**rather** 41:24 74:20 105:9 171:3 286:21
**reach** 114:18
**reaction** 290:18
**read** 66:3 93:21 97:8,14,14,17 97:23 98:3,7,16 99:24 100:17 100:24 101:6 102:11 103:2,7 103:14 104:7 105:23 107:21 108:2,13 112:9 112:24 114:10 115:4 116:4 117:24 120:6 120:18 122:18 122:18,21 126:23 129:2 132:4 142:18 155:9 160:21 161:4,6,8,21,22 161:23 162:2 162:12,17,18 162:19,20,24 163:3,5,8,16,19 164:4,13 171:1 172:2 173:14 198:7 213:12 214:19 219:12 227:16 252:12 254:16,19,23 255:3,7,19,24 256:3,21 257:1 257:9,17 258:11,17 262:24 263:25 264:5,16 266:5 267:2,6,15,15 268:2 270:1,16 271:1,1,21 274:21 277:3 277:25 279:24 280:19 281:1,4 281:22 282:4 282:10,21,22 282:24,25 283:2,4,10 284:15 286:23 288:1,11,16,22 289:4,6,21 314:8 315:9 340:17 341:6 341:11 342:12

348:25 349:12 349:21,25 351:20,24 359:9 383:9 385:4,6 386:2,6 386:9,11 403:3
**reading** 99:14 112:2 155:1 163:8 172:23 174:14,23 270:18,20 285:1 290:14 346:22 385:11 386:8
**real** 97:6 340:21,24 341:17
**realize** 61:6 223:22
**realized** 30:12
**really** 29:20 64:16 78:5 79:24 80:2 111:12 185:1 219:17 221:10 221:13 233:11 233:12 252:13 255:3 257:22 259:9 287:25 299:6 325:7 337:2 356:5,25 379:23
**realm** 32:16 358:17
**reason** 21:16 33:18 51:15 59:19 92:4 119:4,9 124:12 159:8 167:15 219:4 220:12 264:20 327:8 328:24 358:21 368:16 371:4 376:23 394:2 405:5
**reasonable** 114:18,23 120:25 121:1 124:6,9 194:7 266:25 278:21 279:1,4 334:23
**reasoning** 123:12
**reasons** 153:10 165:9 167:18 167:21
**recall** 19:8 27:18 33:19 38:13 40:14 52:15 56:11 68:11 69:14 70:4,5,9 71:6,7 71:19,19,20 73:22,24 74:6,9 74:22 75:20,21 77:21 78:12,15 78:25 79:24 80:19 81:10,12 81:18,25 82:5 85:6,16 86:9 88:5,18 91:2,15 92:17,23 93:19 95:16 118:15 118:16 119:11 120:24 126:8 128:15 132:25 133:2 140:21 142:2,10,11,17 142:20,23 143:2,4,7 144:6 149:16,21 151:1 155:16 155:19,20 157:15 158:5 159:16 166:18 166:20,24 167:18,21 168:23 169:2 169:23 170:4 172:8,9,10,11 172:13 174:12 175:3 177:12 177:14,20,22 178:23 180:3 184:12 186:19 186:21 192:7 192:22 194:12 195:20 197:11 205:6,8,11,13 205:14,15,20 206:2,17,19,22 207:3,5 208:1,2 215:22 216:6,8 216:12,16,21 216:25 217:2,5 217:14 218:11 218:12,18 220:10,12,17 220:17,19 221:10,13,16 221:20,22 222:1,12,14 225:11 226:6 226:10,20,25 227:23 228:13 228:15,17 229:7,9 230:13 230:24 231:1,6 231:14,16 232:13,15,20 232:22,25 233:2,3,7,21 235:10 236:8 236:11 237:16 237:24 238:4 238:18,19 239:2,11,19 240:8 242:10 243:12,14,22 244:4 245:1 246:10 247:8 247:11 250:16 252:7,11 257:22 258:1,2 258:3,6,7 259:8 259:9,23

273:22,24,24
278:20,23
279:10 282:12
282:17 285:11
285:12 286:22
288:25 294:2
294:22,25
295:1,2,5,6,23
296:8 297:7
298:12,18
304:6,13 305:3
305:6,12,23
306:5,6,9,13,15
306:16 307:15
307:18,21
308:1,4,9,11
323:6,22 325:5
325:7 326:11
329:19 333:9
338:4 342:9
344:21,25
345:5,8,15,16
345:25 346:6,7
346:8,13
348:14,15,20
348:22,23
349:5,7,8,10
350:8,11
354:11 355:22
356:2 357:6
360:2,5,13
361:20 366:11
367:25 369:1
371:13,17,21
372:7 374:5
375:6,10 376:4
377:4 378:3,6
378:15,21
379:5 384:7,9
384:11,14,18
384:20 396:24
397:22,23
398:1,2,9,16,18
399:18,20,21
399:24 401:11
401:14,18,22
**recalled** 170:3
**recalling**
304:19
**receipt** 349:4
**receive** 46:25
47:4 54:11,20
64:2,6 119:20
338:11 344:4
345:19 360:3
**received** 45:17
46:3 47:25
67:23 126:10
215:2 262:23
274:6 275:14
286:9 317:3
340:16 346:1
369:2 370:14
370:20 371:8
371:24 374:6
**receiving**
273:22,24
293:25 348:14
348:15,20
370:25
**recently** 338:16
338:25
**recess** 66:17
124:25 176:2
228:5 273:4
309:2 352:8
395:3
**recipient**
272:11,12
**recognizable**
61:21 62:14
63:4,10,19
64:14
**recognize** 97:21
119:23,24
126:7 154:11
154:23 160:19
161:17 169:9
169:16 175:13
214:11 253:20
254:14 269:16
313:21 348:2,6
352:20 383:14
383:24 384:3
**recognized**
219:23 223:14
269:14
**recognizing**
234:21 284:9
**recollection**
69:9 120:21
127:3 139:17
144:9,22 145:1
145:10 151:24
152:13 233:8
238:7 239:6
258:23 295:24
320:1 326:17
329:8,14
340:25 343:19
362:6 365:1
396:25 398:5
401:19
**recommendat...**
152:10 335:14
**recommendat...**
335:12
**recommended**
333:11
**record** 15:5
17:5,25 28:1,4
66:16,19,21
67:4 68:16
69:4 72:1,20
80:8 81:4
83:19 84:13,14
84:14 88:7,24
92:11 93:20
94:4 98:12,13
124:24 125:2
174:2,14 176:1
176:7 212:17
228:4,7 240:21
272:25 273:1,3
273:6,7 287:3
287:10 294:17

309:1,4 316:12 317:18 322:24 352:5,7,10 381:1,19,21,23 381:23,24 382:4,5 386:15 386:17,21,24 387:8,9,11,13 387:15,17,20 388:5,12,15,15 388:22,22,23 389:1,11,12,19 389:20 390:14 391:9,21 392:1 392:25 393:14 394:25 395:2,5 400:25 402:13 403:6

**recorded** 1:19 2:18 67:7,10,14 67:19,25 68:7 68:20 69:7,8,11 69:15,22 71:1,5 75:12 76:1,2,9 77:7 78:12 80:13,16 81:9 81:16,22 82:24 88:22 93:24 94:14,22 402:1 404:11

**recording** 15:10 66:24 69:5,10 70:5 73:8 75:3,7,7 75:18 76:11,18 77:10 80:9,14 80:25 81:12,18 81:23 84:2,7 87:25 89:12 93:1 94:2,9,16 401:24

**recordings** 67:24 76:21 77:4,8

**records** 301:3,5 396:13,19

**recount** 285:14

**redesignate** 273:13

**reese** 40:2,6 315:5,11

**refer** 22:10 64:24 257:14 263:2,3 281:9 359:2

**reference** 150:22 244:22 245:2,4,10,12 246:4 274:5,12 318:18 332:16

**referenced** 157:21 169:10 296:21 318:19 399:25

**references** 117:19 250:14 319:14 321:13

**referencing** 118:9 143:10 148:25 169:17 233:4 251:25 284:18 292:5

**referred** 137:16 247:19 249:23

**referring** 32:7 128:25 137:13 218:3 228:25 229:17 238:14 242:19,24 257:20,25 259:6 271:5 286:15 316:4 350:7 382:13 382:20

**refers** 284:16 319:6

**reflect** 84:3 89:10 288:1

**reflected** 183:15 202:1 316:13

**reflecting** 301:4 396:13

**reflection** 68:16 163:24 207:8

**refresh** 103:4 120:21 228:24 258:23 288:2 294:8 307:20 360:17

**refreshed** 361:16

**refusing** 386:1

**regard** 28:17 34:7 42:2 80:3 151:9,10 152:9 218:7 249:2 308:19 354:9

**regarding** 114:25 126:15 138:24 139:1 152:17 213:14 228:20 251:21 314:22 355:13 369:6,22 370:3 396:5,22

**regardless** 217:1 353:16 361:13

**regularly** 39:8

**rehearsal** 214:18

**relate** 85:22 318:7

**related** 16:24 17:3 36:23 47:1 67:19 85:23,25 150:23 267:19 318:14,19 319:15 320:5 330:24 373:15 401:4

**relates** 284:25 317:14
**relations** 9:15 16:15 147:22 332:20,23 333:8,16 336:4 336:22 337:8 338:3 340:17 341:23
**relationship** 22:21,22 24:13 299:8 308:17
**relationships** 42:10,14
**relative** 332:12 404:17
**release** 294:12 319:21
**released** 295:2
**reluctantly** 166:25 167:1
**rely** 65:16,19 65:23 89:10
**remained** 184:14
**remarks** 104:16 105:19
**remediation** 340:10
**remember** 41:22 68:24 73:20,25 77:24 79:5 81:23 83:8 85:19,20 86:14 91:21 118:22 126:9 135:2 182:11 189:14 192:24 205:7 215:23 215:25 216:22 220:25 221:2 221:19 222:7 226:11 235:14 235:14 237:17 240:24 241:5 246:7,20 249:20 252:8,9 252:24 275:17 285:25 286:18 287:20,21 288:3,7 299:3 300:12,17 302:24 304:20 308:13 315:10 315:12 338:4 353:10 355:20 356:6 360:16 364:17 368:9 368:12 398:11
**remembering** 52:3 289:3
**remembers** 315:11
**remind** 98:11 169:22 233:17 258:19
**remote** 400:10 400:11
**remotely** 83:12
**remove** 185:12 185:16
**removed** 151:15 152:3 153:10 186:6
**repeat** 20:25 29:13 51:6 58:2,22 76:24 183:4 188:16 195:15 227:4 276:4,7 316:15 321:6 368:20 379:13
**repeated** 142:7 144:10
**repeatedly** 267:12
**rephrase** 39:1 55:22 196:4 242:15 285:24
**rephrased** 72:12
**replaced** 267:23
**reply** 85:11
**report** 57:9 58:18 59:1 113:2,10,16 245:14 292:3 344:15 399:10
**reported** 1:23 57:4,8 114:11 212:19 242:22
**reporter** 2:25 17:11,13,20 33:15 117:11 117:12 173:6 261:11 382:22 404:3
**reporter's** 404:1
**reporting** 57:14 116:6 337:24 405:1
**reposting** 174:19
**represent** 15:18 73:1 316:11
**representative** 128:19 138:9 280:3,5 392:12 395:8
**representatives** 138:13
**represented** 74:21 377:18 377:25
**representing** 317:2 377:24
**reputation** 158:24 159:6,9 390:10
**request** 255:19 264:18 265:3 296:7
**requested** 171:19 220:22

404:14
**required** 199:2 199:5,9 203:23 296:20
**requirement** 265:12
**research** 24:21
**reserve** 270:2
**reserving** 273:12
**reshoot** 232:1
**reside** 92:3
**resides** 87:13 87:15
**residing** 18:19
**resolved** 378:23
**resource** 396:22
**resources** 37:1 37:2 39:11 113:3,11 116:19,21,24 130:8,21 131:13 132:9 138:12,24 140:16,22 141:7 395:8,9 395:15 397:2 399:16,21
**respect** 34:11 36:3 37:3 38:7 50:20 63:1 92:9 115:11 144:10,23 190:12 200:20 200:24 391:25 398:8 399:15
**respectful** 255:1 396:5
**respectfully** 256:3 257:15
**respond** 104:25 126:18,19 235:21 240:2 256:25 344:16
**responded** 164:12 278:15 342:23 343:22 346:24
**responding** 78:23 128:1 296:6 386:13
**responds** 257:8
**response** 126:18,22 235:11,23 236:22 258:14 343:25
**responsibilities** 112:20
**responsible** 129:25 130:8 133:24 139:13 202:25
**rest** 191:11 286:17 354:4
**result** 247:10 378:22
**resulted** 230:25
**resume** 279:8 279:10
**resumes** 280:1
**retain** 335:15
**retained** 330:22 334:5 343:12 369:8,10
**retaliation** 13:15 64:4 65:6 100:20 114:13 116:1,5 140:25 141:19 151:5
**retention** 369:7 369:13,16 370:3
**retired** 38:11 38:12,14
**return** 41:12 261:17 262:1 262:19 263:4 264:7 296:20 303:25
**returned** 213:24
**returning** 270:5,8 279:12
**revenue** 45:16 45:21,25 46:25 47:7,16 48:10
**revenues** 48:1,5
**reverent** 233:14
**reverse** 255:9
**review** 94:13 404:13
**reviewed** 94:23 100:7,9 372:14
**reviewing** 85:13
**revisions** 155:20
**reynolds** 10:4 89:1,5 93:22 373:16
**rhetorical** 390:7
**rid** 298:9
**ridiculous** 34:8
**right** 17:15 18:10 19:3 20:23 23:23 24:1,5,10,17,20 25:6 26:11,16 26:18 32:25 35:23 42:9 43:5 49:2 50:21 59:16 62:17 68:9,21 69:12 70:20,22 75:18 80:15 82:19 90:9 95:21 98:2 103:24 104:18 105:19 108:6 111:25 112:13 115:14,17

116:13,17
119:20 122:7
127:20 128:12
129:22 131:7
132:6 135:5,10
138:3,6 139:22
140:20 141:20
149:24 150:1
150:13 156:10
158:12,18
161:16 162:6
164:2,25 165:2
165:6,17 166:6
167:5,9 171:20
172:4 176:11
177:4 186:7
189:16 193:11
193:16,17,17
194:19 195:14
196:8 198:14
198:19 204:10
204:13 206:1
208:2 211:4,16
216:5 220:7
221:17 225:1
231:2,14 234:6
255:19,20
257:18 258:12
258:22 259:2
260:24 262:2,4
262:18 271:19
271:21 273:12
273:20 274:6
274:13 275:12
275:24 276:2
277:17 280:17
282:5,11
288:24 289:14
292:19 295:6
295:10 301:6
302:22 318:2,4
321:25 325:10
327:22 332:14
332:20 339:17
339:23 341:25
347:1 350:18
351:21 353:3
355:7 367:20
369:18 373:13
377:15 390:17
391:12 394:24
400:14

**rights** 270:2

**risk** 263:12

**road** 20:22

**roeser** 4:6 15:23,23

**role** 34:22,24 35:21 38:17 41:5 54:19 55:24 56:16,23 63:2,24 64:2 113:10 115:20 120:10 121:8 121:14 122:24 123:1 134:8 135:17,19,22 136:18 156:15 165:17,23 167:23 168:7 168:25 169:12 171:17,25 172:15 174:4 174:25

**roles** 36:14,15 123:5,7 128:5 136:8,10,10

**room** 72:23 289:19 390:16 390:24 391:22 392:4 393:3 400:13,17

**root** 231:20 233:5,20

**rothman** 137:1 137:8

**rough** 24:24,25 48:15,16

**route** 191:4,4

**rules** 20:22 388:10

**run** 134:11

**running** 123:5 129:18,21 133:23 134:1 137:4

**ryan** 93:22 290:6 314:22

**s**

**s** 3:1,9 4:1 5:1 6:1 7:1 8:1 9:1 10:1 405:5

**sacco** 12:13 130:11,21 131:4,14 132:10

**safe** 42:6 57:19 59:10 77:17 82:18 133:15 133:18 136:17 137:21,23 270:7,8 376:5

**safety** 140:14 140:16 141:6 141:16 280:9

**sag** 138:20 263:10,11,14

**saging** 293:13

**saks** 12:9,9,11 117:16 118:5 118:12,18 119:6,17,25 120:22 122:11 127:17 128:4 130:11,21 131:4,14 132:10 202:22 202:25 210:20 213:23 214:13 215:6,10,17,22 216:17 217:1,8 217:11,14 218:2,12,19 220:11,13,21 221:4 222:7,14

222:25 223:2 227:9,14,15 228:9,20 229:10 230:5,9 231:7 232:10 232:21 233:19 236:14 237:6 237:20,25 238:15,24 239:9,11 240:9 240:15 241:20 242:20 243:7 243:10,11 399:4,5,12
**sales** 49:1
**salsa** 25:23
**sandbox** 53:22 54:24
**sandwich** 332:7
**santa** 6:7
**sarowitz** 7:4 9:4 17:7 19:23 26:18,20 44:11 44:18,24 149:14,18 197:5 259:16 259:19,21 338:8
**sarowitz's** 56:11 151:23
**sat** 19:2
**saw** 19:18 23:8 136:18 137:19 145:7 187:9,9 211:21 212:2,3 265:6,19 277:11 340:21 342:3,23 356:24 357:5
**saying** 62:19 73:23 100:23 128:25 129:7 129:24 130:3,4 135:15 137:12 137:20 143:21 155:22 167:22 172:8,22 184:16 186:9 188:25 194:6,9 194:9,24 200:25 201:9 201:10,11 205:13,20 207:19 216:18 216:22 217:2 218:12 219:2 221:2,17,23 222:12,15 223:19,20 226:21,25 227:23 235:1 238:1 239:2,11 239:19 240:8,9 241:5 248:6 252:9,11 253:9 260:16 277:20 278:4,20 283:2 283:4 288:3 289:16 298:16 299:13 304:13 306:3,6 308:1,4 308:8,11 331:10 335:1 335:16 336:18 338:24 343:7 344:9 351:20 357:1,20 366:17 378:12 390:25 394:8 399:9,21
**says** 31:14 43:19 100:16 102:10 103:6 104:6 105:2 106:16,23 107:20 109:10 109:15 110:1 110:13,23 111:20,21 112:23 114:9 115:3 116:3 117:23 120:5 129:1,6 135:3 151:8,10,12 162:11 164:19 164:21 173:13 191:6 211:25 214:17 223:18 227:15 256:19 263:24 264:15 267:5 274:20 276:24 281:22 282:4 283:25 289:10,17,20 290:19 316:14 316:24 325:12 341:5 342:11 347:16 349:23 385:1
**sbenson** 7:13
**scenario** 190:19
**scenarios** 275:21
**scene** 177:11,18 178:4,24 190:16 192:9 193:4,15,18 197:7 198:13 199:23 201:21 201:25 203:23 231:24 234:12 234:24 314:15 314:20 322:21
**scenes** 244:13
**schedule** 39:23 44:14 166:23
**scope** 290:2 371:6
**scored** 30:21
**screen** 51:16 192:4
**script** 168:24 169:10,24 170:1,6 230:8 297:6 298:10 300:1 303:16

**second** 13:14 41:14 104:2 189:8,9 192:14 213:15 254:18 255:11 256:18 270:21 280:20 280:23 282:11 316:24
**section** 112:19 114:6
**see** 20:11,13 32:22 34:10 36:16 42:11 43:11,22 47:23 56:23 57:3 77:6 100:21 101:3,13,16,25 102:8 103:21 104:4 106:9,10 106:16,19,23 108:7,8 111:15 112:1,5,5,6,21 112:22 113:7 113:15 114:7 116:16 117:21 120:3 121:13 121:20 126:5 126:21 129:6 137:20 149:10 150:12 152:15 152:18 154:4,9 154:10,14,17 154:19 162:9 164:16,22 165:1 172:17 174:8 178:22 187:12 189:3,7 189:7,18 190:12 192:3 194:5 195:19 196:12,19 199:18 214:16 214:24 217:17 218:15 228:24 233:18 235:21 235:22,25 237:13 256:23 256:24 257:6 257:11 260:15 261:19 262:3,5 262:19 264:11 264:21 265:11 265:15,22 266:7 268:20 272:16,20,21 273:21 274:11 274:14,15,18 274:19 275:4 275:11 276:5 276:17,23 278:7,11,18 279:20,22 280:12 281:9 281:11,25 282:1,3,6 314:4 314:5 315:17 316:6,9,22 318:10 320:16 324:3 327:5 340:11,14,24 341:9,20 342:15,16,18 344:2 346:23 348:8,9,12,12 348:15,18 350:4,9 356:22 359:3,13 366:6 366:22 377:22 384:21,24 385:2,5,16,18 385:20 394:19
**seeing** 133:2 140:21 174:16 174:19 274:11 327:14 340:25 342:9
**seeking** 156:24
**seem** 254:4 271:7
**seemed** 124:6 190:3 196:25 197:1 237:14 334:23 356:4 376:15
**seeming** 80:6
**seems** 81:14 120:25 263:3 265:1 347:13 354:4
**seen** 42:25 96:2 96:3,25 111:12 132:22 139:19 140:6 150:19 183:15,15 192:13,15 207:8 261:20
**selected** 167:8
**send** 88:14 94:13 95:12 129:4 159:23 186:14,20 269:22 329:20 359:25
**sending** 258:1,3 258:6 259:8 384:11
**sends** 261:25
**senior** 122:12
**sense** 53:6 59:5 59:7 175:14 224:5 285:25 288:8,13 290:16 291:14 308:14
**sensitive** 376:6 376:9,14
**sent** 94:24 95:2 95:10 119:22 163:25 172:5 174:15 227:10 228:19,19 262:22 263:5 325:11 326:3,4 328:12 329:21 329:23 344:1 359:24 369:2

371:20
**sentence** 104:22,24 105:2,4 268:1 342:11
**sentiment** 77:25 78:16 79:4
**seo** 341:12,13
**separate** 35:10 116:18,21,24 239:15,20
**separately** 83:23
**separates** 35:12
**september** 147:25 148:21 363:14,17,23 364:3,9
**sequence** 70:9
**series** 390:7
**serious** 116:10
**services** 103:18 127:18 345:1 347:12 351:8 351:13
**session** 176:4
**set** 35:17 48:1 48:10 49:11 125:11,12 130:5 133:18 135:10,14 136:21 137:21 137:23 138:10 141:16 148:7 149:9 155:24 197:5,15 198:13,16,19 198:22 199:2,8 199:9,16,21 200:2,10,12,19 200:23 201:3,5 201:8,11,11,16 201:18,23 202:16,18 203:9,11,25 204:2 213:24 220:9,23 221:11 226:14 226:25 227:22 233:19 235:21 236:4 237:3 245:15 249:7 249:12,16 260:13,16 263:4 265:13 265:17,20,24 266:10 267:20 267:22 270:6 288:15 293:9 299:5 300:22 330:20 340:16 359:11,15,19 363:4,7 372:10 404:6
**sets** 49:19,20 200:6
**setting** 105:10 118:25 263:12 363:5
**settings** 362:18 363:4
**seven** 32:16 387:2,3 390:1
**several** 19:7 125:25 159:11 209:15
**sex** 101:15 104:17 105:19 284:24
**sexual** 13:15 102:12 104:2,8 104:14,15,18 104:19 105:2,3 105:11,12,24 107:22 108:4,9 108:10 109:4,5 109:15,16,21 109:23 110:4,9 110:21 111:9 112:11 285:9
**sexually** 110:14 111:24 112:12 274:24 275:8 276:1,20 277:13 296:13
**sexy** 238:12 242:23 244:23 246:4 248:7,20 249:23 250:14 253:25 286:16 305:10
**shah** 3:17
**shane** 149:15 377:3
**shapes** 54:1
**shapiro** 8:3,4 17:1,1,2,8 23:13 26:12,25 34:12 35:24 36:6,10 39:17 44:5,12,21 45:2 47:2,9 48:7,11 50:5 51:4 52:13 54:16,22 55:8 56:2,19,25 57:5,15,20 58:1 58:8,14,21 59:4 59:17 60:1,13 60:19,24 61:18 61:25 63:6,14 63:20 64:15 65:8,18,25 66:9 66:14 67:1,5,20 68:1,3,10,25 69:16,24 70:6 71:9 72:9,17,22 74:3 75:8,14 76:4,12 77:12 78:2,19 79:6 81:1 82:6,21,25 83:16 84:15,20 85:5,10,18 87:5 88:3,17 89:23 90:4,7,18 91:3

| | | | |
|---|---|---|---|
| 92:6,13 93:14 | 147:18,24 | 207:11,18 | 256:1,5 260:6 |
| 94:10 95:4,8,15 | 148:17 150:25 | 208:6,13,19 | 260:14 261:1 |
| 97:2,23 98:17 | 151:17 152:19 | 210:14 211:5,7 | 264:25 265:10 |
| 98:21 99:3,6,8 | 152:22,24 | 214:6,9 215:13 | 265:18,25 |
| 99:12,15,18,21 | 155:7 156:11 | 215:21 216:2 | 266:11,19 |
| 99:23 100:8 | 156:16,21 | 216:10,20 | 267:21 268:15 |
| 102:23 105:13 | 157:6,19 | 217:9 218:17 | 268:22 269:11 |
| 106:15,22 | 158:19,25 | 218:22 219:5 | 270:15,25 |
| 107:13 108:18 | 159:3,10 160:2 | 220:5,14,24 | 271:14 272:2 |
| 108:24 109:6,9 | 161:11 162:23 | 221:8,18,25 | 272:16,23 |
| 109:24 110:6 | 163:1 164:17 | 222:13,22 | 276:3,10,22 |
| 111:2 112:14 | 165:18 167:25 | 223:3 224:11 | 277:4,7,15,18 |
| 113:13,25 | 168:8 169:1 | 224:17 225:2 | 278:6,17 |
| 115:15,22 | 176:15 177:5 | 225:10,18 | 283:17 284:5 |
| 117:10 118:21 | 177:13,21 | 226:7,15,18 | 287:1,6,9,12 |
| 121:16 122:3 | 180:10 181:24 | 227:2,25 | 288:20 289:15 |
| 122:15 123:3,9 | 184:17 185:4 | 228:14,22 | 290:5 291:12 |
| 123:17,22 | 185:13,21 | 229:11,22 | 291:25 292:14 |
| 124:1,10,14,18 | 186:8,16 | 230:10,14 | 293:22 294:14 |
| 124:19 125:7 | 187:17,22 | 231:3,8,15 | 294:18 296:14 |
| 127:8,13,21 | 188:7,9,13 | 232:7,11,17 | 297:18,21 |
| 128:7,13 129:5 | 191:17 192:19 | 233:25 236:16 | 298:1 299:2,18 |
| 129:16 130:2 | 193:21 194:11 | 236:19,23 | 299:24 300:7 |
| 131:15 132:1 | 194:20,25 | 237:1 238:3,20 | 300:11,25 |
| 132:11,16,20 | 195:3,12 196:2 | 239:5,17,21 | 301:12,18 |
| 132:24 133:4 | 196:13,20 | 240:4,12,22 | 302:3,7,23 |
| 135:7,11,20 | 197:9,19 | 241:13,16,24 | 303:7 304:4,12 |
| 136:4,7,20 | 199:11,19 | 242:25 245:6 | 306:8,14,21 |
| 137:25 138:7 | 200:4,14 201:1 | 245:25 246:6 | 307:7,14,25 |
| 138:14 140:10 | 202:3,6,19 | 248:1,23 249:1 | 309:8,11,14,19 |
| 141:1,8,11,21 | 203:5,12,16 | 250:15,21 | 309:24 310:1,8 |
| 143:3,19 | 204:19,24 | 251:6,12,15,23 | 310:11,14,25 |
| 144:13 145:2 | 205:5,19 206:5 | 253:1,13,18 | 311:3,8,13,23 |
| 146:25 147:5 | 206:15,18,25 | 254:2 255:21 | 312:7,18 313:3 |

313:15 318:3,9
318:22 319:4,9
320:6,22
321:11,18
322:6,12,19
323:21 324:1
325:19 326:12
326:23 327:6
327:11 328:1
328:20 329:3
329:12 330:13
331:1,21 332:5
334:20 335:3
335:18 336:24
337:15 340:19
342:1,7,21
343:14 344:10
345:4,11,20
346:11 347:3,9
347:18 348:7
351:11,23
355:8 356:14
357:12,23
358:9 360:15
361:3,6,14,22
363:1,18
365:11 366:10
366:16 367:2
367:16 368:2,8
370:4,13,21
371:2,11
372:12,21
373:18 374:10
376:3,21 378:2
378:11,17
379:3,12,20
380:6,13,17,22
381:3,8,12,16
381:18,22
382:2,5,11,18
383:17,21
384:5 385:8,19
386:3,16,20
387:1,21,25
388:8 391:18
395:11,17
396:1,7 397:3
397:14 398:15
398:24 399:17
400:4 401:6,21
402:3,8

**shapiroarato....** 8:10,11

**share** 35:8 40:13 76:3,11 76:17,23 77:10 84:23 94:16,19 145:25 173:15 190:5 242:9 257:3,5 266:22 303:2 305:1 309:10 325:2 345:22 376:6

**shared** 77:14 77:17 96:13 196:7 242:8 257:10 258:18 259:13 291:14 304:22 305:12

**sharing** 195:25 304:3 307:3 376:10

**she'd** 300:22

**sheehy** 86:10

**sheet** 199:3,6 199:10,18,21 200:3 202:5,11 203:1,4,10,23 203:24 204:3 403:5 405:1

**sheets** 138:18 139:1 199:23 200:9

**shekinah** 40:2

**shirt** 184:24,25 185:3

**shit** 162:14 163:21 171:4

**shoot** 190:16,18 191:2 252:14

**shooting** 166:21 209:9 209:17 213:15 250:8 267:9

**shorthand** 2:25 404:2,16

**shortly** 237:11 240:16

**shot** 183:3,8 190:23 193:16 193:18 314:15 314:20 322:21

**show** 43:2,7,16 120:12 127:1,7 178:6,8,10 189:12 194:19 218:25 219:15 225:7 246:13 278:24 339:15

**showed** 176:10 177:10 178:18 184:1 187:8,16 188:23 191:14 192:3,16 193:2 193:10 219:24 246:15,15,17 246:19 304:21 314:16

**showing** 187:10 189:11 191:9 192:10 193:19 194:17 195:10 219:16,19 220:2 225:23 263:20 283:24

**shown** 215:11 215:18 217:3 284:9

**shows** 128:21 142:25 172:6

**shut** 244:12 269:20

**shutdown** 259:24

**sic** 108:20 236:1 382:23

384:22
**side** 49:19,19 91:15 178:22 212:5 308:13 308:16,17
**sign** 35:16 153:16 155:14 292:3
**signal** 359:2,10 359:15,22,25 360:3,7,8,14,24 361:1,5,20,25 362:4,10,15,17 362:21,24 363:7,13,17,23 364:3,6,9,15,19 364:23 365:6 365:10,15,23 366:6,23 367:9 367:23 368:7 368:13,16,18 369:2 372:14 373:24 375:12 376:2,20,24
**signature** 154:4 154:11,14 404:24
**signatures** 154:9
**signed** 28:20 155:17 271:7 333:4 334:23
**significant** 55:25
**signs** 34:19
**silly** 275:1,3 391:13,15
**similar** 136:15 232:21
**simple** 153:23 165:7 167:10 266:15
**simply** 73:11 299:25 394:12
**simultaneously** 99:13
**singer** 37:9 44:1
**singing** 179:25
**single** 282:12
**sir** 17:14
**sister** 179:23 181:17
**sit** 19:6,8 258:19 393:12
**sitting** 52:12 69:14 139:21 191:5 192:14 231:21
**situation** 73:3 78:5 171:14
**situations** 304:16
**six** 32:15 148:18 289:25 290:3,9 347:20 387:1
**sixty** 313:15
**skills** 35:17
**slammed** 232:2
**slate** 237:21,22 238:11,24 239:2,4 242:4 242:22 243:5 245:4 246:2 247:15 248:20 249:3 250:13 251:11 253:17 253:23 259:2,6 260:5 268:13 269:4 305:9 401:13
**slate's** 20:1 238:1,16 239:10
**slater** 38:8 39:6 39:12,15 395:8 395:14 396:22 397:1,12,20 398:3,12 401:5 401:9,12,15
**sloane** 6:4
**small** 20:14 27:1,4 133:22 134:1
**smaller** 38:15
**snarky** 195:4
**social** 340:9 341:7 349:2 356:8 358:11
**soevyn** 1:23 2:24 12:5 13:5 14:5 17:12 404:2,24
**softly** 175:6
**sole** 395:7
**solemnly** 17:16
**solid** 214:23 219:13
**solutions** 10:6 15:9
**somebody** 53:13 80:17 81:3 86:8 167:8 205:13 205:20,23 358:1 360:11
**somebody's** 80:18
**someone's** 87:25 88:6
**something's** 39:3
**someway** 73:18
**son's** 164:5
**sony** 47:21 48:2 55:23 72:7,15 79:22,23,24 81:8,11,12 118:1,3,13,19 119:6,7 120:12 121:7 123:5 134:5,6,8,23,24 137:1 153:13

154:2,25 155:15,18 156:19 252:17 280:2 319:19
**sony's** 305:18
**sorry** 29:13 40:14 49:8 51:21 61:6 76:24 78:10 87:16 108:21 122:17 142:6 153:2 157:13 173:4 183:4 188:3,5,17 196:3 197:6 219:17,20 223:22 227:3,4 228:23 234:7 240:5 241:17 251:25 254:25 260:2 313:16 316:16 357:2 383:5 384:14 385:3,25 387:2
**sort** 35:10,13 84:5 107:5 210:22 212:16 226:1 240:18 331:13 347:11 370:8
**sorts** 22:24
**sound** 43:5,8 86:5 397:8
**sounded** 81:6 86:4
**sounds** 27:21 70:13 136:15 146:18 169:3
**southern** 1:2 2:2
**spe** 12:15,15 154:7
**speak** 49:2 62:24 73:1 91:5 119:2 121:17 123:11 151:18,22 174:22 220:15 235:4 269:21 310:23 334:1,4 334:21 343:10 353:11,12 355:24 364:22 379:23 380:1 392:18 398:3 398:10 401:9 401:12,15
**speaking** 55:5 80:23 89:2 98:14,20,21 99:5 136:24 155:21 188:15 194:4 359:7 380:24 381:10 390:16,23 391:3,9 392:17 398:5
**speaks** 233:12 318:24
**specific** 60:10 77:24 81:21 97:18 126:8 132:13 134:18 160:24 195:20 200:19 209:3 221:14 224:7 245:12 268:10 281:6 343:19 360:19 396:25
**specifically** 36:22 71:19 74:9 104:3 125:15 128:20 128:21 138:10 139:20 191:16 192:9 207:10 222:4 245:4 289:20 296:24 299:17 302:4,8 303:8 305:3 307:10,16 324:4 354:24 368:10 398:9 399:8,21
**specificity** 303:4 356:3
**speculate** 59:19 123:18,20 124:11 224:18
**speculating** 331:19
**speculation** 78:6
**speech** 392:19 392:25
**speeches** 98:18 98:22 147:5 152:20
**spell** 18:9
**spelling** 33:16
**spend** 41:9 155:1 332:13
**spending** 23:15 31:19 332:8
**spends** 87:7
**spent** 255:22
**spiritual** 23:4,5
**spoke** 117:20 242:11 303:24 304:6
**spoken** 268:13 304:7
**spouses** 284:25
**spreadsheet** 13:19
**spring** 166:17
**sr** 14:8 352:17
**sr1.9** 13:23
**sr100009** 347:24
**sroeser** 4:13
**staff** 374:20,21
**stage** 181:21,21 270:3 328:13 349:16

**stages** 55:16 181:18 182:7
**stairs** 212:18
**stamp** 98:10 169:14 274:17
**stamped** 100:14 117:17 119:19 126:1 154:7 160:18 173:10 215:5 254:13 261:18 274:16 313:20 340:4 347:24 383:16
**stamps** 274:16
**stand** 241:7 290:20
**standalone** 105:4
**standard** 399:11
**stands** 85:17
**star** 158:17 165:5 167:5,9
**starring** 162:15 163:22
**stars** 162:16 163:23
**start** 36:8 70:4 80:9 120:13 166:21 171:1 314:9 331:13
**started** 23:15 29:21 55:20 89:7 213:25 250:8 290:13 292:1 315:7
**starting** 15:18 67:24 283:23 352:24
**startled** 219:19
**state** 17:16,24 72:4 73:12 83:1,3 174:14 204:9,23 206:24 208:24 209:1 264:20 265:4 404:3
**stated** 32:19 75:19 177:24 380:4
**statement** 43:17 110:8 164:9 175:8 377:23 378:13 378:16,22 379:5,25 380:16 387:15 392:1,5 393:3,4 393:5,6,11,14 393:16,18 394:1
**statements** 42:18,21 43:25 206:3 241:4 391:20 403:7 404:10
**states** 1:1 2:1 107:15
**stating** 253:20
**status** 101:20 263:6
**staying** 206:11
**ste** 6:7
**stellar** 158:24
**stenographic** 17:11,20 33:15 117:12 173:6 261:11
**stenographic...** 1:23 404:11
**step** 62:20 130:15,16 211:21
**stephanie** 3:3 4:6 15:23 16:9 16:12 70:14,16 70:20 71:13,23 77:23 88:2,10 92:10
**stephanie's** 72:3,25
**steps** 211:20 370:1,7 371:23 372:2,8 375:8
**steve** 7:4 9:4 17:7 19:23 41:17 44:11 151:23 256:22 257:2 259:13 259:15,15,18 259:21
**steve's** 44:9
**sticker** 198:2
**stickler** 170:2
**stone** 173:9
**stood** 319:22 331:11
**stop** 29:6,14 98:19,21 99:1 152:19 225:7
**stopped** 29:9
**stops** 35:23
**stored** 179:7
**stories** 351:2
**story** 49:16 72:7 96:7,10,11 96:12 146:23 207:21 285:14 315:14 377:13 377:15
**strasberg** 6:5 13:10 261:14
**strasberg's** 270:20 278:15
**strategy** 41:8
**streaming** 47:8 47:16 48:25
**streams** 48:10
**street** 3:9 5:16 9:15,20 16:15 18:15 332:20 332:23 333:8 333:16 336:4 336:21 337:8

338:3 340:16 341:23
**stress** 234:15
**strictly** 104:8
**strike** 69:17 78:22 121:5 131:19 135:17 187:1 195:16 232:19 247:13 263:8,10,11,14 329:22 334:12 339:13 347:16 368:22
**strikes** 267:23 297:5 304:16
**strong** 156:15 298:20
**strongly** 239:10
**structure** 35:13 36:3
**struggle** 300:1
**struggles** 299:16
**struggling** 298:8
**studio** 129:10 129:18,21
**studios** 1:8,13 2:8,13 7:2 9:2 12:3 13:3 14:3 15:14 30:17 32:3,7 100:25 103:8 113:4 114:16,21 115:6 131:5 133:21 150:6,7 150:8,10 154:12 405:2
**stuff** 124:5 190:7 275:22 290:16 293:14 298:21 303:2,5 344:13,14 351:16,19,25 353:21 357:7
**stupid** 35:11
**style** 190:23
**subject** 74:9,12 74:13 77:20 116:11 117:19 120:1,1,23 126:9 142:7 219:25 313:1 340:9 367:25
**submission** 105:25
**submitted** 142:6
**subscribe** 403:6
**subscribed** 403:12 405:22
**subsidiary** 134:17
**substance** 21:11 208:3 311:6,21
**substantially** 106:4,13
**substantive** 394:18
**subtle** 107:23 107:23
**successful** 29:18 263:16
**sued** 88:16 150:15,17 377:6,9 379:9 379:17 402:6
**suggest** 68:15 143:20 247:9 289:19 375:20
**suggested** 127:17,19 128:11 209:20 333:2 368:7
**suggesting** 122:11 353:25 354:17
**suggestion** 121:2,7,19 124:6 256:14
**suggestions** 127:23 130:19
**suggests** 278:8
**suing** 153:5
**suit** 177:24
**suite** 4:10 9:10 9:21
**sullivan** 3:5,16
**sum** 208:3
**summary** 227:10 330:11
**summer** 7:7 16:17
**sunday** 67:23 77:18
**sunshine** 7:8
**super** 42:12
**supervise** 56:17 56:20
**supervision** 56:24
**supervisor** 112:19,25 130:12 136:2 138:17 398:23 399:3,7,23
**supervisors** 103:11 138:17
**support** 13:12 25:1 35:20 128:18 333:19 333:20 334:16 334:18,19 336:2 337:2,7 349:19 395:9 395:15 396:23 397:2,5,13,17 397:21,25 398:13
**supported** 333:17
**suppose** 42:9 61:14 185:6 272:19 345:16

**sure** 23:24 24:3 24:14 35:22 41:15 46:1 53:25 59:14 60:14 61:6,13 62:12 66:1,11 75:15 77:25 82:2,15 100:1 103:3,6 106:18 108:14 112:15 120:8 121:3 128:24 133:15 133:18,24 135:12 136:16 136:23 137:22 137:24 138:4 140:12 147:2 149:9 156:3 158:13,20 160:14 172:17 172:21 181:14 182:5,22 184:4 191:9 192:18 192:22 198:5 211:2 212:1 219:9 226:18 228:24,25 229:1 230:4 238:6 259:4 260:23 261:9 313:12 316:17 316:19 326:6 328:3 330:21 339:9,23 350:25 351:2 354:17 359:11 364:11,12 367:18 370:7 372:3,15 373:5 373:20

**surgent** 281:16

**surprise** 267:7

**surprised** 284:10

**svp** 36:21

**switch** 383:6

**sworn** 403:12 405:22

**t**

**tag** 325:11 326:3 329:25 330:10,22 331:18 332:19 337:1 341:19 349:17

**tahler** 3:6 16:8 16:8

**taitelman** 7:5 16:18

**take** 22:18 31:15 41:20 47:4 66:10 97:6,19 98:16 99:14 100:12 113:5 114:3 115:6 118:19 119:6 124:14 136:25 161:22 165:22 168:6 168:25 169:11 175:20 198:18 210:5,13 220:1 221:12 226:15 228:2 264:13 270:17 272:7 279:2 282:15 283:21 295:3 308:21 344:16 371:23 372:2 374:16 375:8 383:12,19 387:6 389:11 393:24,25 394:14

**taken** 2:19 15:15 19:6 62:20 185:19 198:12 222:20 255:23 370:1,6 404:5,16

**talk** 23:3 46:2 70:12 174:13 235:7 237:20 240:3,10,10 241:11 252:5 259:12 268:25 284:7,17,22 285:5,18,19,23 286:1,4,7,12 298:6 300:17 301:21 305:8 310:17 311:11 328:5 343:9 353:8 354:13 381:5 382:1,7 387:10 388:7 391:8 392:22 394:5,6

**talked** 74:1 140:24 178:3 193:13 194:23 226:13 228:18 237:23 238:11 238:16 248:9 248:17 250:11 253:24 257:2 259:18,21,23 269:14 273:18 284:2,4,6,8 285:15 287:22 298:25 300:18 300:19,24 301:4 309:12 323:19 343:4 356:5,6 375:11 376:19 377:2 401:24

**talking** 23:2 43:14,23 62:1,3 77:2 144:10 164:6 191:7,7 213:21 215:23 217:19,22 218:1 232:12 233:15 244:11

245:16,19 249:12,18 252:24 258:4,5 260:25 286:18 286:22 287:20 287:21 289:1 291:6 293:1,13 306:19 311:1 366:19 371:19 376:13 397:1,9
**talks** 347:15
**tap** 240:18
**tarnish** 390:9
**taryn** 295:18
**tasha** 314:16
**team** 55:19 86:8 94:25 95:2,10,13 221:6 251:21 252:3 253:12 331:25 341:7 341:19 343:8 349:1,13 353:19
**technically** 26:13 391:3
**technician** 15:8
**technology** 29:21
**telephone** 174:21
**television** 27:25 49:20
**tell** 43:17 72:7 72:15 73:7 74:24 84:6 89:11 91:4 92:24 94:5 96:7 98:15 146:23 174:1 174:24 175:4 190:12 193:22 194:17 195:10 219:6 220:16 223:5 243:21 245:24 266:12 276:15 282:16 287:6 296:11 296:18,22 297:4 301:25 304:1,9 305:13 305:14,17,20 306:1,2 314:7 331:24 333:15 351:15 356:24 357:5 359:7 368:6 375:15 392:15 393:15
**telling** 27:15 148:10 161:7 172:10,13 217:11 219:22 220:1 224:9 238:7 247:10 250:20 286:1 301:20 310:9 348:23,24
**tells** 315:14
**ten** 235:5 283:5 392:17 394:24
**tending** 31:4
**tera** 34:4 35:16 37:14 40:13
**term** 32:6 49:23 57:11 106:2 171:4 200:18,19 201:5 275:20 356:20
**terminated** 151:4
**termination** 115:8 116:12 150:23
**terms** 333:3
**testified** 76:20 77:3 96:1 111:6 142:1,5 149:1 157:2 158:22 169:23 172:19,22 174:9 176:10 177:10,17 194:16 204:22 205:24 220:11 222:25 225:5 227:14 228:10 229:6 230:5 231:7,19 234:4 236:11 237:6 237:25 238:10
238:25 239:9 239:14 240:16 241:9 272:18 288:24 297:20 302:9 307:11
**testify** 68:3 151:23 215:17 244:3 252:2 390:1
**testifying** 111:14 205:8 215:25 217:14 252:7 306:13
**testimony** 17:16 21:3,11 21:14,17 27:21 64:25 142:3 144:1,6 149:13 151:23 157:15 158:5 177:15 186:4 187:8 192:16 195:8 197:4 205:11 205:15 206:2 206:17,22 207:3,15,19 208:8,10,14,16 208:20 213:10 215:6 216:9,17 218:12 222:7 225:12 228:18 229:12 231:2 232:9 233:2 241:3,22,25

242:20 248:16 274:4 295:19 308:5,19 309:6 309:17 310:6 310:18 311:7 311:22 313:1 342:17 357:8 404:8
**testy** 73:3
**texas** 9:22
**text** 12:16,18 12:19 13:6,8,12 13:17 14:7,9 132:18 148:25 149:2 159:23 160:16,19 161:17 162:7,8 163:25 169:9,9 169:12 170:8,9 170:10,12 173:8,12 174:11 175:3 209:10 214:12 215:1 219:11 227:11,14,15 251:20 252:3 254:11,14 273:22 274:4 274:12 301:9 301:10 313:18 313:21,24 314:2 317:25 318:6,11,20,23 319:5,8 321:12 345:19,25 346:4 357:14 360:25 361:10 361:25 376:14 383:3,14,25 384:3,9,12,19 384:23,25 385:6
**thank** 17:4,20 37:2 47:12 62:4 76:6 79:10 99:23 117:12,13 119:15 152:25 152:25 163:11 163:12 166:6 173:2,4 204:19 256:17 257:19 261:11 294:18 294:22 340:1 381:1,11 385:22 394:25
**thanks** 31:3 173:19
**theme** 156:9
**theory** 367:18
**therapist** 68:15 68:20
**therapy** 68:14 68:14
**thing** 25:24 62:24 97:14,15 97:18 98:3,7 99:25 105:9 161:8,23 162:19 164:3 226:12 230:24 254:24 255:7 258:11 268:8 281:2,5 287:23 291:5 316:15 320:14 353:14
**things** 23:17 30:4,22 31:10 41:12 46:10 61:15 63:1 64:12 77:6 90:10,11,14 107:6,9 109:22 110:4,9,19 118:2 119:8 127:24 140:24 152:17 160:5 163:8 201:13 202:22 224:3 224:22,23 225:1,6,17,25 226:4,13 229:24 230:2 238:25 242:8 244:14 247:10 250:23,24 255:5 265:16 265:20,23 266:9,24 268:25 271:6 275:1 282:17 282:20,21,24 283:4,5 288:7 288:19,25 289:12 290:14 290:20 291:9 291:14 292:3,4 318:1,6 321:22 322:10,17 323:1 324:3 331:10 332:16 335:9 341:24 342:4 346:15 350:25 353:18 356:23 357:1,1 375:5 376:19
**think** 20:16 21:13,23 24:16 27:12 35:2,8,11 46:3 52:12 53:3 57:23 58:5,11,17,25 60:11,18 61:19 61:25 62:13 63:25 65:9,19 66:6 73:15 76:20 84:10 91:19 92:4 96:1,18,19 105:15 111:6 111:10,15,16 118:24 120:9 120:15 121:1 122:10,21,25 124:2 128:3,8 128:10 134:24

137:16 143:17
146:19 152:14
152:16 155:9
155:13 156:14
156:22 159:8
161:23 162:3
175:4,8 177:24
180:12 181:25
182:1 183:9
187:23 188:20
189:21,24
191:10 193:23
197:3 198:17
228:25 229:1
229:12 231:9
233:23 236:10
238:5 243:12
243:13 244:6
250:19 253:25
255:22 266:17
268:17 274:9
275:21,22
278:13,25
279:2,3,21
285:4 286:21
286:23 287:24
291:23 292:8
292:21 293:12
294:11,12
297:24 304:25
305:6,11
306:22 312:4
312:13 319:18
326:2 327:25
328:9 330:2,15
336:17 337:21
350:14 354:16
355:10 358:21
359:16,16,23
360:9,12,25
361:1,15 362:7
363:2 368:13
372:7 377:13
380:11 394:20
394:21,22

**thinking** 40:9
94:3 120:7
159:17 189:6
193:25 258:7
275:20 277:21
277:25 363:11

**third** 1:11,12
2:11,12 41:20
42:7 73:21
231:20 280:4

**thoroughly**
114:14

**thought** 23:17
50:13 62:6
94:6 118:19
123:13,24
127:25 128:4
131:24 133:14
145:20 173:15
185:18 190:23
194:7 211:22
217:15,23
218:3,14
219:16,19,23
219:23 220:2
223:13 225:22
225:23 231:24
231:25 246:18
263:19 266:1
271:4 304:19
304:20,21
305:20 334:19

**thoughts**
275:23,24

**thousand**
337:11

**thread** 12:12
12:21 13:10,20
13:22 344:6
363:3 373:20

**threads** 357:14
372:14 373:5
373:10,15

**threat** 90:6,15
90:15,20,24

**threatened**
89:8,14,18,20
90:17 292:25
381:15 382:10

**three** 18:18
24:15 27:16
28:13 32:15
33:6,23 67:7,11
68:23 81:10,24
82:4 159:21
205:23 210:24
212:7 228:10
235:3 239:15
239:20 244:10
285:3 294:11
294:13 335:22
335:23 350:3
377:10

**throat** 335:5

**throwing**
190:24

**thrown** 124:4

**time** 15:6,7
21:24 23:15,22
25:4 31:18,19
36:8,20 40:8,9
53:4 55:17
66:16,19 67:8
69:22 70:1
71:5,8 74:5
75:19 76:2,3,9
76:10 77:11
78:3 79:20
85:4,9 87:7
88:18 89:13
93:4 94:4,23
95:24 96:2
98:15,16 99:4
99:14 113:11
119:5 123:25
124:3,24 125:2
127:4,22 128:1
128:15 130:19
137:2 146:2
148:11 149:7,8
151:19 155:1

155:20 158:23 159:9,13,19 160:1,8 163:25 164:24 167:13 168:5,10 170:23 176:1,7 176:20,23 177:2,23 181:1 181:3 184:12 186:11 191:1 191:19 192:6 210:8 212:11 212:16 224:4 228:4,7 231:20 234:11,13 237:7,15 242:3 242:5,6,21,23 245:14 249:21 250:10,23 254:3 255:22 256:3 266:20 273:3,6,25 274:9 275:6,24 277:20,22 282:14 283:21 289:21 293:25 294:15 298:21 300:2 302:10 307:24 309:1,4 314:17 315:2 318:16 325:3 326:4 327:14 335:19,21,22 340:22,22,24 341:17 342:18 342:23 345:6 346:14,17 347:19 348:20 352:4,7,10 359:15 360:6 360:16,23 362:8 365:18 365:21 366:20 366:25 368:25 369:3 371:22 372:11 373:9 377:21 380:16 381:1,4,4,25 382:6 386:25 387:12 388:15 390:11 395:2,5 402:13 404:6,7 404:10

**timeline** 13:19 314:9 316:3,8 316:21 317:7 317:10,11,15 317:24 318:14 319:3,14 320:4 320:9,11 324:15,18,20 324:22,24,24 325:3,6,9,15,23 326:2,15,18,20 327:18 328:6 328:10,25 329:9,11,17,20 329:21,23 330:3,7 331:18

**times** 34:6 96:4 136:23 182:15 228:11 235:4 274:8 285:8,15 288:15 301:24 355:24

**timing** 53:6 379:22

**tiptoeing** 298:13

**tired** 394:10,21

**title** 33:3,8 34:4 51:13,14 57:11 262:14

**titled** 12:14

**titles** 33:1 34:6 34:8,8 35:9

**today** 15:7 17:6 21:1,3,11,17 52:12 56:13 69:14 139:21 194:18 209:19 256:22 257:10 258:18 342:17 344:11 402:6

**today's** 402:12

**todd** 314:25

**together** 30:16 31:9 42:22 55:19,21 146:1 316:2 337:2

**told** 25:21 48:17 83:21 93:22 96:10,12 96:19 119:5,6 129:9 140:22 144:3 159:20 171:22 187:13 195:23 207:16 217:15 218:14 232:4 237:25 238:10 239:1 242:21 247:6 248:16,19 249:9 252:3 256:22 268:12 268:20 297:10 299:14,23 300:5,9 303:6 321:16 342:6 372:5 382:15 398:25 399:5 399:12

**tom** 136:25 137:8

**tomorrow** 212:10,21 266:13 293:6 389:24 390:2 394:21

**tone** 235:13

**tonight** 212:15 212:20,21

**took** 147:15 179:9 182:14 211:21 225:19 226:1 227:9

250:25 251:2 263:12 294:23 335:14 379:24 400:20
**top** 24:15 25:12 34:18 100:16 139:15,16 162:7 178:16 178:20 192:15 198:3 256:19 384:25
**topic** 283:14 284:11 293:24
**topics** 283:14 287:17
**toskovic** 13:17 37:7 313:19,20 313:22,25 316:2 317:7,9 318:1,7,13,21 319:3,14 321:3 321:8,16 323:11,19 324:8,14 327:17,25 329:17
**totally** 390:20 390:21
**touching** 111:8 111:16,17 221:6
**tough** 78:5 274:22
**toward** 142:25
**towards** 149:20
**towel** 178:13,14 178:15,17,21 180:9,11,14
**town** 96:3
**track** 200:13 214:23 219:13
**tracking** 114:22
**trailer** 204:9,23 205:16 206:11 208:4,23 209:22 210:11 210:21 212:18 212:24 213:1,3 213:9,14 214:20,22 217:21 218:5 222:18,19 223:8,16 225:9 226:9 248:3 264:19 265:3,9 287:23 294:4 294:23 295:2,9 304:11 305:1 314:18
**trailing** 150:11
**trained** 57:24 58:6 271:18 272:3
**trainer** 314:21 321:20
**training** 64:3,6 64:11 65:3,16 65:20 120:13 121:7 396:4,11 396:14 399:25 400:10,11,12 400:17 401:1
**trainings** 65:11 271:23
**transcribed** 404:12
**transcript** 403:3,6 404:13 404:16
**transpired** 26:4
**travis** 377:6,9 402:5
**treading** 298:19
**tricky** 260:8
**tried** 177:18 209:13,14 212:20 217:15 218:13 237:18 246:16
**trigger** 65:6
**trouble** 24:20 52:3
**troubled** 297:5
**true** 19:25 61:16,20 148:9 177:15 297:17 404:15,21
**truly** 252:6,18
**trust** 25:12 83:25 295:15
**trustworthy** 42:6
**truth** 17:18,18 17:18 143:12 160:3
**try** 60:17 145:21 256:15 314:10
**trying** 29:8 74:16 78:5,17 79:13 83:23 105:7 111:11 111:19 146:2 170:25 175:5 212:9 223:19 233:14 234:24 236:2 256:8 263:10,18 275:21 290:15 303:18 308:12 349:19 358:6 394:13
**tub** 178:12 179:4 180:5,6,7 180:22,24 182:23
**turn** 45:8 154:6 206:23 207:16 223:20 255:11 281:7 314:6

**turnaround** 210:8 212:11 212:16
**turned** 150:12 211:25 232:4
**tv** 50:23
**twice** 191:10
**two** 19:24 32:15 34:2 36:23 40:10 45:13 52:4 64:8 96:16 124:20 128:14 152:6 186:2 209:9 212:6 213:4,17,20 226:12 230:20 230:21 231:13 238:11,14 241:4 255:5,22 256:5 260:1 261:6 267:22 271:18 274:16 294:11,12 344:7,17 350:2 350:7
**type** 65:4 118:2 119:8
**types** 111:24 140:23
**typically** 53:12 87:2 116:23 117:4 130:5 138:15 357:17

**u**

**u** 33:17
**uh** 104:1 116:14 130:24 148:13 152:12 153:9 234:10 291:19,21 295:11 296:11 301:24 317:1 318:4 323:3 337:9 340:12 401:25
**ultimate** 333:3
**ultimately** 34:19 35:16 130:11 279:4
**um** 253:6
**unclear** 242:12
**uncomfortable** 176:14,21,24 177:3 208:4,12 208:17 215:12 215:20 216:19 217:2,7 219:3 219:22 220:3 222:11 224:2,6 224:8,9,16,21 226:2 250:13 251:11 253:17 291:11 293:9 293:11
**uncustomary** 269:22
**under** 21:10 24:22 28:2,4 36:3 67:24 101:24 104:13 106:20 108:12 110:21 112:13 133:12 142:22 143:18 154:12 154:14 234:19 404:7,20,20
**undermine** 226:23 227:20
**understand** 22:14 35:6 43:12,23 48:9 59:20 62:7 64:24 65:14 68:6 80:4 87:1 87:10,21 101:22 102:1,3 102:15,17,25 104:10,13,21 105:11 106:11 106:19,25 107:1,4,5,7,14 107:24,25 108:9,11,13,14 108:16,22,25 109:4,10,13,18 109:22,25 110:3,19,23,24 111:7,19,20,21 111:23 112:4,6 112:7 113:9,20 114:24 115:10 115:13 118:18 121:4,6,10,14 128:24 134:16 138:4 141:5,12 141:18,22 144:9 147:3,23 155:4,10 157:7 157:13,22 160:25 161:3 161:14 170:9 172:18 176:9 176:13 190:20 197:14 198:21 200:18 202:14 204:11,12,14 204:21 205:3 206:9 210:3 211:2 236:14 240:6 245:18 245:20,20 246:19 250:7 250:11 251:10 253:7,10,16 254:19 256:10 259:15 261:24 262:6 263:1 266:8 269:3,9 270:23 272:1 274:3 275:6 276:18 277:8 278:3 287:8,13 306:12 308:18 324:9 326:25

334:8,16,22 335:7 336:3,14 336:15,19,19 336:20 337:13 339:9 358:2,6,8 358:14 372:22 376:10 386:13 388:2,3
**understandable** 61:21 62:14 63:4,19 64:13
**understanding** 20:22 31:10 32:2 48:22 52:22 62:10 83:13 86:23 103:4 105:15 107:1 108:20 111:5 116:25 123:8,10,11 127:6 130:7,10 131:16 138:5 138:16 143:10 143:12 147:15 156:24 191:15 191:18 193:24 198:11 202:12 210:12 219:3 225:15 270:13 272:4 276:16 291:9 333:24 334:13,15 335:15 336:6 336:10 337:1 337:22,25 339:11 376:23 398:20 399:15
**understands** 358:11
**understood** 79:19 89:3 103:22 104:18 113:23 115:14 135:6,9 158:12 164:23 177:3 189:2 193:14 194:6,8 225:5 235:6 245:7 249:14 269:12 271:24 277:10 291:13 323:24 336:8 337:17 337:19 341:23 351:13 358:24 368:13,15 376:5
**undress** 204:10 204:23 206:24 208:25 209:2 264:20 265:4
**undressed** 304:11
**uneasy** 72:3
**unfollowed** 331:9,20
**unfollowing** 331:14
**unhappy** 244:17 265:23
**unify** 23:7
**unions** 138:20
**unique** 23:16 35:17
**united** 1:1 2:1
**universal** 28:2 28:5,10
**unknown** 167:17
**unnecessary** 394:22
**unpaid** 103:17
**unprofessional** 103:9 252:6
**unreasonably** 106:5,13
**unsafe** 274:24 275:8 276:1,20 277:12
**unsure** 72:3 319:17
**untraceable** 345:2,10 346:2
**unwilling** 252:19
**update** 245:13 259:25 303:9 330:11,16 346:18
**updated** 328:25
**updating** 341:12
**upload** 185:23
**uploaded** 184:6
**upset** 144:1 237:14
**urquhart** 3:5 3:16
**use** 32:6 41:24 73:17 80:18,24 84:18 92:11 114:17 175:6 224:7,15 356:20 375:21 376:23 382:2,3 388:13
**used** 49:23 80:17,17,23 81:2 92:15,19 92:21 108:23 134:1 216:5 246:4 290:23 347:6 375:15 390:10
**using** 57:10 84:12 249:25 368:16 376:1 381:25 382:6
**utilize** 35:17 41:10

**v**

**v** 12:3 13:3 14:3 15:13 405:2

**vague** 378:18 379:7 398:5
**vaguely** 378:3
**value** 165:10
**vanity** 54:6
**vendors** 103:15
**verbal** 27:8,9 105:24 109:16 112:10 132:18 142:9,24 144:12 374:9
**verbally** 346:9 346:12
**verify** 155:11 155:12,22
**veritext** 10:6 15:9 405:1
**version** 206:6,9 207:13 304:23
**versions** 205:8
**versus** 110:16 201:11
**vice** 36:18,19 36:19
**video** 1:19 2:18 15:8,12 176:10 177:10 178:7,8 178:10,14,18 178:24 179:1,2 179:3,3,7,15,18 179:19,21 180:16,17,19 181:6,22 182:2 182:8 184:24 185:3,10,19 186:14 187:8 187:14,16 190:6,13 191:8 191:14,24 192:12,17 193:2,10,14,20 194:17 195:11 195:19,25 196:7,12,19 197:6 215:11 215:19 217:3 217:16,24 218:4,8,15 219:4,15 223:13 225:22 246:13,16 284:3,4,7,8 304:3,21 314:16 389:14 389:16,17
**videographer** 10:8 15:4 17:4 66:15,18 124:20,23 125:1 175:25 176:6 228:3,6 273:2,5 294:16 308:25 309:3 339:24 347:20 352:6,9 382:4 387:4 389:18 395:1,4 402:11
**videos** 186:5,24 187:3 225:8 283:24
**view** 42:19 59:24 121:15 121:18 129:25 164:24 187:20 213:9,11 222:8 236:25 268:14 271:10,12 276:19 297:10 307:5 332:11 336:8
**viewed** 275:7 277:11 278:4 288:14
**violation** 113:1 113:3 116:10
**visible** 192:10
**visit** 49:15 299:5
**visited** 314:17
**visual** 112:10
**vivian** 204:17
**voice** 75:3,6 290:23 351:15
**volume** 235:13
**volunteers** 103:17
**vp** 36:21 37:4,7 38:2 262:15
**vs** 1:7,11,14 2:7 2:11,14
**vulnerable** 89:17

**w**

**waist** 148:7 205:4
**waist's** 147:22
**wait** 293:5,6
**waive** 212:16 272:15
**waived** 310:19
**walk** 232:6 235:19 236:4
**walked** 188:24 189:8 191:10 192:1 212:5,17 212:22 219:15 232:3 237:18 249:16
**walker** 9:17 16:15
**walks** 269:17
**wall** 261:3
**wallace** 9:15 13:23 16:15 332:20,23 333:7,16 334:1 334:2,4 335:15 336:4,21 337:7 338:3,6,12 339:3 341:23 343:2,4,10 347:23 352:16 352:21 353:3,5

353:8 354:5,14 354:19 355:13 355:14,16,19 355:25 356:12 357:9,21 358:7 358:19 359:1 359:18,21 360:1,4,14,23 361:10,18 363:22 364:23 365:5,8 366:7 366:24 367:13 367:24 368:6 375:11,20,25 376:10,20
**wallace's** 344:23 345:1
**want** 21:1 29:24 36:11 40:9 42:3 45:20 53:6 59:18,20 62:23 64:22,24,25 72:4 73:14,15 79:12,21 90:11 97:8,14,17,19 98:4,11 99:25 105:8 106:18 111:13 124:11 126:25 127:6 138:4 145:19 147:2 148:4,22 149:5 163:3,5 167:7 170:2,7 171:7,12 174:14,22 176:25 183:5 190:19 211:2 225:7,9 227:6 236:9 241:9 248:14 249:25 252:4,4 254:19 254:25 255:9 256:10,12 257:4 258:9 259:10 261:9 265:2 266:3 276:12 281:1,4 282:19,25 283:1,22 285:6 286:7 287:2,2,9 287:16 299:12 299:22 322:24 348:19 353:16 353:18 354:2 376:16 381:20 383:9 385:4 386:5,12 387:16,24 388:5,14,16,21 388:22,23 389:11,21,23 391:16 392:15 392:19,20 393:22 394:1
**wanted** 69:1 73:4,11 78:22 84:4 89:4,8 94:4 130:17 145:13 146:23 167:4 171:8 187:12 189:3,6 189:7 190:16 190:18 191:24 192:3 194:5 195:19,24 209:12,19,24 212:25 217:17 218:15 219:11 225:6 226:14 241:6,11 248:9 248:13 264:24 268:25 269:19 285:7 317:24 318:16 319:23 320:8 331:15 331:18 350:23 351:4 354:16 367:11 368:6
**wanting** 190:12 226:24 227:21 269:13 284:22 392:17
**wants** 175:21 212:19,21 214:17 263:4 269:16 271:6 394:14
**wardrobe** 244:23 245:2 245:23 246:4 247:18 248:11 249:13,18,23 286:16
**wardrobes** 245:5
**warm** 178:16
**warner** 28:20
**warren** 20:10 20:11,13 173:9 384:13,16 385:1,6,17,20
**washington** 5:18
**waste** 40:9 381:1,3
**watched** 183:10,13
**water** 60:7 180:13 339:21 339:22
**way** 22:6 31:9 48:9 67:19,21 84:19 98:25 152:2 170:24 173:16 175:12 187:5 191:2 203:2,7 220:16 220:19 224:5 225:12 227:7 232:25 233:1 236:10 243:24 244:18 252:15 252:18 262:10 265:7 272:19 283:6,8,10

329:1 330:3,10 330:15 332:7 332:17 351:17 358:24 373:16 374:14
**wayfarer** 1:8 1:13 2:8,13 7:2 9:2 12:3 13:3 13:11 14:3 15:14 16:19,21 16:25 17:3 26:21 27:5,16 27:23 30:6,9,17 30:18 32:1,3,6 32:7 35:5,7 36:5 38:20 39:4 42:3 43:2 44:2,10,15,25 45:10,16 47:16 47:25 49:5,22 50:8,15,15,18 50:19,24 51:1,5 51:8,10 64:7 66:7 93:8 100:25 101:7 103:8 113:4 114:16,21 115:5,21,25 116:18 120:8 120:10 121:9 121:15 122:5 122:13,24 123:1 126:19 126:24 129:15 129:22,25 130:4 131:5,7 133:8,16,21 134:5,6,14,17 134:22 135:5 135:16 136:19 137:14,17 139:8,10 144:5 150:6,7,8,10,15 154:3,12,24 156:19 157:3 157:16 166:21 171:23 198:12 221:6 261:18 262:11 302:13 334:8,14 336:21 338:6 338:12 341:16 343:5,11 345:10 353:15 354:14,21 355:7 365:15 369:5,12,21 370:2,8,11 372:5 374:3,20 374:21 377:3,6 377:14,20 378:1,8,24,25 379:17 395:10 395:15,20,23 398:10 405:2
**wayfarer's** 39:6 41:1 42:17,21 43:20 46:14 66:3 93:3,9,12 97:22 98:4 101:24 104:10 110:3,12 111:20,21 112:3,13 114:25 115:10 130:17 142:22 261:25 286:9 382:10 395:7
**wayfarers** 104:14
**ways** 35:10 289:17 361:24
**we've** 46:8 125:20 146:14 183:15 197:18 243:24 294:16 297:9 319:21 352:13 353:19 353:21,23 382:23
**wear** 35:7
**wearing** 184:24 184:25 185:2
**weber** 6:4
**wedge** 390:8 394:13
**wednesday** 1:21 2:23 12:4 13:4 14:4 15:2 176:5
**weeds** 357:4,7
**week** 77:18 186:2 359:11
**weekend** 120:7 357:15
**weeks** 186:2 191:1 213:17 213:20 223:16 253:3,8 301:20
**weight** 314:23 321:21
**weird** 190:6
**welcome** 255:8
**went** 18:7 56:12 133:25 139:1 191:10 210:20 212:23 231:23 237:11 237:12,17 250:6 292:2 314:24 317:22 335:12
[redacted] 7:10 18:15
**wet** 180:13
**wga** 263:8
**whatsoever** 378:10 379:11 379:19 390:4
**whispering** 180:1
**whisperings** 331:10
**whitesell** 86:4 87:1,3 88:21 89:4

**whoa** 205:17,17 205:18
**wholly** 134:17
**wife** 25:14,19 25:22,23 26:6 176:10 178:7,8 178:11,12,14 178:16 179:4 179:24 180:5 180:21 182:23 183:20 187:14 189:10,13 190:5 191:8 192:14 195:25 196:7,17 215:12,19 219:16 225:8 246:14 283:25 332:6
**wife's** 178:19 186:25,25
**wild** 164:15,21 165:2
**willing** 172:3 172:15 174:4 175:1 270:3 271:2
**willkie** 5:3,13 16:4
**willkie.com** 5:8 5:19
**win** 28:24
**wind** 164:19
**wise** 28:22 29:18 54:25 55:15
**withdraw** 276:15
**withdrawing** 287:14
**witness** 8:2 11:2 17:19 23:14 26:13 27:1 33:17 34:13 35:25 36:11 39:18 44:6,13,22 45:3 47:3,11 48:12 50:6 51:5 52:14 54:17,23 55:9 56:3,20 57:1,6,16,21 58:2,9,15,22 59:5,18 60:2,14 60:20,25 61:19 63:7,15,21 64:16 65:9,19 66:1,12 67:2,6 67:21 68:2,11 69:1,25 71:10 72:10,18,24 74:4 75:9,15 76:13 77:13 78:3 79:8 81:2 82:7 83:1,17 84:16,21 85:6 85:11,19 87:6 88:4,18 89:24 90:19 91:4 92:7,14 93:15 94:11 95:9,16 97:3,13 98:15 99:7,9,24 100:9 105:14 106:16 106:23 107:14 108:25 109:10 109:25 110:7 112:15 113:14 114:1 115:23 117:4,8,13 118:22 119:15 121:17 122:16 123:4,10,18 124:2,11 125:8 127:9,14,22 128:8,14 129:6 129:17 130:3 131:16,21 132:2,12,25 133:5 135:12 135:21 136:8 136:21 138:1,8 138:15 140:11 141:2,12,22 143:4,20 144:14 145:3 147:4,6,25 148:18 151:1 151:18 153:2 156:12,17,22 157:7,20 158:20 159:4 159:11 160:3 160:14 161:12 162:24 165:19 168:1,9 169:2 173:2,4 175:23 176:16 177:6 177:14,22 180:11 181:25 184:18 185:5 185:14,22 186:9 187:18 187:23 188:16 191:18 192:21 193:22 194:12 194:21 196:3 196:14,21 197:22,25 198:3,5 199:12 199:20 200:5 200:15 201:2 202:7,20 203:6 203:17 204:25 205:6,20 206:6 206:19 207:1 207:12,19 208:7,14,20 210:15 211:6 211:12 215:14 215:22 216:11 216:21 217:10 218:18,23 219:6 220:15 220:25 221:9

221:19 222:1
222:14,23
223:4 224:12
224:18 225:3
225:11,19
226:8 227:3
228:1,15,23
229:12,23
230:15 231:4,9
231:16 232:12
234:1 236:20
237:2 238:4,21
239:6,22 240:5
240:13,23
241:17,25
243:1 245:7
246:7 248:2
249:2 250:16
250:22 251:7
251:16,24
253:2,14,19
254:3 256:7
260:7,15 261:2
261:9 265:1,11
265:19 266:1
266:12,20
267:22 268:16
268:23 269:12
270:16 271:1
271:15 272:3
272:13,19,22
276:4,23 277:8
277:19 278:7
278:18 281:1
283:18 284:6
288:21 289:16
290:6 291:13
292:1,15
294:19 296:15
297:22 298:2
299:3,19,25
300:12 301:1
301:13,19
302:4,24 303:8
304:5,13 306:9
306:15,22
307:15 308:1
308:23 309:10
309:12,21,25
310:20 311:1
312:21 313:12
318:4,10,23
319:5,10 320:7
320:23 321:12
321:19 322:7
322:13,20
323:22 324:2
325:20 326:24
327:12 328:2
328:21 329:4
329:13 330:14
331:2,22 332:6
334:21 335:4
335:19 336:25
337:16 338:14
339:17,21
340:1,20 342:3
342:8,22
343:15 344:11
345:5,13,22
346:4,12
347:10 348:8
351:12,24
354:23 355:9
356:16 357:13
357:25 358:10
360:16 361:7
361:15,23
363:2,19,25
365:12 366:1
366:11,17
367:3,18 368:4
368:9 370:5,6
370:14,22
371:3,12
372:13,22
373:19 374:11
375:18 376:4
376:13,22
378:3,18
379:13,21
380:7,18 381:4
381:7 382:12
382:19,22
383:1,9,22
384:6 385:9,20
386:4 389:24
390:16,17,18
390:22 391:2
391:17,19,21
391:22 392:4,9
393:22 394:10
395:12,18
396:2,8 397:4
397:15 398:16
398:25 399:18
400:5 401:7,22
402:4,9 404:7,8
**witnessed** 291:6
**witnesses** 98:14 207:8 210:25 405:3
**wives** 25:5
**wme** 86:4 91:18
**woman** 71:21 152:7 153:8 187:10 290:19 307:23
**woman's** 75:3
**women** 149:20 150:22,23 152:3 283:24 285:16
**won** 29:4
**wondered** 26:1
**wonderful** 40:15 189:21 189:24
**wondering** 182:16
**word** 246:4 295:3 356:10 385:5,16
**words** 31:2 63:12 77:24

80:14 109:13 189:15 190:1 194:13,14 205:18 207:17 215:23 216:4 224:7,15 225:13 232:13 243:23 246:8 252:9,22 253:11 278:1 306:16 356:21
**wore** 136:22
**work** 28:14 29:1 30:20 31:9 39:6,9 42:3 50:20 54:24 74:16 83:14 87:7 106:6,8,14 107:10,11 111:13 173:17 173:20 191:5 201:22 204:2 209:14 214:22 219:13 270:5 293:6 296:20 303:25 325:13 325:14 337:2 338:12 341:18 343:2,3,11 344:12 345:9 354:9,20 355:6 355:13 357:20
**workday** 307:1
**worked** 28:17 30:16,18 39:15 51:2,9 56:6 131:12 132:8 138:23 306:24 349:13
**working** 28:22 29:6,14 30:24 38:15 83:12 213:25 234:14 234:19 263:8 297:1 303:15 305:18,22 341:15 350:21 353:15
**workplace** 57:14,19,24 58:7,13,18 59:1 59:25 89:22 101:8 115:20 118:2,13 119:7 120:2,11 121:8 133:15,18 136:17 141:6 222:9,9 396:6
**works** 40:23 87:10
**workweek** 307:1
**world** 23:3 31:8 32:20 334:17 334:17 358:1,7
**worried** 88:25 212:10
**worries** 173:6
**worth** 41:25
**would've** 255:23
**wow** 239:16
**wrap** 235:1,5
**write** 164:3 203:21 314:13 322:2
**writer** 28:21 53:17
**writers** 29:19
**writes** 275:11
**writing** 169:23 174:23 264:9 275:18
**written** 27:7,9 27:12 93:22 110:1 142:24 241:10 269:4 279:3 283:10 284:11 351:6 384:22 385:24
**wrong** 134:11 145:11 152:8 184:21 201:14 235:23 236:1 259:10 378:9 379:10,18
**wrote** 164:10 169:10 170:3,6 170:10,12
172:23,24 175:4 229:6 276:17 321:25

**x**

**x** 145:25,25

**y**

**y** 18:9
**yeah** 22:12 31:6 43:13,22 44:6 45:7 50:1 51:11 53:12 55:5 57:6 62:15 65:9 74:11 76:13 79:2 82:13,13 83:4 87:4 92:21 95:22,23 100:9 105:6 110:15 152:23 153:4 158:20 161:1 164:20 165:13 175:13 178:12 180:4,6 184:18 185:5 188:19,21 189:12 191:9 192:18 198:15 205:1,9 207:12 208:7 214:14 214:16 218:10 221:9 223:10 226:8 233:21 235:24 242:7

243:3 246:3,15 246:15,16 250:2,6 251:3 251:16 253:10 264:4 269:8,19 272:17,22 274:2 283:18 284:2 289:2 291:1,2 299:19 301:9 302:11 302:15 318:10 318:11 319:2 332:2 333:23 334:15 337:16 337:20 340:8 343:24 346:8 355:17 385:15 389:21 392:10 392:23
**year** 28:11 29:4 34:3 40:10 43:15,16 53:5,5 64:8,8 148:19 164:8 317:19 317:23 320:2
**years** 18:7,18 21:20 22:19 23:9,18 25:3 27:14,16 28:9 28:12,13 30:10 30:23 34:2 40:10 42:18 47:4 48:15 64:8 95:20,21 95:23 128:14 148:15,16 159:21 261:6 271:18 296:25 296:25,25 297:2 388:10
**yell** 146:11,12
**yelled** 228:10 230:9 232:2 235:25
**yesterday** 96:8 142:1,12,12 143:24 149:1 157:2 158:23 228:18 229:7 245:15 273:18 274:4 332:6 366:19
**york** 1:2 2:2 3:21,21 8:9,9 405:1
**younger** 23:18

**z**

**z** 18:8
**zavala** 20:10 172:10,19 173:9,12 174:9 174:24 175:17 384:13,16,19
**zoom** 5:14 6:5 7:8 10:4,7 69:4 69:5,6,10,11 120:13 230:6 231:6,9 238:15 374:15,18 400:2,6,7
**zooms** 69:15

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---oOo---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.,

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.,
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.,
Consolidated Defendants.

---

**CONFIDENTIAL**

VIDEO-RECORDED DEPOSITION OF JAMEY HEATH
Los Angeles, California
Thursday, October 9, 2025

Stenographically Reported by: Ashley Soevyn,
CALIFORNIA CSR No. 12019

CONFIDENTIAL



UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---0O0---

BLAKE LIVELY,
Plaintiff,
vs. CASE NO. 24-CV-10049-LJL (LEAD CASE)
25-CV-449 (LJL) (MEMBER CASE)

WAYFARER STUDIOS LLC, ET AL.,

Defendants.

---

JENNIFER ABEL,
Third-party Plaintiff,
vs.
JONESWORKS, LLC,
Third-party Defendant.

---

WAYFARER STUDIOS LLC, et al.,
Consolidated Plaintiffs,
vs.
BLAKE LIVELY, et al.,
Consolidated Defendants.

---

**CONFIDENTIAL**

Video-recorded Deposition of JAMEY HEATH, taken on behalf of the Plaintiff Stephanie Jones and Jonesworks, Pursuant to Notice, at the offices of Manatt Phelps & Phillips, 2049 Century Park East, Los Angeles, California beginning at 9:08 a.m. and ending at 6:39 p.m. on Thursday, October 9, 2025, before me, ASHLEY SOEVYN, California Certified Shorthand Reporter No. 12019.



A P P E A R A N C E S:

For the Plaintiffs Stephanie Jones and Jonesworks LLC:
QUINN EMANUEL URQUHART & SULLIVAN
BY: LAURENNE BABAYAN
BY: OLIVIA HOLMES
Attorneys at Law
865 S. Figueroa Street
8th Floor
Los Angeles, California 90017
laurennebabayan@quinnemanuel.com
oliviaholmes@quinnemanuel.com
(212) 849-7000
-AND-
QUINN EMANUEL URQUHART & SULLIVAN
BY: MAAREN A. SHAH
Attorney at Law
51 Madison Avenue
22nd Floor
New York, New York 10010
maarenshah@quinnemanuel.com
(212) 849-7000



A P P E A R A N C E S:

For the Plaintiff Blake Lively:
MANATT PHELPS & PHILLIPS LLP
BY: ESRA HUDSON
BY: STEPHANIE ROESER
BY: KATELYN CLIMACO (Via Zoom)
Attorneys at Law
2049 Century Park East
Suite 1700
Los Angeles, California 90067
ehudson@manatt.com
sroeser@manatt.com
ehudson@manatt.com
(310) 312-4207
-AND-
MANATT PHELPS & PHILLIPS LLP
BY: MATTHEW F. BRUNO (Via Zoom)
Attorney at Law
Times Square Tower
7 Times Square, 23rd Floor
New York, New York 10036
mbruno@manatt.com
(212) 790-4500



A P P E A R A N C E S:
For the Plaintiff Blake Lively:
WILLKIE FARR & GALLAGHER
BY: MICHAEL GOTTLIEB (Not present)
Attorney at Law
2029 Century Park East
Los Angeles, California 90067
mgottlieb@willkie.com
(310) 855-3000

-AND-

WILLKIE FARR & GALLAGHER
BY: KRISTIN BENDER (Via Zoom)
Attorneys at Law
1875 K Street
Northwest
Washington, D.C. 20006
kbender@willkie.com
(202) 303-1245

CONFIDENTIAL

Page 6

A P P E A R A N C E S:

For the Plaintiff Blake Lively:

SLOANE OFFER WEBER AND DERN
BY: LINDSEY STRASBERG (VIA ZOOM)
Attorney at Law
10100 Santa Monica Blvd., Ste. 750
Los Angeles, California 90067
(310) 248-5100

Page 7

A P P E A R A N C E S:

For the Defendants Wayfarer Studios LLC, Jennifer Abel, Melissa Nathan and Justin Baldoni, Jamey Heath and Steve Sarowitz:

LINER FREEDMAN TAITELMAN+COOLEY
BY: BRYAN FREEDMAN
BY: SUMMER BENSON
BY: JASON SUNSHINE (VIA ZOOM)
Attorneys at Law
1801 Century Park West, 5th Floor
Los Angeles, California 90067
bfreedman@lftcllp.com
sbenson@lftcllp.com
jsunshine@lftcllp.com
(310) 201-0005

Page 8

A P P E A R A N C E S:

For the Defendants Wayfarer Studios LLC, Jennifer Abel, Melissa Nathan and Justin Baldoni, Jamey Heath and Steve Sarowitz:

SHAPIRO ARATO BACH
BY: ALEXANDRA SHAPIRO
BY: JONATHAN P. BACH
Attorneys at Law
1140 Avenue of the Americas
17th Floor
New York, New York 10036
ashapiro@shapiroarato.com
jbach@shapiroarato.com
(212) 257-4880

Page 9

A P P E A R A N C E S:

For the Defendants Wayfarer Studios LLC, Jennifer Abel, Melissa Nathan and Justin Baldoni, Jamey Heath and Steve Sarowitz:

AHOURAIAN LAW
BY: MITRA AHOURAIAN
Attorney at Law
2029 Century Park East
Suite 400
Los Angeles, California 90067
mitra@ahouraianlaw.com
(310) 376-7878

For the Defendants Jed Wallace and Street Relations, Inc.:

JACKSON WALKER LLP
BY: JOEL R. GLOVER
Attorney at Law
1401 McKinney Street
Suite 1900
Houston, Texas 77010
jglover@jw.com
(713) 752-4226

CONFIDENTIAL



A P P E A R A N C E S:

Also Present:
Justin Baldoni
Jennifer Abel
Melissa Nathan (Via Zoom)
Steve Sarowitz (Via Zoom)
Dan Acosta, Veritext Legal Solutions Concierge (Via Zoom)
Jonathan Hernandez, Videographer



INDEX TO EXAMINATION

WITNESS: JAMEY HEATH


| EXAMINATION BY: | PAGE |
|---|---|
| MS. SHAH | 17 |


WITNESS INSTRUCTION NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 19 | 19 |
| 24 | 5 |
| 24 | 15 |
| 24 | 24 |
| 26 | 3 |
| 27 | 2 |

MARKED QUESTION

| PAGE | LINE |
|---|---|
| 252 | 4 |



INDEX TO EXHIBITS
JAMEY HEATH
JONESWORKS, ET AL. V. WAYFARER STUDIOS LLC, ET AL.
Thursday, October 9, 2025
Ashley Soevyn, CSR No. 12019


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 22 | Notice of 30(b)(6) Deposition of Wayfarer Studios LLC | 37 |
| Exhibit 23 | Jonesworks agreement from Stephanie Jones signed on May 6, 2020 by Labid Abiz; Bates No. JONESWORKS_38539 - 38543 | 47 |
| Exhibit 24 | Text messages date range: 6/10/2020; Bates No. JONESWORKS_41594 - 41596 | 54 |
| Exhibit 25 | Jonesworks agreement to Jamey Heath; Bates No. JONESWORKS_41705 - 41709 | 59 |
| Exhibit 26 | Email dated July 31, 2024 from Mitz Toskovic to Jennifer Abel; Bates No. JONESWORKS_WAYFARER_3776 | 65 |
| Exhibit 27 | Email thread dated 10/24/24 from Mitz Toskovic to Laura Voglesong; Bates No. JONESOWORKS_WAYFARER_3754 - 3764 | 111 |
| Exhibit 28 | Email dated May 6, 2024 from Jamey Heath to Jennifer Abel; Bates No. JONESWORKS_WAYFARER_3838 | 116 |
| Exhibit 29 | Text message dated 7/26/2024; Bates No. JONESWORKS_JB_1142 | 174 |




INDEX TO EXHIBITS
JAMEY HEATH
JONESWORKS, ET AL. V. WAYFARER STUDIOS LLC, ET AL.
Thursday, October 9, 2025
Ashley Soevyn, CSR No. 12019


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 30 | Text Messages date range: 7/26/2024; Bates No. JONESWORKS_40269 - 40273 | 178 |
| Exhibit 31 | Text message dated 7/26/2024; Bates No. HANKS_12 - 13 | 185 |
| Exhibit 32 | Text message dated 7/26/2024; Bates No. JONESWORKS_WAYFARER_4651 - 4652 | 190 |
| Exhibit 33 | Email thread dated 8/4/2024 from Katie Case to Jennifer Abel; Bates No. JONESWORKS_MN_1208 - 1210 | 201 |
| Exhibit 34 | Daily Mail article titled It Ends With Us fans are convinced there's a huge feud between Blake Lively and Justin Baldoni - here's why by Lillian Gissen, August 8, 2024 | 211 |
| Exhibit 35 | Text message dated 8/8/24; Bates No. HEATH_46697 - 46711 | 211 |
| Exhibit 36 | Text message dated 12/22/24; Bates No. WAYFARER_167550 - 167559 | 269 |
| Exhibit 37 | Text messages date range: 8/17/2024 - 8/18/2024; Bates No. KCASE-369 - 373 | 292 |

CONFIDENTIAL




INDEX TO EXHIBITS
JAMEY HEATH
JONESWORKS, ET AL. V. WAYFARER STUDIOS LLC, ET AL.
Thursday, October 9, 2025
Ashley Soevyn, CSR No. 12019

| EXHIBIT NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 38 | Email thread dated 8/7/2024 from Jennifer Abel to Katie Case; Bates No. HEATH_28187 | 303 |
| Exhibit 39 | Text message date range: 8/18/24; Bates No. JONESWORK_14718 - 14725 | 326 |
| Exhibit 40 | Email thread dated 3/7/2024 from Joseph Lanius to David Weber among others; Bates No. BL-38477 - 38515 | 334 |




---0O0---
CONFIDENTIAL DEPOSITION PROCEEDINGS
THURSDAY, OCTOBER 9, 2025
---0O0---

THE VIDEOGRAPHER: Good morning. We're on the record. The time is 9:08 a.m. Pacific Daylight Time. Today is October 9th, 2025.

My name is Jonathan Hernandez. I'm a video technician with Veritext Legal Solutions located in Los Angeles, California. We are recording these proceedings at 2049 Century Park East, Los Angeles, California.

This is the video deposition of Jamey Heath in the action entitled Blake Lively v. Wayfarer Studios LLC, et al. This deposition is being taken on behalf of the plaintiff. The Case No. is 24-CV-10049.

Now, would you all please identify yourselves and who you represent, starting with the noticing attorney.

MS. SHAH: Maaren Shah from Quinn Emanuel Urquhart & Sullivan for Stephanie Jones and Jonesworks.

MS. HOLMES: Olivia Holmes from Quinn Emanuel for Stephanie Jones and Jonesworks.



MS. BABAYAN: Laurenne Babayan from Quinn Emanuel for Stephanie Jones and Jonesworks.

MS. HUDSON: Esra Hudson of Manatt, Phelps & Phillips for Plaintiff, Blake Lively.

MS. ROESER: Stephanie Roeser of Manatt, Phelps & Phillips, also for Plaintiff, Blake Lively.

MR. GLOVER: Joel Glover of Jackson Walker for Jed Wallace and Street Relations, Inc.

MR. FREEDMAN: Bryan Freedman for the Wayfarer-related parties.

MS. BENSON: Summer Benson of Liner Freedman Taitelman & Cooley on behalf of the Wayfarer parties.

MS. AHOURAIAN: Mitra Ahouraian on behalf of the Wayfarer parties.

MR. BACH: Jonathan Bach, Shapiro Arato Bach, Wayfarer parties.

MS. SHAPIRO: Alexandra Shapiro of Shapiro Arato Bach for Mr. Heath and the Wayfarer parties.

THE VIDEOGRAPHER: Thank you.

Will the court reporter please swear in the witness.

THE STENOGRAPHIC REPORTER: Do you solemnly state that the testimony you're about to



give in this deposition will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do, indeed.

THE STENOGRAPHIC REPORTER: Great. Thank you.

MS. SHAPIRO: Before we start, Mr. Heath wanted to clarify one of his answers from yesterday.

MS. SHAH: Okay. Please go ahead.

THE WITNESS: Thanks.

I just want to make a point regarding the 17-point list. I was in bed all night, I was reflecting, and realizing that everything that I said yesterday, while I was, indeed, true about how I saw it, I kind of tripped myself up, and I was not able to see clearly that, indeed, at that time, I also saw that it may have insinuated some of past feelings. And I just want to be clear about that so that my testimony today can reflect that.

MS. SHAH: Okay. Thank you.

EXAMINATION

BY MS. SHAH:

Q Now, you said in your last answer that you came to this realization by reflecting overnight; is that correct?

A Indeed.

CONFIDENTIAL

Page 18

Q Did you discuss your answer to that question yesterday or any issues around the answer that you just gave to me today with anyone else between the end of your deposition last night and the beginning of the deposition today?
You can just do a yes or no, and then I will get into whether they were attorneys or not.
A Yes.
Q Okay. Were any of the people that you discussed this answer with, or the issues surrounding this answer, attorneys?
A I'm sorry. Were anyone -- were they anybody attorneys?
Q Yes.
A Can I answer that?
Q Just yes or no.
MS. SHAH: He can answer that.
MS. SHAPIRO: Yes. Just yes or no.
THE WITNESS: Yes.
BY MS. SHAH:
Q Okay. Which attorneys? And you can answer by name.
A I spoke with -- with Alexandra and Jonathan.
Q Okay. Any other attorneys?

Page 19

A I don't recall.
THE WITNESS: Can I answer this?
BY MS. SHAH:
Q You can answer by name.
MS. SHAPIRO: You can give the names.
THE WITNESS: It was Jonathan and Alexandra, and I believe Bryan and Summer.
BY MS. SHAH:
Q Okay. Did you speak about this between the end of the deposition last night and the beginning of the deposition this morning with anyone else who was not an attorney?
A My wife.
Q Okay. Anyone else?
A No.
Q Okay. Did you speak about it with your wife outside of the presence of attorneys?
A I was in bed with my wife last night.
Q Okay. What did you discuss with your wife about the answer you just gave to me today?
MS. SHAPIRO: Objection. That is covered by the marital privilege. So I'm going to direct him not to answer that.
BY MS. SHAH:
Q Are you going to take your counsel's

Page 20

instruction?
A I would like to be able to just say the statement that I made.
Q You need to consult with your counsel about that?
MS. SHAPIRO: Yeah. Can we just take a brief break?
MS. SHAH: Yes. Let's go off the record.
THE VIDEOGRAPHER: We are going off the record. The time is 9:13 a.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record. The time is 9:18 a.m.
MS. SHAH: Ms. Shapiro, do you want to put something on the record?
MS. SHAPIRO: Yes, so we spoke off record and indicated to Ms. Shah that Mr. Heath was willing to answer conversations about that -- sorry -- questions about that particular conversations with his wife if counsel would stipulate that it wasn't a waiver for other purposes of the marital privilege. And I understand that counsel is not willing to do that, so the instruction to not answer the question on grounds of marital privilege still stands.
MS. SHAH: Thank you.

Page 21

BY MS. SHAH:
Q And you are going to follow your counsel's instruction?
A I think it's always wise to follow my counsel's instruction.
Q Okay. How long would you say this conversation with your wife was? Just how long, the time that you think it took?
A Thirty seconds.
Q Okay. And when you discussed this with your lawyers, how long would you say that conversation was?
A A couple minutes.
Q Okay. Did that conversation take place yesterday evening or this morning?
A This morning.
Q Okay. Where did it take place?
A In the office this morning in a breakout room.
Q Okay. In the large breakout room at the end of the hallway?
A Yes, our room. Yes.
Q Who was present in the room when that conversation took place?
A My lawyers, my wife. I don't know if

CONFIDENTIAL

Page 22

Justin and Emily were there. But then -- I don't know.
Q It's possible that they were in there?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know. I don't know.
BY MS. SHAH:
Q Was Jennifer Abel in there?
A I don't believe so.
Q Was anyone else in there?
A I don't believe so.
Q Did you talk to Justin Baldoni about this between last night's deposition and the start of this morning's deposition?
A About this particular thing here?
Q Yes.
A I didn't talk to him about it, but I shared with him that I needed to talk to the lawyers.
Q Did you share with him what you needed to talk to the lawyers about?
A Yes.
Q And what did you share with him that you needed to talk to the lawyers about?
A That I had -- exactly what I said. That

Page 23

I was thinking last night and I was reflecting on testimony, and I feel that I was a little confused in how I was thinking about this 17-point list. And I needed to talk to attorneys. And he said, follow your heart.
Q Did he say anything else?
A It was really about, follow your heart.
Q Any other words that you can remember?
A He was the spirit of, I trust you, follow your heart. Whatever you need to share, don't worry about anything, just share. Share whatever you need to. I don't remember the exact words, but it was in that spirit.
Q Did he offer to you his recollection or interpretation of the 17-point list?
A No, absolutely not.
Q Okay. When did that conversation take place?
A This morning.
Q How long was that conversation?
A A minute.
Q In person or on the phone?
A In person.
Q Where was that?
A In the office downstairs. In this

Page 24

building downstairs.
Q Okay. Was there anyone else present for that conversation?
A I believe it was just he and I.
Q Okay. Give your lawyers a chance to object.
When you spoke to your wife about this last night, what did she say to you?
MS. SHAPIRO: Objection. I'm going to instruct you not to answer that question on marital privilege grounds.
BY MS. SHAH:
Q Are you going to follow that instruction?
A I think it's best.
Q Okay. And when you spoke to your lawyers about this issue this morning, what did you say to them?
MS. SHAPIRO: Objection. And I'm going to instruct you not to answer that on attorney-client privilege grounds.
BY MS. SHAH:
Q Are you going to follow that instruction?
A Yes.
Q And when you spoke to your lawyers about it this morning, what did they say to you?

Page 25

MS. SHAPIRO: Same instruction. Do not answer on the grounds of attorney-client privilege.
BY MS. SHAH:
Q Are you going to follow that instruction?
A Yes.
Q Did you speak with your lawyers between the end of last night's deposition and the start of the deposition this morning about what the substance of your testimony this morning would be?
A About --
Q Yes or no?
A No. I did not. About the substance of today?
Q About the substance of the answer you gave to me at the top of the deposition this morning?
A No.
Q You did not speak to them in any respect about what it was that you wanted to correct from your testimony yesterday?
MS. SHAPIRO: Objection.
THE WITNESS: Oh, I see.
Can I answer that?
MS. SHAPIRO: You can answer yes or no.
THE WITNESS: I'm a little confused about

what you mean by "substance."
BY MS. SHAH:
Q Did you explain to them, yes or no, what it was about your testimony yesterday that you wanted to correct?
MS. SHAPIRO: Yeah. I'm going to object and direct you not to answer on privilege grounds. I mean, you're essentially asking him to discuss the substance of the conversations but in the form of a yes-or-no question, which is the basis for the objection and the instruction not to answer.
BY MS. SHAH:
Q Are you going to follow that instruction?
A Yes.
Q All right. I'm going to try and use a different word.
Yes or no, when you were speaking to your attorneys about this subject this morning, did you discuss with them -- I'm trying not to use the word "substance" -- the contents of your testimony?
MS. SHAPIRO: I will make the same objection and give the same direction not to answer that on the same grounds.
BY MS. SHAH:
Q Are you going to follow the instruction?



A I am.
Q Did you discuss with them, yes or no, what you were going to testify about with respect to that answer this morning?
MS. SHAPIRO: Same objection and same instruction.
BY MS. SHAH:
Q Are you going to follow that instruction?
A I think it's best.
Q Okay. I don't have the words right in front of me, but you did give me the correction that you wanted to correct at the top of the testimony today. Would you just explain that to me again? What it is about yesterday's testimony that you wanted to correct in today's testimony.
A I think simply, as I was testifying as it pertains to 17-point list and my state of mind and how I viewed it, in reflecting, while, of course, I agreed that all of these things were reasonable things that anyone asked for, I think I also messaged that I may not have considered that some of these things had some -- a nod to how -- what may have been brought up in the past. And that's what I wanted to.
Q I see. So am I understanding correctly



that what you're essentially saying is, you think during the deposition yesterday, it may have appeared from your testimony that you were not leaving room for the possibility that some of the things on the 17-point list related in some way to past incidents, and -- and that's the aspect of it that you want to expand on this morning?
MS. SHAPIRO: Objection.
Go ahead.
THE WITNESS: Not necessarily that it related or not, but that I -- that I had considered that could some of these things have some sort of nod -- for lack of a better term -- to what we had discussed in the past.
BY MS. SHAH:
Q What you and Ms. Lively and others had discussed in the past?
A What -- yeah, some of the concerns that she may have spoken about.
Q Okay. And when you say the word "nod," like it may have some nod to those things, do you mean reference, or relatedness, or can you give me another verb?
A That it could have insinuated that possibly, is this related to anything that's come up



before? While I didn't necessarily land on that, but that it was a consideration.
Q It's something that went through your mind at the time?
A Sure.
Q Okay. Why was it important to you to correct that aspect of your testimony this morning?
MS. SHAPIRO: Objection.
THE WITNESS: I want to really do my best to reflect and to be truthful. And if that was sitting in me, that did I convey that correctly? And so that was -- that was the purpose.
BY MS. SHAH:
Q Is there anything else about your testimony yesterday that you want to take the opportunity now to correct?
A No.
Q Okay. You were in the room, the breakout room with your lawyers last night after the deposition with some of the other defendants here, and I believe your wife and Mr. Baldoni's wife for quite a long time last night. During that time, did you discuss the substance of your deposition testimony yesterday in any respect?
A I don't believe so.

CONFIDENTIAL

Page 30

Q What were you in there talking about?
MS. SHAPIRO: Objection. I'm going to direct you not to answer that question on the grounds of privilege.
I will just represent on the record that given the Judge's ruling, that we did take some time to prepare Mr. Heath for the 30(b)(6) aspect of today's deposition.
MS. SHAH: Understood.
BY MS. SHAH:
Q So am I to understand that when you all were in the room towards the end of the hallway last night until about 8:30 p.m., I think, at least part of that time you were preparing for the 30(b)(6) or corporate representative deposition today; is that correct?
A Yes.
Q Was Justin Baldoni present for that?
A No.
Q He was not in the room?
A He was not. You're talking about for when we were prepping for the 30(b)(6)?
Q Uh-huh.
A He was not.
Q Okay. Where was he?

Page 31

A I don't know.
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q Okay. Was your wife in the room?
A I don't know. I don't think so. I don't know. I wasn't -- I was focused on the two of them right there.
Q Forgive me for saying it this way, but I saw you all leave together at the end of the night. So if certain people were not in the room while you were prepping, were they elsewhere in this building? Did they leave and come back?
A I can be clearer.
Q Okay.
A When I was prepping with them --
MS. SHAPIRO: Objection.
THE WITNESS: There is two rooms we have.
BY MS. SHAH:
Q Understood. Thank you.
A We were in one room. Then afterwards, I believe everybody was in support waiting for me so that we could be together.
Q All right.
A And that was the other room.
Q Thank you. That was helpful

Page 32

clarification.
So do I take it that while you were preparing for the 30(b)(6) deposition with your lawyers, was there anyone else present in that room other than your lawyers?
A I don't think so. You asked me about my wife. I don't think she was in there.
Q Uh-huh.
A But that's it.
Q Okay.
A Just the three of us, and I can't say for certain if she was in there or not --
Q Okay.
A -- but I don't believe so.
Q And you don't recall anyone else being in there?
A There was nobody else in there.
Q Okay. How long did you spend last night preparing for the 30(b)(6) deposition?
A Fifteen minutes maybe.
Q Okay. All right.
And so I take it that you understand that you are testifying today, A, in your personal capacity as Jamey Heath, an individual; and, B, in your capacity as Wayfarer, the company's, corporate

Page 33

representative; is that correct?
A I am aware of that.
Q Okay.
A It's all a bit confusing to me, to be honest, but I'm aware.
Q And as CEO of Wayfarer, do you feel capable to testify about the activities of Wayfarer?
A I believe so.
Q Okay. Can you describe for me what your responsibilities --
MS. SHAH: Actually, let's pull up tab 1.
THE WITNESS: Can I ask a question?
Will I know when this is a question that's of me, Jamey Heath, versus that of a representative of Wayfarer?
BY MS. SHAH:
Q Let me put it this way. As we go through the testimony today, if you feel like there is a need to distinguish in your answer whether you are answering on behalf of Jamey Heath, yourself as an individual, or answering on behalf of Wayfarer, the company, please go ahead and make that distinction.
A Okay.
Q Otherwise, I will assume that you are answering all questions in both capacities.

CONFIDENTIAL

Page 34

A Okay.
Q Thank you.
A In both capacities?
Q Yes.
A Can I have clarity on that? I'm sorry. I just want to have clarity.
Q Meaning, whatever your answer is --
A On all questions throughout the day?
Q Yes, unless you distinguish it for me, will be your answer as Jamey Heath and your answer as Wayfarer, the company.
A Okay. I have a clarifying question about this, just so I'm clear.
Q Please go ahead.
A I'm so sorry.
Q No, it's all right.
A There are certain topics on here that regard -- in regard to the 30(b)(6). There will be other topics that you may ask me about that have nothing to do with the topics. Why would my answer as individual be applicable to Wayfarer if, in fact, they are not topics on the 30(b)(6)?
Q It's very difficult to answer in a vacuum.
A Okay.

Page 35

Q This might be a better question for your lawyers on a break.
A Okay.
Q But I think the best way to go about it is, if in response to any question you want to tell me, you know, this I don't know as Jamey Heath --
A Okay.
Q -- but I learned as Wayfarer's corporate designee, then tell me that.
A Okay.
Q Or vice versa.
A I'll do my best.
Q Thank you.
MS. SHAPIRO: Counsel, just to be clear, I'm not sure that -- that your instruction is correct. Because to the extent that -- you know, the -- the purpose of the 30(b)(6) is only to cover the specifically delineated topics. If you ask him something about a different topic, he's not here on behalf of Wayfarer; he's just here as Jamey Heath.
MS. SHAH: And I will say --
MS. SHAPIRO: I don't think he should have to memorize and remember each time to make that distinction and have in mind what the 16 topics are. So I think we should have understanding that if the

Page 36

question deviates from those topics, that whether he says, this is just me as Jamey Heath, or not, that we have to assume it's just his individual testimony.
MS. SHAH: I'm not going to agree to that or assume that. If you think an objection is proper on that basis, please make the objection.
MS. SHAPIRO: Well, that's what I'm doing.
MS. SHAH: To each question.
MS. SHAPIRO: Okay. Well, we're going to have a standing objection along those lines, but I'll do my best to try to police it.
MS. SHAH: All right. Your side requested a co-extensive 30(b)(6) and individual deposition. And so that's why we're doing it that way today. So if you think any of the questions deviate from the notice and you have not prepared him in a corporate capacity or you think the question is outside that knowledge, make an objection or he can so indicate.
Thank you.
THE WITNESS: Would it be helpful if I answer every question that this is on behalf of Jamey Heath?

Page 37

MS. SHAH: No.
THE WITNESS: Well, I will --
MS. SHAH: Thank you, though.
So I'm going to mark this as Exhibit 1. This is the notice -- oh, sorry, 2? Oh, 22, Exhibit 22. This is the notice of 30(b)(6) deposition that we served on Wayfarer Studios.
(Exhibit 22 marked for identification.)
BY MS. SHAH:
Q And my first question is: Have you ever seen this document before?
A I have.
Q If you will -- when did you see it?
A I believe I looked at it last night, and I think I saw it a few days ago.
Q Okay. If you will look for me at the Topics for Examination starting on page 6. I just want you to read through the topics 1 through 16 and tell me if there is any topic in there that you are not prepared to testify about today.
A Okay. I think for the most part, I can. Although, I am not an expert on these things. So I haven't had much time to prepare, so I will do my best.

CONFIDENTIAL

Page 38

Q Okay. Thank you.
Can you describe for me what are your responsibilities as CEO of Wayfarer?
A I can. Quickly, the financial strategy of Wayfarer, what we're investing in. Everything that has to do with that, investments, the way that we do our deals, where we are holding our money, anything of that nature. Creatively, projects that we do, are they in line with who we are, are they good, the quality of it. There is more to it than that, but that's the basic.
Also, our leadership and culture. How we walk, our purpose as a company, what our goals are, and to build relationships with others.
Q What is Wayfarer's purpose as a company?
A We want to make art that lifts the human spirit, that speaks to things that oftentimes don't have an opportunity to be commercial. They don't have to be commercial, but oftentimes they're -- they don't have a path. To give filmmakers, sometimes new filmmakers, opportunities to make movies. To tell stories that a lot of people may not see are worth telling.
And, as I say -- and my CFO gets mad at me all the time -- is we want to make things that

Page 39

have impact whether or not they make money. Of course we have to make money, but that's not our primary goal.
Q Is Wayfarer profitable?
A No.
Q Has it ever been?
A No.
Q I believe Mr. Sarowitz testified that Wayfarer is paying for the litigation fees and expenses of the various defendants in these two related litigations; is that correct?
A I don't know about -- well, the defendants, yes, we are paying for those.
Q And that includes litigation fees and expenses for Mr. Baldoni's defense?
A It does.
Q And for Ms. Abel's defense?
A It does.
Q And for Ms. Nathan's defense?
A It does.
Q And for Wayfarer's defense?
A Yes.
Q For Mr. Wallace's defense?
A Yes. Sorry. I just needed to -- there is a lot of expenses, so I'm just making sure.

Page 40

Q And for Street Relations' defense?
A I believe so. I don't know if there is a distinction between the two.
Q And for The Agency Group's defense?
A I believe so.
Q For your defense?
A Yes.
Q For Mr. Sarowitz's defense?
A Yes.
Q Am I missing any defendants that you are paying for?
A I don't think --
MS. SHAPIRO: Objection.
THE WITNESS: -- there's any other defendants.
BY MS. SHAH:
Q Okay. How about attorneys' fees for Ms. Case's legal fees related to this case?
MS. SHAPIRO: Objection. Objection.
THE WITNESS: I don't know.
BY MS. SHAH:
Q How about for the attorneys' fees related to Ms. Koslow's involvement in this case?
MS. SHAPIRO: Objection.
THE WITNESS: Similarly, I don't know.

Page 41

BY MS. SHAH:
Q Okay. Are there any other third-party non-defendant witnesses or individuals whose involvement in this case Wayfarer is paying costs and attorneys' fees for?
A Yes.
Q Who are they?
A I don't know everyone. I believe Isabela Ferrer, we have to pay for. I'm drawing a blank on who anyone is, but if you give me a memory on who's on part of it, I might be able to answer better. There are so many components, so I don't -- I can't think of anyone else, but there may be.
Q How about Jenny Slate?
MS. SHAPIRO: Objection.
THE WITNESS: I believe that is a yes.
BY MS. SHAH:
Q How about Colleen Hoover?
MS. SHAPIRO: Objection.
THE WITNESS: I believe that's a no.
BY MS. SHAH:
Q Now, I believe you testified yesterday that Wayfarer received about 60 million in revenue from the film It Ends with Us; is that correct?
A Correct.

CONFIDENTIAL

Page 42

Q Okay. And that of that 60 million, 31 million was tied to Wayfarer's investment in the film; is that right?
A Correct.
Q Okay. Of the 29 million from that, that presumably remained available after accounting for Wayfarer's investment in the film. Are you aware whether or not Wayfarer is paying for litigation expenses and attorneys' fees in relation to this case out of those funds?
MS. SHAPIRO: Objection.
THE WITNESS: I don't believe there is a distinction.
BY MS. SHAH:
Q A distinction in what?
A Meaning, out of those funds. I believe that the funds, they come in but then are given to Wayfarer. Now Wayfarer has its fund of money, and we're paying for legal fees. That's a question my CFO would have better answer to, but I believe that's the general answer.
Q Okay. So to the extent that that 29 million were still available in the pull of money that Wayfarer has, it's reasonable to presume that the litigation expenses and fees are being paid out

Page 43

of that general pool of money; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: I believe so.
BY MS. SHAH:
Q Okay. As CEO of Wayfarer, do you have ultimate decision-making responsibility on all major material aspects of the company?
MS. SHAPIRO: Objection.
THE WITNESS: Ultimate decision-making, I would say no.
BY MS. SHAH:
Q How would you characterize your authority or decision-making role as CEO of Wayfarer?
A There is not a document that stipulates here's a ceiling and anything above that. There is a general understanding that normal course of business and, you know, I will approve any outgoing expenses or investments. But I consult with the chairmen, Justin and Steve, for anything that's substantial. That number is arbitrary. And then we will make a decision together.
Q Okay. Do you have oversight or approval over the legal contracts that Wayfarer enters into?
A Oversight is probably too strong a word. I have legal counsel. So I trust them. We consult,

Page 44

certainly. We have some outside counsel. So we get their minds together, whatever contracts we're going into. And then -- but certainly, I end up signing them.
Q Okay. And do you have some approval, even if it's not ultimate or sole approval, over legal contracts before Wayfarer signs them?
MS. SHAPIRO: Objection.
THE WITNESS: I'm a little confused on that. Jamey?
BY MS. SHAH:
Q Yes. As CEO, I'm trying to understand your role with respect to any legal agreements that Wayfarer enters into or has with anyone else.
A So the question is? Sorry.
Q The question is: With respect to legal agreements that Wayfarer either enters into with anyone else or has with anyone else, what is your role as CEO?
A My role is to trust the individuals that are positioned to give me the information. We consult whether or not this is the right path to turn left, or turn right, to whatever that may be. And then I also make the decision --
Q Okay.

Page 45

A -- whether to move forward.
Q Okay.
Did you -- were you -- how to say this.
Were you involved with Wayfarer when it was first started?
A No.
Q Okay. How long after Wayfarer was first started did you become involved with Wayfarer?
A And for Wayfarer, you mean Wayfarer Studios?
Q Yes, I do.
A Nine months to a year maybe.
Q How did you first come to meet Stephanie Jones?
A I don't recall the first time I met her, but through Justin, or through -- through Wayfarer.
Q Sure.
A Sure.
Q Do you recall that when you came onto the Wayfarer Studios team, that Stephanie Jones was and had been doing personal publicity for Justin?
A I don't know that I knew that at the beginning. I didn't have a relationship with Stephanie Jones. But at some point, I learned that. Obviously, I know she's the namesake. It's her

CONFIDENTIAL

Page 46

company. But then I learned that Justin had a relationship with her prior to the team that we had once I joined.

Q I understand. And are you aware or do you recall when you joined Wayfarer, whether Jonesworks was already representing Wayfarer, the company, as its publicist?

A When I joined, Jonesworks was representing the company.

Q Okay. Okay. Did you ever, from the time you joined Wayfarer, until, let's say, the start of filming on It Ends with Us movie, did you have any personal interaction or conversations with Stephanie Jones around Jonesworks' publicity work for Wayfarer?

A I do not believe so. I don't think I had any conversation with Stephanie. You're saying up until the start of the production regarding publicity?

Q For anything.

A I don't recall. There may have been one, and it was maybe inadvertent. But I don't recall it, as she was not active in my -- my daily life with Wayfarer and Jonesworks.

Q Okay.

Page 47

MS. SHAH: I'm showing you what's been marked as Exhibit 23. It's a Jonesworks contract, Bates-stamped JONESWORKS_, several zeros, 38539.

(Exhibit 23 marked for identification.)

BY MS. SHAH:

Q Do you see this?

A I do.

Q And do you see that it's been marked "confidential" at the bottom of each page?

A I do.

Q Would you agree that this is a confidential document?

MS. SHAPIRO: Objection.

THE WITNESS: I would agree that it has "confidential" on it, so that would suggest yes, indeed.

BY MS. SHAH:

Q Sure. In your own estimation, though, do you agree that a contract entered into between Wayfarer Studios and an outside vendor is a confidential document?

A Yes.

Q Okay. Have you seen this before?

A I didn't really look at it long, but it looks like if this is the agreement with Wayfarer

Page 48

and Jonesworks, which it looks to be, I have seen it before.

Q Okay. And this is the agreement with Wayfarer and Jonesworks; is that right?

A Yes.

Q It was signed by Labid Aziz, who I believe is Wayfarer's former CEO; is that correct?

A Correct.

Q Okay. And at the time this contract was signed, did Labid Aziz have signature authority in terms of entering into contracts on Wayfarer's behalf?

A I believe so.

Q Okay. And at the time, or around the time this contract was signed in May or June of 2020, did Labid Aziz have authority to enter into agreements on Wayfarer's behalf?

A I wasn't there, so I can't speak to if he had authority or not. But it appears that he may have.

Q Okay. And as Wayfarer's corporate representative, you don't have any reason to understand that he did not have such authority around this time, correct?

MS. SHAPIRO: Objection.

Page 49

THE WITNESS: Correct.

BY MS. SHAH:

Q Okay. But you were not at Wayfarer at the time this contract was signed; do I take that correctly?

A I was not.

Q Okay. If you look for me at paragraph 2 of this contract on the first page.

A Hold on. May we just pause for a minute because I am looking at the date here?

Q Uh-huh.

A I just want to be sure.

Yes, I was not.

Q Okay.

A I was just looking at the date and I got confused.

Q Meaning, you were not at Wayfarer at the time the contract was signed, correct?

A I was -- I was not.

Q Look for me at page -- the first page of this, at the second paragraph. It starts "The initial term of client's engagement."

A Yes.

Q And it says:

(As read):

CONFIDENTIAL

Page 50

"The initial term of client's engagement of company as contemplated in this agreement shall commence on May 7th, 2020 and conclude on May 6th, 2021. This agreement shall automatically renew for additional one-year periods unless notice is received by either party 90 days prior to the expiration of the initial term of this agreement or any extension period."
Do you see that?
A I do.
Q Okay. Wayfarer did not terminate Jonesworks before May 7th of 2024, did it?
A Before May 7th of 2024, we did not.
Q Okay. And Wayfarer did not send to Jonesworks any sort of termination notice or termination letter before May 7th of 2024, correct?
A Correct.
Q Okay. Flip for me to the last page of this agreement, marked Schedule A, please.
A Yes.
Q In your understanding, does this list

Page 51

fairly reflect or encompass the general services that Jonesworks was to perform for Wayfarer under this agreement?
A Yes.
Q And did Jonesworks also perform similar services around this time for Mr. Baldoni personally?
A I say yes, but it was his personal so he would have been more contact than I necessarily would have been. But I believe so.
Q Okay. And you're aware that, from the time of this agreement and afterwards, Jonesworks performed publicist services for Wayfarer and also performed publicist services separately for Mr. Baldoni; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: Correct. I just want to clarify that as I see what's on Schedule A. I don't know if all of these would have been applicable to Justin as an individual.
BY MS. SHAH:
Q Sure.
A So, again, I just want to be clear that I'm not sure all that they did for him. But I know Jonesworks represented him. And I'm, of course,

Page 52

very well aware of that, but to all capacities, I don't know.
Q Okay. Okay.
And after the time of this agreement, Wayfarer paid for the portion of Jonesworks' fee attributable to its personal publicity services for Mr. Baldoni; is that correct?
MS. SHAPIRO: Objection.
THE WITNESS: Correct.
BY MS. SHAH:
Q And you're aware, are you not, that Wayfarer had requested of Jonesworks around the time that this agreement in Exhibit 23 was signed, that Jonesworks issue a single invoice to Wayfarer for payment that encompassed both the fee for Wayfarer services and the fee for Mr. Baldoni's personal publicity services, correct?
MS. SHAPIRO: Objection.
THE WITNESS: I believe that to be accurate.
BY MS. SHAH:
Q Okay. And Wayfarer regularly paid those joint or bundled invoices when they were issued by Jonesworks on behalf of both Wayfarer's services and Mr. Baldoni's personal publicity services, correct?

Page 53

MS. SHAPIRO: Objection.
THE WITNESS: We did.
BY MS. SHAH:
Q Okay. And that total fee for Jonesworks services that was paid by Wayfarer and that encompassed both Jonesworks' services for Wayfarer and Jonesworks' services for Mr. Baldoni, was $25,000 a month; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MS. SHAH:
Q And you understand that Wayfarer had requested, around the time that this agreement in Exhibit 23 was signed -- well, let me ask it this way.
Prior to the time when Jonesworks began working for Wayfarer and before this agreement that we looked at in Exhibit 23 was signed, Jonesworks had already been working for Mr. Baldoni personally, right?
A I have knowledge that they worked together, yes, that Stephanie was his publicist. I don't know to what capacity and what agreements because it was before I was there.
Q Sure.

CONFIDENTIAL

Page 54

A But I know they worked together.
Q Okay. And once this agreement between Wayfarer and Jonesworks was signed that we're looking at in Exhibit 23, you're aware that Wayfarer asked Jonesworks to bundle Mr. Baldoni's contract together with this Wayfarer contract, right?
MS. SHAPIRO: Objection.
A I don't know if I understand the mechanics that happened when they were bundled, but I'm aware that they were bundled at some point.
Q Okay.
MS. SHAH: I am going to show you what's been marked as tab 3 -- sorry.
THE STENOGRAPHIC REPORTER: Twenty-four.
MS. SHAH: Thank you. What is going to be marked as Exhibit 24.
THE WITNESS: Thank you.
(Exhibit 24 marked for identification.)
BY MS. SHAH:
Q For the record, this is a text thread between Labid Aziz and Stephanie Jones dated June 10th, 2020, and it's marked JONESWORKS_, several zeroes, 41594.
Have you seen this text exchange before?
A I have not.

Page 55

Q Okay. Please go ahead and take a minute to review it.
A It says -- but -- okay.
Q So if you look at the page marked 595 at the bottom --
A Yup.
Q -- at 3:03 p.m. Labid Aziz texts:
(As read):
"Just wanted to ask if you'll give me a little break for bundling for contracts under Studios."
Do you see that?
A I do.
Q Do you have an understanding of what "bundling for contracts under Studios" means?
A Well, I would be guessing, obviously, I have never seen this between them. But it appears that studios would be Wayfarer Studios.
Q Okay. And it appears he's essentially asking to bundle Justin's personal contract under the Wayfarer Studios' contract, right?
A That's what I gather.
Q Okay. And he's asking for some sort of fee adjustment in consideration for that bundling, right?

Page 56

A Yes, that's what it appears.
Q Okay. And at the end it seems that -- that the fees for bundled contracts that is agreed on is a total of $25,000 a month, right?
A Correct.
Q And that is your understanding of what Wayfarer paid after this point forward for the bundled contracts of Wayfarer and Mr. Baldoni, right?
A Yes.
Q Okay.
A Do you want me to keep looking at this?
Q I don't think so.
A Okay.
Q Thank you.
Did there come a time when Wayfarer also engaged Jonesworks in 2024, moving forward in time to 2024, for specific social media services?
A Yes.
Q Was that request related -- or was that -- were the social media services to be performed specifically related to the promotion of It Ends with Us?
A I can't say for certain if it was specifically for It Ends with Us.

Page 57

Q Okay.
A But I believe it was also during that time so I don't know.
Q You do you have a recollection of how the request from Wayfarer to Jonesworks to perform certain social media services came about?
A I don't recall it, but I know that we wanted to give Justin some social support.
Q Okay.
A So this was born out of that.
Q Okay.
And do you know what the social media services were to encompass?
A I think I have a general understanding.
Q What is that general understanding?
A Help come up with ideas of social posts, post them for him, record any video that might be needed to be recorded at a particular event or something he may have been doing, and to help strategize about the best way to run its social.
Q Okay.
A It may have included more than that, but that's my -- that's my memory.
Q Do you recall that that -- that there was an agreement related to the social media services of

CONFIDENTIAL

Page 58

Jonesworks?
A I do.
Q I have the agreement here. I believe it's been marked attorneys' eyes only by us, so let's go AEO.
THE A/V TECHNICIAN: For counsel in the room, I do have a Katelyn Climaco, a Ms. Nathan, so I will assign her to the room.
MS. HUDSON: Katelyn is an attorney.
THE A/V TECHNICIAN: That's the only other name I don't recognize today.
MS. HUDSON: It would be Melissa and Steve.
THE A/V TECHNICIAN: Katelyn Climaco, is she part of counsel?
MS. HUDSON: She is part of counsel, yes.
MS. SHAPIRO: Melissa and Steve need to log off.
MS. SHAH: But Steve Sarowitz and Melissa Nathan, if you can put them in the waiting room for a few minutes, I would appreciate it.
THE A/V TECHNICIAN: Yes, ma'am.
MS. SHAH: Thank you.
THE A/V TECHNICIAN: We're all set.
MS. SHAH: Thank you.

Page 59

MS. SHAPIRO: Thank you.
(The following testimony is designated Attorneys' Eyes Only.)
MS. SHAH: So I'm showing you what's been marked as Exhibit 25. It's a contract between Wayfarer Studios and Jonesworks marked JONESWORKS_00041705.
Have you seen this before?
(Exhibit 25 marked for identification.)
THE WITNESS: I'm sure I have but I don't -- I don't recall it. And I believe, if I'm not incorrect, that this one is not signed, so I don't know if this is the most recent one.
BY MS. SHAH:
Q This is -- I don't have another signed one, so I can represent that to you.
A Okay.
Q What I will ask is, without holding you to whether this is the final version or an execution copy, et cetera, looking at this, do you have a general understanding that this is at least a draft of the contract with Jonesworks for the social media services that we were just discussing?
A I do.
Q Okay. And does it fairly reflect to your

Page 60

understanding what you understand the scope of the agreement for social media services to be?
A Can I ask for clarity? Are you asking about what the services will be or the contract language?
Q That's a fair request for clarity. What I'm -- what I'm trying to get at is, does this essentially look to you in your understanding for what you recall this social media agreement to be?
MS. SHAPIRO: Objection.
THE WITNESS: I believe this reflects in general terms what we were discussing. I just want to be clear that I don't know if this is what we ended up agreeing to.
BY MS. SHAH:
Q Sure.
A So this may have been a first round versus -- you know, so I just wanted to state that.
Q Okay. If you look at the back page, Schedule A, does the scope of work fairly reflect your understanding of what the scope of the intended social media services were to be?
A Yeah, I think so.
Q And if you look at the front, it may help you recall the first page and the second paragraph.

Page 61

But my question is going to be, do you recall that the agreement was to run for an initial four-month term with an option for renewal after that?
A I recall a version of that. I don't know if that's what we ended up agreeing to, but I do recall there was a short period of time that we were committing to, and then we didn't continue.
Q Right. So it's your recollection that after the short period of time, Wayfarer elected not to continue with this contract; is that right?
A Correct.
Q Okay. And what was the purpose in your understanding, at least from Wayfarer's perspective, of the initial short period of time for the social media agreement?
A I think it's whenever you go into any relationship, you don't know how long -- if it's working, will it last? Do I still need it? And what is uncustomary about when I would see this is, typically you might do a month to month. I understand initially someone is going to get their feet wet, so they need three months run time to get going. So I oftentimes will agree to that, and then it goes to month to month, oftentimes like agents.
So there was a concern with wanting to

CONFIDENTIAL

Page 62

commit to anything more than what we needed to.
Q Sure.
A That was the reasoning.
Q Okay. And, again, in your understanding, was the purpose of this social media agreement and the initial period for it, related directly to promotion for It Ends with Us on social media or not?
A I don't think I can say that, but I can -- I think Justin is a -- to whatever level he is a celebrity, has social media and has a following and he doesn't manage it in the way many celebrities might have a social media manager. So this was an effort to give him support. I don't know if it was specifically for It Ends with Us, rather than it being included in the scope of work he might need.
Q Sure. And you recall Jonesworks, in fact, did perform social media services for Wayfarer and Justin during some few-month period around this time; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know if it was for Wayfarer as well, other than by proxy, because Justin is also part of Wayfarer. I believe it was all focused on Justin.

Page 63

BY MS. SHAH:
Q Okay.
A That's my -- that's my recollection.
Q Okay. But Jonesworks did perform social media services for Justin or Wayfarer or both during these few months; is that right?
A Yes.
Q And at some point in time, I believe you said Wayfarer elected to cease those services moving forward?
A Yes.
Q Let's look at --
A You didn't go through the rules with me at the beginning to not nod and say yes or no. Forgive me for the nod.
Q No problem. I will remind you if -- if --
A It's okay.
Q -- it happens.
And during the time that Jonesworks performed social media services for Wayfarer or Justin, Wayfarer paid Jonesworks for those social media services, right?
A Correct.
Q Okay.

Page 64

MS. HOLMES: Do you want to go off AEO here?
MS. SHAH: This one is not on AEO?
MS. HOLMES: No.
MS. SHAH: Okay. We can go off AEO.
(End of the Attorneys' Eyes Only designation of the testimony.)
THE WITNESS: Is there a reason why we would see something -- Sorry. I'm not supposed to talk to her.
I just don't know why we would look at a document that is not signed versus one that's a draft.
BY MS. SHAH:
Q So let me ask you this question: Do you believe that Wayfarer has a copy of this contract or whatever contract that was ultimately agreed to with Jonesworks for social media services in its files?
A I don't know myself as we sit here today, but typically, if we have a contract that was signed, we would, of course, have a copy.
Q Okay. And if you had a contract that wasn't signed but reflected your agreement and understanding, would you typically also keep a copy?
A Yeah.

Page 65

Q Okay.
Do you know whether you went back as part of discovery in this case and searched Wayfarer's files for a copy of the social media contract with Jonesworks?
A ^I don't know specifically what we looked for other than what our attorneys were instructed to do, and we gave them access to turn over everything that we were supposed to.
Q Okay. To the extent that this has not been produced by Wayfarer and is encompassed within our discovery request, we are going to call for production.
MS. SHAPIRO: Okay. If it exists.
MS. SHAH: I've shown you what has been marked as Exhibit 26.
(Exhibit 26 marked for identification.)
THE WITNESS: Okay.
BY MS. SHAH:
Q It's an email dated July 31, 2024, between Mitz Toskovic and Jennifer Abel, copying yourself. And it's marked Jonesworks_Wayfarer_000003776.
Do you see this?
A I do.

CONFIDENTIAL

Page 66

Q Do you recall this email?
A I can't say that I recall it, but this makes sense. I mean, yes.
Q And does this reflect Wayfarer's termination of the social media engagement or agreement with Joneswork that we were just discussing?
A Yes.
And what I notice here it says, "beyond the 3 month term." So that suggests to me -- because I think this said 4 months, so I believe...
Q So does this refresh your recollection that there was an initial three-month term or are you just relying on what this says?
A That's my recollection, is that it was a three-month term.
Q Okay. And is it your recollection that at the end of the three-month term, Wayfarer elected not to continue with that agreement?
A Yes.
Q Okay. And is it your recollection that during the three-month term, there was at least some agreement between Wayfarer and Jonesworks to perform these social media services in exchange for payment?
A During those three months, yes.

Page 67

Q Yes. Okay. Thank you.
As of the date of this email in Exhibit 26, July 31, 2024, do you recall whether Wayfarer had already decided to leave Jonesworks and go with Jen Abel when she was to leave Jonesworks, as Wayfarer's publicist?
MS. SHAPIRO: Objection.
THE WITNESS: So I'm sorry. Can you rephrase the question? Just so -- it was --
BY MS. SHAH:
Q Sure.
What I'm asking is, do you recall if as of the time of this email, Wayfarer had already decided that it was going to leave Jonesworks to go with Jen Abel when she left Jonesworks?
A No. We had not decided to do anything as it pertains to Jonesworks based on this. This was -- is standing alone.
Q Okay. But even if not based on this, do you recall if as of this time you had made a decision whether or not to leave Jonesworks to go with Jen Abel?
A I do not believe so. I think this is -- no.
Q Okay.

Page 68

A Sorry. I'm just making sure about dates because there's a lot of dates. So...
Q Please do. I appreciate that and encourage that.
Do you recall when Wayfarer made the decision to leave Jonesworks and go with Jen Abel as a publicist?
A I think your question included two things in it, so I want to be clear. First question was, when we decided to sever ties with Jonesworks. The second one is, when we decided to have Jen as our publicist. That's two different conversations, so you encapsulate it in one. So maybe we can separate those.
Q Sure.
Tell me about -- so you recall those two things as being two separate conversations?
MS. SHAPIRO: Objection.
THE WITNESS: Two separate decisions, conversations.
BY MS. SHAH:
Q Sure.
You recall those things as being two separate decisions?
A Correct.

Page 69

Q Do you recall them as being related in any way to one another?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MS. SHAH:
Q So it's your testimony that Wayfarer's decision to leave Jonesworks had absolutely nothing to do with the fact that Jen Abel was leaving Jonesworks?
MS. SHAPIRO: Objection.
THE WITNESS: I think that's broad. I think Jen Abel was the only person I had worked with at Jonesworks. Once I learned that she was leaving, would that play a part of my thinking, I would be ridiculous to not acknowledge that. Certainly, where is the person in your relationship? What are they doing? But that wasn't my reason to decide to sever ties with Jonesworks.
BY MS. SHAH:
Q When did you learn that Jen Abel was planning to leave Jonesworks?
A I don't recall the date.
Q Do you recall where you were when the conversation happened or where you learned that?
A I don't.

Q Do you recall how you learned that?
A Not for certain.
Q What is your best recollection of how you learned that?
A I have a memory of Jen sharing with me that she had put in her notice or had put it in, but I don't know when that was.
Q Was it evident to you from that conversation with Jen that she was telling you shortly after she had put in her notice?
A I can't recall the time that it was when she put it in. It could have been five days, it could have been two weeks, it could have been -- that wasn't in my purview, nor did it really matter for me at that point.
Q Do you recall how long -- you recall when Jen Abel was terminated from Jonesworks, right?
MS. SHAPIRO: Objection.
THE WITNESS: What do you mean by that?
BY MS. SHAH:
Q You recall when Jen Abel actually did leave Jonesworks, right? It was pretty disruptive?
MS. SHAPIRO: Objection.
THE WITNESS: I do remember that.



BY MS. SHAH:
Q Okay. Is that a fairly clear memory in your mind of when she left and how that happened?
MS. SHAPIRO: Objection.
THE WITNESS: It's a general -- generally clear.
BY MS. SHAH:
Q So my question is, do you have a sense of how long before that you learned that she was planning to leave?
A I don't. I don't -- I would need something to reflect or give me some recollection because there was a lot going on. There were so many balls in the air. So when one -- when what was what, I don't know.
Q Do you think it was like the day before she left or like a week or two before she left or like six months before she left?
MS. SHAPIRO: Objection.
THE WITNESS: Not six months.
BY MS. SHAH:
Q Do you think it was three months before she left?
MS. SHAPIRO: Objection.
THE WITNESS: I would say not



three months.
BY MS. SHAH:
Q Do you think it was more than a month before she left?
MS. SHAPIRO: Objection.
THE WITNESS: The question is, more than a month?
BY MS. SHAH:
Q Before she left that you learned she was planning to leave?
A Before she left, meaning the June 20 --
Q The August, when --
A August?
Q Yeah.
A When was it, August?
Q August 21st.
A 21st. Okay. So I'm a little confused on the question.
Q My question is, do you think you learned she was planning to leave and had put in her notice --
A Before that event?
Q -- more than a month before she actually did leave?
A I don't think so.



Q Okay.
A The reason why I'm having trouble is because when she -- when I learned that she had planned on leaving, put in her notice, is a different understanding than when she left this event that you just mentioned, the one that we all know was when she was let go. To me, those are two -- I'm a little confused by the two, because one is putting her notice and one is when she -- this August 21st date when she was terminated or something.
Q Uh-huh. Can you explain a little bit more to me what you mean by that?
A Just that I learned at some point, she put in her notice. To me that means someone is -- let an employer know that I'm leaving, whatever the terms are. This 21st, from what I understand now, was more of a termination. So there is a different -- those are kind of two different things.
Q Sure. So you don't understand how those two things relate?
A I don't recall timing of how they relate.
Q Sure.
Do you recall whether Jen Abel informed you that she had put in her notice before you

CONFIDENTIAL

Page 74

engaged Melissa Nathan?
A I don't recall.
Q Okay. So to the best of your recollection, sometime between when Jen Abel put in her notice and when she was let go from Jonesworks, you learned that she had put in her notice and was planning to leave?
A Say that again for me?
Q At some point in time between when she put in her notice at Jonesworks and when she actually left Jonesworks, is when you learned that she planned to leave?
A I believe so.
Q And you said you recall learning that through a conversation with Jen?
MS. SHAPIRO: Objection.
THE WITNESS: No. Because I don't recall the conversation, but I have a memory of learning about it from her.
BY MS. SHAH:
Q Okay.
A I don't recall how.
Q Can you tell me everything you remember about that?
A I can't because I don't recall how. I

Page 75

just remember getting the information at some point.
Q Okay. Is there anything else that you can tell me about your recollection of getting the information?
A There is not because it was not a -- an event. It was just me learning that she had put in her notice, but I don't recall anything -- any specifics around it.
Q Did you immediately think at that point or wonder what would happen to Wayfarer at Jonesworks when she left?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know what I immediately felt. I don't know.
BY MS. SHAH:
Q Was it ever a concern for you or a consideration for you about what would happen with Wayfarer at Jonesworks after Jen left?
A Sure.
Q Okay. Tell me about that consideration.
MS. SHAPIRO: Objection.
THE WITNESS: I had a four-year, give or take, relationship with Jen. Matthew Mitchell was there. I like Matthew very much. But not the one that I would feel safe being a leader of handling

Page 76

Wayfarer. So if this person was putting in their notice and moving on, what would that mean for Wayfarer? So it was something to consider.
But I do recall that in her notice, that that didn't mean she was leaving tomorrow. There was a duration of time. I don't know -- I don't know if that was a month or two months or three months or whatever it would have been. But certainly, that would have been on my mind.
BY MS. SHAH:
Q You just said something about Matthew not being the person you felt safe considering to be like the leader of the Wayfarer account, right? Who was the person that you felt safe with being the leader of the Wayfarer account?
A Jen.
Q Okay. Anyone else at Jonesworks?
A Jen.
Q Okay. How would you describe the cadence of your relationship and interactions with Jen as Wayfarer's publicist over the four years she had been on that account?
MS. SHAPIRO: Objection.
THE WITNESS: Jen is on top of it. She understands and gets what we're about and how we

Page 77

like to operate. And I trusted her judgment. And based on that, we built a relationship that was a professional trusting of the path we wanted to take. While I liked Matthew Mitchell, he didn't feel to be a leader to me in the way that Jen is.
BY MS. SHAH:
Q Did you feel like you had that close relationship of trust on a professional level with anyone else than Jen at Jonesworks?
A I didn't have distrust with anybody, but Jen was our point.
Q Okay.
THE STENOGRAPHIC REPORTER: Was our what?
THE WITNESS: Point. Point person. Sorry.
BY MS. SHAH:
Q And I think you testified a little bit ago that, like, sure, when you found out Jen was considering leaving, Jonesworks, it was a consideration for you in terms of what would happen to Wayfarer after she left?
A Sure.
Q Can you tell me a little bit more about how you thought about that in your mind?
MS. SHAPIRO: Objection.

CONFIDENTIAL

Page 78

THE WITNESS: You're asking me to think about what I was thinking at that time. I -- I don't know. That was one piece of a million pieces going on.
BY MS. SHAH:
Q Okay.
A So it was information. I recognize that I have to consider when one thing affects the way a boat floats, I have to figure out how to next navigate that. That makes sense. But I don't know what I was thinking at that moment.
Q Okay. You were present for at least part of the deposition that I did with Mr. Baldoni; is that right?
A Yes.
Q I believe you were not in the room the whole time?
A I was not.
Q Okay. Do you recall him testifying that the conversation and consideration about whether to go with Jen when she left Jonesworks was something that he discussed in consultation with you and Tera Hanks?
A I remember that.
Q Is that consistent with your

Page 79

recollection?
A Yes.
Q Okay. Can you tell me about those conversations?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall when they were timeline wise. But they were exactly that. If, in fact -- excuse me -- our point person is leaving, what would that mean? What do we do? I would have to investigate what the next -- who's going to fill it maybe. What -- what just -- what does that mean? That was one part of the conversation. And then there was another conversation, and I don't know which one happened first, but of my concern separately that I had with Jonesworks.
BY MS. SHAH:
Q Okay.
A Or with us being at Jonesworks irrespective of Jen Abel.
Q Okay. Around that time when you were discussing this with -- at least when you were discussing what it would mean for Wayfarer if Jen Abel left Jonesworks and whether you should go with Jen Abel when she left Jonesworks with Tera and

Page 80

Justin, was it important to you how comfortable Justin felt with his own personal publicist?
MS. SHAPIRO: Objection.
THE WITNESS: Sure.
BY MS. SHAH:
Q Was it important to you how comfortable Justin felt with respect to who was going to be Wayfarer's publicist?
MS. SHAPIRO: Objection.
THE WITNESS: Was it comfortable for Justin?
BY MS. SHAH:
Q Meaning, was it important to you as the head of Wayfarer what Justin's perspective was on who he might want to be Wayfarer's publicist?
A Yes, of course.
Q Okay. Would you have felt comfortable hiring a publicist for Wayfarer that was not Justin's preference or that he did not feel comfortable with?
MS. SHAPIRO: Objection.
THE WITNESS: No. I would never do that.
BY MS. SHAH:
Q Okay. So fair to say that his opinion of who he wanted to be his publicist and Wayfarer's

Page 81

publicist was pretty important to you in making decisions?
A Yes. That doesn't mean I wouldn't challenge him --
Q Sure.
A -- for one reason or another and we go back and forth. But I would not hire a publicist for his company or himself that he didn't feel was the right one.
Q Okay. So you said there was a -- you were having conversations with Tera and Justin about whether to go with Jen when she left Jonesworks, and --
A I don't know. No, that wasn't -- it was more, what does this mean for Wayfarer?
Q Okay.
A It was more -- or maybe Justin. I don't recall exactly, but I know we had to have a conversation about if, in fact, your point person is no longer there and there is a hole --
Q Sure.
A -- what does that mean?
Q And I apologize if I asked this already, but can you tell me the substance of those conversations?

CONFIDENTIAL

Page 82

A Not more than that because I don't recall everything said. But that was -- that was the substance. What does it mean? I don't know what the next steps were to do. Whether it was to wait out a period of time. I don't -- I don't know.
Q Okay.
A I just know that we had a conversation about it.
Q Do you recall anyone in that conversation expressing a view one way or another?
A I don't.
Q Okay. And then you said there was separate conversations around being at Jonesworks, irrespective of Jen's decision to leave; am I getting that correct?
A Correct.
Q Okay. What do you recall about those conversations and who were they with?
A I don't recall the exact -- but I -- if it was Justin and I., maybe Tera was there, maybe. But my concern -- I'm really trying to be mindful that I don't speak ill of another. I don't want to do that.
Q Understood. But please give me your best recollection in candid terms.

Page 83

A I did not feel through my conversations with Stephanie that she was capable of being our point. I didn't feel that she was invested. I didn't think her mind -- not about her mental mind on a clinical level -- but, was present.
Forgive the analogy, but I often say if I have someone taking care of my kids, I need them to be present of mind to do well with the kids. And if they've got something else going on in their life, I fully get it, but I still need the person to take care of my kids, irrespective of what is going on in their life. That's what I felt. For a host of reasons. And I was concerned.
Q Did you -- other than what you just described to me, were there any other concerns you had about staying at Jonesworks?
A I'm thinking. I believe my concerns all stemmed around my faith in Stephanie.
Q Okay. And by your "faith in Stephanie," does your concern around your faith in Stephanie essentially encompass what you just described to me or is there anything else --
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q -- that would impact your feeling of your

Page 84

faith in Stephanie?
MS. SHAPIRO: Objection.
THE WITNESS: I think her -- God bless her. She was going through a hard time, I'm sure. But I remember she was talking to Justin about what was going on in her life, and she had a bit of an emotional breakdown, which I hold space for as a human. But I didn't know if she was able to draw the line between her job. Justin was going through a lot at that time himself, and I believe her job was to, as a job, show up for him versus the other. Not dismissing humanity.
When I would speak to her leading up, I didn't speak to her much, but the couple of times and the way she would articulate where she was at, led me feeling that she was maybe not the best person to handle whatever is what we needed. I can't give you a concrete example for everything, but that's the feeling I had.
And then once we got to a phone call I had with her, for me that was a clear indication that I don't know if I can have this person be, as the analogy I said, our babysitter. There was some other events there that happened. So I would need a moment to reflect so that I'm not just leaving them

Page 85

out.
But the accumulation of some of these things, I just -- and -- and honestly, it didn't feel unreasonable. You know, sometimes you have a relationship with someone and it doesn't serve its same purpose today as it did four years later, as last year, and that was something to consider.
BY MS. SHAH:
Q And are all these current -- sorry. Are all these concerns that you just described to me about Stephanie and her ability to be your babysitter in your analogy and your faith in her and her attention to Wayfarer, the reason Wayfarer ultimately decided to cease working with Jonesworks?
A Can you repeat that or rephrase it, please?
Q Sure.
All these concerns that you have just described to me about Wayfarer's relationship with Jonesworks, are those concerns the reason you ultimately decided to terminate your relationship with Jonesworks?
A A great part, yes.
Q Okay. What was any other part of that decision, other than these concerns you just

CONFIDENTIAL

Page 86

described to me?

A The gaping hole that would be there.

Q When Jen left?

A When Jen left.

Q Okay.

A Not necessarily only about Jen, but the hole that would be there. And that was a concern, also.

Q Okay. Anything else?

A At the moment, that's what I can recall. I'm sure as we keep talking, maybe something will come to the surface.

Q Okay.

And you said that phone call that you had with Stephanie around --

A May I -- may I interject?

Q Yes, of course.

A Also, Tera Hanks had some conversations with her also that she had shared with me that she didn't feel that she was in her best state of mind and had concerns with her as well. So that also helped give me context from my own feelings.

Q Okay. And what do you recall about the conversations that Tera had with Stephanie that Tera shared with you in that respect?

Page 87

A I don't have a direct recollection. I just -- the overall theme that I understood was that she was feeling that Stephanie was not at her best.

Q Okay. And the phone call that you just described to me a moment ago that you had with Stephanie around this time, where you said that was a clear indication to you that you didn't know if, essentially, you wanted Wayfarer to continue to work with Stephanie --

A Yup.

Q -- is that the phone call that you recorded?

A It is.

Q Okay. What about that phone call was a clear indication to you that you may not want to continue to move forward with Jonesworks?

A I believe this was August 8th, I think, 7th or 8th. We had just left the premiere in New York. We were treading every step lightly because we just didn't know what was around the corner for a host of reasons. Justin was going through a lot. There was chatter on social media speculating different things. We were trying to get our head around everything.

And in the midst of that, I had learned

Page 88

through Josh Greenstein that Stephanie had been engaging with someone. I didn't know the extent of it at the time because it was all new information. I didn't know all the backstory, but when I called to talk to her about it, her behavior and her ability to be present as someone who was working for Wayfarer versus her own, God bless her, personal stuff, and her own was conflicting for me and, I felt, unprofessional.

And as I was having the conversation with her and trying to separate those things, she did not have the ability, in my estimation, to separate them. And this went on for a while. And I needed her to hear my instruction to not contact anybody. Even though, again, I understand she was worried about a reputation. And I feel for her. But we had a big fire going on we were trying to manage, and she was one of our firefighters, and she was concerned about her own fire. No judgment, but I needed a firefighter in ours. And I did not feel I was getting that. And it gave me great concern moving forward how to work with that.

Q Do you recall where you were when that phone call took place?

A I was in Chicago, I believe.

Page 89

Q Okay. You were in a car with Jen Abel; is that right?

A I don't know for certain if I was in a car. But I remember yesterday I spoke and that was mentioned. So it's quite possible. But I don't know for certain.

Q Okay.

A I just don't remember where I was in that exact moment. There was many calls and conversations, but possibly.

Q You remember being with Jen Abel, though, when you had that conversation with Stephanie on the phone?

MS. SHAPIRO: Objection.

THE WITNESS: I don't have a clear memory because I don't remember where I was, so I can't say that I remember her there.

BY MS. SHAH:

Q Have you listened to that recording ever?

A I have.

Q Have you listened to it recently?

A No.

Q When is the last time you listened to it?

A Maybe when we turned things over to our attorneys, maybe sometime around there.

CONFIDENTIAL

Page 90

Q Did you make the recording?
MS. SHAPIRO: Objection.
THE WITNESS: Did I myself?
BY MS. SHAH:
Q Yes.
A Yes.
Q How?
A I used somebody's phone. I don't know who was ever with me. I don't recall it, but I know I was on my phone. I don't have a direct recollection, but I must have used somebody's device to record it.
Q Okay. So there was at least somebody else with you at the time?
A Sure.
Q Do you remember how many people were with you at the time, or anyone else who was there?
A I don't.
Q Okay. Why did you record that call?
A This was at a time when we were treading lightly. I was. I didn't know at this moment who to -- as dramatic as it sounds, who to trust. And her behavior was suspect to me, and I felt like I needed to have something documented. I can't exactly explain every moment why, but that's what I

Page 91

felt.
Q Did you record any other calls or conversations with anyone else around that period of time?
A Pertaining -- pertaining to Stephanie Jones and Jonesworks?
Q No, pertaining to anything.
A Anybody?
Q Uh-huh.
A Yes.
Q Which ones do you recall?
A A call with Patrick Whitesell.
Q Uh-huh.
A A call with Danny Greenberg.
Q Uh-huh.
A And there was a Sony marketing call.
Q You did not tell Stephanie Jones she was being recorded when you recorded that call with her, did you?
A I didn't.
Q And you are aware that she was on vacation in Europe with her family at the time, right?
A I have a recollection of that. I don't know if I knew that at the time or I learned it

Page 92

afterwards, but I know now that she was there.
Q Okay. You didn't tell Patrick Whitesell that he was being recorded; did you?
A I didn't.
Q Okay. Where were you when you recorded that call?
A I believe I was in my office. Are you referring to Patrick?
Q Yes.
A Yes, I believe I was in my office.
Q In your office in Los Angeles?
A Correct.
Q Okay. And he was also in Los Angeles when you spoke with him on the phone, correct?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know for sure.
BY MS. SHAH:
Q Your best -- your best recollection or expectation is that he was, correct?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know. He very well could have been. He could have been somewhere else too.
BY MS. SHAH:
Q Okay.

Page 93

A He's a traveler. I mean, he's -- he's, you know, so I don't know.
Q You know that he lives in Los Angeles, right?
A I do know he lives in Los Angeles.
Q You know that he works in Los Angeles, right?
A I do.
Q Okay. Did you tell Danny Greenberg you were recording him when you recorded that call?
A I did not.
Q Okay. Were you in Los Angeles when you recorded that call?
A I was.
Q Danny Greenberg was also in Los Angeles when you recorded that call, correct?
A I believe he was.
Q Did you tell anyone on the Sony marketing call that you were recording that call?
A I did not.
Q You were in Los Angeles when you recorded that call, correct?
A I believe so.
Q At least some other participants on that call were in Los Angeles when you recorded that

CONFIDENTIAL

Page 94

call, correct?
MS. SHAPIRO: Objection.
THE WITNESS: I believe so.
BY MS. SHAH:
Q Okay. Other than these four calls that you have described to me, did you recall -- do your -- do you recall recording any other phone calls or conversations with anyone around this period of time?
A No.
Q Okay. When I say "around this period of time," I mean July and August of 2024; is that fair?
A Yes.
Q Do you recall recording any other calls or conversations with anyone between the time that you began filming It Ends with Us and August of 2024?
A It's a long question. Do I remember recording anyone from the time the movie started --
Q Uh-huh.
A -- until August of '24?
Q Yes.
A I do not. Unless, as I testified yesterday, I may have had a therapy call that we both knew we were recording something.

Page 95

Q Okay.
A I don't have a memory of it. But just want to make that clear.
Q Do you have a practice of recording calls and conversations?
A I do not.
Q Okay. Was there something specific about these four calls that made you want to record them?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MS. SHAH:
Q What was that?
MS. SHAPIRO: Objection.
THE WITNESS: The call I had with Patrick was an intense time. We were dealing with what I would just refer to as fireworks all over. Was not sure what Ryan Reynolds and Blake Lively were capable of. And already, we had experienced so much. He was calling what appeared to be either on their behalf or of some nature of that, and I wanted to have documented whatever was being said to us.
Q Okay. What about the other calls that you recorded?
A Danny --
MS. SHAPIRO: Objection.

Page 96

THE WITNESS: Sorry. Danny then called me after the call with Patrick. He may have been on the call as Patrick, as well, Danny. I just don't recall. He called me shortly after the call and was going to read to us a letter that the Reynolds -- I guess I can refer to both of them as the Reynolds -- had written, and I could not believe what was happening. So I recorded it because I wanted it documented.
BY MS. SHAH:
Q What about the --
A Not -- not only documented. I also -- he was going to dictate to me a letter, and I didn't have a hard copy of it, so I wanted to record it so that I could actually write it down and have it.
Q And what about the Sony marketing call?
MS. SHAPIRO: Objection.
THE WITNESS: In the Sony call, we were planning how to navigate these two different premieres, the ins and outs about it or whatever was gonna -- how it was going to look. And we had, from what I believed, a really good relationship with Sony. But it started feeling like there was -- and while I understand they have to kind of pay middleman to whatever they think is going on or not

Page 97

going on. And then there is this group over here. I felt unsure, and I wanted to record the conversation.
BY MS. SHAH:
Q Now, at some point, Jen Abel was terminated from Jonesworks on August 21st. Had you make -- had you made a decision that you wanted to continue with Jen Abel as Wayfarer's publicist before she was terminated from Jonesworks?
A I don't recall. I don't know -- that was August 21st.
Q Uh-huh.
A I don't recall.
Q Okay. Regardless of the date, do you have a memory when she was terminated that you had already kind of knew that you were going to go with her when she left, or when she was terminated, it was like, oh, what do we do?
MS. SHAPIRO: Objection.
THE WITNESS: So the question is, do I have a memory of that?
BY MS. SHAH:
Q Yeah, do you have a memory of kind of understanding before she was terminated that you were already -- you had already basically decided to

CONFIDENTIAL

Page 98

continue with her as your publicist after she left Jonesworks?
A I don't have a particular memory of that.
Q Okay. Do you have the opposite memory? Meaning --
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q -- do you have a memory that she was terminated and you were like, oh, we hadn't made a decision yet, we have to make it right now?
MS. SHAPIRO: Objection.
THE WITNESS: No. She was terminated -- this August 21st date, there was a lot happening in my life, in our lives, Wayfarer's life. So I don't recall what I was thinking about that moment, that event, that period, any more than I remember so much going on.
BY MS. SHAH:
Q Fair to say you were pretty surprised when you found out she was terminated?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MS. SHAH:
Q How did you come to learn that?
A I don't remember how I first came to

Page 99

learn it. Meaning, I don't remember the first phone call, who it came from. Did it come from Matthew Mitchell? Did it come from a text that maybe Jen -- I don't know. So I don't know.
Q But you recall, at some point, coming to learn that Jen Abel had been let go from Jonesworks?
A Yes.
Q And you recall that you came to learn that at some point on the same day, that she was terminated, right?
A Yeah, it was the same day.
Q Yeah. Okay.
What did you understand about what had happened at that point?
A I understood that she went to the office. She was met by some individuals. I believe an attorney, security, maybe someone that represented the company. She was asked for her devices and her company card and things -- whatever had to do with the company. They took her phone, and -- and she was distraught.
Q How did you come to understand that she was distraught?
A I think I spoke to her at some point. I think I spoke to her.

Page 100

Q Okay. At some point on that day?
A I believe so.
Q Okay. Before she was terminated from Jonesworks, do you recall whether you or anyone at Wayfarer had already communicated to her that you were thinking of continuing with her as your publicist after she left Jonesworks?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall, but I know if I see something that will refresh my memory as to timing. But I don't recall the timing of it.
BY MS. SHAH:
Q Okay. Do you recall if at any point before she was terminated from Jonesworks, ever having a conversation that included Jen Abel regarding, like, what is Wayfarer going to do once you are gone from Jonesworks?
MS. SHAPIRO: Objection.
THE WITNESS: I don't recall a conversation like that.
BY MS. SHAH:
Q Like, did you ever talk to her about this? Like, she said, I put in my notice, and did you ever have any other conversation with her after that?

Page 101

A Fair question.
Q Yeah.
A I don't recall it. I overshare. I don't think it's unreasonable that maybe there was a conversation.
Q Okay. Before Jen Abel was terminated from Jonesworks, do you recall having any conversation with Melissa Nathan about the fact that Jen Abel had planned to leave Jonesworks?
A No.
Q Okay.
A No.
Q Do you know, one way or another, whether Melissa Nathan knew that Jen was going to leave Jonesworks before she was terminated?
A I have no recollection of that. I don't -- I don't think so.
Q Okay. Do you know whether Melissa Nathan ever had a conversation with Mr. Baldoni essentially saying, like, Jen is so great. She loves you so much. Like, you should definitely stick with her?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know that firsthand. I think I heard you say something about that with Justin. But I don't know that otherwise.

CONFIDENTIAL

Page 102

BY MS. SHAH:
Q Okay. Other than what you recall me discussing about this with Justin, do you have any other recollection of knowing that or having heard that?
A I don't.
Q Okay. Did Melissa Nathan ever have that kind of conversation with you?
A I do not think so.
Q Okay. Apart from -- well, would you agree with me that August 21st when Jen was let go from Wayfarer --
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q -- was that, like, disruptive for Wayfarer or not disruptive for Wayfarer?
MS. SHAPIRO: Objection.
THE WITNESS: Can you repeat that?
BY MS. SHAH:
Q Yeah, sorry.
Was Jen Abel's termination from Jonesworks disruptive for you or not?
MS. SHAPIRO: Objection.
THE WITNESS: I don't remember how that applied. I don't know.

Page 103

BY MS. SHAH:
Q Fair to say that Wayfarer continued working with Jen Abel as its publicist after she was terminated from Jonesworks?
A Yes.
Q And do you recall any pause in Wayfarer's relationship with or ability to contact Jen Abel for advice after she was terminated?
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q Or was it pretty seamless?
A I think Jen, after this termination date, knew that we were in a firestorm and out of her care, didn't just abandon us. And so I -- I don't recall a gap in her assistance on some level.
Q Okay. After she was terminated from Jonesworks, Jen Abel, that is, did Wayfarer continue paying for her assistance?
A You mean directly after?
Q Uh-huh.
A I don't believe so.
Q Okay. Between the period of time that -- well, I'll ask it a different way.
At some point after Jen was terminated from Jonesworks, Wayfarer entered into an agreement

Page 104

for publicity services with her company, RWA; is that right?
A At some point?
Q Yes.
A Yes.
Q Between the time that Wayfarer entered into the agreement with RWA and the time that she was terminated from Jonesworks, did you pay her at all for any services?
A I don't believe so.
Q Okay. But she did continue to help you during that time, right?
A Sure.
Q Okay.
A Yeah. I don't have a specific memory of something. But I don't -- I know she didn't just drop her hands.
Q Yeah. She didn't just stop working with you guys, right?
MS. SHAPIRO: Objection.
THE WITNESS: She didn't stop assisting. I don't know -- I don't know what to call it. If it was work, I don't know. I just don't know. But yes, she was mindful to make sure that we weren't out in the wind.

Page 105

BY MS. SHAH:
Q Okay. And she didn't stop assisting you with publicity matters, right?
MS. SHAPIRO: Objection.
THE WITNESS: I don't believe so.
BY MS. SHAH:
Q Okay.
THE WITNESS: How long have we been going? Can we take a break?
MS. SHAPIRO: Sure.
MS. SHAH: Would you guys like a break?
MR. BACH: I think so. It's been a couple of hours.
MS. SHAPIRO: If the witness wants one, yes.
MS. SHAH: If you'd like a break, I'm happy to take a break.
THE WITNESS: That would be great. How long have we been going? A couple of hours, it feels like, and I haven't --
MS. SHAH: A couple hours.
THE VIDEOGRAPHER: We are going off the record. The time is 11:06 a.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the

record. The time is 11:28 a.m.

BY MS. SHAH:

Q Coming back to something that you testified about earlier, I just want to make sure the record is clear.

I asked you about the recording that you made of your call with Stephanie Jones on August 7th or 8th of 2024.

A Yeah.

Q And I believe you said that you did not inform her that you were recording that call; is that correct?

A That's correct.

Q Meaning, you did not inform her that you were recording that call?

A I did not inform her.

Q Thank you.

And did I hear you correctly that you believe you listened to that call shortly before you provided it to your attorneys in early September of 2024?

MS. SHAPIRO: Objection.

THE WITNESS: I don't believe I said that.



BY MS. SHAH:

Q Okay. What do you recall? Or --

A I don't recall exactly when I listened to it. I think that I testified that I would -- well, forget what I testified to.

Q Sure. Tell me what your recollection is.

A I believe I listened to it at the time that I had turned everything over to the attorneys.

Q Okay.

A That's -- that's my recollection.

Q Okay. And when you say turned everything over to your attorneys, did you turn -- did you give them your entire physical phone?

A Yes.

Q Okay. Do you have an understanding of whether or not they made a forensic image of your phone?

A They did.

Q Okay.

A Not my attorneys, but whatever the party is. I mean --

Q Sure.

A -- whatever their method is.

Q Yes. Was it your attorneys who were in charge of deciding what materials from your phone



would be produced in this litigation and when?

A I imagine so. My job was to give them everything and then they follow the rules of engagement.

Q You did not make the individual decisions about what from your phone was going to be provided in this litigation and when?

A I did not.

Q Okay. When you -- when did you turn your phone over to your attorneys?

A Sometime during discovery, whenever it was requested. So we're in -- what are we in?

Q October.

A We're in October. I don't know.

Q Was it before this summer?

MS. SHAPIRO: Objection.

THE WITNESS: Summer is July?

MS. SHAPIRO: What year?

BY MS. SHAH:

Q This year.

A I -- I don't recall.

Q Okay. It was certainly before the first production of documents and materials from your phone was made in this case, right?

MS. SHAPIRO: Objection.



BY MS. SHAH:

Q Like, you had to have given your phone to your attorneys before they provided materials to us in this case, right?

A I imagine so.

Q Okay.

A I'm only just being careful, not for any other reason.

Q Sure.

A I just don't -- as soon as I was informed that we had to -- they needed information, we gave all that stuff over.

Q Okay.

A So I don't know when that was.

Q You gave your phone over to your attorneys before October 1st, right?

A Yes.

Q Yes. Before September 1st, right?

A I imagine so.

Q Okay.

A That makes sense.

Q Were the four recordings that you recalled to me that you had made of calls involving Stephanie Jones, Patrick Whitesell, Danny Greenberg, and the Sony marketing people, contained on your

CONFIDENTIAL

Page 110

phone?
A Yes.
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q Okay. And they were contained on your phone at the time you gave your phone to your attorneys, whenever that was, for purposes of discovery in this case?
A I believe so.
Q Okay. You don't have a recollection of going through your phone or any other repository and selecting those four recordings and individually giving them to your attorneys, do you?
MS. SHAPIRO: Objection.
THE WITNESS: I don't have a specific recollection.
BY MS. SHAH:
Q Did you do that?
A That's what I'm saying. I don't have a specific recollection of that.
Q You don't have any recollection of doing that, right?
A I'm trying to think through. I don't recall.
Q Okay.

Page 111

MS. SHAH: Can you pull tab 7?
I'm going to show you what's been marked as Exhibit 27. It's a document -- email with an attachment, dated October 24th, 2024, Bates-stamped JONESWORKS_WAYFARER_, several zeroes, 3754.
(Exhibit 27 marked for identification.)
BY MS. SHAH:
Q Do you see that?
A I do.
Q Who is Mitz Toskovic at Wayfarer? And forgive my pronunciation.
A Mitz Toskovic or Toskovic. She's our vice president of operations.
Q Who is Laura Voglesong?
A She's our controller.
Q Who is brian@wayfarerstudios?
A He's our CFO.
Q What is his last name?
A Singer.
Q You're not on this email, it doesn't appear to me. Unless, are you part of the -- so there is a --
A I'm on it.
Q You're on the accounting listserv?

Page 112

A Well, I'm looking at the top of the email where it says "cc" and my -- my name is there.
Q Oh, it is. All right. You are on this email. Thank you.
This is the contract -- attached to this email is the contract between Wayfarer Studios and Justin Baldoni on the one hand, and RWA, Jen Abel's company; is that right?
A Yes, it looks like it.
Q Okay. And you signed this contract on behalf of Justin Baldoni and Wayfarer Studios, correct?
A Is there a signature page? I would -- I'm not --
Q Yes. It's at the page --
A Yes, I see it.
Q -- ending 3762.
A So I can confirm I did, yes.
Q And you signed that contract on September 27th, 2024.
Do you see that?
A I do.
Q And Jennifer Abel signed the contract on September 30th, 2024.
Do you see that?

Page 113

A I do.
Q Did you, in your role as CEO of Wayfarer, make the ultimate decision for Wayfarer and Mr. Baldoni to enter into this contract with RWA?
MS. SHAPIRO: Objection.
THE WITNESS: Sure. Did I -- did I end up making this decision to do so?
BY MS. SHAH:
Q Uh-huh.
A Through consultation with Justin and others, yes, of course I did.
Q And why did you decide to enter into this contract with RWA?
A Because at this point, we decided to have Jen be our publicist, and her company is RWA.
Q Okay. How far in advance of entering into this -- into this contract did Wayfarer make the decision to have Jen as Wayfarer's publicist?
A This is the end of September, so I would be guessing. This is a year ago, and I -- I don't know -- I don't know if it was -- I don't know. I would need something to refresh my memory. But certainly before this.
Q After Wayfarer and Mr. Baldoni entered into this contract with RWA, Wayfarer did pay RWA

CONFIDENTIAL

Page 114

for its publicity services, correct?
A Correct.
Q Does Wayfarer pay RWA for publicity services both for Wayfarer and for Mr. Baldoni?
A We do.
Q Okay. If you flip to the page that's marked at the bottom 3763.
A 3763? I see it.
Q Does this generally comprise the services that RWA performs for Wayfarer and Mr. Baldoni?
A Yes.
Q And at the time Wayfarer and Mr. Baldoni entered into this agreement with RWA, Jonesworks was no longer providing publicity services to either Wayfarer or Mr. Baldoni; is that right?
A Correct.
Q And since the time that Wayfarer and Mr. Baldoni entered into this contract with RWA, Jonesworks has not provided Wayfarer or Mr. Baldoni with any publicity services, right?
A Correct.
Q And that is at Wayfarer and Mr. Baldoni's request, correct?
MS. SHAPIRO: Objection.
THE WITNESS: Correct.

Page 115

BY MS. SHAH:
Q I may have asked you this already, so forgive me.
Why did you decide to hire Jen and RWA as Wayfarer and Mr. Baldoni's publicist?
A I would say for two reasons. We need a publicist, and we like Jen.
Q Okay. So you testified earlier about learning at some point in time that Jen had put -- yes, you can put that aside -- that Jen had put in her notice to Jonesworks; is that correct?
A Yes.
Q Had she ever, prior to that, indicated to you that she was resigning from Jonesworks?
A I do not think so.
Q Do you recall an email from her to you in around May of 2024 entitled "Resignation"?
A I don't.
Q Okay.
A But you got one.
Q I do.
MS. SHAH: I'm showing you what's been marked as Exhibit 28 for the record. It's an email between you and Jennifer Abel, dated May 6th, 2024, bearing the Bates stamps JONESWORKS_WAYFARER_,

Page 116

several zeroes, 3838.
(Exhibit 28 marked for identification.)
BY MS. SHAH:
Q Do you recognize this email?
A I haven't seen this email since then, but I recognize it as being my email for sure.
Q Okay. Do you remember receiving this as you sit here today?
A I don't.
Q Okay. Do you remember anything about what this -- what this is about?
A I can deduce what this is about.
Q Before you deduce what it's about, do you have a recollection of what this is about?
A I don't.
Q Okay. What is your best guess?
MS. SHAPIRO: Objection.
THE WITNESS: I often tell people jokingly to each shit. It's a childhood thing. A lot of us said that, but it's a childhood thing. And some people know I go in and I will say it in a positive way. Whatever. And I think it was in response to her saying it's been real, peace and love. Because I would joke with her like, I'm not talking to you for a week. I'm not -- it's banter.

Page 117

So it looks like banter.
BY MS. SHAH:
Q Do you have any understanding of why -- sorry.
Do you have any understanding of why Jen Abel is writing to you on May 6 of 2024 an email entitled "Resignation" where she writes:
(As read):
"It has been real. Peace and love.
Jen"?
A I don't recall this email so I -- I can't speculate, other than I don't know what this is referencing.
Q Okay. Would you agree with me that when people say things like "it has been real, peace and love," that's kind of a parting salutation?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MS. SHAH:
Q Do you know one way or another whether Jen had indicated to Jonesworks at this time that she was or was thinking about resigning from Jonesworks?
A And the question for me is, sorry, what?
Q Do you know --

CONFIDENTIAL

Page 118

A Do I know about it?
Q Yeah.
A No, I don't think so.
Q Okay. Meaning, you don't think that was happening or you don't think you knew one way or another?
A I don't think I knew one way or another --
Q Okay.
A -- in May of '24, no. Is that when this is?
Q Yeah.
A Yeah.
Q So you just don't know one way or another?
A I have no recollection of that.
Q Okay. All right. You can put that aside.
I want to talk to you now about conversations that you may have had with Stephanie Jones during the period of filming It Ends with Us.
A Okay.
Q Do you recall having any conversations, whether on the phone or in person, with

Page 119

Stephanie Jones during the filming of It Ends with Us, whether or not other people were involved in those conversations?
A Yes.
Q Okay. What do you recall?
MS. SHAPIRO: Objection.
THE WITNESS: Can you be more specific?
BY MS. SHAH:
Q How many conversations do you recall having?
A I believe I had two conversations with her, and she visited set one day.
Q Okay. Do you recall when the set visit was?
A Oh, I would guess.
Q What is your best guess?
A June of '23.
Q Okay. Would her visit to the set have been recorded anywhere on the call log or anywhere else?
A I don't know.
Q Okay.
A Call log. I'm sorry. You mean --
Q Call sheet?
A Call sheet? Yes. I don't think so but I

Page 120

don't know.
Q Okay. Apart from this set visit, you recall having two calls with Stephanie Jones during the filming of It Ends with Us; is that correct?
A Correct.
Q Do you recall when those calls took place?
A So I have to correct myself. I remember two calls. One was during filming; one was after filming or in between filming.
Q I see. And by "in between filming," what do you mean?
A In between phase one and phase two. There was June until January, so five, six months. Sometime in that time.
Q Okay. In the first call that you recall during filming, what period of time do you think that happened in?
A I believe that was in the end of May.
Q Of what year?
A Of '23.
Q Okay. So the two calls you remember having with Stephanie Jones, one was at the end of May of 2023, and the second was sometime in the period that you took a break from filming between

Page 121

June of '23 and January of '24; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: Correct. Now, those are the ones that stand out to me that I remember having conversation with her. There may have been an inadvertent text. I don't even know when it was. I just want to be clear that I'm not saying those are the only ones, but these -- you know, there may have been -- I just want to be clear. That's what I recall.
BY MS. SHAH:
Q Sure. Yeah, sure.
And putting aside like text messages and emails and other forms of written communication, what I'm really asking you is if you recall any --
A Okay.
Q -- oral conversations on the phone or in person?
A Those are them.
Q So does this comprise what you recall about any oral conversations with her, either on the phone and in person during that period of time?
A It does.
Q Do you recall speaking to her during her set visit in June 2023?

CONFIDENTIAL

Page 122

A Yeah.
Q Okay. What do you recall speaking to her about?
A She was a blast.
Q She's pretty fun, right?
A A lot of fun. A lot of jokes. We joked about craft services, too much chocolate. She was mindful that we had had some challenges to one degree or another, and she made some jokes about that.
Q How had she -- so is it your understanding that she had already come to learn that you were having some challenges on the film by the time she visited the set?
A Yes.
Q Okay. Do you have an understanding of how she had come to learn that you were having some challenges on the set before she visited the set?
A We had a conversation with her.
Q In May of 2023?
A Correct.
Q Okay. In that May 2023 call, what do you recall discussing with her about the challenges that you were having on the set?
A I'm just trying to reflect if it was the

Page 123

end of May or the beginning of June, but I think it was end of May. So please don't hold me, I'm not like saying that is exactly it, but that's what I recall.
I think we were shut down for COVID. I think we had learned that Blake and Jenny had shared that they didn't really care for the "sexy" comments. And we got through that, but Justin just wanted to talk to Stephanie and Jen because I think that was a safe place for him to just be like, oh, you know, I wish I wouldn't have said something of this nature, and there was a conversation about that.
Q Tell me what you recall about that conversation.
A That's pretty much what I recall.
Q Okay. Do you recall anything else being discussed during that call with Stephanie?
A Not specifically. I do not. I mean, Stephanie is -- I don't know her well. Stephanie is pretty crass, she's got a mouth. I don't say that negatively. I mean, she's just -- it's how she speaks. She was more of the spirit of, like, don't fucking worry about it. Yeah, you fucking said "sexy." That kind of thing. That's what I remember

Page 124

her energy being.
Q Do you remember feeling like she was being supportive of Wayfarer and Justin on that call?
A Yes, I do.
Q Do you remember feeling like she believed what you and Justin were telling her about your experiences on set on that call?
A Yeah.
Q Do you think you had given her, or Justin had given her, any reason not to believe what you were telling her about your on-set experiences during that call?
A I don't think she had any reason to believe -- to not believe.
Q Who was on that call?
A Justin, myself, Stephanie, and Jen, I believe.
Q About how long did that call last?
A No idea.
Q More than five minutes?
A Yes.
Q More than an hour?
A I don't think so.
Q More than ten minutes?

Page 125

A Could be. I don't know.
Q Okay. Is there anything else that you recall about the substance or conversation on that call, other than what you've told me?
A No, not at the moment.
Q Did -- did Jen speak during that call?
A I would only imagine that she may have said something, but I don't have a recollection of it.
Q Prior to that call, did Jen already have an understanding of the challenges you were experiencing on set?
A I don't know.
Q Then you said there was a second call that you recall with Stephanie Jones sometime during the period when you were shut down for filming between roughly July of 2023 and January of 2024; is that right?
A Correct.
Q Tell me what you remember about that second call.
A That call, I believe, was after we received on November 9th the 17-point list. And I believe a couple of days later within that time frame, there was a call with them. Justin, again,

CONFIDENTIAL

Page 126

wanted to speak with Stephanie.
Q Do you recall what was discussed during that call?
A I don't have a memory of it other than -- I don't really have a memory of it.
Q Do you recall one way or another whether the 17-point list was discussed during that call?
A I don't have a recollection of us specifically talking about any points. I don't.
Q Who was on that call?
A I believe it would have been me and Justin, Jen, and Stephanie.
Q About how long did that call last?
A I don't know. I don't know.
Q Can you give me an estimate?
A Ten minutes.
Q Okay.
A And if you showed me something that said 30 minutes, I would be like, okay.
Q Okay. Other than the two calls that you just described to me and the on-set visit that you described to me, do you recall any other conversation with Stephanie Jones at any point in time where you discussed with her any of the challenges that you were experiencing on the set of

Page 127

It Ends with Us?
A I have no memory of it.
Q Coming back to the subject of these recorded calls that you -- the call recordings that you made of the four calls, do you know, yes or no, whether or not your attorneys ever shared any of those recordings with any of the witnesses in this case or those witnesses' counsel?
A Say it one more time so I understand it clearly. I'm sorry.
Q Sure.
With respect to the four call recordings that you made that we've discussed earlier today, do you have any knowledge, yes or no, whether your attorneys ever shared any of those recordings with any of the witnesses in this case or their counsel?
A No, I have no knowledge.
Q Okay. Now, at some point in time, Wayfarer made the decision to bring on TAG and Melissa Nathan as crisis communications professionals, right?
A We did.
Q And by "TAG" you understand I'm referring to The Agency Group, which is Melissa Nathan's company, right?

Page 128

A I do.
Q Who made the decision to bring on TAG to Wayfarer's account?
MS. SHAPIRO: Objection.
THE WITNESS: I'm just thinking if there was a collective discussion, if there was or not, but it was me.
BY MS. SHAH:
Q Okay. And what were they brought on to do?
A They were brought on to -- to manage -- not to manage crisis PR. They were crisis PR. And they, from what I understand, crisis PR manages negative stories and things that are happening in the world and help you manage through them. And they were brought on to manage that.
Q Okay. What do you mean by "manage"? Give me some examples of what you understand them to do to manage that.
A Field incoming calls of stories that may be incorrect, to have those and correct them, which at the time, I didn't really understand the difference in -- it's all PR. I thought maybe Jonesworks did that on a level, why wouldn't your publicist do that, but what I came to learn is

Page 129

crisis PR is more if somebody is potentially in a crisis of some sort, regardless of what it is, that you hire them. That's what I pretty much understood.
Q Okay. And part of their job was to manage incoming calls for reporters about potential stories, correct?
A I believe so. That's one of their -- or one of their -- I'm not sure if, like, for instance, Jen in this case who was at Jonesworks, who would field those and how that works but -- but yes.
Q Okay. And part of their job was to communicate with reporters to either correct or help to manage any stories that would be coming out about you; is that right?
A I believe so.
Q Okay. And you had an understanding while TAG worked for Wayfarer that they, in fact, were doing those things, right, to manage the crisis?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MS. SHAH:
Q Okay. What was the crisis?
A That's a big question.
In July, before we hired them, Justin

CONFIDENTIAL

Page 130

personally had lost his movie after a lot of -- lot of tribulation and back and forth with Sony and us and the movie being taken, strippen, what I would say was felt like coercion of sorts. What we believed to be as veiled threats. He had been unfollowed. Not that being unfollowed -- that sounds high school, but the mere fact that you have all of these people who were no longer associating with him, which we didn't understand why.

Honestly, we understood at this point that there was -- there was contention with Blake for one reason or another, but we didn't understand Isabela Ferrer. We didn't understand Brandon Sklenar, and then Colleen. What was happening? We were having conversations now with Danny Greenberg and kind of his optics and what he's hearing, and hearing that they are saying ill things about us. Talking to Sony and some of the executives or people that had certain jobs there that alluded to the fact that Blake has got it out -- these weren't their words, but the sense that I got was that Blake's got it out for Justin.

So now that -- and then also, she was very, in my estimation, very disgruntled about not having a bigger role in the movie or at least not

Page 131

having control of edits and all of her ideas being embraced. Justin did his best with that, but you know, he had a line. Her not getting them caused a lot of feelings. We had a year prior, if not more, had some conversations that were of her expressing that she wasn't happy with certain things. And there was this veiled, like, what does that mean?

What -- so we didn't know. There was this -- for me, there was this fear of an unknown, but also things happening that we were witnessing. What do we do? Jen at some point recommended, I think you should talk to crisis PR. I think they would be helpful. So the purpose to originally meet with them and to hire them was to have some consultation. What does someone do in this particular time? And that's what led us to hire them.

Q Okay.

A Sorry for the long-winded explanation, but there was probably more in there but I just -- just giving you -- you asked me specifically what led us to do that.

Q Sure.

A Some of those things --

Q Thank you. I appreciate that.

Page 132

And I understand from your answer and from some of your testimony yesterday, that at the time this was happening and you thought about bringing on a crisis PR, there were things about this that you didn't understand why these things were happening; is that fair?

A Yeah.

Q And you were confused about why some of these things were happening, like the cast unfollowing Justin and all of this stuff, right?

A Yeah. We didn't have the answers to it.

Q And you'll forgive me for asking it this way, but I listened to your testimony yesterday --

A It's okay.

Q -- and I heard you recount some of the things that happened on set, and I heard counsel ask you questions about some of the things that various women and other movie employees have testified about in this case.

A Other movie employees?

Q Some of the women who were involved in the movie have testified about in this case.

A Oh, I see. Okay.

Q And, you know, coming into August of 2024, how do you think it's possible that you had

Page 133

missed so many indications by then from women involved in the film about their discomfort with the on-set behavior?

MS. SHAPIRO: Objection.

THE WITNESS: Okay. I have to understand that question, because in that question you said -- it sounded like you either implied, so correct me if I'm wrong, you said, "from so many women or other women," so I want that to be clarified so I can respond.

BY MS. SHAH:

Q Sure.

So counsel talked with you yesterday about Ms. Lively's experiences on the set and what she has testified to in this case, correct?

A Correct.

Q And counsel talked to you yesterday about Ms. Slate's experience on set and what she has testified to about this case, right?

A Yes.

Q And counsel talked to you yesterday about Alex Saks' experiences on the set in which she has testified to in this case, correct?

A Okay.

Q And counsel talked to you yesterday about

Isabela Ferrer's experiences on the set and what she has testified to in this case, right?

A I don't believe we talked about Isabela yesterday.

Q Okay. Counsel talked to you yesterday about Ms. Hoover's experiences on the set, and what she has testified to about in this case, right?

MS. SHAPIRO: Objection.

THE WITNESS: I don't recall that.

BY MS. SHAH:

Q Okay. At least with respect to then three women involved in the film; Ms. Lively, Ms. Slate, and Alex Saks, coming into August of 2024, how do you think it's possible that by then you did not recognize indications of their discomfort and concerns about what had happened on the set and people's on-set behavior?

MS. SHAPIRO: Objection.

THE WITNESS: In order to have this conversation or for me to give testimony -- it's not really a conversation. I don't know how this is working. We're going to have to separate Alex Saks. Because other than what I heard and some testimony and until she then also would not go to the premiere, up until that time, we were on fine



speaking terms. She and I were -- everything was good.

So other than, which I acknowledge there was a moment that they bumped heads on set, there was no indication that there was anything more than that with Alex Saks, nor have I heard any accusations that there was more other than they bumped heads a few times.

I don't want to belittle what someone may feel, but I want to be clear that in intense situations, people bump heads all the time. I'm sure you've bumped heads with an attorney once or twice. I saw you guys going at it a few times. It happens, but then do you go and think that there is a problem with this person because you bumped heads? That's what the experience was with Alex. So I think it's important to separate that from anything else. Because there was no indication for me at that point to think when you say "other women" to include Alex, if that's fair.

BY MS. SHAH:

Q I don't know whether it's fair or not, but I accept your answer.

And I guess my question is, respectfully, your perspective of these various incidents seems



very different from a lot of these women's perspective about these various incidents, including Alex Saks'.

A Okay.

Q And so my question is, how do you think it's possible that you missed so many signs of all these women's complaints about on-set behavior up until August of 2024?

MS. SHAPIRO: Objection.

THE WITNESS: This -- this is -- I'm struggling at the moment. Here's why.

There's all these rules to this deposition, and I'm just a person that just wants to have a conversation. So I'm trying to follow the idea of what is like the proper process, and just have a conversation.

BY MS. SHAH:

Q Just tell me whatever your answer is.

A So I'm going to be mindful of it all and just do my best.

Q Sure, fair.

A We had a hard time. Before there was any alleged discomfort that I was aware of or Justin, outside of she was unhappy that he asked about -- the trainer about the weight, which, fine, she had a



feeling about it, whatever she interpreted by that. But was nothing in our radar of any sort of issue other than she was -- she had some feelings about him asking someone about the weight. Fine.

Now we're in pre-production, and I don't say this illfully towards her, but she's very controlling and Justin was managing through this. And when I say "controlling," wonderfully kind and generous in her expression, but it feels a bit, unless you end up bending to what she's wanting, it keeps going. So we were trying to manage that.

Now we're in wardrobe and we're having issues with wardrobe. There is a few other things I can get to, but I'm just kind of giving you a clear picture. Now we've started filming and there has already been a, like, how do we manage her personality, and all that comes with her?

Now we're filming and she gets COVID. During that COVID period, there were some conversations. I know clearly now, she had some conversations with Jenny. And for the first time, Justin and I hear about that there was some feelings about something, was through a conversation with Ange, and it was very casual. It wasn't a big red flag. It was, she's got COVID. She's unhappy. I

called to talk to her about -- I think it was -- I think it was about the script or her wardrobe or something. And she said on that conversation she had shared, she don't really like it when you refer to her as sexy, her wardrobe as sexy. And Jamey, I think she said you showed her a video, and she thought she -- you know, let's not show her any videos. It's like, okay. Yeah, it was in the context of -- but, okay.

But she gets better from COVID and we come back on June 1st. And then we had a meeting, and she talked about all of this stuff. Her upset with getting COVID. She had some concerns with the trailer. She wanted to address and clear the air, as she said. And as I said yesterday, she -- Jamey, when you showed me this video, I thought you were showing me porn. I know it wasn't. Of course it was your wife. But I was like, okay. She wasn't saying anything that it was anything other than what she thought it was. And yes, I got that she didn't really care for that.

She brought up me going into her trailer that -- that moment. But all she said was, like, when I asked you to look away, at some point you made eye contact with me. And I was like, I'm so



sorry, I didn't realize it. She says, I'm not saying you were trying to cop a look. Okay, great. It didn't -- it didn't feel like it had gravity to it, but she wanted it -- she wanted to express it.

She mentioned to Justin about him referring to her wardrobe as "sexy," and acknowledged that he apologized, but she wanted to address it. So I felt it was addressed. It was adults having a moment sharing what they would like an adjustment made.

It wasn't just those things. It was also -- she had -- she had come to me about toilet paper that was in her -- that she didn't have enough toilet paper into something. And it was, I don't want to say it was a bit problem, but it was like, it bothered her, as if that were my job necessarily. Okay. And then she made a -- there were some thoughts that she had. And we talked about them, and we moved on. And there was no other suggestions of anything that was uncomfortable. This was June 1st.

Other than, now we're dealing with the strike. There's production things. Something every production maybe would have had to deal with. We had new ADs. We had production stuff happening,



which made it contentious because for a lot of people, you just walk through some of these hurdles and you figure out a way through them. And maybe for some others, they are annoyed with them or blame someone else for them. And that's what I felt like was happening. But we had discussed it and addressed and moved. Then we got shut down, phase one.

But there was no other conversations about anything that she didn't -- wasn't -- wasn't comfortable with or wanted some course adjustment.

So now we're done. Now we're in the -- Justin has now got five or six months before we come back in January. We don't know when that date is, right? But now during that time he's kind of getting ahead of the movie and he's editing it. He doesn't have a full movie to edit, but he can edit and get ahead of like the first half that we shot so we can kind of start putting some of the pieces together.

And at some point, she wanted to be involved. And he was conflicted with this. Because typically, an actress, an actor is not involved in this process at this stage where he gets to play in the sandbox for himself and throw everything at the



wall and just look at what he's got without the judgment or the eyes or the perspective of anyone, including his producers.

And he was trying to manage that. And we were also managing it with someone who we were unsure -- that we had experienced a lot of trying to manage all that came with Blake. And -- and it felt then when he would try to manage it, there felt to be some feelings about it, but we get through it. Okay. Nothing other than like production stuff and just maybe ego issue, whatever it is.

Then we think we're coming back after the strike. And then we get this protection letter. But we hadn't had any discussions about this since anything that may have been insinuated in there, there was no -- we had talked about it. What does this exactly mean? Okay. And then we looked at it and it's like, well, this is all reasonable.

But, yeah, there was a -- there was a sense of, could this? Is this? But we came to the conclusion through consultation, like this just means what it is. Let's get the movie done. It does say in there, "in lieu of any HR complaint," we just need these things to be -- okay. That doesn't mean that there's any allegations or anything. It

CONFIDENTIAL

Page 142

doesn't mean that there was anything going on.

And then we go back to set. We film the movie with according to her, from what I heard, everything was fine. Continued to be fine since June of '23, and we finished the movie without any issue, other than what I keep mentioning is Justin navigating what we had determined that she was in control now of this movie, one way or another. Whether she was in physical control of it. But Justin was responding, all of us were responding. How do we manage without upsetting her?

I don't know how to put that fully in tangible things on every aspect, but this was the feeling. And Sony felt it too.

But we finished it, and now we're in post. And we're like, okay, we're done with production now. Justin gets to be back in his protected time. And then more stuff kept happening.

So when you ask me, how can I not see all the -- the signs? There was -- not until we got through this period -- I left out one thing. Forgive me. Let me back up. We had the January 4th meeting.

But even in that moment, right or wrong, it felt like her clearing the air. It had been six

Page 143

months before we had any discussion on June 1st when she wanted to clear the air. It was six months later. Everything was fine other than some production stuff. And she wanted to clear the air, and then it was like, okay, let's get back to work.

Whatever she expressed in that meeting wasn't anything new. It was all stuff that we were hearing that was happening six months, eight months prior, which we had never heard before.

But there was no -- anything other than Justin's like in complete shock because we don't agree with anything that she's mentioning, but still, it was not -- there was no feeling of like, so, therefore, I need. It was just like, let's clear the air. And this is why I wanted the protection list. And moved on.

So I don't -- I don't think it's a -- I think it's a fair question why you would ask it. It's easy now at the end of this to put all this puzzle pieces together and say, here's the house. This is what it looks like. How was it? But when you're in real time, and you're having conversations and you and I walk down the hallway and we bump heads accidentally, and I go, oh sorry, and we worked it out and even though I just bumped your

Page 144

head and we're good. But then later you might say it was something else. Well, I thought we -- I thought we were good. It didn't seem like more than that.

So I don't want to keep going on. Maybe I'm taking too much of your time. We did not believe that there was all these signs, as you just suggested, until now. People started unfollowing Justin, then all this stuff. I go, what's going on? That to us was not an indication that there were -- there was other women that testified on behalf of Blake. I hear that. Colleen does not make any mention of it. She's got some contract or she's upset about a coffee table book, which I'm sure if you look more into it, you'll see the discussions we were having. It's not as it's being mentioned. There's no issue with Blake -- with Colleen, until she started spending time with Blake, as far as I know.

Some of the sequence may be a little out of order. I'm sure I'm leaving some stuff out, but I wanted to give you context here to your question.

Q No, I appreciate that. And let me ask you this: You mentioned a couple of the things that Blake raised over the course of time that she wanted

Page 145

to discuss or clear the air about. One of them was the incident with you and she in her trailer, right, when she was getting her body makeup removed. And you mentioned that she had said something to you like, I asked you to look away and I turned around and we made eye contact or something like that, right?

A In the June 1st meeting?

Q Okay.

A Is that what you mean?

Q Sure. At any point in time.

A Okay. I didn't know if you talked about --

Q Fair.

A -- other things.

Q I guess my question is, you understood, though, from your discussions with her that the issue about you entering her trailer was because she was nude from the waist up, right?

A No.

MS. SHAPIRO: Objection.

BY MS. SHAH:

Q You didn't think she asked you to turn around because she was nude from the waist up?

MS. SHAPIRO: Objection.

CONFIDENTIAL

Page 146

THE WITNESS: I did not think that.
BY MS. SHAH:
Q Does she typically ask you to turn around when she's having conversations with you when she has her clothes on?
MS. SHAPIRO: Objection.
THE WITNESS: Fair.
BY MS. SHAH:
Q Okay.
A I didn't see her, what she was wearing or not wearing. I saw that she was leaning back, and it looked like she was either feeding or maybe nursing -- or pumping. That's what it appeared she was doing. When she asked me to look away, I thought it was in that regard.
Q I understand --
A So I never saw it, so I didn't question that. So I moved over and looked away based on that.
Q Okay. But even nursing or pumping involves activity with a woman's breasts, right?
A Sure.
Q And you understood that it was in that context that she was asking you not to look, right?
A Fair. She asked me to look away, so

Page 147

whatever she was doing, she didn't want me to --
Q Right.
A Sure.
Q And what she was doing was something that had to do with her breasts being exposed or involved?
A Okay.
Q Okay. The video that you mentioned that she -- that you showed her of your wife was one of the things that she raised for discussion with you, right?
MS. SHAPIRO: Objection.
THE WITNESS: Correct.
BY MS. SHAH:
Q Okay. However you want to characterize that video, that is a video -- I don't mean that in any way other than I'm trying not to say "birthing video," because I understand there's been some discrepancy around what exactly is in the video.
A Okay.
Q That is a video of some portion of your wife in an intimate scene with you during the process of birthing your child, right?
A The word "intimate" throws me when you say that.

Page 148

Q I will -- I'll say it again.
That video involves your wife during some portion of the process birthing your child, right?
A Not birthing.
Q That's why I was trying to avoid that word. When Blake raised this issue to you, she told you she thought it was porn, right?
A She thought it was porn.
Q Right. Porn has a sexual connotation, correct?
A It does.
Q Okay. And you testified yesterday that in that video, whether or not your wife's breasts were exposed, she was, in fact, nude from the waist up at least, correct?
A Okay.
Q And you understood from your conversation with Blake that the thing she was raising with you about being shown the video had something to do with her perceived -- her perception that it had a sexual connotation, right?
A I don't know if I agree with that.
Q When she said it was porn, what other connotation could that be?
A She didn't say it was porn.

Page 149

Q When she said she thought it was porn at first --
A Yes.
Q -- you understood that that has a sexual connotation?
A I understand that.
Q And that is what she was raising with you?
MS. SHAPIRO: Objection.
THE WITNESS: No. I don't see it that way. That's not what it felt like.
BY MS. SHAH:
Q Okay.
A It felt like her raising it was -- I wasn't prepared to see whatever it is you were showing, or what I thought it was, was porn. I know that it wasn't. So for lack of better argument, if I showed her kids playing in a sandbox and whatever reason someone thought it was porn, you might go, oh my God, I thought that was porn. But I realized it wasn't. At that point, the point was that I was shocked by whatever it was. But once you realize what it is, you're not -- it's -- there is no sexual connotation anymore. That's what -- the feeling that I had.

CONFIDENTIAL

Page 150

Now, I will admit this. Whether I'm right or wrong, that's what I felt. That's what it felt like.

Q I understand. But I guess I'm just trying to cut through to, you understood that what she was saying was, when I thought it was porn, that shocked me?

A Okay.

Q Yes? Fair?

MS. SHAPIRO: Objection.

THE WITNESS: All I can say is that the feeling of it when she had mentioned it, was not that she suggested that I did anything inappropriate as it pertained to a sexual nature. I did not think that.

BY MS. SHAH:

Q Okay. Fair to -- fair to say that you understood, though, that she didn't want you to show her porn on the set?

A Everybody should not want them to show porn. I didn't show porn.

Q I understand that, but fair to say that you understood that she did not want to be shown porn on the set?

A Of course.

Page 151

Q Okay.

The other thing that she raised to you and that others also raised to you at the time was the comments that had been made to her about a sexy or hot wardrobe, right?

MS. SHAPIRO: Objection.

THE WITNESS: Okay.

BY MS. SHAH:

Q And the comments that had been made to Jenny Slate about a sexy wardrobe, right?

MS. SHAPIRO: Objection.

THE WITNESS: No. I don't -- I don't think that was talked about with Blake.

BY MS. SHAH:

Q But if --

A If you're referring to the June 1st, when we had like a, she's back from COVID --

Q I'm not referring to that meeting.

A Okay.

Q I'm just referring to, like, during filming.

A I see.

Q Okay.

Among the conversations that you had either with Blake or Alex or Ange or anyone during

Page 152

filming, was that -- was about the comments to Blake about her sexy or hot wardrobe, right?

MS. SHAPIRO: Objection.

THE WITNESS: I'm having trouble with the language, but let me just -- but I don't think you're saying anything I disagree with, so let's go ahead.

BY MS. SHAH:

Q Sure. And you understand those are being raised to you because of the word -- the words "sexy" and "hot" were used, right?

MS. SHAPIRO: Objection.

THE WITNESS: Okay. That's -- I don't think that's unfair.

BY MS. SHAH:

Q And when you had conversations with anyone about Jenny Slate, the comment made to her about "sexy," you understood that that was being raised to you because the word "sexy" had been used, right?

A Fair.

Q Okay. The letter -- 17-point letter that came to you in November of 2024 -- November of 2023, mentions in several places behavior and restrictions around intimate scenes on the film, right?

Page 153

MS. SHAPIRO: Objection.

THE WITNESS: Yes. Yes, sorry.

BY MS. SHAH:

Q Mentions the requirement for an intimacy coordinator, right?

A Intimacy coordinator was already engaged and now the request was that they wanted them to be there every day, even if she was doing a whatever -- whatever scene that was, yeah, she requested that.

Q It mentioned restrictions around nudity in certain forms and respects, right?

A It mentioned that standard protocol that you would have for those things, yes.

Q It mentioned restrictions or limitations on sexual connotations and sexual comments, correct?

MS. SHAPIRO: Objection.

THE WITNESS: I -- I think I would need to reread it to -- at the moment, just but -- but there is some -- something in there that says some restriction about -- yeah, mentioning -- making mention of her person outside of the character or something like that. Characteristics such as what you mentioned, something like that.

BY MS. SHAH:

Q Okay. Characteristics around sexuality?

CONFIDENTIAL

Page 154

A I hear that. That's in there.
Q Yeah.
A There is an implied.
Q And it mentions at least the idea or contemplation of an HR process, right?
A In the cover letter. Okay.
Q The January 4th meeting that you had with Blake and Ryan Reynolds and others, issues around nudity and sexuality and sexual comments and intimacy on set were discussed, correct?
MS. SHAPIRO: Objection.
THE WITNESS: When you put them in a list like that, it's hard for me to say correct to each one.
BY MS. SHAH:
Q Okay.
A So I'm not mistaken and --
Q All right.
The incident in Blake's trailer that we've discussed was mentioned during the June 4 -- the January 4th meeting, right?
A I don't think that was mentioned during the January 4th meeting.
Q No. The comment to her regarding "sexy" or "hot" was discussed in the January 4th meeting,

Page 155

right?
A I don't recall if that one was or not. It had already been discussed, so I don't know why we have to discuss it again, but it could have been. I don't recall.
Q Ryan was very irritated at that meeting, right?
A Very much.
Q You understood that some of his irritation at least had to do with some of the things that Blake felt she was experiencing on the set, right?
MS. SHAPIRO: Objection.
THE WITNESS: I would not say that. I would say his frustration is that he didn't think Justin was being what he wanted Justin to be. That's -- that's what -- that's what the anger or frustration was at.
BY MS. SHAH:
Q And part of what he wanted Justin to be, you understood, was like not to make comments to his wife that she was sexy and hot, right?
MS. SHAPIRO: Objection.
THE WITNESS: No. That wasn't it.

Page 156

BY MS. SHAH:
Q Okay.
A I'm saying that -- that wasn't what he was getting angry about.
Q Okay.
A He was getting angry when she would say something that Justin was like, what are you talking about? For instance, linger on the lip. He is upset with him just saying, it doesn't matter if you agree with her or not, just fucking apologize. He was like, but I didn't do it. He was mad at him, not necessarily -- I'm not saying he didn't have feelings about -- I can't -- I can't talk about that. But our experience, my experience was, his anger and rage was at Justin for not being the person he wanted him to be in that moment. That's what his rage and anger was and belittlement.
Q Okay. When you mention the linger on the lip incident --
A Right.
Q -- you're talking about the complaint that Justin's mouth lingered too long on Blake's lips when they kissed during a scene in the movie, right?
A Correct.

Page 157

Q Okay. So my question is, all of these things that we've just discussed, that you had conversations with people at various points in time about during filming before August of 2024, all have the common thread that they are concerns involving nudity, intimacy, sexuality, sexual comments, pornography on set.
Do you recognize that?
MS. SHAPIRO: Objection.
THE WITNESS: I can't agree with the way you phrased that.
BY MS. SHAH:
Q Okay.
A I don't. I mean, when --
Q And my question --
A Because you said a lot in there. All of the conversations. All this list. Some maybe -- somewhat correct; somewhat not, the framing of it. And then so that it was a big question with a lot of information in there, so I don't think one could say yes or no to that.
Q Okay.
A At least the way that I heard it.
Q Okay.
By August of 2024, you had had at least

CONFIDENTIAL

Page 158

several conversations with different people regarding incidents that involved in some respect issues touching on intimacy or nudity or sexual commentary or behavior, correct?
MS. SHAPIRO: Objection.
THE WITNESS: Who are the several people? Are you saying with other people or with Blake?
BY MS. SHAH:
Q Blake, Jenny Slate, Ange Giannetti, and Alex Saks, at least.
MS. SHAPIRO: Objection.
THE WITNESS: We never had a conversation with Jenny Slate about that.
BY MS. SHAH:
Q About the "sexy" comment to her?
A I never had a conversation with her about it.
Q She never raised it to anyone on set?
A You were saying "we had a conversation with." Yes, she did mention to someone that she had this.
Q Okay. And I guess my question to you is, coming into August of 2024, how do you think it's possible the issues touching on nudity and intimacy and sexual words and sexual behavior had been

Page 159

mentioned so many times and you didn't see this as any sort of serious concern or situation?
MS. SHAPIRO: Objection.
THE WITNESS: As I -- the best I can tell you is, the movie started May 15th. We had a conversation on June 1st. That's a two-week period. During those two weeks, on May -- I think it started May 16th. On May 17th was the day that I was -- the conversation about the trailer. That's on day two. May 23rd is when I understand when Justin made reference to her wardrobe being sexy. Also on that same day, when she's referring to him lingering on his [sic] lip or smelling her and these things that she's put in her complaint, was also on that day.
The day that she's claiming I showed, whatever version she is saying that I've shown of my wife, which I did not, was also on May 23rd. Shortly after, she got COVID. We came back on June 1st. There was no conversation about any of these things. We had the conversation on June 1st. So you're talking about a ten-day period almost, that then we had discussed on June 1st, addressed whatever -- all the conversations about production and as well as how

Page 160

she wanted to express those, and then we moved without incident.
Whatever correction she need -- I'm sorry. I'm leaving out one. We had heard something about hugs. I didn't know what to make of that, but okay. Okay, there's no more hugs. I didn't hug her. But Justin, if he was hugging her, there was no more incident. We talked about it on June 1st, whatever it was. So any conversations that you're referencing that was multiple, multiple, multiple, conversations, the few that you're saying, whatever that is, was all relating to five months ago, ten months ago, around this period.
We'd had the conversation on the 1st. Now we get this protection letter on November 9th. Okay. Figure it out. We have January 4th. She's not saying something happened in November. She's not saying something happened in July, that continued behavior. It's just a regurg -- regurgitation of what happened in those ten days, or what she alleges happened in those ten days. So we're like, okay, she needs to get some more off of her chest. I don't agree with it. It was very confusing, but okay. And then nothing else.
So I -- forgive me, but when you keep

Page 161

referencing, as if it were continued behavior, whatever, however you view if it was -- if I see it one way and you see it another way and then there was all these conversations, okay. How could you not see it? But it's multiple conversations about the same period of time. And if I step on your foot today and you bring it up and then you bring it up again in two years, and four years, we're still talking about the incident that happened when I stepped on your foot. That doesn't mean that it's, why didn't you do something six months later? It's like, we're talking about the same thing. So that's why.
BY MS. SHAH:
Q Looking back on it now --
A I'm sorry. I need to apologize. If my energy is up --
Q You don't need to apologize.
A It's not directed at you.
Q You don't need to apologize.
A I'm sorry.
Q Don't worry about that.
Looking back on it now, do you think you misunderstood the gravity of the situation?
MS. SHAPIRO: Objection.

CONFIDENTIAL

Page 162

THE WITNESS: I don't know how to answer that. You're asking that based on everything that you've heard and allegations of looking at this big, ugly monster that seems to be painted, and you're saying, should you have done something different based on what grew to be this? But at the time, I don't think we missed it. I don't think so.

We had the June 1st meeting. We had talked to Ange, Alex. I don't know what Alex was saying in -- behind -- not behind our backs, but unbeknownst to us, but there was no -- it felt reasonable that people bump heads. For one reason or another, you move on. You talk about it like adults and we move on and nothing else happens. So I can't say that we -- but I hear that you're trying to make that argument or others are trying to make that argument.

But at the time, given what we were experiencing, I felt that we handled it with the consultation of others, in the best way that it was supposed to be handled, which is what she wanted. That's what we understood. She wanted the conversation and wanted to move on.

BY MS. SHAH:

Q Do you think the fact regardless of

Page 163

whether the conversations referenced only incidents that happened within some ten-day or short period of time --

A Okay.

Q -- do you think that the fact that it kept being brought up over and over and over, at least on June 1st in the November 17-point letter and in the January 2024 meeting, was an indication that, perhaps, at least from Blake's perspective, whatever had happened before was not, in fact, resolved?

MS. SHAPIRO: Objection.

THE WITNESS: Again, I think there wasn't multiple, multiple ones. June 1st was the first conversation. There was the first conversation with Blake, right? Some thoughts had been shared. We had a conversation on June 1st. No other conversations about it. You're referencing the November 9th letter as if that's a conversation. But it was clear. I'm not trying to hide away from the language.

In lieu of an HR complaint, we know that there's a lot of things that happened on set. That involved a lot. There was a lot. We had a lot of strikes. We had COVID. We had issues, production,

Page 164

that had nothing to do with you and me bumping heads. But to say it and characterize that as it's coming up again, it was like, here's the protections that I need to make sure that I feel safe, as she put it, moving forward.

It wasn't bringing back up the June 1st stuff, the conversation. It was like, here's what I need moving forward. Here's some guidelines. We'd give this to anybody, but it wasn't a conversation about it. We did not think it was kept being brought up and brought up. This is, contracts happen all the time of what they need to go on set. Here was one.

The January 4th is what I would consider the second conversation, no matter how you want to frame the other. And that meeting, with a Sony representative, the new Sony producer, myself, Justin, Alex Saks, our other producer, no one felt that this was a -- a nod to then, what do you do next? She got -- she wanted to express it. She said, just want to clear the air, after we talked about it, then we talked about production. See you guys tomorrow.

There was no indication that we were supposed to take another step. We thought the step

Page 165

was done. We talked about it. She got it off her -- even though we disagreed. I still contend to this day that most of what she is saying, either all of it -- either it's twisted or fabricated.

She says I talked about my genitals. I still haven't had -- heard anybody ask me. She said I had a porn addiction in her complaint. No one has asked me where that came from as it pertains to me. But we talked about it.

And our belief -- I don't know if lawyers like it if I say this or not, whether we were right or wrong, our belief at the time was that it was handled, it was discussed, and then we moved on. I'm sorry.

BY MS. SHAH:

Q Don't be sorry.

THE WITNESS: Can we take a break?

MS. SHAH: Yes, absolutely. Why don't we take the lunch break?

MS. SHAPIRO: Forty-five minutes?

MS. SHAH: We can go off the record. Forty minutes?

MS. SHAPIRO: Forty minutes is fine.

THE VIDEOGRAPHER: We are going off the record. The time is 12:50 p.m.

CONFIDENTIAL

Page 166

(Lunch recess.)

THE VIDEOGRAPHER: We're back on the record. The time is 1:42 p.m.
BY MS. SHAH:
Q Good afternoon, Mr. Heath.
A Good afternoon.
Q Before lunch we were discussing your decision to bring on TAG and Melissa Nathan to handle crisis communications. You had mentioned that at some point, Jen had recommended to you that you should consider bringing on crisis communications professionals; is that right?
A Correct.
Q What do you recall about that conversation?
A I recall her saying that she doesn't do crisis PR and this might be a conversation with a crisis PR firm.
Q Do you recall when that conversation occurred?
A I don't.
Q Do you think it was like within several days of when you first talked to Melissa Nathan?
MS. SHAPIRO: Objection.

Page 167

THE WITNESS: I don't know if it was in several days, but it wasn't weeks.
BY MS. SHAH:
Q Okay. Did she recommend Melissa Nathan to you as a potential person that you could hire for crisis comms?
A I believe it was her. Yes.
Q Okay. Meaning, it was Jen?
A I believe so.
Q Did she give you any other names of any other people or firms other than Melissa Nathan that you should consider for crisis communications?
A I don't remember. She may have. I don't remember.
Q Okay. You can't think of any as you sit here today?
A I can't.
Q Did you personally speak with Melissa Nathan or anyone from TAG before you decided to hire them?
A I did.
Q Did you personally speak with or interview any other crisis communications professional?
A I did not.

Page 168

Q Did anyone at Wayfarer ever speak with or interview any other crisis communications professional than Melissa Nathan?
A Not that I'm aware of.
Q Okay. Did you also ask or did anyone at Wayfarer ask Stephanie Jones for recommendations for crisis communications professionals?
A I believe we did.
Q Okay.
A Or -- I don't know if we asked or if they were just shared. But I do know that we got some recommendations from Stephanie Jones. I don't recall how that happened.
Q Okay. And Melissa Nathan was not on Stephanie Jones' list of recommendations to you for crisis communications, right?
A She was not.
Q You were aware that Stephanie Jones expressly warned you that you should not hire Melissa Nathan for this role, correct?
A I was aware.
Q What was your understanding of the reasons that Stephanie thought you should not hire Melissa Nathan in this role?
A To start with, I had a phone conversation

Page 169

with Stephanie also because she -- I believe she called me about it. And there was some either text or email or something suggesting it. I don't know what happened when. At some point, yes, she had said that she didn't think she was the right fit because she thought she was shady.
Q What did you understand Stephanie to mean when she said she thought Melissa Nathan was shady?
A I didn't know exactly. But she went on to tell me, I believe on a phone call, and she was very passionate, as Stephanie wonderfully can be, about her feelings for her.
Q And what did she tell -- what did Stephanie tell you on that phone call about the reasons that she thought Melissa Nathan was shady?
A I don't think on that phone call that I recall anything specific of what she said. It's one of the many phone calls that you have with people so I don't remember exactly. But the sentiment was, she didn't like her. I remember knowing that they had some history. She was pretty adamant about it. Where by the end of the call, I had deduced that they had personal history.
Maybe some of it was based on fact. Maybe some of it was based on personal differences.

CONFIDENTIAL

Page 170

A common theme that happens all the time everywhere in the world and in Hollywood. People like each other one day; they don't another day. I got that sense.

Q And you ultimately hired Melissa Nathan over Stephanie Jones' objections, correct?

A I did.

Q Do you recall understanding at the time, whether from your phone call with Stephanie Jones or from any of the text or email communications you were having at the time, that one of the reasons that Stephanie Jones was uncomfortable working with Melissa Nathan was because of work that Melissa Nathan had done in connection with an incident in Miami where a young aspiring singer was found dead in a bathtub in David Bolno's hotel room?

MS. SHAPIRO: Objection.

THE WITNESS: I did learn something vague about it. She did send me -- she sent me, I think it was a text or a screenshot or a link or something. I remember looking at it for a moment. Not reading it, just kind of glancing at it because who has time to read a whole article about something. And so I don't even recall the content of it other than she was involved in PR to some

Page 171

degree with it.

Q Meaning, Melissa Nathan was involved in PR to some degree with the incident with a girl in the hotel room?

A Correct.

Q You understood from this that Stephanie Jones was expressing that she was uncomfortable with the tactics that Melissa Nathan had used in connection with her PR work relating to that incident, right?

MS. SHAPIRO: Objection.

THE WITNESS: Can you repeat that?

BY MS. SHAH:

Q Yeah. You understood that what Stephanie Jones was expressing to you was that she didn't like some of the tactics and work that Melissa Nathan had done with respect to PR around this incident with a girl in the Miami hotel room, right?

MS. SHAPIRO: Objection.

THE WITNESS: I was aware she had those feelings.

MS. SHAH: Let's mark this one and hand it out.

Page 172

BY MS. SHAH:

Q Do you recall telling Stephanie Jones during any of these conversations that every crisis person has a little dirt on their nose?

A I've heard someone say that. I don't know if it was her or something. I think that's a misrepresentation. I think that's an inaccurate quote. But I heard something about that.

Q Okay. In what way do you think it's inaccurate?

A Well, because the way I've heard it said to me, and maybe I'm mistaken, is that it's a bit dismissive. And I'm realistic and understanding that if I hire some lawyers, I understand that they -- at some point may have defended someone that's not the best type of person you'd want to be associated with.

If you -- I get that. So anyone in crisis, I imagine is dealing with not pretty flowers. So it was in that spirit. Not dismissive. That's the way at least I interpreted that from how I heard it. My response to you now would be like, I mean, I suppose everyone in this field might have some -- dealt with some dirty stuff, some icky stuff.

Page 173

Q Okay. So you recall saying something like that in sum and substance to her; you just didn't mean it dismissively?

MS. SHAPIRO: Objection.

THE WITNESS: I do not recall me saying it. But I know my sentiment and my spirit. So if she's saying I said something of that nature, I would say that would be the only way I would mean that.

BY MS. SHAH:

Q But you don't dispute that you may have said something like that to her?

MS. SHAPIRO: Objection.

THE WITNESS: I don't recall it.

BY MS. SHAH:

Q And so you're not disputing it one way or another?

MS. SHAPIRO: Objection.

THE WITNESS: I am disputing that if I said anything dismissive in that way, I would not have done that. That's the best I can give you.

BY MS. SHAH:

Q Sure. But you're not disputing that you may have said something of that sum and substance to her?

CONFIDENTIAL

Page 174

MS. SHAPIRO: Objection.
THE WITNESS: Okay. Sure. I don't have a recording, a video of it, a text of it. So I can't dispute something that I don't know.
MS. SHAH: Okay. Showing you something that's been marked as Exhibit 29. It's a text thread between Stephanie Jones, you, Tera Hanks, and Justin Baldoni, dated July 26th, 2024, Bates-stamped JONESWORKS_JV_, several zeroes, 1142.
Do you see that?
(Exhibit 29 marked for identification.)
THE WITNESS: I didn't even know you had it in front of me. I do see it.
BY MS. SHAH:
Q So in this text message -- well, let me ask you this. Do you recall receiving this text message?
A I recall seeing this message. I don't recall when I received it or when I looked at it. But yes, this -- I remember this text message.
Q Sure. In reading it now, this is reflective of the kinds of things that you understand Stephanie Jones was expressing to you about her reservations with Melissa Nathan at the time, correct?

Page 175

A Correct.
Q And she notes in here:
(As read):
"I just downloaded Tera on some dark stuff. But please, we cannot work with Melissa Nathan."
Do you know what dark stuff she had downloaded Tera on?
A I don't.
Q Did Tera ever convey that to you in your recollection?
A I don't believe so.
Q Then she goes on to say:
(As read):
"Not someone we would want in Justin's orb or for Blake's PR to use as a weapon against him."
Do you see that?
A I do.
Q And do you -- did you understand from this or any other communication with Stephanie that part of what she was expressing to you was she didn't think it would be good for Justin to be associated with someone like Melissa Nathan?
A I did recognize that was her -- those

Page 176

were her thoughts.
Q Did you also recognize that part of what she was expressing to you was that if Justin were to be associated with someone like Melissa Nathan, Blake's PR people could potentially use that association against Justin?
A I did.
Q Okay. Because of the negative connotations it might have to be associated in that way; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: I see that. I can understand that, yeah. I can understand that that's what she's saying.
BY MS. SHAH:
Q Okay. Did you have any understanding of what dirty work Stephanie thought Melissa Nathan had done apart from the incident in Miami with the girl in the hotel room that we just discussed?
A Can you say it one more time?
Q Sure. In the text she says there is a lot of dirty work she has done.
A I see.
Q So what was your understanding at the time, other than this incident about the girl in the

Page 177

Miami hotel room, of the dirty work that Stephanie thought Melissa Nathan had done?
A I don't recall. And I also frame that with what we all know. That what comes out in different times and then to remember what I knew then is hard to separate. So I don't know.
Q Sure. What do you know now that you might think or have you learned that you think might fall into the category of dirty work that Melissa Nathan had done?
MS. SHAPIRO: Objection.
THE WITNESS: I don't mean -- I don't mean dirty work that I know now. I mean what people say what I knew a week later what Stephanie's thoughts were about it that may have been more colorful.
So I don't know at this time reading this what that meant. But I've seen a lot of noise out there about who Melissa is. So it's all of that, is what I'm saying, is that it's what -- what did she say? I don't know. It's hard to separate them all.
MS. SHAH: Okay. Showing you what's been marked as Exhibit 30. It's a text thread between you and Stephanie Jones also from July 26th 2024. Bates-stamped JONESWORKS_three zeroes, 40269.

(Exhibit 30 marked for identification.)
BY MS. SHAH:
Q You're free to read through this. But I'd also like you, when you're ready, to compare the prior Exhibit 29 to this exhibit so please have that handy.
A Okay. I have the other one here.
Okay.
Q If you have the two of them together, Exhibit 29 and Exhibit 30. You will see in Exhibit 29, it's dated July 26, 2024 with a time stamp of 7:57 p.m.
Do you see that?
A I do.
Q And in Exhibit 30, the first text message in that thread from Stephanie Jones just to you is also dated July 26th, 2024 at 7:57 p.m.
A Okay.
Q So these two text conversations were happening roughly around the same time; is that right?
A It looks like it. Yes.
Q Okay. And in one of the text conversations in Exhibit 29, Stephanie is -- has texted this to you and Tera and Justin.



Do you see that?
A I do.
Q And then Exhibit 30 is a separate text conversation between Stephanie and just you. Do you see that?
A Yup.
Q You start the conversation by saying:
(As read):
"Hey hey. I'm at the barber. I'll call you when I'm done."
Do you see that?
A I do.
Q Okay. Do you have a recollection that she had called you right around this time to discuss this with you?
A I do remember this call.
Q Okay.
A I remember because I was in the barber.
Q Okay.
A I know she called.
Q Okay.
A And I texted this back. But I just remember.
Q Okay. I see. And here's the conversation where she texts you what looks like a



link to this incident with the girl in the Miami hotel room.
Do you see that?
A I do.
Q And then down below, if you look at time stamp 8:09 p.m., Stephanie says to you:
(As read):
"I can't get into detail but this is not a crisis PR person we need to align JB with."
Do you see that?
A I do.
Q And you understood that what she was saying again was that, you know, this is not a good association for Justin Baldoni to have with someone like Melissa Nathan?
A I see that. Yes.
Q And she again says "Also don't want Blake's team to weaponize this against us either."
Do you see that?
A I do.
Q And this is consistent again with what you understood her to be expressing to you at the time, correct?
A Yeah.



Q Okay. And then if you go over one to the page marked 40271. At the top of the page, Stephanie says to you:
(As read):
"I love you and Tera and Justin. I can bow out if you'd like to work with her, but I think it will be a massive mistake and blowup."
Do you see that?
A I do.
Q Did you understand that Stephanie was essentially offering to bow out or back off if you decided to work with Melissa Nathan?
A Yeah, that's what it says.
Q Did you ever have any further conversation or communication with her about that?
A I want to say yes, but I don't recall. I can't recall.
Q Okay. Did you -- did you understand from this that Stephanie's objection to working with Melissa Nathan was so strong that she was willing to take a step back from working with you if that meant she would need to work alongside Melissa Nathan?
MS. SHAPIRO: Objection.
THE WITNESS: Say that one more time?

CONFIDENTIAL

Page 182

BY MS. SHAH:
Q Did you understand from this --
A Please.
Q Sure.
Did you understand from this that Stephanie's objection to working with Melissa Nathan was so strong that she was willing to take a step back in working with you if it -- if you decided that you were going to bring Melissa Nathan on?
MS. SHAPIRO: Objection.
THE WITNESS: I read this -- Stephanie was not involved in our day-to-day. There is a couple of calls we had, for sure. But she was not -- she was not involved in anything Wayfarer.
She may have been behind the scenes at Jonesworks. I have no idea what she does or doesn't do. But my experience was, she was never around. So I read this not as if she would -- where does she say it -- I can bow out -- meaning, more like I'll stop giving my opinion. Not that she would be working alongside or doing anything of that nature because she was never working, as far as I knew, on our account.
BY MS. SHAH:
Q Okay. Do you really mean to say she was

Page 183

never working as far as you knew on your account or do you mean to say she wasn't really like the visible point person on it?
MS. SHAPIRO: Objection.
THE WITNESS: As far as I know, and I was involved in all the Wayfarer stuff, and I've been there coming up on five years. So let's say four by the time we're here.
Other than these few conversations we had had during the It Ends with Us period, I may have talked to her once. Maybe there's -- maybe there's another inadvertent one. And there was calls all the time. Real-time decisions being made, she wasn't involved. It wasn't decisions being made that went back to reflect on that maybe someone could say was consulted on. They were real-time decisions.
So I have no -- nothing to fall on to say that she was involved in our account; in-person meetings. So that's my experience.
So when I read that, I just go like, oh, it's not -- it's not really applicable in the sense that she's going to be on the ground. But meaning, okay, you guys make your decision.

Page 184

BY MS. SHAH:
Q Okay. And then below, at 10:25 p.m. Stephanie says:
(As read):
"I meant to text you, Jen, and Tera. And it was Justin by mistake, sorry."
Do you see that?
A Yeah, which one is this?
Q Same page. But two texts down.
A Yes, I see it.
Q What did you understand she meant by that?
A This is a text thread. I remember this one a bit. This one is just me. So I believe I said something. I don't know if it's on this page.
Q Flip the page.
A Flip a page?
Q I think. Maybe not. Anyway, tell me what you remember.
A I asked her to not send certain texts with Justin on them, because Justin didn't need to see all the stuff that was -- his heart was heavy. And I was trying to, like, just be mindful of his condition right now.
Q Okay. So your recollection is you had

Page 185

asked her essentially to not text Justin or include Justin on texts --
A About this stuff. Not, not text Justin by yourself or whatever that was.
Q Right.
A Just as regard to this, don't -- because she had included him -- I don't know what text thread it is. And at some point, I mentioned to her, could you not keep -- include Justin on some of these things that are hard to see in real-time or discussions. And then that's, I believe, her response.
MS. SHAH: Okay. Showing you what's been marked as Exhibit 31.
THE WITNESS: Are we done with these two?
MS. SHAH: Yes, I think so. It's a text thread between you, Tera Hanks, and Stephanie Jones dated July 26, 2024. Bates-stamped HANKS_several zeroes, 12.
(Exhibit 31 marked for identification.)
THE WITNESS: So this is the day before this other text we just read?
BY MS. SHAH:
Q It is the same day.
A Same day? I thought the other one was

CONFIDENTIAL

Page 186

27. Okay. Okay.
Q Let me amend what I said earlier. It appears that Jen Abel is also on the text thread.
A The previous one as well?
Q No. Just this one. I think this is a text thread between you, Tera Hanks, Stephanie Jones, and Jen Abel.
A Yes, I see that.
Q Stephanie references a conversation that you or some combination of you all had had.
A Okay.
Q And then says:
(As read):
"I think instead of solo calls, it's better if our brain trust here all talk together Monday. Have a nice weekend."
Do you see that?
A I do.
Q Did you have an understanding of what she was suggesting there?
A "I think instead of solo calls, it's better if our brain trust here all talk together Monday. Have a nice weekend." Yeah. This is around the time that I felt -- I felt that Stephanie was inserting herself in a way that I hadn't

Page 187

experienced before.
There was always calls happening, you know, a lot of fast moving, moving things in real-time. And then she had suggested because she knew that two other people spoke, I don't know which two. And she was suggesting we do it all together. But I do remember having the feeling around this time that she was trying to insert herself in something.
Q Okay. And she was suggesting you all reconvene and she would make herself available to talk again about this issue on Monday, right?
A She did.
Q Okay. You went ahead and hired or informed her that you were going to hire or made the decision that you were going to hire Melissa Nathan before Monday rolled around, right?
A It looks like it.
Q If you stay on that first page. Go down to the last text on the page that starts with "edited."
A Yes.
Q It says:
(As read):
"Thanks, all. As per our conversation,

Page 188

I also had a negative experience where I confronted her lies and shady behavior and the attempts to poach, and I had to get the client involved to straighten out the situation."
Do you see that?
A I do.
Q Do you recall this as being a text from Jennifer Abel?
A It looks like it. Yes.
Q And do you recall her communicating that to you in sum or substance?
A I had already known before this text on some level that when she had -- I don't know if she was the one who originally suggested Melissa, but when there was a conversation about it, that they had some history where they -- I don't know if it was bumped heads, but it's a term I'll use -- that they hadn't worked through and she was giving me that heads up. So when I see this, it's more context.
Q Okay. And in the next text on the page marked 13 at the bottom --
A Yes.
Q -- this is a text from you.

Page 189

Do you see that?
A I do.
Q And you say, essentially, to start by thanking Steph and Jen for the information and insight that they had both provided, right?
A Uh-huh.
Q And then you say:
(As read):
"I'm the one essentially who is going to have to see for my own self what I think about the situation and make the ultimate determination on whether or not to hire Melissa Nathan."
Right?
A Yes.
Q And then at the bottom, you say:
(As read):
"Please filter things through us first, as Justin is needing time to recover from so much and I should be the one to navigate when and how we include him."
Do you see that?
A I do.
Q Is this what you were referencing when you essentially asked Stephanie to not loop Justin

CONFIDENTIAL

Page 190

in these communications?
A No. I think this is me reiterating a point that I made in another time.
Q Okay.
MS. SHAH: I'm going to hand you what has been marked as Exhibit 32.
(Exhibit 32 marked for identification.)
THE WITNESS: Thank you.
BY MS. SHAH:
Q It's a text thread between Stephanie Jones and Tera Hanks marked JONESWORKS_WAYFARER_, several zeroes, 4651.
Have you seen this text message before?
A I do not believe so. I am not on this.
Q No, you are not.
In the top text message, Tera Hanks is communicating to Stephanie Jones that Wayfarer had decided to hire Melissa Nathan for crisis communications, correct?
A I see that.
Q Were you aware before Tera communicated this to Stephanie Jones that she was going to communicate to Stephanie Jones that you had decided to hire Melissa Nathan?
A I just -- let me understand the question.

Page 191

Was I aware that Tera was going to communicate this to Steph?
Q Uh-huh.
A Yes.
Q And in the middle of the page at 7:41, Stephanie Jones texts to Tera:
(As read):
"My cybersecurity guys found her behind the site."
Do you see that?
A I do.
Q Did Tera ever communicate to you around this time that Stephanie Jones believed that Melissa Nathan was behind some defamatory websites that had popped up on the Internet about Stephanie?
A I remember hearing about this at some point. I don't know when. So I don't know if she had shown it to me then.
Q Do you remember if Stephanie Jones herself shared that sentiment with you around this time?
A I don't recall.
Q Okay. When you say you remember hearing about that at some point, what do you recall about hearing about that?

Page 192

A I mean, it's been all over. It's one of the things we're dealing with in this case. So at some point, I remember her learning of this.
Q Okay. Were you present for the portions of the depositions of either Melissa Nathan or Mr. Baldoni where I asked them questions about Melissa Nathan's involvement in the Stephanie Jones Leaks and Stephanie Jones Lies websites?
A I don't believe so.
Q Okay.
A And I was barely in Melissa's so...
Q Okay.
A I think there was a time or two I was there but kicked out because of AEO stuff so then -- but I have no recollection. Let's start there.
Q Okay. Did you observe any portion of Katie Case's deposition?
A Small portions.
Q Okay. Did you observe the portion of Katie Case's deposition where she discussed Melissa Nathan's involvement in the Stephanie Jones Leaks website and associated Twitter account?
A I'm just trying to remember what Katie was and I remember watching Breanna a little bit. So I don't recall. It's all -- it would all be

Page 193

vague if I even heard. But I don't have a particular memory.
Q Okay. Did you read the transcript of Katie Case's deposition afterwards?
A No.
Q This issue of Melissa Nathan's involvement in the Stephanie Jones Leaks websites and associated social media accounts, is this the first time you're hearing about it or --
A No. No. No.
Q No. Okay.
A No, I'm just saying I wasn't there for the deposition.
Q Sure.
A I know what the accusations are.
Q Okay. How do you know what the accusations are?
A I don't know. I just heard it. It's either in -- I don't know.
Q Are you aware that Katie Case testified under oath that Melissa Nathan instructed Katie to write copy for the Stephanie Jones Leaks website that included things specifically saying Stephanie Jones holds clients hostage -- is -- mistreats her employees and leaks clients'

confidential information?
MS. SHAPIRO: Objection.
THE WITNESS: That was a long question.
BY MS. SHAH:
Q I will break it down.
A Thank you.
Q Are you aware -- are you aware that Katie Case testified under oath in her deposition in this case that Melissa Nathan instructed Katie Case while Katie Case worked at TAG to write the copy for the Stephanie Jones Leaks website?
MS. SHAPIRO: Objection.
THE WITNESS: I don't think I'm aware of that.
BY MS. SHAH:
Q Okay. You have not heard that before?
A I don't recall it.
Q Okay. Are you aware that Katie Case testified under oath in this case that it was Melissa Nathan who instructed Katie Case specifically to write that Stephanie Jones holds clients hostage, leaks clients' confidential information, and mistreats her employees?
MS. SHAPIRO: Objection.
THE WITNESS: The question is, have I



heard that?
BY MS. SHAH:
Q Yeah.
A I don't recall hearing that.
Q Okay. And you don't -- you don't know that Katie Case testified to that under oath in this case?
MS. SHAPIRO: Objection.
THE WITNESS: I don't think so.
BY MS. SHAH:
Q Okay. Are you aware that Katie Case testified under oath in this case that Jed Wallace was also involved in the creation and publication of the Stephanie Jones Leaks website?
MR. GLOVER: Objection. Form.
THE WITNESS: No.
BY MS. SHAH:
Q Are you aware that Katie Case testified under oath in this case that she also worked with Melissa and Jed Wallace in relation to -- to other defamatory websites?
MS. SHAPIRO: Objection.
THE WITNESS: To other ones?
BY MS. SHAH:
Q Uh-huh.



A Besides?
Q Stephanie Jones'.
A I am not.
Q Okay. Is part of TAG's engagement with Wayfarer, did anyone at TAG ever offer to you to put up a website about someone else involved in the controversy?
MS. SHAPIRO: Objection.
THE WITNESS: Be more specific, I'm sorry.
BY MS. SHAH:
Q Did they ever offer to you, hey, we can do a smear website about someone?
A No.
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q Okay. Is putting out smear websites about people a tactic that you approve of?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MS. SHAH:
Q Is that something you would want to be associated with?
A It's not something I would ever do.
MS. SHAPIRO: Objection.



BY MS. SHAH:
Q Is it something that you would want someone you were associated with to do?
A I would not want them to do it.
Q Okay.
A And I can only be responsible for my own actions.
Q Understood. But had you been aware that this is something that TAG and Melissa Nathan did at the time, would that have influenced your decision whether or not to hire them for Wayfarer?
MS. SHAPIRO: Objection.
THE WITNESS: You're saying if I was aware that they were capable of doing something like that?
BY MS. SHAH:
Q That they had, in fact, done something like this in the past.
A That's a hypothetical that's really hard to answer because you're -- if they had -- I don't know that this to be -- what you're telling me, I don't know this to be true.
I'm not discrediting your, what you're telling me. I just don't know it to be true. So you're asking me would I hire them, be associated

CONFIDENTIAL

Page 198

with them if a hypothetical or an allegation were true is a tough thing to answer.
Q Is it really a tough thing to answer, though? I mean, if you don't -- if you don't approve of that kind of conduct and don't want to be associated with people who do it --
A Okay.
Q -- is it really tough to understand whether or not you would willingly hire someone who you knew did that kind of thing?
MS. SHAPIRO: Objection.
THE WITNESS: Okay. Fair enough. Fair enough. Hypotheticals are tough for me because I kind of more deal in concrete things -- or I try to.
If I had fact, if I had knowledge that somebody is doing something that was not aligned with how I like to do things -- well, that was contrary to how I like to do things, no, I would not want to work with them.
BY MS. SHAH:
Q And so if you had knowledge that Melissa Nathan and TAG put up smear websites about people, would that have affected your decision to hire them for Wayfarer?
MS. SHAPIRO: Objection.

Page 199

THE WITNESS: But I didn't have knowledge. So -- and I don't know what you're telling me. So I can't answer that.
BY MS. SHAH:
Q Are you going to investigate this after you leave this room today?
MS. SHAPIRO: Objection.
THE WITNESS: You want to know if I'm going to investigate a hypothetical as far as I know? I don't know how to answer that.
BY MS. SHAH:
Q I'm not asking you if you're going to investigate a hypothetical. I'm going to ask you if you're going to investigate as a factual matter whether there is evidence in this case or otherwise that this is something that Melissa Nathan and TAG and Jed Wallace do?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
BY MS. SHAH:
Q Now that I've just told you there's evidence about it in this case.
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.

Page 200

BY MS. SHAH:
Q Are you going to look into this at all?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: I'm sorry. I'm not trying to be combative with you, but I think a lot of people have evidence against people that doesn't necessarily amount to what they're alleging. So if you're telling me you have evidence that's proven, is different than you saying you have evidence that's unproven. I -- so I don't want to -- I don't know how to respond to you right now.
BY MS. SHAH:
Q I'm just asking if what I've just said to you is important enough that you're going to do anything to look into it for yourself or not. You can say no.
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I don't know.
BY MS. SHAH:
Q Okay.
A I'm just hearing it, so let me digest it for a day or two.
Q Very fair.

Page 201

And apologies if I asked you this already, but why did you make the decision to hire Melissa Nathan and TAG?
A You did ask me before. Maybe twice before.
Q I'm sorry. It's been a long day.
A Short answer?
Q Please.
A We were scared. We didn't know what was coming in the world. And it made sense to consult with people who might be able to help us navigate any negative stories and PR that might be going around.
MS. SHAH: Okay. I'm going to show you what is going to be marked as Exhibit 33.
THE WITNESS: Thank you.
(Exhibit 33 marked for identification.)
BY MS. SHAH:
Q It's a text thread dated August 4th, 2024, between a few people at TAG, Jennifer Abel, and at least somewhere in this text thread, yourself, and --
A This is an email, right?
Q Oh, I'm sorry. Yeah.
A Just making sure I'm looking at the right

CONFIDENTIAL

Page 202

document.
Q I think you're correct. This is an email dated August 4th, 2024, with the Bates-stamp JONESWORKS_MN_000001208.
Do you see this?
A I do.
Q Okay. I'm going to point you to the bottom email on the page marked 1208.
A Okay.
Q You write:
(As read):
"Thanks, everyone. As I will be in the air and not able to join, can you please record the Zoom? I would like to be able to review and be up to speed."
Do you see that?
A I do.
Q And this referred to a Zoom call that TAG and Jennifer Abel and people from Wayfarer were going to be on together; is that right?
A I don't know what call this was so I can't --
Q You don't? Can you look through this and see if it jogs your memory --

Page 203

A Sure.
Q -- of what call this was?
A Sure. It looks like it starts in the back, though, right?
Q That's right.
A Because it's backwards?
Okay.
Q Do you recall what this call was to be about?
A I do not.
Q Okay. Do you remember asking them to record the Zoom?
A Only because I'm reading it here.
Q And then Katie Case responds to you:
(As read):
"That's not a problem, Jamey. We'll record and send."
Do you see that?
A I do.
Q Do you have any recollection of whether they did actually record the Zoom and send it to you?
A I don't.
Q Do you have any recollection of whether you ever watched that Zoom?

Page 204

A I would almost 99 percent say I did not.
Q Okay.
A But -- because, yeah.
Q Okay. That's all I have on that.
A Okay.
Q Do you recall at some point in time also bringing on Jed Wallace and Street Relations onto the Wayfarer team?
A Yeah.
Q Whose suggestion was that?
A I believe it would have been Melissa's.
Q Did you ever discuss that with Stephanie Jones?
A No.
Q Okay. Did you ever discuss that with Jen Abel?
A I'm sure.
Q Do you recall a point in time, we discussed it a little bit earlier in part, when there were some issues around like whether and who had reached out to The Daily Mail?
A Say that one more time. You probably said that perfectly fine, but I didn't follow.
Q It's all right.
There was a Daily Mail article published

Page 205

on August 8th, and you recall there being some issues with Stephanie and others and Sony and Josh Greenstein about whether anyone reached out to The Daily Mail, right?
A Yes.
Q I believe you testified earlier something about it coming through Josh Greenstein that someone had contacted The Daily Mail; am I getting that correct?
A I heard from Josh -- Josh Greenstein. I don't know who -- I don't know on their end, but Josh was the one that told me.
Q Okay. Tell me about that conversation.
A Okay. It was a quick one, but it was -- I don't remember in time what day this was or what's going on, but -- I mean, I remember that period. I just don't know the sequence. He said, who -- who is -- he didn't say the first name. He said, who is Ms. Jones, or who is Steph, Stephanie at Jonesworks? And I said, Stephanie Jones, it's her namesake. And he had said, Okay, she's the one reaching out. You gotta get a fucking hold of these people.
Q Was that a phone conversation?
A It was.
Q Did he call you or did you call him?

CONFIDENTIAL

Page 206

A He called me.
Q Okay. Did anything else happen during the conversations?
A That was pretty much the conversation.
Q Okay. Did you respond to him?
A Yeah. I was like, let me look into this. I don't know what's going on.
Q Okay.
Did you have an understanding before you talked to Josh Greenstein that someone had reached out to The Daily Mail?
A I have -- yes. I don't know exactly what. There was a lot happening. A lot of moving, just things happening at the same time. I do believe there was some -- that someone from Sony or someone was trying to figure it out. And then I don't know where they got to, but then he called me and then told me who he heard it was.
Q Okay. Other than hearing that from Josh Greenstein, meaning that Stephanie Jones had reached out to her contact -- well, let me ask you this: What was he -- what did you understand him to be saying? That Stephanie Jones had tried to contact The Daily Mail, or that she had actually contacted and spoken to someone at The Daily Mail?

Page 207

A That's what was being conveyed.
MS. SHAPIRO: Objection.
THE WITNESS: That he was -- what I believe was being conveyed is that she was in communication and talking bad about Blake.
BY MS. SHAH:
Q To The Daily Mail?
A I believe it was The Daily Mail.
Q Okay.
A I just -- yeah.
Q Sure.
Other than what Mr. Greenstein conveyed to you in that short phone call, did you have any other basis to understand that Stephanie Jones had contacted The Daily Mail to talk badly about Blake?
A Here's what's my basis. And by the way, I didn't necessarily think she did or didn't. I didn't have a personal perspective. But my basis was, I know and believe that it was not anyone that was in daily conversations or in -- in the -- on the -- on the field with us right then, which would have been Jen and Melissa. Maybe Matthew Mitchell was -- I can't recall if he was on calls. Maybe he was. Because we essentially were trying to manage the relationship with Leslie Sloane and keep

Page 208

everything kosher. So I did not believe it was someone that I was in contact with. And he called me and said he learned that it was Stephanie. So that seemed plausible. I don't know for sure, so then I had a conversation with her.
Q With Stephanie?
A Yes.
Q Okay. Apart from that, you didn't have any personal knowledge one way or another whether she had done this or not, correct?
A I did not.
Q Okay. And you didn't necessarily have a belief at the time as to whether she had or had not done this; is that correct?
A I did not have a strong belief, but it just seemed -- I didn't have a strong belief.
Q What was your -- you said, "and then I had a conversation with her." What was your conversation with Stephanie about this?
A And maybe before the conversation, maybe there was a text thread. I don't remember the sequence, but there was communication about it, including a conversation. And I think it was text first, but including a conversation, which is the one that we have talked about that I recorded.

Page 209

Q I understand. Okay. What was the problem for Wayfarer at the time, if someone had contacted The Daily Mail to speak badly about Blake?
A Well, number one, I didn't want anybody speaking badly about Blake. We were very clear that our only messaging would be how great she was in the movie. Justin had spoken publicly about her involvement and just flying colors about her.
As everyone knew from my direct instruction, was while we are -- always should defend ourselves and be prepared for any incoming, that we were always and never say anything ill about anybody, number one.
Number two, we also don't want to stir any pots just to give it any -- any gasoline. So contacting anyone at that point would have just been, it's gasoline, it's stirring a pot. And that was pretty much the reason.
Q Okay. You said you gave direct instructions about this to the team; is that right?
A Correct.
Q Including to TAG?
A Unless there was incoming to them, to not go and do anything negative.
Q Okay.

A Yes.
Q Are you aware that Breanna Butler Koslow testified under oath in this case that she leaked information to help plant a negative article about Blake during this time?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know that.
BY MS. SHAH:
Q You've never heard this before?
A I don't know that.
Q Did you authorize that?
MS. SHAPIRO: Objection.
THE WITNESS: Did I authorize it?
BY MS. SHAH:
Q Uh-huh.
A Never in my life.
Q Would that have been contrary to your direct instruction to TAG?
MS. SHAPIRO: Objection.
THE WITNESS: If that happened and I know that to have happened, that would have been contrary to my instruction, yes.
BY MS. SHAH:
Q Okay. You're aware that Stephanie Jones denied ever contacting anyone at The Daily Mail,



right?
A Say it again --
Q You're --
A -- please.
Q You're aware that Stephanie Jones denied ever contacting anyone at The Daily Mail, right?
A I'm aware that she said that to me, yes.
Q And she said that to everyone, right?
A All I can speak is what she said to me.
Q Sure.
I'm going to show you The Daily Mail article.
MS. SHAH: Tab 31 and tab 33, please. We are going to mark as Exhibit 34 an article from The Daily Mail, by Lillian Gissen, published on August 8th, 2024.
(Exhibit 34 marked for identification.)
MS. SHAH: We're also handing you what's been marked Exhibit 35, which is a text thread dated August 8th, 2024, bearing the Bates stamp HEATH_000044697. Okay.
Just take a look through these and let me know when you're ready.
(Exhibit 35 marked for identification.)
THE WITNESS: What is that?



Okay.
BY MS. SHAH:
Q Okay. Do you remember this text thread?
A Do I -- do I need to keep reading the rest of this stuff? I get it. I remember this stuff. So I'll read -- I reserve the right to continue reading if you ask me something I --
Q Thank you. All right.
So you generally remember this text thread, right?
A Generally.
Q Yeah.
So if you look at the top of the text -- and I want you to have the article next to you as well. If you look at the top of the text thread in Exhibit 35, it is a screenshot that Stephanie Jones is forwarding to you and other people of an email that Lillian Gissen sent to her and Jennifer Abel and Wayfarer Studios.
Do you see that?
A I do.
Q Yes. Okay. And the email says, "Call for comment."
Do you see that?
A Yes.



Q And Lillian Gissen is The Daily Mail senior reporter who wrote the article in Exhibit 34.
Do you see that?
A I see that.
Q Okay. And the article in Exhibit 34 was published at 11:20 Eastern Daylight Time on August 8th, 2024.
Do you see that?
A I do.
Q Okay. Stephanie Jones' text to you and others in Exhibit 35, forwarding the screenshot of Lillian Gissen's inquiry, comes at 11:19:50 a.m. on August 8th, 2024.
Do you see that?
A I do.
Q That is -- looks to be about ten seconds before the article was published.
Do you see that?
A I do.
Q Okay. If you look at the time stamp in that email --
A Timestamp in the email?
Q -- in the email that she screenshotted from Lillian Gissen --
A Okay.

Q -- it says 4:16 p.m.
Do you see that?
A I do.
Q "Today at 4:16 p.m."
Do you see that?
A I do.
Q Okay. I am going to represent to you that is 4:16 p.m. UK time, because Stephanie was in the UK, which is 11:16 a.m. Eastern Standard Time.
A Okay.
Q Okay.
So what we're looking at here is an email that came into Stephanie Jones and Jen Abel and Wayfarer Studios at 11:16 a.m. on August 8th --
A Okay.
Q -- asking for comment on an article that was published at 11:20 on August 8th.
Do you see that?
A I see that.
Q Okay.
Do you have any reason to believe that Stephanie Jones contacted Lillian Gissen and spoke badly about Blake between the time that she received that email asking for comment and the time the article was published?



MS. SHAPIRO: Objection.
THE WITNESS: That's a long, good setup there. And unfortunately, all I can say is, I don't -- I respect what you pointed out. I don't really have a perspective. I would need to, like, digest this, and I don't know -- let me just start with the simple thing.
The question was, do I have any reason to believe what?
BY MS. SHAH:
Q That Stephanie Jones reached out and contacted and spoke to Lillian Gissen between the time she sent Stephanie this email and the time the article was published? In those four minutes, do you know one way or another whether Stephanie spoke to Lillian Gissen?
A I don't know.
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q You don't know. And as you sit here today, you don't have any evidence and -- and you just don't know one way or another whether Stephanie spoke to Lillian Gissen ahead of the publication of the article in Exhibit 34 or whether she didn't; is that correct?



A At this time here, looking at this, I would say I don't know. What my attorneys know now --
MS. SHAPIRO: Objection.
THE WITNESS: -- might be different than what I know.
BY MS. SHAH:
Q Yeah, I understand that. And I'm not asking you what your attorneys know. I'm asking you as you sit here today, do you know one way or another whether Stephanie spoke to Lillian Gissen ahead of the publication of the article in Exhibit 34?
A I don't know.
Q Okay. At the -- at the bottom of the text thread on the first page here on Exhibit 35, it's the page stamped at the bottom ending in 97.
A I see it.
Q Jen Abel says:
(As read):
"Melissa and team" -- "her team are into this one already."
Do you see that?
A Yup.
Q Okay. What does that mean?



A I don't know for sure, but it looks like based on what was read before:
(As read):
"Lillian has been nice, fixed things. I can give her a ring. This is nothing."
And then that is Jen's number, right?
Q I believe so.
A (As read):
"Melissa and her team are into this one already."
So I think it's in response to that.
Q So she's essentially telling Stephanie, like, nothing for you to do. Melissa's handling this one?
A Sure. I mean, this is English to me. But I don't know. I mean, when I say, "I don't know," I -- look, I don't want to -- I don't want to be silly here. She's saying she can give her a call. There's a response that says, "Melissa and her team are already into this one." I think that's information. I don't necessarily know what it means beyond that, but it looks like more information, context.
Q Okay. If you flip the page, there's a

text from you at 11:35 a.m. that says:
(As read):
"Hold on, guys. Please, no one call Daily Mail right now. Melissa is in the middle of it."
What did you mean by, "Melissa is in the middle of it"?
A It looked like that she was fielding -- we brought in, at this point, crisis to navigate through this. And she was discussing it, and I didn't want multiple people calling. Stephanie, as I had mentioned, was not in the daily loop in conversations. So what she might know the marching orders are and the intricacies of it, she's not involved or I don't know how much she knows. So I've asked Michelle to take care of it. Please, it's okay. She's taking care of it.
Q Okay. So at this point in time, you were having Melissa Nathan handle any inquiries from The Daily Mail and otherwise manage the press around this, and you did not want Stephanie Jones to do it; is that fair?
MS. SHAPIRO: Objection.
THE WITNESS: I didn't want anyone doing it that wasn't in our inner circle talking about it



all the time. Because there were daily, hourly, possibly, whatever, decisions and conversations of navigating it. And unless you were in that loop every day, I didn't want anyone doing something.
BY MS. SHAH:
Q I understand that. But Stephanie Jones in your mind was not in that loop and so you did not want her interfacing with The Daily Mail on this; is that correct?
A Correct. I did not want her to.
Q Okay. And that was at least in part because Melissa Nathan was already doing it and -- and you wanted Melissa Nathan as the crisis person to be doing that, right?
A I don't know if I would -- I can say that. I think it was, there's a team of people that are meeting. We've consulted. That's how I wanted to handle it. Now, whether it was Melissa or whether it was another person at TAG or maybe it would have been Jen, I don't know, necessarily, again this wasn't my world. But I just knew it was all people that were hearing from me, and Stephanie was not one.
Q Okay. Who were the people that were hearing from you on this that were in the circle?



A Justin, to an extent, tried to -- Melissa, Jen, Breanna, Katie. I don't know them well, but I -- but enough. There was -- I think there was another one. I don't recall. That's what I can recall.
Q Okay.
A There may have been others. And Justin. Of course, Justin. Just maybe -- he may have been not in every single conversation just because I'm trying to spare him.
Q Yeah. So down below on the page marked ending in the Bates stamp 98, you say:
(As read):
"I am hearing from Sony that, quote, 'someone named Stephanie Jones' has responded out to The Daily Mail saying that Blake is to blame and now this has escalated it all."
Do you see that?
A I'm sorry. I just got lost because I was looking --
Q Sorry. I'm just on the second page.
A Yep.
Q Ending in 98 at the bottom.
A Okay. I got you.



Q Near the bottom you send a text at 12:16 p.m. It says:
(As read):
"I am hearing from Sony that, quote, 'someone named Stephanie Jones' had responded out to Daily Mail saying that Blake is to blame and now this has escalated it all."
Do you see that?
A I do.
Q Is that -- when you say, "I am hearing from Sony that, quote, 'someone named Stephanie Jones' had responded out," you're referring to the brief call you had with Josh Greenstein; is that right?
A Correct.
Okay. And right below that, Stephanie Jones immediately says:
(As read):
"I did not even speak to Daily Mail so I know this isn't true."
Do you see that?
A I do.
Q Okay. And if you flip the page, ending in 99, in middle of the page at 12:33 p.m., she says

again:
(As read):
"To clarify again, I have not spoken to Daily Mail."
Do you see that?
A I do.
Q And at the bottom of the page at 12:35 she says:
(As read):
"I am not contacting press, but it is concerning if Danny or Kim are saying I have escalated this, as I haven't even touched this."
Do you see that?
A I do.
Q And that's consistent with what she was conveying to you at the time, right?
MS. SHAPIRO: Objection.
THE WITNESS: It's consistent, yes, with all of her messaging in this. Yes.
BY MS. SHAH:
Q Okay. At this point in time or at any point in time, you did not know whether or not she was or was not contacting The Daily Mail, right?
A Other than, you mean, getting a call from



Sony?
Q Yeah.
A I did not have confirmation of either way.
Q Okay. Did you believe her when she was saying, "I didn't contact anyone"?
A Mostly.
Q Okay. Did you think she was outright lying to you?
A The fact that I'm putting on and off glasses is --
Q Is that your tell?
A It's my tell I'm getting old. No, no, no. It's like that I'm getting older. I'm actually using glasses, my God. No, I don't think she was outright -- outright lying. I didn't have that sense. I just mostly believed her. I think oftentimes, it happens.
Q Okay.
A I just can't see you when they're on, so that's why --
Q It's no problem.
Did you listen in on Leslie Sloane's deposition in this case?
A I think I logged in and probably -- I



don't think so. I think not. I think I may have logged in for a moment, but there was another deposition happening, and I just never...
Q Did you read the -- excuse me -- transcript from Leslie Sloane's deposition?
A I did not.
Q Are you aware that Leslie Sloane has testified that Josh Greenstein's information that it was Stephanie Jones who contacted The Daily Mail came from Leslie?
A One more time.
Q Are you aware that Leslie's testified in this case that Josh Greenstein's information that he relayed to you that it was Stephanie Jones who had contacted The Daily Mail, that information came from Leslie Sloane?
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q Are you aware of that?
MS. SHAPIRO: Objection.
THE WITNESS: Let me -- let me follow. Leslie Sloane -- Josh called me to say that he heard about Stephanie Jones, and --
BY MS. SHAH:
Q Leslie told Josh?



A Leslie told Josh.
Q Yeah. Did you know that?
A That she testified to that?
Q Yeah.
A I did not.
Q Okay. Did you know that she testified that she came to that understanding from a suggestion by the reporter James Vituscka or Vituscka?
MS. SHAPIRO: Objection.
THE WITNESS: Okay.
BY MS. SHAH:
Q You didn't know that?
A I don't think so.
Q Okay.
A I'm trying to follow your map.
Q I -- I hear you on that.
Are you aware that Leslie's testified in this case that she believes that during this whole period about this issue of who's contacting The Daily Mail, that she now believes that she was being played by Melissa Nathan and her sister Sara Nathan?
MS. SHAPIRO: Objection.
THE WITNESS: That Leslie is saying this?

CONFIDENTIAL

Page 226

BY MS. SHAH:
Q Uh-huh.
A Okay.
Q You -- you're not aware of that?
A I am not aware.
Q Okay. Did you ever talk to Leslie Sloane about this issue whatsoever?
A I've never talked to Leslie Sloane.
Q Ever?
A Not that I have ever known.
Q Okay.
A Unless it was -- I don't know if it was by accident.
Q Okay.
Are you aware that a reporter at The Daily Mail told Melissa Nathan around this time, that Colleen Hoover had, in fact, leaked negative information about the production to The Daily Mail?
MS. SHAPIRO: Objection.
THE WITNESS: Okay. Give me that map again.
BY MS. SHAH:
Q Colleen Hoover leaked. Are you aware of that?
A Who is saying that?

Page 227

Q A reporter at The Daily Mail told Melissa Nathan.
A A reporter at The Daily Mail told Melissa that Colleen actually leaked what?
Q Negative information about the film.
A I'm not aware of that.
Q Okay.
A Can I ask you a question?
Q Probably not, but go ahead.
A Is this information just because you want me to have it or because you have a question for me about it?
Q I'm not going to answer that question. Let's move onto my next question.
A Okay. Fair enough.
Q Did you tell Stephanie Jones around this time that she should not be contacting any press in any respect on behalf of Wayfarer or Justin Baldoni?
A At some point, I did.
Q Okay. Do you have any indication that she didn't follow that instruction after you gave it?
MS. SHAPIRO: Objection.
THE WITNESS: After I gave indication? Well, I would have to reflect on that because I do

Page 228

remember getting -- answer [sic] me the question one more time, if you don't mind.
BY MS. SHAH:
Q Sure.
Do you have any basis to tell me as you sit here today that Stephanie Jones didn't follow your instruction for her to stand down after you told her to do that?
A I don't know. I -- I can't recall anything.
Q Okay. And after the point in time that you told Stephanie she was not to contact any reporters on behalf of Wayfarer or Justin, did you have any substantive or strategy or other conversations or communications with Stephanie about Wayfarer's publicity after that?
MS. SHAPIRO: Objection.
THE WITNESS: After I asked her to stand down?
BY MS. SHAH:
Q Uh-huh.
A Did I have any subsequent conversations with her?
Q Yes.
A About the positioning of Jonesworks with

Page 229

Wayfarer?
Q About -- no, about Wayfarer's publicity plans.
A Right. Not immediately after, I don't. When I say "immediately," I don't mean within days because we were dealing with the current flames. But that is something that became a little -- became apparent to me that there seemed to be no discussion on that at some point. Once I had learned -- you mean during this time or at anytime?
Q What I'm essentially asking is, after you told her to stand down, did you later, like, loop her back onto the team and get her involved, or no?
A As I said, she's never been involved.
Q Okay.
A As far as I'm concerned.
Q Okay. So you didn't invite her into the team after that?
MS. SHAPIRO: Objection.
THE WITNESS: She was -- she was never a part of it.
BY MS. SHAH:
Q Okay.
A No -- no offense to Stephanie.
Q Understood.

CONFIDENTIAL

Page 230

A She just never was. So other than some of these instances, but...
Q Now, there came a time in late August of 2024 where Wayfarer provided notice to Jonesworks that it was terminating Jonesworks; is that right?
A Late August?
Q Uh-huh.
A I probably need to see an email or something so I can confirm the date, but for the moment I can take your word for it.
Q Sure. Even apart from the date, you recall that there came a point in time when Wayfarer terminated Jonesworks, right?
A Yes.
Q Okay. Who made that decision?
A Ultimately?
Q Uh-huh.
A Me.
Q Okay. Why did you make that decision?
A I mean, I think I expressed it before so I will just give you the short version.
Q Please.
A I had come to the conclusion that I had lost faith. I don't like saying -- I had lost faith in what I believed Stephanie could provide and

Page 231

Jonesworks felt like -- thank you so much -- a place that we've been for some years and, you know, changes happen. And also, our point person who I trusted with my kids, going back to the babysitter analogy, I just trusted her. And here she's going somewhere else. And this happens all the time with agencies and managers. You know, you have a relationship with -- with Ms. Shah, not the law firm you are at.
THE WITNESS: Thank you.
MS. SHAPIRO: Do you want a break?
MS. SHAH: Yes. I think the reporter would like a break. Why don't we go off the record. How long would you like?
THE WITNESS: Was this for me?
THE VIDEOGRAPHER: We are going off the record. The time is 3:04 p.m.
(Recess.)
(Recess.)
THE VIDEOGRAPHER: We're back on record. The time is 3:44 p.m.
BY MS. SHAH:
Q You're aware that Wayfarer filed counterclaims against Jonesworks and Ms. Jones in this case, correct?

Page 232

A I am.
Q Who ultimately at Wayfarer made the decision to file those counterclaims?
A I believe that would be Steve, Justin, and I.
Q What is Steve's last name?
A Sarowitz.
Q Did you review the counterclaims before they were filed on Wayfarer's behalf?
A We did.
Q One of your counterclaims is for breach of contract against Jones and Jonesworks, correct?
A Correct.
Q And that is a breach of the contract that we looked at earlier from 2020 between Wayfarer and Jonesworks, correct?
A Correct.
Q Okay. And you allege -- Wayfarer alleges in its counterclaims that "Jones and Jonesworks have breached this contract because Jonesworks and Jones failed to render services in a professional manner and in accordance with Wayfarer's goals"; is that correct?
A Correct.
Q What is your basis for alleging that

Page 233

Jones and Jonesworks failed to render services in a professional manner and in accordance with Wayfarer's goals?
A Okay. First, I'm not a lawyer. So in terms of the category that they fit in under law is not my expertise. Once we came to a point, a feeling that Stephanie Jones was working -- not working in a way that was helpful to us, number one, and that she had taken confidential information, what we believe handed over, was in itself and some others, based on breaching a contract that we had of confidentiality.
Q Those are the bases for your breach of contract claims against Stephanie Jones and Jonesworks?
A Also, I would say that we had an expectation that once Jen either had put in her notice or was let go, that there would be some clear guidance of how Jonesworks, for the money we were paying for, was showing up for us. And there was no conversation about that, and there was nothing put in place.
Q Okay. Other than what you just described -- well, let me ask it this way: Other than what you just described, are there any other

CONFIDENTIAL

Page 234

bases to your understanding for Wayfarer's breach of contract claim against Stephanie Jones and Jonesworks?
MS. SHAPIRO: Objection.
THE WITNESS: I think I would have to defer to my lawyers for anything more than that.
BY MS. SHAH:
Q Okay. Regarding what you alleged to be and what Wayfarer alleges to be disclosure by Stephanie Jones and Jonesworks of Wayfarer's confidential information, tell me the basis for your allegation that Stephanie Jones and Jonesworks disclosed Wayfarer's confidential information.
A We had learned that confidential information about our company and Justin was shared to some extent with Leslie Sloane, was also given over to Blake Lively. We had had enough information and info to -- or two of the same words, "information" and "info," by the way. I repeated myself -- for us to believe that our confidential information was breached.
Q What was the information that was disclosed or breached?
A Well, I mentioned a couple of them, and I believe the rest, I'd have to leave for my

Page 235

attorneys.
Q So one of the bases you mentioned was that you learned that confidential information about Wayfarer and Justin was shared to some extent with Leslie Sloane. Is that one of the bases for the claim?
A Correct.
Q Okay. What specific information or evidence do you have to support your belief that confidential information about Wayfarer and Justin was shared by Stephanie Jones with Leslie Sloane?
A Specifically, I believe that we -- I don't recall who it was, a name. But that the information was then shared to Leslie Sloane via Stephanie that I think a reporter had said that they had gotten ahold of or had been read to or something, which led back to us knowing that Jen's information, which included Wayfarer's information, was then breached. And based on that, through the counsel of our attorneys who did their own work, I'd have to leave that for them.
Q Okay. You're going to have to explain that for me a little bit more. I don't --
A Okay.
Q I don't totally follow.

Page 236

A Okay.
Q Are you saying you learned from a reporter that Stephanie had shared confidential information with Leslie Sloane?
A No. That's -- Stephanie had shared with Leslie Sloane. The reporter part, I'm a little confused on.
Q Me too.
A Me too. So I'm doing my best to recollect it. So I would have to say that this is not something that I'm prepared to speak eloquently on. Other than we had enough information and belief to discuss with our attorneys and then move from there.
Q But what was that information that you had that you thought was enough to file this claim?
A I don't know what the exact information was. But that there was information gathered from Jen's phone that was shared with another, regarding Wayfarer communication.
Q Why did you come to think that?
A There was communication between, I believe, either Melissa or Jen who spoke to Leslie Sloane who had said something to the effect that I have seen -- maybe it was Melissa, that you guys are

Page 237

going -- I've seen the text messages and I know what you guys are doing, or something alluding to that she's got information from Stephanie.
Q And is that the entire basis for your allegation, that Stephanie Jones shared Wayfarer confidential information with Leslie Sloane?
MS. SHAPIRO: Objection.
THE WITNESS: I cannot say that's the entire basis, but my understanding is limited to that.
BY MS. SHAH:
Q Okay. And as you sit here today, you cannot think of any other basis or information that you have that would support the allegation that Stephanie Jones or Jonesworks shared Wayfarer confidential information with Leslie Sloane?
MS. SHAPIRO: Objection.
THE WITNESS: As I sit here today, that is what I'm able to speak of.
BY MS. SHAH:
Q Okay. Still sticking with Leslie Sloane.
A Okay.
Q You said that your belief is that Stephanie shared Wayfarer confidential information with Leslie?

CONFIDENTIAL

Page 238

A Correct.
Q What was the Wayfarer confidential information that you think Stephanie Jones shared with Leslie Sloane?
A I don't have that information off the top of my head.
Q Do you have it anywhere?
MS. SHAPIRO: Objection.
THE WITNESS: I would have to consult with my lawyers.
BY MS. SHAH:
Q Other than consulting with your lawyers, do you have any information from which you could tell me what Wayfarer confidential information you believe was shared with Leslie Sloane?
A Communications between Justin, myself, Jen, Melissa, during the month of August. I don't know if it's sometime in July or September but sometime in that frame.
Q Which communications?
A I am not at -- I don't know at the moment.
Q Did you ever know?
A I may have.
Q But you don't recall sitting here today

Page 239

if you ever knew with specificity which communications were allegedly shared with Leslie Sloane?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know. I don't recall.
BY MS. SHAH:
Q What is your basis for saying that the communications that were shared with Leslie Sloane were text messages between you, Justin, Melissa, and Jen in this July and August 2024 time period?
A And the question is what? What is the basis for what?
Q For you saying that the communications that were shared with Leslie Sloane were communications between you four in this time period?
A What I can recall right now is that that information gathered by Stephanie from Jen's phone was then shared with Leslie Sloane and also shared with Blake Lively at some point.
Q But putting aside Blake Lively, I'm trying to focus on when you say that information was gathered by Stephanie and shared with Leslie Sloane, are you talking about text messages?
A I believe text messages, possibly emails,

Page 240

communication that would have been gathered from a phone.
Q Do you have any idea which communications we're talking about?
A I don't know at this moment as we're speaking.
Q Okay. Did you ever see any communications that were allegedly shared by Stephanie Jones to Leslie Sloane?
MS. SHAPIRO: Sorry. I just want to give Mr. Heath a direction to make sure that to the extent his answer is based on information provided to him by his counsel, that you can't answer the question if that's the source of your information. If it's some other source, you can answer.
THE WITNESS: Understood.
So one more time, please.
BY MS. SHAH:
Q Sure. Can you identify for me as you sit here today, the substance of a single specific communication that you have evidence to believe was shared by Stephanie Jones with Leslie Sloane?
MS. SHAPIRO: Objection.
THE WITNESS: Other than what I've learned from my attorneys, I can't speak of any.

Page 241

BY MS. SHAH:
Q Yes or no, have you even learned from your attorneys the substance of a specific communication that you understand was shared by Stephanie Jones to Leslie Sloane?
MS. SHAPIRO: I'm going to object and direct you not to answer that question which calls for attorney-client communications, which are privileged.
BY MS. SHAH:
Q Are you going to follow your counsel's instruction?
A I am.
Q We've been undergoing discovery in this case for several months, correct?
A Yes.
Q And you're aware that you, as a party to the case, have access subject to potentially AEO limitations to the discovery that's been produced, correct?
A Correct.
Q Have you seen any evidence in discovery in this case that would support the allegation that Stephanie Jones shared Wayfarer confidential information with Leslie Sloane?

CONFIDENTIAL

Page 242

MS. SHAPIRO: I'm going to, again, direct you not to answer to the extent the answer calls for information about communications with your attorneys or documents attorneys may have shown you in the course of those communications.

MS. SHAH: Well, I'm not asking you what your attorneys may have told you. So let's put that to the side. If he has seen a document produced in discovery in this case, the fact that he has seen it is not privileged.

MS. SHAPIRO: Well, the fact that an attorney showed it to reflects --

MS. SHAH: I'm not asking if an attorney showed it to him. I'm asking if he's ever seen it.

MS. SHAPIRO: So my direction is that to the extent he has seen a document because his attorneys produced it in discovery, because his attorneys showed it to him, that is work product. And to that extent, he can't answer the question.

MS. SHAH: I disagree that he -- that prevents him from answering my question as asked.

MS. SHAPIRO: Well, that's fine, but that's my instruction.

BY MS. SHAH:

Q All right. I'm going to ask it again.

Page 243

Have you seen any evidence produced in discovery in this case that supports Wayfarer's allegation that Stephanie Jones disclosed Wayfarer confidential information to Leslie Sloane?

A Any evidence I may or may not have seen has come from the guidance of my attorneys so I'm not at liberty to speak to it.

Q Well, I'm not asking what you may or may not have seen. I'm asking if you have seen anything.

If the answer is, no, I can't think of anything I have seen, then I'm entitled to that answer.

MS. SHAPIRO: Well, I don't --

MS. SHAH: If the answer is no, then his attorneys, obviously, didn't show him anything. So it is not privileged.

MS. SHAPIRO: No, but -- but you're asking him yes or no so if the answer is yes --

MS. SHAH: If the answer is no, there's nothing privileged about that. So if the answer is no, you can answer that question.

MS. SHAPIRO: Well, I don't think you can answer that. To the extent, whatever your answer is, is based on what your attorneys have shown you

Page 244

or selected to show you or not, that's privileged.

MS. SHAH: But if the answer is no, nobody showed him anything, attorneys or not. So that cannot be privileged and you cannot stop him from answering the question that he has no evidence to support this claim.

MS. SHAPIRO: Well, that's not --

MS. SHAH: That's what I'm asking.

MS. SHAPIRO: It's a very interesting way of describing what you're asking, but I don't agree with you, and I'm going to direct him not to answer the question.

BY MS. SHAH:

Q Are you going to follow your attorney's instructions?

A Yes.

Q Can you identify for me any evidence that would support the allegation that Stephanie Jones shared Wayfarer confidential information with Leslie Sloane?

A I believe I'm -- this falls under attorney-client privilege.

Q I'm asking you if you can identify from your own memory any evidence whatsoever that supports Wayfarer's allegation that Wayfarer, not

Page 245

its attorney, made in this case? That is not privileged.

MS. SHAPIRO: It is privileged if he learned the information through his attorneys. I think that's the point of my instruction.

MS. SHAH: I understand that, but it doesn't hold logical sense.

MS. SHAPIRO: Well, that's your view. Obviously, we disagree so...

MS. SHAH: I'm asking you --

MS. SHAPIRO: I'm entitled to give him an instruction. You know, you can try to phrase your question around it. But...

BY MS. SHAH:

Q As you sit here today, other than what you told me already, can you tell me any other basis or evidence for your allegation that Stephanie Jones or Jonesworks shared Wayfarer confidential information with Leslie Sloane?

A I cannot tell you something that I've learned outside of my attorneys.

Q Can you tell me anything that you have learned not from your attorneys?

A I don't recall.

Q So other than information that you may or

CONFIDENTIAL

Page 246

may not have learned from your attorneys, sitting here today, you cannot tell me any other basis or evidence that supports your allegation that Stephanie Jones shared Wayfarer confidential information with Leslie Sloane?

MS. SHAPIRO: Objection.

THE WITNESS: Outside of what I've already told you, the rest I believe falls under attorney-client.

BY MS. SHAH:

Q Is there something you're thinking of that falls under attorney-client or not? Yes or no?

A That feels like a question that still falls under attorney-client.

Q It's not.

MS. SHAPIRO: Objection to the commentary.

BY MS. SHAH:

Q Is there something that you're thinking of right now as you sit here today that falls under attorney-client? Yes or no?

MS. SHAPIRO: Objection. I don't think you can answer that without breaching privilege.

MS. SHAH: You're either going to have to instruct him not to answer or just make an

Page 247

objection. Don't coach.

MS. SHAPIRO: I'm not coaching. I'm instructing you not to answer.

BY MS. SHAH:

Q Are you going to follow that instruction?

A I am.

MS. SHAH: I'm going to hold this deposition open pending going to Judge Liman on this question.

MS. SHAPIRO: You can do whatever you want, but let's get through the seven hours, if you're going to take them.

MS. SHAH: I am going to end up taking them if we keep fighting about this. So I'm going to ask it one more time. If you want to instruct him, you can, obviously. I'm going to hold the deposition open in that case pending going to Judge Liman to get an answer on these questions.

MS. SHAPIRO: What is your question that you think you can ask that won't require him to reveal anything he learned from his attorneys about the basis for the claims in the complaint?

MS. SHAH: I think there is nothing he learned from his attorneys. And if that's the case, I'm entitled to a "no" answer.

Page 248

MS. SHAPIRO: Well, I don't agree with that.

MS. SHAH: Okay. Then I'm going to ask it again and you can give your instruction. But that's subject to leaving the deposition open.

THE WITNESS: Meaning, we have to go through this again?

BY MS. SHAH:

Q Uh-huh.

Sitting here today, can you tell me any basis or evidence, other than what you've already told me, that would support Wayfarer's allegation that Stephanie Jones or Jonesworks shared Wayfarer confidential information with Leslie Sloane?

MS. SHAPIRO: Objection. Can we -- can we take a break? We would like to just consult with him about the privilege.

MS. SHAH: Yes. Let's go off the record.

THE VIDEOGRAPHER: We are going off the record. The time is 4:07 p.m.

(Recess.)

THE VIDEOGRAPHER: We're back on the record. The time is 4:19 p.m.

BY MS. SHAH:

Q Okay. I'm going to ask this to you as a

Page 249

yes or no question. That's been approved by your attorneys.

A Okay.

Q Yes or no, sitting here today, can you tell me any basis or evidence other than what you've already told me that supports Wayfarer's allegation that Stephanie Jones or Jonesworks shared Wayfarer confidential information with Leslie Sloane?

A I believe I will say yes, because if the question is -- does that include information I've learned from my attorneys?

Q It could include information that you've learned from your attorneys.

A Okay. Yes.

Q Okay. Other than information that you may have learned from your attorneys, can you tell me any evidence or basis for Wayfarer's allegation that Stephanie Jones or Jonesworks shared Wayfarer confidential information with Leslie Sloane?

MS. SHAPIRO: Objection. Do you mean other than what he's already talked about?

MS. SHAH: Yes. All right. Here we go again.

MS. SHAPIRO: Sorry.

MS. SHAH: It's all right.

THE WITNESS: I've been up and down a lot so maybe it's a little bit...

BY MS. SHAH:

Q It's no problem.

Other than information that you may have learned from your attorneys and other from what you have already testified to, is there anything else that you can tell me that forms a basis or evidence for Wayfarer's allegation that Stephanie Jones or Jonesworks shared Wayfarer's confidential information with Leslie Sloane?

A I believe not.

Q Okay. Thank you.

I want to move on to Blake Lively.

A Should I get up again?

Q No. I hope we've worked this out by now.

You mentioned that among the bases for Wayfarer's claim for breach of contract for disclosing confidential information is that you believe that Ms. Jones or Jonesworks shared Wayfarer confidential information with Blake Lively; is that right?

A Correct.

Q Tell me the basis for that claim.

A When the CRD complaint came out, we



saw -- and there were allegations of information and text messages that would have been part of our confidential information, which gives us the belief that that came from Stephanie Jones.

Q Is what you've just told me the entire basis for Wayfarer's allegation that Stephanie Jones or Jonesworks shared Wayfarer's confidential information with Blake Lively?

A Other than what I've learned from my attorneys.

Q Okay. Yes or no, have you learned anything from your attorneys other than what you just told me that would support that claim? Yes or no?

A Yes.

Q Okay. Is the Wayfarer confidential information that you believe and allege Stephanie Jones and Jonesworks shared with Blake Lively anything other than the text messages and information contained in Ms. Lively's CRD complaint?

MS. SHAPIRO: Objection.

THE WITNESS: Other than what I've learned from my attorneys; is that your question?

BY MS. SHAH:

Q What is the Wayfarer confidential



information that you believe Stephanie Jones and Jonesworks shared with Blake Lively specifically?

A Text messages, emails, communications that would have been retrieved from Jen Abel's phone.

Q Anything else?

A Anything else would be what I learned from my attorneys.

MS. SHAH: I'm going to put a pin in that one.

THE WITNESS: Okay.

MS. SHAH: Can you mark that?

THE STENOGRAPHIC REPORTER: Yes.

BY MS. SHAH:

Q Other than what you may have learned from your attorneys and what you just told me, does anything else comprise the information, the Wayfarer confidential information, that you believe Stephanie Jones shared with Blake Lively?

A I don't follow the question. I'm sorry.

Q Okay. What I'm trying to get at is, other than what we talked about that you think is Wayfarer's confidential information that was shared with Blake lively; text messages, emails, communications pulled from Jen Abel's phone, right?



A Right.

Q And other than anything that you learned from your attorneys, is there anything else that you think Stephanie Jones shared with Blake lively that was Wayfarer's confidential information?

A Not that I can recall.

Q Can you identify for me as you sit here today what specific text messages or emails or communications pulled from Jen Abel's phone you believe contained Wayfarer confidential information?

A There's a bit of that that I'm confused about. What specific text?

Q Uh-huh.

A I can't identify a specific text.

Q Okay. Can you identify any specific communication, whether it's a text message, email or other communication, with specificity, that you believe was Wayfarer's confidential information that was shared with Blake Lively?

A I cannot identify a specific one.

Q Okay. Do you have any evidence that Stephanie Jones or Jonesworks shared any text messages, emails or communications pulled from Jen Abel's phone with Blake Lively, not pursuant to a subpoena?

CONFIDENTIAL

Page 254

MS. SHAPIRO: Objection.
THE WITNESS: I would have to defer to my attorneys for that one.
BY MS. SHAH:
Q Sitting here today, other than deferring to your attorneys, can you tell me any basis or evidence that you have that any text messages, emails or communications pulled from Jen Abel's phone were shared by Stephanie Jones to Blake Lively other than pursuant to a subpoena?
MS. SHAPIRO: Objection.
THE WITNESS: Outside of communications with my attorneys, I cannot speak to any.
BY MS. SHAH:
Q Your complaint also lists that you allege, Wayfarer alleges, that Stephanie Jones and Jonesworks shared Wayfarer confidential information with Ryan Reynolds.
What is the basis for that allegation?
A I believe that would fall under what I have learned from my attorneys.
Q Have you -- yes or no, have you learned anything from your attorneys that you believe you cannot tell me on this question due to attorney-client privilege?

Page 255

A I don't follow that one.
Q You just testified that you can't say anything other than what you've learned from your attorneys on that, right?
A Yes.
Q Okay. And I'm asking you, have you actually learned anything from your attorneys that would support that allegation? Yes or no?
A I believe so.
Q Okay. Other than information that you may have learned from your attorneys about this, can you tell me any basis or evidence for Wayfarer's allegation that Stephanie Jones or Jonesworks shared Wayfarer confidential information with Mr. Reynolds?
A I cannot recall.
Q What Wayfarer confidential information do you allege Stephanie Jones or Jonesworks shared with Mr. Reynolds?
A I believe that information would have come from conversations with my attorney.
Q Okay. Other than conversations with your attorneys, can you identify any specific piece of Wayfarer confidential information that you claim Stephanie Jones or Jonesworks shared with Ryan Reynolds?

Page 256

A I believe that's information I've learned from my attorneys.
Q Okay. So other than information that you learned from your attorneys, there's nothing else you can tell me about that?
A I cannot recall.
Q Okay. Wayfarer has also asserted a cause of action against Jonesworks and Ms. Jones for breach of the implied covenant and -- of good faith and fair dealing. Are you aware of that?
A I am.
Q (As read):
"And Wayfarer has alleged that Jones and Jonesworks engaged in conduct that prevented Wayfarer from receiving the benefits contemplated under the agreement, including by maliciously feeding its confidential information to hostile third parties for the specific purpose of harming Wayfarer and Baldoni, acting against Wayfarer's interests, and otherwise depriving Wayfarer of the benefit of its bargain."
Okay?

Page 257

A Yup.
Q Okay. Identify for me the conduct that Wayfarer alleges Jonesworks and Jones engaged in that prevented Wayfarer from receiving the benefits contemplated under the agreement.
A I believe confidentiality is a benefit that we have in our agreement. So anything as we've spoken about before, would have been a breach of that and fell under that.
Q So do I understand that correctly to mean that any breach by Jones or Jonesworks of Wayfarer's confidentiality clause is the basis for that claim?
A Anything more than that, I would have discussed with my attorneys or learned.
Q Okay. Yes or no, is there anything more than that that you are aware of sitting here today that supports this claim that you learned from your attorneys? Yes or no?
A Yes.
Q Okay. Other than what you may have learned from your attorneys, can you tell me any other basis for Wayfarer's claim that Jonesworks and Jones prevented Wayfarer from receiving the benefits contemplated under the agreement?
A I cannot recall.

CONFIDENTIAL

Page 258

Q Okay.
(As read):
"Wayfarer also alleges that Jonesworks and Jones maliciously fed its confidential information to hostile third parties."
I'm going to stop there.
A Okay.
Q What is the basis for your allegation that Jones and Jonesworks acted in malice?
A In layman's terms, I can tell you.
Q Yes, please.
A I believe Stephanie Jones in her heart knows that Justin and I and Wayfarer are innocent of any of these claims. The fact that she would take confidential information to give to another side, that is, she knew that we all believed had some intentions of hurting us one way or another. And to give information to support wherever [sic] they were doing was malicious.
Q Other than that, anything else that was malicious?
A I believe that would fall under things that I have learned in consult with my attorneys.
Q Yes or no, is there anything sitting here

Page 259

today that you have learned that would constitute additional malicious conduct -- let me start again.
Sitting here today, yes or no, is there anything that you have learned from your attorneys that you believe would constitute additional malicious conduct that you are not telling me?
A Yes.
MS. SHAH: Okay. I'm going to put your attorneys and you on notice for all of the prior questions and any questions to follow in this vein that we're going to take the position that any additional fact that you later disclose in this case that has been shielded during this deposition by an invocation of privilege is not going to be admissible in this case.
MS. SHAPIRO: On what basis? I mean, what is your basis for that?
MS. SHAH: Because part of the purpose of discovery is to understand the factual basis for the claim. So if there are facts that are not being disclosed in discovery, on the basis of privilege now, we are going to take the position that you may not later disclose them and ambush us and use them in this case.
MS. SHAPIRO: But you're talking about

Page 260

facts, not evidence. So...
MS. SHAH: Well, evidence is facts.
MS. SHAPIRO: Well, no. I mean, I'm not sure whether it's appropriate to get into a debate on the record.
MS. SHAH: That's fine. We don't have to --
MS. SHAPIRO: We can discuss this further off the record.
MS. SHAH: We can discuss this further off the record. I'm just putting you on notice of this now.
If something's being shielded by privilege that constitutes facts or evidence in this case that we're not getting --
MS. SHAPIRO: That you're not getting in some other form?
MS. SHAH: I disagree.
MR. BACH: I know I'm the second attorney. So let me ask. Can I just ask you one clarifying question?
MS. SHAH: Yes.
MR. BACH: So you're asking a non-lawyer about the bases for claims and their work --
THE WITNESS: Should I leave? I just

Page 261

don't want --
MR. GLOVER: No, no, no.
MS. SHAH: It's all right. You can stay for the moment.
THE WITNESS: Okay.
MS. SHAH: You can stay for the moment.
MR. BACH: There were objections to the 30(b)(6) notice invoking attorney-client privilege, and I know that you're asking a non-attorney about the basis for legal claims. So I'm assuming you understand that there's a complaint that lays out the bases for these claims. There's been additional discovery other than through Mr. Heath. And so I don't hear you to be implying, but I just want to be clear, that you get to preclude all that other stuff just because he couldn't remember it on the spot in the context of a 30(b)(6) questioning about a legal instrument to which there were objections in a 30(b)(6) notice.
MS. SHAH: Here's what I will say on the record, and then I think if we need to discuss this more, we should go off.
MR. BACH: Okay.
MS. SHAH: Number one, the complaint does not lay out evidence for the claim. It lays out

CONFIDENTIAL

Page 262

allegations to be proven in discovery and trial.
Number two, he is not testifying that he can't recall any other bases. He is testifying that there are other bases that he can recall that he will not recount now under oath because of privilege.
So to that extent, if there is facts or evidence that is being shielded in this deposition by invocations of privilege, we are later going to take the position, if it becomes necessary, that you cannot later use those facts or evidence in the case. And I don't want to debate the contours and "if thens" of that. I want to put you on notice about this.
MR. BACH: And notice is always appreciated. I just want to say, I think if you're really going to say that this is the litmus test of what's admissible going forward, you need to put that in your notice and say, I expect the witness to be able to come here and recite every evidentiary basis for these claims. Otherwise, you know, to put someone on the spot, not put documents in front of them, and just say this is a high school test on the bases of your complaint, I just don't think a judge is going to see that as determinative of the scope

Page 263

of the litigation going forward.
I just want to note that on the record. You're free to make whatever argument you want. But we did object to the 30(b)(6) questions, and I do think it's a little bit of a weird kind of 30(b)(6) to do it in the way you're doing it. Not that you're not asking excellent questions or being very careful.
MS. SHAH: I understand. I don't agree with that position. I don't think it's worth debating.
MR. BACH: Okay.
MS. SHAH: And I don't agree with the validity or timing of the 30(b)(6) objections, but I also don't think that's worth debating. I think we can move on.
MR. BACH: Okay. Thank you.
MS. SHAH: Thank you.
THE WITNESS: So stay?
MS. SHAH: Yes, please.
BY MS. SHAH:
Q Going back to your allegation that Stephanie Jones and Jonesworks maliciously fed Wayfarer's confidential information to hostile third parties. Who are the hostile third parties that

Page 264

this allegation refers to?
A I believe Blake Lively, Ryan Reynolds.
Q Okay. You then go on to allege that Jones and Jonesworks did that for the specific purpose of harming Wayfarer and Baldoni.
What bases do you have for the allegation that Jones and Jonesworks provided information for the specific purpose of harming Wayfarer and Baldoni?
A I think I spoke to it. Number one, I do not believe she believes any of this. So for her to turn over something that's confidential, that we are alleging is confidential, and to share it in spite of that, against a party that she knows had intentions of some sort, that in its very nature is malicious, and what I've learned from my attorneys.
Q When you say "she" in that last answer, you mean Stephanie Jones, right?
A I believe I mean Stephanie Jones, but I'm only talking about Stephanie Jones and/or Blake Lively and Ryan Reynolds. So the "she" would be Stephanie Jones.
Q Okay. Is there any other way than what you've described to me in this whole prior conversation that you believe Stephanie Jones or

Page 265

Jonesworks acted against Wayfarer's interests or otherwise deprived Wayfarer of the benefit of its bargain?
A Can you repeat that, please?
Q Other than what we've just discussed in the last however long --
A Sure.
Q -- is there any other way, any other conduct by Stephanie Jones or Jonesworks that you believe acted against Wayfarer's interests or otherwise deprived Wayfarer of the benefit of its bargain?
MS. SHAH: Objection.
THE WITNESS: I believe that falls under what I've learned from my attorneys.
BY MS. SHAH:
Q Okay. Other than what you may have learned from your attorneys, anything else?
A I do not recall.
Q Okay. If someone were to say -- sorry.
If someone were to disclose the contract between Wayfarer and Jonesworks that we looked at earlier in the day, do you believe that would be in breach of a confidentiality obligation?
A Could you be more specific?

CONFIDENTIAL

Page 266

Q If either Wayfarer or Jonesworks were to give to anyone else the Wayfarer/Jonesworks contract, do you believe that would breach the contract's confidentiality --
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q -- as between Jonesworks and Wayfarer?
MS. SHAPIRO: Objection.
THE WITNESS: I would rely on my, in that case, my in-house legal to determine if it does or not. I don't know.
BY MS. SHAH:
Q Okay. If either Jonesworks or Wayfarer were to disclose communications between Jonesworks and Wayfarer to someone else, do you think that would breach the contract's confidentiality obligations?
MS. SHAPIRO: Objection.
THE WITNESS: Repeat that again. It sounds like an important question so I just want to understand it.
BY MS. SHAH:
Q If either Jonesworks or Wayfarer or anyone acting on their behalf were to disclose communications, emails, texts between Jonesworks and

Page 267

Wayfarer to somebody else, would that breach a confidentiality obligation between Jonesworks and Wayfarer?
MS. SHAPIRO: Objection.
THE WITNESS: Again, I would have to rely on counsel's legal perspective on that, as I'm not a lawyer and I have to understand from that.
BY MS. SHAH:
Q Okay. Did you authorize Mr. Freedman, your lawyer, to disclose to reporters at Puck --
A At where?
Q Puck News -- the Wayfarer/Jonesworks contract?
MS. SHAPIRO: Objection. I'm going to instruct you not to answer to the extent that would disclose your communications with Mr. Freedman.
THE WITNESS: That makes it easy because that was going to be my answer anyways.
BY MS. SHAH:
Q So you're not going to answer on the basis of attorney-client privilege?
A That would be -- you asked me, just to be clear, if I instructed my attorney? Which would mean that is communication between me and my attorney.

Page 268

Q So you are not going to answer on the basis of attorney-client privilege?
A Correct.
Q Okay. Did you instruct your attorney, Mr. Freedman, to send to reporters at Puck News emails between Jonesworks and Wayfarer?
MS. SHAPIRO: I'm going to make the same objection and give you the same instruction to not disclose.
THE WITNESS: I'm confused. Because I think the question itself is asking about communication I have had with Mr. Freedman. And so I believe that falls under client-attorney privilege.
BY MS. SHAH:
Q And so you are not going to answer on the basis of attorney-client privilege, correct?
A Of course not. Why -- yeah, why would I answer a question that's attorney-client privilege?
Q Did you approve Mr. Freedman sending to Puck News reporters the Jonesworks/Wayfarer complaint or emails between Jonesworks and Wayfarer?
MS. SHAPIRO: I will make the same instruction and -- sorry, the same objection and give you the same instruction.

Page 269

THE WITNESS: Yes, I will follow my attorney's advice.
BY MS. SHAH:
Q Okay.
A You didn't ask me that, but...
Q You know the drill by now.
A I know the drill.
MS. SHAH: All right. I'm going to show you what's been marked as Exhibit 36. It's a text thread between Matt Belloni at Puck News and Bryan Freedman dated December 22, 2024.
With the Bates stamp WAYFARER, several zeroes, 167550.
(Exhibit 36 marked for identification.)
THE WITNESS: Okay.
BY MS. SHAH:
Q Have you seen this before?
A I have not.
Q Okay. Let me know when you're ready.
Okay. You'll see that on the first page marked 167550, Mr. Freedman under the moniker of "Dad" sends a contract to Matt Belloni, right?
A Yes. The part that says:
(As read):
"Here is contract - refer yes but print

CONFIDENTIAL

Page 270

no"?
Q Yes.
A Okay. I don't know what that is, but I see that there's an attachment.
Q Okay. And if you flip to the page marked 555 at the end.
A Okay.
Q You'll see that the attachment is the Jonesworks/Wayfarer contract, dated May 6, 2020.
Do you see that?
A Dated May 6, 2020. I'm sorry, you're talking about this document here?
Q Yeah. That's the Jonesworks/Wayfarer contract, right?
A Yeah, dated May 7 -- okay, I see what you're talking about, yes.
Q But this is the Jonesworks/Wayfarer contract, right?
A It appears to be so, yes. Yes.
Q Okay. And then Matt Belloni at 2:04 says --
A Sorry. Can I ask you a question? Are you saying that this attachment is what I'm looking at here?
Q Yes.

Page 271

A Okay.
Q And I'll represent to you that this is how you produced this to us.
A Okay.
Q Matt Belloni says:
(As read):
"Okay, got it. I'm on plane for next couple hours. But I'm confused what this 'subpoena' is that New York -- NYT says led to the publication of the private communications."
Do you see that?
A I do.
Q (As read):
"You can't subpoena documents until a formal proceeding, lawsuit or labor complaint is filed, right?"
You see that?
A I do.
Q And then Bryan Freedman says:
(As read):
"You're correct. Subpoena is a lie."
Do you see that?
A I do.
Q What evidence do you have that the

Page 272

subpoena that was issued to Stephanie Jones and Jonesworks that's been produced in this case was a lie?
A I'm confused because I'm not on this. This is the first time I'm seeing this so I don't know anything about this.
Q Okay. Did you read the New York Times article about Blake Lively's CRD complaint?
A I did. But I read it one time and it was a while ago, so I don't recall a lot of it.
Q Do you recall that that article references that documents were provided to Blake Lively pursuant to a subpoena?
A I don't recall.
Q Do you have any evidence sitting here today that you can think of that when The New York Times said the documents were provided by Stephanie Jones pursuant to the subpoena, that was a lie?
MS. SHAPIRO: Objection.
THE WITNESS: You mean outside of this communication, or are you asking me in general?
BY MS. SHAH:
Q Sure. Yes.
A Outside of what I learned from my

Page 273

attorneys, this would have happened, this text, after the CRD complaint. So anything I would have learned from my attorneys, I can't speak of.
Q Okay. Are you saying, yes or no, that you have learned facts from your attorneys that would lead you to believe that when The New York Times wrote that documents were provided by Stephanie Jones pursuant to a subpoena, that was a lie?
A I'm a little confused because this is not something that is in a document of ours or a -- so I'm just looking at a text thread. So...
Q Mr. Freedman is your lawyer in this case, right?
A Yes.
Q Wayfarer's lawyer in this case?
A Yes.
Q Do you understand when you look at this text thread that he was acting and speaking on Wayfarer's behalf?
A Actually, I don't know the answer to that.
Q Do you think when you look at this text thread that he was speaking and acting in his own personal -- on his own personal behalf?

CONFIDENTIAL

Page 274

MS. SHAPIRO: Objection.
THE WITNESS: I don't know the answer to that. I don't know what this falls under. I don't know if every communication an attorney has is on behalf of their client or not and if they're allowed personal conversations or what is what. So I don't know.
I don't know how the law works in that regard so I just don't have an answer.
BY MS. SHAH:
Q Do you think Bryan Freedman has any reason to talk to a reporter about Blake's CRD complaint and The New York Times article other than on Wayfarer's behalf and your-all collective behalf?
MS. SHAPIRO: Objection.
THE WITNESS: Ask me that one more time? It's a fair question. I just want to understand it.
BY MS. SHAH:
Q Do you think Bryan Freedman has any reason to talk to a reporter about Blake's CRD complaint and The New York Times article other than on Wayfarer's and the Wayfarer defendant's behalf?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know.

Page 275

BY MS. SHAH:
Q Okay. Outside of this document so --
A Okay.
Q -- put that document to the side.
A All right.
Q As the CEO of Wayfarer and in your capacity as a Wayfarer corporate representative witness --
A Okay.
Q -- can you tell me any evidence or basis that you have for believing that the statement that Stephanie Jones provided information pursuant to a subpoena is a lie?
MS. SHAPIRO: Objection.
THE WITNESS: As the CEO of Wayfarer, and if I'm separating myself from Jamey Heath the individual, I'm not sure how that works.
BY MS. SHAH:
Q Me neither.
A Any information that I would know would be what I could get from attorneys, and I don't know what they would share with me. I'm confusing myself. I'm just -- I'm trying to work through it.
Q Sure. Let me try and make it easier, if I can.

Page 276

A Please.
Q Do you have any basis to think this whole subpoena thing is a lie? Any basis whatsoever?
MS. SHAPIRO: Objection.
THE WITNESS: I think that would be learned from the attorneys.
BY MS. SHAH:
Q Okay. Outside of anything that you may have learned from your attorneys, any basis you can think of that this whole subpoena thing is a lie?
MS. SHAPIRO: Objection.
THE WITNESS: I think any information after 22nd, once the CRD complaint came out, we had attorneys and all information happened with attorneys.
BY MS. SHAH:
Q Okay. So other than information that you may have learned from your attorneys, any other basis to think that this subpoena thing is a lie?
MS. SHAPIRO: Objection.
THE WITNESS: I believe all information I have is through my information from attorneys.
BY MS. SHAH:
Q Okay. Flip to the page marked 552 at the end, please.

Page 277

A Ending in 552?
Q Yes.
A Okay.
Q You'll see that Bryan Freedman under the moniker of "Dad" shares a screenshot of an email from Stephanie Jones to you, Tera, Imene, and Mara.
Do you see that?
A And Mara? Are you talking about ending in 552?
Q Yes. Do you see a screenshot there?
A Yeah, I see -- I don't know. Oh, I see. Got you. It's very small.
Q Yes.
A Jamey, Tera, Imene, and Mara.
Q So this is an email that Stephanie Jones sent to you, Tara, Imene, and Mara, right?
A Appears to be so, yes.
Q Okay.
A Is there a bigger version?
Q I don't think so.
A Okay. I'll do my best.
Q All right.
A Well, do you want me to read that?
Q No, I can't even read that so...
A Oh, okay.

Q Right above that screenshot -- we're still on the page ending 552.
A Okay.
Q It looks like there's a cut and paste of an email from Stephanie to you.
Do you see that?
A It looks like it, yes.
Q Do you recognize that as an email that Stephanie wrote to you?
A Let me just read it real quickly because I haven't. Yes, I recognize that.
Q Okay. Do you think it's kind of rich that Wayfarer is accusing Stephanie Jones of breaching its confidentiality by providing internal text messages and information when Wayfarer's lawyer is doing the same thing?
MS. SHAPIRO: Objection.
THE WITNESS: You're probably frustrated when I asked you to say it one more time, but will you ask it one more time?
BY MS. SHAH:
Q Do you think it's kind of rich that Wayfarer is accusing Stephanie Jones of breaching confidentiality by providing internal text messages and information when Wayfarer's lawyer is doing the



same thing?
MS. SHAPIRO: Objection.
THE WITNESS: I don't think I have enough understanding or information to be able to comment on that.
MS. SHAH: Okay.
THE WITNESS: I do like the use of the word "rich." I did like that.
BY MS. SHAH:
Q How about ironic?
Do you see any irony here?
MS. SHAPIRO: Objection.
THE WITNESS: It's okay. Is that a question?
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q That is a question.
A My answer is still the same.
Q Okay. Wayfarer has asserted damages against Jonesworks and Stephanie Jones in this case, correct?
A Correct.
Q What is your understanding of the damages that Wayfarer is seeking from Stephanie Jones?
A We are working with an expert, and I



don't have that information myself.
Q Okay.
THE WITNESS: Bless you.
THE STENOGRAPHIC REPORTER: Thank you.
BY MS. SHAH:
Q If I give you a document that is long, are you going to want to read the whole thing or can I point you to a specific paragraph and ask you a question?
MS. SHAPIRO: Objection.
THE WITNESS: I think that's a fair question. And I respect it. And I don't want to play games so I'm not going to just read something just to screw with you. I am not going to do that. But I cannot promise that I don't need to read enough for me to feel comfortable and safe.
BY MS. SHAH:
Q That is fair.
Are you aware that Wayfarer has submitted disclosures to us in this case that lay out its theory of damages?
A Am I aware that my attorneys --
Q Yes.
A -- gave you what? Say it again.
Q Disclosures in this case. Like written



disclosures about certain things, including Wayfarer's theory of damages.
A Probably. But there is a lot of terms that are lost in my mind.
Q Sure. I will represent to you that we have disclosures from your attorneys.
A Great, thank you.
Q That among other things, talk about Wayfarer's damages. Okay?
A Okay.
Q Those disclosures say in part that as a result of the Jones' parties wrongful actions, Wayfarer has suffered and is seeking recovery for damages resulting from lost business, harm to relationships likely to lead to future economic advantage and reputational harm. Okay?
A Okay.
Q Can you tell me what lost business Wayfarer has suffered as a result of the Jones parties" wrongful actions?
A Really?
Q Yeah.
A I believe that, as we allege, that these communications that were confidential, that has ultimately led to an incredibly -- incredible amount

CONFIDENTIAL

Page 282

of damaged reputation. In our business, you know, reputation is one of the ways that you work, which allows for more business. We have lost a lot of business. We've lost projects that are -- were incredibly important. And all of this stuff has led to that, to the loss of this.

Q What project specifically?

A Can I name those?

MS. SHAH: Do you want to go on AEO?

MS. SHAPIRO: Yes.

MS. SHAH: There may not be anyone else here. Justin can stay.

We can mark it as AEO. I think all of those are attorneys.

THE VIDEOGRAPHER: Jason, Lindsey, and Matthew.

MS. SHAH: They're attorneys.

THE A/V TECHNICIAN: The only new person we have on right now is Ms. Strasberg.

THE VIDEOGRAPHER: She's fine.

MS. SHAH: Okay. Happy to mark this AEO. I understand that you agree that Justin can stay in the room?

(The following testimony is designated Attorneys' Eyes Only.)

Page 283

MS. SHAPIRO: Yes.

BY MS. SHAH:

Q Okay. Yeah. Which projects?

A Okay. We can start with one. Pac-Man.

Q Okay.

A We had spent the last three years developing. We had the rights to the property, Pac-man, the IP, which belongs to Bandai Namco. We had spent quite a bit of money in development. We were just about to go out to the market with a -- when I say this, I don't say this lightly. This is a company's dreams to land IP like this.

And as a result of this, we lost it. And we were just -- the doors were just -- not the doors. All the work we had done was just about to come to fruition. And as a result, we lost that.

Q What do you mean when you say you've lost it?

A Because of what we are going through, they have pulled the project from us.

Q Who has?

A Bandai Namco.

Q And what do you mean when you say "pulled the project from you"?

A Ended our contract.

Page 284

Q Did you have a written contract?

A Yes.

Q Signed?

A Yes.

Q Have you produced it in this case?

A Anything that should be produced, I leave to the attorneys. I don't know.

Q Okay. When you say they pulled the project as a result of all this, what do you mean by "all this"?

A This lawsuit.

Q Okay.

A These allegations.

Q Okay. How did they communicate that to you?

A First, I believe on Zoom.

Q I mean, what did they say to you?

A Sorry.

Q Sorry.

A It's okay. That they were concerned -- this was the steps. This was a few steps.

Q Sure. Tell me all of it, if you would.

A We've had an incredible relationship with them for over the years. Then they had some concern that the allegations themselves and what was being

Page 285

said would hurt their brand.

Q Which allegations?

A The allegations of sexual harassment and retaliation.

Q Okay. So they communicated that to you --

A Correct.

Q -- as a reason they were pulling the project?

A Initially, no. Initially was they raised the concern.

Q Okay.

A Over the next couple months from that time, so this would have been back in January.

Q Of 2025?

A Correct.

Q Okay.

A I was trying to think if it was possibly the end of '24, but I believe it was January so let's just call it December, January.

They expressed their concern. I thought it was reasonable that they would want to have a conversation about this. They didn't really lay any groundwork to begin with, but they wanted to let us know they were concerned and get some information.

CONFIDENTIAL

Page 286

We had said we need to just take a breath for a minute and see what's happening. I believe this was -- I don't remember. I can't remember. I would just be guessing, but sometime in January.
Q Okay.
A Which then led to over the months, us having further communications and them eventually saying that they have decided that while they appreciate us and the work we've done, that they would need to sever our ties.
Q Because of what reason?
A Because of the allegations of sexual harassment and retaliation.
Q Okay. What other projects?
A That's the big one. And then many others that I cannot think of the names of these. But just because I just can't recall them right now.
We have movies that come in all the time. We had -- and I wish, and then I'm going to regret this in a few minutes because I'm going to be like, oh, I didn't name this one or this one. So I don't know how this works. I will talk to the attorneys, but I'm happy to provide a list of them.
Q Thank you. Can you give me your best recollection today of those other projects?

Page 287

A Oh, I think I just mentioned that right now.
Q Even if you don't have names.
A Okay.
Q Anything about them that would help me identify them or anything you can remember about other projects that you contend you've lost as a result of this?
A I'm going to state again, I'm going to regret it, but if you ask me my kids' names right now, I couldn't remember them. It's not -- and I promise you, I'm not playing games with you. We have so many projects that we do. Development and production. And for me to think of these right now, they're escaping me.
Q Okay. Can you tell me with specificity what was communicated to you about the reason you lost those other projects, and by whom?
A Well, let me just give you generally since I'm not recalling the projects.
Q Uh huh.
A There is different stages that you have. Things in development, you have things that we have investments in, things that we can invest in money wise, that, obviously, lead to the same thing. And

Page 288

new-coming projects that come in. You get 100 knocks on your door a week and then it goes down to five.
So there are also projected projects that were coming in, especially off a successful year for many reasons; not just It Ends with Us. Those calls stopped coming in. Projects that we had that were ready for us to invest in development, hoping to get into production, essentially with the same reason that Bandai, that there was too much heat around your name with these allegations and we're not comfortable to move forward working with us.
Q Do you recall, at least with respect to some of those projects, it being actually communicated to you that there's too much heat around you with respect to the allegations of sexual harassment and retaliation?
A The "heat" term is mine.
Q That they determined not to have moved forward with those projects?
MS. SHAPIRO: Objection.
THE WITNESS: Yes.
BY MS. SHAH:
Q Okay.
A Not only that. As a result, losing our

Page 289

positioning with WME. Not necessarily only Justin as an artist, but representing Wayfarer. Which is where a lot of the projects would come from. That faucet was shut off as a result of them dropping us. And the projects that were coming in through that faucet were also opportunities that were no longer there.
Q Okay. Apart from projects that were in some stage of development already with you, in terms of your expectation of incoming calls, was it ever communicated to you with respect to the lessening of any incoming calls that the reason communicated to you -- that the reason that the calls were not coming was allegations surrounding -- was the issues surrounding the allegations of sexual harassment and retaliation?
MS. SHAPIRO: Objection.
THE WITNESS: Well, I can answer that with this. If you're getting 100 calls a week and the 95 don't come, then you can't get from the 95 why they're not calling. But I think it's a fair reasoning that if all of a sudden that stops, and there's an event that happens, that you tie them together. So aside from the actual concrete ones that I can say that we've lost, and then the

incoming would be -- it's a hard question to ask when you do that.

BY MS. SHAH:

Q Okay.

A Answer -- it's a hard question to answer is what I mean.

Q Sure. And Wayfarer has also alleged harm to relationships likely to lead to future economic advantage and reputational harm.

A Yeah.

Q Describe to me the reputational harm and harm to relationships likely to lead to future economic advantage that you are contending Wayfarer lost as a result of Ms. Jones and Jonesworks' actions.

MS. SHAPIRO: Objection.

THE WITNESS: While our industry is big in one regard, it's really small. So other producers, writers, people that we build projects on, other studios and distributors, it has been very hard to get them to return calls.

There was a moment -- well, still where it was impossible for our Head of Physical -- not Head of Physical, our President of Production Development at Wayfarer to get meetings to continue



anything that was going on. So simply because of what we were going through. And that has ripple effects.

BY MS. SHAH:

Q Do you think the same reputational impacts and implications that you are experiencing in your industry also hold true for the PR, entertainment PR industry?

MS. SHAPIRO: Objection.

THE WITNESS: I think your question is do I -- if I'm giving you my reason for Wayfarer and for Justin, is that applicable to others as well -- I'm starting to lose my voice -- to others as well in other fields?

BY MS. SHAH:

Q Uh-huh.

A I couldn't argue against that.

Q Okay.

A Water here?

Q Do you want any?

A Yes, I do. Please.

Q Holding out on you.

A Thank you very much.

Q Are you aware that Wayfarer is asserting no less than $8 million in such damages as a result



of Jonesworks' and Ms. Jones' conduct?

A I am aware.

Q Okay. Does that number sound right to you?

A In what context? I mean, do I know that that's what we're asserting?

Q Uh huh.

A Yes.

Q Okay. What is to your understanding the basis for quantifying and asserting damages of that number, $8 million?

MS. SHAPIRO: Objection.

THE WITNESS: I would have to defer to the experts on this one.

MS. SHAH: Okay. Handing you what's been marked as Exhibit 37. It is a text conversation bearing the dates August 17th to August 18th, 2024. Bates-stamped KCASE, several zeroes, 369.

(Exhibit 37 marked for identification.)

THE WITNESS: I'm not on this, to be clear?

BY MS. SHAH:

Q I don't believe so.

A Okay. Thank you. I just -- it's helpful for any to have that.



Is this the one that you had said, will I read all the way through?

Q No. That one was longer. You can read this, but I will focus you on the last two pages.

A Okay.

MS. SHAH: Oh, and we can go off AEO to the extent that that was not clear on the transcript.

(End of the Attorneys' Eyes Only designation of the testimony.)

THE WITNESS: Okay.

BY MS. SHAH:

Q Okay.

A I might have to reread it, whoever you bring, but --

Q Sure.

A -- I kind of do it -- I try to do it quickly.

Q Sure. Thank you.

Look for me at the page marked 372. It's the second from the last.

A Okay.

Q At Jen Abel's text at the bottom of the page at 1:13 a.m., she writes:

(As read):

"So this girl is claiming that Justin invited her up to his hotel room years ago. I didn't want to share the vid but Mitz did a screen record and this is her account so you guys can look at it. Part of me wants Will, his former assistant, to comment and say this never happened. Ridiculous." And then there's an attachment.

Do you see that?

A I do.

Q Do you have any understanding of what this is about?

A Do I know what this is referring to?

Q Yes.

A I do.

Q Okay. What?

A Some video of a young girl -- young woman, forgive me. She was young, maybe in college or something, who did a video who appeared to be intoxicated to some sort, claiming that Justin invited her up to his -- to his room.

Q Have you seen the video?

A I saw it.

Q How did you see it?



A I don't remember. I don't recall how I saw it. I just remember seeing it.

Q Did someone send it to you?

A I don't know.

Q Or did they show it to you on their phone?

A I don't know.

Q Okay.

A This would have been -- this is back when this is -- I don't know when this communication is in, but I don't know.

Q Do you think you saw it around the time of this communication when it was first flagged?

A Maybe.

Q Okay.

Did you tell Justin about this?

A I don't have a memory of it, but I probably did. I mean, this was -- this wasn't anything that I was afraid of.

Q Okay. Did Wayfarer ever send a cease and desist to this woman?

A I don't know. I don't recall.

Q It's possible?

MS. SHAPIRO: Objection.

THE WITNESS: I don't have a memory of



it.

BY MS. SHAH:

Q You don't have a memory one way or another?

A I don't.

Q Okay. If you flip the page, at 11:30 a.m., Breanna Butler says:

(As read):

"Let us chat to Jed as well on this."

Do you see that?

A I do.

Q Were you aware that TAG was raising this video with Jed Wallace?

MS. SHAPIRO: Objection.

THE WITNESS: I don't recall.

BY MS. SHAH:

Q It's possible?

MS. SHAPIRO: Objection.

THE WITNESS: I don't -- I don't recall.

MR. GLOVER: Objection. Form.

BY MS. SHAH:

Q Okay. Do you have any understanding of why TAG would be raising this video with Jed Wallace?

MS. SHAPIRO: Objection.



MR. GLOVER: Objection to form.

THE WITNESS: Well, I mean, I could do simple math.

BY MS. SHAH:

Q Tell me.

A He's monitoring, looking at everything that's going on, trying to get a temperature of what is happening in the world. If he hadn't seen this, wasn't aware of it, this would be important for him to know about, I imagine. Now, I'm speculating, but that seems reasonable to me.

Q Why would it be important for him to know about?

MS. SHAPIRO: Objection.

MR. GLOVER: Objection. Form.

THE WITNESS: Because from what I understood, his role is that he was in support of crisis, monitoring and having his pulse on the temperature of what was happening in the world. And if this is what's happening out in the world as it pertains to Justin, it would be good for him to know.

BY MS. SHAH:

Q Okay. In text below that from Breanna Butler at 1:44 p.m., she says:

CONFIDENTIAL

Page 298

(As read):
"Positive videos being boosted."
Do you see that?
A I do.
Q What do you understand "being boosted" means?
A I think -- in my mind, I don't know. This is, again, I think I said yesterday it's kind of like code to me. I don't understand code. My son builds games and has code. I have no idea what it means. And he's -- and he's nine.
But boosted in this sense meant to me, and I've used this analogy, and this is the only way I can think of it. If you post something on Facebook years ago, and you want a lot of people to see it, it would say "boost this," and you could click it and spend a dollar and it would be on more feeds than normal. That to me is what I would imagine a boost would be. How do I get more eyes to see something that's up there?
Q Okay. And so from this where Ms. Butler says "positive videos being boosted," you understood that to mean that positive videos about Justin were being boosted, right?
A Well, I'm not on this so I don't know

Page 299

what this was.
Q I'm just asking for your best understanding. When she says, "positive videos being boosted," do you understand the mean -- that to mean she's talking about positive videos of Justin being boosted, right?
MS. SHAPIRO: Objection.
THE WITNESS: I would speculate. I'm sorry, I'm not trying to be nuanced in the weeds, but I don't know. I mean, it -- could it be that it's about something you press the dollar sign to get it on more -- on more feeds, or is it like they are boosted? I don't know. I'm just speculating.
BY MS. SHAH:
Q Okay. But we are talking about videos that are like relevant to Wayfarer and Justin, right?
A We are.
Q Okay. Then, she goes on to say:
(As read):
"The crazy Charlotte gal."
Do you understand that the woman in the video, her name was Charlotte Poole, did you know that?
A I did not know that.

Page 300

Q Okay.
A Or if I did, I forgot it.
Q Okay.
(As read):
"The crazy Charlotte gal," comma, "team said it actually works in our favor to have negative comments below post. Already now she's getting slammed, so they'll work with that to elevate how ridiculous/false story is while keeping watch to make sure it doesn't spiral more."
Do you see that?
A I do.
Q What do you understand it to mean that the team will "work with that to elevate how ridiculous and false the story is"?
A No idea.
Q What does "elevate" mean to you?
A Elevate, to raise from one level to another.
Q Make higher, make better?
MS. SHAPIRO: Objection.
THE WITNESS: I think that would be included in elevated, sure.

Page 301

BY MS. SHAH:
Q Okay. Did you have an understanding that the TAG team and Jed Wallace were working to elevate how ridiculous and false Charlotte Pole's story was?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: Say that again, please.
BY MS. SHAH:
Q Did you have an understanding that the TAG team and Jed Wallace were working to elevate how ridiculous and false Charlotte Pole's story was?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I have no knowledge of that.
BY MS. SHAH:
Q Okay. No reason to dispute it?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I have no knowledge of it.
BY MS. SHAH:
Q One way or another?
MR. GLOVER: Objection. Form.
THE WITNESS: I have no knowledge of it.

CONFIDENTIAL

Page 302

BY MS. SHAH:
Q Okay.
A But I like your follow-up questions.
MS. SHAH: How much time is left?
THE VIDEOGRAPHER: Forty-nine. Six hours and 11 minutes.
THE WITNESS: You want two more hours?
MS. SHAH: We're at 49?
THE WITNESS: Would you like a nine-hour deposition?
MS. SHAH: I don't think we'll need that today.
THE WITNESS: Okay. Good. I don't want to give it to you. I'm just asking if you'd like it. Here. There you go. I'm just trying to keep myself alive.
MS. SHAH: I hear you.
THE WITNESS: So I'm only bantering for -- I do need to potty. Is that okay?
MS. SHAH: Let's take a -- yes.
THE WITNESS: I can go by myself if you'd like really quickly.
MS. SHAH: It's totally fine. Let's take a break. Let's go off the record.
THE VIDEOGRAPHER: We are going off the

Page 303

record. The time is 5:32 p.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record. The time is 5:51 p.m.
BY MS. SHAH:
Q So Mr. Heath, before the break, recall we were discussing a video on Instagram featuring a woman named Charlotte Pole. And I had asked you if you knew whether Wayfarer had sent a cease and desist to Charlotte Pole?
A Right.
Q I am going to ask it a bit of a different way now, which is, do you know if any cease and desist letter was ever sent to Charlotte Pole?
A I don't -- I don't know.
MS. SHAH: I'm going to show you what's been marked as Exhibit 38.
(Exhibit 38 marked for identification.)
THE WITNESS: Thank you.
BY MS. SHAH:
Q This is an email thread dated August 7th, 2024, with the Bates stamp HEATH_000028187.
A Okay.
Q This is an email that you're included on

Page 304

with a number of people from TAG and Jennifer Abel, discussing what looks to be a statement of work for potential social, digital mitigation and remediation.
Do you see this?
A I do.
Q Okay. And you received this email, correct?
A I see that I'm on the -- that I received it, so yes, my -- I received it.
Q Okay. And it says:
(As read):
"Following up on the social/digital conversation this morning, with specifics re: social and digital mitigation and remediation."
Do you see that?
A I do.
Q Do you have a recollection of being on a conversation the morning of August 7th, 2024 with respect to social and digital efforts?
A I don't have a particular memory.
Q Do you have a general memory?
A I have a general memory that I would have conversations with TAG, but not this particular one.

Page 305

Q Okay. Do you have general memory of having conversations with TAG about social and digital mitigation and remediation efforts?
A Yeah.
Q Okay. Can you tell me your recollection of those conversations?
A I remember learning that they needed support. Again, I don't know exactly what that meant. We hired someone to be in charge of -- of PR crisis, so if they needed support, it was just, sure, what do you need? Excuse me. So I remember having conversations like that. At some point, when I learned that they wanted to bring on Jed, they were working out whatever details that meant, and then they would report to me, essentially, what this would cost, things of that nature.
Q Okay. And do you recall having any conversations with TAG or Jed about what the social and digital services would be?
A Say that again?
Q Do you recall having any conversations with either TAG or Jed Wallace about what the social and digital services would be?
A Not specifically. Generally, I understood, as I had said, that he was being brought

on to monitor the digital realm. And I mean, that's really what I knew.
Q You understood that "social" meant social media, right?
A Sure.
Q Okay. And if you look at Katie Case's email, the first sentence, she says:
(As read):
"Following up on the social/digital conversation this morning, with specifics re: social and digital mitigation and remediation."
What do you understand social and digital mitigation and remediation to mean?
A I don't think I gave that mind, other than -- and on this particular document, I have no recollection of seeing this. But looking at social/digital mitigation, remediation, if I ever heard those terms at that time, it just would mean to me in the world of their -- their crisis PR.
Q Mitigation means to make lesser, right?
MS. SHAPIRO: Objection.
THE WITNESS: I'm only pausing because I'm thinking about the definition and what it includes. I think that's one of the term -- terms.



I think it can also mean to manage. But I don't want to nitpick. I think that's a fair understanding from -- from -- in most circumstances.
BY MS. SHAH:
Q Okay. And remediation means to make better, right?
MR. GLOVER: Objection. Form.
THE WITNESS: Yeah.
BY MS. SHAH:
Q Okay.
A I'm not willing any -- winning any spelling bees, but...
Q This isn't a spelling test.
A Or not spelling bee, but definition contest. But I believe so. I would understand that to mean that, generally.
Q And then it goes on to say:
(As read):
"The team will focus on the social and digital elements, boosting SEO efforts, and updating with new content to enforce SEO efforts."
Let's stop there.
A Okay.
Q What do you understand "boosting SEO



efforts" to mean?
A I don't know if -- what I knew at the time. I think I've learned that boosting SEO means search engine, something.
Q Optimization?
A There you go. And from what I understand in layman's terms is, you have a business, you want to search for it, it comes tenth. How do you make it so it's on the top three so that people see your business? Something like that.
Q And when it says, "updating with new content to enforce SEO efforts," do you have an understanding what that means?
A I don't.
Q Okay. Do you understand that you can update or create digital webpages in order to help make SEO efforts more prominent? For example, if you create more web pages that have certain content, then when people search for things on Google, it essentially boosts that search result?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
BY MS. SHAH:
Q Do you understand that?
MS. SHAPIRO: Objection.



THE WITNESS: I want to say I will take your word for it because I don't know.
BY MS. SHAH:
Q Okay. You don't have any understanding of that in general terms?
A I don't.
Q Okay.
A And all these years, I thought I was like technologically capable.
Q So you don't know one way or another whether that kind of thing is what is being referred to here?
A I don't.
MR. GLOVER: Objection. Form.
BY MS. SHAH:
Q And then it goes on to say:
(As read):
"Monitoring and directly influencing forums that are working against Justin and Wayfarer to adjust the narrative in real-time."
Do you see that?
A I do.
Q Did you have an understanding that that was something that the TAG team and Jed Wallace were

CONFIDENTIAL

Page 310

doing on Wayfarer and Justin's behalf?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I did not. And also, sorry, but to be clear, I don't recall ever seeing this, so I did not have an understanding of something I don't recall seeing. But if you are asking me if I understand it now, I don't know that anyone engaged in this or not. I don't know.
BY MS. SHAH:
Q Okay.
You would agree with me that, "Directly influencing forums that are working against Justin and Wayfarer to adjust the narrative in real-time," is something different than monitoring, right?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: (Witness reading the exhibit.)
I would agree that the word "influencing," just in general terms, is a bit different than maybe simply monitoring. But I don't know how that is applicable in the case of -- I don't know how that's applicable necessarily.

Page 311

BY MS. SHAH:
Q And you would agree with me that monitoring is a passive observation, and directly influencing to a Justin narrative in real-time is active participation; that's one way they are different, right?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: I don't know.
BY MS. SHAH:
Q You don't know?
A I don't. Again, I'm trying to not be a stickler for words, because there's always nuance to everything. I don't know. I don't know if -- let me say this: Did I -- do I think that when someone's monitoring, that simply just means only looking and looking around? I have ADT security, and they monitor. But in their monitoring, they also will call the police if they see something because of their monitoring. That's included in monitoring. So I only say that to say that, I don't know if monitor just means to simply just watch. It might require some sort of action that's under the realm of monitoring.
Q Okay.

Page 312

A Please don't tell anyone I have ADT security.
Q We can designate that part AEO.
A Thank you.
Q And then it goes on to say:
(As read):
"And collate assets and background to work in conjunction with Jen and her team as well as TAG PR."
Do you see that?
A I do.
(As read):
"And collate assets and background to work in conjunction with Jen and her team."
Okay.
Q Do you have an understanding of what "collate assets and background" means?
A I don't.
Q Okay.
A Even to this moment when I'm looking at it, I cannot.
Q Then it goes on to say:
(As read):
"The integral part here is to execute

Page 313

all without fingerprints."
Do you see that?
A I do.
Q And you understand that when they say "without fingerprints," they mean so that you cannot discover who is responsible for it, right?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I would be speculating, so I don't know.
BY MS. SHAH:
Q What does it mean to you to do something without fingerprints?
A Look, I -- I would just be pointlessly getting into a back and forth with you. I understand that what that could imply. I don't know what that means, though.
Q Okay. And what is your understanding about what this could imply?
MR. GLOVER: Objection. Form.
THE WITNESS: To do something without fingerprints would mean without leaving behind fingerprints, so that someone may not know that you are involved in it. I can see that what you're saying, but I don't know how that's applicable

CONFIDENTIAL

Page 314

necessarily.
BY MS. SHAH:
Q Okay.
A But as a standalone sentence, I see that.
Q Sure.
And then there's a bulleted list of items under the heading "Specific Efforts Include."
Do you see that?
A I do.
Q Do you understand that these were among the services that Jed Wallace was to provide to Wayfarer and Mr. Baldoni?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: Say that again? Do I understand that these were the services?
BY MS. SHAH:
Q That Jed Wallace was to provide for Wayfarer and Mr. Baldoni?
MR. GLOVER: Objection. Form.
THE WITNESS: I did not understand that these were the services.
BY MS. SHAH:
Q Do you disagree that these were the services or you just don't know one way or another?

Page 315

MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: I disagree that these were the services that I was aware of, or that I approved of, or that I gave instruction to.
BY MS. SHAH:
Q Okay. Which ones of these are outside of the services that you approved of?
A Well, I didn't see this list or didn't respond to this list, so I can't speak to it in an itemized way. Only again, to just reiterate one thing, my conversation with anybody was what I expected everyone to do. And some of these would have -- had I seen this, I would have said, yeah, this is a menu of items. I don't need all of these menu of items. No, thank you. Thank you for sharing what is on your menu. And so you want me to go through each one and say what I would say "no, thank you" to?
Q Yes.
A Huh?
Q Yeah.
A At least the way I understand them. I might ask for clarity, because I don't know, but:
(As read):

Page 316

"Monitor and report forums, threads, sites, and more."
I'd say that makes sense. Okay.
Q So that's a yes?
A I would say yes --
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.
THE WITNESS: -- to the -- to the general understanding of it.
BY MS. SHAH:
Q Okay.
A Right? But I didn't see this so this conversation didn't happen.
Q Okay.
A (As read):
"Justin and the overall narrative as well as derogatory comments."
I don't know what that means. So I -- I would probably ask for clarity.
(As read):
"Leverage relationships with Discord, Reddit, to expose behavior of Blake and other parties both current and past and engage directly with communities to adjust or influence conversations taking place in real-time."

Page 317

"Leverage relationships," I would -- this would be a big flag for me. I'd be like, what does that mean? So I would definitely need clarity on that one. Because as a statement in itself, it wouldn't feel like something I would approve.
(As read):
"Utilize CTR manipulation. Change subject matter opinion on first page of Google."
I mean, I can go through each one. I'm looking as I'm reading. I would probably need clarity on each one of these.
Q Okay.
A Work to remove links that are harmful to Wayfarer Studios. I would want clarity on that. Is that -- you know, I think that's within general scope if -- if I have a friend who is a celebrity, and they took movies of hers in the past and put still images of her nude and posted them everywhere. And they worked to take these harmful things down. That was certainly within her legal right. And I would just want to understand like those things seem reasonable to me. And...
(Witness reading exhibit.)

CONFIDENTIAL

Page 318

You know what? I don't understand what these things mean.

(Witness reading exhibit.)

My question would be, what does that mean to sway an algorithm? If this is something that we're actively doing that's harmful to another, don't f'ing do that.

"Taking down full Reddit and also social accounts as needed." Again, you put a nude photo of someone from a movie and put it out there and you -- it's within your understandable right to take something like that down. That seems -- I would be like that seems reasonable, but I don't know.

(Witness reading exhibit.)

Organically engaging. "Changing the overall narrative and helping keep it on track."

The last one:

(Witness reading exhibit.)

Yeah, so I'm sorry it took so long to go through it, but --

Q It's all right.

A -- we did agree that we would. There's a lot of this that I would have questions to. But I can tell you this, if I see this right now and someone says, do I have permission to move ahead, my

Page 319

answer would be absolutely not.

Q Okay.

A Stop in your tracks. I need to understand this. This does not feel like anything that I'm comfortable with without full clarity. And that conversation didn't happen based on this document.

Q Okay. And because you don't remember reading this list at the time or having a further conversation about it, you don't know one way or another whether this list is, in fact, what TAG instructed Jed Wallace to do, correct?

MR. GLOVER: Objection. Form.

MS. SHAPIRO: Objection.

THE WITNESS: I can't know something I don't know. But I will tell you this, if anyone instructed anybody to do this, it would have been a big problem.

BY MS. SHAH:

Q Okay.

A So I never approved this. We never would have. And nor do I believe that this is what anyone did because I gave clear instruction over and over again of what I expected people to do and not do, without necessarily looking at this, just as an

Page 320

overall theme and message.

Q Okay.

A And I say that on my kids. It is not how I can live in the world.

Q There's been a lot of social media influencer and content creator posting on the Internet since these litigations have started. Are you aware of that?

A There's a lot.

Q Yes. Is Wayfarer paying any social media influencers to post content in relation to these litigations or subject matter?

MS. SHAPIRO: Objection.

THE WITNESS: Easy. Never. Absolutely not.

BY MS. SHAH:

Q Is Wayfarer paying any content creators to post content in relation to these litigations or subject matter?

A Easy. Absolutely not.

Q Okay. Is Wayfarer using any bots to influence the social media discourse in relation to this litigation or the subject matter?

A Okay. I'm going to change my answer to this. Easy. Absolutely not. I would never approve

Page 321

that.

Q Okay.

A And nor do I have any belief to think that anyone is doing otherwise.

Q Okay. If you look at the email at the top of the page, Jen Abel writes back to Katie Case:

(As read):

"Thanks, Katie. Just for clarity so we understand, does this cover your initial fee plus what we discussed in terms of social media mitigation and proactive fan posting to counter the narrative, or is this in addition to the 15K previously agreed upon fee for TAG and does not include what we discussed with MN earlier regarding social manipulation?"

Do you see that?

A I do.

Q What do you understand "social manipulation" to be?

A I don't have an understanding.

Q What do you understand the word "manipulation" to mean?

A Fair question. To manipulate would be to

CONFIDENTIAL

Page 322

change something from one stage to another in some capacity. Did I pass that test?
Q We'll find out later.
A Okay.
Q Do you have any knowledge of whether Jen Abel discussed social manipulation with Melissa Nathan in advance of this email?
A Do I have any knowledge that Jen Abel spoke to Melissa Nathan about social manipulation in advance of this coming?
Q Uh-huh.
A I have no knowledge.
Q Okay. You don't know one way or another?
A I don't have any recollection of anything of that.
Q Okay.
A Unless you remind me of some -- something I'm missing.
Q It's correct that -- well, it looks like the estimated fee for these services that are listed out below is $30,000.
Do you see that?
MS. SHAPIRO: Objection.
THE WITNESS: I do.

Page 323

BY MS. SHAH:
Q Did Wayfarer, in fact, pay Jed Wallace $30,000 a month for his services once he was engaged?
A We did.
Q Over the course of Wayfarer's relationship with Jonesworks, it paid Jonesworks $20,000 a month, correct, for publicity?
MS. SHAPIRO: Objection.
THE WITNESS: It was 25 for both.
BY MS. SHAH:
Q Twenty-five for both --
A Correct.
Q -- Baldoni and Wayfarer, correct?
A Correct.
Q And when you brought on TAG, what was TAG's monthly retainer fee?
A Fifteen, I believe.
Q What do you believe Jed Wallace was doing for Wayfarer at this time that was worth double the fee that Wayfarer was paying to Melissa Nathan?
MS. SHAPIRO: Objection.
THE WITNESS: I don't know how to answer that beyond I overpaid all the time for things. I just had an editor do something, and he charged

Page 324

three times as much as the previous editor. Depending upon the time, you call a plumber in the middle of the night versus in the middle of the day, they charge more. So I don't know. You have particular fees, someone else has particular fees, and you determine for yourself what you're worth. So this is what he came with. Maybe I got scammed; maybe I didn't. At that point, I wasn't thinking about that.
MS. SHAH: Okay. I'm going to show you what's been marked as Exhibit 39.
MS. SHAPIRO: Can I just -- for clarification, was that last answer on behalf of you, Jamey Heath, or on behalf of Wayfarer?
THE WITNESS: That was on behalf of me, from my understanding.
MS. SHAH: Counsel, I --
THE WITNESS: Okay. I'm sorry I responded.
MS. SHAH: -- we would appreciate just an objection. Although, I realize I did ask you to object just on that basis. So...
MS. SHAPIRO: You did.
This is the -- the question about -- I was referring to the answer relating to the -- what

Page 325

he -- what they were paying for.
MS. SHAH: Yeah.
MS. SHAPIRO: -- and whether it was worth it, et cetera.
MS. SHAH: Yeah. All right. Well, okay.
So let me ask that again then.
BY MS. SHAH:
Q Wayfarer is the one that paid Jed Wallace $30,000 a month, right?
A Correct.
Q And Wayfarer is the one that paid TAG $15,000 a month, right?
A Correct.
Q So as CEO of Wayfarer and as Wayfarer's corporate designee, what is your understanding of what Jed Wallace was doing that was worth double the fee that Melissa Nathan was being paid?
MS. SHAPIRO: Objection.
MR. GLOVER: Objection. Form.
THE WITNESS: That's what he charged.
BY MS. SHAH:
Q And you just accepted it?
A Oftentimes, I do.
Q Okay.
A And if you look -- sorry, I know you

CONFIDENTIAL

Page 326

maybe do not want commentary. If you look at what I pay people, if you looked at all of my emails with everything, I most of the time overpay people because I think people need to be valued for their worth.

MS. SHAH: Okay. I'm going to hand you what's been marked as Exhibit 39. It's a text thread dated August 18th, 2024.

(Exhibit 39 marked for identification.)

THE WITNESS: Okay. Am I on this one?

BY MS. SHAH:

Q I'm looking. I don't believe so.
A Okay.
Q Oh, you are.
A I am on it.
Q Yeah, you are.
A Okay.
Q It's between you and Justin and a bunch of people from TAG, and Jennifer Abel and Matthew Mitchell. Bates-stamped JONESWORKS_00014718.
A May I read this?
Q Yes, please. Although, I'm going to focus you on the first three pages.
A Okay.
Q This appears to be a thread, at least at

Page 327

the beginning, where Mr. Baldoni is sending social media posts and asking the digital team to boost them online, right?
A He is saying to boost. I see that, to boost.
Q Okay.
A I see that.
Q And if you flip to the page ending in 720, Mr. Baldoni says, among other things:
(As read):
"I really don't want bots defending me as it feeds into their potential narrative."
Do you see that?
A What time? I'm so sorry, I thought you were --
Q Oh, that's all right. It's the -- it's the first text at the top. It looks like it is at --
A The first text, it says --
Q You'll have to -- you'll have to flip the page back one --
A Oh, I see.
Q -- to see. It's a text from Mr. Baldoni, timestamped 6:02. And then if you -- you have to

Page 328

flip the page to see the content.
A It starts with "Hey, TAG team"?
Q Yes.
A Yes, okay.
Q So he says:
(As read):
"I really don't want bots defending me as it feeds into their potential narrative."
A Correct.
Q Was that the reason that Wayfarer did not want to use bots?

MS. SHAPIRO: Objection.

THE WITNESS: Well, can I read his whole text?

BY MS. SHAH:

Q Yeah.
A Because it's saying:
(As read):
"I've been seeing some IG comments on random posts defending me by people who are -- who are private with no followers and they feel like bots. Can you please confirm we are not doing any of that? I really don't want bots

Page 329

defending me as it feeds into their potential narrative."
I think this is further confirmation that we were -- did not want to do anything of this nature.
Q Right.
A And by asking them, because he's saying that, is like, we just want to be sure that we're clear. That's how I read that.
Q Okay. And my question to you is: Is it your understanding that you didn't want to be doing anything of that nature because it fed into Blake Lively's potential narrative?

MS. SHAPIRO: Objection.

THE WITNESS: No, that was not the reason. I think, in this particular thing, he might state that. But the whole context of this is saying he doesn't want to be doing that. And also, I don't -- I don't want to do something because it's not okay to do. And also, if anything like that were to ever happen, they could suggest that we're doing that.

So I think it's twofold.

BY MS. SHAH:

Q Okay. And then Melissa Nathan responds:

(As read):
"I can fully, fully confirm we do not have bots. This is also not" -- "this is not also what we do. Bots look fake to anyone."
And then she says:
(As read):
"The other team is doing something very specific in terms of what they do. I know Jamey and Jed connected on this."
Do you see that?
A I do.
Q What did you and Jed connect on in relation to this?
A About this very thing.
Q And what was that?
A Hey, Jed, there's nothing fishy happening, right? Nobody's doing anything that I haven't said? Absolutely not. Of course, not. We don't do this kind of stuff. Okay. I just want to be sure. Which is what I do all the time with people, even when -- it's not because I don't trust people. I just know human nature sometimes can -- needs to be reminded. So I think that's what she was talking about.



Q Is it your testimony that you have a recollection of a conversation you had with Jed Wallace where you said, hey, I just want to make sure you're not doing anything fishy?
MS. SHAPIRO: Objection.
THE WITNESS: No.
BY MS. SHAH:
Q In sum or substance?
A Thank you. I -- that's -- I'm not quoting.
Q Yes, I understand.
A But yes, I remember having a conversation, as I did with everybody, constantly reminding of that. And if I saw something and I had a question -- because sometimes your brain can go like, dang, there's a lot of this stuff out there. What the heck? I know it's not happening. But I just need sometimes confirmation over and over again. Sometimes I would do that.
Q Okay. So you called Jed to ask him about that; is that right?
MS. SHAPIRO: Objection.
THE WITNESS: I don't remember who called who. I don't remember how it happened. I just know that there was a -- a connection on that. I



remember having -- asking for clarity.
BY MS. SHAH:
Q Do you remember whether it was a phone conversation or some sort of written communication?
MR. GLOVER: Objection. Form.
THE WITNESS: I don't. I don't recall.
BY MS. SHAH:
Q You don't --
A I -- I imagine it was a phone call, but I don't know for sure.
Q Okay. So you don't have a specific recollection of a phone call where you said this to him?
A No, I just have a specific recollection of inquiring and stating -- restating.
Q Okay. It says:
(As read):
"The other team is doing something very specific in terms of what they do. I know Jamey and Jed connected on this."
Did you connect with Jed on what his team was doing that was something very specific that his team does?
MR. GLOVER: Objection. Form.
MS. SHAPIRO: Objection.



THE WITNESS: I don't read that that way.
(As read):
"I can fully confirm we do not have bots. This is not also what we do. Bots look fake to anyone."
The other team -- I could be wrong, but I read this as the other team, as in Blake Lively, is doing something very specific in terms of what they do. "I know Jamey and Jed connected on this." I don't know. That's how I read it. But this is from Melissa. I just don't know.
BY MS. SHAH:
Q Okay. You can put that document to the side.
A Okay. People don't like it when I speculate, but I -- I -- I don't -- I'm not...
Q All right. I'm going to show you a contract that is a very long document now.
A Oh, this is the one you wanted to know if I'm going to read from beginning to end?
Q Yes. And I will direct you to the pages that I have a question about, which are only two pages in this. Feel free to flip through it. I would appreciate if you don't take a long time, given that we're near the end.

CONFIDENTIAL

Page 334

A I promise you, I will not.
Q Thank you.
A Let -- let me just see what it is.
Q Sure.
A And then I will understand context.
Q Sure.
A What is this I'm looking at?
MS. SHAH: This has been marked as Exhibit 40. It's an email from, I believe, Wayfarer's legal counsel to Ms. Lively's legal counsel that attaches Ms. Lively's draft contract.
(Exhibit 40 marked for identification.)
THE WITNESS: It's an email from my counsel?
BY MS. SHAH:
Q Your counsel, to Ms. Lively's counsel.
A In this case, Lindsey Strasberg.
Q That's right. That attaches -- that attaches a markup, like a redline revision to Ms. Lively's contract.
A Her loan-out contract?
Q Yes.
A So this is an email, so is this going backwards to forwards? I'm trying to move it along quickly. But -- okay.

Page 335

Q Sure. Yeah, what -- I'm going to ask you about something in the contract.
A Why don't you ask me the question. I'm trying --
Q Great --
A -- we can help each other here.
Q -- thank you. Yes.
A And then if I feel like I need to reflect on something, I will.
Q Okay. That sounds great.
My first question is: Joseph Lanius at Convergence was Wayfarer's legal counsel, right?
A He's outside counsel.
Q Outside counsel. Okay.
If you flip to page ending in 504.
A Ending in 504?
Q Paragraph 7 is entitled "Sexual Harassment."
A I see it.
Q Okay. I'm going to represent to you that what is in the black writing was the way the contract had originally been written. And then the blue writing at the end of that paragraph is what Blake's counsel, Ms. Strasberg, added to the contract around this time. And it is struck out by

Page 336

Wayfarer's counsel, deleted.
A Okay.
Q Okay? So I'm focusing on that deleted blue portion at the end of this paragraph --
A Okay.
Q -- that was proposed by Blake's legal counsel and rejected by Wayfarer's legal counsel.
A I have just have one question.
Q Sure.
A Is this the most current contract, or the last one, or is this an early stage? Do we know anything about that?
Q This is the one that was being negotiated on March 7th of 2024.
A Okay.
Q And in the blue writing that's struck out, it says:
(As read):
"In the event Artist is aware of any sexual harassment conduct by company, notwithstanding the terms of paragraph 16.6 below, Lender and/or Artist shall have the right to terminate this agreement, shall remain entitled to full compensation, and shall have the

Page 337

right to avail themselves of all rights and remedies hereunder and under applicable law."
Do you see that?
A I do.
Q Do you have a recollection of Ms. Lively wanting this language to be added to her contract around this point in time?
A Do I have a recollection of why she would want this added at this point in time?
Q Not why, but do you have a recollection of the fact that she wanted this added at this point in time?
A This has to do with indemnification in some way. And my memory is when this was added, this was a conversation with Michael Marshall at Sony. I believe other legal from their side, our legal, about this and that they would not approve to this. They would not themselves approve to this kind of language. But that's my recollection of it. Outside of that, this is between attorneys.
MS. SHAPIRO: Can we ask Mr. Hernandez how much time is left?
THE VIDEOGRAPHER: Ten minutes.

CONFIDENTIAL

Page 338

BY MS. SHAH:
Q Okay. Is it also your understanding that Wayfarer did not approve of this language?
A I don't know either way.
Q Okay. You see the comment bubble there, it says "this is not acceptable"?
A Yes.
Q (As read):
"There can be no instances where there is a right to terminate the agreement or have a right of injunctive relief."
A Injunctive relief. I assumed indemnification. I spoke incorrectly. Thank you.
Q Oh, I understand. So your prior answer -- when you said "indemnification" in your prior answer, you meant "injunctive relief"?
A Yeah. I don't think that was my answer. I think it was more of a statement. I think this had to do with indemnification. But I meant to say I think this had to do with injunctive relief. Okay.
Q Okay. And you understood that if this clause were added, it would give Ms. Lively the right to quit the movie and keep the money in the event of any sexual harassment conducted by the

Page 339

company, right?
MS. SHAPIRO: Objection.
THE WITNESS: Did I understand at the time or do I understand now?
BY MS. SHAH:
Q Either. Both.
A I don't know. Well, forget both. I understand now.
Q Okay.
A Of what this implies. At the time, I don't recall.
Q Okay. And do you understand that it was Wayfarer's position that they would not accept this because they did not want there to be any instances in which Ms. Lively had a right to terminate the agreement or seek injunctive relief on this basis?
MS. SHAPIRO: Objection.
THE WITNESS: I think that this was a conversation -- I know -- sorry, guys. I'm trying to -- I know you guys are talking and you need to because you're lawyers, but I'm -- I'm hearing you, and I don't want to hear you. And I don't want her to think that I'm listening to you. So...
MS. SHAH: Thank you.
THE WITNESS: This was a conversation

Page 340

with Sony and our lawyers, and I don't think I really understand the implication of this at all.
BY MS. SHAH:
Q Okay.
A Or understood, I should say.
Q Would there be any reason for Wayfarer not to agree to this if there was no risk that this might happen?
MS. SHAPIRO: Objection.
THE WITNESS: From my understanding, injunctive relief isn't something that is ever really given. Don't hold me to that. That's why I'm saying from my understanding. So I -- I don't know.
BY MS. SHAH:
Q Okay. This is in March of 2024 and explicitly references a remedy that Ms. Lively could get in relation to any sexual harassment conducted by the company.
Do you see that?
MS. SHAPIRO: Objection.
THE WITNESS: Okay.
BY MS. SHAH:
Q My question to you is: In addition to some of the things that we discussed earlier that

Page 341

occurred on set and otherwise, did her request for this clause to be added to the contract indicate to you, in March of 2024, that there -- she perceived that there could be an issue relating to sexual harassment conducted by the company?
MS. SHAPIRO: Objection.
THE WITNESS: You're asking me to reflect back -- when -- when is this? May of '24, so this is --
BY MS. SHAH:
Q March of '24.
A March of '24. So this is a year and a half ago. Ms. Shah, I don't understand the question. I don't know.
Q Okay. You didn't, for example, look at this and say, sexual harassment conducted by the company, what is she talking about? Why is she bringing this up?
MS. SHAPIRO: Objection.
THE WITNESS: If this was in March and we came back in January, and now we finish the movie, and as I testified before, that any such concerns that happened in June of '23, and now we're a year later without incident or anything, that I think this represented that? I don't believe that was top

CONFIDENTIAL

Page 342

of mind. But I also don't recall what -- I -- this was between attorneys at this point, so --
BY MS. SHAH:
Q Okay.
A -- you're asking me now how I see it.
Q If you'll flip to the page ending in 510.
A Okay.
Q Paragraph 18 is the confidentiality clause.
Do you see that?
A Paragraph 18 ending in -- oh --
Q 510.
A -- I'm sorry. I went the other way.
Okay. I see it.
Q Paragraph 18 is a confidentiality clause. And there is, again, blue language that's been added by Ms. Lively's attorney and struck out by Wayfarer's counsel.
Do you see that?
A I do.
Q It says:
(As read):
"Nothing herein shall prevent any party from making truthful statements about their participation in the production

Page 343

or in connection with any exercise of their legal rights hereunder, or under any agreement in connection with the production."
Do you see that?
A I do.
Q Why would Wayfarer not want to agree to that?
MS. SHAPIRO: Objection.
THE WITNESS: Let me read this one again, if you don't mind.
BY MS. SHAH:
Q Sure.
A So I'm -- I'm going to have to say that this was language that was happening again, I know that Sony's legal, Michael Marshall and their team. And from what I recall, a big problem with this is, "nothing herein shall prevent any party from making truthful statements." And truthful, I remember a conversation about, well, what constitutes truthful? And that's -- that was the conversation.
MS. SHAPIRO: I just -- Mr. Heath, just make sure you're not disclosing any conversations with lawyers.
THE WITNESS: Fair enough.

Page 344

MS. SHAPIRO: If you have a conversation with someone else, that's fine.
THE WITNESS: Fair enough.
BY MS. SHAH:
Q But if it's Sony's lawyers, that's fine?
A No, I'm not trying --
Q Okay.
A I hear -- I hear it. I'm also not -- I need these to see. I don't need them. I can see it.
I think there was some conversation about that. But I know that they went back and forth on this. I didn't quite understand it all. And -- and I suppose this is why this was Xed out, crossed out.
Q Did you have any understanding that it could open a whole can of worms on a debate about what is and is not truthful --
A Oh, there it is. It says it there.
Q -- because that could be subjective? Was that the sum and substance of the concern?
MS. SHAPIRO: Objection.
THE WITNESS: Or I think that says there, so I had not read that when I spoke, so I think my recollection was somewhat on -- somewhere in the world of what this bubble says. But I don't know.

Page 345

I don't understand. I mean, you lawyers pick apart every single word and what it could imply and what it doesn't imply and all that. So the lawyers are doing that, and I defer to the lawyers on potential language.
BY MS. SHAH:
Q Okay. Do --
MS. SHAPIRO: I think we're almost out of time.
BY MS. SHAH:
Q Do you think -- do you think the truth is often subjective and not objective?
MS. SHAPIRO: Objection.
THE WITNESS: That's a big philosophical question there. I don't know how to answer that. Do I think the truth -- no, I think truth is truth.
MS. SHAPIRO: Mr. Hernandez, how much -- is there any time left?
THE VIDEOGRAPHER: A minute.
THE WITNESS: Okay. I think truth is truth. But I do think -- I believe in God; you may not. To me, it's as true as it can be. You may not, and that could be subjective.
BY MS. SHAH:
Q Did Wayfarer have any interest, at the

CONFIDENTIAL



time, in preventing Ms. Lively from being able to tell the truth about her experience on the production?

MS. SHAPIRO: Objection.

THE WITNESS: Can you repeat that, please?

BY MS. SHAH:

Q Did Wayfarer have any interest, at the time, of preventing Ms. Lively from telling the truth about her experience on the production?

MS. SHAPIRO: Objection.

THE WITNESS: Do we have any interest in preventing her from telling the truth? No, I don't have a problem with someone speaking the truth. But if someone says that -- if my truth is that you're racist against me and that in this room you were calling me names, and there was a clause that says I can say my truth and that was the truth, I think that's a problem. So I think there is some conversation around that.

MS. SHAPIRO: Okay.

MS. SHAH: Okay.

MS. SHAPIRO: I'm pretty sure we're done now.

MS. SHAH: Thank you, Mr. Heath. I



appreciate your time.

THE VIDEOGRAPHER: This marks the conclusion of today's deposition. We are going off the record. The time is 6:39 p.m.

(WHEREUPON THE DEPOSITION CONCLUDED AT 6:39 p.m.)



REPORTER'S CERTIFICATE

I, ASHLEY SOEVYN, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That a review of the transcript by the deponent was/ was not requested;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Dated this 10th day of October 2025.

ASHLEY SOEVYN
CSR No. 12019



BLAKE LIVELY vs. WAYFARER STUDIOS LLC, ET AL.
10/9/2025 - JAMEY HEATH

ERRATA SHEET

PAGE_____ LINE_____ CHANGE__________________
_____________________________________________
REASON______________________________________
PAGE_____ LINE_____ CHANGE__________________
_____________________________________________
REASON______________________________________
PAGE_____ LINE_____ CHANGE__________________
_____________________________________________
REASON______________________________________
PAGE_____ LINE_____ CHANGE__________________
_____________________________________________
REASON______________________________________
PAGE_____ LINE_____ CHANGE__________________
_____________________________________________
REASON______________________________________
PAGE_____ LINE_____ CHANGE__________________
_____________________________________________
REASON______________________________________

_______________________________ ______________
JAMEY HEATH Date

CONFIDENTIAL

Page 350

BLAKE LIVELY vs. WAYFARER STUDIOS LLC, ET AL.
10/9/2025 - JAMEY HEATH

ACKNOWLEDGEMENT OF DEPONENT

I, JAMEY HEATH, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ _______________
JAMEY HEATH Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS ______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC

**&**

**&** 2:21 3:5,16 4:4,17 5:3,13 15:22 16:4,6 16:12

**0**

**000001208** 202:4
**000003776** 65:23
**000028187** 303:23
**000044697** 211:21
**00014718** 326:20
**00041705** 59:7
**0o0** 1:3 2:3 15:1,4

**1**

**1** 33:11 37:4,19
**10/24/24** 12:17
**10/9/2025** 349:2 350:2
**100** 288:1 289:19
**10010** 3:21
**10036** 4:22 8:11
**10049** 1:7 2:7 15:17
**10100** 6:7
**10:25** 184:2
**10th** 54:22 348:22
**11** 302:6
**111** 12:17
**1140** 8:9
**1142** 12:23 174:9
**116** 12:20
**11:06** 105:23
**11:16** 214:9,14
**11:19:50** 213:12
**11:20** 213:6 214:17
**11:28** 106:1
**11:35** 218:1
**12** 13:9 185:19
**12/22/24** 13:20
**12019** 1:24 2:25 12:5 13:5 14:5 348:25
**1208** 13:13 202:8
**1210** 13:14
**12:16** 221:2
**12:33** 221:25
**12:50** 165:25
**13** 13:9 188:23
**1401** 9:20
**14718** 14:10
**14725** 14:10
**15** 11:14
**15,000** 325:12
**15k** 321:14
**15th** 159:5
**16** 35:24 37:19
**16.6** 336:22
**167550** 13:20 269:13,21
**167559** 13:21
**16th** 159:8
**17** 11:6 17:11 23:3,15 27:17 28:5 125:23 126:7 152:22 163:7
**1700** 4:10
**174** 12:22
**178** 13:7
**17th** 8:10 159:8 292:17
**18** 342:8,11,15
**1801** 7:10
**185** 13:9
**1875** 5:16
**18th** 292:17 326:8
**19** 11:12,12
**190** 13:10
**1900** 9:21
**1:13** 293:24
**1:42** 166:4
**1:44** 297:25
**1st** 109:16,18 138:11 139:21 143:1 145:8 151:16 159:6 159:20,22,24 160:8,14 162:8 163:7,14,17 164:6

**2**

**2** 11:17 37:5 49:7
**20** 72:11 350:15
**20,000** 323:8
**20006** 5:18
**201** 13:12
**201-0005** 7:15
**202** 5:20
**2020** 12:9 48:16 50:4 54:22 232:15 270:9,11
**2021** 50:5
**2023** 120:24 121:25 122:20 122:22 125:17 152:23
**2024** 12:15,20 13:17 50:15,16 50:19 56:17,18 65:20 67:3 94:12,17 106:8 106:21 111:4 112:20,24 115:17,24

117:6 125:17 132:25 134:14 136:8 152:23 157:4,25 158:23 163:8 174:8 177:24 178:11,17 185:18 201:20 202:3 211:16 211:20 213:7 213:13 230:4 239:11 269:11 292:18 303:22 304:20 326:8 336:14 340:16 341:3
**2025** 1:21 2:24 12:4 13:4 14:4 15:3,7 285:15 348:22
**2029** 5:6 9:9
**2049** 2:21 4:9 15:11
**211** 13:15,18
**212** 3:14,23 4:24 8:14
**21st** 72:16,17 73:10,17 97:6 97:11 98:13 102:11
**22** 12:7 37:5,6 37:8 269:11
**22nd** 3:20 276:13
**23** 12:8 47:2,4 52:13 53:14,18 54:4 119:17 120:21 121:1 142:5 341:23
**23rd** 4:21 159:10,18
**24** 1:7 2:7 11:13,14,15,15 12:11 15:17 54:16,18 94:21 118:10 121:1 285:19 341:8 341:11,12
**248-5100** 6:9
**24th** 111:4
**25** 1:7 2:7 12:13 59:5,9 323:10
**25,000** 53:8 56:4
**252** 11:22
**257-4880** 8:14
**26** 11:16 12:15 65:16,17 67:3 178:11 185:18
**269** 13:20
**26th** 174:8 177:24 178:17
**27** 11:17 12:17 111:3,7 186:1
**27th** 112:20
**28** 12:20 115:23 116:2
**28187** 14:8
**29** 12:22 42:5 42:23 174:6,11 178:5,10,11,24
**292** 13:22
**2:04** 270:20

**3**

**3** 11:16 54:13 66:10
**3/7/2024** 14:11
**30** 12:7 13:7 30:7,14,22 32:3,19 34:18 34:22 35:17 36:15 37:6 126:19 177:23 178:1,10,15 179:3 261:8,17 261:19 263:4,5 263:14
**30,000** 322:21 323:3 325:9
**303** 14:7
**303-1245** 5:20
**30th** 112:24
**31** 12:15 13:9 42:2 65:20 67:3 185:14,20 211:13
**310** 4:15 5:9 6:9 7:15 9:13
**312-4207** 4:15
**32** 13:10 190:6 190:7
**326** 14:9
**33** 13:12 201:15,17 211:13
**334** 14:11
**34** 13:15 211:14,17 213:2,5 215:24 216:13
**35** 13:18 211:19,24 212:16 213:11 216:16
**36** 13:20 269:9 269:14
**369** 13:23 292:18
**37** 12:7 13:22 292:16,19
**372** 293:20
**373** 13:23
**3754** 12:19 111:6
**376-7878** 9:13
**3762** 112:17
**3763** 114:7,8
**3764** 12:19
**3776** 12:16
**38** 14:7 303:17 303:18
**3838** 12:21 116:1

**38477** 14:12
**38515** 14:12
**38539** 12:10 47:3
**38543** 12:10
**39** 14:9 324:11 326:7,9
**3:03** 55:7
**3:04** 231:17
**3:44** 231:21

**4**

**4** 11:22 66:11 154:20
**40** 14:11 334:9 334:12
**400** 9:10
**40269** 13:8 177:25
**40271** 181:2
**40273** 13:8
**41594** 12:12 54:23
**41596** 12:12
**41705** 12:14
**41709** 12:14
**449** 1:7 2:7
**4651** 13:11 190:12
**4652** 13:11
**46697** 13:19
**46711** 13:19
**47** 12:8
**49** 302:8
**4:07** 248:20
**4:16** 214:1,4,8
**4:19** 248:23
**4th** 142:23 154:7,21,23,25 160:16 164:14 201:20 202:3

**5**

**5** 11:13
**504** 335:15,16
**51** 3:19
**510** 342:6,12
**54** 12:11
**552** 276:24 277:1,9 278:2
**555** 270:6
**59** 12:13
**595** 55:4
**5:32** 303:1
**5:51** 303:4
**5th** 7:10

**6**

**6** 12:7,9,20 30:7,14,22 32:3,19 34:18 34:22 35:17 36:15 37:6,18 117:6 261:8,17 261:19 263:4,5 263:14 270:9 270:11
**6/10/2020** 12:11
**60** 41:23 42:1
**65** 12:15
**6669** 348:23
**6:02** 327:25
**6:39** 2:23 347:4 347:5
**6th** 50:5 115:24

**7**

**7** 4:21 111:1 270:15 335:17
**7/26/2024** 12:22 13:7,9 13:10
**713** 9:24
**720** 327:9
**750** 6:7
**752-4226** 9:24
**77010** 9:22
**790-4500** 4:24
**7:41** 191:5
**7:57** 178:12,17
**7th** 50:4,15,16 50:19 87:18 106:8 303:22 304:20 336:14

**8**

**8** 13:17 291:25 292:11
**8/17/2024** 13:22
**8/18/2024** 13:22
**8/18/24** 14:9
**8/4/2024** 13:12
**8/7/2024** 14:7
**8/8/24** 13:18
**849-7000** 3:14 3:23
**855-3000** 5:9
**865** 3:9
**8:09** 180:6
**8:30** 30:13
**8th** 3:10 87:17 87:18 106:8 205:1 211:16 211:20 213:7 213:13 214:14 214:17

**9**

**9** 1:21 2:24 12:4 13:4 14:4 15:3
**90** 50:8
**90017** 3:11
**90067** 4:11 5:7 6:8 7:11 9:11
**95** 289:20,20
**97** 216:17
**98** 220:12,24
**99** 204:1 221:25
**9:08** 2:23 15:6

**9:13** 20:10
**9:18** 20:13
**9th** 15:7 125:23 160:15 163:19

**a**

**a.m.** 2:23 15:6 20:10,13 105:23 106:1 213:12 214:9 214:14 218:1 293:24 296:7
**abandon** 103:14
**abel** 1:10 2:10 7:3 8:3 9:3 10:5 12:15,20 13:13 14:7 22:8 65:21 67:5,15,22 68:6 69:8,12 69:20 70:17,21 73:24 74:4 79:20,24,25 89:1,11 97:5,8 99:6 100:15 101:6,9 103:3 103:7,17 112:23 115:24 117:6 186:3,7 188:9 201:21 202:20 204:16 212:18 214:13 216:19 304:1 321:6 322:6,8 326:19
**abel's** 39:17 102:21 112:7 252:4,25 253:9 253:24 254:8 293:23
**ability** 85:11 88:6,12 103:7
**abiz** 12:9
**able** 17:15 20:2 41:11 84:8 201:11 202:13 202:15 237:19 262:20 279:4 346:1
**above** 43:15 278:1
**absolutely** 23:16 69:7 165:18 319:1 320:14,20,25 330:19
**accept** 135:23 339:13
**acceptable** 338:6
**accepted** 325:22
**access** 65:8 241:18
**accident** 226:13
**accidentally** 143:24
**accordance** 232:22 233:2
**account** 76:13 76:15,22 128:3 182:23 183:1 183:19 192:22 294:5
**accounting** 42:6 111:25
**accounts** 193:8 318:9
**accumulation** 85:2
**accurate** 52:20
**accusations** 135:7 193:15 193:17
**accusing** 278:13,23
**acknowledge** 69:15 135:3
**acknowledged** 139:7
**acknowledge...** 350:3
**acosta** 10:8
**acted** 258:10 265:1,10
**acting** 256:21 266:24 273:19 273:24
**action** 15:14 256:8 311:23 348:19
**actions** 197:7 281:12,20 290:15
**active** 46:23 311:5
**actively** 318:6
**activities** 33:7
**activity** 146:21
**actor** 140:23
**actress** 140:23
**actual** 289:24
**actually** 33:11 70:21 72:23 74:11 96:15 203:21 206:24 223:14 227:4 255:7 273:21 288:14 300:6
**adamant** 169:21
**added** 335:24 337:7,10,12,15 338:23 341:2 342:16
**addiction** 165:7
**addition** 321:13 340:24
**additional** 50:6 259:2,5,12 261:12

**additions** 350:6
**address** 138:14 139:8
**addressed** 139:8 140:7 159:24
**adjust** 309:20 310:14 316:25
**adjustment** 55:24 139:10 140:11
**admissible** 259:15 262:18
**admit** 150:1
**ads** 139:25
**adt** 311:17 312:1
**adults** 139:9 162:14
**advance** 113:16 322:7,10
**advantage** 281:16 290:9 290:13
**advice** 103:8 269:2
**aeo** 58:5 64:1,3 64:5 192:14 241:18 282:9 282:13,21 293:6 312:3
**affected** 198:23
**affects** 78:8
**afraid** 295:19
**afternoon** 166:6,7
**agencies** 231:7
**agency** 40:4 127:24
**agents** 61:24
**ago** 37:16 77:18 87:5 113:20 160:12 160:13 272:10 294:3 298:15 341:13
**agree** 36:5 47:11,14,19 61:23 102:11 117:14 143:12 148:22 156:10 157:10 160:23 244:10 248:1 263:9,13 282:22 310:12 310:20 311:2 318:22 340:7 343:7
**agreed** 27:19 56:3 64:17 321:14
**agreeing** 60:14 61:5
**agreement** 12:8 12:13 47:25 48:3 50:3,5,10 50:23 51:3,12 52:4,13 53:13 53:17 54:2 57:25 58:3 60:2,9 61:2,15 62:5 64:23 66:6,19,23 103:25 104:7 114:13 256:17 257:5,7,24 336:24 338:10 339:16 343:3
**agreements** 44:13,17 48:17 53:23
**ahead** 17:8 28:9 33:22 34:14 55:1 140:16,18 152:7 187:14 215:23 216:12 227:9 318:25
**ahold** 235:16
**ahouraian** 9:6 9:7 16:14,14
**ahouraianlaw...** 9:12
**air** 71:14 138:14 142:25 143:2,4,15 145:1 164:21 202:13
**al** 1:8,13,15 2:8 2:13,15 12:3,3 13:3,3 14:3,3 15:15 349:1 350:1
**alex** 133:22 134:13,22 135:6,16,20 136:3 151:25 158:10 162:9,9 164:18
**alexandra** 8:6 16:18 18:23 19:7
**algorithm** 318:5
**align** 180:9
**aligned** 198:16
**alive** 302:16
**allegation** 198:1 234:12 237:5,14 241:23 243:3 244:18,25 245:17 246:3 248:12 249:6 249:17 250:9 251:6 254:19 255:8,13 258:9 263:22 264:1,6
**allegations** 141:25 162:3 251:1 262:1 284:13,25 285:2,3 286:12 288:11,16 289:14,15

**allege** 232:18 251:17 254:16 255:17 264:3 281:23
**alleged** 136:23 234:8 256:13 290:7
**allegedly** 239:2 240:8
**alleges** 160:21 232:18 234:9 254:16 257:3 258:3
**alleging** 200:8 232:25 264:13
**allowed** 274:5
**allows** 282:3
**alluded** 130:19
**alluding** 237:2
**alongside** 181:23 182:21
**ambush** 259:23
**amend** 186:2
**americas** 8:9
**amount** 200:8 281:25
**analogy** 83:6 84:23 85:12 231:5 298:13
**ange** 137:24 151:25 158:9 162:9
**angeles** 1:20 2:22 3:11 4:11 5:7 6:8 7:11 9:11 15:10,12 92:11,13 93:3 93:5,6,12,15,21 93:25
**anger** 155:17 156:15,17
**angry** 156:4,6
**annoyed** 140:4
**answer** 11:10 17:22 18:1,2 18:10,11,15,17 18:22 19:2,4 19:20,23 20:18 20:23 24:10,19 25:2,14,23,24 26:7,11,22 27:4 30:3 33:19 34:7,10 34:10,20,23 36:24 41:11 42:20,21 132:1 135:23 136:18 162:1 197:20 198:2,3 199:3 199:10 201:7 227:13 228:1 240:12,13,15 241:7 242:2,2 242:19 243:11 243:13,15,19 243:20,21,22 243:24,24 244:2,11 246:23,25 247:3,18,25 264:17 267:15 267:18,20 268:1,16,19 273:21 274:2,9 279:18 289:18 290:5,5 319:1 320:24 323:23 324:13,25 338:15,16,17 345:15
**answering** 33:20,21,25 242:21 244:5
**answers** 17:7 132:11
**anybody** 18:13 77:10 88:14 91:8 164:9 165:6 209:4,13 315:12 319:17
**anymore** 149:24
**anytime** 229:10
**anyway** 184:18
**anyways** 267:18
**apart** 102:10 120:2 176:18 208:8 230:11 289:8 345:1
**apologies** 201:1
**apologize** 81:23 156:10 161:16 161:18,20
**apologized** 139:7
**apparent** 229:8
**appear** 111:22
**appeared** 28:3 95:19 146:13 294:20
**appears** 48:19 55:17,19 56:1 186:3 270:19 277:17 326:25
**appended** 350:7
**applicable** 34:21 51:19 183:22 291:12 310:23,24 313:25 337:3
**applied** 102:25
**appreciate** 58:21 68:3 131:25 144:23 286:9 324:20 333:24 347:1
**appreciated** 262:16
**appropriate** 260:4
**approval** 43:22 44:5,6

**approve** 43:17 196:18 198:5 268:20 317:6 320:25 337:18 337:19 338:3
**approved** 249:1 315:4,8 319:21
**arato** 8:5 16:16 16:19
**arbitrary** 43:20
**argue** 291:17
**argument** 149:17 162:16 162:17 263:3
**art** 38:16
**article** 13:15 170:23 204:25 210:4 211:12 211:14 212:14 213:2,5,17 214:16,25 215:14,24 216:12 272:8 272:11 274:13 274:21
**articulate** 84:15
**artist** 289:2 336:19,22
**ashapiro** 8:12
**ashley** 1:23 2:24 12:5 13:5 14:5 348:2,24
**aside** 115:10 118:18 121:13 239:21 289:24
**asked** 27:20 32:6 54:5 81:23 99:18 106:6 115:2 131:21 136:24 138:24 145:5 145:23 146:14 146:25 165:8 168:10 184:20 185:1 189:25 192:6 201:1 218:16 228:18 242:21 267:22 278:19 303:8
**asking** 26:8 55:20,23 60:3 67:12 78:1 121:15 132:12 137:4 146:24 162:2 197:25 199:12 200:14 203:11 214:16 214:24 216:9,9 229:11 242:6 242:13,14 243:8,9,19 244:8,10,23 245:10 255:6 260:23 261:9 263:7 268:11 272:22 299:2 302:14 310:8 327:2 329:7 332:1 341:7 342:5
**aspect** 28:6 29:7 30:7 142:13
**aspects** 43:7
**aspiring** 170:15
**asserted** 256:7 279:19
**asserting** 291:24 292:6 292:10
**assets** 312:7,13 312:18
**assign** 58:8
**assistance** 103:15,18
**assistant** 294:7
**assisting** 104:21 105:2
**associated** 172:17 175:24 176:4,9 192:22 193:8 196:23 197:3,25 198:6
**associating** 130:8
**association** 176:6 180:15
**assume** 33:24 36:3,6
**assumed** 338:12
**assuming** 261:10
**attached** 112:5
**attaches** 334:11 334:18,19
**attachment** 111:4 270:4,8 270:23 294:9
**attempts** 188:3
**attention** 85:13
**attorney** 3:18 4:19 5:5 6:6 9:8,19 15:20 19:12 24:20 25:2 58:9 99:17 135:12 241:8 242:12 242:13 244:22 245:1 246:9,12 246:14,21 254:25 255:20 260:20 261:8,9 267:21,23,25 268:2,4,13,17 268:19 274:4 342:17 348:18
**attorney's** 244:14 269:2
**attorneys** 3:8 4:8 5:15 7:9 8:8 18:7,11,13 18:21,25 19:17

23:4 26:18 40:17,22 41:5 42:9 58:4 59:2 64:6 65:7 89:25 106:20 107:8,12,20,24 108:10 109:3 109:16 110:7 110:13 127:6 127:15 216:2,9 235:1,20 236:13 240:25 241:3 242:3,4 242:7,17,18 243:6,16,25 244:3 245:4,21 245:23 246:1 247:21,24 249:2,11,13,16 250:6 251:10 251:12,23 252:8,16 253:3 254:3,6,13,21 254:23 255:4,7 255:11,22 256:2,4 257:14 257:18,21 258:24 259:4,9 264:16 265:15 265:18 273:1,3 273:5 275:21 276:6,9,14,15 276:18,22 280:22 281:6 282:14,17,25 284:7 286:22 293:9 337:21 342:2

**attributable** 52:6

**august** 13:17 72:12,13,15,16 73:10 87:17 94:12,16,21 97:6,11 98:13 102:11 106:8 132:24 134:13 136:8 157:4,25 158:23 201:20 202:3 205:1 211:16,20 213:7,13 214:14,17 230:3,6 238:17 239:11 292:17 292:17 303:22 304:20 326:8

**authority** 43:12 48:10,16,19,23

**authorize** 210:11,13 267:9

**automatically** 50:6

**avail** 337:1

**available** 42:6 42:23 187:11

**avenue** 3:19 8:9

**avoid** 148:5

**aware** 33:2,5 42:7 46:4 51:11 52:1,11 54:4,10 91:21 136:23 168:4 168:18,21 171:21 190:21 191:1 193:20 194:7,7,13,18 195:11,18 197:8,14 210:2 210:24 211:5,7 224:7,12,19 225:18 226:4,5 226:15,23 227:6 231:23 241:17 256:10 257:16 280:19 280:22 291:24 292:2 296:12 297:9 315:4 320:8 336:19

**aziz** 48:6,10,16 54:21 55:7

**b**

**b** 12:7 30:7,14 30:22 32:3,19 32:24 34:18,22 35:17 36:15 37:6 261:8,17 261:19 263:4,5 263:14

**babayan** 3:6 16:1,1

**babysitter** 84:23 85:12 231:4

**bach** 8:5,7 16:16,16,17,19 105:12 260:19 260:23 261:7 261:23 262:15 263:12,17

**back** 20:12 31:12 60:19 65:2 81:7 105:25 106:3 127:3 130:2 138:11 140:14 141:12 142:2 142:17,22 143:5 146:11 151:17 159:19 161:15,23 164:6 166:3 179:22 181:12 181:22 182:8 183:15 203:4 229:13 231:4 231:20 235:17 248:22 263:22 285:14 295:9 303:3 313:15 321:6 327:22 341:8,21

344:12
**background** 312:7,13,18
**backs** 162:10
**backstory** 88:4
**backwards** 203:6 334:24
**bad** 207:5
**badly** 207:15 209:3,5 214:23
**baldoni** 7:3 8:3 9:3 10:4 13:16 22:12 30:18 51:6,15 52:7 53:7,19 56:8 78:13 101:19 112:7,11 113:4 113:24 114:4 114:10,12,15 114:18,19 174:8 180:15 192:6 227:18 256:21 264:5,9 314:12,19 323:14 327:1,9 327:24
**baldoni's** 29:21 39:15 52:16,25 54:5 114:22 115:5
**balls** 71:14
**bandai** 283:8 283:22 288:10
**banter** 116:25 117:1
**bantering** 302:18
**barber** 179:9 179:18
**barely** 192:11
**bargain** 256:24 265:3,12
**based** 67:17,19 77:2 146:18 162:2,6 169:24 169:25 217:2 233:11 235:19 240:12 243:25 319:6
**bases** 233:13 234:1 235:2,5 250:17 260:24 261:12 262:3,4 262:24 264:6
**basic** 38:11
**basically** 97:25
**basis** 26:10 36:7 207:14,16 207:18 228:5 232:25 234:11 237:4,9,13 239:8,13 245:16 246:2 247:22 248:11 249:5,17 250:8 250:24 251:6 254:6,19 255:12 257:12 257:22 258:9 259:16,17,19 259:21 261:10 262:21 267:21 268:2,17 275:10 276:2,3 276:9,19 292:10 324:22 339:16
**bates** 12:9,11 12:13,16,18,21 12:23 13:7,9 13:11,13,18,20 13:22 14:8,9 14:12 47:3 111:5 115:25 174:9 177:25 185:18 202:3 211:20 220:12 269:12 292:18 303:22 326:20
**bathtub** 170:16
**bearing** 115:25 211:20 292:17
**bed** 17:11 19:18
**bee** 307:14
**bees** 307:12
**began** 53:16 94:16
**beginning** 2:22 18:5 19:11 45:23 63:14 123:1 327:1 333:20
**behalf** 2:19 15:16 16:12,14 33:20,21 35:20 36:24 48:12,17 52:24 95:20 112:11 144:11 227:18 228:13 232:9 266:24 273:20,25 274:5,14,14,22 310:1 324:13 324:14,15
**behavior** 88:5 90:23 133:3 134:17 136:7 152:24 158:4 158:25 160:19 161:1 188:3 316:22
**belief** 165:10 165:12 208:13 208:15,16 235:9 236:12 237:23 251:3 321:3
**believe** 19:7 22:9,11 24:4 29:21,25 31:21 32:14 33:8 37:15 39:8 40:2,5 41:8,16 41:20,22 42:12

42:16,20 43:3 46:16 48:7,13 51:10 52:19 57:2 58:3 59:11 60:11 62:24 63:8 64:16 66:11 67:23 74:13 78:16 83:17 84:10 87:17 88:25 92:7,10 93:17,23 94:3 96:7 99:16 100:2 103:21 104:10 105:5 106:10,19,23 107:7 110:9 119:11 120:19 124:11,15,15 124:18 125:22 125:24 126:11 129:8,16 134:3 144:7 167:7,9 168:8 169:1,10 175:12 184:14 185:11 190:14 192:9 204:11 205:6 206:15 207:4,8,19 208:1 214:21 215:9 217:8 223:5 232:4 233:10 234:20 234:25 235:12 236:23 238:15 239:25 240:21 244:21 246:8 249:9 250:12 250:20 251:17 252:1,18 253:10,18 254:20,23 255:9,19 256:1 257:6 258:13 258:23 259:5 264:2,11,19,25 265:10,14,23 266:3 268:13 273:6 276:21 281:23 284:16 285:19 286:2 292:23 307:15 319:22 323:18 323:19 326:12 334:9 337:17 341:25 345:21

**believed** 96:22 124:6 130:5 191:13 223:17 230:25 258:17

**believes** 225:19 225:21 264:11

**believing** 275:11

**belittle** 135:9

**belittlement** 156:17

**belloni** 269:10 269:22 270:20 271:5

**belongs** 283:8

**bender** 5:14

**bending** 137:10

**benefit** 256:23 257:6 265:2,11

**benefits** 256:16 257:4,23

**benson** 7:7 16:11,11

**best** 24:14 27:9 29:9 35:4,12 36:13 37:25 57:20 70:3 74:3 82:24 84:16 86:20 87:3 92:18,18 116:16 119:16 131:2 136:20 159:4 162:20 172:16 173:21 236:9 277:21 286:24 299:2

**better** 28:13 35:1 41:12 42:20 138:10 149:17 186:15 186:22 300:22 307:6

**beyond** 66:9 217:23 323:24

**bfreedman** 7:12

**big** 88:17 129:24 137:24 157:19 162:3 286:15 290:17 317:3 319:18 343:17 345:14

**bigger** 130:25 277:19

**birthing** 147:17 147:23 148:3,4

**bit** 33:4 73:12 77:17,23 84:6 137:9 139:15 172:12 184:14 192:24 204:19 235:23 250:2 253:11 263:5 283:9 303:12 310:21

**bl** 14:12

**black** 335:21

**blake** 1:5,15 2:5,15 4:3 5:2 6:3 13:16 15:14 16:4,6 95:17 123:6 130:11,20 141:7 144:12 144:17,18,25 148:6,18 151:13,25 152:1 154:8

155:11 158:7,9 163:16 207:5 207:15 209:3,5 210:5 214:23 220:17 221:7 234:17 239:20 239:21 250:14 250:21 251:8 251:18 252:2 252:19,24 253:4,19,24 254:9 264:2,20 272:8,12 316:22 329:12 333:7 349:1 350:1
**blake's** 130:21 154:19 156:22 163:9 175:16 176:5 180:19 274:12,20 335:24 336:6
**blame** 140:4 220:17 221:7
**blank** 41:10
**blast** 122:4
**bless** 84:3 88:7 280:3
**blowup** 181:8
**blue** 335:23 336:4,16 342:16
**blvd** 6:7
**boat** 78:9
**body** 145:3
**bolno's** 170:16
**book** 144:14
**boost** 298:16 298:19 327:2,4 327:5
**boosted** 298:2 298:5,12,22,24 299:4,6,13
**boosting** 307:20,25 308:3
**boosts** 308:20
**born** 57:10
**bothered** 139:16
**bots** 320:21 327:11 328:7 328:12,23,25 330:3,4 333:4 333:5
**bottom** 47:9 55:5 114:7 188:23 189:16 202:8 216:15 216:17 220:24 221:1 222:7 293:23
**bow** 181:6,12 182:19
**brain** 186:15 186:22 331:15
**brand** 285:1
**brandon** 130:13
**breach** 232:11 232:14 233:13 234:1 250:18 256:9 257:8,11 265:24 266:3 266:16 267:1
**breached** 232:20 234:21 234:23 235:19
**breaching** 233:11 246:23 278:14,23
**break** 20:7 35:2 55:10 105:9,11 105:16,17 120:25 165:17 165:19 194:5 231:11,13 248:16 302:24 303:6
**breakdown** 84:7
**breakout** 21:18 21:20 29:18
**breanna** 192:24 210:2 220:2 296:7 297:24
**breasts** 146:21 147:5 148:13
**breath** 286:1
**brian** 111:17
**brief** 20:7 221:14
**bring** 127:19 128:2 161:7,7 166:9 182:9 293:15 305:13
**bringing** 132:4 164:6 166:12 204:7 341:18
**broad** 69:11
**brought** 27:23 128:9,11,16 138:22 163:6 164:11,11 218:9 305:25 323:16
**bruno** 4:18
**bryan** 7:6 16:9 19:7 269:10 271:20 274:11 274:19 277:4
**bubble** 338:5 344:25
**build** 38:14 290:19
**building** 24:1 31:11
**builds** 298:10
**built** 77:2
**bulleted** 314:6
**bump** 135:11 143:23 162:12

**bumped** 135:4 135:8,12,15 143:25 188:18
**bumping** 164:1
**bunch** 326:18
**bundle** 54:5 55:20
**bundled** 52:23 54:9,10 56:3,8
**bundling** 55:10 55:15,24
**business** 43:17 281:14,18 282:1,3,4 308:7,10
**butler** 210:2 296:7 297:25 298:21

**c**

**c** 3:1 4:1 5:1 6:1 7:1 8:1 9:1 10:1
**cadence** 76:19
**california** 1:20 1:24 2:22,25 3:11 4:11 5:7 6:8 7:11 9:11 15:10,12 348:3 348:21
**call** 65:12 84:20 86:14 87:4,11,14 88:24 90:19 91:12,14,16,18 92:6 93:10,13 93:16,19,19,22 93:25 94:1,24 95:14 96:2,3,4 96:16,18 99:2 104:22 106:7 106:11,15,19 119:19,23,24 119:25 120:16 122:22 123:18 124:4,8,13,16 124:19 125:4,6 125:10,14,21 125:22,25 126:3,7,10,13 127:4,12 169:10,14,16 169:22 170:9 179:10,16 202:19,22 203:2,8 205:25 205:25 207:13 212:22 217:20 218:3 221:14 222:25 285:20 311:19 324:2 332:9,12
**called** 88:4 96:1 96:4 138:1 169:2 179:14 179:20 206:1 206:17 208:2 224:22 331:20 331:23
**calling** 95:19 218:11 289:21 346:17
**calls** 89:9 91:2 94:5,8,14 95:4 95:8,22 109:23 120:3,6,9,22 126:20 127:4,5 128:20 129:6 169:18 182:13 183:12 186:14 186:21 187:2 207:23 241:7 242:2 288:6 289:10,12,13 289:19 290:21
**candid** 82:25
**capable** 33:7 83:2 95:18 197:14 309:9
**capacities** 33:25 34:3 52:1
**capacity** 32:24 32:25 36:19 53:23 275:7 322:2
**car** 89:1,4
**card** 99:19
**care** 83:7,11 103:14 123:7 138:21 218:16 218:17
**careful** 109:7 263:8
**case** 1:7,7,7 2:7 2:7,7 13:13 14:7 15:16 40:18,23 41:4 42:10 65:3 108:24 109:4 110:8 127:8,16 129:10 132:19 132:22 133:15 133:19,23 134:2,7 192:2 193:20 194:8,9 194:9,10,18,19 194:20 195:6,7 195:11,12,18 195:19 199:15 199:22 203:14 210:3 223:24 224:13 225:19 231:25 241:15 241:18,23 242:9 243:2 245:1 247:17 247:24 259:12 259:15,24 260:15 262:12 266:10 272:2 273:13,16 279:20 280:20 280:25 284:5 310:23 321:6 334:17

**case's** 40:18 192:17,20 193:4 306:6
**cast** 132:9
**casual** 137:24
**category** 177:9 233:5
**cause** 256:7
**caused** 131:3
**cc** 112:2
**cease** 63:9 85:14 295:20 303:9,13
**ceiling** 43:15
**celebrities** 62:12
**celebrity** 62:11 317:18
**century** 2:22 4:9 5:6 7:10 9:9 15:11
**ceo** 33:6 38:3 43:5,13 44:12 44:19 48:7 113:2 275:6,15 325:14
**certain** 31:10 32:12 34:17 56:24 57:6 70:2 89:3,6 130:19 131:6 153:11 184:20 281:1 308:18
**certainly** 44:1,3 69:15 76:9 108:22 113:23 317:22
**certificate** 348:1
**certified** 2:25 348:2
**certify** 348:4,17
**cetera** 59:20 325:4
**cfo** 38:24 42:20 111:18
**chairmen** 43:19
**challenge** 81:4
**challenges** 122:8,13,18,23 125:11 126:25
**chance** 24:5
**change** 317:8 320:24 322:1 349:4,7,10,13 349:16,19
**changes** 231:3 350:6
**changing** 318:15
**character** 153:21
**characteristics** 153:22,25
**characterize** 43:12 147:15 164:2
**charge** 107:25 305:9 324:4
**charged** 323:25 325:20
**charlotte** 299:21,23 300:5 301:4,11 303:8,10,14
**chat** 296:9
**chatter** 87:22
**chest** 160:23
**chicago** 88:25
**child** 147:23 148:3
**childhood** 116:19,20
**chocolate** 122:7
**circle** 218:25 219:25
**circumstances** 307:3
**claim** 234:2 235:6 236:16 244:6 250:18 250:24 251:13 255:23 257:12 257:17,22 259:20 261:25 261:12 262:21
**clarification** 32:1 324:13
**clarified** 133:9
**clarify** 17:7 51:18 222:3
**clarifying** 34:12 260:21
**clarity** 34:5,6 60:3,6 315:24 316:19 317:4 317:13,16 319:5 321:8 332:1
**clause** 257:12 338:23 341:2 342:9,15 346:17
**clear** 17:17 34:13 35:14 51:23 60:13 68:9 71:2,6 84:21 87:7,15 89:15 95:3 106:5 121:7,9 135:10 137:14 138:14 143:2,4 143:15 145:1 163:20 164:21 209:5 233:18 261:15 267:23 292:21 293:7 310:5 319:23 329:9
**claiming** 159:16 294:1 294:21
**claims** 233:14 247:22 258:15 260:24 261:10

**clearer** 31:13
**clearing** 142:25
**clearly** 17:15 127:10 137:20
**click** 298:17
**client** 24:20 25:2 188:4 241:8 244:22 246:9,12,14,21 254:25 261:8 267:21 268:2 268:13,17,19 274:5
**client's** 49:22 50:1
**clients** 193:24 193:25 194:22 194:22
**climaco** 4:7 58:7,14
**clinical** 83:5
**close** 77:7
**clothes** 146:5
**coach** 247:1
**coaching** 247:2
**code** 298:9,9,10
**coercion** 130:4
**coffee** 144:14
**collate** 312:7,13 312:18
**collective** 128:6 274:14
**colleen** 41:18 130:14 144:12 144:17 226:17 226:23 227:4
**college** 294:19
**colorful** 177:16
**colors** 209:8
**combative** 200:6
**combination** 186:10
**come** 28:25 31:12 42:17 45:13 56:16 57:16 86:12 98:24 99:2,3 99:22 122:12 122:17 138:11 139:12 140:13 230:23 236:21 243:6 255:20 262:20 283:16 286:18 288:1 289:3,20
**comes** 137:17 177:4 213:12 308:8
**comfortable** 80:1,6,10,17,20 140:11 280:16 288:12 319:5
**coming** 99:5 106:3 127:3 129:14 132:24 134:13 141:12 158:23 164:3 183:7 201:10 205:7 288:1,5 288:7 289:5,14 322:10
**comma** 300:5
**commence** 50:3
**comment** 152:17 154:24 158:15 212:23 214:16,24 279:4 294:7 338:5
**commentary** 158:4 246:17 326:1
**comments** 123:8 151:4,9 152:1 153:15 154:9 155:21 157:6 300:7 316:17 328:20
**commercial** 38:18,19
**commit** 62:1
**committing** 61:7
**common** 157:5 170:1
**comms** 167:6
**communicate** 129:13 190:23 191:1,12 284:14
**communicated** 100:5 190:21 285:5 287:17 288:15 289:11 289:12
**communicating** 188:11 190:17
**communication** 121:14 175:21 181:16 207:5 208:22 236:20 236:22 240:1 240:21 241:4 253:16,17 267:24 268:12 272:22 274:4 295:10,13 332:4
**communicati...** 127:20 166:10 166:13 167:12 167:23 168:2,7 168:16 170:10 190:1,19 228:15 238:16 238:20 239:2,9 239:14,16 240:3,8 241:8 242:3,5 252:3 252:25 253:9 253:23 254:8 254:12 266:14 266:25 267:16 271:11 281:24

286:7
**communities** 316:24
**company** 33:22 34:11 38:13,15 43:7 46:1,7,9 50:2 81:8 99:18,19,20 104:1 112:8 113:15 127:25 234:15 336:20 339:1 340:19 341:5,17
**company's** 32:25 283:12
**compare** 178:4
**compensation** 336:25
**complaint** 141:23 156:21 159:14 163:22 165:7 247:22 250:25 251:20 254:15 261:11 261:24 262:24 268:22 271:17 272:8 273:2 274:13,21 276:13
**complaints** 136:7
**complete** 143:11 350:9
**components** 41:12
**comprise** 114:9 121:20 252:17
**concern** 61:25 75:16 79:15 82:21 83:20 86:7 88:21 159:2 284:24 285:11,21 344:20
**concerned** 83:13 88:19 229:16 284:20 285:25
**concerning** 222:11
**concerns** 28:18 83:15,17 85:10 85:18,20,25 86:21 134:16 138:13 157:5 341:22
**concierge** 10:8
**conclude** 50:4
**concluded** 347:5
**conclusion** 141:21 230:23 347:3
**concrete** 84:18 198:14 289:24
**condition** 184:24
**conduct** 198:5 256:14 257:2 259:2,6 265:9 292:1 336:20
**conducted** 338:25 340:18 341:5,16
**confidential** 1:17 2:17 15:2 47:9,12,15,21 194:1,22 233:9 234:11,13,14 234:20 235:3 235:10 236:3 237:6,16,24 238:2,14 241:24 243:4 244:19 245:18 246:4 248:14 249:8,19 250:10,19,21 251:3,7,16,25 252:18,23 253:5,10,18 254:17 255:14 255:16,23 256:18 258:5 258:16 263:24 264:12,13 281:24
**confidentiality** 233:12 257:6 257:12 265:24 266:4,16 267:2 278:14,24 342:8,15
**confirm** 112:18 230:9 328:24 330:2 333:3
**confirmation** 223:3 329:3 331:18
**conflicted** 140:22
**conflicting** 88:8
**confronted** 188:2
**confused** 23:2 25:25 44:9 49:16 72:17 73:8 132:8 236:7 253:11 268:10 271:8 272:4 273:10
**confusing** 33:4 160:24 275:22
**conjunction** 312:8,14
**connect** 330:13 332:21
**connected** 330:10 332:20 333:9
**connection** 170:14 171:9 331:25 343:1,3
**connotation** 148:9,21,24

149:5,24
**connotations** 153:15 176:9
**consider** 76:3 78:8 85:7 164:15 166:12 167:12
**consideration** 29:2 55:24 75:17,20 77:20 78:20
**considered** 27:21 28:11
**considering** 76:12 77:19
**consistent** 78:25 180:22 222:16,19
**consolidated** 1:14,15 2:14 2:15
**constantly** 331:13
**constitute** 259:1,5
**constitutes** 260:14 343:20
**consult** 20:4 43:18,25 44:22 201:10 238:9 248:16 258:24
**consultation** 78:22 113:10 131:15 141:21 162:20
**consulted** 183:16 219:17
**consulting** 238:12
**contact** 51:9 88:14 103:7 138:25 145:6 206:21,24 208:2 223:6 228:12
**contacted** 205:8 206:25 207:15 209:3 214:22 215:12 224:9,15
**contacting** 209:16 210:25 211:6 222:10 222:24 225:20 227:17
**contained** 109:25 110:5 251:20 253:10
**contemplated** 50:2 256:16 257:5,24
**contemplation** 154:5
**contend** 165:2 287:7
**contending** 290:13
**content** 170:24 307:21 308:12 308:18 320:6 320:11,17,18 328:1
**contention** 130:11
**contentious** 140:1
**contents** 26:20
**contest** 307:15
**context** 86:22 138:9 144:22 146:24 188:21 217:24 261:17 292:5 329:17 334:5
**continue** 61:7 61:10 66:19 87:8,16 97:8 98:1 103:17 104:11 212:7 290:25
**continued** 103:2 142:4 160:19 161:1
**continuing** 100:6
**contours** 262:12
**contract** 47:2 47:19 48:9,15 49:4,8,18 54:5 54:6 55:20,21 59:5,22 60:4 61:10 64:16,17 64:20,22 65:4 112:5,6,10,19 112:23 113:4 113:13,17,25 114:18 144:13 232:12,14,20 233:11,14 234:2 250:18 265:21 266:3 267:13 269:22 269:25 270:9 270:14,18 283:25 284:1 333:18 334:11 334:20,21 335:2,22,25 336:10 337:7 341:2
**contract's** 266:4,16
**contracts** 43:23 44:2,7 48:11 55:10,15 56:3 56:8 164:11
**contrary** 198:18 210:17 210:21
**control** 131:1 142:8,9
**controller** 111:16

**controlling** 137:7,8
**controversy** 196:7
**convergence** 335:12
**conversation** 21:7,12,14,24 23:17,20 24:3 46:17 69:24 70:9 74:15,18 78:20 79:13,14 81:19 82:7,9 88:10 89:12 97:3 100:15,20 100:24 101:5,8 101:19 102:8 121:5 122:19 123:12,15 125:3 126:23 134:20,21 136:14,16 137:23 138:3 148:17 158:12 158:16,19 159:6,9,20,21 160:14 162:23 163:15,15,17 163:19 164:7,9 164:15 166:16 166:18,20 168:25 179:4,7 179:25 181:16 186:9 187:25 188:16 205:13 205:23 206:4 208:5,18,19,20 208:23,24 220:9 233:21 264:25 285:23 292:16 304:14 304:20 306:10 315:12 316:13 319:6,10 331:2 331:13 332:4 337:16 339:19 339:25 343:20 343:21 344:1 344:11 346:20
**conversations** 20:18,19 26:9 46:13 68:12,17 68:20 79:4 81:11,25 82:13 82:18 83:1 86:18,24 89:10 91:3 94:8,15 95:5 118:20,24 119:3,9,11 121:17,21 130:15 131:5 137:20,21 140:9 143:22 146:4 151:24 152:16 157:3 157:17 158:1 159:25 160:9 160:11 161:4,5 163:1,18 172:3 178:19,24 183:9 206:3 207:20 218:13 219:2 228:15 228:22 255:20 255:21 274:6 304:25 305:2,6 305:12,18,21 316:25 343:23
**convey** 29:11 175:10
**conveyed** 207:1 207:4,12
**conveying** 222:17
**convinced** 13:15
**cooley** 7:5 16:12
**coordinator** 153:5,6
**cop** 139:2
**copy** 59:20 64:16,21,24 65:4 96:14 193:22 194:10
**copying** 65:21
**corner** 87:20
**corporate** 30:15 32:25 35:8 36:19 48:21 275:7 325:15
**correct** 17:24 25:19 26:5 27:12,15 29:7 29:16 30:16 33:1 35:16 39:11 41:24,25 42:4 48:7,8,24 49:1,18 50:20 50:21 51:17 52:7,9,17,25 56:5 61:11 63:24 68:25 82:15,16 92:12 92:14,19 93:16 93:22 94:1 106:12,13 112:12 114:1,2 114:16,21,23 114:25 115:11 120:4,5,8 121:3 122:21 125:19 128:21 129:7,13 133:7 133:15,16,23 147:13 148:10 148:15 153:15 154:10,13 156:25 157:18 158:4 166:14 168:20 170:6 171:5 174:25 175:1 180:24 190:19 202:2 205:9 208:10

208:14 209:21 215:25 219:9 219:10 221:16 231:25 232:12 232:13,16,17 232:23,24 235:7 238:1 241:15,20,21 250:23 268:3 268:17 271:22 279:21,22 285:7,16 304:8 319:12 322:19 323:8,13,14,15 325:10,13 328:10 348:15 348:22 350:8
**correction** 27:11 160:3
**corrections** 350:6
**correctly** 27:25 29:11 49:5 106:18 257:10
**cost** 305:16
**costs** 41:4
**counsel** 20:4,20 20:22 35:14 43:25 44:1 58:6,15,16 127:8,16 132:16 133:13 133:17,21,25 134:5 235:20 240:13 324:17 334:10,11,14 334:16,16 335:12,13,14 335:24 336:1,7 336:7 342:18
**counsel's** 19:25 21:3,5 241:11 267:6
**counter** 321:12
**counterclaims** 231:24 232:3,8 232:11,19
**couple** 21:13 84:14 105:13 105:19,21 125:24 144:24 182:13 234:24 271:8 285:13
**course** 27:18 39:2 43:16 51:25 64:21 80:16 86:17 113:11 138:17 140:11 144:25 150:25 220:8 242:5 268:18 323:6 330:19
**court** 1:1 2:1 16:22
**covenant** 256:9
**cover** 35:17 154:6 321:9
**covered** 19:21
**covid** 123:5 137:18,19,25 138:10,13 151:17 159:19 163:25
**craft** 122:7
**crass** 123:21
**crazy** 299:21 300:5
**crd** 250:25 251:20 272:8 273:2 274:12 274:20 276:13
**create** 308:16 308:18
**creation** 195:13
**creatively** 38:8
**creator** 320:6
**creators** 320:17
**crisis** 127:20 128:12,12,13 129:1,2,19,23 131:12 132:4 166:10,12,18 166:19 167:6 167:12,23 168:2,7,16 172:3,19 180:9 190:18 218:9 219:13 297:18 305:10 306:20
**crossed** 344:14
**csr** 1:24 12:5 13:5 14:5 348:25
**ctr** 317:8
**culture** 38:12
**current** 85:9 229:6 316:23 336:10
**cut** 150:5 278:4
**cv** 1:7,7 2:7,7 15:17
**cybersecurity** 191:8

**d**

**d.c.** 5:18
**dad** 269:22 277:5
**daily** 13:15 46:23 204:21 204:25 205:4,8 206:11,24,25 207:7,8,15,20 209:3 210:25 211:6,11,15 213:1 218:4,12 218:20 219:1,8 220:16 221:6 221:20 222:4 222:24 224:9 224:15 225:21 226:16,18 227:1,3

**damaged** 282:1
**damages** 279:19,23 280:21 281:2,9 281:14 291:25 292:10
**dan** 10:8
**dang** 331:16
**danny** 91:14 93:9,15 95:24 96:1,3 109:24 130:15 222:11
**dark** 175:4,7
**date** 12:11 13:7 13:22 14:9 49:10,15 67:2 69:22 73:10 97:14 98:13 103:12 140:14 230:9,11 349:24 350:12
**dated** 12:15,17 12:20,22 13:9 13:10,12,18,20 14:7,11 54:21 65:20 111:4 115:24 174:8 178:11,17 185:18 201:19 202:3 211:19 269:11 270:9 270:11,15 303:21 326:8 348:22
**dates** 68:1,2 292:17
**david** 14:11 170:16
**day** 34:8 71:16 99:9,11 100:1 119:12 153:8 159:8,10,12,15 159:16,22 163:2 165:3 170:3,3 182:12 182:12 185:21 185:24,25 200:24 201:6 205:15 219:4 265:23 324:3 348:22 350:15
**daylight** 15:7 213:6
**days** 37:16 50:8 70:12 125:24 160:20,21 166:24 167:2 229:5
**dead** 170:16
**deal** 139:24 198:14
**dealing** 95:15 139:22 172:19 192:2 229:6 256:10
**deals** 38:7
**dealt** 172:24
**debate** 260:4 262:12 344:16
**debating** 263:11,15
**december** 269:11 285:20
**decide** 69:17 113:12 115:4
**decided** 67:4,14 67:16 68:10,11 85:14,21 97:25 113:14 167:19 181:13 182:8 190:18,23 286:8
**deciding** 107:25
**decision** 43:6,9 43:13,21 44:24 67:21 68:6 69:7 82:14 85:25 97:7 98:10 113:3,7 113:18 127:19 128:2 166:9 183:24 187:16 197:10 198:23 201:2 230:15 230:19 232:3
**decisions** 68:19 68:24 81:2 108:5 183:13 183:14,17 219:2
**declare** 348:20 350:4
**deduce** 116:12 116:13
**deduced** 169:22
**deemed** 350:6
**defamatory** 191:14 195:21
**defend** 209:11
**defendant** 1:12 2:12 41:3
**defendant's** 274:22
**defendants** 1:9 1:15 2:9,15 7:2 8:2 9:2,15 29:20 39:10,13 40:10,15
**defended** 172:15
**defending** 327:11 328:7 328:21 329:1
**defense** 39:15 39:17,19,21,23 40:1,4,6,8
**defer** 234:6 254:2 292:13 345:4
**deferring** 254:5
**definitely** 101:21 317:4

**definition** 306:24 307:14
**degree** 122:9 171:1,3
**deleted** 336:1,3
**delineated** 35:18
**denied** 210:25 211:5
**depending** 324:2
**deponent** 348:14 350:3
**deposition** 1:19 2:18 12:7 15:2 15:13,15 17:1 18:4,5 19:10 19:11 22:13,14 25:7,8,15 28:2 29:20,23 30:8 30:15 32:3,19 36:16 37:7 78:13 136:13 192:17,20 193:4,13 194:8 223:24 224:3,5 247:8,17 248:5 259:13 262:8 302:10 347:3,5
**depositions** 192:5
**deprived** 265:2 265:11
**depriving** 256:22
**dern** 6:4
**derogatory** 316:17
**describe** 33:9 38:2 76:19 290:11
**described** 83:15,21 85:10 85:19 86:1 87:5 94:6 126:21,22 233:24,25 264:24
**describing** 244:10
**description** 12:6 13:6 14:6
**designate** 312:3
**designated** 59:2 282:24
**designation** 64:7 293:9
**designee** 35:9 325:15
**desist** 295:21 303:10,14
**detail** 180:8
**details** 305:14
**determination** 189:12
**determinative** 262:25
**determine** 266:10 324:6
**determined** 142:7 288:19
**developing** 283:7
**development** 283:9 287:13 287:23 288:8 289:9 290:25
**deviate** 36:18
**deviates** 36:1
**device** 90:11
**devices** 99:18
**dictate** 96:13
**difference** 128:23
**differences** 169:25
**different** 26:16 35:19 68:12 73:5,19,19 87:23 96:19 103:23 136:1 158:1 162:5 177:5 200:10 216:5 287:22 303:12 310:15 310:22 311:6
**difficult** 34:23
**digest** 200:23 215:6
**digital** 304:3,13 304:15,21
305:3,19,23 306:1,9,11,13 306:18 307:20 308:16 327:2
**direct** 19:22 26:7 30:3 87:1 90:10 209:9,19 210:18 241:7 242:1 244:11 333:21
**directed** 161:19
**direction** 26:22 240:11 242:15
**directly** 62:6 103:19 309:18 310:12 311:3 316:24
**dirt** 172:4
**dirty** 172:24 176:17,22 177:1,9,13
**disagree** 152:6 242:20 245:9 260:18 314:24 315:3
**disagreed** 165:2
**disclose** 259:12 259:23 265:21 266:14,24 267:10,16 268:9
**disclosed** 234:13,23

243:3 259:21
**disclosing** 250:19 343:23
**disclosure** 234:9
**disclosures** 280:20,25 281:1,6,11
**discomfort** 133:2 134:16 136:23
**discord** 316:21
**discourse** 320:22
**discover** 313:6
**discovery** 65:3 65:12 108:11 110:8 241:14 241:19,22 242:9,17 243:2 259:19,21 261:13 262:1
**discrediting** 197:23
**discrepancy** 147:19
**discuss** 18:1 19:19 26:8,19 27:2 29:23 145:1 155:4 179:14 204:12 204:15 236:13 260:8,10 261:21
**discussed** 18:10 21:10 28:14,17 78:22 123:18 126:2,7,24 127:13 140:6 154:10,20,25 155:3 157:2 159:23 165:13 176:19 192:20 204:19 257:14 265:5 321:10 321:16 322:6 340:25
**discussing** 59:23 60:12 66:7 79:22,23 102:3 122:23 166:8 218:10 303:7 304:2
**discussion** 128:6 143:1 147:10 229:8
**discussions** 141:14 144:15 145:17 185:11
**disgruntled** 130:24
**dismissing** 84:12
**dismissive** 172:13,20 173:20
**dismissively** 173:3
**dispute** 173:11 174:4 301:17
**disputing** 173:16,19,23
**disruptive** 70:22 102:15 102:16,22
**distinction** 33:22 35:24 40:3 42:13,15
**distinguish** 33:19 34:9
**distraught** 99:21,23
**distributors** 290:20
**district** 1:1,2 2:1,2
**distrust** 77:10
**document** 37:11 43:14 47:12,21 64:12 111:3 202:1 242:8,16 270:12 273:11 275:2,4 280:6 306:16 319:7 333:13,18
**documented** 90:24 95:21 96:9,12
**documents** 108:23 242:4 262:22 271:15 272:12,17 273:7
**doing** 36:9,16 45:21 57:19 69:17 110:21 129:19 146:14 147:1,4 153:8 182:21 197:14 198:16 218:24 219:4,12,14 236:9 237:2 258:20 263:6 278:16,25 310:1 318:6 321:4 323:19 325:16 328:24 329:11,18,22 330:8,18 331:4 332:18,22 333:8 345:4
**dollar** 298:17 299:11
**door** 288:2
**doors** 283:14 283:15
**double** 323:20 325:16
**downloaded** 175:4,8
**downstairs** 23:25 24:1
**draft** 59:21 64:13 334:11

**dramatic** 90:22
**draw** 84:8
**drawing** 41:9
**dreams** 283:12
**drill** 269:6,7
**drop** 104:17
**dropping** 289:4
**due** 254:24
**duration** 76:6

**e**

**e** 3:1,1 4:1,1 5:1 5:1 6:1,1 7:1,1 8:1,1 9:1,1 10:1,1 349:3,3 349:3
**earlier** 106:4 115:8 127:13 186:2 204:19 205:6 232:15 265:23 321:16 340:25
**early** 106:20 336:11
**easier** 275:24
**east** 2:22 4:9 5:6 9:9 15:12
**eastern** 213:6 214:9
**easy** 143:19 267:17 320:14 320:20,25
**economic** 281:15 290:8 290:13
**edit** 140:17,17
**edited** 187:21
**editing** 140:16
**editor** 323:25 324:1
**edits** 131:1
**effect** 236:24
**effects** 291:3
**effort** 62:14
**efforts** 304:21 305:3 307:20 307:22 308:1 308:12,17 314:7
**ego** 141:11
**ehudson** 4:12 4:14
**eight** 143:8
**either** 44:17 50:8 95:19 114:14 121:21 129:13 133:7 146:12 151:25 165:3,4 169:2 180:19 192:5 193:19 223:3 233:17 236:23 246:24 266:1 266:13,23 305:22 338:4 339:6
**elected** 61:9 63:9 66:18
**elements** 307:20
**elevate** 300:9 300:16,19,20 301:3,10
**elevated** 300:25
**eloquently** 236:11
**email** 12:15,17 12:20 13:12 14:7,11 65:20 66:1 67:2,13 111:3,21 112:1 112:4,6 115:16 115:23 116:4,5 116:6 117:6,11 169:3 170:10 201:23 202:2,8 212:17,22 213:21,22,23 214:12,24 215:13 230:8 253:16 277:5 277:15 278:5,8 303:21,25 304:7 306:7 321:5 322:7 334:9,13,23
**emails** 121:14 239:25 252:3 252:24 253:8 253:23 254:8 266:25 268:6 268:22 326:2
**emanuel** 3:5,16 15:21,25 16:2
**embraced** 131:2
**emily** 22:1
**emotional** 84:7
**employee** 348:18
**employees** 132:18,20 193:25 194:23
**employer** 73:16
**encapsulate** 68:13
**encompass** 51:1 57:13 83:21
**encompassed** 52:15 53:6 65:11
**encourage** 68:4
**ended** 60:14 61:5 283:25
**ends** 13:15 41:24 46:12 56:23,25 62:7 62:15 94:16 118:22 119:2 120:4 127:1 183:10 288:6
**energy** 124:1 161:17
**enforce** 307:22 308:12

**engage** 316:24
**engaged** 56:17 74:1 153:6 256:14 257:3 310:9 323:4
**engagement** 49:22 50:2 66:5 108:4 196:4
**engaging** 88:2 318:15
**engine** 308:4
**english** 217:16
**enter** 48:16 113:4,12
**entered** 47:19 103:25 104:6 113:24 114:13 114:18
**entering** 48:11 113:16 145:18
**enters** 43:23 44:14,17
**entertainment** 291:8
**entire** 107:13 237:4,9 251:5
**entitled** 15:14 115:17 117:7 243:12 245:11 247:25 335:17 336:24
**errata** 350:7
**escalated** 220:18 221:8 222:12
**escaping** 287:15
**especially** 288:5
**esra** 4:5 16:3
**essentially** 26:8 28:1 55:19 60:8 83:21 87:8 101:19 181:12 185:1 189:3,9,25 207:24 217:13 229:11 288:9 305:15 308:20
**estimate** 126:15
**estimated** 322:20
**estimation** 47:18 88:12 130:24
**et** 1:8,13,15 2:8 2:13,15 12:3,3 13:3,3 14:3,3 15:15 59:20 325:4 349:1 350:1
**europe** 91:22
**evening** 21:15
**event** 57:18 72:22 73:6 75:6 98:16 289:23 336:19 338:25
**events** 84:24
**eventually** 286:7
**everybody** 31:21 150:20 331:13
**evidence** 199:15,22 200:7,9,10 215:21 235:9 240:21 241:22 243:1,5 244:5 244:17,24 245:17 246:3 248:11 249:5 249:17 250:8 253:21 254:7 255:12 260:1,2 260:14 261:25 262:8,11 271:25 272:15 275:10
**evident** 70:8
**evidentiary** 262:20
**exact** 23:12 82:19 89:9 236:17
**exactly** 22:25 79:7 81:18 90:25 107:3 123:3 141:17 147:19 169:9 169:19 206:12 305:8
**examination** 11:1,5 17:20 37:18 348:10
**example** 84:18 308:17 341:15
**examples** 128:18
**excellent** 263:7
**exchange** 54:24 66:24
**excuse** 79:8 224:4 305:11
**execute** 312:25
**execution** 59:19
**executives** 130:18
**exercise** 343:1
**exhibit** 12:6,7,8 12:11,13,15,17 12:20,22 13:6 13:7,9,10,12,15 13:18,20,22 14:6,7,9,11 37:4,6,8 47:2,4 52:13 53:14,18 54:4,16,18 59:5,9 65:16 65:17 67:3 111:3,7 115:23

116:2 174:6,11 177:23 178:1,5 178:5,10,10,11 178:15,24 179:3 185:14 185:20 190:6,7 201:15,17 211:14,17,19 211:24 212:16 213:2,5,11 215:24 216:13 216:16 269:9 269:14 292:16 292:19 303:17 303:18 310:19 317:25 318:3 318:14,18 324:11 326:7,9 334:9,12
**exhibits** 12:1 13:1 14:1
**exists** 65:14
**expand** 28:7
**expect** 262:19
**expectation** 92:19 233:17 289:10
**expected** 315:13 319:24
**expenses** 39:10 39:15,25 42:9 42:25 43:18
**experience** 133:18 135:16 156:14,14 182:17 183:20 188:1 346:2,10
**experienced** 95:18 141:6 187:1
**experiences** 124:8,12 133:14,22 134:1,6
**experiencing** 125:12 126:25 155:11 162:19 291:6
**expert** 37:23 279:25
**expertise** 233:6
**experts** 292:14
**expiration** 50:9
**explain** 26:3 27:13 73:12 90:25 235:22
**explanation** 131:19
**explicitly** 340:17
**expose** 316:22
**exposed** 147:5 148:14
**express** 139:4 160:1 164:20
**expressed** 143:6 230:20 285:21
**expressing** 82:10 131:5 171:7,15 174:23 175:22 176:3 180:23
**expression** 137:9
**expressly** 168:19
**extension** 50:10
**extensive** 36:15
**extent** 35:16 42:22 65:10 88:2 220:1 234:16 235:4 240:12 242:2 242:16,19 243:24 262:7 267:15 293:7
**eye** 138:25 145:6
**eyes** 58:4 59:3 64:6 141:2 282:25 293:9 298:19

**f**

**f** 4:18
**f'ing** 318:7
**fabricated** 165:4
**facebook** 298:15
**fact** 34:21 62:18 69:8 79:8 81:19 101:8 129:18 130:7,19 148:14 162:25 163:5,10 169:24 197:17 198:15 223:10 226:17 242:9 242:11 258:15 259:12 319:11 323:2 337:12
**facts** 259:20 260:1,2,14 262:7,11 273:5
**factual** 199:14 259:19
**failed** 232:21 233:1
**fair** 60:6 80:24 94:12 98:19 101:1 103:2 132:6 135:20 135:22 136:21 143:18 145:14 146:7,25 150:9 150:17,17,22 152:21 198:12 198:12 200:25 218:22 227:15 256:10 274:17 280:11,18 289:21 307:2

321:25 343:25 344:3
**fairly** 51:1 59:25 60:20 71:2
**faith** 83:18,19 83:20 84:1 85:12 230:24 230:24 256:9
**fake** 330:4 333:5
**fall** 177:9 183:18 254:20 258:23
**falls** 244:21 246:8,12,14,20 265:14 268:13 274:3
**false** 300:10,17 301:4,11
**family** 91:22
**fan** 321:12
**fans** 13:15
**far** 113:16 144:18 182:22 183:1,5 199:9 229:16
**farr** 5:3,13
**fast** 187:3
**faucet** 289:4,6
**favor** 300:6
**fear** 131:9
**featuring** 303:7
**fed** 258:4 263:23 329:12
**fee** 52:5,15,16 53:4 55:24 321:10,14 322:20 323:17 323:21 325:17
**feeding** 146:12 256:18
**feeds** 298:18 299:12 327:12 328:8 329:1
**feel** 23:2 33:6 33:18 75:25 77:4,7 80:19 81:8 83:1,3 85:4 86:20 88:16,20 135:10 139:3 164:4 280:16 317:6 319:4 328:23 333:23 335:8
**feeling** 83:25 84:16,19 87:3 96:23 124:2,6 137:1 142:14 143:13 149:24 150:12 187:7 233:7
**feelings** 17:17 86:22 131:4 137:3,22 141:9 156:13 169:12
171:22
**feels** 105:20 137:9 246:13
**fees** 39:9,14 40:17,18,22 41:5 42:9,19 42:25 56:3 324:5,5
**feet** 61:22
**fell** 257:9
**felt** 75:14 76:12 76:14 80:2,7 80:17 83:12 88:9 90:23 91:1 97:2 130:4 139:8 140:5 141:7,8 142:14,25 149:11,14 150:2,3 155:11 162:11,19 164:18 186:24 186:24 231:1
**ferrer** 41:9 130:13
**ferrer's** 134:1
**feud** 13:16
**field** 128:20 129:11 172:23 207:21
**fielding** 218:8
**fields** 291:14
**fifteen** 32:20 323:18
**fighting** 247:14
**figueroa** 3:9
**figure** 78:9 140:3 160:16 206:16
**file** 232:3 236:16
**filed** 231:23 232:9 271:17
**files** 64:18 65:4
**fill** 79:11
**film** 41:24 42:3 42:7 122:13 133:2 134:12 142:2 152:25 227:5
**filming** 46:12 94:16 118:21 119:1 120:4,9 120:10,10,11 120:17,25 125:16 137:15 137:18 151:21 152:1 157:4
**filmmakers** 38:20,21
**filter** 189:18
**final** 59:19
**financial** 38:4
**financially** 348:19
**find** 322:3
**fine** 134:25 136:25 137:4

142:4,4 143:3 165:23 204:23 242:22 260:6 282:20 302:23 344:2,5
**fingerprints** 313:1,5,13,22 313:23
**finish** 341:21
**finished** 142:5 142:15
**fire** 88:17,19
**firefighter** 88:20
**firefighters** 88:18
**firestorm** 103:13
**fireworks** 95:16
**firm** 166:19 231:8
**firms** 167:11
**first** 37:10 45:5 45:7,13,15 49:8,20 60:17 60:25 68:9 79:15 98:25 99:1 108:22 120:16 137:21 140:18 149:2 163:14,15 166:24 178:15 187:19 189:18 193:9 205:18 208:24 216:16 233:4 269:20 272:5 284:16 295:13 306:7 317:9 326:23 327:18,20 335:11
**firsthand** 101:24
**fishy** 330:17 331:4
**fit** 169:5 233:5
**five** 70:12 120:14 124:21 140:13 160:12 165:20 183:7 288:3 323:12
**fixed** 217:4
**flag** 137:25 317:3
**flagged** 295:13
**flames** 229:6
**flip** 50:22 114:6 184:16,17 217:25 221:24 270:5 276:24 296:6 327:8,21 328:1 333:23 335:15 342:6
**floats** 78:9
**floor** 3:10,20 4:21 7:10 8:10
**flowers** 172:20
**flying** 209:8
**focus** 239:22 293:4 307:19 326:23
**focused** 31:6 62:25
**focusing** 336:3
**follow** 21:2,4 23:4,7,9 24:13 24:22 25:4 26:13,25 27:8 108:3 136:14 204:23 224:21 225:16 227:21 228:6 235:25 241:11 244:14 247:5 252:20 255:1 259:10 269:1 302:3
**followers** 328:23
**following** 59:2 62:11 282:24 304:13 306:9
**foot** 161:6,10
**foregoing** 348:5,15,21 350:5
**forensic** 107:16
**forget** 107:5 339:7
**forgive** 31:8 63:15 83:6 111:12 115:3 132:12 142:22 160:25 294:19
**forgot** 300:2
**form** 26:9 195:15 199:19 199:23 200:4 200:18 260:17 296:20 297:1 297:15 301:5 301:12,18,23 307:7 308:21 309:14 310:2 310:16 311:8 313:7,20 314:13,20 315:1 316:6 319:13 325:19 332:5,24
**formal** 271:16
**former** 48:7 294:6
**forms** 121:14 153:11 250:8
**forth** 81:7 130:2 313:15 344:12 348:6
**forty** 165:20,22 165:23 302:5
**forums** 309:19 310:13 316:1
**forward** 45:1 56:7,17 63:10 87:16 88:22

164:5,8 262:18 263:1 288:12 288:20
**forwarding** 212:17 213:11
**forwards** 334:24
**found** 77:18 98:20 170:16 191:8
**four** 54:14 61:2 75:22 76:21 85:6 94:5 95:8 109:22 110:12 127:5,12 161:8 183:7 215:14 239:16
**frame** 125:25 164:16 177:3 238:19
**framing** 157:18
**free** 178:3 263:3 333:23
**freedman** 7:5,6 16:9,9,12 267:9,16 268:5 268:12,20 269:11,21 271:20 273:13 274:11,19 277:4
**friend** 317:18
**front** 27:11 60:24 174:13
262:22
**fruition** 283:16
**frustrated** 278:18
**frustration** 155:15,18
**fucking** 123:24 123:24 156:10 205:22
**full** 140:17 318:8 319:5 336:25
**fully** 83:10 142:12 330:2,2 333:3
**fun** 122:5,6
**fund** 42:18
**funds** 42:10,16 42:17
**further** 181:15 260:8,10 286:7 319:9 329:3 348:17
**future** 281:15 290:8,12

**g**

**gal** 299:21 300:5
**gallagher** 5:3 5:13
**games** 280:13 287:12 298:10
**gap** 103:15
**gaping** 86:2
**gasoline** 209:15 209:17
**gather** 55:22
**gathered** 236:18 239:18 239:23 240:1
**general** 42:21 43:1,16 51:1 57:14,15 59:21 60:12 71:5 272:22 304:23 304:24 305:1 309:5 310:21 316:8 317:17
**generally** 71:5 114:9 212:9,11 287:19 305:24 307:16
**generous** 137:9
**genitals** 165:5
**getting** 75:1,3 82:15 88:21 131:3 138:13 140:16 145:3 156:4,6 205:8 222:25 223:13 223:14 228:1 260:15,16 289:19 300:8 313:15
**giannetti** 158:9
**girl** 171:3,18 176:18,25 180:1 294:1,18
**gissen** 13:17 211:15 212:18 213:1,24 214:22 215:12 215:16,23 216:11
**gissen's** 213:12
**give** 17:1 19:5 24:5 26:22 27:11 28:22 38:20 41:10 44:21 55:9 57:8 62:14 71:12 75:22 82:24 84:18 86:22 107:12 108:2 126:15 128:18 134:20 144:22 164:9 167:10 173:21 209:15 217:5 217:19 226:20 230:21 240:10 245:11 248:4 258:16,19 266:2 268:8,25 280:6 286:24 287:19 302:14 338:23
**given** 30:6 42:17 109:2

124:10,11 162:18 234:16 333:25 340:12 350:9
**gives** 251:3
**giving** 110:13 131:21 137:14 182:20 188:19 291:11
**glancing** 170:22
**glasses** 223:11 223:15
**glover** 9:18 16:7,7 195:15 199:19,23 200:4,18 261:2 296:20 297:1 297:15 301:5 301:12,18,23 307:7 308:21 309:14 310:2 310:16 311:8 313:7,20 314:13,20 315:1 316:6 319:13 325:19 332:5,24
**go** 17:8 20:8 28:9 33:17,22 34:14 35:4 55:1 58:5 61:16 63:13 64:1,5 67:5,14 67:21 68:6 73:7 74:5 78:21 79:24 81:6,12 97:16 99:6 102:11 116:21 134:24 135:14 142:2 143:24 144:9 149:19 152:6 164:12 165:21 181:1 183:21 187:19 209:24 227:9 231:13 233:18 248:6 248:18 249:22 261:22 264:3 282:9 283:10 293:6 302:15 302:21,24 308:6 315:18 317:11 318:19 331:15
**goal** 39:3
**goals** 38:13 232:22 233:3
**god** 84:3 88:7 149:20 223:15 345:21
**goes** 61:24 175:13 288:2 299:19 307:17 309:16 312:5 312:23
**going** 19:22,25 20:9 21:2 24:9 24:13,18,22 25:4 26:6,13 26:15,25 27:3 27:8 30:2 36:5 36:11 37:4 44:2 54:12,15 61:1,21,23 65:12 67:14 71:13 78:4 79:11 80:7 83:9,11 84:4,6 84:9 87:21 88:17 96:5,13 96:21,25 97:1 97:16 98:17 100:16 101:14 105:9,19,22 108:6 110:11 111:2 134:22 135:13 136:19 137:11 138:22 142:1 144:5,9 165:24 182:9 183:23 187:15 187:16 189:9 190:5,22 191:1 199:5,9,12,13 199:14 200:2 200:15 201:12 201:14,15 202:7,21 205:16 206:7 211:11,14 214:7 227:13 231:4,5,16 235:22 237:1 241:6,11 242:1 242:25 244:11 244:14 246:24 247:5,7,8,12,13 247:14,16,17 248:3,19,25 252:9 258:7 259:8,11,14,22 262:9,17,18,25 263:1,22 267:14,18,20 268:1,7,16 269:8 280:7,13 280:14 283:19 286:19,20 287:9,9 291:1 291:2 297:7 302:25 303:12 303:16 320:24 324:10 326:6 326:22 333:17 333:20 334:23 335:1,20 343:14 347:3
**gonna** 96:21
**good** 15:5 38:10 96:22 135:2 144:1,3 166:6,7 175:23 180:14 215:2

256:9 297:21 302:13
**google** 308:19 317:10
**gotta** 205:22
**gotten** 235:16
**gottlieb** 5:4
**gravity** 139:3 161:24
**great** 17:4 85:23 88:21 101:20 105:18 139:2 209:6 281:7 335:5,10
**greenberg** 91:14 93:9,15 109:24 130:15
**greenstein** 88:1 205:3,7,10 206:10,20 207:12 221:15
**greenstein's** 224:8,13
**grew** 162:6
**ground** 183:23
**grounds** 20:24 24:11,20 25:2 26:7,23 30:4
**groundwork** 285:24
**group** 97:1 127:24
**group's** 40:4
**guess** 96:6 116:16 119:15 119:16 135:24 145:16 150:4 158:22
**guessing** 55:16 113:20 286:4
**guidance** 233:19 243:6
**guidelines** 164:8
**guys** 104:19 105:11 135:13 164:23 183:24 191:8 218:3 236:25 237:2 294:5 339:19 339:20

**h**

**h** 349:3
**half** 140:18 341:13
**hallway** 21:21 30:12 143:23
**hand** 112:7 171:23 190:5 326:6
**handed** 233:10
**handing** 211:18 292:15
**handle** 84:17 166:10 218:19 219:18
**handled** 162:19 162:21 165:13
**handling** 75:25 217:14
**hands** 104:17
**handy** 178:6
**hanks** 13:9 78:23 86:18 174:7 185:17 185:18 186:6 190:11,16
**happen** 75:10 75:17 77:20 164:12 206:2 231:3 316:13 319:6 329:21 340:8
**happened** 54:9 69:24 71:3 79:14 84:24 99:14 120:18 132:16 134:16 160:17,18,20 160:21 161:9 163:2,10,23 168:13 169:4 210:20,21 273:1 276:14 294:8 331:24 341:23
**happening** 96:8 98:13 118:5 128:14 130:14 131:10 132:3,6 132:9 139:25 140:6 142:18 143:8 178:20 187:2 206:13 206:14 224:3 286:2 297:8,19 297:20 330:18 331:17 343:15
**happens** 63:19 135:14 162:14 170:1 223:18 231:6 289:23
**happy** 105:17 131:6 282:21 286:23
**harassment** 285:3 286:13 288:17 289:15 335:18 336:20 338:25 340:18 341:5,16
**hard** 84:4 96:14 136:22 154:13 177:6 177:21 185:10 197:19 290:1,5 290:21
**harm** 281:14 281:16 290:7,9 290:11,12
**harmful** 317:15 317:21 318:6
**harming** 256:20 264:5,8

**head** 80:14 87:23 144:1 238:6 290:23 290:24
**heading** 314:7
**heads** 135:4,8 135:11,12,15 143:24 162:12 164:2 188:18 188:20
**hear** 88:14 106:18 137:22 144:12 154:1 162:15 225:17 261:14 302:17 339:22 344:8,8
**heard** 101:24 102:4 132:15 132:16 134:23 135:6 142:3 143:9 157:23 160:4 162:3 165:6 172:5,8 172:11,22 193:1,18 194:16 195:1 205:10 206:18 210:9 224:22 306:19
**hearing** 130:16 130:17 143:8 191:16,23,25 193:9 195:4 200:23 206:19 219:22,25 220:14 221:4 221:11 339:21
**heart** 23:5,7,10 184:22 258:13
**heat** 288:10,15 288:18
**heath** 1:19 2:19 7:3 8:3 9:3 11:2 12:2,13 12:20 13:2,19 14:2,8 15:14 16:19 17:6 20:17 30:7 32:24 33:14,20 34:10 35:6,20 36:2,25 166:6 211:21 240:11 261:13 275:16 303:6,23 324:14 343:22 346:25 349:2 349:24 350:2,4 350:12
**heavy** 184:22
**heck** 331:17
**help** 57:16,19 60:24 104:11 128:15 129:13 201:11 210:4 287:5 308:16 335:6
**helped** 86:22
**helpful** 31:25 36:23 131:13 233:8 292:24
**helping** 318:16
**hereto** 350:8
**hereunder** 337:2 343:2
**hernandez** 10:10 15:8 337:22 345:17
**hey** 179:9,9 196:12 328:2 330:17 331:3
**hide** 163:20
**high** 130:7 262:23
**higher** 300:22
**hire** 81:7 115:4 129:3 131:14 131:16 167:5 167:20 168:19 168:23 172:14 187:15,16 189:13 190:18 190:24 197:11 197:25 198:9 198:24 201:2
**hired** 129:25 170:5 187:14 305:9
**hiring** 80:18
**history** 169:21 169:23 188:17
**hold** 49:9 84:7 123:2 205:22 218:3 245:7 247:7,16 291:7 340:12
**holding** 38:7 59:18 291:22
**holds** 193:24 194:21
**hole** 81:20 86:2 86:7
**hollywood** 170:2
**holmes** 3:7 15:24,24 64:1 64:4
**honest** 33:5
**honestly** 85:3 130:10
**hoover** 41:18 226:17,23
**hoover's** 134:6
**hope** 250:16
**hoping** 288:8
**host** 83:12 87:21
**hostage** 193:24 194:22
**hostile** 256:19 258:5 263:24 263:25
**hot** 151:5 152:2 152:11 154:25 155:22

**hotel** 170:16 171:4,18 176:19 177:1 180:2 294:2
**hour** 124:23 302:9
**hourly** 219:1
**hours** 105:13 105:19,21 247:11 271:8 302:5,7
**house** 143:20 266:10
**houston** 9:22
**hr** 141:23 154:5 163:22
**hudson** 4:5 16:3,3 58:9,12 58:16
**hug** 160:6
**huge** 13:16
**hugging** 160:7
**hugs** 160:5,6
**huh** 30:23 32:8 49:11 73:12 91:9,13,15 94:20 97:12 103:20 113:9 189:6 191:3 195:25 210:15 226:2 228:21 230:7,17 248:9 253:13 287:21 291:16 292:7 315:21 322:11
**human** 38:16 84:8 330:23
**humanity** 84:12
**hurdles** 140:2
**hurt** 285:1
**hurting** 258:18
**hypothetical** 197:19 198:1 199:9,13
**hypotheticals** 198:13

**i**

**icky** 172:24
**idea** 124:20 136:15 154:4 182:16 240:3 298:10 300:18
**ideas** 57:16 131:1
**identification** 37:8 47:4 54:18 59:9 65:17 111:7 116:2 174:11 178:1 185:20 190:7 201:17 211:17,24 269:14 292:19 303:18 326:9 334:12
**identify** 15:18 240:19 244:17 244:23 253:7 253:14,15,20 255:22 257:2 287:6
**ig** 328:20
**illfully** 137:6
**image** 107:16
**images** 317:20
**imagine** 108:2 109:5,19 125:7 172:19 297:10 298:19 332:9
**imene** 277:6,14 277:16
**immediately** 75:9,14 221:18 229:4,5
**impact** 39:1 83:25
**impacts** 291:6
**implication** 340:2
**implications** 291:6
**implied** 133:7 154:3 256:9
**implies** 339:10
**imply** 313:16 313:19 345:2,3
**implying** 261:14
**important** 29:6 80:1,6,13 81:1 135:17 200:15 266:20 282:5 297:9,12
**impossible** 290:23
**inaccurate** 172:7,10
**inadvertent** 46:22 121:6 183:12
**inappropriate** 150:13
**incident** 145:2 154:19 156:19 160:2,8 161:9 170:15 171:3 171:10,18 176:18,25 180:1 341:24
**incidents** 28:6 135:25 136:2 158:2 163:1
**include** 135:20 185:1,9 189:21 249:10,12 314:7 321:15
**included** 57:22 62:16 68:8 100:15 185:7 193:23 235:18 300:25 303:25 311:20

**includes** 39:14 306:25
**including** 136:2 141:3 208:23 208:24 209:22 256:17 281:1
**incoming** 128:20 129:6 209:11,23 289:10,12 290:1
**incorrect** 59:12 128:21
**incorrectly** 338:13
**incredible** 281:25 284:23
**incredibly** 281:25 282:5
**indemnificati...** 337:14 338:13 338:15,19
**index** 11:1 12:1 13:1 14:1
**indicate** 36:21 341:2
**indicated** 20:17 115:13 117:21
**indication** 84:21 87:7,15 135:5,18 144:10 163:8 164:24 227:20 227:24
**indications** 133:1 134:15
**individual** 32:24 33:21 34:21 36:3,15 51:20 108:5 275:17
**individually** 110:12
**individuals** 41:3 44:20 99:16
**industry** 290:17 291:7,8
**influence** 316:25 320:22
**influenced** 197:10
**influencer** 320:6
**influencers** 320:11
**influencing** 309:18 310:13 310:21 311:4
**info** 234:18,19
**inform** 106:11 106:14,16
**information** 44:21 75:1,4 78:7 88:3 109:11 157:20 189:4 194:1,23 210:4 217:22 217:23 224:8 224:13,15 226:18 227:5 227:10 233:9 234:11,13,15 234:17,19,21 234:22 235:3,8 235:10,14,18 235:18 236:4 236:12,15,17 236:18 237:3,6 237:13,16,24 238:3,5,13,14 239:18,22 240:12,14 241:25 242:3 243:4 244:19 245:4,19,25 246:5 248:14 249:8,10,12,15 249:19 250:5 250:11,19,21 251:1,3,8,17,20 252:1,17,18,23 253:5,10,18 254:17 255:10 255:14,16,19 255:23 256:1,3 256:18 258:5 258:16,19 263:24 264:7 275:12,20 276:12,14,17 276:21,22 278:15,25 279:4 280:1 285:25
**informed** 73:24 109:10 187:15
**initial** 49:22 50:1,9 61:2,14 62:6 66:13 321:10
**initially** 61:21 285:10,10
**injunctive** 338:11,12,16 338:20 339:16 340:11
**inner** 218:25
**innocent** 258:14
**inquiries** 218:19
**inquiring** 332:15
**inquiry** 213:12
**ins** 96:20
**insert** 187:8
**inserting** 186:25
**insight** 189:5
**insinuated** 17:16 28:24 141:15
**instagram** 303:7

**instance** 129:9 156:8
**instances** 230:2 338:9 339:14
**instruct** 24:10 24:19 246:25 247:15 267:15 268:4
**instructed** 65:7 193:21 194:9 194:20 267:23 319:12,17
**instructing** 247:3
**instruction** 11:10 20:1,23 21:3,5 24:13 24:22 25:1,4 26:11,13,25 27:6,8 35:15 88:14 209:10 210:18,22 227:21 228:7 241:12 242:23 245:5,12 247:5 248:4 268:8,24 268:25 315:5 319:23
**instructions** 209:20 244:15
**instrument** 261:18
**integral** 312:25
**intended** 60:21
**intense** 95:15 135:10
**intentions** 258:18 264:15
**interaction** 46:13
**interactions** 76:20
**interest** 345:25 346:8,12
**interested** 348:19
**interesting** 244:9
**interests** 256:22 265:1 265:10
**interfacing** 219:8
**interject** 86:16
**internal** 278:14 278:24
**internet** 191:15 320:7
**interpretation** 23:15
**interpreted** 137:1 172:21
**interview** 167:23 168:2
**intimacy** 153:4 153:6 154:10 157:6 158:3,24
**intimate** 147:22,24 152:25
**intoxicated** 294:21
**intricacies** 218:14
**invest** 287:24 288:8
**invested** 83:3
**investigate** 79:10 199:5,9 199:13,14
**investing** 38:5
**investment** 42:2,7
**investments** 38:6 43:18 287:24
**invite** 229:17
**invited** 294:2 294:22
**invocation** 259:14
**invocations** 262:9
**invoice** 52:14
**invoices** 52:23
**invoking** 261:8
**involved** 45:4,8 119:3 132:21 133:2 134:12 140:22,23 147:6 158:2 163:24 170:25 171:2 182:12 182:14 183:6 183:14,19 188:4 195:13 196:6 218:15 229:13,14 313:24
**involvement** 40:23 41:4 192:7,21 193:7 209:8
**involves** 146:21 148:2
**involving** 109:23 157:5
**ip** 283:8,12
**ironic** 279:10
**irony** 279:11
**irrespective** 79:20 82:14 83:11
**irritated** 155:6
**irritation** 155:10
**isabela** 41:9 130:13 134:1,3
**issue** 24:16 52:14 137:2 141:11 142:6 144:17 145:18 148:6 187:12 193:6 225:20 226:7 341:4

**issued** 52:23 272:1
**issues** 18:2,10 137:13 154:8 158:3,24 163:25 204:20 205:2 289:14
**itemized** 315:11
**items** 314:6 315:15,16

**j**

**jackson** 9:17 16:7
**james** 225:8
**jamey** 1:19 2:19 7:3 8:3 9:3 11:2 12:2 12:13,20 13:2 14:2 15:14 32:24 33:14,20 34:10 35:6,20 36:2,25 44:10 138:5,15 203:16 275:16 277:14 324:14 330:10 332:20 333:9 349:2,24 350:2,4,12
**january** 120:14 121:1 125:17 140:14 142:23 154:7,21,23,25 160:16 163:8 164:14 285:14 285:19,20 286:4 341:21
**jason** 7:8 282:15
**jb** 12:23 180:10
**jbach** 8:13
**jed** 9:15 16:8 195:12,20 199:17 204:7 296:9,13,24 301:3,10 305:13,18,22 309:25 314:11 314:18 319:12 323:2,19 325:8 325:16 330:10 330:13,17 331:3,20 332:20,21 333:9
**jen** 67:5,15,22 68:6,11 69:8 69:12,20 70:5 70:9,17,21 73:24 74:4,15 75:18,23 76:16 76:18,20,24 77:5,9,11,18 78:21 79:20,24 79:25 81:12 86:3,4,6 89:1 89:11 97:5,8 99:4,6 100:15 101:6,9,14,20 102:11,21 103:3,7,12,17 103:24 112:7 113:15,18 115:4,7,9,10 117:6,10,21 123:9 124:17 125:6,10 126:12 129:10 131:11 166:11 167:8 184:5 186:3,7 189:4 204:16 207:22 214:13 216:19 219:20 220:2 233:17 236:23 238:17 239:11 252:4,25 253:9 253:24 254:8 293:23 312:8 312:14 321:6 322:6,8
**jen's** 82:14 217:7 235:17 236:19 239:18
**jennifer** 1:10 2:10 7:2 8:2 9:2 10:5 12:15 12:20 13:13 14:7 22:8 65:21 112:23 115:24 188:9 201:21 202:20 212:18 304:1 326:19
**jenny** 41:14 123:6 137:21 151:10 152:17 158:9,13
**jglover** 9:23
**job** 84:9,10,11 108:2 129:5,12 139:16
**jobs** 130:19
**joel** 9:18 16:7
**jogs** 202:25
**join** 202:13
**joined** 46:3,5,8 46:11
**joint** 52:23
**joke** 116:24
**joked** 122:6
**jokes** 122:6,9
**jokingly** 116:19
**jonathan** 8:7 10:10 15:8 16:16 18:24 19:6
**jones** 2:20 3:3 12:9 15:22,25 16:2 45:14,20 45:24 46:14 54:21 91:6,17 106:7 109:24 118:21 119:1 120:3,23

125:15 126:23
168:6,12,15,18
170:6,9,12
171:7,15 172:2
174:7,23
177:24 178:16
185:17 186:7
190:11,17,22
190:23 191:6
191:13,19
192:7,8,21
193:7,22,24
194:11,21
195:14 196:2
204:13 205:19
205:20 206:20
206:23 207:14
210:24 211:5
212:16 213:10
214:13,22
215:11 218:21
219:6 220:15
221:5,13,18
224:9,14,23
227:16 228:6
231:24 232:12
232:19,20
233:1,7,14
234:2,10,12
235:11 237:5
237:15 238:3
240:9,22 241:5
241:24 243:3
244:18 245:17
246:4 248:13
249:7,18 250:9
250:20 251:4,6
251:18 252:1
252:19 253:4
253:22 254:9
254:16 255:13
255:17,24
256:8,13 257:3
257:11,23
258:4,10,13
263:23 264:4,7
264:18,19,20
264:22,25
265:9 272:1,18
273:8 275:12
277:6,15
278:13,23
279:20,24
281:12,19
290:14 292:1

**jonesoworks** 12:19

**joneswork** 14:10

**jonesworks** 1:12 2:12,20 3:3 12:3,8,10 12:12,13,14,16 12:21,23 13:3 13:8,11,13 14:3 15:23,25 16:2 46:6,8,14 46:24 47:2,3 48:1,4 50:15 50:18 51:2,5 51:12,25 52:5 52:12,14,24 53:4,6,7,16,18 54:3,5,22 56:17 57:5 58:1 59:6,7,22 62:17 63:4,20 63:22 64:18 65:5,23 66:6 66:23 67:4,5 67:14,15,17,21 68:6,10 69:7,9 69:13,18,21 70:17,22 74:5 74:10,11 75:11 75:18 76:17 77:9,19 78:21 79:16,19,24,25 81:12 82:13 83:16 85:14,20 85:22 87:16 91:6 97:6,9 98:2 99:6 100:4,7,14,17 101:7,9,15 102:22 103:4 103:17,25 104:8 111:5 114:13,19 115:11,14,25 117:21,23 128:24 129:10 174:9 177:25 182:16 190:12 202:4 205:19 228:25 230:4,5 230:13 231:1 231:24 232:12 232:16,19,20 233:1,15,19 234:3,10,12 237:15 245:18 248:13 249:7 249:18 250:10 250:20 251:7 251:18 252:2 253:22 254:17 255:13,17,24 256:8,14 257:3 257:11,22 258:3,10 263:23 264:4,7 265:1,9,22 266:1,2,7,13,14 266:23,25 267:2,12 268:6 268:21,22 270:9,13,17 272:2 279:20 290:14 292:1 323:7,7 326:20

**joseph** 14:11 335:11

**josh** 88:1 205:2 205:7,10,10,12 206:10,20

221:14 224:8 224:13,22,25 225:1
**jsunshine** 7:14
**judge** 247:8,17 262:24
**judge's** 30:6
**judgment** 77:1 88:19 141:2
**july** 12:15 65:20 67:3 94:12 108:17 125:17 129:25 160:18 174:8 177:24 178:11 178:17 185:18 238:18 239:11
**june** 48:15 54:22 72:11 119:17 120:14 121:1,25 123:1 138:11 139:21 142:5 143:1 145:8 151:16 154:20 159:6 159:20,22,24 160:8 162:8 163:7,14,17 164:6 341:23
**justin** 7:3 8:3 9:3 10:4 13:16 22:1,12 30:18 43:19 45:16,21 46:1 51:20 57:8 62:10,19 62:24,25 63:5 63:22 80:1,2,7 80:11 81:11,17 82:20 84:5,9 87:21 101:25 102:3 112:7,11 113:10 123:8 124:3,7,10,17 125:25 126:12 129:25 130:22 131:2 132:10 136:23 137:7 137:22 139:5 140:13 142:6 142:10,17 144:9 155:16 155:16,20 156:7,15 159:11 160:7 164:18 174:8 175:23 176:3,6 178:25 180:15 181:5 184:6,21 184:21 185:1,2 185:3,9 189:19 189:25 209:7 220:1,7,8 227:18 228:13 232:4 234:15 235:4,10 238:16 239:10 258:14 282:12 282:22 289:1 291:12 294:1 294:21 295:16 297:21 298:23 299:6,16 309:19 310:13 311:4 316:16 326:18
**justin's** 55:20 80:14,19 143:11 156:22 175:15 310:1
**jv** 174:9
**jw.com** 9:23

**k**

**k** 5:16
**katelyn** 4:7 58:7,9,14
**katie** 13:13 14:7 192:17,20 192:23 193:4 193:20,21 194:7,9,10,18 194:20 195:6 195:11,18 203:14 220:2 306:6 321:6,8
**kbender** 5:19
**kcase** 13:23 292:18
**keep** 56:12 64:24 86:11 142:6 144:5 160:25 185:9 207:25 212:4 247:14 302:15 318:16 338:24
**keeping** 300:10
**keeps** 137:11
**kept** 142:18 163:6 164:10
**kicked** 192:14
**kids** 83:7,8,11 149:18 231:4 287:10 320:3
**kim** 222:11
**kind** 17:14 73:19 96:24 97:16,23 102:8 117:16 123:25 130:16 137:8 137:14 140:15 140:19 170:22 198:5,10,14 263:5 278:12 278:22 293:17 298:8 309:11 330:20 337:20
**kinds** 174:22
**kissed** 156:23
**knew** 45:22 91:25 94:25 97:16 101:14 103:13 118:5,7 177:5,14 182:22 183:1 187:5 198:10 209:9 219:21

239:1 258:17
303:9 306:2
308:2
**knocks** 288:2
**know** 21:25
22:2,5,6 31:1,5
31:6 33:13
35:6,6,16
39:12 40:2,20
40:25 41:8
43:17 45:22,25
51:19,24 52:2
53:23 54:1,8
57:3,7,12
59:13 60:13,18
61:4,17 62:14
62:22 64:11,19
65:2,6 70:7
71:15 73:7,16
75:13,14 76:6
76:7 78:3,10
79:14 81:14,18
82:3,5,7 84:8
84:22 85:4
87:7,20 88:2,4
89:3,6 90:8,9
90:21 91:25
92:1,16,21
93:2,2,3,5,6
97:10 99:4,4
100:9 101:13
101:18,23,25
102:25 104:16
104:22,22,23
104:23 108:14
109:14 113:21
113:21,22
116:21 117:12
117:20,25
118:1,14
119:21 120:1
121:6,8 123:11
123:20 125:1
125:13 126:14
126:14 127:5
131:3,8 132:24
134:21 135:22
137:20 138:7
138:17 140:14
142:12 144:19
145:12 148:22
149:16 155:3
160:5 162:1,9
163:22 165:10
167:1 168:10
168:11 169:3,9
172:6 173:6
174:4,12 175:7
177:4,6,7,13,17
177:21 179:20
180:14 183:5
184:15 185:7
187:3,5 188:14
188:17 191:17
191:17 193:15
193:16,18,19
195:5 197:21
197:22,24
199:2,8,10,10
200:12,20
201:9 202:22
205:11,11,17
206:7,12,17
207:19 208:4
210:7,10,20
211:23 215:6
215:15,17,20
215:22 216:2,2
216:6,9,10,14
217:1,17,18,22
218:13,15
219:15,20
220:2 221:21
222:23 225:2,6
225:13 226:12
228:9 231:2,7
236:17 237:1
238:18,21,23
239:5 240:5
245:12 260:19
261:9 262:21
266:11 269:6,7
269:19 270:3
272:6 273:21
274:2,3,4,7,8
274:24 275:20
275:21 277:11
282:1 284:7
285:25 286:22
292:5 294:14
295:4,7,10,11
295:22 297:10
297:12,22
298:7,25
299:10,13,23
299:25 303:13
303:15 305:8
308:2 309:2,10
310:8,9,23,24
311:9,11,14,14
311:22 313:10
313:16,23,25
314:25 315:24
316:18 317:17
318:1,13
319:10,15,16
322:13 323:23
324:4 325:25
330:10,23
331:17,24
332:10,20
333:9,10,11,19
336:11 338:4
339:7,19,20
340:14 341:14
343:15 344:12
344:25 345:15
**knowing** 102:4
169:20 235:17
**knowledge**
36:20 53:21
127:14,17
198:15,21
199:2 208:9
301:14,20,24
322:5,8,12

**known** 188:13 226:10
**knows** 218:15 258:14 264:14
**kosher** 208:1
**koslow** 210:2
**koslow's** 40:23
**kristin** 5:14

**l**

**labid** 12:9 48:6 48:10,16 54:21 55:7
**labor** 271:16
**lack** 28:13 149:17
**land** 29:1 283:12
**language** 60:5 152:5 163:21 337:7,20 338:3 342:16 343:15 345:5
**lanius** 14:11 335:11
**large** 21:20
**late** 230:3,6
**laura** 12:18 111:15
**laurenne** 3:6 16:1
**laurennebaba...** 3:12
**law** 3:8,18 4:8 4:19 5:5,15 6:6 7:9 8:8 9:6,8 9:19 231:8 233:5 274:8 337:3
**laws** 348:21
**lawsuit** 271:16 284:11
**lawyer** 233:4 260:23 267:7 267:10 273:13 273:16 278:15 278:25
**lawyers** 21:11 21:25 22:19,21 22:24 24:5,15 24:24 25:6 29:19 32:4,5 35:2 165:10 172:14 234:6 238:10,12 339:21 340:1 343:24 344:5 345:1,3,4
**lay** 261:25 280:20 285:23
**layman's** 258:11 308:7
**lays** 261:11,25
**lead** 1:7 2:7 273:6 281:15 287:25 290:8 290:12
**leader** 75:25 76:13,15 77:5
**leadership** 38:12
**leading** 84:13
**leaked** 210:3 226:17,23 227:4
**leaks** 192:8,22 193:7,22,25 194:11,22 195:14
**leaning** 146:11
**learn** 69:20 98:24 99:1,6,8 122:12,17 128:25 170:18
**learned** 35:8 45:24 46:1 69:13,24 70:1 70:4 71:9 72:9 72:19 73:3,14 74:6,11 87:25 91:25 123:6 177:8 208:3 229:9 234:14 235:3 236:2 240:25 241:2 245:4,21,23 246:1 247:21 247:24 249:11 249:13,16 250:6 251:9,11 251:23 252:7 252:15 253:2 254:21,22 255:3,7,11 256:1,4 257:14 257:17,21 258:24 259:1,4 264:16 265:15 265:18 272:25 273:3,5 276:6 276:9,18 305:13 308:3
**learning** 74:14 74:18 75:6 115:9 192:3 305:7
**leave** 31:9,12 67:4,5,14,21 68:6 69:7,21 70:22 71:10 72:10,20,24 74:7,12 82:14 101:9,14 199:6 234:25 235:21 260:25 284:6
**leaving** 28:4 69:8,13 73:4 73:16 76:5 77:19 79:9 84:25 144:21 160:4 248:5 313:22
**led** 84:16 131:16,22 235:17 271:10

281:25 282:5 286:6
**left** 44:23 67:15 71:3,17,17,18 71:23 72:4,9 72:11 73:5 74:11 75:11,18 77:21 78:21 79:24,25 81:12 86:3,4 87:18 97:17 98:1 100:7 142:21 302:4 337:23 345:18
**legal** 10:8 15:9 40:18 42:19 43:23,25 44:7 44:13,16 261:10,17 266:10 267:6 317:22 334:10 334:10 335:12 336:6,7 337:17 337:18 343:2 343:16
**lender** 336:22
**leslie** 207:25 223:23 224:5,7 224:10,16,22 224:25 225:1 225:24 226:6,8 234:16 235:5 235:11,14 236:4,6,23 237:6,16,21,25 238:4,15 239:2 239:9,15,19,23 240:9,22 241:5 241:25 243:4 244:19 245:19 246:5 248:14 249:8,19 250:11
**leslie's** 224:12 225:18
**lessening** 289:11
**lesser** 306:21
**letter** 50:19 96:5,13 141:13 152:22,22 154:6 160:15 163:7,19 303:14
**level** 62:10 77:8 83:5 103:15 128:24 188:14 300:20
**leverage** 316:21 317:2
**lftcllp.com** 7:12 7:13,14
**liberty** 243:7
**lie** 271:22 272:3,19 273:9 275:13 276:3 276:10,19
**lies** 188:2 192:8
**lieu** 141:23 163:22
**life** 46:23 83:9 83:12 84:6 98:14,14 210:16
**lifts** 38:16
**lightly** 87:19 90:21 283:11
**liked** 77:4
**likely** 281:15 290:8,12
**lillian** 13:17 211:15 212:18 213:1,12,24 214:22 215:12 215:16,23 216:11 217:4
**liman** 247:8,18
**limitations** 153:14 241:19
**limited** 237:9
**lindsey** 6:5 282:15 334:17
**line** 11:11,21 38:9 84:9 131:3 349:4,7 349:10,13,16 349:19
**liner** 7:5 16:12
**lines** 36:12
**linger** 156:8,18
**lingered** 156:22
**lingering** 159:13
**link** 170:20 180:1
**links** 317:15
**lip** 156:8,19 159:13
**lips** 156:23
**list** 17:11 23:3 23:15 27:17 28:5 50:25 125:23 126:7 143:16 154:12 157:17 168:15 286:23 314:6 315:9,10 319:9 319:11
**listed** 322:20
**listen** 223:23
**listened** 89:19 89:21,23 106:19 107:3,7 132:13
**listening** 339:23
**lists** 254:15
**listserv** 111:25
**litigation** 39:9 39:14 42:8,25 108:1,7 263:1 320:23
**litigations** 39:11 320:7,12

320:18
**litmus** 262:17
**little** 23:2 25:25 44:9 55:10 72:17 73:8,12 77:17,23 144:20 172:4 192:24 204:19 229:7 235:23 236:6 250:2 263:5 273:10
**live** 320:4
**lively** 1:5,15 2:5,15 4:3 5:2 6:3 13:16 15:14 16:4,6 28:16 95:17 134:12 234:17 239:20,21 250:14,21 251:8,19 252:2 252:19,24 253:4,19,24 254:9 264:2,21 272:13 333:7 337:6 338:23 339:15 340:17 346:1,9 349:1 350:1
**lively's** 133:14 251:20 272:8 329:13 334:10 334:11,16,20 342:17
**lives** 93:3,5 98:14
**ljl** 1:7,7 2:7,7
**llc** 1:8,12,13 2:8 2:12,13 3:4 7:2 8:2 9:2 12:3,7 13:3 14:3 15:15 349:1 350:1
**llp** 4:4,17 9:17
**loan** 334:21
**located** 15:10
**log** 58:18 119:19,23
**logged** 223:25 224:2
**logical** 245:7
**long** 21:6,7,11 23:20 29:22 32:18 45:7 47:24 61:17 70:16 71:9 94:18 105:8,19 124:19 126:13 131:19 156:22 194:3 201:6 215:2 231:14 265:6 280:6 318:19 333:18 333:24
**longer** 81:20 114:14 130:8 289:6 293:3
**look** 37:17 47:24 49:7,20 55:4 60:8,19 60:24 63:12 64:11 96:21 138:24 139:2 141:1 144:15 145:5 146:14 146:24,25 180:5 200:2,16 202:24 206:6 211:22 212:13 212:15 213:20 217:18 273:18 273:23 293:20 294:5 306:6 313:14 321:5 325:25 326:1 330:4 333:5 341:15
**looked** 37:15 53:18 65:6 141:17 146:12 146:18 174:19 218:8 232:15 265:22 326:2
**looking** 49:10 49:15 54:4 56:12 59:20 112:1 161:15 161:23 162:3 170:21 201:25 214:12 216:1 220:21 270:23 273:12 297:6 306:17 311:17 311:17 312:21 317:12 319:25 326:12 334:7
**looks** 47:25 48:1 112:9 117:1 143:21 178:22 179:25 187:18 188:10 203:3 213:16 217:1,23 278:4 278:7 304:2 322:19 327:18
**loop** 189:25 218:12 219:3,7 229:12
**los** 1:20 2:22 3:11 4:11 5:7 6:8 7:11 9:11 15:10,12 92:11 92:13 93:3,5,6 93:12,15,21,25
**lose** 291:13
**losing** 288:25
**loss** 282:6
**lost** 130:1 220:20 230:24 230:24 281:4 281:14,18 282:3,4 283:13 283:16,17 287:7,18 289:25 290:14

**lot** 38:22 39:25 68:2 71:13 84:10 87:21 98:13 116:20 122:6,6 130:1 130:1 131:4 136:1 140:1 141:6 157:16 157:19 163:23 163:24,24,24 176:22 177:18 187:3 200:6 206:13,13 250:1 272:10 281:3 282:3 289:3 298:15 318:23 320:5,9 331:16
**love** 116:24 117:9,16 181:5
**loves** 101:20
**lunch** 165:19 166:1,8
**lying** 223:9,16

**m**

**ma'am** 58:22
**maaren** 3:17 15:21
**maarenshah** 3:22
**mad** 38:24 156:11
**made** 20:3 67:20 68:5 95:8 97:7 98:9 106:7 107:16 108:24 109:23 122:9 127:5,13 127:19 128:2 138:25 139:10 139:17 140:1 145:6 151:4,9 152:17 159:11 183:13,14 187:15 190:3 201:10 230:15 232:2 245:1 348:10 350:5
**madison** 3:19
**mail** 13:15 204:21,25 205:4,8 206:11 206:24,25 207:7,8,15 209:3 210:25 211:6,11,15 213:1 218:4,20 219:8 220:16 221:6,20 222:4 222:24 224:9 224:15 225:21 226:16,18 227:1,3
**major** 43:6
**make** 17:10 26:21 33:22 35:23 36:7,20 38:16,21,25 39:1,2 43:21 44:24 90:1 95:3 97:7 98:10 104:24 106:4 108:5 113:3,17 144:12 155:21 160:5 162:16 162:16 164:4 183:24 187:11 189:11 201:2 230:19 240:11 246:25 263:3 268:7,23 275:24 300:11 300:22,22 306:21 307:5 308:8,17 331:3 343:23
**makes** 66:3 78:10 109:21 267:17 316:3
**makeup** 145:3
**making** 39:25 43:6,9,13 68:1 81:1 113:7 153:20 201:25 342:24 343:18
**malice** 258:10
**malicious** 258:20,22 259:2,6 264:16
**maliciously** 256:17 258:4 263:23
**man** 283:4,8
**manage** 62:12 88:17 128:11 128:12,15,16 128:17,19 129:6,14,19 137:11,16 141:4,7,8 142:11 207:24 218:20 307:1
**manager** 62:13
**managers** 231:7
**manages** 128:13
**managing** 137:7 141:5
**manatt** 2:21 4:4,17 16:3,5
**manatt.com** 4:12,13,14,23
**manipulate** 321:25
**manipulation** 317:8 321:17 321:21,24 322:6,9
**manner** 232:21 233:2
**map** 225:16 226:20

**mara** 277:6,8 277:14,16
**march** 336:14 340:16 341:3 341:11,12,20
**marching** 218:13
**marital** 19:22 20:21,24 24:10
**mark** 37:4 171:23 211:14 252:12 282:13 282:21
**marked** 11:20 37:8 47:2,4,8 50:23 54:13,16 54:18,22 55:4 58:4 59:5,6,9 65:16,17,22 111:2,7 114:7 115:23 116:2 174:6,11 177:23 178:1 181:2 185:14 185:20 188:23 190:6,7,11 201:15,17 202:8 211:17 211:19,24 220:11 269:9 269:14,21 270:5 276:24 292:16,19 293:20 303:17 303:18 324:11 326:7,9 334:8 334:12
**market** 283:10
**marketing** 91:16 93:18 96:16 109:25
**marks** 347:2
**markup** 334:19
**marshall** 337:16 343:16
**massive** 181:7
**material** 43:7
**materials** 107:25 108:23 109:3
**math** 297:3
**matt** 269:10,22 270:20 271:5
**matter** 70:14 156:9 164:15 199:14 317:9 320:12,19,23
**matters** 105:3
**matthew** 4:18 75:23,24 76:11 77:4 99:3 207:22 282:16 326:19
**mbruno** 4:23
**mckinney** 9:20
**mean** 26:1,8 28:22 45:9 66:3 70:19 73:13 76:2,5 79:9,12,23 81:3,15,22 82:3 93:1 94:12 103:19 107:21 119:23 120:12 123:19 123:22 128:17 131:7 141:17 141:25 142:1 145:10 147:16 157:14 161:10 169:7 172:23 173:3,8 177:12 177:13,13 182:25 183:2 192:1 198:4 205:16 216:25 217:16,17 218:6 222:25 229:5,10 230:20 249:20 257:10 259:16 260:3 264:18 264:19 267:24 272:21 283:17 283:23 284:9 284:17 290:6 292:5 295:18 297:2 298:23 299:4,5,10 300:15,19 306:1,14,19 307:1,16 308:1 313:5,12,22 317:4,11 318:2 318:4 321:24 345:1
**meaning** 34:7 42:16 49:17 72:11 80:13 98:5 99:1 106:14 118:4 167:8 171:2 182:19 183:23 206:20 248:6
**means** 55:15 73:15 141:22 217:22 298:6 298:11 306:21 307:5 308:3,13 311:16,22 312:18 313:17 316:18
**meant** 177:18 181:22 184:5 184:11 298:12 305:9,14 306:3 338:16,19
**mechanics** 54:9
**media** 56:18,21 57:6,12,25 59:22 60:2,9 60:22 61:15 62:5,7,11,13,18 63:5,21,23 64:18 65:4 66:5,24 87:22

193:8 306:4 320:5,10,22 321:11 327:2
**meet** 45:13 131:13
**meeting** 138:11 142:23 143:6 145:8 151:18 154:7,21,23,25 155:6 162:8 163:8 164:16 219:17
**meetings** 183:20 290:25
**melissa** 7:3 8:3 9:3 10:6 58:12 58:17,20 74:1 101:8,14,18 102:7 127:20 127:24 166:9 166:24 167:4 167:11,19 168:3,14,20,24 169:8,15 170:5 170:13,14 171:2,8,17 174:24 175:6 175:24 176:4 176:17 177:2 177:10,19 180:16 181:13 181:21,23 182:6,9 187:16 188:15 189:13 190:18,24 191:14 192:5,7 192:21 193:6 193:21 194:9 194:20 195:20 197:9 198:22 199:16 201:3 207:22 216:21 217:10,20 218:4,6,19 219:12,13,18 220:2 225:22 226:16 227:2,3 236:23,25 238:17 239:10 322:7,9 323:21 325:17 329:25 333:11
**melissa's** 192:11 204:11 217:14
**member** 1:7 2:7
**memorize** 35:23
**memory** 41:10 57:23 70:5 71:2 74:18 89:15 95:2 97:15,21,23 98:3,4,8 100:10 104:15 113:22 126:4,5 127:2 193:2 202:25 244:24 295:17,25 296:3 304:22 304:23,24 305:1 337:15
**mental** 83:4
**mention** 144:13 153:21 156:18 158:20
**mentioned** 73:6 89:5 139:5 144:16,24 145:4 147:8 150:12 153:10 153:12,14,23 154:20,22 159:1 166:10 185:8 218:12 234:24 235:2 250:17 287:1
**mentioning** 142:6 143:12 153:20
**mentions** 152:24 153:4 154:4
**menu** 315:15 315:16,17
**mere** 130:7
**message** 12:22 13:9,10,18,20 14:9 174:15,17 174:18,20 178:15 190:13 190:16 253:16 320:1
**messaged** 27:21
**messages** 12:11 13:7,22 121:13 237:1 239:10 239:24,25 251:2,19 252:3 252:24 253:8 253:23 254:7 278:15,24
**messaging** 209:6 222:20
**met** 45:15 99:16
**method** 107:23
**mgottlieb** 5:8
**miami** 170:15 171:18 176:18 177:1 180:1
**michael** 5:4 337:16 343:16
**michelle** 218:16
**middle** 191:5 218:5,7 221:25 324:3,3
**middleman** 96:25
**midst** 87:25
**million** 41:23 42:1,2,5,23 78:3 291:25 292:11

**mind** 27:17 29:4 35:24 71:3 76:9 77:24 83:4,4,8 86:20 219:7 228:2 281:4 298:7 306:15 342:1 343:11
**mindful** 82:21 104:24 122:8 136:19 184:23
**minds** 44:2
**mine** 288:18
**minute** 23:21 49:9 55:1 286:2 345:19
**minutes** 21:13 32:20 58:21 124:21,25 126:16,19 165:20,22,23 215:14 286:20 302:6 337:24
**misrepresent...** 172:7
**missed** 133:1 136:6 162:7
**missing** 40:10 322:18
**mistake** 181:8 184:6
**mistaken** 154:17 172:12
**mistreats** 193:25 194:23
**misunderstood** 161:24
**mitchell** 75:23 77:4 99:3 207:22 326:20
**mitigation** 304:3,16 305:3 306:12,14,18 306:21 321:11
**mitra** 9:7,12 16:14
**mitz** 12:15,18 65:21 111:11 111:13 294:4
**mn** 13:13 202:4 321:16
**moment** 78:11 84:25 86:10 87:5 89:9 90:21,25 98:15 125:5 135:4 136:11 138:23 139:9 142:24 153:18 156:16 170:21 224:2 230:10 238:22 240:5 261:4,6 290:22 312:21
**monday** 186:16 186:23 187:12 187:17
**money** 38:7 39:1,2 42:18 42:23 43:1 233:19 283:9 287:24 338:24
**monica** 6:7
**moniker** 269:21 277:5
**monitor** 306:1 311:18,22 316:1
**monitoring** 297:6,18 309:18 310:15 310:22 311:3 311:16,18,20 311:21,24
**monster** 162:4
**month** 53:8 56:4 61:2,20 61:20,24,24 62:19 66:10,13 66:16,18,22 72:3,7,23 76:7 238:17 323:3,8 325:9,12
**monthly** 323:17
**months** 45:12 61:22 63:6 66:11,25 71:18 71:20,22 72:1 76:7,8 120:14 140:13 143:1,2 143:8,8 160:12 160:13 161:11 241:15 285:13 286:6
**morning** 15:5 19:11 21:15,16 21:18 23:19 24:16,25 25:8 25:9,16 26:18 27:4 28:7 29:7 304:14,20 306:10
**morning's** 22:14
**mouth** 123:21 156:22
**move** 45:1 87:16 162:13 162:14,23 227:14 236:13 250:14 263:16 288:12 318:25 334:24
**moved** 139:19 140:7 143:16 146:18 160:1 165:13 288:19
**movie** 46:12 94:19 130:1,3 130:25 132:18 132:20,22 140:16,17 141:22 142:3,5 142:8 156:23

159:5 209:7 318:10 338:24 341:21
**movies** 38:22 286:18 317:19
**moving** 56:17 63:9 76:2 88:22 164:5,8 187:3,3 206:13
**multiple** 160:10,10,10 161:5 163:14 163:14 218:11

**n**

**n** 3:1 4:1 5:1 6:1 7:1 8:1 9:1 10:1
**namco** 283:8 283:22
**name** 15:8 18:22 19:4 58:11 111:19 112:2 205:18 232:6 235:13 282:8 286:21 288:11 299:23
**named** 220:15 221:5,12 303:8
**names** 19:5 167:10 286:16 287:3,10 346:17
**namesake** 45:25 205:20
**narrative** 309:20 310:14 311:4 316:16 318:16 321:13 327:13 328:9 329:2,13
**nathan** 7:3 8:3 9:3 10:6 58:7 58:20 74:1 101:8,14,18 102:7 127:20 166:9,24 167:4 167:11,19 168:3,14,20,24 169:8,15 170:5 170:13,14 171:2,8,17 174:24 175:6 175:24 176:4 176:17 177:2 177:10 180:16 181:13,21,23 182:6,9 187:16 189:13 190:18 190:24 191:14 192:5 193:21 194:9,20 197:9 198:22 199:16 201:3 218:19 219:12,13 225:22,22 226:16 227:2 322:7,9 323:21 325:17 329:25
**nathan's** 39:19 127:24 192:7 192:21 193:6
**nature** 38:8 95:20 123:12 150:14 173:7 182:21 264:15 305:16 329:5 329:12 330:23
**navigate** 78:10 96:19 189:21 201:11 218:9
**navigating** 142:7 219:3
**near** 221:1 333:25
**necessarily** 28:10 29:1 51:9 86:6 139:16 156:12 200:8 207:17 208:12 217:22 219:20 289:1 310:24 314:1 319:25
**necessary** 262:10 350:7
**need** 20:4 23:10 23:11 33:19 58:17 61:18,22 62:16 71:11 83:7,10 84:24 113:22 115:6 141:24 143:14 153:17 160:3 161:16,18,20 164:4,8,12 180:9 181:23 184:21 212:4 215:5 230:8 261:21 262:18 280:15 286:1 286:10 302:11 302:19 305:11 315:15 317:4 317:12 319:3 326:4 331:18 335:8 339:20 344:9,9
**needed** 22:18 22:20,24 23:4 39:24 57:18 62:1 84:17 88:13,20 90:24 109:11 305:7 305:10 318:9
**needing** 189:19
**needs** 160:22 330:24
**negative** 128:14 176:8 188:1 201:12 209:24 210:4 226:17 227:5 300:7

**negatively** 123:22
**negotiated** 336:13
**neither** 275:19
**never** 55:17 80:22 143:9 146:17 158:12 158:16,18 182:17,22 183:1 209:12 210:9,16 224:3 226:8 229:14 229:20 230:1 294:8 319:21 319:21 320:14 320:25
**new** 1:2 2:2 3:21,21 4:22 4:22 8:11,11 38:21 87:18 88:3 139:25 143:7 164:17 271:9 272:7,16 273:6 274:13 274:21 282:18 288:1 307:21 308:11
**news** 267:12 268:5,21 269:10
**nice** 186:16,23 217:4
**night** 17:11 18:4 19:10,18 23:1 24:8 29:19,22 30:13 31:9 32:18 37:15 324:3
**night's** 22:13 25:7
**nine** 45:12 298:11 302:5,9
**nitpick** 307:2
**nobody's** 330:18
**nod** 27:22 28:13,20,21 63:14,15 164:19
**noise** 177:18
**non** 41:3 260:23 261:9
**normal** 43:16 298:18
**northwest** 5:17
**nose** 172:4
**notary** 350:13 350:19
**note** 263:2
**noted** 350:7
**notes** 175:2 348:16
**notice** 2:20 12:7 36:18 37:5,6 50:7,18 66:9 70:6,10 72:21 73:4,9 73:15,25 74:5 74:6,10 75:7 76:2,4 100:23 115:11 230:4 233:18 259:9 260:11 261:8 261:19 262:13 262:15,19
**noticing** 15:20
**notwithstandi...** 336:21
**november** 125:23 152:23 152:23 160:15 160:17 163:7 163:19
**nuance** 311:13
**nuanced** 299:9
**nude** 145:19,24 148:14 317:20 318:9
**nudity** 153:10 154:9 157:6 158:3,24
**number** 43:20 209:4,13,14 217:7 233:8 261:24 262:2 264:10 292:3 292:11 304:1
**nursing** 146:13 146:20
**nyt** 271:9

**o**

**oath** 193:21 194:8,19 195:6 195:12,19 210:3 262:5 348:7
**object** 24:6 26:6 241:6 263:4 324:22
**objection** 19:21 22:4 24:9,18 25:21 26:11,22 27:5 28:8 29:8 30:2 31:2,16 36:6,7,12,21 40:13,19,19,24 41:15,19 42:11 43:2,8 44:8 47:13 48:25 51:16 52:8,18 53:1,9 54:7 60:10 62:21 67:7 68:18 69:3,10 70:18 70:23 71:4,19 71:24 72:5 74:16 75:12,21 76:23 77:25 79:5 80:3,9,21 83:23 84:2 89:14 90:2 92:15,20 94:2

95:9,13,25 96:17 97:19 98:6,11,21 100:8,18 101:22 102:13 102:17,23 103:9 104:20 105:4 106:22 108:16,25 110:3,14 113:5 114:24 116:17 117:17 119:6 121:2 128:4 129:20 133:4 134:8,18 136:9 145:21,25 146:6 147:12 149:9 150:10 151:6,11 152:3 152:12 153:1 153:16 154:11 155:13,23 157:9 158:5,11 159:3 161:25 163:12 166:25 170:17 171:11 171:20 173:4 173:13,18 174:1 176:11 177:11 181:20 181:24 182:6 182:10 183:4 194:2,12,24 195:8,15,22 196:8,15,19,25 197:12 198:11 198:25 199:7 199:18,19,23 199:24 200:3,4 200:18,19 207:2 210:6,12 210:19 215:1 215:18 216:4 218:23 222:18 224:17,20 225:10,23 226:19 227:23 228:17 229:19 234:4 237:7,17 238:8 239:4 240:23 246:6 246:16,22 247:1 248:15 249:20 251:21 254:1,11 265:13 266:5,8 266:18 267:4 267:14 268:8 268:24 272:20 274:1,15,23 275:14 276:4 276:11,20 278:17 279:2 279:12,15 280:10 288:21 289:17 290:16 291:9 292:12 295:24 296:14 296:18,20,25 297:1,14,15 299:7 300:23 301:5,6,12,13 301:18,19,23 306:22 307:7 308:21,22,25 309:14 310:2,3 310:16,17 311:7,8 313:7 313:8,20 314:13,14,20 315:1,2 316:6 316:7 319:13 319:14 320:13 322:23 323:9 323:22 324:21 325:18,19 328:13 329:14 331:5,22 332:5 332:24,25 339:2,17 340:9 340:21 341:6 341:19 343:9 344:21 345:13 346:4,11

**objections** 170:6 261:7,18 263:14 348:9

**objective** 345:12

**obligation** 265:24 267:2

**obligations** 266:17

**observation** 311:3

**observe** 192:16 192:19

**obviously** 45:25 55:16 243:16 245:9 247:16 287:25

**occurred** 166:21 341:1

**october** 1:21 2:24 12:4 13:4 14:4 15:3,7 108:13,14 109:16 111:4 348:22

**offense** 229:24

**offer** 6:4 23:14 196:5,12

**offering** 181:12

**office** 21:18 23:25 92:7,10 92:11 99:15

**offices** 2:21

**oftentimes** 38:17,19 61:23 61:24 223:18 325:23

**oh** 25:22 37:5,5 97:18 98:9 112:3 119:15 123:10 132:23

143:24 149:19 183:21 201:24 277:11,25 286:21 287:1 293:6 326:14 327:17,23 333:19 338:14 342:11 344:18

**okay** 17:8,19 18:9,21,25 19:9,14,16,19 21:6,10,14,17 21:20 23:17 24:2,5,15 27:10 28:20 29:6,18 30:25 31:4,14 32:10 32:13,18,21 33:3,9,23 34:1 34:12,25 35:3 35:7,10 36:11 37:17,22 38:1 40:17 41:2 42:1,5,22 43:5 43:22 44:5,25 45:2,7 46:10 46:10,25 47:23 48:3,9,14,21 49:3,7,14 50:14,17,22 51:11 52:3,3 52:22 53:4 54:2,11 55:1,3 55:19,23 56:2 56:11,14 57:1 57:9,11,21 59:17,25 60:19 61:12 62:4 63:2,4,18,25 64:5,22 65:1 65:10,14,18 66:17,21 67:1 67:19,25 71:2 72:17 73:1 74:3,21 75:2 75:20 76:17,19 77:12 78:6,12 78:19 79:3,18 79:21 80:17,24 81:10,16 82:6 82:12,17 83:19 85:24 86:5,9 86:13,23 87:4 87:14 89:1,7 90:13,19 92:2 92:5,13,25 93:9,12 94:5 94:11 95:1,7 95:22 97:14 98:4 99:12 100:1,3,13 101:6,11,18 102:2,7,10 103:16,22 104:11,14 105:2,7 107:2 107:9,11,15,19 108:9,22 109:6 109:13,20 110:5,10,25 112:10 113:16 114:6 115:8,19 116:7,10,16 117:14 118:4,9 118:17,23 119:5,13,18,22 120:2,16,22 121:16 122:2 122:16,22 123:17 125:2 126:17,19,20 127:18 128:9 128:17 129:5 129:12,17,23 131:18 132:14 132:23 133:5 133:24 134:5 134:11 136:4 138:8,9,18 139:2,17 141:10,17,24 142:16 143:5 145:9,12 146:9 146:20 147:7,8 147:15,20 148:12,16 149:13 150:8 150:17 151:1,7 151:19,23 152:13,22 153:25 154:6 154:16 156:2,5 156:18 157:1 157:13,22,24 158:22 160:6,6 160:16,22,24 161:4 163:4 167:4,8,15 168:5,9,14 172:9 173:1 174:2,5 176:8 176:16 177:22 178:7,8,18,23 179:13,17,19 179:21,24 181:1,19 182:25 183:24 184:2,25 185:13 186:1,1 186:11 187:10 187:14 188:22 190:4 191:23 192:4,10,12,16 192:19 193:3 193:11,16 194:16,18 195:5,11 196:4 196:17 197:5 198:7,12 200:22 201:14 202:7,9 203:7 203:11 204:2,4 204:5,15 205:13,14,21 206:2,5,8,19 207:9 208:8,12

209:1,19,25
210:24 211:21
212:1,3,22
213:5,10,20,25
214:7,10,11,15
214:20 216:15
216:25 217:25
218:17,18
219:11,24
220:6,25
221:17,24
222:22 223:5,8
223:19 225:6
225:11,15
226:3,6,11,14
226:20 227:7
227:15,20
228:11 229:15
229:17,23
230:15,19
232:18 233:4
233:23 234:8
235:8,22,24
236:1 237:12
237:21,22
240:7 248:3,25
249:3,14,15
250:13 251:11
251:16 252:11
252:21 253:15
253:21 255:6
255:10,21
256:3,7,25
257:2,15,20
258:1,8 259:8
261:5,23
263:12,17
264:3,23
265:17,20
266:13 267:9
268:4 269:4,15
269:19,20
270:3,5,7,15,20
271:1,4,7
272:7 273:4
275:2,3,9
276:8,17,24
277:3,18,21,25
278:3,12 279:6
279:13,19
280:2 281:9,10
281:16,17
282:21 283:3,4
283:5 284:8,12
284:14,20
285:5,12,17
286:5,14 287:4
287:16 288:24
289:8 290:4
291:18 292:3,9
292:15,24
293:5,11,13,22
294:17 295:8
295:15,20
296:6,22
297:24 298:21
299:15,19
300:1,3 301:2
301:17 302:2
302:13,19
303:24 304:7
304:11 305:1,5
305:17 306:6
307:5,10,24
308:15 309:4,7
310:11 311:25
312:16,20
313:18 314:3
315:7 316:3,11
316:14 317:14
319:2,8,20
320:2,21,24
321:2,5 322:4
322:13,16
324:10,18
325:5,24 326:6
326:10,13,17
326:24 327:6
328:4 329:10
329:20,25
330:20 331:20
332:11,16
333:13,15
334:25 335:10
335:14,20
336:2,3,5,15
338:2,5,21,22
339:9,12 340:4
340:16,22
341:15 342:4,7
342:14 344:7
345:7,20
346:21,22

**old** 223:13

**older** 223:14

**olivia** 3:7 15:24

**oliviaholmes** 3:13

**once** 46:3 54:2 69:13 84:20 100:16 135:12 149:22 183:11 229:9 233:6,17 276:13 323:3

**ones** 91:11 121:4,8 163:14 195:23 289:24 315:7

**online** 327:3

**open** 247:8,17 248:5 344:16

**operate** 77:1

**operations** 111:14

**opinion** 80:24 182:20 317:9

**opportunities** 38:21 289:6

**opportunity** 29:16 38:18

**opposite** 98:4

**optics** 130:16

**optimization** 308:5

**option** 61:3

**oral** 121:17,21
**orb** 175:16
**order** 134:19 144:21 308:16
**orders** 218:14
**organically** 318:15
**originally** 131:13 188:15 335:22
**outgoing** 43:17
**outright** 223:8 223:16,16
**outs** 96:20
**outside** 19:17 36:20 44:1 47:20 136:24 153:21 245:21 246:7 254:12 272:21,25 275:2 276:8 315:7 335:13 335:14 337:21
**overall** 87:2 316:16 318:16 320:1
**overnight** 17:24
**overpaid** 323:24
**overpay** 326:3
**overshare** 101:3
**oversight** 43:22 43:24
**own** 47:18 80:2 86:22 88:7,8 88:19 189:10 197:6 235:20 244:24 273:24 273:25

**p**

**p** 3:1,1 4:1,1 5:1,1 6:1,1 7:1 7:1 8:1,1,7 9:1 9:1 10:1,1
**p.m.** 2:23 30:13 55:7 165:25 166:4 178:12 178:17 180:6 184:2 214:1,4 214:8 221:2,25 231:17,21 248:20,23 297:25 303:1,4 347:4,5
**pac** 283:4,8
**pacific** 15:6
**page** 11:5,11,21 12:6 13:6 14:6 37:18 47:9 49:8,20,20 50:22 55:4 60:19,25 112:13,15 114:6 181:2,2 184:9,15,16,17 187:19,20 188:22 191:5 202:8 216:16 216:17 217:25 220:11,22 221:24,25 222:7 269:20 270:5 276:24 278:2 293:20 293:24 296:6 317:9 321:6 327:8,22 328:1 335:15 342:6 349:4,7,10,13 349:16,19
**pages** 293:4 308:18 326:23 333:21,23
**paid** 42:25 52:5 52:22 53:5 56:7 63:22 323:7 325:8,11 325:17
**painted** 162:4
**paper** 139:13 139:14
**paragraph** 49:7,21 60:25 280:8 335:17 335:23 336:4 336:21 342:8 342:11,15
**park** 2:22 4:9 5:6 7:10 9:9 15:11
**part** 30:13 37:22 41:11 58:15,16 62:24 65:2 69:14 78:12 79:12 85:23,24 111:22 129:5 129:12 155:20 175:22 176:2 196:4 204:19 219:11 229:21 236:6 251:2 259:18 269:23 281:11 294:6 312:3,25
**participants** 93:24
**participation** 311:5 342:25
**particular** 20:19 22:15 57:18 98:3 131:16 193:2 304:22,25 306:16 324:5,5 329:16
**parties** 16:10 16:13,15,17,20 256:19 258:6 263:25,25 281:12,20

316:23 348:18
**parting** 117:16
**party** 1:11,12 2:11,12 41:2 50:8 107:20 241:17 264:14 342:23 343:18
**pass** 322:2
**passionate** 169:11
**passive** 311:3
**past** 17:16 27:23 28:6,14 28:17 197:18 316:23 317:19
**paste** 278:4
**path** 38:20 44:22 77:3
**patrick** 91:12 92:2,8 95:14 96:2,3 109:24
**pause** 49:9 103:6
**pausing** 306:23
**pay** 41:9 96:24 104:8 113:25 114:3 323:2 326:2
**paying** 39:9,13 40:11 41:4 42:8,19 103:18 233:20 320:10 320:17 323:21 325:1
**payment** 52:15 66:24
**peace** 116:23 117:9,15
**penalty** 348:20
**pending** 247:8 247:17
**people** 18:9 31:10 38:22 90:16 109:25 116:18,21 117:15 119:2 130:8,18 135:11 140:2 144:8 157:3 158:1,6,7 162:12 167:11 169:18 170:2 176:5 177:13 187:5 196:18 198:6,23 200:7 200:7 201:11 201:20 202:20 205:22 212:17 218:11 219:16 219:22,24 290:19 298:15 304:1 308:9,19 319:24 326:2,3 326:4,19 328:21 330:22 330:23 333:15
**people's** 134:17
**perceived** 148:20 341:3
**percent** 204:1
**perception** 148:20
**perfectly** 204:23
**perform** 51:2,5 57:5 62:18 63:4 66:23
**performed** 51:13,14 56:22 63:21
**performs** 114:10
**period** 50:11 61:6,9,14 62:6 62:19 82:5 91:3 94:9,11 98:16 103:22 118:21 120:17 120:25 121:22 125:16 137:19 142:21 159:7 159:23 160:13 161:6 163:2 183:10 205:16 225:20 239:11 239:16
**periods** 50:7
**perjury** 348:20
**permission** 318:25
**person** 23:22 23:23 69:12,16 76:1,12,14 77:14 79:8 81:19 83:10 84:17,22 118:25 121:18 121:22 135:15 136:13 153:21 156:16 167:5 172:4,16 180:9 183:3,19 219:13,19 231:3 282:18
**personal** 32:23 45:21 46:13 51:8 52:6,16 52:25 55:20 80:2 88:7 169:23,25 207:18 208:9 273:25,25 274:6
**personality** 137:17
**personally** 51:7 53:19 130:1 167:18,22
**perspective** 61:13 80:14 135:25 136:2 141:2 163:9 207:18 215:5 267:6

**pertained** 150:14
**pertaining** 91:5 91:5,7
**pertains** 27:17 67:17 165:8 297:21
**phase** 120:13 120:13 140:7
**phelps** 2:21 4:4 4:17 16:4,6
**phillips** 2:21 4:4,17 16:4,6
**philosophical** 345:14
**phone** 23:22 84:20 86:14 87:4,11,14 88:24 89:13 90:8,10 92:14 94:7 99:1,20 107:13,17,25 108:6,10,24 109:2,15 110:1 110:6,6,11 118:25 121:17 121:22 168:25 169:10,14,16 169:18 170:9 205:23 207:13 236:19 239:18 240:2 252:5,25 253:9,24 254:9 295:6 332:3,9 332:12
**photo** 318:9
**phrase** 245:12
**phrased** 157:11
**physical** 107:13 142:9 290:23 290:24
**pick** 345:1
**picture** 137:15
**piece** 78:3 255:22
**pieces** 78:3 140:19 143:20
**pin** 252:9
**place** 21:14,17 21:24 23:18 88:24 120:7 123:10 231:1 233:22 317:1 348:6
**places** 152:24
**plaintiff** 1:6,11 2:6,11,19 4:3 5:2 6:3 15:16 16:4,6
**plaintiffs** 1:14 2:14 3:3
**plane** 271:7
**planned** 73:4 74:12 101:9
**planning** 69:21 71:10 72:10,20 74:7 96:19
**plans** 229:3
**plant** 210:4
**plausible** 208:4
**play** 69:14 140:24 280:13
**played** 225:22
**playing** 149:18 287:12
**please** 15:18 16:22 17:8 33:22 34:14 36:7 50:23 55:1 68:3 82:24 85:16 123:2 175:5 178:5 182:3 189:18 201:8 202:14 211:4 211:13 218:3 218:16 230:22 240:17 258:12 263:20 265:4 276:1,25 291:21 301:7 312:1 326:22 328:24 346:6
**plumber** 324:2
**plus** 321:10
**poach** 188:3
**point** 17:10,11 23:3,15 27:17 28:5 45:24 54:10 56:7 63:8 70:15 73:14 74:9 75:1,9 77:11 77:14,14 79:8 81:19 83:3 97:5 99:5,9,14 99:24 100:1,13 103:24 104:3 113:14 115:9 125:23 126:7 126:23 127:18 130:10 131:11 135:19 138:24 140:21 145:11 149:21,21 152:22 163:7 166:11 169:4 172:15 183:3 185:8 190:3 191:17,24 192:3 202:7 204:6,18 209:16 218:9 218:18 222:22 222:23 227:19 228:11 229:9 230:12 231:3 233:6 239:20 245:5 280:8 305:12 324:8 337:8,10,12 342:2
**pointed** 215:4
**pointlessly** 313:14

**points** 126:9 157:3
**pole** 303:8,10 303:14
**pole's** 301:4,11
**police** 36:13 311:19
**pool** 43:1
**poole** 299:23
**popped** 191:15
**porn** 138:17 148:7,8,9,23,25 149:1,16,19,20 150:6,19,21,21 150:24 165:7
**pornography** 157:7
**portion** 52:5 147:21 148:3 192:16,19 336:4
**portions** 192:4 192:18
**position** 259:11 259:22 262:10 263:10 339:13
**positioned** 44:21
**positioning** 228:25 289:1
**positive** 116:22 298:2,22,23 299:3,5
**possibility** 28:4
**possible** 22:3 89:5 132:25 134:14 136:6 158:24 295:23 296:17
**possibly** 28:25 89:10 219:2 239:25 285:18
**post** 57:17 142:16 298:14 300:7 320:11 320:18
**posted** 317:20
**posting** 320:6 321:12
**posts** 57:16 327:2 328:21
**pot** 209:17
**potential** 129:6 167:5 304:3 327:12 328:8 329:2,13 345:4
**potentially** 129:1 176:5 241:18
**pots** 209:15
**potty** 302:19
**pr** 128:12,12,13 128:23 129:1 131:12 132:4 166:18,19 170:25 171:3,9 171:17 175:16 176:5 180:9 201:12 291:7,8 305:9 306:20 312:9
**practice** 95:4
**pre** 137:5
**preclude** 261:15
**preference** 80:19
**premiere** 87:18 134:25
**premieres** 96:20
**prepare** 30:7 37:24
**prepared** 36:18 37:21 149:15 209:11 236:11
**preparing** 30:14 32:3,19
**prepping** 30:22 31:11,15
**presence** 19:17
**present** 5:4 10:3 21:23 24:2 30:18 32:4 78:12 83:5,8 88:6 192:4
**president** 111:14 290:24
**press** 218:20 222:10 227:17 299:11
**presumably** 42:6
**presume** 42:24
**pretty** 70:22 81:1 98:19 103:11 122:5 123:16,21 129:3 169:21 172:19 206:4 209:18 346:23
**prevent** 342:23 343:18
**prevented** 256:15 257:4 257:23
**preventing** 346:1,9,13
**prevents** 242:21
**previous** 186:4 324:1
**previously** 321:14
**primary** 39:3
**print** 269:25
**prior** 46:2 50:8 53:16 115:13 125:10 131:4 143:9 178:5 259:9 264:24 338:14,16
**private** 271:11 328:22

**privilege** 19:22 20:21,24 24:11 24:20 25:2 26:7 30:4 244:22 246:23 248:17 254:25 259:14,21 260:14 261:8 262:6,9 267:21 268:2,14,17,19
**privileged** 241:9 242:10 243:17,21 244:1,4 245:2 245:3
**proactive** 321:12
**probably** 43:24 131:20 204:22 223:25 227:9 230:8 278:18 281:3 295:18 316:19 317:12
**problem** 63:16 135:15 139:15 203:16 209:2 223:22 250:4 319:18 343:17 346:14,19
**proceeding** 271:16
**proceedings** 15:2,11 348:5
**process** 136:15 140:24 147:23 148:3 154:5
**produced** 65:11 108:1 241:19 242:8 242:17 243:1 271:3 272:2 284:5,6
**producer** 164:17,18
**producers** 141:3 290:19
**product** 242:18
**production** 46:18 65:13 108:23 137:5 139:23,24,25 141:10 142:17 143:4 159:25 163:25 164:22 226:18 287:14 288:9 290:24 342:25 343:4 346:3,10
**professional** 77:3,8 167:24 168:3 232:21 233:2
**professionals** 127:21 166:13 168:7
**profitable** 39:4
**project** 282:7 283:20,24 284:9 285:9
**projected** 288:4
**projects** 38:8 282:4 283:3 286:14,25 287:7,13,18,20 288:1,4,7,14,20 289:3,5,8 290:19
**prominent** 308:17
**promise** 280:15 287:12 334:1
**promotion** 56:22 62:7
**pronunciation** 111:12
**proper** 36:6 136:15
**property** 283:7
**proposed** 336:6
**propounded** 348:9
**protected** 142:18
**protection** 141:13 143:16 160:15
**protections** 164:3
**protocol** 153:12
**proven** 200:9 262:1
**provide** 230:25 286:23 314:11 314:18
**provided** 106:20 108:6 109:3 114:19 189:5 230:4 240:12 264:7 272:12,17 273:7 275:12
**providing** 114:14 278:14 278:24
**proxy** 62:23
**public** 350:19
**publication** 195:13 215:23 216:12 271:10
**publicist** 46:7 51:13,14 53:22 67:6 68:7,12 76:21 80:2,8 80:15,18,25 81:1,7 97:8 98:1 100:7 103:3 113:15 113:18 115:5,7 128:25
**publicity** 45:21 46:14,19 52:6

52:17,25 104:1 105:3 114:1,3 114:14,20 228:16 229:2 323:8
**publicly** 209:7
**published** 204:25 211:15 213:6,17 214:17,25 215:14
**puck** 267:10,12 268:5,21 269:10
**pull** 33:11 42:23 111:1
**pulled** 252:25 253:9,23 254:8 283:20,23 284:8
**pulling** 285:8
**pulse** 297:18
**pumping** 146:13,20
**purpose** 29:12 35:17 38:13,15 61:12 62:5 85:6 131:13 256:20 259:18 264:5,8
**purposes** 20:21 110:7
**pursuant** 2:20 253:24 254:10 272:13,18 273:8 275:12
**purview** 70:14
**put** 20:15 33:17 58:20 70:6,6 70:10,12 72:20 73:4,15,25 74:4,6,10 75:6 100:23 115:9 115:10,10 118:17 142:12 143:19 154:12 159:14 164:5 196:5 198:22 233:17,21 242:7 252:9 259:8 262:13 262:18,21,22 275:4 317:19 318:9,10 333:13 348:7
**putting** 73:9 76:1 121:13 140:19 196:17 223:10 239:21 260:11
**puzzle** 143:20

**q**

**quality** 38:10
**quantifying** 292:10
**question** 11:20 18:2 20:23 24:10 26:10 30:3 33:12,13 34:12 35:1,5 36:1,10,20,24 37:10 42:19 44:15,16 61:1 64:15 67:9 68:8,9 71:8 72:6,18,19 94:18 97:20 101:1 117:24 129:24 133:6,6 135:24 136:5 143:18 144:22 145:16 146:17 157:1,15,19 158:22 190:25 194:3,25 215:8 227:8,11,13,14 228:1 239:12 240:14 241:7 242:19,21 243:22 244:5 244:12 245:13 246:13 247:9 247:19 249:1 249:10 251:23 252:20 254:24 260:21 266:20 268:11,19 270:22 274:17 279:14,17 280:9,12 290:1 290:5 291:10 318:4 321:25 324:24 329:10 331:15 333:22 335:3,11 336:8 340:24 341:14 345:15
**questioning** 261:17
**questions** 20:19 33:25 34:8 36:17 132:17 192:6 247:18 259:10,10 263:4,7 302:3 318:23 348:9
**quick** 205:14
**quickly** 38:4 278:10 293:18 302:22 334:25
**quinn** 3:5,16 15:21,24 16:1
**quinnemanue...** 3:12,13,22
**quit** 338:24
**quite** 29:22 89:5 283:9 344:13
**quote** 172:8 220:14 221:4 221:12
**quoting** 331:10

**r**

**r** 3:1 4:1 5:1 6:1 7:1 8:1 9:1,18 10:1 349:3,3
**racist** 346:16
**radar** 137:2
**rage** 156:15,17
**raise** 300:20
**raised** 144:25 147:10 148:6 151:2,3 152:10 152:19 158:18 285:10
**raising** 148:18 149:7,14 296:12,23
**random** 328:21
**range** 12:11 13:7,22 14:9
**rather** 62:15
**reached** 204:21 205:3 206:10 206:21 215:11
**reaching** 205:21
**read** 37:19 49:25 55:8 96:5 117:8 170:23 175:3 175:14 178:3 179:8 180:7 181:4 182:11 182:18 183:21 184:4 185:22 186:13 187:24 189:8,17 191:7 193:3 202:11 203:15 212:6 216:20 217:2,3 217:9 218:2 220:13 221:3 221:19 222:2,9 224:4 235:16 256:12 258:2 269:24 271:6 271:14,21 272:7,9 277:23 277:24 278:10 280:7,13,15 293:2,3,25 296:8 298:1 299:20 300:4 304:12 306:8 307:18 309:17 312:6,12,24 315:25 316:15 316:20 317:7 321:7 326:21 327:10 328:6 328:14,19 329:9 330:1,7 332:17 333:1,2 333:7,10,20 336:18 338:8 342:22 343:10 344:23 350:5
**reading** 170:22 174:21 177:17 203:13 212:4,7 310:18 317:12 317:25 318:3 318:14,18 319:9
**ready** 178:4 211:23 269:19 288:8
**real** 116:23 117:9,15 143:22 183:13 183:16 185:10 187:4 278:10 309:21 310:14 311:4 317:1
**realistic** 172:13
**realization** 17:23
**realize** 139:1 149:22 324:21
**realized** 149:20
**realizing** 17:12
**really** 23:7 29:9 47:24 70:14 82:21 96:22 121:15 123:7 126:5 128:22 134:21 138:4 138:21 182:25 183:2,22 197:19 198:3,8 215:5 262:17 281:21 285:23 290:18 302:22 306:2 327:11 328:7,25 340:2 340:12
**realm** 306:1 311:24
**reason** 48:22 64:8 69:17 73:2 81:6 85:13,20 109:8 124:11,14 130:12 149:19 162:12 209:18 214:21 215:8 274:12,20 285:8 286:11 287:17 288:9 289:12,13 291:11 301:17 328:11 329:16 340:6 349:6,9 349:12,15,18 349:21
**reasonable** 27:19 42:24 141:18 162:12 285:22 297:11 317:24 318:13
**reasoning** 62:3 289:22
**reasons** 83:13 87:21 115:6 168:23 169:15

170:11 288:6
**recall** 19:1 32:15 45:15,19 46:5,21,22 57:7,24 59:11 60:9,25 61:1,4 61:6 62:17 66:1,2 67:3,12 67:20 68:5,16 68:23 69:1,22 69:23 70:1,11 70:16,16,21 73:22,24 74:2 74:14,17,22,25 75:7 76:4 78:19 79:6 81:18 82:1,9 82:17,19 86:10 86:23 88:23 90:9 91:11 94:6,7,14 96:4 97:10,13 98:15 99:5,8 100:4,9 100:11,13,19 101:3,7 102:2 103:6,15 107:2 107:3 108:21 110:24 115:16 117:11 118:24 119:5,9,13 120:3,6,16 121:10,15,20 121:24 122:2 122:23 123:4 123:14,16,17 125:3,15 126:2 126:6,22 134:9 155:2,5 166:15 166:17,20 168:13 169:17 170:8,24 172:2 173:1,5,14 174:16,18,19 177:3 181:17 181:18 188:8 188:11 191:22 191:24 192:25 194:17 195:4 203:8 204:6,18 205:1 207:23 220:4,5 228:9 230:12 235:13 238:25 239:6 239:17 245:24 253:6 255:15 256:6 257:25 262:3,4 265:19 272:10,11,14 286:17 288:13 295:1,22 296:15,19 303:6 305:17 305:21 310:5,7 332:6 339:11 342:1 343:17
**recalled** 109:23
**recalling** 287:20
**received** 41:23 50:8 125:23 174:19 214:23 304:7,9,10
**receiving** 116:7 174:16 256:15 257:4,23
**recent** 59:13
**recently** 89:21
**recess** 20:11 105:24 166:1 231:18,19 248:21 303:2
**recite** 262:20
**recognize** 58:11 78:7 116:4,6 134:15 157:8 175:25 176:2 278:8,11
**recollect** 236:10
**recollection** 23:14 57:4 61:8 63:3 66:12,15,17,21 70:3 71:12 74:4 75:3 79:1 82:25 87:1 90:11 91:24 92:18 101:16 102:4 107:6,10 110:10,16,20 110:21 116:14 118:16 125:8 126:8 175:11 179:13 184:25 192:15 203:20 203:24 286:25 304:19 305:5 306:17 322:14 331:2 332:12 332:14 337:6,9 337:11,20 344:24
**recommend** 167:4
**recommendat...** 168:6,12,15
**recommended** 131:11 166:11
**reconvene** 187:11
**record** 15:6 20:8,10,13,15 20:16 30:5 54:20 57:17 90:12,19 91:2 95:8 96:14 97:2 105:23 106:1,5 115:23 165:21,25 166:4 202:14 203:12,17,21 231:13,17,20 248:18,20,23 260:5,9,11 261:21 263:2 294:4 302:24

303:1,4 347:4
**recorded** 1:19 2:18 57:18 87:12 91:18,18 92:3,5 93:10 93:13,16,21,25 95:23 96:8 119:19 127:4 208:25 348:11
**recording** 15:11 89:19 90:1 93:10,19 94:7,14,19,25 95:4 106:6,11 106:15 174:3
**recordings** 109:22 110:12 127:4,7,12,15
**recount** 132:15 262:5
**recover** 189:19
**recovery** 281:13
**red** 137:24
**reddit** 316:22 318:8
**redline** 334:19
**refer** 95:16 96:6 138:4 269:25
**reference** 28:22 159:11
**referenced** 163:1
**references** 186:9 272:12 340:17
**referencing** 117:13 160:10 161:1 163:18 189:24
**referred** 202:19 309:11
**referring** 92:8 127:23 139:6 151:16,18,20 159:12 221:14 294:14 324:25
**refers** 264:1
**reflect** 17:18 29:10 51:1 59:25 60:20 66:4 71:12 84:25 122:25 183:15 227:25 335:8 341:7
**reflected** 64:23
**reflecting** 17:12,23 23:1 27:18
**reflective** 174:22
**reflects** 60:11 242:12
**refresh** 66:12 100:10 113:22
**regard** 34:18 34:18 146:15
185:6 274:9 290:18
**regarding** 17:10 46:18 100:16 154:24 158:2 234:8 236:19 321:16
**regardless** 97:14 129:2 162:25
**regret** 286:19 287:10
**regularly** 52:22
**regurg** 160:19
**regurgitation** 160:20
**reiterate** 315:11
**reiterating** 190:2
**rejected** 336:7
**relate** 73:21,22
**related** 16:10 28:5,11,25 39:11 40:18,22 56:20,22 57:25 62:6 69:1
**relatedness** 28:22
**relating** 160:12 171:9 324:25 341:4
**relation** 42:9 195:20 320:11
320:18,22 330:14 340:18
**relations** 9:15 16:8 40:1 204:7
**relationship** 45:23 46:2 61:17 69:16 75:23 76:20 77:2,8 85:5,19 85:21 96:22 103:7 207:25 231:8 284:23 323:7
**relationships** 38:14 281:15 290:8,12 316:21 317:2
**relative** 348:17
**relayed** 224:14
**relevant** 299:16
**relief** 338:11,12 338:16,20 339:16 340:11
**rely** 266:9 267:5
**relying** 66:14
**remain** 336:24
**remained** 42:6
**remediation** 304:4,16 305:3 306:12,14,18 307:5

**remedies** 337:2
**remedy** 340:17
**remember** 23:8 23:12 35:23 70:24 74:23 75:1 78:24 84:5 89:4,8,11 89:16,17 90:16 94:18 98:16,25 99:1 102:24 116:7,10 120:8 120:22 121:4 123:25 124:2,6 125:20 167:13 167:14 169:19 169:20 170:21 174:20 177:5 179:16,18,23 184:13,19 187:7 191:16 191:19,23 192:3,23,24 203:11 205:15 205:16 208:21 212:3,5,9 228:1 261:16 286:3,3 287:6 287:11 295:1,2 305:7,11 319:8 331:12,23,24 332:1,3 343:19
**remind** 63:16 322:17
**reminded** 330:24
**reminding** 331:14
**remove** 317:15
**removed** 145:3
**render** 232:21 233:1
**renew** 50:6
**renewal** 61:3
**repeat** 85:15 102:18 171:12 265:4 266:19 346:5
**repeated** 234:19
**rephrase** 67:9 85:15
**report** 305:15 316:1
**reported** 1:23
**reporter** 2:25 16:22,24 17:4 54:14 77:13 213:2 225:8 226:15 227:1,3 231:12 235:15 236:3,6 252:13 274:12,20 280:4 348:3
**reporter's** 348:1
**reporters** 129:6 129:13 228:13 267:10 268:5 268:21
**repository** 110:11
**represent** 15:19 30:5 59:16 214:7 271:2 281:5 335:20
**representative** 30:15 33:1,15 48:22 164:17 275:7
**represented** 51:25 99:17 341:25
**representing** 46:6,9 289:2
**reputation** 88:16 282:1,2
**reputational** 281:16 290:9 290:11 291:5
**request** 56:20 57:5 60:6 65:12 114:23 153:7 341:1
**requested** 36:15 52:12 53:13 108:12 153:9 348:14
**require** 247:20 311:23
**required** 350:13
**requirement** 153:4
**reread** 153:18 293:14
**reservations** 174:24
**reserve** 212:6
**resignation** 115:17 117:7
**resigning** 115:14 117:22
**resolved** 163:11
**respect** 25:18 27:3 29:24 44:13,16 80:7 86:25 127:12 134:11 158:2 171:17 215:4 227:18 280:12 288:13,16 289:11 304:21
**respectfully** 135:24
**respects** 153:11
**respond** 133:10 200:12 206:5 315:10
**responded** 220:16 221:6 221:13 324:19

**responding** 142:10,10
**responds** 203:14 329:25
**response** 35:5 116:23 172:22 185:12 217:12 217:20
**responsibilities** 33:10 38:3
**responsibility** 43:6
**responsible** 197:6 313:6
**rest** 212:5 234:25 246:8
**restating** 332:15
**restriction** 153:20
**restrictions** 152:24 153:10 153:14
**result** 281:12 281:19 283:13 283:16 284:9 287:8 288:25 289:4 290:14 291:25 308:20
**resulting** 281:14
**retainer** 323:17
**retaliation** 285:4 286:13 288:17 289:16
**retrieved** 252:4
**return** 290:21
**reveal** 247:21
**revenue** 41:23
**review** 55:2 202:15 232:8 348:13
**revision** 334:19
**reynolds** 95:17 96:5,6 154:8 254:18 255:14 255:18,25 264:2,21
**rich** 278:12,22 279:8
**ridiculous** 69:15 294:8 300:10,17 301:4,11
**right** 26:15 27:10 31:7,23 32:21 34:16 36:14 42:3 43:1 44:22,23 48:4 51:15 53:8,20 54:6 55:21,25 56:4 56:9 61:8,10 62:20 63:6,23 70:17,22 76:13 78:14 81:9 89:2 91:23 93:4,7 98:10 99:10 104:2,12 104:19 105:3 108:24 109:4 109:16,18 110:22 112:3,8 114:15,20 118:17 121:1 122:5 125:18 127:21,25 129:15,19 132:10 133:19 134:2,7 140:15 142:24 145:2,7 145:19 146:21 146:24 147:2 147:11,23 148:3,7,9,21 150:2 151:5,10 152:2,11,20,25 153:5,11 154:5 154:18,21 155:1,7,12,22 156:20,24 163:16 165:11 166:13 168:16 169:5 171:10 171:19 176:10 178:21 179:14 184:24 185:5 187:12,17 189:5,14 200:12 201:23 201:25 202:21 203:4,5 204:24 205:4 207:21 209:20 211:1,6 211:8 212:6,8 212:10 217:7 218:4 219:14 221:15,17 222:17,24 229:4 230:5,13 239:17 242:25 246:20 249:22 249:25 250:22 252:25 253:1 255:4 261:3 264:18 269:8 269:22 270:14 270:18 271:17 273:14 275:5 277:16,22 278:1 282:19 286:17 287:1 287:10,14 292:3 298:24 299:6,17 303:11 306:4 306:21 307:6 310:15 311:6 313:6 316:12 317:22 318:11 318:21,24 325:5,9,12 327:3,17 329:6 330:18 331:21 333:17 334:18 335:12 336:23

337:1 338:10 338:11,24 339:1,15
**rights** 283:7 337:1 343:2
**ring** 217:5
**ripple** 291:2
**risk** 340:7
**roeser** 4:6 16:5 16:5
**role** 43:13 44:13,19,20 113:2 130:25 168:20,24 297:17
**rolled** 187:17
**room** 21:19,20 21:22,23 28:4 29:18,19 30:12 30:20 31:4,10 31:20,24 32:4 58:7,8,21 78:16 170:16 171:4,18 176:19 177:1 180:2 199:6 282:23 294:2 294:22 346:16
**rooms** 31:17
**roughly** 125:17 178:20
**round** 60:17
**rules** 63:13 108:3 136:12
**ruling** 30:6
**run** 57:20 61:2 61:22
**rwa** 104:1,7 112:7 113:4,13 113:15,25,25 114:3,10,13,18 115:4
**ryan** 95:17 154:8 155:6 254:18 255:25 264:2,21

**s**

**s** 3:1,9 4:1 5:1 6:1 7:1 8:1 9:1 10:1 349:3
**safe** 75:25 76:12,14 123:10 164:4 280:16
**saks** 133:22 134:13,22 135:6 136:3 158:10 164:18
**salutation** 117:16
**sandbox** 140:25 149:18
**santa** 6:7
**sara** 225:22
**sarowitz** 7:4 8:4 9:4 10:7 39:8 58:19
232:7
**sarowitz's** 40:8
**saw** 17:14,16 31:9 37:16 135:13 146:11 146:17 251:1 294:24 295:2 295:12 331:14
**saying** 28:1 31:8 46:17 101:20 110:19 116:23 121:7 123:3 130:17 138:19 139:2 150:6 152:6 156:3,9,12 158:7,19 159:17 160:11 160:17,18 162:5,10 165:3 166:17 173:1,5 173:7 176:14 177:20 179:7 180:14 193:12 193:23 197:13 200:10 206:23 217:19 220:16 221:6 222:11 223:6 225:24 226:25 230:24 236:2 239:8,14 270:23 273:4 286:8 313:25 327:4 328:18
329:7,17 340:13
**says** 36:2 49:24 55:3 66:9,14 112:2 139:1 153:19 165:5 176:21 180:6 180:18 181:3 181:14 184:3 186:12 187:23 212:22 214:1 216:19 217:20 218:1 221:2,18 221:25 222:8 269:23 270:20 271:5,10,20 296:7 297:25 298:22 299:3 304:11 306:7 308:11 318:25 327:9,20 328:5 330:6 332:16 336:17 338:6 342:21 344:18 344:22,25 346:15,17
**sbenson** 7:13
**scammed** 324:7
**scared** 201:9
**scene** 147:22 153:9 156:23
**scenes** 152:25 182:15

**schedule** 50:23 51:18 60:20
**school** 130:7 262:23
**scope** 60:1,20 60:21 62:16 262:25 317:18
**screen** 294:4
**screenshot** 170:20 212:16 213:11 277:5 277:10 278:1
**screenshotted** 213:23
**screw** 280:14
**script** 138:2
**seamless** 103:11
**search** 308:4,8 308:19,20
**searched** 65:3
**second** 49:21 60:25 68:11 120:24 125:14 125:21 164:15 220:22 260:19 293:21
**seconds** 21:9 213:16
**security** 99:17 311:17 312:2
**see** 17:15 25:22 27:25 37:14 38:23 47:6,8 50:12 51:18 55:12 61:19 64:9 65:24 100:10 111:9 112:16,21,25 114:8 120:11 132:23 142:19 144:15 146:10 149:10,15 151:22 159:1 161:2,3,5 164:22 174:10 174:13 175:18 176:12,23 178:10,13 179:1,5,11,24 180:3,11,17,20 181:9 184:7,10 184:22 185:10 186:8,17 188:6 188:20 189:1 189:10,22 190:20 191:10 202:5,17,25 203:18 212:20 212:24 213:3,4 213:8,14,18 214:2,5,18,19 216:18,23 220:19 221:9 221:22 222:5 222:14 223:20 230:8 240:7 262:25 269:20 270:4,8,10,15 271:12,18,23 277:4,7,10,11 277:11 278:6 279:11 286:2 294:10,25 296:10 298:3 298:16,20 300:13 304:5,9 304:17 308:9 309:22 311:19 312:10 313:2 313:24 314:4,8 315:9 316:12 318:24 321:18 322:22 327:4,7 327:14,23,24 328:1 330:11 334:3 335:19 337:4 338:5 340:20 342:5 342:10,14,19 343:5 344:9,9
**seeing** 174:18 272:5 295:2 306:17 310:5,7 328:20
**seek** 339:16
**seeking** 279:24 281:13
**seem** 144:3 317:23
**seemed** 208:4 208:16 229:8
**seems** 56:2 135:25 162:4 297:11 318:12 318:13
**seen** 37:11 47:23 48:1 54:24 55:17 59:8 116:5 177:18 190:13 236:25 237:1 241:22 242:8,9 242:14,16 243:1,5,9,9,12 269:17 294:23 297:8 315:14
**selected** 244:1
**selecting** 110:12
**self** 189:10
**send** 50:17 170:19 184:20 203:17,21 221:1 268:5 295:3,20
**sending** 268:20 327:1
**sends** 269:22
**senior** 213:2
**sense** 66:3 71:8 78:10 109:21 130:21 141:20 170:4 183:22 201:10 223:17 245:7 298:12

316:3
**sent** 170:19 212:18 215:13 277:16 303:9 303:14
**sentence** 306:7 314:4
**sentiment** 169:19 173:6 191:20
**seo** 307:20,22 307:25 308:3 308:12,17
**separate** 68:13 68:17,19,24 82:13 88:11,12 134:22 135:17 177:6,21 179:3
**separately** 51:14 79:15
**separating** 275:16
**september** 106:20 109:18 112:20,24 113:19 238:18
**sequence** 144:20 205:17 208:22
**serious** 159:2
**serve** 85:5
**served** 37:7
**services** 51:1,6 51:13,14 52:6 52:16,17,24,25 53:5,6,7 56:18 56:21 57:6,13 57:25 59:23 60:2,4,22 62:18 63:5,9 63:21,23 64:18 66:24 104:1,9 114:1,4,9,14,20 122:7 232:21 233:1 305:19 305:23 314:11 314:16,22,25 315:4,8 322:20 323:3
**set** 58:24 119:12,13,18 120:2 121:25 122:14,18,18 122:24 124:8 124:12 125:12 126:21,25 132:16 133:3 133:14,18,22 134:1,6,17,17 135:4 136:7 142:2 150:19 150:24 154:10 155:12 157:7 158:18 163:23 164:12 341:1 348:6
**setup** 215:2
**seven** 247:11
**sever** 68:10 69:18 286:10
**several** 47:3 54:23 111:5 116:1 152:24 158:1,6 166:23 167:2 174:9 185:18 190:12 241:15 269:12 292:18
**sexual** 148:9,20 149:4,23 150:14 153:15 153:15 154:9 157:6 158:3,25 158:25 285:3 286:12 288:16 289:15 335:17 336:20 338:25 340:18 341:4 341:16
**sexuality** 153:25 154:9 157:6
**sexy** 123:7,25 138:5,5 139:6 151:4,10 152:2 152:11,18,19 154:24 155:22 158:15 159:12
**shady** 169:6,8 169:15 188:2
**shah** 3:17 11:6 15:21,21 17:8 17:19,21 18:17 18:20 19:3,8 19:24 20:8,14 20:17,25 21:1 22:7 24:12,21 25:3 26:2,12 26:24 27:7 28:15 29:13 30:9,10 31:3 31:18 33:11,16 35:21 36:5,10 36:14 37:1,3,9 40:16,21 41:1 41:17,21 42:14 43:4,11 44:11 47:1,5,17 49:2 51:21 52:10,21 53:3,11 54:12 54:15,19 58:19 58:23,25 59:4 59:14 60:15 63:1 64:3,5,14 65:15,19 67:10 68:21 69:5,19 70:20 71:1,7 71:21 72:2,8 74:20 75:15 76:10 77:6,16 78:5 79:17 80:5,12,23 83:24 85:8 89:18 90:4

92:17,24 94:4
95:11 96:10
97:4,22 98:7
98:18,23
100:12,21
102:1,14,19
103:1,10 105:1
105:6,11,16,21
106:2 107:1
108:19 109:1
110:4,17 111:1
111:8 113:8
115:1,22 116:3
117:2,19 119:8
121:11 128:8
129:22 133:11
134:10 135:21
136:17 145:22
146:2,8 147:14
149:12 150:16
151:8,14 152:8
152:15 153:3
153:24 154:15
155:19 156:1
157:12 158:8
158:14 161:14
162:24 165:15
165:18,21
166:5 167:3
171:13,23
172:1 173:10
173:15,22
174:5,14
176:15 177:22
178:2 182:1,24
184:1 185:13
185:16,23
190:5,9 194:4
194:15 195:2
195:10,17,24
196:11,16,21
197:1,16
198:20 199:4
199:11,20
200:1,13,21
201:14,18
207:6 210:8,14
210:23 211:13
211:18 212:2
215:10,19
216:7 219:5
222:21 224:18
224:24 225:12
226:1,22 228:3
228:20 229:22
231:8,12,22
234:7 237:11
237:20 238:11
239:7 240:18
241:1,10 242:6
242:13,20,24
243:15,20
244:2,8,13
245:6,10,14
246:10,18,24
247:4,7,13,23
248:3,8,18,24
249:22,25
250:3 251:24
252:9,12,14
254:4,14 259:8
259:18 260:2,6
260:10,18,22
261:3,6,20,24
263:9,13,18,20
263:21 265:13
265:16 266:6
266:12,22
267:8,19
268:15 269:3,8
269:16 272:23
274:10,18
275:1,18 276:7
276:16,23
278:21 279:6,9
279:16 280:5
280:17 282:9
282:11,17,21
283:2 288:23
290:3 291:4,15
292:15,22
293:6,12 296:2
296:16,21
297:4,23
299:14 301:1,8
301:16,21
302:1,4,8,11,17
302:20,23
303:5,16,20
307:4,9 308:23
309:3,15
310:10 311:1
311:10 313:11
314:2,17,23
315:6 316:10
319:19 320:16
323:1,11
324:10,17,20
325:2,5,7,21
326:6,11
328:16 329:24
331:7 332:2,7
333:12 334:8
334:15 338:1
339:5,24 340:3
340:15,23
341:10,13
342:3 343:12
344:4 345:6,10
345:24 346:7
346:22,25
**shapiro** 8:5,6
16:16,18,18,19
17:6 18:18
19:5,21 20:6
20:14,16 22:4
24:9,18 25:1
25:21,24 26:6
26:21 27:5
28:8 29:8 30:2
31:2,16 35:14
35:22 36:8,11
40:13,19,24
41:15,19 42:11
43:2,8 44:8
47:13 48:25

51:16 52:8,18
53:1,9 54:7
58:17 59:1
60:10 62:21
65:14 67:7
68:18 69:3,10
70:18,23 71:4
71:19,24 72:5
74:16 75:12,21
76:23 77:25
79:5 80:3,9,21
83:23 84:2
89:14 90:2
92:15,20 94:2
95:9,13,25
96:17 97:19
98:6,11,21
100:8,18
101:22 102:13
102:17,23
103:9 104:20
105:4,10,14
106:22 108:16
108:18,25
110:3,14 113:5
114:24 116:17
117:17 119:6
121:2 128:4
129:20 133:4
134:8,18 136:9
145:21,25
146:6 147:12
149:9 150:10
151:6,11 152:3
152:12 153:1
153:16 154:11
155:13,23
157:9 158:5,11
159:3 161:25
163:12 165:20
165:23 166:25
170:17 171:11
171:20 173:4
173:13,18
174:1 176:11
177:11 181:24
182:10 183:4
194:2,12,24
195:8,22 196:8
196:15,19,25
197:12 198:11
198:25 199:7
199:18,24
200:3,19 207:2
210:6,12,19
215:1,18 216:4
218:23 222:18
224:17,20
225:10,23
226:19 227:23
228:17 229:19
231:11 234:4
237:7,17 238:8
239:4 240:10
240:23 241:6
242:1,11,15,22
243:14,18,23
244:7,9 245:3
245:8,11 246:6
246:16,22
247:2,10,19
248:1,15
249:20,24
251:21 254:1
254:11 259:16
259:25 260:3,8
260:16 266:5,8
266:18 267:4
267:14 268:7
268:23 272:20
274:1,15,23
275:14 276:4
276:11,20
278:17 279:2
279:12,15
280:10 282:10
283:1 288:21
289:17 290:16
291:9 292:12
295:24 296:14
296:18,25
297:14 299:7
300:23 301:6
301:13,19
306:22 308:22
308:25 310:3
310:17 311:7
313:8 314:14
315:2 316:7
319:14 320:13
322:23 323:9
323:22 324:12
324:23 325:3
325:18 328:13
329:14 331:5
331:22 332:25
337:22 339:2
339:17 340:9
340:21 341:6
341:19 343:9
343:22 344:1
344:21 345:8
345:13,17
346:4,11,21,23
**shapiroarato....**
8:12,13
**share** 22:20,23
23:10,11,11
264:13 275:22
294:3
**shared** 22:18
86:19,25 123:6
127:6,15 138:4
163:16 168:11
191:20 234:15
235:4,11,14
236:3,5,19
237:5,15,24
238:3,15 239:2
239:9,15,19,19
239:23 240:8
240:22 241:4
241:24 244:19
245:18 246:4
248:13 249:7
249:18 250:10

250:20 251:7 251:18 252:2 252:19,23 253:4,19,22 254:9,17 255:13,17,24
**shares** 277:5
**sharing** 70:5 139:9 315:17
**sheet** 119:24,25
**shielded** 259:13 260:13 262:8
**shit** 116:19
**shock** 143:11
**shocked** 149:22 150:7
**short** 61:6,9,14 163:2 201:7 207:13 230:21
**shorthand** 2:25 348:2,16
**shortly** 70:10 96:4 106:19 159:19
**shot** 140:18
**show** 54:12 84:11 111:2 138:7 150:18 150:20,21 201:14 211:11 243:16 244:1 269:8 295:5 303:16 324:10 333:17
**showed** 126:18 138:6,16 147:9 149:18 159:16 242:12,14,18 244:3
**showing** 47:1 59:4 115:22 138:17 149:16 174:5 177:22 185:13 233:20
**shown** 65:15 148:19 150:23 159:17 191:18 242:4 243:25
**shut** 123:5 125:16 140:7 289:4
**sic** 159:13 228:1 258:19
**side** 36:14 242:8 258:16 275:4 333:14 337:17
**sign** 299:11
**signature** 48:10 112:13 348:23
**signed** 12:9 48:6,10,15 49:4,18 52:13 53:14,18 54:3 59:12,15 64:12 64:21,23 112:10,19,23 284:3
**signing** 44:3
**signs** 44:7 136:6 142:20 144:7
**silly** 217:19
**similar** 51:5
**similarly** 40:25
**simple** 215:7 297:3
**simply** 27:16 291:1 310:22 311:16,22
**singer** 111:20 170:15
**single** 52:14 220:9 240:20 345:2
**sister** 225:22
**sit** 64:19 116:8 167:15 215:20 216:10 228:6 237:12,18 240:19 245:15 246:20 253:7
**site** 191:9
**sites** 316:2
**sitting** 29:11 238:25 246:1 248:10 249:4 254:5 257:16 258:25 259:3 272:15
**situation** 159:2 161:24 188:5 189:11
**situations** 135:11
**six** 71:18,20 120:14 140:13 142:25 143:2,8 161:11 302:5
**sklenar** 130:14
**slammed** 300:8
**slate** 41:14 134:13 151:10 152:17 158:9 158:13
**slate's** 133:18
**sloane** 6:4 207:25 224:7 224:16,22 226:6,8 234:16 235:5,11,14 236:4,6,24 237:6,16,21 238:4,15 239:3 239:9,15,19,23 240:9,22 241:5 241:25 243:4 244:20 245:19 246:5 248:14 249:8,19 250:11
**sloane's** 223:23 224:5
**small** 192:18 277:12 290:18

**smear** 196:13 196:17 198:22
**smelling** 159:13
**social** 56:18,21 57:6,8,12,16,20 57:25 59:22 60:2,9,22 61:14 62:5,7 62:11,13,18 63:4,21,22 64:18 65:4 66:5,24 87:22 193:8 304:3,13 304:15,21 305:2,18,22 306:3,3,9,11,13 306:18 307:19 318:8 320:5,10 320:22 321:11 321:17,20 322:6,9 327:1
**soevyn** 1:23 2:24 12:5 13:5 14:5 348:2,24
**sole** 44:6
**solemnly** 16:25
**solo** 186:14,21
**solutions** 10:8 15:9
**somebody** 90:13 129:1 198:16 267:1
**somebody's** 90:8,11
**someone's** 311:16
**something's** 260:13
**somewhat** 157:18,18 344:24
**son** 298:10
**sony** 91:16 93:18 96:16,18 96:23 109:25 130:2,18 142:14 164:17 164:17 205:2 206:15 220:14 221:4,12 223:1 337:17 340:1
**sony's** 343:16 344:5
**soon** 109:10
**sorry** 18:12 20:18 34:5,15 37:5 39:24 44:15 54:13 64:9 67:8 68:1 77:15 85:9 96:1 102:20 117:4,24 119:23 127:10 131:19 139:1 143:24 153:2 160:4 161:16 161:21 165:14 165:16 184:6 196:10 200:5 201:6,24 220:20,22 240:10 249:24 252:20 265:20 268:24 270:11 270:22 284:18 284:19 299:9 310:5 318:19 324:18 325:25 327:15 339:19 342:13
**sort** 28:12 50:18 55:23 129:2 137:2 159:2 264:15 294:21 311:23 332:4
**sorts** 130:4
**sound** 292:3
**sounded** 133:7
**sounds** 90:22 130:7 266:20 335:10
**source** 240:14 240:15
**southern** 1:2 2:2
**space** 84:7
**spare** 220:10
**speak** 19:9,16 25:6,18 48:18 82:22 84:13,14 125:6 126:1 167:18,22 168:1 209:3 211:9 221:20 236:11 237:19 240:25 243:7 254:13 273:3 315:10
**speaking** 26:17 121:24 122:2 135:1 209:5 240:6 273:19 273:24 346:14
**speaks** 38:17 123:23
**specific** 56:18 95:7 104:15 110:15,20 119:7 169:17 196:9 235:8 240:20 241:3 253:8,12,14,15 253:20 255:22 256:19 264:4,8 265:25 280:8 314:7 330:9 332:11,14,19 332:22 333:8
**specifically** 35:18 56:22,25 62:15 65:6 123:19 126:9 131:21 193:23

194:21 235:12 252:2 282:7 305:24
**specificity** 239:1 253:17 287:16
**specifics** 75:8 304:15 306:11
**speculate** 117:12 299:8 333:16
**speculating** 87:22 297:10 299:13 313:9
**speed** 202:16
**spelling** 307:12 307:13,14
**spend** 32:18 298:17
**spending** 144:18
**spent** 283:6,9
**spiral** 300:11
**spirit** 23:9,13 38:17 123:23 172:20 173:6
**spite** 264:13
**spoke** 18:23 20:16 24:7,15 24:24 89:4 92:14 99:24,25 187:5 214:22 215:12,15,23 216:11 236:23 264:10 322:9 338:13 344:23
**spoken** 28:19 206:25 209:7 222:3 257:8
**spot** 261:16 262:22
**square** 4:20,21
**sroeser** 4:13
**stage** 140:24 289:9 322:1 336:11
**stages** 287:22
**stamp** 178:12 180:6 202:3 211:20 213:20 220:12 269:12 303:22
**stamped** 47:3 111:5 174:9 177:25 185:18 216:17 292:18 326:20
**stamps** 115:25
**stand** 121:4 228:7,18 229:12
**standalone** 314:4
**standard** 153:12 214:9
**standing** 36:12 67:18
**stands** 20:24
**start** 17:6 22:13 25:7 46:11,18 140:19 168:25 179:7 189:3 192:15 215:6 259:2 283:4
**started** 45:5,8 94:19 96:23 137:15 144:8 144:18 159:5,8 320:7
**starting** 15:19 37:18 291:13
**starts** 49:21 187:20 203:3 328:2
**state** 16:25 27:17 60:18 86:20 287:9 329:17 348:3
**statement** 20:3 275:11 304:2 317:5 338:18
**statements** 342:24 343:19 348:10
**states** 1:1 2:1
**stating** 332:15
**stay** 187:19 261:3,6 263:19 282:12,22
**staying** 83:16
**ste** 6:7
**stemmed** 83:18
**stenographic** 16:24 17:4 54:14 77:13 252:13 280:4
**stenographic...** 1:23 348:11
**step** 87:19 161:6 164:25 164:25 181:22 182:7
**steph** 189:4 191:2 205:19
**stephanie** 2:20 3:3 4:6 12:9 15:22,25 16:2 16:5 45:14,20 45:24 46:14,17 53:22 54:21 83:2,18,19,20 84:1 85:11 86:15,24 87:3 87:6,9 88:1 89:12 91:5,17 106:7 109:24 118:21 119:1 120:3,23 123:9 123:18,20,20 124:17 125:15 126:1,12,23 168:6,12,15,18 168:23 169:1,7

169:11,14
170:6,9,12
171:7,15 172:2
174:7,23
175:21 176:17
177:1,24
178:16,24
179:4 180:6
181:3,11
182:11 184:3
185:17 186:6,9
186:24 189:25
190:11,17,22
190:23 191:6
191:13,15,19
192:7,8,21
193:7,22,24
194:11,21
195:14 196:2
204:13 205:2
205:19,20
206:20,23
207:14 208:3,6
208:19 210:24
211:5 212:16
213:10 214:8
214:13,22
215:11,13,15
215:22 216:11
217:13 218:11
218:21 219:6
219:22 220:15
221:5,13,18
224:9,14,23
227:16 228:6
228:12,15
229:24 230:25
233:7,14 234:2
234:10,12
235:11,15
236:3,5 237:3
237:5,15,24
238:3 239:18
239:23 240:9
240:22 241:5
241:24 243:3
244:18 245:17
246:4 248:13
249:7,18 250:9
251:4,6,18
252:1,19 253:4
253:22 254:9
254:16 255:13
255:17,24
258:13 263:23
264:18,19,20
264:22,25
265:9 272:1,18
273:8 275:12
277:6,15 278:5
278:9,13,23
279:20,24

**stephanie's** 177:14 181:20 182:6

**stepped** 161:10

**steps** 82:4 284:21,21

**steve** 7:4 8:4 9:4 10:7 43:19 58:13,17,19 232:4

**steve's** 232:6

**stick** 101:21

**sticking** 237:21

**stickler** 311:13

**stipulate** 20:20

**stipulates** 43:14

**stir** 209:14

**stirring** 209:17

**stop** 104:18,21 105:2 182:20 244:4 258:7 307:23 319:3

**stopped** 288:7

**stops** 289:22

**stories** 38:22 128:14,20 129:7,14 201:12

**story** 300:10,17 301:4,11

**straighten** 188:5

**strasberg** 6:5 282:19 334:17 335:24

**strategize** 57:20

**strategy** 38:4 228:14

**street** 3:9 5:16 9:15,20 16:8 40:1 204:7

**strike** 139:23 141:13

**strikes** 163:25

**strippen** 130:3

**strong** 43:24 181:21 182:7 208:15,16

**struck** 335:25 336:16 342:17

**struggling** 136:11

**studios** 1:8,13 2:8,13 7:2 8:2 9:2 12:3,7 13:3 14:3 15:15 37:7 45:10,20 47:20 55:11,15 55:18,18,21 59:6 112:6,11 212:19 214:14 290:20 317:16 349:1 350:1

**stuff** 88:8 109:12 132:10 138:12 139:25 141:10 142:18 143:4,7 144:9 144:21 164:7 172:24,25 175:5,7 183:6 184:22 185:3

192:14 212:5,6 261:15 282:5 330:20 331:16
**subject** 26:18 127:3 241:18 248:5 317:9 320:12,19,23
**subjective** 344:19 345:12 345:23
**submitted** 280:19
**subpoena** 253:25 254:10 271:9,15,22 272:1,13,18 273:8 275:13 276:3,10,19
**subscribed** 350:14
**subsequent** 228:22
**substance** 25:8 25:12,14 26:1 26:9,20 29:23 81:24 82:3 125:3 173:2,24 188:12 240:20 241:3 331:8 344:20
**substantial** 43:20
**substantive** 228:14
**successful** 288:5
**sudden** 289:22
**suffered** 281:13 281:19
**suggest** 47:15 329:21
**suggested** 144:8 150:13 187:4 188:15
**suggesting** 169:3 186:20 187:6,10
**suggestion** 204:10 225:8
**suggestions** 139:19
**suggests** 66:10
**suite** 4:10 9:10 9:21
**sullivan** 3:5,16 15:22
**sum** 173:2,24 188:12 331:8 344:20
**summer** 7:7 16:11 19:7 108:15,17
**sunshine** 7:8
**support** 31:21 57:8 62:14 235:9 237:14 241:23 244:6 244:18 248:12 251:13 255:8 258:19 297:17 305:8,10
**supportive** 124:3
**supports** 243:2 244:25 246:3 249:6 257:17
**suppose** 172:23 344:14
**supposed** 64:9 65:9 162:21 164:25
**sure** 29:5 35:15 39:25 45:17,18 47:18 49:12 51:22,24 53:25 59:10 60:16 62:2,17 67:11 68:1,15,22 73:20,23 75:19 77:18,22 80:4 81:5,21 84:4 85:17 86:11 90:15 92:16 95:17 104:13 104:24 105:10 106:4 107:6,22 109:9 113:6 116:6 121:12 121:12 127:11 129:9 131:23 133:12 135:12 136:21 144:14 144:21 145:11 146:22 147:3 152:9 164:4 173:23 174:2 174:21 176:21 177:7 182:4,13 193:14 201:25 203:1,3 204:17 207:11 208:4 211:10 217:1 217:16 228:4 230:11 240:11 240:19 260:4 265:7 272:24 275:17,24 281:5 284:22 290:7 293:16 293:19 300:11 300:25 305:11 306:5 314:5 329:8 330:21 331:4 332:10 334:4,6 335:1 336:9 343:13 343:23 346:23
**surface** 86:12
**surprised** 98:19
**surrounding** 18:11 289:14 289:15
**suspect** 90:23
**sway** 318:5

**swear** 16:22
**sworn** 350:14

**t**

**t** 349:3,3
**tab** 33:11 54:13 111:1 211:13 211:13
**table** 144:14
**tactic** 196:18
**tactics** 171:8,16
**tag** 127:19,23 128:2 129:18 166:9 167:19 194:10 196:5 197:9 198:22 199:16 201:3 201:20 202:19 209:22 210:18 219:19 296:12 296:23 301:3 301:10 304:1 304:25 305:2 305:18,22 309:25 312:9 319:11 321:15 323:16 325:11 326:19 328:2
**tag's** 196:4 323:17
**taitelman** 7:5 16:12
**take** 19:25 20:6 21:14,17 23:17 29:15 30:6 32:2,22 49:4 55:1 75:23 77:3 83:10 105:9,17 164:25 165:17 165:19 181:22 182:7 211:22 218:16 230:10 247:12 248:16 258:15 259:11 259:22 262:10 286:1 302:20 302:23 309:1 317:21 318:11 333:24
**taken** 2:19 15:16 130:3 233:9 348:5,16
**talk** 22:12,17 22:18,21,24 23:4 64:10 88:5 100:22 118:19 123:9 131:12 138:1 156:13 162:13 186:15,22 187:12 207:15 226:6 274:12 274:20 281:8 286:22
**talked** 133:13 133:17,21,25 134:3,5 138:12 139:18 141:16 145:12 151:13 160:8 162:9 164:21,22 165:1,5,9 166:24 183:11 206:10 208:25 226:8 249:21 252:22
**talking** 30:1,21 84:5 86:11 116:25 126:9 130:18 156:7 156:21 159:22 161:9,12 207:5 218:25 239:24 240:4 259:25 264:20 270:12 270:16 277:8 299:5,15 330:25 339:20 341:17
**tangible** 142:13
**tara** 277:16
**team** 45:20 46:2 180:19 204:8 209:20 216:21,21 217:10,21 219:16 229:13 229:18 300:5 300:16 301:3 301:10 307:19 309:25 312:9 312:15 327:2 328:2 330:8 332:18,21,23 333:6,7 343:16
**technician** 15:9 58:6,10,14,22 58:24 282:18
**technologically** 309:9
**tell** 35:5,9 37:20 38:22 68:16 74:23 75:3,20 77:23 79:3 81:24 91:17 92:2 93:9,18 107:6 116:18 123:14 125:20 136:18 159:4 169:10 169:13,14 184:18 205:13 223:12,13 227:16 228:5 234:11 238:14 245:16,20,22 246:2 248:10 249:5,16 250:8 250:24 254:6 254:24 255:12 256:5 257:21 258:11 275:10 281:18 284:22 287:16 295:16 297:5 305:5

312:1 318:24 319:16 346:2
**telling** 38:23 70:9 124:7,12 172:2 197:21 197:24 199:3 200:9 217:13 259:6 346:9,13
**temperature** 297:7,19
**ten** 124:25 126:16 159:22 160:12,20,21 163:2 213:16 337:24
**tenth** 308:8
**tera** 78:23 79:25 81:11 82:20 86:18,24 86:24 174:7 175:4,8,10 178:25 181:5 184:5 185:17 186:6 190:11 190:16,21 191:1,6,12 277:6,14
**term** 28:13 49:22 50:1,9 61:3 66:10,13 66:16,18,22 188:18 288:18 306:25
**terminate** 50:14 85:21 336:23 338:10 339:15
**terminated** 70:17 73:10 97:6,9,15,17,24 98:9,12,20 99:10 100:3,14 101:6,15 103:4 103:8,16,24 104:8 230:13
**terminating** 230:5
**termination** 50:18,19 66:5 73:18 102:21 103:12
**terms** 48:11 60:12 73:17 77:20 82:25 135:1 233:5 258:11 281:3 289:9 306:19 306:25 308:7 309:5 310:21 321:11 330:9 332:19 333:8 336:21
**test** 262:17,23 307:13 322:2
**testified** 39:8 41:22 77:17 94:23 106:4 107:4,5 115:8 132:18,22 133:15,19,23 134:2,7 144:11 148:12 193:20 194:8,19 195:6 195:12,18 205:6 210:3 224:8,12 225:3 225:6,18 250:7 255:2 341:22
**testify** 27:3 33:7 37:21
**testifying** 27:16 32:23 78:19 262:2,3
**testimony** 16:25 17:18 23:2 25:9,20 26:4,20 27:12 27:14,15 28:3 29:7,15,24 33:18 36:4 59:2 64:7 69:6 132:2,13 134:20,23 282:24 293:10 331:1 348:8 350:9
**texas** 9:22
**text** 12:11,22 13:7,9,10,18,20 13:22 14:9 54:20,24 99:3 121:6,13 169:2 170:10,20 174:3,6,15,16 174:20 176:21 177:23 178:15 178:19,23 179:3 184:5,13 185:1,3,7,16,22 186:3,6 187:20 188:8,13,22,25 190:10,13,16 201:19,21 208:21,23 211:19 212:3,9 212:13,15 213:10 216:16 218:1 221:1 237:1 239:10 239:24,25 251:2,19 252:3 252:24 253:8 253:12,14,16 253:22 254:7 269:9 273:1,12 273:19,23 278:15,24 292:16 293:23 297:24 326:7 327:18,20,24 328:15
**texted** 178:25 179:22
**texts** 55:7 179:25 184:9

184:20 185:2
191:6 266:25
**thank** 16:21
17:4,19 20:25
31:19,25 34:2
35:13 36:22
37:3 38:1
54:15,17 56:15
58:23,25 59:1
67:1 106:17
112:4 131:25
190:8 194:6
201:16 212:8
231:1,10
250:13 263:17
263:18 280:4
281:7 286:24
291:23 292:24
293:19 303:19
312:4 315:16
315:16,19
331:9 334:2
335:7 338:13
339:24 346:25
**thanking** 189:4
**thanks** 17:9
187:25 202:12
321:8
**theme** 87:2
170:1 320:1
**thens** 262:13
**theory** 280:21
281:2
**therapy** 94:24
**thing** 22:15
78:8 116:19,20
123:25 142:21
148:18 151:2
161:12 198:2,3
198:10 215:7
276:3,10,19
278:16 279:1
280:7 287:25
309:11 315:12
329:16 330:15
**things** 27:19,20
27:22 28:5,12
28:21 37:23
38:17,25 68:8
68:17,23 73:19
73:21 85:3
87:23 88:11
89:24 99:19
117:15 128:14
129:19 130:17
131:6,10,24
132:4,5,9,16,17
137:13 139:11
139:23 141:24
142:13 144:24
145:15 147:10
153:13 155:11
157:2 159:14
159:21 163:23
174:22 185:10
187:3 189:18
192:2 193:23
198:14,17,18
206:14 217:4
258:23 281:1,8
287:23,23,24
305:16 308:19
317:21,23
318:2 323:24
327:9 340:25
**think** 21:4,8
24:14 27:9,16
27:20 28:1
30:13 31:5
32:6,7 35:4,22
35:25 36:6,17
36:19 37:16,22
40:12 41:13
46:16 56:13
57:14 60:23
61:16 62:9,10
66:11 67:23
68:8 69:11,12
71:16,22 72:3
72:19,25 75:9
77:17 78:1
83:4 84:3
87:17 96:25
99:24,25 101:4
101:17,24
102:9 103:12
105:12 107:4
110:23 115:15
116:22 118:3,4
118:5,7 119:25
120:17 123:1,5
123:6,9 124:10
124:14,24
131:12,12
132:25 134:14
135:14,17,19
136:5 138:1,2
138:6 141:12
143:17,18
145:23 146:1
150:14 151:13
152:5,14
153:17 154:22
155:15 157:20
158:23 159:7
161:23 162:7,7
162:25 163:5
163:13 164:10
166:23 167:15
169:5,16
170:19 172:6,7
172:9 175:23
177:8,8 181:7
184:18 185:16
186:5,14,21
189:11 190:2
192:13 194:13
195:9 200:6
202:2 207:17
208:23 217:12
217:21 219:16
220:3 223:8,15
223:17,25
224:1,1,1
225:14 230:20

231:12 234:5
235:15 236:21
237:13 238:3
243:11,23
245:5 246:22
247:20,23
252:22 253:4
261:21 262:16
262:24 263:5
263:10,15,15
264:10 266:15
268:11 272:16
273:23 274:11
274:19 276:2,5
276:10,12,19
277:20 278:12
278:22 279:3
280:11 282:13
285:18 286:16
287:1,14
289:21 291:5
291:10 295:12
298:7,8,14
300:24 302:11
306:15,25
307:1,2 308:3
311:15 317:17
321:3 326:4
329:3,16,23
330:24 338:17
338:18,18,20
339:18,23
340:1 341:24
344:11,22,23
345:8,11,11,16
345:16,20,21
346:18,19

**thinking** 23:1,3 69:14 78:2,11 83:17 98:15 100:6 117:22 128:5 246:11 246:19 306:24 324:8

**third** 1:11,12 2:11,12 41:2 256:19 258:6 263:24,25

**thirty** 21:9

**thought** 77:24 128:23 132:3 138:7,16,20 144:2,3 146:15 148:7,8 149:1 149:16,19,20 150:6 164:25 168:23 169:6,8 169:15 176:17 177:2 185:25 236:16 285:21 309:8 327:15

**thoughts** 139:18 163:16 176:1 177:15

**thread** 12:17 13:12 14:7,11 54:20 157:5 174:7 177:23 178:16 184:13 185:8,17 186:3 186:6 190:10 201:19,22 208:21 211:19 212:3,10,15 216:16 269:10 273:12,19,24 303:21 326:8 326:25

**threads** 316:1

**threats** 130:5

**three** 32:11 61:22 66:13,16 66:18,22,25 71:22 72:1 76:8 134:12 177:25 283:6 308:9 324:1 326:23

**throw** 140:25

**throws** 147:24

**thursday** 1:21 2:23 12:4 13:4 14:4 15:3

**tie** 289:23

**tied** 42:2

**ties** 68:10 69:18 286:10

**time** 15:6,7 17:15 20:10,13 21:8 29:4,22 29:22 30:6,14 35:23 37:24 38:25 45:15 46:10 48:9,14 48:15,24 49:4 49:18 51:6,12 52:4,12 53:13 53:16 56:16,17 57:3 61:6,9,14 61:22 62:20 63:8,20 67:13 67:20 70:11 74:9 76:6 78:2 78:17 79:21 82:5 84:4,10 87:6 88:3 89:23 90:14,17 90:20 91:4,22 91:25 94:9,12 94:15,19 95:15 103:22 104:6,7 104:12 105:23 106:1 107:7 110:6 114:12 114:17 115:9 117:21 120:15 120:17 121:22 122:14 125:24 126:24 127:9 127:18 128:22 131:16 132:3 134:25 135:11 136:22 137:21 140:15 142:18 143:22 144:6 144:18,25

145:11 151:3 157:3 161:6 162:6,18 163:3 164:12 165:12 165:25 166:4 170:1,8,11,23 174:25 176:20 176:25 177:17 178:11,20 179:14 180:5 180:24 181:25 183:8,13,13,16 185:10 186:24 187:4,8 189:19 190:3 191:13 191:21 192:13 193:9 197:10 204:6,18,22 205:15 206:14 208:13 209:2 210:5 213:6,20 214:8,9,23,24 215:13,13 216:1 218:18 219:1 222:17 222:22,23 224:11 226:16 227:17 228:2 228:11 229:10 230:3,12 231:6 231:17,21 239:11,16 240:17 247:15 248:20,23 272:5,9 274:16 278:19,20 285:14 286:18 295:12 302:4 303:1,4 306:19 308:3 309:21 310:14 311:4 317:1 319:9 323:20,24 324:2 326:3 327:15 330:21 333:24 335:25 337:8,10,13,23 339:4,10 345:9 345:18 346:1,9 347:1,4 348:6 348:7,10

**timeline** 79:7

**times** 4:20,21 84:14 135:8,13 159:1 177:5 272:7,17 273:7 274:13,21 324:1

**timestamp** 213:22

**timestamped** 327:25

**timing** 73:22 100:11,11 263:14

**titled** 13:15

**today** 15:7 17:18 18:3,5 19:20 25:13 27:13 30:15 32:23 33:18 36:17 37:21 58:11 64:19 85:6 116:8 127:13 161:7 167:16 199:6 214:4 215:21 216:10 228:6 237:12,18 238:25 240:20 245:15 246:2 246:20 248:10 249:4 253:8 254:5 257:16 259:1,3 272:16 286:25 302:12

**today's** 27:15 30:8 347:3

**together** 31:9 31:22 43:21 44:2 53:22 54:1,6 140:20 143:20 178:9 186:16,22 187:6 202:21 289:24

**toilet** 139:12,14

**told** 125:4 148:6 199:21 205:12 206:18 224:25 225:1 226:16 227:1,3 228:8,12 229:12 242:7 245:16 246:8 248:12 249:6 251:5,13 252:16

**tomorrow** 76:5 164:23

**took** 21:8,24 88:24 99:20 120:6,25 317:19 318:19

**top** 25:15 27:12 76:24 112:1 181:2 190:16 212:13,15 238:5 308:9 321:6 327:18 341:25

**topic** 35:19 37:20

**topics** 34:17,19 34:20,22 35:18 35:24 36:1 37:18,19

**toskovic** 12:15 12:18 65:21 111:11,13,13

**total** 53:4 56:4

**totally** 235:25 302:23

**touched** 222:13

**touching** 158:3 158:24

**tough** 198:2,3,8 198:13
**towards** 30:12 137:6
**tower** 4:20
**track** 318:16
**tracks** 319:3
**trailer** 138:14 138:22 145:2 145:18 154:19 159:9
**trainer** 136:25
**transcribed** 348:12
**transcript** 193:3 224:5 293:8 348:13 348:16 350:5,9
**traveler** 93:1
**treading** 87:19 90:20
**trial** 262:1
**tribulation** 130:2
**tried** 206:23 220:1
**tripped** 17:14
**trouble** 73:2 152:4
**true** 17:13 197:22,24 198:2 221:21 291:7 345:22 348:15,21 350:8
**trust** 23:9 43:25 44:20 77:8 90:22 186:15,22 330:22
**trusted** 77:1 231:4,5
**trusting** 77:3
**truth** 17:1,2,2 345:11,16,16 345:16,20,21 346:2,10,13,14 346:15,18,18
**truthful** 29:10 342:24 343:19 343:19,20 344:17
**try** 26:15 36:13 141:8 198:14 245:12 275:24 293:17
**trying** 26:19 44:12 60:7 82:21 87:23 88:11,17 110:23 122:25 136:14 137:11 139:2 141:4,6 147:17 148:5 150:5 162:15 162:16 163:20 184:23 187:8 192:23 200:5 206:16 207:24 220:10 225:16 239:22 252:21 275:23 285:18 297:7 299:9 302:15 311:12 334:24 335:4 339:19 344:6
**turn** 44:23,23 65:8 107:12 108:9 145:23 146:3 264:12
**turned** 89:24 107:8,11 145:5
**twenty** 54:14 323:12
**twice** 135:13 201:4
**twisted** 165:4
**twitter** 192:22
**two** 31:6,17 39:10 40:3 68:8,12,16,17 68:19,23 70:13 71:17 73:8,8 73:19,21 76:7 96:19 115:6 119:11 120:3,9 120:13,22 126:20 159:6,7 159:10 161:8 178:9,19 184:9 185:15 187:5,6 192:13 200:24 209:14 234:18 262:2 293:4 302:7 333:22
**twofold** 329:23
**type** 172:16
**typically** 61:20 64:20,24 140:23 146:3

**u**

**ugly** 162:4
**uh** 30:23 32:8 49:11 73:12 91:9,13,15 94:20 97:12 103:20 113:9 189:6 191:3 195:25 210:15 226:2 228:21 230:7,17 248:9 253:13 287:21 291:16 292:7 322:11
**uk** 214:8,9
**ultimate** 43:6,9 44:6 113:3 189:12
**ultimately** 64:17 85:14,21 170:5 230:16 232:2 281:25
**unbeknownst** 162:11

**uncomfortable** 139:20 170:12 171:8
**uncustomary** 61:19
**under** 51:2 55:11,15,20 193:21 194:8 194:19 195:6 195:12,19 210:3 233:5 244:21 246:8 246:12,14,20 254:20 256:16 257:5,9,24 258:23 262:5 265:14 268:13 269:21 274:3 277:4 311:23 314:7 337:2 343:2 348:7,20 348:20
**undergoing** 241:14
**understand** 20:22 30:11 32:22 44:12 46:4 48:23 53:12 54:8 60:1 61:21 73:17,20 88:15 96:24 99:13,22 127:9,23 128:13,18,22 130:9,12,13 132:1,5 133:5 146:16 147:18 149:6 150:4,22 152:9 159:10 169:7 172:14 174:23 175:20 176:13,13 181:11,19 182:2,5 184:11 190:25 198:8 206:22 207:14 209:1 216:8 219:6 241:4 245:6 257:10 259:19 261:11 263:9 266:21 267:7 273:18 274:17 282:22 298:5,9 299:4 299:22 300:15 306:13 307:15 307:25 308:6 308:15,24 310:8 313:4,16 314:10,16,21 315:23 317:23 318:1 319:4 321:9,20,23 331:11 334:5 338:14 339:3,4 339:8,12 340:2 341:13 344:13 345:1
**understandable** 318:11
**understanding** 27:25 35:25 43:16 50:25 55:14 56:6 57:14,15 59:21 60:1,8,21 61:13 62:4 64:24 73:5 97:24 107:15 117:3,5 122:12 122:16 125:11 129:17 168:22 170:8 172:13 176:16,24 186:19 206:9 225:7 234:1 237:9 279:4,23 292:9 294:12 296:22 299:3 301:2,9 307:3 308:13 309:4 309:24 310:6 312:17 313:18 316:9 321:22 324:16 325:15 329:11 338:2 340:10,13 344:15
**understands** 76:25
**understood** 30:9 31:19 82:24 87:2 99:15 129:4 130:10 145:16 146:23 148:17 149:4 150:5,18 150:23 152:18 155:9,21 162:22 171:6 171:14 180:13 180:23 197:8 229:25 240:16 297:17 298:22 305:25 306:3 338:22 340:5
**unfair** 152:14
**unfollowed** 130:6,6
**unfollowing** 132:10 144:8
**unfortunately** 215:3
**unhappy** 136:24 137:25
**united** 1:1 2:1
**unknown** 131:9
**unprofessional** 88:9
**unproven** 200:11
**unreasonable** 85:4 101:4
**unsure** 97:2 141:6

**update** 308:16
**updating** 307:21 308:11
**upset** 138:12 144:14 156:9
**upsetting** 142:11
**urquhart** 3:5 3:16 15:22
**use** 26:15,19 175:16 176:5 188:18 259:23 262:11 279:7 328:12
**used** 90:8,11 152:11,19 171:9 298:13
**using** 223:15 320:21
**utilize** 317:8

**v**

**v** 12:3 13:3 14:3 15:14 58:6,10,14,22 58:24 282:18
**vacation** 91:22
**vacuum** 34:24
**vague** 170:18 193:1
**validity** 263:14
**valued** 326:4
**various** 39:10 132:17 135:25 136:2 157:3
**veiled** 130:5 131:7
**vein** 259:10
**vendor** 47:20
**verb** 28:23
**veritext** 10:8 15:9
**versa** 35:11
**version** 59:19 61:4 159:17 230:21 277:19
**versus** 33:14 60:18 64:12 84:11 88:7 324:3
**vice** 35:11 111:14
**vid** 294:3
**video** 1:19 2:18 15:9,13 57:17 138:6,16 147:8 147:16,16,18 147:19,21 148:2,13,19 174:3 294:18 294:20,23 296:13,23 299:23 303:7
**videographer** 10:10 15:5 16:21 20:9,12 105:22,25 165:24 166:3 231:16,20 248:19,22 282:15,20 302:5,25 303:3 337:24 345:19 347:2
**videos** 138:8 298:2,22,23 299:3,5,15
**view** 82:10 161:2 245:8
**viewed** 27:18
**visible** 183:3
**visit** 119:13,18 120:2 121:25 126:21
**visited** 119:12 122:14,18
**vituscka** 225:8 225:9
**voglesong** 12:18 111:15
**voice** 291:13
**vs** 1:7,11,14 2:7 2:11,14 349:1 350:1

**w**

**waist** 145:19,24 148:14
**wait** 82:4
**waiting** 31:21 58:20
**waiver** 20:21
**walk** 38:13 140:2 143:23
**walker** 9:17 16:8
**wall** 141:1
**wallace** 9:15 16:8 195:12,20 199:17 204:7 296:13,24 301:3,10 305:22 309:25 314:11,18 319:12 323:2 323:19 325:8 325:16 331:3
**wallace's** 39:23
**want** 17:10,17 20:14 28:7 29:9,15 34:6 35:5 37:19 38:16,25 49:12 51:17,23 56:12 60:12 64:1 68:9 80:15 82:22 87:15 95:3,8 106:4 118:19 121:7,9 133:9 135:9,10 139:15 144:5 147:1,15 150:18,20,23 164:16,21 172:16 175:15

180:18 181:17 196:22 197:2,4 198:5,19 199:8 200:11 209:4 209:14 212:14 217:18,18 218:11,21,24 219:4,8,10 227:10 231:11 240:10 247:11 247:15 250:14 261:1,14 262:12,13,16 263:2,3 266:20 274:17 277:23 280:7,12 282:9 285:22 291:20 294:3 298:15 302:7,13 307:2 308:7 309:1 315:17 317:16 317:23 326:1 327:11 328:7 328:12,25 329:4,8,11,18 329:19 330:20 331:3 337:10 339:14,22,22 343:7

**wanted** 17:7 25:19 26:5 27:12,15,24 55:9 57:8 60:18 77:3 80:25 87:8 95:20 96:8,14 97:2,7 123:9 126:1 138:14 139:4,4,7 140:11,21 143:2,4,15 144:22,25 153:7 155:16 155:20 156:16 160:1 162:21 162:22,23 164:20 219:13 219:17 285:24 305:13 333:19 337:12

**wanting** 61:25 137:10 337:7

**wants** 105:14 136:13 294:6

**wardrobe** 137:12,13 138:2,5 139:6 151:5,10 152:2 159:11

**warned** 168:19

**washington** 5:18

**watch** 300:11 311:22

**watched** 203:25

**watching** 192:24

**water** 291:19

**way** 28:5 31:8 33:17 35:4 36:17 38:6 53:15 57:20 62:12 69:2 77:5 78:8 82:10 84:15 101:13 103:23 116:22 117:20 118:5,7,14 126:6 132:13 140:3 142:8 147:17 149:11 157:10,23 161:3,3 162:20 172:9,11,21 173:8,16,20 176:10 186:25 207:16 208:9 215:15,22 216:10 223:4 233:8,24 234:19 244:9 258:18 263:6 264:23 265:8 293:2 296:3 298:13 301:22 303:13 309:10 311:5 314:25 315:11,23 319:10 322:13 333:1 335:21 337:15 338:4 342:13

**wayfarer** 1:8 1:13 2:8,13 7:2 8:2 9:2 12:3,7 12:16,19,21 13:3,11,20 14:3 15:15 16:10,13,15,17 16:19 32:25 33:6,7,15,21 34:11,21 35:20 37:7 38:3,5 39:4,9 41:4,23 42:8,18,18,24 43:5,13,23 44:7,14,17 45:4,7,8,9,9,16 45:20 46:5,6 46:11,15,24 47:20,25 48:4 49:3,17 50:14 50:17 51:2,13 52:5,12,14,15 52:22 53:5,6 53:12,17 54:3 54:4,6 55:18 55:21 56:7,8 56:16 57:5 59:6 61:9 62:18,23,24 63:5,9,21,22 64:16 65:11,23 66:18,23 67:4 67:13 68:5

75:10,18 76:1 76:3,13,15 77:21 79:23 80:14,18 81:15 85:13,13 87:8 88:7 100:5,16 102:12,16,16 103:2,17,25 104:6 111:5,11 112:6,11 113:2 113:3,17,24,25 114:3,4,10,12 114:15,17,19 114:22 115:5 115:25 124:3 127:19 129:18 168:1,6 182:14 183:6 190:12 190:17 196:5 197:11 198:24 202:20 204:8 209:2 212:19 214:14 227:18 228:13 229:1 230:4,12 231:23 232:2 232:15,18 234:9 235:4,10 236:20 237:5 237:15,24 238:2,14 241:24 243:3 244:19,25 245:18 246:4 248:13 249:7 249:18 250:20 251:16,25 252:17 253:10 254:16,17 255:14,16,23 256:7,13,15,20 256:23 257:3,4 257:23 258:3 258:14 264:5,8 265:2,11,22 266:1,2,7,13,15 266:23 267:1,3 267:12 268:6 268:21,22 269:12 270:9 270:13,17 274:22 275:6,7 275:15 278:13 278:23 279:19 279:24 280:19 281:13,19 289:2 290:7,13 290:25 291:11 291:24 295:20 299:16 303:9 309:20 310:1 310:14 314:12 314:19 317:16 320:10,17,21 323:2,14,20,21 324:14 325:8 325:11,14 328:11 338:3 340:6 343:7 345:25 346:8 349:1 350:1

**wayfarer's** 35:8 38:15 39:21 42:2,7 48:7,11,17,21 52:24 61:13 65:3 66:4 67:6 69:6 76:21 80:8,15,25 85:19 97:8 98:14 103:6 113:18 128:3 228:16 229:2 232:9,22 233:3 234:1,10,13 235:18 243:2 244:25 248:12 249:6,17 250:9 250:10,18 251:6,7 252:23 253:5,18 255:12 256:21 257:11,22 263:24 265:1 265:10 273:16 273:20 274:14 274:22 278:15 278:25 281:2,9 323:6 325:14 334:10 335:12 336:1,7 339:13 342:18

**wayfarerstud...** 111:17

**ways** 282:2

**we've** 127:13 137:15 154:20 157:2 219:17 231:2 241:14 250:16 257:7 265:5 282:4 284:23 286:9 289:25

**weapon** 175:17

**weaponize** 180:19

**wearing** 146:10 146:11

**web** 308:18

**weber** 6:4 14:11

**webpages** 308:16

**website** 192:22 193:22 194:11 195:14 196:6 196:13

**websites** 191:14 192:8 193:7 195:21 196:17 198:22

**weeds** 299:9

**week** 71:17 116:25 159:6 177:14 288:2 289:19

**weekend** 186:16,23
**weeks** 70:13 159:7 167:2
**weight** 136:25 137:4
**weird** 263:5
**went** 29:3 65:2 88:13 99:15 169:9 183:15 187:14 342:13 344:12
**west** 7:10
**wet** 61:22
**whatsoever** 226:7 244:24 276:3
**whitesell** 91:12 92:2 109:24
**wife** 19:13,17 19:18,20 20:20 21:7,25 24:7 29:21,21 31:4 32:7 138:18 147:9,22 148:2 155:22 159:18
**wife's** 148:13
**willing** 20:17 20:22 181:21 182:7 307:11
**willingly** 198:9
**willkie** 5:3,13
**willkie.com** 5:8 5:19
**wind** 104:25
**winded** 131:19
**winning** 307:11
**wise** 21:4 79:7 287:25
**wish** 123:11 286:19
**witness** 11:2,10 16:23 17:3,9 18:19 19:2,6 22:5 25:22,25 28:10 29:9 31:17 33:12 36:23 37:2 40:14,20,25 41:16,20 42:12 43:3,9 44:9 47:14 49:1 51:17 52:9,19 53:2,10 54:17 59:10 60:11 62:22 64:8 65:18 67:8 68:19 69:4,11 70:19,24 71:5 71:20,25 72:6 74:17 75:13,22 76:24 77:14 78:1 79:6 80:4 80:10,22 84:3 89:15 90:3 92:16,21 94:3 95:10,14 96:1 96:18 97:20 98:12,22 100:9 100:19 101:23 102:18,24 104:21 105:5,8 105:14,18 106:23 108:17 110:15 113:6 114:25 116:18 117:18 119:7 121:3 128:5 129:21 133:5 134:9,19 136:10 146:1,7 147:13 149:10 150:11 151:7 151:12 152:4 152:13 153:2 153:17 154:12 155:14,24 157:10 158:6 158:12 159:4 162:1 163:13 165:17 167:1 170:18 171:12 171:21 173:5 173:14,19 174:2,12 176:12 177:12 181:25 182:11 183:5 185:15 185:21 190:8 194:3,13,25 195:9,16,23 196:9,20 197:13 198:12 199:1,8 200:5 200:20 201:16 207:3 210:7,13 210:20 211:25 215:2 216:5 218:24 222:19 224:21 225:11 225:24 226:20 227:24 228:18 229:20 231:10 231:15 234:5 237:8,18 238:9 239:5 240:16 240:24 246:7 248:6 250:1 251:22 252:11 254:2,12 260:25 261:5 262:19 263:19 265:14 266:9 266:19 267:5 267:17 268:10 269:1,15 272:21 274:2 274:16,24 275:8,15 276:5 276:12,21 278:18 279:3,7 279:13 280:3 280:11 288:22 289:18 290:17 291:10 292:13 292:20 293:11

295:25 296:15 296:19 297:2 297:16 299:8 300:24 301:7 301:14,20,24 302:7,9,13,18 302:21 303:19 306:23 307:8 309:1 310:4,18 310:18 311:9 313:9,21 314:15,21 315:3 316:8 317:25 318:3 318:14,18 319:15 320:14 322:24 323:10 323:23 324:15 324:18 325:20 326:10 328:14 329:15 331:6 331:23 332:6 333:1 334:13 339:3,18,25 340:10,22 341:7,20 343:10,25 344:3,22 345:14,20 346:5,12 348:7 348:8
**witnesses** 41:3 127:7,8,16
**witnessing** 131:10
**wme** 289:1
**woman** 294:19 295:21 299:22 303:8
**woman's** 146:21
**women** 132:18 132:21 133:1,8 133:9 134:12 135:19 144:11
**women's** 136:1 136:7
**wonder** 75:10
**wonderfully** 137:8 169:11
**word** 26:16,19 28:20 43:24 147:24 148:6 152:10,19 230:10 279:8 309:2 310:20 321:23 345:2
**words** 23:8,12 27:10 130:21 152:10 158:25 234:18 311:13
**work** 46:14 60:20 62:16 87:8 88:22 104:23 143:5 170:13 171:9 171:16 175:5 176:17,22 177:1,9,13 181:6,13,23 198:19 235:20 242:18 260:24 275:23 282:2 283:15 286:9 300:9,16 304:2 312:8,14 317:15
**worked** 53:21 54:1 69:12 129:18 143:25 188:19 194:10 195:19 250:16 317:21
**working** 53:17 53:19 61:18 85:14 88:6 103:3 104:18 134:22 170:12 181:20,22 182:6,8,21,22 183:1 233:7,8 279:25 288:12 301:3,10 305:14 309:19 310:13
**works** 93:6 129:11 274:8 275:17 286:22 300:6
**world** 128:15 170:2 201:10 219:21 297:8 297:19,20 306:20 320:4 344:25
**worms** 344:16
**worried** 88:15
**worry** 23:10 123:24 161:22
**worth** 38:23 263:10,15 323:20 324:6 325:3,16 326:5
**write** 96:15 193:22 194:10 194:21 202:10
**writers** 290:19
**writes** 117:7 293:24 321:6
**writing** 117:6 335:21,23 336:16
**written** 96:7 121:14 280:25 284:1 332:4 335:22
**wrong** 133:8 142:24 150:2 165:12 333:6
**wrongful** 281:12,20
**wrote** 213:2 273:7 278:9

**x**

**xed** 344:14

**y**

**yeah** 20:6 26:6 28:18 60:23 64:25 72:14 97:23 99:11,12 101:2 102:20 104:15,18 106:9 118:2,12 118:13 121:12 122:1 123:24 124:9 132:7,11 138:8 141:19 153:9,20 154:2 171:14 176:13 180:25 181:14 184:8 186:23 195:3 201:24 204:3,9 206:6 207:10 212:12 216:8 220:11 223:2 225:2,4 268:18 270:13 270:15 277:11 281:22 283:3 290:10 305:4 307:8 315:14 315:22 318:19 325:2,5 326:16 328:17 335:1 338:17

**year** 45:12 50:7 75:22 85:7 108:18,20 113:20 120:20 131:4 288:5 341:12,23

**years** 76:21 85:6 161:8,8 183:7 231:2 283:6 284:24 294:2 298:15 309:8

**yep** 220:23

**yesterday** 17:7 17:13 18:2 21:15 25:20 26:4 28:2 29:15,24 41:22 89:4 94:24 132:2,13 133:13,17,21 133:25 134:4,5 138:15 148:12 298:8

**yesterday's** 27:14

**york** 1:2 2:2 3:21,21 4:22 4:22 8:11,11 87:19 271:9 272:7,16 273:6 274:13,21

**young** 170:15 294:18,18,19

**yup** 55:6 87:10 179:6 216:24 257:1

**z**

**zeroes** 54:23 111:5 116:1 174:9 177:25 185:19 190:12 269:13 292:18

**zeros** 47:3

**zoom** 4:7,18 5:14 6:5 7:8 10:6,7,9 202:14,19 203:12,21,25 284:16

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit J

https://www.latimes.com/entertainment-arts/story/2024-12-23/whos-who-it-ends-with-us-legal-complaint-blake-lively-justin-baldoni

# Who's who in the 'It Ends With Us' controversy



Blake Lively has accused her "It Ends With Us" director and co-star Justin Baldoni of harassment and creating a hostile on-set working environment (Scott A. Garfitt / Invision / Associated Press)

**By Amy Kaufman and Mark Olsen**

**Dec. 23, 2024 12:56 PM PT**

The behind-the-scenes machinery of modern Hollywood burst into the open over the weekend as actor Blake Lively filed a legal complaint accusing her "It Ends With Us" director and co-star Justin Baldoni of harassment and creating a hostile on-set working environment. Also included in the complaint are allegations that Baldoni hired crisis PR operatives to wage a sophisticated online smear campaign against Lively as the movie was being released last summer.

As detailed in exhibits accompanying the legal filing, crisis management expert Melissa Nathan responded to a request from Baldoni by saying, "You know we can bury anyone."

An adaptation of the popular novel by Colleen Hoover, the romantic drama "It Ends With Us," details an abusive relationship. Released by Sony Pictures, the film has grossed more than $350 million worldwide.

Below is a primer on the key figures involved in the scandal.

**Blake Lively**

Lively had her first breakout role in 2005's "The Sisterhood of the Traveling Pants" and its 2008 sequel. She reached a new level of stardom thanks to her leading role in the hit television series "Gossip Girl," running from 2007 to 2012. Since then she has appeared in films such as "The Age of Adeline," "The Shallows" and "A Simple Favor."

In 2012, Lively married actor and producer Ryan Reynolds, which has increased her visibility and fame, as has her close friendship with superstar musician Taylor Swift. Lively made a cameo appearance in Reynolds' 2024 hit "Deadpool & Wolverine" and said in an interview that her husband had rewritten a scene in "It Ends With Us." Lively has more than 45 million followers on Instagram.

In a statement, Lively said of the complaint, "I hope that my legal action helps pull back the curtain on these sinister retaliatory tactics to harm people who speak up about misconduct and helps protect others who may be targeted."

**Justin Baldoni**

Baldoni is an actor, director and producer who first gained broader attention by appearing on the CW series "Jane the Virgin" from 2014 to 2019. He previously directed the 2019 romantic drama "Five Feet Apart" and the 2020 biographical drama "Clouds."

Baldoni married actress Emily Foxler in 2013. He is also the co-host of the podcast "Man Enough," described as exploring "what it means to be a man today and how rigid gender roles have affected all people." Baldoni has nearly 4 million followers on Instagram.

Among the allegations against Baldoni are comments about Lively's weight, including reaching out to her personal trainer, as well as physical touching and sexual remarks without consent. Lively requested that no more "sex scenes, oral sex or on camera climaxing" be added outside of what was already in the script.

In the filming of a scene in which her character gives birth, Lively alleges that she was pressured into being mostly nude from the chest down and that many non-essential crew members were on set as she was left exposed in a vulnerable position. Additionally, Baldoni cast a personal friend to play the OB-GYN in the scene, which Lively described as "invasive and humiliating."

In a statement, Bryan Freedman, an attorney who represents Baldoni, Wayfarer Studios and its representatives, called Lively's allegations "another desperate attempt to 'fix' her negative reputation which was garnered from her own remarks and actions during the campaign for the film. ... These claims are completely false, outrageous and intentionally salacious with an intent to publicly hurt and rehash a narrative in the media."

Of the alleged smear campaign Freedman added, "What is pointedly missing from the cherry-picked correspondence is the evidence that there were no proactive measures taken with media or

otherwise; just internal scenario planning and private correspondence to strategize which is standard operating procedure with public relations professionals."

On Saturday, after the allegations were made public, Baldoni was dropped by talent agency WME, which also represents Lively.

**Wayfarer Studios**

After his five-year stint on "Jane the Virgin," Baldoni launched his own production company in 2019. He has cited his Baha'i faith as one of the inspirations behind launching the company, whose stated mission is to "champion inspirational stories that act as true agents of social change." Its first project, Baldoni's directorial debut "Five Feet Apart," a romantic drama about two cystic fibrosis patients, was released that year. It was his work on the film that Baldoni said convinced Colleen Hoover, author of "It Ends With Us," to grant his company the rights to her book.

Wayfarer is also behind Baldoni's weekly podcast, "Man Enough," which aims to explore gender roles and avoid "polarizing and demonizing men and masculinity." The studio also produced "Will & Harper," the Netflix documentary about Will Ferrell's road trip with his transgender best friend Harper Steele, which recently made the shortlist for a potential Academy Award nomination.

**Jamey Heath**

Heath, who is named as one of the defendants in Lively's legal complaint, is Baldoni's close friend and colleague. In addition to serving as the chief executive officer of Wayfarer Studios and as producer on "It Ends With Us," he is a co-host of the "Man Enough" podcast. Like Baldoni, the father of four is also a member of the Baha'i faith.

According to Lively's complaint, on Jan. 4, 2024, Heath was part of a small meeting of "It Ends With Us" collaborators where Lively alleged that the producer and Baldoni had engaged in "inappropriate conduct" on set. Lively claimed that Heath pressured her to "simulate full nudity" in a birth scene and showed her a video of his wife in labor "fully nude … with her legs spread apart." When Lively expressed alarm, she said, Heath replied that his wife "isn't weird about this stuff."

Heath insisted on taking a meeting with Lively while she was "topless and having body makeup removed," according to the legal document. Though he agreed to keep his back turned to her, she said, he instead stared directly at her.

**Steve Sarowitz**

Sarowitz, the billionaire co-chairman of Wayfarer Studios, is one of the primary financiers of Baldoni's production company, investing at least $125 million in the venture. He amassed his fortune after taking his payroll firm, Paylocity, public in 2014; he is now worth a reported $2.7 billion. Sarowitz is also a member of the Baha'i community.

Lively's complaint alleges that at the New York premiere of "It Ends With Us" in August, Sarowitz said he was "prepared to spend $100 million to ruin the lives of Ms. Lively and her family." Further, the document says, Sarowitz "flew in for one of his few set visits" on the day that Lively was filming the birth scene where she only had a "small piece of fabric covering her genitalia."

**Jennifer Abel**

Abel, founder and CEO of RWA Communications, is the publicist for Baldoni and Wayfarer. In July, she founded her own public relations company after serving as a partner at the communications firm Jonesworks. Her client roster is relatively small; Baldoni and actor Jameela Jamil are the most well known names she represents.

Lively's legal complaint includes dozens of private text messages and emails between Abel, Baldoni and other communications experts that the actor claims show intent to destroy her reputation. According to those messages, Baldoni first expressed concern to Abel in May that Lively's on-set allegations could go public. That was when Baldoni noticed that Lively's husband, Ryan Reynolds, had blocked him on social media, the complaint says.

"HE BLOCKED YOU?! Is he a 12 year old girl?!" Abel texted Baldoni, per the document. "We can put the plan down on paper … to make sure we have all of the documentation needed of what happened on set, who witnessed what and who would be our Allies to go on background if needed to shut down her claims."

By then, the complaint alleges that Abel was already in touch with a crisis communications expert, Melissa Nathan, relaying that Baldoni "wants to feel like [Lively] can be buried."

**Melissa Nathan**

Nathan, co-owner and CEO of the Agency Group, was officially brought in by Abel in July to work for Baldoni, according to Lively's complaint. The document says Nathan quoted the actor a fee of up to $175,000 for three to four months of her work.

The Agency Group then created a "scenario planning" document for Wayfarer to be implemented if Lively were to make her "grievances" public. According to this document, which was cited in Lively's complaint, one idea was to float the narrative that Lively involved Reynolds in the filmmaking to "create an ilmalance [sic] of power between her" and Baldoni. The PR firm also suggested reminding reporters that Lively has a "less than favorable reputation in the industry" and has "issues" working with Leighton Meester, Anna Kendrick and Ben Affleck.

A month before starting her work with Wayfarer, Nathan in June announced the launch of her own public relations firm after departing Hiltzik Strategies, the crisis PR firm where she was executive vice president.

Nathan's new company is partially owned by Ithaca Media Ventures, according to corporate registration records filed in California. Ithaca is owned by HYBE America, whose CEO is

entrepreneur and former talent manager Scooter Braun. HYBE America is one of the Agency Group's clients, along with Johnny Depp, Logan Paul and Drake.

**Jed Wallace**

According to Lively's complaint, Wallace is a public relations contractor from Austin, Texas, whom the Agency Group hired to "seed and influence" negative social media discussion about the actor.

In an Aug. 9 text message referenced in the complaint, Nathan relays to Abel that Wallace said "we are crushing it on Reddit." A day later, the alleged messages show, Abel compliments Wallace "and his team's efforts to shift the narrative" about Baldoni.

**Scooter Braun**

Braun, the former manager of Justin Bieber and Ariana Grande, now runs the U.S. arm of the South Korean entertainment company HYBE. HYBE America is a co-founder of Nathan's company, the Agency Group, and one of its clients.

Braun has also been engaged in a years-long public dispute with Swift, who is one of Lively's best friends. The battle between the singer and the executive began in 2019, when Braun acquired the record label Big Machine, which held the rights to the master recordings for Swift's music from her 2006 self-titled debut to 2017's "Reputation." Swift responded by launching the "Taylor's Version" series of rerecordings and rereleases of those albums.

In Lively's complaint, Nathan sends a June text message telling the Wayfarer team that she is aware the actor "does have some of the TS fanbase so we will be taking it extremely seriously."

Later, in the Agency Group's "scenario planning" document, the company says its team could explore "planting stories about the weaponization of feminism and how people in BL's circle like Taylor Swift, have been accused of utilizing these tactics to 'bully' into getting what they want."

*Times staff writer Matt Hamilton contributed to this report.*