# EXHIBIT C

Planet Depos
We Make It Happen™

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Transcript of Stephanie Jones

**Date:** September 16, 2025
**Case:** Joneswork -v- Abel

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - x
STEPHANIE JONES AND :
JONESWORKS LLC, :
Plaintiffs, : Civ. Action No.
v. : 1:25-cv-00779-LJL
JENNIFER ABEL, MELISSA :
NATHAN, JUSTIN BALDONI, :
WAYFARER STUDIOS LLC, :
AND JOHN DOES 1-10, :
Defendants. :
- - - - - - - - - - - - - x

Videotaped Deposition of STEPHANIE JONES

New York, New York

Tuesday, September 16, 2025

9:16 A.M.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Job No.: 594347
Pages: 1 - 280
Reported By: Anita M. Trombetta, RMR, CRR,
California CSR No. 14647

Videotaped deposition of STEPHANIE JONES, held at the offices of:

Meister Seelig & Fein, LLP
125 Park Avenue
7th Floor
New York, NY 10017
212.655.3500

Pursuant to notice, before Anita M. Trombetta, a Certified Shorthand Reporter in the State of California, RMR, CRR, and Notary Public in and for the State of New York.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF STEPHANIE JONES AND JONESWORKS LLC:

KRISTIN N. TAHLER, ESQUIRE
MAAREN A. SHAH, ESQUIRE (New York)
MORGAN ANASTASIO, ESQUIRE (New York)
NICHOLAS INNS, ESQUIRE (Washington, D.C.)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S Figueroa St, 10th Floor
Los Angeles, CA 90017
212.849.7000

ON BEHALF OF JENNIFER ABEL, MELISSA NATHAN, JUSTIN BALDONI, WAYFARER STUDIOS LLC, AND JOHN DOES 1-10:

BRYAN J. FREEDMAN, ESQUIRE
THERESA TROUPSON, ESQUIRE (via Zoom)
LINER FREEDMAN TAITELMAN COOLEY LLP
1801 Century Park West, 5th Floor
Los Angeles, CA 90067-6408
310.201.0005

(Appearances continued on next page.)

A P P E A R A N C E S  C O N T I N U E D

ON BEHALF OF JENNIFER ABEL, MELISSA NATHAN, JUSTIN BALDONI, WAYFARER STUDIOS LLC, and JOHN DOES 1-10:

MITCHELL SCHUSTER, ESQUIRE
JORDAN BIENER, ESQUIRE
MARIE A. KESSEL, ESQUIRE
KEVIN A. FRITZ, ESQUIRE (via Zoom)
SUMMER BENSON, ESQUIRE (via Zoom)
MEISTER SEELIG & FEIN PLLC
125 Park Avenue, 7th Floor
New York, NY 10017
310.201.0005
-and-
MITRA AHOURAIAN, ESQUIRE (via Zoom)
AHOURAIAN LAW
2029 Century Park E #14
Los Angeles, CA 90067
310.376.7878

(Appearances continued on next page.)

A P P E A R A N C E S   C O N T I N U E D

ATTORNEYS FOR STREET RELATIONS, INC. and
JED WALLACE:
JOEL GLOVER, ESQUIRE
JACKSON WALKER LLP
1401 McKinney St # 1900
Houston, TX 77010
713.752.4226

ATTORNEYS FOR BLAKE LIVELY:
ESRA HUDSON, ESQUIRE (via Zoom)
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East
Century City, CA 90067
310.312.4207
-and-
AARON E. NATHAN, ESQUIRE
MICHAEL J. GOTTLIEB, ESQUIRE (Los Angeles)
VINCE BIAGIOTTI, ESQUIRE
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, NY 10019
212.728.8904

(Appearances continued on next page.)

A P P E A R A N C E S C O N T I N U E D

ATTORNEYS FOR BLAKE LIVELY: (Continued)

LINDSEY STRASBERG, ESQUIRE (via Zoom)
SLOANE OFFER WEBER & DERN
10100 Santa Monica Boulevard, Suite 750
Los Angeles, CA 90067
310.248.5100
-and-
DUNN ISAACSON RHEE LLP
MERYL GOVERNSKI, ESQUIRE (via Zoom)
401 9th Street, NW
Washington, DC 20004
202.240.2927

ALSO PRESENT:

Robert Palos, Videographer
Steve Sarowitz (via Zoom)
Jamey Heath (via Zoom)
Melissa Nathan (via Zoom)
Jennifer Abel (via Zoom)

--------------------I N D E X------------------
WITNESS - STEPHANIE JONES

| EXAMINATION BY | Page |
|---|---|
| ATTORNEY FREEDMAN | 10 |

---------------E X H I B I T S-----------------

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 1 | Email Bearing Bates JONESWORKS_00030155 | 167 |
| Exhibit 2 | Email Chain Bearing Bates JONESWORKS_38566 through JONESWORKS_38590 | 181 |
| Exhibit 3 | Text Exchange, Bates JONESWORKS_00040102 Through JONESWORKS_00040103 | 183 |
| Exhibit 4 | Email, Bates JONESWORKS_20577 | 184 |
| Exhibit 5 | Text Exchange, Bates JONESWORKS_39988 Through 39991 | 193 |
| Exhibit 6 | Text Exchange, Bates JONESWORKS_40021 Through 40027 | 200 |
| Exhibit 7 | Text Exchange, Bates JONESWORKS_40573 | 208 |

| | | |
|---|---|---|
| | Through 40586 | |
| Exhibit 8 | Text Message, Bates BALDONI_21305 | 226 |
| Exhibit 9 | Message Chain, Bates JONESWORKS_12591 Through 12592 | 229 |
| Exhibit 10 | Text Exchange, Bates JONESWORKS_00039746 Through 39748 | 231 |
| Exhibit 11 | Text Exchange, Bates JONESWORKS_00040269 Through 40271 | 235 |
| Exhibit 12 | Text Exchange, Bates JONESWORKS_00039132 Through 38171 | 255 |
| Exhibit 13 | Text Exchange, Bates JONESWORKS_40323 Through 40332 | 263 |
| Exhibit 14 | Text Exchange, Bates JONESWORKS_40141 Through 40125 | 266 |
| Exhibit 15 | Message Chain, Bates BL-21190 Through BL-21196 | 267 |
| Exhibit 16 | Plaintiffs' Second Amended Initial Disclosures | 274 |

P R O C E E D I N G S 09:13:43
THE VIDEOGRAPHER: Here begins media 09:16:08
number 1 in the videotaped deposition of Stephanie 09:16:19
Jones, in the matter of Jonesworks vs. Abel, in 09:16:21
the United States District Court, Southern 09:16:25
District of New York, Case Number 00779. 09:16:28
Today's date is September 16th, 2025. The 09:16:33
time on the video monitor is 9:16 A.M. The video 09:16:36
deposition is taking place at 125 Park Avenue, 09:16:41
New York, New York. 09:16:44
Would counsel please voice-identify 09:16:45
themselves and state whom they represent. 09:16:49
ATTORNEY TAHLER: Kristin Tahler, Maaren 09:16:52
Shah, Nicholas Inns, and Morgan Anastasio from 09:16:55
Quinn Emanuel for the witness and Jonesworks. 09:16:58
ATTORNEY NATHAN: Aaron Nathan, Willkie 09:17:04
Farr & Gallagher for Blake Lively, with Mike 09:17:08
Gottlieb and Vincent Biagiotti. 09:17:10
ATTORNEY GLOVER: Joel Glover, Jackson 09:17:19
Walker for defendant Street Relations. 09:17:21
ATTORNEY SCHUSTER: Mitchell Schuster from 09:17:25
Meister Seeling & Fein on behalf of the Wayfarer 09:17:27
defendants, here with my associate Jordan Biener, 09:17:30
and Marie Kessel in the corner. 09:17:34
ATTORNEY FREEDMAN: Bryan Freedman for the 09:17:37

same parties. 09:17:39
THE VIDEOGRAPHER: All right. The court reporter today is Anita Trombetta representing Planet Depos. 09:17:41 09:17:42 09:17:45
The witness will now be sworn in. 09:17:45
S T E P H A N I E J O N E S, called as a witness, having been first duly sworn by a Notary Public, was examined and testified as follows: 09:17:47 09:17:47 09:17:47
EXAMINATION BY
ATTORNEY FREEDMAN: 09:17:47 09:17:57
Q Good morning. 09:17:57
A Good morning. 09:18:03
Q Is this the first time you've had your deposition taken? 09:18:04 09:18:10
A Yes. 09:18:11
Q Welcome. 09:18:12
Where did you go -- did you go to college? 09:18:15
A Yes. 09:18:18
Q Where did you go? 09:18:19
A I took -- well, I started getting college credits at Arkansas State University when I was in high school, and then I went to University of Memphis. And then I also -- when I moved here after college, I took classes at NYU as well. Creative writing, things like that. 09:18:20 09:18:23 09:18:25 09:18:27 09:18:31 09:18:35

ATTORNEY FREEDMAN: Yeah. I don't think I'll be there very long. 09:49:02 09:49:03
ATTORNEY TAHLER: Okay. 09:49:05
Q Generally, in 2011 when you said that you started working for Jonesworks -- is that right? 09:49:06 09:49:09
A Yes. 09:49:11
Q Generally, what services did Jonesworks provide at that time? 09:49:12 09:49:17
A Brand PR, corporate comms, like corporate comms, meaning -- I define that as -- for a brand, a corporation, their executives, like leadership executive positioning, leadership visibility, press. Really strategy. We were rooted, and still are, rooted in strategy. How a person and all their ancillary businesses or it might be a brand and all the different parts of that brand and what the siloed stories are and what the holistic story is. 09:49:19 09:49:26 09:49:30 09:49:34 09:49:39 09:49:42 09:49:47 09:49:50 09:49:53 09:49:57
Q So at that time, Jonesworks provided brand PR, corporate comms and press strategy; is that right? 09:49:58 09:50:02 09:50:07
ATTORNEY TAHLER: Objection. 09:50:07
A We did public relations, media relations, publicity, personal publicity, brand marketing. It's -- they all blend together depending on the 09:50:08 09:50:14 09:50:20

type of client. And we would make bespoke plans, still do that to this day, for each person. Like Kendra Scott is a perfect example. I believe she's their client as well. Kendra Scott was a founder, so we might tell her founder story. And then we might tell the brand story about how great these earrings are in Vogue or Harper's Bazaar or Elle, but then we might also have Kendra doing press. So it's the same that we do today. 09:50:22 09:50:25 09:50:28 09:50:31 09:50:36 09:50:39 09:50:42 09:50:47 09:50:49

Q Have the services been the same since you started Jonesworks that you provided, or have the services expanded over time? 09:50:54 09:50:57 09:51:00

A Well, I guess you could say that when I was three people or four people in a one-bedroom apartment, I wasn't -- we expanded our clientele, so our work expanded, yes. 09:51:02 09:51:08 09:51:13 09:51:19

Q So you discussed a bunch of different areas that -- that you started out providing in terms of services. 09:51:22 09:51:27 09:51:30

How did the business expand in terms of what it provided? 09:51:32 09:51:34

ATTORNEY TAHLER: And actually, with these questions, can we go AEO since we're talking about kind of overall strategy for the -- 09:51:35 09:51:37 09:51:40

ATTORNEY FREEDMAN: Sure. 09:51:43

A I've had two apartments in Los Angeles. 10:47:27
In what year, you're asking me? 10:47:32
Q At any time. 10:47:36
A I had an apartment on Alta Loma that I was renting. And then we bought a place on North Flores. I don't remember her coming by there. 10:47:37 10:47:46 10:47:51
Maybe, she could have come by my apartment, but I don't recall, no. 10:47:53 10:47:56
Q When did Jonesworks start working for Justin Baldoni? 10:47:59 10:48:02
A I believe it was the last season that he was in "Jane the Virgin," because I went to the CBS lot for my first meeting with him. 10:48:04 10:48:08 10:48:14
Q When did Jonesworks start working for Wayfarer Studios? 10:48:16 10:48:23
A He had had Wayfarer -- I believe he ended up naming -- there was a name change of Wayfarer, and then he ended up renaming it Wayfarer Studios. There was Wayfarer Entertainment. I don't -- so I don't know if we ever -- in my recollection, because we worked with him around eight years, I don't remember if we referred to it as Wayfarer, one of the old Wayfarer entities. But we -- he got an investment from Steve Sarowitz. We announced it. And then we started doing -- and 10:48:24 10:48:34 10:48:37 10:48:41 10:48:46 10:48:49 10:48:52 10:48:56 10:49:03 10:49:08

that's when we officially took it on -- 10:49:14
Q Did -- 10:49:17
A -- in addition to his personal. 10:49:17
Q Did Jonesworks start working with Justin Baldoni prior to working with Wayfarer? 10:49:20 10:49:24
A Yes. 10:49:25
Q Did Jonesworks have a written agreement with Justin Baldoni? 10:49:26 10:49:30
A When we first started working with him, I'm not sure. I think we went on and off cycle with him. So we worked with him, we quit working with him, we went off cycle. He wanted -- if I recall correctly, he wanted to come back on cycle. And then that also -- I believe was shortly thereafter when they did the event, the acquisition -- or the partnership with -- or got the cash infusion from Steve Sarowitz. 10:49:31 10:49:37 10:49:48 10:49:50 10:49:56 10:49:59 10:50:05 10:50:09 10:50:12
Q What do you mean by "cycle"? 10:50:14
A I'm sorry? 10:50:16
Q You used the word "cycle," off cycle? 10:50:17
A On and off cycle. When you work with someone and if they go into production, or whatever it is, you might go off cycle with them because they don't need you at that point in time because they can't do press, they're, you know, 10:50:20 10:50:25 10:50:28 10:50:32 10:50:34

shooting, whatever it is. So I remember being on cycle with him, going off cycle, if I recall correctly, and then came back on with him. And then shortly thereafter, Steve Sarowitz invested. 10:50:37 10:50:41 10:50:45 10:50:48

Q Do you remember Jonesworks having a written agreement at any time with Justin Baldoni? 10:50:54 10:50:59

A I believe that we may have sent him one and he never executed it or -- I'm not -- I'm not sure. 10:51:01 10:51:17 10:51:24

Q As you sit here today, do you recall a written agreement between Jonesworks and Justin Baldoni? 10:51:26 10:51:28 10:51:31

ATTORNEY TAHLER: Objection. 10:51:33

A I don't know that we got an executed -- I -- I'm -- if I recall, I know we likely sent him an agreement, as we do with all clients. I'm not sure if he signed it or if it was just a verbal. But I believe we were doing his personal publicity at that time a long time ago for $5,000 a month. And he was paying us. And in my first meeting with him, Scooter Braun called me. I didn't answer, I don't think. And I -- he said something to the -- he FaceTimed when he found out I was with Justin. 10:51:34 10:51:47 10:51:50 10:51:54 10:52:01 10:52:03 10:52:07 10:52:09 10:52:21 10:52:24 10:52:26

And Justin said, "Tell him you're with 10:52:27

Q You mean like speaking engagements? 10:58:43
A Or press. It was part of his brand and who we would pitch accordingly based on what the needs were, if it was for film or his TV show, a book, whatever it was. 10:58:46 10:58:54 10:58:56 10:59:01
Q Would you pitch sponsorship deals to Justin Baldoni? 10:59:03 10:59:07
ATTORNEY TAHLER: Objection. 10:59:08
A I -- if I recall, I remember him asking if we could reach out to certain brands or sponsors. And then I recall -- and I always do this if I have a relationship somewhere or if it's a client and I know that they, you know, want to invest in something and maybe consider sponsoring it, I might ask. 10:59:08 10:59:16 10:59:20 10:59:26 10:59:28 10:59:33 10:59:37
I remember conversations about how can we find brands. He wanted brand partnerships to sponsor -- if I recall, it was his podcast, but it may have been something else. 10:59:39 10:59:46 10:59:49 10:59:54
Q Was there a time that you stopped the -- that Jonesworks stopped representing Justin Baldoni? 10:59:55 11:00:00 11:00:02
ATTORNEY TAHLER: Objection. 11:00:02
A They -- Jamey Heath, I believe it was, emailed me August, I think, 30th or 31st of 2024 11:00:03 11:00:11

and terminated Jonesworks. 11:00:21

Q Did he terminate Jonesworks from representing Justin Baldoni also or just representing Wayfarer? 11:00:25 11:00:29 11:00:32

A I don't recall the specifics of his email, but I can tell you he did not want us working with Justin or Wayfarer. 11:00:38 11:00:40 11:00:46

Q Did you speak to Justin Baldoni about continuing to work with him after Jamey terminated Jonesworks? 11:00:48 11:01:03 11:01:09

A I don't believe I did. I don't believe so. 11:01:10 11:01:17

Q How did Jamey Heath terminate Jonesworks services? 11:01:17 11:01:25

A I believe it was via email. It was in an email. 11:01:26 11:01:31

Q And did the email say that Jonesworks' services were terminated? 11:01:31 11:01:35

ATTORNEY TAHLER: Objection. 11:01:37

A I believe so. 11:01:38

Q And is there a writing which you're aware of where Jonesworks terminated Justin Baldoni as a client? 11:01:41 11:01:52 11:01:58

ATTORNEY TAHLER: Objection. 11:01:58

A Again, I can't remember the specifics of 11:01:59

correctly, it was head of crisis communications or something to that effect. 11:25:45 11:25:48

Q Had anyone had that role prior to that time? 11:25:49 11:25:52

A No. 11:25:52

Q And why did you want to give her that particular title? 11:25:53 11:26:03

Why did you think that would be good for Jonesworks? 11:26:05 11:26:08

ATTORNEY TAHLER: Objection. 11:26:08

A I recall her saying that that's what she loved, and that was what she wanted her area of focus to be. 11:26:09 11:26:15 11:26:19

Q Did you work on the Wayfarer account -- is that the right word? Is "account" the right word, do you call it? 11:26:20 11:26:44 11:26:49

A Justin Baldoni and Wayfarer accounts, yes, I worked on them both. 11:26:50 11:26:52

Q Do you consider them one in the same or are they separate? 11:26:53 11:26:56

A The scope of work was specific to Justin with regards to his personal publicity. And the scope of Wayfarer was different than that, because it was a studio company. 11:26:57 11:27:00 11:27:02 11:27:05

Q Were you personally involved in working on 11:27:10

behalf of Justin? 11:27:12

ATTORNEY TAHLER: Objection. 11:27:18

A Can you clarify by what you mean by "personally involved"? 11:27:18 11:27:22

Q Sure. 11:27:23

Was there a particular person that was responsible for the account or who would be more active on Justin's behalf at the company? Was it you or was it someone else that was the point person? 11:27:23 11:27:25 11:27:27 11:27:30 11:27:32

ATTORNEY TAHLER: Objection. 11:27:33

A The way that we -- Justin was in LA, and I'm based in New York. So we had a full team around him. There was no one person. 11:27:35 11:27:44 11:27:48

Q Did that ever change? 11:27:55

A No. 11:27:57

Q So from the time that Justin started with Jonesworks until the time that he no longer worked with Jonesworks, he had some sort of team around him, right; there wasn't one particular person that was more involved? 11:27:58 11:28:04 11:28:09 11:28:12 11:28:15

A Correct. 11:28:16

Q And what about for Wayfarer, did Wayfarer also have its own team? 11:28:18 11:28:23

A Yes. 11:28:24

Q Was that a different team -- 11:28:25
ATTORNEY TAHLER: Objection. 11:28:28
Q -- than Justin's team? 11:28:29
ATTORNEY TAHLER: Objection. 11:28:32
A We do bespoke work for our clients. So if we needed to bring in additional team members for something specific that Justin and/or Wayfarer needed, we might. But typically we had -- when we were asked by his COO to bundle the team together, we've put the team in place that was best suited for him, as well as Wayfarer. And there was a lot of crossover. So we had more people -- more work, rather, for Wayfarer than we would for a small, smaller-sized personal publicity. 11:28:32 11:28:39 11:28:42 11:28:44 11:28:50 11:28:59 11:29:01 11:29:07 11:29:13 11:29:17
Q And did you personally do work for Justin Baldoni? 11:29:24 11:29:26
ATTORNEY TAHLER: Objection. 11:29:26
A Yes. 11:29:27
Q What did you do? 11:29:28
ATTORNEY TAHLER: Objection. 11:29:30
A I did whatever Justin needed us to do. It was based on whatever -- the needs were ever evolving. It may be TV. It may be book. It might be the production studios. It might be do you have any contacts at this brand that can help 11:29:31 11:29:39 11:29:43 11:29:47 11:29:50

us? Do you know any brands? Can you get your client to watch this project and see if they would be interested in producing it with me? 11:29:52 11:29:55 11:30:02

It was very bespoke and ever-changing. 11:30:04

Q What did you specifically do, yourself? 11:30:09

ATTORNEY TAHLER: Objection. 11:30:14

A I'm sorry, I thought I just answered that. Did I not? 11:30:14 11:30:19

I did whatever Justin asked me to do and needed done. I'm not one of those publicists that just says I'm only, you know, this. I've become very close with clients and help them with whatever their needs are, even if it's not publicity. 11:30:20 11:30:24 11:30:29 11:30:34 11:30:37 11:30:39

Q Who else, if you recall, was on the team for Justin Baldoni? 11:30:39 11:30:49

ATTORNEY TAHLER: Objection. 11:30:52

A In the beginning or throughout the eight years? 11:30:53 11:30:59

Q We can start in the beginning. 11:31:00

What year was the first year? 11:31:02

A It was eight years from last year, so we had Kirby Allison, who worked with me for almost ten years. We had someone named Lindsay Shane, who I believe, if I recall correctly worked on 11:31:04 11:31:09 11:31:16 11:31:25

this account. Jennifer Abel, Matthew Mitchell. I 11:31:27
don't recall -- Andy, I believe. They asked Matt 11:31:44
Gibson to help on occasion. He was in our LA 11:31:51
office. 11:31:54
Q Anyone else? 11:32:03
A I mean, I don't recall off the top of my 11:32:04
head any additional. I know we had a large team. 11:32:08
We had six or seven people on the account. 11:32:15
Q What about Wayfarer's account? 11:32:17
A Oh, I'm sorry. I thought you meant Justin 11:32:20
and Wayfarer. I consider -- those are all the 11:32:24
people who worked across. 11:32:29
Q Did -- 11:32:31
A I'm sorry, I was confused about the 11:32:32
question. 11:32:34
Q Do those people work on both accounts? 11:32:37
A Well, we only had Justin initially, and I 11:32:39
had Kirby and then the other people. And then we 11:32:44
had Jen and Matthew, who were both very seasoned 11:32:49
and senior because we had Wayfarer and Justin. 11:32:53
And Matthew came from NBC, and we thought Wayfarer 11:32:57
would be a good fit for him. So we put Matthew as 11:32:59
an SVP. 11:33:04
Q Jonesworks was paid $20,000 a month to 11:33:05
provide services to Wayfarer; is that correct? 11:33:15

A We were paid 25,000 a month for Wayfarer and Justin. It was combined. 11:33:20 11:33:22
Q Do those services include crisis PR? 11:33:25
ATTORNEY TAHLER: Objection. 11:33:39
A Again, crisis PR, we would have considered to handle some -- what Justin would consider crisis or Justin would be stressed about. If there were litigation matters, If there was -- you know, what he might consider a crisis, we might not refer to as crisis, but if he deemed it a crisis, yes, we would do it. 11:33:40 11:33:53 11:33:56 11:33:58 11:34:01 11:34:03 11:34:06
But, yes, we handled -- we handled things that could have been categorized as crisis for him; something that needed to be moved upon urgently, something that needed to be corrected or fixed, litigation that he was in, etc. 11:34:11 11:34:18 11:34:23 11:34:27 11:34:30
Q Was that at an additional cost to Wayfarer or Justin or was that covered under the same $25,000 per month for both of the clients? 11:34:36 11:34:42 11:34:46
ATTORNEY TAHLER: Objection. 11:34:51
A What I had also said earlier was that we went above and beyond, and we would often do things for our clients no matter what it was. 11:34:51 11:34:55 11:34:58
I don't recall that we ever charged him for extra hours or working on crises for him. No, 11:35:03 11:35:05

I don't -- I don't recall that we ever billed him for that ever. I don't recall. 11:35:12 11:35:14

Q Did Jonesworks ever refer Wayfarer or Justin to any crisis PR firms? 11:35:15 11:35:30

ATTORNEY TAHLER: Objection. 11:35:36

A Did we refer him to crisis PR? I don't recall ever referring him. But I do remember one of the legal cases I was concerned about, and I was worried that we might need it only because the scope -- it was big. It was -- it would have required a lot of work. So I may have, in conversation, said we need to look or perhaps someone on his team had asked if we should. But I don't recall -- I don't recall that we ever hired crisis for him. 11:35:37 11:35:47 11:35:59 11:36:08 11:36:11 11:36:13 11:36:18 11:36:21 11:36:29 11:36:32

I -- I think in that particular case that I'm thinking of, it was -- I helped him find a litigator, and I referred a litigator in Los Angeles. 11:36:33 11:36:36 11:36:42 11:36:50

And I don't think that we hired a crisis for that. I don't recall. I don't think that we did. 11:36:52 11:36:54 11:36:59

Q At some point in time, did Justin or Wayfarer bring a crisis PR person onto the team, so to speak? 11:36:59 11:37:06 11:37:12

ATTORNEY TAHLER: Objection. 11:37:14
A In July, I believe of 2024, Jennifer Abel -- well, I'll just answer your question, yes. 11:37:15 11:37:34
Q And who was involved in -- making the decision to bring a crisis person onto Justin and Wayfarer's team? 11:37:38 11:37:45 11:37:50
ATTORNEY TAHLER: Objection. 11:37:51
A It was my understanding, Jamey Heath. 11:37:51
Q Were you involved at all in that decision? 11:37:58
ATTORNEY TAHLER: Objection. 11:38:02
A It was my understanding that it didn't matter what I thought; that Jamey was making the decision, and he made that clear to me. 11:38:02 11:38:12 11:38:15
Q What did you discuss about that decision with Jamey? 11:38:17 11:38:22
A I said, "Without getting into too much granular detail, this is not a crisis person that you need to align with. I've personally experienced something highly unethical that she did, and I worry for Justin about it." 11:38:24 11:38:31 11:38:35 11:38:41 11:38:44
And I distinctly remember Jamey saying, "Well, all crisis people have a little dirt on their nose, don't they?" 11:38:49 11:38:52 11:38:57
Q Did you respond to that? 11:39:00
A If I recall, I said, "Jamey, no, that's 11:39:06

not accurate." 11:39:11
And Jen Abel had asked me for 11:39:15
recommendations and I recommended two firms that 11:39:19
are highly -- have highly specialized divisions 11:39:28
doing this. And I asked if he had met either of 11:39:31
them. And I recall him saying something to the 11:39:36
effect of, no. So I was questioning, well, why 11:39:41
did he even ask me, Jen ask me. 11:39:47
And then he said he had talked to her, he 11:39:50
liked the way she thought or he -- he had a good 11:39:58
takeaway from a Zoom or a call that he had had 11:40:03
with her. 11:40:07
Q How did you learn that Wayfarer or Justin 11:40:09
Baldoni were hiring a crisis person? 11:40:13
A I believe it was from a text that Tera 11:40:21
Hanks sent me. 11:40:26
Q And who is Tera Hanks? 11:40:27
A She is the president of Wayfarer. 11:40:29
Q And how long have you known Tera Hanks 11:40:32
for? 11:40:38
A I don't know how many years, but she 11:40:38
worked with Scooter Braun for a very long time, 11:40:41
and that's how I met her. 11:40:43
Q Where was she working at the time that you 11:40:47
met her? 11:40:50

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, ANITA M. TROMBETTA, RMR, CRR, and Certified California Shorthand Reporter, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested [or not requested, as appropriate]; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 17th day of September, 2025.

My commission expires: 10.07.2025

______________________________

Anita M. Trombetta, RMR, CRR

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHANIE JONES, JONESWORKS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>JENNIFER ABEL, MELISSA NATHAN, JUSTIN BALDONI, WAYFARER STUDIOS LLC, AND JOHN DOES 1-10,<br><br>Defendants. | Case No: 1:25-cv-00779-LJL |
| BLAKE LIVELY,<br><br>Plaintiff,<br><br>v.<br><br>WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, and JENNIFER ABEL,<br><br>Defendants. | Civ. Action No. 1:24-cv-10049-LJL<br>(Consolidated for pretrial purposes with 1:25-cv-00449-LJL)<br>rel. 1:25-cv-00449-LJL |
| JENNIFER ABEL,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>JONESWORKS LLC,<br><br>Third-Party Defendant | |

WAYFARER STUDIOS LLC,
JUSTIN BALDONI, JAMEY HEATH, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, JENNIFER ABEL, and STEVE SAROWITZ,

Plaintiffs,

v.

BLAKE LIVELY, RYAN REYNOLDS, LESLIE SLOANE, VISION PR, INC., and THE NEW YORK TIMES COMPANY,

Defendants.

**ERRATA SHEET FOR THE DEPOSITION OF STEPHANIE JONES**

| Page: Line(s) | Existing | Revision | Reason |
|---|---|---|---|
| 17:6 | Segal | Siegel | Mistranscription |
| 49:4 | gage | gauge | Mistranscription |
| 49:19 | gage | gauge | Mistranscription |
| 99:17-18 | They found two condoms and drugs in her dead body and no else there. | They found two condoms and drugs **and** her dead body and no else there | Mistranscription |
| 148:2-5 | And I remember feeling that about you know, the boss, so I can -- but not in a -- it was never in a negative way that they were frightened of me. | And I remember feeling that about you know, **a** boss, so I can -- but not in a -- it was never in a negative way that they were frightened of me. | Mistranscription |
| 159:15 | Nestli | Nestlé | Mistranscription |
| 159:17 | Nestli | Nestlé | Mistranscription |
| 173:12-14 | I had worked with her years earlier when she was at New York Post doing a fashion supplement-- | I had worked with her years earlier when she was at New York Post doing a fashion supplement **lux ad and had Venus Williams on the cover.** | Mistranscription |

| Page: Line(s) | Existing | Revision | Reason |
|---|---|---|---|
| 178:1 | I believe it was July 25th. | I believe it was July **25**. | Mistranscription |
| 198:5-7 | I just knew that I wanted Scooter to relay back to Melissa, because I knew Melissa was behind the cite. | I just knew that I wanted Scooter to relay back to Melissa, because I knew Melissa was behind the **site**. | Mistranscription |
| 227:19-21 | Your strength and authenticity through this all truly embody the teachings of your Baha'm faith. | Your strength and authenticity through this all truly embody the teachings of your **Bahá'í** faith. | Mistranscription |
| 264:17-19 | I may have asked her if she was talking to Madeline or she may have told me. | I may have asked her if she was talking to **Mandelyn** or she may have told me. | Mistranscription |

Date: 10/15/2025

Signature: Stephanie Jones

.

No. 594347

Re: Deposition of **Stephanie Jones**
Date: 9/16/2025
Case: Joneswork -v- Abel
Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

I, Stephanie Jones, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

10/15/2025 Stephanie Jones

(Date) (Signature)