# Exhibit 3

# EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT (this "Agreement") dated as of November 22, 2021 ("Effective Date") is by and between Jonesworks, LLC, a Delaware limited liability company with its principal place of business at 211 East 43rd Street, Suite 1501, New York, New York 10017 ("Company") and Jennifer Abel, an individual residing at [redacted] ("Employee" and, together with Company, the "Parties," and each individually, a "Party").

WHEREAS, the Company and Employee desire to enter into an employment agreement to memorialize the terms and conditions of Employee's employment with the Company.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties, and covenants contained herein, each Party agrees as follows:

1. Employment Term. The Company shall continue to employ Employee, and Employee agrees to continue to be employed with the Company, upon the terms and conditions set forth in this Agreement, for the period beginning on the Effective Date and ending on the first anniversary of the Effective Date (the "Employment Term"); provided, however, that commencing on the first anniversary of the Effective Date and on each subsequent anniversary of the Effective Date (each such anniversary, a "Renewal Date"), the Employment Term shall automatically be extended for one additional year unless, not later than sixty (60) days prior to such Renewal Date, the Company or Employee shall have given written notice not to extend the Employment Term; provided, further, however, that the Employment Term shall be subject to earlier termination as provided in Section 5 hereof (the "Term").

2. Responsibilities and Authority. Company hereby employs Employee to serve as Vice President, Talent. Employee shall perform such duties and responsibilities, consistent with Employee's title, training and experience, as are from time to time reasonably assigned to Employee. Employee's primary place of employment pursuant to this Agreement shall be Los Angeles, CA.

3. Acceptance of Employment. Employee accepts employment by Company on the terms and conditions herein provided and agrees, subject to the terms of this Agreement, to devote all of her business time, attention and energies to the performance of the duties assigned to Employee hereunder, and to perform such duties faithfully, diligently and to the best of her abilities and subject to such laws, rules, regulations and policies from time to time applicable to the Company's employees. Notwithstanding the foregoing, Employee shall be permitted to engage in charitable and civic activities and to manage Employee's personal investments so long as such activities do not materially interfere with the performance of Employee's duties hereunder and do not breach or conflict with any of Employee's obligations to the Company under this Agreement.

4. Compensation and Benefits. As compensation for Employee's services hereunder, Employee shall be entitled to the following:

4.1. Salary. Employee's starting base salary will be at the gross annual rate of $180,000 per year, less applicable withholdings and taxes, paid in accordance with the Company's standard payroll practices (currently, the 15th and the last day of each month). Salary adjustments will be considered by the Company annually in conjunction with Employee's annual performance evaluation and shall be at the Company's sole discretion.

4.2. Annual Cash Bonus. For fiscal years during Employee's employment with the Company, Employee shall be eligible to receive a cash bonus, as determined and in the sole discretion of the Company. Any annual cash bonus payable to Employee will be paid at the time the Company normally pays such bonuses.

4.3. Other Benefits. Employee will be eligible to participate in all fringe benefit plans and retirement plans of the Company, as are generally available to Company's employees ("Benefits"), such as health insurance plans, disability insurance plans, life insurance plans, expense reimbursement and the Company's 401(k) retirement plan, if any, which shall be in Company's sole discretion.

4.4. Paid Time Off Entitlement and Paid Sick Leave. Employee shall be entitled to preapproved unlimited paid time off ("PTO") per Employment Term to be used for time away from work due to vacation, personal business or religious observance.

4.5. Expenses. The Company shall reimburse Employee for all necessary, approved and reasonable business expenses incurred by Employee in the scope of Employee's employment hereunder, upon submission of itemized expense statements in the manner and at the time specified by Company in accordance with Company's expense policy as amended by Company from time to time (the "Business Expenses").

4.6. Distribution Based Bonus. During the Employment Term, and provided that Employee fully performs the services set forth hereunder and Employee is not in material breach of this Agreement, upon Company making a distribution, other than a tax distribution, to the members of the Company (the "Members"), which shall be at Company's sole discretion, Employee shall be entitled to a bonus of one percent (1%) of such aggregate distribution (a "Distribution Based Bonus"). It is specifically stipulated and agreed that the Distribution Based Bonus shall be reduced to the extent and in proportion that the Members of the Company as of the Effective Date have their equity interests diluted for any future interest in equity in the Company. For purposes of this Section 4.6, no repayment of any capital contributions made by any Members of the Company to the Company shall be considered a distribution.

4.7. Company Sale or Other Disposition. Upon any sale of the Company during the Term ("Company Sale"), the Company shall make or cause to be made payments to Employee (the "Sale Payment") in an amount equal to the product of the Net Transaction Proceeds (as defined below) multiplied by the Applicable Percentage (as hereinafter defined), less the repayment of any capital contributions paid by any Members of the Company. It is specifically stipulated and agreed that Employee shall have no entitlements whatsoever under this Section 4.7 should any such Company Sale not occur during the Employment Term. For purposes of this Section 4.7, the following shall apply:

4.7.1. The "Applicable Percentage" shall be one percent (1%) should the closing of an agreement to effect a Company Sale occur during the Term of this Agreement. It is specifically stipulated and agreed that the Applicable Percentage shall be reduced to the extent and in proportion that the Members as of the Effective Date have their equity interests diluted for any future interest in equity in the Company.

4.7.2. Unless the parties otherwise agree, payment of the Sale Payment shall be made (i) to Employee on or about the same time as proceeds of the Company Sale are paid to the Company's Members and (ii) to Employee wholly in cash or wholly in other assets or securities, or partly in cash and partly in other assets or securities, in the same proportions as the proceeds of the Company Sale

are paid to the Company's Members; provided that, if any portion of the Net Sale Proceeds is in the form of securities or other property, the Company will have the option to pay Employee in the same form of consideration as the purchase price is being received by the Company and/or Members of the Company, or in cash for the fair value thereof as reasonably determined by the Company. For greater clarity, in the event the Net Transaction Proceeds include any consideration that is contingent and/or payable over time, Employee shall be paid the portion of Employee's Sale Payment applicable to such portion of the Net Transaction Proceeds as, when, and if such portion of Net Transaction Proceeds are paid to the Company's Members; provided that Employee remains employed by the Company at the time such Net Sale Proceeds are paid. Notwithstanding any other provision of this Agreement, neither the Company's Members nor the Company itself, shall be obligated to proceed with any Company Sale transaction, and shall not have any liability to Employee for failing or refusing to proceed with any Company Sale transaction.

4.7.3. "Net Transaction Proceeds" means the gross consideration (determined as provided below) that is actually received by the Company's Members in connection with a Company Sale, less (1) all transaction and closing fees and expenses associated with such transaction (including but not limited to the fees of agents, investment bankers, brokers, finders and other third parties and all consultants', attorneys' and accountants' fees); (2) the full amount of all liabilities, obligations and indebtedness of the Company, other than deferred compensation, change-in-control or other similar obligations but specifically including obligations owed to the Company's Members or any of Company's affiliated entities ("Affiliated Entities") for advances provided to the Company or for trade payables incurred in the ordinary course of business to any of the Affiliated Entities, which are paid by Company or assumed by the Buyer or any Company's Members in connection with the Company Sale; (3) distributions from the operations of the Company that are consistent with the historical practices of Company prior to the closing of the Company Sale, specifically including profits that may have been accrued by the Company (in accordance with industry standards) prior to the date of closing of any Company Sale; and (4) the amount of any post-closing employment compensation payments to any Company's Members pursuant to employment or consulting covenants or agreements arising from the Company Sale that are not in excess of market compensation for the employment or consulting role and responsibilities in comparable businesses and transactions.

4.7.4. Notwithstanding anything to the contrary in this Agreement, in no event shall Employee be entitled to any Distribution Based Bonus or Sale Payment if Employee is not employed by the Company for any reason at the time of such payment.

5. Termination. This Agreement may be terminated upon the following terms:

5.1. Termination upon Death. If Employee dies during the Employment Term, this Agreement shall automatically terminate on the date of death. All Salary through such date and any amounts owed for Business Expenses, Distribution Based Bonus or Sale Payment, if any, that Employee incurs through such date will be paid to Employee's designated beneficiary as promptly as practicable following the date of death but not later than forty-five (45) days thereafter. All Benefits will terminate on the death of Employee's death unless a) expressly provided to the contrary in a written agreement between Employee and Company; b)expressly provided to the contrary by Company's policy applicable to its employees generally; or c) as otherwise required by law.

5.2. Termination upon Total Disability. Company may terminate this Agreement because of Employee's Total Disability upon at least ten (10) days' prior notice to Employee, which notice will specify the effective date of termination. All Salary through such date and any amounts owed for Business Expenses, Distribution Based Bonus or Sale Payment, if any, that Employee incurs through

such date will be paid to Employee's designated beneficiary as promptly as practicable following the date of Total Disability but not later than forty-five (45) days thereafter. All Benefits will terminate on the death of Employee's death unless a) expressly provided to the contrary in a written agreement between Employee and Company; b)expressly provided to the contrary by Company's policy applicable to its employees generally; or c) as otherwise required by law. "Total Disability" means an illness or other physical or mental disability of Employee that makes it impossible or impracticable for Employee to perform Employee's material duties and responsibilities hereunder (with whatever reasonable accommodation may be required by applicable law) for a period of at least four (4) weeks in the aggregate during any twelve (12) month period during the Employment Term.

5.3. Termination by Company with Cause. Company shall be entitled to terminate Employee's employment at any time for Cause. The Salary will continue to be paid to Employee through the date of termination, and any amounts owed for Business Expenses that Employee incurs through such date will be paid to Employee as promptly as practicable following termination but no later than forty-five (45) days thereafter. All Benefits will, unless otherwise required by law, terminate on the date of termination. Any of the following will constitute "Cause":

5.3.1. Employee's continued failure to perform Employee's material duties and responsibilities under this Agreement (other than a failure resulting from a Total Disability); and, to the extent such failure to perform is reasonably capable of being cured (as determined by Company in its good faith discretion) on a one (1) time basis, such performance is not cured within five (5) business days after written notice thereof;

5.3.2. Employee engaging in willful, reckless, or grossly negligent misconduct that is materially injurious to Company, whether such injury is to Company's finances, reputation or otherwise;

5.3.3. Employee is indicted of, or enters a plea of guilty or no contest to, a felony or of any other crime that has, or is reasonably likely to have, a material adverse effect on Company's finances, reputation or otherwise;

5.3.4. Employee commits an act of fraud or personal dishonesty that is injurious to Company's finances, reputation, or otherwise, or Employee commits an act of misappropriation of material funds or property of Company;

5.3.5. Employee takes actions requiring approval of the Board of Directors or Company's Members without having obtained such approval, commits a material breach of this Agreement or materially breaches any of Company's employment policies and procedures, and to the extent reasonably capable of being cured, fails to satisfactorily cure and correct such breach in all respects within ten (10) days (as determined by Company in good faith) on a one (1) time basis, or such lesser period of time as Company reasonably determines to be appropriate under the circumstances, from the date that Company gives notice thereof to Employee identifying the breach; or

5.3.6. Employee receives any payments or distributions of cash or other assets from any person or entity which has a substantial business relationship with Company.

5.4. Termination by Company Without Cause. Company may at any time terminate Employee's employment without Cause. If Employee's employment is terminated prior to the end of the Employment Term by Company without Cause, all Salary through such date and any amounts owed for Business Expenses, Distribution Based Bonus or Sale Payment, if any, that Employee incurs

through such date will be paid to Employee's designated beneficiary as promptly as practicable following the date of death but not later than forty-five (45) days thereafter. All Benefits will terminate on the date of termination unless a) expressly provided to the contrary in a written agreement between Employee and Company; b)expressly provided to the contrary by Company's policy applicable to its employees generally; or c) as otherwise required by law. Additionally, the Company shall pay Employee one (1) month severance (the "Without Cause Payment"). Company may require, as a condition to payment of the Without Cause Payment, that Employee execute and deliver, and does not revoke, a separation agreement that will include, among other things, a general release and waiver of all claims all in form and substance satisfactory to Company. The Without Cause Payment shall be the sole and exclusive remedy of Employee against Company if Employee's employment with Company is terminated by Company without Cause.

5.5. Effect of Termination. Except as expressly provided in this Section 5, and except for the obligations set forth in Sections 6 and 10, all further obligations of the Parties under this Agreement will terminate upon termination of Employee's employment with Company. Upon a termination of Employee's employment, all restrictive covenants set forth in Section 6 hereof shall remain effective. In addition, upon termination of Employee's employment for any reason, (i) Employee shall be deemed to have resigned from all other positions or offices with Company and all Company's Affiliates, (ii) Employee will not be considered an employee of Company for any purpose and (iii) Employee will no longer use or access Company resources and will no longer represent that Employee is an employee of Company.

5.6. Compliance with 409A. Company intends that all compensation referred to in this Agreement will be administered and paid to Employee in a manner that is intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended, including without limitation delaying the timing of any payments to be made under this Agreement by six (6) months as necessary if Employee is then a "specified employee" as defined under Section 409A, and the parties agree to amend this Agreement in any matter necessary to comply with Section 409A.

6. Restrictive Covenants.

6.1. Confidentiality.

6.1.1. Employee acknowledges and agrees that prior to and during the term of this Agreement, Employee has learned and will continue to learn and obtain information, tangible or intangible, relating to: (i) the Company and its respective owners (collectively, the "Company Parties"); (ii) employees or independent contractors of the Company; (iii) the customers and clients of the Company; and/or (iv) the business, operations, prospects and condition (financial or otherwise) of the Company, such employees, independent contractors, customers and clients (collectively, "Proprietary Information"). Proprietary Information includes, but is not limited to, any and all written or electronic research, developments, trade secrets, know-how, inventions, techniques, processes, customer lists, financial data, sales, marketing plans, specifications, designs, budgets, schedules, drawings, tapes, notes, and the like.

6.1.2. Employee agrees to hold all Proprietary Information (whether received prior to or during the Employment Term) in strict confidence and trust for the sole benefit of the Company and not to, directly or indirectly, disclose, use, copy, publish, or summarize any Proprietary Information, except or unless (i) during Employee's service to the Company, to the extent necessary to carry out Employee's responsibilities under this Agreement; (ii) after termination of this Agreement, as specifically authorized in writing by the Company or as required by any law, court order, or similar

process or proceeding (in which event Employee shall promptly consult with the Company on the advisability of taking legally available steps to resist or narrow such request or requirement, and if disclosure is required, disclose any such information which Employee is advised by legal counsel is legally required to be disclosed and exercise reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded); (iii) such Proprietary Information is or becomes publicly known through lawful means; (iv) the Proprietary Information was rightfully in Employee's possession or part of Employee's general knowledge prior to employment with the Company and Employee did not learn of it, directly or indirectly, from the Company, its agents or employees; or (v) such Proprietary Information is disclosed to Employee without confidential or proprietary restriction by a third party who rightfully possesses such Proprietary Information (without confidential or proprietary restriction) and did not learn of it, directly or indirectly, from the Company, its agents or employees. Employee agrees that all Company-related business procured by Employee and all Company-related business opportunities and plans made known to Employee while employed by Company, are and shall remain the permanent and exclusive property of the Company. Upon termination of this Agreement for any reason, Employee shall return to the Company all books, records, notes, manuals, recordings, technology equipment, and other personal property and tangible Proprietary Information obtained or prepared by Employee during the course of employment with the Company, or otherwise belonging to the Company.

6.2. Non-Competition. During the Employment Term, Employee shall not perform any professional services for any other person or entity, other than the Company or an affiliate of Company, except as permitted by Section 3 herein. Employee acknowledges that an employer is entitled to its employees' undivided loyalty during the period of employment and an employee may not transfer such employee's loyalty to a competitor during such period of employment. This duty of loyalty is breached if an employee acts against the best interests of Company during such period of employment. In addition, while employed by the Company and for six (6) months following Employee's date of termination, regardless of the reason for the employment termination, Employee shall not compete with the Company, or engage in or participate in any business that is in direct competition in any manner whatsoever with the Company, either as an employee, Company, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity. However, Employee may make passive or personal investments in companies that are publicly traded on a national stock exchange or the NASDAQ, but not exceeding more than five percent (5%) of the total outstanding shares of any such company, which might be in a competitive business or have competitive business practices with that of the Company, and Employee may own shares in a mutual fund that is registered under the Investment Company Act of 1940.

6.3. Non-Solicitation and Business Relationships. Employee agrees that during Employee's employment by the Company and for two (2) years following Employee's date of termination, regardless of the reason for the employment termination, Employee shall not, directly or indirectly

6.3.1. solicit, induce, or attempt to solicit or induce, any officer, director, employee, consultant, agent or joint venture partner of the Company or any of its affiliates to terminate his, her or its employment or other relationship with the Company or any of its affiliates for the purpose of associating with any competitor of the Company or any of its affiliates, or otherwise encourage any such person to leave or sever his, her or its employment or other relationship with the Company or any of its affiliates for any other reason, or authorize the taking of such actions by any other person or entity, or assist or participate with any such person or entity in taking such action; or

6.3.2. use any Company formula, practice, process, design, instrument, pattern, commercial method, or compilation of information that derives independent economic value, actual or potential, from not being generally known to the public or other persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy in order to, solicit, induce, or attempt to solicit or induce, any business from any of the Company's existing clients, employees, referral sources, or business contacts so long as the Company carries on its same business in the county of New York or Los Angeles. Nothing shall restrict Employee from notifying the public of Employee's separation from the Company, so long as such notice is done in a manner normal and customary in the PR community, however such notification to the Company's clients must be pre-approved by Stephanie Jones.

6.4. Company Policies. Employee shall adhere to all Company policies and practices of which Employee is notified in writing which are applicable to other employees of Company as the same may change from time to time.

6.5. Nature of Services and Remedies. Employee acknowledges, understands, and agrees that the breach or threatened breach of any of the provisions of this Section 6 may result in immediate and irreparable injury to Company, which cannot be fully compensable by damages. Therefore, Employee agrees that if any of the provisions of Section 6 are breached or threatened to be breached, Company shall be entitled to seek a decree of specific performance or other injunctive relief without posting a bond or other security and without the need to prove damages.

6.6. Blue Penciling. In the event any provision of this Section 6 is held by an arbitrator or court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall nevertheless continue in full force without being impaired or invalidated in any way. Without in any way limiting the generality of the preceding sentence, in the event the non-solicitation clause contained herein, in the view of a court or arbitrator asked to rule upon the issue, is deemed unenforceable by reason of covering too large an area, too long a period of time, or too many business activities, then the same shall be deemed to cover only the largest area, the longest time period, or the most business activities, as the case may be, which will not render it unenforceable. In the event in any proceeding, a court of competent jurisdiction or arbitrator shall refuse to enforce any of the separate covenants deemed included in this Section 6, then such unenforceable covenants shall be deemed deleted from this Section 6 to the extent necessary to permit the remaining separate covenants to be enforced.

6.7. Covenants Reasonable. Employee agrees that the covenants provided for in this Section 6, including the term and geographical area encompassed therein, are necessary and reasonable in order to protect the value of the Company's business and assets which the Company has expended substantial time, resources and money to develop and the confidentiality of the Proprietary Information of the Company, including goodwill.

6.8. The provisions of this Section 6 shall survive the Term of this Agreement.

7. Intellectual Property Rights.

7.1.1. Employee acknowledges and agrees that all Employee's contributions to Projects and all of the results and proceeds of Employee's services, retroactive to the date Employee began working with Company (including prior to the date hereof) and continuing through the termination of Employee's employment (collectively, the "Contributions") shall be "Works Made for Hire" under the U.S. copyright law and shall be owned exclusively by Company.

7.1.2. In the event that any of the Contributions are deemed not to be a work for hire, Employee hereby grants, assigns, and transfers to Company the sole and exclusive ownership of all right, title, and interest in and to the Contributions, without any residual rights therein belonging to Employee. Employee shall execute, acknowledge, and deliver any assignments, affidavits, and other instruments prepared by Company and shall do such other reasonable things as are required to assist Company to obtain, for the benefit of Company, at Company's sole expense, all of such ownership rights including, without limitation, trademarks, patents, or copyrights in and to any and all Contributions. Company shall have no obligation to use the Contributions in any manner.

8. Records. The ownership and right of control of all work, information, records, and reports and all documents in support of or relating to the business of Company shall be and remain the sole property of Company. Employee agrees that upon termination or expiration of this Agreement, Employee will promptly return to Company all information, records, reports and documents relating to Company's business which are then or were in Employee's possession or control and not theretofore returned to Company.

9. Conflicts of Interest.

9.1. Employee represents to Company (a) there are no restrictions, agreements, or understandings, oral or written, to which Employee is a party or by which Employee is bound that prevent, conflict with or make unlawful Employee's execution or performance of this Agreement, and (b) Employee does not have any business or other relationship that creates a conflict between the interests of Employee and Company.

9.2. Employee recognizes and agrees that Employee owes Company a fiduciary duty of loyalty, fidelity, and allegiance to act at all times in the best interests of Company and to do no act which might injure the business, interests, or reputation of Company. Employee's duty of loyalty will extend throughout the Employment Term and will continue following termination of this Agreement to the extent set forth in this Agreement and as recognized by law. Employee agrees to disclose in writing to Company any facts that could reasonably be expected to involve a material conflict of interest upon Employee's knowing that such a material conflict could exist.

10. Indemnification.

10.1. Except to the extent caused by Employee or resulting from a breach of this Agreement by Employee, Company shall indemnity, defend and hold harmless Employee from and against any and all liability, claims, costs, damages, and expenses (including reasonable outside attorneys' fees and court costs) arising out of or in connection with any breach by Company of the terms of this Agreement or any warranties and representations made herein.

10.2. Employee shall indemnity, defend and hold harmless Company, any affiliate of Company, and those individuals that comprise Company from and against any and all liability, claims, costs, damages, and expenses (including reasonable outside attorneys' fees and court costs) arising out of or in connection with any breach by Employee of the terms of this Agreement or any warranties and representations made herein.

11. Miscellaneous.

11.1. Nature of Company's Business/Acknowledgment and Consent to Exposure to Materials. Employee acknowledges that in the course and scope of Company's business and

Employee's duties while working for Company, Employee may be exposed to Company's clients' indecent, offensive, and/or graphic material and profane language. Such graphic material may include, but is not limited to, sexually explicit photographs and video recordings, lewd or salacious video or audio recordings, audio or video recordings containing reference to or acts of sexual or physical violence and/or other criminal acts, video and photographs depicting or referencing the use of alcohol and/or other controlled substances, audio or video recordings featuring insensitive or offensive comments regarding race, religion, ethnicity, sexuality, national origin, and disabilities, and other offensive material not herein mentioned. Employee understands that Company, in the performance of its duties as a publicist, may be required to address a client's involvement in any of the foregoing acts and thus the likelihood of Employee's exposure thereto. Employee represents and acknowledges that she is comfortable and capable of working in an environment in which she may be exposed to such obscene, indecent, offensive, and/or graphic materials and profane language. Employee further agrees that nothing in this paragraph shall be construed as Company's condoning any such deplorable behavior. Further, Employee acknowledges, understands and agrees that should Employee engage in any behavior referred to in this Section 11.1 Company shall have the right to terminate Employee pursuant to Section 5.3 of this Agreement.

11.2. Right to Insure. Company shall have the right to secure in its own name, or otherwise, and at its own expense, life, health, accident or other insurance covering Employee. Employee shall have no right, title or interest in and to such insurance. Employee shall assist Company, at Company's expense, in procuring such insurance by submitting to examinations and by signing such applications and other instruments as may be reasonably required by the insurance carriers to which application is made for any such insurance.

11.3. Taxes. All amounts paid to Employee hereunder shall be subject to the applicable withholding of social security, federal, state, and other taxes and deductions as required by law.

11.4. Successors. All of the terms, agreements, covenants, representations, warranties, and conditions of this Agreement are binding upon, and inure to the benefit of, and are enforceable by, the Parties and their respective successors or permitted assigns.

11.5. Assignment. Employee may not assign either this Agreement or any of Employee's rights, interests, or obligations hereunder without the prior written approval of Company, which may be withheld in Company's absolute and sole discretion. Company may freely assign its rights and obligations hereunder to any affiliate of Company, successor or assign which agrees to perform and discharge Company's duties and obligations hereunder.

11.6. Notices. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by commercial messenger or courier service requiring signed acknowledgment of delivery, or mailed by registered or certified mail (return receipt requested) or sent via electronic mail (with acknowledgment of complete transmission). If sent by registered or certified mail, notice shall be deemed to have been received and effective five (5) business days after mailing, and if by overnight mail, electronic mail or personal delivery, one (1) business day after being sent. All notices shall be addressed to the parties at the addresses set forth in the preamble to this Agreement. A copy of any notice to Company shall be sent to Frankfurt Kurnit Klein & Selz, P.C., 28 Liberty Street, New York, NY 10005, Attention Mara P. Canner, Esq. mcanner@fkks.com.

11.7. Governing Law. This Agreement and the performance of the Parties' obligations hereunder will be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law principles.

11.8. Disputes. Each Party submits to the jurisdiction of any state or federal court sitting in New York, New York with respect to any action relating to this Agreement, whether for injunctive or legal relief, and each party agrees that all claims in respect of any such action may be heard and determined in any such court. The prevailing party in any action shall be entitled to reimbursement of its reasonable attorneys' fees and costs of the action.

11.9. Injunctive Relief.

11.9.1. Employee acknowledges that remedies at law will be inadequate to protect the Company against any actual or threatened breach of Sections 6 and 7 of this Agreement and, without prejudice to the rights and remedies otherwise available to the Company, Employee agrees to the Company's right to injunctive relief in the Company's favor without proof of actual damages and to waive any requirement for the securing or posting of any bond in connection with such remedy.

11.9.2. Notwithstanding anything to the contrary in this Agreement, Employee understands and agrees that under no circumstances may Employee seek injunctive relief against Company for any reason, including without limitation relating to Company's breach of this Agreement or Company's use or non-use of any Contributions; Employee hereby waives such right in perpetuity and agrees further that Employee shall refrain from materially interfering in any manner with the Projects or the development, production, distribution or other exploitation thereof.

11.10. Remedies. Except as expressly provided herein, the rights, obligations and remedies created by this Agreement are cumulative and in addition to any other rights, obligations, or remedies otherwise available at law or in equity. Except as expressly provided herein, nothing herein will be considered an election of remedies.

11.11. Counterparts. This Agreement may be executed in two or more counterparts, including electronic transmissions (e.g., email, facsimile), each of which will be deemed an original but all of which together will constitute one and the same instrument.

11.12. Headings. The article and section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

11.13. Entire Agreement. This Agreement and any schedules and exhibits hereto constitute the entire agreement and understanding of the Parties in respect of the subject matter of this Agreement and supersedes all prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof. There are no third party beneficiaries having rights under or with respect to this Agreement.

11.14. Amendments and Waivers. No amendment, modification, replacement, termination, or cancellation of any provision of this Agreement will be valid, unless the same will be in writing and signed by the Parties. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence.

11.15. Severability. The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; provided that if any provision of this Agreement, as applied to any Party or to any

circumstance, is adjudged by a governmental body, arbitrator, or mediator not to be enforceable in accordance with its terms, the Parties agree that the governmental body, arbitrator, or mediator making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, and/or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced.

11.16. Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party because of the authorship of any provision of this Agreement. Any reference to any federal, state, local, or foreign Law will be deemed also to refer to Law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include," "includes," and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words "this Agreement," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. The Parties intend that each representation, warranty, and covenant contained herein will have independent significance. If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached will not detract from or mitigate the fact that the Party is in Breach of the first representation, warranty, or covenant.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the Effective Date.

Jonesworks, LLC

DocuSigned by:

By: ______________________

Stephanie Jones, President

*Jennifer Abel*
Jennifer Abel (Dec 10, 2021 09:25 PST)

Jennifer Abel

**Signature:**

**Email:** [redacted]



FKKS:2862641v.1 27179.100