**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE LIVELY,<br><br>Plaintiff,<br><br>-v-<br><br>WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, JENNIFER ABEL, JED WALLACE, and STREET RELATIONS INC.,<br><br>Defendants. | Case No. 1:24-cv-10049-LJL<br>(consolidated with 1:25-cv-00449-LJL)<br><br>**LOCAL RULE 56.1 STATEMENT BY THIRD-PARTY PLAINTIFF JENNIFER ABEL** |
| JENNIFER ABEL,<br><br>Third-Party Plaintiff,<br><br>-v-<br><br>JONESWORKS LLC,<br><br>Third-Party Defendant. | |

Third-party Plaintiff Jennifer Abel ("Abel"), by her undersigned attorneys, hereby submits the following statement, pursuant to Local Civil Rule 56.1, of which she claims that there are no genuine issues of material fact to be tried:

**The Pleadings**

1. On December 31, 2024, Plaintiff Blake Lively ("Plaintiff" or "Lively") commenced this action by filing a complaint. (*See* Dkt. 1).

2. Lively named, among others, Abel as a defendant in the complaint. (Id).

3. On July 30, 2025, Lively filed a second amended complaint, again naming Abel as a defendant. (*See* Dkt. 520).

4. On August 13, 2025, Abel answered the second amended complaint and filed an amended third-party complaint ("Answer and Third-Party Compl."), naming Jonesworks LLC ("Jonesworks") as a third-party defendant. (*See* Declaration of Kevin Fritz, dated November 3, 2026 ("Fritz Decl."), Ex. A).

5. Jonesworks responded to the amended third-party complaint by filing a motion to dismiss. (*See* Dkt. 670).

6. On October 9, 2025, the Court issued an Opinion and Order, denying Jonesworks' motion to dismiss, in its entirety. (*See* Dkt. 852).

7. On October 23, 2025, Jonesworks filed an answer to Abel's amended third-party complaint ("Answer"). (Fritz Decl., Ex. B).

**Abel's Employment with Jonesworks**

8. Abel resides in Beverly Hills, California. (*See* Declaration of Jennifer Abel, dated November 3, 2026 ("Abel Decl."), ¶ 3).

9. On or about July 9, 2020, Jonesworks hired Abel as Vice President. (Fritz Decl., Ex. A, ¶ 16; Ex. B, ¶ 16; Abel Decl., ¶ 5; Abel Decl., Ex. 1).

10. Jonesworks is a well-known public relations firm founded by Stephanie Jones ("Jones"), who serves as its CEO. (Abel Decl., ¶ 4; Fritz Decl., Ex. C at 32:7-33:16).

11. As a condition of her employment, Abel executed a Non-Disclosure and Intellectual Property Rights and Non-Solicitation Agreement ("2020 Employment Agreement"). (Fritz Decl. Ex. A, ¶ 17; Ex. B, ¶ 17; Abel Decl., ¶ 6; Abel Decl., Ex. 2).

12. Pursuant to the 2020 Employment Agreement, Abel was an at-will employee of Jonesworks. (Fritz Decl., Ex. A, ¶ 18; Ex. B, ¶ 18; Abel Decl., ¶ 7; Abel Decl., Ex. 2, ¶ 10).

13. The 2020 Employment Agreement further stated:

> **Exclusive Employment.** Employee agrees that while Employee is employed by the Agency, Employee's employment shall be exclusive and Employee shall not provide services to any entity in the public relations, media communications, marketing, branding or talent management business or any business without the Agency's prior written approval.

(Abel Decl., Ex. 2, ¶ 9; Fritz Decl., Ex. A, ¶ 18; Ex. B, ¶ 18).

14. When she joined Jonesworks, Abel oversaw Jonesworks' talent department and sought to grow its Los Angeles office, which at the time only had four employees. (Abel Decl., ¶ 5).[1]

15. On or about November 22, 2021, Jonesworks and Abel entered into a modified employment agreement ("2021 Employment Agreement"), which required Abel to dedicate all her business time to Jonesworks. (Fritz Decl., Ex. A, ¶ 20; Ex. B, ¶ 20; Abel Decl., ¶ 8; Abel Decl., Ex. 3).

16. The 2021 Employment Agreement states that Abel would serve as Vice President, Talent. (Abel Decl., Ex. 3, ¶ 2).

17. The 2021 Employment Agreement states: Abel's "primary place of employment pursuant to this Agreement shall be Los Angeles, CA." (Abel Decl., Ex. 3, ¶ 2; Abel Decl., ¶ 10).

---

[1] *See also* Deadline Article, dated February 16, 2023, "Jennifer Abel Named Partner at Jonesworks" (https://deadline.com/2023/02/jennifer-abel-named-partner-jonesworks-1235262051/) ("Abel was tapped in 2019 to run the Entertainment Division of the Los Angeles office, overseeing a strong growth period, and launching a social media and digital division.").

**The Wayfarer Clients Engage Jonesworks**

18. In or about 2018, before Abel's employment with Jonesworks, Defendant Justin Baldoni ("Baldoni") engaged Jonesworks to provide public relations services to him. (Abel Decl., ¶¶ 5, 14; Fritz Decl., Ex. C at 69:9-13; 71:18-20 ("I believe we were doing his personal publicity at that time a long time ago for $5,000 a month. And he was paying us.")).

19. After Baldoni's engagement, Defendant Wayfarer Studios LLC ("Wayfarer") retained Jonesworks. (Fritz Decl., Ex. C at 69:14-70:6; Abel Decl., Ex. 4).

20. Wayfarer is a production studio founded by Baldoni and others. (Abel Decl., ¶ 12).

21. On or about May 6, 2020, Jonesworks and Wayfarer entered into an agreement on Jonesworks letterhead ("Wayfarer Agreement"). (Abel Decl., ¶ 15; Abel Decl., Ex. 4).

22. Pursuant to the terms of the Wayfarer Agreement, Wayfarer retained Jonesworks "as its exclusive public relations counsel to provide strategic communications services as" described in a schedule to the agreement. (Abel Decl., ¶ 15; Abel Decl., Ex. 4).

23. Schedule A to the Wayfarer Agreement set forth the services Jonesworks would provide in the following chart:

| | |
|---|---|
| Press Materials | • Assist in developing, writing and updating communication materials related to all press outreach such as biographies, media kits, boilerplates, press releases, and key messaging<br>• Manage media and press communications |
| Inter-Agency Programs | Advise on any marketing and campaign strategies to ensure brand messaging is consistent, opportunities are maximized, and the strongest press angles aligned |
| Executive Visibility | Position and utilize Wayfarer Studios key executives as thought-leaders and change agents in the film and television industry |
| On-Going/Proactive Outreach | • Develop a 12-month media and communications strategy to further drive awareness<br>• Strategize and execute select film and television project announcements<br>• Conduct proactive feature pitching to top-tier print, broadcast and online media outlets<br>▪ Conduct media monitoring and competitor tracking for industry press<br>▪ Conduct regular check-on calls surrounding the status of Wayfarer Studios projects, events and news |
| Measurement and Evaluation | ▪ Clip and Service media as published<br>▪ Create monthly clip books and activity reports that detail account activity and media impressions<br>▪ Create and maintain a media library on behalf of Wayfarer Studios |

(Abel Decl., Ex. 4, Schedule A; Abel Decl., ¶ 16).

24. Pursuant to the terms of the Wayfarer Agreement, the initial term of the agreement would commence on May 7, 2020, and conclude on May 6, 2021. (Abel Decl., Ex. 4).

25. The Wayfarer Agreement further provides: "This agreement shall automatically renew for additional one-year periods ("Extension Period(s)") unless notice is received by either party ninety (90) days prior to the expiration of the Initial Term of this Agreement, or any Extension Period." (*Id*).

26. In addition to expenses and other fees, per the Wayfarer Agreement, Wayfarer agreed to pay Jonesworks a service fee of $20,000 per month. (*Id*).

27. According to Jones, Baldoni and Wayfarer collectively paid Jonesworks $25,000 per month. (Fritz Decl., Ex. C at 86:24-87:2).

**Jonesworks Provides Services for Wayfarer Clients**

28. Jones personally provided services to both Baldoni and Wayfarer (collectively, the "Wayfarer Clients"). (Fritz Decl., Ex. C at 82:14-18; 82:25-83:5; 84:15-18).

29. According to Jones, the scope of the work for Baldoni was for his personal publicity. (Fritz Decl., Ex. C at 82:19-22).

30. Jones, however, also testified that she and Jonesworks would do "whatever [Baldoni] needed us to do. It was based on whatever - - the needs were ever evolving. It may be TV. It may be a book. It might be the production studios. It might be do you have any contacts at this brand that can help us? Do you know any brands? Can you get your client to watch this project and see if they would be interested in producing it with me? It was very bespoke and ever-changing." (Fritz Decl., Ex. C at 84:21-85:4).

31. Jones also testified: "I did whatever [Baldoni] asked me to do and needed done. I'm not one of those publicists that just say I'm only, you know, this. I've become very close with clients and help them with whatever their needs are, even if it's not publicity." (Fritz Decl., Ex. C at 85:9-14).

32. Jonesworks set up email distribution lists to help service the Wayfarer Clients. (Abel Decl., ¶ 20).

33. Emails sent to those distribution lists were received by multiple Jonesworks' personnel, including Jones and Abel. (*Id*).

34. Jonesworks also provided Baldoni with "crisis PR". (Fritz Decl., Ex. C at 87:3-87:16).

35. Jonesworks also assisted Baldoni with "litigation matters". (Fritz Decl., Ex. C at 87:5-16).

36. Jones testified: "we handled - - we handled things that could have been categorized as crisis for him; something that needed to be moved upon urgently, something that needed to be corrected or fixed, litigation that he was in, etc." (Fritz Decl., Ex. C at 87:12-16).

37. Jones did not work alone providing services to Baldoni and Wayfarer. (Fritz Decl., Ex. C at 83:6-14).

38. Jonesworks dedicated a full team to service the Wayfarer Clients. (Fritz Decl., Ex. C at 83:12-14).

39. Among others, Abel was on the Jonesworks' team working for Baldoni and Wayfarer. (Fritz Decl., Ex. C at 85:15-86:23).

40. After joining Jonesworks, Abel served as the primary point person for Wayfarer and Baldoni during Wayfarer's multi-year engagement with Jonesworks. (Abel Decl., ¶ 17).

41. Abel managed Jonesworks' work for Wayfarer from Jonesworks' Los Angeles office. (Abel Decl., ¶ 18).

42. Through Jonesworks' engagement with Wayfarer, Abel developed a close and trusting relationship with the Wayfarer Clients. (*Id*).

43. Jonesworks directed Abel to carry out the duties of a competent public relations professional on behalf of the Wayfarer Clients, including but not limited to garnering good publicity and eliminating or minimizing bad publicity for them and the film *It Ends With Us* (the "Film"). (Abel Decl., ¶¶ 13, 19).

44. Baldoni directed and co-starred in the Film. (Abel Decl., ¶ 13).

45. For its services, including Abel's public relations services, the Wayfarer Clients from May 2020 to August 2024 paid fees to Jonesworks. (Abel Decl., ¶ 25; Abel Decl., Ex. 5; Fritz Decl., Ex. C at 86:24-87:2).

**Jonesworks' Public Relations Work for the Wayfarer Clients Concerning the Film**

46. On July 24, 2024, Abel informed Jones that Wayfarer sought recommendations for a crisis management professional to work with Jonesworks in countering potentially negative publicity related to issues on the set of the Film. (Abel Decl., ¶ 31; Abel Decl., Ex. 7).

47. Jones turned to Abel for recommendations. (*Id*).

48. Wayfarer hired The Agency Group PR LLC ("TAG") to assist Jonesworks with crisis management. (Abel Decl., ¶ 32; Abel Decl., Ex. 8).

49. On July 31, 2024, Abel texted Jamey Heath ("Heath") and Mitz Toskovic of Wayfarer about a conversation she had with an independent journalist concerning Baldoni's exclusion from Film-related promotions and that the journalist was willing to publish a story of Lively's misconduct. (Abel Decl., ¶ 33; Abel Decl., Ex. 9).

50. At the time she communicated with the journalist, Abel acted within the scope of her employment at Jonesworks, providing public relations services to the Wayfarer Clients. (Abel Decl., ¶ 33; Abel Decl., Ex. 4, Schedule A ("Manage media and press communications")).

51. Abel never followed up her communication with the journalist nor referred the journalist to anyone. (Abel Decl., ¶ 33).

52. The journalist never published the story. (*Id*).

53. On August 2, 2024, a representative of TAG sent Abel a "Scenario Planning" document describing TAG's objective to "[p]rotect the reputation of" the Wayfarer Clients "in the lead up, during, and following the premiere" of the Film and related goals. (Abel Decl., ¶ 34; Abel Decl., Ex. 10).

54. TAG shared the "Scenario Planning" document with Abel because she was a Jonesworks employee responsible for providing public relations services to the Wayfarer Clients.

(Abel Decl., ¶ 34; Abel Decl., Ex. 4, Schedule A ("Advise on any marketing and campaign strategies to ensure brand messaging is consistent, opportunities are maximized, and the strongest press angles aligned")).

55. On August 5, 2024, Abel notified Baldoni that Sony (the co-producer of the Film) had an issue with the word "friction" being used in social media commentary about the on-set relationship between Baldoni and Lively. (Abel Decl., ¶ 35; Abel Decl., Ex. 11).

56. Abel proposed the word "challenge" to downplay such commentary and highlight that, as director of the Film, Baldoni successfully brought all people together to "create something beautiful" in the Film. (*Id*).

57. Abel made the proposal as part of her employment with Jonesworks, providing a public relations "strategy" to Jonesworks' clients, *i.e.,* the Wayfarer Clients. (*Id*.; Abel Decl., Ex. 4, Schedule A ("Assist in developing, writing and updating communication materials related to all press outreach …")).

58. On August 7, 2024, Abel exchanged text messages with Jonesworks' employee Matthew Mitchell ("Mitchell") and TAG employees Melissa Nathan ("Nathan") and Katie Case ("Case") and Breanna Koslow ("Koslow") about an online narrative concerning Baldoni and Lively's separate promotion of the Film (as opposed to both being present). (Abel Decl., ¶ 36; Abel Decl., Ex. 12).

59. Abel made her comments concerning how to handle the narrative in the course of her employment at Jonesworks providing public relations services to the Wayfarer Clients. (Abel Decl., ¶ 36; Abel Decl., Ex. 4, Schedule A ("Assist in developing, writing and updating communication materials related to all press outreach …")).

60. On August 7, 2024, Case sent Heath and Abel (at her Jonesworks email address) an email referring to "social and digital mitigation and remediation" and to public narratives concerning Baldoni and Wayfarer. (Abel Decl., ¶ 37; Abel Decl., Ex. 13).

61. Case sent the email to Abel in her capacity as a Jonesworks employee providing public relations services to the Wayfarer Clients. (Abel Decl., ¶ 37).

62. On August 8, 2024, Abel sent a text message to Mitchell (of Jonesworks), Nathan, Case, and Koslow concerning negative social media posts about Baldoni by a content creator named Jenna Redfield. (Abel Decl., ¶ 38; Abel Decl., Ex. 14).

63. Abel flagged the negative public commentary about Baldoni as part of her employment at Jonesworks. (Abel Decl., ¶ 38; Abel Decl., Ex. 4, Schedule A ("Conduct media monitoring …")).

64. On August 9, 2024, Abel exchanged text messages with Nathan concerning articles about a "rift" or "feud" between Baldoni and Lively, as well as other potential media coverage of the situation. (Abel Decl., ¶ 39; Abel Decl., Ex. 15).

65. As part of her employment at Jonesworks, Abel monitored news outlets for negative publicity about Baldoni and sought to potentially garner positive publicity for him. (Abel Decl., ¶ 39; Abel Decl., Ex. 4, Schedule A ("Conduct media monitoring …"; "Advise on any marketing and campaign strategies to ensure brand messaging is consistent, opportunities are maximized, and the strongest press angles aligned")).

66. Abel exchanged text messages with Nathan on August 9, 2024, as part of her employment at Jonesworks. (Abel Decl., ¶ 39; Abel Decl., Ex. 15).

67. On August 10, 2024, Abel exchanged text messages with Heath, Mitchell (of Jonesworks), Nathan, Case, and Koslow concerning a *Hollywood Reporter* article and TikTok videos related to Lively and/or Baldoni. (Abel Decl., ¶ 40; Abel Decl., Ex. 16; Abel Decl., Ex. 6).

68. The TikTok video from May 17, 2023, included within the text chain shows Baldoni and Lively in a pleasant atmosphere on the set of the Film. (Abel Decl., ¶ 40; Abel Decl., Ex. 6).

69. The *Hollywood Reporter* article discusses why it was important for Baldoni to make a movie about domestic violence. (Abel Decl., ¶ 40; Abel Decl., Ex. 6).

70. Abel sent text messages on August 10, 2024, concerning the *Hollywood Reporter* article and TikTok videos as part of her employment with Jonesworks. (Abel Decl., ¶ 40; Abel Decl., Ex. 4, Schedule A ("Conduct media monitoring")).

71. On August 11, 2024, and acting in her capacity as a Jonesworks employee, Abel advised Wayfarer via text message about whether the timing was appropriate for Baldoni to issue further comments about domestic violence. (Abel Decl., ¶ 41; Abel Decl., Ex. 17).

72. On August 13, 2024, Abel exchanged texts with Heath, Baldoni, Mitchell (of Jonesworks), Nathan, Case, and Koslow concerning another TikTok video praising Baldoni and another video criticizing Lively for her marketing of the Film in a manner insensitive to domestic violence victims. (Abel Decl., ¶ 42; Abel Decl., Ex. 18).

73. Abel sent the August 13, 2024, text messages as part of her employment at Jonesworks, providing public relations services for the Wayfarer Clients. (Abel Decl., ¶ 42; Abel Decl., Ex. 4, Schedule A ("Conduct media monitoring")).

74. On August 15, 2024, Abel exchanged text messages with Heath, Baldoni, Mitchell (of Jonesworks), Nathan, Case, and Koslow concerning the positive public comments made by

Brandon Sklenar (an actor in the Film) about Baldoni and concerning other publicity related to the Film. (Abel Decl., ¶ 43; Abel Decl., Ex. 19).

75. Abel exchanged the August 15, 2024, text messages as part of her employment with Jonesworks and as its point person assigned to the Wayfarer Clients. (Abel Decl., ¶ 43; Abel Decl., Ex. 4, Schedule A ("Conduct media monitoring"; "Advise on any marketing and campaign strategies to ensure brand messaging is consistent, opportunities are maximized, and the strongest press angles aligned")).

76. On August 18, 2024, Abel exchanged text messages with Heath, Baldoni, Mitchell (of Jonesworks), Nathan and Koslow concerning TikTok videos related to the Film. (Abel Decl., ¶ 44; Abel Decl., Ex. 20).

77. The TikTok video called the Film "one of the best movies ever made" and said the Film touched on domestic violence "in the best way possible." (*Id.;* Abel Decl., Ex. 6).

78. Abel exchanged the August 18, 2024, text messages and commented about one of the videos as part of her employment with Jonesworks, providing public relations services for the Wayfarer Clients. (*Id*.; Abel Decl., Ex. 4, Schedule A ("Conduct media monitoring"; "Advise on any marketing and campaign strategies to ensure brand messaging is consistent, opportunities are maximized, and the strongest press angles aligned")).

79. Abel's employment with Jonesworks ended on August 21, 2024. (Abel Decl., ¶ 23).

**<u>Lively's Claims against Abel Due to her Employment with Jonesworks</u>**

80. On July 30, 2025, Lively filed her Second Amended Complaint asserting claims against Abel for: (a) aiding and abetting harassment and retaliation in violation of California's Fair

Employment and Housing Act ("FEHA"); (b) false light invasion of privacy; and (c) civil conspiracy (collectively, "Lively's Claims"). (Abel Decl., ¶ 26; Dkt. 520).

81. The Second Amended Complaint alleged that Nathan, TAG, and Abel "perpetrated a retaliation scheme against Ms. Lively" including via "the amplifying of negative content about Ms. Lively …." (Abel Decl., ¶ 27; Dkt. 520, ¶ 230).

82. Abel denies Lively's allegations. (Abel Decl., ¶ 27; Fritz Decl., Ex. A, ¶ 230).

83. Abel never published, planted, or pitched any negative content about Lively. (Abel Decl., ¶ 45).

84. Abel never "boosted" or "amplified" any negative content about Lively. (Abel Decl., ¶ 46).

85. The pleading further alleges that Nathan, TAG and Abel "aided and abetted the discriminatory conduct of Defendants It Ends With Us Movie LLC, Wayfarer, Baldoni and Heath, including but not limited to by participating in the above-described coordinated 'astroturfing' campaign to discredit and 'bury' Ms. Lively." (Abel Decl., ¶ 27; Dkt. 520, ¶ 411).

86. Abel denies Lively's allegations. (Abel Decl., ¶ 27; Fritz Decl., Ex. A, ¶ 411).

87. In her Third Amended Responses and Objections to Abel's Second Set of Interrogatories (the "Interrogatory Responses"), Lively purports to identify the "negative content about [her] (including through the engagement of social media)" that she alleges was "amplified" by Abel. (Abel Decl., ¶ 28; Abel Decl., Ex. 6).

88. In her Interrogatory Responses, Lively further alleges that Abel "amplified" negative content about her "by virtue of recommending services to be performed by TAG and facilitating that engagement" and "by direct communications with TAG and/or digital teams identifying relevant narratives as well as content to be amplified, boosted, or similar conduct, in

order to negatively affect the online conversation regarding [her]." (Abel Decl., ¶ 29; Abel Decl., Ex. 6).

89. As discussed above, the alleged conduct that forms the basis of Lively's Claims against Abel consists of public relations activities conducted on behalf of the Wayfarer Clients as part of Abel's employment with Jonesworks and its clients. (Abel Decl., ¶ 30).

**Jonesworks Knew of and Authorized Abel's Actions**

90. Abel denies any fault and/or responsibility for Lively's Claims or the alleged loss or damage incurred by Lively, because, *inter alia*, Abel undertook the actions while employed by and in the course of her employment with Jonesworks. (Abel Decl., ¶ 47).

91. Abel did not take any of the actions at issue herein in pursuit of her own interest. (Abel Decl., ¶ 48).

92. Jonesworks knew of and foresaw Abel's actions because it directed her to render public relations services to the Wayfarer Clients. (Abel Decl., ¶ 49).

93. Jonesworks had contracted with the Wayfarer Clients to perform, *inter alia*, public relations services. (Abel Decl., ¶ 49; Abel Decl., Ex. 4).

94. Jones knew that Abel was working with Baldoni on his press tour in connection with the premiere of the Film in late July/early August 2024, amid reports of strife between Baldoni and Lively. (Abel Decl., ¶ 51).

95. In a July 25, 2024 text message to Baldoni, Jones: (a) confirms that she is "on [the phone] with [Abel] now"; (b) tells Baldoni that she has "a plan" for him to attend the premiere of the Film; and (c) assures Baldoni that she has "his back and nothing is going to happen on [her] watch." (Abel Decl., ¶ 51; Abel Decl., Ex. 21).

96. Jones also knew that other Jonesworks employees and Abel were handling press inquiries concerning alleged issues on the set of the Film. (Abel Decl., ¶ 53).

97. In fact, Abel communicated directly with Jones about the Film's premiere and Baldoni's press tour. (Abel Decl., Ex. 22).

98. Jones instructed Abel to tell Baldoni that Abel was taking "meticulous notes for overall recap." (*Id*).

99. On August 8, 2024, Jonesworks' Chief of Staff (Gordon Duren) forwarded (to an internal email distribution list) an inquiry from *The Hollywood Reporter* concerning alleged Film-related "drama…." (Abel Decl., ¶ 53; Abel Decl., Ex. 24).

100. Abel confirmed to Jones and Duren that the situation was being handled by the Jonesworks employees assigned to the Wayfarer Clients' accounts. (*Id*).

101. On August 9, 2024, Jones forwarded (to two internal email distribution lists) an inquiry from *The Daily Mail* concerning purported on-set issues. (Abel Decl., ¶ 54; Abel Decl., Ex. 25).

102. Again, Abel confirmed to Jones that the matter was being handled. (*Id*).

103. On August 9, 2024, Jones forwarded a press inquiry concerning alleged on-set drama to the Jonesworks (internal) email distribution lists, and Jonesworks employee Matthew Mitchell confirmed that the inquiry would be handled. (Abel Decl., ¶ 55; Abel Decl., Ex. 26).

104. Jones also knew that Jonesworks employees were monitoring social media activity concerning Baldoni and the Film, including online comments from Jenna Redfield. (Abel Decl., ¶ 52).

105. For instance, in an August 8, 2024, email, a Jonesworks employee passed along information related to such social media monitoring to Jones. (Abel Decl., ¶ 52; Abel Decl., Ex. 23).

106. Abel's alleged actions were consistent with how Jonesworks rendered public relations services. (Abel Decl., ¶ 56).

107. In an August 9, 2024, text message, Jones noted that *People* had reported that Baldoni was "largely absent from grouped promotional appearances, including at the New York premiere" and that he "didn't introduce the film ahead pf the screening." (Abel Decl., ¶ 56; Abel Decl., Ex. 27).

108. Jones wrote that Baldoni "introduced at screening" and instructed Abel to "have [the story] corrected." (*Id*).

109. In an August 14, 2024, email to Heath, Jones referred to herself as "a key member of both Justin's and Wayfarer's account" and "a keyman on Justin's account." (Abel Decl., ¶ 57; Abel Decl., Ex. 28).

110. In the August 14, 2024 email chain (Abel Decl., Ex. 28), Jones provided the Wayfarer Clients with Jonesworks' "recommended strategy" for dealing with the publicity crisis: (1) "Flood the Zone with Positives" – "ensure that we promote positive narratives that media outlets cannot ignore" and because "[c]urrently, most stories are heavily biased towards Blake's perspective" it is "crucial" that "we fight for every inch of every story"; and (2) "Prepare Alternative Stories" – "mobilize a robust network of supporters and third-party advocates ready to counter these narratives on deep background as well as some on the record, making it clear that the claims being made are untrue and unfounded." (*Id*).

111. Jones states in the August 14, 2024, email chain (Abel Decl., Ex. 28) that she has "successfully managed every crisis for Justin without any negative press coming to light." (*Id*).

112. Jones also knew that Wayfarer had retained TAG to assist Jonesworks with crisis management. (Abel Decl., ¶ 58; Abel Decl., Ex. 29; Fritz Decl., Ex. C at 88:3-89:3).

113. After Abel's employment ended on August 21, 2024, Jones continued to coordinate crisis management efforts with TAG. (*Id*.; Fritz Decl., Ex. C at 76:20-77:7).

**<u>The Dismissal of Lively's Claims</u>**

114. In an Opinion and Order dated April 2, 2026, Lively's Claims were dismissed and the Court granted judgment in Abel's favor as to Lively's Claims. (Dkt. 1273, p. 95, 143, 150 – 51).

115. Abel incurred significant legal fees and costs in defending against Lively's Claims, which were advanced by Wayfarer. (Abel Decl., ¶ 60).

**<u>Additional Undisputed Facts</u>**

116. Jonesworks is a Delaware limited liability company with its principal place of business in New York. (Dkt. 877, ¶ 2).

117. Jonesworks declined to defend Abel against Lively's Claims and denies any obligation to do so. (Abel Decl., ¶ 59; Fritz Decl., Ex. B).

118. Throughout her employment with Jonesworks, Abel lived in California, was paid in California, and performed her work for Jonesworks, including her work for the Wayfarer Clients, in California. (Abel Decl., ¶¶ 3, 5, 10, 11, 18.

119. In June 2024, amid concerns that Lively would publicize "lies/exaggerate[d] truth" about on-set issues, Jones instructed Jonesworks staff to "be armed with [an] arsenal of stuff" about

Lively, and Jonesworks staff confirmed they would "dig for details on [Lively's] indiscretions[.]" (Abel Decl., ¶ 50; Abel Decl., Ex. 20A).

120. Jonesworks separately sued Abel, alleging that Abel's public relations work "went far beyond the legitimate scope of Abel's employment." (Fritz Decl., Ex. D, ¶ 4).

Dated: November 4, 2026

*/s/ Kevin Fritz*

LINER FREEDMAN TAITELMAN + COOLEY, LLP
Bryan J. Freedman (*pro hac vice*)
Ellyn S. Garofalo (*pro hac vice*)
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Tel: (310) 201-0005
Email: bfreedman@lftcllp.com
egarofalo@lftcllp.com

MEISTER SEELIG & SCHUSTER PLLC
Mitchell Schuster
Kevin Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
Email: ms@mss-pllc.com
kaf@mss-pllc.com