UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BLAKE LIVELY,

Plaintiff,

-v-

WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, JENNIFER ABEL, JED WALLACE, and STREET RELATIONS INC.,

Defendants.

JENNIFER ABEL,

Third-Party Plaintiff,

-v-

JONESWORKS LLC,

Third-Party Defendant.

Case No. 1:24-cv-10049-LJL
(consolidated with 1:25-cv-00449-LJL)

**MEMORANDUM OF LAW IN SUPPORT OF THIRD-PARTY PLAINTIFF JENNIFER ABEL'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

I. PRELIMINARY STATEMENT .......... 1

II. STATEMENT OF FACTS .......... 2

A. Jonesworks Hires Abel .......... 2

B. The Wayfarer Clients Retain Jonesworks .......... 3

C. Lively's Claims Against Abel Stem Exclusively from Her Employment with Jonesworks .......... 4

D. Lively's Lawsuit Against Abel .......... 8

III. LEGAL STANDARD .......... 9

IV. ABEL IS ENTITLED TO INDEMNIFICATION UNDER CALIFORNIA LABOR CODE SECTION 2802 .......... 11

A. California Law Governs the First Cause of Action .......... 11

B. Abel Is Entitled to Indemnification Under California Labor Code Section 2802 .......... 14

V. ALTERNATIVELY, ABEL IS ENTITLED TO COMMON LAW INDEMNIFICATION UNDER NEW YORK LAW .......... 19

A. New York Law Applies to Abel's Claim for Common Law Indemnification .......... 19

B. New York Law Permits Recovery of Defense Costs Paid by Another .......... 20

VI. CONCLUSION .......... 23

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abdel-Karim v. EgyptAir Airlines*,
116 F. Supp. 3d 389 (S.D.N.Y. 2015) ..... 10

*Abdel-Karim v. Egyptair Holding Co.*,
649 Fed. App'x 5 (2d Cir. 2016) ..... 10

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..... 9

*Antaeus Enters., Inc. v. SD-Barn Real Est., L.L.C.*,
480 F. Supp. 2d 734 (S.D.N.Y. 2007) ..... 12

*Barkanic v. Gen. Admin. of Civ. Aviation of the People's Republic of China*,
923 F.2d 957 (2d Cir. 1991) ..... 12

*Booking v. Gen. Star Mgmt. Co.*,
254 F.3d 414 (2d Cir. 2001) ..... 11

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*,
769 F.2d 919 (2d Cir. 1985) ..... 10

*Caldarola v. Calabrese*,
298 F.3d 156 (2d Cir. 2002) ..... 10

*Carter v. Entercom Sacramento, LLC*,
219 Cal. App. 4th 337 (2013) ..... 15

*Cassady v. Morgan, Lewis & Bockius LLP*,
145 Cal. App. 4th 220 (2006) ..... 14, 18

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..... 9

*CSC Sci. Co. Inc. v. Manorcare Health Servs., Inc.*,
867 F. Supp. 2d 368 (S.D.N.Y. 2011) ..... 19

*Dargahi v. Honda Lease Tr.*,
370 Fed. App'x 172 (2d Cir. 2010) ..... 12

*DiPerna v. Am. Broad. Cos.*,
200 A.D.2d 267 (1st Dep't 1994) ..... 20, 21, 22, 23

*Fincher v. Depository Tr. & Clearing Corp.*,
604 F.3d 712 (2d Cir. 2010) ........ 9

*Gallano v. Burlington Coat Factory of Cal., LLC*,
67 Cal. App. 5th 953 (2021) ........ 15

*Gulf Offshore Logistics, LLC v. Superior Ct.*,
45 Cal. App. 5th 285 (2020) ........ 14

*Hicks v. Baines*,
593 F.3d 159 (2d Cir. 2010) ........ 10

*In re Allstate Ins. Co. (Stolarz),*
81 N.Y.2d 219 (1993) ........ 11

*Ins. Co. of the State of Pa. v. Equitas Ins. Ltd.*,
68 F.4th 774 (2d Cir. 2023) ........ 19

*Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*,
363 F.3d 137 (2d Cir. 2004) ........ 11

*Jacobus v. Krambo Corp.*,
78 Cal. App. 4th 1096 (2000) ........ 15, 17

*John R. v. Oakland Unified Sch. Dist.*,
48 Cal. 3d 438 (1989) ........ 15

*Ketchum v. Moses*,
24 Cal. 4th 1122 (2001) ........ 18

*Lively v. Wayfarer Studios LLC*,
2025 WL 2884407 (S.D.N.Y. Oct. 9, 2025) ........ 11, 16

*Lolley v. Campbell*,
28 Cal. 4th 367 (2002) ........ 18

*Lowe v. Dollar Tree Stores, Inc.*,
40 A.D.3d 264 (1st Dep't 2007) ........ 20

*Mar-Cone Appliance Parts Co. v. Mangan*,
879 F. Supp. 2d 344 (W.D.N.Y. 2012) ........ 11, 12

*Matsushita Elec. Indus. Co. Ltd., v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ........ 10

*Matzinger v. MAC II, LLC*,
2018 WL 3350328 (S.D.N.Y. July 9, 2018) ........ 20

*McCarthy v. Turner Constr., Inc.*,
953 N.E.2d 794 (N.Y. 2011) ........ 20

*McDermott v. City of New York*,
50 N.Y.2d 211 (1980) ........ 19

*N.X. v. Cabrini Med. Ctr.*,
97 N.Y.2d 247 (2002) ........ 20

*Neumeier v. Kuehner*,
31 N.Y.2d 121 (1972) ........ 11, 12

*Niagara Mohawk Power Corp. v. Jones Chem. Inc.*,
315 F.3d 171 (2d Cir. 2003) ........ 10

*Playwell Toy, Inc. v. Bureau Veritas Consumer Prods. Servs., Inc.*,
2007 WL 2892031 (W.D.N.Y. Sept. 28, 2007) ........ 12

*PLCM Grp. v. Drexler*,
22 Cal. 4th 1084 (2000) ........ 19

*Raskin v. Wyatt Co.*,
125 F.3d 55 (2d Cir. 1997) ........ 10

*Rivera v. Columbia Hicks Assocs. LLC*,
203 A.D.3d 524 (1st Dep't 2022) ........ 22, 23

*Rodriguez v. City of New York*,
2004 WL 444089 (S.D.N.Y. Mar. 10, 2004) ........ 10

*Rogers v. Dorchester Assocs.*,
32 N.Y.2d 553 (1973) ........ 20

*Ross v. Fay's Drug Co. of Cohoes*,
132 Misc. 2d 65 (Sup. Ct. Albany Cnty. 1986) ........ 22, 23

*Skistimas v. Old World Owners Ass'n*,
127 Cal. App. 4th 948 (2005) ........ 19

*Sullivan v. Oracle Corp.*,
51 Cal. 4th 1191 (2011) ........ 14

*Trs. of Columbia Univ. in City of N.Y. v. Mitchell/Giurgola Assocs.*,
109 A.D.2d 449 (1st Dep't 1985) ........ 19

*Vitrano v. State Farm Ins. Co.*,
2009 WL 3365866 (S.D.N.Y. Oct. 19, 2009) .......... 10

*Ward v. United Airlines, Inc.*,
9 Cal. 5th 732 (2020) .......... 14

*Weinstock v. Columbia Univ.*,
224 F.3d 33 (2d Cir. 2000) .......... 10

*Wright v. Goord*,
554 F.3d 255 (2d Cir. 2009) .......... 9

*Youngman v. Robert Bosch LLC*,
923 F. Supp. 2d 411 (E.D.N.Y. 2013) .......... 12

**Statutes**

Cal. Lab. Code § 2802 .......... Passim

**Rules**

Fed. R. Civ. P. 56(a) .......... 9

Fed. R. Civ. P. 56(c)(1) .......... 9

**Other Authorities**

Restatement (First) of Restitution § 76 (Am. L. Inst. 1937) .......... 19

Third-party plaintiff Jennifer Abel ("Abel") respectfully submits this Memorandum of Law in support of her motion for summary judgment against third-party defendant Jonesworks LLC ("Jonesworks") on her First Cause of Action or, alternatively, her Second Cause of Action. For the reasons set forth below, Abel's motion should be granted as to liability, with the amount of attorneys' fees and costs to be determined on a subsequent submission. Because Lively's Claims have been dismissed and Abel faces no liability to Lively, Abel withdraws her Third Cause of Action for contribution against Jonesworks. Abel's withdrawal of her contribution claim does not affect her indemnification claims.

## I. PRELIMINARY STATEMENT

Abel was employed by Jonesworks to render public relations services to its clients, such as Justin Baldoni ("Baldoni") and Wayfarer Studios LLC ("Wayfarer") (collectively, the "Wayfarer Clients"). As part of her job responsibilities and at Jonesworks' direction, Abel performed public relations activities for the Wayfarer Clients, including in connection with the film *It Ends With Us* (the "Film"). In late July/early August 2024, public commentary circulated concerning purported on-set strife between Baldoni and the Film's co-star, plaintiff Blake Lively ("Lively"). At the time, Jonesworks was the Wayfarer Clients' "exclusive public relations counsel," paid to monitor the media, manage press communications, and protect their public image during the Film's release. Abel and other Jonesworks employees discussed how to garner positive publicity and to minimize negative publicity for the Wayfarer Clients, which was within Abel's scope of employment with Jonesworks.

Abel was the Jonesworks employee assigned to that account. Every act on which Lively later sued Abel (recommending a crisis management firm, flagging online commentary, and suggesting messaging) was work Jonesworks contracted to perform, billed for, and in many

instances directed. Jones herself told the Wayfarer Clients that Jonesworks would "[f]lood the [z]one with [p]ositives" and "fight for every inch of every story," and instructed Abel to "have [the story] corrected."

Abel's actions were *all* undertaken as a Jonesworks employee, within the scope of her employment, and were foreseeable by and known to Jonesworks. Therefore, Abel is entitled to indemnification from Jonesworks, notwithstanding Jonesworks' effort, in its own lawsuit against Abel, to recast that work as outside the scope of her employment. Lively's claims against Abel were dismissed, extinguishing the threat of a judgment for monetary damages. However, the defense was not free. Jonesworks, which declined to defend Abel, remains liable to her for the attorneys' fees and costs incurred in that successful defense.

## II. STATEMENT OF FACTS

### A. Jonesworks Hires Abel

Founded by Jones, the firm's current chief executive officer, Jonesworks provides, *inter alia*, public relations services to its clientele. (Local Rule 56.1 Statement by Third-Party Plaintiff Jennifer Abel ("56.1") ¶ 10; Declaration of Jennifer Abel ("Abel Decl.") ¶ 4; Declaration of Kevin Fritz ("Fritz Decl."), Ex. C at 32:7–33:16). Jonesworks hired Abel as a publicist on or about July 9, 2020 and Abel was subsequently elevated to Vice President. (56.1 ¶¶ 9, 16; Fritz Decl. Ex. A, ¶ 16; Ex. B ¶ 16; *see also* Abel Decl. ¶¶ 3, 5; Abel Decl. Ex. 1). As a condition of her employment, Abel executed a Non-Disclosure and Intellectual Property Rights and Non-Solicitation Agreement ("2020 Employment Agreement"). (56.1 ¶ 11; Fritz Decl. Ex. A ¶ 17; Ex. B ¶ 17; Abel Decl. ¶ 6; Abel Decl. Ex. 2). Under the terms of the 2020 Employment Agreement, Jonesworks hired Abel as an at-will employee. (56.1 ¶ 12; Fritz Decl. Ex. A, ¶ 18; Ex. B ¶ 18; Abel Decl. ¶ 7; Abel Decl. Ex. 2, ¶ 10). Abel further agreed during the term of her employment that she would work

exclusively for Jonesworks, providing no services to any other entity in the public relations industry, media communications, marketing, branding or talent management business, or any other business without Jonesworks prior written approval. (56.1 ¶ 13; Abel Decl. Ex. 2, ¶ 9; Fritz Decl. Ex. A, ¶ 18; Ex. B ¶ 18).

Approximately sixteen months later, on or about November 22, 2021, Abel was promoted to Vice President of Talent, and Jonesworks and Abel entered into a modified employment agreement ("2021 Employment Agreement"). Like the earlier agreement, the 2021 Employment Agreement required Abel to devote all her business time to Jonesworks. (56.1 ¶¶ 15–17; Fritz Decl. Ex. A, ¶ 20; Ex. B ¶ 20; Abel Decl. ¶ 8; Abel Decl. Ex. 3).

### B. <u>The Wayfarer Clients Retain Jonesworks</u>

In or about 2018, Baldoni retained Jonesworks to provide him with public relations services. (56.1 ¶ 18; Abel Decl. ¶¶ 5, 14; Fritz Decl. Ex. C at 69:9-70:6). Subsequently, Wayfarer, a production studio founded by Baldoni and others, similarly retained Jonesworks for public relations services. (56.1 ¶¶ 19-20; Fritz Decl. Ex. C at 69:14-70:6; Abel Decl. ¶ 12; Abel Decl. Ex. 4). A May 6, 2020 agreement between Wayfarer and Jonesworks ("Wayfarer Agreement") provided for Jonesworks to serve "as [Wayfarer's] exclusive public relations counsel." (56.1 ¶ 21; Abel Decl. ¶ 15; Abel Decl. Ex. 4). The Wayfarer Agreement tasked Jonesworks with providing "strategic communications services" including:

- "Assist in developing, writing and updating communication materials related to all press outreach such as biographies, media kits, boilerplates, press releases, and key messaging";
- "Advise on any marketing and campaign strategies to ensure brand messaging is consistent, opportunities are maximized, and the strongest press angles aligned";
- "Conduct media monitoring and competitor tracking for industry press"; and
- "Conduct regular check-on calls surrounding the status of Wayfarer Studios projects, events and news".

(56.1 ¶ 23; Abel Decl. Ex. 4, Schedule A; Abel Decl. ¶ 16). At deposition, Jones (in her capacity as Jonesworks CEO) testified that Jonesworks would do "whatever [Baldoni] needed us to do." (56.1 ¶¶ 29-31; Fritz Decl. Ex. C at 82:14-22; 82:25-83:5; 84:15-18; 84:21-85:4). Jones stated that:

> I did whatever [Baldoni] asked me to do and needed done. I'm not one of those publicists that just say I'm only, you know, this. I've become very close with clients and help them with whatever their needs are, even if it's not publicity.

(56.1 ¶ 31; Fritz Decl. Ex. C at 85:9-14). In exchange for Jonesworks' personalized services, Wayfarer agreed to pay Jonesworks a monthly service fee of $20,000 plus expenses and other fees, and, according to Jones, Baldoni and Wayfarer together paid Jonesworks $25,000 per month. (56.1 ¶¶ 26-27; Abel Decl. Ex. 4; Fritz Decl. Ex. C at 86:24-87:2). The Wayfarer Agreement had an initial term of one year after which it would "automatically renew for additional one-year periods" unless terminated. (56.1 ¶¶ 24–25; Abel Decl. Ex. 4).

Following its retention, Jonesworks dedicated a full team to service the Wayfarer Clients. (56.1 ¶ 38; Fritz Decl. Ex. C at 83:12-14). Jonesworks also set up email distribution lists to help service the Wayfarer Clients. (56.1 ¶ 33; Abel Decl. ¶ 20). Jonesworks assigned Abel to serve as the primary point person for the Wayfarer Clients working out of Jonesworks' Los Angeles office. (56.1 ¶¶ 39-41; Fritz Decl. Ex. C at 83:12-14; 85:15-86:23; Abel Decl. ¶¶ 17-18).

### C. Lively's Claims Against Abel Stem Exclusively from Her Employment with Jonesworks

Throughout the summer of 2024, consistent with the Wayfarer Agreement and its role as "exclusive public relations counsel," Jonesworks provided a wide range of public relations services to the Wayfarer Clients, including in connection with the premiere of the Film. (56.1 ¶¶ 23, 29-32, 35-37, 44-45, 46-78; Abel Decl. ¶¶ 13, 15, 19, 31-44; Abel Decl. Ex. 4). During that time and

within the scope of her employment with Jonesworks, Abel provided public relations services to the Wayfarer Clients. (56.1 ¶¶ 45-78; Abel Decl. ¶¶ 13, 19, 31-44). A number of those activities later served as the basis of Lively's Claims (as defined herein) against Abel, as detailed below.

On July 24, 2024, Abel informed Jones that Wayfarer was seeking recommendations for a crisis management professional to work with Jonesworks in countering potentially negative publicity related to issues on the set of the Film. (56.1 ¶ 46; Abel Decl. ¶ 31; Abel Decl. Ex. 7). Jones turned to Abel for recommendations and, at Abel's recommendation, Wayfarer hired The Agency Group PR LLC ("TAG") to assist Jonesworks with crisis management. (56.1 ¶¶ 47, 48; Abel Decl. ¶ 32; Abel Decl. Ex. 8).

On July 31, 2024, Abel texted Wayfarer's Jamey Heath ("Heath") and Mitz Toskovic about a conversation she had with an independent journalist concerning Baldoni's exclusion from Film-related promotions and that the journalist was willing to publish a story about Lively's misconduct. (56.1 ¶ 49; Abel Decl. ¶ 33; *see also* Abel Decl. Ex. 9). Abel never followed up or referred the journalist to anyone, and the story was never published. (56.1 ¶¶ 51-52; Abel Decl. ¶ 33). On August 2, 2024, a representative of TAG sent Abel a "Scenario Planning" document describing TAG's objective to "[p]rotect the reputation of" the Wayfarer Clients "in the lead up, during, and following the premiere" of the Film and related goals. (56.1 ¶ 53; Abel Decl. ¶ 34; Abel Decl. Ex. 10). The "Scenario Planning" document was shared with Abel because she was a Jonesworks employee responsible for providing public relations services to the Wayfarer Clients. (56.1 ¶ 54; Abel Decl. ¶ 34; Abel Decl. Ex. 4, Schedule A).

On August 5, 2024, Abel notified Baldoni that Sony (the co-producer of the Film) had an issue with the word "friction" being used in his press interviews about the on-set relationship between Baldoni and Lively. (56.1 ¶¶ 55-57; Abel Decl. ¶ 35; Abel Decl. Ex. 11). Abel proposed

the word "challenge" to downplay the social media speculation of an "on-set feud" and highlight that, as director of the Film, Baldoni successfully brought all people together to "create something beautiful" in the Film. (*Id.*).

On August 7, 2024, Abel exchanged text messages with Jonesworks employee Matthew Mitchell ("Mitchell") and TAG's Melissa Nathan ("Nathan"), Katie Case ("Case"), and Breanna Koslow ("Koslow") about an online narrative concerning Baldoni and Lively's separate promotion of the Film (as opposed to both being present). (56.1 ¶ 58; Abel Decl. ¶ 36; Abel Decl. Ex. 12; Abel Decl. Ex. 4, Schedule A). On the same day, Case sent Heath and Abel (at her Jonesworks email address) an email referring to "social and digital mitigation and remediation" and public narratives concerning Baldoni and Wayfarer. (56.1 ¶ 60; Abel Decl. ¶ 37; Abel Decl. Ex. 13). The email was sent to Abel in her capacity as a Jonesworks employee providing public relations services to the Wayfarer Clients. (56.1 ¶ 61; Abel Decl. ¶ 37).

The next day, August 8, 2024, Abel sent a text message to her Jonesworks colleague (Mitchell) and TAG's Nathan and Case concerning negative social media posts about Baldoni by a content creator named Jenna Redfield. (56.1 ¶ 62; Abel Decl. ¶ 38; Abel Decl. Ex. 14). Taking note of (or "flagging") negative public commentary about Baldoni was a key part of Abel's duties as a Jonesworks employee performing public relations services for its clients. (56.1 ¶ 63; Abel Decl. ¶ 38; Abel Decl. Ex. 4, Schedule A). On August 9, 2024, Abel exchanged text messages with Nathan concerning articles about a "rift" or "feud" between Baldoni and Lively, as well as other potential media coverage of the situation. (56.1 ¶¶ 64-66; Abel Decl. ¶ 39; Abel Decl. Ex. 15; Abel Decl. Ex. 4, Schedule A).

On August 10, 2024, Abel exchanged text messages with Heath, Mitchell, Nathan and Case concerning a *Hollywood Reporter* article and TikTok videos related to Lively and/or Baldoni. (56.1

¶¶ 67–69; Abel Decl. ¶ 40; Abel Decl. Ex. 16). The TikTok video from May 17, 2023, included within the text chain, shows Baldoni and Lively in a pleasant atmosphere on the set of the Film. (*Id.*). The *Hollywood Reporter* article discusses why it was important for Baldoni to make a movie about domestic violence. (*Id.*). On August 11, 2024, again acting in her capacity as a Jonesworks employee, Abel advised Wayfarer via text message about whether the timing was appropriate for Baldoni to issue further comments about domestic violence. (56.1 ¶ 71; Abel Decl. ¶ 41; Abel Decl. Ex. 17). On August 13, 2024, Abel exchanged texts with Heath, Baldoni, Mitchell, Case, Koslow, and Nathan concerning another TikTok video praising Baldoni and another video criticizing Lively for her marketing of the Film in a manner insensitive to domestic violence victims. (56.1 ¶¶ 72-73; Abel Decl. ¶ 42; Abel Decl. Ex. 18; Abel Decl. Ex. 4, Schedule A). On August 15, 2024, Abel exchanged text messages with Heath, Baldoni, Mitchell, Case, Koslow and Nathan concerning the positive public comments made by Brandon Sklenar (an actor in the Film) about Baldoni and concerning other publicity related to the Film. (56.1 ¶¶ 74-75; Abel Decl. ¶ 43; Abel Decl. Ex. 19; Abel Decl. Ex. 4, Schedule A). Finally, on August 18, 2024, Abel exchanged text messages with Heath, Baldoni, Mitchell, Nathan and Koslow concerning TikTok videos related to the Film. (56.1 ¶ 76; Abel Decl. ¶ 44; *see also* Abel Decl. Ex. 20). The TikTok video from August 17, 2024, called the Film "one of the best movies ever made" and said the Film touched on domestic violence "in the best way possible." (56.1 ¶ 77; *id.*; Abel Decl. Ex. 6).

Jonesworks benefitted from the work performed by Abel, receiving its monthly $25,000 fee from the Wayfarer Clients. (56.1 ¶¶ 27, 45; Abel Decl. ¶ 25; Abel Decl. Ex. 5; Fritz Decl. Ex. C at 86:24-87:2). Abel continued to service the Wayfarer Clients as a Jonesworks employee until her employment ended on August 21, 2024. (56.1 ¶ 79; Abel Decl. ¶¶ 21-24).

**D. Lively's Lawsuit Against Abel**

Abel never published, planted, pitched, "boosted," or "amplified" negative content about Lively. (56.1 ¶¶ 83-84; Abel Decl. ¶¶ 45-46). Nevertheless, on July 30, 2025, Lively filed her Second Amended Complaint asserting claims against Abel for: (a) aiding and abetting harassment and retaliation in violation of California's Fair Employment and Housing Act ("FEHA"); (b) false light invasion of privacy; and (c) civil conspiracy (collectively, "Lively's Claims"). (56.1 ¶ 80; Abel Decl. ¶ 26; Dkt. 520). The Second Amended Complaint alleged that Nathan, TAG, and Abel "perpetrated a retaliation scheme against Ms. Lively" including via "the amplifying of negative content about Ms. Lively…." (56.1 ¶ 81; Abel Decl. ¶ 27; Dkt. 520, ¶ 230). The pleading alleges that Nathan, TAG and Abel "aided and abetted the discriminatory conduct of Defendants It Ends With Us Movie LLC, Wayfarer, Baldoni and Heath, including but not limited to by participating in the above-described coordinated 'astroturfing' campaign to discredit and 'bury' Ms. Lively." (56.1 ¶ 85; Abel Decl. ¶ 27; Dkt. 520 ¶ 411). Abel denies Lively's allegations. (56.1 ¶¶ 82-86; Abel Decl. ¶¶ 27, 45, 46; Fritz Decl. Ex. A, ¶¶ 230, 411; Dkt. 520 ¶ 411).

In her Third Amended Responses and Objections to Abel's Second Set of Interrogatories (the "Interrogatory Responses"), Lively purports to identify the "negative content about [her] (including through the engagement of social media)" that she alleges was "amplified" by Abel. (56.1 ¶ 87; Abel Decl. ¶ 28; Abel Decl. Ex. 6). Lively's Interrogatory Responses state that Abel: (a) "amplified" negative content about her "by virtue of recommending services to be performed by TAG and facilitating that engagement"; and (b) "by direct communications with TAG and/or digital teams identifying relevant narratives as well as content to be amplified, boosted, or similar conduct, in order to negatively affect the online conversation regarding [her]." (56.1 ¶ 88; Abel Decl. ¶ 29; Abel Decl. Ex. 6). Abel denies Lively's assertions in her Interrogatory Responses. (56.1

¶¶ 82-86; Abel Decl. ¶¶ 27, 45, 46; Fritz Decl. Ex. A, ¶¶ 230, 411; Dkt. 520 ¶ 411). Moreover, each of the specific instances identified in Lively's Interrogatory Responses consists of public relations activities performed during and as part of Abel's employment with Jonesworks and, accordingly, Abel's activities between July and August 2024 were within the scope of her employment with Jonesworks. (56.1 ¶ 90; Abel Decl. ¶¶ 39-78; Abel Decl. Ex. 4).

In an Opinion and Order dated April 2, 2026, Lively's Claims were dismissed and the Court granted judgment in Abel's favor as to Lively's Claims. (56.1 ¶ 114; Dkt. 1273 at 95, 143, 150–51). Abel incurred significant legal fees and costs in defending against Lively's Claims, which were advanced by Wayfarer. (56.1 ¶ 115; Abel Decl. ¶ 60). Jonesworks declined to defend Abel. (56.1 ¶ 117; Abel Decl. ¶ 59; Fritz Decl. Ex. B).

## III. LEGAL STANDARD

Summary judgment is appropriate where the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting Fed. R. Civ. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In response, the non-moving party must then set out "specific facts showing a genuine issue of material fact for trial." *See* Fed. R. Civ. P. 56(c)(1); *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). A genuine issue of material fact exists only when there is sufficient evidence favoring the non-moving party such that a reasonable jury could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Id.* at 248. The non-movant must do "more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*."

*Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (citing *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The "mere existence of a scintilla of evidence" supporting the non-movant cannot survive summary judgment. *Rodriguez v. City of New York*, No. 02-CV-8203 (SAS), 2004 WL 444089, at *2 (S.D.N.Y. Mar. 10, 2004) (citing *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003)).

"A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Equally, a party may not defeat summary judgment on inadmissible hearsay. *Vitrano v. State Farm Ins. Co.*, No. 08-CV-103 (JGK), 2009 WL 3365866, at *4 (S.D.N.Y. Oct. 19, 2009) (citing *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 924 (2d Cir. 1985)); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."); *Abdel-Karim v. EgyptAir Airlines*, 116 F. Supp. 3d 389, 409 (S.D.N.Y. 2015), *aff'd sub nom. Abdel-Karim v. Egyptair Holding Co.*, 649 Fed. App'x 5 (2d Cir. 2016) ("A party 'cannot rely on inadmissible hearsay in opposing a motion for summary judgment ... .'") (quoting *Burlington Coat Factory Warehouse Corp.*, 769 F.2d at 924). Summary judgment is the time "to put up or shut up." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).

Abel is entitled to indemnification under the laws of either California or New York, as detailed below. Therefore, she is indifferent as to whether the Court grants her summary judgment on her First Cause of Action (applying California statutory law) or her Second Cause of Action (applying New York common law).

## IV. ABEL IS ENTITLED TO INDEMNIFICATION UNDER CALIFORNIA LABOR CODE SECTION 2802

### A. California Law Governs the First Cause of Action

Abel's First Cause of Action seeks statutory indemnification pursuant to California Labor Code Section 2802 for any expenditures or losses (including attorneys' fees) she incurs in connection with Lively's Claims. (Dkt. 639 ¶¶ 41–51). In its Order dated October 9, 2025, the Court held that the First Cause of Action "does not sound in contract and does not fall within the scope of the [2021 Employment] Agreement's narrow New York choice-of-law provision." (Dkt. 852 at 15).

A federal court sitting in diversity must apply the choice-of-law rules of the state in which it sits. *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004). Accordingly, courts in this district apply New York choice-of-law rules. *See, e.g.*, *Lively v. Wayfarer Studios LLC*, No. 24-cv-10049 (LJL), 2025 WL 2884407, at *5 (S.D.N.Y. Oct. 9, 2025). "[U]nder New York's choice-of-law principles, 'the first step . . . of [the] inquiry is to determine whether there is an 'actual conflict' between the laws invoked by the parties." *Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 419 (2d Cir. 2001) (citation omitted); *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993) (requiring conflict analysis only if "there is an actual conflict between the laws of the jurisdictions involved"). The Court previously determined that a conflict exists with respect to the First Cause of Action. (Dkt. 852 at 15).

"Under New York choice of law rules, when a conflict concerns a loss-allocating rule, including a claim for contribution or indemnification, the court applies the three-part interest analysis rule established in *Neumeier v. Kuehner*, 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454, 457-58 (1972) (applying Ontario guest statute), to determine the state with the greatest interest or concern with the specific issues raised in the litigation." *Mar-Cone Appliance Parts Co. v.*

*Mangan*, 879 F. Supp. 2d 344, 363 (W.D.N.Y. 2012); *Youngman v. Robert Bosch LLC*, 923 F. Supp. 2d 411, 416 (E.D.N.Y. 2013) ("If the conflict involves rules that allocate loss — that is, rules that prohibit, assign, or limit liability after the tort occurs — the court must apply the principles set forth in *Neumeier v. Kuehner*, 31 N.Y.2d 121 (1972), which take into account the domicile of the parties, the conduct at issue, and the purposes of the applicable substantive law.") (internal quotation marks omitted).

Indemnification, like contribution, involves rules for the allocation of loss. *Mar-Cone*, 879 F. Supp. 2d at 363; *Playwell Toy, Inc. v. Bureau Veritas Consumer Prods. Servs., Inc.*, No. 03-CV-0704C (SC), 2007 WL 2892031, at *3 (W.D.N.Y. Sept. 28, 2007); *see also Dargahi v. Honda Lease Tr.*, 370 Fed. App'x 172, 174 (2d Cir. 2010) ("Vicarious liability laws are loss allocating rules[.]"). Therefore, the three so-called *Neumeier* rules govern the choice-of-law analysis for Abel's First Cause of Action. *Barkanic v. Gen. Admin. of Civ. Aviation of the People's Republic of China*, 923 F.2d 957, 963 (2d Cir. 1991) ("[W]e believe the only factors the New York Court of Appeals now considers relevant with respect to loss distribution issues are those factors incorporated in the three *Neumeier* rules.").

Under *Neumeier*, there are "three guidelines for courts considering the interests of competing jurisdictions":

> The first applies when the parties are domiciled in the same state, in which case the law of the state of the common domicile applies. The second rule applies when the parties are domiciled in different states and the law of each state is favorable to its respective litigant. In that case, the law of the place where the tort occurred applies. The third *Neumeier* rule applies to all other split-domicile scenarios. The law of the state where the tort occurred presumptively controls, except where displacing the law of the place of the tort will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants.

*Antaeus Enters., Inc. v. SD-Barn Real Est., L.L.C.*, 480 F. Supp. 2d 734, 742–43 (S.D.N.Y. 2007) (cleaned up), *aff'd in part, remanded in part*, 305 Fed. App'x 675 (2d Cir. 2008).

It is undisputed that Abel is domiciled in California (56.1 ¶ 8, Dkt. 1057 at 2 ¶ 8) and Jonesworks is a Delaware limited liability company with a principal place of business in New York. (56.1 ¶ 116, Dkt. 877 ¶ 2). Section 2802 provides that an employer "shall indemnify" its California-based employees (such as Abel) "for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties . . ." Cal. Lab. Code § 2802(a). New York has no equivalent statute governing an employer's statutory obligation to indemnify its employees, including their attorneys' fees. As such, California law favors Abel, whereas Jonesworks will presumably contend that New York law applies. The Court has already determined that "the conflict is evident…." (Dkt. 852 at 15). Thus, *Neumeier*'s second rule requires the application of the law of the place of injury.

That place is California. The loss to be allocated is the cost of defending conduct Abel performed as a California-based employee: her "primary place of employment" was Los Angeles (56.1 ¶ 17); she managed the Wayfarer account from Jonesworks' Los Angeles office and performed her work in California (*id.* ¶¶ 41, 118); and this Court found that the conduct underlying Lively's retaliation claims "largely occurred in and [was] directed from California." (Dkt. 1273 at 94). Even if the third *Neumeier* rule applied, the result would be the same: California's interest in ensuring that employers, not employees, bear the costs of their business is directly implicated, while New York, which has no comparable statute, has no comparable interest in leaving a California employee to absorb those costs.

Applying California law advances the purposes of Section 2802 without impairing the multistate system, because an employer that hires and directs employees in California can expect California employment law to govern its obligations to them. California courts apply the same principle in deciding whether the state's employment statutes reach a particular worker: "If an

employee resides in California, receives pay in California, and works exclusively, or principally, in California, then that employee is a 'wage earner of California' and presumptively enjoys the protection of [California law]." *Gulf Offshore Logistics, LLC v. Superior Ct.*, 45 Cal. App. 5th 285, 293 (2020); *see Ward v. United Airlines, Inc.*, 9 Cal. 5th 732, 741 (2020) (application of California wage statement law turns on whether the employee's principal place of work is in California); *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1199–1200 (2011) (other states lack a legitimate interest in shielding an employer from California labor law as to work performed in California). Abel, who lived, was paid, and worked in California, is such an employee. (56.1 ¶¶ 8, 17, 118). California law therefore governs the First Cause of Action. In any event, the outcome is the same under New York law (*see infra* Section V), so the Court need not resolve the conflict to grant the motion.

### B. Abel Is Entitled to Indemnification Under California Labor Code Section 2802

California Labor Code Section 2802(a) provides:

> An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful.

Cal. Lab. Code § 2802(a). A claim under Section 2802 has three elements: "(1) the employee made expenditures or incurred losses; (2) the expenditures or losses were incurred in direct consequence of the employee's discharge of his or her duties, or obedience to the directions of the employer; and (3) the expenditures or losses were necessary." *Cassady v. Morgan, Lewis & Bockius LLP*, 145 Cal. App. 4th 220, 230 (2006).

It is undisputed that Abel qualifies as a Jonesworks employee. (56.1 ¶¶ 12 – 17, Dkt. 639 ¶¶ 17–18; Dkt. 877 ¶¶ 17–18). The employer-employee relationship is memorialized in the 2021 Employment Agreement. (56.1 ¶ 15, Abel Decl. Ex. 3). With respect to the first element of a

Section 2802 claim, the reference to both *expenditures* and *losses* which have been *incurred* is construed to include both actual payments and liabilities or debts which the employee is subject to and may be required to repay. *Gallano v. Burlington Coat Factory of Cal., LLC*, 67 Cal. App. 5th 953, 962 (2021) ("[A]n indemnification claim may arise under Section 2802 when the employee has made a monetary payment (*i.e.* an expenditure) for a business-related expense *or* incurred a loss in some other way — such as becoming 'liable or subject to' a charge or obligation on the employer's behalf.") (emphasis in original).

The second element requires a plaintiff to show that "the conduct defended against was within the course and scope of employment," equating the test with that of the doctrine of respondeat superior. *Jacobus v. Krambo Corp.*, 78 Cal. App. 4th 1096, 1101 (2000). "Scope of employment is viewed broadly in this context." *John R. v. Oakland Unified Sch. Dist.*, 48 Cal. 3d 438, 447 (1989). For that reason, "an employee's conduct may fall within the scope of [her] employment even though the act does not benefit the employer, even though the act is willful or malicious, and even though the act may violate the employer's direct orders or policies." *Jacobus*, 78 Cal. App. 4th at 1102.

As for the "necessary" requirement of the third element, "if the employer declines to defend the employee in ... a [third party] case, the employee's expenditures on his or her own defense are considered 'necessary' within the meaning of the statute and thus subject to the employer's duty to indemnify." *Carter v. Entercom Sacramento, LLC*, 219 Cal. App. 4th 337, 346 (2013).

As for the second element, the alleged conduct that forms the basis of Lively's Claims against Abel consists of public relations activities on behalf of the Wayfarer Clients during the time in which they were Jonesworks' clients, all within the scope of Abel's employment, and any such conduct was undertaken at Jonesworks' direction. In sum, the record firmly establishes: (a)

Wayfarer and Baldoni retained Jonesworks to perform public relations services for them (56.1 ¶¶ 18-27; Abel Decl. ¶¶ 4, 5, 12, 14, 15, 16, 20; Abel Decl. Ex. 4, Schedule A); (b) Jonesworks employed Abel to render those services (56.1 ¶¶ 9-17, 46-79; Fritz Decl. Ex. A, ¶¶ 16-18, 20; Ex. B ¶¶ 16-18, 20; Abel Decl. ¶¶ 4, 5, 6, 7, 8, 10, 11; Abel Decl. Ex. Nos. 1-3);[1] and (c) Jonesworks knew of and directed Abel's public relations activities for Wayfarer and Baldoni, including garnering positive publicity and eliminating or minimizing negative publicity for them. (56.1 ¶¶ 46–79, 90-112; Abel Decl. ¶¶ 47-58; Abel Decl. Exs. 4, 21-29).

Specifically, Jonesworks provided the Wayfarer Clients with a wide range of public relations services (56.1 ¶¶ 21-23; Abel Decl. ¶¶ 15, 16; Abel Decl. Ex. 4, Schedule A; Fritz Decl. Ex. C at 83:6-14; 87:12-16). As Jones testified, both she and her firm did "whatever [Baldoni] needed us to do." (56.1 ¶¶ 30–31; Fritz Decl. Ex. C at 82:14-22; 82:25-83:5; 84:15-18; 84:21-85:4; 85:9-14). This necessarily included providing advice, counsel, and public relations support surrounding the premiere of the Film. Furthermore, as discussed above, each of the purported acts that form the basis of Lively's Claims against Abel consists of public relations activities that were not only within the scope of Abel's employment with Jonesworks, but also part and parcel of Jonesworks' obligations to the Wayfarer Clients. Jonesworks therefore has no basis to deny responsibility for Abel's activities.

Jones knew of Abel's actions, providing supervision and direction. (56.1 ¶ 92; Abel Decl. ¶ 49). The record further establishes: (a) Jones knew Abel was working with Baldoni on his press tour (56.1 ¶ 94; Abel Decl. ¶¶ 50–52; Abel Decl. Ex. 21); (b) Jones knew Jonesworks employees

---

[1] The Court already concluded an employment relationship exists between Jonesworks and Abel. *See Lively*, 2025 WL 2884407, at *7 (finding an employment relationship "established by contract").

(such as Abel) monitored social media activity concerning Baldoni and the Film (a standard practice) (56.1 ¶¶ 104-106; Abel Decl. ¶¶ 52, 56; Abel Decl. Exs. 23, 27); (c) Jones knew Abel and other Jonesworks employees interacted with the press handling inquiries and other public relations issues (56.1 ¶¶ 96-103; Abel Decl. ¶¶ 53, 54, 55; Abel Decl. Exs. 22, 24-26); and (d) Jones knew Wayfarer had retained TAG to provide crisis management advice and services. (56.1 ¶ 112; Abel Decl. ¶ 58; Abel Decl. Ex. 29; Fritz Decl. Ex. C at 88:3-89:3). Jones herself even provided the Wayfarer Clients with a strategy to handle publicity. (56.1 ¶¶ 109-111; Abel Decl. ¶ 57; Abel Decl. Ex. 28). In fact, even after Abel's employment ended, Jonesworks continued to represent both Wayfarer and Baldoni until at least August 30, 2024. (56.1 ¶ 113; Abel Decl. ¶ 58; Abel Decl. Ex. 29; Fritz Decl. Ex. C at 76:20-77:7; 88:3-89:3).

Jonesworks' direction predated the Film's premiere. In June 2024, amid concerns that Lively would publicize "lies/exaggerate[d] truth" about on-set issues, Jones instructed Jonesworks staff to "be armed with [an] arsenal of stuff" about Lively, and staff confirmed they would "dig for details on [Lively's] indiscretions[.]" (56.1 ¶ 119; Abel Decl. ¶ 50; Abel Decl. Ex. 20A). The conduct Lively attributed to Abel was, at most, the execution of a strategy set by Jonesworks' CEO.

Jonesworks declined to defend Abel and denies any obligation to do so. (56.1 ¶ 117; Abel Decl. ¶ 59; Fritz Decl. Ex. B). Jonesworks separately sued Abel based upon (false) allegations that Abel's public relations work "went far beyond the legitimate scope of Abel's employment." (56.1 ¶ 120; Fritz Decl. Ex. D ¶ 4). That litigation position does not create a genuine dispute of material fact. Under California law, conduct may be within the scope of employment "even though the act does not benefit the employer, even though the act is willful or malicious, and even though the act may violate the employer's direct orders or policies," *Jacobus*, 78 Cal. App. 4th at 1102, and the

work at issue here was client service that Jonesworks contracted for and billed. (56.1 ¶¶ 21-23, 45).

Finally, the expenditures were necessary to defend against Lively's Claims. California Labor Code Section 2802 "requires an employer to indemnify an employee who is sued by third persons for conduct in the course and scope of his or her employment, including paying any judgment entered and attorney's fees and costs in defending the action." *Cassady*, 145 Cal. App. 4th at 230. "As long as the employee is acting within the scope of his or her employment, the right to indemnity is not dependent upon a finding that the underlying action was unfounded." *Id.* Moreover, Section 2802(c) expressly provides that, for purposes of that section, the term "necessary expenditures or losses" includes "attorneys' fees incurred by the employee enforcing the rights granted by [Section 2802]." Cal. Lab. Code § 2802(c).

Under California law, "it has been generally agreed that a party may 'incur' attorney's fees even if the party is not personally obligated to pay such fees." *Lolley v. Campbell*, 28 Cal. 4th 367, 373 (2002) (holding that indigent employee represented by Labor Commissioner has "incurred" fees within meaning of Labor Code section 98.2(c)). "'A party's entitlement to fees is not affected by the fact that the attorneys for whom fees are being claimed were funded by governmental or charitable sources or agreed to represent the party without charge.'" *Id.* (quoting Cal. Attorney Fee Awards § 3.3, at 48 (Cal. Cont. Educ. of the Bar 2d ed. 1999)). "[I]n cases involving a variety of statutory fee-shifting provisions, California courts have routinely awarded fees to compensate for legal work performed on behalf of a party pursuant to an attorney-client relationship, although the party did not have a personal obligation to pay for such services out of his or her own assets." *Id.*; *see also Ketchum v. Moses*, 24 Cal. 4th 1122, 1141 (2001) (holding that award of fees under anti-SLAPP statute was authorized to pay attorney for indigent defendant who did not pay fees out of

his own assets); *PLCM Grp. v. Drexler*, 22 Cal. 4th 1084, 1097 (2000) (corporation represented by in-house counsel could recover attorneys' fees under Civil Code section 1717).

Similarly, a party's right to recover expert witness fees is not diminished by someone else's payment of those fees on the party's behalf. *Skistimas v. Old World Owners Ass'n*, 127 Cal. App. 4th 948 (2005).

## V. ALTERNATIVELY, ABEL IS ENTITLED TO COMMON LAW INDEMNIFICATION UNDER NEW YORK LAW

### A. New York Law Applies to Abel's Claim for Common Law Indemnification

In her Second Cause of Action, Abel seeks indemnification under common law for any liability, expenditure, or losses she incurs in connection with Lively's Claims. (Dkt. 639 ¶¶ 52–61). Jonesworks contends that New York law applies to the Second Cause of Action. (Dkt. 277 at 5–10). For purposes of this motion and reserving all rights with respect to her other claims, Abel agrees. "[W]here the parties agree that [New York] law controls, this is sufficient to establish choice of law." *Ins. Co. of the State of Pa. v. Equitas Ins. Ltd.*, 68 F.4th 774, 779 n.2 (2d Cir. 2023).

In New York, "[c]ommon law or implied indemnification is a 'quasi-contract' doctrine rooted in principles of equity and fairness conceptually related to restitution." *CSC Sci. Co., Inc., v. Manorcare Health Servs., Inc.*, 867 F. Supp. 2d 368, 377 (S.D.N.Y. 2011). Implied or common law indemnification recognizes that "a person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity." *McDermott v. City of New York*, 50 N.Y.2d 211, 216 (1980) (quoting Restatement (First) of Restitution § 76 (Am. L. Inst. 1937)). "[T]he predicate of common law indemnity is vicarious liability without actual fault on the part of the proposed indemnitee," and "a party who has itself actually participated to some degree in the wrongdoing cannot receive the benefit of the doctrine." *Trs. of Columbia Univ. in City of N.Y. v.*

*Mitchell/Giurgola Assocs.*, 109 A.D.2d 449, 451 (1st Dep't 1985). Common law indemnity "will generally be available 'in favor of one who is held responsible solely by operation of law because of his relation to the actual wrongdoer.'" *Matzinger v. MAC II, LLC*, No. 17-cv-4813 (DLC), 2018 WL 3350328, at *2 (S.D.N.Y. July 9, 2018) (quoting *McCarthy v. Turner Constr., Inc.*, 953 N.E.2d 794, 799 (N.Y. 2011)). Thus, if an employee is held liable for following the instructions of an employer who is vicariously responsible for those actions, and whose instructions the employee was required to follow, that employee is entitled to indemnification from the person who gave the instruction. *Rogers v. Dorchester Assocs.*, 32 N.Y.2d 553, 565 n.2 (1973). Under the doctrine of respondeat superior in New York, "an employer may be vicariously liable for the tortious acts of its employees only if those acts were committed in furtherance of the employer's business and within the scope of employment." *N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 251 (2002). As detailed below, Abel's conduct falls squarely within the scope of this doctrine, supporting her Second Cause of Action for common law indemnification against Jonesworks.

As shown in Section IV.B, above, Wayfarer and Baldoni retained Jonesworks to perform public relations services, Abel provided those services within the course and scope of her employment, Jonesworks knew of and directed Abel's public relations activities for Wayfarer and Baldoni (including garnering positive publicity and eliminating or minimizing negative publicity for them), and Abel's expenditure of legal fees was necessary to defend against claims arising from those services. Hence, Abel is entitled to indemnification under New York common law.

**B. <u>New York Law Permits Recovery of Defense Costs Paid by Another</u>**

"The right to indemnification at issue includes the right to recover attorneys' fees, costs and disbursements for defending against plaintiff's action." *Lowe v. Dollar Tree Stores, Inc.*, 40 A.D.3d 264, 265 (1st Dep't 2007). For instance, in *DiPerna v. Am. Broad. Cos.*, 200 A.D.2d 267

(1st Dep't 1994), a construction worker commenced a personal injury action against ABC, the owner of the site, which in turn sought indemnification from the construction manager, its contractor (Corinno Civetta) and the subcontractor (Anthony Concrete). *Id.* at 268.[2] After the jury found that ABC and the third-party defendants were free from fault, ABC filed a post-trial motion seeking contractual indemnification for the legal fees and expenses it incurred defending the main action. *Id.* at 268–69. The trial court denied ABC's indemnification claim, holding that the third-party actions were mooted by: (a) the finding of no liability in the primary action; and (b) the pendency of ABC's separate action against, *inter alia*, the contractor's liability insurers for the costs of defending the action. *Id.* at 269.

The Appellate Division, First Department reversed and granted ABC's motion. *Id.* The First Department rejected the contractor's contention that "the claim for the costs of defending the action does not survive the extinction of the primary claim and has no existence independent of the plaintiff's claim." *Id.* at 271. The First Department stated: "It is well settled … that a third-party plaintiff is entitled to a recovery in excess of its liability on the plaintiff's claim." *Id.*

Significantly, in *DiPerna*, that someone else paid ABC's legal fees and expenses did not bar ABC's indemnification claim. The First Department determined: "Nor, to prevail on its claim for indemnification, was ABC required to prove that it had sustained an actual loss, i.e., that it had paid attorneys' fees." 200 A.D.2d at 270. Furthermore, the First Department noted that the contractor's obligation to indemnify ABC "has nothing to do with the liability insurers' obligations, in consideration of a premium paid to them, to defend and indemnify ABC…." *Id.* The First Department also rejected the contractor's argument that ABC lacked standing to pursue its defense

[2] Although the *DiPerna* and the following decisions arose in the contractual indemnification context, their reasoning applies equally to common law indemnification: in each, the court held that a third party's payment of the indemnitee's defense costs does not diminish the indemnitor's separate and distinct obligation.

costs, reasoning that the fact that ABC had insurance "does not diminish the separate and distinct obligation of [the contractor], its contractual indemnitor." *Id.* The matter was remanded to the trial court for a hearing on damages (*i.e.*, attorneys' fees and costs). *Id.* at 271.

In *Rivera v. Columbia Hicks Assocs. LLC*, 203 A.D.3d 524 (1st Dep't 2022), the First Department affirmed the denial of defendant SDS Columbia's ("SDS") motion for summary judgment, which sought the dismissal of defendant Columbia Hicks' ("Hicks") claim against it for contractual indemnification. *Id.* at 524. Even though Hicks' insurer paid the settlement amount due from Hicks to the personal injury plaintiff, the First Department held that "the procurement of insurance by Hicks to pay the costs of its defense and liability 'does not diminish the separate and distinct obligation of [SDS], its contractual indemnitor.'" *Id.* (quoting *DiPerna*, 200 A.D.2d at 271).

Similarly, in *Ross v. Fay's Drug Co. of Cohoes*, 132 Misc. 2d 65 (Sup. Ct. Albany Cnty. 1986), plaintiff commenced a personal injury action against a shopping center parking lot owner/operator (Aragona) and a retailer (Fay's) in the shopping center. *Id.* at 65. The Supreme Court, Albany County dismissed the action against Fay's and entered judgment in Fay's favor. *Id.* Aragona then sought dismissal of Fay's cross-claim for contractual indemnification on the grounds that Fay's incurred no defense costs because its attorneys were compensated by its insurer. *Id.* Based upon a prior ruling requiring Aragona to reimburse Fay's for all expenses incurred in defending the action, which was law of the case, the court denied Aragona's motion and directed it to reimburse Fay's for the attorneys' fees paid by Fay's insurer. *Id.* at 66–67.

The same result is warranted here. Jonesworks is obligated to indemnify Abel because Lively's Claims were based upon Abel's public relations activities within the scope of Abel's employment. Although Lively's Claims have been dismissed, Abel is still entitled to

indemnification for the attorneys' fees and costs incurred in the defense of Lively's Claims. Wayfarer's advancement of the attorneys' fees and costs incurred by Abel does not diminish Jonesworks' separate and distinct obligation to pay Abel, just as an insurer's payment of the defendant/indemnitee's attorneys' fees and costs in *DiPerna*, *Rivera*, and *Ross* did not extinguish the indemnitor's liability to the defendant/indemnitee. *See DiPerna*, 200 A.D.2d at 271; *Rivera*, 203 A.D.3d at 524; *Ross*, 132 Misc. 2d at 67 (denying property owner's motion to dismiss tenant's cross claim for contractual indemnification, which motion contended tenant was not entitled to reimbursement of fees incurred in defense of personal injury action because insurer had paid fees).

## VI. CONCLUSION

For these reasons, the Court should grant Jennifer Abel summary judgment against Jonesworks on either the First or Second Cause of Action.

Dated: November 4, 2026

LINER FREEDMAN TAITELMAN + COOLEY, LLP
Bryan J. Freedman (*pro hac vice*)
Ellyn S. Garofalo (*pro hac vice*)
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Tel: (310) 201-0005
Email: bfreedman@lftcllp.com
egarofalo@lftcllp.com

*/s/ Kevin Fritz*

MEISTER SEELIG & SCHUSTER PLLC
Mitchell Schuster
Kevin Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
Email: ms@mss-pllc.com
kaf@mss-pllc.com