# Exhibit 1

Planet Depos
We Make It Happen™

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**

# Transcript of Stephanie Jones

**Date:** September 16, 2025
**Case:** Joneswork -v- Abel

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - x
STEPHANIE JONES AND :
JONESWORKS LLC, :
Plaintiffs, : Civ. Action No.
v. : 1:25-cv-00779-LJL
JENNIFER ABEL, MELISSA :
NATHAN, JUSTIN BALDONI, :
WAYFARER STUDIOS LLC, :
AND JOHN DOES 1-10, :
Defendants. :
- - - - - - - - - - - - - x

Videotaped Deposition of STEPHANIE JONES
New York, New York
Tuesday, September 16, 2025
9:16 A.M.
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Job No.: 594347
Pages: 1 - 280
Reported By: Anita M. Trombetta, RMR, CRR,
California CSR No. 14647

Videotaped deposition of STEPHANIE JONES, held at the offices of:

Meister Seelig & Fein, LLP
125 Park Avenue
7th Floor
New York, NY 10017
212.655.3500

Pursuant to notice, before Anita M. Trombetta, a Certified Shorthand Reporter in the State of California, RMR, CRR, and Notary Public in and for the State of New York.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF STEPHANIE JONES AND JONESWORKS LLC:

KRISTIN N. TAHLER, ESQUIRE
MAAREN A. SHAH, ESQUIRE (New York)
MORGAN ANASTASIO, ESQUIRE (New York)
NICHOLAS INNS, ESQUIRE (Washington, D.C.)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S Figueroa St, 10th Floor
Los Angeles, CA 90017
212.849.7000

ON BEHALF OF JENNIFER ABEL, MELISSA NATHAN, JUSTIN BALDONI, WAYFARER STUDIOS LLC, AND JOHN DOES 1-10:

BRYAN J. FREEDMAN, ESQUIRE
THERESA TROUPSON, ESQUIRE (via Zoom)
LINER FREEDMAN TAITELMAN COOLEY LLP
1801 Century Park West, 5th Floor
Los Angeles, CA 90067-6408
310.201.0005

(Appearances continued on next page.)

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF JENNIFER ABEL, MELISSA NATHAN, JUSTIN BALDONI, WAYFARER STUDIOS LLC, and JOHN DOES 1-10:

MITCHELL SCHUSTER, ESQUIRE
JORDAN BIENER, ESQUIRE
MARIE A. KESSEL, ESQUIRE
KEVIN A. FRITZ, ESQUIRE (via Zoom)
SUMMER BENSON, ESQUIRE (via Zoom)
MEISTER SEELIG & FEIN PLLC
125 Park Avenue, 7th Floor
New York, NY 10017
310.201.0005

-and-

MITRA AHOURAIAN, ESQUIRE (via Zoom)
AHOURAIAN LAW
2029 Century Park E #14
Los Angeles, CA 90067
310.376.7878

(Appearances continued on next page.)

A P P E A R A N C E S   C O N T I N U E D

ATTORNEYS FOR STREET RELATIONS, INC. and
JED WALLACE:
JOEL GLOVER, ESQUIRE
JACKSON WALKER LLP
1401 McKinney St # 1900
Houston, TX 77010
713.752.4226

ATTORNEYS FOR BLAKE LIVELY:
ESRA HUDSON, ESQUIRE (via Zoom)
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East
Century City, CA 90067
310.312.4207
-and-
AARON E. NATHAN, ESQUIRE
MICHAEL J. GOTTLIEB, ESQUIRE (Los Angeles)
VINCE BIAGIOTTI, ESQUIRE
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, NY 10019
212.728.8904

(Appearances continued on next page.)

A P P E A R A N C E S   C O N T I N U E D

ATTORNEYS FOR BLAKE LIVELY: (Continued)

LINDSEY STRASBERG, ESQUIRE (via Zoom)
SLOANE OFFER WEBER & DERN
10100 Santa Monica Boulevard, Suite 750
Los Angeles, CA 90067
310.248.5100
-and-
DUNN ISAACSON RHEE LLP
MERYL GOVERNSKI, ESQUIRE (via Zoom)
401 9th Street, NW
Washington, DC 20004
202.240.2927

ALSO PRESENT:

Robert Palos, Videographer
Steve Sarowitz (via Zoom)
Jamey Heath (via Zoom)
Melissa Nathan (via Zoom)
Jennifer Abel  (via Zoom)

correctly, it was head of crisis communications or something to that effect. 11:25:45 11:25:48

Q Had anyone had that role prior to that time? 11:25:49 11:25:52

A No. 11:25:52

Q And why did you want to give her that particular title? 11:25:53 11:26:03

Why did you think that would be good for Jonesworks? 11:26:05 11:26:08

ATTORNEY TAHLER: Objection. 11:26:08

A I recall her saying that that's what she loved, and that was what she wanted her area of focus to be. 11:26:09 11:26:15 11:26:19

Q Did you work on the Wayfarer account -- is that the right word? Is "account" the right word, do you call it? 11:26:20 11:26:44 11:26:49

A Justin Baldoni and Wayfarer accounts, yes, I worked on them both. 11:26:50 11:26:52

Q Do you consider them one in the same or are they separate? 11:26:53 11:26:56

A The scope of work was specific to Justin with regards to his personal publicity. And the scope of Wayfarer was different than that, because it was a studio company. 11:26:57 11:27:00 11:27:02 11:27:05

Q Were you personally involved in working on 11:27:10

behalf of Justin? 11:27:12
ATTORNEY TAHLER: Objection. 11:27:18
A Can you clarify by what you mean by 11:27:18
"personally involved"? 11:27:22
Q Sure. 11:27:23
Was there a particular person that was 11:27:23
responsible for the account or who would be more 11:27:25
active on Justin's behalf at the company? Was it 11:27:27
you or was it someone else that was the point 11:27:30
person? 11:27:32
ATTORNEY TAHLER: Objection. 11:27:33
A The way that we -- Justin was in LA, and 11:27:35
I'm based in New York. So we had a full team 11:27:44
around him. There was no one person. 11:27:48
Q Did that ever change? 11:27:55
A No. 11:27:57
Q So from the time that Justin started with 11:27:58
Jonesworks until the time that he no longer worked 11:28:04
with Jonesworks, he had some sort of team around 11:28:09
him, right; there wasn't one particular person 11:28:12
that was more involved? 11:28:15
A Correct. 11:28:16
Q And what about for Wayfarer, did Wayfarer 11:28:18
also have its own team? 11:28:23
A Yes. 11:28:24

Q Was that a different team -- 11:28:25
ATTORNEY TAHLER: Objection. 11:28:28
Q -- than Justin's team? 11:28:29
ATTORNEY TAHLER: Objection. 11:28:32
A We do bespoke work for our clients. So if we needed to bring in additional team members for something specific that Justin and/or Wayfarer needed, we might. But typically we had -- when we were asked by his COO to bundle the team together, we've put the team in place that was best suited for him, as well as Wayfarer. And there was a lot of crossover. So we had more people -- more work, rather, for Wayfarer than we would for a small, smaller-sized personal publicity. 11:28:32 11:28:39 11:28:42 11:28:44 11:28:50 11:28:59 11:29:01 11:29:07 11:29:13 11:29:17
Q And did you personally do work for Justin Baldoni? 11:29:24 11:29:26
ATTORNEY TAHLER: Objection. 11:29:26
A Yes. 11:29:27
Q What did you do? 11:29:28
ATTORNEY TAHLER: Objection. 11:29:30
A I did whatever Justin needed us to do. It was based on whatever -- the needs were ever evolving. It may be TV. It may be book. It might be the production studios. It might be do you have any contacts at this brand that can help 11:29:31 11:29:39 11:29:43 11:29:47 11:29:50

us? Do you know any brands? Can you get your client to watch this project and see if they would be interested in producing it with me? 11:29:52 11:29:55 11:30:02
It was very bespoke and ever-changing. 11:30:04
Q What did you specifically do, yourself? 11:30:09
ATTORNEY TAHLER: Objection. 11:30:14
A I'm sorry, I thought I just answered that. Did I not? 11:30:14 11:30:19
I did whatever Justin asked me to do and needed done. I'm not one of those publicists that just says I'm only, you know, this. I've become very close with clients and help them with whatever their needs are, even if it's not publicity. 11:30:20 11:30:24 11:30:29 11:30:34 11:30:37 11:30:39
Q Who else, if you recall, was on the team for Justin Baldoni? 11:30:39 11:30:49
ATTORNEY TAHLER: Objection. 11:30:52
A In the beginning or throughout the eight years? 11:30:53 11:30:59
Q We can start in the beginning. 11:31:00
What year was the first year? 11:31:02
A It was eight years from last year, so we had Kirby Allison, who worked with me for almost ten years. We had someone named Lindsay Shane, who I believe, if I recall correctly worked on 11:31:04 11:31:09 11:31:16 11:31:25

that Justin Baldoni interfered with Jen Abel's employment contract?

ATTORNEY TAHLER: Objection.

A I can't recall all of the communications. I don't exactly remember based on those communications. It seems like he did, but I wasn't in the room, so I don't -- yeah, I don't -- I believe based on communications, yes.

Q Did you tell Jen Abel that she could work for Justin Baldoni?

ATTORNEY TAHLER: Objection.

A If I recall correctly, in a moment of sadness and disappointment at something that was transpiring, I may have made a -- I assumed -- based on the fact that I assumed we were going to have an amicable parting of ways, like I had with other publicists who had left and I would send them clients, and that's what Jen and I had talked about, that I would send her clients, I would help her in any way that I could.

And when I saw that there were negative things happening and that she was lying and just not being truthful about many things, I -- bringing Melissa on and not giving them the context that she shared with me on a regular basis

about her opinion of Melissa and her thoughts on 15:19:35
Melissa, I was -- I was sad. And in a moment of 15:19:38
sadness, I think that I texted her, "Why are you 15:19:44
doing this? You can have Justin. We don't need 15:19:47
to be this way." I -- I wanted it to be amicable, 15:19:51
and she clearly had another intent. 15:19:57

Q Do you recall texting with her or 15:20:00
communicating with her where you told her that she 15:20:16
could have Justin? 15:20:19

ATTORNEY TAHLER: Objection. 15:20:20

A That's just what I went over just now. 15:20:21
I -- in a moment of being heartbroken about 15:20:24
whatever it was we were communicating about, about 15:20:28
Melissa, I could tell that something was going on 15:20:31
behind the scenes and that she was -- she was 15:20:37
lying and I knew. And in a moment of sadness in 15:20:42
that moment, I recall texting her something 15:20:50
that -- knowing that it was going to be -- I 15:20:55
thought it was amicable, and she could have him, 15:20:57
it didn't have to be this way. Because I -- you 15:21:02
know, I was heartbroken. I couldn't believe she 15:21:04
was doing this to me. I really -- yeah. 15:21:07

Q What was she doing to you that you were 15:21:10
heartbroken over as of July 26th? 15:21:13

A Was that the date of the text? 15:21:18

ACKNOWLEDGMENT OF DEPONENT

I, STEPHANIE JONES, do hereby acknowledge that I have read and examined the foregoing testimony and the same is a true, correct, and complete transcription of the testimony given by me and any corrections appear on the attached errata sheet signed by me.

______________________ ______________________
(SIGNATURE) (DATE)

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, ANITA M. TROMBETTA, RMR, CRR, and Certified California Shorthand Reporter, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested [or not requested, as appropriate]; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 17th day of September, 2025.

My commission expires: 10.07.2025

______________________________

Anita M. Trombetta, RMR, CRR