**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BLAKE LIVELY,

Plaintiff,

-v-

WAYFARER STUDIOS LLC, JUSTIN BALDONI, JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH US MOVIE LLC, MELISSA NATHAN, THE AGENCY GROUP PR LLC, JENNIFER ABEL, JED WALLACE, and STREET RELATIONS INC.,

Defendants.

JENNIFER ABEL,

Third-Party Plaintiff,

-v-

JONESWORKS LLC,

Third-Party Defendant.

Case No. 1:24-cv-10049-LJL
(consolidated with 1:25-cv-00449-LJL)

**JENNIFER ABEL'S MEMORANDUM OF LAW IN OPPOSITION TO THIRD-PARTY DEFENDANT JONESWORKS LLC'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

I. PRELIMINARY STATEMENT ..... 1

II. STATEMENT OF FACTS ..... 3

A. Jonesworks Hires Abel ..... 3

B. The Wayfarer Parties Retain Jonesworks ..... 4

C. Lively's Claims Against Abel Stem Exclusively from Her Employment with Jonesworks ..... 5

D. Lively's Lawsuit Against Abel ..... 8

III. LEGAL STANDARD ..... 10

IV. JONESWORKS' MOTION SHOULD BE DENIED ..... 10

A. The Indemnification Claims Are Not Moot ..... 11

B. The Law Permits Recovery of Defense Costs Paid by Another ..... 12

C. Abel Acted Within the Scope of her Employment for Jonesworks ..... 14

1. Lively's Allegations Are Not Evidence ..... 14

2. There is No Evidence that Abel Engaged in Any "Scheme" ..... 15

3. Abel's Actions Were Standard Public Relations Activities ..... 16

4. Jonesworks Authorized Abel to Take the Wayfarer Clients With Her ..... 19

D. Jonesworks Cites No Evidence of Post-Termination Conduct Warranting Limitation of Indemnification ..... 21

V. CONCLUSION ..... 22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Blitz v. BLDG Mgmt. Co., Inc.*,
2023 WL 6162295 (S.D.N.Y. Sept. 21, 2023) .... 11, 12

*Bustamante v. KIND, LLC*,
100 F.4th 419 (2d Cir. 2024) .... 14

*Capobianco v. City of New York*,
422 F.3d 47 (2d Cir. 2005) .... 16

*Cassady v. Morgan, Lewis & Bockius LLP*,
145 Cal. App. 4th 220 (2006) .... 11

*Coutard v. Mun. Credit Union*,
848 F.3d 102 (2d Cir. 2017) .... 10

*Glowczenski v. Taser Int'l Inc.*,
2010 WL 1957289 (E.D.N.Y. May 13, 2010) .... 16

*In re Document Tech. Litig.*,
275 F.Supp.3d 454 (S.D.N.Y. 2017) .... 19

*Jeffers v. City of New York*,
2018 WL 904230 (E.D.N.Y. Feb. 13, 2018) .... 10

*Lively v. Wayfarer Studios LLC*,
2025 WL 2884407 (S.D.N.Y. Oct. 9, 2025) .... 17

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*,
418 F.3d 168 (2d Cir. 2005) .... 13

*Sank v. City Univ. of New York*,
2002 WL 1792922 (S.D.N.Y. Aug. 2, 2002) .... 10

*Schneider v. National R.R. Pass. Corp.*,
987 F.2d 132 (2d Cir. 1993) .... 13

*Schwabenbauer v. Board of Education of City Sch. Dist. of Olean*,
667 F.2d 305 (2d Cir. 1981) .... 10

*Tencza v. TAG Court Sq., LLC*,
2013 WL 2449178 (S.D.N.Y. June 6, 2013) .... 14

*United States v. Diebold, Inc.*,
369 U.S. 654 (1962) ........ 10

*USS-Posco Industries v. Case*,
244 Cal.App.4th 197 (2016) ........ 13

*Walter Karl, Inc. v. Wood*,
137 A.D.2d 22 (2d Dept. 1988) ........ 19

*Zinter Handling, Inc. v. Britton*,
46 A.D.3d 998 (3d Dept. 2007) ........ 19

**Statutes**

California Labor Code Section 2802 ........ 12, 13

**Rules**

Fed. R. Civ. P. 56(c)(3) ........ 10

Third-party plaintiff Jennifer Abel ("Abel") respectfully submits this Memorandum of Law in opposition to the motion, by third-party defendant Jonesworks LLC ("Jonesworks"), for summary judgment on the First and Second Causes of Action in the Amended Third-Party Complaint. As noted in her separate motion for summary judgment, which is incorporated herein by reference, Abel withdraws her Third Cause of Action for contribution (Dkt. 1488, p. 1) and thus does not oppose that prong of the relief sought in Jonesworks' motion.

## I. PRELIMINARY STATEMENT

Jonesworks does not meaningfully dispute that Abel was sued by Blake Lively ("Lively") because Abel rendered public relations services for Justin Baldoni ("Baldoni") and Wayfarer Studios LLC ("Wayfarer") (collectively, the "Wayfarer Clients") on behalf of Jonesworks. Instead, Jonesworks offers four reasons why the Court should dismiss Abel's claims. Each of the four grounds lack merit.

First, Jonesworks contends that because the Court dismissed Lively's claims against Abel ("Lively's Claims"), and because Abel has not paid any legal fees in defense thereof, she is not entitled to indemnification. (Dkt. 1490, p.1). However, under the laws of both California and New York, neither the dismissal of Lively's Claims nor Wayfarer's advancement of legal fees on Abel's behalf insulates Jonesworks from its obligation to indemnify Abel.

Second, Jonesworks argues that the conduct underlying Lively's Claims fell outside the scope of Abel's employment because, according to Lively's pleadings, the alleged "social manipulation" campaign "took shape with Wayfarer's retention … of Ms. Nathan" in late July 2024. (Dkt. 1490, p.1) (quoting Dkt. 521, ¶ 193 – 94, 224 – 26). By relying upon Lively's *allegations*, Jonesworks ignores Lively's verified interrogatory responses, in which she identified the specific actions, emails and text messages forming the basis of Lively's Claims. Those actions

and communications consist of monitoring negative publicity of Baldoni and potentially garnering positive publicity for him, actions that indisputably fall within the scope of Abel's employment. Tellingly, Jonesworks does not cite any evidence, *because there is none*, establishing that Abel engaged in any "social manipulation" directed at Lively (or anyone else). Furthermore, Jonesworks' contention that its work for the Wayfarer Clients "had always been positive publicly" (Dkt. 1490, p. 2) is refuted by Stephanie Jones' ("Jones") own instruction to her staff to "be armed with [an] arsenal of stuff" about Lively. (Dkt. 1486-21). As for Jonesworks' statement that "Abel recommended Nathan even though Stephanie Jones had warned" Wayfarer against hiring Nathan, Jonesworks does not explain how a mere recommendation brings all of Abel's actions outside the scope of her employment and, in any event, the record demonstrates that Abel recommended *several* crisis managers to Wayfarer. (Declaration of Kevin Fritz ("Fritz Opp. Decl."), Ex. 7 (JONESWORKS_WAYFARER_000004651)).

Third, Jonesworks maintains that "Abel acted for herself and against Jonesworks" (Dkt. 1490, p. 2), but Jonesworks' hyperbolic language and selective quotations fail to demonstrate any impropriety on Abel's part. Furthermore, the alleged "wrongdoing" is unrelated to Lively's Claims. Although Jonesworks alleges that Abel "secretly formed a competing firm, RWA Communications" (*id.*), the record indisputably shows that: (a) Abel told Jonesworks of her resignation (Declaration of Jennifer Abel ("Abel Opp. Decl."), Ex. A (JONESWORKS_WAYFARER_00017543)); (b) Jonesworks knew that Abel would be starting a public relations firm because Jones authorized Abel to take the Wayfarer Clients with her (Abel Opp. Decl., Ex. B; Fritz Opp. Decl., Ex. 2 (Abel Dep. (Sept. 25, 2025) 128:24–129:20, 130:14–21, 130:23–25, 131:5–132:1); Fritz Opp. Decl., Ex. 1 (Jones Dep. 187:9–10, 187:12–188:9, 188:11–22)); and (c) RWA Communications did not commence operations until *after* Jonesworks

fired Abel. (Abel Opp. Decl., ¶ 15). With respect to the allegation that Abel "helped a reporter publish a *Business Insider* story that damaged Jonesworks," the "evidence" thereof cited by Jonesworks is a text message simply showing that the reporter notified Abel that the story had been published and thanked Abel for her "help." (Dkt. 1490, p. 2) (citing Dkt. 1056-14). Notably, *at Jones's request*, Abel arranged for Baldoni to send an email to the reporter praising Jones (using mostly Jones's own words). (Fritz Opp. Decl., Ex. 8; Ex. 9; Ex. 10). And, Abel's "going to war" comment was a reference to the public relations battle *between the Wayfarer Clients and Lively/Ryan Reynolds* and not concerning any dispute between Abel and Jonesworks. (Abel Opp. Decl., ¶ 13).

Fourth, Jonesworks claims that "Abel cannot obtain indemnity for anything she did after Jonesworks terminated her employment on August 21, 2024." (Dkt. 1490, p. 2). However, according to Lively, the alleged conduct forming the basis of Lively's Claims consisted of public relations activities during the time Abel was employed by Jonesworks. (Dkt. 1486-6, p. 6 – 22).

## II. STATEMENT OF FACTS

### A. Jonesworks Hires Abel

Founded by Jones, the firm's current chief executive officer, Jonesworks provides, *inter alia*, public relations services to its clientele. (Dkt. 1486 ¶ 4; Dkt. 1485-3 at 32:7–33:16). Jonesworks hired Abel as a Vice President on or about July 9, 2020. (Dkt. 1486-1). As a condition of her employment, Abel executed a Non-Disclosure and Intellectual Property Rights and Non-Solicitation Agreement ("2020 Employment Agreement"). (Dkt. 1486-2). Under the terms of the 2020 Employment Agreement, Jonesworks hired Abel as an at-will employee. (Dkt. 1486-2, ¶ 10). Abel further agreed during the term of her employment that she would work exclusively for Jonesworks, providing no services to any other entity in the public relations industry, media

communications, marketing, branding or talent management business, or any other business without Jonesworks prior written approval. (Dkt. 1486-2, ¶ 9).

Approximately sixteen months later, on or about November 22, 2021, Jonesworks and Abel entered into a modified employment agreement ("2021 Employment Agreement"). Like the earlier agreement, the 2021 Employment Agreement required Abel to devote all her business time to Jonesworks. (Dkt. 1486-3).

### B. The Wayfarer Parties Retain Jonesworks

In or about 2018, Baldoni retained Jonesworks to provide him with public relations services. (Dkt. 1486 ¶¶ 5, 14; Dkt. 1485-3 at 69:9-70:6). Subsequently, Wayfarer, a production studio founded by Baldoni and others, similarly retained Jonesworks for public relations services. (Dkt. 1485-3 at 69:14-70:6; Dkt. 1486 ¶ 12; Dkt. 1486-4). A May 6, 2020 agreement between Wayfarer and Jonesworks ("Wayfarer Agreement") provided for Jonesworks to serve "as [Wayfarer's] exclusive public relations counsel." (Dkt. 1486 ¶ 15; Dkt. 1486-4). The Wayfarer Agreement tasked Jonesworks with providing "strategic communications services" including:

- "Assist in developing, writing and updating communication materials related to all press outreach such as biographies, media kits, boilerplates, press releases, and key messaging";
- "Advise on any marketing and campaign strategies to ensure brand messaging is consistent, opportunities are maximized, and the strongest press angles aligned";
- "Conduct media monitoring and competitor tracking for industry press"; and
- "Conduct regular check-on calls surrounding the status of Wayfarer Studios projects, events and news".

(Dkt. 1486-4, Schedule A; Dkt. 1486 ¶ 16). At deposition, Jones (in her capacity as Jonesworks CEO) testified that Jonesworks would do "whatever [Baldoni] needed us to do." (Dkt. 1485-3 at 82:14-22; 82:25-83:5; 84:15-18; 84:21-85:4). Jones stated that:

> I did whatever [Baldoni] asked me to do and needed done. I'm not one of those publicists that just say I'm only, you know, this. I've become very close with clients and help them with whatever their needs are, even if it's not publicity.

(Dkt. 1485-3 at 85:9-14). In exchange for Jonesworks' personalized services, Wayfarer agreed to pay Jonesworks a monthly service fee of $20,000 plus expenses and other fees, and, according to Jones, Baldoni and Wayfarer together paid Jonesworks $25,000 per month. (Dkt. 1486-4; Dkt. 1485-3 at 86:24-87:2). The Wayfarer Agreement had an initial term of one year after which it would "automatically renew for additional one-year periods" unless terminated. (Dkt. 1486-4).

Following its retention, Jonesworks dedicated a full team to service the Wayfarer Clients. (Dkt. 1485-3 at 83:12-14). Jonesworks also set up email distribution lists to help service the Wayfarer Clients. (Dkt. 1486 ¶ 20). Jonesworks assigned Abel to serve as the primary point person for the Wayfarer Clients working out of Jonesworks' Los Angeles office. (Dkt. 1485-3 at 83:12-14; 85:15-86:23; Dkt. 1486 ¶¶ 17-18).

### C. Lively's Claims Against Abel Stem <u>Exclusively from Her Employment with Jonesworks</u>

Throughout the summer of 2024, consistent with the Wayfarer Agreement and its role as "exclusive public relations counsel," Jonesworks provided a wide range of public relations services to the Wayfarer Clients, including in connection with the premiere of the Film. (Dkt. 1486 ¶¶ 13, 15, 19, 31-44; Dkt. 1486-4). During that time and within the scope of her employment with Jonesworks, Abel provided public relations services to the Wayfarer Clients. (Dkt. 1486 ¶¶ 13, 19, 31-44). A number of those activities later served as the basis of Lively's Claims (as defined herein) against Abel, as detailed below.

On July 24, 2024, Abel informed Jones that Wayfarer was seeking recommendations for a crisis management professional to work with Jonesworks in countering potentially negative publicity related to issues on the set of the Film. (Dkt. 1486 ¶ 31; Dkt. 1486-7). Wayfarer hired

The Agency Group PR LLC ("TAG") to assist Jonesworks with crisis management. (Dkt. 1486 ¶ 32; Dkt. 1486-8). The "Scope of Work" set forth in the written agreement between Wayfarer and TAG provides that TAG will "[a]lign with Jonesworks and team on the timeline for the coming months", "[s]upport Jonesworks in media management" and "[w]ork with Jonesworks and team to monitor relevant coverage and social conversation while flagging, correcting, and updating as needed, adding statements, and background items, and more in real time." *See* Abel Decl., Ex. 8 (Dkt. 1486-8, p. 5)

On July 31, 2024, Abel texted Wayfarer's Jamey Heath ("Heath") and Mitz Toskovic about a conversation she had with an independent journalist concerning Baldoni's exclusion from Film-related promotions and that the journalist was willing to publish a story about Lively's misconduct. (Dkt. 1486 ¶ 33; *see also* Dkt. 1486-9). Abel never followed up or referred the journalist to anyone, and the story was never published. (Dkt. 1486 ¶ 33). On August 2, 2024, a representative of TAG sent Abel a "Scenario Planning" document describing TAG's objective to "[p]rotect the reputation of" the Wayfarer Clients "in the lead up, during, and following the premiere" of the Film and related goals. (Dkt. 1486 ¶ 34; Dkt. 1486-10). The "Scenario Planning" document was shared with Abel because she was a Jonesworks employee responsible for providing public relations services to the Wayfarer Clients. (Dkt. 1486 ¶ 34; Dkt. 1486-4, Schedule A).

On August 5, 2024, Abel notified Baldoni that Sony (the co-producer of the Film) had an issue with the word "friction" being used in his press interviews about the on-set relationship between Baldoni and Lively. (Dkt. 1486 ¶ 35; Dkt. 1486-11). Abel proposed the word "challenge" to downplay the social media speculation of an "on-set feud" and highlight that, as director of the Film, Baldoni successfully brought all people together to "create something beautiful" in the Film. (*Id.*).

On August 7, 2024, Abel exchanged text messages with Jonesworks employee Matthew Mitchell ("Mitchell") and TAG's Nathan, Katie Case ("Case"), and Breanna Koslow ("Koslow") about an online narrative concerning Baldoni and Lively's separate promotion of the Film (as opposed to both being present). (Dkt. 1486 ¶ 36; Dkt. 1486-12; Dkt. 1486-4, Schedule A). On the same day, Case sent Heath and Abel (at her Jonesworks email address) an email referring to "social and digital mitigation and remediation" and public narratives concerning Baldoni and Wayfarer. (Dkt. 1486 ¶ 37; Dkt. 1486-13). The email was sent to Abel in her capacity as a Jonesworks employee providing public relations services to the Wayfarer Clients. (Dkt. 1486 ¶ 37).

The next day, August 8, 2024, Abel sent a text message to her Jonesworks colleague (Mitchell) and TAG's Nathan and Case concerning negative social media posts about Baldoni by a content creator named Jenna Redfield. (Dkt. 1486 ¶ 38; Dkt. 1486-14). Taking note of (or "flagging") negative public commentary about Baldoni was a key part of Abel's duties as a Jonesworks employee performing public relations services for its clients. (Dkt. 1486 ¶ 38; Dkt. 1486-4, Schedule A). On August 9, 2024, Abel exchanged text messages with Nathan concerning articles about a "rift" or "feud" between Baldoni and Lively, as well as other potential media coverage of the situation. (Dkt. 1486 ¶ 39; Dkt. 1486-15; Dkt. 1486-4, Schedule A).

On August 10, 2024, Abel exchanged text messages with Heath, Mitchell, Nathan and Case concerning a *Hollywood Reporter* article and TikTok videos related to Lively and/or Baldoni. (Dkt. 1486 ¶ 40; Dkt. 1486-16). The TikTok video from May 17, 2023, included within the text chain, shows Baldoni and Lively in a pleasant atmosphere on the set of the Film. (*Id.*). The *Hollywood Reporter* article discusses why it was important for Baldoni to make a movie about domestic violence. (*Id.*). On August 11, 2024, again acting in her capacity as a Jonesworks employee, Abel advised Wayfarer via text message about whether the timing was appropriate for Baldoni to issue

further comments about domestic violence. (Dkt. 1486 ¶ 41; Dkt. 1486-17). On August 13, 2024, Abel exchanged texts with Heath, Baldoni, Mitchell, Case, Koslow, and Nathan concerning another TikTok video praising Baldoni and another video criticizing Lively for her marketing of the Film in a manner insensitive to domestic violence victims. (Dkt. 1486 ¶ 42; Dkt. 1486-18; Dkt. 1486-4, Schedule A). On August 15, 2024, Abel exchanged text messages with Heath, Baldoni, Mitchell, Case, Koslow and Nathan concerning the positive public comments made by Brandon Sklenar (an actor in the Film) about Baldoni and concerning other publicity related to the Film. (Dkt. 1486 ¶ 43; Dkt. 1486-19; Dkt. 1486-4, Schedule A). Finally, on August 18, 2024, Abel exchanged text messages with Heath, Baldoni, Mitchell, Nathan and Koslow concerning TikTok videos related to the Film. (Dkt. 1486 ¶ 44; *see also* Dkt. 1486-20). The TikTok video from August 17, 2024, called the Film "one of the best movies ever made" and said the Film touched on domestic violence "in the best way possible." (Dkt. 1486-6).

Jonesworks benefitted from the work performed by Abel, receiving its monthly $25,000 fee from the Wayfarer Clients. (Dkt. 1486 ¶ 25; Dkt. 1486-5; Dkt. 1485-3 at 86:24-87:2). Abel continued to service the Wayfarer Clients as a Jonesworks employee until her employment ended on August 21, 2024. (Dkt. 1486 ¶¶ 21-24).

**D. <u>Lively's Lawsuit Against Abel</u>**

Abel never published, planted, pitched, "boosted," or "amplified" negative content about Lively. (Dkt. 1486 ¶¶ 45-46). Nevertheless, on July 30, 2025, Lively filed her Second Amended Complaint asserting claims against Abel for: (a) aiding and abetting harassment and retaliation in violation of California's Fair Employment and Housing Act ("FEHA"); (b) false light invasion of privacy; and (c) civil conspiracy (heretofore defined as "Lively's Claims"). (Dkt. 1486 ¶ 26; Dkt. 520). The Second Amended Complaint alleged that Nathan, TAG, and Abel "perpetrated a retaliation scheme against Ms. Lively" including via "the amplifying of negative content about

Ms. Lively…." (Dkt. 1486 ¶ 27; Dkt. 520, ¶ 230). The pleading alleges that Nathan, TAG and Abel "aided and abetted the discriminatory conduct of Defendants It Ends With Us Movie LLC, Wayfarer, Baldoni and Heath, including but not limited to by participating in the above-described coordinated 'astroturfing' campaign to discredit and 'bury' Ms. Lively." (Dkt. 1486 ¶ 27; Dkt. 520 ¶ 411). Abel denies Lively's allegations. (Dkt. 1486 ¶¶ 27, 45, 46; Dkt. 1485-1, ¶¶ 230, 411; Dkt. 520 ¶ 411).

In her Third Amended Responses and Objections to Abel's Second Set of Interrogatories (the "Interrogatory Responses"), Lively purports to identify the "negative content about [her] (including through the engagement of social media)" that she alleges was "amplified" by Abel. (Dkt. 1486 ¶ 28; Dkt. 1486-6). The Interrogatory Responses state that Abel: (a) "amplified" negative content about her "by virtue of recommending services to be performed by TAG and facilitating that engagement"; and (b) "by direct communications with TAG and/or digital teams identifying relevant narratives as well as content to be amplified, boosted, or similar conduct, in order to negatively affect the online conversation regarding [her]." (Dkt. 1486 ¶ 29; Dkt. 1486-6). Abel denies the assertions in the Interrogatory Responses. (Dkt. 1486 ¶¶ 27, 45, 46; Dkt. 1485-1, ¶¶ 230, 411; Dkt. 520 ¶ 411). Moreover, each of the specific instances identified in the Interrogatory Responses consists of public relations activities performed during and as part of Abel's employment with Jonesworks and, accordingly, Abel's activities between July and August 2024 were within the scope of her employment. (Dkt. 1486 ¶¶ 39-78; Dkt. 1486-4).

In an Opinion and Order dated April 2, 2026, Lively's Claims were dismissed and the Court granted judgment in Abel's favor as to Lively's Claims. (Dkt. 1273 at 95, 143, 150–51). Abel incurred significant legal fees and costs in defending against Lively's Claims, which were

advanced by Wayfarer. (Dkt. 1486 ¶ 60). Jonesworks declined to defend Abel. (Dkt. 1486 ¶ 59; Dkt. 1485-2).

## III. LEGAL STANDARD

On November 4, 2026, Abel filed her own motion seeking summary judgment against Jonesworks on either the First or Second Cause of Action, which is incorporated herein by reference. (Dkt. 1484, Dkt. 1485, Dkt. 1486, Dkt. 1487, Dkt. 1488). *See Sank v. City Univ. of New York*, No. 94-cv-0253, 2002 WL 1792922, at *3 (S.D.N.Y. Aug. 2, 2002) ("courts may consider the *entire* record before it, in addition to papers submitted on summary judgment"); *Jeffers v. City of New York*, No. 14-cv-6173, 2018 WL 904230, at *4 (E.D.N.Y. Feb. 13, 2018) (considering, in opposition to summary judgment motion, exhibits previously field on docket and incorporated by reference); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

The parties have filed dueling motions for summary judgment. "In considering such motions and determining whether there is a genuine issue of fact to be tried, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017) (quoting *Schwabenbauer v. Board of Education of City Sch. Dist. of Olean*, 667 F.2d 305, 314 (2d Cir. 1981); *see, e.g.*, *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (the evidence must be viewed in the light most favorable to the party opposing the motion under consideration).

## IV. JONESWORKS' MOTION SHOULD BE DENIED

Abel's separate summary judgment motion explained why she is entitled to summary judgment on either her First Cause of Action (applying California statutory law) or her Second

Cause of Action (applying New York common law). Therefore, Abel will not repeat the same arguments herein, except where necessary to address Jonesworks' specific arguments.

### A. <u>The Indemnification Claims Are Not Moot</u>

Jonesworks argues that "Abel's claims for indemnification and contribution fail because there is no underlying liability to shift to Jonesworks." (Dkt. 1490, p. 7). Abel agrees that the Third Cause of Action for contribution is not actionable because there is no liability to apportion and has withdrawn that claim. However, as discussed in detail in Abel's prior Memorandum of Law, the indemnification claims are not dependent on the finding of liability against Abel on Lively's Claims, under both California and New York law. (Dkt. 1488, p. 18 – 21). Notably, one of the cases cited by Jonesworks – *Cassady v. Morgan, Lewis & Bockius LLP*, 145 Cal. App. 4th 220 (2006) – warrants the denial of Jonesworks' motion and the granting of Abel's motion because, therein, the California Court of Appeal held that "[a]s long as the employee is acting within the scope of his or her employment, the right to indemnity is not dependent upon a finding that the underlying action was unfounded." *Id.* at 230.

The primary case upon which Jonesworks relies is easily distinguished. In *Blitz v. BLDG Mgmt. Co., Inc.,* No. 20-cv-5462, 2023 WL 6162295 (S.D.N.Y. Sept. 21, 2023), the plaintiff filed claims under two federal statutes against the management company (and agents thereof) of his apartment building based upon disturbances he faced due to repeated loud barking from his neighbor's dog. *Id.* at *1. Defendants filed a Third-Party Complaint against the neighbor Wendi Newman (the owner of the dog) seeking indemnification and contribution "to the extent that Defendants are held liable on any of Plaintiff's causes of action." *Id.* at *13. The Opinion & Order quoted the Third-Party Complaint as seeking the following relief: "*If, however, the Court finds in favor of Blitz* ... the Landlord asserts that it is entitled to relief from Newman on the theory of

common law indemnification or contribution or contractual indemnification or contribution pursuant to the lease between the parties.") (emphasis added by the Court). Because the Court found that Defendants are not liable to plaintiff Blitz on any of his claims, the relief sought in the Third-Party Complaint was moot. *Id.*

Here, Abel's Third-Party Complaint does *not* seek indemnification *only if* the Court found in Lively's favor on Lively's Claims against her, as was the case in *Blitz*. Rather, on the First Cause of Action for indemnification pursuant to California Labor Code Section 2802, Abel seeks a judgment:

> (a) declaring that to the extent that Abel incurs any expenditures or losses (including attorneys' fees) as a result of defending this action, judgment be entered against Jonesworks in favor of Abel in the amount of such expenditures or losses (including attorneys' fees); and (b) for monetary damages against Jonesworks in an amount according to proof, including the expenditures and losses (including attorneys' fees) incurred by Abel in direct consequence of the discharge of her duties as a public relations professional employed by Jonesworks, or of her obedience to the directions of Jonesworks….

(Dkt. 1485-1, p. 83). On the Second Cause of Action for common law indemnification, and *in addition to* seeking a declaration that, to the extent Abel is adjudged to have any liability to Lively resulting from Jonesworks' own negligence then Jonesworks is liable to Abel for such amount, the claim seeks monetary damages against Jonesworks in the amount of the expenditures and losses (including attorneys' fees) incurred by Abel in connection with Lively's Claims. (Dkt. 1485-1, ¶ 61 and pp. 83 – 84). Thus, Abel's indemnification claims are *not* conditioned on a finding of liability against her, as was the situation in *Blitz*.

### B. <u>The Law Permits Recovery of Defense Costs Paid by Another</u>

Next, Jonesworks contends that Abel's claims must be dismissed because she has not demonstrated that she paid any legal fees or expenses. (Dkt. 1490, p. 9). However, Abel's prior Memorandum of Law cited legal authority from both California and New York for the proposition

that an indemnitor's obligation to reimburse legal fees and expenses is not extinguished merely because a third-party pays such costs for an indemnitee. (Dkt. 1488, p. 18 – 21).

Jonesworks' reliance upon *USS-Posco Industries v. Case*, 244 Cal.App.4th 197 (2016) is misplaced. In that matter, employees choosing to participate in optional training at the company's expense were required to sign an agreement pledging to reimburse the company for the expense if they voluntarily leave the company within 30 months of completing the program. *Id.* at 202 – 03. The defendant resigned from the company two months after completing the training program and then refused to reimburse the company for his training expenses. *Id.* at 203. The company filed suit against him for breach of contract and he cross-complained, alleging that the reimbursement agreement violated California Labor Code Section 2802. *Id.* The California Court of Appeal rejected the Section 2802 claim because: (1) the employee did not make an expenditure or suffer any loss in direct consequence of the discharge of his duties; and (2) even assuming the employee could be deemed to have made a qualifying expenditure or incurred a loss, such expenditure or loss "was not necessary" because the training was voluntary. *Id.* at 206. Here, to the contrary, Abel did not voluntarily assume the obligation to pay for the significant legal fees and expenses necessary to defend against Lively's Claims, and Abel derived no benefit in exchange for any such obligation, as were the facts in *Case*.

The other authorities cited by Jonesworks are distinguished. In *Schneider v. National R.R. Pass. Corp.*, 987 F.2d 132 (2d Cir. 1993), the Second Circuit construed a party's right to indemnification under Connecticut law, *id.* at 138 (citing Connecticut state court cases), which is inapplicable here. In *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168 (2d Cir. 2005), the Second Circuit held that plaintiff was required to demonstrate that owes a given amount of fees to its counsel because "the language of the parties' underlying

indemnity agreement … requires defendant to reimburse plaintiff only *after* plaintiff has demonstrated a loss or liability." *Id.* at 180 (emphasis in original). Here, Abel's claims are not based upon any similarly restrictive contractual indemnification clause, but rather statutory and common law indemnification.

**C. Abel Acted Within the Scope of her Employment for Jonesworks**

Jonesworks argues that Abel's actions that were the subject of Lively's Claims were outside the scope of her employment. (Dkt. 1490, p. 9). However, Jonesworks' argument suffers from a litany of problems. First, Jonesworks improperly relies upon *allegations* in Lively's Second Amended Complaint. Second, Jonesworks does not cite any *evidence* that Abel engaged in some "social manipulation" scheme, as alleged by Lively. Third, the evidence demonstrates that Abel's actions (monitoring negative publicity of Baldoni and potentially garnering positive publicity for him) were within the scope of Abel's employment. Fourth, Jonesworks complains about Abel's departure from the company (even though Jonesworks fired her) without describing how the termination of her employment relates to Lively's Claims.

1. Lively's Allegations Are Not Evidence

Allegations in a complaint are not evidence. *Tencza v. TAG Court Sq., LLC*, No. 10-cv-3752, 2013 WL 2449178, at *8 (S.D.N.Y. June 6, 2013). Lively's Second Amended Complaint "is not verified and its allegations therefore are not evidence for summary judgment purposes." *Bustamante v. KIND, LLC*, 100 F.4th 419, 432 (2d Cir. 2024). Nonetheless, Jonesworks improperly cites the *allegations* from Lively's Second Amended Complaint against Abel as "proof" that Abel's actions fell outside the scope of her employment. (Dkt. 1490, p. 12) (citing Dkt. 521 (Lively 2d Am. Compl.) ¶ 230)). Those allegations are not evidence.

2. There is No Evidence that Abel Engaged in Any "Scheme"

Jonesworks fails to demonstrate that Abel engaged in the conduct alleged in Lively's Second Amended Complaint. According to Jonesworks: "Lively's claims against Abel alleged Abel's involvement in a 'social manipulation' retaliation scheme, which involved planting negative, false stories about Lively and amplifying critical content, both to cover up Baldoni's conduct and to retaliate against Lively." (Dkt. 1490, p. 12) (citing Dkt. 521 ¶ 230). Jonesworks fails to cite any evidence that Abel planted negative and false stories about Lively, amplified content critical of Lively, or otherwise manipulated anything. Abel denies engaging in any such acts. (Dkt. 1486, ¶¶ 45 – 46).

Instead, Jonesworks inadequately cites evidence concerning *Wayfarer's* retention of crisis communications firm TAG but fails to explain why such engagement warrants a finding that *Abel's* actions were outside the scope of her employment. (Dkt. 1490, p. 12). Specifically, Jonesworks notes that Wayfarer retained TAG against Jones's recommendation (*id.*, p. 13) but omits any rationalization about why Wayfarer needed Jones's "approval" or why Abel is responsible for Wayfarer's apparent disregard of Jones's advice.

Moreover, Jonesworks' attempt to escape liability to Abel based upon Wayfarer's retention of TAG is further undermined by the record, which shows that: (a) Wayfarer's President Tera Hanks told Jones that Wayfarer was retaining TAG based upon Hanks's experience with Nathan (of TAG) at Hanks's prior positions with Westbrook and CAA, and that Abel had recommended *other crisis managers* (Fritz Opp. Decl., Ex. 7); (b) the "Scope of Work" set forth in the written agreement between Wayfarer and TAG provides that TAG will "[a]lign with *Jonesworks* and team on the timeline for the coming months", "[s]upport *Jonesworks* in media management" and "[w]ork with *Jonesworks* and team to monitor relevant coverage and social conversation while

flagging, correcting, and updating as needed, adding statements, and background items, and more in real time." *See* Abel Decl., Ex. 8 (Dkt. 1486-8, p. 5) (emphasis added); and (c) even *after* Jonesworks terminated Abel's employment on August 21, 2024, Jones herself continued to coordinate crisis management efforts with TAG. (Dkt. 1486-30).

Additionally, defendants' expert James Haggerty has opined: "The 'Scope of Work' agreement prepared by TAG, and the subsequent 'Scenario Planning' document, are in keeping with standard practice in the crisis communications field as evidence of reactive crisis planning." (Dkt. 1113-1, p. 11). Mr. Haggerty also opined: "The hiring of a crisis communications consultant in the face of perceived reputational threats should not be considered in any way evidence of a negative, or nefarious, intent. Rather, it is well established that such a retention is entirely acceptable, appropriate, and prudent for organizations, brands (personal or corporate), and high-profile individuals seeking to mitigate reputational risk, particularly in the face of threats." (*Id*., p. 31). Hence, the Expert Report confirms that scenario planning about which Jonesworks complains was standard public relations steps. Jonesworks previously submitted the Expert Report to the Court in opposition to Abel's motion for conditional summary judgment (Dkt. 1066-6), and thus the Court can consider the unrebutted findings therein. *See Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) (finding "defendants waived any objections to the admissibility of the reports by offering them themselves."); *Glowczenski v. Taser Int'l Inc.*, No. CV04-4052(WDW), 2010 WL 1957289, at *3 (E.D.N.Y. May 13, 2010) (finding party may rely on expert report introduced by opposing side).

3. <u>Abel's Actions Were Standard Public Relations Activities</u>

The documentary and testimonial evidence shows that the conduct that forms the basis of Lively's Claims against Abel consists of public relations activities on behalf of the Wayfarer

Clients during the time in which they were Jonesworks' clients, all within the scope of Abel's employment, and any such conduct was undertaken at Jonesworks' direction. The record establishes: (a) the Wayfarer Clients retained Jonesworks to perform public relations services for them (Dkt. 1484 ¶¶ 4, 5, 12, 14, 15, 16, 20; Dkt. 1484-4, Schedule A); (b) Jonesworks employed Abel to render those services (Dkt. 1484 ¶¶ 4, 5, 6, 7, 8, 10, 11; Dkt. 1484-1; Dkt. 1484-2; Dkt. 1484-3);[1] and (c) Jonesworks knew of and directed Abel's public relations activities for Wayfarer and Baldoni, including garnering positive publicity and eliminating or minimizing negative publicity for them. (Dkt. 1484 ¶¶ 47-58; Dkt. 1484-4; Dkt. 1484-22; Dkt. 1484-23; Dkt. 1484-24; Dkt. 1484-25; Dkt. 1484-26; Dkt. 1484-27; Dkt. 1484-28; Dkt. 1484-29; Dkt. 1484-30).

Specifically, Jonesworks provided the Wayfarer Clients with a wide range of public relations services, including, among other things: assisting in developing, writing and updating communication materials related to all press outreach; managing media and press communications; and advising on marketing and campaign strategies to ensure brand messaging is consistent, opportunities are maximized, and the strongest press angles are aligned. (Dkt. 1484-4, Schedule A). As Jones testified, both she and her firm did "whatever [Baldoni] needed us to do." (Fritz Opp. Decl., Ex. 1 (Jones Dep. at 82:14-24; 82:25-83:5; 84:15-18; 84:19-85:4; 85:5-14)).

Jonesworks' services included providing advice, counsel, and public relations support surrounding the premiere of the Film. The record establishes: (a) Jones knew Abel was working with Baldoni on his press tour (Dkt. 1486 ¶¶ 50–52; Dkt. 1486-22); (b) Jones knew Jonesworks employees (such as Abel) monitored social media activity concerning Baldoni and the Film (a

[1] The Court already concluded an employment relationship exists between Jonesworks and Abel. *See Lively v. Wayfarer Studios LLC*, No. 24-cv-10049 (LJL), 2025 WL 2884407, at *7 (S.D.N.Y. Oct. 9, 2025) (finding an employment relationship "established by contract").

standard practice) (Dkt. 1486 ¶¶ 52, 56; Dkt. 1486-24; Dkt. 1486-28); and (c) Jones knew Abel and other Jonesworks employees interacted with the press handling inquiries and other public relations issues (Dkt. 1486 ¶¶ 53, 54, 55; Dkt. 1486-22; Dkt. 1486-24; Dkt. 1486-25; Dkt. 1486-26).

Jones herself even provided the Wayfarer Clients with a strategy to handle the publicity crisis surrounding the Film: (1) "Flood the Zone with Positives" – "ensure that we promote positive narratives that media outlets cannot ignore" and because "[c]urrently, most stories are heavily biased towards Blake's perspective" it is "crucial" that "we fight for every inch of every story"; and (2) "Prepare Alternative Stories" – "mobilize a robust network of supporters and third-party advocates ready to counter these narratives on deep background as well as some on the record, making it clear that the claims being made are untrue and unfounded." (Dkt. 1484 ¶ 57; Dkt. 1484-29). Contrary to Jonesworks' theory that Abel went "rogue" (Dkt. 1490, p. 11), Jones's own emails show that she had assigned *multiple employees* ("Team Baldoni") to work on the Wayfarer Clients' account during Summer of 2024. (Dkt. 942-26).

Jonesworks argues that its practice for Baldoni and Wayfarer "had always been positive publicity" and "had never included seeding, planting, or promoting negative stories about his co-stars or manipulating social media." (Dkt. 1490, p. 12). There is no evidence that Abel seeded, planted or promoted negative stories about Lively or manipulated social media. In any event, Jonesworks is far from virtuous, as it boasts. When Jones was notified about growing tension between Lively and Baldoni, Jones told her team, including Abel, that they would "get through it" and directed her team to "be armed with arsenal of stuff" about Lively. (Dkt. 1484-21). Jonesworks personnel responded to Jones's instruction stating: "Agreed. It's horrible we'll dig in for details on *her* indiscretions[.]" (*Id.*). (emphasis added). Jones then thanked her team. (*Id.*). Stated differently,

Jones instructed Jonesworks' employees to engage in the very acts she now claims are beyond the scope of Abel's employment. Thus, any negative press about Lively that originated from Abel (there is none) was foreseeable to Jonesworks.

4. Jonesworks Authorized Abel to Take the Wayfarer Clients With Her

Next, Jonesworks takes issue with the way Abel departed the company. (Dkt. 1490, p. 14 – 16). Jonesworks does not explain how its dispute with Abel is relevant to the issue of whether Abel's actions *vis-à-vis* Lively fell within the scope of her employment. Furthermore, Jonesworks' hyperbole ignores the facts that Abel gave notice of her resignation, that Jonesworks told Abel she could take the Wayfarer Clients with her to a competing company, and that then Jonesworks fired her.

Specifically, Jonesworks claims that "Abel formed a competing business, RWA Communications LLC, behind Jones's back." (Dkt. 1490, p. 15). However, on July 10, 2024, Abel notified Jonesworks of her resignation and offered to stay at Jonesworks for a transition period. (Dkt. 1486, ¶ 21). A few days later, Abel re-confirmed her decision to resign and advised Jones that she would be starting her own public relations firm. (*Id.* ¶ 22). On July 19 2024, and in anticipation of the upcoming end of her employment with Jonesworks, Abel formed RWA. Under New York law, an employee may prepare to compete during the term of a non-competition provision, including incorporating a later competing business.[2] *See In re Document Tech. Litig.*, 275 F.Supp.3d 454, 464 (S.D.N.Y. 2017); *Zinter Handling, Inc. v. Britton*, 46 A.D.3d 998, 1001 (3d Dept. 2007); *Walter Karl, Inc. v. Wood*, 137 A.D.2d 22, 28 (2d Dept. 1988). Jonesworks

[2] As detailed in Abel's motion for summary judgment in *Jones v. Abel*, No. 25-cv-779 (S.D.N.Y.), the non-compete provision in her employment agreement is unenforceable. (Dkt. 286, p. 14).

terminated Abel's employment on August 21, 2024. (Dkt. 1486, ¶ 23). RWA did not commence its operations until after Abel's employment with Jonesworks ended. (Abel Opp. Decl., ¶ 15).

Jonesworks further alleges that Abel "lure[d]" the Wayfarer Clients away from Jonesworks in connection with her departure from the company. (Dkt. 1490, p. 15). However, it is undisputed that Jonesworks authorized Abel to take the Wayfarer Clients with her to her new venture. On July 26, 2024, Jones texted Abel: "[Y]ou can have Justin[.]" (Abel Opp. Decl., Ex. B). Jones acknowledged that at the time she sent the text, "I thought it was amicable, and she could have him." (Fritz Opp. Decl. Ex. 1 (Jones Dep. 188:7–9, 188:11–22)). Abel understood Jones's statement to include both Baldoni and his company, Wayfarer. (Abel Opp. Decl., ¶ 11). Having authorized Abel to take the Wayfarer Clients with her, Jonesworks should not be permitted to reverse course and now complain about the Wayfarer Clients' departure, especially after Jones turned her back on them during their time of greatest need. Moreover, the Wayfarer Clients did not decide to engage RWA until after Jonesworks terminated Abel's employment, and Wayfarer did not enter into an agreement with RWA until September 27, 2024. (Abel Opp. Decl., ¶ 15).

Jonesworks further alleges that Abel assisted "in creating the Business Insider 'kill story' that damaged Jonesworks's reputation." (Dkt. 1490, p. 16). However, the only evidence cited by Jonesworks of Abel's "assistance" is a text message simply showing that the reporter notified Abel that the story had been published and thanked Abel for her "help." (Dkt. 1490, p. 2) (citing Dkt. 1056-14). It is noted that, *at Jones's request*, Abel arranged for Baldoni to send an email to the reporter praising Jones (using mostly Jones's own words). (Fritz Opp. Decl., Ex. 9). In any event, Jonesworks neglects to explain how any involvement of Abel in the *Business Insider* article demonstrates that the public relations activities at issue in Lively's Claims were outside the scope of her employment.

With respect to Jonesworks' contention that Abel took "confidential" documents (Dkt. 1490, p. 16), the cited evidence consists of a list of *media coverage* of the Film's premiere (Dkt. 1056-79; Dkt. 1056-80), media requests for comments on the dispute between the co-stars of the Film. (Dkt. 1056-81), which are neither confidential nor proprietary, as well as an email from Nathan to Jonesworks in which Nathan copied and pasted Lively's prior demands (from months earlier) for her to return to the set of the Film. (Dkt. 1056-82). Given that Jonesworks blessed Abel's taking of the Wayfarer Clients with her to her new venture, it is unclear why Jonesworks takes issue with Abel ensuring that she possessed the requisite information to properly render public relations services to the Wayfarer Clients after her employment with Jonesworks ended.

Lastly, Abel's "going to war" comment (Dkt. 1490, p. 16) was a reference to the public relations battle *between the Wayfarer Clients and Lively/Ryan Reynolds* and not concerning any dispute between Abel and Jonesworks. (Abel Opp. Decl., ¶ 13). Similarly, Nathan's July 29, 2024 text that "once you are gone - we will be on accounts together" (Dkt. 1490, pp. 2, 15) reflects only Nathan's speculation about future work, not any conduct by Abel, and has no bearing on whether the activities underlying Lively's Claims were within the scope of Abel's employment. (Abel Opp. Decl., ¶ 12).

### D. Jonesworks Cites No Evidence of Post-Termination Conduct Warranting Limitation of Indemnification

Jonesworks argues that summary judgment is unavailable for Abel's post-termination conduct (*i.e.*, conduct after Jonesworks terminated her on August 21, 2024). (Dkt. 1490, p. 17). However, Jonesworks does not submit *evidence* of any such post-termination conduct that is the subject of Lively's Claims. Instead, Jonesworks refers only to Lively's *allegation* that the so-called "retaliation" was ongoing through July 30, 2025. (*Id.*) (citing Dkt. 520, ¶ 55). As noted above, Lively's allegations are not evidence. Furthermore, the *Cassidy* case (on which Jonesworks relies),

limits indemnity to conduct during employment, and Lively's Interrogatory Responses identifies conduct occurring only in July 2024 through August 2024. (Dkt. 1486 ¶ 28; Dkt. 1486-6)

## V. CONCLUSION

For these reasons, as well as those contained in Abel's separate motion, the Court should deny Jonesworks summary judgment, grant Abel on either her First or Second Cause of Action and deem the Third Cause of Action as withdrawn.

Dated: November 23, 2026

*/s/ Kevin Fritz*

MEISTER SEELIG & SCHUSTER PLLC
Mitchell Schuster
Kevin Fritz
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
Email: ms@mss-pllc.com
kaf@mss-pllc.com

LINER FREEDMAN TAITELMAN + COOLEY, LLP
Bryan J. Freedman (*pro hac vice*)
Ellyn S. Garofalo (*pro hac vice*)
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Tel: (310) 201-0005
Email: bfreedman@lftcllp.com
egarofalo@lftcllp.com