UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLAKE LIVELY, et al, Plaintiffs, -v- WAYFARER STUDIOS, et al Defendants. | Civil Action No. 1:24-cv-10049 (LJL); Civil Action No. 1:25-cv-449 (LJL) |

**JONESWORKS LLC'S RESPONSE TO RULE 56.1 STATEMENT BY THIRD-PARTY PLAINTIFF JENNIFER ABEL AND COUNTERSTATEMENT OF MATERIAL FACTS**

Third-Party Defendant Jonesworks LLC ("Jonesworks") submits the following responses to Third-Party Plaintiff Jennifer Abel's ("Abel") Local Civil Rule 56.1 Statement, dated November 4, 2026 (Dkt. 1487).

**The Pleadings**

1. On December 31, 2024, Plaintiff Blake Lively ("Plaintiff" or "Lively") commenced this action by filing a complaint. (*See* Dkt. 1).

**RESPONSE:** Undisputed.

2. Lively named, among others, Abel as a defendant in the complaint. (Id).

**RESPONSE:** Undisputed.

3. On July 30, 2025, Lively filed a second amended complaint, again naming Abel as a defendant. (*See* Dkt. 520).

**RESPONSE:** Undisputed.

4. On August 13, 2025, Abel answered the second amended complaint and filed an amended third-party complaint ("Answer and Third-Party Compl."), naming Jonesworks LLC ("Jonesworks") as a third-party defendant. (*See* Declaration of Kevin Fritz, dated November 3, 2026 ("Fritz Decl."), Ex. A).

**RESPONSE:** Undisputed.

5. Jonesworks responded to the amended third-party complaint by filing a motion to dismiss. (*See* Dkt. 670).

**RESPONSE:** Undisputed.

6. On October 9, 2025, the Court issued an Opinion and Order, denying Jonesworks' motion to dismiss, in its entirety. (*See* Dkt. 852).

**RESPONSE:** Undisputed.

7. On October 23, 2025, Jonesworks filed an answer to Abel's amended third-party complaint ("Answer"). (Fritz Decl., Ex. B).

**RESPONSE:** Undisputed.

**Abel's Employment with Jonesworks**

8. Abel resides in Beverly Hills, California. (See Declaration of Jennifer Abel, dated November 3, 2026 ("Abel Decl."), ¶ 3).

**RESPONSE:** Undisputed.

9. On or about July 9, 2020, Jonesworks hired Abel as Vice President. (Fritz Decl., Ex. A, ¶ 16; Ex. B, ¶ 16; Abel Decl., ¶ 5; Abel Decl., Ex. 1).

**RESPONSE:** Undisputed.

10. Jonesworks is a well-known public relations firm founded by Stephanie Jones ("Jones"), who serves as its CEO. (Abel Decl., ¶ 4; Fritz Decl., Ex. C at 32:7-33:16).

**RESPONSE:** Undisputed.

11. As a condition of her employment, Abel executed a Non-Disclosure and Intellectual Property Rights and Non-Solicitation Agreement ("2020 Employment Agreement"). (Fritz Decl. Ex. A, ¶ 17; Ex. B, ¶ 17; Abel Decl., ¶ 6; Abel Decl., Ex. 2).

**RESPONSE:** Undisputed.

12. Pursuant to the 2020 Employment Agreement, Abel was an at-will employee of Jonesworks. (Fritz Decl., Ex. A, ¶ 18; Ex. B, ¶ 18; Abel Decl., ¶ 7; Abel Decl., Ex. 2, ¶ 10).

**RESPONSE:** Undisputed.

13. The 2020 Employment Agreement further stated:

> **Exclusive Employment.** Employee agrees that while Employee is employed by the Agency, Employee's employment shall be exclusive and Employee shall not provide services to any entity in the public relations, media communications, marketing, branding or talent management business or any business without the Agency's prior written approval.

(Abel Decl., Ex. 2, ¶ 9; Fritz Decl., Ex. A, ¶ 18; Ex. B, ¶ 18).

**RESPONSE:** Undisputed.

14. When she joined Jonesworks, Abel oversaw Jonesworks' talent department and sought to grow its Los Angeles office, which at the time only had four employees. (Abel Decl., ¶ 5).

**RESPONSE:** Undisputed.

15. On or about November 22, 2021, Jonesworks and Abel entered into a modified employment agreement ("2021 Employment Agreement"), which required Abel to dedicate all her business time to Jonesworks. (Fritz Decl., Ex. A, ¶ 20; Ex. B, ¶ 20; Abel Decl., ¶ 8; Abel Decl., Ex. 3).

**RESPONSE:** Undisputed.

16. The 2021 Employment Agreement states that Abel would serve as Vice President, Talent. (Abel Decl., Ex. 3, ¶ 2).

**RESPONSE:** Undisputed.

17. The 2021 Employment Agreement states: Abel's "primary place of employment pursuant to this Agreement shall be Los Angeles, CA." (Abel Decl., Ex. 3, ¶ 2; Abel Decl., ¶ 10).

**RESPONSE:** Undisputed.

**The Wayfarer Clients Engage Jonesworks**

18. In or about 2018, before Abel's employment with Jonesworks, Defendant Justin Baldoni ("Baldoni") engaged Jonesworks to provide public relations services to him. (Abel Decl., ¶¶ 5, 14; Fritz Decl., Ex. C at 69:9-13; 71:18-20 ("I believe we were doing his personal publicity at that time a long time ago for $5,000 a month. And he was paying us.")).

**RESPONSE:** Partially disputed to the extent that Jonesworks began representing Baldoni in 2017. Dkt. 1060 (Jones Decl.) ¶ 5.

19. After Baldoni's engagement, Defendant Wayfarer Studios LLC ("Wayfarer") retained Jonesworks. (Fritz Decl., Ex. C at 69:14-70:6; Abel Decl., Ex. 4).

**RESPONSE:** Undisputed.

20. Wayfarer is a production studio founded by Baldoni and others. (Abel Decl., ¶ 12).

**RESPONSE:** Undisputed.

21. On or about May 6, 2020, Jonesworks and Wayfarer entered into an agreement on Jonesworks letterhead ("Wayfarer Agreement"). (Abel Decl., ¶ 15; Abel Decl., Ex. 4).

**RESPONSE:** Undisputed.

22. Pursuant to the terms of the Wayfarer Agreement, Wayfarer retained Jonesworks "as its exclusive public relations counsel to provide strategic communications services as" described in a schedule to the agreement. (Abel Decl., ¶ 15; Abel Decl., Ex. 4).

**RESPONSE:** Undisputed.

23. Schedule A to the Wayfarer Agreement set forth the services Jonesworks would provide in the following chart: (Abel Decl., Ex. 4, Schedule A; Abel Decl., ¶ 16).

| | |
|---|---|
| Press Materials | • Assist in developing, writing and updating communication materials related to all press outreach such as biographies, media kits, boilerplates, press releases, and key messaging<br>• Manage media and press communications |
| Inter-Agency Programs | Advise on any marketing and campaign strategies to ensure brand messaging is consistent, opportunities are maximized, and the strongest press angles aligned |
| Executive Visibility | Position and utilize Wayfarer Studios key executives as thought-leaders and change agents in the film and television industry |
| On-Going/Proactive Outreach | • Develop a 12-month media and communications strategy to further drive awareness<br>• Strategize and execute select film and television project announcements<br>• Conduct proactive feature pitching to top-tier print, broadcast and online media outlets<br>▪ Conduct media monitoring and competitor tracking for industry press<br>▪ Conduct regular check-on calls surrounding the status of Wayfarer Studios projects, events and news |
| Measurement and Evaluation | ▪ Clip and Service media as published<br>▪ Create monthly clip books and activity reports that detail account activity and media impressions<br>▪ Create and maintain a media library on behalf of Wayfarer Studios |

**RESPONSE:** Undisputed.

24. Pursuant to the terms of the Wayfarer Agreement, the initial term of the agreement would commence on May 7, 2020, and conclude on May 6, 2021. (Abel Decl., Ex. 4).

**RESPONSE:** Undisputed.

25. The Wayfarer Agreement further provides: "This agreement shall automatically renew for additional one-year periods ("Extension Period(s)") unless notice is received by either party ninety (90) days prior to the expiration of the Initial Term of this Agreement, or any Extension Period." (*Id*).

**RESPONSE:** Undisputed.

26. In addition to expenses and other fees, per the Wayfarer Agreement, Wayfarer agreed to pay Jonesworks a service fee of $20,000 per month. (*Id*).

**RESPONSE:** Undisputed.

27. According to Jones, Baldoni and Wayfarer collectively paid Jonesworks $25,000 per month. (Fritz Decl., Ex. C at 86:24-87:2).

**RESPONSE:** Undisputed as to the content of Jones's referenced testimony.

**<u>Jonesworks Provides Services for Wayfarer Clients</u>**

28. Jones personally provided services to both Baldoni and Wayfarer (collectively, the "Wayfarer Clients"). (Fritz Decl., Ex. C at 82:14-18; 82:25-83:5; 84:15-18).

**RESPONSE:** Undisputed as to the content of Jones's referenced testimony.

29. According to Jones, the scope of the work for Baldoni was for his personal publicity. (Fritz Decl., Ex. C at 82:19-22).

**RESPONSE:** Undisputed as to the content of Jones's referenced testimony.

30. Jones, however, also testified that she and Jonesworks would do "whatever [Baldoni] needed us to do. It was based on whatever - - the needs were ever evolving. It may be TV. It may be a book. It might be the production studios. It might be do you have any contacts at this brand that can help us? Do you know any brands? Can you get your client to watch this project and see if they would be interested in producing it with me? It was very bespoke and ever-changing." (Fritz Decl., Ex. C at 84:21-85:4).

**RESPONSE:** Undisputed as to the content of Jones's referenced testimony.

31. Jones also testified: "I did whatever [Baldoni] asked me to do and needed done. I'm not one of those publicists that just say I'm only, you know, this. I've become very close with

clients and help them with whatever their needs are, even if it's not publicity." (Fritz Decl., Ex. C at 85:9-14).

**RESPONSE:** Undisputed as to the content of Jones's referenced testimony.

32. Jonesworks set up email distribution lists to help service the Wayfarer Clients. (Abel Decl., ¶ 20).

**RESPONSE:** Undisputed.

33. Emails sent to those distribution lists were received by multiple Jonesworks' personnel, including Jones and Abel. (*Id*).

**RESPONSE:** Disputed. Jones was not on these email listservs continuously or at all times, but was added in late July 2024. Dkt. 1060 (Jones Decl.) ¶ 15.

34. Jonesworks also provided Baldoni with "crisis PR". (Fritz Decl., Ex. C at 87:3-87:16).

**RESPONSE:** Disputed. Jonesworks occasionally assisted Baldoni with matters that he considered to be a "crisis," but Jonesworks—whose ethos centers on positive publicity—did not provide what is commonly referred to in the PR industry as "crisis PR" because Jonesworks is not a "crisis PR" firm. Dkt. 1060 (Jones Decl.) ¶ 12.

35. Jonesworks also assisted Baldoni with "litigation matters". (Fritz Decl., Ex. C at 87:5-16).

**RESPONSE:** Undisputed as to the content of Jones's referenced testimony.

36. Jones testified: "we handled - - we handled things that could have been categorized as crisis for him; something that needed to be moved upon urgently, something that needed to be corrected or fixed, litigation that he was in, etc." (Fritz Decl., Ex. C at 87:12-16).

**RESPONSE:** Undisputed as to the content of Jones's referenced testimony.

37. Jones did not work alone providing services to Baldoni and Wayfarer. (Fritz Decl., Ex. C at 83:6-14).

**RESPONSE:** Undisputed.

38. Jonesworks dedicated a full team to service the Wayfarer Clients. (Fritz Decl., Ex. C at 83:12-14).

**RESPONSE:** Undisputed.

39. Among others, Abel was on the Jonesworks' team working for Baldoni and Wayfarer. (Fritz Decl., Ex. C at 85:15-86:23).

**RESPONSE:** Undisputed.

40. After joining Jonesworks, Abel served as the primary point person for Wayfarer and Baldoni during Wayfarer's multi-year engagement with Jonesworks. (Abel Decl., ¶ 17).

**RESPONSE:** Undisputed.

41. Abel managed Jonesworks' work for Wayfarer from Jonesworks' Los Angeles office. (Abel Decl., ¶ 18).

**RESPONSE:** Partially disputed to the extent the term "managed" is vague and undefined. Undisputed that Abel performed work for Wayfarer from Jonesworks' Los Angeles office, and that she also performed work for Wayfarer and Baldoni in New York. *See* Abel Decl. ¶ 34 n.2.

42. Through Jonesworks' engagement with Wayfarer, Abel developed a close and trusting relationship with the Wayfarer Clients. (*Id*).

**RESPONSE:** Disputed to the extent "close and trusting relationship" is vague and undefined, and Abel's assertion regarding the nature of her relationship with the Wayfarer Clients is speculative. Moreover, Abel disparaged Baldoni to others including Nathan, including stating

that he is "so pompous," "not that important and nobody gives a shit how hard [his] life is," and that "[h]e needs to be humbled." Dkt. 1056-1 (Tahler Decl., Ex. 1) (JONESWORKS_00041606).

43. Jonesworks directed Abel to carry out the duties of a competent public relations professional on behalf of the Wayfarer Clients, including but not limited to garnering good publicity and eliminating or minimizing bad publicity for them and the film It Ends With Us (the "Film"). (Abel Decl., ¶¶ 13, 19).

**RESPONSE:** Partially disputed to the extent the direction Jonesworks provided Abel to carry out the duties of a competent public relations professional at no time included activities contributing or amounting to the digital smear campaign Abel, Nathan, and others engaged in against Lively on Baldoni's and Wayfarer's behalf as alleged by Lively in this action. Dkt. 1060 (Jones Decl.) ¶¶ 44-49. Abel was expected to guide her clients as they interacted with the press, but Abel was not expected to, was never instructed to, and was prohibited from manipulating social media conversations to attack a non-client on behalf of Jonesworks' clients or pitch, seed, or promote negative false stories about a non- client who had complained of misconduct against her client. Dkt. 1060 (Jones Decl.) ¶ 17. Abel was never instructed to and was prohibited from engaging or participating in conduct that could be considered harassment, discrimination, or retaliation in violation of state or federal laws or aiding and abetting harassment, discrimination, or retaliation in violation of state and federal laws. Dkt. 1060 (Jones Decl.) ¶ 18. Abel was never instructed to and was prohibited from engaging or participating in any conduct that would amount to "astroturfing," or the manufacturing of grassroots support of or opposition to a message or person orchestrated through fake or paid for social-media accounts or engagement and coordinated disinformation to manufacture what appears to be an organic consensus response. Dkt. 1060 (Jones

Decl.) ¶ 19. Abel knew that Jonesworks did not engage in these types of nefarious activities. Dkt. 1060 (Jones Decl.) ¶ 20.

44. Baldoni directed and co-starred in the Film. (Abel Decl., ¶ 13).

**RESPONSE:** Undisputed.

45. For its services, including Abel's public relations services, the Wayfarer Clients from May 2020 to August 2024 paid fees to Jonesworks. (Abel Decl., ¶ 25; Abel Decl., Ex. 5; Fritz Decl., Ex. C at 86:24-87:2).

**RESPONSE:** Undisputed that Wayfarer and Baldoni paid Jonesworks through August 2024. Disputed to the extent the "public relations services" for which Wayfarer and Baldoni paid Jonesworks did not include any activities contributing or amounting to the digital smear campaign Abel, Nathan, and others engaged in against Lively on Baldoni's and Wayfarer's behalf as alleged by Lively in this action. Dkt. 1060 (Jones Decl.) ¶¶ 44-49. The work Jonesworks did for Baldoni and Wayfarer under their agreement at no time included seeding, planting, or promoting negative stories about individuals in disputes with Baldoni or Wayfarer. Dkt. 1060 (Jones Decl.) ¶ 11. Nor did Jonesworks directly influence conversations about Baldoni or Wayfarer occurring on social media through false or paid for accounts or comments, or otherwise engage in social media manipulation. *Id.*

__**Jonesworks' Public Relations Work for the Wayfarer Clients Concerning the Film**__

46. On July 24, 2024, Abel informed Jones that Wayfarer sought recommendations for a crisis management professional to work with Jonesworks in countering potentially negative publicity related to issues on the set of the Film. (Abel Decl., ¶ 31; Abel Decl., Ex. 7).

**RESPONSE:** Undisputed.

47. Jones turned to Abel for recommendations. (*Id*).

**RESPONSE:** Partially disputed to the extent that this statement mischaracterizes communications. When Abel informed Jones that Wayfarer was looking for crisis recommendations, Abel said she told Wayfarer she "would connect with [Jones] for best recos"; Jones responded "who do you rec? i think actum could be amazing or shawn sachs team," to which Abel replied, "[n]ot familiar with actum but I trust your reccs here!!" Abel Decl., Ex. 7.

48. Wayfarer hired The Agency Group PR LLC ("TAG") to assist Jonesworks with crisis management. (Abel Decl., ¶ 32; Abel Decl., Ex. 8).

**RESPONSE:** Disputed to the extent this fact asserts that Wayfarer hired TAG to "assist Jonesworks." TAG was engaged for separate "scenario planning" and crisis-management issues—not to support or assist Jonesworks in its public-relations efforts. Abel Decl., Ex. 10 (August 2 scenario planning document specifying TAG would work "alongside Jen Abel and her team"); Dkt. 1056-2 (Tahler Decl., Ex. 2) at 3, KCASE-000005118 (TAG employees discussing how they "thought this was Jen on her own already coming to us for help").

49. On July 31, 2024, Abel texted Jamey Heath ("Heath") and Mitz Toskovic of Wayfarer about a conversation she had with an independent journalist concerning Baldoni's exclusion from Film-related promotions and that the journalist was willing to publish a story of Lively's misconduct. (Abel Decl., ¶ 33; Abel Decl., Ex. 9).

**RESPONSE:** Partially disputed to the extent this mischaracterizes the document. That "independent journalist" was Abel's self-described "friend of 12+ years," and Abel told Heath and Toskovic that her friend "hates Blake" and was "armed and ready to take this story of Blake weaponizing feminism to any of her outlines." Abel Decl., Ex. 9. Abel additionally told Heath and Toskovic that she was "going to connect her [friend] to Melissa tomorrow." Abel Decl., Ex. 9.

50. At the time she communicated with the journalist, Abel acted within the scope of her employment at Jonesworks, providing public relations services to the Wayfarer Clients. (Abel Decl., ¶ 33; Abel Decl., Ex. 4, Schedule A ("Manage media and press communications")).

**RESPONSE:** Disputed. Abel's scope of employment at Jonesworks did not include, and expressly prohibited, participating in or contributing to any digital smear or astroturfing campaign that Abel, Nathan, and others engaged in against Lively on Baldoni's and Wayfarer's behalf as alleged by Lively in this action, and Abel did not perform such work in her capacity as a Jonesworks employee. Dkt. 1060 (Jones Decl.) ¶¶ 44-49. Neither Jonesworks nor Jones ever advised or instructed Abel to plant, seed, or promote negative stories about Lively, and to the extent that Abel did so, it was without Jonesworks' or Jones's knowledge or consent. Dkt. 1060 (Jones Decl.) ¶¶ 45-49. Jones specifically expected and instructed Abel to carry out here duties in an ethical and lawful manner, which did not include astroturfing, digital smear campaigns, retaliation, or any of the other nefarious behavior and/or actions that Lively alleged Abel did. Dkt. 1060 (Jones Decl.) ¶ 48. Jonesworks' written scope of services for Wayfarer and Baldoni does not reference or authorize activities involving anonymous dissemination of disparaging information, coordination of online attacks, or use of personal accounts to communicate with journalists. Abel Decl., Ex. 4. The work Jonesworks did for Baldoni and Wayfarer under their agreement at no time included seeding, planting, or promoting negative stories about individuals in disputes with Baldoni or Wayfarer. Dkt. 1060 (Jones Decl.) ¶ 11. Nor did Jonesworks directly influence conversations about Baldoni or Wayfarer occurring on social media through false or paid for accounts or comments, or otherwise engage in social media manipulation. *Id.*

51. Abel never followed up her communication with the journalist nor referred the journalist to anyone. (Abel Decl., ¶ 33).

**RESPONSE:** Disputed. Abel told Heath and Toskovic she was "going to connect [her journalist friend] to Melissa tomorrow." Abel Decl., Ex. 9.

52. The journalist never published the story. (*Id*).

**RESPONSE:** Disputed to the extent Abel does not identify the journalist and does not state whether that journalist (who according to Abel "hates Blake") never wrote or published or contributed in any manner to a story about Lively, Baldoni, or *It Ends With Us*. *See* Abel Decl. ¶ 33.

53. On August 2, 2024, a representative of TAG sent Abel a "Scenario Planning" document describing TAG's objective to "[p]rotect the reputation of" the Wayfarer Clients "in the lead up, during, and following the premiere" of the Film and related goals. (Abel Decl., ¶ 34; Abel Decl., Ex. 10).

**RESPONSE:** Undisputed.

54. TAG shared the "Scenario Planning" document with Abel because she was a Jonesworks employee responsible for providing public relations services to the Wayfarer Clients. (Abel Decl., ¶ 34; Abel Decl., Ex. 4, Schedule A ("Advise on any marketing and campaign strategies to ensure brand messaging is consistent, opportunities are maximized, and the strongest press angles aligned")).

**RESPONSE:** Disputed. Abel establishes no basis to understand TAG's intention or purpose in sharing the "Scenario Planning" document with Abel, and the cited evidence does not support the assertion that TAG shared the document with Abel because she was a Jonesworks employee or based on any responsibility she held for providing public relations services. *See* Abel Decl., Ex. 10 ("Scenario Planning" document providing TAG intended to work with "Abel and her team," not Jonesworks).

55. On August 5, 2024, Abel notified Baldoni that Sony (the co-producer of the Film) had an issue with the word "friction" being used in social media commentary about the on-set relationship between Baldoni and Lively. (Abel Decl., ¶ 35; Abel Decl., Ex. 11).

**RESPONSE:** Undisputed.

56. Abel proposed the word "challenge" to downplay such commentary and highlight that, as director of the Film, Baldoni successfully brought all people together to "create something beautiful" in the Film. (*Id*).

**RESPONSE:** Undisputed.

57. Abel made the proposal as part of her employment with Jonesworks, providing a public relations "strategy" to Jonesworks' clients, i.e., the Wayfarer Clients. (*Id.*; Abel Decl., Ex. 4, Schedule A ("Assist in developing, writing and updating communication materials related to all press outreach …")).

**RESPONSE:** Disputed. At the same time Abel was advising Baldoni of what to say about Lively during press in these messages, Abel was also coordinating negative messages about Lively with Baldoni and Nathan as part of the digital smear campaign as alleged by Lively in this action. Abel Decl., Ex. 11. In direct response to Abel's message to "stick to the words of 'challenge,'" Baldoni sent Abel social media content about "hailey bieber's history of bullying many women (not just selena gomez) throughout the years," and told Abel "This is what we would need." Abel Decl., Ex. 11. Abel responded that she "literally just spoke to Melissa about this on the break about what we discussed last night for social and digital." Abel Decl., Ex. 11.

Abel's activities contributing to or amounting to the digital smear campaign as alleged by Lively in this action were not within the scope of Abel's employment at Jonesworks or performed by Abel in her capacity as a Jonesworks employee. Dkt. 1060 (Jones Decl.) ¶¶ 45-49. Moreover,

the context of Abel's conduct undermines any claim that she was acting within her Jonesworks role: Abel and Nathan were attempting to develop and execute a strategy after Stephanie Jones had recommended that Wayfarer not hire TAG, meaning the proposal and related communications were not part of any approved Jonesworks project or scope of work. Dkt. 1056-3 (Tahler Decl., Ex. 3) (JONESWORKS_JB_000001142) (Jones warning Baldoni and Heath that Nathan was "not someone we would want in justin's orb. or for blake's PR to use as weapon against him"); Dkt. 1056-5 (Tahler Decl., Ex. 5) (10/6/25 Baldoni Dep. Tr. at 136:24–137:25, 147:3–8) ("Q Okay. Do you understand from this text message that Stephanie is telling you and Jamey and Tera that it might not be good for you to be associated with someone like Melissa Nathan based on the type of tactics that she has used in the past? A That seems to be an accurate summary.").

58. On August 7, 2024, Abel exchanged text messages with Jonesworks' employee Matthew Mitchell ("Mitchell") and TAG employees Melissa Nathan ("Nathan") and Katie Case ("Case") and Breanna Koslow ("Koslow") about an online narrative concerning Baldoni and Lively's separate promotion of the Film (as opposed to both being present). (Abel Decl., ¶ 36; Abel Decl., Ex. 12).

**RESPONSE:** Disputed to the extent it mischaracterizes the text messages, in which Abel, Mitchell, Nathan, Case, and Koslow discussed Nathan's speaking with celebrity gossip reporter Deuxmoi, "having social kill asap" regarding certain stories, and "potentially getting ahead of this," and placing a story with Puck's Matthew Belloni. Abel Decl., Ex. 12.

59. Abel made her comments concerning how to handle the narrative in the course of her employment at Jonesworks providing public relations services to the Wayfarer Clients. (Abel Decl., ¶ 36; Abel Decl., Ex. 4, Schedule A ("Assist in developing, writing and updating communication materials related to all press outreach …")).

**RESPONSE:** Disputed. In the August 7, 2024 text messages, Abel and others discussed speaking with reporters about Lively, "having social kill asap" regarding certain stories, and "potentially getting ahead of this," and placing a story with Puck's Matthew Belloni. Abel Decl., Ex. 12. The work Jonesworks did for Baldoni and Wayfarer under their agreement at no time included seeding, planting, or promoting negative stories about individuals in disputes with Baldoni or Wayfarer or otherwise adverse or potentially adverse to them; nor did Jonesworks directly influence conversations about Baldoni or Wayfarer occurring on social media through false or paid for accounts or comments, or otherwise engage in social media manipulation. Dkt. 1060 (Jones Decl.) ¶ 11.

60. On August 7, 2024, Case sent Heath and Abel (at her Jonesworks email address) an email referring to "social and digital mitigation and remediation" and to public narratives concerning Baldoni and Wayfarer. (Abel Decl., ¶ 37; Abel Decl., Ex. 13).

**RESPONSE:** Undisputed.

61. Case sent the email to Abel in her capacity as a Jonesworks employee providing public relations services to the Wayfarer Clients. (Abel Decl., ¶ 37).

**RESPONSE:** Disputed. Abel's declaration does not and cannot establish Case's state of mind, purpose, or reason for sending the email, Abel does not purport to have any basis to claim to understand why Case sent this email, and the cited evidence does not support the asserted fact. Rather, the email states that TAG and Wallace would "work in conjunction with Jen and her team, as well as TAG PR," not Jonesworks. Abel Decl., Ex. 13.

62. On August 8, 2024, Abel sent a text message to Mitchell (of Jonesworks), Nathan, Case, and Koslow concerning negative social media posts about Baldoni by a content creator named Jenna Redfield. (Abel Decl., ¶ 38; Abel Decl., Ex. 14).

**RESPONSE:** Undisputed.

63. Abel flagged the negative public commentary about Baldoni as part of her employment at Jonesworks. (Abel Decl., ¶ 38; Abel Decl., Ex. 4, Schedule A ("Conduct media monitoring …")).

**RESPONSE:** Disputed. After Abel flagged the negative public commentary, it was "flagged to Jed [Wallace] and his team for more serious action on the social side." Abel Decl., Ex. 14. Abel's coordination with TAG and Wallace was at no time within Abel's scope of employment for Jonesworks or performed by Abel in her capacity as a Jonesworks employee. Dkt. 1060 (Jones Decl.) ¶¶ 36, 44-49. Neither Jonesworks nor Jones advised or instructed Abel to plant, seed, or promote any negative stories about Lively, and to the extent Abel did so, it was without Jonesworks' or Jones's knowledge. Dkt. 1060 (Jones Decl.) ¶¶ 44-46. Neither Jonesworks nor Jones advised or instructed Abel to boost or amplify negative false content about Lively in traditional or social media to cover up any misconduct. Dkt. 1060 (Jones Decl.) ¶ 46.

64. On August 9, 2024, Abel exchanged text messages with Nathan concerning articles about a "rift" or "feud" between Baldoni and Lively, as well as other potential media coverage of the situation. (Abel Decl., ¶ 39; Abel Decl., Ex. 15).

**RESPONSE:** Partially disputed to the extent this mischaracterizes the text messages, in which Abel told Nathan she could "tell [Nathan had] done a lot of work" to keep references to Lively "being unsafe. Fat comments. Sexual." out of the press. Abel Decl., Ex. 15. Nathan responded with a message from Jed Wallace that "we are crushing it on Reddit" and "[w]eve [sic] confused people[.] So much mixed messaging[.] It's actually really funny if you think about it." Id. Further in these messages, Nathan said to Abel, "[a]nd you take this fucking client and never talk to [Jones] again I swear to God." *Id.*

65. As part of her employment at Jonesworks, Abel monitored news outlets for negative publicity about Baldoni and sought to potentially garner positive publicity for him. (Abel Decl., ¶ 39; Abel Decl., Ex. 4, Schedule A ("Conduct media monitoring …"; "Advise on any marketing and campaign strategies to ensure brand messaging is consistent, opportunities are maximized, and the strongest press angles aligned")).

**RESPONSE:** Partially disputed to the extent that Abel's scope of employment with Jonesworks at no time included any activity contributing or amounting to the digital smear campaign alleged by Lively in this action. Dkt. 1060 (Jones Decl.) ¶¶ 44-49.

66. Abel exchanged text messages with Nathan on August 9, 2024, as part of her employment at Jonesworks. (Abel Decl., ¶ 39; Abel Decl., Ex. 15).

**RESPONSE:** Disputed to the extent this statement asserts that Abel's August 9, 2024 text messages with Nathan were sent as part of her employment at Jonesworks because the messages demonstrate that Abel was working against Jonesworks' interests. See Abel Decl., Ex. 15 (Nathan said to Abel, "[a]nd you take this fucking client and never talk to [Jones] again I swear to God.").

67. On August 10, 2024, Abel exchanged text messages with Heath, Mitchell (of Jonesworks), Nathan, Case, and Koslow concerning a Hollywood Reporter article and TikTok videos related to Lively and/or Baldoni. (Abel Decl., ¶ 40; Abel Decl., Ex. 16; Abel Decl., Ex. 6).

**RESPONSE:** Disputed to the extent this mischaracterizes the text message, which also discussed how "[w]e've also started to see a shift on social, due largely to Jed and his team's efforts to shift the narrative towards shining a spotlight on Blake and Ryan." Abel Decl., Ex. 16.

68. The TikTok video from May 17, 2023, included within the text chain shows Baldoni and Lively in a pleasant atmosphere on the set of the Film. (Abel Decl., ¶ 40; Abel Decl., Ex. 6).

**RESPONSE:** Partially disputed to the extent the text chain Abel cites purports to include multiple "TikToks," but does not actually attach any videos, so it is not clear what the "TikTok video from May 17, 2023," is, Abel Decl., Ex. 16, but that it does include a TikTok posted on May 17, 2023, that features a video of Lively patting Baldoni on the shoulder on set (https://www.tiktok.com/t/ZTNsQDYjj/).

69. The Hollywood Reporter article discusses why it was important for Baldoni to make a movie about domestic violence. (Abel Decl., ¶ 40; Abel Decl., Ex. 6).

**RESPONSE:** Partially disputed to the extent the article discusses why Baldoni felt it was "important to bring the book's story to the big screen," which the article describes as involving a romantic relationship that "remind [Lively's character] of her parents' abusive relationship" and that Lively's character "must learn to rely on her on strength to move forward." Abel Decl., Ex. 16 (https://www.hollywoodreporter.com/movies/movie- features/justin-baldoni-it-ends-with-us-interview-ryle-pressure-1235970799/); Abel Decl., Ex. 6.

70. Abel sent text messages on August 10, 2024, concerning the *Hollywood Reporter* article and TikTok videos as part of her employment with Jonesworks. (Abel Decl., ¶ 40; Abel Decl., Ex. 4, Schedule A ("Conduct media monitoring")).

**RESPONSE:** Disputed. When Abel shared the May 17, 2023 TikTok to Heath, Mitchell, Nathan, and TAG employees, the most recent comments on it were negative to Blake Lively, Abel Decl., Ex. 6, and Abel noted it "would be great for the digital team to boost this in any way possible," to which Case responded, "responded, "We'll flag to them!" Abel Decl., Ex. 16. Abel also shared a TikTok that featured commentary on Lively's alleged "problematic on-set behavior" on the set of Gossip Girl. Abel Decl., Ex. 16. Abel also asked for the digital team to "amplify" the *Hollywood Reporter* article. *Id.* Case responded: "Thank you! We'll share this as well — at the

very least ask for engagement in the comments." *Id.* Abel's activity contributing or amounting to the digital smear campaign as alleged by Lively in this action, including by flagging to amplifying negative coverage of Lively, was at no time within Abel's scope of employment for Jonesworks or performed by Abel in her capacity as a Jonesworks employee. Dkt. 1060 (Jones Decl.) ¶¶ 44-49.

71. On August 11, 2024, and acting in her capacity as a Jonesworks employee, Abel advised Wayfarer via text message about whether the timing was appropriate for Baldoni to issue further comments about domestic violence. (Abel Decl., ¶ 41; Abel Decl., Ex. 17).

**RESPONSE:** Partially disputed to the extent Abel, Heath, and Toskovic were discussing Baldoni's media response in connection to *It Ends With Us*, including "stay[ing] the course" which "in great part what has combated the noise against [Baldoni]," Abel Decl., Ex. 17, and the work Abel performed for Baldoni and Wayfarer with TAG, including the digital smear campaign as alleged by Lively in this action, was at no time within Abel's scope of employment for Jonesworks or performed by Abel in her capacity as a Jonesworks employee, nor was Jones included in that message thread. Dkt. 1060 (Jones Decl.) ¶¶ 44-49.

72. On August 13, 2024, Abel exchanged texts with Heath, Baldoni, Mitchell (of Jonesworks), Nathan, Case, and Koslow concerning another TikTok video praising Baldoni and another video criticizing Lively for her marketing of the Film in a manner insensitive to domestic violence victims. (Abel Decl., ¶ 42; Abel Decl., Ex. 18).

**RESPONSE:** Undisputed.

73. Abel sent the August 13, 2024, text messages as part of her employment at Jonesworks, providing public relations services for the Wayfarer Clients. (Abel Decl., ¶ 42; Abel Decl., Ex. 4, Schedule A ("Conduct media monitoring")).

**RESPONSE:** Disputed to the extent this statement asserts that Abel sent the August 13, 2024 text messages as part of her employment at Jonesworks. *See* Abel Decl., Ex. 18 (demonstrating Abel's efforts to amplify negative content about Lively in support of digital smear campaign as alleged by Lively). Abel's activity contributing or amounting to the digital smear campaign as alleged by Lively in this action, including by flagging to amplifying negative coverage of Lively, was at no time within Abel's scope of employment for Jonesworks or performed by Abel in her capacity as a Jonesworks employee. Dkt. 1060 (Jones Decl.) ¶¶ 44-49

74. On August 15, 2024, Abel exchanged text messages with Heath, Baldoni, Mitchell (of Jonesworks), Nathan, Case, and Koslow concerning the positive public comments made by Brandon Sklenar (an actor in the Film) about Baldoni and concerning other publicity related to the Film. (Abel Decl., ¶ 43; Abel Decl., Ex. 19).

**RESPONSE:** Partially disputed to the extent this mischaracterizes the text message, in which Abel asked "Can we have digital team boost this interview[?]" and Koslow confirmed. Abel Decl., Ex. 19.

75. Abel exchanged the August 15, 2024, text messages as part of her employment with Jonesworks and as its point person assigned to the Wayfarer Clients. (Abel Decl., ¶ 43; Abel Decl., Ex. 4, Schedule A ("Conduct media monitoring"; "Advise on any marketing and campaign strategies to ensure brand messaging is consistent, opportunities are maximized, and the strongest press angles aligned")).

**RESPONSE:** Disputed to the extent this statement asserts that Abel exchanged the August 15, 2024 test messages as part of her employment at Jonesworks. Abel's activity contributing or amounting to the digital smear campaign as alleged by Lively in this action, including by flagging to amplifying negative coverage of Lively, was at no time within Abel's scope of employment for

Jonesworks or performed by Abel in her capacity as a Jonesworks employee. Dkt. 1060 (Jones Decl.) ¶¶ 44-49.

76. On August 18, 2024, Abel exchanged text messages with Heath, Baldoni, Mitchell (of Jonesworks), Nathan and Koslow concerning TikTok videos related to the Film. (Abel Decl., ¶ 44; Abel Decl., Ex. 20).

**RESPONSE:** Partially disputed to the extent this mischaracterizes the text messages, which included videos negative to Lively and her perceived promotion of the Film, including one in which the author of the post commented, "I am flabbergasted that with the huge audience that Blake Lively has and all of the press interviews she's had she doesn't once talk about DV," which Baldoni requested "[t]o boost." Abel Decl., Ex. 20; Abel Decl., Ex. 6.

77. The TikTok video called the Film "one of the best movies ever made" and said the Film touched on domestic violence "in the best way possible." (*Id.*; Abel Decl., Ex. 6).

**RESPONSE:** Disputed to the extent the referenced document includes multiple TikTok videos, but did not include with production any actual videos, Abel Decl., Ex. 20, so it is not clear what "[t]he TikTok video" refers to in this paragraph.

78. Abel exchanged the August 18, 2024, text messages and commented about one of the videos as part of her employment with Jonesworks, providing public relations services for the Wayfarer Clients. (*Id.*; Abel Decl., Ex. 4, Schedule A ("Conduct media monitoring"; "Advise on any marketing and campaign strategies to ensure brand messaging is consistent, opportunities are maximized, and the strongest press angles aligned")).

**RESPONSE:** Disputed to the extent this statement asserts that Abel exchanged the August 18, 2024 text messages as part of her employment at Jonesworks. *See* Abel Decl., Ex. 20 (Abel, Baldoni, and others discuss "boost[ing]" social media content, including content critical of Lively).

Abel's activity contributing or amounting to the digital smear campaign as alleged by Lively in this action, including by flagging to amplifying negative coverage of Lively, was at no time within Abel's scope of employment for Jonesworks or performed by Abel in her capacity as a Jonesworks employee. Dkt. 1060 (Jones Decl.) ¶¶ 44-49

79. Abel's employment with Jonesworks ended on August 21, 2024. (Abel Decl., ¶ 23).

**RESPONSE:** Undisputed.

**Lively's Claims against Abel Due to her Employment with Jonesworks**

80. On July 30, 2025, Lively filed her Second Amended Complaint asserting claims against Abel for: (a) aiding and abetting harassment and retaliation in violation of California's Fair Employment and Housing Act ("FEHA"); (b) false light invasion of privacy; and (c) civil conspiracy (collectively, "Lively's Claims"). (Abel Decl., ¶ 26; Dkt. 520).

**RESPONSE:** Undisputed.

81. The Second Amended Complaint alleged that Nathan, TAG, and Abel "perpetrated a retaliation scheme against Ms. Lively" including via "the amplifying of negative content about Ms. Lively …." (Abel Decl., ¶ 27; Dkt. 520, ¶ 230).

**RESPONSE:** Partially disputed to the extent the Second Amended Complaint alleges the "retaliation scheme" Abel and others perpetuated "was what TAG described as a "social manipulation" plan relying on direct and constant media engagement, the seeding of content on traditional and social media platforms, the boosting of content (sometimes the very content that TAG and its affiliates had seeded), the suppressing of negative content about Mr. Baldoni, and the amplifying of negative content about Ms. Lively (including through engagement via comments on social media)." ECF No. 520 ¶ 230.

82. Abel denies Lively's allegations. (Abel Decl., ¶ 27; Fritz Decl., Ex. A, ¶ 230).

**RESPONSE:** Undisputed that Abel denies the allegations made in paragraph 230 of Lively's complaint. Fritz Decl., Ex. A, ¶ 230.

83. Abel never published, planted, or pitched any negative content about Lively. (Abel Decl., ¶ 45).

**RESPONSE:** Disputed. For example, on July 31, 2024, Abel pitched a negative story of Lively to a "friend of 12+ years who writes for people magazine, Fox News, in touch, us weekly"; that journalist friend "hates Blake," and was "armed and ready to take the story of Blake weaponizing feminism to any of her outlets." Abel Decl., Ex. 9. The August 2 Scenario Planning document noted TAG, "[a]longside Jen Abel and her team," would "plant[] a seed earlier on to position [Baldoni's] truth / narrative . . . hinting that . . . [Baldoni] and Blake didn't always agree at times" and plant stories about the "weaponization of feminism and how people in BL's circle like Taylor Swift, have been accused of utilizing these tactics to 'bully' into getting what they want." Abel Decl., Ex. 10. On August 4, 2024, Abel wrote to Nathan "I'm having reckless thoughts of wanting to plant pieces this week of how horrible Blake is to work with." Dkt. 1056-6 (Tahler Decl., Ex. 6), JONESWORKS_00016237. Nathan responded, "Same," and confirmed she had "already off the records spoke to the editor Daily Mail because she's my friend. She's ready when we are." *Id.* On August 5, 2024, Baldoni sent Abel social media content about "hailey bieber's history of bullying many women (not just selena gomez) throughout the years," and told Abel "This is what we would need." Abel Decl., Ex. 11. Abel responded that she "literally just spoke to Melissa about this on the break about what we discussed last night for social and digital." Id. On August 7, 2024, Abel wrote to Nathan that "I think we really need to put the social combat plan … into motion." Dkt. 1056-7 (Tahler Decl., Ex. 7) (NATHAN_000003599). On January 3, 2025, Abel sent content creator and former Freedman client, Sage Steele, a set of "talking points" for her

use in crafting a social-media post about the lawsuit. Dkt. 1056-8 (Tahler Decl., Ex. 8) (NATHAN_000018774). Wayfarer co-founder and defendant Steve Sarowitz noted that he "defer[red] to Jen [Abel] and Melissa [Nathan]" on Steele's script. Abel Decl., Ex. 6; Dkt. 1056-9 (Tahler Decl., Ex. 9), WAYFARER_000167841. Abel then worked hand-in- hand with Steele so her social media content would have maximum impact—with Steele providing Abel the first take of her recording and ultimately posting a tailored video on Tik Tok accusing Lively of "abusing her power," "hurting other women" and "discredit[ing] other women that are true victims of sexual harassment" that has been viewed more than 1.5 million times. Abel Decl., Ex. 6; Dkt. 1056-10 (Tahler Decl., Ex. 10), ABEL_000019523; @officialsagesteele, TikTok (Jan. 7, 2025), https://www.tiktok.com/@officialsagesteele/video/7457284296856866091.

84. Abel never "boosted" or "amplified" any negative content about Lively. (Abel Decl., ¶ 46).

**RESPONSE:** Disputed. The August 2 Scenario Planning document noted TAG, "[a]longside Jen Abel and her team," would "plant[] a seed earlier on to position [Baldoni's] truth / narrative . . . hinting that . . . [Baldoni] and Blake didn't always agree at times" and plant stories about the "weaponization of feminism and how people in BL's circle like Taylor Swift, have been accused of utilizing these tactics to 'bully' into getting what they want." Abel Decl., Ex. 10; Abel Decl., Ex. 6. The "social and digital mitigation and remediation" plan TAG intended to implement with Wallace and Abel also included "[l]everag[ing] relationships with Discord, Reddit, X, IG, TikTok, YouTube, etc. to expose behavior of Blake and other parties, both current and past and engage directly with communities to adjust or influence the conversations taking place in real time." Abel Decl., Ex. 13; Abel Decl., Ex. 6. On August 5, 2024, Baldoni sent Abel social media content about "hailey bieber's history of bullying many women (not just selena gomez) throughout

the years," and told Abel "This is what we would need." Abel Decl., Ex. 11. Abel responded that she "literally just spoke to Melissa about this on the break about what we discussed last night for social and digital." *Id.* On August 8, 2024, Abel flagged social media content to TAG, who in turn "flagged to Jed and his team for more serious action on the social side." Abel Decl., Ex. 6; Abel Decl., Ex. 14. On August 10, 2024, Case told Heath, Nathan, Abel, and Koslow that "[w]e've also started to see a shift on social, due largely to Jed and his team's efforts to shift the narrative towards shining a spotlight on Blake and Ryan." Abel Decl., Ex. 6; Abel Decl., Ex. 16. In that same thread, Abel circulated a TikTok that had recent negative comments about Lively and instructed that it "would be great for the digital team to boost this in any way possible." Abel Decl., Ex. 16. Abel circulated another TikTok about Lively's alleged "problematic on-set behavior" on the set of Gossip Girl with the note: "I like that this is now getting some viral attention." *Id.* On August 13, 2024, Baldoni sent TikToks to Abel and others, including one that criticized Lively's marketing of the Film as insensitive to domestic violence survivors. Abel Decl., Ex. 6; Abel Decl., Ex. 18. Abel responded, "we have this and this is what the digital team is amplifying." Abel Decl., Ex. 18. On August 18, 2024, Baldoni shared TikToks with Abel and others, including another by an author who commented "I am flabbergasted that with the huge audience that Blake Lively has and all of the press interviews she's had she doesn't once talk about DV." Abel Decl., Ex. 6; Abel Decl., Ex. 20. Abel responded "Yes definitely let's boost these vids," to which Koslow replied "Will let digital know!" Abel Decl., Ex. 20. Also on August 18, 2024, Abel circulated a recording of a TikTok video by a young woman who claimed that Baldoni invited her up to his hotel room when she was in college. Abel Decl., Ex. 6; Dkt. 1056-11 (Tahler Decl., Ex. 11) (BBKOSLOW-000005085). Koslow responded TAG would "chat to Jed as well on this" and later confirmed that "[p]ositive videos [are] being boosted[.] The crazy Charlotte gal, team said it actually works in our

favor to have negative comments below post – already now she's getting slammed, so they'll work with that to elevate how ridiculous / false story is, while keeping watch to make sure it doesn't spiral more[.]" Abel Decl., Ex. 6; Dkt. 1056-11 (Tahler Decl., Ex. 11) (BBKOSLOW-000005085).

85. The pleading further alleges that Nathan, TAG and Abel "aided and abetted the discriminatory conduct of Defendants It Ends With Us Movie LLC, Wayfarer, Baldoni and Heath, including but not limited to by participating in the above-described coordinated 'astroturfing' campaign to discredit and 'bury' Ms. Lively." (Abel Decl., ¶ 27; Dkt. 520, ¶ 411).

**RESPONSE:** Undisputed.

86. Abel denies Lively's allegations. (Abel Decl., ¶ 27; Fritz Decl., Ex. A, ¶ 411).

**RESPONSE:** Partially disputed to the extent that Abel answered the allegations in paragraph 411 of Lively's complaint as follows: "the allegations [in paragraph 411] require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations." Fritz Decl., Ex. A, ¶ 411.

87. In her Third Amended Responses and Objections to Abel's Second Set of Interrogatories (the "Interrogatory Responses"), Lively purports to identify the "negative content about [her] (including through the engagement of social media)" that she alleges was "amplified" by Abel. (Abel Decl., ¶ 28; Abel Decl., Ex. 6).

**RESPONSE:** Partially disputed to the extent that Lively's Interrogatory Responses to Abel's Second Set of Interrogatories No. 21 identifies, subject to numerous objections, "the 'negative content about Ms. Lively (including through engagement of comments on social media)" that [Lively] allege[s] was amplified by Jennifer Abel, as alleged in paragraph 230 of the Second Amended Complaint." Abel Decl., Ex. 6 at No. 21.

88. In her Interrogatory Responses, Lively further alleges that Abel "amplified" negative content about her "by virtue of recommending services to be performed by TAG and facilitating that engagement" and "by direct communications with TAG and/or digital teams identifying relevant narratives as well as content to be amplified, boosted, or similar conduct, in order to negatively affect the online conversation regarding [her]." (Abel Decl., ¶ 29; Abel Decl., Ex. 6).

**RESPONSE:** Partially disputed to the extent Lively's Interrogatory Responses to Abel's Second Set of Interrogatories No. 22 includes, subject to numerous objections: "Ms. Lively further responds that Ms. Abel's involvement in the amplification of such content was by virtue of recommending services to be performed by TAG and facilitating that engagement. Thereafter, Ms. Abel's involvement continued by direct communication with TAG and/or digital teams identifying relevant narratives as well as content to be amplified, boosted, or similar conduct, in order to negatively affect the online conversation regarding Ms. Lively." Abel Decl., Ex. 6 at No. 22.

89. As discussed above, the alleged conduct that forms the basis of Lively's Claims against Abel consists of public relations activities conducted on behalf of the Wayfarer Clients as part of Abel's employment with Jonesworks and its clients. (Abel Decl., ¶ 30).

**RESPONSE:** Disputed. Abel's activities contributing or amounting to a digital smear campaign as alleged by Lively in this action was not within the scope of Abel's employment with Jonesworks or performed by Abel in her capacity as a Jonesworks employee. Dkt. 1060 (Jones Decl.) ¶¶ 44-49. Abel's own expert report in this action acknowledges that "Lively claims that TAG was retained *not* to provide standard crisis communications services given the perceived threat of reputational damage but rather to engage in 'a sophisticated press and digital' campaign to smear her in retaliation for the exercise of her rights to speak up about Wayfarer's misconduct

on set … is not in keeping with standard practices in the public relations industry and in its sub-category, crisis communications." Dkt. 1056-12 (Tahler Decl., Ex. 12) at 9 (Expert Report of James F. Haggerty).

**Jonesworks Knew of and Authorized Abel's Actions**

90. Abel denies any fault and/or responsibility for Lively's Claims or the alleged loss or damage incurred by Lively, because, *inter alia*, Abel undertook the actions while employed by and in the course of her employment with Jonesworks. (Abel Decl., ¶ 47).

**RESPONSE:** Undisputed that Abel claims she is "not at fault and bear[s] no responsibility for Lively's Claims or the alleged loss or damage incurred by Lively" Abel Decl. ¶ 47. Disputed as to the merit of Abel's claim, which is the subject of this litigation.

91. Abel did not take any of the actions at issue herein in pursuit of her own interest. (Abel Decl., ¶ 48).

**RESPONSE:** Disputed. Abel did take the actions at issue in pursuit of her own personal and competitive interests: Abel actively planned to poach Jonesworks clients, steal confidential documents, and undermine Jonesworks while still employed, including by collaborating with Nathan to plant a *Business Insider* "kill story" against Jonesworks and persuade Wayfarer and Baldoni to breach their contract and move their business to Abel and Nathan instead. See, e.g., Dkt. 1056-13 (Tahler Decl., Ex. 13) (JONESWORKS_MN_000000740); Ex. 14 (JONESWORKS_00013606) (*Business Insider* writer texting Abel "Story is up! Thanks again for your help."); Tahler Decl., Ex 15 (JONESWORKS_00016395) (Nathan telling Abel she said to Baldoni: "I'm just going to step out of line before I go to bed and tell you Jen is amazing. She's so loyal she loves you so much and you have to go with her and he was like oh my God of course course I'm going with her," to which Abel responded "Hahahaha omg love you"); Abel Decl., Ex.

15 (Nathan texting Abel, "[a]nd you take this fucking client and never talk to [Jones] again I swear to God).

92. Jonesworks knew of and foresaw Abel's actions because it directed her to render public relations services to the Wayfarer Clients. (Abel Decl., ¶ 49).

**RESPONSE:** Disputed. Jonesworks did not know of, foresee, or direct Abel's actions; in fact, Abel's conduct was directly contrary to what Jonesworks and Jones instructed her to do. Dkt. 1060 (Jones Decl.) ¶¶ 18-20, 44-47. Jonesworks, including Jones herself, was purposefully excluded from Abel and TAG's crisis response in connection to *It Ends With Us* and misled about the work TAG would be doing for Wayfarer and Baldoni. Dkt. 1060 (Jones Decl.) ¶¶ 25, 31, 35-36; Tahler Decl., Ex. 16 (JONESWORKS_00030156); Tahler Decl., Ex. 17 (JONESWORKS_WAYFARER_000004205) (Heath: "I don't like the idea that there is continued cannibalization from within the same side. Meaning 'Jonesworks' ie Stephanie, and the Crisis team. I only want us to be communicating with people who are working together and not the ones who are undermining others within our team. Stephanie is casing doubt and can have an affect like poison."); Dkt. 1056-4 (Tahler Decl., Ex. 4) (10/9/25 Heath Dep. Tr. at 218:18– 219:10) (Heath's testifying that he "didn't want anyone" who was not "in our inner circle" such as Stephanie Jones handling press inquiries); Dkt. 1056-18 (Tahler Decl., Ex. 18) (Case Dep. Tr. at 408:12–14) ("Q: Did you ever talk to Ms. Jones regarding Wayfarer? A: I did not."); Dkt. 1056-19 (Tahler Decl., Ex. 19) (10/10/25 Wallace Dep. Tr. at 118:3–119:8) (testifying he did not have any recollection of speaking with Jones regarding Wayfarer)).

93. Jonesworks had contracted with the Wayfarer Clients to perform, *inter alia*, public relations services. (Abel Decl., ¶ 49; Abel Decl., Ex. 4).

**RESPONSE:** Partially disputed to the extent the public relations services Jonesworks contracted with the Wayfarer Clients to perform did not include any activities contributing or amounting to the digital smear campaign Abel, Nathan, and others engaged in against Lively on Baldoni's and Wayfarer's behalf as alleged by Lively in this action. Dkt. 1060 (Jones Decl.) ¶¶ 7, 9-11, 47, 49.

94. Jones knew that Abel was working with Baldoni on his press tour in connection with the premiere of the Film in late July/early August 2024, amid reports of strife between Baldoni and Lively. (Abel Decl., ¶ 51).

**RESPONSE:** Undisputed.

95. In a July 25, 2024 text message to Baldoni, Jones: (a) confirms that she is "on [the phone] with [Abel] now"; (b) tells Baldoni that she has "a plan" for him to attend the premiere of the Film; and (c) assures Baldoni that she has "his back and nothing is going to happen on [her] watch." (Abel Decl., ¶ 51; Abel Decl., Ex. 21).

**RESPONSE:** Undisputed.

96. Jones also knew that other Jonesworks employees and Abel were handling press inquiries concerning alleged issues on the set of the Film. (Abel Decl., ¶ 53).

**RESPONSE:** Partially disputed to the meaning of "handling press inquiries," because Jones did not know—and in fact was deliberately excluded from—Abel's and TAG's pitching, seeding, planting, amplifying, and boosting, negative stories about Lively in support of their digital smear campaign as alleged by Lively in this action. Dkt. 1060 (Jones Decl.) ¶¶ 32-33, 35-38, 44-47, 49.

97. In fact, Abel communicated directly with Jones about the Film's premiere and Baldoni's press tour. (Abel Decl., Ex. 22).

**RESPONSE:** Partially disputed to the extent on August 5 and August 6, 2024, Abel and Jones had a text conversation in which they discussed, among other things, Baldoni's press. Abel Decl., Ex. 22.

98. Jones instructed Abel to tell Baldoni that Abel was taking "meticulous notes for overall recap." (*Id*).

**RESPONSE:** Partially disputed to the extent this mischaracterizes the communications. After Jones mentioned she "liked press junkets," Abel said "Oh no Justin wants to pause and recap after every interview." Jones responded "you just tell him you're making meticulous notes for overall recap," to which Abel relied "smart." Abel Decl., Ex. 22.

99. On August 8, 2024, Jonesworks' Chief of Staff (Gordon Duren) forwarded (to an internal email distribution list) an inquiry from *The Hollywood Reporter* concerning alleged Film-related "drama…." (Abel Decl., ¶ 53; Abel Decl., Ex. 24).

**RESPONSE:** Partially disputed to the extent the inquiry "wanted to see if Justin has any background info to share from his end or wanted to weigh in on the matter," and Abel responded to Duren and teambaldoni@jonesworks.com that "this is handled." Abel Decl., Ex. 24.

100. Abel confirmed to Jones and Duren that the situation was being handled by the Jonesworks employees assigned to the Wayfarer Clients' accounts. (*Id*).

**RESPONSE:** Disputed. Abel does not specify who is handling the outreach nor how the outreach was being handled, including whether it was Abel, Nathan, or another TAG employee, stating only "this is handled." *Id.*

101. On August 9, 2024, Jones forwarded (to two internal email distribution lists) an inquiry from The Daily Mail concerning purported on-set issues. (Abel Decl., ¶ 54; Abel Decl., Ex. 25).

**RESPONSE:** Undisputed.

102. Again, Abel confirmed to Jones that the matter was being handled. (*Id*).

**RESPONSE:** Partially disputed to the extent Abel responded "Thanks this is being handled" but does not specify whether Abel, Nathan, or another TAG employee was doing so nor how they were handling the matter. Abel Decl., Ex. 25.

103. On August 9, 2024, Jones forwarded a press inquiry concerning alleged on-set drama to the Jonesworks (internal) email distribution lists, and Jonesworks employee Matthew Mitchell confirmed that the inquiry would be handled. (Abel Decl., ¶ 55; Abel Decl., Ex. 26).

**RESPONSE:** Partially disputed to the extent Mitchell said "Will handle" but did not specify in what manner or by whom. Abel Decl., Ex. 26.

104. Jones also knew that Jonesworks employees were monitoring social media activity concerning Baldoni and the Film, including online comments from Jenna Redfield. (Abel Decl., ¶ 52).

**RESPONSE:** Partially disputed to the extent Jones knew Jonesworks employees as of August 8, 2024, were engaged in "some social monitoring from accounts talking about JB and It Ends With Us," which included compiling and sharing links of social media content, including from creator Jenna Redfield, Abel Decl., Ex. 23, but that Jones did not know that Abel or anyone else was engaged in activities contributing or amounting to the digital smear campaign as alleged by Lively in this action. Dkt. 1060 (Jones Decl.) ¶¶ 9-11, 44-47, 49.

105. For instance, in an August 8, 2024, email, a Jonesworks employee passed along information related to such social media monitoring to Jones. (Abel Decl., ¶ 52; Abel Decl., Ex. 23).

**RESPONSE:** Partially disputed to the extent that the cited email reflects only that, on August 8, 2024, a Jonesworks employee passed along links reflecting "some social monitoring from accounts talking about JB and It Ends With Us," which included compiling and sharing links of social media content, including from creator Jenna Redfield, Abel Decl., Ex. 23. It does not show that Jones was provided anything beyond publicly-available monitoring, nor that she understood anyone—including Abel—to be engaged in activities contributing or amounting to a digital smear campaign as alleged by Lively in this action. *Id.*; Dkt. 1060 (Jones Decl.) ¶¶ 9-11, 44-47, 49.

106. Abel's alleged actions were consistent with how Jonesworks rendered public relations services. (Abel Decl., ¶ 56).

**RESPONSE:** Disputed. The public relations services Jonesworks renders and has rendered do not and have never included activities contributing or amounting to a digital smear campaign, including that aids and abets discriminatory conduct or is in retaliation for raising concerns of inappropriate behavior or sexual harassment, which is the conduct alleged by Lively in this action. Dkt. 1060 (Jones Decl.) ¶¶ 7, 11, 18-20, 47-49. Abel's own expert report in this action acknowledges that "Lively claims that TAG was retained *not to* provide standard crisis communications services given the perceived threat of reputational damage but rather to engage in 'a sophisticated press and digital' campaign to smear her in retaliation for the exercise of her rights to speak up about Wayfarer's misconduct on set … is not in keeping with standard practices in the public relations industry and in its sub-category, crisis communications." Dkt. 1056-12 (Tahler Decl., Ex. 12) at 9 (Expert Report of James F. Haggerty).

107. In an August 9, 2024, text message, Jones noted that *People* had reported that Baldoni was "largely absent from grouped promotional appearances, including at the New York

premiere" and that he "didn't introduce the film ahead pf the screening." (Abel Decl., ¶ 56; Abel Decl., Ex. 27).

**RESPONSE:** Undisputed.

108. Jones wrote that Baldoni "introduced at screening" and instructed Abel to "have [the story] corrected." (*Id*).

**RESPONSE:** Partially disputed to the extent Jones said: "He introduced at screening so let's please have corrected." Abel Decl., Ex. 27.

109. In an August 14, 2024, email to Heath, Jones referred to herself as "a key member of both Justin's and Wayfarer's account" and "a keyman on Justin's account." (Abel Decl., ¶ 57; Abel Decl., Ex. 28).

**RESPONSE:** Undisputed.

110. In the August 14, 2024 email chain (Abel Decl., Ex. 28), Jones provided the Wayfarer Clients with Jonesworks' "recommended strategy" for dealing with the publicity crisis: (1) "Flood the Zone with Positives" – "ensure that we promote positive narratives that media outlets cannot ignore" and because "[c]urrently, most stories are heavily biased towards Blake's perspective" it is "crucial" that "we fight for every inch of every story"; and (2) "Prepare Alternative Stories" – "mobilize a robust network of supporters and third-party advocates ready to counter these narratives on deep background as well as some on the record, making it clear that the claims being made are untrue and unfounded." (*Id*).

**RESPONSE:** Undisputed.

111. Jones states in the August 14, 2024, email chain (Abel Decl., Ex. 28) that she has "successfully managed every crisis for Justin without any negative press coming to light." (*Id*).

**RESPONSE:** Undisputed.

112. Jones also knew that Wayfarer had retained TAG to assist Jonesworks with crisis management. (Abel Decl., ¶ 58; Abel Decl., Ex. 29; Fritz Decl., Ex. C at 88:3-89:3).

**RESPONSE:** Disputed. Jones did not know that Wayfarer had retained TAG to "assist Jonesworks," nor did she foresee or approve the work Nathan and TAG were doing, because Wayfarer and Abel repeatedly misled and lied to Jones from the outset about hiring Nathan and about the scope of work he and TAG would be performing. Dkt. 1060 (Jones Decl.) ¶¶ 31-38; Dkt. 1056-20 (Tahler Decl., Ex. 20) (KCASE-000000585) (Abel telling then-TAG employee Case to send the scope of work to her RWA email address, not her Jonesworks email address, and that she was "going to have Tera [Hanks] call Steph and let her know"); Dkt. 1056-21 (Tahler Decl., Ex. 21) (BBKOSLOW- 000002816) (Nathan's texting Koslow, "Jamey told SJ he hired us," and Koslow's responding, "Oh god I'm so sick of this fucking woman – does that mean anything that she knows?, and Nathan's replying, "No, I'm so fucking sick of her too"); Dkt. 1056-16 (Tahler Decl., Ex. 16) (JONESWORKS_00030156); Dkt. 1056-22 (Tahler Decl., Ex. 22) (JONESWORKS_00015108).

Moreover, Wayfarer did not hire TAG to "assist Jonesworks" but Abel, who had already announced her intention to leave Jonesworks and had established an LLC for her soon- to-be competing business (before telling Jones of her intent to start a new firm and while still employed by Jonesworks) and who intended—with Nathan's and TAG's assistance—to poach Baldoni and Wayfarer from Jonesworks in violation of her and the Wayfarer Clients' contracts with Jonesworks. Dkt. 1056-23 (Tahler Decl., Ex. 23) (9/25/25 Abel Dep. Tr. at 56:17–57:4); Fritz Decl., Ex. A (ECF No. 154, Abel's Third-Party Complaint ¶ 28); Dkt. 1056-24 (Tahler Decl., Ex. 24) at 3-4 (WAYFARER_000141577); Dkt. 1056-2 (Tahler Decl., Ex. 2) at 3 (KCASE-000005118); Dkt. 1056-20 (Tahler Decl., Ex. 20) (KCASE-000000585); Dkt. 1056-25 (Tahler

Decl., Ex. 25) (BBKOSLOW-000008776); Dkt. 1056-26 (Tahler Decl., Ex. 26) (JONESWORKS_00016275) ("take this fucking client and never talk to her again I swear to God"); Dkt. 1056-27 (Tahler Decl., Ex. 27) (JONESWORKS_MN_0000022208); Dkt. 1056-28 (Tahler Decl., Ex. 28) (NATHAN_000000141) ("this [Wayfarer] the first one that Jen is giving us and she's taking all the clients").

113. After Abel's employment ended on August 21, 2024, Jones continued to coordinate crisis management efforts with TAG. (*Id.*; Fritz Decl., Ex. C at 76:20-77:7).

**RESPONSE:** Disputed. Jones did not participate in and at all times was deliberately excluded from Wayfarer and Baldoni's crisis efforts with TAG. In fact, Heath testified that Jones was "never [] involved" in the work Wayfarer was doing with TAG. Dkt. 1056-4 (Tahler Decl., Ex. 4) (10/9/25 Heath Dep. Tr. 229:11–14); see also id. at 218:18–219:10. To the contrary, Jones was instructed by Wayfarer to "not to speak to, respond to, or contact anyone" on behalf of Wayfarer or Baldoni after Wayfarer was told—falsely and without any due diligence—that Jones had spoken to reporters about *It Ends With Us*. Dkt. 1056-29 (Tahler Decl., Ex. 29) (HANKS_000000054). Although Wayfarer did not purport to terminate its agreement with Jonesworks until August "30th or 31st of 2024," Fritz Decl., Ex. C at 76:20-77:7, it continued its work with Abel and TAG after Abel's termination on August 21 without pause, Dkt. 1056-30 (Tahler Decl., Ex. 30) (JONESWORKS_JA_000000254) (8/22 text with Baldoni "adding Jen's new number" to continue working with Abel after her termination from Jonesworks).

**The Dismissal of Lively's Claims**

114. In an Opinion and Order dated April 2, 2026, Lively's Claims were dismissed and the Court granted judgment in Abel's favor as to Lively's Claims. (Dkt. 1273, p. 95, 143, 150 – 51).

**RESPONSE:** Undisputed that, in its April 2, 2026 Opinion and Order, the Court granted judgment in Abel's favor on each of Lively's claims against her. Dkt. 1273 at 136–43, 150–51. Jonesworks further states that, in so ruling, the Court found that Nathan and Abel "were hired by Wayfarer and IEWUM to perform services on their behalf and as their agents" and were "for all intents and purposes individual employees carrying out alleged adverse employment actions at the direction of the employer." Dkt. 1273 at 138–39. The Lively Action was thereafter dismissed with prejudice. Dkt. 1434 ¶ 3.

115. Abel incurred significant legal fees and costs in defending against Lively's Claims, which were advanced by Wayfarer. (Abel Decl., ¶ 60).

**RESPONSE:** Disputed. Abel has not paid, and is not obligated to pay, any legal fees or costs in defending against Lively's claims. Abel testified that she is not paying her legal fees and has never seen a bill, and that "Wayfarer Studios is covering my legal fees." Dkt. 1056-49 (Tahler Decl., Ex. 49) (9/26/25 Abel Dep. Tr. at 253:18–24, 254:14–19). Wayfarer's CEO confirmed that Wayfarer is paying Abel's fees. Dkt. 1056-4 (Tahler Decl., Ex. 4) (10/9/25 Heath Dep. Tr. at 39:8–18). Abel's engagement letter names Wayfarer as the "Obligor" that "agrees to pay for all legal services which LFTC provides to Clients and costs incurred in the representation of Clients." Dkt. 1056-76 (Tahler Decl., Ex. 76) (ABEL_000021588); Abel Decl., Exs. 30–31. Abel has produced no agreement or document obligating her to repay Wayfarer, and her counsel represented that the only responsive documents are "legal invoices and her engagement agreement(s)." Dkt. 1056-55 (Tahler Decl., Ex. 55); Dkt. 1056-86 (Tahler Decl., Ex. 86). The characterization of fees as "advanced" is unsupported by any document reflecting an obligation to repay. Disputed further that the fees were "significant" or reasonable, as Abel has submitted no invoices or other evidence of the amount.

**Additional Undisputed Facts**

116. Jonesworks is a Delaware limited liability company with its principal place of business in New York. (Dkt. 877, ¶ 2).

**RESPONSE:** Undisputed.

117. Jonesworks declined to defend Abel against Lively's Claims and denies any obligation to do so. (Abel Decl., ¶ 59; Fritz Decl., Ex. B).

**RESPONSE:** Undisputed that Jonesworks declined Abel's demand that it defend her against Lively's claims and denies any obligation to defend or indemnify her. Disputed to the extent this statement implies Jonesworks had any such obligation. The conduct on which Lively's claims were based was not within the scope of Abel's employment with Jonesworks, was undertaken without Jonesworks' knowledge or consent, and was concealed from Jonesworks. Dkt. 1060 (Jones Decl.) ¶¶ 17–20, 32–38, 44–49; Dkt. 1056-20 (Tahler Decl., Ex. 20) (KCASE-000000585); Dkt. 1056-4 (Tahler Decl., Ex. 4) (10/9/25 Heath Dep. Tr. at 229:11–14).

118. Throughout her employment with Jonesworks, Abel lived in California, was paid in California, and performed her work for Jonesworks, including her work for the Wayfarer Clients, in California. Abel Decl., ¶¶ 3, 5, 10, 11, 18.

**RESPONSE:** Partially disputed. Undisputed that Abel resided in California and primarily worked from Jonesworks' Los Angeles office. Disputed that Abel performed her work for Jonesworks, including for the Wayfarer Clients, only in California. Abel performed work for Wayfarer and Baldoni in New York and elsewhere, including in connection with the Film's premiere and press tour. *See* Abel Decl. ¶ 34 n.2; Declaration of Stephanie Jones in Opposition to Abel's Motion for Summary Judgment ("Jones Opp. Decl.") ¶ 4. Jonesworks is headquartered in New York, where its business decisions are made and its finances, including litigation expenses,

are handled. Jones Opp. Decl. ¶ 2-3. Abel reported to and consulted with Jonesworks' New York operations daily. *Id.* ¶ 5.

119. In June 2024, amid concerns that Lively would publicize "lies/exaggerate[d] truth" about on-set issues, Jones instructed Jonesworks staff to "be armed with [an] arsenal of stuff" about Lively, and Jonesworks staff confirmed they would "dig for details on [Lively's] indiscretions[.]" (Abel Decl., ¶ 50; Abel Decl., Ex. 20A).

**RESPONSE:** Disputed to the extent this statement mischaracterizes the communications and their context. Abel Decl., Ex. 20A. Jones's message to "be armed with an arsenal of stuff" refers to a list of items to help support Baldoni and Wayfarer if Lively came out against them, including "all of the bulleted facts from Jamey of what actually happened on set, who was there to witness it, who we can call who will speak to press on deep background about what actually happened and support Justin and wayfarer." *Id.* The discussion about Lively's possible "lies/exaggerate[d] truth" was directed to a different issue—calming Baldoni, who was "spiraling" over the fact that the author of *It Ends With Us*, Colleen Hoover, was "no longer being buddies with Justin and [was] telling Justin that she support[ed] whatever Blake want[ed] to do." The team discussed telling Baldoni that Lively "may be using" the fact that Colleen Hoover "may need Blake for another film, the prequel" to console Baldoni. At no time did Jones instruct anyone to plant, seed, boost, or amplify negative content about Lively, to engage in astroturfing, or to manipulate social media. Jones Opp. Decl. ¶¶ 8–11; Dkt. 1060 (Jones Decl.) ¶¶ 11, 17–20, 44–49.

120. Jonesworks separately sued Abel, alleging that Abel's public relations work "went far beyond the legitimate scope of Abel's employment." (Fritz Decl., Ex. D, ¶ 4).

**RESPONSE:** Undisputed that Jonesworks' complaint against Abel contains the quoted allegation. Jonesworks further states that its allegation is consistent with, and supported by, the

record evidence that Abel's conduct was outside the scope of her employment and undertaken for her own benefit. *See* Counterstatement ¶¶ 12-27, *infra*.

**JONESWORKS LLC'S COUNTERSTATEMENT OF MATERIAL FACTS**

Pursuant to Local Civil Rule 56.1, Third-Party Defendant Jonesworks respectfully submits this Counterstatement of Material Facts, without admitting that any of Abel's statements are material.

**Jonesworks' Business and Abel's Obligations**

1. Jonesworks' work for Justin Baldoni and Wayfarer Studios LLC ("Wayfarer") consisted of positive publicity: creating promotional materials, supporting Baldoni's promotional activities and philanthropy, and securing press coverage of his work. Dkt. 1060 (Jones Decl.) ¶¶ 5–6.

2. Jonesworks' work never included seeding, planting, or promoting negative stories about Baldoni's co-stars or manipulating social media. Dkt. 1060 (Jones Decl.) ¶ 7.

3. The Wayfarer Agreement's scope of services does not authorize anonymous dissemination of disparaging information or coordination of online attacks. Dkt. 1486-4 (Abel Decl., Ex. 4, Schedule A).

4. Abel was prohibited from engaging in astroturfing, retaliation, or social-media manipulation against non-clients, and she knew Jonesworks did not engage in such practices. Dkt. 1060 (Jones Decl.) ¶¶ 17–20.

5. Abel's 2021 Employment Agreement imposed "a fiduciary duty of loyalty, fidelity, and allegiance to act at all times in the best interests of [Jonesworks] and to do no act which might injure the business, interests, or reputation of [Jonesworks]," and barred her from competing with Jonesworks or soliciting its clients. Abel Decl., Ex. 3 §§ 6.2–6.3, 9.2.

6. Abel's Employment Agreement provides that it is governed by New York law. Abel Decl., Ex. 3 ¶ 11.7.

**Jonesworks' New York Headquarters and Abel's Reporting**

7. Jonesworks maintains its principal place of business in New York. Jones Opp. Decl., ¶ 2.

8. Control over Jonesworks' operations emanates from New York, and its major decisions are made there. *Id.*

9. Jonesworks' financial matters, including litigation expenses, have always been handled in its New York office. Jones Opp. Decl. ¶ 3.

10. Abel's work for Baldoni and Wayfarer was nationwide and frequently required travel to other states, including Illinois and New York. Jones Opp. Decl. ¶ 4.

11. Abel traveled to New York for clients in May, June, August, and September of 2023, and in March, April, and August of 2024. *Id.*

12. Abel also frequently traveled to other states, including Georgia, Nevada, Hawaii, Texas, and Colorado, for client needs throughout her time working for Jonesworks. *Id.*

13. Wherever her duties took her, Abel reported to and consulted with Jonesworks' New York operations daily. *Id.*

**Abel Brings In Nathan and TAG Over Jones's Objection**

14. On July 19, 2024, while still employed by Jonesworks and without telling Stephanie Jones, Abel formed a competing firm, RWA Communications LLC ("RWA"). Dkt. 1056-75 (JONESWORKS_JA_000001760).

15. When Wayfarer sought crisis recommendations days later, Abel turned to Melissa Nathan, whose firm, The Agency Group PR LLC ("TAG"), had launched only weeks earlier. Dkt. 521 (Second Am. Compl.) ¶¶ 194–96.

16. Jones had warned Baldoni and Jamey Heath that Nathan was "not someone we would want in justin's orb." Dkt. 1060 (Jones Decl.) ¶ 23; Dkt. 1056-3 (JONESWORKS_JB_000001142).

17. Wayfarer's principals admit they hired Nathan over Jones's objections. Dkt. 1056-5 (Baldoni Dep. 137:18–21, 140:1–4, 147:3–148:3); Dkt. 1056-4 (Heath Dep. 168:18–21).

18. Nathan described the Wayfarer engagement as business "that you me and her would work on," because Abel was "leaving Jonesworks in three weeks." Dkt. 1056-25 (BBKOSLOW-000008781); Dkt. 1056-35 (Nathan Dep. 334:10–16).

19. TAG's staff understood the engagement as "Jen on her own already coming to us for help." Dkt. 1056-2 (KCASE-000005118).

20. Nathan told Abel that "once you are gone - we will be on accounts together and make really good money." Dkt. 1056-45 (JONESWORKS_00037451).

**Abel Conceals Her Work With TAG and Acts Against Jonesworks**

21. Abel had TAG send its scope of work to her RWA email address rather than her Jonesworks address. Dkt. 1056-20 (KCASE-000000585).

22. Jones was excluded from TAG's first call with Wayfarer. Dkt. 1056-52 (JONESWORKS_WAYFARER_000004651).

23. Wayfarer told Jones that TAG would only be "working through scenario planning" and "would not be having any comm[unication]s outside of our internal teams." Dkt. 1056-52 (JONESWORKS_WAYFARER_000004651).

24. TAG's scenario planning in fact contemplated managing media inquiries "on background," working "[a]longside Jen Abel and her team." Abel Decl. Ex. 10 at 1.

25. Abel discussed the "social combat plan" and the Jed Wallace engagement only with Nathan and Wayfarer; Heath testified that Jones had "never been involved." Dkt. 1060 (Jones Decl.) ¶¶ 32, 36, 44; Dkt. 1056-4 (Heath Dep.) at 229:11-14; Dkt. 1056-18 (Case Dep.) at 408:12-14; Dkt. 1056-19 (Wallace Dep.) at 118:3-119:8

26. Abel helped a reporter publish a story damaging to Jonesworks. Dkt. 1056-14 (JONESWORKS_00013606).

27. Abel proposed telling the press that Baldoni and Wayfarer had "severed ties" with Jonesworks. Dkt. 1056-74 (JONESWORKS_00016169).

28. Abel took Jonesworks' confidential documents and told Nathan she was "going to war" with Jonesworks. Dkt. 1056-13 (JONESWORKS_MN 000000740); Dkt. 1056-77 (JONESWORKS_00040860); Dkt. 1056-78 (JONESWORKS_00040862); 1056-80 (JONESWORKS_JA_000000799); Dkt. 1056-81 (JONESWORKS_JA_000000904); Dkt. 1056-82 (JONESWORKS_JA_000001063).

29. Jones's instructions to "flood the zone with positives" and to have stories "corrected" concerned positive publicity and did not authorize anonymous attacks on a non-client. *See* Dkt. 1060 (Jones Decl.) ¶¶ 6–7, 17–20.

**The Lively Claims and the Court's Judgment**

30. Lively sued Abel for aiding and abetting retaliation under FEHA, false light, and civil conspiracy, alleging a campaign that "took shape with Wayfarer's retention … of Ms. Nathan" on or around July 31, 2024. Dkt. 521 (Second Am. Compl.) ¶¶ 194–95, 203–06, 215–16, 224–26, 230.

31. On April 2, 2026, the Court granted Abel judgment on every claim Lively asserted against her. Dkt. 1273 at 136–43, 151.

32. The Court found that Nathan and Abel "were hired by Wayfarer and IEWUM to perform services on their behalf and as their agents" and acted "at the direction of the employer." Dkt. 1273 at 138–39.

33. The Lively Action was dismissed with prejudice. Dkt. 1434.

**Abel Has Paid Nothing for Her Defense**

34. Abel testified that she is not paying her legal fees and has never seen a bill: "Q: You're not paying? A: No. Q: You ever seen a bill? A: No." Dkt. 1056-49 (Abel Dep. (9/26/25) 253:18–24).

35. Abel's engagement letter names Wayfarer as the "Obligor" that "agrees to pay for all legal services," and names Abel only as "client" and "obligee." Dkt. 1056-76 (ABEL_000021588); Dkt. 1486-31 (Abel Decl. Ex. 30); Dkt. 1486-32 (Abel Decl. Ex. 31).

36. Wayfarer's CEO, Jamey Heath, confirmed that Wayfarer is paying Abel's litigation fees and expenses. Dkt. 1056-4 (Heath Dep. 39:8–18).

37. Abel concedes that her fees "were advanced by Wayfarer." Motion at 9; Abel Decl. ¶ 60.

38. The only documents Abel identified as supporting her claimed losses are "legal invoices and her engagement agreement(s)," and she has produced no document obligating her to repay any fees. Dkt. 1056-55 (Sept. 11, 2025 Correspondence With Counsel); Dkt. 1056-86 (Email re Search Terms).

39. Abel has no contract entitling her to indemnity from Jonesworks, and no insurer paid in exchange for a premium is funding her defense. Motion at 21 n.2; Abel Decl., Ex. 3.

Dated: November 23, 2026

Respectfully submitted,

By: */s/ Brad Beckworth*

Bradley E. Beckworth, *pro hac vice*
Christina Yarnell, *pro hac vice*
NIX PATTERSON, LLP
8701 Bee Cave Road
Seven Oaks East, Suite 500
Austin, Texas 78746
Telephone: (512) 328-5333
bbeckworth@nixlaw.com
cyarnell@nixlaw.com
*Attorneys for Third-Party Defendant Jonesworks LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below, the foregoing was filed electronically with the Court and served by operation of the Court's ECF notification system upon all counsel of record.

Austin, Texas
November 23, 2026

*/s/ Brad Beckworth*
Bradley E. Beckworth